## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," JOSE URIBE, AND FRED DAIBES,

*Defendants.*

23-cr-490

**AGREEMENT TO FORFEIT PROPERTY**

I, Wael Hana, as the sole owner and managing member of Capital Management EG, LLC, acknowledge, pursuant to 18 U.S.C. § 3142(c)(1)(B)(xi), in consideration of the release of the defendant, that I and my personal representatives jointly and severally agree to forfeit to the United States of America the following property:

> Capital Management EG, LLC's 100% ownership interest in Henry Street Plaza LLC, a domestic limited liability company which was duly filed in accordance with the laws of the State of New Jersey on November 23, 2021, and was assigned identification number 0450732587, and which was formed for the business purpose of developing real estate. Henry Street Plaza LLC retains a 49% interest in 503 Fairview Avenue Associates, LLC, a special purpose entity that wholly owns an unencumbered real estate development valued at $3,600,000.

I declare under penalty of perjury that I am this property's (*i.e.*, Capital Management EG, LLC's ownership interest in Henry Street Plaza LLC) sole owner and that it is not subject to any claim, lien, mortgage, or other encumbrance except as disclosed. I promise not to sell, mortgage, or otherwise encumber Henry Street Plaza LLC, or do anything to reduce its value, while this agreement is in effect. The following ownership documents are attached to this agreement:

- Operating Agreement of Henry Street Plaza, LLC, attached hereto as Exhibit A;
- Contract for Sale of Membership Interest of 503 Fairview Avenue Associates, LLC, attached hereto as Exhibit B; and
- Second Amended and Restated Operating Agreement of 503 Fairview Avenue Associates, LLC, attached hereto as Exhibit C.

The conditions of this agreement are that the defendant, Wael Hana, is to appear before this court and at such other places as the defendant may be required to appear, in accordance with any and all orders and directions relating to the defendant's appearance in this case, including any

1

appearance for violation of a condition of defendant's release as may be ordered or noticed by this court or any other United States Court to which the defendant may be held to answer or the cause transferred. The defendant is to abide by any judgment entered in such matter by surrendering to serve any sentence imposed and obeying any order or direction in connection with such judgment or otherwise.

It is agreed and understood that this is a continuing agreement (including any proceedings on appeal or review) which shall continue until such time as the undersigned is exonerated or the proceedings are otherwise concluded.

If the defendant appears as ordered or notified and otherwise obeys and performs the foregoing conditions of this agreement, then this agreement is to be void, but if the defendant fails to obey or perform any of these conditions, the property described in this agreement shall immediately be forfeited to the United States. Forfeiture under this agreement for any breach of its conditions may be declared by any United States District Court having cognizance of the above entitled matter at the time of such breach, and if the property is forfeited and if the forfeiture is not set aside or remitted, judgment maybe entered upon motion in such United States District Court against each debtor jointly and severally for forfeiture of the property together with interest and costs, and execution may be issued and the property secured as provided by the Federal Rules of Criminal Procedure and any other laws of the United States of America.

Date:   October 9, 2023

Wael Hana
Property owner's printed name

Property owner's signature

Agreement accepted.

Date:

UNITED STATES OF AMERICA

Eli J. Mark

Assistant U.S. Attorney printed name

Assistant U.S. Attorney signature

# Exhibit A

# OPERATING AGREEMENT
## OF
## HENRY STREET PLAZA, LLC

**THIS OPERATING AGREEMENT** (the "Operating Agreement") effective November 23, 2021, made by Capital Management EG, Inc. having a mailing address of 125 River Road, (is referred to as "Member (s)").

## B A C K G R O U N D

A.     **HENRY STREET PLAZA, LLC** (the "Company") is being formed pursuant to the filing of a Certificate of Formation for the sole purpose of engaging in any lawful business, purposes or activities permitted by the Act or laws of any jurisdiction in which the LLC may do business, and the LLC shall have the authority to do all things necessary, convenient or incidental to accomplish its purposes and operate its businesses as described herein.

B. Capital Management EG, Inc desires that the Company be operated as a Limited Liability Company pursuant to the New Jersey Limited Liability Company Act, <u>N.J.S.A.</u> 42:2B-1 et seq. ("Act").

**NOW THEREFORE,** the parties hereby agree that this Operating Agreement shall be effective as of the date hereof and shall continue in full force and effect thereafter as follows:

1.     **Formation of Company.**     The Members hereby form the Company pursuant to the provisions of the Act, its Certificate of Formation and this Operation Agreement. The Company shall be organized on the date of the filing of the certificate of Formation. The Member, as such term is hereinafter defined, shall execute the Certificate of Formation and shall cause it to be filled with the Secretary of state of New Jersey.

2.     **Name.** The name of the Company shall be **HENRY STREET PLAZA, LLC** and such name shall be used at all times in connection with the business and affairs of the Company.

3.     **Purpose of the Company.**     The sole purpose of engaging in any lawful business, purposes or activities permitted by the Act or laws of any jurisdiction in which the LLC may do business, and the LLC shall have the authority to do all things necessary, convenient or incidental to accomplish its purposes and operate its businesses as described herein.

4.     **Term**. The term of the Company shall commence on the date of the filing of the certificate of Formation and shall continue perpetually unless sooner terminated in accordance with the terms of this Agreement or otherwise as provided by law.

5.     **Membership Interests; Profits and Losses.**     The membership interests ("Membership Interests") of the Company shall be divided between and consist of 100 Percent Interest for Capital Management EG, Inc. Profit and losses of the Company and distribution of cash or other assets of the Company shall be in accordance with the Membership Interests of the Members.

6.      **Capital Contributions**.

        **Capital Management EG, Inc** has contributed $ 0   for the membership interest.

    7.      **Loans to the Company.**      Loans to the Company shall be permitted from any Member. The amount of a loan, if any, made to the Company shall not be considered an increase in such Member's capital contribution or otherwise constitute a contribution of the Company, nor shall the making such loan entitle such Member to an increase Membership Interest. Loans to the Company shall bear such reasonable rate of interest and shall feature such other terms as shall be agreed upon by all Member.

