UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ROBERT MENENDEZ,
NADINE MENENDEZ,
   a/k/a "Nadine Arslanian,"
WAEL HANA,
   a/k/a "Will Hana,"
JOSE URIBE, and
FRED DAIBES,

              Defendants.

**SUPERSEDING INDICTMENT**

S2 23 Cr. 490 (SHS)

## Overview

1.     ROBERT MENENDEZ, the defendant, is the senior U.S. Senator from the State of New Jersey. From at least in or about 2018 up to and including in or about 2023, MENENDEZ and his wife, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, engaged in a corrupt relationship with three New Jersey associates and businessmen—WAEL HANA, a/k/a "Will Hana," JOSE URIBE, and FRED DAIBES, the defendants—in which MENENDEZ and NADINE MENENDEZ agreed to and did accept hundreds of thousands of dollars of bribes in exchange for using MENENDEZ's power and influence as a Senator to seek to protect and enrich HANA, URIBE, and DAIBES and to benefit the Arab Republic of Egypt and the State of Qatar. Those bribes included cash, gold, payments toward a home mortgage, compensation for a low-or-no-show job, a luxury vehicle, and other things of value.

2.     This corrupt relationship resulted in ROBERT MENENDEZ, the defendant, promising to take and taking a series of official acts and breaches of official duty in exchange for bribes that benefitted him both directly, and indirectly through NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant. Among other things, first, MENENDEZ promised to and did

use his influence and power and breach his official duty in ways that benefited the Government

of Egypt and WAEL HANA, a/k/a "Will Hana," the defendant, an Egyptian-American

businessman, among others. Among other actions, MENENDEZ provided sensitive U.S.

Government information and took other steps that secretly aided the Government of Egypt.

MENENDEZ also improperly advised and pressured an official at the United States Department

of Agriculture for the purpose of protecting a business monopoly granted to HANA by Egypt

and used in part to fund the bribes being paid to MENENDEZ through NADINE MENENDEZ.

Second, MENENDEZ promised to and did use his influence and power and breach his official

duty to seek to disrupt a criminal investigation and prosecution undertaken by the New Jersey

Attorney General's Office related to JOSE URIBE, the defendant, and his associates. Third,

MENENDEZ promised to and did use his influence and power and breach his official duty to

recommend that the President nominate an individual as U.S. Attorney for the District of New

Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to the

federal criminal prosecution of FRED DAIBES, the defendant, and to seek to disrupt that same

prosecution. Fourth, MENENDEZ agreed to and did accept payment from DAIBES, knowing

that DAIBES expected MENENDEZ in exchange to use his influence and power and breach his

official duty to assist DAIBES, who was seeking millions of dollars in investment from a fund

with ties to the Government of Qatar, by performing acts to benefit the Government of Qatar.

      3.    ROBERT MENENDEZ, the defendant, further promised to take and took a series

of acts on behalf of Egypt, including on behalf of Egyptian military and intelligence officials,

and conspired to do so with WAEL HANA, a/k/a "Will Hana," and NADINE MENENDEZ,

a/k/a "Nadine Arslanian," the defendants, who also communicated requests and directives from

Egyptian officials to MENENDEZ.

4.      In or about June 2022, federal agents executed court-authorized search warrants on the New Jersey home of ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, and the safe deposit box of NADINE MENENDEZ. In conducting these court-authorized searches, agents found certain of the fruits of MENENDEZ's and NADINE MENENDEZ's corrupt bribery agreement with WAEL HANA, a/k/a "Will Hana," JOSE URIBE, and FRED DAIBES, the defendants, including cash, gold, the luxury vehicle, and home furnishings. Over $480,000 in cash—much of it stuffed into envelopes and hidden in clothing, closets, and a safe—was discovered in the home, along with over $70,000 in NADINE MENENDEZ's safe deposit box. Some of the envelopes contained the fingerprints and/or DNA of DAIBES or his driver. Other of the envelopes were found inside jackets bearing MENENDEZ's name and hanging in his closet, as depicted below.



During the same court-authorized search of the home, agents also found home furnishings provided by HANA and DAIBES, the luxury vehicle paid for by URIBE parked in the garage, as well as over one hundred thousand dollars' worth of gold bars in the home, which were provided by either HANA or DAIBES. Two of the gold bars DAIBES provided are depicted in the photographs below.

3



**Relevant Individuals**

***Senator Robert Menendez and his Wife, Nadine Menendez, a/k/a "Nadine Arslanian"***

     5.     ROBERT MENENDEZ, the defendant, is the senior U.S. Senator from the State of New Jersey. MENENDEZ served as mayor of Union City, New Jersey, and a member of the New Jersey state legislature until 1993, when he was elected to the U.S. House of Representatives representing a New Jersey district. MENENDEZ was appointed to the U.S. Senate in 2006, subsequently elected in 2006, and reelected in 2012 and 2018. At all times relevant to this Indictment, MENENDEZ held a leadership position on the Senate Foreign Relations Committee (the "SFRC"), first as the Ranking Member and then the Chairman, and therefore possessed influence over, among other things, the Executive Branch's decisions to provide foreign military sales, foreign military financing, and other aid or support to or for the benefit of the Government of Egypt. By virtue of his position as the senior U.S. Senator from the State of New Jersey, at all times relevant to this Indictment, MENENDEZ had the ability to recommend to the President that a particular individual be nominated to serve as the U.S. Attorney for the District of New Jersey. At all times relevant to this Indictment, the official public website for MENENDEZ's Senate office stated that his office could not take certain

actions, including actions to influence private business matters, and actions to intervene with
judicial issues and criminal trials, as detailed in the below excerpt from the website.



## OUR OFFICE CANNOT

**COMPEL** an agency to act in your favor or expedite your case.

**OVERTURN** or influence matters involving private businesses.

**INTERVENE** with judicial issues, provide legal advice or recommend an
attorney. Our Senate office cannot legally get involved with pending
litigation, including questions about criminal trials or imprisonment, child
custody issues, and civil lawsuits. My office cannot overturn or in any way
influence a court's decision.

6.     NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, began dating
ROBERT MENENDEZ, the defendant, in or about early February 2018. They became engaged
in or about early October 2019, and married in or about early October 2020. Before NADINE
MENENDEZ began dating MENENDEZ, she was unemployed. Beginning in at least in or
about 2018, NADINE MENENDEZ had meetings and direct communications with multiple
Egyptian officials, at least some of whom she understood were intelligence officials, and
received requests from them, and conveyed information and requests from them to
MENENDEZ.

### *The Three New Jersey Businessmen*

7.     At all times relevant to this Indictment, WAEL HANA, a/k/a "Will Hana," the
defendant, who is originally from Egypt, resided principally in New Jersey, and maintained close
connections with Egyptian officials. HANA and NADINE MENENDEZ, a/k/a "Nadine
Arslanian," the defendant, were friends for many years before she began dating ROBERT
MENENDEZ, the defendant. A court-authorized search in or about November 2019 of a

5

cellphone HANA used revealed thousands of text messages between HANA and NADINE MENENDEZ, many of which NADINE MENENDEZ deleted from her own cellphone. That search also revealed thousands of text messages, many via an encrypted application, with Egyptian military and intelligence officials, pertaining to various topics, including MENENDEZ, and including requests and directives for HANA to act upon.

8.      JOSE URIBE, the defendant, is a businessman who resides in New Jersey and works in the trucking and insurance business, after having previously been convicted of fraud and having his insurance broker's license revoked. URIBE is a business associate and friend of WAEL HANA, a/k/a "Will Hana," the defendant. URIBE developed a relationship with ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, in or about 2018.

9.      FRED DAIBES, the defendant, is a New Jersey real estate developer, a founder of a New Jersey-based bank, and a business associate of WAEL HANA, a/k/a "Will Hana," the defendant. On or about October 30, 2018, DAIBES was charged by the United States Attorney's Office for the District of New Jersey with obtaining loans under false pretenses from that bank. DAIBES was a longtime fundraiser for ROBERT MENENDEZ, the defendant.

### Relevant Statutory Background on FARA

10.      The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, is a federal registration and disclosure statute that requires any person agreeing to act or acting in the United States as "an agent of a foreign principal" to register with the United States Attorney General if he or she agrees to engage or engages, directly or through another person, in certain types of conduct, such as political activities, political consulting, public relations, or publicity activities, for or in the interest of the foreign principal. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit within the U.S. Department

6

of Justice.

11.     The purpose of FARA is to prevent covert influence by foreign principals.  Proper registration under the statute allows the United States Government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals in light of their status as foreign agents.  Among other things, a FARA registration, which is publicly available, reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and any political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

12.     Public officials, including Members of Congress, are prohibited by law from agreeing to be or acting as an agent of a foreign principal required to register under FARA.  At all times relevant to this Indictment, the Senate Ethics Manual, which was publicly available, stated, among other things, "Regardless of compensation, a public official may not act as an agent or attorney for a foreign principal required to register under the Foreign Agents Registration Act of 1938, as amended, that is, generally, those individuals engaged in lobbying, political, or propaganda activities on behalf of foreign governments or political parties," citing Title 18, United States Code, Section 219.

