# **EXHIBIT H**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 28, 2023

**BY EMAIL**

Lawrence Lustberg, Esq. (llustberg@gibbonslaw.com)
Anne Collart, Esq. (acollart@gibbonslaw.com)
Ricardo Solano, Jr. (rsolano@gibbonslaw.com)

**Re:** ***United States v. Wael Hana*,**
**S1 23 Cr. 490 (SHS)**

Dear Counsel:

The Government writes to disclose certain information regarding certain potential witnesses in the above-captioned matter, to reiterate its request for reciprocal discovery, and to request material obtained via Rule 17(c) subpoenas. This disclosure should not be taken to indicate the Government necessarily believes that it has an obligation to disclose this information at this time, *see* 18 U.S.C. § 3500; Fed. R. Crim. P. 16(a)(2); rather, we make this disclosure as a courtesy and to assist you in preparing your defense.[1] Nor should this letter be read as waiving the Government's right to decline to provide additional information regarding potential witnesses at this time. This letter and the information contained herein is designated as Attorney's Possession Only under the October 6, 2023 protective order entered by the Court.

1. On or about June 16, 2022, [REDACTED] [REDACTED][2] made the following statements to law enforcement agents, in substance and in part:
    a. [REDACTED] asked Nadine Menendez to do marketing work for [REDACTED] [REDACTED] [REDACTED] hired her because he liked her appearance. Nadine Menendez had no marketing experience or medical background. [REDACTED] did not hire Nadine Menendez because of her relationship with her husband, Senator Robert Menendez ("Menendez").
    b. When asked to describe what marketing services Nadine Menendez was providing for [REDACTED] [REDACTED] repeatedly said "marketing" and that Nadine Menendez would talk to people about [REDACTED] When asked if Nadine Menendez

[1] We are amenable to discussing a specific timeline for the production of 3500 material as part of a mutual schedule for all pretrial and trial-related disclosures, including expert notice, Rule 26.2 material, a defense witness list, and defense exhibits.

[2] The Government understands that [REDACTED] is represented by [REDACTED] [REDACTED]



ever made any marketing materials, such as flyers or pamphlets, said no. made marketing materials.

c. tasked Nadine Menendez to recruit doctors, specifically oncology doctors, to use testing services. Oncology work required a lot of testing. never offered to pay the doctors for using testing services. When asked why Nadine Menendez would know doctors, stated there was no particular reason why she would. explained Nadine Menendez was his employee and it was a project he had tasked her with.

d. When asked if Nadine Menendez had successfully recruited any doctors to use testing services, said no. Nadine Menendez was an investment hoped would pay off in the future. invested in many things and did not expect an immediate return on his investment.

e. Menendez never made calls on behalf of or

2. On or about July 15, 2022, stated to law enforcement agents and representatives of this Office, in substance and in part:

a. believed Nadine Menendez was on the board of was a target hospital for wanted to conduct blood work testing for n 2017, prior to meeting Nadine Menendez. Nothing had come out of meeting with

b. was always looking to hire someone who would get him a big client. was his goal. had a discussion with that Nadine Menendez would help get business.

c. did a lot to try to partner with municipalities as well as police stations. would edit his target letter to fit his desired client. When asked if he talked to Nadine Menendez or Menendez to help him partner with municipalities, said no. When asked if Nadine Menendez told to contact mayors, said yes. tried calling the mayors, but nothing came of it. reached out to everyone he could to get business, including health directors. did not remember if he thought he needed something from them to start testing.

d. When started COVID-19 testing in 2020, he thought he needed a permit from the Department of Health like you do when you do blood work. By 2021, understanding changed and he realized it was easier to set up a COVID-19 testing site than a blood work site. lab manager, told he did not need a permit. as lab manager, took care of all the paperwork and licenses required by the state.

e. complained about the and blood work monopoly to Menendez. He did not talk about city employees to Menendez. When asked if Nadine Menendez told that Menendez met with, called, or spoke with mayors on behalf of or stated he did not recall.



said if Menendez recommended to anyone, it was because was a good company.

f. said he never tried to use anyone's name to get ahead.

3.

