

Lawrence S. Lustberg

Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310
Direct: 973-596-4731 Fax: +1 973-639-6285
llustberg@gibbonslaw.com

June 28, 2024

**VIA ECF**

Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street, Courtroom 23A
New York, New York 10007

> Re: **United States of America v. Menendez, et al.,**
> **Dkt. No. 23-cr-490-SHS**

Dear Judge Stein:

Please accept this letter brief on behalf of defendant Wael Hana in response to the Government's June 26, 2024 Letter (ECF No. 485) seeking to preclude all or most of Mr. Hana's modest defense case, following as it does on the Government's seven (7) week-long presentation. For the reasons set forth below, that motion should be denied.

**Evidence of IS EG Halal's Operations Is Relevant and Admissible**

On June 23, 2024, counsel for Mr. Hana timely provided the Government with substantive proffers for several employees of IS EG Halal Certified, Inc. ("IS EG Halal") whom Mr. Hana intends to call as brief but important fact witnesses in his defense case; in total, these witnesses are expected to testify for significantly less than a day. Four of these employees will, as Mr. Hana proffered, testify with regard to IS EG Halal's certification business, including, but not limited to, IS EG Halal's legitimate business operations and ample qualifications to continue to serve as Egypt's sole halal certifier. The Government claims that this proffered testimony is irrelevant to this case and to the extent this testimony has any limited probative value, such probative value is substantially outweighed by the risk of confusing the jury and presenting unnecessary and cumulative evidence "lengthening the already lengthy trial and wasting the jury's time." ECF No. 485 at 2-3. But leaving aside the irony of citing the length of its case as a basis for denying Mr. Hana any defense, evidence of IS EG Halal's operations during the time period specified in the Indictment is certainly relevant to the facts of this case as the Government has presented it and is, in fact, necessary to refute the Government's clear, repeated allegation that Mr. Hana has maintained his contract with Egypt as the result of corrupt bribes.

The Government first asserts that "the nature and capabilities of IS EG Halal's global operations *after* it was awarded a monopoly by Egypt are irrelevant to this case." *Id.* at 2 (emphasis in original). The Government, however, has made it abundantly clear that the allegations

GIBBONS P.C.

June 28, 2024
Page 2

pertaining to Mr. Hana and his halal certification business relate to protecting Mr. Hana's contract with Egypt; not Egypt's initial decision to award the halal contract to IS EG Halal. As the prosecution said when it was in its interest to do so during pretrial proceedings, the Government is "not alleging that Senator Menendez caused Egypt to give the monopoly to Mr. Hana"; rather, the Government is "alleging that Senator Menendez took actions to stop the United Stated Department of Agriculture from helping to get Egypt to remove the monopoly, which is a separate point." April 23, 2024 Tr. at 17:7-11. "They're not the same thing," the Government reiterated. *Id*. at 17:12-13. Thus, the Government has emphasized that it has "never alleged and do[es] not intend to try to prove" that Mr. Hana's sole source contract was obtained "as a result of bribes." *Id*. at 17:14-17; *see also* Ind. ¶ 2 ("MENENDEZ also improperly advised and pressured an official at the United States Department of Agriculture for the purpose of *protecting* a business monopoly granted to HANA by Egypt . . .") (emphasis added).

And, indeed, at trial, the Government repeatedly attacked the legitimacy of IS EG Halal and its qualifications to serve as the sole halal certifier for Egypt. Beginning with its opening statement the Government claimed that despite "zero" experience in the halal certification business, "[o]vernight, Hana's brand-new company became the only one that could approve shipments of beef from the United States to Egypt." Tr. at 54:14-17. The Government carried this theme throughout its case, and elicited testimony during its direct examination of multiple witnesses that IS EG Halal was not qualified to be Egypt's sole halal certifier, that the company was not capable of handling the amount of work required to perform the halal certification for Egypt, and that its selection would lead to disruption of US meat exports to Egypt and negatively impact numerous participants in the United States meat industry. *See, e.g.*, *id*. at 453:19-21 (direct examination of Bret Tate) ("[A]t the time Egypt announced that IS EG Halal would be the sole certifier, IS EG had no 'capacity'/business'"); *id*. at 476:7-11 (direct examination of Bret Tate) ("We had serious concerns at the embassy that the new certifying entity IS EG Halal was new to the market and didn't not have the capacity to certify a production system as large as the United States. If they were unable to certify, then it could lead to market disruption. . . ."); *id*. at 1756:7, 1792:4-8, 1814:17-19 (direct examination of Ted McKinney) (describing IS EG Halal as "inexperienced" and "nonexperienced" and claiming its selection would lead to "lost markets" for the meat industry in the United States). Thus, in no uncertain terms, the Government alleged not just that IS EG Halal and Mr. Hana had no experience as a halal certifier but also that it lacked the "capacity" to meet the requirements of the Egyptian government. It is through this allegation—as well as the not so subtle implication in the Government's presentation that IS EG Halal got its business based not on the merits, but on its contacts with various Egyptians[1]—that the Government

