

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 29, 2024

**By ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:   *United States v. Robert Menendez, et al.*,
              S4 23 Cr. 490 (SHS)

Dear Judge Stein:

      The Government respectfully writes in the above-captioned matter to identify for the Court certain of the Government's objections to evidence that the defendants will seek to introduce in the defense case as early as this Monday, July 1, 2024, through certain summary charts marked as DXs 1302, 1303, 1304, and 1305, and certain underlying defense exhibits, including one that was received for the first time last evening.[1]

## I.   The Defense Summary Charts

      The Government received three draft summary charts, DXs 1302, 1303, and 1304, from Menendez on Monday, June 24, 2024.[2] These summary charts take the Government's summary charts, which were marked as GXs 1302, 1303, and 1304, and interpose and add additional line entries and exhibits, some of which are already in evidence and some of which the Government understands the defendants seek to admit as defense exhibits in connection with the summary charts. On Wednesday, June 26, before the trial day began, the Government responded to all defendants advising them of several of the Government's concerns and requested to confer with the defendants to seek to narrow the issues the Government would need to bring to the Court. On June 27, 2024, the Government received revised summary charts from the defendants, which added multiple new entries and exhibits, which the Government promptly reviewed. The Government

---

[1] The Government understands the summary charts to be joint defense exhibits, composed of exhibits marked by Robert Menendez (labeled with the prefix DX, followed by a number), and those marked by Wael Hana (labeled with the prefix Hana, followed by a number). The summary charts, but not the underlying exhibits referenced herein, are attached as Exhibits A through D.

[2] The Government also received a fifth summary chart from Hana, DX Hana 1300, approximately nine days earlier, on June 15, 2024. The Government has been able to confer with Hana's counsel and resolve all disputes regarding that chart.

Honorable Sidney H. Stein
June 29, 2024
Page 2

requested proffers of relevance regarding certain exhibits and advised the defendants of the Government's objections to the new exhibits later the same day. Although the Government subsequently had productive conversations with Hana's counsel, which significantly narrowed the issues, counsel for Menendez did not respond to the Government's multiple inquiries until approximately one hour before the Government's midday deadline on Saturday, June 29.

At approximately 9 p.m. last night, *i.e.*, Friday night—less 18 hours earlier, after being made aware of the Government's midday filing deadline today, despite still having failed to meaningfully confer with the Government on outstanding issues or even reply to many of the Government's emails on the charts, and well after such material should have been disclosed pursuant to the parties' written agreement and the Court's directives—Menendez sent the Government *an entirely brand new, 22-page summary chart*, marked DX 1305.

Putting aside the unfairly and deeply prejudicially delinquent disclosure of DX 1305, which should be sufficient to preclude that summary chart in its entirety, the Government's concerns on all of the charts relate both to form and to substance. The Government has only highlighted its substantive concerns below, which are organized topically, by summary chart.[3] For the reasons discussed below, the Court should preclude Menendez from introducing the following proposed evidence pursuant to Federal Rules of Evidence 401, 403, 404, and/or 802.

## II. Inflammatory Summary Chart Entries Pertaining to the Relationship Between the Ex-Boyfriend and Nadine Menendez Should be Precluded Consistent With the Court's Prior Rulings (DX 1302, 1303)

As discussed in the Government's submission regarding Menendez's first two witnesses, which was submitted to the Court on June 27, 2024, and in a colloquy with the Court after the trial day that same day, Menendez seeks to introduce both witness testimony and multiple exhibits related to Nadine Menendez's relationship with a particular ex-boyfriend (the "Ex-Boyfriend"). Although the Government's argument in both its June 27 submission and orally before the Court was primarily related to the testimony of Nadine Menendez's family member, the Government advised the Court that there were multiple entries on the defendants' summary charts that either describe or allude to alleged emotional and physical abuse that Nadine Menendez experienced. The Government understood the Court's ruling at the end of the trial day on June 27 to largely exclude all but a limited amount and specific type of evidence and testimony related to the Ex-Boyfriend. Specifically, the Court ruled that, although "[t]here can be some evidence that there was an issue with a boyfriend concerning physical safety," the Court was not going to admit "details about being beaten up or anything like that about [the Ex-Boyfriend], this is not going to

---

[3] The Government is continuing to confer with the defendants regarding various issues with the form of the charts. For example, the Government advised the defendants that, among other things, the summary charts included multiple citations to non-admitted GX documents; citations to DX documents, where the same document was already admitted as a GX; and to unredacted versions of GXs that were admitted in redacted form, all of which threaten to confuse the record or the jury regarding what is in evidence or how it was offered. The Government expects that the defendants are working to correct those errors before seeking to introduce the summary charts.

Honorable Sidney H. Stein
June 29, 2024
Page 3

be Days of Our Lives or some soap opera. That is really 403, extraneous, prejudicial; hospitalizations, beating up, assaults. None of that." (Trial Tr. 5537.) In addition, at the conclusion of Rule 29 arguments yesterday, June 28, 2024, the Court reiterated that "[t]he risk of prejudice from specific acts of abuse or stalking far outweigh any probative value, especially because there is not a sufficient connection to abuse or stalking to the charges in this case." (Trial Tr. 5747.)

After the Court's ruling on June 27, the Government highlighted for the defendants the entries on the summary charts pertaining to the Ex-Boyfriend that the Government identified as falling within the Court's ruling. The Government inquired whether the defendants would be revising the chart to exclude certain entries and proposed redactions to other entries. Counsel for Menendez advised the Government that it "disagree[d] that the Court's Order requires any of these entries to be removed or redacted" because they allegedly provide "evidence of an 'issue' with [the Ex-Boyfriend] concerning physical safety, but do not veer into evidence of 'hospitalization' or 'beating up.'" Menendez also stated that, because "some of the entries merely concern Nadine's concealing her relationship with [the Ex-Boyfriend] from RM," such entries were "fair game (and untouched by the Court's Order)." Although the Government believes Menendez's reading of the Court's ruling is incorrect, even if the Court's ruling did not specifically address the information described below—and as the Government understands the Court's ruling does—such evidence must be precluded pursuant to Rules 401, 403, and/or 802. Menendez did not advise the Government that he had changed his position in light of the Court's additional guidance on June 28.[4]

In sum, notwithstanding the Court's ruling, Menendez seeks to introduce the very type of evidence that would both inflame the jury and delve into the very kind of relationship drama the Court sought to avoid through its ruling. Among the line entries Menendez has claimed are exempt from the Court's ruling—and to which the Government objects pursuant to Rules 401, 403, and/or 802—are:

- DX 1303, lines 25-24, 25-25: "Nadine files Temporary Restraining Order against [Ex-Boyfriend]" (citing DX 616) and a message from Nadine to Menendez approximately thirty minutes later stating, "I'm waiting for the police to reach the Judge. The report is done. I will text you all info. I love you" (citing DX 1933-3). The restraining order Menendez seeks to offer includes graphic descriptions of the alleged assault, including the injuries she suffered, resulting in her hospitalization, harassment, and threats to kill her. (*See* DX 616.)

