O5hWmen1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    v.                        23 Cr. 490 (SHS)

5    ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
6    and FRED DAIBES,

7                    Defendants.
                                              Trial
8    ------------------------------x

9                                             New York, N.Y.
                                              May 17, 2024
10                                            10:10 a.m.

11

12   Before:

13
                          HON. SIDNEY H. STEIN,
14
                                              District Judge
15                                            -and a Jury-

16                           APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division

23

24

25

APPEARANCES CONTINUED


PAUL HASTINGS LLP
       Attorneys for Defendant Menendez
BY:  ADAM FEE
     AVI WEITZMAN
     ROBERT D. LUSKIN
     RITA FISHMAN




GIBBONS, P.C.
       Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
     ANNE M. COLLART
     CHRISTINA LaBRUNO
     ANDREW J. MARINO
     RICARDO SOLANO, Jr.
     ELENA CICOGNANI
     JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
       Attorneys for Defendant Daibes


Also Present:  Marwan Abdel-Rahman
               Bachar Alhalabi
               Interpreters (Arabic)

               Rachel Wechsler
               Connor Hamill
               Braden Florczyk
               Paralegal Specialists, U.S. Attorney's Office

               Justin Kelly, DOAR

O5hWmen1

1                    (Trial resumed; jury not present)

2                    THE COURT:  Please be seated in the back.

3                    Government, I think you had an issue with an exhibit.

4                    No?

5                    All right.  Bring this jury in.

6                    MS. CLARK:  Yes.  I'm sorry.

7                    Yes, your Honor.

8                    We had two exhibits that we used yesterday that were

9      not reflected in the long list, and we just wanted to make sure

10     they're properly admitted.  And that's Government Exhibits 1239

11     and 1242.

12                   THE COURT:  Any objection?

13                   MR. FEE:  No, your Honor.

14                   THE COURT:  All right.  1239 and 1242, admitted.

15                   (Government Exhibits 1239 and 1242 received in

16     evidence)

17                   What's your estimate of the remainder of cross if

18     you're efficient at this point?

19                   MR. FEE:  45 minutes, your Honor.

20                   THE COURT:  So it went up in estimation.

21                   MR. FEE:  No, no.  It's at the top of my range, your

22     Honor.

23                   THE COURT:  Bring in the jury.

24                   (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (Jury present)

2          THE COURT:  Please be seated in the courtroom.

3          Good morning, ladies and gentlemen.

4          Good morning, Agent.  I remind you, sir, that you

5    remain under oath.  You understand that, correct?

6          THE WITNESS:  I do, yes, sir.

7    ARISTOTELIS JOHN KOUGEMITROS, resumed.

8          THE COURT:  Mr. Fee, continue and conclude your cross.

9          THE WITNESS:  Sir, before we begin, if I could take a

10   minute to clarify or modify some testimony from yesterday?

11         MR. FEE:  Go for it.

12         THE WITNESS:  Upon review of last night, for the

13   members of the jury, I went in and reviewed the exit

14   photographs of room bravo.  And upon exit -- reviewing the exit

15   photographs of room bravo and that blazer that we talked about

16   so much, it appears that the blazer -- there's photos of the

17   exit that clearly differentiate between the two doors, and it

18   would be my testimony that the blazer was on the door of room

19   bravo the entire time that my team was at 41 Jane Drive.

20         THE COURT:  All right.  Thank you.

21         Mr. Fee.

22         MR. FEE:  Thank you, Agent Kougemitros.

23   CROSS-EXAMINATION CONTINUED

24   BY MR. FEE:

25   Q.  Your decision to go back and further review the exhibits

O5hWmen1                    Kougemitros - Cross

1   was yours alone?

2   A.   Yes.

3   Q.   No one from the government spoke to you last night?

4   A.   That's not true.  I -- when I made the discovery, I called

5   my supervisor to discuss it, because I wanted to -- I didn't

6   know what procedure of how I could bring this out.  So that's

7   why I -- I did it.  For the benefit of the jury, the best

8   information that I could provide for you.

9           MR. FEE:  I think the jury and we all appreciate that.

10   Thank you for making that clarification, or that correction.

11           Let's just make sure we understand what we're talking

12   about.

13           Can we show just to Agent Kougemitros the walk-through

14   video that the FBI created, marked as DX131, beginning at the

15   eight-minute mark.  Again, just for the agent and the lawyers.

16   DX131.

17   Q.   Agent Kougemitros, I'm going to actually show you a few

18   seconds of this walk-through video and then ask you to confirm

19   what it is.

20           (Media played)

21   A.   Confirm what this is?

22           MR. FEE:  No.  You don't have to narrate it.  Be quiet

23   for now.  I'm going to ask you some more questions.

24           All right.  We can stop it there.

25   Q.   Agent Kougemitros, this is the walk-through video that

1  you're referring to, correct?

2  A.  What I just -- I didn't actually look at it from the video,

3  I actually saw it from still shots.

4  Q.  Got it.

5     This is thing you just looked is the walk-through video

6  that the FBI created on the date of the search at 41 Jane,

7  right?

8  A.  I don't know that unless you show me from the start.  I

9  understand that this -- it looks like if the letters are there

10 it must be part of it.

11         MR. FEE:  OK.  Your Honor, we would offer DX131.

12         MS. POMERANTZ:  No objection.

13         THE COURT:  Admitted.

14         (Defendant's Exhibit 131 received in evidence)

15         MR. FEE:  You can keep it right here.

16         May we publish, your Honor?

17         THE COURT:  Yes.

18         MR. FEE:  Put it up for all the parties, Mr. Kelly,

19 please.

20 Q.  Just to orient everybody, Agent Kougemitros, we are now

21 looking at the FBI video into the master bedroom, room bravo,

22 right?

23 A.  Yes.

24         MR. FEE:  Let's play, Mr. Kelly.

25         (Media played)

1   BY MR. FEE:

2   Q.  So that's the room, the exercise thing, right?

3   A.  Yes.

4   Q.  Then a bathroom shot.

5       Agent, this is one of the locked closets now opened, D?

6   A.  That's correct.  That was locked when I -- when we arrived.

7   Q.  Got it.

8       And then that's the closet, the closet that had been

9   locked, right, room Charlie?

10  A.  That's correct.

11  Q.  From where the FBI recovered the two one-kilogram gold bars

12  in this closet?

13  A.  That's correct.

14          MR. FEE:  Now let's watch closely in this part,

15  please, Agent.

16      (Media played)

17          MR. FEE:  We can stop it there.  That's fine.

18          You can go forward a few seconds.

19          Perfect.  OK.  Well, let it play.

20          All right.  Stop it there.

21  Q.  Agent, as you just said this morning, this is the blazer

22  that we had spent so much time talking about yesterday, right?

23  A.  Yes, I believe so.

24  Q.  And your recollection is now clear that the blazer, the

25  senator's blazer, was hanging on the back of the front door to

O5hWmen1                      Kougemitros - Cross

1   the master bedroom, not inside that locked closet, correct?

2   A.   Just to be clear, I -- I had no independent recollection,

3   so this is from looking at the still shots, but I agree with

4   you.  The blazer was hanging on the back door of room bravo

5   door and not that of room Charlie.

6          MR. FEE:  Got it.  And just, I'll leave this alone,

7   because I really do appreciate the clarification.

8          THE COURT:  Question, sir.  Question, answer.

9          MR. FEE:  Thank you, your Honor.

10  Q.   The testimony yesterday that it was inside the closet is no

11  longer accurate testimony, in your view?

12         MS. POMERANTZ:  Objection.

13         THE COURT:  I'll allow that.

14  A.   Based on the information I had yesterday, no.  That is

15  correct.  I do believe this testimony is correct, what I gave

16  you today.

17  Q.   Today is correct?

18  A.   Yes.

19         MR. FEE:  We can put that down.

20         Let me put up GX1F-1019, and we'll leave this closet

21  alone with you.

22  Q.   Agent, this is another photo.  So we talked about the

23  blazer; that's done.  And then we talked about these ties with

24  rodents and cheese and skulls.  Remember that yesterday?

25  A.   Yes.

O5hWmen1                    Kougemitros - Cross

1   Q.  Other than that, inside Nadine's -- the locked closet,

2   there's no other item of clothing, of which you are aware, that

3   you would describe as a men's article of clothing, correct?

4   A.  I don't believe I have any basis to make that

5   determination.

6   Q.  Well, you don't remember seeing anything else in that

7   locked closet that is an article of men's clothing other than

8   those ties -- we don't have to worry about the blazer -- other

9   than those ties?

10  A.  I did not search room Charlie.  I'm making the

11  determination solely on the photographs, and therefore, I do

12  not believe I can make that determination, that there's no

13  other articles of clothing in there.

14          MR. FEE:  Let's put up Government Exhibit 1F-1023,

15  which you testified about on direct, Agent.

16  Q.  Having testified about this photograph, Agent Kougemitros,

17  sitting here today, do you see anything that you would identify

18  as a men's article of clothing?

19          THE COURT:  As he's looking at this photo?

20          MR. FEE:  Yes, your Honor.

21          THE COURT:  All right.

22  A.  Looking at this photo, I can't make a determination of very

23  much anything, minus -- I would say there probably are a few

24  dresses.  But other than that, I can't make out what is behind

25  something else, so I can't -- I can't make a clear

O5hWmen1                        Kougemitros - Cross

1    determination.  Like I said before, I did not search this

2    closet.

3           MR. FEE:  Fair enough.  You can put that down.

4    Q.  Sir, at the start of your testimony, you talked about

5    knocking and announcing and not hearing a response at Nadine's

6    house, correct?

7    A.  At the residence at 41 Jane Drive, I knocked and announced.

8    Q.  Yes.  And then you said you put tape over the doorbell

9    camera, right?

10   A.  Eventually put tape over the doorbell camera, yes.

11   Q.  And disabled the wi-fi in the house once you were inside?

12   A.  Eventually, yes.

13   Q.  And your testimony yesterday was that you did that so no

14   one could see the faces of the agents or, like, post FBI

15   tactics on YouTube or something, right?

16   A.  Partially.  That's not what I said.  I did say it was for

17   FBI tactics.  It was to not let anybody know where we would be

18   potentially in the house.  And I'm not saying for just this

19   house.  Just in general, if somebody did want to come back to

20   the residence or a business we were searching, if they knew the

21   location that we were or we weren't, that potentially could

22   cause harm to somebody.

23       You know, additionally, there's other reasons.  Once the

24   wi-fi's on, if somebody could come into a computer and be able

25   to wipe information, so it's to preserve evidence as well.

1   There's several reasons why we do it.

2   Q.  All makes sense.  And I take your point, this is policy;

3   it's not as though there was some particular reason you were

4   worried about safety.

5       Here, you've got to be safe in everything you do, right?

6   A.  Right.  I don't know if it's policy, by the way.

7   Q.  OK.  It's just good practice that you have adopted, fair to

8   say?

9   A.  Yes.

10  Q.  But that also meant it had the effect that no one was

11  recording what the FBI did that day other than the FBI, right?

12          MS. POMERANTZ:  Objection, your Honor.

13          THE COURT:  Sustained.

14  BY MR. FEE:

15  Q.  To your knowledge, the only folks making a record of the

16  search and the activities of the agents that day were the FBI?

17          MS. POMERANTZ:  Objection.

18          THE COURT:  To his knowledge.  I'll allow that.

19  A.  Yes, to my knowledge.  We were very discreet about our, our

20  presence.

21  Q.  Right.  You said because it was a high-profile case and you

22  didn't want to be calling undue attention, fair to say?

23  A.  Yes.

24  Q.  And then you also testified that, something about body

25  cameras, that the FBI now would use body cameras in this kind

1    of search?

2                MS. POMERANTZ:  Objection.

3                MR. FEE:  It was on direct, your Honor.

4                THE COURT:  Did you testify to that, sir?  Yes or no.

5                THE WITNESS:  Yes, your Honor.

6                THE COURT:  All right.

7    BY MR. FEE:

8    Q.  You are aware that the body camera directive for the FBI

9    was mandated as of June 2021, about a year before this search,

10   right?

11   A.  I'm not aware of that.  We were not issued the body cameras

12   until just a few months ago.  We didn't have them.

13   Q.  Got it.

14       So if the search was conducted today, you would have body

15   cameras, but you didn't have them back then so you couldn't

16   have used them, right?

17   A.  Correct.

18   Q.  In any event, after you did that stuff in the front door

19   and put the tape over the Ring, you said you entered through

20   the garage door, right?

21   A.  That's correct.

22   Q.  And you actually testified, you recall, you had a code for

23   the garage?

24   A.  Yes.  It was provided to me.

25   Q.  Right.  And in fact, the code was provided by Senator

O5hWmen1                              Kougemitros - Cross

1    Menendez to an FBI agent who was with him at his apartment in

2    Washington, D.C., right?

3    A.  I don't know if it was provided from him or from somebody

4    else, but I received it from one of the case squad agents.

5    Q.  Right.  You received it from one of the case agents who was

6    in Washington, D.C., at the time at the senator's apartment,

7    correct?

8    A.  I'm not sure if that agent was in Washington, D.C., at the

9    time.

10   Q.  You were aware at the time you conducted this search that

11   the senator and his wife Nadine were at the senator's apartment

12   in Washington, D.C., that day, correct?

13   A.  I was aware that the senator was in Washington, D.C.  I

14   don't know exactly where he was that day.  That was not part of

15   my task that day.

16   Q.  You were aware because others in the FBI told you that the

17   FBI knew the senator was in D.C. that day, correct?

18              MS. POMERANTZ:  Objection.

19              THE COURT:  Sustained as to form.

20              Sir, you were told Mr. Menendez was in D.C., correct?

21              THE WITNESS:  Yes.

22              THE COURT:  Did you know where he was in D.C.?

23              THE WITNESS:  No.

24              THE COURT:  Next.

25   BY MR. FEE:

O5hWmen1                         Kougemitros - Cross

1   Q.  You were also informed that the FBI did not recover any

2   cash or gold from Senator Menendez's --

3              MS. POMERANTZ:  Objection.

4   BY MR. FEE:

5   Q.  -- D.C. apartment, correct?

6              THE COURT:  Sustained.  Sustained as to form.  The

7   question has an assumption in it.  Change the form.

8              MR. FEE:  Thank you, your Honor.

9   Q.  You never learned that the FBI recovered cash or gold from

10  Senator Menendez's apartment in D.C., correct?

11             MS. POMERANTZ:  Objection.

12             THE COURT:  I'll allow it.

13  A.  I was never informed of anything like that.

14             THE COURT:  Ladies and gentlemen, I'm not singling out

15  this question for any particular reason except this.  Remember

16  it's only the answers that are evidence, not the questions, so

17  you can't take anything from the question.  What's important is

18  the answer.  Obviously, the answer is the answer to the

19  question, but what I mean by that is Mr. Fee said, "You never

20  learned that the FBI recovered cash or gold from Senator

21  Menendez's apartment, correct?"

22             And he said he was never informed.

23             You cannot draw an inference from that question that

24  the FBI, in fact, did or did not recover cash or gold from

25  Senator Menendez's apartment in D.C.

1          Do you understand that?

2          The only thing you can take away from that interchange

3   is this witness's statement that he was never informed of

4   anything like that.

5          All right.

6          MR. FEE:  Thank you, your Honor.

7          THE COURT:  Watch the assumptions in your question.

8   Leading questions are fine, but be careful of the assumptions.

9          THE WITNESS:  Just to reinforce, I'm not a member of

10  the investigative team.

11         MR. FEE:  Understood.  Thank you, your Honor.

12         Thank you, Agent.

13         THE COURT:  Agent, I'll remind you that your job is

14  simply to answer the questions.

15         Let's proceed.

16         MR. FEE:  A lot of coaching, your Honor.

17         THE COURT:  Everything is formal procedures, but there

18  are valid reasons underlying the procedures.

19         Mr. Fee.

20  BY MR. FEE:

21  Q.  Agent, you also testified about a sketch artist that was

22  present on the date of the search, correct, or a sketcher?

23  A.  Yes.

24  Q.  What did that -- what is the term you used, actually,

25  sketch artist?

1   A.  It's an agent that's just assigned to do the sketch.

2   Q.  An agent who went to art school?

3   A.  No.

4            THE COURT:  Mr. Fee, let's move on.

5   BY MR. FEE:

6   Q.  What did they do?  What did they do that day?

7   A.  They made a sketch.

8            MR. FEE:  We can put it up and show him what's been

9   marked as Defendant's Exhibit 723, just for the agent and the

10  lawyers, please.  Let's give him a second so we can cycle

11  through the pages.

12           Don't say anything yet, Agent Kougemitros.

13  Q.  OK.  So four pages of that, is that the sketch, Agent

14  Kougemitros?

15  A.  That was the sketch that the agent made.

16           MR. FEE:  Your Honor, we would offer Defendant's

17  Exhibit 723.

18           MS. POMERANTZ:  No objection, your Honor.

19           THE COURT:  Admitted.

20           (Defendant's Exhibit 723 received in evidence)

21           MR. FEE:  Your Honor, before I publish that, I also

22  want to show just the agent and the lawyers Defendant's Exhibit

23  104.

24           Agent, I just want you to take a look at this and,

25  again, not say anything.

1          You know what?  I'm going to hand it to him.  You can

2     put it up, but I'm also going to hand him what's been admitted

3     as exhibit 723 in case he wants to compare.  So put up 104, and

4     I'm going to hand him 723.

5          May I approach?

6          THE COURT:  Yes.

7          MR. FEE:  You can cycle through those pages,

8     Mr. Kelly, Defendant's Exhibit 104.

9     Q.  Have you had a chance to look at that, Agent Kougemitros?

10    A.  Yes.

11    Q.  Defendant's Exhibit 104, is that a fair and accurate

12    depiction of 41 Jane on the date of the search?

13    A.  No.

14    Q.  Defendant's Exhibit 723, you would agree, is?

15    A.  723 is also missing some information on it.

16    Q.  So what is missing from 104?  We're now talking about 104.

17    Just tell me what you think is missing.

18    A.  There's just some inaccuracies of where certain things are

19    placed.

20    Q.  OK.  Aside from where you see things placed, is the layout

21    of the home, as depicted in Defendant's Exhibit 104, fair and

22    accurate?

23    A.  The layout -- can you just scroll through it again?

24          MR. FEE:  Sure, of course.

25          Mr. Kelly, not too fast.

O5hWmen1                    Kougemitros - Cross

1   A.  The layout seems -- seems the same.

2   Q.  OK.  And the things that are -- what things are in the

3   wrong places on 104?

4   A.  There's -- some of the -- there's doors that are not in the

5   right place or nonexistent.  The safes are not in the right

6   spots.

7   Q.  The safes are in the right rooms but not in precisely the

8   right location on 104?

9   A.  Yes.

10          MR. FEE:  Got it.

11          Your Honor, we would offer Defendant's Exhibit 104 as

12  well.

13          MS. POMERANTZ:  Your Honor, we would object.

14          THE COURT:  He said it's not an accurate

15  representation, sir.

16          MR. FEE:  Understood, your Honor.  I won't argue it

17  here.  Let's go with 723, which is already in.

18          Can we publish that, Mr. Kelly.

19          Sir, I won't go through this in any great detail.

20  Let's go to page 3 of 4 of 723.

21  Q.  And again, just so the jury understands where we are, Agent

22  Kougemitros, this page of the FBI sketch depicts the top floor

23  of the residence, correct?

24  A.  Yes.

25  Q.  B is that bedroom and then C is that closet, right?

O5hWmen1                        Kougemitros - Cross

1   A.  Yes.

2   Q.  And then C, again, is that closet where you discussed the

3   safe and the two one-kilogram gold bars, correct?

4   A.  That's correct.

5        MR. FEE:  All right.  Let's go to GX1F-1158, please.

6   Q.  Do you recognize this as the cash that was recovered from

7   the closet?

8   A.  I would have to match it to which item it was.

9   Q.  Understood.  I'm not going to do that with you now.

10      You would agree there's no Post-its with any handwritten

11  notations on this cash, right?

12  A.  On the cash itself?

13  Q.  Yes.

14  A.  No.

15  Q.  Before you in that photograph.

16  A.  I mean I can't see every bill, if there is annotations on

17  any of these bills.

18       MR. FEE:  Totally fair.  Let's go back to page 723,

19  page 1 of 4, Defense Exhibit 723, page 1 of 4.

20  Q.  Again, Agent Kougemitros, this is now the basement of the

21  residence depicted in this sketch, page 1, correct?

22  A.  Yes.

23  Q.  And U was that storage room you testified about with all

24  the coats hanging up, right?

25  A.  U was that room, yes.

O5hWmen1                          Kougemitros - Cross

1    Q.  U.  And then Q was the senator's office with the golf balls

2    and the duffel bag with cash in it, right?

3    A.  I don't know whose office Q was, but Q was an office.

4    Q.  I hear you.

5        It was an office where you saw the duffel bag, the golf

6    balls and some other stuff, fair to say?

7    A.  Lots of other stuff.

8    Q.  Lots of other stuff.  OK.

9        And from those two rooms, the storage room U and the office

10   Q, there was cash recovered but no gold, correct?

11   A.  From those two rooms?

12   Q.  Correct, just those two.

13   A.  Correct.

14   Q.  Got it.

15       So from everything you talked about yesterday, for the

16   search of 41 Jane, there's three rooms where cash was

17   recovered, correct?  I could walk through it.

18   A.  Three rooms.  Yes.

19   Q.  Charlie, the locked closet; U, the storage room in the

20   basement; and Q, the office.  Those are the only places where

21   cash was recovered, right?

22   A.  That's correct.

23   Q.  And then, again, gold was only in the locked closet, right?

24   I'm sorry.  The one-kilogram gold was only in the locked closet

25   Charlie?

1   A.  The one-kilogram gold was in locked Charlie, yes.

2         MR. FEE:  Let's just put up Government Exhibit

3   1F-1306, which you looked at yesterday, please.

4   Q.  So you testified this was found in the office room Q,

5   correct?

6   A.  That's correct.

7   Q.  And then you'll see, where I'm circling in red, notes or

8   Post-its with some handwritten -- at least you can see one

9   Post-it with handwritten material on it, right?

10  A.  Yes.

11        MR. FEE:  Let's go to GF1F -- sorry.  GX1F-1307, the

12  next photo in the series.

13  Q.  This is the cash in the duffel from the office laid out by

14  the FBI, right?

15  A.  For the smaller duffel.

16  Q.  The smaller duffel in the bigger duffel from the office

17  laid out by the FBI, correct?

18  A.  That's correct.

19  Q.  Got it.

20        And again, we see, just visible on this photo, Agent

21  Kougemitros, one, two, three, four, five, six, seven yellow

22  pieces of paper affixed to bills, right?

23  A.  Yes.

24  Q.  And some of them have notations on them --

25        MR. FEE:  You can zoom in on one.  You pick, Justin,

1    Mr. Kelly.

2    Q.  -- the 2K.

3    A.  I see 2K?

4    Q.  Yes, I see 2K.  You see 2K?

5              THE COURT:  We see 2K.  Next.

6              MR. FEE:  And just stay there.  Zoom in a little bit

7    more.

8    Q.  Some of these bills are old, aren't they, Agent

9    Kougemitros?  Can you see what that says?

10   A.  Series 2006.

11   Q.  Right.  So that means the bill was put out in circulation

12   by the United States government in the year 2006, right?

13             MS. POMERANTZ:  Objection.

14             THE COURT:  Sustained.

15   BY MR. FEE:

16   Q.  Are you aware what that means?

17   A.  I'm not aware what that means.

18             MR. FEE:  Let's pull back out, Mr. Kelly, and go to --

19   zoom in on the $100 bill with the 10K Post-it or note written

20   on it.

21             No.  I'm sorry.  The other one.

22             There you go.  It's all good.

23             And you can zoom in on the series.

24   Q.  Can you read that?

25   A.  Not clearly.

O5hWmen1                          Kougemitros - Cross

1   Q.  Not clearly.  Does it look like 2000-something, you would

2   agree, Agent Kougemitros?

3   A.  2000-something, I would agree.

4              MR. FEE:  OK.  Got it.  Zoom out, and let's go in on

5   that 50 on the top left.  And try to zoom in on where it says

6   series.  Maybe not too close.

7   Q.  You would agree, Agent Kougemitros, that that's a

8   199-something or a 1-something-something; how about that?

9   A.  It's definitely a 1-something.

10  Q.  So the first digit, we can all agree, is a 1, fair to say?

11  A.  Yes.

12             MR. FEE:  You can put that down.

13             THE COURT:  Do you know what the series number

14  indicates, sir?

15             THE WITNESS:  I've never been told.  I could make

16  an --

17             THE COURT:  I don't want a guess, sir.

18             THE WITNESS:  No, I don't know.

19             THE COURT:  Next.

20             MR. FEE:  Let's go to the storage area, room U, and

21  put up Government Exhibit 1F-1264.

22  Q.  You testified on direct, I think, it was $95,000 found in

23  that yellow bag, right?

24  A.  That's correct.

25  Q.  Do you remember where that yellow bag was from?

1        THE COURT:  Where it was from in the house?

2        MR. FEE:  No, no.  I'm sorry.  You know what?  I'll

3   show you.  Put up Government Exhibit -- is it 1265, Mr. Kelly?

4        Put that up for everybody.  That's in evidence.

5   Q.  There's the 95K with the stamps or with the wrappers, Agent

6   Kougemitros?

7   A.  Yes.

8   Q.  And are you able to read that it says forever here?

9   A.  I do see that it's written forever.

10  Q.  Do you know what Forever 21 is?

11  A.  I do know that's a retail store.

12  Q.  Got it.

13       Are you aware it's a retail store for, like, young women's

14  fashion?

15       MS. POMERANTZ:  Objection.

16       THE COURT:  Let's move on.

17       MR. FEE:  OK.  Let's go to Government Exhibit 1F-127,

18  also in the basement -- 1207.  Thank you, Mr. Weitzman.

19  Government Exhibit 1F-1207.  Or is it 67?

20  Q.  67, so you testified about this yesterday.

21       MR. FEE:  And then let's go to the next one in the

22  series.

23  Q.  That's the jacket, right, that you testified about

24  yesterday?

25  A.  That's one of the jackets.

| 1 | MR. FEE:  One of the jackets.

| 2 | Let's go to where the cash is displayed.  That's it.

| 3 | And let's -- no.  This is the wrong jacket.

| 4 | Q.  Anyway, you see here two more Post-its, right?

| 5 | A.  I see two Post-its on the cash.

| 6 | MR. FEE:  OK.  Let's put all that down.

| 7 | If we can just publish, or show only to the agent and

| 8 | the attorneys, we're going to start with DX121 and go through

| 9 | 130.

| 10 | Q.  Agent, you testified about taking stills from the

| 11 | walk-through video; you mentioned looking at still photographs

| 12 | from the videos made that day, correct?

| 13 | A.  No, I didn't.

| 14 | Q.  OK.  You talked about the walk-through video at exit,

| 15 | right?

| 16 | A.  That a walk-through video was made?

| 17 | Q.  Yes.

| 18 | A.  Yes.

| 19 | MR. FEE:  OK.  I'm going to ask you to look at 121,

| 20 | and then we're going to cycle through these.  Give him some

| 21 | time, Mr. Kelly.

| 22 | Keep going.

| 23 | Five more minutes, your Honor.

| 24 | Q.  Agent Kougemitros, do those photographs fairly and

| 25 | accurately depict the residence on the date of the search?

1   A.  I can only speak to some of those photographs, because I

2   could tell from the letters that are listed there.  The other

3   ones I can't tell when those were taken.

4   Q.  Understood.  I'm not asking you to tell me when they were

5   taken.

6       Based on your review of the photographs and videos and your

7   participation in the search, do the items you just saw fairly

8   and accurately depict the residence on that date?

9   A.  I don't think I can say that.

10            MR. FEE:  All right.  Let's put up, let's go to 130.

11  Q.  Did you search or did the FBI search a second closet called

12  room K?

13  A.  Yes.

14            MR. FEE:  And if we can put up Government Exhibit --

15  excuse me, Defense Exhibit 723 and go to, I think it's the

16  third page, or the second page.  Excuse me.

17            Got it.

18  Q.  So K was a closet off of a smaller bedroom on the top

19  floor, correct?

20  A.  That's correct.

21  Q.  And it wasn't depicted on the FBI sketch?

22  A.  That's -- I see the -- that's right.

23  Q.  So there are some things that were searched that aren't

24  reflected here, correct?

25  A.  I disagree with that statement.

1    Q.  Well, room K was searched by the FBI, that closet off of

2    the smaller bedroom on the top floor; that was searched, right?

3    A.  That's correct.

4    Q.  And it's not reflected, there's no room K in the FBI sketch

5    of that date?

6    A.  There is no label K on this sketch.

7    Q.  Oh, but you're saying the room is there?

8    A.  That's right.

9    Q.  Can you point out -- you can even circle it with your

10   finger on the screen.

11   A.  Oh, it would have been right here.

12   Q.  Got it.

13       So there was another bedroom with a smaller closet, and in

14   that closet you found a series of ties, right?

15   A.  In room K there were ties.

16   Q.  Got it.

17       And I'm going to show you -- well, let's keep going.  There

18   was a second closet -- a third closet you also searched that I

19   don't think is labeled on this sketch.  Is that correct?

20   A.  That's correct.

21   Q.  It was called by the FBI room I, so a third closet in a

22   different, third bedroom on the top floor, correct?

23   A.  Yes, sir.

24   Q.  And I don't know if you can do this from memory, room I

25   isn't here, but do you know where in this sketch room I, that

O5hWmen1                        Kougemitros - Cross

1    closet, would be depicted?

2    A.   Yes.

3    Q.   Please point it out to the jury.

4    A.   So, this would be room H.

5            JUROR:  Point it out to the jury?  The jury's not

6    looking at anything.

7            MR. FEE:  Oh, it's not up?

8            This is in evidence.  Sorry.  Please publish it for

9    the jury.

10           Your Honor, I don't want to talk to the jury directly.

11   Did they not see any of that?

12           JUROR:  No.

13           MR. FEE:  OK.  It will take a second.

14   Q.   Why don't you draw where room H, I, then I'll ask you to do

15   the J and K.  You have H and I up there.  J, K.

16           MR. FEE:  And let the record reflect H is in the top

17   left; J in the bottom left; and I is within H and K is within

18   J.

19   Q.   So I was this, another closet, no lock on that closet,

20   right?

21   A.   That's right.

22   Q.   And within I, you found men's suits, correct?

23   A.   I didn't search room I.

24   Q.   Do you know what the FBI found in room I, the closet?

25   A.   No.

1  Q.  Would it refresh your recollection to look at the FBI's

2  collection log?

3          MS. POMERANTZ:  Objection.

4  A.  No.

5  Q.  Was there a log made of what was searched that day?

6  A.  Nothing was found in room I.

7  Q.  Oh.  So there was no cash, no gold, nothing of evidentiary

8  value found in room I, that closet?

9          MS. POMERANTZ:  Objection.

10          THE COURT:  If he's able to answer that, he may.

11  A.  Can you repeat the question?

12  Q.  Sure.

13      There was no gold, no cash, nothing of evidentiary value

14  that you told your team to seize from room I, that closet?

15          MS. POMERANTZ:  Objection.

16          THE COURT:  I'll allow it.

17          If you can answer.

18  A.  Nothing was seized from room I.

19  Q.  And you're the one who the other agents, the other

20  searchers would go to and say, hey, do we seize this, right?

21  A.  That's right.

22  Q.  So you would know if there was anything like gold or cash

23  that was seized that day from room I, right?

24  A.  Nothing was --

25          MS. POMERANTZ:  Objection.

O5hWmen1                          Kougemitros - Cross

1        THE COURT:  I'll allow that.

2   A.   Nothing was seized from room I.

3   Q.   Same story with the closet we are calling room K, where you

4   testified there were ties, correct; no gold, no cash, nothing

5   seized from room K on the date of this search?

6   A.   I don't believe I said that there was ties in room K.  If I

7   did -- nothing was seized from room K.

8   Q.   Got it.

9        Now you're not sure there were ties, but you do know that

10  there was nothing seized from room K.  Fair to say?

