O67Wmen1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7            Defendants.
                                            Trial
8   ------------------------------x

9                                           New York, N.Y.
                                            June 7, 2024
10                                          10:15 a.m.

11

12  Before:

13

14                    HON. SIDNEY H. STEIN,

14                                          District Judge
15                                          -and a Jury-

16                    APPEARANCES

17  DAMIAN WILLIAMS
         United States Attorney for the
18       Southern District of New York
    BY:  PAUL M. MONTELEONI
19       DANIEL C. RICHENTHAL
         ELI J. MARK
20       LARA E. POMERANTZ
         CATHERINE E. GHOSH
21       Assistant United States Attorneys
         -and-
22       CHRISTINA A. CLARK
         National Security Division

23

24

25

O67Wmen1

                        APPEARANCES CONTINUED


PAUL HASTINGS LLP
       Attorneys for Defendant Menendez
BY:   ADAM FEE
      AVI WEITZMAN
      ROBERT D. LUSKIN
      RITA FISHMAN




GIBBONS, P.C.
       Attorneys for Defendant Hana
BY:   LAWRENCE S. LUSTBERG
      ANNE M. COLLART
      CHRISTINA LaBRUNO
      ANDREW J. MARINO
      RICARDO SOLANO, Jr.
      ELENA CICOGNANI
      JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
       Attorneys for Defendant Daibes



Also Present:  Marwan Abdel-Rahman
               Rodina Mikhail
               Interpreters (Arabic)

               Rachel Wechsler
               Connor Hamill
               Braden Florczyk
               Paralegal Specialists, U.S. Attorney's Office

               Justin Kelly, DOAR

O67Wmen1

1          (Trial resumed; jury not present)

2          THE COURT:  I just wanted to give you a status report.

3          We're still missing one juror.  She texted another

4     juror and said she was running late.  I had my deputy call the

5     juror; the mailbox is full.

6          Let's wait a little while, given the fact that she did

7     text the other juror to say she'd be late.

8          All right.  Thank you.

9          (Recess)

10          THE COURT:  All right.  That juror just arrived.  If

11     any of the lawyers who have been waiting around need to go to

12     the restroom, to do it now, immediately, because they're lining

13     up.

14          Everyone seems OK.

15          Put the witness on the stand.

16          Good morning.

17          THE WITNESS:  Good morning.

18          (Continued on next page)

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Please be seated in the courtroom.

3        Welcome, ladies and gentlemen.  Let me remind all of

4   you again how important it is that everyone be here on time.

5   We can't do anything until all of you are present.

6        Government, call your next witness.

7        MS. GHOSH:  Thank you, your Honor.

8        The government calls Kira Glass.

9   KIRA GLASS,

10       called as a witness by the government,

11       having been duly sworn, testified as follows:

12       THE COURT:  Welcome, Ms. Glass.

13       Your witness.

14       MS. GHOSH:  Thank you, your Honor.

15  DIRECT EXAMINATION

16  BY MS. GHOSH:

17  Q.  Where do you currently work, Ms. Glass?

18  A.  The FBI laboratory in Quantico, Virginia.

19  Q.  What is the FBI laboratory?

20  A.  It's the forensic laboratory for the Federal Bureau of

21  Investigation, where we test evidence that's submitted for

22  federal cases.

23  Q.  What is your current title?

24  A.  I'm a physical scientist forensic examiner in the latent

25  prints operations unit.

O67Wmen1                          Glass - Direct

1   Q.   What does the latent prints operations unit do?

2   A.   We process evidence for the detection of latent prints and

3   then compare those latent prints to known records.

4   Q.   We'll discuss this more in a few minutes, but at a high

5   level, what are latent prints?

6   A.   Latent prints are impressions from the hands or the feet

7   that can be left behind when you touch an item.

8   Q.   Is that similar to a fingerprint?

9   A.   A fingerprint simply means that the impression is just from

10  the end joint of the finger.

11  Q.   What are your duties and responsibilities as a physical

12  scientist forensic examiner in the latent print operations

13  unit?

14  A.   I receive evidence.  I'll then inventory that evidence to

15  make sure I've received what I need.  I will then process that

16  evidence with light sources and chemicals in order to see if

17  there's any latent prints present.  I will then have those

18  photographed or captured, and then I will compare those to

19  known records and search them in an automated database.

20  Q.   For how long have you worked as a forensic examiner in the

21  latent print operations unit?

22  A.   16 years.

23  Q.   What did you do before you started working at the FBI lab?

24  A.   I spent a year working for the Virginia Department of

25  Forensic Science in their evidence management unit.

1   Q.  Could you please tell the jury about your education in the

2   field of forensic science?

3   A.  I have a bachelor's of science degree in forensic

4   investigative science from West Virginia University, and I

5   completed an 18-month training program at the FBI laboratory in

6   the field of latent prints.

7           MS. GHOSH:  Ms. Glass, just for the benefit of the

8   court reporter and interpreters, if I could ask you to just

9   slow down a little bit.

10  Q.  What training did you receive in forensic science?

11  A.  During my bachelor's of science degree, I took classes in

12  criminal investigations, latent prints, crime scenes.  And then

13  during my time at the FBI laboratory, that included instruction

14  in the proper handling of processing of evidence, capturing of

15  latent prints, how to compare latent prints and prepare

16  reports.

17  Q.  And how many months of training did you say you received at

18  Quantico?

19  A.  It was about 18 months.

20  Q.  After those 18 months, are there any additional periods of

21  extra supervision?

22  A.  Yes.  We spend about six months after that in a

23  probationary period, where our work is reviewed by our

24  supervisor.

25  Q.  Could you please describe any ongoing education and

1   training that you've received in the field of latent prints?

2   A.  We're required to have eight hours of continuing education

3   every year, and this is usually comprised of attending

4   conferences, bringing in outside trainers, attending

5   presentations, reading articles.

6   Q.  Have you given any presentations or published research in

7   the field of latent prints?

8   A.  Yes, I have.

9   Q.  Is the FBI laboratory accredited to perform latent print

10  testing?

11  A.  Yes.

12  Q.  What institution accredits the FBI laboratory?

13  A.  The laboratory is accredited by an organization known as

14  ANAB, which stands for the American National Standards

15  Institute National Accreditation Board.

16  Q.  What does it mean for a lab to be accredited?

17  A.  It's where an outside organization comes in and recognizes

18  that organization is qualified to do the testing that they're

19  doing.

20  Q.  Is the FBI lab audited in connection with that

21  accreditation process?

22  A.  Yes.

23  Q.  Did the FBI lab pass those audits?

24  A.  Yes.

25  Q.  Do you personally undergo any reviews or evaluations on a

1    regular basis?

2    A.   My work is routinely technical and administrative reviewed.

3    We also complete a processing proficiency test every three

4    years and we take a yearly comparison test.

5    Q.   You mentioned administrative and technical review.  Could

6    you just explain what types of reviews those are?

7    A.   Those are reviews that are conducted once our cases are

8    complete and our review is -- excuse me, our report is

9    submitted for review.  So a technical review will go over all

10   of the decisions that we've made, and an administrative review

11   will review our documentation to make sure that it's accurate.

12   Q.   You also mentioned proficiency testing.  What accuracy rate

13   does your lab require in order to consider your proficiency

14   test score passing?

15   A.   100 percent.

16   Q.   Have you ever failed a proficiency test?

17   A.   No.

18   Q.   Have you reviewed latent print analyses performed by others

19   in the lab during your career?

20   A.   Yes.

21   Q.   Have your latent print analyses been reviewed by others in

22   the lab?

23   A.   Yes.

24   Q.   What percentage of the prints that you identify as a match

25   to another print are reviewed by someone else?

1    A.   100 percent.

2    Q.   What kinds of verifications are typically performed on your

3    latent print identifications?

4    A.   We have verification and blind verification.  Both of those

5    involve an independent review of the comparison by another

6    examiner.  The only difference is that in a blind verification,

7    that examiner's unaware of the decisions or circumstances

8    surrounding that comparison.

9    Q.   Does this verification process take place before any report

10   of your identifications is finalized?

11   A.   Yes.

12   Q.   Are you aware of whether a verifier ever disagreed with a

13   print that you identified?

14   A.   Yes.

15   Q.   How many times?

16   A.   One time.

17   Q.   And when did that happen?

18   A.   That was in 2011.

19   Q.   Approximately how long had you been at the lab at that

20   point?

21   A.   I had been at the lab for three years and out of training

22   for about a year.

23   Q.   Generally, what were the circumstances when the verifier

24   disagreed with your identification in 2011?

25   A.   It was a case where multiple prints were identified to one

1   person.  So those were given out for verification, and on one

2   of those prints, the verifier disagreed and determined that it

3   was an exclusion.

4   Q.  So this error was caught during the verification process?

5   A.  Yes.

6   Q.  Were you provided with additional training and supervision

7   for a period after this?

8   A.  Yes.

9   Q.  Since that situation in 2011, have you been found to have

10  any other erroneous identifications?

11  A.  No.

12  Q.  Around how many latent prints would you estimate you've

13  analyzed in your career?

14  A.  Thousands.

15  Q.  Have you testified before in court as an expert about

16  latent print analyses that you've conducted?

17  A.  Yes.

18  Q.  Approximately how many times?

19  A.  Ten.

20          MS. GHOSH:  Your Honor, the government offers

21  Ms. Glass as an expert in the field of latent print analysis.

22          THE COURT:  Hearing no objection, the motion is

23  granted.

24          Ladies and gentlemen, you'll remember what it means

25  when I say someone is an expert.  It simply means that they are

1    allowed to be asked and to answer opinion questions in their

2    area of expertise.  And here, the area of this witness's

3    expertise is latent print analysis.

4              You may proceed.

5    BY MS. GHOSH:

6    Q.  Ms. Glass, at a very high level, what was your involvement

7    in this case?

8    A.  I received evidence in the latent print unit that I then

9    processed for the detection of latent prints, and then I

10   compared those latent prints to known records.

11   Q.  Other than conducting latent print analysis, did you have

12   any other involvement in this investigation or prosecution?

13   A.  No.

14   Q.  Let's take a step back.

15             Could you explain to the jury what a latent print is?

16   A.  On the surface of your hands and the soles of your feet,

17   you have a specialized type of skin called friction ridge skin.

18   This skin is comprised of raised portions, called the ridges,

19   and the lower portions in between them called furrows.  A

20   latent print is simply a chance recording of that skin that can

21   be left behind when you touch an item.  It's usually composed

22   of sweat, oil or other substances that you come into contact

23   through throughout the day.  They're usually fragmentary in

24   nature, and they need some sort of development in order to be

25   seen.

O67Wmen1                        Glass - Direct

1    Q.  Does the material or type of surface that someone touches

2    affect latent prints?

3    A.  Yes.  Generally, smooth surfaces are really good.  The more

4    highly textured a surface is the more difficult it would be for

5    you to leave something behind.  It also depends on how that

6    surface is left after you touch it, how dirty it is at the time

7    and other factors like that.

8    Q.  Are you familiar with the term "porous" in relation to

9    latent prints?

10   A.  Yes.

11   Q.  What does porous mean?

12   A.  Porous is a type of item that we get for processing, and it

13   simply means that it's absorbent.  So a common piece of paper

14   is a porous-type item because the latent print will get

15   absorbed into that item instead of sitting on top.

16   Q.  And what's an example of a type of material that is

17   nonporous?

18   A.  Nonporous is anything that would be nonabsorbent.  So this

19   water bottle, for example, a tabletop, a window, those are all

20   items where if you touch it that latent print is going to be

21   left on the surface.

22   Q.  Can testing for latent prints on evidence assist in

23   identifying who touched that evidence?

24   A.  Yes.

25   Q.  What allows you to use latent prints as a means of

O67Wmen1                            Glass - Direct

1    identification?

2    A.   The friction ridge skin is both permanent and unique.  It's

3    permanent in that it's formed before you're born and remains in

4    the same configuration until decomposition after death.  And

5    it's also unique, meaning that it's developed based on both

6    genetic and nongenetic factors that allow it to develop

7    differently from person to person and finger to finger.

8    Q.   Can you determine from a latent print when it was left on

9    an item?

10   A.   No.

11   Q.   If a person's prints are not on an object, does that mean

12   that person never touched that object?

13   A.   No.

14   Q.   Why might prints not be left behind?

15   A.   It depends a lot on the condition of the skin and the

16   condition of the item.  For example, if you're someone who's

17   recently watched your hands, you have really dry skin, you're a

18   lot less likely to leave something behind.  Similarly, if that

19   item was left out in the rain after it was touched, then it's

20   possible that that latent print won't be there anymore.

21   Q.   Once a print is on something, does it stay on that object

22   forever?

23   A.   Not necessarily.

24   Q.   In what ways could a print that is initially on an object

25   get removed?

1   A.  It could be wiped off from other touches that may occur.

2   If it's left out in the weather or a hot car or things of that

3   nature, it's exposed to the environment, then it's possible

4   that that latent print could be wiped off or evaporated.

5   Q.  We've been discussing latent prints.  Are you familiar with

6   the term "known print"?

7   A.  Yes.

8   Q.  What is a known print?

9   A.  A known print is just an intentional recording of your

10   friction ridge skin.  For fingerprints, they're commonly taken

11   in black printer's ink on a white background or with the

12   assistance of a scanner, and they're rolled from one side of

13   the nail to the other.

14   Q.  How do you use known fingerprints, if at all, in the course

15   of your work?

16   A.  Known fingerprint records are what we use to compare to any

17   latent prints that are detected.

18   Q.  Let's turn to this case now.

19      Were you asked to test certain items of evidence for latent

20   prints in this case?

21   A.  Yes.

22   Q.  We'll discuss the test themselves in a moment, but what is

23   the overall purpose of the various tests that you performed on

24   items of evidence?

25   A.  To detect if there are any latent prints that were left

O67Wmen1                         Glass - Direct

1    behind.

2    Q.   Are you familiar with the phrase "suitable for comparison"?

3    A.   Yes.

4    Q.   What does that mean in the context of latent prints?

5    A.   Suitable for comparison means that there is sufficient

6    quantity and quality of information in the latent print such

7    that an identification may be possible.

8    Q.   Could you please describe the process that an item of

9    evidence goes through when it's received by the FBI lab for

10   latent print testing?

11   A.   First, we're going to make sure that we -- that what we

12   receive is what we were supposed to receive and that it matches

13   the descriptions in our system.  And then based on the type of

14   evidence that it is, it's going to go through a series of light

15   source and chemical testing.

16   Q.   You mentioned receiving evidence in the latent print unit.

17   Who do you receive that evidence from?

18   A.   The evidence is typically dropped off at our unit by

19   another unit called the evidence management unit that

20   facilitates the transfer of evidence throughout the laboratory.

21   Q.   In a given case does the latent print operations unit

22   necessarily test all of the evidence that's submitted to the

23   FBI lab?

24   A.   No.

25   Q.   Who makes the decision as to what should be tested for

O67Wmen1                          Glass - Direct

1    prints?

2    A.   That is usually a collaboration between the evidence

3    management unit and the contributor as well as what the

4    evidence management knows about the units and the laboratory

5    and what we do and don't test.

6    Q.   Did you perform the tests in this case on the evidence

7    entirely by yourself?

8    A.   No.

9    Q.   Who assisted you?

10   A.   I had the assistance of a processing technician.

11   Q.   What did the processing technician do to assist on some of

12   the testing?

13   A.   She conducted some of the physical processing of some of

14   the evidence given the timeline that we had at the time.

15   Q.   For the items that the processing technician assisted with,

16   who analyzed any resulting print images?

17   A.   I did.

18   Q.   What protective equipment, if any, do you wear while

19   testing evidence for prints?

20   A.   We wear cotton and nitrile glove, safety goggles, lab coats

21   and safety shoes.

22   Q.   What types of evidence did you test for latent prints in

23   this case?

24   A.   In this case I received a combination of envelopes with

25   tape, gold and gold coins, and some of that was inside some

1   plastic packaging.

2   Q.  Did you choose which items to test, or were they provided

3   to you by someone else?

4   A.  We received it -- I received it from the evidence

5   management unit, and then I determined how that evidence was

6   going to be processed.

7   Q.  You mentioned testing some gold and gold coins.  Did you

8   end up identifying any prints on those items?

9   A.  On the gold coins themselves, no.  I believe there was one

10  identification made on a piece of the plastic packaging.

11  Q.  Based on your training and experience, was the gold that

12  you tested in this case a material that was good for retaining

13  prints or not?

14  A.  No.

15  Q.  Why not?

16  A.  The gold coins are highly textured, so they were similar to

17  what you would picture a quarter looking like.  There's a

18  design on each side, which is not really conducive to leaving a

19  latent print behind.

20  Q.  And you also mentioned gold that was not in the form of a

21  gold coin.  Is that right?

22  A.  Yes.  I had a gold bar.

23  Q.  And why was that not conducive, a material not conducive to

24  retaining prints?

25  A.  The gold bar was a little bit dinged up, had clearly been

O67Wmen1                         Glass - Direct

1   handled, and it wasn't in any sort of protective packaging.  So

2   when no latent prints were detected, I wasn't surprised by

3   that.

4   Q.  And you also mentioned some plastic packaging.  Was that

5   the type of material that's generally good for prints?

6   A.  It can be.  The plastic packaging is similar probably to

7   what, like, batteries are packaged in, so there's a lot of

8   shapes in that.  So that can certainly affect how a latent

9   print may be left behind.

10  Q.  Were you asked to test any cash for latent prints in this

11  case?

12  A.  No.

13  Q.  Have you ever tested cash for fingerprints in other cases?

14  A.  Yes.

15  Q.  In your experience, do you typically get prints suitable

16  for comparison from cash?

17  A.  No.

18  Q.  To be clear, have you ever gotten prints off of cash?

19  A.  Yes.

20  Q.  In your experience, why are prints suitable for comparison

21  not often found on cash?

22  A.  Cash is sort of an interesting texture.  It's sort of

23  almost like fabric but a little bit like paper, so it's a

24  really interesting surface.  And in addition to that, money is

25  fairly dirty.  It's handled often.  It's folded up, put in a

1    wallet or a pocket.  And all of those things combined just make

2    it not the best surface for a latent print.

3    Q.  Does cash have a different material than a typical piece of

4    paper?

5    A.  Yes.  We treat it like a porous item, but like I said, it's

6    almost like fabric, which traditionally is something we don't

7    process.  We don't process clothing because it affects whether

8    or not latent prints can be left.

9    Q.  In your experience, are you more likely to find prints

10   suitable for comparison on cash or on an envelope?

11   A.  An envelope.

12   Q.  You also mentioned that you tested some tape for prints.

13   Where did the tape come from?

14   A.  The tape was removed from the envelopes that were

15   submitted.

16   Q.  How is tape removed from envelopes in order to test it for

17   latent prints?

18   A.  We have a substance that we use, called Undo, which we

19   apply to the envelope, and it briefly releases some of the

20   adhesive on the tape so that we can easily peel off the tape

21   without damage.

22   Q.  Did you say that's called Undo?

23   A.  Uh-huh.

24   Q.  Does this process damage the envelope or the tape?

25   A.  No.

1    Q.   Let's turn to the envelopes and tape.

2         Did you perform the same types of tests for both the

3    envelopes and the tape?

4    A.   No.   The envelopes are a porous item, which we have a

5    specific sequence for.   And then the tape is a nonporous item

6    with an adhesive backing, and we have a different process for

7    that as well.

8    Q.   Starting with the envelopes, how many different testing

9    methods did you use on those to determine whether there were

10   any latent prints?

11   A.   Four.

12   Q.   What is the first method?

13   A.   The first method is just a visual exam, using the ambient

14   lighting in the room.

15   Q.   Why do you do that?

16   A.   That's just simply to see if there's any latent prints

17   visible before we begin any of our chemical testing.

18   Q.   What was the second method you used on envelopes?

19   A.   The second method is a combination of forensic light

20   sources, so UV lights or lasers, and that is in order to see if

21   there's any latent prints that inherently fluoresce or glow

22   before we apply any chemicals.

23   Q.   What does that mean, for a print to fluoresce or glow?

24   A.   So, there are some substances you may leave behind from

25   your fingers that may naturally glow when they're exposed to an

1    ultraviolet light or a laser, and it makes it visible to the

2    naked eye.

3    Q.  Can you give an example?

4    A.  Sometimes there are certain lotions or drugs that you may

5    take that may cause your prints to be fluorescent.

6    Q.  What was the third method you used to test for prints on

7    the envelopes?

8    A.  We used a chemical process called indanedione, which is a

9    chemical that we spray on, and then we put it either in the

10   humidity cabinet or an oven for a period of time for it to

11   develop.

12            THE COURT:  Tell me what the name of that is again.

13            THE WITNESS:  Indanedione.

14            THE COURT:  How do you spell that?

15            THE WITNESS:  I-N-D-I-A-N-D-I-O-N-E.

16            THE COURT:  Thank you.

17   BY MS. GHOSH:

18   Q.  And what types of prints does indanedione help reveal?

19   A.  Indanedione is meant to detect what you leave behind with

20   amino acids that can be present in your sweat.

21   Q.  So that type of method reveals prints left from the sweat

22   on your hands, is that right?

23   A.  Yes.

24   Q.  And what was the fourth method of testing that you used on

25   the envelopes?

O67Wmen1                          Glass - Direct

1   A.   The fourth method is the method called physical developer.

2   This involves soaking a piece of paper in a series of chemicals

3   and then drying them.   And that is meant to develop the oily or

4   greasy prints you may leave behind in an item.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O675men2                              Glass - Direct

1   BY MS. GHOSH:   (Continuing)

2   Q.  Now let's turn to the tape.  How many different testing

3   methods did you use on the tape in this case?

4   A.  Five.

5   Q.  What are those methods?

6   A.  The first two methods are visual and forensic light source,

7   just looking to see if there is anything present before we

8   begin our exams.  The third exam is super glue fuming.  So we

9   take the item, we place it in a cabinet that we then add super

10  glue to so it fumes and that can adhere to any residue that is

11  left behind by a latent print.

12  Q.  And the super glue fuming, is that a method you use on, is

13  that for the sticky side or the non-sticky side of the tape?

14  A.  That is for the non-sticky side.

15  Q.  And what is the process used for the sticky side of the

16  tape?

17  A.  The sticky side of the tape we have something -- we have a

18  few chemicals we can use.  On a lot of this tape I use

19  something called Wetwop.  I think I also used alternate black

20  powder.  That is simply just a solution of black powder that we

21  use a brush to apply to the adhesive side and then we rinse it

22  off with tap water.

23  Q.  Did you say Wetwop?

24  A.  Yes.

25  Q.  Were there any other testing methods you used on the tape?

O675men2                          Glass - Direct

1   A.  We then, for the non-adhesive side, applied a chemical

2   called Romeo, which is just a fluorescent dye stain that can

3   stick to the glue that may have been left behind, and then we

4   will look at that side with additional forensic light sources.

5   Q.  For either the envelopes or the tape, after you performed

6   these various tests, what are the possible outcomes of the

7   testing?

8   A.  We will either mark something for photography so that we

9   can look at it later, or we will just move on with the next

10  step in the processing sequence.

11  Q.  So do you perform all of these tests on the individual

12  item?

13  A.  Yes.

14  Q.  When the testing reveals prints, what do you do next?

15  A.  We will have them captured and then we will analyze those

16  prints at a later time.

17  Q.  In this case, did the testing reveal any latent prints?

18  A.  Yes.

19  Q.  Were you able to obtain prints from every piece of evidence

20  that you analyzed or just some?

21  A.  Some.

22  Q.  If the testing did not reveal prints on some envelopes or

23  tape, does that mean no one ever touched those items?

24  A.  No.

25  Q.  Why not?

1   A.   Because it is possible to touch an item and not leave a

2   latent print behind.

3   Q.   Let's talk about the items where testing did reveal prints.

4   If you look in front of you there should be a binder.   Could

5   you please look through the documents in the third tab.   And

6   while you do that, I am going to read into the record a list of

7   exhibits that have been marked for identification.   They all

8   begin with the prefix 16A.   16A-25, 16A-25-1, 16A-25-1-1,

9   16A-26, 16A-32A, 16A-32B, 16A-33A, 16A-33B, 16A-34, 16A-35-1,

10  16A-54A, 16A-54B, 16A-54C, 16A-54-1, 16A-54-1-1, 16A-55,

11  16A-55-1-1, 16A-56-1-1, 16A-59A, 16A-59B, 16A-62-1-1, 16A-64,

12  16A-64A, 16A-92-1-1, 16A-94-1-1, 16A-94-1-3, 16A-95-1-4,

13  16A-96-1, 16A-97-1, 16A-98, 16A-98-1-1, 16A-99 and 16A-99-1-1.

14          Ms. Glass, do you recognize those documents marked for

15  identification with the numbers I just read?

16  A.   Yes.

17  Q.   And generally, what are they?

18  A.   Those are images from my latent print exams.

19  Q.   Do those images fairly and accurately depict FBI lab photos

20  of evidence you analyzed in this case?

21  A.   Yes.

22          MS. GHOSH:   Your Honor, the government offers those

23  exhibits into evidence.

24          THE COURT:   Admitted without objection.

25          (Government's Exhibits 16A-25, 16A-25-1, 16A-25-1-1,

O675men2                            Glass - Direct

1    16A-26, 16A-32A, 16A-32B, 16A-33A, 16A-33B, 16A-34, 16A-35-1,

2    16A-54A, 16A-54B, 16A-54C, 16A-54-1, 16A-54-1-1, 16A-55,

3    16A-55-1-1, 16A-56-1-1, 16A-59A, 16A-59B, 16A-62-1-1, 16A-64,

4    16A-64A, 16A-92-1-1, 16A-94-1-1, 16A-94-1-3, 16A-95-1-4,

5    16A-96-1, 16A-97-1, 16A-98, 16A-98-1-1, 16A-99 16A-99-1-1

6    received in evidence)

7              MS. GHOSH:  Ms. Wechsler can you please publish

8    16A-54A, which is in evidence?

9    BY MS. GHOSH:

10   Q.  Ms. Glass, what do we see here?

11   A.  This is one of the envelopes I received for processing.

12   Q.  And who put the arrows on here?

13   A.  I did.

14   Q.  Can you explain the purpose of those arrows?

15   A.  Those arrows were placed on there after using the chemical

16   indanedione and are pointing to the areas I wanted to have

17   captured.

18   Q.  So when you described earlier marking areas that you wanted

19   to be photographed, is this how you mark those areas?

20   A.  Yes.

21             MS. GHOSH:  We can take down that exhibit for now.

22   Thanks.

23   Q.  Ms. Glass, when conducting your analysis, what did you do

24   once you obtained photographs of the prints?

25   A.  I analyzed the latent prints to see if there were any that

O675men2                          Glass - Direct

1    were suitable for comparison.

2    Q.  And how do you actually look at the prints?

3    A.  We use a combination of either a physical photograph that

4    is actual size, or we can also use the assistance of computers.

5    Q.  When you look at the photographs of the prints -- when you

6    are looking, are the prints life-size or magnified?

7    A.  They're magnified.

8    Q.  So even if you have the physical printout you said it was

9    life-size, I believe, or actual size?So.

10   A.  So all of our prints are captured in actual size, but when

11   we use those images for exams if it is a physical photo we will

12   use the assistance of a magnifier.  If it is on I a computer

13   screen then we will simply use a zoom tool to get it closer.

14   Q.  In this case, were all of the latent prints found suitable

15   for comparison?

16   A.  No.

17   Q.  Why not?

18   A.  With the definition of suitable for comparison, some of

19   them did not have sufficient quantity and quality of

20   information such that an identification could be possible, so

21   those prints were not used.