    8.      **Managing Member**

        8.1      **Management of the Company; Appointment of Managing Member**.

    The Managing Member shall be solely responsible for the management of the Company's business with all the rights and powers generally conferred by law or necessary, advisable or consistent therewith but subject to the limitations of Article 3 related to the stated purposes of the Company and this Article 8. Capital Management EG, Inc is hereby appointed as Managing Member and shall devote all necessary time and attention to the business of the Company. Any party may engage in any other business while serving as Managing Member.

        8.2      **Budget.**      The Company shall be operated and managed based upon a budget (the "Budget") that shall be proposed by the Managing Member and approved by all the Members. The Budget shall set include a base salary for the Members and budgeted expenses for the term of the Budget.

        8.3      **Matters Not Requiring Approval of all Members.**      The Managing Member shall not need the consent of any Member to undertake any of the following actions

            (a) borrow money or obtain bank or other commercial credit;

            (b) grant credit to customers;

            (c) amend this Operating Agreement;

            (d) deviate from any of the purposes of the Company as set forth in Article 3;

            (e) take any action to reconstitute the Company in the event of the dissolution of the Company for any reason;

            (f) increase the salary of the Managing Member.

    9.      **Death, Incompetency, Bankruptcy, or Withdrawal of a Member**.

The death, incompetency, bankruptcy, withdrawal, insolvency or similar event of a Member shall cause the dissolution of the Company, unless all of the remaining Members consent to the continuation of the business of the Company in accordance with the Act.

10.    **Restrictions on Transfer**.    Except as expressly provided in this Article II, no Member may sell, assign, pledge, hypothecate, transfer or otherwise dispose (hereinafter "Transfer") all or any part of his Membership Interest. A Member may not Transfer all or any portion of his Membership Interest in the Company without obtaining prior written consent of all Members in writing to such Transfer which consent may be withheld in the sole and arbitrary determination of a Member. In addition, the other Members shall have the right of first refusal to purchase the Membership Interest of a selling Member.

11.    **Benefit**.    Subject to the limitations concerning the transferability of interests in the Company contained herein, this Operating Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective personal representative, heirs' successors in interest and permitted assigns.

12.    **Choice of Law**.    This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey without regard to conflict of law principles.

13.    **Amendments**. This Operating Agreement shall not be modified or amended except by written agreement signed by the parties hereto. No provision hereof may be waived except by an agreement in writing signed and by the waiving party. A waiver of any term or provision shall not be construed as a waiver of any other term or provision.

14.    **Entire Agreement**.    This constitutes the entire agreement of the parties. In the event any portion of the Operating Agreement shall be held invalid, then the remainder of this Operating Agreement shall continue in full force and effect as if said provision was not herein contained.

15.    **Execution**.    This Operating Agreement may be executed in several counterparts, each of which shall be deemed an original by all of which taken together shall constitute one and the same instrument.


# Intentionally left blank

**IN WITNESS WHEREOF,** the Member have executed this Operating Agreement as of this 23rd day of November, 2021.

**HENRY STREET PLAZA, LLC** a New Jersey limited liability company

By:

Wael Hana, on behalf of Capital Management EG, Inc, its Managing Member

# Exhibit B

# CONTRACT FOR SALE OF MEMBERSHIP INTEREST OF 503 FAIRVIEW AVENUE ASSOCIATES, LLC

**AGREEMENT,** dated as of this 19th day of January 2022, between the **Fairview Opportunity Zone Fund, LLC,** having a mailing address of 125 River Road, Edgewater, New Jersey 07020, (hereinafter referred to as **"Seller"**), and **Henry Street Plaza, LLC**, having a mailing address of 125 River Road, Suite 301, Edgewater, New Jersey 07020 (hereinafter referred to as **"Purchaser"**).

## RECITALS:

*Whereas,* 503 Fairview Avenue Associates, LLC, is a New Jersey limited liability company, hereinafter known as the **"LLC"**;

*Whereas,* Seller, Fairview Opportunity Zone Fund, LLC's membership interest is ninety-nine (99%) percent of the LLC;

*Whereas,* the DFT Manager, LLC's membership interest is one (1%) percent of the LLC;

*Whereas,* Purchaser desires to purchase forty-nine (49%) percent of Seller's membership interest in the LLC (**"Membership Interest"**);

*Whereas,* Seller agrees to sell forty-nine (49%) percent of its Membership Interest to the Purchaser;

*Whereas,* The Operating Agreement of the LLC is dated January 1, 2018, and amended by the Amended and Restated Operating Agreement dated August 5, 2019, which governs the business of the LLC and the members' business relations (the **"Operating Agreement"**);

*Whereas,* the Operating Agreement permits the sale of Seller's Membership Interest to Purchaser;

*Whereas,* The LLC is the owner of property located and attached as schedule "A"; and,

*Whereas,* Seller and Purchaser agree to complete the sale of the Membership Interest through this Agreement, and each abide by the terms and conditions herein.

## 1. AGREEMENT TO SELL AND PURCHASE.

**1.01.** The Seller agree to sell to the Purchaser and the Purchaser agrees to purchase from the Seller, subject to the terms and conditions of this Agreement, a forty-nine (49%) percent interest in the LLC. Upon closing Seller shall have a membership interest of fifty (50%) percent in the LLC. The Purchaser shall have a membership interest of forty-nine (49%) percent in the LLC. Profits, however, will be shared as if the parties each have a 50% interest.

## 2. PURCHASE PRICE.

**2.01.** The Purchaser shall acquire the Membership Interest of the Seller for the sum of Twelve Million ($12,000,000.00) Dollars (the "**Purchase Price**"). Purchaser by purchasing the Membership Interest agrees to assume the assets, all liabilities and obligations of the LLC.

**2.02. Payments.** The Purchaser shall pay and deliver the Purchase Price to Seller in twenty-four (24) equal monthly payments beginning between January 15 - 20, 2022. Payments shall be paid between the fifteenth and twentieth day of each month thereafter until the final payment date between December 15 - 20, 2023. All payments shall be made by check in the amount not less than $500,000.00. Purchaser may prepay the balance of the Purchase Price at any time without premium or penalty.