### MENENDEZ's Public Statements about FARA, and NADINE MENENDEZ's and HANA's Failure to Register

13.     Between at least approximately 2020 and 2022, ROBERT MENENDEZ, the defendant, made multiple requests for the U.S. Department of Justice to commence an investigation against another person for allegedly failing to register under FARA.  In particular, on or about May 18, 2020, MENENDEZ sent a letter to the then-head of the National Security

Division asking the Department of Justice to investigate another individual who had previously

served as a Member of Congress (the "Former Member of Congress") for allegedly failing to

register as a foreign agent. In that letter, MENENDEZ stated, "The Act is clear that acting

directly or indirectly in any capacity on behalf of a foreign principal triggers the requirement to

register under FARA." Moreover, on or about May 4, 2022, MENENDEZ sent a second letter to

the U.S. Attorney General reiterating his request that the Former Member of Congress be

investigated for allegedly failing to register as a foreign agent. In that second letter,

MENENDEZ stated, "If [the Former Member of Congress] carried out work that requires

registration under FARA, it is imperative that the Justice Department ensure he is held to

account." The first of these letters was posted on the official public website for MENENDEZ's

Senate office and the official public website for the SFRC, and the second of these letters was

posted on the official public website for the SFRC.

14.      As a public official, ROBERT MENENDEZ, the defendant, was prohibited from

serving as a foreign agent.

15.      NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a

"Will Hana," the defendants, have never registered as foreign agents or lobbyists.

## MENENDEZ Agrees to Take Actions that Benefit Egypt and HANA in Exchange for Promises of Things of Value

16.      In or about early 2018, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the

defendant, informed WAEL HANA, a/k/a "Will Hana," the defendant, that she was dating

ROBERT MENENDEZ, the defendant. In the following months and years, HANA and

NADINE MENENDEZ worked to introduce Egyptian intelligence and military officials to

MENENDEZ for the purpose of establishing and solidifying a corrupt agreement in which

HANA, with assistance from FRED DAIBES and JOSE URIBE, the defendants, provided

8

hundreds of thousands of dollars of bribes to MENENDEZ and NADINE MENENDEZ, in

exchange for MENENDEZ's acts and breaches of duty to benefit the Government of Egypt,

HANA, and others, including with respect to foreign military sales and foreign military

financing.

### *Background on Foreign Military Sales and Foreign Military Financing*

17.     At all times relevant to this Indictment, Egypt was among the largest recipients in

the world of U.S. military aid. Between approximately 2018 and approximately 2022, the U.S.

Government supplied substantial military aid to Egypt, including in the form of grants of over $1

billion per year ("foreign military financing"), and in the form of direct government-to-

government sales of military equipment ("foreign military sales"), which Egypt typically paid for

with foreign military financing, and which the Executive Branch was required to notify Congress

about under certain circumstances prior to going forward with those sales. The U.S. Department

of State (the "State Department") played a central role in reviewing and approving foreign

military sales to Egypt and obligating foreign military financing to Egypt, which was conditioned

on certain certifications being made by the State Department. As a matter of longstanding,

voluntary practice, the State Department would typically honor so-called "holds" placed by the

Chairman or the Ranking Member of the SFRC on both foreign military financing and foreign

military sales. In other words, the State Department would typically not proceed with a transfer

of foreign military financing grant money to Egypt's bank account (located at all relevant times

in Manhattan), or with a foreign military sale to Egypt, while the Chairman or the Ranking

Member of the SFRC had not signed off on, and was maintaining a "hold" on, such a transfer or

sale. As a result, at all times relevant to the Indictment, ROBERT MENENDEZ, the defendant,

9

as the Chairman or the Ranking Member of the SFRC, possessed substantial influence over foreign military sales and foreign military financing to Egypt.

18.    For at least several years prior to 2018, despite its strategically important relationship with the U.S. and in the Middle East, Egypt had often faced resistance in obtaining foreign military financing and foreign military sales. For example, in or about August 2017, the State Department announced that it was withholding $195 million in foreign military financing until Egypt could demonstrate improvements on human rights and democracy, and was canceling an additional $65.7 million in foreign military financing to Egypt. By in or about early 2018, multiple U.S. Senators had raised human rights or rule-of-law objections to foreign military financing to Egypt, and no foreign military sales of offensive military equipment to Egypt requiring congressional notification had been concluded since in or about March 2016.

### *HANA and NADINE MENENDEZ Introduce Egyptian Officials to MENENDEZ for Corrupt Purposes*

19.    In or about 2018, shortly after ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, began dating, WAEL HANA, a/k/a "Will Hana," the defendant, and NADINE MENENDEZ arranged a series of meetings and dinners with MENENDEZ—paid for by HANA or his associates—at which Egyptian officials raised, among other things, requests related to foreign military sales and foreign military financing. In exchange for MENENDEZ and NADINE MENENDEZ's promise that MENENDEZ would, among other things, use his power and authority to facilitate such sales and financing to Egypt, HANA promised, among other things, to put NADINE MENENDEZ on the payroll of his company in a low-or-no-show job. For example:

a.    In or about March 2018, MENENDEZ met with an Egyptian military official ("Egyptian Official-1") and other Egyptian military officials at a meeting arranged and

10

attended by his then-girlfriend NADINE MENENDEZ and her friend HANA. MENENDEZ
allowed NADINE MENENDEZ and HANA to arrange and participate in this meeting, which
took place at MENENDEZ's Senate office in Washington, D.C. and included discussions of
foreign military financing to Egypt, among other topics. A photograph taken during the meeting
is depicted below.



b.      MENENDEZ and NADINE MENENDEZ again met with HANA on or
about May 6, 2018. Later that same day, MENENDEZ sought from the State Department non-
public information regarding the number and nationality of persons serving at the U.S. Embassy
in Cairo, Egypt. Although this information was not classified, it was deemed highly sensitive
because it could pose significant operational security concerns if disclosed to a foreign
government or if made public. Without telling his professional staff, SFRC staff, or the State
Department that he was doing so, on or about May 7, 2018, MENENDEZ texted that sensitive,
non-public embassy information to his then-girlfriend NADINE MENENDEZ, writing:

> Just FYI. [a number] Americans – combination of diplomats,
> commercial service, USAID, other
> [a number] Egyptians, locally employed staff

This is what's at American embassy. [Summary of ratio] are Egyptians working at Embassy.

NADINE MENENDEZ forwarded this message to HANA, who forwarded it to an Egyptian government official ("Egyptian Official-2").

       c.     That same month, in or about May 2018, HANA hosted another dinner at a high-end restaurant with MENENDEZ, during which MENENDEZ disclosed to HANA non-public information about the United States's provision of military aid to Egypt. Shortly after the dinner, HANA texted Egyptian Official-1, "The ban on small arms and ammunition to Egypt has been lifted. That means sales can begin. That will include sniper rifles among other articles."

       d.     Later that month, in or about May 2018, NADINE MENENDEZ conveyed to MENENDEZ a request from an Egyptian official seeking assistance in editing and drafting a letter lobbying other U.S. Senators to support U.S. aid to Egypt. NADINE MENENDEZ explained that she wanted MENENDEZ to prepare the letter because HANA and an Egyptian official, whom she referred to as the "General" in her communications with MENENDEZ, had gotten NADINE MENENDEZ "clearance for a project." In response, MENENDEZ secretly edited and ghost-wrote the requested letter on behalf of Egypt seeking to convince other U.S. Senators to release a hold on $300 million in aid to Egypt. MENENDEZ sent this ghost-written letter to NADINE MENENDEZ from his personal email account. NADINE MENENDEZ forwarded the ghost-written letter to HANA, facilitating HANA's conveyance of the revised draft back to Egyptian officials. Both MENENDEZ and NADINE MENENDEZ deleted the email in which NADINE MENENDEZ asked MENENDEZ to write this letter.

      20.     In or about July 2018, ROBERT MENENDEZ, the defendant, met again with Egyptian Official-1 and multiple other Egyptian military officials to discuss foreign military financing and foreign military sales during a meeting that was arranged, scheduled, and attended

by NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants. In advance of that meeting, the Egyptian Government, through HANA and NADINE MENENDEZ, provided to MENENDEZ briefing materials advocating Egyptian foreign policy goals and positions and setting forth Egypt's requests for the approval of foreign military financing and foreign military sales to Egypt. The next day, MENENDEZ texted NADINE MENENDEZ:

> Tell Will [HANA] I am going to sign off this sale to Egypt today. Egypt: 46,000 120MM Target Practice Rounds and 10,000 Rounds Tank Ammunition: $99 million
>
> NOTE: These tank rounds are for tanks they have had for many years. They are using these in the Sinai for the counter-terrorism campaign.

NADINE MENENDEZ forwarded this text to HANA, who forwarded it to Egyptian Official-1 and Egyptian Official-2. Egyptian Official-1 replied with a "thumbs up" emoji.