4. On or about June 16, 2022, [4] stated to law enforcement agents, in substance and in part:

a. Jose Uribe works for believes is the owner of

b. Uribe asked to make a few payments on Uribe's Mercedes-Benz for Uribe, so did. never provided Uribe with his email address to use to purchase or make payments on any vehicle.

5. On or about December 1, 2022, stated to a law enforcement agent and representatives of this Office, in substance and in part:

a. was the owner of and Uribe worked in the office.

b. One night, Uribe and were out at a restaurant drinking and having fun. Uribe said he needed to make a payment for a Mercedes-Benz vehicle, but could not use his own credit card. offered to make the payment for him. did not know the payment was for a female friend of Uribe's. just thought he was doing Uribe a favor.

c. A May 3, 2019 text wrote to Uribe stating, "Eso se llama poder," was a joke unrelated to the subject of Uribe's request on that date for to make a car payment. believed Uribe was paying for a car for a girlfriend of his and was trying to hide it from his wife.

6.

---

[3] .

[4] The Government understands that is represented by

a. [redacted].

7. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



11.

12. On or about July 26, 2022 stated to a law enforcement agent and representatives of this Office, in substance and in part:

a. From 2018 to the present, has not seen an evolution in Menendez's position on aid to various Middle Eastern countries or Egypt in particular.

13.

14.

15. On or about June 22, 2022, made the following statements to law enforcement agents and representatives of this Office, in substance and in part:



a. Prior to the pandemic, Menendez called [redacted] personal cellphone and asked him to meet at Menendez's Senate office in New Jersey. [redacted] was asked if this call occurred in January 2019. [redacted] stated, "that sounds about right." [redacted] did not recall phone calls with Menendez on September 4, 2019 or January 16, 2020.

16. On or about September 1, 2023, [redacted] made the following statements to a law enforcement agent and representatives of this Office, in substance and in part:

a. After being shown a page of his toll records from September 4, 2019 and a calendar entry from September 6, 2019, [redacted] agreed that the September 4, 2019 phone call with Menendez, which took place two days prior to his meeting with Menendez, was probably a call in which [redacted] and Menendez set up the meeting.

b. After being shown a page of his toll records from January 29, 2019 and a printout from Menendez's public website, which listed 202-224-4744 as Menendez's Washington, DC office phone number, [redacted] did not remember the January 29, 2019 phone call from 202-224-4744 reflected on those records. The only time that [redacted] remembers Menendez raising a criminal investigation with [redacted] was during the September 6, 2019 meeting. [redacted] did not remember what was discussed on the January 29, 2019 phone call. If Menendez brought up something like he did during the September 6 meeting, that would have stuck out in [redacted] mind, and [redacted] would have expected to tell [redacted] and [redacted] about it.

c. [redacted] believed his call with [redacted] took place after [redacted] meeting with Menendez. [redacted] linked his call with [redacted] to his meeting with Menendez because the subject matter of the two was the same. Because the subject matter of the [redacted] call and the Menendez meeting was the same, [redacted] thought that the [redacted] call happened after the Menendez meeting.

17. [redacted]

18. On or about April 14, 2023, Randish Joeglal made the following statements to law enforcement agents, in substance and in part:

a. Uribe also worked at [redacted] He worked in the office and was possibly an employee. [redacted] was the main agent, but sometimes Uribe would bring them into his office to discuss insurance issues.

---

[5] The Government understands that [redacted] is represented by Robert Andalman, Esq., A & G Law LLC.



19. [redacted]

20. On or about July 14, 2023, [redacted][7] made the following statements to law enforcement agents and representatives of this Office, in substance and in part:

a. When asking [redacted] to set up meetings and invite particular people, Menendez has both verbally told [redacted] names and written down names for [redacted] Menendez has used "various formats" to tell [redacted] to invite particular people to a meeting and/or to set up a meeting. Menendez would sometimes handwrite invitations for [redacted] to then coordinate, though at the time of this interview, [redacted] could not remember another specific instance when Menendez fully wrote out an invitation for [redacted] to then handle.

b. Referring to the March 2018 meeting with [redacted], it was not unusual for a meeting to get on Menendez's calendar in the way this meeting did.

c. In or about March 2022, Menendez told [redacted] to figure out how to list, on his financial disclosure form, an asset of gold bullion owned by Nadine Menendez. Menendez told [redacted] that the gold bullion was gold that Nadine Menendez had received from her deceased mother.