---

[1] *See, e.g.*, *id*. at 413:22-416:23 (direct examination of Bret Tate) (explaining that upon his arrival to Washington, D.C., Tate joined Mr. Hana, Dr. Ahmed Abdel Kareem and two other gentleman who were already sitting at the hotel bar); *id*. at 432:17-21 (direct examination of Bret Tate) ("Q. Was Dr. Ahmed Abdel Kareem with anybody else at the restaurant in the Marriott? A. He was. He was having lunch with Mr. Hana and with Dr. Mona Mehrez, the vice minister. There were two Americans with him and then a third Egyptian man."); *id*. at 493:1-25 (direct examination of

GIBBONS P.C.

June 28, 2024
Page 3

seeks to convey that IS EG Halal was not and could not be a legitimate halal certifier. And it is precisely these claims that Mr. Hana seeks to defend against, in an effort to show that he has maintained his halal contract with Egypt on the merits, having nothing to do with Senator Menendez's purportedly corrupt actions.

Specifically:

- IS EG Employee-1—who, unlike both Tate and McKinney, has actual knowledge of what it takes to open and operate a halal certification business—will present crucial testimony establishing that the "parade of horribles" presented by Tate and McKinney did not, in fact come to pass and that, to the contrary IS EG has flourished. Employee-1's testimony is also necessary to rebut the underlying suggestion that IS EG Halal could only have been selected as a result of corruption within Egypt, or because of Mr. Hana's connection to Senator Menendez.
- IS EG Employee-2, who has extensive expertise in halal slaughter and participated in the 2019 audits that were the subject of the extensive testimony by Tate and McKinney, will testify about IS EG Halal's qualifications to be Egypt's sole halal certifier. Employee-2 will also explain why the existing certifiers were not in compliance with Egyptian halal standards, making his testimony directly relevant to Tate's contention that the other halal certifiers were capable of meeting Egypt's requirements and should not have been delisted. *See, e.g.*, Tr. 699:2-9 (redirect examination of Bret Tate) ("I would say in general, all of them, they were all eager to show that they could meet the requirements. . . . that they could indeed meet [Egypt's] requirements."); Tr. 1860:1-3 (direct examination of Ted McKinney) ("Q. So you advocated aggressively to the Egyptian government to reinstate the prior certifiers, right? A. Yes, sir, I did.").
- IS EG Employee-3 began working for IS EG Halal in or about October 2019 and is involved in the company's operations throughout all of Latin America. Employee-3 will demonstrate that IS EG Halal has legitimate, global operations and was complying, across the globe, with Egypt's halal certification standards and meeting all of the requirements to perform the halal certification function for Egypt.
- And IS EG Employee-4, who has worked for IS EG Halal in the United States offices since approximately July 2021, will present critical testimony establishing the legitimacy of IS EG Halal's operations in the United States. Employee-4 will testify to all of the steps that

---

Bret Tate) (explaining that Mr. Hana had a "friendly relationship" and frequently dined with Dr. Ahmed Abdel Kareem and Mona Mehrez during the audit in Washington, D.C.); *id*. at 494:1-4 (direct examination of Bret Tate) ("Q. Did you see while you were in D.C. a similar relationship between either Dr. Ahmed Abdel Kareem and Mona Mehrez with any of the other halal certifiers? A. No, I did not."); *id*. at 599:8-600:22 (cross-examination of Bret Tate) (clarifying Tate's testimony on direct regarding the "friendly relationship" between Mr. Hana and Dr. Ahmed Abdel Kareem and his suspicion that Mr. Hana built this relationship to influence Egyptian officials to give IS EG Halal the contract)

GIBBONS P.C.

June 28, 2024
Page 4

        IS EG Halal takes in connection with onboarding and authorizing approved facilities for exporting halal-certified meat to Egypt.