---

[4] In contrast, counsel for Hana has made several redactions to entries about which the Government had concerns, including even prior to the Court's ruling. (*See* DX 1302, lines 2-1, 5-6 (describing chemical smells in her head and brain fluid).) The Government understands that Menendez may disagree with those redactions. However, for the reasons discussed herein, and consistent with the Court's oral orders, details of Nadine Menendez's injuries should be precluded pursuant to Rules 401 and 403.

- DX 1303, line 26-58: A message from Menendez to Nadine in which he states, in part, "I worry about your safety and well-being. [Ex-Boyfriend] is a violent man, who has delivered injuries to you that have affected your health and which you are still living with today…I am also concerned that he will manipulate you into conversations with him directly or through others that he will use. Unfortunately that happened before and you were not strong enough to say no to your friends who call or text on his behalf. . . . I respect that this is very hard, has an emotional toll on you based on whatever affection you had/have for him and that you think it will all go away. I wish it would. . . . My disappointment, however, does not change my love for you. You are the love of my life and hopefully we can live in peace and happiness the rest of our lives." (citing DX 1933-5).

- DX 1302, line 0: A 2017 email from the Ex-Boyfriend to Nadine, with the subject line, "RULES" in which he sets out an enumerated list of rules Nadine is to follow, including telling the Ex-Boyfriend everywhere she goes within "5 MINUTES OF THE ACTION." He tells her to "PRINT THIS AND READ IT OVER AND OVER UNTIL YOU GET IT." (citing DX 1821.)

- DX 1303, lines 65-1, 65-2: Texts from Menendez to Nadine, stating: "I know you are being manipulated by your ex. He is good at torturing you. But you allow it for some reason. . . . I guess he has something over you that your afraid of. Sorry you have to live with that fear."[5] (citing DX 1933-6.)

- DX 1302, line 75-3: Text from Nadine to Hana stating, "[Ex-Boyfriend] filed missing report and broke into my house." (citing DX Hana C102-102.)

- DX 1303, line 4-15: Text from Nadine to Hana stating, "I am going to enterprise I have to rent a car for a day. I can't go see the senator in this car he will in a second run the plates and see it's registered to [Ex-Boyfriend]." (citing DX 1928-1.)

- DX 1302, line 345-3; DX 1303, line 78-5: Email from Nadine to an individual in Menendez's witness list in which she states, "I called my attorney to see what's going on with the paperwork because I want it done before Bob comes home Friday and he said he hasn't done any replies because two people in the office have gotten a text supposedly from me that [Ex-Boyfriend] and I are getting married in August. [Ex-Boyfriend] is not stopping the spoofing." (citing DX 617.)[6]

---

[5] The Government does not object to the later portion of the text chain, which describes the status of the relationship between Menendez and Nadine at the time, where Nadine responds, "I have your ring. Whenever it's convenient I'll give it to you…I'm so sorry I upset you. I would do anything to take back the hurt." (DX 1303, line 65-4.) Similarly, the Government has not objected to other texts that reflect the status of the relationship between Nadine and the Ex-Boyfriend. (*See, e.g.*, DX 1302, line 74-4; DX 1303, line 23-1, line 78-4.)

[6] The Government does not object to the portion of the message that states, "[Ex-Boyfriend] is not stopping the spoofing" but proposes redacting the remainder of DX 617 and line 345-3 on DX 1302.

Although the Court's ruling gave Menendez limited leeway to elicit testimony that Nadine Menendez was fearful of her Ex-Boyfriend and concerned about her physical safety, the evidence described above goes *far* beyond that. Collectively, the evidence is highly inflammatory, detailed, and emotionally fraught, and injects both (a) irrelevant details about alleged physical and emotional abuse and (b) unnecessary details about her continued relationship with the Ex-Boyfriend and precisely *why* Nadine was fearful. That is improper, and it is inconsistent with the Government's understanding of the Court's oral rulings of both June 27, 2024 and yesterday. *See, e.g.*, *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (unfair prejudice exists when there is "the tendency of the evidence to prove some adverse fact not properly in issue . . . to unfairly excite emotions"); *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) (unfair prejudice is to "unduly inflame the passion of the jury"); *United States v. Ozusamlar*, 428 F. Supp. 2d 161, 170 (S.D.N.Y. 2006) (risk of prejudice from "proving an adverse *immaterial* fact, or by simply exciting the emotions of the jurors") (emphasis in original).

In addition, to the extent the Court permitted the defendants to introduce facts related to the Ex-Boyfriend, the Rules of Evidence still apply, and a significant portion of the messages above are also being offered for their truth and constitute inadmissible hearsay. *See* Fed. R. Evid. 802.

Moreover, none of the above-described details is necessary to make the points Menendez asserts he wants to make. Evidence of "spoofing" has already been admitted (*see, e.g.* GX B105-40), and there are other entries on the summary chart to which the Government is not objecting to allow Menendez to make arguments about the "007 phone," why Menendez tracked or monitored Nadine's location, and the fact that the Ex-Boyfriend engaged with Nadine and Hana regarding the Uribe case.[7] And indeed the jury has already heard that the phone was purchased as a result of text messages about spoofing (*see, e.g.*, Tr. 2394 (Graves direct, citing B105-40); Tr. 2641 (Graves cross, citing *id.*)), allowing it to understand why Menendez and Nadine Menendez used "007" to refer to the phone (*see, e.g.*, Tr. 2395), and in any event the limited evidence of location monitoring, offered to respond to the *defense*'s arguments in their opening statement and repeated questions on cross-examination suggesting that Menendez lacked knowledge of Nadine's activities, is fully explained by the evidence the Court permitted in its ruling. The additional evidence that Menendez seeks to offer is thus cumulative as to the points that he says he wants to make—while also inflammatory.

---

[7] For example, there are multiple entries regarding the Ex-Boyfriend's work on the Uribe case to which the Government is not objecting. And with respect to Nadine's alleged fear of the Ex-Boyfriend, in addition to her family member's testimony, the Government has not objected to an entry in which Nadine states that she is fearful of the Ex-Boyfriend (*see,* line 4-8, DX 1928-1, message from Nadine to Hana stating in part: "Thank you for last night and thank you for giving me the strength to do what I know I should've done before. . . . The senator said he does not have a car for today and wants me to go to Newark to help him pack for California. I definitely do not want to take [the Ex-Boyfriend's] car. I am scared but listening to your words yesterday I know what I have to do and I know what you're telling me is the truth of what I have to do."), and as discussed above, *see supra* n.6, the Government does not object to another reference to the Ex-Boyfriend "spoofing" Nadine.