11       MS. POMERANTZ:  Objection.

12       THE COURT:  I'll allow it.

13  A.   Can you repeat the question?

14       MR. FEE:  Of course.

15       THE COURT:  Wait.  Did the FBI seize anything from

16  room K, to your knowledge?

17       THE WITNESS:  Nothing was seized from room K.

18       MR. FEE:  OK.  Last thing.  Let's put up Government

19  Exhibit 1F-1225.  Let's zoom in from the top of the hanger

20  down.

21  Q.   Agent Kougemitros, you testified about this on direct,

22  these handwritten things with Democratic Caucus on it.  Do you

23  recall that?

24  A.   Yes.

25  Q.   And you testified about these handwritten things, and one

1  of them that has Senator Menendez's name on it, during the time

2  when you mistakenly had told the jury that the blazer was

3  inside the locked closet, right?

4          MS. POMERANTZ:  Objection.

5          THE COURT:  Sustained as to form.

6  BY MR. FEE:

7  Q.  Yesterday, when you testified about these handwritten

8  notes, one of them bearing Senator Menendez's name, you had

9  indicated this blazer was found inside the locked closet,

10  correct?

11  A.  Yes.

12  Q.  You would agree with me that, in fact, these notes which

13  were found inside the blazer were not inside that locked closet

14  when the FBI searched the residence, correct?

15  A.  Yes.

16          MR. FEE:  Thank you, your Honor.

17          THE COURT:  All right.

18          Is there any redirect?

19          Oh, I'm sorry.  There is more than one defendant.

20          MR. LUSTBERG:  It won't be long.

21          THE COURT:  Yes.  That is correct.

22  CROSS-EXAMINATION

23  BY MR. LUSTBERG:

24  Q.  Good morning, Agent.  Just one question, hopefully.

25          You testified yesterday with regard to the seizure of a

1    number of one-ounce gold bars, correct?

2    A.  Yes.

3    Q.  And do you recall that only two of them were marked Asahi

4    one-ounce gold bars?

5             THE COURT:  As you sit here, sir, do you recall that

6    only two of the gold bars, of the one-ounce gold bars were

7    marked Asahi?  Yes, no, I don't know.

8    A.  I don't recall.

9             MR. LUSTBERG:  OK.  Can we pull up Government Exhibit

10   1F-1209.

11   Q.  OK.  If you see on the left-hand side of Government Exhibit

12   1F-1209 those two bars that say Asahi?

13   A.  Yes, I see them.

14   Q.  OK.  Do you recall whether there were any other gold bars

15   with the Asahi marking that were the one-ounce gold bars?

16   A.  I don't recall the -- I don't recall if the other ones were

17   marked Asahi.  I know the seven ones were Valcambi, but I don't

18   know -- there's still two other ones that I don't know what

19   they are.

20             MR. LUSTBERG:  OK.  Well, let's pull those up.  Take a

21   look at Government Exhibit 1F-1188.

22   Q.  These were the seven Valcambi that you discussed?

23   A.  Yes.

24   Q.  And they are not marked Asahi, correct?

25   A.  They are not.

1          MR. LUSTBERG:  OK.  Let's take a look at Government

2    Exhibit 1F-1164.

3    Q.  Do you see those two gold bars on the right-hand side that

4    say Credit Suisse?

5    A.  I do.

6    Q.  And those obviously don't say Asahi either, correct?

7    A.  That's correct.

8    Q.  OK.  Are you aware that now covers all of the one-ounce

9    gold bars that you seized?

10   A.  Yes.

11   Q.  So there were only two that were marked Asahi, correct?

12   A.  That's correct.

13          MR. LUSTBERG:  Thank you.

14          Nothing further, Judge.

15          THE COURT:  Mr. De Castro.

16          MR de CASTRO:  Thank you, Judge.  We have nothing.

17          THE COURT:  Any redirect?

18          MS. POMERANTZ:  Yes, your Honor.

19          Your Honor, I would ask just to give me a moment to

20   look at defense exhibit -- I just didn't have a copy of Defense

21   Exhibit 723.

22          THE COURT:  Yes.

23          MS. POMERANTZ:  I believe the special agent has that

24   copy.

25          THE COURT:  Go ahead.

1          MS. POMERANTZ:  Thank you.

2          THE COURT:  You want to physically take it?  Go ahead.

3          MS. POMERANTZ:  Yes, please.

4          THE COURT:  Yes, ma'am.

5   REDIRECT EXAMINATION

6   BY MS. POMERANTZ:

7   Q.  Good morning.

8   A.  Good morning.

9   Q.  You were asked questions on cross-examination about Defense

10  Exhibit 723, a sketch of 41 Jane Drive.  Do you recall that?

11  A.  Yes.

12  Q.  And Defense Exhibit 723 has -- and just to be clear, you're

13  not the person who drew the sketch, is that correct?

14  A.  That's right.

15  Q.  And Defense Exhibit 723 has some circles on it with numbers

16  in it, correct?

17  A.  Yes.

18  Q.  To be clear, those numbers that are in circles, those are

19  not -- those numbers are not correlated with the government

20  exhibit numbers that you testified about yesterday, correct?

21  A.  That's right.

22  Q.  And those numbers with circles in it on Defense Exhibit 723

23  are not correlated with the 1B numbers that you testified about

24  yesterday either, correct?

25  A.  That's correct.

1   Q.  And the numbers that are in circles on Defense Exhibit 723

2   are not correlated with the evidence collection item log

3   numbers either, correct?

4   A.  That's right.

5   Q.  You were asked questions on cross-examination yesterday

6   about your fingerprints.  Do you remember that?

7   A.  Yes.

8   Q.  Special Agent Kougemitros, are you an expert in fingerprint

9   analysis?

10  A.  No.

11  Q.  Did you conduct any fingerprint analysis in this case?

12  A.  I did not.

13  Q.  Where does the FBI send items to be tested by actual

14  experts for fingerprint analysis?

15  A.  To our lab at Quantico, Virginia.

16  Q.  Can you remind the jury whether any of the envelopes that

17  were found inside the safe inside the closet were sent down to

18  the laboratory for expert fingerprint analysis?

19  A.  Yes, they were.

20  Q.  Do you remember being asked questions on cross-examination

21  about some of the security measures in the house, like the

22  locked bedroom door?

23  A.  Yes.

24          MS. POMERANTZ:  I want to pull up Government Exhibit

25  1F-1079.

1   Q.  Do you see that, Special Agent?

2   A.  I do.

3   Q.  Is this a -- did you testify about this photograph

4   yesterday?

5   A.  I did.

6   Q.  Is this an entry photograph of the kitchen?

7   A.  It is.

8   Q.  Do you see that chair propped under the doorknob?

9   A.  Yes.

10  Q.  Where does that door lead to?

11  A.  The exterior of the home, rear exterior of the home.

12  Q.  Did the FBI put that chair there, or was that there when

13  you arrived?

14  A.  That was there when we arrived.

15  Q.  Do you remember being asked a series of questions about

16  what rooms in the house you seized evidence from?

17  A.  Yes.

18  Q.  Can you remind us in what room you found the duffel bag

19  with over $100,000 in cash?

20  A.  In the office, room Q.

21  Q.  Was that the room with the statue of the Capitol?

22  A.  Yes.

23  Q.  Was that the room with sports memorabilia?

24  A.  Yes.

25  Q.  Was that the duffel bag that had a U.S. Senate folder in

1   it?

2   A.  Yes.

3   Q.  You testified earlier, yesterday, about finding cash in

4   jackets.  Can you remind the jury, where did the FBI find that

5   cash?

6   A.  In the jacket pockets?

7   Q.  Yes.

8   A.  In -- what room?  Is that your question?

9   Q.  In what room?

10  A.  In room U.

11       MS. POMERANTZ:  And I want to pull up for the jury

12  Government Exhibit 1F-1264.

13  Q.  I'm going to direct your attention to the yellow bag on the

14  shelf.  How far was that bag from the jackets with the cash

15  marked by the Post-it notes?

16  A.  Inches.

17       MS. POMERANTZ:  Let's pull up Government Exhibit

18  1F-1265.

19  Q.  Was this what was found in the yellow bag that you just

20  testified was inches from the jackets with the cash?

21  A.  That's correct.

22       MS. POMERANTZ:  Let's pull up Government Exhibits

23  1F-1269 and 1280 side by side.

24  Q.  Are these two of the jackets where the FBI found cash?

25  A.  Yes.

O5hWmen1                         Tate - Direct

1   Q.  Whose name is on these two jackets?

2   A.  Robert Menendez and Senator Menendez.

3   Q.  Did you see the name Nadine on any of the jackets where the

4   FBI found cash in the pockets?

5   A.  No.

6   Q.  Do you recall seeing the name Nadine on any of the jackets

7   on that rack in the basement at all?

8   A.  No.

9   Q.  Whose name did you see on the jackets from that rack?

10  A.  Robert Menendez and Senator Menendez.

11          MS. POMERANTZ:  No further questions.

12          THE COURT:  Thank you, Agent.  You may step down.

13  You're excused.

14          (Witness excused)

15          THE COURT:  Next witness for the government.

16          MR. MARK:  The government calls as its next witness

17  Bret Tate.

18  JAMES BRET TATE,

19       called as a witness by the government,

20       having been duly sworn, testified as follows:

21          THE COURT:  Please be seated, sir.  Welcome.

22          Your witness.

23          MR. MARK:  Thank you, your Honor.

24  DIRECT EXAMINATION

25  BY MR. MARK:

O5hWmen1                         Tate - Direct

1    Q.  Good morning, Mr. Tate.

2    A.  Good morning.

3    Q.  Are you currently employed, Mr. Tate?

4    A.  I am.

5    Q.  Where are you employed?

6    A.  I'm currently working at the U.S. embassy in Santiago,

7    Chile.

8    Q.  What is your title at the U.S. embassy in Santiago, Chile?

9    A.  I am -- well, I have a couple titles, but my working title

10   is the agricultural *attaché*.

11   Q.  Just briefly, what is an agricultural *attaché*?

12   A.  We are part of the U.S. diplomatic corps that works to

13   promote U.S. business interests overseas.

14   Q.  And you said that's one of your working titles.  Do you

15   have any other titles?

16   A.  I do.  I do.  I have a diplomatic title.  I'm a first

17   secretary.

18   Q.  And what does a first secretary refer to?

19   A.  The first secretary is the diplomatic title that's given to

20   sort of the middle-level management at an embassy.

21   Q.  Who is your employer at the U.S. embassy in Santiago,

22   Chile?

23   A.  I was hired by the U.S. Department of Agriculture.

24   Q.  Just briefly, what is the U.S. Department of Agriculture?

25   A.  The U.S. Department of Agriculture cabinet-level agency

O5hWmen1                         Tate - Direct

1    that oversees -- inside the United States oversees farm and

2    food programs, and then we have some international programming

3    as well.

4    Q.   When you refer to cabinet level, is that part of the

5    executive branch?

6    A.   That is correct.

7    Q.   I'll ask you some more questions about the U.S.D.A., but

8    first, how long have you been employed by that agency?

9    A.   Since 2011.

10   Q.   What is your educational background, Mr. Tate?

11   A.   I have a bachelor's from Texas A&M University and a

12   master's from Georgetown University.

13   Q.   What did you get your master's in at Georgetown?

14   A.   In public policy.

15   Q.   And what's your position at U.S.D.A.?

16   A.   So, I'm a career foreign service officer.

17   Q.   What is a career foreign service officer?

18   A.   So, we are -- career foreign service officers are the U.S.

19   diplomatic corps, so we come from a few different agencies.

20   But basically we represent U.S. diplomatic and commercial

21   interests overseas.

22   Q.   How does your position as a foreign service officer compare

23   to the title that you just talked about as agricultural

24   *attaché*?

25   A.   Yeah.  Fair question.

O5hWmen1                           Tate - Direct

1    So a foreign service -- as a foreign service officer, I

2    will spend two-thirds of my career overseas, but depending on

3    the specific posting, I may have a different kind of title.

4    Q.  Broadly speaking, you're saying foreign services,

5    diplomatic corps, can you just explain a little bit more about

6    what the duties and responsibilities of a foreign service

7    officer are?

8    A.  Yeah, certainly.  In broad terms, we represent the United

9    States in front of foreign governments.  We manage the

10    diplomatic relationships with foreign countries, and we

11    advocate for the U.S. interests.  In my specific role I

12    advocate for U.S. commercial and economic interests.

13    Q.  And I think you referred to diplomatic corps.  Like, what

14    is a diplomat?

15    A.  Yeah.  A diplomat -- it's a good question.  A diplomat is

16    an agent of one country that represents a country in another

17    country.  But also, as part of that, you are given -- you are

18    given diplomatic credentials by the receiving country and

19    accredited as a diplomat in that country.

20    Q.  And currently, are you an accredited diplomat in Chile?

21    A.  That's correct.

22    Q.  How long have you been a foreign service officer?

23    A.  Since 2013.

24    Q.  Did you have to take any exams or tests to become one?

25    A.  I did.  There's a foreign service exam we all have to pass

1    to become foreign service officers.

2    Q.  What, if any, appointment process was there to become a

3    foreign service officer?

4    A.  I mean after passing the tests and receiving an offer, the

5    executive branch, the president would have nominated me and

6    then I would be confirmed by the Senate -- or was confirmed by

7    the Senate.

8    Q.  Is that the case for you, that you were nominated by the

9    president, confirmed by the Senate?

10   A.  That's correct.

11   Q.  And apart from your current assignment in Santiago, Chile,

12   have you served abroad anywhere else as a foreign service

13   officer?

14   A.  I have.

15   Q.  Where else have you served?

16   A.  Immediately before this, I served in Washington, D.C.

17   Prior to that I served in Cairo, Egypt.

18   Q.  How long did you serve in Cairo, Egypt?

19   A.  For four years.

20   Q.  When did you start your tour in Cairo and when did you end

21   it?

22   A.  I began in late August of 2015 and I departed in late

23   August of 2019.

24   Q.  What was your position when you were in Egypt?

25   A.  I was the agricultural *attaché* at the U.S. embassy in

1  Cairo.

2  Q.  Were you an accredited diplomat at that time as well?

3  A.  I was.

4  Q.  From in the United States, from what branch of government

5  do accredited diplomats serve?

6  A.  We serve the executive branch.

7  Q.  So when you worked as an agricultural *attaché* in Cairo,

8  where was your office located?

9  A.  My office was in the U.S. embassy in Cairo.

10  Q.  And what, generally speaking, is a U.S. embassy?

11  A.  Fair enough.

12      A U.S. embassy is -- it is the facility, the office where

13  U.S. diplomats serve.  It's basically the office building where

14  we work, the office where we represent the United States

15  overseas.

16  Q.  Does the U.S. embassy represent the U.S. in another

17  country?

18  A.  That's correct.

19  Q.  Who is usually in charge of the U.S. embassy?

20  A.  The ambassador.

21  Q.  What if there's no U.S. ambassador; who's in charge of the

22  embassy then?

23  A.  If there's no U.S. ambassador, the No. 2 in the embassy

24  becomes the acting ambassador, and the acting ambassador we

25  call the *chargé d'affaires*.

O5hWmen1                         Tate - Direct

1  Q.  And is the role of the ambassador or the *chargé d'affaires*

2  basically the same?

3  A.  They're exactly the same.  Identical.

4  Q.  What, broadly speaking, is the role and responsibility of

5  the ambassador and the *chargé d'affaires* of the U.S. embassy?

6  A.  The ambassador is the president's representative overseas,

7  so they have the ultimate responsibility for execution of U.S.

8  foreign policy overseas.

9  Q.  Are you familiar with the term "deputy chief of mission"?

10 A.  Yes.

11 Q.  What does that refer to?

12 A.  The deputy chief of mission is the No. 2 in the embassy, so

13 the person just below the ambassador.

14 Q.  Is that sometimes referred to as the DCM of the embassy?

15 A.  It's always referred to as the DCM.

16 Q.  Who was in charge of the embassy for the majority of your

17 time in Cairo?

18 A.  For the majority of my time in Cairo, that was Chargé

19 D'affaires Goldberger, Thomas Goldberger.

20 Q.  Generally speaking, who works in a U.S. embassy?

21 A.  Generally speaking, U.S. diplomats, but we have three

22 foreign service agencies that are represented in almost every

23 embassy.  Those people come from the departments of State,

24 Agriculture and Commerce.  And there are other executive branch

25 employees that also may be in the embassy.

O5hWmen1                          Tate - Direct

1   Q.  Are there both Americans and local staff at the U.S.

2   embassy?

3   A.  Yeah, that's correct.  That's correct.

4   Q.  Is the total number of people who work at the Cairo embassy

5   public?

6   A.  Absolutely not.

7   Q.  Is the total number of American staff at the Cairo embassy

8   public?

9   A.  Absolutely not.

10  Q.  What about the total number of local staff who work at the

11  U.S. embassy in Cairo?

12  A.  It is not.

13  Q.  Is information about who works at an embassy sensitive

14  information?

15  A.  It is very sensitive.

16  Q.  Why is it sensitive?

17  A.  They're American diplomats, and American interests are

18  targeted overseas by opponents of the United States.  So

19  protecting our personnel is important.

20  Q.  Focusing on your specific role at the Cairo embassy, did

21  you have responsibility for agricultural policy for any

22  countries when you were there?

23  A.  I did.  I did.  I was primarily responsible for ag. policy

24  and trade policy for Egypt, Israel and Lebanon.

25  Q.  Focusing on the Egyptian trade policy --

O5hWmen1                        Tate - Direct

1              THE COURT:  Sir, let me ask you a question.  You said

2     the staff is -- may be, or is; I don't know what you said --

3     targeted overseas by opponents of the United States, so

4     protecting our personnel is important.

5              In what way does keeping the number of people, the

6     numbers of the total people, the numbers of the local staff and

7     the numbers of the Egyptian staff working in the Egyptian

8     embassy nonpublic, how does that protect them?

9              That was too convoluted.

10             You said this information is not public, is that

11    correct?

12             THE WITNESS:  That is correct, your Honor.

13             THE COURT:  Why is it not public?

14             THE WITNESS:  It's not public, I guess, for two

15    reasons -- well, two related reasons.  For our American staff,

16    obviously we would not want the American staff to be targets of

17    terrorists or of other opponents of the U.S.

18             THE COURT:  Go ahead.  Finish.

19             THE WITNESS:  And then for the local staff, similar,

20    we also would not want them to be targets, but also for local

21    staff, especially in Egypt and countries like that, we have a

22    concern of the host country as well.  So we wouldn't want them

23    to be targeted by the host country government in the same way

24    we wouldn't want them to be other anti-U.S. actors.

25             THE COURT:  And how does making the numbers public

O5hWmen1                          Tate - Direct

 1    increase the likelihood of their being targets?

 2              THE WITNESS:  That's a fair question.

 3              It would be one piece of information that could be

 4    aggregated to other information to identify those people.

 5              THE COURT:  OK.

 6    BY MR. MARK:

 7    Q.  And when you were talking about targets of another country,

 8    like Egypt, could you just explain what you meant by that?

 9    A.  Certainly.  I mean in many countries, dissidents of the

10    government are targeted by the government, by their own

11    government for opposing the government's interests.  So a

12    staffer or a person that was known to advocate against the

13    interests of their own government could become targets of their

14    government.

15    Q.  From working in Egypt, was that your experience, that

16    sometimes the country of Egypt would target dissidents in their

17    country?

18    A.  That's correct, yes.

19    Q.  Now, turning to your role as the agricultural *attaché* in

20    Cairo embassy, what, if any, particular goals or objectives,

21    broadly speaking, did you have in that position?

22    A.  Broadly speaking, our job was to advocate for U.S. economic

23    interests.  We were there to help U.S. businesses export more

24    products to Egypt.

25    Q.  When you talk about exporting products, can you just

O5hWmen1                          Tate - Direct

1    explain that a little bit, sort of technical term?

2    A.  Certainly.  Certainly.  Somebody exporting products would

3    be when a U.S. company wanted to sell their products in Egypt,

4    we would help those companies do that.  The inverse, of course,

5    would be imports, where a foreign company would sell products

6    in the United States.

7    Q.  Are you familiar with the term "barriers to trade"?

8    A.  I am.

9    Q.  What is a barrier to trade?

10   A.  A barrier to trade is a policy that restricts free movement

11   of those goods.

12   Q.  What types of barriers to trade can there be?

13   A.  Yeah, certainly.  It's pretty technical, but there are sort

14   of traditional barriers to trade, tariffs and quotas.  A

15   tariff's a tax on foreign goods; it increases the price of them

16   so people don't want to buy them in the other country.  A quota

17   is a limit on the number of products that can be shipped.

18   That, of course, would restrict the amount of products that go.

19       And then there are sanitary barriers to trade, there are

20   technical barriers to trade, which are more nuanced.  A

21   sanitary barrier to trade could be a requirement for -- a

22   requirement under the auspices of human health.  So for

23   example, we can't ship chicken to Egypt unless we can show it

24   has zero salmonella on it, for example.  That would be a

25   sanitary barrier.

O5hWmen1                              Tate - Direct

1          A technical barrier would be using a technical measure to

2     achieve the same objective.  So with automobiles, often

3     countries will have requirements on how bright the headlights

4     have to be.  So if Europeans have very bright headlights and

5     U.S. cars have regular bright headlights, the European car

6     might be allowed and the U.S. car's not allowed.  That would be

7     a technical barrier to trade.

8     Q.   Now, are you familiar with the World Trade Organization?

9     A.   I am.

10    Q.   Is that sometimes called the WTO?

11    A.   Yes, sir.

12    Q.   What is the World Trade Organization?

13    A.   The World Trade Organization is an international body that

14    develops international trading standards, which all members

15    agree to.

16    Q.   And is the U.S. a member of the World Trade Organization?

17    A.   It is.

18    Q.   What about Egypt?

19    A.   Also.

20    Q.   Now, from your time serving in Cairo, were you familiar

21    with whether the United States exported any beef products to

22    Egypt?

23    A.   Yes.

24    Q.   What role, if any, did the U.S.D.A. play in the export of

25    beef products to Egypt?

O5hWmen1                         Tate - Direct

1   A.  The U.S.D.A. was in charge of certifying for export all the

2   beef products that went to Egypt.

3   Q.  Are you familiar with the meat and poultry export

4   certificate of wholesomeness?

5   A.  Yes, sir, I am.

6   Q.  What is that certificate?

7   A.  That is the FSIS 9060-5.

8           THE COURT:  Slowly.  Slowly, sir.

9           THE WITNESS:  Sorry.

10          THE COURT:  It is all new to us.

11          THE WITNESS:  OK.  No problem.

12  A.  The export certificate of wholesomeness is basically a

13  health certificate that a veterinarian in the United States

14  signs attesting to the fact that the products, the meat

15  products, are safe and wholesome for human consumption.

16  Q.  And you gave, like, a form number.  I think it was FSIS,

17  and I didn't catch the last numbers.  Can you just give that to

18  us now?

19  A.  Yeah.  9060-5.

20  Q.  OK.  When it says FSIS, what does that refer to?

21  A.  FSIS is a food safety inspection service, and that is the

22  part of the U.S.D.A. that inspects meat and poultry products

23  for safety.

24          MR. MARK:  Mr. Hamill, could you show for the witness

25  only what has been marked for identification as Government

O5hWmen1                        Tate - Direct

1    Exhibit 8B-34.

2    Q.  Mr. Tate, do you recognize this exhibit?

3    A.  I do.

4    Q.  What is it?

5    A.  This is the FSIS 9060-5, the meat and poultry certificate

6    of wholesomeness.

7              MR. MARK:  The government offers Government Exhibit

8    8B-34 into evidence.

9              MR. LUSTBERG:  No objection.

10              THE COURT:  Hearing no objection, admitted.

11              (Government Exhibit 8B-34 received in evidence)

12              MR. MARK:  May we publish, your Honor?

13              THE COURT:  Yes.

14              Counsel, just so you know, once a document is

15    admitted, you can show it to the jury.  There is no need to

16    ask.  I realize you're restating that formulation.  That's

17    fine.  But you have permission to show it to the jury once it's

18    been admitted.

19              Proceed.

20              MR. MARK:  Thank you very much.

21    Q.  Mr. Tate, generally, what is the information that goes in

22    this form?

23    A.  Certainly.  So, this is general information about the

24    product and the destination.  So it begins with the country of

25    destination.  That's where the product is going.  Then the

exporter, so that's the company that will be shipping the

product.  And then the importer, so that's the person overseas

that's buying the product.  There's a place with the

establishment number.  That's where the product was produced

here in the United States.  And then, of course, the weight,

the number of packages and the description of what's in the

packages.

          MR. MARK:  And if we could now, Mr. Hamill, go look at

the bottom of the document.

Q.  Mr. Tate, could you just explain generally what is

reflected here in the bottom of this certificate?

A.  Yeah, certainly.  So, this is where the U.S. official that

has inspected the product is attesting to the fact that it

is -- it has been inspected and it is safe for human

consumption, and then they would sign and date the certificate.

Q.  And how, if at all, is this form important for an exporter

of goods from the U.S. to Egypt?

A.  In the case of meat and poultry products, the product can't

leave without the certificate.

Q.  Are there other requirements an exporter might have to

comply with to export goods from the U.S. to Egypt?

A.  Yes, there are.

Q.  What sort of other requirements could there be?

A.  There are other certificates required in some cases,

depending on the product.  Among those could be a certificate

O5hWmen1                              Tate - Direct

1    of free sale.  But also a halal certificate could be required

2    for meat products.

3              MR. MARK:  Mr. Hamill, you can take this down now.

4    Q.  What sort of beef products did Egypt purchase from the

5    United States?

6    A.  The Egyptians actually buy majority, 70 percent, of U.S.

7    beef liver.

8    Q.  And so was that a significant percent of the U.S. beef

9    liver --

10   A.  Yes.

11   Q.  -- was sold to Egypt?

12   A.  That's correct.  That's correct.  Most of our beef liver

13   exports to Egypt.

14   Q.  How, if at all, were the exports of beef livers from the

15   United States to Egypt important for U.S. businesses?

16   A.  They're very important.  I mean, as you all know, Americans

17   don't eat a lot of beef liver.  So if we don't sell them

18   domestically and we can't export them, then they end up being

19   rendered and used for pet food.

20   Q.  From your experience, why does Egypt purchase so much of

21   the U.S. beef liver?

22   A.  Well, there's two answers to that question.  The first is

23   the Egyptians make a really nice liver sandwich, green peppers

24   and onions.  If you're in Cairo, I highly recommend it.  But

25   the second reason is it's a cheap source of protein.  Egyptian

1  consumers are low-income consumers, and this is a way for them

2  to be able to eat meat.

3  Q.  Now, are you familiar with the term "halal"?

4  A.  I am.

5  Q.  What is halal?

6  A.  Halal is a lot like kosher.  It's the set of ritual rites

7  that are required for -- during slaughter for the, for beef

8  products that will be consumed by Muslims.

9  Q.  What do you mean by slaughter in this circumstance?

10  A.  I mean when the animal's killed and turned into steaks or

11  whatever it's turned into, there are a certain set of processes

12  that must be followed for the beef to then be eaten by Muslims.

13  Q.  Is halal food sometimes marked when somebody purchases it?

14  A.  Almost always.

15          THE COURT:  You mean there's a physical mark on the

16  food product?

17          THE WITNESS:  It's on the packaging.

18  BY MR. MARK:

19  Q.  And for instance, if you go to the supermarket, even in the

20  United States, could you sometimes see a halal marking on the

21  food product?

22  A.  You certainly can.

23  Q.  Do any foreign countries require that beef which that

24  country imports from the U.S. has to be certified as halal?

25  A.  Most Muslim majority countries do require halal

1    certification.

2    Q.   Now, turning to Egypt, did Egypt have any requirements

3    pertaining to halal certification while you served at the

4    embassy in Cairo?

5    A.   Yes, Egypt did require halal certification for meat

6    products.

7    Q.   And did Egypt have any requirements pertaining to who could

8    certify that the beef that was being imported into Egypt was

9    halal?

10   A.   They did have requirements about who could certify the

11   beef.

12   Q.   Were these requirements on who could certify the beef the

13   same the whole time you were stationed in Cairo, or did they

14   ever change?

15   A.   No.   They changed toward the end of my tour in Cairo.

16   Q.   When during your tour in Cairo did those requirements

17   change?

18   A.   They changed following an audit we did in late March.   I

19   think the official notification change was in mid-April, 23rd

20   or 24th of April, 2019.

21   Q.   And how did those requirements related to halal

22   certification change in mid-April 2019?

23   A.   Prior to the change, there were four different U.S.

24   companies that could certify halal for product going to Egypt.

25   After the change, there was a single certified that was

1    approved, so just one company could certify.

2    Q.  Is there a term that's sometimes used to a situation where

3    only one company could do a certain type of business?

4    A.  Yes, that is a monopoly.

5    Q.  So at that time there was a change from four different

6    companies that could do the certification to a single monopoly?

7    A.  That is correct.

8    Q.  From your time at the U.S.D.A. have you become familiar

9    with those four companies, those U.S. companies that had done

10   halal certifications before the change?

11   A.  Yes.  Yes, I knew them all.

12   Q.  And from knowing those companies, what was your impression

13   of the business practices of those four U.S. companies?

14           MR. FEE:  Objection, your Honor.

15           THE COURT:  Sustained.

16           MR. MARK:  We'll get to that in a little bit.

17   Q.  What was the -- when the change of which companies could

18   certify halal happened in mid-April 2019, what company took

19   over as a monopoly?

20   A.  After the change, the certification -- the monopoly for

21   certification was given to IS EG Halal.

22   Q.  Prior to 2019, were you familiar with the operations of IS

23   EG Halal?

24   A.  No, sir.  They were not in the market prior to 2019.

25   Q.  And during 2019, did you ultimately become familiar with IS

O5hWmen1                         Tate - Direct

1   EG Halal?

2   A.  Ultimately, I did become familiar with them, yes.

3   Q.  How did you become familiar with IS EG Halal?

4   A.  I met with them in Washington, D.C., following the beef law

5   that I mentioned in late March.

6   Q.  From meeting with the company, did you learn who owned it?

7   A.  I did.

8   Q.  Who owned the company?

9   A.  Mr. Wael Hana.  He also goes by Will Hana.

10  Q.  And did you ever meet Mr. Hana?

11  A.  I did.

12  Q.  Let me ask you, Mr. Tate.  Do you see him in the courtroom

13  today?

14  A.  I do.

15  Q.  Can you please describe where the person you recognize is

16  sitting and describe an item of clothing that he's wearing?

17          MR. LUSTBERG:  Judge, we'll stipulate.

18          THE COURT:  All right.

19          The gentleman right next to the gentleman that stood

20  up, correct?

21          THE WITNESS:  That's correct.

22          THE COURT:  All right.

23          The witness and the defendant are smiling at each

24  other.

25  BY MR. MARK:

O5hWmen1                           Tate - Direct

1    Q.   When Egypt made the change to Mr. Hana's company as the

2    sole certifier for halal products, did the U.S. government take

3    a position on that change?

4    A.   The U.S. government did.

5    Q.   How are you familiar with that position?

6    A.   I helped develop the position.

7    Q.   What position did the U.S. government take on Mr. Hana's

8    company being awarded the monopoly?

9              MR. FEE:   I'm sorry.   Objection to the use of "U.S.

10   government" in the question.

11             THE COURT:   Lay a foundation.

12   BY MR. MARK:

13   Q.   Now, you talked about the U.S. government taking a position

14   on the policy that Egypt had made.   Can you explain what you

15   meant by the U.S. government in that situation?

16   A.   Certainly.   I would say that the -- in this case, I mean

17   the U.S. government, the U.S. Department of Agriculture, which

18   I was representing at the time, developed a policy position,

19   which was the same policy position that was developed by the

20   U.S. embassy in Cairo, and approved by the *chargé d'affaires* at

21   the embassy.

22   Q.   And when the *chargé d'affaires* communicates a position to

23   Egypt, on whose behalf is the *chargé d'affaires* communicating

24   that position?

25   A.   The *chargé d'affaires* is the president's representative
     overseas.(Continued on next page)

1    Q.  At that location?

2    A.  In that country, correct.

3    Q.  So when you're talking about the U.S. government's

4    positions, is that what you're referring to here in your

5    testimony?