22   Q.  Were any of the latent prints in this case suitable for

23   comparison?

24   A.  Yes.

25          MS. GHOSH:  Ms. Wechsler, could you please pull up for

O675men2                          Glass - Direct

1    just the witness what has been marked as a demonstrative

2    exhibit Government Exhibit 16A-9?

3    Q.   Ms. Glass, just generally, what is this?

4    A.   This is a presentation I made to demonstrate the comparison

5    process.

6    Q.   And did you prepare this in advance of your testimony

7    today?

8    A.   Yes, I did.

9    Q.   Would this presentation help you in describing for the jury

10   some of the techniques and analysis that we are going to be

11   talking about today?

12   A.   Yes.

13          MS. GHOSH:   The government offers Government Exhibit

14   16A-9, a demonstrative exhibit.

15          THE COURT:   Hearing no objection, I am admitting this

16   as a demonstrative.

17          Ladies and gentlemen, what that means is it is not

18   evidence in and of itself.   What it is, it is an aid to help

19   you understand what the evidence is.   Apparently it is

20   something that this witness has developed that will help you

21   understand the process of latent print analysis.   All right?

22   It is an aid, it is not evidence itself.

23          Admitted as a demonstrative.

24          (Government's Exhibit 16A-9 received in evidence)

25          MS. GHOSH:   Ms. Wechsler, if you could publish this

O675men2                           Glass - Direct

1    for the witness, please?

2    BY MS. GHOSH:

3    Q.  Ms. Glass, as you go through this, if you could speak

4    particularly slowly so we can all follow along.

5           Before you begin explaining latent print analysis,

6    where does the image on slide 1 of your presentation come from?

7    A.  This image was taken from the adhesive side of a piece of

8    tape that was designated as item 54-1-1, and it was developed

9    with a method called Wetwop.

10          MS. GHOSH:  Ms. Wechsler, for a moment could you put

11   up, side by side, with this, Government Exhibit 54-1-1?

12   Q.  Ms. Glass, is item 54-1-1 from your slides the same

13   adhesive tape as shown in Government Exhibit 54-1-1?

14   A.  Yes.

15          MS. GHOSH:  We can take down Government Exhibit

16   54-1-1.

17   Q.  Is that also the case for the rest of the item numbers and

18   government exhibit numbers that you reviewed before your

19   testimony?

20   A.  Yes.

21   Q.  Now, turning to Government Exhibit 16A-9, using slides 1

22   through 9, could you please explain to the jury what you looked

23   for when you are analyzing a latent print?

24          THE COURT:  It is 16A-9 is that demonstrative; is that

25   correct?

 1              MS. GHOSH:  That's correct, hour Honor.

 2              THE COURT:  That is what you have up, ladies and

 3    gentlemen.

 4              Proceed.

 5              THE WITNESS:  For our latent print exams we use a

 6    process called ACE, which stands for analysis, comparison, and

 7    evaluation.  So this first set of slides is just to demonstrate

 8    what we are looking for in the analysis of the latent print.

 9              So, if you could go to slide 2?

10              THE COURT:  What the jury has up says 54-1-1 but that

11    is not what is up, correct?

12    BY MS. GHOSH:

13    Q.  54-1-1; Ms. Glass, what is 54-1-1 as written on this slide,

14    slide 1?

15    A.  That is just telling you where this latent print image came

16    from, which is lab item 54-1-1, which was a piece of tape.

17              THE COURT:  All right.

18    Q.  Ms. Glass, could you continue explaining what you do in

19    your latent print analysis?

20    A.  Our analysis is divided into three different levels of

21    detail so we start with our Level 1 information.  One of the

22    things that we look at is the overall shape of the latent

23    impression, which is what is highlighted here on slide 2.  If

24    you look at that orange oval, that's consistent with the shape

25    of an impression that is from the end joint of the finger.

1              Can we move on to slide 2?

2              Another part of Level 1 information is the overall

3      ridge flow and pattern type.  So, that yellow line that you see

4      down at the bottom is following the ridge flow of this latent

5      impression.  There is three different pattern types that your

6      fingers can have, those are loops, arches, and whirls.  This

7      yellow line is demonstrating a pattern that is consistent with

8      either a loop or a whirl because the ridge flow comes in on one

9      side, makes a recurve in the center and goes out on the other

10     side, but we don't have complete information to know if it is a

11     loop or a whirl at this time.

12             We can move on to slide 3.

13     Q.  Just for the record, I believe that was slide 3 and we are

14     now on slide 4.

15     A.  Oh.  Yes, you are correct.

16             That blue arrow there is indicating the proper

17     orientation that we believe this impression to be in.  So with

18     a combination of the ridge flow that we see, we are going to

19     orient this latent print so that it is what we call "tip up",

20     which is the same how it with appear on a common known card.

21             Move on to slide 5.

22     Q.  And by a common known card, do you mean one of those

23     fingerprint cards you referred to earlier?

24     A.  Yes.

25             Other information we may take in with Level 1 is

1    presence of any disruptions to the ridge flow, scars, white

2    lines, or creases.  In this case what is highlighted in that

3    green circle is some sort of disruption to the ridge flow.  You

4    are not able to follow the ridges from the left side to the

5    right side.  This could be because there is some sort of

6    disruption on the skin such as a scar or maybe a wart.

7                We can move on to slide 6.

8                This blue line down the center is just me noting that

9    there is a clear line down the middle that could either be from

10   the item that the tape was lifted from, or it could have

11   something to do with the backing of the tape and I am just

12   noting it on my analysis.

13               We can move on to slide 7.

14               After we look at all of the Level 1 information, we

15   are then going to look for our Level 2 information so that is

16   zooming in a little bit further what we are looking at.  The

17   Level 2 information consists of minutia that could be

18   bifurcations, end ridges, or dots.  Ending ridges are rows that

19   flow and come to a stop, bifurcations are ridges that flow and

20   split into two or more ridges, and dots are simply ridges that

21   are as wide as they are tall like the period at the end of a

22   sentence.  And what we are looking for in this information is

23   their type, their location, their spatial relationship, and

24   where they are, overall, in the print.

25               We can move on to slide 8.  We can go one more slide,

1   please?

2           After we look at all of the Level 2 information, we

3   are going to look at our Level 3 information, and this is

4   getting as close as you can to look at the pores along those

5   ridges and the shape of the edge of the ridges.  So the arrow

6   on the left is pointing to two pores that are along that ridge,

7   so in this image the ridges are black and the white dots that

8   you see along them are the locations of the sweat pores.  The

9   arrow on the right is pointing to the shape of that ridge.  If

10  you look carefully, there is a little dip on the side of the

11  ridge where that arrow is pointing.

12          And once we have taken in all of that Level 1, Level

13  2, Level 3 information, we are then going to determine if that

14  latent print is suitable for comparison, meaning does it have

15  the sufficient quantity and quality of information such that an

16  identification may be possible.  In this case, given all the

17  information that is present, it is suitable for comparison so I

18  will then move on to a similar analysis of the known.

19  Q.  And you have been talking about the ridges, if we could go

20  back for a moment, are the ridges in the black lines or the

21  white in between the black lines?

22  A.  The ridges are black and the furrows are white.

23          THE COURT:  Let me see if I understand you, ma'am, and

24  I don't want to put words in your mouth, I am just trying to

25  understand what you are saying.

1          If I understand, you will take a print, you will go

2     through, you will look at the Level 1 information that is the

3     shape, ridge, flow, pattern, edge, something else, and then the

4     Level 2 information and then the Level 3 information, and at

5     the end of that you decide whether the quantity and quality of

6     the information you have makes that print suitable for you to

7     then compare that print to something else.  Is that basically

8     it?

9          THE WITNESS:  Yes.

10          THE COURT:  And the something else you compare it to I

11     think you called a known print; is that right?

12          THE WITNESS:  Yes.

13          THE COURT:  OK.  Now I am with you.  So far.

14     BY MS. GHOSH:

15     Q.  Ms. Glass, in addition to testing certain evidence to look

16     for latent prints, in this case did you have any involvement

17     with comparing latent prints to others?

18     A.  Yes.

19     Q.  And what can latent prints be compared against?

20     A.  They can be compared against a standard known card, which

21     is simply a recording of the 10 digits on your fingers, or they

22     can be searched in an automated database which is a repository

23     of known records.

24     Q.  What comparison methods did you use in this case?

25     A.  In this case it was a combination of both automated

O675men2                          Glass - Direct

1    searching and standard 10-print cards.

2              MS. GHOSH:  At this point I would like to read part of

3    Government Exhibit 1441, a stipulation that is in evidence,

4    paragraphs 1 through 3.  It says that:

5              The parties agree that the document marked for

6    identification as Government Exhibit 16A-5 is a true and

7    accurate copy of fingerprints of Robert Menendez.

8              The document marked for identification as Government

9    Exhibit 16A-6 is a true and accurate copy of fingerprints of

10   Fred Daibes.

11             And the documents marked for identification as

12   Government's Exhibits 16A-7 and 16A-8A are true and accurate

13   copies of fingerprints of Johnathan Joseph Pilot.

14             The government offers exhibits 16A-5, 16A-6, and

15   16A-8A into evidence.

16             THE COURT:  Admitted.

17             (Government's Exhibits 16A-5, 16A-6, 16A-8A  received

18   in evidence)

19             MS. GHOSH:  Ms. Wechsler if we can publish 16A-5 for

20   the jury?

21   BY MS. GHOSH:

22   Q.  Ms. Glass, what are we looking at here?

23   A.  This is a standard 10-print card bearing the name "Robert

24   Menendez".

25             THE COURT:  Did you say standard 10-print card?

O675men2                              Glass - Direct

1            THE WITNESS:  Yes.

2            THE COURT:  OK?

3   Q.  Is this an example of the type of print card that you

4   compare latent prints against?

5   A.  Yes.

6            MS. GHOSH:  Let's go back to the demonstrative,

7   please, 16A-9 to slide 10.

8   Q.  Looking at the image on this slide, where did this come

9   from?

10  A.  This is one of the finger blocks from a 10-print card with

11  the name "Fred Daibes".

12  Q.  Using slides 10 through 15 of Government Exhibit 16A-9,

13  could you please explain how you analyze a known print?

14  A.  The analysis of the known is very similar to the analysis

15  of the latent print.

16           We can move on to slide 11.

17           This rounded square shape that you see is the typical

18  shape that you may see on a standard 10-print card because it

19  is an intentional recording that is rolled from one side of the

20  nail to the other.

21           We can move on to slide 12.

22           So here that yellow line is also highlighting the

23  ridge flow for you.  This is a whirl-type pattern because it

24  makes a complete circuit in the middle.

25           We can move on to slide 13.

1          That blue arrow, similar to the latent print, is also

2    telling you the tip up direction which is simply the top of the

3    finger and how it would appear on your standard 10-print card.

4          Move to the next slide?

5          On slide 14, looking at that other Level 1

6    information, that green circle is highlighting for you there is

7    a disruption to the ridge flow just above the core area of the

8    print where you are not able to follow the ridges completely

9    from one side to the other.

10         Next slide?

11         After we look at that information we are going to look

12   at the presence of Level 2.  Those red dots there are

13   highlighting those ending ridges, bifurcations, and dots that

14   are available in this print.

15         We can move on to the next slide.

16   Q.  If you could go back one slide, please?  15?

17   A.  So, again, similar to the latent print analysis, once we

18   have evaluated all of that information to make sure it is

19   suitable for comparison, in this case the known is also

20   suitable for comparison.  So, once the analysis portion is

21   done, we are then going to move on to the actual comparison

22   stage which is simply placing the latent print and the known

23   print, side by side.

24   Q.  So now using slide 16 through 23 of Government Exhibit

25   16A-9, the demonstrative, could you please explain what you

O675men2                              Glass - Direct

1   look for when you are comparing a latent print from a piece of

2   evidence to a known print?

3   A.   What we are simply doing is looking for any similarities or

4   differences.  So, in looking at the latent print on the left

5   and the latent print on the right, they both have a similar

6   ridge flow where the ridges are coming in from the bottom on of

7   the left, making a curve in the center, and going back out on

8   the right.

9   Q.   And just to pause for a moment, I think you may have said a

10  latent print on the left and a latent print on the right.

11  A.   I'm sorry.  A known print on the right, latent print on the

12  left.

13  Q.   Please, go on.

14  A.   Because that information is in agreement, we are then going

15  to proceed to looking at the Level 2 information that may be

16  present.

17           We can move on to the next slide -- oh, I got ahead of

18  myself.  Sorry.

19           This yellow line is highlighting the similar ridge

20  flow between the two, and then above the core area of the print

21  you have that disruption to the ridge flow that is highlighted

22  in that green circle.

23           THE COURT:  Is this a comparison that you make

24  visually without -- or unaided?

25           THE WITNESS:  We may use the assistance of

O675men2                         Glass - Direct

1    magnification, but otherwise yes.

2            So, for demonstrative purposes I'm going to highlight

3    some of that Level 2 information I discussed.  Looking at the

4    latent print, what I have marked for you, is something called

5    characteristic A, which is an ending ridge that is pointing up.

6    And if you look over at the known print, I have also marked --

7    and any ridge facing up is characteristic A so that is going to

8    be my starting point for my comparison.

9            We can move on to the next slide.

10           So looking at the latent print, if we move from

11   characteristic A one, two, three -- four ridges to the right,

12   there is also an ending ridge facing up.

13           Moving over to the known print and from

14   characteristic A, if you move four ridges to the right there is

15   also an ending ridge fending up and these are marked as

16   characteristic B.

17           Move on to slide 20.

18           Looking at the latent print at characteristic B, which

19   is that ending ridge in the middle, we are going to move to the

20   right one, two, three, four, five -- six ridges, and just past

21   that sixth ridge is a Level 2 characteristic that is a dot, so

22   like the period at the end of a sentence, that is

23   characteristic C.  Looking at the known print and starting at

24   characteristic B, if you move six ridges to the right just past

25   that there is a dot also marked as characteristic C.

1              Move on to 21?

2              From that dot that is marked characteristic C and the

3    latent print we move one, two -- three ridges to the right and

4    there is an ending -- I'm sorry, a bifurcation opening up that

5    I have marked as characteristic B.  Looking at the known print

6    and that dot that is marked as characteristic C we move one,

7    two -- three ridges to the right and there is also a

8    bifurcation facing up that I have marked as Characteristic D.

9              Slide 22?

10             Then, from Characteristic D, moving just one ridge to

11   the right in the latent print there is an ending ridge facing

12   up, and then looking at the known print and from

13   characteristic D, one ridge to the right is characteristic E,

14   which is also an ending ridge facing up.

15             So, I move through the print in this fashion comparing

16   all of the Level 2 information that is available between the

17   latent print and the known.

18             Move on to slide 23.

19             So these extra dots that I haven't explained are

20   marking other Level 2 information that is in agreement between

21   the latent print and the known print.  And once I have

22   evaluated all of that information, I can then move on to the

23   final stage of the ACE process which is evaluation.

24   Q.  When making a comparison, what are the possible results?

25   A.  There are three possible conclusions.  There is

1    identification, meaning that there is sufficient agreement

2    between the latent print and the known print and disagreement

3    between the latent print and the known print, such that I would

4    not expect them to -- I'm sorry -- such that they came from the

5    same source; exclusion, meaning that there is sufficient

6    disagreement between the latent print and the known print such

7    that I would not expect them to come from the same source; or

8    inconclusive, meaning there is not enough information for me to

9    determine if there is an identification or an exclusion.  The

10   most common example of this that we come across is if the

11   latent print is from the very tip area of your finger it is not

12   commonly recorded on a 10-print card so we would need

13   additional known recordings in order to determine if that

14   latent print is an identification or exclusion.

15   Q.  In this case, did any of your comparisons of latent prints

16   to known prints result in identifications?

17   A.  Yes.

18   Q.  Did you follow the same process and use the same techniques

19   that we have just discussed to make all of your identifications

20   in this case?

21   A.  Yes.

22   Q.  And looking at slide 24 of Government Exhibit 16A-9, what

23   does this show?

24   A.  This shows that the latent print on item 54-1-1 was

25   identified with this print from the known card of Fred Daibes.

O675men2                          Glass - Direct

1   Q.   You mentioned earlier a verification step.  What, if any

2   verification process, did your identifications go through in

3   this case?

4   A.   They all went through either a verification or blind

5   verification step which was another examiner looking at that

6   print and coming to their own conclusion.

7   Q.   During your work analyzing various prints in this case, did

8   you prepare any reports of your conclusions?

9   A.   Yes.

10  Q.   How many?

11  A.   Four.

12  Q.   Are laboratory reports prepared and maintained in the

13  ordinary course of the FBI lab's business?

14  A.   Yes.

15  Q.   Are those reports made at or near the time of the events

16  recorded in the reports?

17  A.   Yes.

18  Q.   Are they kept in the course of regularly conducted activity

19  by the FBI lab?

20  A.   Yes.

21  Q.   Is maintaining those records a regular practice of that

22  activity?

23  A.   Yes.

24  Q.   In the first tab of the binder in front of you, you should

25  have what has been marked for identification as Government's

O675men2                          Glass - Direct

1    Exhibits 16A-1 through 16A-4.  Generally, what are those?

2    A.  These are copies of my laboratory reports.

3    Q.  Are those from your analyses in this case?

4    A.  Yes.

5              MS. GHOSH:  The government offers Government Exhibit

6    16A-1 through 16A-4.

7              THE COURT:  Admitted, without objection; 803(6).

8              (Government's Exhibits 16A-1 through 16A-4 received in

9    evidence)

10             MS. GHOSH:  Ms. Wechsler, can you please show the

11   witness what's been marked for identification as Government

12   Exhibit 1334?

13   BY MS. GHOSH:

14   Q.  Ms. Glass, do you recognize this document?

15   A.  Yes.

16   Q.  Generally, what is it?

17   A.  This is a chart showing the item numbers, 1B numbers, and

18   descriptions, and individuals that were identified in those

19   items?

20   Q.  Did you have an opportunity to review Government Exhibit

21   1334 before your testimony today?

22   A.  Yes.

23   Q.  Is it accurate?

24   A.  Yes.

25             MS. GHOSH:  The government offers Government Exhibit

1    1334.

2                THE COURT:  Admitted.

3                (Government's Exhibit 1334 received in evidence)

4                MS. GHOSH:  Can we publish that for the jury now,

5    please?

6    BY MS. GHOSH:

7    Q.  Ms. Glass, does this chart accurately reflect information

8    regarding some of your latent print identifications in this

9    case?

10   A.  Yes.

11   Q.  Just to be clear, did you identify even more prints that

12   aren't in this chart?

13   A.  Yes.

14   Q.  Did you select the identifications that are included in

15   this chart or did the prosecutors?

16   A.  The prosecutors.

17   Q.  Are there any other -- strike that.

18                Is the full set of identifications that you made in

19   your lab reports that are now in evidence as Government's

20   Exhibits 16A-1 through 16A-4?

21   A.  Yes.

22   Q.  I would like to start by discussing, briefly, the type of

23   information contained in this chart, Government Exhibit 1334.

24   What does the first column indicate?

25   A.  I believe those are the numbers that you are referring to

O675men2                          Glass - Direct

1    them for court purposes.

2    Q.  And have you reviewed those exhibit numbers before your

3    testimony today?

4    A.  Yes.

5    Q.  To be clear, does that column reference all of the

6    photographs that you took of prints or just some of them?

7    A.  Some.

8    Q.  What does the second column reference?

9    A.  The second column is the laboratory item numbers that they

10   were given when they came into the lab.

11   Q.  And does an item maintain the same lab item number

12   throughout its time at the Quantico lab, whichever unit it goes

13   to?

14   A.  Yes.

15   Q.  What does the third column indicate?

16   A.  The third column is a 1B number that's assigned by the

17   field.

18   Q.  And is that 1B number referenced in your lab report?

19   A.  Yes.

20   Q.  What does the fourth column show?

21   A.  The description of the items.

22   Q.  And is that information referenced in your lab reports?

23   A.  Yes.

24   Q.  To be clear, did you write or verify that information or is

25   that information that was provided to you?

1   A.  For the report?

2   Q.  Yes.

3   A.  Those descriptions were assigned by the evidence management

4   unit at the time that they were submitted, and then when I

5   receive it, verify that what I have matches that description.

6   Q.  And are you familiar with some of the descriptions in the

7   lab report mentioning a location of certain items?

8   A.  Yes.

9   Q.  Do you have any independent awareness of where the items

10  that you tested for prints were found?

11  A.  No.

12  Q.  What does the last column in this chart, 1334, indicate?

13  A.  The individuals that were identified to latent prints that

14  were found on those items.

15  Q.  And we will go through some specifics, but generally, what

16  types of materials were the prints in this chart obtained from?

17  A.  They were either from the envelopes or the tape.

18  Q.  So looking at your chart, do you see item 35-1 listed?

19  A.  Yes.

20  Q.  Could you please read the description of that item?

21  A.  Tape from envelope beginning "Online, you're..."

22  Q.  Based on the FBI lab naming conventions, what item of

23  evidence does the tape in item 35-1 come from?

24  A.  It came from item 35.

25  Q.  Is tape from an item given the item number and then a "-1"

1    or "-some other number"?

2    A.  Once an item is separated, we do something called dashing

3    out to indicate that it came from a parent item so that we

4    would know that this tape came from specifically from item 35.

5    Q.  Based on this chart, what 1B number is lab item 35?

6    A.  1B73.

7            MS. GHOSH:  Ms. Wechsler, just for a moment, can we

8    please bring up Government Exhibit 1301, which is in evidence,

9    and go to the entry for 1B73 on the very bottom of page 5 and

10   top of page 6?

11   Q.  Ms. Glass, can you just read the location in the fourth

12   column of 1B73?

13   A.  Room U (basement).

14   Q.  And to save some time, what is the location listed on

15   page 5 in 1301 --

16           MS. GHOSH:  We can zoom out of that for a moment, and

17   see more of the page -- for 1B -- give me a moment -- page 5,

18   please?  Thank you, Ms. Wechsler.

19   Q.  What is the location listed for 1B70, 72, and 73, which

20   correspond, in your chart 1334 to lab items 32, 33, and 34?

21   A.  Room U (basement).

22   Q.  To be clear, do you have any independent knowledge of the

23   location of any evidence found in this case?

24   A.  No.

25           MS. GHOSH:  Going back to item 35, 1B73, can we please

 1   pull up, side by side, Government Exhibit 1F-1275 and 1F-1276,

 2   which are two of the exhibits listed in that entry that we just

 3   looked at in 1301?  In 1F-1275 could you please zoom in on the

 4   envelope in the pocket of the jacket?  Keeping these photos up

 5   could we now also bring up Government Exhibit 16A-35-1?

 6   Q.  Ms. Glass, what is the item shown in this photograph?

 7   A.  A piece of tape.

 8   Q.  And what item number is this?

 9   A.  Item 35-1.

10   Q.  Which envelope did it come from?

11   A.  It came from item 35.

12   Q.  Does this photo show one of the prints that you identified?

13   A.  Yes.

14   Q.  Who did you identify this print as coming from?

15   A.  Fred Daibes.

16   Q.  What does "ID#2 Daibes" mean, written in pink, on this

17   item?

18   A.  "ID" means identified, the "#2" is indicating the finger

19   number.  So, all of the finger blocks on the 10-print card are

20   numbered and the #2 corresponds to the right index finger.  And

21   then, the last name is the person that is identified.

22   Q.  In order to conclude that this is a fingerprint from Fred

23   Daibes, what did you compare this latent print to?

24   A.  To the known card with the name Fred Daibes.

25   Q.  Is that the case for all of the identifications that you

O675men2                        Glass - Direct

1  will discuss today, that they were made by comparing the latent

2  print to a known print?

3  A.  Yes.

4          THE COURT:  Were they all to what you call a 10-print

5  card?

6          THE WITNESS:  All of the known prints are from

7  10-print cards, yes.

8          THE COURT:  OK.

9  BY MS. GHOSH:

10  Q.  And on the right side of this do you see "P1" written in

11  pink?

12  A.  Yes.

13  Q.  What does that mean?

14  A.  All of our latent prints are given a designation specific

15  to that print, so this one is given P1, so item 35-1 P1 is

16  specifically this latent print.

17  Q.  Who made the pink marks on this image?

18  A.  I did.

19  Q.  And besides the typing that we just talked about, what

20  other marks have you drawn on the photo?

21  A.  There is a horseshoe or claiming mark, which is that

22  semicircle that you see above the latent print, that is drawn

23  on there after our analysis is complete to indicate that it is

24  suitable for comparison.  And then you may also see some pink

25  dots which are the Level 2 information that I marked during my

1    analysis.

2    Q.  Now let's look at lab item 32, which you read a moment ago

3    was also listed in 1301 for the location Room U (basement).

4             MS. GHOSH:  Ms. Wechsler, could you please put up side

5    by side Government's Exhibits 1F-1313 and 1F-1314?  And could

6    you please zoom in on the envelope in 1314?  Now let's bring up

7    Government Exhibit 16A-32A.

8    Q.  Ms. Glass, what do we see here in Government Exhibit

9    16A-32A?

10   A.  It is item 32, which is an envelope.

11   Q.  Whose prints did you identify on this envelope?

12   A.  Nader Moussa.

13   Q.  What does the pink and the light blue writing mean on this

14   identification?

15   A.  The pink horseshoe was the original mark I drew during my

16   analysis indicating that that is the orientation I believed it

17   to be in but, upon comparison I actually found it to be in the

18   opposite orientation.  So, the blue mark is indicating where

19   the tip up direction is on this latent print.  And then, to

20   designate that change, I single-stuck and initialed and dated

21   the original claiming mark and drew the new claiming mark.

22   Q.  By "single-struck" are you referring to that light blue

23   line that goes through the pink horseshoe?

24   A.  Yes.

25   Q.  And notwithstanding that you realize that the direction of

O675men2                          Glass - Direct

1   the finger changed from one direction to another, did that

2   affect your ability to identify this print as coming from Nader

3   Moussa?

4   A.  No.

5           MS. GHOSH:  Can we now please take down 32A and bring

6   up Government Exhibit 16A-32B, please, Ms. Wechsler?

7   Q.  Ms. Glass, what do we see here?

8   A.  This is another image of a portion of the envelope that is

9   item 32.

10  Q.  So the same envelope we were just looking at in 32A?

11  A.  Yes.

12  Q.  And whose print was on this part of the envelope?

13  A.  Nader Moussa.

14  Q.  Now let's look at lab item 33, which you read is also

15  listed in Government Exhibit 1301 with the location Room U

16  (basement).

17          MS. GHOSH:  Ms. Wechsler could you please put up, side

18  by side, Government's Exhibits 1F-1315 and 1316?  And could you

19  please zoom in on the envelope in 1316?  Can we now bring up

20  Government Exhibit 16A-33A, please?

21  Q.  Ms. Glass, what do we see here?

22  A.  This is item 33, which is an envelope.

23  Q.  Whose prints did you identify on this envelope?

24  A.  Robert Menendez.

25  Q.  What does "ID#6 Menendez" mean on this identification?

O675men2                          Glass - Direct

1    A.  "ID" means identified, "#6" indicates that it is a left

2    thumb on the known card with the name "Robert Menendez".

3           MS. GHOSH:  Ms. Wechsler, please take down 33A and put

4    up Government Exhibit 16A-33B?  Thank you.

5    Q.  Ms. Glass, what do we see here?

6    A.  This is another photo of item 33.

7    Q.  So the same envelope we just looked at in 33A?

8    A.  Yes.

9    Q.  And if we could zoom in a bit, whose print is on this

10   portion of the envelope?

11   A.  This was identified to the right middle finger of Robert

12   Menendez.

13   Q.  So "ID#8" refers to the right middle finger; is that

14   correct?