**2.03.** The failure to make any payment on or before its due date as set forth in Section 2.02 shall be a material event of default. Seller shall notify Purchaser in writing that payment has not been received and Purchaser shall have 10 days to cure the overdue payment. In the event Purchaser fails to cure the event of default, Seller shall have the option to terminate this Agreement. Upon termination, Seller shall have 90 days to return all payments received from Purchaser plus 10% interest from the payments accruing from the date such payments were received by the seller. Notice of termination shall be delivered in writing to the Purchaser at the address set forth in this agreement.

## 3. THE CLOSING.

**3.01.** Subject to other provisions of this Agreement, the closing of title provided for in this Agreement shall take place on or about January 19, 2022. Closing shall take place at the office of Seller, 125 River Road, Suite 301, Edgewater, New Jersey 07020.

**3.02.** As part of this Agreement, Purchaser shall execute and deliver to the Seller, the Purchaser's signature page to the Amended Limited Liability Company Agreement of the Company, dated January 19, 2022 a copy of which is attached hereto as Exhibit A (as amended, supplemented or otherwise modified from time to time, the "**LLC Agreement**").

## 4. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SELLER.

**4.01.** The Seller represents and warrants to the Purchaser as follows:

**A.** That they are the sole owner of the Membership Interest which is the subject of this agreement and that there are no liens or encumbrances affecting same.

**B.** No portion of the Membership Interest or property owned by the Seller is, and the Seller has not received any notice and has no knowledge that, any portion of the property will be, subject to or affected by any condemnation or similar proceeding.

**C.** The Seller has no knowledge of any existing action, suit or proceeding affecting the Membership Interest or property or any portion thereof or relating to, or arising out of the ownership, management or operation of the Membership Interest or property, in any court or before

or by any federal, state, county or municipal department, commission, board, bureau or agency or other governmental instrumentality, exclusive of any action, claim or proceeding seeking monetary damages for personal injury or property damage which does not affect title to the property; nor is operation of the property in violation of any rent control laws.

**D.** No person, firm or other entity has any right or option to acquire the Membership Interest or property or any portion thereof or any interest therein.

**E.** There exists no ground lease for the property which is owned by the seller. The real property owned by the seller is and will be owned in fee simple.

**F.** Seller affirmatively represent that there are currently no mortgages or liens, of any nature whatsoever, currently encumbering the real property owned by 503 Fairview Avenue Associates, LLC.

**G.** It is anticipated that, during the course of the business and operation of the assets of 503 Fairview Avenue Associates, LLC, construction loans and/or mortgages will be obtained, all of which will act as a lien on the property. Seller agrees that the maximum amount of a mortgage for which the LLC, shall be responsible for shall not exceed Sixty Million ($60,000,000) Dollars (the "**Mortgage Cap**"). Seller and DFT Manager, LLC, shall be jointly and severally, solely responsible for any mortgage amount in excess of said Mortgage Cap. That responsibly shall include, but not be limited to, the payments of principal, interest and any escrows attendant to the amount of the mortgage over the amount set forth herein. Additionally, Purchaser shall only be liable for up to Thirty Million ($30,000,000) Dollars of debt notwithstanding the total amount of any mortgage obtained for construction financing.

## 5. REPRESENTATIONS AND WARRANTIES OF PURCHASER.

**5.01.** Purchaser represents and warrants to Seller that it has full power, in accordance with law, to enter into this Agreement and to carry out the transactions provided for herein. Neither the execution and delivery of this Agreement nor the consummation of the transactions provided for herein will constitute a violation or breach by Purchaser of any provision of any agreement or other instrument to which Purchaser is a party or to which Purchaser may be subject although not a party, or will result in or constitute a violation or breach of any judgment, order, writ, injunction or decree issued against Purchaser. Purchaser has sufficient financial ability to consummate the transactions described herein and to secure the financing contemplated hereby.

## 6. PROVISIONS WITH RESPECT TO THE CLOSING.

**6.01.** On the Closing Date, the Seller shall deliver to the Purchaser the executed Amended Limited Liability Company Operating agreement containing Purchaser's newly acquired interest in the LLC.

## 7. NOTICES.

**7.01.** All notices and other communications under this Agreement shall be in writing and shall be sent by registered or certified mail, return receipt requested, postage prepaid, addressed as

follows: If intended for Seller to it at the address set forth above and if intended for Purchaser, to the Purchaser at the address set forth above. Any such notice or other communication shall be deemed to have been sufficiently given for all purposed hereof 3 days following the date on which the same is deposited in a general or branch post office or mail box maintained by the Postal Service, certified mail, return receipt requested, the next day after delivery to a recognized overnight carrier, and on the day of actual service if served personally.

## 8. ENTIRE AGREEMENT.

**8.01.** This Agreement and the documents referred to herein, embodies and constitutes the entire understanding between the parties with respect to the sale and purchase provided for herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement. Neither this Agreement nor any provisions hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

## 9. GOVERNING LAW.

**9.01.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey applicable to agreements made and to be performed wholly within the State of New Jersey.

## 10. CAPTIONS.

**10.01.** The captions in this Agreement are inserted for convenience or reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

## 11. BINDING EFFECT.

**11.01.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

## 12. TRANSFER OF WARRANTIES AND GUARANTEES.

**12.01.** Seller agrees to transfer to Purchaser at closing all guaranties and warranties received from vendors or contractors with respect to the property.

## 13. ATTORNEYS FEES.

**13.01.** In the event that legal action is necessary to enforce the provisions of this agreement, the successful party shall be entitled to recover costs of suit or other legal proceedings together with reasonable attorney's fees from the unsuccessful party.

## 14. OTHER PROVISIONS.

**14.01.** Purchaser covenants and agrees not to record this Agreement and agrees that any

recording hereof by Purchaser shall be deemed a material default hereunder.

**14.02.** This Contract may not be assigned by Purchaser without the express written permission of Seller which consent shall not be unreasonably withheld.