21.     On or about May 21, 2019, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, met with an Egyptian intelligence official ("Egyptian Official-3") at MENENDEZ's Senate office in Washington, D.C. During this meeting, the group discussed a human rights matter pertaining to the resolution of a claim involving the serious injuries suffered by an American citizen, who was injured in a 2015 airstrike by the Egyptian military using a U.S.-manufactured Apache helicopter. The incident leading to the citizen's injuries and the perception of certain Members of Congress that the Government of Egypt was not willing to provide fair compensation to the injured citizen for the attack resulted in objections by some Members of Congress to the awarding of certain military aid to Egypt. Shortly after the meeting with Egyptian Offical-3, MENENDEZ conducted a web search for the name of that American citizen and visited a website that contained an article about the citizen's claim. Approximately a week later, using an

13

encrypted messaging application, Egyptian Official-3 texted HANA in Arabic regarding this human rights matter, writing, in part, that if MENENDEZ helped resolve the matter, "he will sit very comfortably," to which HANA replied, "orders, consider it done." Egyptian Official-3 then texted HANA screenshots of a statement from the American citizen's attorney pertaining to the claim, which HANA then forwarded a few days later to NADINE MENENDEZ, who in turn forwarded it to MENENDEZ. NADINE MENENDEZ subsequently deleted her text messages with HANA about this matter.

### MENENDEZ Takes Action to Protect IS EG Halal

#### *HANA Fails to Deliver on Promised Bribe Payments*

22.     WAEL HANA, a/k/a "Will Hana," the defendant, repeatedly promised NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, payments, including through a low-or-no-show job, from IS EG Halal Certified, Inc. ("IS EG Halal"), a New Jersey company that HANA operated with financial support and backing from FRED DAIBES, the defendant, in furtherance of the scheme. However, IS EG Halal had little to no revenue between in or about 2018 and in or about early 2019, and HANA did not deliver on his promises to make those payments during this time period.

23.     After several months of nonpayment following the initial March 2018 meeting described in paragraph 19.a, above, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, complained to multiple associates of WAEL HANA, a/k/a "Will Hana," the defendant, about HANA's failure to pay her, and caused at least one of them to believe that ROBERT MENENDEZ, the defendant, would cease acting for HANA's benefit and at his request, including with respect to Egypt, unless HANA came through on his promises and paid her. NADINE MENENDEZ also complained directly to MENENDEZ about HANA's as-yet-unfulfilled promises, writing, "I have been so upset all morning. Will left for Egypt yesterday

14

supposedly and now thinks he's king of the world and has both countries wrapped around his pinky. I really hope they replace him."

### *HANA Obtains a Lucrative Monopoly for IS EG Halal*

24.    In or about the spring of 2019, the Government of Egypt granted IS EG Halal an exclusive monopoly on the certification of U.S. food exports to Egypt as compliant with halal standards, despite the fact that neither WAEL HANA, a/k/a "Will Hana," the defendant, nor his company, had experience with halal certification. Prior to this action, a number of other U.S. companies had been licensed to certify U.S. meat exports to Egypt for halal compliance for years.

25.    The monopoly for IS EG Halal allowed WAEL HANA, a/k/a "Will Hana," the defendant, to provide payments to NADINE MENENDEZ, a/k/a "Nadine Arslanian," and ROBERT MENENDEZ, the defendants. Indeed, on or about April 7, 2019, an Egyptian government official informed HANA that IS EG Halal was likely to become Egypt's sole halal certifier for imports from the U.S. market. The next day, NADINE MENENDEZ texted MENENDEZ, "Seems like halal went through. It might be a fantastic 2019 all the way around."

### *NADINE MENENDEZ Forms an LLC to Receive Bribe Payments*

26.    In or about June 2019, after IS EG Halal obtained its monopoly, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, formed an entity titled Strategic International Business Consultants, LLC ("Strategic International Business Consultants") in New Jersey, with the assistance of ROBERT MENENDEZ, the defendant. The company was used to receive bribe payments in furtherance of the crimes charged herein. When sending a relative information about the formation of her company, NADINE MENENDEZ stated, by text message, "every time I'm in a middle person for a deal I am asking to get paid and this is my consulting company."

### *MENENDEZ Intervenes to Protect the Lucrative Monopoly*

27.     The IS EG Halal monopoly advanced the scheme by, among other things, providing a revenue stream from which WAEL HANA, a/k/a "Will Hana," the defendant, could make good on the bribe payments he had promised to ROBERT MENENDEZ, the defendant, through NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant. The monopoly also resulted in increased costs for various U.S. meat suppliers and others. As a result, in or about April and May 2019, multiple U.S. Government officials from the U.S. Department of Agriculture ("USDA") contacted the Government of Egypt objecting to and seeking reconsideration of its grant of monopoly rights to IS EG Halal, and the USDA prepared a public report regarding the increased cost for halal certification and the likely disruption to the U.S. market caused by the new monopoly.

28.     During the May 21, 2019 meeting described in paragraph 21 above among ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, and Egyptian Official-3, HANA also requested MENENDEZ's assistance to counter the USDA's objections to IS EG Halal's monopoly. Later that evening, the same participants, along with an Egyptian-American associate of HANA, met at a steakhouse in Washington, D.C. for dinner, during which dinner there was discussion of various matters of foreign policy, and NADINE MENENDEZ stated, "what else can the love of my life do for you?" This dinner is depicted below.



29.     Over the next two days, on or about May 22 and 23, 2019, WAEL HANA, a/k/a

"Will Hana," the defendant, provided NADINE MENENDEZ, a/k/a "Nadine Arslanian," the

defendant, with a variety of materials regarding the USDA's objections to IS EG Halal's

monopoly, some of which HANA received from an Egyptian official.  NADINE MENENDEZ

then texted certain of those materials to ROBERT MENENDEZ, the defendant, who later

deleted them.

30.     On or about May 23, 2019, ROBERT MENENDEZ, the defendant, called a high-

level USDA official ("Official-1") and insisted, in sum and substance, that the USDA stop

opposing IS EG Halal's status as sole halal certifier.  When Official-1 attempted to explain why

the monopoly was detrimental to U.S. interests, MENENDEZ reiterated his demand, in sum and

substance, that the USDA stop interfering with IS EG Halal's monopoly.  Official-1 did not

accede to MENENDEZ's demand, but IS EG Halal nevertheless kept its monopoly.

### *IS EG Halal is Used to Fund Bribe Payments*

31.     After financially benefitting from IS EG Halal's monopoly status as the sole halal certifier, WAEL HANA, a/k/a "Will Hana," the defendant, at times with the assistance of FRED DAIBES and JOSE URIBE, the defendants, provided payments in furtherance of the scheme.

32.     For example, in or about July 2019, after the mortgage company for the residence of NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, initiated foreclosure proceedings, WAEL HANA, a/k/a "Will Hana," the defendant, caused IS EG Halal to pay $23,568.54 to the company that held NADINE MENENDEZ's mortgage to bring NADINE MENENDEZ's mortgage current. HANA made this payment following a series of discussions with NADINE MENENDEZ, as well as JOSE URIBE and FRED DAIBES, the defendants, about various options for bringing the mortgage current. When at one point URIBE responded to NADINE MENENDEZ that HANA might balk at the amount required to bring the mortgage current, NADINE MENENDEZ replied, in part, "When I feel comfortable and plan the trip to Egypt he [*i.e.*, HANA] will be more powerful than the president of Egypt." Thereafter, URIBE and HANA worked to facilitate the payments, and ROBERT MENENDEZ, the defendant, continued taking actions to assist HANA and Egypt, including those discussed below.

33.     A few months later, in or about September 2019, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, texted FRED DAIBES, the defendant, complaining that WAEL HANA, a/k/a "Will Hana," the defendant, had not paid her what he owed her. DAIBES replied to NADINE MENENDEZ, "Nadine I personally gave Bob a check for September."

34.     Several days later, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, texted ROBERT MENENDEZ, the defendant, to complain that WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, had not made payments, writing, "I am soooooo upset," stating that HANA had not left her an envelope, and remarking, "I thought Fred

18

[DAIBES] would make sure it's there and the second day in a row there is nothing." NADINE

MENENDEZ also wrote, "I thought after everything that happened especially last Saturday and

that week [referring to meetings MENENDEZ had with senior Egyptian officials] that at least he

would honor his word one time I don't know if I should text Fred [DAIBES] or wait what should

I do?" MENENDEZ responded, "No, you should not text or email." Soon thereafter, NADINE

MENENDEZ called DAIBES. IS EG Halal issued a $10,000 check to Strategic International

Business Consultants the next day, on or about September 28, 2019. In total, IS EG Halal issued

three $10,000 checks to Strategic International Business Consultants, dated August 30,

September 28, and November 5, 2019, which DAIBES helped provide or facilitate.