21. [redacted]

22. On or about August 11, 2023, [redacted][9] made the following statements to a law enforcement agent and representatives of this Office, in substance and in part:

---

[6] The Government understands that [redacted] is represented by [redacted].

[7] The Government understands that [redacted] is represented by [redacted].

[8] [redacted]

[9] The Government understands that [redacted] is represented by [redacted]



a. [redacted] was not aware of many social meetings between Menendez and foreign government officials. Menendez would occasionally have evening/dinner meetings for which the Senate Foreign Relations Committee ("SFRC") staff would prepare memos (such as when Menendez had dinner with certain Greek people). If Menendez had dinner/evening meetings with foreign government officials, [redacted] did not attend them.

b. With regard to Menendez's constituents and SFRC business, [redacted] would "bear in mind" those things that were relevant to Menendez as Chairman or Ranking Member. [redacted] had staff meet with New Jersey constituents to help understand their issues.

c. The SFRC's work involved handling a lot of classified information. SFRC work also involved non-public information, such as the negotiations related to a piece of legislation. There was no absolute prohibition on members sharing non-public SFRC information with third parties.

d. With regard to Foreign Military Sales ("FMS"), there was a period of SFRC review prior to Congressional notification. The fact that a sale was pending was not public information. [redacted] did not recall Menendez ever directing [redacted] to convey messages about FMS, prior to Congressional notification, to private third parties (apart from registered agents of a foreign government and possibly with respect to [redacted]). [redacted] could recall occasions when they spoke to a foreign government official about human rights concerns prior to Congressional notification. Contracting companies sometimes called to ask whether a sale was going to go through. Such communication generally went through [redacted] there was no prohibition on [redacted] being frank with the company if the Senator had already made a decision on the sale.

e. [redacted] stated that Menendez held up Egypt money for "forever and a day." SFRC staff could not hold up a billion dollars without Menendez's approval. Egypt received $1.3 billion in Foreign Military Financing ("FMF") per year; Menendez held up that money for a long time.

23. On or about December 19, 2022, [redacted][10] made the following statements to law enforcement agents, in substance and in part:

a. [redacted] operates and may own [redacted] Uribe does work at [redacted] but not frequently.

24. On or about February 2, 2023, [redacted] made the following statements to law enforcement agents and representatives of this Office, in substance and in part:

a. [redacted] is now owned by [redacted] and Uribe worked as a consultant for this company.

---

[10] The Government understands that [redacted] is represented by [redacted]



b. [REDACTED] did not remember who or what he and Uribe were discussing in the text messages between him and Uribe from 2:25 PM to 2:47 PM on September 6, 2019.

25. [REDACTED]

26. On or about June 16, 2022, [REDACTED] made the following statements to law enforcement agents, in substance and in part:

a. Menendez helped Hana with the halal project in order to better the relationship between Egypt and the United States.

b. The only jewelry Hana ever provided to Nadine Menendez was a $20 bracelet with an Egyptian symbol on it. Nadine Menendez did not mention anything to [REDACTED] about her engagement ring coming from Hana.

c. Hana has not purchased a car or house for Menendez or Nadine Menendez as far as [REDACTED] is aware.

d. [REDACTED] was not aware of Hana attempting to assist [REDACTED] with his criminal case.

e. Throughout the duration of their relationship, Nadine Menendez attempted to pay [REDACTED] twice for work he performed at Menendez's house. Usually, Nadine Menendez would pay the workers directly. [REDACTED] gave a lawnmower and a powerhouse for Menendez's home. Menendez became angry when he learned about the lawnmower and told Nadine Menendez she had to pay [REDACTED]

27. [REDACTED]

28. On or about September 14, 2022, [REDACTED] made the following statements to law enforcement agents and representatives of this Office, in substance and in part:

a. Shortly after the first dinner between them, Nadine Menendez asked [REDACTED] to cut the grass at her residence. She also asked for assistance with projects around her house. [REDACTED] did these favors because he thought Nadine Menendez could help with his brother. Sometimes [REDACTED] would bring additional help, such as

11 [REDACTED]



a lawn care service. If did the job himself, he would not ask for payment. If he brought another service, Nadine Menendez would pay them either directly or through Sometimes, Nadine Menendez would try to pay but he would refuse. On one occasion, Nadine Menendez gave him $200 and said it was for daughters, so he accepted it.