Taken together, this testimony shows that that IS EG Halal not only obtained, but maintained its contract with Egypt on the merits. That is, contrary to the Government's position that IS EG Halal has its contract as a result of a corrupt act taken by Senator Menendez, or as more explicitly stated by the Government, because Mr. Hana had a "U.S. Senator in his pocket," Tr. at 54:17-20, IS EG Halal obtained its contract as a result of its legitimate performance under that contract, and its competence and compliance with Egypt's halal certification standards, as evidenced by the company's growing success.[2]

        Perhaps even more fundamentally, though the Government contends that the witnesses' testimony is irrelevant because it comes "*after* [IS EG Halal] was awarded a monopoly by Egypt," ECF 485 at 2 (emphasis in original), this argument ignores the fact that the witnesses' testimony and work for IS EG Halal is well within the relevant time period alleged in the Indictment for the purported bribery scheme to assist Mr. Hana and IS EG Halal. *See* Ind. ¶¶ 1, 37, 75, 91, 93. That is, the Indictment states that "*[f]rom in or about 2018 up to and including in or about 2023*, MENENDEZ and his wife, NADINE MENENDEZ . . . engaged in a corrupt relationship with three New Jersey associated and businessmen," *id*. ¶ 1(emphasis added), and explicitly alleges that the bribery scheme "continued through 2020 and into 2022," *id*. ¶ 37. The Government cannot, on the one hand, allege a lengthy conspiracy period and, on the other, seek to limit a defendant's presentation of evidence from over half of that period. Yet that is what it seeks to do in its effort to eviscerate Mr. Hana's defense presentation, brief though that presentation would be.

        Finally, it is insufficient for the Government to say that "there is already ample evidence in the record" upon which Mr. Hana can rely to make his case. While it is true that the defense elicited testimony from Government witnesses who have provided testimony that undermines its theory of the case, such testimony (and related Government exhibits) is not a substitute for a defendant's introduction of his own testimony and exhibits. Otherwise, the Government could

---

[2] In support of their position, the Government cites to two cases that allegedly stand for the proposition that it would be "inappropriate" for Mr. Hana to suggest that "IS EG Halal's monopoly was somehow, over time, beneficial, or non-harmful." ECF No. 485 at 2. But Mr. Hana does not purport to present testimony from IS EG Halal employees to demonstrate that it engaged in good deeds over a period of time, as in the cases cited by the Government. *Id*. (citing *United States v. Skelos*, No. 15-cr-317, 2016 WL 1532253, at *6 (S.D.N.Y. Apr. 14, 2016), *vacated on other grounds*, 707 F. App'x 733 (2d Cir. 2017); *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991)). Rather, his argument is that such testimony rebuts the allegations in the Indictment and trial testimony suggesting that IS EG Halal was not only not qualified to be Egypt's sole halal certifier in the first place but has somehow retained its "monopoly," though it did not deserve it, through illicit means.

GIBBONS P.C.

June 28, 2024
Page 5

always preclude the bulk of a defendant's case—and thereby interfere with the fundamental constitutional right to present a defense, *see Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986))—by introducing an inordinate number of exhibits and arguing that the defendant's supplementation of that body of evidence would be cumulative. Indeed, just two days ago, the Government argued emphatically, in support of its ability to introduce close to 700 exhibits as cleanup exhibits at the end of its case, that the Court ought not interfere with *its* right not to limit the quantum of evidence it can put on the record, even after weeks of introducing and relying upon thousands of documents. Tr. at 5049-55 (noting that "[t]his is a document-intensive case so there is a large volume of documents," "there is a huge number of documents that we now have a substantial number that are left that we wish to offer," and "in a case this big and this document-intensive, the volume of cleanup is rather large"). But what is, as the saying goes, "good for the goose is good for the gander."[3] The Government's effort to decimate Mr. Hana's extremely modest defense case on the basis of the prolixity of its own presentation should be rejected.

**IS EG Employee-2's Testimony is Relevant and Admissible**

IS EG Employee-2 will not only testify about IS EG Halal's certification business, but also recount that he was part of the 2019 audits of halal certifiers and slaughterhouses that were the subject of lengthy testimony offered by Government witnesses Bret Tate and Ted McKinney. Tr. at 387-462, 486-493, 589-614, 626-33, 1847-56. As the record shows, these audits generated significant concerns on the part of Egypt regarding the other halal certifiers operating in, or seeking to operate in, the United States. The Government witnesses, however, cast aspersions on these concerns, arguing that these certifiers should have been approved, or at least given another opportunity to be. Obviously relevant though IS EG Halal Employee 2's testimony supporting Egypt's concerns would seem to be, the Government objects to that testimony on multiple grounds. First, it writes that "it does not appear that this witness can competently testify to the bases for the Egyptian government's decision, which was made at far more senior levels." That, of course, is true: the witness's testimony would not be dispositive of the issue. But it would be probative— that is, it would have some "tendency to make . . . fact[s] [of consequence] more or less probable," Fed. R. Evid. 401—without any resulting prejudice. Indeed, the Government's own case proves