Moreover, to the extent Nadine's family member testifies that Nadine was fearful of the Ex-Boyfriend—testimony that would precede the introduction of the summary charts—much of the evidence described above would be rendered further cumulative. Put simply, additional, inflammatory details as to *why* Nadine feared the Ex-Boyfriend or her continued relationship with the Ex-Boyfriend are both unfairly prejudicial and unnecessary to make the points Menendez wants to make, and they should be precluded pursuant to Rules 401 and 403. *See, e.g. Ozusamlar*, 428 F. Supp. 2d at 170 ("[D]istrict courts must take care to determine whether there exists any alternative evidence with the same or greater probative value, but with a lesser threat of unfair[] prejudic[e]."); *Old Chief v. United States*, 519 U.S. 172, 182-83 (1997) ("If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk."); *see also Sowers v. R.J. Reynolds Tobacco Co.*, 975 F.3d 1112, 11121-22 (11th Cir. 2020) (information regarding a couple's marital disputes and husband's infidelity would be prejudicial and was appropriately excluded under Rule 403).

### III.  Defense Exhibit 1302

DX 1302 primarily pertains to allegations related to Egypt and IS EG Halal, communications between Nadine Menendez and Hana, and Nadine and Menendez in the early stages of their relationship. In addition to the messages related to the Ex-Boyfriend, described above, the Government also objects to several entries related to IS EG Halal's business practices, Nadine's purported work on behalf of IS EG Halal, and several miscellaneous entries that constitute inadmissible hearsay, and/or should be precluded pursuant to Rules 401 and 403.

#### A. Hearsay Evidence Pertaining to Nadine Menendez's Purported Work for IS EG Halal Should be Precluded

Hana is seeking to introduce multiple text messages between Nadine and an IS EG Employee in Uruguay (identified as IS EG Employee-5, in the Government's prior letter motion, at Dkt. 485), and between Hana and IS EG Employee-5, in which they discuss the work Nadine claims to have done on behalf of IS EG Halal in India. (*See* DX 1302, lines 1104-1 through -18, 1120-1 through 1120-2, 1121-2 through 1121-5 (citing Hana-190 and Hana-192).) As discussed in the Government's letter motion seeking to preclude certain evidence in Hana's defense case (*see* Dkt. 485), the communications between IS EG Employee-5 and Nadine, and between IS EG Employee-5 and Hana constitute inadmissible hearsay (or hearsay within hearsay) and must be precluded.

Specifically, the text messages reflect that IS EG Employee-5 is a middle-person telling Nadine what Hana told IS EG Employee-5 regarding what Nadine should be looking for in office space. (*See, e.g.*, DX 1302, lines 1104-13 to 1104-15(IS EG Employee-5 stating that "yesterday I *spoke* to him [*i.e.*, Hana] on the phone and he *said* New Delhi" and Nadine responding "Wael has originally *said* Mumbai. I will cancel the meetings in Mumbai and set up meetings in Delhi. Very different cities") (emphases added).) And IS EG Employee-5 is then telling Hana what Nadine said back to IS EG Employee-5. (*See*, *e.g.*, DX 1302, line 1104-18 "Good afternoon Wael. I talked to Nadine and she *said* she will set up meetings in New Delhi to get the info, and will send it to us

Honorable Sidney H. Stein
June 29, 2024
Page 7

by next week") (emphasis added).) Each of the above-described messages (and those like them) constitutes inadmissible hearsay, and in some cases, double-hearsay, offered for the truth of the matter asserted—*i.e.*, that Nadine was asked to do, and did work for IS EG Halal, which Hana presumably will argue to the jury justified the consulting agreement that his then-lawyer prepared more than a month earlier and payments he made to Nadine before and after this date. That is classic, and inadmissible hearsay. There is no indication from these messages that IS EG Employee-5, who worked in the Uruguay offices, personally observed Nadine (who was in New Jersey at the time) doing any work related to India, and the defense does not offer any actual *work product* by Nadine, which would not raise such hearsay issues. The defense presumably does not intend to offer such evidence—because it does not exist—yet intends to suggest to the jury, through hearsay, that it does exist. That is improper, unfair, confusing, and should be precluded.

Moreover, many of the messages, as noted above, contain hearsay within hearsay. IS EG Employee-5 is communicating to Nadine what Hana told IS EG Employee-5, and then communicating what Nadine told her back to Hana. There is no basis to admit either level of hearsay under any relevant exception. Accordingly, Hana-190, and Hana-192 and the corresponding line entries on the summary chart should be precluded pursuant to Rules 403, 802, and 805.

> B. <u>Miscellaneous Line Entries Should be Precluded Pursuant to Rules 403, 802, and/or 901</u>

The Government also objects to several miscellaneous entries on GX 1302 that are inadmissible under Rules 403, 802 and/or 901.

- DX 1302, lines 1208-1, 1208-2 (citing DX 820): Email exchange between a staffer for another Senator and Sarah Arkin. In the first email, the other staffer writes, "Is one or both of you preparing RM for the meeting with Kamel on Tuesday? [The other Senator] and I are meeting with him immediately before, and it might be good to coordinate." Arkin responds, "I will be, yes." The other staffer's discussion about his Senator's meeting with Kamel is inadmissible hearsay, and the fact that another Senator met with Kamel is irrelevant to Menendez's guilt or innocence. Moreover, Arkin already testified that she prepared a meeting Memo for Menendez for the June 2021 meeting with Kamel (*see* Trial Tr. 4544-45); thus, these messages are also cumulative and should be precluded pursuant to Rule 403. In addition, the particular Senator at issue was highly critical of Egypt—and far more critical than Menendez—yet Menendez wants to offer the fact that he was going to meet with General Kamel, without that context. Menendez is not entitled to leave the jury with such a misimpression.

- DX 1302, line 1159-1 (citing DX 487): Associated Press Article titled: 'Ethiopia blasts Trump remark that Egypt will 'blow up' dam [GERD].'" A press article is classic inadmissible hearsay, and the Court previously sustained objections to questions intended to elicit charged subjects such as then-President Trump speculating on the possibility that Egypt might conduct a military strike. (Trial Tr. 4710.) Indeed, the Court sustained objections premised on the same alleged fact. *Id.* Moreover, there is no indication that Menendez was contemporaneously aware of the article, much less relied on what is said

therein; thus, it is also irrelevant to Menendez's state of mind as to why he took particular actions pertaining to GERD. And to the extent that Menendez wishes to argue that he had proper reasons to seek to resolve the GERD dispute, including to seek to avoid a conflict, that was *already* elicited by him on cross-examination of Ms. Arkin. (Trial Tr. 4712-15.) The additional evidence that he seeks to offer is thus cumulative—and, at the same time, is also inflammatory.