6    A.  That's correct.

7    Q.  What position did the U.S. government take on the decision

8    for Egypt for IS EG Halal to be awarded the monopoly?

9              MR. FEE:  I'll object again, your Honor.

10             THE COURT:  I'll allow that.

11   Q.  You can answer the question.

12   A.  So the U.S. government generally opposes monopolies, in

13   most every industry.  So our position there was that there was

14   in the U.S. economic and commercial interest to maintain free

15   competition within the halal certification market.

16   Q.  When you explained the U.S. government generally opposes

17   monopolies, from your experience working for the United States

18   government for many years, what is your understanding of why?

19             MR. FEE:  Objection.

20             THE COURT:  Let me go back a little.  Are you talking

21   about the USDA policy?

22             THE WITNESS:  Well, the USDA policy, but more broadly,

23   the monopolies run counter to our economic interests.  We tend

24   to oppose them writ large.

25             MR. MARK:  It is 11:30.  Would your Honor like me to

O5H3MEN2                          Tate - Direct

1    continue?

2              THE COURT:  How long do you have?

3              MR. MARK:  Well, I have many hours with this witness.

4              THE COURT:  I see.  Is 15 minutes, ladies and

5    gentlemen of the jury?  I want to get -- I'm sorry.  What I

6    mean is to continue for 15 minutes.  Is that all right?  I want

7    to keep things moving.  Proceed.

8    Q.  So, you explained that a monopoly is generally against U.S.

9    interests.  Could you explain why that's so from your

10   experience?

11   A.  Certainly.  When a single company has control of the

12   market, they can manipulate prices, they can control prices

13   entirely.  Competition would force them to maintain lower

14   prices.  At the end of the day, consumers benefit from

15   competition.  That is generally the U.S. government's position.

16   Free competition is better for everyone.

17   Q.  Turning to Mr. Hana.  When did you first meet him?

18   A.  So I met him immediately after this audit I mentioned.  I

19   believe that was on March 28, 2019.

20   Q.  Where did you first meet Mr. Hana in March of 2019?

21   A.  I met him at the Marriott Hotel in Arlington, Virginia.

22   Q.  What were you doing at the Marriott Hotel in March 2019?

23   A.  I was accompanying the head of an Egyptian delegation,

24   Dr. Ahmed Abdel Kareem.  He and I were returning from Denver to

25   Washington D.C. for meetings, and we were arriving to the hotel

1    to check in.

2    Q.  You mentioned you were accompanying an Egyptian delegation.

3    What was that delegation doing at the time?

4    A.  That was an audit of the U.S. beef facilities, beef

5    processing plants across the U.S.

6    Q.  What did that audit concern?

7    A.  There were two objectives to that audit.  One was we were

8    hoping to -- we wanted the Egyptian government to approve the

9    U.S. food safety system, to allow all U.S. plants to export to

10   the Egypt.  Prior to this it had been plant by plant, so

11   individual plants had to be audited.  We wanted the entire

12   system to be approved so any plant could ship.  That was our

13   first objective.

14          Then our second objective was to allow additional

15   halal certifiers to be certified to be approved for

16   certification to Egypt.

17          THE COURT:  More than the four?

18          THE WITNESS:  Companies in addition to the four.

19          THE COURT:  All right.

20   Q.  Let me take those each objective in line.  So first you

21   mentioned plants.  What were you referring to when you used

22   that term?

23   A.  By that I mean slaughterhouses generally.  The facilities

24   where animals are processed and turned into meat.

25   Q.  Then the second objective you were talking about related to

1   additional halal certifiers.  Can you explain what that

2   objective was for the audit?

3   A.   Certainly.  Companies had approached the embassy in Cairo

4   asking if they could be added to the list of approved

5   certifiers, to certify halal beef for Egypt.  So, this audit

6   was an opportunity to have those certifiers meet with Egyptian

7   authorities to then be added to the list of approved companies.

8   Q.   What role did you have in connection with increasing the --

9   or attempting to increase the number of halal certifiers that

10  would be approved to export to Egypt?

11  A.   What did I do specifically or what was my objective there?

12  Q.   What was your objective there.

13  A.   My objective was to support U.S. companies.  At the end of

14  the day, we're to support U.S. businesses, so that's what we

15  were doing.

16  Q.   Have you ever participated in any audits by a foreign

17  country of U.S. facilities apart from the one that Egypt

18  conducted?

19  A.   I have, yes.

20  Q.   Approximately how many?

21  A.   Probably 10.

22  Q.   What is an audit, generally, in these circumstances?

23  A.   Generally speaking, just in very general terms, regulators

24  from one country will visit another country.  In that visit

25  they'll want to see food processing plants in the other

1   country.  Generally they are related to food safety, but it is

2   to show the visiting regulators that the other country can meet

3   their requirements for food safety.

4   Q.  So attempting to show the U.S. is up to meeting the food

5   safety requirements of the foreign country?

6   A.  In Egypt, that's correct.  We wanted to show the U.S.

7   companies met the Egyptian standards.

8   Q.  What role did you play in the audits you participated in?

9   A.  The Egypt audit?

10  Q.  In the Egypt audit.

11  A.  Well, I was responsible for organizing much of the visit,

12  arranging logistics, from meeting one of the two audit teams,

13  and joining for opening and closing meetings with government

14  officials.

15  Q.  Who apart, from you, participated in the March 2019 audit

16  of these U.S. beef slaughterhouses?

17  A.  We had two veterinary specialists from USDA, and we had

18  myself and one of our Egyptian staff with us.  We had I believe

19  six regulatory specialists from Egypt.  And toward the end of

20  the visit, Dr. Ahmed Abdel Kareem who was the head of the

21  veterinary section of the Egyptian Ministry of Agriculture.  He

22  came at the end of the visit.

23  Q.  What was Dr. Ahmed Abdel Kareem's position in Egypt?

24  A.  Dr. Ahmed was the chief veterinary officer, which means

25  that he, within the ministry of agriculture was in charge of

1    everything that had to do with animal products, animals, and

2    food products that come from animals.

3    Q.  Did he participate in the entire audit or did he only join

4    in after a certain period of time?

5    A.  No, he only joined for the final few days.

6            MR. MARK:  Mr. Hamill, could you please show for

7    identification only to the witness Government Exhibit 2A-23.

8    Q.  Mr. Tate, do you recognize this exhibit?

9    A.  I do.

10   Q.  What is it?

11   A.  And this is a photograph of Dr. Ahmed Abdel Kareem.

12           MR. MARK:  The government offers Government

13   Exhibit 2A-23 into evidence.

14           THE COURT:  Hearing no objection, admitted.

15           (Government's Exhibit 2A-23 received in evidence)

16           MR. MARK:  Can you please publish, Mr. Hamill.  You

17   can take it down now.

18   Q.  Mr. Tate, could you generally describe how this audit

19   proceeded in March 2019?

20   A.  Yeah, of course.  So we started in Washington, D.C. where

21   we had opening meetings with the U.S. regulators and the

22   Egyptian regulators in the room together.  We divided the

23   Egyptian team in half into two teams.  One went to Wichita,

24   Kansas, and the team I led went to Chicago.

25           From there, we drove across the country, visiting

O5H3MEN2                          Tate - Direct

1    slaughterhouses meeting with halal certifiers, eventually

2    ending in Denver, Colorado, where we had closing meetings with

3    U.S. regulators.  And the technical teams left and Dr. Ahmed

4    and I went to Washington.

5    Q.  Did you meet any halal certifiers?

6    A.  We did.  We met with a total of four halal certifiers.

7    Q.  Did the four halal certifiers you met with, include

8    entities that Egypt were already accepting halal certificates

9    from?

10   A.  Yes.

11   Q.  During the audit, did you get to see any of these halal

12   certifiers operations?

13   A.  Of the four we visited, we saw two in operation.

14   Q.  Did you visit any of these halal certifiers' offices?

15   A.  We did.  We visited offices of all four.

16   Q.  From these meetings with the halal certifiers, did you

17   become familiar with those halal certifiers operations?

18   A.  Yes.

19           THE COURT:  Were these the four who already had halal

20   certificates from --

21           THE WITNESS:  For Egypt?  No, no, sir.  Of the ones we

22   visited on the road, I believe that I know two were already

23   certified for Egypt.  I believe that two were new.  Maybe three

24   and one.

25           THE COURT:  This is part of your plan or goal to

1  increase the number of halal certified producers; is that

2  right?

3            THE WITNESS:  That's correct.

4  Q.  Just to clarify.  You saw both some existing operations of

5  the current halal certifiers on your trip, right?

6  A.  That's correct.

7  Q.  And then also did you see operations of or only meet some

8  of the new potential halal certifiers?

9  A.  We only met the new ones.

10  Q.  So the two operations that you saw were of existing halal

11  certifiers?

12  A.  That's correct.

13  Q.  From these meetings, did you become familiar with how these

14  entities were organized?

15  A.  I did.

16  Q.  How were these entities generally organized?

17  A.  I mean, generally they have a home office, and then they

18  would have certifiers, sometimes they're called blessers, that

19  folks stationed in the beef facilities across the country.

20  Q.  What was the purpose of having blessers or inspectors in

21  the particular facilities?

22  A.  One of the parts of this religious rite is the animal has

23  to be prayed over, and then someone has to be there to observe

24  that they are meeting all the requirements.  So this individual

25  in the plant would be there to carry out those needs.

1  Q.  So, each of these certifiers actually employ different

2  blessers or inspectors in the facilities?

3  A.  That's correct.

4  Q.  Focusing on those four halal certifiers that you talked

5  about that you met with.  These were these all U.S. entities?

6  A.  They're all U.S. companies.

7  Q.  And where generally did they operate?

8  A.  Where did they operate?

9  Q.  In performing halal certifications, where generally did

10  they, did they perform their operations?

11  A.  Again, they have headquarter offices which are usually in

12  the cities of middle America.  So, in Omaha, for example, there

13  is a headquarters office, and then those inspectors would be in

14  the plants scattered across the country.

15  Q.  And for whom did they provide halal certifications for at

16  the time?

17  A.  For what U.S. entity?

18  Q.  Focusing on those four different certifiers.  For whom did

19  they -- two of those you said provided halal certifications for

20  Egypt, right?  Did those entities only provide halal

21  certifications for Egypt?

22  A.  No.  The certifiers provided certification for many other

23  countries other than Egypt.  Some also for domestic products,

24  Canadian products.  Many different countries.

25  Q.  For the two potential new certifiers that you met with

O5H3MEN2                                    Tate - Direct

1    during that trip.  Did they -- so they weren't yet providing

2    halal certifications for Egypt, right?

3    A.  That's correct.

4    Q.  But were they at that time providing halal certifications

5    for others?

6    A.  Yes.  Yes, they were certifying for other countries.

7    Q.  So from meeting with these different halal certifiers, what

8    was your impression of the business practices of these four

9    entities you met with?

10            MR. FEE:  Objection.

11            THE COURT:  Sustained as to form.

12            Let's take a break, ladies and gentlemen.  Midmorning,

13   15 minutes.  You're not to discuss the case, don't check any

14   news.

15            (Jury excused)

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

O5H3MEN2                              Tate - Direct

1           THE COURT:  15 minutes.  Thank you.

2           MR. DE CASTRO:  Your Honor, I think there is no

3    objection from the parties.  I had made a request through your

4    deputy for three days that we end at 4 p.m.  It was Monday,

5    May 20, Monday, June 3.

6           THE COURT:  Just a moment.

7           MR. DE CASTRO:  Sure.

8           THE COURT:  May 20.

9           MR. DE CASTRO:  May 20, that's this Monday, June 3,

10   and June 10.

11          THE COURT:  Let my deputy know the reason.  I'll let

12   you know.

13          MR. DE CASTRO:  Thank you.

14          (Recess)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O5H3MEN2                        Tate - Direct

 1                  (In open court; jury present)
 2                  THE COURT:  You may continue with your direct
 3       examination of Mr. Tate.
 4                  MR. MARK:  Thank you, your Honor.
 5       Q.  Before the break, Mr. Tate, we were talking about the
 6       March 2019 audit at the U.S. beef slaughterhouses.  Do you
 7       recall that?
 8       A.  Yes, sir.
 9       Q.  You had mentioned you had met with four different halal
10       certifiers during your trip through America.  Two of those were
11       existing companies that had been certifying halal for Egypt; is
12       that right?
13       A.  That's correct.
14       Q.  And during this part of the audit, did you observe the
15       business practices of any of these halal certifiers?
16       A.  I did.
17       Q.  How many of those halal certifiers did you observe the
18       practices of?
19       A.  We saw two in operation at slaughterhouses, and then for
20       all four we visited their home offices.
21       Q.  Focusing on the operations of those two.  What did you
22       observe about their business practices?
23                  MR. FEE:  Objection, your Honor.  Vague.
24                  THE COURT:  Sustained as to form.
25       Q.  You observed those two of those halal certifiers conducting

1    their practice?

2    A.  Yes, I did.

3    Q.  What did you observe about how they were conducting their

4    practice?

5          MR. FEE:  Objection.

6          THE COURT:  I'll allow that.

7    Q.  You can answer.

8    A.  Well, generally speaking, everything seemed professional.

9    The blessers I observed seemed to know what they were doing,

10   they seemed very professional.  The companies at the

11   headquarters offices were willing to show documents and give

12   evidence as to their experience in the market.

13         MR. FEE:  Objection and move to strike.

14         THE COURT:  I'll allow it.  You can have cross.

15   Proceed.

16   Q.  Now, you mentioned you also met at the offices with all

17   four of those halal certifiers; is that right?

18   A.  That's correct.

19   Q.  Did any of them provide documentation to you?

20   A.  They all provided documents in hard copy and soft copy.

21   Q.  What did you observe about the documentation that was

22   provided to you?

23   A.  The Egyptians had requested certain documents.  They had a

24   checklist of documents they wanted to see, and in all four of

25   these instances, the companies provided the documents

1    requested.

2    Q.  From the document documentation that you received, did you

3    understand what the prices that were being charged by these

4    halal certifiers were?

5    A.  I did.

6    Q.  Generally, what were the prices that were being charged by

7    those halal certifiers?

8              THE COURT:  You're talking about the price for what?

9    Q.  Do the halal certifiers charge a fee for certification of

10   meat as halal?

11   A.  That's correct.  Theses are private companies, they are in

12   the business of certification to earn a profit, so of course

13   they charge the companies a fee for their services.

14   Q.  When they charge a fee, who do they charge that fee to?

15   A.  The fee would generally be paid -- it can be paid by the

16   importing company or the exporting company, depending on the

17   individual arrangements.

18             THE COURT:  I'm sorry.  I am a little confused, sir.

19   Are we talking about fees charged by the blesser to the halal

20   certifier for whom they work or are we talking about something

21   else?

22             THE WITNESS:  No, sir.  These are two different

23   things.  So the blesser would be an employee of the halal

24   company.  And the company would charge the halal company, the

25   certifying company would charge the U.S. beef company that's

1   exporting the product a fee.

2           THE COURT:  Again, I'm not sure.  Let's say -- I'm

3   making this up -- that the company that takes the beef and

4   processes it is called Swift.  And they have, in this

5   hypothetical, they have blessers who determine whether the meat

6   is properly halal, very similar to what's done if meat has to

7   be processed in a kosher way.  Swift -- I think you're saying

8   that Swift, you said the company would charge the halal

9   company.  That I don't understand.

10          THE WITNESS:  Let me try to explain a little more

11  clearly.  So these private companies, these halal certifying

12  companies, there are four that we visited.  These are private

13  firms and they employ blessers.

14          THE COURT:  Are they the meat processors?

15          THE WITNESS:  No, they are not.  They're independent

16  firms, independent companies.  And their service is to send an

17  inspector to the Swift plant in your example.  That inspector

18  then gives his thumbs up or thumbs down that the meat is

19  processed accordingly.  If it is a thumbs up, then that

20  certifying firm issues a certificate.

21          So Swift is paying for a service provided from this

22  third-party company.

23          THE COURT:  Okay.

24          THE WITNESS:  Does that make sense?

25          THE COURT:  No.  It would make sense if -- Swift is

O5H3MEN2                        Tate - Direct

1    paying for the service that is provided by the third-party

2    company.

3              THE WITNESS:  Correct.

4              THE COURT:  In other words, the halal certification

5    entity sends its employees to Swift.

6              THE WITNESS:  Correct.

7              THE COURT:  Watches what's happening, ask whatever

8    questions, whatever he or she has to do, and then gives, I

9    assume literally, the stamp of approval or not.

10             THE WITNESS:  That's correct.

11             THE COURT:  And Swift pays the halal certifying

12   company for the services of the blesser who came to the Swift

13   processing plant.

14             THE WITNESS:  That's exactly correct.

15             THE COURT:  Got it.

16             THE WITNESS:  The single caveat, if I may, is that

17   Swift can pay or the buyer can also pay.

18             THE COURT:  And the buyer is the person in Egypt or

19   Chile or Canada.

20             THE WITNESS:  Correct.  That's to be determined by a

21   contract.

22             THE COURT:  That's what entities do.  So in other

23   words it would be, the fee could be paid by Swift, or the fee

24   could be paid by whomever Swift is selling the beef to in

25   Canada, Chile, Egypt.

O5H3MEN2                          Tate - Direct

```
 1           THE WITNESS:  Correct.  That's exactly right.
 2   BY MR. MARK:
 3   Q.  And in this sort of hypothetical with Swift, how would that
 4   halal certificate be important to Swift, for instance, if it
 5   needed to export meat to Egypt?
 6   A.  Yeah, that's a great question.  In the case of Egypt
 7   specifically, the beef cannot be shipped unless it has a
 8   certificate.
 9   Q.  And now, we were talking about the fees for these
10   certificates.  Generally, how much were these fees that you
11   observed?
12   A.  Yeah.  So, pennies per pound, but we -- if I can check my
13   notes quickly, I could tell you the exact number.
14           THE COURT:  Just give an estimate if you can.  Not a
15   guess, but an estimate.
16           THE WITNESS:  I believe we were in the range of 10 to
17   $20 per ton.
18   Q.  And now we're talking about tons of beef.  In general, like
19   when we are talking about shipments of beef to Egypt, how much
20   would be shipped at a time of beef?
21   A.  Yeah, that's a good question, too.  These shipments
22   generally go in containers.  A container is -- a shipping
23   container is the size of a 18-wheeler trailer basically.  They
24   hold up to 23 tons.
25   Q.  And in your experience, would a certificate usually be
```

O5H3MEN2                          Tate - Direct

1   charged by the container of beef?

2   A.  The certificate would go with a lot, so it depends on

3   the -- it depends on a lot.  It can be anywhere from a box to a

4   container.

5   Q.  The fee would be by the amount of beef and it could vary,

6   like, how much the fee would be depending on the amount of

7   beef?

8   A.  Right.  The fee would be generally charged per weight.

9   Q.  Now, focusing on just the fee that we were talking about

10  and we'll discuss this more.  Did you observe that the fee

11  changed at all for a halal certificate from when there were

12  four certifiers to when this was this single certifier of IS EG

13  halal?

14  A.  I did.  The fee increased drastically.

15  Q.  When you talk about drastically, can you give some context

16  to that?

17  A.  Yes, certainly.  The fee, if we think about a container,

18  the fees for that container with the four certifiers would have

19  been in the 200 to $400 range.  And with a single certifier,

20  they increased over $5,000, assuming a full container, assuming

21  23 tons.

22  Q.  Understood.  While you were conducting the audit, in

23  March 2019, did any Egyptian -- strike that.

24       While you were on the audit, was Dr. Ahmed Abdel Kareem

25  with you the whole time?

1    A.  No, he was not.

2    Q.  Approximately when did he join you during the course of

3    your audit?

4    A.  He joined only for the last few days after the audit.

5    Q.  Focusing on the time before Dr. Ahmed Abdel Kareem joined

6    you.  Did the Egyptian team observe the halal practices of any

7    of the existing certifiers?

8    A.  Yes.  The team observed the practices of two certifiers.

9    Q.  Did that Egyptian team make any comments to you about the

10   practices of those halal certifiers while you were conducting

11   that audit?

12            MR. FEE:  Objection.  Hearsay.

13            MR. MARK:  Not for its truth.

14            THE COURT:  Just a moment.

15            I'll allow you to answer that yes or no.  Did the

16   Egyptian team make any comments to you about the practices?

17   Yes or no?

18   A.  No.

19            We are talking about the period before Dr. Ahmed

20   arrived?

21   Q.  Correct.

22   A.  No.

23   Q.  So just may I ask just a clarifying question, your Honor.

24   So prior to Dr. Ahmed Abdel Kareem joining you, you and the

25   Egyptian officials had observed the halal practices of existing

```
 1    entities, and there had been no comments from any of the
 2    Egyptian members or your Egyptian counterparts on the halal
 3    practices?
 4    A.   The Egyptian audit team with me had no concerns with the
 5    halal practices prior to Dr. Ahmed's arrival.
 6               MR. FEE:  Objection, your honor.
 7               THE COURT:  Sustained.
 8               MR. FEE:  And move to strike.
 9               THE COURT:  Yes.  The jury will disregard the answer.
10    Q.   Mr. Tate --
11               THE COURT:  Let me ask you to rephrase it.
12    Q.   Let me rephrase this.  Before Dr. Ahmed Abdel Kareem joined
13    you, did any members of the Egyptian team that was there with
14    you on the audit make any negative comments about any of the
15    halal practices of any of the existing certifiers?
16               THE COURT:  Either yes or no.
17    A.   They did not.
18    Q.   After Dr. Ahmed Abdel Kareem joined you, did Dr. Ahmed
19    Abdel Kareem make any negative comments about any of the halal
20    certifiers?
21               THE COURT:  I'll sustain it at this point.
22               MR. MARK:  Just one moment.
23               THE COURT:  Did Dr. Ahmed Abdel Kareem, after he
24    joined you, make any comments about any of the halal
25    certifiers?  Simply yes or no.
```

1            THE WITNESS:  Dr. Ahmed did, yes.

2    Q.  Now, you mentioned that after Dr. Ahmed Abdel Kareem joined

3    you, he did make some negative comments about halal certifiers?

4            THE COURT:  No, I asked whether he made comments.

5            MR. MARK:  Sorry, your Honor.

6    Q.  What were the nature of those comments once he joined you?

7    A.  Certainly Dr. Ahmed had two sets of concerns.  One set was

8    about the way the animals were slaughtered.  The second was

9    about the way the animals were stunned.

10   Q.  And so prior to Dr. Ahmed Abdel Kareem joining you, nobody

11   else had raised any concerns like that, correct?

12   A.  That's correct.

13   Q.  And just so we understand, he said something about stunning

14   and something as well about the cut; is that right?

15   A.  I'm sorry?

16   Q.  You mentioned a comment about stunning first.  What was the

17   nature of that comment?

18   A.  Yeah, in the United States, we stun animals before we

19   slaughter them, before they're killed.  And the concern was

20   that the animals might have died during stunning.  And if they

21   had died during stunning, then they wouldn't be halal, but

22   there would also be a question of food safety.

23   Q.  Did you observe any concerns about stunning of the animals

24   during the audit?

25   A.  I did not.

1  Q.  When you're talking about stunning, what does that mean?

2  A.  Well, the animals are -- they're stunned so that they are

3  not conscious when they're slaughtered.  That stunning can,

4  there are a few different mechanisms they use.  With smaller

5  animals it is often electrical stunning.  With larger animals,

6  sometimes it is an impact to the head.

7  Q.  You said if there were concerns about stunning, that would

8  not just be a halal issue, that would also be a sanitary issue,

9  right?

10 A.  That's correct.  In the United States we don't allow people

11 to consume dead animals.

12 Q.  While you are on this audit, you didn't observe any

13 concerns about stunning, did you?

14 A.  That's correct.  I did not see any.

15 Q.  The second comment that you mentioned Dr. Ahmed Abdel

16 Kareem made was related to the cut of the animal being

17 slaughtered?

18 A.  That's correct.  That's correct.  There are two ways to

19 slaughter a cow.  Transverse cut or a lateral cut.  And in the

20 United States, slaughterhouses prefer the lateral cut because

21 it's faster, though they can do both.  Some halal certifiers

22 require a transverse cut.  Some don't.  So, the U.S. industry

23 does both.  But, and Dr. Ahmed saw both.

24 Q.  And you mentioned Dr. Ahmed Abdel Kareem made a mention

25 about the type of cut to the halal certifiers; is that right?

1    A.  That's correct.

2    Q.  How did those halal certifiers respond to that comment?

3    A.  They responded with saying no problem, we can cut the other

4    way.

5    Q.  Now, how long did this audit take approximately?

6    A.  I mean, all together, we were in the United States for two

7    weeks.

8    Q.  Where did the audit end?

9    A.  The technical team finished in Denver, Colorado.

10   Q.  Did you travel anywhere after Denver, Colorado?

11   A.  I did.  Dr. Ahmed and myself and one of the USDA

12   veterinarians traveled back to Washington, D.C. after the

13   audit.

14   Q.  Where were you staying when you were in D.C.?

15   A.  We stayed at the Marriott in Arlington, Virginia, just a

16   few miles from the airport.

17   Q.  What happened upon arrival at your hotel?

18   A.  Well, when we arrived at the hotel, the clerk said, oh, I'm

19   glad to see you.  People have been asking when you will arrive.

20   Which surprised me, because I didn't have anyone waiting for

21   me, and Dr. Ahmed had never been to the United States.

22   Q.  So what did you do after arriving at the hotel?

23   A.  As we were checking in, a couple, two gentlemen approached

24   us, an older Egyptian man and a younger one.  The older man

25   embraced Dr. Ahmed, they were old friends.  They introduced me

1   to the two as being a father and a son who lived in Maryland of

2   Egyptian descent.  And we talked as we were checking in and

3   they invited us for a drink.

4   Q.  Did you join Dr. Ahmed Abdel Kareem and these two other

5   gentlemen?

6   A.  After I checked in, I dropped my bags, and joined them for

7   a drink.

8   Q.  Where were they sitting at the time?

9   A.  They were sitting at the bar restaurant area adjacent to

10  the check-in in the front of the hotel.

11  Q.  Were they sitting with anyone else?

12  A.  They were.  They were sitting with Mr. Hana.

13  Q.  Did you join them?

14  A.  I did.

15  Q.  Had you ever met Mr. Hana before then?

16  A.  No.  This was the first time I met Mr. Hana.

17  Q.  Where did you sit when you joined Dr. Ahmed Abdel Kareem

18  and Mr. Hana?

19  A.  It was a U-shaped table, and there was only one seat

20  available when I walked up, and that was beside Mr. Hana, so I

21  sat with him.

22  Q.  Did you introduce yourself to Mr. Hana?

23  A.  I did, I did.

24  Q.  Did he introduce himself to you?

25  A.  He introduced himself to me and I asked him, you know, who

O5H3MEN2                          Tate - Direct

1   are you with?  Is that who you worked with?  And he said I'm

2   with you.

3            THE COURT:  "I'm with you" meaning you, the witness?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Okay.

6   Q.  What did you understand that to mean?

7   A.  I didn't know how to take that.  I was -- it was an unusual

8   introduction.

9   Q.  Did you speak with Mr. Hana that evening?

10  A.  I did.

11  Q.  What did you discuss with him that evening?

12  A.  We discussed a few different things.  I guess first, he

13  said he had met with U.S. regulatory officials, President Sisi

14  and President Trump.

15  Q.  Was Donald Trump president at the time in 2019?

16  A.  He was.

17  Q.  You mentioned President Sisi.  Who is President Sisi?

18  A.  President Sisi was and continues to be the president of

19  Egypt.

20  Q.  How long has President Sisi been the president of Egypt?

21  A.  I don't know the exact number, but 8 or 10 years.

22  Q.  What did Mr. Hana say about President el-Sisi during the

23  dinner?

24  A.  He said that the Egyptian president had instructed him to

25  increase bilateral trade.  There were three specific

1    commodities he mentioned.  They wanted to see increased trade

2    in Egypt in wheat, beef and citrus.

3    Q.  You used the term bilateral trade.  What does that refer

4    to?

5    A.  Bilateral trade would mean U.S. shipments to Egypt and

6    Egyptian shipments to the U.S.  At the time Egypt was

7    interested in shipping citrus to the United States, and of

8    course, the United States is a large producer of beef and

9    wheat.

10   Q.  How did you respond to Mr. Hana when he made that comment?

11   A.  I explained how global markets work.  At the time U.S.

12   wheat was expensive as compared to our competitors.  I

13   explained that we of course had wheat and would be happy to

14   sell it to the Egyptians, but our price would be high.  So I

15   essentially told him that in the U.S. we believe in free

16   markets.  We have products.  If you would like to buy them, we

17   can help you with that.

18   Q.  During your meeting with Mr. Hana, did he discuss any other

19   meetings he had in D.C.?

20   A.  Yes, he mentioned two other meetings.

21   Q.  What other meetings did he mention?

22   A.  He told me he would meet with an undersecretary at USDA,

23   and that he would also meet with Dr. Ahmed.

24   Q.  While you were in D.C., did you have any other meetings

25   scheduled?

1   A.  I did.  I did.  The following morning, I had a meeting

2   scheduled between myself and the USDA undersecretary, and the

3   Egyptian vice minister of agriculture, Mona Mehrez, and

4   Dr. Ahmed.

5   Q.  You mentioned the term undersecretary.  What does that term

6   refer to?

7   A.  The undersecretary would be the head of a section within

8   the USDA.  So, sort of the secretary's deputies, his set of

9   deputies.

10  Q.  How far removed is that from you in the chain of command?

11  A.  Quite far.

12          THE COURT:  Up or down?

13          THE WITNESS:  The undersecretary has a higher position

14  than I do.

15  Q.  Despite the term "under."

16          You said that Mr. Hana mentioned also meeting with

17  Dr. Ahmed Abdel Kareem while he was in D.C.  What did he say

18  about that?

19  A.  He said that they would meet the following day to discuss

20  halal.

21  Q.  Did you have any meetings with Dr. Ahmed Abdel Kareem the

22  next day?

23  A.  Yes, Dr. Ahmed, I scheduled four meetings with halal

24  certifiers for Dr. Ahmed.  At the time I did not know that

25  Mr. Hana was representing a halal certifier.

1    Q.   What was the purpose of your meetings with the halal

2    certifiers and Dr. Ahmed Abdel Kareem the next day?

3    A.   So as with the companies, as with the halal certifiers we

4    met in middle America, these four certifiers would like to be

5    added -- wanted to be added to the approved list for Egypt.

6    And they weren't able to meet with Egyptians on the road trip,

7    so they met us in Washington.

8            So, to answer your question, to increase the number of

9    certifiers.

10   Q.   When you were meeting with Mr. Hana this first time, what

11   language were you speaking with him in?

12   A.   We spoke in English.

13   Q.   And what did you observe about Mr. Hana's English language

14   skills during that evening?

15   A.   He has fluent English.  A slight accent, but fluent

16   English.

17   Q.   Did Mr. Hana give you a business card that evening?

18   A.   He did.

19   Q.   What did it say?

20   A.   It said LEG.  I believe LEG Import Export.

21   Q.   What did you do with the business card?

22   A.   I saved it with my other business contacts.

23   Q.   Did you receive other business cards during the audit trip?

24   A.   Yes.

25   Q.   What did you do with those?

O5H3MEN2                        Tate - Direct

1   A.  I kept them, I took them all back to the office and added

2   them to our contact list.

3          MR. MARK:  Mr. Hamill, would you show, please show to

4   the witness only what is marked for identification as

5   Government Exhibit 8B-33.

6   Q.  Mr. Tate, do you recognize this exhibit?

7   A.  I do.

8   Q.  What is it?

9   A.  These are business cards I received during the audit visit.

10         MR. MARK:  The government offers GX 8B-33 into

11  evidence.

12         MR. LUSTBERG:  May I very briefly voir dire?

13         THE COURT:  Yes.

14  BY MR. LUSTBERG:

15  Q.  Mr. Tate, I see on the far-upper-right one, where it says

16  Will Hana, that there's some handwriting.  It says IS EG.  Is

17  that your handwriting?

18  A.  Yes, sir.

19  Q.  So, when you're identifying this, you're identifying it

20  with your handwriting as what you had in the office, correct?

21  A.  I'm sorry.  Can you repeat?

22  Q.  Is that what you brought back to the office with your

23  handwriting on it?