15   A.  Yes.

16          MS. GHOSH:  We can take those down.

17   Q.  Now let's look at lab item 34, which you read was also

18   listed in Government Exhibit 1301 with the location Room U

19   (basement).

20          MS. GHOSH:  Ms. Wechsler, can we please put up side by

21   side 1F-1273 and 1F-1275?  And in 1275 can you please zoom in

22   on the manila envelope?  Ms. Wechsler could you please now add

23   Government Exhibit 16A-34?

24   Q.  Ms. Glass, what type of item is this in 16A-34?

25   A.  This is item 34, which was an envelope.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O675men2                          Glass - Direct

1   Q.   Whose prints did you identify on this envelope?

2   A.   Robert Menendez.

3   Q.   Which of Menendez' fingers does this come from?

4   A.   This was identified to the #8 which is the left middle

5   finger.

6           MS. GHOSH:  We can take those down and let's go back

7   to the chart Government Exhibit 1334.

8   Q.   What 1B number is associated with lab items 25-1 and

9   25-1-1?

10  A.   1B78.

11          MS. GHOSH:  Ms. Wechsler, can you please put up

12  Government Exhibit 1301 and go to the top of page 6?

13  Q.   Ms. Glass, what is the location listed in the fourth column

14  for 1B78?

15  A.   Room C closet (safe).

16  Q.   And what is the location listed on page 6 in 1301 for 1B79,

17  1B86, 1B79?

18  A.   Room C closet (safe).

19  Q.   1B86?

20  A.   Room C closet (box no. 2 in safe).

21  Q.   And 1B88?

22  A.   Room C closet (safe).

23          MS. GHOSH:  Let's go back to 1B78.  Ms. Wechsler, can

24  you put up 1F-1126 and 1F-1170?  And can we also pull up

25  Government Exhibit 16A-25-1.

O675men2                          Glass - Direct

1    Q.  What is this item in 16A-25-1?

2    A.  It is a piece of tape from item 25.

3    Q.  Whose prints did you identify on this piece of tape?

4    A.  Fred Daibes.

5         MS. GHOSH:  Can we please take down 25-1 and put up

6    16A-25-1-1 instead?

7    Q.  What is this item?

8    A.  This is a piece of tape from item 25.

9    Q.  Is this a second piece of tape from the same envelope item

10   25?

11   A.  Yes.

12   Q.  Whose prints were on this piece of tape from the envelope

13   in lab item 25?

14   A.  These were also identified to Fred Daibes.

15   Q.  This has two markings in pink, "P1" and "P2".  Could you

16   explain what those mean?

17   A.  Those are the designators for the specific latent print, so

18   that print on the right is item 25-1-1P1 and the print on the

19   left is item 25-1-1P2.

20   Q.  And is there a distinction between the writing in pink and

21   dark blue that says ID, and then a number, Daibes?

22   A.  The writing in blue indicates to me that this was an

23   identification that I made as the result of an automated search

24   in the database, and what is written in pink is a traditional

25   manual comparison where I placed that next to the physical

O675men2                         Glass - Direct

 1    known card.

 2              MS. GHOSH:  Before we move to a new item,

 3    Ms. Wechsler, could you please pull up Government

 4    Exhibit 16A-25?

 5    Q.  Ms. Glass, what are we looking at in 16A-25?  What item?

 6    A.  This is item 25, the envelope.

 7    Q.  Is this the envelope that the tape that we just looked at

 8    came from?

 9    A.  Yes.

10    Q.  In the photo 16A-25, is the tape still on the envelope?

11    A.  No.

12    Q.  Where had the tape been?

13              MS. GHOSH:  If we could zoom out maybe it would be

14    easier to see.  Thank you?

15    A.  So, just above the writing that appears on there, the word

16    "online", there is a hard line that cuts from the left side to

17    the right, that is the bottom edge of where the tape used to

18    be, and there is that sort of lighter rectangle where the

19    entire piece of tape was removed.

20    Q.  You may be able to mark on your screen with your finger.

21    If you could do that to indicate where you are referring to?

22    A.  So, right above this line there is the bottom of the edge

23    of the tape and the outline right here, if you look over here

24    on the right, you can see the little ridges that come from the

25    edge of the tape.

1    Q.   And so the writing that is visible on this envelope, is

2    that under the tape?

3    A.   Yes.

4    Q.   Looking at this photo here that you have, what do the notes

5    written on here mean?

6    A.   So, when I originally analyzed all of the images in this

7    case, I did claim that latent print there as suitable for

8    comparison, and during my comparison I realized that is

9    actually a print that was already present on the tape, it is

10   from the same touch, and we don't report out the same print

11   twice, so I single-struck and initialed my claiming on that

12   item and then referred you to item 25-1-1P1.

13   Q.   Could you explain what you mean when you say it was from

14   the same touch?

15   A.   So that print that you see on the envelope is the exact

16   same print that is on the underside of the tape and there was a

17   transfer that took place, either from the tape to the envelope

18   or the envelope to the tape.

19   Q.   Based on your experience analyzing prints, what is your

20   assessment about whether the print was likely first left on the

21   tape or on the envelope?

22   A.   I think it is likely it was first left on the tape.  If you

23   look at the print on the envelope, that latent print cuts off

24   exactly at the edge of the tape where it used to be, it doesn't

25   continue on to the rest of the envelope, so that indicates to

1    me that it was likely originally on the tape.

2    Q.  We can take these down and now look at lab item 26, which

3    you read was also listed in 1301 with the location Room C

4    closet (safe).

5            MS. GHOSH:  Ms. Wechsler, can we first go back to 1334

6    for a moment, the chart?

7    Q.  Ms. Glass, what is the description listed for lab item 26

8    or 1B79.

9    A.  The description you said?

10   Q.  Yes, please.

11   A.  The envelope beginning "Fred A. Daibes".

12           MS. GHOSH:  We can take that down.  Ms. Wechsler, can

13   you put up, side by side, Government's Exhibits 1F-1126 and

14   1F-1167?  And Ms. Wechsler can you also pull up Government

15   Exhibit 16A-26?

16   Q.  Ms. Glass, what do we see in Government Exhibit 16A-26?

17   A.  Lab item 26, which is an envelope.

18   Q.  Whose prints did you determine was on this envelope?

19   A.  This was identified to the card with the name "Johnathan

20   Pilot".

21   Q.  Which of Johnathan Pilot's fingers made the prints on this

22   envelope?

23   A.  This was from the left middle finger.

24   Q.  Now let's look at lab item 55, which is also listed in 1301

25   with the location Room C closet (safe).

1          MS. GHOSH:  Ms. Wechsler, can you please put up, side

2     by side, 1F-1126 and 1F-1176?  And could we please zoom in on

3     the envelope in 1176?  Thank you.  Could you please now also

4     put up Government Exhibit 16A-55-1-1?

5     Q.  What is this, Ms. Glass?

6     A.  This is a piece of tape from item 55, which was an

7     envelope.

8     Q.  Whose prints did you identify on the tape in Government

9     Exhibit 16A-55-1-1?

10    A.  Fred Daibes.

11         MS. GHOSH:  Ms. Wechsler, could you please bring up,

12    side by side, 16A-55?

13    Q.  Ms. Glass, how does 16A-55 relate to 16A-55-1-1?

14    A.  55-1-1 was removed from item 55.

15    Q.  And in the photo of the envelope in 16A-55 on the top right

16    of the screen, is the tape still on the envelope in that

17    picture?

18    A.  No.

19    Q.  So the writing that is visible on the envelope, is that

20    writing on the envelope itself?

21    A.  Yes.

22    Q.  Where had the tape been in relation to that writing?

23    A.  The tape had been over the bottom half of the writing about

24    right there.

25         MS. GHOSH:  We can take those down and now let's look

1  at lab item 56, which you read was also listed to the closet

2  (safe) location in 1301.  Can we please put up, side by side,

3  1F-1126 and 1F-1197?  Would you please zoom in on the envelope

4  in 1197?  Now let's put up Government Exhibit 16A-56-1-1,

5  please?

6  Q.  Is this a piece of tape from the envelope that is item 56?

7  A.  Yes.

8  Q.  Whose prints did you identify on this tape?

9  A.  Fred Daibes.

10  Q.  And which finger did this come from, from Mr. Daibes?

11  A.  The right index finger.

12       MS. GHOSH:  We can take those down and let's go back

13  to Government Exhibit 1334.

14  Q.  Ms. Glass, what 1B number is associated with lab items 59,

15  62, and 64?

16  A.  1B90.

17       MS. GHOSH:  Can we please go to Government Exhibit

18  1301, page 7?  What is the location listed in the fourth column

19  for 1B90?

20  A.  Room C (closet).

21       MS. GHOSH:  Ms. Wechsler, could you please put up,

22  side by side, Government's Exhibits 1F-1240 and 1F-1250?  And

23  in 1F-1250, can you please zoom in on the top envelope?  Thank

24  you.  Now let's put up Government Exhibit 16A-59A, please, and

25  could you please enlarge that, Ms. Wechsler?  Thank you.

1    Q.  Ms. Glass, what are we looking at in 16A-59A?

2    A.  This is lab item 59, which is an envelope.

3    Q.  Whose prints did you identify on this envelope?

4    A.  Nader Moussa and Mr. Kougemitros.

5    Q.  During your work on this case, did you learn, generally,

6    who Kougemitros is?

7    A.  I believe he is an FBI agent.

8    Q.  In your experience, does it sometimes happen that agents'

9    prints are found on evidence?

10   A.  Yes.

11   Q.  How often does that happen?

12   A.  It's not uncommon.

13   Q.  Did you also find agent prints on a few other pieces of

14   evidence that you analyzed?

15   A.  Yes.

16   Q.  Were the agent's prints that you found on the tape or the

17   envelope?

18   A.  No.  Well, I'm sorry.  This one was on the envelope.

19   Q.  Were the agent prints ever found on tape?

20   A.  I don't think so.

21   Q.  Would looking at your report help refresh your recollection

22   on that?

23   A.  Yes.

24           THE COURT:  Ladies and gentlemen, while that is being

25   done, why don't I give you your mid-morning break.  We will

O675men2                          Glass - Direct

1    make it 10 minutes.  And because we had a late start, why don't

2    we make this only 10 minutes and we will go to 1:15 so you get

3    more evidence in front of you.

4                 Thank you.  10 minutes, then.

5                 (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O675men2                          Glass - Direct

1              (Jury not present)

2              THE COURT:  You may step down, Ms. Glass, or you may

3    stay there and continue your review.

4              THE WITNESS:  Thank you.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Please be seated in the courtroom.

3            You may continue, Ms. Ghosh.

4            MS. GHOSH:  Thank you, your Honor.

5            THE COURT:  Approximately how much longer do you

6    believe you have?

7            MS. GHOSH:  Perhaps 15, 20 minutes.

8            THE COURT:  All right.  Fine.

9    BY MS. GHOSH:

10   Q.  Ms. Glass, before the break, we were talking about agent

11   prints that you found on some of the items.  Did you ever find

12   agent prints on the tape or only on some envelopes?

13   A.  Only on some envelopes.

14           THE COURT:  Now, when you say agent prints, you're

15   referring to FBI agents, is that correct?

16           THE WITNESS:  Yes.

17           MS. GHOSH:  Ms. Wechsler, you have up on the screen

18   now 59a.  Could you take 59a down and replace it with

19   Government Exhibit 16A-59b, please.

20   Q.  Ms. Glass, how does 59a relate to the item in 59b?

21   A.  This is another image of that envelope.

22   Q.  So the same envelope, but a different part?

23   A.  Yes.

24   Q.  Whose prints did you identify on this part of the envelope,

25   16A-59b?

O67Wmen3                              Glass - Direct

1    A.  Nader Moussa.

2    Q.  And do you see in pink the P4 notation?

3    A.  Yes.

4    Q.  What does that indicate there?

5    A.  That indicates that this is latent print item 59-P4.

6    Q.  Does that indicate that this is the fourth print you found

7    on this item of evidence?

8    A.  Yes.

9              MS. GHOSH:  We can take those down.

10             Now let's turn to item 62.

11             Ms. Wechsler, could you please put up side by side

12   1F-1240 and 1F-1246.  And could you please zoom in on the

13   envelope in 1246.

14         Ms. Wechsler, could you also please bring up Government

15   Exhibit 16A-62-1-1.

16   Q.  What is this item, 62-1-1?

17   A.  This is a piece of tape from item 62.

18             MS. GHOSH:  If we could zoom in a bit on that tape.

19   Q.  Whose prints did you identify on this tape from item 62?

20   A.  Fred Daibes.

21             MS. GHOSH:  Let's turn now to item 64.

22             Ms. Wechsler, could you please take these down and put

23   up side by side Government Exhibits 1F-1240 and 1F-1244.  And

24   could you please zoom in on the envelope.

25             Now let's put up Government Exhibit 16A-64.

1  Q.  What kind of item is item 64 that we see here?

2  A.  An envelope.

3  Q.  Whose prints did you identify on this envelope?

4  A.  Gazmend Lita.

5           MS. GHOSH:  If we could just expand the blowup so that

6  we can see the pink horseshoe underneath.

7           Thank you.

8  Q.  And which finger from Gazmend Lita made this print?

9  A.  This is the ninth finger, or the left ring finger.

10          MS. GHOSH:  Let's take down 1F-1240 for a moment and

11 bring up Government Exhibit 16A-64A.  If we could take down

12 1240 -- that's fine as well.  Leave up 1240 and add 16A-64a,

13 please.

14 Q.  Ms. Glass, in 16A-64a, which is on the top left, what item

15 is this?

16          MS. GHOSH:  Zoom in a bit.

17 A.  Item 64.

18 Q.  Is this the same envelope that we saw a moment ago?

19 A.  Yes.

20 Q.  Is this a photograph from another part of the FBI

21 laboratory?

22 A.  Yes.

23          MS. GHOSH:  Ms. Wechsler, could you please rotate the

24 envelope in 64a 180 degrees, and could you zoom in on the flap

25 of the envelope, please.

1          Thank you.  And are you able to blow that up any more,

2     Ms. Wechsler?

3          Maybe zoom out.  It's a little blurry when it's blown

4     up like that.

5     Q.  Ms. Glass, could you read the scribbled-out text in blue

6     ink on the flap of this envelope?

7     A.  It says Gus.

8          MS. GHOSH:  We can take all of those down, and let's

9     go back to the chart, Government Exhibit 1334.

10    Q.  What 1B number is associated with lab items 92 and 94

11    through 99?

12    A.  1B94.

13         MS. GHOSH:  Let's take item 94.

14         Ms. Wechsler, could you bring up the lab report that's

15    in evidence as Government Exhibit 16A-1 and go to the top of

16    page 7, please.

17    Q.  Ms. Glass, could you please read the description of item

18    94?

19    A.  "Envelope beginning 'use quick pay' from 50 Grand Avenue,

20    box 13."

21         MS. GHOSH:  Thank you.

22         Ms. Wechsler, could you please bring up Government

23    Exhibit 1D134.  And now let's bring up next to that Government

24    Exhibit 16A-94-1-1, please.

25    Q.  What is this item?

O67Wmen3                         Glass - Direct

1    A.   This is a piece of tape from item 94.

2    Q.   Whose prints did you identify on this piece of tape?

3    A.   Nadine Arslanian.

4           MS. GHOSH:   We can take that one down.  And now let's

5    bring up instead Government Exhibit 16A-95-1-4, please.

6    Q.   Is this tape from another envelope that's listed as part of

7    1B94?

8    A.   Yes.  This was from item 95.

9    Q.   Whose prints did you identify on this tape?

10   A.   Nadine Arslanian.

11   Q.   We won't look at everything, but did you also identify a

12   few other prints belonging to Nadine Arslanian on envelopes or

13   tape?

14   A.   Yes.

15   Q.   Are those all listed in your chart, Government Exhibit

16   1334?

17   A.   Yes.

18   Q.   Now, were there any prints that you identified for Nadine

19   Arslanian that were not on items from 1B94?

20   A.   No.

21          MS. GHOSH:   We can take down 16A-95-1-4.  And let's

22   put up instead 16A-96-1.

23   Q.   Is this tape from another envelope item in 1B94?

24   A.   Yes.  This is from item 96.

25   Q.   Whose prints did you identify on this tape from item 96?

1    A.  Fred Daibes.

2    Q.  And how many prints did you identify for Fred Daibes on

3    this tape?

4    A.  Two.

5           MS. GHOSH:  Let's replace 96-1 with a new photo,

6    16A-97-1, please.

7    Q.  Is this tape from another envelope item in 1B94?

8    A.  Yes, this is from item 97.

9    Q.  Whose prints did you identify on this tape?

10   A.  Fred Daibes.

11   Q.  How many prints from Fred Daibes did you identify on this

12   tape from item 97?

13   A.  Two.

14          MS. GHOSH:  We can take that one down, and let's put

15   up 16A-99.

16   Q.  Which item number is this?

17   A.  Item 99.

18   Q.  And is this an envelope from 1B94?

19   A.  Yes.

20   Q.  Whose prints did you identify on this envelope?

21   A.  Fred Daibes.

22          MS. GHOSH:  Ms. Wechsler, could you please put up as

23   well Government Exhibit 16A-99-1-1.  And could you zoom in on

24   the top portion of that so we can see the top more clearly.

25   Q.  Ms. Glass, in Government Exhibit 16A-99-1-1, what does POS

1   question mark mean on it?

2   A.   POS stands for position.   When I originally analyzed this

3   latent print, I drew my claiming mark in what I thought was the

4   most likely orientation, but I recognized that it was possible

5   it may be in another orientation.   So we will designate that by

6   writing POS with a question mark, and then we will compare this

7   in multiple positions.

8   Q.   And what did you later decide the correct position was?

9   A.   The correct orientation is in line with the blue claiming

10  mark that you see that's pointing down towards the bottom.

11  Q.   Notwithstanding this change in position, were you still

12  able to identify this print?

13  A.   Yes.

14  Q.   Whose print is it?

15  A.   Fred Daibes.

16       MS. GHOSH:   We can take down all of those, please.

17       Let's bring back up Government Exhibit 1334.

18  Q.   Finally, I'd like to turn to item 54 in the chart.   Do you

19  see the row for item 54?

20  A.   Yes.

21  Q.   Which 1B number is item 54?

22  A.   1B84.

23       MS. GHOSH:   Ms. Wechsler, could you please bring back

24  up Government Exhibit 1301 and go to page 6.

25  Q.   Ms. Glass, could you please read the fourth column,

O67Wmen3                              Glass - Direct

1    location, for 1B84?

2    A.   "Room C (closet) safe."

3              MS. GHOSH:  Ms. Wechsler, could you please bring up

4    side by side Government Exhibits 1F-1126 and 1F-1179.  And

5    could you please zoom in on the envelope in 1179.

6              Now let's bring up on top of that two exhibits:

7    16A-54-1 and 16A-54-1-1.

8    Q.   What are these two items on top?

9    A.   These are pieces of tape from item 54.

10   Q.   Whose prints did you identify on these two pieces of tape?

11   A.   Fred Daibes.

12   Q.   Which of Daibes's fingers made these prints?

13   A.   The print on the left is the No. 7 finger, which is your

14   left index.  And the print on the right is the No. 2 finger,

15   which is the right index.

16             MS. GHOSH:  Ms. Wechsler, let's take down the top two

17   photos, exhibits 54-1 and 54-1-1, and put up Government Exhibit

18   16A-54C.

19             Thank you.  And could you please zoom in.

20   Q.   Ms. Glass, what item is this?

21   A.   This is item 54.

22   Q.   And is this an envelope?

23   A.   Yes.

24   Q.   Whose prints did you identify on this envelope?

25   A.   Robert Menendez.

O67Wmen3                          Glass - Direct

1    Q.  How many of Menendez's prints are on this envelope?

2    A.  Two.

3    Q.  Are both the light blue and the dark blue identifications

4    yours?

5    A.  Yes.

6          MS. GHOSH:  Ms. Wechsler, let's take down 1126 and

7    bring up Government Exhibit 16A-54-1, which we just looked at.

8    Q.  Ms. Glass, how, if at all, does the envelope in 54C on top

9    of the screen with Menendez's prints relate to the tape in 54-1

10   with Daibes's print?

11   A.  The tape was removed from that envelope.

12         MS. GHOSH:  Ms. Wechsler, let's take down 16A-54-1 and

13   put up instead 16A-54-1-1.

14   Q.  Ms. Glass, how, if at all, does the envelope in 54C with

15   Menendez's prints relate to the tape in 54-1-1 with Daibes's

16   print?

17   A.  That piece of tape was also removed from that envelope.

18   Q.  Now, on all the prints we just looked at which were on

19   pieces of tape, was the print you found on the sticky side or

20   the smooth side of the tape?

21   A.  It was found on the sticky side.

22   Q.  And is that the side of the tape that was pressed against

23   the envelope?

24   A.  Yes.

25   Q.  Focusing on the items on which you identified Fred Daibes's

O67Wmen3                          Glass - Cross

1   prints, were Daibes's prints always on at least the tape?

2   A.  Yes.

3   Q.  And in one instance, was it also on both the tape and the

4   envelope?

5   A.  Yes.

6   Q.  Were the prints of Robert Menendez ever on the sticky side

7   of the tape or only on the envelopes?

8   A.  Only on the envelopes.

9           MS. GHOSH:  No further questions.

10          THE COURT:  Is there cross-examination, sir?

11          MR. FEE:  Yes, your Honor.

12          THE COURT:  Your witness.

13  CROSS-EXAMINATION

14  BY MR. FEE:

15  Q.  Hi, Ms. Glass.

16  A.  Good morning.

17  Q.  My first question is a follow-up.  What drugs make your

18  fingerprints glow in the dark?

19  A.  I don't know specifically.  I just know that there are some

20  drugs that may cause your sweat to fluoresce when you leave

21  behind a latent print.

22  Q.  Thank you.

23      How do known prints, the things to which you compare latent

24  prints -- that was known prints?

25  A.  Yes.

O67Wmen3                          Glass - Cross

1    Q.  How does a known print enter FBI records?

2    A.  Known prints are typically taken for either civil or

3    criminal purposes, and then they're retained by our criminal

4    justice information services division.  I don't know how they

5    ingest them into the system.

6    Q.  So, like, if somebody's charged with a crime, somehow their

7    known prints enter your FBI record system, is that what you're

8    saying?

9              MS. GHOSH:  Objection.

10   BY MR. FEE:

11   Q.  To your knowledge.

12             THE COURT:  I'll allow it.

13   A.  They could end up in the system from that, yes.

14   Q.  Is that the same with DNA?

15             MS. GHOSH:  Objection.

16             THE COURT:  Sustained.

17   BY MR. FEE:

18   Q.  During your direct exam -- let's put up that chart, GX

19   1334.  This is what you used, obviously, during your direct.

20   This doesn't list, as you said, all the fingerprints that you

21   identified during the tests you conducted, correct?

22   A.  Yes.

23   Q.  And again, who made the decisions about what things to put

24   on this chart?

25   A.  The prosecutor.

O67Wmen3                              Glass - Cross

1    Q.  Who decided to put Robert Menendez in red?

2    A.  The -- I -- I only reviewed it for accuracy.  I didn't put

3    any of it together.

4    Q.  So the red, Robert Menendez, and the green, Aristotelis

5    Kougemitros, doesn't mean anything to you?

6    A.  No.

7    Q.  This one item that is Kougemitros, you said he was an FBI

8    agent, right?

9    A.  Yes.

10   Q.  And have you come to learn that he participated in the

11   search of Nadine Arslanian's house in this case?

12             MS. GHOSH:  Objection.  Assumes a fact.

13             THE COURT:  Yes.

14             Do you know anything about Agent Kougemitros?

15             THE WITNESS:  No.

16             THE COURT:  Next question.

17   BY MR. FEE:

18   Q.  Well, you know he's an FBI employee?

19   A.  Yes.

20   Q.  Did you know that when you started to test these items?

21   A.  No.

22   Q.  How did you learn it?

23   A.  His identification was made with the assistance of the

24   automated database, so I wasn't aware of who he was until the

25   results were communicated to the contributor.

O67Wmen3                          Glass - Cross

1    Q.  The contributor is what?

2    A.  In this case I spoke with the agent that submitted the

3    evidence.

4    Q.  The agent that submitted the evidence, that's the

5    contributor?

6    A.  Yes.

7    Q.  Do you remember which agent that was?

8    A.  It was Agent Ryan Larkin.

9    Q.  Are you aware of his role in this case that's happening

10   here?

11              MS. GHOSH:  Objection.

12              THE COURT:  I'll allow it.

13   A.  I only know that he facilitated getting the evidence to the

14   laboratory.

15   Q.  And you said Agent Larkin, or the contributor -- was it

16   just Agent Larkin, or were there others that you're referring

17   to as the contributor?

18   A.  In this particular case, he's the only one that I spoke

19   with.

20   Q.  Got it.

21       So you said Agent Larkin and something called the EMU,

22   evidence management unit, made the decisions about what should

23   be tested and what should not be tested, correct?

24              MS. GHOSH:  Objection.

25              THE COURT:  I'll allow it.

1    A.  The evidence management unit just determines which evidence

2    is able to be tested by which units based on what their

3    acceptance policies are and then they facilitate how it moves

4    through the building.  And in that process there may be

5    conversations about what's accepted, what isn't, what's best

6    and what isn't.

7    Q.  So, as you understand it, having done this many times, the

8    evidence management unit of the FBI has, like, a set of rules

9    of what could be tested, is that fair to say?

10   A.  They have guidance on what the specific units may take for

11   testing.

12   Q.  And then the FBI makes up those rules, right; it's not like

13   a federal law, as you understand it?

14          MS. GHOSH:  Objection.

15          THE COURT:  I'll allow it.  She may have an

16   understanding.

17          Where do those rules come from?

18          THE WITNESS:  Each unit in our laboratory has their

19   own acceptance procedures and things that they will take for

20   testing, and that's based on their experience and the needs of

21   each case.

22   BY MR. FEE:

23   Q.  OK.  So they have rules, but the contributor, the FBI is

24   the one that suggests things to test, correct?

25          MS. GHOSH:  Objection.

O67Wmen3                              Glass - Cross

 1                 THE COURT:  Does the FBI suggest to you what to test?

 2                 THE WITNESS:  We -- we simply receive the evidence

 3      that they're wanting us to test.

 4                 THE COURT:  OK.

 5                 THE WITNESS:  And then we can determine whether or not

 6      it's something we're going to accept.

 7                 THE COURT:  But you're not aware of any suggestion by

 8      anybody.

 9                 THE WITNESS:  No.

10                 THE COURT:  OK.

11      BY MR. FEE:

12      Q.  Well, if it's not given to you by the FBI, it will not be

13      tested, correct?

14      A.  We can only test what we receive.

15      Q.  So you have one here from Nader Moussa -- I'm sorry, that

16      lists identified prints for Nader Moussa and Aristotelis

17      Kougemitros, Agent Kougemitros, correct, just one on this

18      chart?

19      A.  Yes.

20                 MR. FEE:  Can we put that up, Government Exhibit

21      16A-59a, please, Mr. Kelly, if you have it.

22      Q.  Based on what you testified to on direct, Ms. Glass, you

23      have Moussa touching it and Kougemitros touching it?

24      A.  Yes.

25      Q.  And this does not mean that they touched it at the same

O67Wmen3                              Glass - Cross

1   time, correct?

2   A.  No.

3   Q.  In fact, you have no idea who touched it first, right?

4   A.  Correct.

5   Q.  You have no idea if they did touch it at the same time,

6   right?

7   A.  No.

8   Q.  Do you know if those two men were ever in the same room at

9   the same time?