**14.03.** This Agreement is negotiated agreement, each of the Parties hereto being represented by legal counsel. This Agreement shall not be construed against either party by reason of same being prepared by its respective attorneys.

**INTENTIONALLY LEFT BLANK**

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

WITNESS:                                          SELLER:

                                                  Fairview Opportunity Zone Fund, LLC

_____                           _____
                                                  By: Fred A. Daibes, Managing Member


WITNESS:                                          PURCHASER:

                                                  Henry Street Plaza, LLC

_____                           _____
                                                  By: Wael Hana, Managing Member

# Schedule A



**SCHAN ASSOCIATES**
PROFESSIONAL LAND SURVEYORS/PLANNERS   41 HORSENECK ROAD, MONTVILLE, NEW JERSEY 07045  (973) 541-1555 FAX (973) 541-1555

MEMBER:
• NJSPLS

Description of Lot 4 in Block 605 (Tax Assessment Map designation), in the Borough of Fairview, Bergen County, New Jersey

Beginning at the intersection of the centerline of the vacated Dallytown Road R.O.W. (designated as Henry Street/Dallytown Rd on the Borough Tax Map), with the northeasterly line of Fairview Avenue (50' wide R.O.W.), and running thence:

1. Along said northeasterly line North 30 degrees 39 minutes 08 seconds West, a distance of 18.59 feet to a point of curvature, thence;
2. Still along said northeasterly line and along the easterly line of Fairview Avenue along a curve to the right having a radius of 246.13 feet and a central angle of 30 degrees 51 minutes 55 seconds, an arc length of 132.59 feet to a point of tangency, thence;
3. Still along said easterly line North 0 degrees 12 minutes 47 seconds East, a distance of 68.81 feet to the division line between subject property and Lot 3 in Block 605 (as designated on said Tax Assessment Map), lands now or formerly of Santo-Pizzi, Inc., thence;
4. Along said division line South 65 degrees 51 minutes 13 seconds East, a distance of 191.64 feet to the westerly line of Bergen Boulevard / New Jersey State Highway Route 63 (80' wide R.O.W.), thence;
5. Along said westerly line South 14 degrees 28 minutes 47 seconds West, a distance of 141.08 feet to the intersection of said westerly line with said centerline of Dallytown Road, thence;
6. Along said centerline North 87 degrees 44 minutes 13 seconds West, a distance of 96.07 feet to the Point of Beginning.

Containing: 26,009 square feet, more or less.

date:   6 Apr 2019

Andre Schan, LS, N.J. Lic. #30749

# Exhibit A



# Exhibit C

## SECOND AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## 503 FAIRVIEW AVENUE ASSOCIATES, LLC

**THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT**
(hereinafter sometimes referred to as the **"Agreement"**), dated as of the 19ᵗʰ day of January, 2022 is hereby made by and between FAIRVIEW OPPORTUNITY ZONE FUND, LLC, DFT MANAGER, LLC, and HENRY STREET PLAZA, LLC (hereinafter referred to together as the "Members" or individually as a "Member"). This Second Amended and Restated Operating Agreement replaces and supersedes all prior operating agreements of 503 FAIRVIEW AVENUE ASSOCIATES, LLC (the **"Company"**).

### RECITALS

**WHEREAS,** the Members desire to enter into this Agreement in order to formally define and express all the terms and conditions of 503 FAIRVIEW AVENUE ASSOCIATES, LLC and to set forth their respective rights and obligations with respect thereto.

**NOW, THEREFORE,** in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

### SECTION 1. - FORMATION, NAME AND ADDRESS

1.1    Formation. The parties agree to form the Company under the provisions of the New Jersey Limited Liability Company Act (1993) (the **"LLC Act"**) and this Agreement.

1.2    Name. The name of the Company shall be "503 FAIRVIEW AVENUE ASSOCIATES, LLC".

1.3    Principal Place of Business/Registered Agent. The principal place of business and the principal office of the Company shall be located at c/o DFT Manager, LLC, 125 River Road, Suite 301, Edgewater, New Jersey 07020, and/or such other location or locations as, from time to time, the Manager shall select. The Registered Agent shall be Robert P. Travers, Esq. and the Registered Office shall be 129 Alexander Way, Edgewater, NJ 07020. Such office and agent may be changed, from time to time, as the Manager shall determine.

### SECTION 2. - BUSINESS AND PURPOSE OF THE COMPANY

2.1    Business and Purpose. The purpose of the Company is to acquire, own, operate, manage, mortgage, lease and/or sell certain real estate located at 503 Fairview Avenue, Fairview, Bergen County, New Jersey and designated as Block 605, Lot 4 on the Tax Map of the Brough of Fairview, together with any additional or replacement real estate as the Company may now own or hereafter acquire (collectively referred to as the **"Property"**) and to do any and all other acts and things which may be necessary, appropriate or incidental to the carrying out of the business and purposes of the Company.

## SECTION 3. – DEFINITIONS

3.1.   "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon: (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.2.   "Capital Account" means, with respect to any Member or assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

3.3.   "Capital Contribution" means, with respect to any Member or assignee, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by such Member or assignee. The initial Capital Contributions of the Members are set forth in **Exhibit A.**

3.4.   "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.5.   "Deficit Capital Account" means with respect to any Member or assignee, the deficit balance, if any, in such Member's or assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)   Credit to such Capital Account any amount which such Member or assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704- 2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1 .704- 2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1 .704-2(i)(3)); and

(b)   Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

3.6.   "Daibes Members" means Fairview Opportunity Zone Fund, LLC and DFT Manager, LLC collectively.

3.7    "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New Jersey Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New Jersey Act.

3.8.    "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 7 hereof.

3.9.    "New Jersey Act" means the New Jersey Limited Liability Company Act, N.J.S.A 42:2B-1, et seq., as the same may be amended from time to time.

3.10.    "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in **Exhibit A** hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof. Other than by application of Sections 6.1, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.11.    " Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.12.    "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(l) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.13.    "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## SECTION 4. - MEMBERS AND COMPANY INTERESTS

4.1    Members. The Members shall own the Company Interests set forth on **Exhibit A**.

## SECTION 5. - CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

5.1.    Members' Capital Contributions. Each Member shall contribute such amount as is set forth in **Exhibit A** as its share of the initial Capital Contributions. No interest shall be paid on any initial or subsequent Capital Contribution.