### *HANA and DAIBES Continue to Seek Action from MENENDEZ for Egypt*

35.    During the same period when IS EG Halal issued these checks, on or about

September 9, 2019, Egyptian Official-3 texted WAEL HANA, a/k/a "Will Hana," the defendant,

that "[A State Department employee] told [an Egyptian diplomatic official] today that senator

Menendize [sic] put an [sic] hold on a billion $ of usaid to Egypt before the recess !!!!" and "Is

this true ?" HANA responded to Egyptian Official-3 that HANA would ask. HANA then

attempted to contact NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant. Several

minutes later, HANA called FRED DAIBES, the defendant, via an encrypted messaging

program, and forwarded Egyptian Official-3's text message to DAIBES. DAIBES promptly

called ROBERT MENENDEZ, the defendant, and then DAIBES called HANA back via the

same encrypted messaging program. Less than two minutes later, HANA texted Egyptian

Official-3, writing that it was not true and "he" (*i.e.*, MENENDEZ) did not know anything about

the hold on U.S. aid to Egypt.

36.    Also in or about September 2019, ROBERT MENENDEZ, the defendant, offered

to provide his assistance to Egypt and to WAEL HANA, a/k/a "Will Hana," the defendant,

19

during an official trip to India. Following a dinner among HANA, MENENDEZ, and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, HANA texted Egyptian Official-3, "our man [MENENDEZ] is traveling to India after two weeks and he is asking if there any message we need or anything for ISEG?" Later that same month, MENENDEZ, HANA, and FRED DAIBES, the defendant, met in Manhattan with Egyptian Official-3.

37.     The meetings between ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, and Egyptian officials, and the receipt of things of value by MENENDEZ and NADINE MENENDEZ in exchange for MENENDEZ's promises to take actions favorable to Egypt and WAEL HANA, a/k/a "Will Hana," the defendant, and others, continued through 2020 and into 2022. For example:

    a.     In or about March 2020, NADINE MENENDEZ texted Egyptian Official-3, "anytime you need anything you have my number and we will make everything happen." A few days later she arranged for MENENDEZ to meet with Egyptian Official-3, whom NADINE MENENDEZ referred to as "the general," regarding negotiations between Egypt, Ethiopia, and Sudan over a dam on the Nile River being built by Ethiopia, known as the Grand Ethiopian Renaissance Dam (the "Dam"), which was generally regarded as one of the most important foreign policy issues for Egypt. Within one month, in or about April 2020, MENENDEZ wrote a letter to the then-Secretary of the Treasury and the then-Secretary of State regarding the Dam, beginning the letter, "I am writing to express my concern about the stalled negotiations between Egypt, Ethiopia, and Sudan over [the Dam]," and stating, "I therefore urge you to significantly increase the State Department's engagement on negotiations surrounding the [Dam]."

    b.     In or about October 2020, MENENDEZ and NADINE MENENDEZ met for dinner with Egyptian Official-3 and another Egyptian official ("Egyptian Official-4") at a restaurant in Edgewater, New Jersey. After this dinner, NADINE MENENDEZ and Egyptian

Official-4 began texting with each other on an ongoing basis and had additional in-person meetings, including a dinner they had in or about December 2020 with MENENDEZ and Egyptian Official-3.

   c.  In or about early 2021, HANA used IS EG Halal funds to cause two exercise machines and an air purifier, among other items, collectively worth thousands of dollars, to be purchased online and delivered to the house of MENENDEZ and NADINE MENENDEZ.

   d.  On or about June 21, 2021, NADINE MENENDEZ and Egyptian Official-4 organized a private meeting between MENENDEZ and a senior Egyptian intelligence official ("Egyptian Official-5") in a hotel in Washington, D.C. prior to a meeting between Egyptian Official-5 and other U.S. Senators the next day. On the day of the private meeting, MENENDEZ provided NADINE MENENDEZ with a copy of a news article reporting on questions that other U.S. Senators intended to ask Egyptian Official-5 regarding a human rights issue. NADINE MENENDEZ then sent that article to Egyptian Official-4, who responded, "Thanks you so much, chairman [*i.e.*, MENENDEZ, the Chairman of the SFRC] also raised it today, we appreciate it." The next day, NADINE MENENDEZ texted Egyptian Official-4 that she hoped the article she had sent was helpful, and stated, "I just thought it would be better to know ahead of time what is being talked about and this way you can prepare your rebuttals."

   e.  On or about June 23, 2021—*i.e.*, two days after the private meeting between MENENDEZ and Egyptian Official-5—HANA purchased 22 one-ounce gold bars, each with a unique serial number. Two of these one-ounce gold bars were subsequently found during the court-authorized search in June 2022 of the residence of MENENDEZ and NADINE MENENDEZ. During the relevant time periods, the spot market price of gold was approximately $1,800 per ounce.

f.       In or about the fall of 2021, NADINE MENENDEZ communicated directly with Egyptian Official-4 to arrange a trip for MENENDEZ and NADINE MENENDEZ to Egypt, which they took in or about October 2021.  NADINE MENENDEZ and Egyptian Official-4 originally planned the trip as an unofficial visit, and therefore without supervision from the State Department.  When an SFRC staffer contacted the U.S. Embassy in Cairo regarding the trip, causing the planned trip to become a formal congressional delegation under the supervision of the State Department, Egyptian Official-4 texted NADINE MENENDEZ "i will probably loose [sic] my job" and "SOS".  NADINE MENENDEZ forwarded this text to MENENDEZ.  HANA was also in Egypt during MENENDEZ's and NADINE MENENDEZ's trip, and they met for at least one dinner while there.  During that trip, MENENDEZ and NADINE MENENDEZ also met with multiple Egyptian officials, including for a private dinner at the home of Egyptian Official-5, a photo of which is below.



g.       In or about January 2022, MENENDEZ sent NADINE MENENDEZ a link to a news article reporting on two pending foreign military sales to Egypt totaling

approximately \$2.5 billion dollars. NADINE MENENDEZ forwarded this link to HANA, writing, "Bob had to sign off on this."

38.     In exchange for the promises and acts set forth above, WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, provided multiple things of value to ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, including with the assistance of JOSE URIBE, the defendant. Those things of value included hundreds of thousands of dollars in checks, cash, and gold, some of which was recovered during the June 2022 court-authorized search of the residence of MENENDEZ and NADINE MENENDEZ described above. NADINE MENENDEZ caused some of the gold to be sold in Manhattan prior to the search and deposited the proceeds into bank accounts she controlled.

## MENENDEZ Agrees to Disrupt New Jersey State Criminal Matters in Exchange for a Mercedes-Benz Convertible

39.     In or about 2019, WAEL HANA, a/k/a "Will Hana," and JOSE URIBE, the defendants, offered and then helped to buy a new Mercedes-Benz C-300 convertible (the "Mercedes-Benz Convertible") worth more than \$60,000 for NADINE MENENDEZ, a/k/a "Nadine Arslanian," and ROBERT MENENDEZ, the defendants. In exchange, MENENDEZ agreed and sought to interfere in a New Jersey state criminal prosecution of an associate of URIBE (the "New Jersey Defendant") and a state criminal investigation involving an employee of URIBE (the "New Jersey Investigative Subject"), whom URIBE referred to as a relative in communicating with NADINE MENENDEZ. Specifically, MENENDEZ contacted a senior state prosecutor in the Office of the New Jersey Attorney General who supervised the prosecution of the New Jersey Defendant and the investigation involving the New Jersey Investigative Subject ("Official-2") in an attempt, through advice and pressure, to cause Official-2 to resolve these matters favorably to the New Jersey Defendant and the New Jersey

23

Investigative Subject. Official-2 considered ROBERT MENENDEZ's actions inappropriate and did not agree to intervene.

### *MENENDEZ Agrees to Disrupt the Prosecution of the New Jersey Defendant*

40. The first matter that ROBERT MENENDEZ, the defendant, agreed to attempt to influence concerned the New Jersey Defendant. The New Jersey Defendant was an associate of JOSE URIBE, the defendant, and was charged with insurance fraud relating to a trucking company ("Trucking Company-1"), the insurance of which was brokered by a company controlled by URIBE (the "Insurance Company"). The New Jersey Investigative Subject, an employee of URIBE who worked at the Insurance Company and whom he referred to as a relative, allegedly was involved in submitting the insurance applications at issue in the New Jersey Defendant's criminal case. URIBE was implicated in the conduct with which the New Jersey Defendant was charged, and URIBE raised concerns about the case to WAEL HANA, a/k/a "Will Hana," the defendant, among others, writing in or about April 2018 about the case that "the deal is to kill and stop all investigation."

41. NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, was involved in a car accident in or about December 2018 that left her without a car. On multiple occasions up to and including in or about January 2019, NADINE MENENDEZ sent text messages to WAEL HANA, a/k/a "Will Hana," the defendant, about her lack of a car.