29. On or about June 16, 2022, [12] made the following statements to law enforcement agents, in substance and in part:

   a. was asked if Hana and/or Uribe offered to assist with his workman's compensation case in any way. stated, "What could they do? They're not lawyers."

   b. never gave Hana or Uribe any money for their help with his case. never paid anyone to bring his case to a conclusion favorable to

30. On or about June 16, 2023, , made the following statement to a law enforcement agent and representatives of this Office:

   a. It would have been extraordinary for FMF funding that was on hold in September 2019 not to have been released by the end of the month regardless.

   b. To some extent, partner nations are aware of the review processes for FMS. Some partner nations have had better ambassadors than others. These ambassadors can have relationships with Congressional members.

   c. could not recall a disagreement between Menendez and his staff relating to Egypt sales.

31.

32.

33.

[12] The Government understands that is represented by

[13] The Government understands that is represented by



a. [redacted] and his former chief of staff exhausted their resources without finding a letter from the Government of Egypt addressed to [redacted] dated on or about June 24, 2018.

34. On or about September 19, 2023, [redacted][14] told a law enforcement agent and representatives of this Office, in substance and in part:

a. [redacted] has an extensive coin collection, which Nadine Menendez brought up at a party in 2021. At the party, Fred Daibes said to [redacted] "would you look at my gold?" [redacted] responded that he would. Weeks or months later, [redacted] received a call from Nadine Menendez saying that Daibes brought his gold to her. Nadine Menendez raised the topic several times more as months passed.

b. One conversation about Daibes's gold [redacted] had with Nadine Menendez was at a lunch, where Nadine Menendez asked how she could get the gold to [redacted]

35. On or about August 20, 2020, [redacted][15] told law enforcement agents, in substance and in part:

a. Nadine Menendez and [redacted] contacted [redacted] and took her out to dinner in approximately July 2019. [redacted] and Nadine Menendez said they had both been cheated by Hana. Hana refused to pay back [redacted] the money he borrowed, and Hana had promised Nadine Menendez a car and some of IS EG Halal's profits as she had helped him with the paperwork for setting up the business.

36. [redacted]

37. [redacted]

---

[14] The Government understands that [redacted] is represented by [redacted]

[15] The Government understands that [redacted] is represented by [redacted]

[16] [redacted]



a. [redacted]

[redacted]

38. [redacted]

[redacted]

39. [redacted]

[redacted]

40. [redacted]

[redacted]

[redacted]

---

[17] The Government understands that [redacted] is represented by [redacted].

c.



.

Separately, we note that we have not received any reciprocal discovery to date. We again renew our request for reciprocal disclosure from the defendant. Please confirm whether the defendant has, to date, met the defendant's respective reciprocal disclosure obligations under Rule 16(b). *See* Fed. R. Crim. P. 16(b)(1); *see also, e.g.*, *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530, at *5 (S.D.N.Y. Feb. 25, 2011). Please also confirm whether the defendant recognizes that such obligations are continuing ones.

Finally, we request material obtained pursuant to Rule 17(c) subpoenas. *See* Fed. R. Crim. P. 17(c)(1); *see also, e.g.*, *United States v. Sellers*, 275 F.R.D. 620, 625 (D. Nev. 2011); *United States v. Reyes*, 162 F.R.D. 468, 470 (S.D.N.Y. 1995). So that we may seek relief from the Court if warranted, please advise us as to whether you have received any such material, and if you have not, whether you agree to produce any such material that you receive in the future.

As always, the Government remains available to confer at your convenience regarding discovery or the case generally.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: s/ Paul M. Monteleoni
Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Assistant United States Attorneys
(212) 637-2431/2109/2219/2343