---

[3] The expression "what's good for the goose is good for the gander" is derived from an earlier phrase "what's sauce for the goose is sauce for the gander" Wiktionary, What's Sauce for the Goose is Sauce for the Gander, (Oct. 11, 2023), https://en.wiktionary.org/wiki/what%27s_sauce_for_the_goose_is_sauce_for_the_gander#:~:text=English-,Etymology,the%20bull%E2%80%9D%20(1549). The expression appears in *A Tale of Two Cities*: "For you cannot sarse the goose and not the gander." Charles Dickens, *A Tale of Two Cities* (Collins, London & Glasgow 1859) at 420. And it has made its way into the law. *See, e.g., Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272 (2016) ("After all, in the law, what is sauce for the goose is normally sauce for the gander.").

GIBBONS P.C.

June 28, 2024
Page 6

this point: Employee-2 is Mr. Tate's mirror image—he can testify to the Egyptian government's decision just as competently as Mr. Tate could to "the context and basis for the *U.S. Government's* official policy position on Egypt's awarding of the monopoly to IS EG Halal." ECF No. 485 at 4 (emphasis in original). The Government's objection to the testimony of Mr. Tate's Egyptian analogue is merely an attempt to keep the defense from operating on a level playing field and introducing precisely the kind of evidence that the Government adduced.

The Government nevertheless contends that Employee-2's testimony, including its rebuttal of the testimony of Mr. Tate and Mr. McKinney, is not relevant because the "Government witness' observations were offered and admitted for entirely different purposes": (1) demonstrating the context and basis for the U.S. Government's position and (2) "as background and context to Hana's attempted participation in meetings with USDA officials at the close of the 2019 audit." *Id*. But Mr. Tate's and Mr. McKinney's protracted testimony about the 2019 audit was far more extensive than necessary to serve these modest purposes and provide mere "background and context." Indeed, "the bases for the Egyptian government's decision," ECF No. 485 at 4, was made central to this case by the Government minutes after the start of trial. In its opening, the Government itself alluded to the idea that Egypt's decision was illegitimate and pretextual, stating that "[a]fter months and months of helping the government of Egypt influence Menendez, Hana got a business monopoly" and "[t]he government of Egypt dropped a lucrative monopoly into Hana's lap," emphasizing his lack of experience in this business, and again stating that what Mr. Hana did have were "connections in the Egyptian government and a U.S. senator in his pocket." Tr. at 54. This was beyond implication—it was a flat-out allegation that Egypt's decision was pretextual and was based upon Mr. Hana's purported bribery of Senator Menendez. Mr. Hana simply must have the opportunity to rebut these allegations.

Nor, as discussed above, is Mr. Hana limited in his presentation to that which he can derive from the Government's case, as the Government now argues, writing that "there is already ample evidence in the record from which Hana can make [the] arguments" that Egypt's decision to decertify the prior halal certifiers was on the merits. ECF No. 485 at 4. To be sure, Mr. Tate, for example, noted that Dr. Ahmed Abdel Karim had concerns with the way animals were stunned and slaughtered. But the evidence already in the record is simply not an adequate substitute for Employee-2's testimony. Thus, the defense should not be required to rely upon the testimony of Mr. Tate, who stated, among other things, that Mr. Hana's introduction to him was "unusual," that Mr. Hana did not "present knowledge of the halal process," that Mr. Hana's attorney asked Mr. Tate himself how halal slaughter worked, that Mr. Hana had a friendly relationship with Dr. Ahmed, and that he was concerned that Mr. Hana had influenced the Egyptian officials to give them the contract. Tr. at 414, 434, 464-65, 493, and 531. Moreover, Mr. Tate himself testified that Dr. Ahmed's concerns seemed to vary from meeting to meeting and he did not appear attentive, and that the concerns raised by Dr. Ahmed did not align with his own observations of the audit. *Id*. at 453-54, 702. IS-EG Employee 2 would, then, provide evidence justifying IS EG Halal's receipt of the contract without this obvious baggage, and, in any event would be more competent and reliable than Mr. Tate's testimony with regard to the bona fides of IS EG Halal's

6

potential competition. Indeed, while Mr. Tate testified that he possessed some knowledge of halal requirements, he conceded that he was not a halal expert, and attended only half of the 2019 audits. *Id*. at 396-97, 603. Employee-2, on the other hand, is an expert in the veterinary aspects of halal certification and can testify with precision to the issues encountered during the 2019 audits.