- DX 1302, line 498-1 (citing DX 1003): Email from Nadine Menendez to her daughter in which Nadine discusses giving her resume to "Hackensack Hospital children with cancer to be on the board of the foundation" and says she was nominated for all the volunteer work she does. The entry and corresponding exhibit are plainly irrelevant to any matter at issue in this case and are simply being offered as improper character evidence (barred by Rule 405(b)) for an individual who is not presently on trial. To the extent Menendez suggests the document is relevant to show that Nadine had some business background, the document is not probative of that alleged fact, which is false, and to the extent there is any exceptionally limited probative value, any such probative value is substantially outweighed by unfair prejudice and confusion, as well as apparent intention to effect an end-run about the limits on character evidence. Moreover, to the extent it is being offered for its truth—*i.e.*, that Nadine Menendez did volunteer work that warranted nomination to a board—it is also inadmissible hearsay.

- DX 1302, lines 1260-1, 1260-2 (citing Hana-202): Email from a staffer for Senator Leahy asking Menendez staff how the discussions went in Egypt during Menendez's CODEL. Damian Murphy responds, "Pretty well. RM raised human rights with Sisi EGIS and the foreign minister. Also had a good meeting with a very compelling group of human rights groups." The messages are plainly offered for the truth of the matter asserted—here, that Menendez, in fact, allegedly raised human rights issues with Sisi, and thus are classic inadmissible hearsay. Moreover, Sarah Arkin, who is a recipient of the email, already testified that Menendez raised human rights with Sisi (*see* Trial Tr. 4635); thus, the message is also cumulative, yet at the same time, unlike the testimony of Arkin, the alleged fact cannot be placed in context, because it is offered via an out-of-court statement alone. That is impermissible pursuant to Rules 403 and 802.

- DX 1302, lines 2-4 through 2-6 (citing Hana A101-100): January 2018 texts between Nadine and Menendez in which Nadine commented on a lapel ribbon Menendez was wearing pinned to his suit. Menendez told her, "It is the symbol against violence against women and sexual assault." Nadine responded, "Wow. I did not know that. You are truly amazing." These messages are not relevant to any issue, are an impermissible effort to prove Menendez's alleged good character or beliefs, and have a particular risk of engendering sympathy given that Menendez is also arguing that Nadine had an abusive relationship with the Ex-Boyfriend. The messages should be precluded pursuant to Rules 401 and 403. There simply is no proper purpose for the evidence at all, much less a purpose that that Federal Rules of Evidence permit.

Honorable Sidney H. Stein
June 29, 2024
Page 9

- DX 1302 lines 637-1, 1198-1 (citing Hana-013, 013-T, and Hana-191, 191-T): Purported agreements between IS EG Halal and an Egyptian entity. The Government would not object to these agreements to the extent they are offered for a proper non-hearsay purpose, with a proper limiting instruction. However, the Government does object because Hana has failed to proffer a sufficient good faith basis to believe they are authentic, including whether they are from the dates that they purport to be. This concern is particularly acute given the testimony of former IS EG employees *not* knowing the connection between the company and Egypt. Without some basis to believe that these documents are authentic, they cannot be admitted.

IV.   **Defense Exhibit 1303**

DX 1303 is primarily focused on the allegations related to the New Jersey Attorney General's Office's investigation and prosecution related to Jose Uribe's associates. The objections below relate to certain line entries pertaining to not-yet admitted defense exhibits.

   A. Exhibits Offered to Seek to Impeach Jose Uribe Should be Precluded

The majority of line entries to which the Government objects pertain to various exhibits that concern prior statements and actions of Jose Uribe, a Government witness. These exhibits are not inconsistent with any of Uribe's testimony, are irrelevant, and should be precluded under Rule 613(b) and 403. As the Court is aware, prior inconsistent statements are generally admissible for impeachment purposes only, *see* Fed. R. Evid. 613, and are inadmissible hearsay for substantive purposes unless they were made at "a trial, hearing, or other proceeding, or in a deposition." Fed. R. Evid. 801(d)(1)(A); *see Santos v. Murdock*, 243 F.3d 681, 684 (2d Cir. 2001). Extrinsic evidence of a prior inconsistent statement, as reflected in the line entries in dispute, are only admissible in limited circumstances. *See United States v. Ghailani*, 761 F. Supp. 2d 114, 117–18 (S.D.N.Y. 2011) (internal citations and quotation marks omitted). And even then, the Court may nevertheless exclude the extrinsic evidence under Rule 403. *Id.*

In particular, the Government highlights the following line entries that are impermissible extrinsic impeachment evidence. For each of these entries, the defense has failed to demonstrate that the prior statement is inconsistent, not collateral, and/or laid a proper foundation by affording (a) the witness an opportunity to explain or deny the prior allegedly inconsistent statement and (b) the opposite party an opportunity to question the witness about it. *See id.*

- Line 0 (Dec. 11, 2011): Jose Uribe's entire sentencing transcript from his prior state felony conviction. Although made under oath, this is not a prior inconsistent statement under Rule 801(d)(1)(A). In addition, the fact of Uribe's prior conviction is already in evidence, as it was elicited on his direct examination, and further evidence would be cumulative. It would also be confusing. *See* Fed. R. Evid. 403.

- Lines 34-1, 36-2, 36-3, 65-5, 496-1, 1075-1, 1142-28, 1142-29, 1142-43, 1142-47, 1142-48, 1142-51, 1143-1 (various dates):  These are 13 different text messages sent by Jose Uribe using the word "culo," which is Spanish for the word "ass." For example, certain of the messages translate to: "I have to die with cancer in my ass" (DX 2179, -T); "Break his

ass. And run." (DX 2182, -T); and "If you stand on your ass from a chair your house will be cleaner" (DX 2176, -T). These messages are not proper impeachment under Rule 613 for multiple reasons, including because they were not even attempted to be used on cross-examination. Moreover, the attempted introduction of a witness using a word that can have a derogatory meaning, at in certain contexts, could inflame the jury against a witness, leading to unfair prejudice that substantially outweighs any minimal relevance the exhibits could otherwise possibly have under Rule 403. To the extent that Menendez seeks to draw some purported comparison to Uribe's testimony that Menendez used the diminutive form of the word, "culito" (Tr. 3152), the probative value of this comparison is nonexistent. Obviously, a witness's use of the word "culo" to *other* people in *other* contexts—of which the defendant had no knowledge at all—has no bearing on whether the defendant separately said the word "culito" to that witness, rendering this a classic example of evidence excludable under Rules 401 and 403.