24  A.  I took these to the office, I photocopied them, I wrote

25  handwritten notes on the photocopy, and that's what you see

O5H3MEN2                          Tate - Direct

1    here.

2              MR. LUSTBERG:  Thank you.  I have no objection, your

3    Honor.

4              THE COURT:  Admitted.

5              (Government's Exhibit 8B-33 received in evidence)

6              MR. MARK:  Mr. Hamill, can you please publish

7    Government Exhibit 8B-33 to the jury.

8    Q.  Focusing on the upper-right-hand business card.  What

9    business does this associate Mr. Hana with on the business

10   card?

11   A.  The card says he represents LEG.

12   Q.  And then to the right, do you see some handwriting?

13   A.  Yes.

14   Q.  What does that handwriting say?

15   A.  It says IS EG.

16   Q.  Is that your handwriting?

17   A.  It is my handwriting.

18   Q.  At the time that you received the business card from

19   Mr. Hana, did you know that Mr. Hana was associated with IS EG?

20   A.  I did not.

21             THE COURT:  Did you place IS EG on that card

22   subsequent to the date you received it from Mr. Hana?

23             THE WITNESS:  Yes, sir.  Two weeks later.

24             THE COURT:  Thank you.

25             MR. MARK:  Mr. Hamill, we can take that down now.

1  Q.  Now, turning to the next day, I believe was that March 29,

2  2019, the next day after you met Mr. Hana?

3  A.  Yes.

4  Q.  And you mentioned that you had a meeting scheduled with an

5  undersecretary the next day; is that right?

6  A.  That's correct.

7  Q.  Which undersecretary at the Department of Agriculture did

8  you have with?

9  A.  Undersecretary Ted McKinney.  He was the undersecretary for

10  trade and foreign agricultural affairs.

11  Q.  Was that the undersecretary that oversaw the part of USDA

12  that you were associated with?

13  A.  That's correct.

14  Q.  Who was scheduled to attend that meeting?

15  A.  We had scheduled myself, Undersecretary McKinney, Dr. Mona

16  Mehrez, the Egyptian vice minister of agriculture, and

17  Dr. Ahmed.

18  Q.  When you talked about Mona Mehrez being a vice minister,

19  can you explain what her position was?

20  A.  Of course.  That's a bit tricky because that's my

21  translation of the Arabic.  But she was the deputy to the

22  minister.  So she was the number 2 in the ministry.

23  Q.  So, similar to the number 2 within the ministry of

24  agriculture in Egypt?

25  A.  That's correct.

O5H3MEN2                              Tate - Direct

1  Q.  A comparable position to Undersecretary McKinney here in
2  the United States?
3  A.  That's right, and sometimes she would be called vice
4  minister, sometimes undersecretary, sometimes deputy minister
5  in English.  The title varied.
6  Q.  So, variation of titles -- do names sometimes vary slightly
7  between Arabic and English?
8  A.  Yes, confusingly they do.
9  Q.  Do you speak Arabic?
10  A.  I do.  I speak Arabic.
11  Q.  How good is your Arabic?
12  A.  I mean, in 2019 it was pretty good.  Today it is a bit
13  rusty.
14  Q.  What's your understanding of, like, why sometimes names
15  might vary or titles might vary between the Arabic and English?
16  A.  In Arabic, Arabic does not write vowels out.  Readers just
17  know the vowels.  Those are then transliterated into English.
18  We insert vowels which may or may not be correct.
19  Q.  In the English sometimes you see variations of how the
20  Arabic names might be spelled in Arabic?
21  A.  That's correct.  So Mona, for example, could be spelled
22  M-U-N-A or M-O-N-A.  Kareem could be spelled with two Es or
23  with an I at the end in English.
24          THE COURT:  In this meeting, sir, it sounds like
25  Undersecretary McKinney and deputy minister or Undersecretary

1    Mona Mehrez are at the same level in the hierarchy.  And based

2    on what you said, you are -- I think you said far below.  Where

3    does Dr. Ahmed rank in this hierarchy?

4             THE WITNESS:  That's a reasonable question.  I would

5    say two layers below the vice minister.

6             THE COURT:  Thank you.

7    Q.  So now focusing on this meeting, that was scheduled on

8    March 29, 2019, between Undersecretary McKinney and Mona

9    Mehrez.  Where did that meeting happen?

10   A.  That meeting was scheduled at the main USDA building at

11   14th and Independence in Washington.

12   Q.  Did you greet minister or Deputy Minister Mehrez when she

13   arrived?

14   A.  I did.

15   Q.  What time was the meeting scheduled for?

16   A.  The meeting was scheduled for 10 a.m.

17   Q.  Was she on time to that meeting?

18   A.  No, she arrived at 10:20.

19   Q.  How did Ms. Mehrez arrive?

20   A.  She arrived in a car driven by an individual that we had

21   seen the night before at the hotel.

22   Q.  Who did she arrive to the meeting with?

23   A.  With her was Dr. Ahmed and Mr. Hana.

24   Q.  When Ms. Mehrez arrived at the USDA building, did you talk

25   with her?

1    A.  I did.

2    Q.  Did you say anything to her about Wael Hana?

3    A.  I did.  I explained to the vice minister that

4    Undersecretary McKinney would welcome Mr. Hana, but they would

5    not be able to have the same frank government-to-government

6    meeting with him in the room.  So it was her decision if she

7    would like him to sit out in the lobby or join the meeting.

8    Q.  What did you mean it wouldn't be the same sort of frank

9    meeting if he was in the room?

10            MR. FEE:  Objection to relevance about his meaning.

11            THE COURT:  I'll allow it.

12    Q.  You can answer.

13            THE COURT:  I'm sorry.  Just a moment.  Sustained.

14            As to whose meaning?

15            MR. MARK:  Mr. Tate's meaning in communicating that.

16            THE COURT:  No, I'll allow that.  If it's his meaning,

17    I'll allow it.

18    A.  Okay.  The reality was --

19            THE COURT:  What did you intend to convey?  Go ahead.

20    A.  The undersecretary and I had expected a

21    government-to-government meeting.  During which both

22    governments could be frank and upfront about the problems we

23    faced.  If there was someone from the private sector in that

24    meeting, then it would impact the tone and the ability for us

25    to be as forthright as had it only been government to

1  government.

2  Q.  Was that what you were communicating to Mona Mehrez when

3  you talked to her about Mr. Hana's presence in the meeting?

4  A.  That's correct.

5  Q.  What did Dr. Mehrez, what, if anything, did she say to you

6  after you told her this?

7  A.  I mean, to me she just said okay, and then she went to

8  speak to Mr. Hana.

9  Q.  Did you see Dr. Mehrez talk with Mr. Hana?

10  A.  I did.  She pulled him aside and whispered to him in

11  Arabic.

12  Q.  What, if anything, did you notice about Mr. Hana's demeanor

13  after Dr. Mehrez spoke with him?

14  A.  He was visibly upset.

15  Q.  What did you notice about him that reflected that he was

16  visibly upset?

17  A.  His facial expression, his stance, he was visibly unhappy.

18  I understood at the moment that she had asked him to sit out,

19  and he was not happy about that.

20  Q.  Did you attend the meeting between Dr. Mehrez and

21  Undersecretary McKinney?

22  A.  I did.

23  Q.  Was the audit discussed during that meeting?

24  A.  It was.

25  Q.  What was discussed about the audit during that meeting?

1    A.   Basically, Dr. Mehrez discussed the audit in general terms.

2    She noted it had been successful, and that the team would be

3    relaying an official report back to the USDA within 14 days;

4    within two weeks.

5    Q.   Were other matters of agriculture policy also discussed

6    apart from the audit?

7    A.   Yes.

8            MR. MARK:   Mr. Hamill, can you please show to the

9    witness only what has been marked for identification as

10   Government Exhibit 8B-48.

11   Q.   Mr. Tate, do you recognize this exhibit?

12   A.   I do.

13   Q.   What is this exhibit?

14   A.   This is a photo of Dr. Mehrez and Undersecretary McKinney.

15   Q.   Is that from the date of the meeting that we were just

16   talking about?

17   A.   That's correct, this was at the end of the meeting.

18           MR. MARK:   The government offers Government

19   Exhibit 8B-48 into evidence.

20           MR. LUSTBERG:   No objection.

21           THE COURT:   Admitted without objection.

22           (Government's Exhibit 8B-48 received in evidence)

23           MR. MARK:   Mr. Hamill, can you briefly publish this to

24   the jury.

25   Q.   And Mr. Tate, where was this photograph taken?

1   A.  This was taken at the USDA, the main USDA building, the

2   second floor in the administrative building.

3            THE COURT:  In D.C.?

4            THE WITNESS:  In Washington, yes.

5   Q.  Do you recall, like, where in the building this was taken?

6   A.  This was in the conference room adjacent to the

7   undersecretary's office.

8            THE COURT:  Is that an Egyptian flag and an American

9   flag in their hands?

10            THE WITNESS:  Yes, sir.  It is.

11   Q.  After the meeting with Mona Mehrez and Undersecretary

12   McKinney was complete, where did you go later that day?

13   A.  So the meeting ended about 11:40, 11:45.  We had halal

14   certifier meetings scheduled at 12:30 at the hotel.  So around

15   noon I got a taxi from the USDA building back to the hotel in

16   Arlington, Virginia.

17   Q.  What hotel are you referring to now?

18   A.  To the Marriott where we were staying.  Just the Crystal

19   City Marriott.

20   Q.  How many certifiers were you supposed to meet with later

21   that day at the Marriott?

22   A.  Four.

23   Q.  What was the purpose of those four meetings?

24   A.  Those four meetings were designed to allow these four

25   companies to present their credentials to the government of

O5H3MEN2                          Tate - Direct

1  Egypt in hopes of being added as approved entities for

2  certification to Egypt.

3  Q.  Who was to participate in those meetings?

4  A.  Myself and Dr. Ahmed.

5  Q.  Do you recall the entities that you were scheduled to meet

6  with that day?

7  A.  I believe so, I recall the first one was Halalco from

8  Atlanta, Georgia.  There was Halal Certifiers in the Washington

9  area.  IS EG, and a fourth firm called Amana from this area.

10  Q.  What role, if any, did you have in helping schedule those

11  meetings at the Marriott that day?

12  A.  I scheduled them directly.

13  Q.  Did you use e-mail to help schedule those meetings?

14  A.  Yes.

15       MR. MARK:  Mr. Hamill, can you show for the witness

16  only what has been marked for identification as Government

17  Exhibit 8B-1, and Government Exhibit 8B-2.

18  Q.  Mr. Tate, do you recognize these exhibits?

19  A.  I do.

20  Q.  What do you recognize them as?

21  A.  These are e-mails that I had with Mr. Antranig Aslanian and

22  from IS EG Halal to schedule their meeting at 3 p.m. on

23  March 29.

24       MR. MARK:  The government offers Government

25  Exhibit 8B-1 and 8B-2 into evidence.

1              MR. LUSTBERG:  No objection.

2              THE COURT:  Admitted.

3              (Government's Exhibit 8B-1, 8B-2 received in evidence)

4              MR. MARK:  Mr. Hamill, can you publish only Government

5     Exhibit 8B-1 initially.

6     Q.  In scheduling the meeting with IS EG Halal, who did you

7     correspond with?

8     A.  With the gentleman named -- forgive me -- Antranig

9     Aslanian.

10    Q.  Focusing on this e-mail, which is Government Exhibit 8B-1,

11    and if we can scroll down a bit as well.  What did this e-mail

12    concern?

13    A.  This was the e-mail confirming the scheduling of the

14    meeting, as well as providing some detailed information about

15    the Egyptian delegation's expectations.

16    Q.  What did it provide in this e-mail about the Egyptian

17    delegation's expectations for the meeting?

18    A.  We provided a copy of the Egyptian halal standards, as well

19    as a checklist.  We also asked that companies provide the

20    requested documents in paper and electronic copy.

21             MR. MARK:  Mr. Hamill, if can you scroll down in this

22    document a little bit.

23    Q.  What sort of documentation was requested in this e-mail?

24    A.  It would be the documents in the Egyptian government's

25    checklist, but essentially they wanted to see the company's

1  bona fides, they wanted to see they were operating, to see

2  where they were operating, what products they were certifying;

3  these sort of things.

4  Q.  Were other halal certifiers provided with similar

5  instructions prior to meeting?

6  A.  Every company was given the exact same information.

7  Q.  Apart from IS EG Halal, did the other certifiers provide

8  the info on their halal certification processes?

9  A.  Yes.

10 Q.  And experience that was requested?

11 A.  Yes.  Of the eight halal certifiers we met, seven provided

12 all the documents as requested.

13 Q.  Which company did not provide information as requested?

14 A.  IS EG Halal did not provide any documentation.

15          THE COURT:  How many did?

16          THE WITNESS:  Seven.

17 Q.  So seven out of eight did; is that right?

18 A.  That's correct.

19 Q.  And IS EG was the only one that did not provide it?

20 A.  That's correct.

21 Q.  Turn back to the meetings with the halal certifiers that

22 were scheduled at the Marriott.  Did you arrive at the Marriott

23 by yourself or with anyone else?

24 A.  On the day of the certifier meetings?

25 Q.  On the day of the certifiers meetings.

O5H3MEN2                          Tate - Direct

1    A.  I went to the hotel by myself.

2    Q.  What happened when you arrived for the meetings that day?

3    A.  The first meeting was set for 12:30, so I went upstairs to

4    the conference room to find the company Halalco already set up

5    with the presentation for Dr. Ahmed.

6    Q.  Were they an operating entity prior to this date?

7    A.  They were.  They were one of the largest halal certifiers

8    in the United States.

9            THE COURT:  If I understand, they were one of the

10   largest halal certifiers in the United States, but they hadn't

11   been certified for Egypt.

12           THE WITNESS:  That's correct, that's correct.

13   Q.  And what was the purpose of them meeting with you and

14   Dr. Ahmed Abdel Kareem that day?

15   A.  The company had a presentation about their operations,

16   about the number of facilities they were working in, about

17   their affiliation to religious institutions.  They had brought

18   a lot of documents to evidence their work, and they were

19   prepared to give a presentation about their company to the

20   Egyptians.

21   Q.  We can put this document down.

22           So, when you arrived at the Marriott, Halalco you said

23   was there.  Was Dr. Ahmed Abdel Kareem also at the scheduled

24   meeting?

25   A.  No.  Dr. Ahmed was not there.

1   Q.  Did there come a time that you went to look for Dr. Ahmed

2   Abdel Kareem?

3   A.  That's right, yes.  So the meetings were supposed to start

4   at 12:30, and about a few minutes before 1, I went to look for

5   him.

6   Q.  And did you ultimately find him?

7   A.  I did.  I did.  Initially, I found him just about 1 o'clock

8   and he said, oh, I'm going to have a coffee, then I'll be right

9   up.

10  Q.  Did he come right up after getting a coffee?

11  A.  He did not, he did not.

12  Q.  Did you go to look for him again?

13  A.  I did.  So about 30 minutes later, 25, 30 minutes later,

14  we're now almost a full hour after the meeting should have

15  started, I walked downstairs to find to see if I can find

16  Dr. Ahmed, and I find him in the restaurant.

17  Q.  Was Dr. Ahmed Abdel Kareem with anybody else at the

18  restaurant in the Marriott?

19  A.  He was.  He was having lunch with Mr. Hana and with

20  Dr. Mona Mehrez, the vice minister.  There were two Americans

21  with him and then a third Egyptian man.

22  Q.  Did you later come to learn who the other gentleman with

23  Mr. Hana, Dr. Abdel Kareem, and Mona Mehrez were?

24  A.  The Americans, yes.

25  Q.  The two Americans?

O5H3MEN2                         Tate - Direct

1    A.  I did.

2    Q.  Who were they?

3    A.  One was Howard Dorian, who was at the time counsel for

4    Mr. Hana.  And the other one I believed to be Mr. Aslanian.

5    Q.  What did you do when you saw Dr. Abdel Kareem when you came

6    to look for him the second time at the restaurant?

7    A.  You know, he is an hour late for his meeting.  I said

8    Dr. Ahmed, please, you have this company waiting for you.  Can

9    we finish up and get started.

10   Q.  How did Dr. Ahmed respond?

11   A.  He said, okay, okay, don't worry, I'm coming.  Dr. Mehrez

12   seemed visibly upset I was interrupting their lunch.

13   Q.  What do you mean by Dr. Mehrez seemed visibly upset?

14   A.  Her facial expression, she glared at me and seemed

15   disapproving that I was interrupting them.

16   Q.  So, the first meeting was with Halalco you said, this

17   established company?

18   A.  That's correct.

19   Q.  Was there a later meeting that day with IS EG Halal?

20   A.  That's correct.

21   Q.  Who participated in that meeting?

22   A.  In the meeting with IS EG Halal, we had Dr. -- I'm sorry,

23   excuse me.  Mr. Hana, we had Dr. Ahmed, myself, Howard Dorian,

24   and Mr. Aslanian.

25   Q.  Generally, what was discussed during the meeting with IS EG

O5H3MEN2                          Tate - Direct

1    Halal that day?

2    A.  Mostly we discussed trade over all.  Mr. Hana mentioned he

3    had an order for beef liver he was having a hard time filling.

4    That the large supplier, he was having a difficult time working

5    with them.

6    Q.  From your time working in ag, what was your impression of

7    this comment from Mr. Hana?

8    A.  It seemed a bit unusual.  U.S. companies are always willing

9    to sell their product, so it seemed unusual he was having a

10   hard time filling the order.

11   Q.  And you mentioned there was discussion about trade.  Was

12   there any discussion about the actual IS EG company?

13   A.  A little bit.  A little bit.  So, they explained to me that

14   IS EG was not in the certification business yet.  Mr. Dorian

15   asked me specifically how halal certification works, which I

16   explained in general terms.  Mr. Dorian then noted he was sure

17   they would be able to meet Egyptian requirements.

18   Q.  Did IS EG provide any documents to review during the

19   meeting as requested in your e-mail?

20   A.  No.

21   Q.  Did IS EG present knowledge of the halal process during the

22   meeting as requested in your e-mail?

23   A.  No.

24   Q.  How, if at all, did you respond to Mr. Dorian's question

25   about what is halal slaughter during that meeting?

O5H3MEN2                        Tate - Direct

1    A.  I mean, I explained in general terms.  We discussed the

2    lateral versus transverse cut.  We discussed the need to have

3    blessers in the plants.  We discussed the complexity and size

4    of the U.S. beef system.

5            I suggested that if IS EG were interested in getting

6    into the market, that they start with some smaller plants until

7    they could get established.

8    Q.  After having attended -- so in total, how many halal

9    certifiers did you meet with during this audit?

10   A.  During the total two weeks, we met with eight companies.

11   Q.  Based on the meetings that you had, what did you expect

12   Egypt was going to do with the halal certification process

13   after the audit?

14           MR. FEE:  Objection, your Honor.

15           THE COURT:  Sustained.

16   Q.  After the audit, did there come a time that you saw

17   Dr. Mona Mehrez again?

18   A.  I did.  I did.  On April 1st, I saw her.

19   Q.  Where did you see Dr. Mehrez on April 1st?

20   A.  I was flying back to Cairo following the audit, had a

21   layover in Frankfurt, and you saw her in the Lufthansa lounge

22   in Frankfurt.

23   Q.  What were you doing in the Lufthansa lounge in Frankfurt on

24   April 1st?

25   A.  Having breakfast, waiting for my flight.

O5H3MEN2                          Tate - Direct

1   Q.  Where were you waiting for a flight to?

2   A.  I was going back to Cairo.

3   Q.  Was she going back to Cairo, too?

4   A.  Also, yes.

5   Q.  Did you talk with Dr. Mehrez then?

6   A.  I did.  We had a lengthy discussion.

7   Q.  Did you discuss the audit with her at all then?

8   A.  We did.  We discussed the audit, yes.

9   Q.  What, if anything, did Dr. Mehrez say to you about the

10  audit when you were chatting with her?

11  A.  I think the most memorable thing she mentioned was the fact

12  that she -- she said that Egypt needed a single halal

13  certifier.  That they needed to change their certification, and

14  go from one -- from many certifiers to one.

15  Q.  Had anybody from Egypt expressed that to you prior to your

16  meeting with Dr. Mehrez at the Frankfurt airport?

17  A.  Absolutely not.

18  Q.  How did you respond to Dr. Mehrez when she made this

19  comment about Egypt needing to go to a single certifier?

20  A.  I guess first I was surprised.  I was surprised she said

21  this.  And so I argued -- I argued against it.  I made the case

22  that monopolies will drive up certification costs.  Egypt was

23  already facing high food inflation, so this means high

24  inflation for consumers.  I mentioned that a single certifier,

25  if something were to happen to that company, then suddenly no

1    one would be able to certify.  I argued that competition was

2    good for markets, and without competition there were, there

3    were actually laws in the United States that could complicate

4    them, because of the monopolistic behavior.

5    Q.  Did Ms. Mehrez respond to the merits of your points?

6    A.  She did not.

7             THE COURT:  Did she respond?

8             THE WITNESS:  She, for the most part, just continued

9    to make her point, just reiterated her points.

10   Q.  So, in your experience, from having participated in

11   multiple audits with the USDA, what usually happens after an

12   audit?

13   A.  Yeah, after an audit, the auditors will send an audit

14   report, an evaluation to in this case to the U.S. government.

15   That audit report will explain the problems they saw in the

16   audit, and how to correct those problems.

17            Generally they're very technical.  There are things

18   like the refrigeration was 32 degrees instead of 33, very small

19   tweaks.  The companies can then make adjustments based on those

20   recommendations.

21   Q.  Is the purpose of sharing that report typically so that the

22   companies, existing companies can make changes in response to

23   the audit?

24   A.  Yeah, that's correct, that's correct.

25   Q.  Based on your meetings in D.C. with Dr. Ahmed Abdel Kareem,

1    was it discussed whether Egypt would share its audit report

2    before it was finalized?

3    A.  Before it was finalized?

4    Q.  Or would it share its audit report?

5    A.  Yes.  The Egyptian authorities committed to providing us an

6    audit report within 14 days.

7    Q.  Did the U.S. government receive Egypt's audit report by the

8    time it was expected?

9    A.  No.

10           MR. MARK:  Mr. Hamill, could you show for the witness

11   only what has been marked as Government Exhibit C-104B.

12   Q.  Mr. Tate, do you recognize this exhibit?

13   A.  I do.

14   Q.  What is it?

15   A.  This is a letter from Ali Abdi, my boss at the embassy, to

16   Dr. Mehrez.

17   Q.  Is this a photograph of that letter?

18   A.  It is.

19           MR. MARK:  The government offers Government Exhibit

20   C-104B into evidence.

21           MR. LUSTBERG:  No objection.

22           THE COURT:  Admitted.

23           (Government's Exhibit C-104B received in evidence)

24           MR. MARK:  Mr. Hamill, can you please publish

25   Government Exhibit C-104B.

1    Q.   What is the date of this letter?

2    A.   The letter is dated April 17, 2019.

3    Q.   And who sent this letter?  If you go to the bottom,

4    Mr. Hamill, please.

5    A.   The letter came from Ali Abdi.

6    Q.   It says under his name Minister Counselor for Agriculture

7    Affairs?

8    A.   That's correct.

9    Q.   What is that position?

10   A.   So, that position is he was my boss at the time.  So that

11   would be when we talked about the midlevel management at the

12   embassy, Ali held that position at the time.

13   Q.   And was he stationed in Cairo with you?

14   A.   He was.

15   Q.   And if we look at the bottom of the letter, we see some

16   cc's there.  What does cc refer to here?

17   A.   That's a courtesy copy of the letter.

18   Q.   Who was cc'd on this letter?

19   A.   Dr. Abdel Hakim Mohammed who was an official at the

20   ministry of agriculture, and Dr. Hesham Alem.

21            THE COURT:  That's the Egyptian minister of

22   agriculture?

23            THE WITNESS:  That's correct.

24            THE COURT:  Did you play any role in the preparation

25   of this particular letter that Mr. Ali Abdi sent?

1                THE WITNESS:  I did.

2    Q.  What role did you play?

3    A.  I drafted the original copy.

4    Q.  Generally, what did this letter concern?

5    A.  Generally it concerned the audit.  It talked about the

6    audit report that we were waiting for.  It mentioned that the

7    report was promised by April 11, and it had not yet arrived.  I

8    had mentioned that we understood that there was a problem with

9    halal certifiers.

10              I think that's it in general terms.

11   Q.  Was this a government-to-government letter?

12   A.  That's correct, yes.

13   Q.  Did you expect that a letter like this would be shared

14   outside of the Egyptian government?

15              MR. FEE:  Objection, your Honor.

16              THE COURT:  I'll allow that.  When you say a letter

17   like this, be more specific.

18   Q.  Would you expect in general that a letter between the U.S.

19   government and the Egyptian government officials would be

20   shared outside of the U.S. government or the Egyptian

21   government?

22   A.  Government-to-government correspondence is generally not

23   shared outside of government.

24   Q.  Why not?

25   A.  It depends on the specific context.  But, if we are

O5H3MEN2                           Tate - Direct

1    negotiating with a foreign government, if we are trying to

2    resolve problems with a foreign government, it's often best

3    that that not be in the public sphere.

4    Q.  Turning to the third paragraph, turning to the third

5    paragraph in this letter, do you see the letter references an

6    April 11 meeting?

7    A.  Yes.

8    Q.  Do you recall that meeting?

9    A.  I do.

10   Q.  What do you recall about an April 11 meeting?

11   A.  I remember that Ali and I went to the Egyptian ministry of

12   agriculture, we met with a team, a technical team, I believe

13   Dr. Ahmed was there.  In that meeting we ask about the audit

14   report and when we should expect it.  We were expecting it that

15   day.  We were hoping we would get it that day.

16         We also, through unofficial channels, had heard that

17   the ministry was considering delisting other certifiers, so we

18   asked Dr. Ahmed if that was correct.

19   Q.  How did Dr. Ahmed Abdel Kareem respond to you in the

20   April 11, 2019, meeting?

21   A.  In that meeting he said they had had concerns with U.S.

22   halal certifiers.

23   Q.  Did he say anything else beyond that he had concerns with

24   U.S. halal certifiers?

25   A.  I really don't remember the specifics.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5H3MEN2                          Tate - Direct

1    Q.  Do you recall whether he explained the nature of those

2    concerns at all?

3    A.  I don't remember.  I did take notes from that meeting.  But

4    I don't remember.

5           MR. MARK:  Now, continuing on in this letter, if you

6    could go, Mr. Hamill, if we can enlarge the fourth paragraph of

7    this letter.

8    Q.  And Mr. Tate, could you just read for the benefit of the

9    jury the first sentence of this letter and then stop.

10   A.  "We understood from the follow-up meeting that all except

11   one U.S. organization might be rejected for halal

12   certification."

13   Q.  When this letter refers to the follow-up meeting, what

14   meeting is being referred to here?

15   A.  The April 11 meeting.

16   Q.  What was the one U.S. organization referred to in this

17   letter?

18   A.  The one U.S. organization would be IS EG Halal.

19   Q.  Can you explain what that sentence means.

20   A.  Yeah.  So what we're saying here is that we met with the

21   technical team, the technical team told us that all except for

22   one halal certifier were going to be removed from the list, and

23   this one had the monopoly.

24           This is Ali explaining this to the vice minister, and

25   asking for an explanation.

1              THE COURT:  This is your embassy person explaining it

2   to the Egyptian equivalent?

3              THE WITNESS:  That's correct.

4   Q.  Mr. Tate, can you read for the benefit of the jury the rest

5   of that paragraph starting with "confusingly."

6   A.  "Confusingly, the one organization that may be approved a

7   halal certifier is not currently in the business of halal

8   certification.  This raises questions regarding the criteria

9   used to assess U.S. halal certifiers, as well as legal

10  questions regarding fair competition.  We respectfully request

11  a draft audit report clarifying these points."

12  Q.  What was meant by questions regarding fair competition?

13  A.  We understood from the meeting that a single certifier, a

14  monopoly was about to be created.  And that would push out

15  other certifiers and stop competition.

16  Q.  When it would push out other certifiers, were those U.S.

17  businesses or Egyptian businesses?

18  A.  These were all U.S. businesses.

19  Q.  So were you concerned about the impact on U.S. businesses

20  at the time?

21  A.  That's correct, this would have a negative impact on U.S.

22  economic and commercial interests.

23  Q.  Could you continue reading the next paragraph of the letter

24  beginning with the United States.

25  A.  "The United States --"

O5H3MEN2                          Tate - Direct

1              THE COURT:  Sir, when people read, they tend to speed

2       up.  So for the reporter, slow down.

3              THE WITNESS:  Yes, sir.

4       A.  "The United States is keenly interested in receiving a

5       draft version of the audit report so that U.S. regulators and

6       industry may address any deficiencies or corrective actions

7       immediately.  The United States Department of Agriculture is

8       committed to meeting Egyptian standards and to providing safe,

9       wholesome beef products to Egypt."

10      Q.  What was purpose of sending this letter to the Egyptians at

11      this time?

12      A.  Yeah, so, in the meeting Dr. Ahmed had said the audit

13      report was awaiting ministerial approval.  So we are asking

14      that they send us a draft, the non-approved version, so we can

15      take a look at it, and then our companies can start taking

16      steps to make corrective actions.

17      Q.  Did the embassy ever receive a draft audit report from the

18      Egyptian side?

19      A.  We did not.

20      Q.  Did there come a time that the U.S. embassy received an

21      official notification from Egypt that all halal certifiers but

22      one were rejected by the Egyptian ministry of agriculture?

23      A.  Yes, we received the notification April 23.

24      Q.  How did you receive that notification?

25      A.  I believe the initial version was sent by WhatsApp, and

1    then a paper copy was sent later the following day.

2    Q.  What did you learn from this official notification?

3    A.  In the official notification, I learned that all halal

4    certifiers have been delisted except for IS EG.  Importantly, I

5    also learned that the U.S. food safety system had been

6    approved.  I'm sorry, our first objective was achieved.

7    Q.  So when you said the first objective was achieved related

8    to the food safety system, can you explain that?

9    A.  Earlier when we talked about the objectives of the audit,

10   one objective was approval of the entire U.S. food safety

11   system for the Egyptian regulators, and the second was the

12   addition of halal certifiers to the lists of approved

13   certifiers.

14   Q.  Was that --

15              THE COURT:  In other words, more than four.

16              THE WITNESS:  Correct.  That's correct.  More than

17   four.

18   Q.  So, related to food safety, that objective was achieved.

19   But related to halal certification, it wasn't achieved?

20   A.  That's correct.  So related to food safety it was achieved,

21   related to halal certification we actually went the wrong

22   direction.  We went from four to one.

23              MR. MARK:  Mr. Hamill, could you please show for the

24   witness only --

25              THE COURT:  If you're moving on to a new document, why

O5H3MEN2                            Tate - Direct

 1   don't we break for lunch.  Is that a logical time?

 2             MR. MARK:  I think this is a very logical time.

 3             THE COURT:  Please be back at 10 after 1, ladies and

 4   gentlemen.

 5             Third time I've done it.  I am trying to move things

 6   along briskly, but not that briskly.  You do have an hour for

 7   lunch.  My apologies.  10 after 2 so the record is correct.

 8             (Jury excused)

 9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5H3MEN2                          Tate - Direct

1           THE COURT:  10 after 2.  You may step down, sir.

2           MS. CLARK:  Briefly, speaking of correcting the

3    record.  Does not have to do with the witness, your Honor.  I

4    misstated the exhibits that --

5           THE COURT:  I'm sorry?

6           MS. CLARK:  I misstated the exhibits that were not

7    introduced. it is 1F-1239 and 1F-1242.

8           THE COURT:  You want those admitted?

9           MS. CLARK:  Yes, your Honor.

10          THE COURT:  Now, and there is no objection.  I hereby

11   admit those.

12          What you now put on the record, we put on the record

13   already that ones were admitted, should I --

14          MS. CLARK:  It was just missing the 1F.  The numbers

15   were correct.  It was just missing the prefix.

16          THE COURT:  Is the record accurate as of now?

17          MS. CLARK:  Yes, your Honor.

18          THE COURT:  Thank you.

19          MR. MONTELEONI:  Can I place one thing on the record

20   now that the witness has left.  Thank you, your Honor.