10  A.  I have no idea.

11  Q.  No idea.

12         This was not the only thing on which you found Agent

13  Kougemitros's print, correct?

14  A.  Correct.

15         MR. FEE:  You can put that down.

16  Q.  You found nine latent prints from Agent Kougemitros on

17  items submitted by the FBI for testing, correct?

18  A.  Can I look at my report?

19  Q.  Of course.  Please.

20  A.  He was identified six times.

21         MR. FEE:  Can we look at --

22  Q.  Do you remember making a note that said he was identified

23  on nine separate latent prints?  Do you remember making a

24  report that indicated that for Agent Kougemitros?

25  A.  No.

1          MR. FEE:  OK.  Let's just show the witness and the

2     lawyers what's been marked for identification as 3514-002, page

3     8.

4     Q.  OK.  Don't say anything yet, Ms. Glass.  Just look at that

5     and count the number of times you see, and then I'm going to

6     show you one more thing.

7     A.  Count the number of times I see?

8     Q.  The question I posed was if you remember indicating that

9     Agent Kougemitros showed up on nine items.  So I don't want you

10    to testify about anything yet.  I just want you to look at the

11    two things I'm showing you.

12    A.  OK.

13    Q.  OK?  And I want you to think about the question I posed as

14    you look at it.  Let me know when you have had a chance to

15    look.

16    A.  I'm good.

17         MR. FEE:  OK.  Let's put up the next item, 3514-004.

18         Mr. Gross, can you tell him the page.  Keep going.

19    Keep going.

20         THE WITNESS:  My apologies.  This was a separate

21    report.

22         MR. FEE:  Yeah, yeah.  So it sounds like -- is it true

23    that --

24    Q.  Is it correct that you have had your recollection

25    refreshed?

O67Wmen3                          Glass - Cross

1          THE COURT:  Having looked at these documents, do you

2   now have a refreshed recollection as to whether or not you made

3   a note that said Kougemitros was identified on nine separate

4   items?  Yes or no.

5          MR. FEE:  I'm sorry.  Nine prints, your Honor.

6          THE COURT:  Nine prints.

7          MR. FEE:  Yes.

8          THE COURT:  I'm sorry.

9          THE WITNESS:  There are nine prints in total that he

10  was identified to.

11  BY MR. FEE:

12  Q.  And you identified nine prints for the agent on five items,

13  if you remember?

14  A.  Yes.

15  Q.  OK.  So I guess that means some of the items had more than

16  one print --

17  A.  Yes.

18  Q.  -- of Agent Kougemitros, right?

19  A.  Correct.

20  Q.  It would not be possible, in your experience and your

21  expert opinion, for the agent to leave prints on those items if

22  he was wearing gloves when he was in contact with the items,

23  correct?

24  A.  It is possible to leave prints through latex and nitrile

25  gloves.  But I would not expect that to be the case.

O67Wmen3                          Glass - Cross

1   Q.  And then there were other FBI employees whose prints you

2   identified in your work on this case, right?

3   A.  I believe that's correct, yes.

4   Q.  There was a person named Alexander Visiliades, does that

5   ring a bell?

6   A.  Yes.

7   Q.  And then another FBI employee named Rasul Chew?

8   A.  Yes.

9   Q.  And your testimony was that it's not uncommon that that

10  happens, that FBI agents leave their prints on items recovered

11  or items presented to you for testing, correct?

12  A.  Yes.

13  Q.  And the reason it is not uncommon is because fingerprints

14  can be left on items somewhat randomly, fair to say?

15          MS. GHOSH:  Objection.

16          THE COURT:  Sustained.

17  BY MR. FEE:

18  Q.  You used the phrase --

19          THE COURT:  Why is it not uncommon to have FBI prints

20  on items that you are testing?  If you know.

21          THE WITNESS:  I mean all I can say is that we do come

22  across it from time to time.  Occasionally it's cases that

23  involve drug buys, where they're not able to wear gloves at the

24  time.  But beyond that, I'm not there when they collect it.  I

25  just know that we do on occasion run across developing

O67Wmen3                              Glass - Cross

1   fingerprints on their items.

2   BY MR. FEE:

3   Q.  I think I heard you use the phrase "chance recording."  Is

4   that correct?

5   A.  Yes.

6   Q.  What does chance recording mean in your work?

7   A.  It simply means that you're not going to leave a latent

8   print behind just because you touched something.

9   Q.  So chance implies some degree of uncertainty or randomness,

10  correct?

11          MS. GHOSH:  Objection.

12          THE COURT:  Sustained.

13  BY MR. FEE:

14  Q.  Could you please define chance, as you understand it?

15  A.  It just means that when you pick up an item there is a

16  chance that when your skin comes in contact with it, that you

17  may leave something behind.

18  Q.  Are you able to predict with any certainty when someone

19  will leave a print after touching an item?

20  A.  No.

21  Q.  Would that indicate to you that it is random?

22          MS. GHOSH:  Objection.

23          THE COURT:  I'll let her answer that.

24  A.  I would just say it's -- there's a chance you would leave

25  it behind.  I don't -- I don't know that that's the scientific

O67Wmen3                              Glass - Cross

1    definition of random.

2              MR. FEE:  Fair enough.

3              THE COURT:  I take it the chances of it being left

4    behind increase according to the factors that you already

5    testified to, I think the porous nature of the material, the

6    oily nature of the skin, things of that nature.  Is that

7    correct?

8              THE WITNESS:  Yes.

9    BY MR. FEE:

10   Q.  In connection with that testimony, you said that there are

11   some things that provide a higher probability of leaving a

12   print, some materials that leave a higher probability of

13   yielding a print, is that correct?

14   A.  There are some materials that we find latent prints are

15   more protected, those being, like, porous items, where they're

16   absorbed versus a surface where it could be wiped off.

17   Q.  And I think you said paper was actually -- which category

18   does paper fall into?

19   A.  Paper is a porous item.

20   Q.  Sorry.  I wasn't good in science.  Which way does that go?

21   A.  Porous means --

22   Q.  Is it more likely to leave a print?

23       Sorry to speak over you.

24   A.  Porous means the latent print is going to be absorbed into

25   that item so it's more protected than on a nonporous item.

1  Q.  OK.  Which means you are more likely to find a print?

2  A.  We --

3          MS. GHOSH:  Objection.

4          THE COURT:  Does that mean you're more likely to find

5  a print on a porous item than on a nonporous item?

6          THE WITNESS:  No.

7  BY MR. FEE:

8  Q.  The other way?

9  A.  It could be either.  I mean we do find that paper can be

10  more productive, but we get a fair amount of prints on

11  nonporous surfaces as well.

12          THE COURT:  Are you saying protective or productive?

13          THE WITNESS:  Both.

14          THE COURT:  Both.  All right.

15  BY MR. FEE:

16  Q.  So an example of paper is a Post-it note?

17  A.  Yes.

18          MR. FEE:  Can we put up an exhibit you were shown a

19  number of times, GX 1F-1275, please, Mr. Kelly.  And can we

20  zoom in on the right side, the money.

21  Q.  Do you remember being shown this a number of times?

22  A.  Yes.

23  Q.  This thing that I'm circling on the money, do you recognize

24  that to be some kind of what appears to be paper note?

25  A.  Yes.  It's a small piece of paper.

1    Q.  And you tested some notes in this case that were similar in

2    appearance to that, correct?

3    A.  Yes.

4    Q.  And none of those notes yielded any prints, any identified

5    prints, correct?

6    A.  I would have to look at my report.

7    Q.  Go ahead.

8    A.  None of those prints were identified.

9    Q.  Got it.

10        Just to refresh, the question was from the Post-it notes

11   you tested, you did not identify any -- you did not --

12            THE COURT:  Just a moment.  Are you saying that those

13   are Post-it notes?

14            THE WITNESS:  The -- well, some of them are Post-its.

15   Some of them were not.

16            THE COURT:  OK.

17            THE WITNESS:  On the small pieces of paper of what was

18   developed, they were not identified.

19   BY MR. FEE:

20   Q.  Got it.  So no identified fingerprints on any of those

21   Post-its or small pieces of paper?

22   A.  Correct.

23   Q.  From your work?

24   A.  Correct.

25   Q.  You did not test all of them, correct, all of the small

O67Wmen3                          Glass - Cross

1    pieces of paper?  Do you know?

2    A.  I know I tested what I received.  I don't know if there

3    were pieces that I did not receive.

4    Q.  I'm sorry.  Obviously.

5          Just so I understand the product of the work, you, as

6    an expert, cannot offer any opinion about who did or did not

7    touch any of those small pieces of paper that you tested in

8    this case, correct?

9    A.  All I can say is that either I didn't detect anything or I

10   didn't identify what was detected.

11   Q.  And so the answer here is you didn't detect anything?

12   A.  There was one -- there was one that had one print that was

13   not identified.  The remaining pieces of paper that I had did

14   not have any latent prints detected.

15   Q.  Got it.

16         And if you don't test an item, you can't offer any opinion

17   about who might have touched that item, correct?

18   A.  Correct.

19   Q.  You were shown, on direct, several pictures with cash in

20   it, right?

21   A.  Yes.

22   Q.  You did not test a single bill in this case, correct?

23   A.  I did not receive any paper money.

24   Q.  As an expert, the only way you could offer an opinion about

25   who touched money is if you tested it, correct?

1              MS. GHOSH:  Objection.

2              THE COURT:  Sustained.

3    BY MR. FEE:

4    Q.  Can you offer an opinion about an item you do not test?

5    A.  No.

6    Q.  And you were not given any cash to test in this case,

7    correct?

8    A.  Correct.

9    Q.  If you were given cash, you might be able to offer an

10   opinion about who touched it, right?

11   A.  Correct.

12   Q.  But we talked about the limits of fingerprints, fair to

13   say, what they can determine, what they cannot determine?

14             THE COURT:  Not a question.  Proceed.

15   BY MR. FEE:

16   Q.  So you can't tell when; we talked about that, right?

17   A.  Correct.

18   Q.  Meaning if I have a piece of paper, I touch it and I leave

19   it on the table and then you touch it, if you test it, you

20   can't tell that I touched it first and you touched it second,

21   right?

22   A.  Correct.

23   Q.  You also can't tell where, right?  Meaning if I am holding

24   it here, this book, and I walk it up to you and leave it on the

25   bench in front of you and then you test it, you can't tell that

1    I applied my fingerprint over here, correct?

2    A.  Unless I witnessed you do that, no.

3    Q.  That's a better answer.

4        Apart from seeing me do it, you can't tell just from the

5    fingerprint examinations you conducted?

6    A.  Correct.

7    Q.  You also can't tell -- this is obvious -- why a fingerprint

8    was put on an item, right?

9    A.  Correct.

10   Q.  You can't tell that I was giving you this book as a gift,

11   for example, correct?

12            MS. GHOSH:  Objection.

13            THE COURT:  Sustained.

14   BY MR. FEE:

15   Q.  OK.  Let's talk about something that happened in this case.

16            MS. GHOSH:  Objection.

17            THE COURT:  Sustained.  The jury will, as always,

18   disregard the comments.

19            What's your question, sir?

20   BY MR. FEE:

21   Q.  Most of the fingerprint analysis you did in this case was

22   completed by around, at some point in 2023, right?

23   A.  I believe so.

24   Q.  Except not everything, right; you did some more fingerprint

25   analysis very recently?  Correct?

1    A.  For evidence in this case?

2    Q.  Yes.

3    A.  I recently received some known -- known 10-print

4    recordings.

5    Q.  Can you just explain to me what happened in 2024 in this

6    case with respect to fingerprint analysis?

7    A.  All I --

8    Q.  What is that finger referring to right there?

9    A.  The report?

10   Q.  No, no.  You just said you recently received some new

11   information?

12   A.  I received known finger recordings, so a known 10-print

13   card.

14   Q.  OK.

15   A.  For some of the individuals related to this case.

16   Q.  OK.  So what happened?  You received a new known

17   fingerprint.  What did you do?

18              MS. GHOSH:  Objection.

19              THE COURT:  Yes.  Sustained.

20              Just a moment.  You received known 10 print, one or

21   more known 10-print cards in 2024, correct?

22              THE WITNESS:  Yes.

23              THE COURT:  What did you do with them, if anything?

24              THE WITNESS:  They were used to compare to the known

25   records I had already seen in this case.

O67Wmen3                          Glass - Cross

1    BY MR. FEE:

2    Q.  OK.  And in fact, you found that this person was known by

3    the name Yanik Fenton-Espinosa, correct?

4    A.  Oh, yes.

5    Q.  Right.  And that her print was identified from an item

6    taken from 41 Jane Drive, according to your reports, correct?

7           MS. GHOSH:  Objection.  I believe the witness and

8    Mr. Fee are talking about two different things.  I think it

9    should just be cleared up.

10          THE COURT:  All right.

11          MS. GHOSH:  Ms. Glass was referring to 10-print cards,

12   and Mr. Fee is referring to a single print.

13   BY MR. FEE:

14   Q.  Why don't you clear it up for me, Ms. Glass, please.

15   A.  So, as a part of our routine case work, anything that we

16   search in the automated database is entered into what we call

17   the unsolved latent file, and the unsolved latent file is

18   continuously searched against new records that might be added

19   to the system.

20   Q.  So recently you got a hit that this person,

21   Ms. Fenton-Espinosa, had a print on an item tested in this

22   case, correct?

23   A.  Yes.  We received a notification that there was an unsolved

24   latent match, so we then pulled the information for that.  I

25   made the identification, and then we issued an additional email

O67Wmen3                          Glass - Cross

1   with that information.

2                MR. FEE:  Got it.

3                THE COURT:  Let me see if I understand it.  This

4   automated system is constantly putting into it new fingerprint

5   information, correct?

6                THE WITNESS:  Yes.

7                THE COURT:  And it showed -- again, if I understand

8   you correctly -- that new information was -- that a print that

9   you had not been able to identify was, in fact, now identified,

10  is that it?

11               THE WITNESS:  Yes.  This person had a standard

12  10-print card that was enrolled --

13               THE COURT:  Standard 10-print card.  Go ahead.

14               THE WITNESS:  That was enrolled into the database,

15  which was then cascaded against the unsolved latent file, which

16  resulted in this additional identification.

17               THE COURT:  I see.  OK.

18  BY MR. FEE:

19  Q.  And so you obviously have no idea why her prints came into

20  this system now; that's not what you did?

21  A.  No.

22  Q.  Are you aware, or did the contributors tell you, that

23  Ms. Fenton-Espinosa is currently a Zumba --

24               MS. GHOSH:  Objection.

25  BY MR. FEE:

O67Wmen3                              Glass - Cross

1   Q.  -- instructor in Miami --

2              MR. RICHENTHAL:  Your Honor --

3              MS. GHOSH:  Objection.

4   BY MR. FEE:

5   Q.  -- and who used to work for a Florida Congressperson?

6              THE COURT:  Sustained.

7   BY MR. FEE:

8   Q.  Well, did the contributors tell you --

9              MS. GHOSH:  Objection.

10  BY MR. FEE:

11  Q.  -- who Ms. Fenton-Espinosa is?

12             THE COURT:  Just a moment.

13             Were you informed who Ms. Fenton-Espinosa is?

14             THE WITNESS:  No.

15  BY MR. FEE:

16  Q.  And again, you have no idea -- I'm sorry.

17      Her fingerprints --

18             THE COURT:  Remember, ladies and gentlemen, questions

19  not answered are not evidence.

20  BY MR. FEE:

21  Q.  Her fingerprints were found on item 79, which was an

22  envelope.  Do you remember that?

23  A.  Do you mind if I look at my report?

24  Q.  Please, go for it.  I think it's dated May 16 of '24.

25  A.  Yes.  Item 79 is an envelope.

1    Q.  OK.  And again, you had no ability to determine from your

2    work whether that envelope originated in a Congressperson's

3    office in D.C. and was then sent or delivered to New Jersey,

4    correct?

5              MS. GHOSH:  Objection.

6              THE COURT:  Sustained.

7              Do you know anything about where any of these

8    materials originated?

9              THE WITNESS:  No.

10   BY MR. FEE:

11   Q.  It's fair to say, though, based on your opinion as an

12   expert, that the results of your analysis do not indicate that

13   Ms. Fenton-Espinosa necessarily visited the location where the

14   item was recovered, correct?

15             THE COURT:  Sustained.  Rephrase it.

16   BY MR. FEE:

17   Q.  Are you able to determine where the print for

18   Ms. Fenton-Espinosa was applied in terms of location in the

19   world?

20   A.  No.  I can only say that at some point she came into

21   contact with it.

22             MR. FEE:  Thank you.

23   Q.  And just to follow up what you just said, is it fair to

24   characterize the work you do as being able to indicate that at

25   some point in time, at some location, for some reason, the

O67Wmen3                          Glass - Cross

 1  person touched the item?

 2  A.  Yes.

 3  Q.  And that's not necessarily always a 100 percent certainty,

 4  that the person touched the item, because sometimes prints can

 5  be transferred, is that correct?

 6  A.  It is possible for one -- for a print to transfer from one

 7  item to another.

 8  Q.  OK.  Unlikely, but it happens?

 9  A.  Yes.

10  Q.  And it's also not a 100 percent certainty because

11  sometimes, very rarely, prints can be misidentified by an

12  examiner, correct?

13  A.  It is possible that things could be misidentified.  But we

14  do have quality assurance procedures in place to minimize that

15  risk.

16  Q.  And you said it only happened once in your long career?

17  A.  Yes.

18  Q.  And just so I understand the quality assurance, it's not

19  like your work is checked against a computer's work, correct?

20  A.  Correct.

21  Q.  It's just another examiner takes the same pair -- one

22  latent, one known -- and does that comparison again, is that

23  right?  Is that how accuracy is checked?

24  A.  They are provided with an image of the latent print that we

25  used and the 10-print card that we identified it with.

O67Wmen3                          Glass - Cross

1   Q.  OK.  And that's another, in your work, another FBI employee

2   who does what you just described, correct?

3   A.  Yes.

4   Q.  And that's how accuracy is tested?

5   A.  That is how we ensure proper quality assurance.

6   Q.  Understood.

7       And again, based on what you testified to in the direct,

8   you have no role and no understanding of the evidentiary

9   importance of any of the items you tested, correct?

10  A.  Correct.

11  Q.  I could tell you to test the table at which the prosecutors

12  are sitting and you could find all of their prints there, but

13  you would not be able to offer any view about whether that was

14  important from an evidentiary perspective, correct?

15          THE COURT:  Sustained.

16  BY MR. FEE:

17  Q.  In your experience and in your opinion as an expert, is it

18  likely -- let me rephrase that.

19      In your opinion, is it likely to find someone's prints on

20  items in their home?

21  A.  I would think so, yes.

22  Q.  But even that is, of course, not a 100 percent certainty,

23  that you will find the resident's prints on items in their

24  home, correct?

25  A.  Correct.

O67Wmen3                        Glass - Cross

1    Q.  And in fact, can you tell me in this case the items you

2    identified as bearing prints of the person you called Nadine

3    Arslanian, were any of them recovered, based on your files and

4    your reports, from the location 41 Jane Drive?

5    A.  I would have to look at my report.

6    Q.  Please go ahead.

7    A.  That does not appear in the description of the items that

8    she was identified on.

9    Q.  So you did not identify anything taken from 41 Jane Drive

10   that had an identified print for the person named Nadine

11   Arslanian in your work?

12             MS. GHOSH:  Objection.

13             THE COURT:  Sustained.

14   BY MR. FEE:

15   Q.  Just so I understand, were any of the items identified as

16   being touched by Nadine Arslanian taken from 41 Jane Drive?

17             MS. GHOSH:  Objection.

18             THE COURT:  Sustained.

19   BY MR. FEE:

20   Q.  Can you tell me the location of the items where Nadine

21   Arslanian's fingerprints were found?

22   A.  I can tell you based on the description that's in the

23   report.

24   Q.  Of course, of course.  I know you didn't have any role

25   there.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    THE COURT:  Where were the items found that had Nadine

2  Arslanian's prints, according to your records?

3    THE WITNESS:  50 Grand Avenue, box 13.

4  BY MR. FEE:

5  Q.  Your files indicate box 13?

6  A.  That's what's in the description in my report.

7  Q.  Got it.

8    And I believe you testified on direct that cash, in your

9  experience, may not be ideal, but it can yield prints, correct?

10  A.  Yes.

11  Q.  And gold, you said, can yield prints, correct?

12    MS. GHOSH:  Objection.

13    THE COURT:  Yes.  Rephrase it.

14  BY MR. FEE:

15  Q.  Can gold yield prints?

16  A.  In theory, it's possible to test anything for prints.  I

17  haven't received a lot of gold in my career, but the gold that

18  I did have, I was not surprised when nothing was detected.

19  Q.  Got it.

20    So the first thing you said was it can yield prints --

21  gold?

22  A.  In theory.

23  Q.  And in fact, you did test one piece of gold -- and only one

24  piece of gold -- in this case, right?

25  A.  I have multiple pieces of gold, but the majority of it was

1    in packaging.  I had one gold bar that was on its own without

2    any outer packaging.

3    Q.  You tested that one gold bar, and it did not yield any

4    prints?

5    A.  Correct.

6    Q.  And then one of the gold bars was in a plastic bag, right?

7            MS. GHOSH:  Objection.

8            THE COURT:  I'll allow it.

9    A.  That's the -- I believe that's the same gold bar.

10   Q.  Got it.  Thank you.

11       And that bag had Agent Kougemitros's prints on it?

12   A.  Yes.

13   Q.  In your work as a print examiner for the FBI, have you

14   previously seen investigators ask you to print surfaces in a

15   residence?

16   A.  Like, if I were going to go to a scene?

17   Q.  Or anyone go to a scene and do printing there, can that

18   happen?

19           THE COURT:  No.  I'm sorry.  I don't know whether

20   you're asking about her or others, so clarify.

21           MR. FEE:  Sure.

22   Q.  You first.  Have you ever been asked to go to a scene and

23   take prints from a scene?

24   A.  No.

25   Q.  Have you worked on any cases where prints were taken from a

1    scene and brought back to your lab?

2    A.  We routinely get what we call latent lifts, which are when

3    surfaces are treated with fingerprint powder -- latent prints

4    that can be powdered at the scene, and then they're lifted with

5    something adhesive, like a piece of tape, and then applied to a

6    backing card.

7    Q.  You said you get those routinely, but just to be clear, not

8    in this case?

9    A.  Correct.

10            MR. FEE:  Let's put up Government Exhibit --

11            THE COURT:  If you would lower the mike toward your

12   mouth -- it's very directional -- that will help.

13            OK.

14            MR. FEE:  -- 1F-1126, Mr. Kelly.

15   Q.  You were shown this -- you remember being shown this image

16   on direct, right?

17   A.  Yup.

18   Q.  And again, you have no idea what this is or how it got in

19   this condition, correct?

20   A.  Correct.

21   Q.  You testified on direct, though, that certain surfaces can

22   yield prints, right?

23   A.  Yes.

24   Q.  Plastic?

25   A.  Possible.

O67Wmen3                          Glass - Cross

1    Q.  Possible.

2         Metal?

3    A.  Possible.

4    Q.  That's all I can think of -- glass?

5    A.  Glass is possible.

6    Q.  Possible?

7              This item that you were shown on direct, you're

8    unaware of being asked to review any latent lifts from this

9    thing that looks like a safe, correct?

10             MS. GHOSH:  Objection.

11             THE COURT:  If she knows.

12   A.  I didn't --

13             THE COURT:  Were you asked to review any latent lifts

14   involved in this matter?

15             THE WITNESS:  No.

16             THE COURT:  All right.

17   BY MR. FEE:

18   Q.  And your file has a number of items, if you recall, that

19   indicate they were taken from a safe, correct?

20   A.  I -- if that's in the evidence description, I believe so.

21   Q.  Yeah, you can --

22   A.  Yeah.

23   Q.  Do you remember?  You're welcome to look.

24   A.  No.

25   Q.  You remember, though, the word "safe" appearing in the

1    evidence description?

2    A.   Yes.

3    Q.   You, sitting here today, cannot offer any opinion about who

4    did or did not touch -- did or did not touch -- the item

5    described in your files as a safe, correct?

6    A.   I did not receive anything relating to a safe.

7    Q.   So you cannot offer any opinion about who did or did not

8    touch it, right?

9    A.   Correct.

10          MR. FEE:  Let's put back up Government Exhibit

11   1F-1275.

12          Can we zoom in tightly on the money on the right side.

13   And maybe just even tighter on the series.  Yeah, yeah.  I

14   don't know -- out a little bit, please.  Goldilocks problem,

15   just right.

16   Q.   Ms. Glass, are you able to read what it says next to

17   series?

18          MS. GHOSH:  Objection.  Scope.

19          MR. FEE:  She was shown this photo, your Honor.

20          THE COURT:  I will allow it.

21          Can you read that?  No guesses.

22          MR. FEE:  No guesses.

23          THE WITNESS:  No, I can't read it.  I'm sorry.

24          MR. FEE:  Yeah, good answer.  It's too fuzzy.

25   Q.   You testified, I think you were asked if prints stay on

| 1 | something forever? |

| 2 | MS. GHOSH:  Objection. |

| 3 | BY MR. FEE: |

4  Q.  Do you remember being asked that?

5  A.  No.

6  Q.  OK.  Well, do prints stay on objects forever?

7  A.  I know they can stay on for a long period of time.  As to

8  whether or not that extends to forever, I don't know.

9  Q.  Who knows?  If it stays on for ten years, five years, it

10  could vary, is that fair to say?

11  A.  Yes.

12            MS. GHOSH:  Objection.

13            THE COURT:  I'll allow it.

14  BY MR. FEE:

15  Q.  And you testified about some of the things that might cause

16  a print, I'm not sure what the word is, to be removed from an

17  item, correct?

18  A.  Yes.

19  Q.  That could be if it's, like, cleaned or exposed to the

20  elements or gets wet or other things?

21  A.  Correct.

22  Q.  And so I just want to be absolutely clear.  It's not just

23  that you're unable to tell when a person touched an item; you

24  can't date across -- you can't tell that it's necessarily older

25  than some given period of time, if that makes sense?

1              THE COURT:  No, it doesn't.

2              MR. FEE:  Thank you, your Honor.  Very candid.

3    Q.  Can you tell, for example, if a print was taken from a

4    piece of cash, a bill, whether it is older than five years or

5    newer than five years?  Are you able to conduct that analysis?

6              THE COURT:  The print?  You're asking about the print.

7              MR. FEE:  Yes, yes.

8              THE COURT:  OK.

9              MR. FEE:  The print.  The hypothetical print.

10   A.  No.

11   Q.  So you can tell nothing about timing from when you take a

12   print?

13   A.  Correct.

14   Q.  It could have been applied in 2013, it could have been

15   applied in 2022, you would be unable to tell?

16   A.  I can only say that it occurred at some point.

17             MR. FEE:  We can put that down.

18   Q.  Senator Menendez, you testified about finding his prints on

19   some items, right?

20   A.  Yes.

21   Q.  And you found eight prints for Senator Menendez on items in

22   your work?

23   A.  Yes.

24   Q.  And you found eight prints across five different items,

25   right?

O67Wmen3

1  A.  Can I check my report?

2  Q.  Yes, please.  Please.  And just while you're looking -- if

3  I may, your Honor -- I'm going to ask you also the location

4  where those eight prints were found or the description of the

5  location where they were found.

6  A.  Yeah, he was identified on five items.

7  Q.  Five items, eight prints?

8  A.  Yes.

9  Q.  And all of them were taken, the description for all the

10  items on which you found a print for Senator Menendez said it

11  came from 41 Jane Drive, correct?