5.2.    Additional Contributions. Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions. In order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Manager.

5.3.    Capital Accounts. A separate Capital Account will be maintained for each Member.

    (a)    Each Member's Capital Account will be increased by:

        (i)      The amount of money contributed by the Member to the Company;

        (ii)     The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

        (iii)    Allocations to the Member of Profits; and

        (iv)    Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

    (b)    Each Member's Capital Account will be decreased by:

        (i)      The amount of money distributed to the Member by the Company;

        (ii)     The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

        (iii)    Allocations to the Member of Losses; and

        (iv)    Allocations to the Member of deduction or expense as provided in Section 6.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

    (c)    In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section I.704-l(b)(2)(iv).

    (d)    The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder. If in the Manager's opinion, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified to comply with Section 704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

    (e)    Except as otherwise required in the New Jersey Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

5.4.    Withdrawal or Reduction of Members' Contributions to Capital. A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Manager in his sole discretion. A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

5.5.    Advances by the Members. A Member may from time to time, with the consent of the Manager, advance additional monies to or for the Company's benefit, and each such advance shall

be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Manager. Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

5.6.    Transactions Between Member and/or Manager and the Company. Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in N.J.S.A. 42:2B-9.

## SECTION 6. – ALLOCATIONS AND DISTRIBUTIONS

6.1.    Allocations of Profits and Losses. Profits and Losses of the Company and distribution of cash or other assets of the Company shall be divided between and consist of Fifty (50%) Percent Interest for Fairview Opportunity Zone Fund, LLC and Fifty (50%) Percent Interest for Henry Street Plaza, LLC.

6.2.    Special Allocations. Notwithstanding the provisions of Section 6.1:

(a)    Minimum Gain. Notwithstanding any other provision of this Section 6.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 6.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704 2(f)(4).

(b)    Qualified Income Offset. If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704- 1(b)(2)(ii)(d)(4), (5) or (6), which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 6.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)(d).

(c)    Deficit Balance. If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)(c) and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(l) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)(d)), the Capital Account of the Member shall be specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

(d)     Nonrecourse Deductions. Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Regulation Section 1.704 2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704 2(i). Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704 2(b)) those deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

(e)     Section 704(c). In accordance with Section 704(c)(l)(A) of the Code and Regulation Section 1.704-l(b)(2)(iv)(d)(3), if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

(f)     Curative Allocations. Any credit or charge to the Members' Capital Accounts pursuant to Sections 6.2(a) through 6.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 6.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 6.1 and 6.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 6 if the special allocations required by Sections 6.2(a) through 6.2(d) had not occurred.

6.3.    Distributions.

(a)     The Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Manager shall determine. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member. Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

(i)     The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Manager);

(ii)    All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

(iii)   The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

(b)     The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

(c)     Subject to the terms and conditions of Section 6.3(d), a Member who receives a distribution in violation of Section 6.3(b), and who knew at the time of the distribution that the distribution violated Section 6.3(b), shall be liable to the Company for the amount of the distribution. A Member who receives a distribution in violation of Section 6.3(b), and who did not know at the time of the distribution that the distribution violated Section 6.3(b), shall not be liable for the amount of the distribution.

(d)     Unless otherwise agreed upon by the Manager, a Member who receives a distribution from the Company in violation of Section 6.3(b) shall have no liability under the New Jersey Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

## SECTION 7. - MANAGEMENT

7.1.    Management.

(a)     The Company's business and affairs shall be managed by the Manager. The Manager shall participate in the direction, management and control of the Company's business to the best of his ability.

(b)     If there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with a majority vote of the Managers required to take action. Each Manager shall have one (1) vote.

(c)     The Company's initial Manager shall be DFT Manager, LLC.

(d)     Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

7.2.    Number, Tenure and Qualifications. The number of Managers of the Company shall be not less than one (1). Each Manager shall hold office until his or her successor shall have been elected and qualified. Managers shall be elected by the unanimous vote of the Members. Managers need not be residents of the State of New Jersey or Members of the Company.

7.3.    Certain Powers of Managers. Without limiting the generality of Section 7.1, the Manager shall have power and authority, on the Company's behalf:

(a)     To acquire property from any Person as the Manager may determine. The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person; If such acquisition is in excess of 20,000 written notice must be given to Henry Street Plaza LLC. Henry Street Plaza LLC shall respond to the proposed acquisition within 5 days or failure to respond shall constitute a waiver and the Manager shall proceed as it deems fit.

(b)     To borrow money from any Person, including banks, other lending institutions, the Members, or affiliates of the Members on such terms as the Manager deems appropriate, and in connection therewith, to hypothecate, encumber, pledge and grant security interests in the Company's assets to secure repayment of the borrowed sums. Except as otherwise provided in the New Jersey Act, no debt shall be contracted or liability incurred by or on the Company's behalf

except by the Manager; If such loan is in excess of 20,000, written notice must be given to Henry Street Plaza LLC. Henry Street Plaza LLC shall respond to the proposed acquisition within 5 days or failure to respond shall constitute a waiver and the Manager shall proceed as it deems fit.

(i) It is anticipated that, during the course of the business and operation of the assets of the company, construction loans and/or mortgages will be obtained, all of which will act as a lien on the property. The Members jointly and severally, agree that the maximum amount of a mortgage that Henry Street Plaza LLC shall be jointly responsible for is, and shall not exceed the amount of thirty million dollars ($30,000,000). The Members, including but not limited to Fairview Opportunity Zone Fund, LLC and DFT Manager, LLC shall be jointly and severally, solely responsible for any mortgage amount in excess of said thirty million dollars ($30,000,000). That responsibility shall include, but not be limited to, the payments of principle, interest, and any escrows attendant to the amount of the mortgage over the amount set forth herein. The exposure of Henry Street Plaza LLC shall be capped at thirty million dollars in mortgage obligations. In addition, any calculations as to profits and losses shall use the mortgage cap number in determining same as to Henry Street Plaza LLC.