42. Beginning in or about January 2019, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," and JOSE URIBE, the defendants, agreed that MENENDEZ would attempt to intervene with Official-2 to influence the prosecution of the New Jersey Defendant in exchange for a car. For example:

a. On or about January 26, 2019, NADINE MENENDEZ invited HANA and URIBE to a dinner with her and MENENDEZ. MENENDEZ, NADINE MENENDEZ, and

24

HANA had the dinner on or about January 27 without URIBE, who could not attend because of a scheduling conflict. After the dinner, HANA sent NADINE MENENDEZ a series of text messages providing facts about the prosecution of the New Jersey Defendant. NADINE MENENDEZ subsequently deleted these text messages.

  b. On or about January 29, 2019—*i.e.*, two days after the dinner described in paragraph 42.a, above—MENENDEZ called Official-2 and spoke with him in an attempt, through advice and pressure, to cause a resolution of the prosecution in the New Jersey Defendant's favor. In preparation for this call, MENENDEZ requested and received multiple text messages from NADINE MENENDEZ about the New Jersey Defendant, including the charges he was facing, which NADINE MENENDEZ, in turn, requested and received from HANA. MENENDEZ and NADINE MENENDEZ both subsequently deleted these text messages.

  c. After being contacted by MENENDEZ, to avoid any potential inappropriate influence in the case, Official-2 did not share with the prosecution team that MENENDEZ had contacted him about the matter, and did not intervene in the matter. Nonetheless, in or about April 2019, the New Jersey Defendant resolved his criminal prosecution with a guilty plea pursuant to a plea agreement that recommended a non-incarceratory sentence. This resolution was more favorable for the New Jersey Defendant than the prosecutors' initial plea offer earlier in the case.

### *URIBE Provides NADINE MENENDEZ with a Luxury Car*

  43. After ROBERT MENENDEZ, the defendant, agreed to and did call Official-2 about the New Jersey Defendant's case in or about January 2019, WAEL HANA, a/k/a "Will Hana," and JOSE URIBE, the defendants, worked to provide NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, with the Mercedes-Benz Convertible, as HANA had

25

previously promised. Only a few days after MENENDEZ's first call to Official-2, on or about February 3, 2019, NADINE MENENDEZ texted HANA, "All is GREAT! I'm so excited to get a car next week. !!" After some delays, URIBE ultimately facilitated NADINE MENENDEZ's purchase of the car through the following events, among others:

      a.     On or about March 12, 2019, NADINE MENENDEZ called URIBE and spoke with him for over 21 minutes. After the call, URIBE texted NADINE MENENDEZ, "I am real. I will stand by my word."

      b.     On or about March 27, 2019, URIBE texted NADINE MENENDEZ the information for a Mercedes-Benz dealership in Edison, New Jersey. Over the next several days, URIBE worked to put NADINE MENENDEZ in touch with a salesman at the car dealership. Once at the dealership, NADINE MENENDEZ sent MENENDEZ photos of two different cars to seek his input on the color scheme.

      c.     On or about April 3, 2019, NADINE MENENDEZ texted a Mercedes-Benz car dealership salesperson that URIBE said she would be going to the dealership on April 5 to pick up the car. Later that day, URIBE texted an associate ("Associate-1"), a message roughly translated from Spanish as, "I did everything on this side. I need 15k cash this afternoon." Later that day, NADINE MENENDEZ texted URIBE, "You are a miracle worker who makes dreams come true I will always remember that."

      d.     On or about April 4, 2019, NADINE MENENDEZ left MENENDEZ a voicemail saying that she was going "to meet Jose for five minutes" and then met URIBE in the parking lot of a restaurant where URIBE provided NADINE MENENDEZ with approximately $15,000 in cash.

      e.     The next day, NADINE MENENDEZ purchased the Mercedes-Benz Convertible, making a $15,000 down payment with a combination of cash, a credit card, and

several checks, and taking out an automotive loan to finance the remainder of the approximately

$60,000 purchase price. A number of the statements NADINE MENENDEZ made on the

application in order to secure the loan financing were false, including statements about her

employment and income. After the purchase was complete, NADINE MENENDEZ messaged

MENENDEZ, "Congratulations mon amour de la vie, we are the proud owners of a 2019

Mercedes. ♥." Later that day, after URIBE asked her, "are you happy?," NADINE

MENENDEZ responded, "I will never forget this." NADINE MENENDEZ later texted

MENENDEZ a photo of the Mercedes-Benz Convertible, which is below.



   f.  After initially providing cash to NADINE MENENDEZ to purchase the

Mercedes Benz Convertible, URIBE subsequently caused monthly financing payments to be paid

for the car, which were routed either through one of his business associates or through a

company he controlled. In order to make the initial payments, in or about early May 2019,

URIBE asked a business associate of his ("Associate-2") to make a payment for the Mercedes-

27

Benz Convertible from Associate-2's corporate bank account, which had previously been opened at a bank branch in the Bronx. URIBE explained to Associate-2, in making this request, that he did not want his own name to be associated with the payment. URIBE and Associate-2 manually made each periodic payment from in or about May 2019 through in or about October 2019, either from Associate-2's bank account or from an account owned by a trucking company nominally owned by a relative of URIBE ("Trucking Company-2").

### *MENENDEZ Agrees to Disrupt the New Jersey Investigation*

44.     In or about late July 2019, a New Jersey detective sought to interview the New Jersey Investigative Subject in a criminal investigation related to the prosecution of the New Jersey Defendant. Following that interview request, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and JOSE URIBE, the defendants, agreed that MENENDEZ would attempt to intervene with Official-2 again. For example:

a.     After learning of this interview request, URIBE contacted NADINE MENENDEZ and met with her on or about the evening of July 31, 2019. The next morning, URIBE sent NADINE MENENDEZ a series of texts saying that he did not want anyone to "bother" the New Jersey Investigative Subject (who as discussed above in paragraph 40 was an insurance broker at the Insurance Company he controlled), and also saying that "[w]e need to make things go away," "[w]e need to move fast," and "[w]e can still stop this." That day, NADINE MENENDEZ wrote to URIBE, among other things, that she would "address it first thing tomorrow morning or tonight depending on when he [*i.e.*, MENENDEZ] is home," and adding, "he will be home first thing tomorrow I will address it first thing tomorrow and have the phone calls go out." Later that day, MENENDEZ performed a Google search for the initials of the state agency employing the insurance fraud investigator who was seeking to interview the New Jersey Investigative Subject. A few days later NADINE MENENDEZ texted URIBE that

MENENDEZ had commented about URIBE's two requests related to these criminal matters, that "it would've been so so easy if we had wrapped both [requests] together."

    b. On or about September 3, 2019, URIBE—who at this point had been making the periodic payments for the Mercedes-Benz Convertible for several months—texted NADINE MENENDEZ, "Please don't forget about me. I will never forget about you" and "I need peace." The next day, on or about September 4, 2019, MENENDEZ called Official-2 to schedule an in-person meeting with Official-2 for September 6, 2019, at MENENDEZ's Senate office in Newark, New Jersey. The day after that call—*i.e.*, September 5, 2019—URIBE, MENENDEZ, and NADINE MENENDEZ met at NADINE MENENDEZ's house.

    c. On or about September 6, 2019, MENENDEZ met with Official-2 and another senior official at the Office of the New Jersey Attorney General at MENENDEZ's Senate office in Newark, New Jersey in an attempt, through advice and pressure, to cause Official-2 to favorably resolve the investigation involving the New Jersey Investigative Subject. After the meeting, MENENDEZ met with URIBE at MENENDEZ's apartment. URIBE thereafter texted another business associate of his ("Associate-3") that the meeting between MENENDEZ and Official-2 had been a "good meeting" and that—while nothing was final, to URIBE's understanding—MENENDEZ had informed URIBE that the meeting with Official-2 was "very positive."

    d. Over the next several weeks following the September 6, 2019 meeting between MENENDEZ and Official-2, URIBE repeatedly texted NADINE MENENDEZ asking for updates and stating that he needed "peace."

    e. On or about October 29, 2019—the day after URIBE texted NADINE MENENDEZ, "I always text you on Monday in case you have an update. I just need peace."— MENENDEZ called URIBE from his Senate office in Washington, D.C. Within minutes of

getting off the phone, URIBE texted NADINE MENENDEZ, writing, "I just got a call and I am a very happy person." and "GOD bless you and him for ever." Several nights later, MENENDEZ, NADINE MENENDEZ, URIBE, and Associate-3 met for a celebratory dinner and toasted with a bottle of champagne, as depicted below.



f.      On or about November 5, 2019—*i.e.*, several days after receiving the call from MENENDEZ and meeting for the celebratory champagne dinner—URIBE texted NADINE MENENDEZ asking for information that would allow him to set up automatic payments for the Mercedes-Benz Convertible. Two minutes after saying he intended to set up automatic payments, URIBE texted NADINE MENENDEZ again, writing, "I have so much peace. Gracias a DIOS and to you guys."

g.      Neither Official-2 nor the other senior official present at the September 6, 2019 meeting with MENENDEZ described in paragraph 44.c intervened in the investigation involving the New Jersey Investigative Subject. That investigation closed without charges.