Finally, the Government writes that much of Employee-2's testimony "appears, at least in large part, to be either inadmissible hearsay and/or inadmissible speculation." ECF No. 485 at 4. This is wrong. Employee-2 will testify as to his own observations of both the slaughter of the animals at the halal certifiers and videos that purported to show "live footage" but were timestamped with a different time.[4] And the Government cites no basis for actually requiring the introduction of the footage that Employee-2 reviewed. In any event, whether or not Employee-2's testimony presents hearsay issues can and should be assessed on a question-by-question basis, as the Court has done throughout this trial. And Mr. Hana will, of course, not oppose the Government's voir dire of Employee-2, as the Government seeks in the alternative, to confirm that his testimony is grounded in his personal observations.

**IS EG Employee-5's Testimony is Not Hearsay**

Finally, IS EG Employee-5 will testify regarding a particular, and particularly significant, issue in the case: Nadine Menendez's (then Arslanian's) work for IS EG Halal, her expected work for IS EG Halal, and the removal of Ms. Menendez's assignment by Mr. Hana. ECF No. 485 at 5. Employee-5 communicated with Ms. Menendez electronically and telephonically, and can testify regarding those conversations based on her personal knowledge. This testimony would rebut the Government's contention that Mr. Hana gave Ms. Arslanian what was always intended to be a no-show job.

The Government, however, writes that Employee-5 "cannot offer out-of-court statements supposedly confirming that such work [by Ms. Menendez] was performed, to demonstrate that it was in fact performed." ECF No. 485 at 5. But that misses the point of Employee-5's testimony, which will not only be based upon her personal observations, but will describe the work that she was personally tasked to do with Ms. Menendez. Whether any of the questions of counsel call for hearsay can be assessed on a question-by-question and exhibit-by-exhibit basis, as usual. For example, among the exhibits that Mr. Hana will seek to introduce with Employee-5 will be texts and an email between Employee-5 and Ms. Menendez that will absolutely not be introduced for the truth of the matter asserted—that is, it will not be adduced to prove the results of Ms. Menendez's actual research into office space in New Delhi and Mumbai for IS EG Halal's Indian

---

[4] The Government further argues: "Nor does it appear that this individual has any expertise in discerning whether such footage was allegedly manipulated." That may be true, but it is not at all clear that determining whether a video's timestamp matches the time on one's watch requires any particular expertise. If it does, the Government is certainly free to call a rebuttal witness on the subject.

GIBBONS P.C.

June 28, 2024
Page 8

office—but only to show, through these documents, that Employee-5, IS EG Halal, and Mr. Hana had an expectation that Ms. Menendez was, or was supposed to be, performing work for IS EG Halal. That is, the statements will be introduced not for their truth, but instead to show IS EG Halal employees' beliefs and expectations and, as such, are not hearsay.[5]

**Conclusion**

No one should miss the import of the Government's motion: it seeks to bar all or almost all of Mr. Hana's modest defense case. While, of course, the evidence and testimony introduced by a defendant must satisfy the Federal Rules of Evidence, the Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes*, 547 U.S. at 324; *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). As the Supreme Court has long recognized, "a fundamental element of due process of law" is "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). And after a month and a half of Government witnesses, including thousands of exhibits, Mr. Hana should be allowed to live out these principles by presenting the one-day (at most) defense case that he has openly described to the Government, in order to respond to the Government's allegations and address the misimpressions that it seeks to leave with the jury. The Government's motion should be denied.

Thank you for your kind consideration of this matter.

Respectfully submitted,

*s/ Lawrence S. Lustberg*

Lawrence S. Lustberg

---

[5] Employee-5 will also testify that at a certain point following her messages with Ms. Menendez, she stopped communicating with Ms. Menendez and no longer provided assignments to her from Mr. Hana. Because the basis of this testimony will not be out-of-court statements, or, indeed, any statements at all, but rather the cessation of communication, as well as information regarding Employee-5's own job responsibilities, it will not constitute "an end-run around the bar to hearsay." ECF No. 485 at 5. Rather, having introduced thousands of pages of documents that were purportedly not for truth (though one suspects they will be argued for their truth on summation), the Government now seeks to deprive the defense of the benefit of the same legal principles.