- Lines 1142-1 to 1142-20, 1142-30 to 1142-46 (various dates): These are 35 text messages exchanged between Jose Uribe and another person apparently discussing a loan for a home. These messages are irrelevant and not proper impeachment under Rule 613. The Government understands that the defendants might want to introduce these exhibits to provide an alternate explanation for what happened to cash bribes that were paid in this case, and to suggest that Uribe might have pocketed them.) However, such arguments are speculative at best, and the messages are also confusing and numerous. And again, they were not sought to be used on cross-examination of Uribe, where they could have been placed in context—offering them now would therefore leave an unfair misimpression. For all of these reasons, they should be excluded under Rule 403. Moreover, many of these messages are also inadmissible hearsay.

- Line 1142-49 (May 19, 2021): Uribe's purchase of a home "in cash under the name 42 Jani Ct LLC'" is both an inaccurate description of the underlying exhibits (which appear, as the Government understands is common in real estate transactions, to reflect the use of "cash" to mean not physical currency but the purchaser's funds, as opposed to funds loaned to the purchaser by a bank), improper impeachment by extrinsic evidence on a collateral matter, and otherwise inadmissible for similar reasons as the above messages. Indeed, Uribe's purchase of a home, and the sources of financing for that home, are the definition of a collateral matter and the Federal Rules of Evidence bar the lengthening of this trial by the introduction of collateral evidence on them.

Finally,, even if any of the above evidence was potentially admissible—which it is not—evidence admitted for purposes of impeachment is not appropriate to be summarized in an exhibit offered under Rule 1006. Inclusion of such evidence is unfairly prejudicial because it suggests that the evidence can be relied upon more broadly than the limited purpose (*i.e.*, impeachment), for which it should be considered. Rule 1006 is about the summary of substantive evidence, not attempted impeach of a witness who has left the stand.

### B. Evidence of Menendez's Prior Specific Acts Should Be Precluded Pursuant to Rules 401, 403, and 404

Several line entries on the chart pertain to two specific instances in which Menendez reached out to New Jersey Attorney General Gurbir Grewal regarding matters affecting the Latino community and/or discrimination and should be precluded as inadmissible other "good act" evidence. In particular, Menendez seeks to introduce that he took steps to ensure that citizens of the Dominican Republic residing in New Jersey would be permitted to vote in the July 2020 Dominican Republic elections, notwithstanding COVID-19 restrictions in place at the time. (*See* DX 1303, lines 1142-21 through 26 (citing DX 804, 805T).)

As an initial matter, this is an example of a specific instance of conduct that is barred by Rules 404 and 405 and the Court's ruling of yesterday precluding evidence of "specific instances of advocacy" on behalf of the Latino community. (Tr. 5746.) That ruling is law of the case. And Menendez has offered no basis for the Court to revisit it.

Moreover, there are *no* allegations in this case concerning the Dominican Republic or voting. Thus, the introduction of evidence that Menendez sought to ensure certain of his constituents could vote in the elections of the Dominican Republic is irrelevant and would be highly confusing to the jury, which has heard no testimony related to the election in that country or voting. And, of course, this also has nothing to do with raising a particular, pending criminal case, as Menendez is alleged to have done.

Menendez also seeks to introduce that, on one occasion, an individual who is presumably associated with the New Jersey Attorney General's office advised Menendez that the that office and the Department of Justice were investigating ongoing litigation regarding discriminatory zoning laws in Jackson, New Jersey. According to the email, Menendez had offered (presumably to a constituent) to call Mr. Grewal to "express interest in the matter and ask for an update." (DX 1303, line 101-1 (citing DX 2165).) As an initial matter, there is no non-hearsay basis to offer this email. It is not relevant to Menendez's state of mind, but is instead offered for the truth—*i.e.*, that on another occasion, Menendez told someone he would reach out to express interest in a matter involving discriminatory zoning laws. That is improper pursuant to Rule 802, and another specific instance of conduct barred by the Court's prior ruling.

In any event, this evidence is improper positive propensity evidence offered for no other purpose but to suggest that, on other occasions (in which he was not being bribed by Jose Uribe), Menendez spoke to Mr. Grewal about legitimate issues, ergo he must have done so here. That is precisely the type of propensity evidence and argument that Rules 404 and 405 expressly prohibit. *See United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021) ("No less than evidence of a defendant's prior 'bad acts' used to show he committed the crime charged, such 'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—*i.e.*, if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit."); *Quattrone*, 441 F.3d at 191; *see also United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997) (even if prior acts evidence was otherwise admissible, such evidence "may nonetheless be excluded" pursuant to Rule 403); *Doyle*, 130 F.3d at 542 (affirming a district court's refusal to admit evidence of prior good acts because such evidence "had no bearing on the crimes charged"

and because "any probative value was substantially outweighed by the risk of confusing the jury with extraneous matters, or of wasting the court's and jury's time"). And even if this evidence were otherwise proper—and it is not—it should be precluded under Rule 403, because it is confusing, and would likely require the Government to respond by placing these events in context, unduly lengthening the trial on a collateral matter. And again, Menendez had an opportunity to cross-examine Mr. Grewal, and could have asked about such matters if he wished. Menendez's repeated attempt, as described herein, to offer exhibits without a witness who could explain them can only led to juror confusion.

        C. <u>Evidence of the Ex-Boyfriend's Statements Regarding the Provision of a Kickback to Nadine Menendez in Connection with Potentially Representing Elvis Parra Are Inadmissible</u>

Several line entries on the chart pertain to the Ex-Boyfriend's discussions about the Elvis Parra matter and potential involvement as counsel for Parra. In at least one of those entries, the underlying exhibits refer to Nadine Menendez apparently soliciting or agreeing to receive a kickback if the Ex-Boyfriend were to take over the representation of the Elvis Parra case from Michael Critchley, and the Ex-Boyfriend bragging that he could easily resolve the case. (*See* DX 1303, lines 25-19 (citing DX 823).) Although these exhibits may be facially potentially relevant, at least in part, the recounting of the events by the Ex-Boyfriend and others is inadmissible hearsay, and also confuses the issues, and thus should be precluded under Rules 403 and 802. While the defense attempted unsuccessfully to admit some of these exhibits during the Government's case, which offers were denied on multiple grounds (*see* Trial Tr. 3454-57), the same problems highlighted by the Government regarding these exhibits remain.

        D. <u>Miscellaneous Line Entries Are Irrelevant, Contain Inadmissible Hearsay and Should be Precluded Under Rules 401, 403 and 802</u>

The Government also has objections to a few line entries on the chart that do not fall into particular categories, which the Government has briefly summarized below.

- Line 36-4 to 36-5 (Sept. 28, 2018): A text between Uribe and Ana Peguero in which Uribe states the "Certs are done" and Peguero responds, "We are hurting people and that's no fair." This exchange is hearsay and is apparently offered to prove the truth of what Uribe did and Peguero's response that that conduct was "hurting people" and was "no fair." Apart from the hearsay issues, this exchange appears entirely irrelevant as it is speculative what Peguero is referring to and how that could have negative implications. However, to the extent it has any minimal relevance, it is outweighed by the substantial unfair prejudice from Peguero's response that could inflame the jury suggesting that Uribe negatively ran his business in a way that had hurtful implications to others. *See* Fed. R. Evid. 403. Such unfair prejudice is particularly problematic since the defense did not even attempt to introduce this exhibit or explain it with Uribe while he was on the stand, when Uribe could have explained it.