21          Regarding something that happened on cross-examination

22   of our first witness, Special Agent Kougemitros, we had

23   previously had an agreement with defense counsel that they

24   would be providing in advance of witness testimony the

25   non-impeachment defense exhibits that they intended to

introduce.  And prior to this, they indicated a few pages that
were not marked that used as defense exhibits which were not
very helpful to us, because we can't tell what number they're
talking about when they say it.  But then they also used a
defense exhibit that they had not provided, identified to us as
such, at all.  These were all non-impeachment exhibits.

THE COURT:  What is a non-impeachment exhibit?  What
is a non-impeachment exhibit?

MR. MONTELEONI:  I'm so sorry, your Honor.  Very
unfair to the court reporter.

An exhibit that's not used to contradict the
statements of the witness, the reliability, but to make
substantive points.

So, defense counsel introduced a sketch to make
substantive points.  The type of points that they could make if
they called the witness themselves in their case.  They used
Exhibit 723.  That was not for impeachment.  That was to make
their own points.  The other defense exhibits they used were
stills from the exit video, they also again used to make
substantive points about what was or wasn't in the house.
That's different from confronting a witness to show some
previous inconsistency or something to impeach something they
said.  This is to make substantive points.

I will say I want to put this on the record.  We've
had discussions with defense counsel since, and they've agreed

O5H3MEN2                          Tate - Direct

1    they will be providing it.  Since there was a problem the first

2    time around, I wanted to make that clear.

3              THE COURT:  You are just making a record.

4              MR. MONTELEONI:  Yes, your Honor.

5              THE COURT:  Thank you.

6              (Recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        AFTERNOON SESSION

2                              2:10 p.m.

3              THE COURT:  Bring the jury in.

4              (Jury present)

5              THE COURT:  Sir, how much longer do you have on

6    direct, as an estimate?

7              MR. MARK:  As an estimate, around two hours or so,

8    your Honor.

9              THE COURT:  All right.  Proceed.

10             MR. MARK:  Thank you.

11             Mr. Hamill, could you please publish again Government

12   Exhibit C-104B.

13   Q.  Mr. Tate, before the break, do you recall testifying about

14   this letter?

15   A.  Yes, I do.

16   Q.  And does this appear to be a photograph of the letter?

17   A.  Yes, it is.

18   Q.  Did you take this photograph?

19   A.  I don't think so.

20   Q.  Do you know who took this photograph?

21   A.  I do not.

22             MR. MARK:  All right, now, if we could go back,

23   Mr. Hamill, to the reference to -- no, no.  We can keep this

24   exhibit up.  The reference here in the third paragraph to the

25   April 11, 2019, meeting with Dr. Ahmed Abdel Kareem.
```

O5hWmen3                          Tate - Direct

1   Q.  I think when you were testifying you mentioned you didn't

2   have exactly a clear recollection of the meeting but you had

3   taken some notes of that meeting?

4   A.  That's correct.

5   Q.  During the break, did you have an opportunity to look at

6   any notes of that meeting to refresh your recollection about

7   that meeting?

8   A.  I did.  I reviewed my notes from that meeting.

9   Q.  Having reviewed those notes, do you recall what was

10  generally discussed during that meeting?

11  A.  I do.  I do.  We discussed the rationale for the decision

12  regarding the halal certified.

13  Q.  What did Dr. Ahmed Abdel Kareem generally say during that

14  meeting?

15  A.  He had specific concerns with each of the certifiers he had

16  met with.

17  Q.  Can you take those in turn; what were the concerns that he

18  mentioned during that meeting?

19  A.  With the two companies he had -- they had visited, the team

20  had visited on the road, the concerns were, as I mentioned

21  earlier, stunning and the lateral versus transverse cut.  So

22  those two concerns we were aware of.

23  Q.  OK.  And while you were on the audit, had those halal

24  companies responded to those concerns?

25  A.  Yes.  Both companies had agreed to change their practices

1    or to adjust practices for Egypt so that they could meet the

2    certification requirements.

3    Q.  And did Dr. Ahmed Abdel Kareem reference concerns with any

4    of the other companies during this meeting as well?

5    A.  Yes, he did.

6    Q.  What did he say?

7    A.  Well, two of the companies he dismissed as certifying only

8    chicken.

9    Q.  Did you respond to that comment?

10   A.  I did.  One of those two, Halalco, one of the largest

11   certifiers in the United States, certifies chickens, but it's

12   because they're in Georgia, where all the chicken production in

13   the U.S. happens.  So it just stands to reason they would

14   certify mostly chicken because that's where they're located,

15   though the company suggested they could do other kinds of

16   certification, if necessary.

17   Q.  Did Dr. Abdel Kareem reference concerns with any of the

18   other companies that were halal certifiers?

19   A.  Well, the second one that he dismissed as only certifying

20   chicken actually had certified beef in the United States, but

21   they had operations in the U.S. and in Canada.  And I think at

22   the exact time when we had that meeting, they were certifying

23   chicken in the U.S. and beef in Canada.  I believe they were

24   doing lamb or goat, something else, as well.

25   Q.  Did you bring this up with Dr. Ahmed Abdel Kareem during

1  the meeting?

2  A.  I did.

3  Q.  How did he respond?

4  A.  He dismissed my response sort of out of hand.

5  Q.  Did Dr. Ahmed Kareem bring up concerns with any of the

6  other halal certifiers?

7  A.  Yeah.  He said that three of the halal certifiers, if I'm

8  getting my math right, so the two large ones were the two we

9  just mentioned.  Then three more were small.  They were small,

10  very limited in scope; they wouldn't be able to handle the

11  capacity needed for Egypt.

12  Q.  Did you respond to that comment from him?

13  A.  I did, I did.  I told him, of course, if the capacity was

14  the problem, then the companies could grow.  The companies

15  could add capacity if there was demand.

16  Q.  Did Dr. Ahmed Kareem reference any concerns with IS EG

17  Halal?

18  A.  He did not.

19  Q.  Did IS EG Halal at that point in time have any capacity at

20  all?

21  A.  None.

22  Q.  Now, you mentioned that he had raised certain concerns

23  during this meeting.  Had he raised all of these concerns

24  earlier?

25  A.  Dr. Ahmed's concerns seemed to vary from meeting to

1    meeting.  The concerns with the stunning and the cut had been

2    early concerns, during the audit.  The other concerns he had

3    not mentioned until that meeting.

4    Q.  And during the meeting, you had participated in -- sorry.

5        During the audit, you had participated in meetings with

6    each of these different halal certifiers, correct?

7    A.  That's correct.

8    Q.  OK.  In the meetings that you participated in during the

9    audit with the halal certifiers, that Dr. Abdel Kareem also

10   participated in, how attentive did he appear during those

11   meetings?

12   A.  During the meetings in Washington, he did not appear

13   attentive.

14   Q.  Why do you say he didn't appear attentive?

15   A.  He didn't take notes.  He didn't have any preprepared

16   questions.  He wasn't interested in reviewing the documents

17   they provided on the spot.

18   Q.  How, if at all, did that compare to your preparation for

19   those meetings?

20   A.  I mean I personally had copies of all the documents.  I had

21   extra copies for myself.  I took notes throughout.  I was

22   trying to be as careful as I could to protect the U.S.

23   companies.

24            MR. MARK:  Now, Mr. Hamill, could we turn to and show

25   to the witness only what has been marked for identification as

1    Government Exhibit 8B-7.

2    Q.  Mr. Tate, do you recognize this exhibit?

3    A.  I do.

4    Q.  What is it?

5    A.  These are emails from Ali Abdi, so from the embassy, to our

6    team at headquarters.

7            MR. MARK:  The government offers Government Exhibit

8    8B-7 into evidence.

9            MR. LUSTBERG:  One moment, your Honor?

10           No objection.

11           THE COURT:  Admitted.

12           (Government Exhibit 8B-7 received in evidence)

13           MR. MARK:  Mr. Hamill, could you publish 8B-7 and

14    enlarge the top email in the chain, please.

15    Q.  Mr. Tate, what's the date of this email?

16    A.  This email was sent April 24.

17    Q.  Who was this email from?

18    A.  It's from Ali Abdi.

19    Q.  Were you cc'd on this email?

20    A.  I was.

21    Q.  Who generally were the recipients of the email?

22    A.  Yeah, I would say just in general, this was the team in

23    Washington, D.C. that handled the policy issues related to

24    animal products.

25    Q.  And is the U.S.D.A. divided into certain mission areas or

O5hWmen3                           Tate - Direct

1    agencies?

2    A.   Yes.

3    Q.   What agency or mission area do foreign service officers

4    work in?

5    A.   We work in the foreign agricultural service.

6    Q.   Is that sometimes known as FAS?

7    A.   Yes, sir.

8    Q.   Is that also notated on the emails for some of these

9    recipients?

10   A.   That's correct.

11   Q.   What is the mission of the foreign agricultural service?

12   A.   To expand U.S. exports of agricultural and related

13   products.

14   Q.   Now, could you read for the benefit of the jury the first

15   two sentences of the email, and then stop?

16   A.   So, "Today we received the attached letter from Dr. Ahmed

17   Abdel Kareem, the head of the central administration for

18   veterinary quarantine.  As we suspected, they provided approval

19   for the SPS systems but delisted all certifiers except one:  IS

20   EG Halal Certifiers, Inc."

21   Q.   What does delisted all certifiers except one refer to?

22   A.   That means of the four certifiers that had previously

23   certified for Egypt, all four had been delisted, and of the

24   eight we visited all except for one had not been added to the

25   approved list.

O5hWmen3                              Tate - Direct

1    Q.  OK.  Could you now read the next three sentences of the

2    email beginning with "the letter" and then stop?

3    A.  "The letter mentions IS EG Islamic Center, which is

4    actually not the name of the organization according to previous

5    correspondence.  No explanation was provided why this

6    organization, which as we understand is not in the halal

7    business, was approved, or why others are delisted or

8    suspended.  Dr. Ahmed Abdel Karim and Deputy Minister met with

9    this entity during the visit to the U.S."

10   Q.  When Ali Abdi referred to the deputy minister, who is he

11   referring to there?

12   A.  He's referring to Dr. Mona Mehrez, which we've also called

13   the vice minister here.

14   Q.  Could you read the rest of Mr. Abdi's email?

15   A.  Yes.  "Clearly there are many questions surrounding this

16   decision.  I spoke with Dr. Ahmed Abdel Karim this afternoon

17   the decision concerning halal certification.  He refused to

18   provide answers other than to say that the company was -- the

19   company they chose 'expressed willingness to meet all Egyptian

20   requirements.'  I pushed him to explain what this means but he

21   did not provide any explanation.  The deputy minister will not

22   respond to calls."

23   Q.  When Mr. Abdi wrote that the deputy minister will not

24   respond to calls, were you aware of that at the time?

25   A.  I was, yes.

1  Q.  How were you aware of that?

2  A.  From Mr. Abdi.

3  Q.  Had you, in your experience, ever had a situation where the

4  deputy minister of agriculture wouldn't respond to calls

5  before?

6  A.  No, I had not.

7          THE COURT:  Let's make clear you're talking about the

8  deputy minister of agriculture from Egypt.

9          MR. MARK:  Correct, your Honor.

10          THE COURT:  Is that how you understood the question?

11          THE WITNESS:  Yes, sir, it is, the Egyptian vice

12  minister or deputy minister of agriculture.

13  BY MR. MARK:

14  Q.  In your experience, generally when there was a request for

15  a or a meeting with an Egyptian official, typically would you

16  get a response in that circumstance?

17  A.  Yes.  We would always get a response.  I've mentioned this

18  a few times, but Egypt is the No. 2 recipient of U.S. military

19  aid in the world.  When the Americans request a meeting, we get

20  meetings.

21  Q.  So this was an unusual situation, right?

22  A.  That's correct.

23          MR. MARK:  Mr. Hamill, could you turn to page 5 of

24  this exhibit.

25  Q.  And what is here?  Is this the attachment of the email?

1    A.  Yes, sir.

2    Q.  And what is this document?

3    A.  This is the official correspondence from the Egyptian

4    ministry of agriculture to the embassy delisting halal

5    certifiers and approving the food safety system from the U.S.

6    Q.  What language is this in?

7    A.  This is Arabic.

8    Q.  Were you able to read some Arabic at the time?

9    A.  I was.

10   Q.  What's the date of this letter?

11   A.  At the bottom right the letter is dated April 23, 2019.

12          MR. MARK:  Mr. Hamill, could we go to page 4 of this

13   exhibit now.

14   Q.  What's reflected here on page 4 of the exhibit?

15   A.  This is a translation our Egyptian staff at the embassy put

16   together of that letter.

17   Q.  What's the purpose of supplying a translation of the letter

18   when sending it to U.S.D.A. leadership in D.C.?

19   A.  We don't have any Arabic speakers in Washington and

20   certainly not at the Department of Agriculture, so this was a

21   courtesy copy for them.

22   Q.  Before we look at the text of the letter, do you see at the

23   bottom there's a transliteration of Ahmed Abdel Karim's name?

24   A.  Yes.

25   Q.  Is this the same way his name was spelled in the business

O5hWmen3                         Tate - Direct

1   card you received from him?

2   A.  I don't remember that off the top of my head, though I will

3   say Kareem is often spelled with two Es instead of an I.

4           MR. MARK:  Mr. Hamill, could you also publish just

5   next to this Government Exhibit 8B-33.

6           And could you go to the second page.

7   Q.  Do you recognize that business card on the right?

8   A.  Yes.

9   Q.  All right.  Are these spelled different ways?

10  A.  Yes, they are spelled different ways, but it's the same

11  person.

12  Q.  Is this what you're talking about before, that there could

13  be variances of names but still is the same person?

14  A.  Correct.  This is simply a difference in the

15  transliteration Ahmed Abdel Karim and on the business card it

16  had a second last name.

17  Q.  And then to the right on the business card, 8B-33, I

18  noticed there's some handwriting.  Is that your handwriting as

19  well?

20  A.  It is.

21  Q.  What does GOE refer to?

22  A.  Government of Egypt.

23          MR. MARK:  Thank you.  Mr. Hamill, you can take down

24  8B-33 and leave up 8B-7.

25  Q.  Now, Mr. Tate, could you just read the translation of the

O5hWmen3                              Tate - Direct

1    letter starting with "second"?

2    A.   "Second:  With regard to certifying the halal system:

3         "Suspending the use of Halal Transactions of Omaha,

4         "Terminating the use of the following Islamic centers:

5         "Islamic Society of California, ISA, Amana Halal of New

6    York, Halalco, Islamic Society of Washington Area, IFANCA.

7         "Approving the use of IS EG Islamic center, who expressed

8    their willingness to deliver all Egyptian side requirements in

9    halal slaughter and executing related the specifications."

10   Q.   Now, in terms of terminating the use of certain Islamic

11   centers, what was your understanding of what an Islamic center

12   was?

13   A.   In this context, he's referring to the private companies in

14   the United States that are certifying halal.

15   Q.   OK.  And the third one is referenced as Amana.  Did you

16   talk about Amana earlier?

17   A.   I mentioned that we had a meeting in Washington, D.C., with

18   Amana.  They're the last of the certifier meetings we had at

19   the hotel on the 28th of March.

20   Q.   And you mentioned that they operated in this area?

21   A.   That's correct.  That's correct.

22   Q.   What were you referring to when you meant in this area?

23   A.   I didn't remember if they were based in New Jersey and

24   operated in New York or if they were based in New York and

25   operated in New Jersey.  But they were in the New York-New

1     Jersey metro area.

2     Q.  So here, where we are right now --

3     A.  Correct.

4     Q.  -- this courtroom?

5     A.  That's correct.

6     Q.  Now, in this letter, there was a decision here to go with a

7     single company, IS EG Halal, right?

8     A.  Correct.

9     Q.  Was there any discussion while you were in the United

10    States during the audit with Egypt deciding to go with only one

11    halal certifier?

12    A.  No.  No.  The first I heard of it was at the airport in

13    Frankfurt.

14    Q.  Focusing on the airport in Frankfurt, you said you ran into

15    Mona Mehrez there?

16    A.  That's right.

17    Q.  Was that a coincidence, or was that planned?

18    A.  That was a complete coincidence.

19    Q.  What had you done after the audit in D.C.?

20    A.  Oh, yeah.  We finished the audit Friday, or the meetings

21    Friday afternoon.  I flew to Texas to spend the weekend with my

22    family and then flew out on Sunday evening back to -- to

23    Germany and then ultimately to Egypt.

24    Q.  From talking with Mona Mehrez, what did you understand she

25    did after the meeting in D.C.?

O5hWmen3                         Tate - Direct

1   A.  Dr. Mehrez's daughter lives in the D.C. area, so she had

2   spent the week with her daughter, visiting, before flying back.

3   Q.  And you had said that the first time you had heard about

4   Egypt deciding to go with a single certifier was in that

5   coincidental meeting at the Frankfurt airport, right?

6   A.  That's exactly correct.

7   Q.  Did Dr. Mehrez explain to you why one supplier was

8   supposedly a good thing for Egypt during that meeting?

9   A.  She didn't provide any substantive -- substantive

10  rationale.

11  Q.  Did she -- I think you testified earlier that you mentioned

12  many reasons why that was not a good decision, in the U.S.'s

13  view, right?

14  A.  That's correct.

15  Q.  Did Dr. Mehrez disagree with anything you said about the

16  problems with having a single certifier?

17  A.  She did not respond in substance to any of my concerns.

18  Q.  Did Dr. Mehrez appear to be confused about any of the

19  points that you made?

20          MR. FEE:  Objection.  Asked and answered again.

21          MR. MARK:  This was not asked.

22          THE COURT:  I'll allow it.

23  A.  She did not seem to be confused.  She was very clear in her

24  intention.

25          THE COURT:  Could you put up that letter again,

O5hWmen3                          Tate - Direct

1    please.

2            MR. MARK:  Mr. Hamill, could you display that.

3            THE COURT:  Sir, take a look at the last line of the

4    highlighted paragraph there.  The question is not (inaudible).

5            Do you see where it says approving the use of IS EG

6    Islamic center, who expressed their willingness to deliver all

7    Egyptian side requirements in terms of halal slaughter and

8    executing the related specifications?  Do you see that?

9            THE WITNESS:  Yes, your Honor.

10           THE COURT:  If you can tell, did that mean, if you

11   know, all of the requirements of the Egyptian side, or are

12   there side requirements that's talking about?

13           THE WITNESS:  That's a very good question, and this is

14   actually just a bit of a poor translation, but these are

15   requirements of the Egyptian side.

16           THE COURT:  All right.  Thank you.

17           MR. MARK:  Mr. Hamill, you can keep that up.  I now

18   have a follow-up question here.

19   Q.  This writes approving the use of IS EG Islamic center.  As

20   far as you know, was IS EG an Islamic organization?

21   A.  No.

22   Q.  Were any of the owners or operators Islamic?

23   A.  Not to the best of my knowledge.

24   Q.  And from your meeting with IS EG, had IS EG displayed

25   familiarity with the process of halal slaughter in your meeting