12       THE COURT:  Why don't you finish this line, sir, and

13  then I'll give the jury its lunch break.

14       MR. FEE:  Yes, your Honor.

15  A.  Yes, that's correct.

16       MR. FEE:  We can stop there, your Honor.

17       THE COURT:  Ladies and gentlemen, we'll see you back

18  at 2:15.  Enjoy your lunch.  And we'll have a full afternoon of

19  testimony.

20            (Continued on next page)

21

22

23

24

25

O67Wmen3

```
 1                  (Jury not present)
 2                  THE COURT:  You may step down, Ms. Glass.
 3                  (Witness not present)
 4                  THE COURT:  For my planning purposes, approximately
 5      how much longer do you have, Mr. Fee?
 6                  MR. FEE:  Five minutes, your Honor.
 7                  THE COURT:  Oh, OK.
 8                  MR. FEE:  I'm sorry, your Honor.
 9                  THE COURT:  I would've closed it out.
10                  MR. FEE:  I would've messed it up.
11             Thank you.
12                  THE COURT:  Mr. Lustberg.
13                  MR. LUSTBERG:  I don't anticipate having any
14      questions.
15                  THE COURT:  Mr. de Castro.
16                  MR de CASTRO:  Five minutes, your Honor, or less.
17                  THE COURT:  All right.
18             Thank you.  2:15.
19                  MR. MONTELEONI:  Your Honor, can I just put some
20      exhibit-number cleanup on the record?
21                  THE COURT:  Yes.
22             You may be seated in the courtroom.
23                  MR. MONTELEONI:  Thank you, your Honor.
24             In some of the offers of exhibits earlier this week,
25      the transcript didn't fully reflect the exhibit numbers in our
```

O67Wmen3

1    offer or the admission of several exhibits.  So those are

2    Government Exhibits A101-103; that's one exhibit.  Government

3    Exhibit B105-40; that's another exhibit.  And Government

4    Exhibit 3A-10.  Those were all ones that we intended to offer,

5    but the transcript did not reflect it, so we would ask that

6    they be admitted now *nunc pro tunc*.

7         THE COURT:  Admitted, without objection, *nunc pro*

8    *tunc*.

9         (Government Exhibits A101-103, B105-40 and 3A-10

10   received in evidence)

11        MR. MONTELEONI:  And then, finally, for the clarity of

12   the record, one of the transcripts that was displayed as an aid

13   to the jury but not formally admitted, I just want to clarify

14   that that was transcript C216-1-TR, not just 216-1-TR.

15        Thank you.

16        THE COURT:  2:15.

17        Thank you.

18        (Luncheon recess)

19

20

21

22

23

24

25

O675men4                          Glass - Cross

1                    A F T E R N O O N   S E S S I O N

2                               2:20 p.m.

3            THE COURT:  Get the witness on the stand, please.

4            Jury entering.

5            (Jury present)

6            THE COURT:  Please be seated in the courtroom.

7            Ladies and gentlemen of the jury, yesterday I told you

8    that on the 21st, Friday, June 21st, we would not have court.

9    What I neglected to tell you is that Wednesday, June 19th is a

10   federal holiday, it is Juneteenth, so we won't have court then

11   either.  So what that schedule means for you is we will have

12   court every day next week, 9:30 to 5:00.  And this week we have

13   gotten a lot of testimony in.  Next week I hope the same thing

14   will happen as long as everybody shows up on time.  And then,

15   the following week, we will sit Monday, Tuesday, and Thursday

16   because Wednesday is a federal holiday -- Juneteenth -- and

17   Friday the 21st several of you have graduations so we won't

18   meet on that Friday.

19           All right?  The schedule for next two weeks is set.

20           Mr. Fee, conclude your examination.

21           MR. FEE:  Thank you, your Honor.

22   BY MR. FEE:

23   Q.  Hi.

24   A.  Hello.

25   Q.  You testified on direct about finding some items with

O675men4                          Glass - Cross

 1  prints for a person named Fred Daibes; correct?

 2  A.  Yes.

 3  Q.  Before the break you had testified that you are, in your

 4  experience, generally more likely to find the prints of a

 5  resident of a home in that home?

 6          MS. GHOSH:  Objection.

 7          THE COURT:  Sustained.

 8  Q.  Are you, in general, in your experience, more likely to

 9  find on items within a home, a resident of that home?

10          MS. GHOSH:  Objection.

11          THE COURT:  If she can answer.

12          THE WITNESS:  It would not surprise me if that was the

13  case, given that they have access to the items.

14  Q.  Would it not surprise you as well to find that people who

15  frequently visit a particular home would be more likely to

16  leave prints on objects in that home?

17          THE COURT:  Sustained.

18          Are you able to say the more somebody is in a

19  particular location the more likely it is that that person will

20  leave a latent print?

21          THE WITNESS:  I think it is possible but I

22  certainly -- I can't speculate without knowing.

23          THE COURT:  Thank you.

24  BY MR. FEE:

25  Q.  You did not find any prints for a person named Will Hana,

O675men4                          Glass - cross

1    correct?

2    A.   Correct.

3    Q.   You did not find any print for a person named José Uribe,

4    correct?

5    A.   Correct.

6    Q.   Nor any prints for a person named Elvis Parra; correct?

7    A.   Yes.

8    Q.   And just to make sure I have this right:  Senator Menendez,

9    a total of eight prints on five items; correct?

10   A.   Yes.

11   Q.   Agent Kougemitros, nine prints on five items; right?

12   A.   Yes.

13   Q.   So more prints for Agent Kougemitros than Senator Menendez

14   in the work you did on this case?

15   A.   Yes.

16           MR. FEE:  Thank you, your Honor.

17           THE COURT:  Mr. Lustberg?

18           MR. LUSTBERG:  No questions, your Honor.

19           THE COURT:  Mr. de Castro?

20           MR. DE CASTRO:  Thank you.

21   CROSS-EXAMINATION

22   BY MR. DE CASTRO:

23   Q.   Good afternoon.

24   A.   Hello.

25   Q.   I represent Mr. Daibes, my name is Cesar De Castro.  Just a

1   few questions.

2            From all of the items you analyzed, you determined

3   that nine items contained Mr. Daibes fingerprints.  Does that

4   sound right?

5   A.  Can I check my report?

6   Q.  Sure.

7   A.  I believe he was identified on 11 items, in total.

8   Q.  Eleven items or eleven prints?

9   A.  Eleven items.

10  Q.  And of those items, one also contained also a print of

11  Mr. Pilot, correct?  A different item?

12  A.  Mr. Who?

13  Q.  Pilot.

14           MS. GHOSH:  Objection.

15           THE COURT:  I'm not sure where we are on items.

16  Q.  And one item contained the fingerprint of Mr. Pilot; is

17  that correct?

18  A.  Yes.

19  Q.  Now, you can't tell this jury when Mr. Daibes' fingerprints

20  were put on those items or transferred to those items; correct?

21  A.  No.

22           THE COURT:  That is correct, right?

23           THE WITNESS:  Yes.  That's correct.

24  Q.  It is correct that you can't tell where he transferred his

25  fingerprint to those items, where he was; correct?

O675men4                         Glass - Redirect

1   A.   Correct.

2   Q.   You can't also tell the jury under what circumstances those

3   fingerprints were placed or transferred onto those items;

4   correct?

5   A.   No.

6   Q.   All you can tell us is that his fingerprints were present;

7   correct?

8   A.   All I can say is that at some point he came into contact

9   with those items.

10          MR. DE CASTRO:   Thank you.   Nothing further.

11          THE COURT:   Thank you.

12          Any redirect?

13          MS. GHOSH:   Briefly, your Honor.

14          THE COURT:   Yes.

15  REDIRECT EXAMINATION

16  BY MS. GHOSH:

17  Q.   Ms. Glass, do you recall being asked some questions about

18  whether Will Hana's prints were on certain items that you

19  tested for prints?

20  A.   Yes.

21  Q.   And do you recall being asked o to confirm that you did not

22  find Hana's prints on any items?

23  A.   Yes.

24  Q.   Does that mean that Hana never touched the particular item?

25  A.   No.

O675men4                        Glass - Redirect

1   Q.  Do you recall being asked questions on cross-examination

2   about prints from an individual named Yanik Fenton-Espinosa on

3   item 79?

4   A.  Yes.

5   Q.  Do you know who that is?

6   A.  No.

7   Q.  Do you know what, if any jobs, she has had?

8   A.  No.

9   Q.  Do you know what, if any, connections to New Jersey she has

10  had?

11  A.  No.

12          THE COURT:  I take it you don't know anything about

13  her; is that correct?

14          THE WITNESS:  That's correct.

15          THE COURT:  All right.

16  BY MS. GHOSH:

17  Q.  I would like to direct your attention to Government Exhibit

18  16A-2, page 3, which is one of your lab reports, to look at

19  item 79 for a moment.  From whom else did you identify prints

20  on item 79 -- and.

21          I'm sorry.  We may need to zoom out of this

22  Ms. Wechsler.

23  A.  Item 79, I identified prints to Lincoln Diaz-Balart, Robert

24  Menendez, and that's it.  Just those two individuals.

25  Q.  You said Lincoln Diaz-Balart was one of the individuals?

1   A.  Yes.

2   Q.  And Robert Menendez was the other individual with prints on

3   item 79?

4   A.  Yes.

5   Q.  In addition to Yanik Fenton-Espinosa?

6   A.  Yes.

7   Q.  Regarding Diaz-Balart, do you know who that is?

8   A.  No.

9   Q.  Do you know what, if anything, he does for work?

10  A.  No.

11          MS. GHOSH:  We can take that down, Ms. Wechsler.

12  Q.  Ms. Glass, do you recall being asked some questions on

13  cross-examination about a safe?

14  A.  Yes.

15  Q.  In your experience, would a keypad or a dial on a safe be

16  likely to have prints suitable for comparison?

17  A.  I think those are less likely to have prints present.

18  Q.  Why do you say that?

19  A.  Something like a keypad is something that is touched over

20  and over and over, so if any prints are left behind they're

21  going to be on top of one another, and eventually it is going

22  to be dirty, there is not going to be any detail there.  And

23  then -- what was the other surface you said?  The dial?

24  Q.  The dial on a safe.

25  A.  The dial on a safe, in my experience, is usually highly

1    textured, it has ridges along the sides, which would not allow

2    a surface for a latent print to be left behind on.

3            MS. GHOSH:  Ms. Wechsler, could you please put up

4    Government's Exhibits 1301 and 1334 side by side?  And if you

5    could go to page 6 of 1301?

6    Q.  Directing your attention to the row for 1B-84, could you

7    please read the location of 1B 84?

8            MR. FEE:  Scope, your Honor.

9            MS. GHOSH:  Your Honor, this relates to the subject

10   that Mr. Fee questioned about and showed photographs about that

11   safe.

12           MR. FEE:  Scope.

13           THE COURT:  I will allow it.

14   A.  Rule C closet (safe).

15   Q.  Looking at the last column from 1B84 in that chart, please

16   read the last number in the last column beginning with "GX".

17   A.  GX 1F-1126.

18           MS. GHOSH:  Ms. Wechsler, could you please put that

19   photograph up?

20   Q.  Ms. Glass, is this the photo of the safe that defense

21   counsel asked you some questions about?

22   A.  Yes.

23   Q.  Ms. Glass, also in 1301, could you read the second to last

24   number in that same cell?

25   A.  GX 1F-11789.

O675men4                          Glass - Redirect

 1              MS. GHOSH:  Ms. Wechsler, could you bring that out as

 2    well?  And Ms. Wechsler, if you could add 1334?  We don't need

 3    1331 anymore.  Thank you.

 4    Q.  Ms. Glass, directing your attention first to 1334, the

 5    entry for 1B84, whose prints did you identify on that item?

 6              MR. FEE:  Your Honor, they are repeating from the

 7    direct.  This is not within the scope of redirect.

 8              THE COURT:  I'm going to allow this.

 9    A.  I identified prints to Robert Menendez on the envelope and

10    Fred Daibes on the tape.

11    Q.  You were also asked some questions on cross-examination

12    about testing for prints on cash.  Do you recall that?

13    A.  Yes.

14    Q.  And during cross-examination I believe you used the word

15    "productive" when discussing latent prints.  Can you explain

16    what "productive" means in this context?

17    A.  Productive, meaning if we process an item of evidence,

18    whether or not it would produce or detect any latent prints.

19    Q.  In your expert opinion, is testing for prints on cash

20    typically productive?

21    A.  No.

22    Q.  How long would it take you to test for and analyze prints

23    on thousands of bills?

24    A.  That would likely take many hours in terms of the actual

25    processing time.  If any prints are detected, then it would

O675men4                          Glass - Redirect

1    take longer.

2    Q.  Are you able to estimate how long it would take you to

3    analyze prints found on thousands of bills?

4    A.  If prints were detected on every one that would take

5    months, probably.

6    Q.  What are some of the reasons that testing cash for

7    fingerprints is generally not productive?

8    A.  I believe it has to do with the texture of the paper being

9    that sort of cloth-like fabric that is also a little bit papery

10   at the same time, as well as how money is generally handled and

11   how heavily money can be handled.

12            THE COURT:  You mean how frequently it is touched?

13            THE WITNESS:  Yes.

14   Q.  Looking at Government Exhibit 1F-1179 that is up on your

15   screen on the right, in your expert opinion, would testing the

16   cash or the envelope in this photo be more productive?

17   A.  The paper envelope would likely be more productive.

18   Q.  In this case, when you tested envelopes, you in fact found

19   some latent print; correct?

20   A.  Yes.

21   Q.  Including Menendez' print on this envelope; correct?

22   A.  Yes.

23   Q.  And in this case, when you tested the sticky side of some

24   of the tape that had been used to seal envelopes, you found

25   some prints; correct?

O675men4                          Glass - Recross

1   A.   Yes.

2   Q.   Including Fred Daibes' print on the tape from this envelope

3   in 1F-1179; correct?

4   A.   Correct.

5           MS. GHOSH:  No further questions.

6           MR. FEE:  Your Honor, I have two.  Two questions.

7           THE COURT:  Go ahead.

8           MR. FEE:  Can we keep up 1179?  I'm so sorry,

9   Ms. Wechsler?  If you don't mind?

10          It's OK, right, Ms. Ghosh?

11          Just 1179, if you are able to.

12  RECROSS EXAMINATION

13  BY MR. FEE:

14  Q.   You just testified that given the frequency with which

15  money is handled, that informs your view that it would not be

16  productive, in general, to test money; correct?

17  A.   That's one of the factors that would contribute to it; yes.

18  Q.   That's one of the factors?

19  A.   Yes.

20          THE COURT:  What are other factors?

21          THE WITNESS:  The texture of the paper and the money.

22  Q.   Looking at this money --

23          MR. FEE:  If we can zoom in, Ms. Wechsler?  Thank you.

24  Q.   Just from this photo, which -- I'm sorry.

25          By the way, were you even asked before you did the

 1    tests in this case, your view as to whether it would be

 2    productive to test the money recovered here?

 3    A.  I was not asked, no.

 4    Q.  Looking at this money, do you have any observations about

 5    whether it appears to have been handled heavily?

 6              MS. GHOSH:  Objection.

 7              THE COURT:  I will allow it.

 8              Can you tell from this picture whether the money had

 9    been handled heavily or not?

10              THE WITNESS:  No.

11              THE COURT:  All right.

12    BY MR. FEE:

13    Q.  Let me ask you, do you see, just on that one bill there --

14              If you can zoom in, Ms. Wechsler, on the bill where

15    you can see everything?  Thank you.

16    Q.  Do you see any folds?

17              MS. GHOSH:  Objection.

18    Q.  Any creases?

19              THE COURT:  What do you see there on that one bill?

20              THE WITNESS:  Just a $100 bill.

21              THE COURT:  OK.

22    BY MR. FEE:

23    Q.  And are you able to read the date there?

24              Can you zoom in, Ms. Wechsler, where it says "series"

25    but not too close?

1          MS. GHOSH:  Objection.

2          THE COURT:  We had this before.  I will allow it.

3          MR. FEE:  Different bill.

4    Q.  Let me just ask, would you agree that it appears that none

5    of this money has been sitting somewhere for years?

6          MS. GHOSH:  Objection.

7          THE COURT:  Sustained; for years.

8    Q.  Last question.  You are employed by the FBI?

9    A.  Yes.

10   Q.  Do you think it would be a productive use of your time to

11   find the truth?

12         THE COURT:  Sustained.

13         Mr. Fee.

14         The jury will disregard that.

15         MR. FEE:  Thank you, your Honor.

16         THE COURT:  Mr. Fee, please.

17         MR. FEE:  Your Honor --

18         THE COURT:  Sit down.

19         You are excused.  And, thank you.

20         (Witness excused)

21         THE COURT:  Next witness for the government.

22         MS. POMERANTZ:  The government calls José Uribe.

23         THE DEPUTY CLERK:  Please raise your right hand.

24   JOSÉ DOLORES URIBE,

25         called as a witness by the Government,

O675men4                        Uribe - Direct

1    having been duly sworn, testified as follows:

2              THE DEPUTY CLERK:  Please state your full name and

3    spell it for the record.  Speak into the microphone.

4              THE WITNESS:  My name is José Uribe.  José Dolores

5    Uribe, spelled J-O-S-E, D-O-L-O-R-E-S, U-R-I-B-E.

6              THE COURT:  Good afternoon, Mr. Uribe, and welcome.

7              THE WITNESS:  Good afternoon, your Honor.

8              THE COURT:  Your witness, Ms. Pomerantz.

9              MS. POMERANTZ:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MS. POMERANTZ:

12   Q.  Good afternoon, Mr. Uribe.

13   A.  Good afternoon, Ms. Laura.

14   Q.  Have you ever committed federal crimes?

15   A.  Yes, I have.

16   Q.  Did you plead guilty to committing federal crimes?

17   A.  Yes, I did.

18   Q.  Does that include bribery of a public official?

19   A.  Yes, I did.

20   Q.  Who was that public official?

21   A.  Senator Robert Menendez.

22   Q.  Do you see him in the courtroom today?

23   A.  Yes, I do.

24   Q.  Can you please describe where the person you recognize is

25   sitting, and describe an item of clothing that he is wearing?

1          MR. FEE:  We will stipulate, your Honor.

2          THE COURT:  The witness has identified Mr. Menendez.

3     He is sitting in the second row there in the middle

4     there, correct, with gray hair?

5          THE WITNESS:  Yes, he is.

6          THE COURT:  All right.

7     BY MS. POMERANTZ:

8     Q.  Who accepted the bribes you paid?

9     A.  Nadine Menendez.

10    Q.  Who is Nadine Menendez?

11    A.  Senator Menendez' wife.

12         MS. POMERANTZ:  Ms. Wechsler, would you please display

13    what is in evidence as Government Exhibit 2A-2?

14    Q.  Who is this?

15    A.  Nadine Menendez.

16    Q.  When you bribed Robert Menendez, did you do that alone or

17    with other people?

18    A.  With other people.

19         MS. POMERANTZ:  Ms. Wechsler, we can take that down.

20    Q.  Do you recognize anyone in this courtroom whom you worked

21    with to bribe Robert Menendez?

22         THE WITNESS:  Can I stand, please?  I cannot see.

23         THE COURT:  Yes.  Please.  Of course.  Stand.

24    A.  Yes, I do.

25    Q.  Who?

1    A.    Wael Hana.

2    Q.    Can you please describe where the person you recognize is

3    sitting, and describe an item of clothing that he is wearing?

4              MR. SOLANO:    Your Honor, we will stipulate.

5              THE COURT:    Is it the gentleman who is sitting it two

6    individuals to the right of the gentleman who just stood up?

7              THE WITNESS:    Yes.

8              THE COURT:    The witness has identified Mr. Hana.

9    BY MS. POMERANTZ:

10   Q.    You testified that you pled guilty to bribing Robert

11   Menendez.    Did you plead guilty to other crimes as well?

12   A.    Yes, I did.

13   Q.    I will ask you about those other crimes later.    Are you

14   testifying today under the terms of a cooperation agreement

15   with the government?

16   A.    Yes, I am.

17   Q.    At a general level, what did you do that makes you guilty

18   of bribing Robert Menendez?

19   A.    I agreed with Nadine Menendez and other people to provide a

20   car for Nadine in order to get the power and influence of

21   Mr. Menendez to help me get a better resolution for one of my

22   associates that was being charged on a criminal matter, and to

23   stop ongoing investigations that could lead to my daughter and

24   my family members.

25   Q.    I will ask you more questions about that in a few minutes,

1   but first let's take a step back and talk about your

2   background.

3           How old are you?

4   A.  57.

5   Q.  Where were you born?

6   A.  Dominican Republic.

7   Q.  Where did you grow up?

8   A.  Dominican Republic.

9   Q.  Did there come a time when you moved to the United States?

10  A.  Yes.

11  Q.  Approximately when did you move to the United States?

12  A.  December of 1985.

13  Q.  Approximately how old were you when you moved to the United

14  States?

15  A.  18 years old.

16  Q.  Who did you move to the United States with?

17  A.  My brother José Antonio, my mother, my aunt, and my

18  grandma.

19  Q.  You mentioned a brother.  Do you have other siblings?

20  A.  Yes, I do.

21  Q.  How many siblings do you have?

22  A.  Four siblings.

23  Q.  How many brothers?

24  A.  Three brothers and one sister.

25  Q.  Where in the United States did you move to in 1985?

1    A.   Union City, New Jersey.

2    Q.   In what state do you currently live?

3    A.   New Jersey.

4    Q.   Since moving to the United States, have you lived in any

5    state other than New Jersey?

6    A.   No.

7    Q.   Are you a United States citizen?

8    A.   Yes, I am.

9    Q.   Approximately when did you become a citizen?

10   A.   1991 or 1992.

11   Q.   What languages do you speak?

12   A.   English and Spanish.

13   Q.   How good is your Spanish?

14   A.   Very well.  Very good.

15   Q.   How often do you use Spanish to communicate with people?

16   A.   I use it very often.

17   Q.   I want to ask you a little bit more about your family.  Are

18   you currently married?

19   A.   I am divorced.

20   Q.   How many times have you been married?

21   A.   Just once.

22   Q.   Approximately when did you get married?

23   A.   1994.

24   Q.   Do you have children?

25   A.   Yes.

O675men4                          Uribe - Direct

1          MR. FEE:  Objection.  Relevance.

2          THE COURT:  I will allow it.  Background.

3   Q.  How many children?

4   A.  Four kids.  Four childrens.

5   Q.  Now, you said you are no longer married.  Approximately

6   when did you get divorced?

7   A.  2009.

8   Q.  How far did you go in school?

9   A.  I obtained an associate degree in data processing from

10  Hudson County Community College.

11  Q.  In what state is Hudson County Community College?

12  A.  New Jersey.

13  Q.  Did you work while in community college?

14  A.  Yes, I did.

15  Q.  What did you do for work?

16  A.  I worked as a factory worker in a textile factory in the

17  daytime.

18  Q.  Did you go to community college in the nighttime?

19  A.  At nighttime I went to school, yes.

20  Q.  What did you do for work after graduating from community

21  college?

22  A.  I went to work for an insurance agency in Union City.

23  Q.  Approximately when did you start working for an insurance

24  agency?

25  A.  1989 to 1990.

O675men4                         Uribe - Direct

1   Q.  How did you start working for an insurance agency?

2   A.  After I graduated from college I bought my first car, a

3   used car, and I was looking for insurance.  My uncle referred

4   me to a local agency who he knew the broker and I went to look

5   for that coverage for the insurance.  While trying to get the

6   insurance, I had to wait like almost two hours to meet this

7   broker of how busy he is -- he was.  Finally, when I get to

8   speak to the gentleman, I told him, he looked very busy and I

9   was willing to work for him if he was able to hire me.  He said

10  he could hire me but he couldn't pay me.  So I started working

11  for free for him.

12  Q.  About how long did you work for free for him?

13  A.  Just about a month.

14          THE COURT:  Why did you decide to work for free for

15  him?

16          THE WITNESS:  Your Honor, I was impressed by the

17  amount of people looking for this gentleman to serve them, and

18  from the first day I saw the operation of an insurance agency I

19  fell in love with the insurance business.

20  Q.  You said you started working for him for free.  Did that

21  change over time?

22  A.  Yes.

23  Q.  For approximately how many years did you work for that

24  insurance agency?

25  A.  Eight to nine years.

1   Q.  Did there come a time when you got your insurance license?

2   A.  Yes.

3   Q.  Approximately when did you get your insurance license?

4   A.  19 -- 1991-1992.

5   Q.  What is an insurance license, in sum?

6   A.  An insurance license is a license issued by your state of

7   residence that allows you to service the public that is looking

8   for insurance coverage to protect their assets and their

9   businesses.

10          THE COURT:  Is an insurance license the same thing as

11   an insurance brokerage license?

12          THE WITNESS:  An insurance license would allow you to

13   become either an insurance agent or an insurance broker

14   depending who is your, the person that you primarily service.

15          THE COURT:  OK.  Thank you.

16   Q.  Are there different kinds of insurance licenses?

17   A.  Yes, they are.

18   Q.  What kind of insurance license did you get?

19   A.  I got the property and casualty license with health

20   coverage.

21   Q.  What is a property and casualty license?

22   A.  Property and casualty is the license that allows you to

23   secure or be able to provide coverage for individuals for their

24   protection of their personal property, so business properties,

25   and also secure or provide coverage for their -- the risk of

1    their businesses, their liability.

2    Q.   What did you do to get your insurance license?

3    A.   In my case I went to an extensive course of three weeks,

4    full-time.  I completed the number of hours required by law.  I

5    passed the school exam.  And shortly after I took the state

6    exam and also passed that exam as well.

7    Q.   At the time you got your insurance license, were you

8    working?

9    A.   Yes.

10   Q.   Where were you working?

11   A.   I was working at the agency that I mentioned first.

12   Q.   Did there come a time when you started your own insurance

13   agency?

14   A.   Yes.

15   Q.   What was your insurance agency called?

16   A.   Inter-America Insurance Agency.

17   Q.   I'm going to refer to that as Inter-America, OK?

18   A.   That's fine.

19   Q.   Approximately when did you start Inter-America?

20   A.   2001.

21   Q.   Can you explain to the jury the general kind of services

22   that Inter-America provided?

23   A.   Yes.  Inter-America was an insurance brokerage providing

24   and securing coverage for individuals.  My special line of

25   business was for the transportation companies and construction

O675men4                          Uribe - Direct

1    companies.

2    Q.   You mentioned an insurance broker?

3    A.   Yes, I did.

4    Q.   What does it mean to act as an insurance broker?

5    A.   As an insurance broker, my main objective is to meet and

6    interview insureds, determine what kind of coverage do they

7    need for protection of their businesses, and then go ahead to

8    the market and find the best suitable insurance companies that

9    will fit their needs and for the best pricing.

10   Q.   Was Inter-America an insurance broker?

11   A.   Yes, it was.

12   Q.   In what state was Inter-America based?

13   A.   New Jersey.

14   Q.   Approximately how many people worked at Inter-America when

15   you started Inter-America?

16   A.   First days it was my brother Antonio, and myself.

17   Q.   Did there come a time when you closed Inter-America?

18   A.   Yes.

19   Q.   Approximately when did you close Inter-America?

20   A.   2011.

21   Q.   Why did you close Inter-America?

22   A.   I got into legal issues with the New Jersey authorities

23   that made me lose my insurance license and that of the agency

24   as well.