(c)     To purchase liability and other insurance to protect the Company property and the Company's business;

(i)     Henry Street Plaza, LLC shall be named as an additionally named insured on any policies of insurance currently in force and effect.

(d)     To hold and own any Company real and/or personal properties in the Company's name;

(e)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments; ; If such investment is in excess of 20,000 written notice must be given to Henry Street Plaza LLC. Henry Street Plaza LLC shall respond to the proposed acquisition within 5 days or failure to respond shall constitute a waiver and the Manager shall proceed as it deems fit.

(f)     To sell or otherwise dispose of all or substantially all of the Company's assets as part of a single transaction or plan so long as such disposition, is approved by unanimous consent of all Members, and is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(g)     To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the Manager's opinion, to the Company's business;

(h)     To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(i)     To enter into any and all other agreements on the Company's behalf, with any other Person for any purpose, in such forms as the Manager may approve, notwithstanding anything contained herein the Manager shall not enter into any agreement with a property manager where the compensation exceeds three (3%) percent of the gross rent roll; and

(j)     To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

7.4.    Liability for Certain Acts. The Manager shall exercise his business judgment in participating in the management of the Company's business, operations and affairs. Unless violation of reasonable standard of care, fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Manager in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations. The Manager shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of violation of a reasonable standard of care, fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager proved as set forth in this Section 7.4. Unless violation of reasonable standard of care, fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or
venture.

7.5.    The Manager Has No Exclusive Duty to Company. The Manager shall not be required to manage the Company as his sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom. The Manager shall not be compensated for the performance of any duties related to the management of the Property.

7.6.    Bank Accounts. The Manager may open bank accounts in the Company's name. The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager. The Manager shall use such funds solely for the Company's business. Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

7.7.    Resignation. A Manager may resign at any time by giving written notice to the Members. A Manager's resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

7.8.    Removal. Any Manager may be removed at any time, with or without cause, by a majority vote of the Members.

7.9.    Vacancies. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the majority vote of the Members. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the majority vote of the Members. A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

7.10. Intentionally left blank.

7.11. Manager Representations. Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof: (i) the Company was in existence; (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager. Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

(a)   as to who are the Members and Managers hereunder;

(b)   as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Managers or in any other manner germane to the Company's affairs;

(c)   as to who is authorized to execute and deliver any instrument or document of the Company;

(d)   as to the authenticity of any copy of the Certificate of Formation, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

(e)   as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member in the capacity as a Member or Manager of the Company.

7.12. Limitations on Members.

(a)   Notwithstanding any of the foregoing provisions, for any expenditure or contract with a value greater than $20,000.00, the Manager shall obtain three (3) estimates and/or competitive bids before entering into said contract or making said expenditure. The Manager shall present the bids, proposals and/or estimates to the Members of the Company for their review and approval. No expenditure of this nature shall be made, nor shall any contract, agreement or proposal be executed or authorized without the prior written consent of the Members, which shall not be unreasonably withheld. With respect to Henry Street Plaza, LLC, all notices under this Section 7.12(a) shall be sent to its Managing Member. The Members shall, within five (5) business days of the receipt of said estimates/bids, approve or otherwise act upon the recommendation of the Manager. If the Members do not act upon the estimates/bids at the expiration of the five (5) day period, this shall constitute a waiver and the Manager shall proceed as it deems fit and appropriate, without any further involvement of the Members.

(b)   Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

(c)   Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

## SECTION 8. - RESTRICTIONS ON THE TRANSFER OF A MEMBER'S INTEREST

8.1.   Purchase of Existing Members Interest.

(a)   Notwithstanding the Right of First Refusal (Section 8.2, infra) and the Return of Investment Clause (Section 10, infra), the existing Members shall have the right to offer to purchase some or all of the other Member's Interest in 503 Fairview Avenue Associates, LLC. Said offer to purchase can be made at any time, throughout the ownership interest of the offering party. If the offered party agrees to sell some or all of its interest, then the parties thereafter shall negotiate an appropriate purchase price, agreeable to both parties.

(b)   In the event that the parties cannot agree on a value of the interest being sold, then, and in that event, each party shall obtain an independent appraisal, setting forth the value of the interest being sold. The parties shall use the average figure of those two (2) appraisals as determinative of the purchase price. This, however, is predicated by the absolute and unequivocal desire and willingness of the selling party to enter into the transaction and, in fact, sell some or all of its interest.

(c)   The timeframe for the transaction and payment schedule, if any, shall be negotiated and mutually agreed to by the respective parties. There must be a meeting of the minds between the parties hereto that the offered party must be willing to sell some or all of its interest. In the alternative, the offered party may make a counter offer to buy out the other Member, which has made the previous offer. In the event that neither party wishes to, or will allow for, the sale/purchase to the other party, or will not allow for a sale pursuant to the protocol, as set forth in Section 8.2 Right Of First Refusal), infra, no buyout between the current owners shall occur. In that event, the entire assets of 503 Fairview Avenue Associates, LLC., shall and must be sold to an independent, disinterested third party. The sale price shall be determined as follows: each party shall obtain an independent appraisal, setting forth the value of the interest being sold. The parties shall use the average figure of those two (2) appraisals as determinative of the sale price.

8.2.   Right of First Refusal.

(a)   In the event that any entity, individual, trust, limited liability company, or person (hereinafter referred to as Proposed Seller) having any ownership interest, of any nature whatsoever, in 503 Fairview Avenue Associates, LLC., desires to sell its interest in 503 Fairview Avenue Associates, to any individual or entity other than a current owner, it must first offer the existing Member the right to buy out its interest. If the existing Member exercises its right to purchase said interest, the provisions of Section 8.2 shall be controlling. If the existing Member declines to exercise its option pursuant to Section 8.2, the instant right of first refusal protocol shall be binding. However, as is set forth in Section 8.2, any Member, at any time, may offer to purchase some or all of the other remaining Member's interest. The right of first refusal shall be effective in the event that the other Member affirmatively declines the offer to purchase the interest offered to it.