30

h.      On or about November 9, 2019, URIBE set up automatic payments for the Mercedes-Benz Convertible.  URIBE caused a trucking company associated with him ("Trucking Company-3") to make at least approximately 32 monthly payments on the Mercedes-Benz Convertible.  Together with the payments URIBE caused Associate-2 to make for the Mercedes-Benz Convertible, URIBE caused more than $30,000 to be paid for the purchase of the car, not including the cash URIBE had provided in a parking lot to NADINE MENENDEZ to pay towards the down payment.

### MENENDEZ Accepts Things of Value, Including Cash and Gold Bars, Knowing that DAIBES Expected MENENDEZ in Exchange to Disrupt a Federal Criminal Prosecution and to Act for the Benefit of the Government of Qatar and DAIBES

45.      From at least in or about December 2020 to at least in or about 2023, ROBERT MENENDEZ, the defendant, accepted things of value from FRED DAIBES, the defendant, knowing that DAIBES expected MENENDEZ in exchange to influence the pending federal prosecution of DAIBES, and to use his influence and power and breach his official duty to benefit the Government of Qatar and DAIBES.  Specifically, MENENDEZ agreed to and did attempt to influence the pending federal prosecution of DAIBES, in exchange for cash, furniture, and gold bars that DAIBES provided to MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant.  Moreover, when he accepted at least certain of those things of value from DAIBES, MENENDEZ knew that DAIBES also expected MENENDEZ in exchange to take action to benefit the Government of Qatar, and thereby benefit DAIBES, who was seeking millions of dollars in investment from a fund with ties to the Government of Qatar.

### *MENENDEZ Promises and Seeks to Disrupt the Prosecution of DAIBES in Exchange for Cash, Furniture, and Gold Bars*

46.      From at least in or about December 2020 to at least in or about early 2022, ROBERT MENENDEZ, the defendant, agreed to attempt to influence and attempted to influence

the pending federal prosecution of FRED DAIBES, the defendant, in exchange for cash, furniture, and gold bars that DAIBES provided to MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, including by recommending that the President nominate a candidate for U.S Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to DAIBES's case, and by attempting to influence the U.S. Attorney's Office for the District of New Jersey to act favorably in DAIBES's case.

47.    In or about December 2020, ROBERT MENENDEZ, the defendant, met with an individual who would later be nominated to be the U.S. Attorney for the District of New Jersey (referred to herein as the "Candidate" or "Official-3," the latter after Official-3's Senate confirmation). At the time of the meeting, the Candidate was an attorney in private practice, and the purpose of his meeting with MENENDEZ was to consider a potential candidacy for U.S. Attorney in New Jersey. In that meeting, MENENDEZ criticized the U.S. Attorney's Office for the District of New Jersey's prosecution of FRED DAIBES, the defendant, and said that he hoped that the Candidate would look into DAIBES's case if the Candidate became the U.S. Attorney. MENENDEZ did not mention any other case in the meeting. After the meeting, the Candidate informed MENENDEZ that he might have to recuse himself from the DAIBES prosecution as a result of a matter he had handled in private practice involving DAIBES. MENENDEZ subsequently informed the Candidate that MENENDEZ would not put forward the Candidate's name to the White House for a recommendation to be nominated by the President for the position of U.S. Attorney. MENENDEZ also told the Candidate that MENENDEZ would be recommending a different individual for the position.

48.    Instead of the Candidate, ROBERT MENENDEZ, the defendant, recommended a different individual for U.S. Attorney. FRED DAIBES, the defendant, believed that different

individual would likely be sympathetic to him. In or about the spring of 2021, a series of news reports critical of the other individual were published.

49.     During that time period, in or about the spring of 2021, an individual (the "Advisor") associated with ROBERT MENENDEZ, the defendant, spoke to the Candidate and discussed, among other things, the possibility of the Candidate recusing from the prosecution of FRED DAIBES, the defendant. Subsequently, the Advisor informed MENENDEZ that the Advisor believed that the Candidate would likely not have to recuse from the prosecution of DAIBES. On or about May 2, 2021, in connection with MENENDEZ's potential recommendation of the Candidate, the Advisor texted MENENDEZ, "I think if you call [the Candidate], you'll be comfortable with what he says."

50.     Following the events set forth in paragraph 49, ROBERT MENENDEZ, the defendant, recommended to the President that the Candidate be nominated for the position of U.S. Attorney for the District of New Jersey.

51.     On or about October 17, 2021, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, returned from a trip in which they traveled to Qatar as well as to Egypt, as described in paragraph 37.f, landing at John F. Kennedy International Airport. Upon their arrival, a driver for FRED DAIBES, the defendant ("DAIBES's Driver"), picked up MENENDEZ and NADINE MENENDEZ from the airport and drove them to their home in New Jersey. The next day, MENENDEZ performed a web search for "how much is one kilo of gold worth."

52.     Following the recommendation by ROBERT MENENDEZ, the defendant, of the Candidate as described in paragraph 50, above, the Candidate was nominated by the President, confirmed by the Senate, and sworn in as U.S. Attorney for the District of New Jersey in or about December 2021 (hereinafter, Official-3).

53.     Shortly after the swearing in, on the basis of information that Official-3 provided to the U.S. Department of Justice to determine whether a recusal was warranted, Official-3 was informed that Official-3 was recused from the prosecution of FRED DAIBES, the defendant. Official-3 and the U.S. Attorney's Office for the District of New Jersey implemented that recusal.  After Official-3 became the U.S. Attorney, the following events took place, among others:

a.     On or about December 23, 2021, the trial of DAIBES, which had previously been scheduled for January 2022, was adjourned for reasons related to the COVID-19 pandemic.  Later that day, DAIBES texted NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, and asked how ROBERT MENENDEZ, the defendant, who had recently sustained a shoulder injury, was doing.  NADINE MENENDEZ responded that MENENDEZ was doing better having heard that the trial date was adjourned, and that MENENDEZ was "FIXATED on it."  DAIBES responded, "Good I don't want him to be upset over it. This is not his fault he was amazing in all he did he's an amazing friend and as loyal as they come.  How is the shoulder is he sleeping.  Let me know if I can get him a recliner it helped me sleep." DAIBES thereafter provided a recliner to MENENDEZ.

b.     On or about January 21, 2022, MENENDEZ called Official-3 and asked the identity of Official-3's First Assistant U.S. Attorney ("Official-4").  As a result of Official-3's recusal, Official-4 had supervisory responsibility over the prosecution of DAIBES.

c.     On or about January 22, 2022, MENENDEZ and DAIBES called DAIBES's lawyer to complain that the lawyer had not been aggressive enough in attempting to get DAIBES's case dismissed.

d.     On or about January 24, 2022, DAIBES's Driver exchanged two brief calls with NADINE MENENDEZ.  NADINE MENENDEZ then texted DAIBES, writing,

"Thank you. Christmas in January." DAIBES's Driver's fingerprints were later found on an envelope containing thousands of dollars of cash recovered from the residence of MENENDEZ and NADINE MENENDEZ in New Jersey. This envelope also bore DAIBES's DNA and was marked with DAIBES's return address. In or about the early afternoon of January 24, 2022— *i.e.*, approximately two hours after NADINE MENENDEZ had texted DAIBES thanking him and writing "Christmas in January"—MENENDEZ called Official-4, in a call lasting for approximately 15 seconds. This was MENENDEZ's first phone call to Official-4. On or about January 29, 2022—*i.e.*, several days after NADINE MENENDEZ had texted DAIBES, thanking him and writing "Christmas in January"—MENENDEZ performed a Google search for "kilo of gold price."

        e.      On or about January 31, 2022, MENENDEZ again called Official-4, in a call lasting for approximately one minute and 24 seconds. Within minutes of the end of his call with Official-4, MENENDEZ called DAIBES.

        f.      Between approximately in or about December 2021 and February 2022, MENENDEZ directed the Advisor to ask Official-3, who was at the time the U.S. Attorney for the District of New Jersey, why he had recused himself from the prosecution of DAIBES, when MENENDEZ had previously believed that he would not recuse himself. The Advisor declined to do so.

        g.      Later, in or about late March 2022, the Advisor informed MENENDEZ that he was planning to have lunch with Official-3. MENENDEZ told the Advisor, in sum and substance, that he was frustrated with the way the U.S. Attorney's Office was handling the prosecution of DAIBES, and further told the Advisor to tell Official-3 to give DAIBES "all due process," notwithstanding that, as MENENDEZ knew, Official-3 was recused from the matter. The Advisor had the lunch with Official-3, but did not pass on the message from MENENDEZ.

h.      On or about March 30, 2022, NADINE MENENDEZ met for lunch with

DAIBES. Following the lunch, NADINE MENENDEZ texted DAIBES, "THANK YOU Fred

♣ ✖ ⬤ ♥ ." The next day, NADINE MENENDEZ met with a jeweler (the "Jeweler"), who

was friends with DAIBES and WAEL HANA, a/k/a "Will Hana," the defendant, and texted with

DAIBES about the fact that she was meeting the Jeweler. At that meeting, NADINE

MENENDEZ provided the Jeweler two one-kilogram gold bars to be sold. At that time, the spot

market price for gold was over $60,000 per kilogram. NADINE MENENDEZ falsely told the

Jeweler, in sum and substance, that the gold came from her mother. A court-authorized search of

NADINE MENENDEZ's phone later found a photograph, taken the day of NADINE

MENENDEZ's meeting with the Jeweler, of two one-kilogram gold bars marked with serial

numbers indicating they had previously been possessed by DAIBES. A portion of this

photograph is below.