- Lines 36-1 and 74-1: These entries reflect the dates that Michael Critchley filed a motion to dismiss in the Parra matter and when the state court held a hearing on the motion. The

Honorable Sidney H. Stein
June 29, 2024
Page 13

>Government does not object to the line entries reflecting those dates for purposes of providing a chronology. However, the Government does object to the underlying motion and hearing transcript, which are rife with inadmissible hearsay. (See DX Hana 116; DX Hana 111.) Although we have received certain proposed excerpts from Hana's counsel for these documents, the excerpts pose the same problems. Moreover, none of the defendants read the motion or attended the conference; thus, state of mind is not an appropriate basis for admitting the inadmissible hearsay.

V.    **Defense Exhibit 1304**

DX 1304 is primarily focused on the allegations related to the District of New Jersey prosecution of Fred Daibes and Qatar. The Government has outlined its objections only to certain line entries pertaining to not-yet admitted defense exhibits.

   A.    Praise of Qatar That Is Unconnected to Robert Menendez Should be Precluded

While the Government does not object to defense exhibits in the chart reflecting articles and press praising Qatar that are sufficiently connected to Menendez's contemporaneous knowledge, such as those sent to his staff, Menendez also has included multiple line entries, and related underlying exhibits, that pertain to praise of Qatar's actions in Yemen and Afghanistan that are plainly *unconnected* to Menendez's contemporaneous knowledge, including some of which post-date Menendez's press statements praising Qatar. (*See* DX 1304, lines 115-2 to 116-4, 132-4, 132-10, 140-2, 140-3, and 141-1.) These line entries are irrelevant and are also cumulative of other unobjected to defense exhibits in the chart as well as exhibits that were already admitted during the Government's case-in-chief. (*See, e.g.*, DX 1304, line 116-5 (citing GX 104-A, DX 2037), line 117 (citing GX A104-1, GX 104-A), line 132-1 (citing DX 1765), line 132-5 (citing DX 1773, DX 1773-A), line 132-6 (citing DX 1766), line 132-7 (citing DX 1772, DX 1772-A, DX 1772-A-1, DX 1772-B, DX 1772-B-1, DX 1772-C, DX 1772-D, DX 1772-E, DX 1772-F, DX 1772-F-1), line 132-8 (citing DX 1776), line 163-1 (citing GX 10G-1).) As a result, these exhibits should be precluded under Rule 401, as well as under 403, as highly cumulative, confusing, and a waste of the jury's time. The exhibits would also confuse the issues by suggesting that they should consider whether Menendez did a good or bad thing by praising Qatar; however, Menendez can be guilty of bribery whether or not the action was "good" or "bad," and even if he would have otherwise taken the action anyway. *See, e.g.*, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991) (a defendant may be "guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid"); *United States v. Skelos*, No. S1 15 Cr. 317 (KMW), 2016 WL 1532253, at *6 (S.D.N.Y. Apr. 14, 2016) (not a defense to bribery that charged actions allegedly "were consistent with 'the best interest of [defendant's] constituency and the citizens of New York State'"), *vacated on other grounds*, 707 F. App'x 733 (2d Cir. 2017).

Honorable Sidney H. Stein
June 29, 2024
Page 14

> B. <u>Evidence of the Involvement of Lawyers and Due Diligence in the Daibes-Heritage Advisors Real Estate Project and Internal Heritage Investment Memorandum Should be Precluded</u>

In the summary chart and the underlying exhibits, the defense also seeks to offer evidence pertaining to the involvement of lawyers by Heritage Advisors in the Daibes real estate deal, and due diligence on the deal. (*See* DX 1304, line 186-1 (retention of law firm in connection with the deal), line 329-2 (underlying internal Heritage memorandum recommending investment and referring to engagement of law firm to assist with due diligence), line 342-1 (due diligence check list), and line 342-14 (internal Heritage memorandum).)

This evidence has minimal relevance, if any, since why Heritage Advisors chose to invest in the Daibes deal (and whether that in fact was because of any acts Menendez took), and whether Heritage Advisors considered the deal beneficial, is not relevant to the defendants' guilt. Rather, what matters, as previously discussed with the Court, is whether Menendez *believed* that Daibes expected him to take actions beneficial to Qatar in exchange for bribes and whether Daibes similarly *believed* that such actions would assist Daibes in obtaining an investment to what Daibes believed when he bribed Menendez. Whether Heritage Advisors *in fact* invested because of the acts Menendez took, and what steps they took to conduct due diligence prior to investing, are not material to the defendants' guilt. Accordingly, the documents Menendez seeks to introduce related to the retention by Heritage Advisors of a law firm and in internal Heritage investment memorandum have minimal probative value, if any, to any matter to be decided by the jury.

To the extent there is any minimal probative value from such evidence, any such probative value is substantially outweighed by the very real danger of confusing the issues by suggesting that because lawyers were involved in the deal, the defendants must not have been involved in any criminal acts. *See* Fed. R. Evid. 403. Although the line entries on the defense summary chart are brief, the concepts presented by the underlying exhibits are highly complex.

Moreover, there is already evidence that other professionals were engaged to assist Heritage with the deal (*see* GX 4F-28), and the Government does not object to a different line entry on the chart pertaining to Heritage's engagement of another valuation professional for the deal (*see* line 168-1); thus, to the extent that the defendants want to be able to argue that outside professionals were engaged in connection with the Heritage deal they can. Injecting *lawyers* into the mix, without any context, and thereby suggesting there was no illegality in connection with the deal, would be deeply confusing, and unfairly prejudicial given the minimal probative value of this evidence. *Cf. S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013) (The defendant "argues that the presence of lawyers is relevant to the overall context of the transaction, but that is such a fine-grained distinction from a reliance on counsel defense, that it would likely confuse the jury. A lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction. . . . This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense."); *see also United States v. Atias*, No. 14 Cr. 403 (DRH), 2017 WL 563978, at *3 (E.D.N.Y. Feb. 10, 2017) (without an advice-of-counsel defense, argument about the involvement of lawyers is "likely to mislead the jury."); *see generally United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir.