```
 1   with them?
 2   A.  No, they don't.  Actually, they asked me how it worked.
 3           THE COURT:  You mean their attorney did.
 4           THE WITNESS:  That's correct.
 5   BY MR. MARK:
 6   Q.  And Mr. Hana was present for that meeting, correct?
 7   A.  That's correct.
 8   Q.  Did Mr. Hana interject at all when Mr. Dorian made that
 9   comment?
10   A.  He did not.
11   Q.  Did the letter provide any explanation for the decision to
12   go forward with IS EG Halal?
13   A.  It did not.
14           MR. MARK:  You can take that down, Mr. Hamill.
15   Q.  Mr. Tate, are you familiar with something called the export
16   library?
17   A.  I am.
18   Q.  What is the export library?
19   A.  The export library is a web page that the U.S.D.A. -- where
20   the U.S.D.A. lists requirements for exporting certain
21   countries, and so a U.S.D.A. inspector can go to that library.
22   They can choose the country and see the country's requirements
23   to ship there, to ensure, before they issue a certificate, the
24   requirements indeed had been met.
25           (Continued on next page)
```

O5H3MEN4                      Tate - Direct

1   Q.  Were any updates to export library made as a result of

2   Egypt's decision to authorize IS EG Halal?

3   A.  Yes, there were.

4   Q.  What were those updates?

5   A.  The initial update was to add IS EG as an approved

6   certifier for Egypt, though we did not remove the others.

7           MR. MARK:  Can you please display what has been marked

8   for identification as Government Exhibit 8B-28.

9   Q.  Mr. Tate, do you recognize this exhibit?

10  A.  I do.

11  Q.  Were you copied on it?

12  A.  I was.

13          MR. MARK:  The government offers Government Exhibit

14  8B-28 into evidence.

15          MR. FEE:  One moment, your Honor.  No objection.

16          THE COURT:  Admitted.

17          (Government's Exhibit 8B-28 received in evidence)

18          MR. MARK:  Mr. Hamill, can you publish this exhibit.

19  Q.  Mr. Tate what is the date of this e-mail?

20  A.  This is April 28.

21          THE COURT:  2019?

22          THE WITNESS:  2019, yes.

23  Q.  Who sent this e-mail?

24  A.  This is from Ali Abdi.

25  Q.  Were you cc'd on it?

1    A.  Yes, sir.

2    Q.  Who is this e-mail directed to?

3    A.  This is Laura Anderson who at the time was the chief of the

4    division that managed animal product policy for the USDA.

5    Q.  Mr. Tate, can you read the first two sentences of this

6    e-mail beginning with "I also received."

7            THE COURT:  And again, Mr. Tate, even though the name

8    looks Egyptian, Ali Abdi is an American official, correct?

9            THE WITNESS:  That is correct.  Ali Abdi is a U.S.

10   citizen and American diplomat.

11   Q.  Mr. Tate, if you can read those two sentences that Mr. Ali

12   Abdi who is the minister counselor of the U.S. embassy wrote.

13   A.  Ali wrote, "I also received a tax letter from one of the

14   major exports to Egypt.  IS EG is advising U.S. exporters of

15   the government of Egypt's decision appointing them as a sole

16   halal certifier for Egypt effective May 1st, and the operations

17   with respect to exports will not be impacted."

18   Q.  What is a major export in this situation?

19   A.  This would have been one of the large U.S. beef companies.

20   I don't know exactly which one, but the names you're familiar

21   with are Swift or JBS.  These large conglomerates.

22   Q.  A large U.S. company exporting beef to Egypt?

23   A.  That's exactly correct.

24   Q.  When it refers to a decision becoming effective May 1, do

25   you recall what year that was going to be effective as of?

1   A.  Yes.  This was all 2019.

2   Q.  Just a few days later?

3   A.  That's right.

4   Q.  Can I direct your attention now to page 2 of the attached

5   letter.  What is this attachment?

6   A.  This is a letter from IS EG, it's written to whom it may

7   concern.  I understand it went to the U.S. beef companies

8   explaining that they were now the only certifier for Egypt.

9   Q.  What's the date of this letter?

10  A.  April 26, 2019.

11  Q.  Who is it from?

12  A.  It's signed by Jamela Maali.

13  Q.  What title is she listed as having?

14  A.  Managing member.

15  Q.  What's your understanding of what a managing member is?

16  A.  In this context I don't know.

17  Q.  Could you read the first two sentences of IS EG's letter.

18  A.  "Please allow this letter as an instruction to the services

19  provided by IS EG Halal Certified Incorporated.  Currently we

20  are the only entity authorized by the government of Egypt to

21  certify all products, in compliance with halal laws and

22  procedures."

23  Q.  This is reflecting that now they're only the only game in

24  town?

25  A.  Yes, sir.  That is how it seems.

1   Q.  Directing your attention back to the first page of the

2   e-mail.  Could you continue reading what Mr. Abdi wrote.

3   A.  Yes.  So Ali continues.  "Officials are also telling us

4   that trade will not be impacted by this action.  The

5   government's decision to delist all other certifiers is

6   concerning, especially the lack of justification as well as the

7   monopolistic nature of this decision.  We are trying to

8   schedule a meeting for the chargé with the minister of

9   agriculture to raise these concerns."

10  Q.  Taking this in turn.  The e-mail writes "Officials are also

11  telling us that trade will not be impacted by this action."

12  What officials is this is referring to?

13  A.  These are Egyptian government officials at the Ministry of

14  Agriculture.

15  Q.  When it's written at the end, "we're trying to schedule a

16  meeting for the chargé with the minister of agriculture to

17  raise these concerns," who is trying to schedule a meeting?

18  A.  That is the embassy had requested a meeting between the

19  chargé d'affaires, our acting embassador, and the Egyptian

20  minister of agriculture.

21  Q.  And to raise what concerns?

22  A.  To raise our concerns with the monopoly that had been given

23  to IS EG.

24  Q.  Now, in the interim, despite these concerns, was also an

25  ask related to the export library?

1    A.  Yes, Ali asked that Laura update the FSIS library to

2    include IS EG.

3    Q.  Did that change get made as a result of Mr. Abdi's request?

4    A.  It did.

5    Q.  Why did that change get made if there was concerns about

6    Egypt's decision to award the monopoly?

7    A.  Yeah, the main reason is if the change had not been made in

8    the export library, then the certifier, the U.S. inspectors

9    issuing that certificate we saw earlier, they wouldn't be able

10   to issue the certificate.  If they can't issue the certificate,

11   then the companies couldn't sell the product.  So essentially,

12   by not adding IS EG, we would be blocking U.S. export's ability

13   to sell products to Egypt.

14   Q.  So am I right that on one hand, the embassy and the

15   government, the U.S. government's trying to press for a change

16   to what Egypt's doing at the same time they're making changes

17   to an internal website so that trade won't be further impacted?

18   A.  Yes.  That's exactly correct.

19   Q.  After receiving Egypt's decision appointing a sole

20   certifier, I think you said the U.S. government took a position

21   on that decision earlier?

22   A.  Yes, that's right.

23   Q.  Were you involved in the formulation of that position?

24   A.  Yes, I was.

25   Q.  How were you involved in the formulation of the U.S.

1    government's position on Egypt's decision?

2    A.  I was making recommendations to Ali, to the chargé and to

3    the Department of Agriculture.

4    Q.  At this time, in April, May 2019, what was the U.S.

5    government's position on granting IS EG sole authority to issue

6    halal certificates?

7    A.  In general we were opposed to it.  Though I think more

8    specifically, if I may, in early May of that year, we had an

9    inner agency meeting at the embassy where we discussed the

10   U.S.'s position and how it should be handled.

11   Q.  Who participated in that meeting?

12   A.  In that meeting, myself, Mr. Abdi, Thomas Goldberger, the

13   chargé d'affaires, representatives from the State Department,

14   the Commerce Department, the legat office, and the intel

15   community.

16   Q.  What was discussed during that meeting?

17   A.  We discussed how the U.S. embassy should approach this

18   issue.

19   Q.  And how did the chargé express that he wanted the embassy

20   to approach the issue of IS EG?

21          MR. FEE:  Objection.  Hearsay.

22          THE COURT:  Sustained.

23   Q.  You can answer.

24          MR. FEE:  Objection.

25          THE COURT:  I sustained.

1           MR. MARK:  Sorry.  I apologize.  I think was a

2    request, your Honor.

3    Q.  But did the chargé make any requests about how to handle IS

4    EG during that meeting?

5           MR. FEE:  Objection, your Honor.  Hearsay.

6           THE COURT:  Just yes or no.

7           MR. FEE:  I'm not sure the witness heard you.

8           THE COURT:  You may answer yes or no.

9    A.  Did the chargé make -- please repeat the question.

10          THE COURT:  Did the chargé make any requests about how

11   to handle IS EG during that meeting?

12          THE WITNESS:  Yes, he did.

13   Q.  Were you present for that meeting?

14   A.  I was in that meeting, yes.

15   Q.  What request did the chargé make?

16          THE COURT:  Sustained.

17          As a result of that meeting, did you do anything, sir?

18          THE WITNESS:  Yes, sir, I did.

19   Q.  What did you do, Mr. Tate?

20   A.  Following that meeting, we treated this as a trade issue,

21   my office treated it as a trade issue.  And we requested a

22   number of follow-up meetings with the government of Egypt to

23   advocate for the USG position.

24   Q.  You focused this as a trade issue.  Was that outside with

25   the Egyptian government?

1  A.  That's correct.  With the Egyptian government we treated

2  this as a trade issue.

3  Q.  Internally in the embassy, did you have any further follow

4  up?

5  A.  Yes.  Internally in the embassy, the chargé requested that

6  any legal concerns be referred to the legat office, to the law

7  enforcement experts, and that the remainder of the embassy

8  treat this as a trade issue.

9  Q.  What were the legal concerns?

10            MR. LUSTBERG:  Objection, your Honor.

11            THE COURT:  Sustained.

12            MR. MARK:  Now, Mr. Hamill, could you display for the

13  witness only what has been marked for identification as

14  Government Exhibit 8B-19.

15  Q.  Do you recognize this exhibit?

16  A.  Yes.

17  Q.  What is this exhibit?

18  A.  This is an e-mail from Ali where he is forwarding a letter

19  that the chargé d'affaires sent to the minister of agriculture.

20  He is forwarding this to Washington.

21            MR. MARK:  Government offers Government Exhibit 8B-19

22  into evidence.

23            THE COURT:  Hearing no objection, admitted.

24            (Government's Exhibit 8B-19 received in evidence)

25            MR. MARK:  Mr. Hamill, can you publish Government

1    Exhibit 8B-19.

2    Q.  What is the date of this e-mail?

3    A.  This is April 30.

4    Q.  You mentioned that Ali Abdi sent this e-mail?

5    A.  Correct.

6    Q.  Were you cc'd on it?

7    A.  Yes.

8    Q.  Could you please read the text of the e-mail.

9    A.  "Here is a copy of the letter we sent to the minister of ag

10   for reference."

11   Q.  Was that sent by the chargé at the embassy in Cairo?

12   A.  The letter would have gone from the chargé to the ministry,

13   yes.

14   Q.  Was the letter itself, the substance of the letter attached

15   to this e-mail?

16   A.  Yes.

17          MR. MARK:  Mr. Hamill, can we go to page 2.

18   Q.  And what's the date of the letter in the attachment?

19   A.  April 28, 2019.

20   Q.  Is this a copy of the letter that went to the chargé to

21   Egypt?

22   A.  Yes.

23   Q.  Is there a process for letters when they are sent from the

24   chargé in the U.S. embassy to go to Egypt?

25   A.  Yes, that's exactly right.  There is a formal process where

1    diplomatic communication is from an embassy to a foreign

2    government are transmitted.

3    Q.   What is that formal process?

4    A.   The process is called a diplomatic note.  Normally in

5    something like this, a copy of this letter would be sent to the

6    Ministry of Foreign Affairs, with a cover page basically asking

7    the minister of foreign affairs to forward this letter to the

8    minister's office on our behalf.

9    Q.   Did you participate at all in the drafting of this letter?

10   A.   I did.

11   Q.   When this was sent, would it have been on formal letterhead

12   as opposed to in this form right here?

13   A.   That's exactly right.  It would be on an embassy letterhead

14   with watermarks and seals.

15   Q.   Is this, apart from the watermarks, is this the same

16   letter?

17   A.   It is the same letter.  The text is unchanged.

18   Q.   Mr. Tate, could you read the second and third sentence of

19   the letter and then stop.

20   A.   Second sentence.  "I'm writing to you regarding the

21   suspension and termination of U.S. based halal certifiers by

22   the central administration of veterinary quarantine.  We are

23   concerned how this action may affect U.S. agriculture exports

24   to Egypt that are subject to halal certification."

25            MR. MARK:  Mr. Hamill, can we zoom out now.

1  Q.  Can you now read the sentence that reads "to ensure."

2  A.  "To ensure markets are not disrupted by this action, we

3  respectfully request that existing certifiers be allowed to

4  continue their work while this matter is resolved."

5  Q.  What is the comment about markets are not disrupted by this

6  action refer to?

7  A.  We had serious concerns at the embassy that the new

8  certifying entity IS EG Halal was new to the market and didn't

9  not have the capacity to certify a production system as large

10  as the United States.  If they were unable to certify, then it

11  could lead to market disruption.

12  Q.  Why were you concerned they wouldn't be able to certify?

13  A.  As far as we knew, at the time they had one employee.  They

14  would need hundreds of inspectors across the United States in

15  order to certify each individual plant.

16  Q.  Why would they need hundreds of different inspectors?

17  A.  Because we have scores of U.S. slaughterhouses, and each

18  one is working 24 hours a day.  They would need a massive

19  number of people in order to observe that level of production.

20  Q.  Because the different halal certifiers that you had already

21  seen had lots of different inspectors at the time; is that

22  right?

23  A.  That's correct.  And there were many of them.

24  Q.  Apart from the concern about market disruption, were there

25  other concerns that the USG had at the time?

O5H3MEN4                          Tate - Direct

1    A.  I mean, I would say our two primary concerns, one was

2    market disruption.  And then the second, of course, was the

3    question of the monopoly and the impact on the other halal,

4    U.S. halal certifiers.

5    Q.  When you talk about the impact of monopoly, what was the

6    impact of monopoly here?

7    A.  I mean the impacts, for one, the companies that were not

8    chosen would be excluded from the market.  They would be out of

9    business.  And for two, there would be an impact on the cost of

10   certification.

11           MR. MARK:  Mr. Hamill, you can take this down.

12   Q.  Now, Mr. Tate, you mentioned I think the term legat

13   earlier.  What is the legat?

14   A.  The legat office in the embassy is the legal attache's

15   office.  That is an office staffed by one or more FBI officers

16   that take legal referrals and manage legal issues with the host

17   country.

18           THE COURT:  They don't only have to be FBI officers,

19   do they?

20           THE WITNESS:  I'm not certain who else might staff it.

21   That's a good question.

22           THE COURT:  You don't know?

23           THE WITNESS:  I don't know, that's correct.

24   Q.  At the time, was the legat in the legal attache in Cairo an

25   FBI officer?

O5H3MEN4                        Tate - Direct

1    A.  Yes, he was.

2    Q.  Did the legat contact anyone after that meeting?

3              MR. FEE:  Objection.  Relevance.

4              THE COURT:  I'll allow it.  See where it goes.

5              MR. FEE:  403 as well, your Honor.

6              THE COURT:  Objection overruled.

7    A.  We provided information to the legat, which they then

8    forwarded to their U.S. counterparts, and subsequent to that we

9    provided additional information to the U.S. offices.

10   Q.  Did you meet with anybody else after that meeting?

11             MR. FEE:  Objection.  Relevance objection, your Honor.

12             THE COURT:  Overruled.  See where it goes.

13   A.  I met with the FBI.

14   Q.  Approximately when did you meet with the FBI?

15   A.  I don't remember the exact date.  It would have been May to

16   June, we had two different meetings, one internal and one more

17   broad over the larger group.

18   Q.  Do you know where the FBI agents were that you met with?

19             MR. FEE:  Objection, your Honor.  Relevance.

20             THE COURT:  What is your relevance?

21             MR. FEE:  Can we do this at sidebar?

22             THE COURT:  I really dislike sidebars.  Continue on,

23   and when the jury goes out, we'll hear it at sidebar.  I want

24   the absolute minimum of sidebars to maximum the amount of

25   evidence this jury can hear.

1          MR. MARK:  This issue was fronted with defense counsel

2     but we'll continue on right now.

3     Q.  After the meeting with the chargé, that you talked about

4     earlier, where the chargé decided to treat the halal issue as a

5     trade issue.  Did the U.S. embassy request additional meetings

6     with Egyptian ministers on this matter?

7     A.  Yes, we did.

8     Q.  With which ministers?

9     A.  We requested a meeting with the Ministry of Industry and

10    Trade, and then a meeting with the General Organization for

11    Import Export Control.

12    Q.  What is the Ministry of Trade?

13    A.  Pardon me?

14    Q.  What is the Egyptian Ministry of Trade?

15    A.  They are analogous to the Department of Commerce here in

16    the United States.

17    Q.  What was the other ministry that you mentioned there was a

18    meeting with?

19    A.  Right.  The General Organization for Import and Export

20    Control.  That's an Egyptian entity, a government entity that

21    buys and sells some commodities and has some control over

22    imports and exports.

23    Q.  Did the minister of international trade, did that meeting

24    end up happening?

25    A.  The meeting happened, though the minister did not attend.

1   He sent his chief of staff to meet with us instead.

2   Q.  You mentioned that that ministry was sort of similar to the

3   Department of Commerce in the U.S.?

4   A.  Yes.

5   Q.  What is the Department of Commerce?

6   A.  The Department of Commerce here in the U.S., their

7   activities are what I described my job as.  They're here to

8   help U.S. companies to do business, to export more, and also

9   seeking investment back into the U.S.

10  Q.  Did you participate in a meeting with the minister -- with

11  the Ministry of International Trade?

12  A.  I did.

13  Q.  What was generally discussed during that meeting?

14  A.  The ministry, that ministry is very professionalized, they

15  have a group of career diplomats.  So, it was a very good

16  meeting and very frank meeting.

17          In general, though, we expressed our concern with the

18  monopoly being given to IS EG.  We expressed that could run

19  afoul Egypt's international commitments under the WTO.  We

20  expressed we were concerned it would disrupt markets.

21  Q.  You mentioned concerns about Egyptian's commitments to

22  what?

23  A.  Under the WTO, the World Trade Organization.

24  Q.  What were Egypt's commitments under WTO?

25          MR. FEE:  Objection, your Honor.

 1              THE COURT:  Same point?

 2              MR. FEE:  Foundation as well, your Honor.

 3              THE COURT:  All right.  Move on.

 4              MR. MARK:  I think he talked about the WTO earlier.

 5    So I think there is the foundation there.

 6              THE COURT:  Let's move on.

 7              MR. MARK:  Okay.

 8    Q.  How did the ministry, how did the Egyptian side in that

 9    meeting respond to the U.S. side raising these concerns?

10    A.  Yeah, that Egyptian ministry was surprised.  They were

11    surprised that the certification business had been given to one

12    entity.  They were concerned that markets could be disrupted,

13    and they agreed to take up the issue with the Ministry of

14    Agriculture to see what was going on.

15    Q.  Now, you mentioned there was another meeting with a

16    different ministry.  I think you used the name GOEIC?

17    A.  Yes.  General Organization for Import Export Control.

18    Q.  Did you participate in a meeting with the Ministry of

19    GOEIC?

20    A.  I did.

21    Q.  Were similar concerns raised by the U.S. side then?

22              MR. FEE:  Objection.  Hearsay.

23              THE COURT:  I'll allow it.  Yes or no.

24              THE WITNESS:  Yes.

25    Q.  How did the Egyptian Ministry of GOEIC respond during that

1    meeting?

2              MR. FEE:  Objection.

3              THE COURT:  I'll allow it.

4              I see.  I see.  Sustained.

5    Q.  Mr. Tate, were you present in this meeting?

6    A.  I was.

7    Q.  Who else was present at this meeting?

8    A.  With GOEIC?  Ali Abdi.

9    Q.  With you and Mr. Abdi?

10   A.  That's correct.

11   Q.  Who was present for the GOEIC side?

12   A.  I do not remember.

13   Q.  And did you and Mr. Abdi raise any concerns during that

14   meeting?

15   A.  Yes.

16   Q.  What were the nature of those concerns?

17             MR. FEE:  Objection.

18             THE COURT:  No.  It's what he and Abdi raised.  I'll

19   allow it.  It's direct.

20   A.  We raised concerns that giving a single company control

21   over the halal certification business could have market --

22   could create market disruptions.  We noted that it could

23   increase prices for Egyptian consumers.  And we advocated for

24   the inclusion of additional competition in the halal

25   certification business.

1    Q.  How did the GOEIC side respond to these points?

2              MR. FEE:  Objection.

3              THE COURT:  Sustained.

4              MR. MARK:  Your Honor, the response here, as with

5    others, are not offered for the truth.

6              THE COURT:  I will -- no.  It's sustained.

7              Actually I'll reverse myself.  It's not for the truth

8    of the matter asserted.  Simply for what they said.

9              MR. MARK:  Correct.

10             THE COURT:  I'll allow it on that limited basis.

11             MR. MARK:  Thank you, your Honor.

12   Q.  Now, Mr. Tate, you were saying that you and Mr. Abdi had

13   raised a number of concerns in this GOEIC meeting similar to

14   ones that had been raised in other meetings.

15             My question is how did the GOEIC side respond to those

16   points?

17   A.  Yes.  GOEIC generally deferred to the Ministry of

18   Agriculture.  They said they hoped/expected trade wouldn't be

19   interrupted, but they deferred to the Ministry of Agriculture.

20   Q.  Now, we were just talking about a number of meetings that

21   U.S. embassy or people who work at the U.S. embassy had with

22   Egyptian officials related to halal issue, right?

23   A.  Yes.

24   Q.  Okay.  Apart from U.S. officials in the embassy pressing

25   this issue, were there others in Washington, D.C. who were

1  similarly pushing this issue, too?

2  A.  Yes, there were.

3  Q.  Who was pushing the issue from D.C.?

4  A.  I mean, my colleagues in the Foreign Agriculture Service

5  and specifically Undersecretary Ted McKinney.

6         MR. MARK:  Mr. Hamill, for the witness only, could you

7  please display what has been marked for identification as

8  Government Exhibits 8B-20, and 8B-35.

9  Q.  Mr. Tate, do you recognize these exhibits?

10  A.  Yes, I do.

11  Q.  What are they generally?

12  A.  The left page is an e-mail to the general Cairo ag inbox,

13  so our general office e-mail and Ali, where our colleagues in

14  Washington are forwarding along a letter sent from

15  Undersecretary McKinney to Deputy Minister of Agriculture.

16  Q.  How about 8B-35?

17  A.  Number 35, this is e-mail correspondence between the

18  undersecretary, the U.S. Undersecretary Ted McKinney and the

19  Egyptian ambassador where he mentions having called the

20  ambassador and following up with key points.

21  Q.  Were you copied on these e-mails you are looking at right

22  now?

23  A.  Number 20, not copied directly, though I had control over

24  that inbox so, yes, I would have received it.

25         Number 35 I'm copied in a forwarded version.

O5H3MEN4                          Tate - Direct

1              MR. MARK:  The government offers Government Exhibit

2     8B-20 and 35 into evidence.

3              MR. FEE:  Assuming they are also not offered for the

4     truth, no objection, your Honor.

5              THE COURT:  All right.  Admitted.

6              (Government's Exhibit 8B-20, 8B-35 received in

7     evidence)

8              THE COURT:  I assume you are going to have McKinney

9     here in any event; is that right?

10             MR. MARK:  We are, your Honor.

11             THE COURT:  Let's move forward.

12    Q.  So, I'm not going to dwell on these two documents,

13    Mr. Tate, but in sum, how did Mr. McKinney's communications

14    here in these exhibits compare to the ones that you and

15    Mr. Abdi and the chargé were pressing in Cairo?

16    A.  Yeah, certainly these would have been the same kinds of

17    points.  So, this would have been the Department of Agriculture

18    making the case that a monopoly, monopoly on halal

19    certification was bad for U.S. companies, bad for Egyptian

20    consumers, and just generally a problem for the U.S., could

21    potentially disrupt trade, so a problem for the U.S.

22             The Undersecretary at USDA would have communicated

23    this to the Egyptian ambassador in Washington as well as to his

24    counterpart at the Egyptian Ministry of Agriculture, so

25    Dr. Mona Mehrez.

1          MR. MARK:  Mr. Hamill, if can you put up or solely

2   publish Government Exhibit 8B-20.  Turn to the next page.

3   Q.  And is this the undersecretary's letterhead here?

4   A.  Yes.

5          MR. MARK:  Can we turn to the next page, Mr. Hamill.

6   Q.  Is this the letter from Undersecretary McKinney?

7   A.  That's correct, it is.

8   Q.  Could you just read the fourth paragraph.  Only that

9   paragraph.

10  A.  "I respectfully request that you take measures to prevent

11  any disruption in our halal industry.  Effective immediately,

12  please reinstate the seven U.S. halal certifiers.  In addition,

13  we ask that you give U.S. officials and industry an opportunity

14  to address any concerns regarding the halal section of the

15  audit."

16  Q.  Is this what you were referring to that this was consistent

17  with what you Mr. Abdi and the chargé were pressing in Cairo?

18  A.  That's correct.

19         MR. MARK:  Mr. Hamill, you can take that down, now.

20  Q.  Are you familiar, Mr. Tate, with something called the

21  USMEF?

22  A.  Yes, I am.

23  Q.  What is the USMEF?

24  A.  That is the U.S. Meat Export Federation.

25  Q.  What is the U.S. Meat Export Federation?

O5H3MEN4                           Tate - Direct

1    A.  It is an association of beef, of meat exporters.  Mostly

2    beef exports in the U.S.

3    Q.  Did the USMEF participate in the audit in March 2019 in any

4    way?

5    A.  In parts of it, that's right.  They would have been

6    generally available, if necessary.  But in several of the plant

7    visits, an MEF representative was there along with the

8    executives from the plant.

9    Q.  Did USMEF underwrite the audit in any way?

10   A.  Yes, they did.  They would have provided funding for the

11   Egyptian group to travel.

12   Q.  Had you been dealing with USMEF on the halal certification

13   issue?

14   A.  Yes.

15   Q.  After Egypt made this decision to go with IS EG, had USMEF

16   raised any concerns to you?

17   A.  Yes.

18   Q.  What concerns had that organization raised to you?

19   A.  Well, there were a number.  They were similarly concerned

20   that we were -- that markets would be interrupted.  They were

21   concerned that the new certifier did not have staff and

22   capacity to certify the U.S.  And then later there were

23   additional concerns about labeling.

24   Q.  What were the nature of those concerns?

25   A.  During the transition period, as IS EG was taking over from

O5H3MEN4                              Tate - Direct

1    the previous four certifiers, IS EG officials were instructing

2    plants to use labels and documents from the previous

3    certifiers, so essentially to keep using the same stickers

4    you've been using for this product, it will be fine.

5    Q.   How is that a concern for the USMEF?

6    A.   I think that the halal certifiers who had been delisted

7    were unhappy that their labeling and their, their intellectual

8    property was being used to continue this business.  And they

9    were complaining to MEF.

10   Q.   Were the concerns from USMEF and these existing halal

11   certifiers relevant to formulating the U.S. government's

12   response to Egypt's decision?

13   A.   Yes.

14   Q.   So, I think there are a number of exhibits here.  Mr. Tate,

15   I think there is a binder in front of you.

16   A.   Yes.

17   Q.   I'll ask you to take a look at Government Exhibits 8B-5,

18   8B-21, 8B-36, and 8B-40-46, and we gave notice to the defense

19   of each of these exhibits.

20   A.   5, 21?

21   Q.   5, 21, 36, and 40-46.

22   A.   Okay.

23   Q.   Do you recognize these exhibits?

24   A.   Yes.

25   Q.   Were these all e-mails?

1  A.  That's correct.  These are e-mails.

2  Q.  Were you copied on them?

3  A.  I appear to have been copied on all of them.

4  Q.  Do these concern the halal issue we've been talking about?

5  A.  Yes, they do.

6          MR. MARK:  The government offers 8B-5, 8B-21, 8B-36,

7  and then 40-46.

8          MR. FEE:  No objection, your Honor.

9          THE COURT:  Admitted without objection.

10          (Government's Exhibit 8B-5, 8B-21, 8B-36, 8B-40

11  through 8B-46 received in evidence)

12          MR. MARK:  Mr. Hamill, can you publish Government

13  Exhibit 8B-5.

14  Q.  Focusing on the bottom e-mail here.  What was the date of

15  this e-mail?

16  A.  April 30, 2019.

17  Q.  Who is it from?

18  A.  This is from Travis Arp.

19  Q.  Were you cc'd on this e-mail?

20  A.  Yes, I was.

21  Q.  Who is Travis Arp?

22  A.  Travis Arp at the time was the -- I believe his title was

23  director for trade for the USMEF.

24  Q.  What did this e-mail generally concern?

25  A.  Give me just a second here.

O5H3MEN4                          Tate - Direct

1    Q.  Of course.

2    A.  So, Travis, representing the U.S. Meat Export Federation,

3    is e-mailing here to the USDA, the "to" line, these are mostly

4    USDA regulators as well as some foreign agriculture service

5    colleagues.

6            He's e-mailing this group, and saying that they had a

7    call with the U.S. regulators about the changes in the export

8    library, they are concerned that the change will be a trade --

9    a disruption to trade.  Plants, they believe that the new

10   certifier would not have the capacity to provide services to

11   all the plants, and some might not all do business with a new

12   company they didn't know.  And there were essentially rumors

13   circulating with regard to that.

14   Q.  So, in your job, did you generally have like an open line

15   of communication with the USMEF?

16   A.  Yes, we worked very closely with them.

17   Q.  Why did you work very closely with the USMEF?

18   A.  Our objectives are aligned.  The U.S. industry is looking

19   to export more product, and we're looking to also support them.

20   Q.  Now --

21           THE COURT:  You are trying to increase the business of

22   American suppliers, correct?

23           THE WITNESS:  That's correct, that's correct.

24           THE COURT:  That's your job?

25           THE WITNESS:  Yes, sir, that's correct.

1        MR. MARK:  Thank you for that clarification, your

2   Honor.

3        Mr. Hamill, can we take a look now and publish

4   Government Exhibit 8B-21.

5   Q.  What is the date of this e-mail, Mr. Tate?

6   A.  This is May 13, 2019.

7   Q.  Approximately two weeks after the last e-mail we just

8   looked at, right?

9   A.  That's right.

10  Q.  And is this e-mail is from Ali Abdi, your boss?

11  A.  That's correct.

12  Q.  And who did Mr. Abdi send this e-mail to?

13  A.  He sent it again to the team in Washington, that was

14  managing policy issues for animal products, as well as Travis

15  and Paul Clayton, another person with USMEF.  So the industry

16  and Washington.

17  Q.  Both the industry and Washington.  USDA were the recipients

18  of this e-mail?

19  A.  Correct.

20  Q.  And could you just read, it is a short e-mail.  What was

21  written?

22  A.  Ali says, "See attached letter from IS EG to the ministry

23  which makes the claim that all companies have agreed to comply

24  with Egyptian standard and regulation for halal.  The letter is

25  full of errors and appears to misrepresent facts.  We received

O5H3MEN4                    Tate - Direct

1    this via private channels.  Can USMEF check with plants about

2    these claims, thanks."

3    Q.  In references to checking with plants, what are the plants

4    that are being referred to here?

5    A.  Ali is asking Travis to check with the beef slaughterhouses

6    and beef facilities to see if these claims are correct.

7    Q.  What relationship does USMEF have with the beef

8    slaughterhouses?

9    A.  The beef slaughterhouses are members of USMEF, so they pay

10   dues and have representation at USMEF.

11   Q.  Now directing your attention to the attached letter.  Now,

12   who this is letter directed to?

13   A.  This is written to Dr. Ahmed Abdel Kareem.

14   Q.  Is he from IS EG?

15   A.  That's correct.

16   Q.  Now, you had mentioned earlier that Mr. Hana was the owner

17   of IS EG?

18   A.  Yes, sir.

19   Q.  And you first met him at a dinner or drinks with Dr. Ahmed

20   Abdel Kareem?

21   A.  That's correct.

22   Q.  From that dinner, what was your impression of the nature of

23   their relationship?

24           MR. FEE:  Objection, your Honor.

25           THE COURT:  Sustained as phrased.

O5H3MEN4                          Tate - Direct

1   Q.  Did you see, during did the audit in D.C., Mr. Hana and

2   Dr. Ahmed Abdel Kareem interact on a number of occasions?

3   A.  That's correct.  I did see them together on a number of

4   occasions in Washington.

5   Q.  What did you observe about the nature of their

6   interactions?

7            MR. FEE:  Objection.

8            THE COURT:  I'll allow it.  How did they interact?

9            THE WITNESS:  They appeared to be friendly with one

10  another.  They appeared together frequently during our few days

11  in D.C.

12  Q.  What about the nature of their interactions indicated to

13  you that they appeared to be friendly?

14  A.  I think the fact that they dined together, they had coffee

15  together.  When there was downtime, they spent time together.

16  They seemed to be very collegial or friendly.

17  Q.  And you mentioned also that you saw Mr. Hana with Mona

18  Mehrez as well, the vice minister, too?

19  A.  Yes.

20  Q.  What did you observe about their interactions between

21  Mr. Hana and Mona Mehrez during that time?

22  A.  They similarly had a friendly relationship.  They seemed

23  very collegial.  They dined together.  They traveled together.

24  So a similar relationship between Mr. Hana and both of the

25  Egyptian government officials.

O5H3MEN4                    Tate - Direct

1   Q.  Did you see while you were in D.C. a similar relationship

2   between either Dr. Ahmed Abdel Kareem and Mona Mehrez with any

3   of the other halal certifiers?

4   A.  No, I did not.

5   Q.  Focusing on this letter from IS EG to Dr. Ahmed Abdel

6   Kareem.  And here it says -- I think this is a different it

7   says here Dr. Ahmed Abdel Karim Badie.  Is this the same person

8   that we've been talking about before?

9   A.  This is the same person.  This is just a different

10  transliteration of the exact same name.

11  Q.  And what did this letter concern?

12  A.  So this letter was from IS EG to the Egyptian government

13  saying that they had met with a number of U.S. slaughterhouses,

14  and that the U.S. companies agreed to comply with the U.S.

15  department of the Egyptian standards on halal.

16  Q.  Turning to the last page of the letter.  Who appeared to

17  have signed this letter?

18  A.  Jamela Maali.

19  Q.  What was her title listed on the letter?

20  A.  Managing member.

21  Q.  This letter was attached on to an e-mail that was sent to

22  FAS leadership and also USMEF?

23  A.  Yes.

24  Q.  What was the purpose of sending the attached letter to

25  USMEF?

O5H3MEN4                          Tate - Direct

1    A.  Well, it was a bit unusual to get a letter like this that

2    had this sort of U.S. plan information going to a foreign

3    government.  The reality was to see if it was correct.  Had IS

4    EG actually met with the plants, were the plants actually

5    comfortable working with IS EG.  We were just trying to verify

6    that this had indeed happened as was being reported to the

7    Egyptian government.

8    Q.  This one, this letter was from Ali Abdi, your boss?

9    A.  The e-mail is from Ali Abdi.

10   Q.  Yeah, the e-mail was.  When we've been talking about a

11   number of meetings with the chargé and the other ministries,

12   had Ali Abdi been in those?

13   A.  Yes.

14   Q.  Who had more of a speaking role in those meetings, you or

15   your boss?

16   A.  It depends on the meeting, but generally I would defer to

17   Ali.

18   Q.  Changing topics a little bit, are you familiar with the

19   term GAIN Report?

20   A.  Yes, I am.

21   Q.  What is a GAIN Report?

22   A.  A GAIN Report is part of the overseas reporting we do in

23   our offices.  These are reports written by myself and my staff

24   about market conditions, or production supply demand and

25   commodities.  The reports are designed to provide information

O5H3MEN4                          Tate - Direct

1    in the U.S. industry so the industry can make informed

2    decisions about where to do business and where opportunities

3    may be.

4    Q.  As an agriculture attache, was it part of your official

5    duties to prepare GAIN Reports?

6    A.  Yes, it was.

7    Q.  How many have you prepared?

8    A.  In my life, hundreds.

9    Q.  How, generally, when you prepared GAIN Reports, who can

10   access a GAIN Report?

11   A.  That's a good question.  It depends a bit.  Generally, we

12   make them public.  We think that more public information is

13   better, so we try to make things as public as possible.

14   Occasionally, if it is a sensitive issue, we'll make in

15   internal for internal reports that only USDA staff can see

16   them.  For the rest of our reporting, they're on the internet

17   and available to everyone in this room.

18   Q.  When you say on the internet, on the USDA's website?

19   A.  Yes.

20   Q.  When you were stationed in Cairo, did you prepare any

21   public GAIN Reports?

22   A.  I did.

23   Q.  Did you ever prepare one on IS EG Halal?

24   A.  I did.

25   Q.  When approximately did you prepare it?

1    A.  I have in my notes, but I believed it was in May of 2019.

2    Q.  Was that report made publicly available?

3    A.  It was, yes.

4    Q.  Was that made publicly available through the USDA website?

5    A.  Correct, yes.

6            MR. MARK:  Mr. Hamill, for the witness only, could you

7    please display what has been marked for identification as

8    Government Exhibit 8B-32.

9    Q.  Mr. Tate, do you recognize this exhibit?

10   A.  Yes, sir.

11   Q.  What is it?

12   A.  This is a GAIN Report we wrote about -- or I wrote about

13   the new halal certification changes and potential market

14   impacts.

15           MR. MARK:  The government offers Government Exhibit

16   8B-32 into evidence.

17           THE COURT:  Admitted without objection.

18           (Government's Exhibit 8B-32 received in evidence)

19           THE COURT:  I see GAIN stands for Global Agriculture

20   Information Network.  Is that correct, sir?

21           THE WITNESS:  Yes, your Honor.  That's correct.

22           MR. MARK:  Mr. Hamill, can you publish this.  Just

23   focus on the top.  Can you just enlarge where it says GAIN

24   Report right there.

25   Q.  So it says USDA Foreign Agriculture Service.  Is that the

1  part of USDA that issues these GAIN Reports?

2  A.  That's correct.

3  Q.  I've been saying GAIN.  It is a mouthful to say Global

4  Agriculture Information Network.  What is the Global

5  Agriculture Information Network?

6  A.  Fair enough.  This is a series of reports that the USDA

7  produces, so that we can understand global trends in food

8  production supply and demand.

9        MR. MARK:  Zooming out a little, Mr. Hamill.  Can you

10  just enlarge everything below voluntary public.

11  Q.  So, the public here.  That indicates this is a public

12  report?

13  A.  Yes, that's correct.

14  Q.  What's the date of this report?

15  A.  May 13, 2019.

16  Q.  Who prepared this report?

17  A.  I prepared it.

18  Q.  Who approved it?

19  A.  Ali Abdi.

20  Q.  It has two different report categories listed.  Can you

21  just identify what those categories are and explain them.

22  A.  The first category is livestock and products.  The second

23  is trade policy incident report.

24        So livestock and products, that's the category we

25  would apply to any report that we believe would have impacts on

1    livestock or animal products markets.  So if we see an increase

2    in steak consumption or a decrease in cattle production, that

3    sort of data.

4            The second category, trade policy incident report, if

5    we see a change in policy that we think will have impacts for

6    U.S. companies, that's how we flag it.

7    Q.  Now, this is titled:  Update New Egyptian Halal Procedures

8    May Disrupt Markets Drive Up Prices.

9            What was the new Egyptian halal procedures this

10   referred to?

11   A.  This was the change from having multiple certifiers to

12   having a single halal certifier.

13   Q.  When it refers to driving up prices, what does that refer

14   to?

15   A.  We knew that certification costs had gone up.  And we knew

16   that there would be price impacts to Egyptian consumers.

17   Q.  Now, can we scroll up a little bit here.  This is a public

18   GAIN Report, right?

19   A.  Yes, sir.

20   Q.  What does it say underneath the banner of this public GAIN

21   Report?

22   A.  "This report contains assessments of commodity and trade

23   issues made by USDA staff, not necessarily statements of

24   official U.S. government policy."

25   Q.  Was the U.S. government policy in the halal procedure

1    publicly put out on the USDA's website related to IS EG Halal?

2    A.   No.

3    Q.   Was that communicated through meetings and letters with the

4    Egyptian officials?

5    A.   That's correct.

6    Q.   Now, focusing down on the comment that this may drive up

7    prices.  How were prices expected to increase at this point in

8    time?

9    A.   Well, certification costs had increased a lot.  Again, as I

10   mentioned earlier, from 2 to $300 range to $5,000 range for a

11   container.  These were big increases.  So we didn't know how

12   much of that would be absorbed by importers and exporters, and

13   how much would be passed on to consumers.  But we knew price at

14   the retail level had to increase.  That's what we're messaging

15   here.

16   Q.   You said a lot and I think that was a lot of economics.  I

17   am going to ask you some follow-up questions, which is you said

18   there was a price increase.  So first start with the price

19   increase and let's go from there.

20           What was the price increase?

21   A.   Yeah, so certifiers, when we had four certifiers before,

22   they charged, as I mentioned earlier, pennies per pound.  So,

23   in the report we have the actual numbers, I don't want to

24   misrepresent.

25   Q.   Would it help if we go to that part of the report?

O5H3MEN4                          Tate - Direct

1   A.  Yeah, if you scroll down, I can tell you the exact numbers.

2   Q.  You can tell us when to stop here.

3   A.  There you go.  Right there's fine.

4           So, previously, the last paragraph mentions,

5   certifiers charged 10 to $20 per metric ton for certification.

6   That fee increased 10 cents per pound to $220 per metric ton.

7   As a percent change, that's very large.

8   Q.  I didn't mean to interrupt you.

9   A.  I was going to say even in terms of a container, if we

10  think of container is 23 tons, we're talking about an increase

11  from a minimum of $230 up to about $5,060 per container.  So a

12  big increase.

13  Q.  About a 10-fold increase there at least?

14  A.  That's right.

15  Q.  You mentioned some concerns about when there is an increase

16  to a fee like that, what the impact could be.  You're talking

17  about it can be absorbed by different people.

18          Can you explain what you meant by how that fee could

19  have an impact on business or trade?

20  A.  Certainly, certainly.  The increased fee, someone has to

21  pay it.  Initially, the middlemen pay it, but they pass that

22  cost on to the customer which means the exporter will charge

23  the importer more, the importer will charge the supermarket

24  more, the supermarket will charge the customer more.  We

25  expected some of the middlemen would take -- would absorb some

O5H3MEN4                        Tate - Direct

1   of that cost to keep their prices low.  But at the end of the

2   day, the cost increase was so large, we knew consumers would

3   see an increase.  We didn't know how much, but we knew they

4   would see an increase.

5   Q.  Were you explaining some of this cost and increase fee

6   would be borne in the U.S. by U.S. business?

7   A.  It could be in the U.S., could be by the Egyptian

8   importers, could be by the Egyptian supermarkets.  We didn't

9   know that at the time.

10  Q.  Now, the statement right above here where it talks about

11  the export procedures and the fees you are talking about, it

12  has an underlined statement.  Could you read that underlined

13  statement?

14  A.  I wrote that, "Note IS EG Halal Certified is a private

15  company and not an official representative of the Egyptian

16  government."

17  Q.  You said that you wrote it.  What was the purpose of

18  including that in the public report?

19  A.  Well, at the end of the day, this report was designed to

20  give U.S. companies information.  We wanted to make sure they

21  were as informed as possible so they could continue to sell the

22  product.

23      Some companies reported to us that IS EG officials

24  said they represented the Egyptian government.  And so this was

25  to clarify that this is a company, not the Egyptian government.

Q.   And why did you include that?  To try to clarify that
point?

A.   Yeah.  Because when someone shows up at your house or your
business and says I represent a foreign government, well, the
first thing they would do is call us and say, hey, the
government is here.  Why didn't you tell us they were coming?
So this is to dispel that right away.

          THE COURT:  Sir, I'm sorry.  I didn't mean to cut you
off.

          THE WITNESS:  Please.

          THE COURT:  Something I don't understand.  You said
the increased fee someone, has to pay it.

          THE WITNESS:  Yes, sir.

          THE COURT:  Initially the middlemen pay it.  But they
pass that cost on to the customers.  The exporter will charge
the importer more.  In other words, in the example I gave,
Swift will charge if it's going to Egypt, whatever company is
purchasing the container of meat to import to Egypt.  Correct?

          THE WITNESS:  Yes, sir.

          THE COURT:  Then you say, the importer will charge the
supermarket more, and the supermarket will charge the customer
more.

          THE WITNESS:  Yes, sir.

          THE COURT:  Are you referring to a supermarket in
Egypt and a customer in Egypt?

1            THE WITNESS:  Yes, sir.

2            THE COURT:  What is the impact, if any, on American

3   consumers?

4            THE WITNESS:  That's a good question, your Honor.  The

5   impact of course -- as price increases in Egypt, don't forget,

6   Egyptian consumers are very price sensitive, they have very low

7   purchasing power.  As the price increases, at some point, they

8   will not be able to purchase the product.  If they can't

9   purchase the product, then our companies can't sell the

10  product.

11           THE COURT:  All right.  Thank you.

12           THE WITNESS:  Yes, sir.

13  BY MR. MARK:

14  Q.  Apart from that impact on the Egyptian consumer having an

15  impact then back on the U.S. companies, is there an immediate

16  impact from the U.S. to an increased fee?

17  A.  Well, the U.S. companies will pass on the cost.  I guess

18  the answer to that is yes, there is an immediate impact.  But

19  the immediate impact is the U.S. company has to pay that money

20  and pass on the costs.

21           THE COURT:  I'm still confused.

22           THE WITNESS:  Okay.

23           THE COURT:  If Swift gets a halal certification on its

24  meat, you get that little stamp.

25           THE WITNESS:  Yes, sir.

1              THE COURT:  There are consumers in the United States

2    who want to purchase halal certified meat, correct?

3              THE WITNESS:  Yes, your Honor, that's correct.

4              THE COURT:  In the example we're giving, does Swift

5    also sell halal certified meat to consumers in the United

6    States?

7              THE WITNESS:  Yes, your Honor.  I think the confusion

8    lies in the specific market.  The Egyptians are buying mostly

9    beef liver, which we don't sell much of in the United States.

10             THE COURT:  Okay.  I think that does it.  So, to the

11   extent there is an impact, I don't want to put words in your

12   mouth, sir.  If I understand you correctly.  To the extent

13   there is on impact on the ultimate consumer of this product, in

14   the case of Egypt, it's felt primarily, if not entirely, by the

15   consumer -- the person who is going to the supermarket to buy

16   the beef liver.  It's felt primarily on the consumer in Egypt,

17   because the products that Egypt is buying, by and large, are

18   not sold to consumers in the United States.

19             Is that what you're saying?

20             THE WITNESS:  Yes, sir, that's correct, that's

21   correct.  The other consideration along those lines is that in

22   the United States we have multiple certifiers.  There are tens

23   of certifiers in the U.S.  In Egypt, there was one certifier.

24   Q.  So this is to sort of break that down a little bit more.

25   So Swift in this example is going to pay more for the fee?

1  A.  Yes.

2  Q.  And then that Swift pays more, they might pass it on to

3  their consumers, the people they're selling their beef to,

4  because they don't want to absorb that fee themselves?

5  A.  That's correct.  We will see increased cost at the consumer

6  level.

7  Q.  You're concerned with Egypt, that the increase costs the

8  consumers could mean that people in Egypt won't purchase as

9  much beef from the U.S. as otherwise?

10  A.  Yes, that's correct.

11  Q.  While we've been talking about Egypt, for IS EG Halal, did

12  they certify halal products for any other market other than

13  Egypt?

14  A.   Initially IS EG only certified for the United States and

15  Egypt initially.

16  Q.  Did IS EG ever certify for any -- for beef in the United

17  States that went anywhere other than Egypt?

18  A.  No.

19          MR. MARK:  If we could just take a look, Mr. Hamill,

20  in the section titled "Changes to Halal Certification."  If you

21  could zoom in.

22  Q.  Could you just read the second starting at the second

23  sentence of this section.

24  A.  Yes.  "The New Jersey Department of Treasury reports that

25  Mr. Wael Hana and Mr. Antranig Aslanian Jr. incorporated the

1    firm in November 2017."

2    Q.  We can continue.

3    A.  "FAS Cairo is not aware that the company has prior

4    experience in halal certification.  The firm is not known to

5    have a preexisting relationship with the U.S. beef industry or

6    Islamic organizations in the United States.  Exporters

7    interested in shipping beef to Egypt are advised to contact IS

8    EG Halal certified directly, to clarify certification

9    procedures."

10   Q.  Why did you write to clarify certification procedures in

11   this report?

12   A.  At the time the report was written, the U.S. government had

13   very little clarity on the situation.  And we were not getting

14   the clarity we needed from the ministry.  So we pointed U.S.

15   exporters to the certifier directly, so Mr. Hana could answer

16   the questions that they had about shipping.

17   Q.  What do you mean that the embassy didn't have much clarity

18   on the situation?

19   A.  I mean, this would have been the time that we had, that we

20   were advocating for a return to multiple halal certifiers.

21   This was during the time we were requesting a meeting between

22   the chargé and the minister, so things were a bit opaque at the

23   embassy.

24   Q.  Had you had another situation like this when you were

25   stationed in Cairo about lack of clarity in the agricultural

1    area?

2    A.  Not to this level, no.

3          MR. MARK:  Now, Mr. Hamill, can we scroll down to the

4    last portion of this report.

5    Q.  Do you see, Mr. Tate, where it says "Halal certification

6    other countries," that section of the report?

7    A.  Yes, sir.

8    Q.  What does this section of the report refer to?

9    A.  This just generally discusses how halal certification works

10   in other countries.  We note that certifiers are generally

11   associated with religious institutes.  We give a couple of

12   examples of other countries.

13   Q.  So, talking about other Muslim majority countries you

14   talked about before that also required halal certification?

15   A.  Yes, sir.

16   Q.  And could you just read what was written in the last

17   sentence of this paragraph.

18   A.  The last sentence.  "Egypt is now the only U.S. trading

19   partner having only one authorized halal certifier."

20   Q.  You mentioned this is a public report?

21   A.  Yes.

22   Q.  Did the Egyptian media cover the GAIN Report at all?

23   A.  They did, it did.

24   Q.  What news media covered this report?

25   A.  There were a few, but I think mostly Alborsaa.

O5H3MEN4                          Tate - Direct

1   Q.   You mentioned Alborsaa.  What does that literally translate

2   to?

3   A.   It translates to the market, the stock exchange.

4   Q.   What sort of U.S. news media is Alborsaa comparable to?

5   A.   This is like the Wall Street Journal, the Financial Times,

6   that sort of finance specific journal.

7   Q.   In the course of your time at the embassy, would staff in

8   the embassy in Cairo follow articles in the news media?

9   A.   Yes.

10  Q.   Who on staff would generally do that?

11  A.   I mean, my senior ag specialist would keep close tabs on

12  the news.  We also had a clerk whose job it was in the morning

13  to scour the news for articles about the market, things that

14  might impact our trading.

15  Q.   What was the purpose of following -- of having staff follow

16  news articles like this?

17  A.   To know if there were policy changes we weren't tracking,

18  to know if there were market changes we weren't tracking, to

19  keep a pulse on what was happening in the Egyptian economy.

20          MR. MARK:  Mr. Hamill, could you show for the witness

21  only what has been marked for identification as Government

22  Exhibit 8B-29.

23  Q.   Mr. Tate, do you recognize this exhibit?

24  A.   Yes, I do.

25  Q.   What is it?

O5H3MEN4                        Tate - Direct

1   A.  The bottom is an e-mail from our clerk where he's

2   forwarding along a news article.  In the top is an e-mail where

3   we have passed that, or Ali in this case has passed that on to

4   Washington.

5   Q.  Were you copied on this e-mail?

6   A.  I was, yes.

7          MR. MARK:  The government offers Government Exhibit

8   8B-29 into evidence.

9          THE COURT:  Admitted without objection.

10          (Government's Exhibit 8B-29 received in evidence)

11          MR. MARK:  Mr. Hamill, can you publish Government

12   Exhibit 8B-29.

13   Q.  What is the date of this e-mail?

14   A.  May 21, 2019.

15   Q.  And if we can scroll to the bottom of this e-mail.  What is

16   the text of this e-mail from somebody referred to as the clerk

17   in the Office of Agricultural Affairs?

18   A.  The text is basically the headline of an article.  It says

19   that the United States is complaining or criticizing Egyptian

20   halal certification or halal import, meat imports.

21   Q.  In what publication was this article from?

22   A.  This was in Alborsaa.

23   Q.  If we could scroll to the top of this e-mail.  Who is this

24   e-mail from?

25   A.  This is the e-mail from Ali to our colleagues in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5H3MEN4                         Tate - Direct

1    Washington.

2    Q.  In general, in your experience, what's the purpose of

3    sending e-mails about news reporting on to colleagues in

4    Washington?

5    A.  I mean, I guess it's sort of two fold.  For one is to let

6    them know that our reporting is being picked up.  And two, to

7    prepare them in case anyone in the United States sees it.  In

8    case that media hits the U.S., they're tracking it.  They're

9    not surprised.

10   Q.  Can you read the sentence stating "main takeaway."

11   A.  "The main takeaway is that this will lead to higher prices

12   for Egyptian consumers, render control to a single entity."

13   Q.  And now could you read the next sentence that Mr. Abdi

14   wrote.

15   A.  The next sentence, "We're scheduled to meet with the

16   minister of ag on June 2."

17            THE COURT:  Ladies and gentlemen, you can see in this

18   e-mail that there are certain things that are blacked out.  The

19   lawyers can say that's information that's been redacted or

20   taken out.  I assume in this case, and actually in all cases

21   that you'll see, it's because the parties have agreed that

22   whatever is in there is irrelevant to your determination.  It

23   has no part to play, so there is no need to show it to you.

24            Is that fair, Mr. Mark?

25            MR. MARK:  Yes, your Honor.