25   Q.   When you say you had legal issues, what do you mean?

O675men4                          Uribe - Direct

1   A.  I was charged with insurance fraud and theft by deception.

2   Q.  Were you charged in New Jersey?

3   A.  Yes.

4   Q.  Was that in state court or federal court?

5   A.  Federal court.

6   Q.  Sorry.  Is that state court or federal court?

7   A.  It was state court.

8   Q.  What was the outcome of that case?

9   A.  I lost my license.  I pled guilty to the charges, I lost my

10  license, and that of the agency as well.

11          THE COURT:  I'm sorry.  Did you say that was in state

12  court or federal court?

13          THE WITNESS:  State court.

14          THE COURT:  Thank you.

15  BY MS. POMERANTZ:

16  Q.  I want to ask you some additional questions about that

17  later but first I want to ask you a little bit more about your

18  job background.

19          By 2011, how many people worked at Inter-America?

20  A.  At least five people.

21          THE COURT:  In addition to yourself?

22          THE WITNESS:  Including myself.

23  Q.  Did that include any of your family members?

24  A.  Yes, it did.  It included my sister Raisa, my brother

25  Antonio, myself, and a couple of clerical personnel.

1    Q.  After Inter-America was closed, what did you do for work?

2    A.  We formed another insurance agency called Phoenix Risk

3    Management.

4    Q.  I'm going to refer to Phoenix Risk Management as Phoenix,

5    OK?

6    A.  Yes.  It's OK.

7    Q.  Approximately when was Phoenix formed?

8    A.  2011.

9    Q.  Was Phoenix formed before or after you closed

10   Inter-America?

11   A.  Before.

12   Q.  About how long before closing Inter-America was Phoenix

13   formed?

14   A.  A couple of months before that.

15   Q.  What kind of services did Phoenix provide?

16   A.  Phoenix, just as Inter-America, was a retail insurance

17   brokerage.

18   Q.  When Phoenix was formed, who was the owner?

19   A.  Phoenix was formed by my son Omar Contreras.

20   Q.  What was your son Omar's role at Phoenix?

21   A.  Omar was the agent of record, the broker of record.

22   Q.  And what do you mean by agent of record?

23   A.  The broker of record or agent of record is a person with

24   the license that hold the license, the state license and

25   represent the agency, and has the ability and the rights to

O675men4                          Uribe - Direct

1    procure the coverage and to bind the coverage, make it into it

2    effect for the insureds.

3    Q.  What was your role at Phoenix when it was formed?

4    A.  I acted as the insurance advisor and the general manager.

5    Q.  Mr. Uribe, who was running Phoenix?

6    A.  I did.

7    Q.  Did you form Phoenix in your own name?

8    A.  No, I did not.

9    Q.  Why was your son the owner of Phoenix if you were the one

10   running Phoenix?

11   A.  I had lost my license, I cannot be named the owner of the

12   agency.

13   Q.  Were you allowed to be the owner of Phoenix after losing

14   your insurance license, as far as you knew?

15   A.  No, I did not.

16   Q.  When Phoenix was started, approximately how many people

17   worked there?

18   A.  Four people.

19   Q.  Were any of the people who worked at Phoenix family

20   members?

21   A.  We were all family members.

22   Q.  Who worked there?

23   A.  My son Omar, my sister Raisa, my brother Antonio, and

24   myself.

25   Q.  Did there come a time when Phoenix' agent of record

1    changed?

2    A.   Yes.

3    Q.   Approximately when did Phoenix' agent of record change?

4    A.   Approximately 2013.

5    Q.   How did it change?

6    A.   My son Omar, at this time, didn't want to continue in the

7    insurance businesses, he didn't like it.  He wanted to be an

8    attorney and he decided to move to Seattle to complete his

9    education as a lawyer, and at this point we had to change

10   agents.

11   Q.   Who became Phoenix' next agent of record?

12   A.   A young lady that I consider a family member, that I love

13   like my daughter, her name is Ana Peguero.

14              MS. POMERANTZ:  Ms. Wechsler, would you please pull up

15   what is in evidence as Government Exhibit 2A-6?

16   Q.   Who is this?

17   A.   That's my daughter Ana Peguero.

18   Q.   You said she's your daughter.  Is she your biological

19   daughter?

20   A.   She is not.

21   Q.   How did you meet Ana Peguero?

22   A.   In the years of Inter-America in operation, Ana was the

23   best friend to my daughter Vanessa in high school, and she used

24   to work part-time for me at the agency.

25   Q.   You testified that Ana became the agent of record in 2013.

1    Who decided that Ana would become Phoenix' agent of record?

2    A.   I did.

3    Q.   What did Ana do to become the agent of record?

4    A.   Just like I did, she went also to intensive classes, a

5    full-time class of three weeks.  She completed the required

6    hours by the state, passed the school exam, she took the state

7    exam, and then after that she obtained her license.

8    Q.   Did Ana work at Phoenix before becoming the agent of

9    record?

10   A.   Yes, she did.

11   Q.   What did she do?

12   A.   Clerical operation.

13   Q.   Was she full-time or part-time?

14   A.   Full-time.

15   Q.   Did Ana work for you prior to Phoenix?

16   A.   Yes.

17   Q.   And where was that?

18   A.   She worked for Inter-America when I was in operation under

19   Inter-America.

20   Q.   Was she full-time or part-time?

21   A.   Part-time at that time.

22   Q.   In 2013, when Ana became the agent of record, were you

23   still running Phoenix?

24   A.   Yes, I was.

25   Q.   If you were running Phoenix, why didn't you make yourself

O675men4                          Uribe - Direct

1    Phoenix' agent of record?

2    A.   I had no insurance license and I could not be the agent of

3    record.

4    Q.   When Ana became Phoenix' Agent of record in 2013, what

5    involvement, if any, did Omar have in Phoenix?

6    A.   At this time my son has no involvement whatsoever, he is in

7    Seattle going to the attorneys school.

8    Q.   Now, you testified that when Phoenix was formed your son

9    Omar was the owner.  Did there come a time when the owner of

10   Phoenix changed?

11   A.   Yes.

12   Q.   And approximately when did it change?

13   A.   2019.

14   Q.   How did it change?

15   A.   We transferred ownership from Omar to Ana Peguero.

16   Q.   Why did ownership of Phoenix change in 2019 if Omar stopped

17   being involved back in 2013?

18   A.   In the year of '13 when Omar left, we knew that we changed

19   the agent of record but we didn't file the required documents

20   to change the ownership of the agency.

21   Q.   During approximately what years were you running Phoenix?

22   A.   2011 to 2024.

23   Q.   Are you involved in Phoenix today?

24   A.   No, I am not.

25   Q.   To your understanding, were you allowed, under the law, to

1   work at or run an insurance agency like Phoenix?

2   A.  I was not allowed.

3   Q.  Does your cooperation agreement with the government require

4   you to comply with the law?

5   A.  Yes, it does.

6   Q.  When did you enter into your cooperation agreement?

7   A.  February of 2024.

8   Q.  Did you stop being involved in the insurance business after

9   you entered into your cooperation agreement?

10  A.  Yes, I did.

11  Q.  What do you currently do for work?

12  A.  I am, at this point, trying to go back to the trucking

13  business, putting together the logistics of which line of

14  trucking I am going to operate, including the resources that I

15  needed to put the company into operation.

16  Q.  Now, you testified earlier that you bribed Robert Menendez

17  to try to stop criminal investigations.  I'm going to ask you

18  more about that now.  What criminal investigations were you

19  referring to?

20  A.  An associate of mine was being charged with insurance fraud

21  and he was being offered jail time.  There was also an ongoing

22  investigation for the successor company of this one gentleman,

23  and I learned in the process that this investigation could lead

24  to an investigation into my Ana and Phoenix Risk Management.

25  Q.  Now I want to ask you a few questions about what you just

1    said.  You said that there was an investigation relating to

2    insurance fraud into someone you knew?

3    A.  Yes.

4    Q.  Who was that?

5    A.  Elvis Parra and his company E & K Trucking.

6    Q.  Who is Elvis Parra?

7    A.  Elvis Parra is an individual that I met through business,

8    like I said, principal of E & K Trucking, and a person that I

9    also considered a good friend of mine.

10          MS. POMERANTZ:  Ms. Wechsler, would you please pull up

11   what is in evidence as Government Exhibit 2A-11?

12   Q.  Mr. Uribe, who is this?

13   A.  Elvis Parra.

14   Q.  Approximately when did you first meet Elvis Parra?

15   A.  Best of recollection between 2003 to 2006.

16   Q.  How did you meet Elvis Parra?

17   A.  During those years, Elvis wanted to start his own trucking

18   operation and he was referred to me by other trucking companies

19   for his insurance needs.

20   Q.  Can you remind us, what was the name of Elvis' trucking

21   company?

22   A.  E & K Trucking.

23   Q.  What kind of company was E & K Trucking?

24   A.  E & K Trucking was an intermodal motor carrier.

25   Q.  What is an inter-motor motor carrier?

1   A.   An inter-modal motor carrier is a trucking company that has

2   the licenses and the required insurance that allow him to go

3   inside the ports to transport import or export containers.

4   Q.   Did Inter-America provide services for E & K Trucking?

5   A.   Yes, we did.

6   Q.   What kind of services?

7   A.   We obtained the required insurance that were needed to run

8   the company into the port, to allow the company to get into the

9   port.

10  Q.   Apologies.  Is it inter-motor or intermodal?

11  A.   Intermodal.

12  Q.   Thank you.

13       Did Elvis Parra have a business partner at

14  E & K Trucking?

15  A.   Yes, he did.

16  Q.   Who?

17  A.   Bienvenido Hernandez.

18       MS. POMERANTZ:  Ms. Wechsler, would you please pull up

19  what is in evidence as Government Exhibit 2A-9.

20  Q.   Mr. Uribe who is this?

21  A.   Bienvenido Hernandez.

22  Q.   How did you meet Bienvenido Hernandez?

23  A.   Through my association and my dealings with us being the

24  insurance broker for E & K Trucking.

25  Q.   Was your relationship with Elvis Parra and Bienvenido

1    Hernandez purely a business relationship?

2    A.  No, it was not.

3    Q.  Can you describe your relationship with Elvis Parra and

4    Bienvenido Hernandez?

5    A.  Yes.  At the beginnings of the company we started, like,

6    insurance broker and clients, and short after that we developed

7    a friendship that got transformed into a nice brotherhood.  I

8    consider both good friends of mine, almost brothers.

9    Q.  Now, you testified earlier about closing Inter-America.  At

10   the time Inter-America was closed, was Inter-America the

11   insurance broker for E & K Trucking?

12   A.  Yes, it was.

13   Q.  Did you continue to serve as the insurance broker for

14   E & K Trucking after Inter-America closed?

15   A.  Yes.

16   Q.  How?

17   A.  We -- the newly formed agency, Phoenix Risk Management,

18   inherited the clients of Inter-America and we continued the

19   service that way.

20   Q.  What did Phoenix do for E & K Trucking?

21   A.  Just like Inter-America, we secured the required insurance

22   coverage to be an intermodal motor carrier that included

23   coverage such as general liability, the auto liability, their

24   motor truck cargo, and their workers compensation policy.

25   Q.  Did there come a time when Phoenix stopped serving as the

O675men4                              Uribe - Direct

1   insurance broker for E & K Trucking?

2   A.  Yes.

3   Q.  Why did Phoenix stop serving as insurance broker for E & K

4   Trucking?

5   A.  When the investigation for Elvis Parra and E & K Trucking

6   initiated, E & K Trucking was closed and the successor's

7   company, Prestige Trucking Express, was created.

8   Q.  There was a successor company?

9   A.  Yes, ma'am.

10  Q.  What was the name of that successor company?

11  A.  Prestige Trucking Express.

12  Q.  What is Prestige Trucking Express?

13  A.  Another intermodal motor carrier.

14  Q.  Who ran prestige?

15  A.  Bienvenido Hernandez.

16  Q.  What was Bienvenido Hernandez' role at Prestige?

17  A.  He was the owner, president, and general manager of

18  Prestige Trucking Express.  In fact, he still is.

19  Q.  Did Elvis Parra have a role at Prestige?

20  A.  Yes.  He was the partner for Bienvenido Hernandez.

21  Q.  What, if anything, did Phoenix do for Prestige?

22  A.  We provided the insurance coverage that are required under

23  the law to be able to be a motor carrier and get inside the

24  port and import and export containers.

25  Q.  Was Phoenix the insurance broker for Prestige?

1    A.   We were the insurance brokers, yes.

2    Q.   Does Phoenix still serve as the insurance broker for

3    Prestige?

4    A.   No, we do not.

5    Q.   In approximately what year did Phoenix stop serving as the

6    insurance broker for Prestige?

7    A.   2023.

8    Q.   Now, you testified that you learned of a criminal

9    investigation into E & K Trucking.  Do you have an

10   understanding of what the outcome of that criminal

11   investigation was?

12   A.   Yes, I do.

13   Q.   What is your understanding of the outcome of the criminal

14   investigation?

15   A.   Criminal investigation that was in effect was the

16   principal, Elvis Parra, pled guilty to the charges, and later

17   on was sentenced to probation.

18   Q.   You testified that Phoenix served as the insurance broker

19   for E & K Trucking.

20   A.   That's correct.

21   Q.   Did the criminal investigation ever reach Phoenix?

22   A.   Yes, it did.

23   Q.   How?

24   A.   Phoenix received subpoenas from the New Jersey attorney

25   general's office in regards to the investigation on Elvis Parra

1    and his company.

2    Q.  Mr. Uribe, what is your understanding of what a subpoena

3    is?

4    A.  A subpoena would be a document issued by an authority, in

5    this case the New Jersey attorney general's office, requesting

6    information related to investigations of an individual -- in

7    this case Elvis Parra and E & K company.

8    Q.  To your understanding, what did the subpoena require

9    Phoenix to do?

10   A.  We were required to provide all available information in

11   regards to insurance policies issued to E & K Trucking company.

12   Q.  Did the subpoena require Phoenix to produce documents

13   related to E & K Trucking?

14   A.  Yes, it did.

15   Q.  To whom did it require Phoenix to produce the documents?

16   A.  It was required to be produced -- I'm sorry, Ms. Lara.

17   Would you repeat your question, please?

18   Q.  You said that the subpoena required you to produce

19   documents --

20   A.  Available to us, yes.

21   Q.  What entity was investigating E & K Trucking, to your

22   understanding?

23   A.  The New Jersey attorney general's office.

24   Q.  What was the New Jersey attorney general's office?

25   A.  The prosecutors for New Jersey.

O675men4                          Uribe - Direct

1    Q.  In approximately what year did Phoenix get the subpoena for

2    documents related to E & K?

3    A.  2014.

4    Q.  What was your understanding of the focus of the

5    investigation into E & K Trucking?

6    A.  The investigation was focusing on insurance fraud relating

7    to workers compensation policy.

8    Q.  What did you do after Phoenix received the subpoena?

9    A.  We collected the documents that were available to us as

10   indicated in the subpoena, and we turned those documents to the

11   attorneys for the firm Mr. Andy Aslanian, and he was in charge

12   of replying or answering the subpoenas to the state.

13   Q.  In approximately what year did Phoenix get the subpoena for

14   documents related to E & K?

15   A.  2014.

16   Q.  You mentioned, I believe, Andy Aslanian?

17   A.  Yes, I did.

18   Q.  Who is Andy Aslanian?

19   A.  Andy Aslanian is the attorney for Phoenix Risk Management.

20   He is also a person that he is a very good friend of mine that

21   I consider almost like a family member.

22          MS. POMERANTZ:  Ms. Wechsler, would you please display

23   what is in evidence as Government Exhibit 2A-8?

24   Q.  Mr. Uribe, who is this?

25   A.  That is Uncle Aslanian.  Andy Aslanian.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Did Phoenix collect any materials in response to the

2    subpoena?

3    A.  Yes, we did.

4    Q.  Who handled responding to the subpoena on behalf of

5    Phoenix?

6    A.  Ana Peguero and myself.

7    Q.  What did you do?

8    A.  I helped Ana make up the documents available to us.

9    Q.  What was your initial reaction when Phoenix was subpoenaed

10   in 2014?

11   A.  No reaction, just a document to require us to provide

12   information.

13   Q.  Did Ana Peguero express any concerns to you initially about

14   Phoenix being subpoenaed in 2014?

15   A.  No, she did not.

16   Q.  Are you familiar with someone named Suzanna Lopez?

17   A.  Yes, I am.

18   Q.  Who is Suzanna Lopez?

19   A.  Suzanna Lopez is, was the detective in charge of the

20   investigation for the New Jersey attorney general's office.

21   Q.  Did there come a time when you learned that Detective Lopez

22   contacted Ana Peguero?

23   A.  Yes.

24   Q.  How did you learn that Detective Lopez contacted Ana

25   Peguero?

O675men4                          Uribe - Direct

1  A.   One afternoon a couple of years into the investigation my

2  daughter called me that Ms. Lopez decided to stop by her home

3  unannounced and started asking her questions about the

4  investigation.

5  Q.   You said "my daughter."  Who are you referring to?

6  A.   Ana Peguero.

7  Q.   Approximately when did you understand that Detective Lopez

8  went to Ana Peguero's house?

9  A.   Somewhere in 2016.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Was that before or after Phoenix received the subpoena, the

2  subpoenas for documents related to E&K?

3  A.  That was after that.

4  Q.  Did Ana tell you about Det. Lopez's visit in person or over

5  the phone?

6  A.  She call me.  It was over the phone.

7  Q.  What was Ana's tone when she told you about Det. Lopez

8  going to her home?

9  A.  My daughter was upset, preoccupied, unhappy, and she showed

10  a little anxiety.  She was not happy about this.

11  Q.  What, if any, concerns did you have after speaking with

12  Ana?

13  A.  The concern of a father that I don't want somebody to walk

14  into their daughter's home on a Saturday afternoon just to be

15  asking questions, unannounced, and being unpleasant.  Ana

16  described Ms. Lopez as being a very unpleasant, pushing person.

17  Q.  Did Det. Lopez reach out to interview anyone else close to

18  you?

19  A.  Yes.

20  Q.  Who was that?

21  A.  Det. Lopez went to Seattle one afternoon and met my son,

22  where he was in a class in college.

23  Q.  How did you learn that she reached out to your son?

24  A.  My son Omar gave me a call.

25  Q.  What was your reaction after learning that Det. Lopez

O67Wmen5                        Uribe - Direct

1    reached out to your son?

2    A.  The same thing, a concerned father that's seeing his, their

3    kids being attacked by unpleasant investigation.

4    Q.  When Phoenix was subpoenaed in connection with the E&K

5    Trucking investigation, I believe you said you weren't

6    initially concerned.  Is that right?

7    A.  I personally was not.

8    Q.  At some point did that change?

9    A.  Yes.

10   Q.  Approximately when?

11   A.  Early part of 2018, the successor company of E&K also

12   received a subpoena, documents.  In this case, Prestige

13   Trucking Express was issue a subpoena.

14   Q.  When you say -- so who received the subpoena?

15   A.  Phoenix Risk Management received a subpoena for documents

16   related to E&K -- to Prestige.  I'm sorry.

17   Q.  Can you remind us, what was the relationship between

18   Phoenix and Prestige at this time?

19   A.  Prestige was a client and insurer, better term, and Phoenix

20   is the insurance brokerage.

21   Q.  Did Phoenix collect any materials in response to this

22   subpoena?

23   A.  Yes, we did.

24   Q.  Who handled responding to the subpoenas on behalf of

25   Phoenix?

1   A.  Ana Peguero and myself.

2   Q.  What was your role?

3   A.  I was making copies of documents.

4   Q.  Was Andy Aslanian involved?

5   A.  Yes.  Andy still is the attorney for the firm, with a

6   percentage of required documents that were available in our

7   files, handed it to Andy and Andy was in charge of getting to

8   attorney general.

9   Q.  Did Elvis have a lawyer in connection with the New Jersey

10  attorney general's case against him?

11  A.  Yes.  My knowledge, yes.

12  Q.  Who was his lawyer initially?

13  A.  The initial attorney was the attorney by the name Howard

14  Dorian.

15         MS. POMERANTZ:  Ms. Wechsler, would you pull up what's

16  in evidence as Government Exhibit 2A-13.

17  Q.  Mr. Uribe, who is this?

18  A.  That is Howard Dorian.

19  Q.  Did you speak to Howard Dorian about the investigation?

20  A.  Yes, I did.

21  Q.  And what did he tell you?

22         MR. FEE:  Objection.  Hearsay.

23         MS. POMERANTZ:  Your Honor, it's not offered for the

24  truth but to explain what occurred next, and it's context for

25  what happens throughout the entire course of this scheme.

1              MR. FEE:  Objection.

2              THE COURT:  I will allow it not for the truth, ladies

3     and gentlemen, but just to help you understand what's happening

4     and the context.  But it's not for the truth of what this man

5     says.

6     BY MS. POMERANTZ:

7     Q.  Mr. Uribe, what did Howard Dorian tell you?

8     A.  At the time that the Prestige Trucking Express is under

9     investigation, Andy -- Dorian expressed to me on one afternoon

10    the fact that this investigation, that it started into E&K,

11    moving to the successor's company of Prestige, who also lead to

12    an investigation of Ana Peguero and Phoenix Risk Management.

13    Q.  Approximately when did he say this to you?

14    A.  Early part of 2018.

15             THE COURT:  I'm sorry.  Just a moment.  There's an

16    issue that needs to be taken care of.  Just a moment.

17             I'm sorry.  If you remember, ladies and gentlemen, the

18    very first day I told you sometimes I'll need to be dealing

19    with other matters.  What I was doing now does not concern this

20    matter.

21             Proceed.  Ask the last question again.

22             MS. POMERANTZ:  Yes, your Honor.

23    Q.  Approximately when did Howard Dorian say this to you?

24    A.  Early part of 2018.

25    Q.  After that, what, if any, concerns did you have about the

O67Wmen5                          Uribe - Direct

1    investigation?

2    A.    This time I am very concerned that investigation could hurt

3    or get to a family member and hurt my daughter and Omar, my

4    son.

5    Q.    Where were you when Howard Dorian said that to you?

6    A.    I was in Andy Aslanian office.

7    Q.    In what state is Andy Aslanian's office?

8    A.    New Jersey.

9    Q.    What kind of office did Andy work in?

10   A.    Best I describe Andy's office is a building that at a point

11   in time used to be a one-family home, and then he got converted

12   into a office building.

13   Q.    Were there other offices in the building where Andy's

14   office was?

15   A.    Yes.

16   Q.    Who else had offices in the building in 2018?

17   A.    Howard Dorian, and Will Hana had an office there as well.

18          MS. POMERANTZ:   Ms. Wechsler, would you please pull up

19   just for the witness what's been marked for identification as

20   Government Exhibit 2B-2 and 2B-29.

21   Q.    Mr. Uribe, do you recognize this?

22   A.    Yes, I do.

23   Q.    And what are these exhibits?

24   A.    This is the office of Mr. Aslanian, Andy Aslanian office.

25   Q.    Is this a fair and accurate depiction of the exterior of

1    the office building that you've been just testifying about?

2    A.  Yes, it is.

3          MS. POMERANTZ:  The government offers Government

4    Exhibits 2B-2 and 2B-29.

5          THE COURT:  Hearing no objection, admitted.

6          (Government Exhibits 2B-2 and 2B-29 received in

7    evidence)

8          MS. POMERANTZ:  Can we publish those side by side,

9    please.

10   Q.  Mr. Uribe, can you now describe Andy's office?

11   A.  Yes, I can.  The picture to the -- to my right shows the

12   front of building.  Coming through the main entrance door, you

13   will find a lobby area, reception area.  Beside -- behind that

14   reception area will be the library.  Across from the library,

15   you have the secretary's or paralegal stations.  In this comes

16   a staircase that lead to the second floor.

17       On the second floor, you have Andy's office, which will be

18   located to the window to my right.  The center window will be a

19   hallway that communicate that, Andy's office with Howard Dorian

20   office, window to the left.  Behind the, Andy's office will be

21   what used to be occupied by Mr. Hana as his office.  And the

22   other office normally was empty.

23         MS. POMERANTZ:  You can take that down.

24   Q.  You testified earlier that you were running Phoenix at this

25   time.  Were you allowed to be running Phoenix, to your

1   knowledge?

2   A.  I was not.

3   Q.  Did there come a time when you talked about the New Jersey

4   attorney general's case against Elvis Parra with Wael Hana?

5   A.  Yes.

6   Q.  Approximately when was the first time you spoke with Hana

7   about the case?

8   A.  Early part of 2018.

9   Q.  I'm going to ask you more about that, but I want to first

10  back up.  I want to ask you about your relationship with Will

11  Hana.

12          Approximately when did you meet him?

13  A.  Approximately in the 2007 to 2008 year.

14  Q.  How did you meet him?

15  A.  Mr. Hana was referred -- Will was referred to me by other

16  trucking companies that I used to insure, when he was looking

17  for coverage to become a trucking company -- perform his

18  trucking company.

19  Q.  What do you mean he was referred to you?

20  A.  Other truckers that I insure refer him to me for insurance.

21  Q.  At the time you met him, what did he do for work?

22  A.  Will, to my knowledge, have several businesses, one of them

23  being a gas station.  And also he had ownership or relationship

24  with the management and control of restaurants.

25  Q.  You testified that you met him through work, is that right?

1    A.  Correct.

2    Q.  So was it through one of those businesses or through a

3    different business?

4    A.  I met him through a trucking company.

5    Q.  Did you serve as an insurance broker for him?

6    A.  Yes, I did.

7    Q.  Which company of yours served as an insurance broker for

8    him?

9    A.  First Inter America and later on Phoenix Risk.

10   Q.  When you first met Will Hana, was your relationship with

11   him purely a business relationship?

12   A.  Yes, in the beginning of this, it was basically business.

13   At the beginning.

14   Q.  Did that change?

15   A.  That changed very quickly into a great friendship, to the

16   extent that we consider each other brother.

17   Q.  Did you socialize with him?

18   A.  Yes, I did.

19   Q.  How did you socialize with him?

20   A.  Will and I used to go out often and shared dinners and good

21   times together and talk about business and other, personal

22   matters.

23   Q.  What else -- what was your understanding of Will Hana's

24   financial situation in the early years of your friendship?

25              MR. SOLANO:  Objection, your Honor.

1          THE COURT:  Sustained.

2          MS. POMERANTZ:  Your Honor, I'm only --

3          THE COURT:  Sustained as to form.

4          MS. POMERANTZ:  OK.

5    Q.  Based on your friendship with Will Hana and your

6    conversations with him, when you first met him, what was your

7    understanding of his financial situation?

8          MR. SOLANO:  Objection, your Honor.

9          THE COURT:  Sustained.  Same question.

10   BY MS. POMERANTZ:

11   Q.  Did you have an understanding of Will's financial

12   situation?

13         THE COURT:  I don't know what financial situation is.

14   BY MS. POMERANTZ:

15   Q.  Did you have an understanding of Mr. Hana's finances in the

16   early years of your friendship?

17   A.  Yes.  My understanding is at the beginning of our

18   friendship and doing his business together, being his insurance

19   broker, Mr. Hana was financially stable and he got a strong

20   financial position.

21   Q.  Did that change?

22   A.  Yes, it did.

23   Q.  What was your understanding of how that changed?

24         MR. FEE:  Objection.  Foundation.

25         THE COURT:  See if he has.

1        Go ahead.  You may answer.

2   A.  With the passing of years, unfortunately, Will's, his

3   business, it started to deteriorate, one after the other.

4              MR. FEE:  Move to strike.  Nonresponsive.

5              THE COURT:  I'll allow it.

6              Next question.

7   BY MS. POMERANTZ:

8   Q.  Approximately when did it start to deteriorate?

9   A.  Somewhere in the 2013, '14 year.

10  Q.  What, if anything, did Will say to you about his financial

11  situation around this time?