(b)   In the event that Proposed Seller solicits or obtains an offer to purchase some or all of its interest from a individual or entity, other than a current owner, it shall advise the existing members of same. Proposed Seller shall present proof of said bona fide offer to purchase to the Managing Member of the existing member. Upon receipt of same, the existing member shall have the right to investigate and perform its due diligence with regard to the proposed purchaser. Within thirty (30) days of receipt of proposed seller's notice of intent to sell its interest, the existing member, shall do one of the following:

(i)   Match the offer of which it has been advised, meeting substantially the same price and conditions as offered by the Proposed Purchaser; obtain an assignment of that contract;

or enter into a new contract with the Proposed Seller containing substantially the same terms and conditions, or

(ii)    Waive, in writing, its Right Of First Refusal, which shall allow the Proposed Seller to complete the transaction and sell its interest, to whatever extent, to the Proposed Purchaser.

(c)    In the event that Proposed Seller desires to sell some or all of its interest 503 Fairview Avenue Associates, LLC, without having obtained or soliciting any other offers, it shall advise the existing member of its desire to sell. The existing member, shall have thirty days (30) within which to negotiate and execute a contract with the selling entity to purchase some or all of its interest. If, within said thirty (30) day period, the parties cannot reach an agreement, the provisions of Section 8.1 shall apply and be controlling.

(d)    In the event that the existing member, (hereinafter referred to as Proposed Seller) having any ownership interest, of any nature whatsoever, in 503 Fairview Avenue Associates, LLC., desires to sell its interest in 503 Fairview Avenue Associates, LLC., to any individual or entity other than a current owner, the following right of first refusal shall be controlling and binding:

(i)    Within thirty (30) days of receipt of proposed seller's notice of intent to sell its interest, the Managing Member of 503 Fairview Avenue Associates, LLC, for itself and on behalf of the other members of 503 Fairview Avenue Associates, LLC, (excluding proposed Seller) shall do one of the following:

(a)    Match the offer of which it has been advised, meeting substantially the same price and conditions as offered by the Proposed Purchaser; obtain an assignment of that contract; or enter into a new contract with the Proposed Seller containing substantially the same terms and conditions, or

(b)    Waive, in writing, its Right Of First Refusal, which shall allow the Proposed Seller to complete the transaction and sell its interest, to whatever extent, to the Proposed Purchaser.

(e)    In the event that Proposed Seller desires to sell some or all of its interest in 503 Fairview Avenue Associates, LLC, without having obtained or soliciting any other offers, it shall advise the existing member of its desire to sell. The existing member shall have thirty days (30) within which to negotiate and execute a contract with the selling entity to purchase some or all of its interest. If, within said thirty (30) day period, the parties cannot reach an agreement, the provisions of Section 8.1 shall apply and be controlling.

8.3.    Intentionally Deleted.

8.4.    Consent Required for Transfer and Assignment of a Member's Interest. Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, pledge, encumber or in any way alienate all or any part of his or her interest in the Company as a Member except with the prior written consent of the Members. Transfers in violation of this Section 8.4 shall only be effective to the extent set forth in Section 8.7.

8.5.     Further Restrictions on Transfer. No Member shall assign, convey, sell, encumber or in any way alienate all or any part of his or her Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

8.6.     Intentionally Deleted.

8.7.     Effect of Transfer.

(a)     Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

(b)     Intentionally Deleted.

(c)     Intentionally Deleted.

(d)     A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of its Interest.

8.8.     Intentionally Deleted.

8.9.     Intentionally Deleted.

## SECTION 9. - DETERMINATION OF VALUE

Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit B and made a part hereof, executed by the Manager. The Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect. If the Members fail to agree on a revaluation as described above for more than two (2) years, the Value shall be the then Fair Market Value of the Company, as hereinafter defined. For purposes of this Agreement, the "Fair Market Value of the Company" shall be the fair market value of the Company assets, less Company liabilities. The Fair Market Value of the Company's real estate shall be determined by an MAI appraisal selected by the Company. If the selling Member disputes such appraisal, such party shall obtain an MAI appraisal, and the average of the two (2) MAI appraisals shall determine the Fair Market Value of the real property; provided, however, that the higher value is within five (5%) percent of the lower value. If such values are not within five (5%) percent of each other, then the two (2) MAI appraisers shall select a third MAI appraiser, whose valuation shall be final and binding. The Company shall pay for its appraiser, the selling Member shall pay for its appraiser, and the third appraiser, if any, shall be paid fifty (50%) percent by the Company and fifty (50%) percent by the Selling Member or legal representatives of the Decedent's estate, as the case may be. The Fair Market Value of all the other assets of the Company, other than the real estate, shall be determined by the certified public accountant employed by the Company applying generally accepted accounting principles.

The Value of a Member's Membership Interest sold pursuant to this Agreement shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

## SECTION 10. – RETURN OF INVESTMENT

10.1    At any time during the construction on the Property, either the Daibes Members or Henry Street Plaza, LLC (herein referred to as the "party" or "parties") may purchase/buy-out the other party's interest for the full sum of one hundred twenty percent (120%) of its initial investment. The purchasing party shall give written notice of its exercising of this option to the party which is being bought out. Thereafter, the parties shall have thirty days (30) to come to an agreement as to the investment amount actually remitted from the party whose interest is being purchased. Thereafter, the purchasing party shall have thirty days (30) thereafter within which to make the one hundred twenty percent (120%) payment. Should a party exercise its option in accordance with this Section 10, the following shall occur:

(a)    The purchasing party shall be declared as sole owner of the project and of the Company;

(b)    The party that has been bought out, shall have no further ability to purchase the interest in the Company;

(c)    The parties shall have no further rights, responsibilities or obligations to one another.

10.2    This Section and the rights it confers upon the parties, shall not survive after the completion of construction on the Property. The completion of construction shall be defined as the issuance by the Borough of Edgewater of a Certificate of Occupancy; Registration of the building, with the appropriate New Jersey State and federal authorities and such other approvals as are necessary to allow for any individual to take up residence in the building. The Manager and majority Members of the Company, shall use their good offices and shall exercise due diligence and all due dispatch in obtaining said documents, as set forth herein. Any undue delay occasioned by, or attributed to, the Manager or majority Members of the Company, shall make this clause null and void.