54.     Official-3 and Official-4 did not pass on to the prosecution team the fact that

ROBERT MENENDEZ, the defendant, had contacted them as described in the above

paragraphs, and they did not treat the case differently as a result of the above-described contacts.

In or about April 2022, FRED DAIBES, the defendant, pled guilty pursuant to a plea agreement that provided for a probationary sentence.

### *MENENDEZ Accepts Cash and Gold Bars Knowing that DAIBES Expected Him in Exchange to Assist DAIBES by Performing Acts for the Benefit of the Government of Qatar*

55.    From in or about 2021 through in or about 2023, ROBERT MENENDEZ, the defendant, accepted payment from FRED DAIBES, the defendant, knowing that DAIBES expected MENENDEZ in exchange to use his influence and power and breach his official duty to assist DAIBES, who was seeking a multimillion-dollar investment from an investment company with ties to the Government of Qatar (the "Qatari Investment Company"), by performing acts to benefit the Government of Qatar.  Specifically, MENENDEZ accepted, among other things, at least certain of the same cash and gold bars described in paragraphs 46-54, above, from DAIBES, knowing that DAIBES also expected MENENDEZ in exchange to seek to induce the Qatari Investment Company to invest with DAIBES, including by taking action favorable to the Government of Qatar.

56.    During the pendency of his criminal prosecution in the District of New Jersey, FRED DAIBES, the defendant, sought financing for a real estate project in New Jersey and with which he was involved.  In or about June 2021, ROBERT MENENDEZ, the defendant, introduced DAIBES to an investor who was a member of the Qatari royal family and the principal of the Qatari Investment Company (the "Qatari Investor").  The Qatari Investor proceeded to consider and negotiate a multimillion-dollar investment into the real estate project.

57.    While the Qatari Investment Company was considering the potential investment into the real estate development owned by FRED DAIBES, the defendant, ROBERT MENENDEZ, the defendant, made multiple public statements supporting the Government of Qatar.  MENENDEZ provided DAIBES with these statements so that DAIBES could share them

with the Qatari Investor and a Qatari government official associated with the Qatari Investment

Company ("Qatari Official-1"). For example, on or about August 20, 2021, MENENDEZ used

an encrypted messaging application to send DAIBES the text of a press release in which

MENENDEZ praised the Government of Qatar, and several minutes later used the application to

text DAIBES, "You might want to send to them. I am just about to release." Shortly thereafter,

the Qatari Investor messaged Qatari Official-1, "I received copy from F."

58. The next month, in or about September 2021, ROBERT MENENDEZ and FRED

DAIBES, the defendants, attended a private event in Manhattan hosted by the Qatari

government. Several days later, on or about September 27, 2021, DAIBES sent MENENDEZ,

via an encrypted messaging application, photographs of a computer monitor depicting luxury

wristwatches with prices ranging from $9,990 to $23,990, and asked MENENDEZ, "How about

one of these." The photographs are depicted below:

 

Two days later, on or about September 29, 2021, DAIBES used the same encrypted messaging

application to text MENENDEZ a link to a website tracking a Senate resolution supportive of

Qatar, which reflected that one day earlier the resolution had been introduced and referred to the SFRC.

59.     As described in paragraph 51, on or about October 17, 2021—*i.e.*, several weeks after the messages from FRED DAIBES, the defendant, to ROBERT MENENDEZ, the defendant, described in paragraph 58, above—following the return of MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, from a trip to Qatar and Egypt—DAIBES's Driver picked up MENENDEZ and NADINE MENENDEZ at the airport, and the next day MENENDEZ performed a web search for "how much is one kilo of gold worth."

60.     In or about November 2021, the Qatari Investment Company was still considering the proposed investment in the real estate project of FRED DAIBES, the defendant. That month, on or about November 4, 2021—*i.e.*, less than three weeks after ROBERT MENENDEZ, the defendant, performed the web search described in paragraph 59—DAIBES used an encrypted messaging application to send MENENDEZ an update on the proposed Senate resolution supportive of Qatar.

61.     On or about January 4, 2022, in advance of a planned trip by FRED DAIBES, the defendant, to meet with the Qatari Investor in London, ROBERT MENENDEZ, the defendant, used an encrypted messaging application to text the Qatari Investor and DAIBES, "Greetings. I understand my friend is going to visit with you on the 15th of the month. I hope that this will result in the favorable and mutually beneficial agreement that you have been both engaged in discussing."

62.     On or about March 31, 2022—*i.e.*, the day of the sale by NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, of gold bars described in paragraph 53.h—ROBERT MENENDEZ and FRED DAIBES, the defendants, met for dinner. That evening, NADINE

MENENDEZ texted MENENDEZ, "Is it just you, Fred and the Qataris in the private room this entire time?" and MENENDEZ replied in the affirmative.

63.     In or about early May 2022, Qatari Official-1, at the request of ROBERT MENENDEZ, the defendant, provided a close relative (the "Relative") of NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, with tickets to the 2022 Formula One Grand Prix race held in Miami, Florida.

64.     In or about May 2022, following a meeting between ROBERT MENENDEZ and FRED DAIBES, the defendants, and the Qatari Investor and Qatari Official-1 in New Jersey, the Qatari Investment Company signed a letter of intent to enter into a joint venture with a company controlled by DAIBES. Thereafter, DAIBES provided MENENDEZ with at least one gold bar. Three days after the signing of the letter of intent for the Qatari Investment Company's investment with DAIBES, on or about May 26, 2022, MENENDEZ, DAIBES, and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, met for dinner in Edgewater, New Jersey, at approximately 7:30 PM. Later that evening, at approximately 10:30 PM, MENENDEZ performed a Google search for "one kilo gold price".

65.     As noted above, in or about June 2022, a court-authorized search of the residence of ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, revealed, among other things, approximately two one-kilogram gold bars and nine one-ounce gold bars that had serial numbers indicating they had previously been possessed by FRED DAIBES, the defendant. The search also revealed that the residence contained, among other things, hundreds of thousands of dollars of cash, including approximately ten envelopes of cash, with tens of thousands of dollars, bearing the fingerprints and/or DNA of DAIBES. One of those envelopes also bore, in addition to the fingerprints of DAIBES, the fingerprints of MENENDEZ.

66.     In or about 2023, the Qatari Investment Company entered into a joint venture with a company controlled by FRED DAIBES, the defendant, and invested tens of millions of dollars into the project. Thereafter, ROBERT MENENDEZ, the defendant, continued to receive things of value from the Qatari Investment Company. In particular, in or about May 2023, the Qatari Investor caused four tickets for the 2023 Formula One Grand Prix race held in Miami to be provided to the Relative.

67.     At all times relevant to this Indictment, ROBERT MENENDEZ, the defendant, was required as a U.S. Senator to file annual financial disclosure forms listing, among other things, income received by him or his spouse in each calendar year. At all times relevant to this Indictment, MENENDEZ did not disclose, among other things, the receipt of any payments towards the Mercedes-Benz Convertible for the benefit of him or of NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, the receipt of any cash or gold bars by him or by NADINE MENENDEZ, or the Miami Grand Prix tickets for the Relative, in any relevant calendar year.

### MENENDEZ and NADINE MENENDEZ Seek to Cover Up the Bribery Scheme

68.     In or about June 2022, federal agents executed court-authorized search warrants on the residence of ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, among other places, and served subpoenas issued by a federal grand jury sitting in the Southern District of New York on MENENDEZ, NADINE MENENDEZ, JOSE URIBE, the defendant, and IS EG Halal (the "Subpoenas"). The Subpoenas sought documents pertaining to, among other things, payments by URIBE for the Mercedes-Benz Convertible, and payments WAEL HANA, a/k/a "Will Hana, the defendant, caused IS EG Halal to make to NADINE MENENDEZ's mortgage company. After service of the Subpoenas, URIBE ceased making payments on the Mercedes-Benz Convertible.

41

69.     In or about December 2022, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, sought to return the bribe money that WAEL HANA, a/k/a "Will Hana," the defendant had caused IS EG Halal to pay to the mortgage company in July 2019 to avoid foreclosure on NADINE MENENDEZ's home, as described in paragraph 32 above. When MENENDEZ and NADINE MENENDEZ did so, they falsely characterized the return of the bribe money as repayment for a loan.  In particular, on or about December 11, 2022, MENENDEZ wrote NADINE MENENDEZ a check for $23,569, bearing the handwritten memo line "To Liquidate loan", which NADINE MENENDEZ deposited.  The next day, on or about December 12, 2022, NADINE MENENDEZ wrote a check for $23,568.54 to HANA's counsel, in trust for HANA, with the handwritten memo line "Full payment of Wael Hana loan," along with a handwritten letter that stated, in part, that the check was "in full payment of a personal loan he [*i.e.*, HANA] gave me [*i.e.*, NADINE MENENDEZ]."  However, in truth and in fact, and as MENENDEZ and NADINE MENENDEZ well knew, the payment of $23,568.54 that HANA caused to be made to NADINE MENENDEZ's mortgage company, as described in paragraph 32, was not a loan, but a bribe payment.