Honorable Sidney H. Stein
June 29, 2024
Page 15

2015) (There is no "advice-of-counsel defense without demonstrating advice of counsel."). Indeed, the same problems concern the injection of due diligence. *United States v. Bowe*, 360 F.2d 1, 15 (2d Cir. 1966) ("A trial judge has discretion to exclude evidence which is only slightly probative if its introduction would confuse and mislead the jury by focusing its attention on collateral issues and if it would unnecessarily delay the trial."); *cf. United States v. Stein*, 521 F. Supp. 2d 266, 270-71 (S.D.N.Y. 2007) (excluding evidence of uncharged tax shelters under Rule 403 because "[e]vidence concerning these matters is likely to diver the jury's attention from the charged transactions, which are sufficiently complicated in themselves, to another set of complex transactions"); *Manko v. United States*, 2003 WL 1973404, 63 F. Appx. 570, 573 (2d Cir. April 28, 2003) (excluding evidence into the IRS's complex policies of settlement and enforcement because such evidence would have "yielded little probative value" and "would have wasted time"); *United States v. Gentile*, 21 Cr. 54 (RPK), 2024 WL 2941849, at *2 (E.D.N.Y. June 11, 2024) (excluding evidence of a third-party's civil due diligence obligations in a criminal trial because any minimal probative value "would be substantially outweighed by the risk of confusion and unfair prejudice").

Lastly, the Heritage Advisors investment memoranda (lines 329-2 and 342-14) is also inadmissible hearsay. It reflects multiple details about the history and background of the deal, the anticipated project, and the valuation performed by Heritage Advisors. While the defendants might try to suggest these details are not for the truth, these internal Heritage memoranda were not communicated to the defendants, and the defendants plainly are offering it through a summary witness in order to rely on it for its truth in connection with their summation.

For all the reasons discussed above, the relevant lines and the underlying exhibits in this category should be precluded pursuant to Rules 401, 403, and/or 802.

C. <u>Additional Evidence Related to Plea Negotiation of the Daibes D.N.J. Prosecution Should be Precluded</u>

The defense also seeks to offer evidence pertaining to plea negotiations and communications between Daibes's Counsel and the prosecutors with the United States Attorney's Office for the District of New Jersey. (*See* DX 1304, lines 191-3 to -6, 191-8, 197-1, 191-3 to -6, 191-8, 197-1, 209-3.) As the Court no doubt recalls, in negotiating the stipulation for Daibes's Counsel prior to trial, Menendez's counsel repeatedly objected to the draft stipulation for Daibes's Counsel containing additional details about the plea negotiations. (*See* Dkt. 319, April 17, 2024 Tr. 11-14 (referring to deletions made by defense to draft stipulation for Daibes's Counsel).) Now, after the Government has rested, the defense should not be permitted to change course. Indeed, it is deeply unfair to the Government for the defense to introduce details, thereby suggesting that the Government hid them from the jury—when in fact the Government refrained from offering them due to the defense's objection. Additionally, further evidence regarding plea negotiations would be cumulative and a waste of time, as well as confusing, which considerations substantially outweigh any potential minimal relevance, under Rule 403. Moreover, the identified line entries include significant self-serving statements by Daibes's prior counsel, which not only are inadmissible hearsay under Rule 802, but also would serve to confuse the issues, suggesting that

Daibes was innocent of the crimes charged (even though as all parties know he later *pled guilty* to the crimes), and provide further grounds to preclude under Rule 403.

D. <u>Miscellaneous Line Entries Contain Inadmissible Hearsay, are Confusing, and Should be Precluded Under Rules 403 and 802</u>

The Government also has objections to various line entries on the chart that do not necessarily fall into neat categories, for which the Government briefly summaries the line entries and the Government's objections. As reflected below, many of these are hearsay statements of the defendants or Nadine Menendez for which there is no admissible purpose other than if they are for the truth. These line entries and the underlying exhibits also confuse the issues, and are unfairly prejudicial, as they are presented without any context. Accordingly, these exhibits should be also precluded under Rules 403 and 802.

- Line 198-1 (Dec. 14, 2021): A press article reporting on Menendez fracturing his shoulder is classic inadmissible hearsay. Furthermore, the circumstances of Menendez fracturing his shoulder are plainly irrelevant, and the underlying press article includes numerous self-serving hearsay statements by Menendez himself glorifying his public service. (See DX 2002 ("'It's called being too responsible, all to get to the vote and to get to another hearing,' Menendez said. Despite being in pain and walking around with his arm in a sling, Menendez didn't miss the next votes. … 'I'm going to survive and I'm one tough son of a bitch, so this too will pass,' he said afterwards.").) Menendez may testify, if he wishes. He cannot offer his own self-serving statements through press articles (or otherwise).

- Line 216-1 (Dec. 29, 2021): Nadine Menendez texted another person about purchasing a chair for Menendez. Nadine Menendez's text recounts a past act, and the defense plainly is offering it for the truth of the underlying matter. This text also could confuse the issues as it is unclear what chair she is referring to, and whether she kept the chair or returned it after Daibes gifted a chair to Menendez to aid in his recovery, which outweighs any minimal relevance. *See* Fed. R. Evid. 403.

- Lines 263-1 to 263-2: Menendez text exchange with a close friend of his about whether the friend had a lunch with Nadine Menendez, to which the friend confirms he did. To the extent this has any relevance, of which none is apparent, this appears to be offered for the truth of the matter asserted (*i.e.*, that Nadine Menendez did in fact have a lunch with the friend), which would be inadmissible hearsay.

- Line 326-4 (May 12, 2022): Nadine Menendez's receipt of a wire transfer from a family member with a purported purpose of "FAMILY AID," is both irrelevant and hearsay to the extent offered to show that the money that was being provided was family aid. It also appears to be offered to seek to engender sympathy.

- Line 328-3 (May 20, 2022): The press release reporting on Menendez's attendance at the Davos World Economic Forum is inadmissible hearsay. To the extent Menendez wants to prove Menendez's attendance at this forum is relevant, the press release is not a permissible way to attempt to prove this fact. The press release is also confusing, in light of the fact that—contrary to what Menendez has alluded to while cross-examining several

Honorable Sidney H. Stein
June 29, 2024
Page 17

>   witnesses—the forum did not overlap with the actual date of Sellinger's ultimate investiture (in September 2022).
>
> - Line 330-1 (May 23, 2022): Menendez's text to another person that "I am at the world economic forum" similarly is inadmissible hearsay. While the Government can offer the defendant's out of court statements for their truth, when offered by Menendez, they are inadmissible hearsay. While a defendant's own statements can sometimes be offered for an admissible non-hearsay basis, here they are plainly for the truth, as reflected by the defendant's attempt to offer the press release about the forum. This message is also confusing given that it did not overlap with the date of Mr. Sellinger's actual investiture, as noted above. The text accordingly can only confuse the jury—because Menendez's decision not to attend the actual investiture, which was months later, plainly cannot have been because Menendez was elsewhere months earlier.
>
> - Lines 331-2 to 331-3 (May 24, 2022): Text exchange between a Heritage employee and an outside advisor that "Fred's tarnished criminal record gives us some leverage on the site in Sheikh's opinion." This exchange is double hearsay as it is plainly offered for the truth for what the employee was saying about his boss's opinion on the deal. However, even if offered for its truth, for the reasons discussed at length in the Government's Rule 15 opposition, it still has minimal if any relevance, and substantially risks confusing the issues and wasting time. *See* Fed. R. Evid. 403.
>
>   E.  <u>Miscellaneous Line Entries are Irrelevant on Their Face, Confusing, and Should be Precluded</u>