```
 1              THE COURT:  You'll see that in a number of documents.
 2    In other words, you don't have to be concerned that something
 3    is blacked out.  It's just of no interest.  Proceed.
 4              MR. MARK:  Thank you, your Honor.
 5    Q.  And in this e-mail, Mr. Abdi wrote, "We're scheduled to
 6    meet with the minister of ag on June 2."  Was that the Egyptian
 7    minister of agriculture he's referring to?
 8    A.  Yes, sir, that's correct.
 9    Q.  Talking about June 2.  How long had you and Mr. Abdi been
10    trying to get that meeting?
11    A.  Our first request for a meeting would have been -- I forget
12    the dates exactly, but it would have been at the very end of
13    April.  And the second request would have been May 8th I
14    believe.  So we're talking about over a month.
15    Q.  How did this compare with other requests to schedule a
16    meeting with the minister of ag in other situations?
17    A.  We had never experienced a time where the ministry was so
18    reluctant to give us a meeting.  Any ministry in Egypt, not
19    just agriculture.
20              MR. MARK:  Mr. Hamill, can you show for the witness
21    only what has been marked for identification as Government
22    Exhibit 10-A4.
23    Q.  Do you recognize this exhibit?
24    A.  Yes, sir.
25    Q.  Mr. Tate?
```

1    A.  Yes.

2    Q.  What is it?

3    A.  This is the news article about our -- I believe about our

4    GAIN Report.

5    Q.  Is this the Alborsaa news article referred to in the prior

6    e-mail?

7              MR. MARK:  Can you enlarge the top of this article,

8    thank you.

9    A.  Yes, this is the same article as before.

10             MR. MARK:  The government offers Government

11   Exhibit 10-A4 into evidence.

12             MR. LUSTBERG:  No objection.

13             THE COURT:  Admitted without objection.

14             (Government's Exhibit 10-A4 received in evidence)

15             MR. MARK:  Mr. Hamill, can you publish this.  Thank

16   you.

17   Q.  Now, you mentioned this was the article in Alborsaa news.

18   Is this in Arabic?

19   A.  Yes, it is.

20   Q.  Okay.  Now, you had mentioned you read some Arabic.

21   Probably better at the time in Cairo than now.

22   A.  Yes, but I read Arabic, yes.

23   Q.  Now, just in sum, what did this article, this press article

24   report?

25   A.  I mean the headline says that the United States is

1    complaining or criticizing the Egyptian slaughter of imported

2    halal beef.

3    Q.   What did the article appear to be based on?

4    A.   This article is based on our reporting on our GAIN Report.

5    Q.   Is that the same GAIN Report we just looked at?

6    A.   Yes, sir.

7    Q.   Now, around the time of this article, did you notice any

8    changes in the security situation when you were outside the

9    embassy?

10           MR. FEE:  Objection.

11           THE COURT:  On relevance?

12           MR. FEE:  On relevance and 403, your Honor.

13           THE COURT:  Sustained on relevance.

14           MR. MARK:  Your Honor, I can proffer when we have a

15   break.

16           THE COURT:  All right.

17           MR. MARK:  It's about 3:54.  Would now be a good time?

18           THE COURT:  Yes.  Ladies and gentlemen, take 10

19   minutes, afternoon break.  Refresh yourself.

20           (Jury excused)

21           (Continued on next page)

22

23

24

25

O5H3MEN4

1          THE COURT:  You may step down.

2          Mr. Mark, there were two areas where --

3          MR. MARK:  Can I ask -- the witness is present.

4          THE COURT:  Step out, please, if you would.

5          (Witness temporarily excused)

6          THE COURT:  You may be seated in the courtroom.  The

7    two areas where you wanted to do a side bar.  Again, I really

8    try to maximize the amount of time the jury is here, I try to

9    maximize the time they're listening to evidence.  So, I always

10   try to dissuade the parties from asking for sidebars.

11         MR. MARK:  No.

12         THE COURT:  There were two areas, so what's the first

13   one?  The second one is you wanted to know about the security

14   situation and the objection was relevance and 403.  What was

15   the first one?

16         MR. MARK:  I think the first one was when we talked

17   about the FBI.  And that is particularly relevant here.

18         THE COURT:  The FBI in the context of -- was that when

19   he said the legats were FBI and I said not always?

20         MR. MARK:  Right, and he said here there were.  And he

21   had a follow-up meeting with FBI agents in the New York field

22   office related to just broadly concerns about corruption.  That

23   was where we were going to go.

24         We talked with Mr. Lustberg last evening exactly that

25   was the parameters and we were going to stop there.  We

O5H3MEN4

1   understood that was acceptable.

2            I was going to say that further, that's not only

3   relevant to complete the story, but it's particularly relevant

4   because --

5            THE COURT:  What was the corruption that you were

6   asking about, to the extent it would be adduced?

7            MR. MARK:  His broad just concern about corruption on

8   the Egyptian side related to IS EG.  That they were awarded the

9   contract in a corrupt manner, so he spoke with the FBI to make

10  a referral.  And that's --

11           THE COURT:  I don't understand.  Is this what you

12  wanted to come out?

13           MR. MARK:  Yes.

14           THE COURT:  What's the referral?

15           MR. MARK:  So the referral to the FBI is that the FBI

16  ended up opening up an investigation concerned about IS EG and

17  being improperly awarded the contract because of certain

18  contacts with Egyptian officials.

19           THE COURT:  I understand.

20           MR. MARK:  And I will say it's not only relevant here

21  to explain what happened.  But it's particularly relevant

22  because it will explain Mr. McKinney's testimony when he

23  testifies.  Because he's going to testify that he had an

24  initial call with Mr. Menendez, and he didn't have a subsequent

25  follow up with him, because of the fact that there was an --

O5H3MEN4