12  A.  His businesses were doing bad and he was facing a number of

13  issues with his gas station.  The trucking company didn't

14  perform well at all, and he had some issues with the

15  restaurants as well.

16  Q.  Did you understand Will's financial situation to improve or

17  to get worse?

18  A.  It got worse.

19  Q.  Did you understand that he continued to have his

20  businesses?

21  A.  Trucking company, it stop operating.  There were some

22  issues with the gas station, where he either lost the contract

23  or the franchise.  And I don't know the outcome of the, how bad

24  the businesses with -- the restaurant businesses performed.

25       This is also the time where Will lost, unfortunately, his

1    home as well.

2    Q.  What did you understand Will to do for -- withdrawn.

3          In this time period, did you go to meals with Will?

4    A.  We used to go out to meal once in a while, yes.  Often, I

5    would say.

6    Q.  Who paid when you went out for meals with him?

7    A.  Can I ask which period of time you're talking about, ma'am,

8    please?

9    Q.  So, in the period after he had lost his businesses.

10   A.  Well, when -- when Will started doing bad and he and I used

11   to go out together, I would, I will take care of it.  I will

12   pay for the bill, yes.  I used to pay for the bill.

13   Q.  What did you understand Will to do for work in 2018?

14   A.  My understanding is that Will was doing some studies for

15   his transportation -- for his meat company.

16   Q.  I want to now focus on your conversation with Will about

17   the New Jersey attorney general's case against Elvis.  Can you

18   remind us, when was your conversation with Will?

19   A.  Early 2018.

20   Q.  Where were you?

21   A.  One afternoon I was sitting at Andy's office, and I was in

22   Andy's office, just visiting for one afternoon, talking about

23   the Elvis case and the new subpoena that we received for

24   Prestige.

25   Q.  What was your relationship -- withdrawn.

1          You said that you were at Andy's office.  How did the
2     New Jersey attorney general's case come up with Will in 2018?
3     A.  This afternoon Andy and I are talking about both
4     investigations against Elvis and the Prestige Express subpoenas
5     when Will overheard the conversation and pulled me outside to
6     the hallway.  And that's when he and I spoke about these, this
7     investigation.
8     Q.  What did Will say to you?
9     A.  In substance, something like, brother, if this case is
10    about the Parra problem, situation, investigation, for sum of
11    about 200 to $250,000 -- I don't recall the exact amount -- he
12    will mail, he got a way to make these things go away.
13    Q.  Did you and Will talk about the investigation into
14    Prestige?
15    A.  Don't have a full recollection, but we did talk about -- we
16    did talk about both investigations going on at this point, yes,
17    ma'am.
18    Q.  Did he mention any particular names when he said that he
19    could help make the case go away?
20    A.  Yes, he did.
21    Q.  What names?
22    A.  Mentioned the name of Nadine and Senator Menendez.
23    Q.  What did he say about them?
24    A.  He being in some form of relationship with Nadine, he could
25    go to Nadine.  Nadine will work with -- go to Senator Menendez.

1  He also had at this point been in contact with Senator Menendez

2  himself.

3  Q.  Apart from talking about Robert Menendez and Nadine, did

4  Will say exactly how he was going to make the case go away?

5  A.  No.  At this point he did not mention any avenues that were

6  being taken to get a resolution.

7  Q.  When Will said that he could make the case go away, where

8  in the office building were you?

9  A.  We were at, standing outside Andy's office, that hallway

10  that connect both Andy's and Howard Dorian office.

11  Q.  Was anyone else in the hallway with you?

12  A.  No.

13  Q.  And by the way, did you ever mention Bien's name to Will?

14  A.  You mean in this, in this hallway conversation?

15  Q.  Just generally.

16  A.  Yes.  Generally, yes.

17  Q.  Did Will seem to know who you were talking about?

18  A.  Yes, he knew -- he knew him.

19  Q.  And did you ever mention Will's name to Bienvenido?

20  A.  Yes, I did.

21  Q.  Did Bienvenido seem to know who you were talking about?

22  A.  Yes.

23  Q.  In early 2018, had you met Nadine?

24  A.  Yes, I have.

25  Q.  Approximately when did you first meet Nadine?

1   A.  I will say over ten years ago, prior to 2018.

2   Q.  Who did you meet her through?

3   A.  Through Andy Aslanian.

4   Q.  What was your relationship with Nadine in early 2018?

5   A.  We were acquaintance.

6   Q.  Prior to 2018, had you spoken to Nadine on the phone?

7   A.  I never did.

8   Q.  Prior to 2018, had you texted her?

9   A.  Never did.

10  Q.  You testified that Will told you that he could make the

11  investigations go away.  Did you tell anyone that Will said

12  that to you?

13  A.  Yes, I did.

14  Q.  Who did you tell?

15  A.  I told Bien Hernandez.

16  Q.  Approximately how long after your conversation with Will

17  did you tell Bien what Will said?

18  A.  Short after that.

19  Q.  Why did you tell Bien?

20  A.  Bien was under subpoena, Bien and Prestige Trucking

21  Express.  His subpoena is already issue.  And the investigation

22  toward E&K is still outstanding.  So yes, I definitely told him

23  both about this.  They have an interest for it.

24  Q.  What did you tell Bien?

25  A.  Told, in substance, something like Will, my brother Will,

1  expressed to me that he has a way to get a good resolution for

2  Elvis's sentence and make this investigations stop and go away,

3  and I suggested to him that it would be smart for us to get

4  together and listen to what he has to say.

5          THE COURT:  Who is he?  When you said get together and

6  listen to what he had to say, who --

7          THE WITNESS:  I'm talking about Will Hana.

8          THE COURT:  All right.

9          THE WITNESS:  Will.

10  BY MS. POMERANTZ:

11  Q.  Did you mention Robert Menendez and Nadine when you spoke

12  to Bien?

13  A.  I don't have a recollection of that phone call with Bien

14  stating names exactly.

15  Q.  Now, what happened next?

16  A.  The next sequence of event is when I put -- I managed to

17  put this meeting together between Bien Hernandez, Elvis Parra,

18  Will Hana and myself.

19  Q.  Where did the meeting take place?

20  A.  It took place at the Glenpointe Marriott.

21  Q.  What is the Glenpointe Marriott?

22  A.  It's a hotel in New Jersey.

23          MS. POMERANTZ:  Ms. Wechsler, would you please pull up

24  just for the witness what's been marked for identification as

25  Government Exhibit 2B-4.

1              THE COURT:  Where in New Jersey is the Glenpointe

2    Marriott, sir?

3              THE WITNESS:  Teaneck, New Jersey.

4    BY MS. POMERANTZ:

5    Q.  Mr. Uribe, do you recognize this?

6    A.  Yes, I do.

7    Q.  What is it?

8    A.  It's the outside entrance of the Glenpointe Marriott.

9    Q.  Is this a fair and accurate depiction of the exterior of

10   the Glenpointe Marriott in Teaneck, New Jersey?

11             THE WITNESS:  Yes, it is.

12             MS. POMERANTZ:  The government offers Government

13   Exhibit 2B-4.

14             THE COURT:  Admitted, without objection.

15             (Government Exhibit 2B-4 received in evidence)

16             MS. POMERANTZ:  You can publish that, Ms. Wechsler.

17   Q.  Mr. Uribe, where in the hotel did you all meet?

18   A.  We met in the, one of the lobbies inside the Marriott on

19   the first floor.

20   Q.  You said one of the lobbies?

21   A.  Yes, I did.

22             MS. POMERANTZ:  Ms. Wechsler, could you please pull up

23   for just the witness what's been marked for identification as

24   Government Exhibit 2B-5.

25   Q.  Mr. Uribe, do you recognize this?

1    A.  Yes, I do.

2    Q.  And what is it?

3    A.  One of the lounge at the Glenpointe Marriott.

4    Q.  Is this a fair depiction -- a fair and accurate depiction

5    of a lounge inside the Glenpointe Marriott?

6    A.  Yes, it is.

7            MS. POMERANTZ:  The government offers Government

8    Exhibit 2B-5.

9            THE COURT:  Hearing no objection, admitted, a lounge

10   at the Glenpointe Marriott.

11           (Government Exhibit 2B-5 received in evidence)

12           MS. POMERANTZ:  You can publish that for the jury.

13   Q.  Mr. Uribe, can you indicate on Government Exhibit 2B-5

14   where you, Will, Elvis and Bien met?

15   A.  Yes, I can.

16           We were standing in the -- we were standing by the bar

17   at the beginning of the row to the available seats, in there,

18   just where I marked.

19           MS. POMERANTZ:  You can take that down.

20   Q.  Mr. Uribe, who set up the meeting?

21   A.  I did.

22   Q.  Why did you set up the meeting?

23   A.  My brother Will has expressed the fact that he has a way to

24   make this go away.  My associate and friend Elvis is under

25   indictment.  Couldn't get a better resolution.  Will looks

1    solid in that he has a good solution to make this go away, and

2    it was to my interest that these investigations stops in a way

3    that never get to my daughter or my family.

4    Q.  Why did you invite Bienvenido Hernandez to the meeting?

5    A.  Bienvenido Hernandez, he's partner to Elvis Parra, and his

6    company, Prestige, is now under subpoena by the New Jersey

7    attorney general office.

8    Q.  What did Will say at the Glenpointe Marriott?

9    A.  In substance, he confirmed to all of us that he has a way

10   to make this investigation, to -- first of all, get a best

11   resolution for Elvis and make all of this investigations stop

12   and kill if he receive a sum of, somewhere 200 to $250,000.

13   Q.  What investigation or investigations did Will say he would

14   make sure were stopped?

15   A.  Investigation of -- prosecution in this case of Elvis Parra

16   and E&K and the investigation that is on the go for Prestige

17   Trucking Express; that could also lead to an investigation into

18   my daughter Ana and Phoenix Risk Management.

19   Q.  Did Will mention Nadine at this meeting?

20   A.  Yes, he did.

21   Q.  Did he mention Robert Menendez?

22   A.  Yes, he did.

23   Q.  Did he specify at this meeting what he was going to do in

24   order to make sure all investigations were stopped?

25   A.  Except for being in touch with Nadine and Senator Menendez,

O67Wmen5                           Uribe - Direct

1   he did not discuss the avenues that were going to be taken to

2   execute the resolution of these cases.

3   Q.  How did Elvis Parra and Bienvenido Hernandez respond to

4   what Will said?

5   A.  They were accepting his terms and were happy about a

6   possible good resolution.

7   Q.  When you say they were accepting his terms, what do you

8   mean?

9   A.  They accepted to pay the amount that's needed if the

10  investigations and if -- actually, if the -- Elvis doesn't do

11  jail time, doesn't get jail time, get a better sentence, and

12  also this investigation for Prestige and the, and the possible

13  investigation against Phoenix are stop and killed.

14          THE COURT:  Why don't you find a logical point to

15  break.  I'll give the jury its midafternoon break.

16          MS. POMERANTZ:  I think this is fine, your Honor.

17          THE COURT:  All right.  Ten minutes, ladies and

18  gentlemen.

19          (Continued on next page)

20

21

22

23

24

25

1                    (Jury not present)

2                    THE COURT:  I want to see counsel at sidebar.

3                    Counsel, I just need one per each side, although all

4       can join.

5                    (At sidebar)

6                    THE COURT:  Mr. Fee, your last question was highly

7       inappropriate.  I did not want to chastise you in front of the

8       jury, but you clearly knew it was highly inappropriate.  You

9       don't ask do you think it would be a productive use of the

10      FBI's time to find the truth.

11                   Let's let it go at that.  Don't do it again.

12                   I can tell you what each of you have to sell here is

13      your credibility and your good name with the jury.  I did see

14      two jurors shake their heads after you asked that question, so

15      just think about that.  You can make your own analysis of how

16      the jury is reacting to questions, but I don't want to hear a

17      question like that again.

18                   MR. FEE:  Yes, your Honor.

19                   For the record, yesterday when Mr. Richenthal

20      concluded his redirect with two wrongs don't make a right to

21      the former attorney general of New Jersey, I don't think he was

22      chastised in the same manner in front of the jury.

23                   THE COURT:  I did not chastise you in front of the

24      jury.  I'm doing it at sidebar.

25                   I don't remember the specifics.  I assume I sustained

O67Wmen5                          Uribe - Direct

1    an objection to that, although I don't remember.

2                    MR. FEE:  You did.

3                    THE COURT:  All right.  Let's let it go at that,

4    Mr. Fee.

5                    MR. FEE:  Yes, your Honor.

6                    (In open court)

7                    THE COURT:  Ten minutes.

8                    (Recess)

9                    THE COURT:  Put the witness on the stand.

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  You may be seated in the courtroom.

3          You may continue with your direct examination of this

4    witness, Ms. Pomerantz.

5          MS. POMERANTZ:  Thank you, your Honor.

6    Q.  Mr. Uribe, you were just testifying about your meeting with

7    Will, Bien and Elvis at the Glenpointe Marriott, is that right?

8    A.  Yes, I did.

9          MS. POMERANTZ:  Ms. Wechsler, can we please display

10   what's in evidence as Government Exhibit 1308.

11   Q.  Mr. Uribe, does this chart show text messages between you

12   and Wael Hana?

13   A.  Yes, it does.

14   Q.  Does this chart contain some of the texts you exchanged

15   with Wael Hana but in a different format?

16   A.  Yes.

17   Q.  Now, I want to direct your attention to row one, March 28,

18   2019, at 9:02 p.m.  Who sent that text?

19   A.  I send the text.

20   Q.  Who did you send that text to?

21   A.  Will.

22   Q.  In what language did you send the text?

23   A.  I sent it in Spanish.

24   Q.  Did you typically text Will in Spanish?

25   A.  No.

1   Q.   Can you please read the English translation of your text

2   message?

3   A.   "Michael Critchley, but he's not officially in court yet."

4   Q.   Who was Michael Critchley?

5   A.   Michael -- Mr. Critchley was the attorney for Elvis Parra

6   at this time.

7   Q.   Was he the attorney for Elvis Parra before or after Howard

8   Dorian?

9   A.   After Howard Dorian.

10  Q.   Why did you send information about Michael Critchley to

11  Will in March 2018?

12  A.   Will requested to provide him with the information that I

13  have available so he perform his part of the deal, of the

14  agreement.

15  Q.   I want to direct your attention to row 15.  Can you please

16  read the first sentence of that text message?

17  A.   "The deal is to kill and stop all investigations."

18  Q.   Who sent that text message?

19  A.   I did.

20  Q.   Whom did you send that text to?

21  A.   Will.

22  Q.   On what date?

23  A.   April 4, 2018.

24  Q.   What did you mean by the deal is to kill and stop all

25  investigation?

1    A.  I was reconfirming with Will the original deal that was

2    arrange at the meeting at the Marriott.

3    Q.  What did you mean by all investigation?

4    A.  The prosecution against Elvis Parra, the subpoena

5    investigation into Prestige Trucking Express and the possible

6    investigation of Phoenix Risk Management and my daughter, Ana.

7    Q.  Why did you send Will this message?

8    A.  Sitting here right now, I don't have the reasoning, what

9    triggered me to send this message to Will, but I just

10   reconfirming what the original agreement was.

11   Q.  Did you send this text message before or after the meeting

12   at the Glenpointe Marriott with Will, Bien and Elvis?

13   A.  It was sent after.

14        MS. POMERANTZ:  We can take that down, Ms. Wechsler.

15   Q.  I want to direct your attention to July 2018.

16        Did there come a time that month when you saw Robert

17   Menendez in person?

18   A.  Yes.

19   Q.  Where did you see him in person?

20   A.  I saw Mr. Menendez at the Villa Amalfi in fund-raiser that

21   I put together for his campaign.

22   Q.  When did you hold a fund-raiser for Robert Menendez?

23   A.  July the 2018.

24   Q.  Had you been involved in political fund-raising before?

25   A.  I have not.

1    Q.  Why did you hold a fund-raiser for Robert Menendez?

2    A.  In conversations with, with Will, he suggested that --

3    first of all, knowledge me, made me aware that Mr. Menendez was

4    running for reelection, and he suggested that it was a good

5    idea for us to put some fund-raiser together and help

6    campaigns; that will put us in the best -- better standing with

7    Mr. Menendez.

8    Q.  You said better for us.  Who are you referring to?

9    A.  Better for us -- for Elvis, for Bien, for myself.  For the

10   deal.

11   Q.  Did you agree to hold a fund-raiser after Will made this

12   suggestion?

13   A.  Yes, I did.

14   Q.  Why?

15   A.  I wanted to be in the good grace of the senator.

16   Q.  Why?

17   A.  Because it was my best avenue at this point to help my

18   associates and to definitely, if possible, stop an

19   investigation against my daughter and my family.

20   Q.  How did you plan the fund-raiser?

21   A.  After agreeing to put this fund-raiser together, a young

22   lady that works for the senator's office, first name being

23   Samantha -- I don't recall her last name -- contacted me and

24   guide me through the procedures to follow in order to put a

25   fund-raiser together.

1   Q.  Were people invited to the fund-raiser?

2   A.  Yes.

3   Q.  Who decided who was invited to the fund-raiser?

4   A.  I did.

5        MS. POMERANTZ:  Ms. Wechsler, can we display what is

6   in evidence as Government Exhibit E301-T.

7   Q.  Mr. Uribe, what is this?

8        MS. POMERANTZ:  Zoom in on that, please.

9        Thank you.

10        THE WITNESS:  Thank you for that.

11  BY MS. POMERANTZ:

12  Q.  What is this, Mr. Uribe?

13  A.  That is the text, text from me to Bien Hernandez.

14  Q.  Is this an email or a text?

15  A.  I would say an email.  I'm sorry about that.  Sent email.

16  Q.  And what is the email address of the person to whom you

17  sent the email?

18  A.  Bien.hernandez@prestigeexpress.com.

19  Q.  Can you read the from line of your email?

20  A.  Would you indicate me what you call from line here, please?

21  Q.  On the first line, whose name is listed?

22  A.  Coming from me -- I'm sorry -- José Uribe, and that will be

23  my email address, greendaytransport229@gmail.com.

24  Q.  Can you read the subject?

25  A.  "Senator Menendez invitation."

1    Q.   What's the date of your email?

2    A.   July 4, 2018.

3    Q.   When you emailed or texted with Bienvenido Hernandez, what

4    language did you use?

5    A.   Spanish.

6              THE COURT:  It's probably easiest if you move this

7    closer to your mouth, move the microphone.

8              THE WITNESS:  I will do my best, your Honor.

9              THE COURT:  OK.  It's a directional mic, so have it

10   directly in front of your mouth.

11             THE WITNESS:  Thank you, sir.

12   BY MS. POMERANTZ:

13   Q.   I asked when you emailed or texted with Bienvenido

14   Hernandez, what language did you use?

15   A.   Spanish.

16   Q.   Can you please read the translation of your email?

17   A.   "We can't fail."

18   Q.   What did you mean by that?

19   A.   Not that -- we can't fail.  We have to come through with

20   this and be sure that we are -- we do great for this

21   fund-raiser.

22   Q.   Why did you send this email to Bien?

23   A.   Bien is partner to Elvis Parra, the person that is under

24   indictment.  His company's now under investigation.  He has a

25   very good interest for this to come through.

1    THE COURT:  Did you say his company is now under

2    investigation, or did you say his company is not on the

3    investigation?

4    THE WITNESS:  His company was under investigation at

5    the time of this text.

6    THE COURT:  Was under investigation.  All right.

7    Thank you.

8    BY MS. POMERANTZ:

9    Q.  What was attached to your email?

10   MS. POMERANTZ:  Let's go to the second page.

11   THE WITNESS:  Thank you.

12   MS. POMERANTZ:  Third page.

13   Q.  Mr. Uribe, what are we looking at?

14   A.  That's the invitation that was formulated for the people

15   that I was inviting to the fund-raiser.

16   Q.  Can you read the part of the invite starting with your name

17   through fund?

18   A.  "José Uribe invites you to a cocktail reception in support

19   of Senator Bob Menendez to raise funds for Menendez victory

20   fund."

21   Q.  What was the date of the fund-raiser?

22   A.  Friday, July 13, 2018.

23   Q.  Where was the fund-raiser held?

24   A.  Villa Amalfi restaurant.

25   Q.  And where is that?

1   A.  Cliffside Park, New Jersey.

2           MS. POMERANTZ:  Ms. Wechsler, could you pull up for

3   just the witness what has been marked for identification as

4   Government Exhibit 2B-10.

5   Q.  Do you recognize this?

6   A.  Yes, I do.

7   Q.  What is it?

8   A.  The Villa Amalfi.

9   Q.  Is this a fair and accurate depiction of the exterior of

10  Villa Amalfi?

11  A.  Yes, it is.

12          MS. POMERANTZ:  The government offers Government

13  Exhibit 2B-10.

14          THE COURT:  Admitted.  One picture of Villa Amalfi

15  restaurant.

16          (Government Exhibit 2B-10 received in evidence)

17          MS. POMERANTZ:  If we can publish that.

18  Q.  Where was the fund-raiser held within Villa Amalfi?

19  A.  It was held in a private room at the second floor.

20          MS. POMERANTZ:  We can take that down.

21  Q.  Did you invite Bien to the fund-raiser?

22  A.  Yes, I did.

23  Q.  Did you also invite Elvis to the fund-raiser?

24  A.  Yes, I did.

25  Q.  And why did you invite them to the fund-raiser?

O67Wmen5                          Uribe - Direct

1   A.  They are the people that are interest in, that this

2   business arrangement, that the deal is in good standing and can

3   be completed to our favor.

4   Q.  Did Robert Menendez attend the fund-raiser?

5   A.  Yes, he did.

6   Q.  Did you speak to Robert Menendez at the fund-raiser?

7   A.  Yes, I did.

8   Q.  What, if anything, did he say to you at the fund-raiser?

9   A.  We have very short conversations, but in as much substance,

10  he said that he was very impressed with the fine group of

11  business people that I managed to put together for his -- this

12  fund-raiser.

13  Q.  Was Nadine at the fund-raiser?

14  A.  Yes, she was.

15  Q.  Did you speak with her at the fund-raiser?

16  A.  Yes, I did.

17  Q.  Did you speak with her for a short time or a long time?

18  A.  Short time.

19  Q.  What was your relationship with Nadine at this time?

20  A.  Business, just acquaintance.

21          MS. POMERANTZ:  Ms. Wechsler, would you pull up for

22  just the witness what's been marked for identification as

23  Government Exhibit E102-A.

24  Q.  Mr. Uribe, do you recognize this?

25  A.  Yes.

1    Q.  What is it?

2    A.  That is a picture of Elvis Parra, Senator Menendez and

3    myself at the Villa Amalfi.

4    Q.  Is this a fair and accurate depiction of a photograph from

5    that fund-raiser?

6    A.  Yes, it is.

7           MS. POMERANTZ:  The government offers Government

8    Exhibit E102-A.

9           THE COURT:  Admitted, one picture.

10          (Government Exhibit E102-A received in evidence)

11          MS. POMERANTZ:  If we can publish that for the jury.

12   Q.  Mr. Uribe, approximately how much money did you help raise

13   for Robert Menendez at the fund-raiser?

14   A.  $50,000.

15   Q.  Approximately how much money did you personally donate in

16   connection with the fund-raiser?

17   A.  5,000.

18   Q.  What happened after the fund-raiser was over?

19   A.  Some of us went to a after-party at a restaurant in

20   Edgewater.

21          MS. POMERANTZ:  Ms. Wechsler, we can take that down.

22   Q.  Who went?

23   A.  Nadine, Will, Mr. Menendez, few other invites.  And myself.

24   Q.  What did you all do at the restaurant?

25   A.  We have -- we have a couple of cocktails and some laughs,

1    some jokes, and some dancing.

2    Q.  Did you speak with Robert Menendez about the deal at the

3    fund-raiser or the restaurant?

4    A.  No, I did not.

5    Q.  Why not?

6    A.  It was a crowded and loud place.  It was -- it was a little

7    bit impossible to be talking about things like this at this

8    point, in this place.

9    Q.  After you left the restaurant, what was your understanding

10   of the status of the deal?

11   A.  My understanding is that the deal was on his way, that is

12   in good terms, that what Will has promised to have a good

13   result and should have a good result.  I have done my part as

14   putting that fund-raiser together, and I got a lot of hopes

15   that everything was going to work out well for all parties.

16   Q.  Why was that?

17   A.  Senator was there.  He was happy about the fund-raiser.  He

18   was happy about the fine group of people that were there, and

19   that things looks to be underway.

20   Q.  You testified that you felt better about this situation

21   after the fund-raiser.  At some point did that change?

22   A.  Yes.

23   Q.  What changed?

24   A.  It's a point in time where Suzanna Lopez, the investigator

25   for the attorney general's office, resurfaced into these

1   investigations and is looking to interview my daughter, and

2   that created a little anxiety on her and myself.

3   Q.  When you said she was looking to interview your daughter,

4   who are you referring to?

5   A.  Ana Peguero.

6   Q.  How did you learn that Det. Lopez reached out to interview

7   Ana?

8   A.  Andy Aslanian told me about it.

9   Q.  What was your reaction after learning about Det. Lopez's

10  interview request?

11  A.  I was concerned.  My anxiety increases.  There goes the

12  investigator, officer, that definitely made my daughter very

13  unhappy and worry and with a lot of anxieties.  I was not

14  happy.  I was -- I was very worried at this point.

15  Q.  After you learned of Det. Lopez's request to interview Ana,

16  who, if anyone, did you reach out to?

17  A.  I reach out to Will.

18          MS. POMERANTZ:  Ms. Wechsler, can you please display

19  what's in evidence as Government Exhibit 1309.

20  Q.  Mr. Uribe, does this show text messages between you and

21  Will Hana?

22  A.  Yes, it does.

23  Q.  Is this chart similar to the chart we saw last time?

24  A.  It is similar.

25  Q.  I'm going to direct your attention to the first row and ask

1   you to read your text.

2   A.   "I am fucked man."

3   Q.   What's the date of your text message?

4   A.   October 12, 2018.

5   Q.   And what did you mean when you wrote that?

6   A.   At this point I already told my family, my brother and my

7   daughter, that it -- stop the worry.  My brother Will promised

8   me something.  This something is to be in good standing, things

9   looks well, we shouldn't be worried.

10          All of a sudden Ms. Lopez comes back to harass my

11   daughter and that, that, that was -- that was not a good time

12   for me.  That was not.  I was -- I hate to repeat the word, but

13   I was fucked.  That's way I felt.

14          MS. POMERANTZ:  Can you take that down so we can see

15   the other messages, please.

16   Q.   I want to direct your attention to row five and ask you to

17   read your message there.

18   A.   "The whole thing is going bad.  I have no face to talk to

19   my family."

20   Q.   What did you mean by that text?

21   A.   I told my family that I handle it.  My family looked out to

22   me to take care of things, to be out there for them and to

23   protect them all the time.  When Suzanna Lopez resurfaced, I

24   didn't have a way to tell them she's back and whatever I

25   promise you is not true.

1    Q.  What do you mean I didn't have a way to tell them?

2    A.  I couldn't face my family.  I couldn't tell them that what

3    I told them was fine is not fine, obviously.  She's back.

4           THE COURT:  When you say your family, who are you

5    referring to?

6           THE WITNESS:  This case, the person that is more --

7    the family member that is more under pressure and anxiety and

8    worries is my daughter, Ana Peguero.

9           THE COURT:  So if I understand you, sir, when you say

10   I have no face to talk to my family, what you were saying was I

11   have no face to talk to Ana.  Is that what you meant?

12          THE WITNESS:  That would be -- that would be, your

13   Honor, with all due respect, a simple way to say it.  But my

14   family also consists of my brother and my sister, and we all

15   work together.  And I'm responsible for all of them.