## SECTION 11. - TERM OF THE COMPANY

The Company shall commence as of the date its Certificate of Formation is filed with the New Jersey Secretary of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

11.1.    The mutual agreement in writing of all who shall be Members on the date of such agreement to terminate;

11.2.    At such earlier time as may be provided by applicable law;

11.3.    The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

11.4.    The entry of a decree of judicial dissolution in accordance with N.J.S.A. 42:2B-49.

## SECTION 12. - FISCAL YEAR AND ACCOUNTING METHOD

For income tax purposes, the Company's fiscal year shall be as determined by the Manager, and the Company's books shall be kept on the cash or accrual method of accounting as determined

by the Manager. Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law. The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

## SECTION 13. - BOOKS AND RECORDS

13.1. The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

13.2. The Company's books shall be closed at such intervals as the Manager shall determine but not less frequently than annually as of the end of each calendar year by the certified public accountants then regularly retained by the Company. Such certified public accountants for the Company may be changed at any time and from time to time by the Manager. Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Manager.

13.3. A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## SECTION 14. - OTHER ACTIVITIES OF MEMBERS

Any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that operated by this Company. Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

## SECTION 15. - RESIGNATION OF A MEMBER

Pursuant to N.J.S.A. 42:2B-38, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

## SECTION 16. - TAX MATTERS MEMBER

16.1. Notwithstanding any provision set forth in this Agreement to the contrary, for purposes of Section 6231(a)(7) of the Code or any corresponding provision of any future law of the same or similar import, the "Tax Matters Member" of the Company shall be DFT Manager, LLC, or such other Member selected by the Manager from time to time.

16.2. The Tax Matters Member shall be authorized to carry out, on the Company's behalf and at the Company's expense, all acts appropriate to such designation including but not limited to:

(a) Receiving and responding to any and all notices and requests from any taxing authority;

(b) Informing all other Members of any inquiry, examination or proceeding as required by law and, if not so required, as the Tax Matters Member shall deem appropriate;

(c) Meeting and negotiating with representatives of any taxing authority;

(d) Entering into a binding settlement agreement with any taxing authority on the Company's behalf regarding any tax deficiency, assessment, credit or refund, provided that all Members be given adequate prior notice so that any Member without prejudicing the validity of such a settlement agreement, may elect not to be bound by the settlement agreement where permitted under applicable law;

(e) Entering into an agreement with any taxing authority to extend the limitations period on assessment(s) or collection of adjustments;

(f) Commencing administrative or judicial proceedings regarding any tax deficiency, assessment, credit or refund;

(g) Intervening in any judicial action or proceeding, the outcome of which could adversely affect a position taken by the Company;

(h) Prosecuting an appeal from a decision or judgment of any court which is wholly or partially adverse to a position taken by the Company; and

(i) Retaining tax advisors to whom the Tax Matters Member may delegate such of its rights and duties as the Tax Matters Member shall consider necessary and appropriate.

16.3. The Tax Matters Member shall be required to notify all Members (some of whom may not qualify as "notice partners" within the meaning of Section 6231(a)(8) of the Code) of the beginning and completion of an administrative proceeding at the Company level promptly upon such notice being received by the Tax Matters Member.

## SECTION 17. – INDEMNIFICATION

17.1. The Members and Manager shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Manager without negligence, fraud or willful misconduct, including, but not limited to, unforeseen losses caused by strikes, labor troubles, riots, fires, power outages, tornadoes, floods, acts of a public enemy, insurrections, acts of God, breakdown or failure of plant or machinery, the failure to perform its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Manager.

17.2. Notwithstanding anything otherwise herein contained to the contrary, no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.

## SECTION 18. - LIMITATION ON LIABILITY

Except as otherwise provided by the New Jersey Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, or acting as a Manager, employee or agent of the Company. No Member shall be required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

## SECTION 19. - AMENDMENT

This Agreement may be amended only by the unanimous vote of the Members.

## SECTION 20.- MISCELLANEOUS

20.1.   Organizational Fees. The Company shall pay all expenses incurred in the organization of the Company.

20.2.   Company Property. Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Manager may designate. The Manager shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the willful misconduct of such nominee.

20.3.   Notices. All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

20.4.   Failure of Member to Comply with Terms of this Agreement. If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have all remedies available pursuant to New Jersey law, including such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

20.5.   Failure of a Manager to Comply with Terms of this Agreement. A Manager shall not be personally liable for failure to perform in accordance with, or to comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Manager.

20.6.   Applicable Law. This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New Jersey (without regard to its conflicts of laws provisions). Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New Jersey.

20.7.   Severability. If any provision of this Agreement shall be declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in any of such events, such provision(s) shall be deemed to be invalid, and notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

20.8.   Benefit. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

20.9.   Construction. As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

20.10.  Execution. This Agreement may be executed in any number of counterparts, each of which shall be considered an original. The signature by any Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

20.11.  Headings. The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12.  Partnership. It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

# Remainder of page intentionally left blank.

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**503 Fairview Avenue Associates, LLC** a New Jersey limited liability company

By: Fairview Opportunity Zone Fund, LLC

By:_____
Fred A. Daibes, its Managing Member

**503 Fairview Avenue Associates, LLC** a New Jersey limited liability company

By: DFT Manager, LLC

By:_____
Joseph A. Daibes, its Managing Member

**503 Fairview Avenue Associates, LLC** a New Jersey limited liability company

By: Henry Street Plaza, LLC

By:_____
Wael Hana, its Managing Member

## EXHIBIT A

### Capital Contributions and Percentage Interests

|  | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| 1. DFT MANAGER, LLC | $1 | 1% |
| 2. FAIRVIEW OPPORTUNITY ZONE FUND, LLC | $12,000,000.00 | 50% |
| 3. CAPITAL MANAGEMENT EG, LLC | $12,000,000.00 | 49% |