70.     In or about at least December 2022, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, sought to return to JOSE URIBE, the defendant, some, but not all, of the bribe money URIBE had paid to obtain the Mercedes-Benz Convertible, as described above in paragraphs 43.d, 43.f, and 44.h.  When MENENDEZ and NADINE MENENDEZ did so, they falsely characterized the return of the bribe money as repayment for a loan. In particular, on or about December 23, 2022, MENENDEZ wrote NADINE MENENDEZ a check for $23,000 with the memo line "for car payment," which NADINE MENENDEZ deposited.  Shortly thereafter, NADINE MENENDEZ wrote URIBE a check for $21,000 with the memo line "personal loan."  However, in truth and in fact, and as MENENDEZ

and ROBERT MENENDEZ well knew, the funds URIBE provided to NADINE MENENDEZ

(including the cash URIBE provided to her in the parking lot) were not a loan, but bribe payments.

## COUNT ONE
### (Conspiracy to Commit Bribery)
### (As to All Defendants)

The Grand Jury charges:

71.     The allegations contained in paragraphs one through 70 of this Indictment are

repeated, realleged, and incorporated as if fully set forth herein.

72.     From at least in or about January 2018 through at least in or about 2023, in the

Southern District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ,

a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," JOSE URIBE, and FRED

DAIBES, the defendants, while DAIBES was released under Chapter 207 of Title 18 of the

United States Code, and others known and unknown, willfully and knowingly combined,

conspired, confederated, and agreed together and with each other to commit bribery of a federal

employee, in violation of Title 18, United States Code, Sections 201(b)(1)(A) and (C) and

(b)(2)(A) and (C).

73.     It was a part and an object of the conspiracy that ROBERT MENENDEZ, the

defendant, and others known and unknown, being a public official, directly and indirectly, would

and did corruptly demand, seek, receive, accept, and agree to receive and accept something of

value personally and for another person and entity, in return for being influenced in the

performance of an official act and for being induced to do an act and omit to do an act in

violation of his official duty, in violation of Title 18, United States Code, Section 201(b)(2)(A)

and (C).

74.     It was further a part and an object of the conspiracy that NADINE MENENDEZ,

a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," JOSE URIBE, and FRED

43

DAIBES, the defendants, and others known and unknown, directly and indirectly, would and did corruptly give, offer, and promise something of value to a public official, and offer and promise a public official to give something of value to another person and entity, with intent to influence an official act and to induce such public official to do an act and omit to do an act in violation of the lawful duty of such official, in violation of Title 18, United States Code, Section 201(b)(1)(A) and (C).

## Overt Acts

75.     In furtherance of the conspiracy and to effect its illegal objects, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.     On or about June 30, 2018, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, met at a restaurant in Manhattan.

b.     On or about May 3, 2019, JOSE URIBE, the defendant, caused Associate-2 to make a payment from a corporate bank account that had been opened at a bank branch in the Bronx.

c.     On or about September 5, 2019, NADINE MENENDEZ sent URIBE a text message that was transmitted through a cell tower in Manhattan.

d.     On or about September 21, 2019, MENENDEZ, HANA, FRED DAIBES, the defendant, and Egyptian Official-4 met at a restaurant in Manhattan.

e.     On or about March 31, 2022, NADINE MENENDEZ provided to a jeweler two one-kilogram gold bars that had been provided by DAIBES, which gold bars were sold in Manhattan.

(Title 18, United States Code, Sections 371 and 3147(1).)

44

## COUNT TWO
## (Conspiracy to Commit Honest Services Fraud)
## (As to All Defendants)

The Grand Jury further charges:

76. The allegations contained in paragraphs one through 70 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

77. From at least in or about January 2018 through at least in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," JOSE URIBE, and FRED DAIBES, the defendants, while DAIBES was released under Chapter 207 of Title 18 of the United States Code, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

78. It was a part and an object of the conspiracy that ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," JOSE URIBE, and FRED DAIBES, the defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to ROBERT MENENDEZ's honest services as a U.S. Senator and the Chairman and Ranking Member of the SFRC, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

(Title 18, United States Code, Sections 1349 and 3147(1).)

## COUNT THREE
### (Conspiracy to Commit Extortion Under Color of Official Right)
### (As to ROBERT MENENDEZ and NADINE MENENDEZ)

The Grand Jury further charges:

79.     The allegations contained in paragraphs one through 70 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

80.     From at least in or about January 2018 through at least in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion under color of official right, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3).

(Title 18, United States Code, Section 1951.)

## COUNT FOUR
### (Conspiracy For a Public Official to Act as a Foreign Agent)
### (As to ROBERT MENENDEZ, NADINE MENENDEZ, and WAEL HANA)

The Grand Jury further charges:

81.     The allegations contained in paragraphs one through 70 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

82.     From at least in or about January 2018 through at least in or about June 2022, in the Southern District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to have a public official, to wit, ROBERT MENENDEZ,

46

act as an agent of a foreign principal, to wit, the Government of Egypt and Egyptian officials,
required to register under FARA, Title 22, United States Code, Sections 611-621, in violation of
Title 18, United States Code, Section 219.

### Overt Acts

83.    In furtherance of the conspiracy and to effect its illegal object, the following overt
acts, among others, were committed and caused to be committed in the Southern District of New
York and elsewhere:

a.    On or about June 30, 2018, ROBERT MENENDEZ, NADINE
MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants,
met at a restaurant in Manhattan.

b.    On or about September 21, 2019, MENENDEZ, HANA, and Egyptian
Official-4 met at a restaurant in Manhattan.

(Title 18, United States Code, Section 371.)

### **FORFEITURE ALLEGATIONS**

84.    As a result of committing one or more of the offenses alleged in Counts One and
Two of this Indictment, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine
Arslanian," WAEL HANA, a/k/a "Will Hana," JOSE URIBE, and FRED DAIBES, the
defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section
981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and
personal, that constitutes or is derived from proceeds traceable to the commission of said
offenses, including but not limited to a sum of money in United States currency representing the
amount of proceeds traceable to the commission of said offenses and the following specific
property:

a.     The residence of MENENDEZ and NADINE MENENDEZ in Englewood Cliffs, New Jersey (the "Englewood Cliffs Premises").

b.     A 2019 Mercedes-Benz C-Class C300 automobile, vehicle identification number WDDWK8EB7KF873859.

c.     A sum of $486,461 in U.S. currency seized from the Englewood Cliffs Premises on or about June 16, 2022.

d.     A sum of $79,760 in U.S. currency seized from safe deposit box no. 13 at Chase Bank located at 50 Grand Avenue, Englewood, NJ 07631 on or about June 16, 2022.

e.     Two one-kilogram gold bars seized from the Englewood Cliffs Premises on or about June 16, 2022.

f.     Eleven one-ounce gold bars seized from the Englewood Cliffs Premises on or about June 16, 2022.

g.     Any and all funds on deposit in an account with an account number ending in 8817, held in the name of Strategic International Business Consultants, LLC, at PNC Bank.

h.     One Vision Fitness S7100HRT Suspension Trainer found at the Englewood Premises on or about June 16, 2022.

85.     As a result of committing the offense alleged in Count Three of this Indictment, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense and the following specific property:

a.     The Englewood Cliffs Premises.

48

b.    A 2019 Mercedes-Benz C-Class C300 automobile, vehicle identification number WDDWK8EB7KF873859.

c.    A sum of $486,461 in U.S. currency seized from the Englewood Cliffs Premises on or about June 16, 2022.

d.    A sum of $79,760 in U.S. currency seized from safe deposit box no. 13 at Chase Bank located at 50 Grand Avenue, Englewood, NJ 07631 on or about June 16, 2022.

e.    Two one-kilogram gold bars seized from the Englewood Cliffs Premises on or about June 16, 2022.

f.    Eleven one-ounce gold bars seized from the Englewood Cliffs Premises on or about June 16, 2022.

g.    Any and all funds on deposit in an account with an account number ending in 8817, held in the name of Strategic International Business Consultants, LLC, at PNC Bank.

h.    One Vision Fitness S7100HRT Suspension Trainer found at the Englewood Premises on or about June 16, 2022.

SUBSTITUTE ASSETS PROVISION

86.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," JOSE URIBE, and FRED DAIBES, the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

49

e.    has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and

Title 28, United States Code, Section 2461, to seek forfeiture of any other property of the

defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981; Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


FOREPERSON


DAMIAN WILLIAMS
United States Attorney