The Government also has objections to various line entries on this chart for which the relevance is not plain on its face. The Government has repeatedly asked Menendez's counsel for a proffer of relevance, but has received none. Given that they are irrelevant and that one of the messages references a current sitting Congressman, who represents citizens within the confines of the jury pool, the following line entries also create the risk of substantial juror confusion and are unfairly prejudicial under Rule 403:

- 14-1 to 14-3 (Dec. 9, 2020): Menendez's calendar entries for calls with three individuals, including an individual who is now a Member of Congress representing an area that includes a portion of the Southern District of New York.
- 180-4 (Oct. 24, 2021) and 180-5 (Oct. 25, 2021): Nadine Menendez texts about a trip to emergency room because of food poisoning.
- 244-1 (Feb. 11, 2022): Menendez's check to an architecture firm for plans, and a biography of the firm.
- 246-1 (Feb. 23, 2022): Menendez's check to an engineering firm, and a biography of the firm.

VI.  **Defense Exhibit 1305**

As discussed above, the Government received DX 1305 at approximately 9 p.m. last night, just over 12 hours before this submission was to be filed, four days after receiving first drafts of the three other summary charts discussed above, and well after a summary chart of this nature

Honorable Sidney H. Stein
June 29, 2024
Page 18

should have been provided to the Government pursuant to the parties' agreement, and consistent with basic fairness. That alone warrants preclusion. However, based on the Government's review to date, DX 1305 is also wholly improper, irrelevant and inadmissible. The Court should preclude DX 1305, and the underlying exhibits cited therein, in its entirety.

DX 1305 is a 22-page collection of press releases, advocacy to the executive branch and other officials, and internal memoranda, regarding various actions Menendez took or meetings Menendez had apparently to further the interests of minorities, particularly Latinos, including actions more than 15 years ago. *See, e.g.* DX 1898 (Nov. 2, 2007 press release titled, "Menendez Meets Prominent American Latino Business Leaders to Discuss Economic Empowerment and Integration for Latino Community"); DX 2126 (Oct. 13, 2009 letter from Menendez to David Axelrod, Senior Advisor to the President, urging the USDA to settle outstanding discrimination suits brought by Hispanic farmers); DX 1849 (Nov. 19, 2009 press release "Menendez on USDA Discrimination against Hispanic Farmers: Need for Lawsuit Settlement is a Matter of Fairness and Common Sense"); DX 2086 (Nov. 29, 2011 letter to U.S. Citizenship and Immigration Services Director urging him to consider humanitarian parole for a detained individual who was the only familiar donor for a five-year old needing a bone marrow transplant); DX 2079 (June 17, 2016 letter to Consul General at U.S. Embassy in Tbilisi, Georgia urging that a nonimmigrant visa be granted for the mother of a constituent who was suffering from kidney failure); DX 1889 (Sept. 19, 2017 "Menendez, Lujan Grisham Request Update on FCC Efforts to Improve Latino Representation in the Media"); DX 1916 (Oct. 8, 2020 Menendez press release, "Menendez, Booker Lead Call for IG Investigation Into Racial Targeting of U.S. Diplomats at Border Crossings"); DX 1918 (Nov. 17, 2020 press release "Menendez makes Push for National Latino Museum").[8]

As discussed in the Government's prior letter motion regarding the testimony of Menendez' first two witnesses, and oral argument on the same, Menendez should be precluded from eliciting specific acts that he allegedly took on behalf of Latino constituents or the Hispanic community, as are reflected in the underlying exhibits summarized in this belated summary chart. (Tr. 5746.) Introduction of the summary chart and the underlying exhibits, summarizing exactly this sort of evidence, is plainly improper, and is inadmissible under Rules 404(b) and 405(b). *See, e.g.*, *Dawkins*, 999 F.3d at 792 ("No less than evidence of a defendant's prior 'bad acts' used to show he committed the crime charged, such 'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—*i.e.*, if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit."); *Al Kassar*, 660 F.3d at 123 (finding that prior "good acts" were inadmissible pursuant to Rule 404(b)).

Moreover, there are also additional grounds to preclude the belated summary chart and the underlying exhibits. All or almost all of the exhibits in the chart are inadmissible hearsay. Menendez's press releases cannot be offered for the truth of Menendez's actions described therein. This is also true with respect to the multiple entries reflecting letters he wrote or memoranda his staffers drafted. Again, Menendez can testify, if he wishes—but he cannot offer his own alleged

---

[8] The draft chart provided to the Government last night did not have line numbers. As a result all citations are to underlying DXs summarized in the chart.

good acts through out-of-court statements, thereby preventing the Government from cross-examining him.

In addition, notably, even if otherwise admissible (and they are not), the exhibits summarized therein almost entirely predate the charged scheme—the chart goes back to *2007* and literally only 5 of the 22 pages in the chart summarize actions Menendez apparently took from 2018 forward.

Further, the introduction of the summary chart, as well as the underlying exhibits, which would be minimally relevant, at best, also would deeply confuse the issues and waste time, and is a transparent plea to jury nullification that Menendez should not be convicted because he purportedly is a good person. The Government also would have little choice but to respond to this chart, and/or the underlying exhibits, were they admitted, including by placing the events in context and/or offering evidence of actions that Menendez did *not* take. The Government might also need to revisit whether it seeks to offer evidence of Menendez's prior criminal matter, because it sheds light on whether he truly has been consistent in what he does, as he appears now to want to suggest, or to act differently for those offering him things of value. But even if Menendez's prior criminal case were not introduced, if what he seeks in this chart were admitted, a trial regarding his actions at particular times between 2018 and 2023 would turn into a trial about unrelated actions years ago, and whether those actions were or were not similar to the charged actions. Rule 403 exists precisely to prevent such trials-within-trials.

For all of these reasons, including the highly belated disclosure of the summary chart, the Court should preclude the chart, and its underlying exhibits, in their entirety.

\* \* \*

For the foregoing reasons, the Government's objections should be sustained.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   s/ Eli J. Mark
      Eli J. Mark
      Daniel C. Richenthal
      Paul M. Monteleoni
      Lara Pomerantz
      Catherine E. Ghosh
      Assistant United States Attorneys
      (212) 637-2431/2109/2219/2343/1114
      Christina A. Clark
      Special Assistant United States Attorney
      (202) 307-5191

Honorable Sidney H. Stein
June 29, 2024
Page 20

Enclosures

cc:     (by ECF)

      Counsel of Record