```
1   that he was alerted there was an FBI investigation.  It is
2   particularly relevant to explain why Undersecretary McKinney
3   did not have further contact with Mr. Menendez, because as
4   Mr. Fee said, through his opening and through all of his
5   argument, is there is really nothing to be done here.  So, it
6   needs to provide context.
7           THE COURT:  You have to explain that.  What do you
8   mean there is nothing to be done here?
9           MR. MARK:  Meaning this is just an Egyptian decision,
10  so there is nothing for Undersecretary McKinney to do.  He
11  needs to explain why Mr. McKinney didn't do anything further at
12  this point in time related to Senator Menendez.  I think that's
13  directly put at issue by Mr. Weitzman's opening and directly
14  put in issue.
15          THE COURT:  I'm sorry, didn't mean to cut you off.
16  Finish that sentence.
17          MR. MARK:  Directly put in issue because their
18  argument is there is no official act here.  So it is core to
19  explain the acts and what happened here, particularly as to
20  Undersecretary McKinney.  I don't have the particular quote
21  from the opening here.  Maybe my colleague Mr. Richenthal does.
22  But we believe it was directly put at issue by both their
23  arguments on official act and also through their opening.
24          THE COURT:  How is a discussion with McKinney an
25  official act?  What's the official act in this discussion?
```

1    Remember, when we talk about official acts throughout, I'm

2    talking about core protections.

3            MR. MARK:  Your Honor, just to say briefly, this was,

4    we briefed this previously as to why this is an official act.

5    Why Senator Menendez was seeking to influence U.S. policy on IS

6    EG Halal, and that contact with Mr. McKinney was an attempt to

7    influence the official policy of the U.S. government on IS EG.

8            THE COURT:  I can see it as an official policy of the

9    U.S. government.  But you're saying it is an official act for

10   purposes of speech and debate.

11           MR. MARK:  Not a legislative act.  They never argued

12   that's an legislative act.  An official act for *McDonnell*

13   issues.  We briefed this.  This is an official act for

14   *McDonnell* purposes.

15           THE COURT:  Where?

16           MR. MARK:  At the motion to dismiss stage.

17           THE COURT:  Ah.

18           MR. MARK:  There has been no argument from

19   Mr. Menendez's counsel that that's a legislative act or in any

20   way protected by speech and debate.  They did argue it is not

21   an official act, and we argued it obviously is.  That's to

22   provide context to the fact that will be a core issue for the

23   jury to decide whether Senator Menendez was attempting to

24   influence an official act.  And if your Honor wants --

25           THE COURT:  Let him finish.

O5H3MEN4

1          MR. FEE:  Sorry.

2          MR. MARK:  I referenced Mr. Weitzman's opening, but I

3     didn't have it right at hand.  My colleague Mr. Richenthal

4     does.  Either I can read it or Mr. Richenthal can.

5          THE COURT:  Go ahead.  I don't care.

6          MR. RICHENTHAL:  Page 18 of the transcript.

7          THE COURT:  Any particular day?

8          MR. RICHENTHAL:  That's what I'm going to -- this is

9     Mr. Lustberg's opening statement according to this transcript.

10    Page 149, starting line 18.  "But McKinney and Menendez never

11    again discussed the issue."

12          And my memory, but I'm looking for the quote, is

13    Mr. Weitzman said something similar.  There it is.  So, I know

14    your Honor doesn't like tag team, but particularly in light of

15    that statement, the concern is simple.  The inference the

16    defense wants the jury to draw is that the reason Mr. McKinney

17    never raised the issue again with Mr. Menendez is it just

18    wasn't a big deal.

19          THE COURT:  Right.

20          MR. RICHENTHAL:  In fact, Mr. McKinney didn't raise it

21    for a very discrete purpose, and it is important the jury

22    understand it is not what the defense wants the jury to

23    believe.  And the defense opened on this.  That's why we

24    discussed it with Mr. Lustberg last night.  We were trying to

25    be very granular and very narrow, but not to elicit nothing,

1    because that leaves the jury with a misimpression.

2              MR. FEE:  Two things.  Number 1, is this a McKinney

3    problem.  They can deal with it with McKinney.  I have a lot to

4    say about that.  Mr. Tate's views about what caused him to

5    report to the FBI is 100 percent irrelevant and deeply

6    prejudicial.  It should not be put in.  The other point --

7              THE COURT:  Just a moment.  If he is the one making

8    the referral, that apparently led McKinney to not follow up

9    after the Menendez call, how is that not relevant?

10             MR. FEE:  It is absolutely not relevant because he's

11   not going to say anything about telling Ted McKinney about it,

12   number 1.

13             THE COURT:  Just a moment.

14             MR. FEE:  Yes, sir.

15             THE COURT:  Okay.  He doesn't have to tell McKinney

16   about it.  It is the existence -- just a moment, just a moment.

17   It is the existence of the referral that's relevant.  So,

18   shouldn't the jury be able to hear the reason for the referral?

19   And apparently, it's this witness who made the referral.

20             MR. FEE:  Two things.

21             THE COURT:  Now, that's the way it works.

22             MR. FEE:  I've been sitting too long, your Honor.

23   Twos thing.  It is not the referral that's relevant to the

24   point the government is attempting to make.  It is

25   Mr. McKinney's understanding and his reason for not calling

O5H3MEN4

1    Senator Menendez back.  Bret Tate's referral is not relevant.

2    McKinney believing there is a referral is a different

3    discussion.  We disagree with it and I can get into that.

4    That's the number 1.

5          Number 2, he is going to say I referred this because I

6    thought there was a corrupt agreement between Mr. Hana and the

7    Egyptian government.  There is an FCPA problem.  They might not

8    elicit it, but that's actually what's going on.  It is not

9    relevant to this case, and you are going to draw the defense

10   into a discussion about what he actually thought was going on.

11   That does not need to happen before this jury.

12         If they want to talk and elicit from Mr. McKinney,

13   which we have objected to from the start, the reason why he

14   didn't get back to Senator Menendez, I suggest we have that

15   fight then.  This has no relevance for Mr. Tate to offer to

16   this jury.

17         THE COURT:  Either one of you.

18         MR. MARK:  This is absolutely relevant.  This is the

19   factual predicate for McKinney's testimony here.  And we do not

20   intend to -- and we talked with Mr. Lustberg on this exactly

21   last night.  We don't intend to make a lot of this.  We intend

22   to essentially just indicate he made this referral, the nature

23   of the referral just broadly, in the broadest terms.

24         THE COURT:  Can you stay away from the word "corrupt"

25   and "corruption"?

1          MR. MARK:  I can direct him on leading questions.  And

2     I do not intend to argue that there was corruption related to

3     Senator Menendez, and I told Mr. Fee that previously.  That

4     there is no suggestion or we want to leave any ambiguity that

5     anything had to do with Senator Menendez at the time the

6     referral was made.

7          MR. FEE:  We're here for a bribery trial against

8     Senator Menendez.  It is not a cure to say we're just not going

9     to say what sort of referral it is.  They will presume, we will

10    be required, this is a classic 403 problem.  If he just says

11    "referral to the FBI," the cross we have to do is it was about

12    an FCPA concern that had nothing to do with Senator Menendez.

13         THE COURT:  Was it an FCPA concern?

14         MR. MARK:  Yes, that was part of the concern.  And I

15    can lead him in the questions and say was this an FCPA concern?

16    And he can say yes.  We don't need to meander.

17         MR. FEE:  You don't need to establish a factual

18    predicate for Mr. McKinney.

19         THE COURT:  Just a moment, Mr. Fee.  Let's see what

20    this is.

21         MR. RICHENTHAL:  I'm sorry, your Honor.

22         THE COURT:  Go ahead.

23         MR. RICHENTHAL:  I found Mr. Weitzman's similar

24    statement I thought I would read it into the record.  I was

25    giving it to my colleague.

O5H3MEN4

1              THE COURT:  Go ahead.

2              MR. RICHENTHAL:  Page 98, that's also on the day of

3    opening statements.  With respect to Mr. Weitzman that was

4    obviously the prior day.  His opening statement came the prior

5    afternoon.

6              So on page 98 Mr. Weitzman said, "The only contact the

7    senator had was this five-minute phone call."  And then he

8    continues.  And that's true.  But the reason is the issue we're

9    talking about.

10             MR. FEE:  What part was Mr. Weitzman?  Just the

11   five-minute phone call?

12             THE COURT:  Can't you bring that out with McKinney?

13             MR. RICHENTHAL:  The problem with bringing it out with

14   McKinney alone, your Honor, is it had no context.  It will not

15   make any sense to the jury, and it may seem McKinney was

16   mistaken.  This man works several levels below McKinney.

17             THE COURT:  I'm concerned about the introduction of an

18   FCPA problem that really is not part of this trial.

19             MR. FEE:  This is bolstering.

20             THE COURT:  Mr. Fee, just wait your turn each time.  I

21   understand you're eager.

22             MR. RICHENTHAL:  I wanted to make two related points

23   if I could.  First, your Honor, and Mr. Fee has rightly said

24   this.  They've objected to our bringing it out in front of

25   McKinney.  So we're concerned if we don't bring it out now,

O5H3MEN4

1    we're losing the thread.

2           The second thing is we can lead on this.  We can

3    direct the witness to be very granular.  We thought we were

4    going to.  We can revisit that.

5           But I also want to note this is why I said what I just

6    said about Mr. McKinney.  Mr. Weitzman said in his opening in

7    so many words they expect to suggest that Mr. McKinney is

8    lying.  I want to read -- this is on the exact same page within

9    sentences of what I just read.  Meaning about only one phone

10   call.  Mr. Weitzman then said, page 98, "Now you'll learn about

11   all the meetings and the prep that Mr. McKinney had with the

12   government and how his story has changed."  In other words,

13   they are going to suggest he is --

14          THE COURT:  I understand.  Given that and given it's

15   in the opening, I'll allow it.

16          MR. FEE:  No, your Honor.

17          THE COURT:  I want it to be leading narrow questions.

18          MR. FEE:  I insist that reference is to Mr. McKinney's

19   request of his phone call with Senator Menendez.  We are not

20   going to suggest that he's lying about the reason he didn't get

21   back.  This is an attempt to get in irrelevant evidence.

22   Mr. McKinney's reasons, his understanding of an FBI

23   investigation as the reason he didn't get back to Mr. Menendez

24   should only be elicited from anyone, from Mr. McKinney.  This

25   is irrelevant, and it's prejudice that cannot be fixed.

O5H3MEN4

1           THE COURT:  I want it as narrow as possible.  Proceed.

2           MR. FEE:  I would like a proffer as to what they

3  suggest to elicit.

4           THE COURT:  Of course.

5           MR. MARK:  Your Honor --

6           THE COURT:  Thank you, Mr. Fee.

7           MR. MARK:  So there is no ambiguity, what I intend to

8  do, because I will say Foreign Corrupt Practices Act so it has

9  no indication there is anything to do here with any allegations

10  of bribery or anything like that.  And I can direct him that he

11  had particular concerns about IS EG's contact with the Egyptian

12  officials, and we are going to leave it at that.  And the fact

13  there was a referral and he met further with the FBI.

14           MR. FEE:  No one has any idea on that jury what

15  Foreign Corrupt Practices Act means.

16           THE COURT:  I will direct the jury.

17           MR. FEE:  May I suggest something?

18           THE COURT:  Just a moment.  I can instruct the jury --

19  well, you gentlemen will work out an appropriate instruction.

20  So the jury doesn't think there is anything with regard to this

21  concerning Senator Menendez.

22           MR. FEE:  Foreign Corrupt Practices Act, there is no

23  instructions that's going to stop them from speculating through

24  the weekend that it must relate to corruption with foreign

25  actors.  Period.  If we are going to offer anything, I would

O5H3MEN4

1    suggest you ask him whether he's made a referral for an

2    entirely unrelated investigation.  Then they want to avoid

3    that.

4            THE COURT:  Just a moment.  Unrelated to what?

5            MR. FEE:  To this case.  This is not an FCPA case.

6    This is not charged here.

7            THE COURT:  I understand.

8            MR. MARK:  Your Honor, the fact is, that there is a

9    219 charge, all right.  And the fact about whether Mr. Hana is

10   acting and conspiring with Senator Menendez to act as an

11   Egyptian agent is directly relevant.  Mr. Hana's relationship

12   with the Egyptian officials is directly relevant.  Mr. Hana's

13   relationship with Egyptian intelligence and the fact that --

14           THE COURT:  How does this question go to that?

15           MR. MARK:  No, I was going to the fact that he is

16   saying these are unrelated.  I'm saying the facts of these are

17   obviously related.  I am not trying to make the argument that

18   the investigations themselves are related.

19           If I may have one moment.  I don't think the witness's

20   view of whether they're related or not is relevant.  I will

21   lead him as to what his referral was and leave it at that.

22           THE COURT:  Let me hear what that will be.  Take a

23   minute or two.  You can formulate something right now.

24           MR. MARK:  We'll meet with him during the break and

25   I'll say this was directly fronted with --

O5H3MEN4

 1              MR. FEE:  And I objected.

 2              THE COURT:  Mr. Fee, wait, sir.

 3              MR. MARK:  I e-mailed multiple days ago and said this

 4      was what we were doing, and said if there was any proposals

 5      they wanted to raise, we would consider it so we didn't have to

 6      be at this long sidebar.

 7              THE COURT:  Sir, we're there now.  And the break is

 8      over.  Take a minute, talk to him.  Talk to Mr. Fee.  If you

 9      can work something out, fine.  If you can't, I'll rule on it.

10              Everyone should take two or three minutes.  I am going

11      to stay right here.

12              And Mr. Fee, just wait.  It goes one side, then the

13      other.  Don't interrupt.  They're not doing it to you.  Don't

14      do it to them.

15              MR. FEE:  Yes, your Honor.

16              (Recess)

17              (Continued on next page)

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | THE COURT:  All right.  Where do we stand, counsel? |
| 2 | MR. FEE:  Your Honor, I think to make it a lawyerly |
| 3 | resolution, we would object to the reference to the FBI.  My |
| 4 | sense is the Court would allow it here.  Otherwise, we're |
| 5 | comfortable with the formulation.  We're just going to direct |
| 6 | the witness to omit the word "corruption." |
| 7 | THE COURT:  All right.  Agreed.  Yes, I will allow the |
| 8 | reference to FBI.  Talk to the witness. |
| 9 | MR. MARK:  Your Honor, I just want to instruct the |
| 10 | witness. |
| 11 | THE COURT:  Let me raise two minor things. |
| 12 | The District Executive's office has informed me |
| 13 | apparently that the government has represented they would give |
| 14 | to the press a list of their exhibits.  I don't know if that's |
| 15 | true or not, but the District Executive was asking that that |
| 16 | take place, assuming the government agreed to that. |
| 17 | Secondly, I would like to know the witnesses for |
| 18 | Monday. |
| 19 | MR. MARK:  The witnesses for Monday? |
| 20 | THE COURT:  Yes, sir. |
| 21 | MR. MARK:  The next witness will be John Moldovan. |
| 22 | And let me just confer with my colleagues to confirm. |
| 23 | And then Michael Coughlin, who is an FBI agent and the |
| 24 | summary witness, and we expect that he will take us through the |
| 25 | break, your Honor. |

O5hWmen5                          Tate - Direct

1          THE COURT:  You mentioned him yesterday.

2          MR. MONTELEONI:  And I apologize.  Between John

3     Moldovan and Michael Coughlin, we expect to call Joshua Paul, a

4     former State Department employee.

5          THE COURT:  All right.  And each night let me know who

6     the witnesses are for the next day.

7          MR. MARK:  Yes, your Honor.

8          MR. FEE:  Your Honor, on the first point, is the

9     government intending to disclose the exhibits to the press?

10          THE COURT:  I don't know.

11          MR. FEE:  We'll talk to them.  OK.

12          THE COURT:  Talk to each other.

13          MR. FEE:  Got it.

14          THE COURT:  Speak to the witness.  Let's get moving.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O5hWmen5                          Tate - Direct

1          (In open court)

2          THE COURT:  Please be seated.

3          You may continue, Mr. Mark.

4          MR. MARK:  Thank you, your Honor.

5  Q.  Earlier this afternoon, you had mentioned that the U.S.

6  embassy in Cairo had a LEGAT there, is that right?

7  A.  Yes, sir.  That's correct.

8  Q.  What does LEGAT refer to again?

9  A.  That's the legal *attaché*'s office.

10  Q.  That's sort of similar; while you're the agricultural

11  *attaché*, there's a legal *attaché* too?

12  A.  That's correct.  That's correct.

13  Q.  And what is a legal *attaché*?

14  A.  They are generally FBI agents posted to an embassy

15  overseas.

16  Q.  And not just in Cairo but in other embassies too?

17  A.  Yes.

18  Q.  You had mentioned that you met with the LEGAT in 2019,

19  right?

20  A.  Yes, that's correct.

21  Q.  And you met with the LEGAT including regarding IS EG Halal?

22  A.  Yes.

23  Q.  Is that right?

24  A.  That's correct.

25  Q.  What was the general nature of your concern that you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  communicated to the LEGAT when you met with him?

2  A.  We were concerned with the relationship Mr. Hana had with

3  the Egyptian government officials and how he had obtained the

4  business.

5  Q.  Now, after the initial meeting you had with the LEGAT, did

6  you subsequently have any other meetings with FBI agents?

7  A.  Yes, I did.

8  Q.  How did you meet with them?

9  A.  I -- the first instance we met just in the LEGAT office in

10  the embassy.  The second instance it was at the LEGAT office in

11  the embassy, and they dialed in, video-called in colleagues

12  from, I believe from New York, but from the U.S.

13  Q.  Did you believe as a result of those meetings that the FBI

14  opened an investigation related to these concerns that were

15  communicated?

16  A.  I understood that they were going to look into it and not

17  to expect to hear anything back anytime soon.

18        MR. MARK:  Thank you.

19  Q.  Now, changing gears a bit, we had just talked before the

20  break about, that there was some press coverage related to a

21  GAIN report that you had authored with Mr. Abdi, is that right?

22  A.  Yes, that's correct.

23  Q.  And how generally was that GAIN report being covered in the

24  Egyptian press?

25  A.  Well, the -- just generally the Egyptian press was saying

1   the Americans were complaining about a decision the Egyptian

2   government had taken.  There were a couple press articles that

3   basically translated and copied our reporting word for word.

4   That was the gist of it, though.

5   Q.  Did there come a time that you learned about any sort of

6   inquiry to U.S.D.A. related to IS EG Halal from a member of

7   Congress?

8   A.  Yes.

9   Q.  Approximately when was that?

10  A.  It must have been -- it must have been in May, maybe toward

11  the end of May.

12  Q.  What member of Congress made an inquiry?

13          MR. FEE:  Hearsay, your Honor.

14          THE COURT:  No.  I will allow the name of the member

15  of Congress, if he knows.

16          MR. FEE:  Your Honor, he obtained it through hearsay.

17          THE COURT:  Just a moment.

18          Yes.  Sustained.

19          MR. MARK:  Your Honor, I'm sorry.  I didn't hear

20  your --

21          THE COURT:  I sustained the objection.

22          MR. MARK:  OK.  And your Honor, this is not being

23  offered for the truth.  It was only to explain subsequent

24  actions.

25          THE COURT:  Proceed.

O5hWmen5                          Tate - Direct

1           MR. MARK:  Now, to sort of short circuit this,

2    Mr. Hamill, for the witness only, could you please display for

3    the witness the government exhibits that have been marked 8B-14

4    and 8B-15.

5    Q.  Do you recognize these exhibits?

6    A.  Yes, I do.

7    Q.  What are they?

8    A.  These are emails from -- I mean it's a series of emails

9    from leadership at U.S.D.A. and Ali discussing an inquiry from

10   Senator Menendez.

11          MR. MARK:  The government offers Government Exhibit

12   8B-14 and 8B-15 into evidence.

13          THE COURT:  Admitted without objection.

14          (Government Exhibits 8B-14 and 8B-15 received in

15   evidence)

16          MR. MARK:  Mr. Hamill, could we publish initially

17   Government Exhibit 8B-14.

18   Q.  What is the date of this email?

19   A.  The last message, May the 24th, in 2019.

20   Q.  Were you copied on this email?

21   A.  Yes, I was.

22          MR. MARK:  And if we could zoom out a little bit.

23   Q.  Who is this email primarily an exchange between?

24   A.  These are exchanges between Ali Abdi at the embassy and

25   Clay Hamilton in Washington.

O5hWmen5                          Tate - Direct

1    Q.  What was Clay Hamilton's role in Washington at the time?

2    A.  At this time I believe he was our -- either associate

3    administrator or acting administrator.  But he would have been

4    No. 1 or 2 in the foreign agricultural service.

5    Q.  So I know sometimes associate administrator is -- who's in

6    charge of the foreign agricultural service?

7    A.  The administrator.

8    Q.  And so the associate administrator is the No. 2 in the

9    foreign ag. service?

10   A.  Correct.

11   Q.  And who does the administrator in the foreign ag. service

12   report to?

13   A.  To the undersecretary for trade and agricultural affairs.

14   Q.  And what was the subject of this email that we're looking

15   at right now?

16   A.  It was about an article in the news on our reporting.

17   Q.  And what did --

18           MR. MARK:  Mr. Hamill, could you zoom out, please.

19           Thank you.  Yes.  The subject relates to the halal

20   article.

21           Can we go to the initial email in the exchange,

22   please.

23   Q.  What's the subject line of the initial email here?

24   A.  The subject line is halal article -- oh, I'm sorry.  Below

25   that, article from Senator Menendez.

1    Q.  And what's the date of that email?

2    A.  May 23, 2019.

3    Q.  And then is this a forward from Clay of that article to Ali

4    Abdi and Dwight Wilder?

5    A.  Yes, that's correct.

6    Q.  Who was Dwight Wilder at the time in 2019?

7    A.  Dwight Wilder was the area director for northern Africa,

8    which means that in a way he was in Ali's chain of command.  He

9    would have been Ali's boss.

10   Q.  And can you just read what Mr. Hamilton wrote to Mr. Abdi

11   at the time?

12   A.  Clay asks, "Ali, can you provide background on this

13   article.  The Hill has picked it up.  I assume that the embassy

14   press office was involved?"

15           MR. MARK:  Can you go to the next email in the

16   exchange, Mr. Hamill, and if we could enlarge that.

17   Q.  And is this Mr. Abdi's response to Mr. Hamilton?

18   A.  Yes, that's correct.

19   Q.  Did Mr. Abdi copy you on this response?

20   A.  That's correct.

21   Q.  Could you read Mr. Abdi's response to Clay Hamilton?

22   A.  Yes.  Ali says:  "The embassy had no direct involvement in

23   this article but the story is based on a GAIN report."

24           THE COURT:  Slow.  Slow down.

25           THE WITNESS:  My apologies.  My apologies.

O5hWmen5                          Tate - Direct

1   A.  "The embassy had no direct involvement in the article but

2   the story is based on a GAIN report we issued last week as well

3   as complaints from importers about Egypt's new procedure for

4   halal certification for U.S. products.  Our report mentioned no

5   criticism of Egypt unlike the Arabic title of this article

6   suggests.  We reported on the facts.  Hopefully OASA briefed

7   you about Egypt's decision delisting all U.S.-based halal

8   certifiers and appointment of one new organization based in New

9   Jersey (IS EG Halal), which has no relationship or history with

10  industry."

11          THE COURT:  Has no history or relationship with

12  industry.

13          THE WITNESS:  Yes, sir.

14  A.  "This is pushing up prices because the new certifier has

15  quadrupled fees.  The decision came without explanation or

16  notice and the government is yet to provide a report to

17  U.S.D.A. on the audit in March.  We're scheduled to meet with

18  the minister of ag. on June 2 to raise the issue.  Any idea

19  what the senator's angle is to this other than IS EG being

20  based in New Jersey?"

21  Q.  There's a new acronym, other acronyms earlier.  What's OASA

22  that's referred to here?

23  A.  OASA at the time was the office of agreements and

24  scientific affairs.  That was the technical policy office

25  within U.S.D.A. that oversaw technical barriers to trade.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5hWmen5                        Tate - Direct

1              MR. MARK:  Now, Mr. Hamill, could we scroll up to the

2       next email in the chain.

3       Q.  How did Mr. Hamilton reply in this email which you were

4       copied on?

5       A.  Mr. Hamill replied saying, TFAA says they're good, so that

6       means -- do you want me to read it or explain it?

7       Q.  First, if you could read it, and then I'll ask you to

8       explain it?

9       A.  OK.  So:  "TFAA said they are good with the status to date

10      and your involvement.  Keep us posted if you hear anything from

11      the Hill (Senator Menendez).  Ted may talk to him later.  I'll

12      leave it up to you if you want to loop in your ambassador."

13      Q.  And now you said you'd explain that.  Could just you

14      explain?

15      A.  Of course.  Of course.  And so, what Clay's saying here,

16      he's saying that Undersecretary McKinney -- that's TFAA in this

17      instance -- is OK with the actions taken.  He's supportive of

18      our actions.  He says if you hear anything from Congress, let

19      us know.  The undersecretary will probably call Mr. Menendez

20      later, Senator Menendez later.  And then it's up to you if you

21      want to involve your ambassador or not.

22      Q.  And just the term "the Hill," what does that refer to?

23      A.  Yeah.  In this instance the Hill means any member of

24      Congress, though Senator Menendez was the one in question here.

25              THE COURT:  And your ambassador refers to the United

O5hWmen5                              Tate - Direct

1    States ambassador to Egypt.

2              THE WITNESS:  Yes, sir.  That's correct.

3    BY MR. MARK:

4    Q.  And that's the ambassador in the U.S. embassy you were

5    stationed at, is that right?

6    A.  That's correct.  So in this instance it would have been the

7    acting ambassador, the *chargé d'affaires*, Thomas Goldberger.

8    Q.  Have you ever heard of the term "post"?

9    A.  I have, yes.

10   Q.  What does the term "post" refer to?

11   A.  Post is just another way to say embassy.  We have a number

12   of acronyms -- or words that mean the same.  So the embassy,

13   post, the mission.  These all mean essentially the same thing

14   in diplomatic speak.

15             MR. MARK:  Now, Mr. Hamill, could we go to the top

16   email here.

17   Q.  Could you read Mr. Abdi's response?

18   A.  Ali says:  "Thanks, Clay.  I'll update the chargé and

19   report back on the meeting with the minister of ag."

20   Q.  So is he just sort of correcting; there's actually not an

21   ambassador right now, it's the chargé in charge of the embassy?

22   A.  Yeah.  I think so.

23             MR. MARK:  Now, Mr. Hamill, could we publish for the

24   jury Government Exhibit 8B-15.

25   Q.  And is this another email chain that you said you were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5hWmen5                          Tate - Direct

1    copied on related to this matter?

2    A.  Yes, that's correct.

3           MR. MARK:  Mr. Hamill, could we go to --

4    Q.  Actually, the top of this email chain, what's the date of

5    this email?

6    A.  At the top, May 31, 2019.

7           MR. MARK:  Now, could we go to the bottom of this

8    email chain, Mr. Hamill.

9    Q.  Do you see who the bottom of this email chain is between?

10   A.  The initial email is from Robert Kelly, who says he's the

11   deputy chief of staff for the senator, to undersecretary of

12   agriculture, Ted McKinney.

13   Q.  And what's the subject of this email?

14   A.  Article from Senator Menendez.

15          MR. MARK:  Can you scroll up along the chain,

16   Mr. Hamill.

17   Q.  What did Mr. McKinney write in this next email on May 23,

18   2019?

19   A.  Mr. McKinney says:  "Ken, I took a call from Senator

20   Menendez of New Jersey about a halal certifier in New Jersey.

21   I will call you."

22          MR. MARK:  Mr. Hamill, can we continue scrolling up on

23   this chain.  And just, actually, can you stop here.

24   Q.  This says Ken Isley.  Could you just explain?  I don't

25   think we talked about who he is.  Who was he at the time?

O5hWmen5                              Tate - Direct

1    A.  Yeah.  Ken Isley was the administrator, so he was the head

2    of FAS.

3    Q.  So essentially Clay reported to Ken Isley and then Ken

4    Isley reported to Ted McKinney?

5    A.  That's correct.

6            MR. MARK:  Mr. Hamill, if could we scroll up a little

7    more so that -- this looks like it's separated across this

8    break.  Thank you.

9    Q.  So how did Ken Isley respond in this email chain?

10   A.  So, what Ken is doing here is telling his deputies, Daniel

11   and Clay, and his chief of staff, Ryan; he's saying he talked

12   to the undersecretary about this.  The undersecretary said he

13   talked to Danny, and let's discuss a path forward on Tuesday.

14   Q.  Is U/S just another way to say undersecretary?

15   A.  Yes, that's correct.

16           MR. MARK:  Mr. Hamill, can we continue up on this

17   chain.

18   Q.  We see Clay Hamilton forward this to Marielsie Avila --

19           MR. MARK:  I apologize.  I might be butchering her

20   name.

21   Q.  -- what was her position?

22   A.  Marielsie was a senior trade adviser at U.S.D.A.

23           MR. MARK:  And continue up.

24           We can stop here.

25   Q.  Following up on this chain, this is now from Anthony

O5hWmen5                          Tate - Direct

1    Navarrete, and it's May 30.  Who was Anthony Navarrete at the

2    time?

3    A.  Anthony was our desk officer at the time.

4    Q.  What is a desk officer?

5    A.  Yeah.  So, a desk officer essentially is your primary point

6    of contact.  If you're at the embassy overseas and you need

7    someone in Washington to help you out, whether that be to

8    connect you with other offices or agencies, the desk officer

9    does that.  So Anthony was our guy.

10   Q.  So he was the desk officer for Egypt at that time?

11   A.  Yeah, Egypt and, I believe, northern Africa.

12   Q.  Now, what was the subject line of this email?

13   A.  Follow-up -- FAS follow-up regarding TFAA conversations

14   with Senator Bob Menendez.

15   Q.  And the TFAA referred to there is Undersecretary McKinney?

16   A.  Yes, that's correct.

17   Q.  Now, Mr. Tate, could you just read this email?

18   A.  Yes.  So, Anthony begins:  Good afternoon, Mark.  In

19   follow-up to our brief discussion this morning on Egypt, I am

20   writing to provide you with a copy of FAS/Cairo's public

21   *attaché* report on Egypt's new halal procedures as well as the

22   Egyptian media article in response to the GAIN report.  As

23   mentioned, Senator Bob Menendez reached out to Undersecretary

24   McKinney regarding the Egypt halal issue/media report and Clay

25   asked animal division for an update on where things stand and

1    to cross-check the Egyptian media report with the GAIN

2    information.  See the response attached.  We briefed Clay this

3    morning on the broader Egypt situation and he asked us to let

4    Zhulietta know ASAP where things stand on the OIG angle as he

5    was uncertain when Undersecretary McKinney would be following

6    up with Senator Menendez but that it could have been as early

7    as this morning.  Jamie and I spoke briefly with Zhulietta

8    after our briefing with Clay and she said the undersecretary

9    wouldn't be responding to the senator until after the week of

10   June 10."

11              THE COURT:  No, no.

12              THE WITNESS:  Excuse me.

13              THE COURT:  Until the week.

14              THE WITNESS:  Oh, my apologies.

15   A.  "Until the week of June 10 once he is back in town.  We'll

16   follow up and work with the animal division as needed on that

17   front.

18        "Let us know if you have any questions in the meantime and

19   we will keep you informed of any future developments on our

20   end.  As a final point, post is scheduled to meet with the

21   Egyptian minister of ag. on June 2.  We should have more news

22   to share next week."

23   Q.  This email refers to Zhulietta.  Who was Zhulietta at the

24   time?

25   A.  She would have been the chief of staff of the

O5hWmen5                         Tate - Direct

1    undersecretary.

2    Q.  And this refers to OIG angle.  Could you just define what

3    OIG refers to?

4    A.  OIG is office of the inspector general.

5    Q.  Of which agency?

6    A.  In this case, the U.S.D.A.

7    Q.  And was this angle here related to IS EG Halal?

8    A.  Yes, I believe -- I believe that's correct.  That's my

9    understanding, that this information had also been passed on to

10   U.S.D.A.'s office of inspector general.

11            MR. MARK:  Thank you.

12            Now, if we can continue up in this chain.

13   Q.  And this is an email, now May 31, from Jamie Haig.  Can you

14   introduce us to who Jamie Haig is?

15   A.  Yes.  Jamie Haig -- her title's here.  I believe she's a

16   senior -- senior desk officer or senior -- essentially, she is

17   Anthony's boss.  She's Anthony's supervisor.  So Anthony is the

18   desk officer, and she's the team lead for that team.

19   Q.  Now could you read Jamie's response to Anthony's email?

20   A.  So, Anthony -- excuse me.  Jamie responds saying:  "Laura

21   and Marielsie.  Marielsie, Anthony may have already conveyed

22   some of this to you earlier, but we just wanted to circle back

23   with you both to let you know that we spoke with Zhulietta

24   following our meeting this morning with Clay."

25            THE COURT:  Slow down, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE WITNESS:  Yes, sir.

2     A.  "Undersecretary McKinney will plan to respond to Senator

3     Menendez when he is back in the office the week of June 10.

4     Whether this is a phone call or an email is TBD.  In terms of

5     talking points, either way, Zhulietta recommends that we stick

6     to the potential trade impact, cost, etc., to our industry, and

7     include a copy of the GAIN report, with the understanding that

8     what we convey to the senator will likely get back to his

9     constituents.  She also suggested that we might want to work

10    with OGA or others to see whether there were any plants in New

11    Jersey shipping beef liver to Egypt.  Perhaps not likely, but

12    we could look.  She also suggested that we ask legislative

13    affairs for a one-pager on New Jersey agriculture.

14         "Just a heads-up for when McKinney is back, and please let

15    us know whether we can assist in going after any of this

16    stuff."

17    Q.  Now, at this point in the chain, did you then become copied

18    on this email?

19    A.  Yes, that's correct.

20    Q.  So Jamie added you to this?

21    A.  That's right.  Jamie Haig.

22    Q.  Now, just because there's some more acronyms we see, OGA,

23    what does OGA refer to here?

24    A.  OGA is the office of global analysis, economists, data

25    folks.

1  Q.  And now referring to, I think the first time, leg. affairs,

2  what's leg. affairs?

3  A.  Legislative affairs, so any calls from Congress would be

4  relayed through the legislative affairs office.

5          MR. MARK:  And now, if we could go up to the next

6  email in the chain.  And stop here.

7  Q.  So you now chimed in on this chain, is that right?

8  A.  That's correct.

9  Q.  What's the date now?

10  A.  This is May the 31st.

11  Q.  And what did you respond to the group?

12  A.  "Attached is the full list of halal certifiers the

13  Egyptians audited.  I believe that Amana Halal, one of the

14  firms you listed" -- excuse me.  "I believe that Amana Halal,

15  one of the firms delisted, is also based in New Jersey.  The

16  owner lives in New Jersey at least.  If I remember correctly,

17  that firm only certified for Egypt so basically they are out of

18  business now.  That may be of interest to Senator Menendez.

19      "Amana(h) is a pretty common name in the halal business, so

20  beware if you're googling them."

21  Q.  And is Amana the firm you had mentioned before that was

22  operating in this area?

23  A.  That's correct, yes.

24  Q.  And you said you believed, if I remember correctly, that

25  firm only certified for Egypt so they're basically out of

O5hWmen5                          Tate - Direct

1  business now, what did you mean by the firm only certified for

2  Egypt?

3  A.  So, that halal certifier was only certifying products going

4  to Egypt, so when Egypt delisted four certifiers and gave the

5  business to IS EG, then this company, Amana Halal, suddenly had

6  no more clients.  They are out of business entirely.

7  Q.  And is this sort of one of the examples of the impact on

8  U.S. business of the decision to go with a monopoly?

9  A.  That's correct.

10  Q.  And were there impacts to other U.S. businesses too?

11  A.  Certainly there were, yes.

12        MR. MARK:  If we go to the top of the chain.

13  Q.  What was the response?

14  A.  Just thank you.  Good to know.

15        MR. MARK:  All right.  Mr. Hamill, we can take that

16  down now.

17  Q.  In those emails, I think we saw some references to the June

18  2 meeting with the minister of ag.?

19  A.  Yes, that's correct.

20  Q.  And that's the Egyptian minister of agriculture, right?

21  A.  Yes, that's correct.

22  Q.  Did there come a time that you participated in a meeting

23  with the Egyptian minister of agriculture on the halal

24  certification matter?

25  A.  I did, on June 2, 2019.

O5hWmen5                         Tate - Direct

1    Q.   Who participated in that meeting?

2    A.   In that meeting it was the *chargé d'affaires*,

3    Mr. Goldberger, Ali and myself.

4    Q.   And did the *chargé* raise any issues during that meeting?

5    A.   Of course.  His primary point was about IS EG Halal and the

6    monopoly certification, monopoly on certification given to IS

7    EG Halal.

8    Q.   And did the minister, Egyptian minister of agriculture

9    respond to the *chargé*'s points?

10   A.   Not in substance.  He was respectful and listened but

11   didn't have substantive responses.

12   Q.   During that meeting, did the minister provide any

13   explanation for the delisting of the other halal certifiers and

14   the decision to proceed only with IS EG Halal?

15   A.   He did not.

16   Q.   During that meeting, was there discussion regarding the

17   labeling of food products at all?

18   A.   Yes, there was.

19   Q.   What was discussed regarding that topic?

20   A.   We discussed the U.S. industry's concern that IS EG Halal

21   was using the labeling -- well, let me back up two steps.  The

22   minister noted that Egypt had given flexibilities so that

23   U.S. -- IS EG Halal could use the labels of the previous

24   certifiers, and then we raised that as a concern, that they

25   were using these labels that didn't belong to them.

O5hWmen5                         Tate - Direct

1    Q.  And how did the minister respond to that concern that was

2    being raised related to the labels?

3    A.  The minister basically saw this as a flexibility, a

4    flexibility given to the U.S. industry to prevent trade from

5    being disrupted.

6    Q.  Did he discuss what the impact would be on the other halal

7    certifiers whose labels were being used?

8    A.  The minister did not discuss that, though that was one of

9    our points.

10   Q.  You said that was one of your points.  What was your point

11   on that side?

12   A.  I mean the point would be that that intellectual property

13   belongs to these U.S. companies and they would -- they would

14   have to get permission for that to be used by another company.

15   Q.  And was there any indication at that point in time that IS

16   EG or anyone else asked for permission from the halal

17   certifiers in the U.S. to use their labels at the time?

18   A.  The halals -- no, they had not given permission.

19   Q.  How generally did that meeting end with the Egyptian

20   minister of agriculture on June 2?

21   A.  I would characterize it as not fruitful.  I mean it was

22   courteous but not fruitful.  The minister dismissed our

23   concerns, essentially took it under advisement and moved on.

24   Q.  Changing topics a little bit, are you familiar with the

25   term "cable" --

O5hWmen5                         Tate - Direct

1    A.  Yes --

2    Q.  -- from your time working --

3    A.  -- I am.

4    Q.  What is a cable?

5    A.  A cable's a diplomatic communication between an embassy and

6    headquarters.

7    Q.  And what's the purpose of a cable as a method of

8    communication?

9    A.  Yeah.  It's just a way of sending information in a secure

10   format to -- to headquarters, to the U.S. government.  So as,

11   if we see things taking place overseas we're able to

12   communicate that back to policy makers and decision-makers back

13   in Washington.

14   Q.  In your position as agricultural attaché, did you ever

15   prepare cables?

16   A.  I did.

17   Q.  When you were in Egypt, about how many cables a year did

18   you prepare?

19   A.  I would say probably half a dozen per year.

20   Q.  Did you ever prepare a cable regarding IS EG Halal?

21   A.  I did.

22   Q.  Approximately when was that?

23   A.  It would have been right after the meeting between the

24   *chargé* and the minister, June 2, 2019, June 3.

25   Q.  Why did you prepare that cable?

O5hWmen5                        Tate - Direct

A.  Well, we wanted to be certain that all agencies in the U.S.
government were tracking this, so we wanted to be sure that the
office of the U.S. trade representative was tracking this as a
potential trade concern.  We wanted to be certain that there
was a record of the *chargé*'s meeting with the minister and the
readout of that meeting.  Those are the primary reasons.

Q.  You mentioned the U.S. trade representative.  What's the
U.S. trade representative?

A.  The office of the U.S. trade representative -- this is an
executive branch office, so a White House office essentially --
that oversees trade policy between the United States and
whatever country.

Q.  And in overseeing trade policy, does the U.S. trade
representative deal with the WTO at all?

A.  Yes.

Q.  And in overseeing trade policy, is the U.S. trade
representative concerned with any sort of barriers to trade?

A.  Yes, absolutely.

Q.  Were you concerned at this point in time that the sole
certifier, IS EG Halal, would become a barrier to trade?

A.  Yes, that's correct.

Q.  And you mentioned earlier that both U.S. and Egypt were
part of the World Trade Organization, is that right?

A.  Yes, that's correct.

Q.  What obligations do countries that are members of the World

1  Trade Organization have to each other?

2          MR. FEE:  Objection.  Foundation.

3          THE COURT:  Lay a foundation.

4  BY MR. MARK:

5  Q.  Now, what was your position after you were in the U.S. --

6  you were stationed as agricultural *attaché* in the U.S. embassy

7  in Cairo?

8  A.  Yes.  Well, security.

9      Immediately I was posted to Caracas, though the embassy had

10  closed, so I moved back to D.C., where I served as senior trade

11  adviser for U.S.D.A.

12  Q.  And in your role as senior trade adviser for U.S.D.A., what

13  were your duties and responsibilities in that position?

14  A.  To advise on trade policy.

15  Q.  And in that role, were you familiar with the World Trade

16  Organization?

17  A.  Yes, I was.

18  Q.  Were you familiar with agreements that the U.S. was part of

19  in connection with the World Trade Organization?

20  A.  Yes, I was.

21  Q.  How are you familiar with those agreements?

22  A.  That's part of my, part of my duties, part of my day-to-day

23  work.

24  Q.  And so were you familiar with the nature of the agreements

25  that the U.S. is part of and agreements that Egypt is part of

1    with the World Trade Organization?

2    A.  Yes.

3    Q.  Now, with that foundation, could you explain what the

4    nature of those agreements and obligations between the U.S. and

5    Egypt were?

6    A.  Yeah.  In general terms, members of the World Trade

7    Organization agreed to lower their tariff barriers, tariff and

8    nontariff barriers to trade to a certain amount.  They agreed

9    to accept maximums, and they also agreed to certain norms with

10   regard to sanitary barriers to trade, technical barriers to

11   trade and jurisdiction.

12   Q.  And you mentioned that at this point in time, you were

13   concerned about IS EG Halal's monopoly becoming a technical

14   barrier to trade.  Can you explain what you meant by that?

15   A.  Yes, exactly.  So, I think the simplest way to think about

16   it is if a technical measure, whatever that may be, prevents a

17   U.S. company from selling their products, then it's a technical

18   barrier to trade.  There's nothing wrong with a country having

19   halal certification as long as a company can get that

20   certification.  But if a U.S. company can't get the certificate

21   they need, then it becomes a technical barrier to trade.

22   Q.  Now, at this point in time -- we're talking about primarily

23   2019 -- are we talking about halal certification for beef

24   products?

25   A.  Yes, that's correct.  For beef.

O5hWmen5                              Tate - Direct

1  Q.  Now, at your time at U.S.D.A., did there become issues

2  regarding halal certification for other products as well?

3  A.  Yes, there were.

4  Q.  What products?

5  A.  To Egypt?

6  Q.  To Egypt, yeah.

7  A.  There were many other products, but dairy is one that comes

8  to mind.

9  Q.  At the time, in 2019, was dairy a type of product that

10  required halal certification?

11  A.  No, it was not.

12  Q.  Did -- later, did there become any sort of potential change

13  to the halal certification for dairy products from the U.S.?

14  A.  Yes, the Egyptian government notified they were going to

15  require halal certification for dairy products.

16  Q.  How did they notify that?

17  A.  They notified that through the formal process at the World

18  Trade Organization.

19  Q.  And did the U.S. respond in World Trade Organization to

20  that notification to the change in halal certification

21  requirements?

22  A.  Yes, we did.

23  Q.  How did the U.S. government respond in World Trade

24  Organization?

25  A.  The U.S. government, in general terms, responded that this

1    could be a technical barrier to trade.  We responded that as it

2    was only one halal certifier, it would drive up prices for our

3    dairy products, that our dairy products would no longer be

4    competitive in the Egyptian market and so that that this

5    measure could be a technical barrier to trade.

6    Q.  At that point in time, in your position, had you heard

7    concerns from anybody in the U.S. dairy industry regarding that

8    change?

9    A.  Absolutely.  The U.S. dairy industry was very concerned.

10   Q.  What were the nature of the U.S. dairy industry's concerns?

11   A.  So, dairy's a different kind of market.  Margins, profit

12   margins are very, very tight.  And so just a small increase in

13   prices means that our products are too expensive; they're

14   priced out of the market.  So it's very important to them to

15   keep the price as low as they can to compete with New Zealand

16   and other global manufacturers.  So this additional cost for

17   halal certification would have priced us out of the market

18   entirely.

19   Q.  You said a lot right there.  Can you just --

20   A.  Yes, sorry.

21   Q.  Don't apologize.  I just want to break it down a little

22   bit.

23        So you said the profit margins were very small?  Can you

24   explain what that means?

25   A.  Yeah, certainly.  Dairy markets are very competitive.  Our

O5hWmen5                          Tate - Direct

1    global competitors produce dairy products very cheaply.  So for

2    our product -- for a foreign buyer to want our products instead

3    of, say, a product from New Zealand, our prices have to be low.

4    And so that's what I mean by the margins are tight.  We have to

5    keep the price low.

6    Q.  So, just a margin, what's a margin?  What's that technical

7    term mean?

8    A.  The margin is the difference between the price and the

9    cost.

10   Q.  So is your concern essentially that if the cost goes up

11   because of the increased fee for halal certification, it could

12   mean that there's not enough profit such that U.S. dairy could

13   sell to Egypt?

14   A.  Yes, that's correct.  But more than there's not enough

15   profit, there's actually no profit at all.  There's negative

16   profit.

17   Q.  And then the U.S. dairy industry is not able to export

18   dairy products to Egypt?

19   A.  That's correct, yes.

20   Q.  And as we're breaking that down, was that the nature of the

21   U.S. government's concern that was raised with the World Trade

22   Organization relating to halal certification practices in

23   Egypt?

24   A.  Yes, that's correct.

25              MR. MARK:  Your Honor, I know we're at right around 5

O5hWmen5                          Tate - Direct

1    o'clock, and I was about to change topics.  I didn't know if

2    you'd like me to continue.

3              THE COURT:  No.  Let's give the jury a break.

4              Ladies and gentlemen, thank you for being here your

5    first week.  I think things are moving quite apace.  It took a

6    few days before we got the jury, but now that we have a jury, I

7    appreciate the fact that you're clearly paying attention here.

8              Enjoy the weekend.  Don't discuss this case.  Don't

9    read anything or hear anything about this case.

10             We'll see you at 9:30 Monday morning.  Enjoy the

11   weekend.

12             (Jury not present)

13             THE COURT:  9:30 Monday morning.

14             MR. RICHENTHAL:  Your Honor, could we just have one

15   minute to confer to see if there's anything we need to raise

16   with the Court that have been the subject of discussions with

17   the defense?

18             THE COURT:  Yes, yes.  Of course.

19             (Witness not present)

20             MR. RICHENTHAL:  We appreciate the time.  We have

21   nothing for the Court.

22             Have a nice weekend.

23             THE COURT:  9:30, everybody.  Enjoy the weekend.

24   Don't work over the weekend.

25             (Adjourned to May 20, 2024, at 9:30 a.m.)

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                         Page

 3   ARISTOTELIS JOHN KOUGEMITROS

 4   Cross By Mr. Fee . . . . . . . . . . . . . . . 336

 5   Cross By Mr. Lustberg  . . . . . . . . . . . 363

 6   Redirect By Ms. Pomerantz  . . . . . . . . . 366

 7   JAMES BRET TATE

 8   Direct By Mr. Mark . . . . . . . . . . . . . . 370

 9                     GOVERNMENT EXHIBITS

10   Exhibit No.                         Received

11    1239 and 1242  . . . . . . . . . . . . . . . 335

12    8B-34  . . . . . . . . . . . . . . . . . . . 383

13    2A-23  . . . . . . . . . . . . . . . . . . . 396

14    8B-33  . . . . . . . . . . . . . . . . . . . 420

15    8B-48  . . . . . . . . . . . . . . . . . . . 426

16    8B-1, 8B-2  . . . . . . . . . . . . . . . . 429

17    C-104B  . . . . . . . . . . . . . . . . . . 438

18    8B-7  . . . . . . . . . . . . . . . . . . . 455

19    8B-28  . . . . . . . . . . . . . . . . . . . 466

20    8B-19  . . . . . . . . . . . . . . . . . . . 473

21    8B-20, 8B-35  . . . . . . . . . . . . . . . 485

22    8B-5, 8B-21, 8B-36, 8B-40 through 8B-46  . . 489

23    8B-32  . . . . . . . . . . . . . . . . . . . 497

24    8B-29  . . . . . . . . . . . . . . . . . . . 510

25    10-A4  . . . . . . . . . . . . . . . . . . . 513
```

8B-14 and 8B-15   . . . . . . . . . . . . . 533

                    DEFENDANT EXHIBITS

Exhibit No.                              Received

131   . . . . . . . . . . . . . . . . . . 338

723   . . . . . . . . . . . . . . . . . . 348