16          THE COURT:  Thank you.

17   BY MS. POMERANTZ:

18   Q.  Let's look at row six.  Will writes back don't worry.  What

19   did you understand him to mean?

20   A.  This -- this way he try to tell me to -- not to get my

21   anxieties up and that he still have things under control.

22   Q.  Let's direct your attention to row seven, where Will wrote

23   you on October 12, 2018, at 11:09 p.m., she is going crazy

24   because what's going with E&K.  Who did you understand "she" to

25   refer to?

1   A.  Det. Lopez.

2   Q.  And what did you understand him to mean by his text that

3   Det. Lopez was going crazy because what's going with E&K?

4   A.  This time E&K has not been prosecuted; his case is still

5   open.  And I guess that is bothering Ms. Lopez.

6   Q.  I want to direct your attention now to row eight, ask you

7   to read your text from October 13, 2018, at 11:49 a.m.

8   A.  "Morning sir.  Please be sure that you -- that your friend

9   knows about this.  Just as a last favor."

10  Q.  Who were you referring to when you wrote your friend?

11  A.  Senator Menendez.

12  Q.  And what did you mean by please be sure that your friend

13  knows about this?

14  A.  I asked Will to be sure that he knows that Det. Lopez is

15  still in investigation of this case.

16  Q.  What did you mean by last favor?

17  A.  If Will get -- does this for me, I don't have to ask him

18  for anything else.  All I wanted was to protect my family and

19  this woman leave them away -- leave them alone, I would say.

20  Sorry.

21  Q.  And let's look at the next row.  Will responds a minute

22  later and says, I will.  What did you understand him to mean?

23  A.  That he will relay my message and my request.

24  Q.  To who?

25  A.  Senator Menendez.

1   Q.  What did you want him to tell -- withdrawn.

2            Why did you want him to tell Robert Menendez about the

3   investigation?

4   A.  As Will has promised, I want him to tell Mr. Menendez that

5   investigation is still ongoing and to please stop anything, any

6   action that could hurt my family.

7   Q.  Let's look at the next row, row ten.  You respond on

8   October 13, 2018, a minute later.  I'm going to ask you to read

9   your response.

10  A.  "I will handle this from now on.  I am going to face it --

11  I am going to face it everyone.  I will no allow anybody to

12  hurt my Ana -- to harm my Ana."

13  Q.  What did you mean by this text?

14  A.  If Will is not willing to come through with the agreement,

15  for the deal, I was not going to continue hoping that he's able

16  to do anything, and I will face my family and face everyone to

17  the extent that I was willing to ask Ms. Lopez to interview me

18  and leave my family alone.

19           MS. POMERANTZ:  Let's look at the next page.  Let's

20  look at row 11 and also scroll down to row 12.

21  Q.  What did you send Will in these two messages?

22  A.  Could you scroll to the previous page, please, as well?

23           I send Will a picture of an email between Andy

24  Aslanian and Det. Lopez.

25           (Continued on next page)

O675men6                            Uribe - Direct

1   BY MS. POMERANTZ:   (Continuing)

2   Q.  I want to first go to page 3 and zoom in on the photograph

3   which is Government Exhibit E 102C.

4            Mr. Uribe, what is this a photograph of?

5   A.  An e-mail between Suzanne Lopez and Andy Aslanian.

6   Q.  What is the date of the e-mail?

7   A.  Can you zoom in for me, please?

8            MS. POMERANTZ:  Ms. Wechsler, can you zoom in on the

9   date?

10  A.  October -- I'm sorry.  I need to make it larger, please.

11  That would be October 10, 2018.

12  Q.  Can you read the e-mail, please?

13  A.  "Good afternoon, Andy.  I am looking to set up a meeting to

14  speak with your client Ana Peguero in regards to Prestige

15  Express Trucking, Inc.  Please let me know your available.

16  Thank you."

17           MS. POMERANTZ:  Let's zoom out of this and let's go

18  back to page 2 and ask you, Ms. Wechsler, to zoom in on this

19  photograph which is E12-B.

20  Q.  Mr. Uribe what is a photograph of?

21  A.  An e-mail from Andy Aslanian to Ms. Lopez.

22  Q.  What is the date of the e-mail?

23  A.  October 12, 2018.

24  Q.  I'm going to direct your attention, ask you to read the

25  first part of the e-mail through the October 21, 2018.

1    A.   "Dear Detective Lopez, I received your e-mail request of

2    October 10, 2018.  Presently I have a business trip to Egypt

3    from October 13, 2018, to October 21, 2018."

4    Q.   I will ask you to read the next sentence.

5    A.   "I have matters scheduled for the week of the 21st, and I

6    am tentatively scheduled for lung surgery sometime during the

7    week of October 29, 2018.  I expect that surgery will keep me

8    out of the office for approximately 10 days.  I therefore will

9    not be in position to schedule an appointment with you until

10   sometime in the middle or the end of November.  I suggest that

11   we diary this matter for followup for the week after the

12   election day so that we can try to pick an acceptable date for

13   the interview."

14            MS. POMERANTZ:  We can take that down.

15   Q.   Mr. Uribe, why did you send photographs of these e-mails to

16   Will?

17   A.   I wanted Will to understand where the request of me, from

18   Suzanna Lopez wanting to meet with my Ana.  I wanted to take

19   that e-mail and relay it to Nadine and Senator Menendez.  I

20   wanted Will to relay these messages to, requests of

21   interviewing my Ana, to Senator Menendez and Nadine.

22   Q.   Let's go to page 3 of this exhibit.  I am going to direct

23   your attention to row 14 and ask you to read your text message

24   to Will.

25   A.   "Tell him I will not allow the interview."

O675men6                              Uribe - Direct

1    Q.   Who does "him" refer to?

2    A.   Senator Menendez.

3    Q.   What did you mean by "tell him I will not allow the

4    interview"?

5    A.   I will not let Suzanna Lopez bother my daughter.

6    Q.   Let's turn to the next page.  I want to direct your

7    attention to row 15.  How did Will respond to you?

8    A.   "K".

9    Q.   I direct your attention to the next row.  Can you read your

10   response?

11   A.   "It's time to finish the BS."

12   Q.   What did you mean by "It's time to finish the BS"?

13   A.   Wael said he has a way to take this investigation down and

14   finished and that he will get paid for it.  I wanted this

15   bullshit to stop and him to finish his agreement, comply with

16   his agreement.

17   Q.   In the next row will responds "K".  What is the date of

18   these messages between you and will?

19   A.   October 13, 2018.

20   Q.   Let's look at the next row, October 19, 2018, at 12:02 a.m.

21   Mr. Uribe, can you please read your text message to Will?

22   A.   "My brother Wael.  I am fucked.  I know you tried your best

23   but it didn't work.  I am going all the way."

24   Q.   This is on October 19, 2018.  About how much time had

25   passed between this text and your prior text messages with

1   Will?

2   A.   About a week's time.

3   Q.   What did you mean by "I'm fucked.  I know your tried your

4   best but it didn't work"?

5   A.   A week passed by, I got no answer from Will, he seems to be

6   doing nothing.  He might have the good heart to get this done,

7   to get this agreement done.  Nothing is happening and I'm

8   worried for my family.

9   Q.   What you did you mean by "I'm going all the way."

10  A.   I will face Suzanna Lopez or whoever else wanted to touch

11  my family and I will answer and face him.

12  Q.   I want to direct your attention to row 22, a message from

13  October 25, 2018 at 5:02 p.m.  Can you please read your message

14  to Will?

15  A.   "OK.  You never told me what your friend said."

16  Q.   Mr. Uribe, who does "your friend" refer to?

17  A.   Senator Menendez.

18  Q.   What did you mean by you never told me what your friend

19  said?

20  A.   Will hasn't relayed any answers to me in regard to my

21  request or showing him the e-mails tell me what is going on,

22  what is being done.

23  Q.   Let's look at Wael's response.  In row 23 he responds:  "No

24  worry."  What did you understand him to mean?

25  A.   That he is still under control, that I shouldn't worry.

O675men6                          Uribe - Direct

1   Q.   Let's look at the next row, October 25, 2018 a minute

2   later.  Can you read your response?

3   A.   "I am man.  I don't want anybody to harm" -- my Ana.  Anita

4   in this case.  Sorry.

5   Q.   When you wrote "I am man" what did you mean?

6   A.   I was worried.  I am no longer taking his word and his

7   promises that he'd handle it.  I had my doubts.

8   Q.   When you wrote "I don't want anybody to harm Anita," who is

9   Anita?

10  A.   My Ana Peguero.

11  Q.   What did you mean by I don't want anybody to harm Anita?

12  A.   I don't want Suzanna Lopez to come and bother her.

13  Q.   I direct your attention to the next row.  Can you please

14  read your next text?

15  A.   "I feel everyone is leaving me alone."

16  Q.   What did you mean by that?

17  A.   I cannot respond, I don't have a positive response from

18  Will.  I assume that Will at this point has no response from

19  whatever his agreement is with Mr. Menendez and Nadine so I

20  have nobody behind me, the deal is a deal that cannot be done,

21  that he has done nothing about it.  I am by myself.

22  Q.   And he responds in the next line, let's take a look:   "No

23  worry."  What did you understand him to mean?

24  A.   That he is still under control, that he still can do this.

25  Q.   Around this time, in October 2018, based on your

O675men6                          Uribe - Direct

1    conversations with Will, what was your understanding of the

2    relationship between Will and Robert Menendez?

3    A.   My understanding is that they are in contact to each other,

4    just like he is in contact with Nadine, and that Will had

5    relayed the information about the deal and they had some sort

6    of agreements and are working something to get it which I don't

7    have details of.

8    Q.   Between the July 2018 fundraiser and October 2018, had you

9    spent any time with Robert Menendez and Will together?

10   A.   I did.

11   Q.   Where?

12   A.   We met at the Villaggio for dinner.

13   Q.   What is Il Villaggio?

14   A.   The Il Villaggio is a restaurant in New Jersey.

15             MS. POMERANTZ:   Can we please pull up for just the

16   witness what is marked for identification as Government's

17   Exhibits 2B-21 and 2B-22?

18   Q.   Mr. Uribe, starting with the exhibit on the left, do you

19   recognize this?

20   A.   Yes, I do.

21   Q.   What is it?

22   A.   The outside of the Villaggio.

23   Q.   And directing your attention to Government Exhibit 2B-22,

24   do you recognize this?

25   A.   That would be the inside of the Villaggio and to the right

1    of the entrance.

2    Q.  Are these fair and accurate depictions of Il Villaggio?

3    A.  Yes, they are.

4              MS. POMERANTZ:  The government offers Government

5    Exhibit 2B-21 and 2B-22.

6              THE COURT:  Admitted, two photos of another

7    restaurant.

8              (Government's Exhibits 2B-21 2B-22 received in

9    evidence)

10             MS. POMERANTZ:  Yes, your Honor.  May I publish?

11             THE COURT:  Yes.

12             MS. POMERANTZ:  Let's publish those for the jury.

13   BY MS. POMERANTZ:

14   Q.  Mr. Uribe, who met at Il Villaggio?

15   A.  In this instance we met Nadine, Senator Menendez, Will, and

16   myself.

17   Q.  Can you -- withdrawn.

18             What, if anything, was discussed at Il Villaggio?

19   A.  This one dinner was not a meeting of substance, nothing was

20   discussed there of value, I would say.  It is just for people

21   having dinner together.  What does pointless mean?  Nothing to

22   my interest where what I need to protect my family was

23   discussed there.

24   Q.  Why didn't you bring up the deal at Il Villaggio?

25   A.  First of all, in line of respect for Will -- my brother

1    Will.  He is the person in contact that arranged his agreement

2    with Nadine and Senator.  I don't know the terms of what they

3    have talked.  Wael did not bring it up, I didn't bring it up.

4            THE COURT:  Now, sir, you keep on saying "your brother

5    Will."  Are you referring to Mr. Hana?

6            THE WITNESS:  Yes, your Honor.  I'm referring to Will

7    Hana.

8            THE COURT:  Do you have a brother also named Will?

9            SKWRAO:  No, sir.  I don't.

10           THE COURT:  OK.  So you when you say your brother Will

11   you are referring to Mr. Hana.

12           THE WITNESS:  Yes, sir.

13           THE COURT:  OK.  Thank you.

14   BY MS. POMERANTZ:

15   Q.  Mr. Uribe, during this time did you refer to Will as your

16   brother?

17   A.  Yes.

18   Q.  Why is that the case?

19   A.  We have a friendship that extend to being more than

20   brothers.  We were very close for each other, to each other.

21   Q.  Is that unique to Will or is that generally how you refer

22   to people?

23   A.  I do happen to refer to many peoples as brothers, that

24   would be one of my manners, but in reality I do consider Will

25   to be a good brother of mine.

1   Q.  Who paid at Il Villaggio?

2   A.  I did.

3   Q.  How did Will refer to Robert Menendez at Il Villaggio?

4   A.  He call him many time "my senator."

5   Q.  What did you observe about how Will treated Robert Menendez

6   at the dinner?

7   A.  Best description of my observation is somebody that is

8   looking to kiss ass to Mr. Menendez.

9           MR. FEE:  Your Honor, move to strike.  I'm not sure

10  that's an observation so much as an opinion.

11          THE COURT:  Denied.

12  Q.  You testified earlier that Detective Lopez reached out to

13  Andy Aslanian to interview Ana.  Did you understand whether Ana

14  ended up meeting with Detective Lopez at this time?

15  A.  She did not.

16          MS. POMERANTZ:  Let's pull up Government Exhibit 1310.

17  Q.  Mr. Uribe, does this show text messages between you and

18  Will Hana?

19  A.  No.

20          Ask me that question again?  I'm sorry.  I missed the

21  context of the question.

22  Q.  Does this show text messages between you and Will Hana?

23  A.  Yes, it does.  I'm sorry.

24  Q.  I want to direct your attention to row 2.  What does Will

25  send you?

O675men6                              Uribe - Direct

1    A.  A picture of Will and Mr. Menendez.

2    Q.  And on what date did he send you that photograph?

3    A.  January 28, 2019.

4    Q.  Can you please read your response?

5    A.  "Muy bien.  Morning brother.  Mondays are crazy."

6    Q.  What does "muy bien" mean to you?

7    A.  Very good.

8    Q.  What did you mean by that?

9    A.  It is good that they are spending some time together and it

10   looks like their friendship is getting stronger and --

11   Q.  What did you mean by Mondays are crazy?

12   A.  For me Mondays were crazy, are crazy, were crazy in my

13   business as far as it is the day I get the most amount of work.

14   Q.  At that time was that Phoenix?

15   A.  At this time it is Phoenix, yes.

16   Q.  Let's turn to the next page.  I want to direct your

17   attention to row 5, on January 28, 2019, you text Will: "Howard

18   called Buen to meet today.  Do you what's going on."

19          Who is Howard?

20   A.  The former attorney for Elvis Parra.

21   Q.  And who is Buen?

22   A.  In this case I would have meant Bien -- Bien Hernandez.

23   Q.  Let's zoom out of that and I want to continue reading below

24   that you write, in row 6:  "You called.  No Howard."

25          Then Will responds:  "No, I'm with Andy.  Call you

1    when I get to the office."

2          And then you write back:  "Yes, you called for a

3    meeting today.  Howard didn't call anybody."

4          And Will writes back:  "Yes."

5          I'm going to ask you to read your next message in row

6    12.

7    A.  "You are crazy.  Why you didn't tell me."

8    Q.  Will writes back:  "I did."

9          Can you read your next message?

10   A.  "OK.  I don't have the time for today at 5."

11   Q.  Will writes back:  "OK."

12         And now I'm going to ask you to read row 16?

13   A.  "Next time you want to call for meeting, please talk to me

14   before anybody else.  This is very serious and if you are to do

15   something, we talk about it first, brother."

16   Q.  Will responds "OK."

17         Can you read your next text to him?

18   A.  "I know you want to help brother.  Let's take strong steps.

19   But we talk about everything before we talk to others.  They

20   are waiting for you."

21   Q.  Mr. Uribe, do you have independent memory of these

22   messages?

23   A.  Yes.

24   Q.  What do you remember about these?

25   A.  I received a phone call from Bien saying we should get

1    together that afternoon and he used the excuse that Will --

2    that Howard called for a meeting when in fact Howard didn't

3    call for a meeting, the meeting was called in by Will.  Will

4    put a meeting together to meet with all of us -- Bien, Elvis,

5    Will and myself -- but he failed to tell me about it.  OK?  Out

6    of the group I consider myself to be the most busy of all of

7    them at this point in our life and I didn't want Will to be

8    calling up on meetings that I don't know about that has no

9    substance, that nothing is being talked about, and it is just

10   going to be a wasting of my time when I don't have the time.

11   Q.  Did you go to the meeting?

12   A.  I did not.

13   Q.  Remind us, when are these texts from?

14   A.  January 28, 2019.

15   Q.  What did you mean by "let's take strong steps but we talk

16   about everything before we talk to others"?

17   A.  If he was to call upon a meeting to talk to the parties

18   involved in the original agreement, the four of us -- Bien,

19   Elvis, him and myself -- he should talk to me about what is

20   that being said.  If it is of importance, I will go to the

21   meeting.  But if it is just some bullshit line to have a drink

22   I will not be there.  I don't have the time.  I want to do

23   things that are meaningful to get this investigation stopped

24   and killed.

25   Q.  Did there come a time that you spoke directly with Nadine

1    about the New Jersey attorney general's case?

2    A.  Yes.

3    Q.  About when did you speak with her directly?

4    A.  March of 2019.

5    Q.  Why did you speak with her directly?

6    A.  Time is passing by, nothing is developing in a way that

7    gave me assurance that this deal is to be complete.  I lost

8    hope for Will, I decided to talk to Nadine directly since I met

9    her before, I knew about her.

10   Q.  Did you first speak with Nadine in person or by phone in

11   March 2019?

12   A.  We spoke via phone.

13   Q.  Had you spoken with Nadine on the phone before this call?

14   A.  Never before.

15   Q.  Did you have her phone number before this call?

16   A.  No, I did not.

17   Q.  How did you get her number?

18   A.  I got it from Andy Aslanian.

19   Q.  Was the call short or long?

20   A.  Somehow long, yes.

21   Q.  What did Nadine say during the call?

22   A.  There were many things that we spoke about.  Nadine put a

23   line of complaints about how her life was not going well and

24   that most men that had promised her things in the past never

25   come through.  Among those men she was listing Will to the fact

1   that he hasn't come through to the promises he had made to her.

2   Q.  What did she complain about with respect to Will?

3   A.  Among other things, that Will did not provide her the car

4   that she wanted.

5   Q.  How did Nadine sound on the call?

6   A.  Upset, disappointed on most mens in her life, angry.

7   Q.  Had you heard about Will promising to get Nadine a car

8   before this call?

9   A.  Through our conversations prior to this, yes, I heard that

10  Will was going to provide a car to Nadine.

11  Q.  What did Will say to you about this?

12  A.  Will said that from the proceeds that he was going to get

13  from the deal once the deal is completed and the guys pay what

14  they agreed to, he was going to buy from that money a car for

15  Nadine.

16  Q.  When you said "the guys" who are you referring to?

17  A.  Bienvenido Hernandez and Elvis Parra.

18  Q.  When Nadine complained that Will had not gotten her a car,

19  what did you say in response?

20  A.  In substance:  Fortunately, it is a car.  If the problem is

21  the car, I will provide the car as long as she helps me.

22  Q.  You said as soon as she helps you.  What did you say about

23  that to her?

24  A.  She knew -- she acknowledged knowing part of the deal in

25  this conversation.

O675men6                          Uribe - Direct

1    Q.   What do you mean by that?

2    A.   She acknowledged having been, talked to Will about every

3    solution for Elvis Parra and Elvis' Hernandez ceased

4    prosecution at this time.   And I promised her -- she did not

5    know about the other part of the deal.   At this time I promised

6    her that she is able to comply and help me complete this deal,

7    I will provide her for a car.

8    Q.   What did she say in response?

9    A.   She agreed to the terms.

10   Q.   Did the names Prestige Trucking, Phoenix Risk Management,

11   and Ana Peguero, come up during the call?

12   A.   Yes.

13   Q.   And when those names came up, what did Nadine say in

14   response?

15   A.   She knew nothing about it.

16   Q.   What did you say in response?

17   A.   That I was surprised, in substance, because Will knew the

18   whole deal.

19   Q.   What did Nadine say in response?

20   A.   She only knew about E & K.

21   Q.   Why did you agree to help Nadine get a car on this phone

22   call?

23   A.   I want this deal done not only because Elvis is like a

24   family member, person that I respect and care for too, or an

25   investigation is going on with Prestige, or because in reality

1    I didn't want anybody to get close to my family and hurt my

2    kids for an investigation.  I was willing to do anything in my

3    power and if that was to buy a car for Nadine for her to help

4    me complete this investigation, I promise her that I will come

5    through with my promises.

6    Q.  Why did you believe that getting Nadine a car would help

7    you get the deal done?

8    A.  That is what Will said, promised Nadine, and that's what

9    Nadine acknowledged was going to receive from Will once this

10   investigation -- prosecution against Parra is stopped.

11   Q.  What was your understanding about what you would get in

12   exchange for the car based on your conversation with Nadine on

13   the phone?

14   A.  Nadine will contact Senator Menendez, use his influence and

15   power to do anything possible to stop and kill the

16   investigations so my family -- so it doesn't get to my family

17   and my family get hurt.

18           MS. POMERANTZ:  Let's pull up what is in evidence as

19   Government Exhibit 1311.

20   Q.  Mr. Uribe, does this show text messages between you and

21   Nadine?

22   A.  Yes, it does.

23   Q.  Let's read through these messages.  I am going to ask you

24   to start at row 1?

25   A.  "Call me."

1    Q.  Nadine responds:  "I just did.  I'm sorry I could not pick

2    up.  I was on the phone with Bob.  I'm still up.  If you want

3    to call, you can."

4                Can you read your responses?

5    A.  "I just got home.  Going to eat something with my daughter.

6    I am real.  I will stand by my word."

7    Q.  Can you read the next text as well?

8    A.  "Thank you for the call.  Good night."

9    Q.  I'm going to direct your attention to row 2 where Nadine

10   texted you that she could not pick up because she was on the

11   phone with Bob.  Who did you understand "Bob" to refer to?

12   A.  Senator Menendez.

13   Q.  At the time, what was your understanding of Nadine's

14   relationship with Robert Menendez?

15   A.  They were boyfriend and girlfriend.

16   Q.  I direct your attention to row 4.  What did you mean by:

17   "I am real.  I will stand by my word"?

18   A.  I reassured her whatever we talked on that call, that I

19   will come through with my promises as long as she deliver her

20   promises.

21   Q.  Did you send Nadine that text before or after your call

22   with her?

23   A.  After.

24            MS. POMERANTZ:  Let's pull up what is in evidence as

25   Government Exhibit 1312.

1  Q.  Mr. Uribe, does this show WhatsApp messages between you and

2  Bienvenido Hernandez?

3  A.  Yes.

4  Q.  Can you remind us in what language you and Bienvenido

5  texted?

6  A.  Spanish.

7  Q.  Why were you testing with him on WhatsApp?

8  A.  Mr. Hernandez suggested that talking through WhatsApp was a

9  safer way to communicate to each other.

10  Q.  Did you use WhatsApp with Bien before this time?

11  A.  Never before.

12  Q.  Now I want to direct your attention to row 1 and ask you to

13  read the English translation of your message to Bienvenido.

14  A.  "Good morning.  I received a call with good news.  Let's

15  keep the faith."

16  Q.  On what date did you send that message to Bienvenido?

17  A.  March 13, 2019.

18  Q.  You wrote:  "I received a call with good news."  What the

19  call were you referring to?

20  A.  My phone call with Nadine the previous night -- the

21  previous evening.

22  Q.  What did you mean by "I received a call with good news.

23  Let's keep the faith"?

24  A.  My conversation with Nadine gave me the hope that she was

25  willing to help and complete the agreement of killing and

O675men6                          Uribe - Direct

1   stopping these investigations.

2              THE COURT:  Ms. Pomerantz, why don't you complete this

3   line and find a logical time to break.

4              MS. POMERANTZ:  Yes, your Honor, I just have a few

5   more questions and I think it is a perfect stopping time.

6              THE COURT:  All right.

7   Q.  Now Hernandez replied:  "Amen."  I will ask you to read the

8   English translation of your response to Bienvenido?

9   A.  "I received another call.  They're saying that everything

10  is fine.  Done."

11  Q.  What is the date of that message to Bienvenido?

12  A.  March 13, 2019.

13  Q.  What did you mean by this message?

14  A.  I have received a phone call from Nadine confirming that

15  she is willing to help me and complete this.

16             MS. POMERANTZ:  I think that is a good stopping point,

17  your Honor.

18             THE COURT:  Ladies and gentlemen, we have made a lot

19  of progress.  We have had five full days of testimony.  Let's

20  repeat that next week.  Please be here by 9:30.  We cannot

21  begin until every one of you is here.

22             Enjoy the weekend, keep an open mind, you have not

23  heard all of the testimony.  Don't discuss this case, don't

24  read any publicity about it or listen to anything about it.

25             Enjoy the weekend.  9:30 Monday.

O675men6                          Uribe - Direct

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O675men6                         Uribe - Direct

1                    (Jury not present)

2                    THE COURT:  You may step down, sir.

3                    (Witness steps down)

4                    THE COURT:  9:30 Monday.  Have a nice weekend, all.

5                    (Adjourned to June 10, 2024, at    9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     KIRA GLASS

4     Direct By Ms. Ghosh  . . . . . . . . . . . . .2809

5     Cross By Mr. Fee . . . . . . . . . . . . . . .2877

6     Cross By Mr. De Castro . . . . . . . . . . . .2914

7     Redirect By Ms. Ghosh  . . . . . . . . . . . .2916

8     Recross By Mr. Fee . . . . . . . . . . . . . .2922

9     JOSÉ DOLORES URIBE

10    Direct By Ms. Pomerantz  . . . . . . . . . . .2925

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    GOVERNMENT EXHIBITS

2    Exhibit No.                              Received

3    16A-25, 16A-25-1, 16A-25-1-1, 16A-26, . . . .2830

4              16A-32A, 16A-32B, 16A-33A,

5              16A-33B, 16A-34, 16A-35-1,

6              16A-54A, 16A-54B, 16A-54C,

7              16A-54-1, 16A-54-1-1, 16A-55,

8              16A-55-1-1, 16A-56-1-1,

9              16A-59A, 16A-59B, 16A-62-1-1,

10             16A-64, 16A-64A, 16A-92-1-1,

11             16A-94-1-1, 16A-94-1-3,

12             16A-95-1-4, 16A-96-1,

13             16A-97-1, 16A-98, 16A-98-1-1,

14             16A-99 16A-99-1-1

15   16A-9   . . . . . . . . . . . . . . . . . . .2833

16   16A-5, 16A-6, 16A-8A   . . . . . . . . . . .2840

17   16A-1 through 16A-4   . . . . . . . . . . .2848

18   1334   . . . . . . . . . . . . . . . . . . .2849

19   A101-103, B105-40 and 3A-10   . . . . . . .2911

20   2B-2 and 2B-29 . . . . . . . . . . . . . . .2956

21   2B-4   . . . . . . . . . . . . . . . . . . .2966

22   2B-5   . . . . . . . . . . . . . . . . . . .2967

23   2B-10  . . . . . . . . . . . . . . . . . . .2979

24   E102-A   . . . . . . . . . . . . . . . . . .2981

25   2B-21 2B-22   . . . . . . . . . . . . . . . .2994