O6Q5men1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                 23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7            Defendants.
                             Trial
8   ------------------------------x

9                            New York, N.Y.
                            June 26, 2024
10                            9:50 a.m.

11

12   Before:

13

14                 HON. SIDNEY H. STEIN,

15                              District Judge
                              -and a Jury-

16                     APPEARANCES

17   DAMIAN WILLIAMS
         United States Attorney for the
18         Southern District of New York
    BY:  PAUL M. MONTELEONI
19         DANIEL C. RICHENTHAL
         ELI J. MARK
20         LARA E. POMERANTZ
         CATHERINE E. GHOSH
21         Assistant United States Attorneys
         -and-
22         CHRISTINA A. CLARK
         National Security Division

23

24

25

O6Q5men1

1

2                            APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4         Attorneys for Defendant Menendez
BY:  ADAM FEE
5         AVI WEITZMAN
          ROBERT D. LUSKIN
6         RITA FISHMAN

7

8

9  GIBBONS, P.C.
          Attorneys for Defendant Hana
10 BY:  LAWRENCE S. LUSTBERG
          ANNE M. COLLART
11        CHRISTINA LaBRUNO
          ANDREW J. MARINO
12        RICARDO SOLANO, Jr.
          ELENA CICOGNANI
13        JESSICA L. GUARRACINO

14

15 CESAR DE CASTRO
   SETH H. AGATA
16 SHANNON M. McMANUS
          Attorneys for Defendant Daibes

17

18

   Also Present:   Marwan Abdel-Rahman
19                  Bachar Alhalabi
                    Interpreters (Arabic)
20
                    Rachel Wechsler
21                  Connor Hamill
                    Braden Florczyk
22                  Paralegal Specialists, U.S. Attorney's Office

23                  Justin Kelly, DOAR

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O6Q5men1

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning.  The jury is here.  I would

3     really like to start with the jury now.  I am told the parties

4     have issues.  Are they issues that can wait until the break?

5           MR. MONTELEONI:  The issue that we understand defense

6     counsel wants to raise about the moving of a number of exhibits

7     into evidence could wait until the lunch break but we do need

8     to have it teed up for you today.  So, yes, it doesn't have

9     to --

10          THE COURT:  So we can bring the jury in.

11          MR. RICHENTHAL:  The only issue we flagged sooner, I

12    don't know if the Court has had an opportunity to reflect on

13    our request that the Court either instruct the jury with

14    respect to the grand jury or will we be permitted to elicit

15    evidence regarding the grand jury.  This is a request made in

16    the letter that we filed with respect to Geoffrey Mearns that

17    your Honor referenced yesterday.

18          The reason I am asking this morning is we anticipate

19    that one of our witnesses today, Mr. Khanna, would be a

20    witness, not the only witness, who would be in the position

21    that he could answer such questions, and by such questions I

22    mean just generally how the grand jury works.  We are obviously

23    not going to ask those questions if the Court has not yet had

24    an opportunity to determine --

25          THE COURT:  What is the ECF no. on the Mearns letter?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6Q5men1

1          MR. RICHENTHAL:  If you give me a moment?

2          THE COURT:  There have been a flurry.  And I assume

3    the defense has responded?

4          MR. FEE:  We have, your Honor.

5          THE COURT:  Do you know the ECF numbers?  I can find

6    it but, you know, there has been a flurry in the past couple of

7    weeks.

8          MR. FEE:  We will give it to your clerks, your Honor,

9    during the testimony.

10          MR. MONTELEONI:  480 is our letter.

11          THE COURT:  Thank you.

12          The next thing is juror no. 15, you will remember

13    during the jury selection process, informed us that she had a

14    non-refundable cruise scheduled for June 27 to July 3.  I think

15    I should excuse her.  We knew about it in advance, we knew

16    there was a possibility that it would go this long, but I

17    intend to excuse her.

18          Any objection?

19          MR. MONTELEONI:  Not from the government, your Honor.

20          MR. FEE:  No, your Honor.  No objection.

21          MR. LUSTBERG:  No, your Honor.

22          MR. DE CASTRO:  No.

23          THE COURT:  I will do that at the break.

24          Jury entering.

25          (Continued on next page)

```
 1                (Jury present)

 2                THE COURT:  Please be seated.

 3                Good morning, ladies and gentlemen of the jury.  Thank

 4      you for being here in a timely fashion.

 5                Call your next witness, government.

 6                MS. GHOSH:  The government calls Isabella Fuchs.

 7                THE DEPUTY CLERK:  Please raise your right hand.

 8      ISABELLA FUCHS,

 9           called as a witness by the Government,

10           having been duly sworn, testified as follows:

11                THE DEPUTY CLERK:  Please state your name and spell

12      your full name for the record.

13                THE WITNESS:  Isabella Fuchs.  I-S-A-B-E-L-L-A,

14      F-U-C-H-S.

15                THE COURT:  Good morning, Ms. Fuchs, and welcome.

16                THE WITNESS:  Good morning.

17                THE COURT:  Your witness.

18                MS. GHOSH:  Thank you, your Honor.

19      DIRECT EXAMINATION

20      BY MS. GHOSH:

21      Q.  Good morning, Ms. Fuchs.

22      A.  Good morning.

23      Q.  Where do you work?

24      A.  I work for the FBI.

25      Q.  What's your title there?
```

1   A.  A staff operations specialist.

2   Q.  What does that job entail?

3   A.  A staff operations specialist is a job type used to

4   describe someone who analyzes large volumes of data to support

5   FBI investigations.

6   Q.  How long have you worked at the FBI?

7   A.  For five years.

8   Q.  What squad are you assigned to?

9   A.  I work for the healthcare fraud squad.

10  Q.  At a high level, what were you asked to do in connection

11  with this case?

12  A.  I received over 2,000 serial numbers attributed to bills,

13  and I reviewed images of bills to verify that the serial

14  numbers on the list that I received were also printed on the

15  bills that I viewed.

16  Q.  What, if any role, did you have in the investigation that

17  led up to that project?

18  A.  I participated in a discovery review project where I looked

19  at an e-mail account involved in the case.

20  Q.  When did you work on that e-mail review project?

21  A.  This was in October of 2023.

22  Q.  And about how long did you work on that project?

23  A.  I completed that project within a business week.

24  Q.  Other than your work on that other project, did you have

25  any other role in this investigation?

1   A.  No.

2            MS. GHOSH:  Mr. Hamill, could you please put up a

3   stipulation which is marked for identification, just for the

4   witness, please, and Government Exhibit 1438?

5   Q.  Ms. Fuchs, is this a stipulation between the parties

6   related to certain photographs of evidence in this case?

7   A.  Yes.

8   Q.  Did you review this in preparation for your testimony?

9   A.  Yes.

10           MS. GHOSH:  The government offers Government Exhibit

11  1438.

12           THE COURT:  Admitted, without objection.

13           (Government's Exhibit 1438 received in evidence)

14           MS. GHOSH:  Can we please publish that for the jury?

15  BY MS. GHOSH:

16  Q.  Ms. Fuchs, we won't go through all of this stipulation, but

17  does this identify which photographs are of cash contained in

18  certain government exhibits and 1Bs?

19  A.  Yes.

20  Q.  For example, let's go to page 2, paragraph (b)(i) which

21  states that the items marked for identification as Government's

22  Exhibits 1F-3142 through 1F-3144 are photographs of the cash

23  contained in the items marked for identification as Government

24  Exhibit 19, which is the item logged in FBI records as 1B19.

25           And I won't read all of this but, Ms. Fuchs, does this

1  stipulation go on with descriptions of similar photographs of

2  cash for several pages?

3  A.  Yes.

4       MS. GHOSH:  The government offers all of the exhibits

5  cited in Government Exhibit 1438.

6       THE COURT:  Admitted, without objection.

7       MS. GHOSH:  We can take that down.

8       THE COURT:  Did you just read the universe that has

9  been admitted?

10      MS. GHOSH:  I didn't, your Honor.  I can read them

11  into the record or they're now in the stipulation that it is in

12  evidence.

13      THE COURT:  Read them for the record so that the

14  record is clear.

15      MS. GHOSH:  1F-3142 through 1F-3144; 1F-4017 through

16  1F-4019; 1F-6009 through 1F-6015, 1F-7129 through 1F-7137;

17  1F-8139 through 1F-8140; 1F-9021 through 1F-9024; 1F-10026

18  through 1F-10028; 1F-11030 through 1F-11061; 1F-12301 through

19  1F-12331; 1F-13146 through 1F-13299; 1F-14093 through 1F-14127,

20  and 1D-263 through 1D-291.

21      THE COURT:  Yes, admitted.

22      (Government's Exhibits 1F-3142 through 1F-3144;

23  1F-4017 through 1F-4019; 1F-6009 through 1F-6015, 1F-7129

24  through 1F-7137; 1F-8139 through 1F-8140; 1F-9021 through

25  1F-9024; 1F-10026 through 1F-10028; 1F-11030 through 1F-11061;

1   1F-12301 through 1F-12331; 1F-13146 through 1F-13299; 1F-14093

2   through 1F-14127; 1D-263 through 1D-291 received in evidence)

3   BY MS. GHOSH:

4   Q.   Ms. Fuchs, as part of your recent work on this case, did

5   you create or verify any documents?

6   A.   Yes.   I verified documents.

7   Q.   What type of documents?

8   A.   I looked at an Excel spreadsheet and verified items on a

9   chart.

10          MS. GHOSH:   Mr. Hamill could you please put up on the

11   witness' screen documents marked for identification as

12   Government's Exhibits 1335A, B, and C?

13   Q.   While we are getting those up on the screens, Ms. Fuchs,

14   have you, before your testimony this morning, reviewed

15   printouts of an Excel that were marked for identification as

16   Government's Exhibits 1335A, B, and C?

17   A.   Yes.

18   Q.   And did you also review a native Excel version that was

19   marked as Government Exhibit 1335EX?

20   A.   Yes.

21   Q.   We will talk about those in a moment but did you create

22   those documents from scratch yourself?

23   A.   No.

24   Q.   Did you verify that the information in those documents was

25   drawn from certain sources referenced in the documents?

1    A.  Yes.

2    Q.  And do those sources include the photographs that were just

3    admitted into evidence?

4    A.  Yes.

5            MS. GHOSH:  The government offers exhibits 1335A, B,

6    and C, as well as 1335EX, which is the native Excel version of

7    the same spreadsheet.

8            THE COURT:  Admitted, without objection.

9            (Government's Exhibits 1335A, 1335B, 1335C, 1335EX

10   received in evidence)

11           MS. GHOSH:  Mr. Hamill, are we able to publish 1335A?

12   BY MS. GHOSH:

13   Q.  It looks like we are having some difficulties with the

14   system, I will ask a few questions that I am able to right now.

15   Ms. Fuchs, if you need to look at the document itself in order

16   to answer them, just let me know?

17   A.  OK.

18   Q.  Do you recall what sort of bills are referenced --

19           MS. GHOSH:  We now have 1335A, and if we can zoom in

20   on the top portion so we can see it a little more closely?

21   Thank you.

22   Q.  Ms. Fuchs, what types of bills does the information in

23   1335A relate to?

24   A.  1335A contains all the $100 bills that I reviewed.

25   Q.  And are these serial numbers for those bills produced

1    previously?

2    A.  Yes.

3    Q.  Did you personally review all of the entries in this chart?

4    A.  Yes.

5    Q.  Just walking through quickly what the information in here

6    is, what does Column A list?

7    A.  Column A lists the denomination of the bill.  In this chart

8    they're all $100 bills.

9    Q.  And what about Columns B through E?

10   A.  Columns B through E refer to the unique eleven-letter and

11   digit serial number attributed to a bill.

12           THE COURT:  By unique you mean each bill has a

13   different one?

14           THE WITNESS:  Correct.

15   BY MS. GHOSH:

16   Q.  Now, for each of the entries in 1335A, did you verify that

17   that serial number matches a serial number from certain

18   evidence in the case?

19   A.  I did.

20   Q.  Let's talk about how you did that.  What information were

21   you provided in order to verify the serial numbers?

22   A.  I was provided this list of serial numbers and I was also

23   given images of all the bills, and I essentially did a matching

24   project where I looked at the pictures of the bills and the

25   serial number and I looked for the serial number on the bill.

1    Q.  You mentioned images.  Did those include the photographs in

2    the stipulation 1438 that we just looked at?

3    A.  Yes.

4    Q.  Were there also other photographs of cash spread out on the

5    floor?

6    A.  Yes.

7    Q.  Are those photographs that you used to verify the serial

8    numbers listed somewhere in this chart?

9    A.  Yes.  They are in Column H.

10   Q.  You said that in order to verify you looked at the serial

11   number and looked at the actual photograph?

12   A.  Yes.

13   Q.  How long did that process take?

14   A.  I worked on this exclusively for three weeks, every day, so

15   I would say it took approximately 120 hours.

16   Q.  Were you able to verify all of the serial numbers just by

17   looking at the photographs?

18   A.  No.

19   Q.  Why not?

20   A.  There were a couple instances where I identified what I

21   would call a typo in the serial numbers that I received.  In

22   those cases, I identified a serial number on a bill in the

23   photographs that I reviewed that was very closely similar to

24   the serial number I received but there was maybe one or two

25   differences.  For example, there was an M instead of an N, or

1   there was a 5 instead of a 4.  In those cases I marked that

2   change.  In another instance, the photo that I viewed was too

3   blurry to be able to discern whether or not the serial number

4   was in fact the serial number on the image, so in those cases

5   we pulled the physical 1Bs, which is how we saved the evidence,

6   and I looked at the cash itself to verify what the serial

7   number was on the cash.  And in those cases it either was the

8   serial number I was provided, or because the image was too

9   blurry I made -- you know, I verified what the actual number

10  was on the bill.

11  Q.  In these instances where you found a typo or it was too

12  blurry, what did you do when you identified the correct serial

13  number based on looking at the photograph for the actual bill?

14  A.  I denoted the correct serial number and we discussed them

15  and reviewed them.

16  Q.  To be clear, did you choose the serial numbers that are

17  included in this chart or were they provided to you?

18  A.  They were provided to me.

19  Q.  Who provided them to you?

20  A.  The government.

21  Q.  Do you know why these numbers were provided to you?

22  A.  No.

23  Q.  Column G on this chart is called 1B Number.  Did you

24  confirm that the photograph in Column H is associated with a

25  particular 1B number listed in Column G?

O6Q5men1                          Fuchs - Direct

1   A.  I did.

2   Q.  How did you confirm that?

3   A.  I looked at a variety of government exhibits to include

4   Government Exhibit 1301; the exhibit we already discussed 1438;

5   and in some instances I looked at transcriptions and Sentinel

6   documentation.

7   Q.  What is Sentinel?

8   A.  Sentinel is our system of record that the FBI uses to

9   chronicle all of our case-related information.

10  Q.  Are records in Sentinel kept in the ordinary course of FBI

11  business?

12  A.  Yes.

13  Q.  Are they created soon after the event that record in

14  Sentinel is regarding?

15  A.  Yes.

16  Q.  Now, you mentioned earlier that when you identified certain

17  typos or errors you made a note of those; is that right?

18  A.  Yes.

19  Q.  Does this version of the chart, Government Exhibit 1335A,

20  correct those typos or other errors that you identified during

21  your review?

22  A.  Yes.

23  Q.  To the best of your ability, does every bill listed in

24  1335A match a bill in either the photographs of cash or the

25  actual 1B package?

O6Q5men1                              Fuchs - Direct

1   A.  Yes.

2   Q.  Does this spreadsheet necessarily contain serial numbers

3   for all the cash that's evidenced in this case?

4   A.  No.

5   Q.  Do you know how much cash, in total, is in evidence?

6   A.  No.

7   Q.  I want to look now at Column F which is called Payout Date.

8   Did you fill in this data?

9   A.  No.

10  Q.  Do you know the source of that information in Column F?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's from a document that was from the Federal Reserve.

14  Q.  And do you recall if the Government Exhibit no. was 5G-300?

15  A.  It is.

16  Q.  Did you confirm that the payout date in Column F of this

17  chart, 1335A, matches the payout date listed for those serial

18  numbers in 5G-300?

19  A.  Yes.

20  Q.  Do you have any independent knowledge of the accuracy of

21  that payout date information?

22  A.  No.

23  Q.  What is the earliest payout date for the bills listed in

24  this chart, 1335A?

25  A.  The earliest date is February 5, 2018.

O6Q5men1                    Fuchs - Direct

1    Q.  What is the most recent payout date in this chart?

2    A.  March 21, 2022.

3    Q.  Did you select bills for the payout dates between those

4    dates included in this chart?

5    A.  No.

6    Q.  Approximately how many entries are in 1335A relating to

7    $100 bills with payout dates between February 2018 and

8    March 2022?

9    A.  Approximately 900.

10           MS. GHOSH:  Let's turn now to Government Exhibit

11   1335B, please.  If we could zoom in on the top portion so we

12   can see it a little closer?  Thank you.

13   Q.  Ms. Fuchs, generally, what types of bills are included in

14   this chart?

15   A.  This chart contains the $50 and $20 bills.

16   Q.  What do Columns A through C show?

17   A.  Column A denotes the denomination of the bill, either $50

18   or $20; and B refers to the serial number on each bill; Column

19   C refers to the series years of the bill.

20   Q.  Did you select the serial numbers included in this chart,

21   1335B, or were they provided to you?

22   A.  They were provided to me.

23   Q.  Who selected them?

24   A.  The government.

25   Q.  Do you know why these were selected?

1    A.  No.

2    Q.  What, if anything, did you do to verify the serial numbers

3    in this chart, 1335B?

4    A.  I performed the same process where I looked at the serial

5    numbers in this chart and compared them to the images or the

6    physical bills.

7    Q.  Does this chart indicate which photograph shows the

8    particular bill in reach row?

9    A.  Yes; in Column E.

10   Q.  This sheet also has a Column D called 1B.  What, if

11   anything, did you do to verify the information in that column?

12   A.  I reviewed Government Exhibit 1301 and Government Exhibit

13   1438.

14   Q.  Is 1438 a stipulation?

15   A.  Yes.

16   Q.  I want to turn now to Column F.  What does that column

17   show?

18   A.  The Column F shows the earliest date a note could have been

19   delivered from the Bureau of Engraving and Printing to the

20   Federal Bank.

21   Q.  Do you have any independent knowledge of that information?

22   A.  No.

23   Q.  What did you look at to verify the information in Column F

24   of this?

25   A.  I reviewed additional government exhibits provided by the

O6Q5men1                          Fuchs - Direct

1    Bureau of Engraving and Printing.

2             MS. GHOSH:  Mr. Hamill, could you put up Government

3    Exhibit 8D-4 for a moment?

4    Q.  Ms. Fuchs, is this one of the Bureau of Engraving and

5    Printing documents that you are referring to?

6    A.  Yes.

7    Q.  And could you explain how you used documents like this,

8    8L-4, to verify the date --

9             MS. GHOSH:  I'm sorry, Mr. Hamill.  I should have

10   asked if we could do side by side with 1335B, please.  Thank

11   you.

12   Q.  Ms. Fuchs, how did you use the information from the Bureau

13   of Engraving and Printing to verify the information in Column F

14   of 1335B?

15   A.  So, if we can look at Column B, which contains the serial

16   number for the bill, the first two letters are important for

17   this task.  The first letter, P, denotes the series year of the

18   bill, which is 2017A, which we can see at the top here it says

19   series 2017GA.  And then F, the second letter in my serial in

20   Column B, denotes which Federal Reserve bank the bill went to,

21   which is Atlanta; F, down at the bottom.  And so then in the

22   column First Note Delivered, you can see it is July 2020.

23   Q.  So, on that example, which is from row 2 of 1335B; is that

24   right?

25   A.  Yes.

O6Q5men1                          Fuchs - Direct

1   Q.   In that example where the first note delivered from the BEP

2   document is July 2020, what information is in the chart 1335B?

3   Or what date, I should say, is in 1335B, Column F, when the

4   Bureau of Engraving and Printing document lists 7/2020 as the

5   first note delivered date?

6   A.   The first possible date in chart 1335 is going to be

7   July 1, 2020.

8   Q.   So even though there is a range listed in 8L-4, July 2020

9   to December 2022, your chart 1335B takes the earliest possible

10  date from that range?

11  A.   Yes.

12          MS. GHOSH:   We can take down 8L-4.   Thank you.

13  Q.   When verifying the information in 1335B involving $20s and

14  $50s, do you sometimes identify certain typos or errors in the

15  serial numbers that you were given?

16  A.   Yes.

17  Q.   What did you do when you identified those typos or errors?

18  A.   The same process; we pulled the physical bills and I

19  verified the serial number on the bill.

20  Q.   In this version of 1335B, have those typos been corrected?

21  A.   Yes.

22  Q.   What is the earliest year listed in Column F of 1335B?

23  A.   The first date is January 1, 2018.

24  Q.   And what is the latest?

25  A.   July 1, 2020.

Case 1:23-cr-00490-SHS    Document 563    Filed 08/09/24    Page 20 of 285    4936

1  Q.  Now, you said earlier that the bills in 1335A were paid out

2  between 2018 and 2022.  Do you have any understanding of why

3  all the bills in your chart were paid out in 2018 or later?

4  A.  No.

5  Q.  To the best of your ability, does every bill listed in

6  1335B match a bill in either the photographs of cash or the

7  physical 1B package?

8  A.  Yes.

9  Q.  Are all the bills -- are the bills listed in 1335B

10  necessarily all the bills in evidence in this case that are

11  $20s or $50s?

12  A.  No.

13  Q.  Before we discuss the last part of your chart I would like

14  to look at some defense exhibits.

15          MS. GHOSH:  Could we pull up what is in evidence as

16  DX 1679, please?  Can we also pull up side by side Government

17  Exhibit 1D-285?  In 1D-285, can we please zoom in on the $100

18  bill in the first column, second row from the bottom?  Thank

19  you.

20  Q.  Ms. Fuchs, let us know if you need us to rotate it, but can

21  you please compare the serial number between that bill in

22  Government Exhibit 1B-285 and the middle $100 bill with the

23  writing on the side in DX 1679?

24  A.  Yes.

25  Q.  Is that the same bill?

O6Q5men1                         Fuchs - Direct

1    A.  Yes.

2            MS. GHOSH:  Mr. Hamill, could we also please bring up

3    for a moment Government Exhibit 1438, the stipulation, and go

4    to page 4?

5            Looking at the last paragraph, (xii) states that the

6    items marked for identification as Government's Exhibits 1D-263

7    through 1D-291 are photographs of the cash contained in the

8    items marked for identification as Government Exhibit 13 (which

9    is the item logged in FBI records as 1B13).

10           Ms. Fuchs, is the photograph we were just looking at,

11   1D-285, within that range for 1B13?

12   A.  Yes?

13           MS. GHOSH:  Mr. Hamill could we bring up for a moment

14   Government Exhibit 1437 and go to page 3?  And can we zoom in

15   on 2A, please, at the top?

16   Q.  Ms. Fuchs, do you see here a reference to a safe deposit

17   box in 1B13?

18   A.  Yes.

19           MS. GHOSH:  Mr. Hamill, can we now go to page 1 of

20   this document, 1437?

21   Q.  In 1A, Ms. Fuchs, do you see a reference to deposit box

22   no. 13 located at the Chase Bank called the safe deposit box?

23   A.  Yes.

24           MS. GHOSH:  You can take those down.  Let's pull up

25   Defendant's Exhibit 1677 side by side, please, with Government

O6Q5men1                          Fuchs - Direct

1    Exhibit 1D-273.  In 1D-273, could we please zoom in on the last

2    column, the bottom two rows of $50 notes?  And can we rotate

3    1677?

4    Q.  Ms. Fuchs, are the two notes in 1D-273 the $50 notes?  How

5    do those compare to the $50 notes in Defendant's Exhibit 1677?

6    A.  Give me a moment?  Just making sure the serial numbers are

7    the same on both -- and they are the same.

8    Q.  Government Exhibit 1D-273, the one we have there, is that

9    number also within the range that we just read in the

10   stipulation for 1B13?

11   A.  Yes.

12        MS. GHOSH:  We can take those down.  Let's bring up

13   Defendant's Exhibit 1641, please, side by side with Government

14   Exhibit 1D-277.  In 1D-277, can we please zoom in on the $50

15   bill in the bottom row, second column?

16   Q.  Ms. Fuchs, looking at these two bills, how do the serial

17   numbers compare?

18   A.  They are the same.

19   Q.  Is Government Exhibit 1D-277 within that range of

20   photographs for 1B13?

21   A.  Yes.

22        MS. GHOSH:  We can take those down, please, and let's

23   go to Defendant's Exhibit 1640, side by side with Government

24   Exhibit 1D-277.  And could we zoom in on the $20 bill in the

25   third column, fourth row down?

O6Q5men1                              Fuchs - Direct

1    Q.  Ms. Fuchs, are these the same bill?

2    A.  Yes.

3    Q.  Is Government Exhibit 1D-277 within that range of photo for

4    1B13?

5    A.  Yes.

6    Q.  We will come back to 1B13 in a moment but let's go now to

7    1335C.  Ms. Fuchs is this the third part of the chart that you

8    reviewed?

9    A.  Yes.

10   Q.  Generally, what does this sheet contain, 1335C?

11   A.  This is a summary chart of 1Bs and data related to the 1Bs.

12   Q.  And the 1Bs that are listed in Column A, are those the 1Bs

13   referenced in the prior two tabs that we looked at 1335A and B?

14   A.  Yes.

15   Q.  So, looking at Column B, Photo Example, what does that

16   column show?

17   A.  That column contains a photo example of some of the bills

18   that could be contained in that 1B.

19   Q.  Did you compare the photo that is listed here or that is

20   shown here to the reference that is listed in that column?

21   A.  Yes.

22   Q.  Did you choose which photo of a particular 1B to include?

23   A.  No.

24   Q.  Who did?

25   A.  The government.

O6Q5men1                         Fuchs - Direct

Q.   Let's look at the photo example for 1B13 for a moment in
row 2.  Is that the 1B that the defense exhibits we just looked
at were from?

A.   Yes.

         MS. GHOSH:  And this reference is 1D-134.  Can we
please pull that up for a moment, Mr. Hamill?  Thank you.
Could we please zoom in on the top left envelope?

Q.   Ms. Fuchs, it is a bit blurry, but what denominations are
you able to see there?

A.   I believe there are $20 and $100 bills, and I think in the
corner there, there is a $50 bill.

         MS. GHOSH:  Mr. Hamill, can you zoom back out of that
and below and zoom in on the rest of the envelopes in the top
row?

Q.   Ms. Fuchs, what denomination is visible in all of these
envelopes?

A.   $100.

         MS. GHOSH:  Let's zoom out of that and zoom in on the
envelopes in the bottom row.

Q.   Ms. Fuchs, what denomination is visible in all of those
envelopes?

A.   $100.

         MS. GHOSH:  We can take that down and go back to 1335C
now, and if we can zoom in on the top portion so it is a little
larger?  Thank you.

1    Q.  Column C, Seizure Location.  Ms. Fuchs, do you have any

2    independent knowledge of that information?

3    A.  No.

4    Q.  Did you confirm that the information listed in this chart

5    accurately reflects the underlying source documents cited here?

6    A.  Yes.

7    Q.  What type of underlying source documents did you review to

8    verify that?

9    A.  Almost all refer back to Government Exhibit 1301, but

10   additionally I also looked at Government Exhibit 1437 and a

11   couple of transcriptions, and Sentinel documents.

12   Q.  Looking now at Column D, Cash Total of 1B.  For most of the

13   1Bs, where did that information come from?

14   A.  Most of them came from 1301.

15   Q.  Let's look at the rows that don't cite 1301 as the

16   reference, first the top row for 1B13, that refers to

17   Government Exhibit 1437.

18   A.  Yes.

19   Q.  I'm not going to bring that back up.  Is that a

20   stipulation?

21   A.  Yes.

22   Q.  Let's go down to the row for 1B26 which is row 6.  This

23   refers in the column to 1F-6009 through 1F-6015?

24   A.  Yes.

25   Q.  Generally, what type of documents are those?

O6Q5men1                         Fuchs - Direct

1    A.  Those are images of the bills.

2              MS. GHOSH:  Let's just bring up for a moment, side by

3    side, Government Exhibit 1438 and go to page 2, please?

4    Q.  Now if we can look at paragraph B3, do you see that this

5    states that photographs 1F-6009 through 1F-6015 are photographs

6    of the cash contained in 1B26?

7    A.  Yes.

8              MS. GHOSH:  You can take down 1438.

9    Q.  From those photographs, how did you get $2,000 as the value

10   of that 1B?

11   A.  I hand-counted the bills in those photographs to reach

12   $20,000.

13   Q.  By "hand-counted" do you mean you had the physical bills or

14   looked at the photo?

15   A.  Sorry.  From the images.

16   Q.  Are there any other FBI records that you looked at to

17   verify that amount?

18   A.  There was also Sentinel documentation that also listed that

19   amount.

20             MS. GHOSH:  Let's also go now to row 1B31, row 10,

21   please?  Thank you.

22   Q.  The cash total column here lists Government's

23   Exhibits 1F-1158 and 1F-1159.  What kind of documents are those

24   exhibits?

25   A.  Those are photographs.

O6Q5men1                           Fuchs - Direct

1    Q.   How did you use those photographs to determine the amount

2    of cash in that?

3    A.   I used the images to count the dollar bills in the images

4    to obtain the total amount.

5    Q.   Are there any other records you looked at to verify that

6    amount for 1B31?

7    A.   There is also Sentinel documentation that has the same

8    amount.

9    Q.   Now, we just talked about three rows that don't refer to

10   Government Exhibit 1301 in the cash total column.  Do the rest

11   of the rows in this chart rely on 1301 for the 1B total?

12   A.   Yes.

13            MS. GHOSH:  We can go back up to the top of 1335C,

14   please, page 1, and look at Column E now?

15   Q.   Column E states:  Contains at least one bill released into

16   circulation on or after.  Where does that information come

17   from?

18   A.   That information comes from the first two documents that we

19   just looked at and is sourced from Federal Reserve

20   documentation and Bureau of Engraving and Printing

21   documentation.

22   Q.   And by the first two documents we looked at, are you

23   referring to 1335A and B?

24   A.   Yes.

25   Q.   And by the Federal Reserve documentation, are you referring

O6Q5men1                          Fuchs - Direct

1    to 5G-300?

2    A.   Yes.

3    Q.   And the BEP documentation, is that the 8L documents that we

4    talked about earlier?

5    A.   Yes.

6    Q.   Do the entries in this chart mean that only one bill was

7    released on the particular dates listed there?

8    A.   No, that means at least one bill.

9    Q.   If the jury wanted to see how many bills were released into

10   circulation in 2018 or later from a particular 1B, is that

11   information somewhere in Government Exhibit 1335?

12   A.   Yes.

13   Q.   Where is that?

14   A.   It is in the -- should I say the exact column?

15   Q.   Well, is it in the native Excel?  Is it in the first two

16   tabs?

17   A.   Yes.

18   Q.   We will come back to that in a moment but let's just go

19   through a few examples.

20            MS. GHOSH:  Can we go to row 7, please, of 1B28?

21   Q.   Where was this 1B seized from?

22   A.   Room U (basement).

23   Q.   Again, do you have any independent knowledge of that or

24   just the information that you verified?

25   A.   Only the information that I verified.

O6Q5men1                         Fuchs - Direct

1    Q.  How much was in that 1B?

2    A.  $21,000.

3    Q.  And what is the latest identified date that at least one of

4    the bills in that 1B was released into circulation?

5    A.  June 25, 2021.

6    Q.  Let's go now to 1B43 in row 16.  First, did you verify,

7    based on Government Exhibit 1301, that the photo of cash in the

8    yellow bag is a photo from 1B43?

9    A.  Yes.

10   Q.  Where was 1B43 seized from?

11   A.  Room U (basement) shelf.

12   Q.  How much cash was in 1B43?

13   A.  $95,000.

14   Q.  And what is the latest identified date that at least one of

15   the bills in 1B43 went into circulation?

16   A.  March 21, 2022.

17   Q.  That is the payout date of at least one bill in 1B43;

18   correct?

19   A.  Yes.

20        MS. GHOSH:  Mr. Hamill, can we take this down and pull

21   up Government Exhibit 1335EX, the native Excell version for a

22   moment?  In the first tab, the $100 can we filter Column G for

23   1B43, please?

24   Q.  Ms. Fuchs, does this Excel sheet show only the $100 bills

25   in this chart from 1B43?

O6Q5men1                          Fuchs - Cross

```
 1    A.  Yes.

 2    Q.  Do you see some other bills in March 2022 payout dates

 3    listed at the top?

 4    A.  I see one bill with March -- I'm sorry.  Can you repeat the

 5    question?

 6    Q.  Yes.  Do you see other bills with payout dates from

 7    March 2022?

 8    A.  Yes.

 9    Q.  How many bills from 1B43 are in this chart with payout

10    dates of 2018 or later?

11    A.  400.

12              MS. GHOSH:  No further questions.

13              THE COURT:  Thank you.

14              Is there cross-examination of this witness, Mr. Fee?

15              MR. FEE:  Yes, your Honor.

16    CROSS-EXAMINATION

17    BY MR. FEE:

18    Q.  Hi.

19    A.  Hi.

20    Q.  Can you say your last name so I don't mess it up?

21    A.  Fuchs.

22    Q.  Fuchs.

23        Ms. Fuchs, you had mentioned that you had done a little bit

24    of other work on the case before this chart; is that right?

25    A.  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  And I think you said it was a discovery review project?

2  A.  Yes.

3  Q.  What does that mean?

4  A.  That means -- I had pretty limited exposure to this project

5  but, essentially, I was asked to review an e-mail account and

6  there was content in the e-mail account that I could review.

7  Q.  That's good.

8  A.  OK.

9  Q.  You don't have to tell me the person or the name of the

10  e-mail account you reviewed, my question is only this.  Were

11  you given information about the allegations in this case in

12  order to enable you to do that project?

13          MS. GHOSH:  Objection.

14          THE COURT:  I will allow it.

15          Do you know what the claims are in this litigation?

16          THE WITNESS:  Yes.

17          THE COURT:  Did somebody give you that information?

18          THE WITNESS:  Actually, I will rephrase.  I think with

19  media I know what the claims are now but I haven't --

20          THE COURT:  No.  Apart from that.

21          THE WITNESS:  OK.  At the time that I was given the

22  assignment, no.  I was given key words and terms to look for in

23  the e-mail account but I was given no extra information to look

24  for.  It was purely -- I think I was asked to do this

25  assignment because I had no extra knowledge of the case.

O6Q5men1                          Fuchs - Cross

 1   BY MR. FEE:

 2   Q.  Understood.  Understood.

 3        So, are you aware whether or not there are allegations

 4   about bribes being paid after 2018 in this case?

 5   A.  I'm not aware of any information related to dates in this

 6   case.

 7   Q.  And so nothing else until you worked on the charts about

 8   which you just testified?

 9   A.  Correct.

10   Q.  So let's -- and I just want to make sure I understood.

11   Your testimony was that you don't have an understanding of how

12   the prosecutors determined which cash to give you to analyze

13   and which cash, if any, to not give you; is that correct?

14   A.  That's correct.

15   Q.  So you don't have any understanding of, like, their

16   determining rules for your chart?

17   A.  That's correct.

18               MS. GHOSH:  Objection.

19               THE COURT:  I will allow it.

20               MR. FEE:  Let's bring up 1335C, please.

21   Q.  So the Column E, Ms. Fuchs, you testified it says contains

22   at least 1 bill released into circulation on or after, and then

23   there is a date that is in that column.  Do you see that?

24   A.  Yes.

25   Q.  What do you understand, for the purposes of your work on

O6Q5men1                          Fuchs - Cross

1   this chart, the words "released into circulation" to mean?

2   A.  I understand that to mean that that is the first date that

3   the bill could have been circulated.

4   Q.  Circulated by whom to where, if you know?

5   A.  Circulated from the Federal Bank to wherever it goes after,

6   from.

7   Q.  Got it.  From whoever makes these bills until you know

8   where you can use them?

9               MS. GHOSH:  Objection.

10              THE COURT:  Sustained.

11              MS. GHOSH:  And I would also like to note for the

12  record that they're looking at Government Exhibit 1335EX, tab

13  C, the native version, not the 1335C.

14              THE COURT:  Thank you.

15              MR. FEE:  Got it.  They're the same, your Honor, I

16  assume, if I can ask the government.

17              MS. GHOSH:  I am only noting for the record which

18  exhibit is up, I'm not --

19              THE COURT:  Fine.  The record is so noted.  Next

20  question.

21              MR. FEE:  Thank you.

22  BY MR. FEE:

23  Q.  And I know you don't understand the background for why the

24  prosecutors made these determinations but did you notice a

25  trend in the work you did about the dates?

O6Q5men1                          Fuchs - Cross

 1              MS. GHOSH:  Objection.

 2    Q.  For which these bills were released?

 3              THE COURT:  I don't understand the question.

 4              MR. FEE:  Sure.  Sure.

 5    Q.  Did you see any bills in your work that were identified as

 6    being released earlier than 2018?

 7    A.  No.

 8    Q.  Is every bill on this chart something that was released

 9    into circulation after 2018?

10    A.  Yes.

11    Q.  Column A, you said, has an item number; right?

12    A.  Yes.

13    Q.  That is like an FBI creation, they assign that to a thing?

14    A.  Correct.

15              MS. GHOSH:  Objection.

16              THE COURT:  I will allow it.

17    BY MR. FEE:

18    Q.  And an item number could describe multiple objects

19    collected into a single item; is that fair?

20    A.  Well, I will say a 1B number refers to FBI evidence.

21    Q.  All I mean is like let's look at Column B, row 2, this

22    picture?

23    A.  Yes.

24    Q.  You said that is a portion of the item the FBI has called

25    1B13?

1          MS. GHOSH:  Objection.

2          THE COURT:  Just a moment.  I will allow that.

3          Is that what your testimony was?

4   BY MR. FEE:

5   Q.  Correct me if I am wrong.

6   A.  So, Column B refers to a photo example of evidence that

7   could be in that 1B, so if I am answering your question

8   correctly, what I am trying to say is this photo is just an

9   example of evidence that is in that 1B.

10  Q.  Got it.  So at least what is in this photo is in that 1B13

11  item number.  The there could be more, could be less -- could

12  be more but could be less, as far as you know?

13  A.  That's my understanding.

14  Q.  And all I am trying to clarify is so obviously 1B -- it is

15  not like each bill in GX 1D-34 gets a separate 1B number, a

16  collection of items is assigned 1B13.  Fair to say?

17  A.  I'm not privy to the whole assigning of 1B numbers to

18  evidence but based on what you just outlined, that sounds like

19  a logical track to me, yes.

20  Q.  Fair enough.  This thing at least is called 1B13?

21  A.  Yes.

22  Q.  And then you said it is a photo example -- just help me

23  understand -- photo example because there might be more objects

24  or things in the 1B number listed?

25          MS. GHOSH:  Objection.

1           THE COURT:  I will allow it.  If she knows.

2           THE WITNESS:  I think it is a little outside of the

3    scope of what I know.  All I know is contained in this chart.

4    BY MR. FEE:

5    Q.  I am just trying to understand why we used the word, why

6    you used the word, why you and the government use used the word

7    "example".

8    A.  So I did not create the titles for anything in this chart.

9    In fact, I don't have -- I didn't have any role in the

10   photographs or the titles at all related to 1B information.

11   Q.  Let's go to column C.  You testified about Column D, it

12   says cash total of 1B.  So I understand, Ms. Fuchs, your

13   understanding of the data in this column is that it's all the

14   money involved in that item or contained in that item; is that

15   correct?

16   A.  My understanding is that Column D reflects the total cash

17   value of 1B13 and as it goes down.

18   Q.  So it is not -- it is not just the cash, say, in that

19   photo?

20   A.  That's my understanding, yes.

21   Q.  And it is not just the cash that was released into

22   circulation on or after the date listed in Column E?

23   A.  I don't know that I know enough information to answer that

24   last question.

25   Q.  Well, Column E is titled, contains at least one bill

O6Q5men1                          Fuchs - Cross

```
 1  released into circulation on or after a date; right?

 2  A.  Yes.

 3  Q.  So are you aware if there are other bills in each of these

 4  item numbers containing cash that were released into

 5  circulation earlier than the dates listed in Column E?

 6  A.  No.

 7  Q.  You don't know?

 8  A.  Yes, I'm not aware of that.

 9  Q.  Now, the fact that it says at least one bill in Column E,

10  what was the reason you did not specify the date that each bill

11  was released into circulation, say, for item 1B13?

12          MS. GHOSH:  Objection.

13          THE COURT:  I will allow her to answer.

14          THE WITNESS:  I think if I am understanding the

15  question correctly, I would have to list out the date of every

16  bill in that 1B.

17          THE COURT:  I take it you were not asked to do that;

18  is that correct?

19          THE WITNESS:  Yes, I was not asked to do that.

20  BY MR. FEE:

21  Q.  Based on your work here, for some of these rows there is

22  more than one bill released into circulation on or after the

23  date listed?

24  A.  I would need to refer to the data to answer that question.

25  Q.  Got it.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1      And in any event, you were given particular bills to

2  analyze for this chart; correct?

3  A.  Yes.

4  Q.  So you did not analyze the date a bill was released into

5  circulation on or after for every bill in, for example, item

6  1B13?

7  A.  I analyzed the date for the bills that I received, so.

8  Q.  For the bills that you received.

9      And you have no idea whether that is all the bills or just

10  some of the bills?

11  A.  Correct.

12  Q.  So, the cash total for this first item in 1335C-EX is

13  $79,760; correct?

14  A.  Yes.

15  Q.  And it identifies being seized in safe deposit box no. 13.

16  Do you have any idea who owned that safe deposit box?

17  A.  No.

18  Q.  Do you know whether that safe deposit box was located in

19  the same location as, let's say, Room U, on your chart?

20          MS. GHOSH:  Objection.

21          THE COURT:  I will allow it.

22          THE WITNESS:  All I know about the safe deposit box

23  can be found in Government Exhibit 1437.

24  Q.  During your earlier work on this case, did you come across

25  the name Nadine Arslanian?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6Q5men1                          Fuchs - Cross

1            MS. GHOSH:  Objection.

2            THE COURT:  I will allow it.

3            THE WITNESS:  Yes.

4   Q.  Are you aware that she owned that safe deposit box?

5            MS. GHOSH:  Objection.

6            THE COURT:  Sustained.

7            I take it you don't know -- you said, I believe, you

8   don't know who owned that box; is that correct?

9            THE WITNESS:  Correct.

10            THE COURT:  I don't want to put words in your mouth.

11            THE WITNESS:  Thank you.

12            THE COURT:  But I think you said that.

13            THE WITNESS:  Yes, no.  I --

14            THE COURT:  Go ahead.

15   BY MR. FEE:

16   Q.  Fair to say none of your work involved attributing

17   ownership over any of the items in this chart; right?

18   A.  Correct.

19   Q.  So you could not say, with any degree of certainty, whether

20   cash listed here belonged to any particular person?

21            THE COURT:  Any particular person?

22            THE WITNESS:  Correct.  I do not have knowledge of

23   that.

24   Q.  Thank you.

25            So, I want to make sure I understand how the chart works.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6Q5men1                        Fuchs - Cross

1    The total is $79,760, and then you break down in these other

2    tabs, Ms. Fuchs, these same item numbers; correct?

3              MS. GHOSH:   Objection.

4              THE COURT:   Yes, sustained.   I'm not sure --

5              MR. FEE:   Yes, let's look at 1335A, and let's sort it

6    by item number, just 1B13, Mr. Kelly.

7    Q.  Ms. Fuchs, can you tell me what is now listed here, now

8    that we have sorted your 1335A by 1B13, just generally?

9    A.  I'm sorry.  Can you repeat the question?

10   Q.  Sure.  Are you able to tell me what is contained in 1335A?

11   Let's start there.

12   A.  These are $100 denomination bills in the 1B13.

13   Q.  And so, for your work, all the $100 bills that you analyzed

14   are contained in 1335A?

15   A.  Correct.

16   Q.  And so, when we organize -- when we limit it to 1B13, we

17   now have in front of you will all the $100?  1B13 that you were

18   asked to analyze?

19   A.  Correct.

20   Q.  Again, you don't know if there were more bills than in

21   1B13?

22   A.  That's correct.

23   Q.  So I am sure you are experienced at Excel.  Do you see, we

24   have highlighted Column A?

25   A.  Yes.

O6Q5men1                          Fuchs - Cross

1    Q.  And it has a sum there.  Do you see that?

2    A.  Uh-huh.

3           THE COURT:  You have to say yes or no.

4           THE WITNESS:  Yes.

5           THE COURT:  You are talking about at the bottom of

6    what is shown?

7           MR. FEE:  Yes.  Thank you, your Honor; for the record

8    it is at the bottom right third of the screen.

9    BY MR. FEE:

10   Q.  And so, the sum of the $100 bills in item 1B13 is $13,800.

11   Does that appear to be correct?

12   A.  Yes.

13          THE COURT:  I'm sorry.  I don't see that -- now I do.

14   Thank you.  I couldn't see it the last time either.  Now I do.

15   Q.  OK.  So we have that number, $13,800, let's go to 1335B.

16   These are all the $20 and $50 that you were asked to analyze;

17   correct?

18   A.  Correct.

19          MR. FEE:  So, Mr. Kelly, if we can go to Column D and

20   organize just by 1B13?  Oh, it is not there.

21   Q.  So if an item number is not there, what does that mean in

22   1335B?

23   A.  Not all 1Bs are in each of the charts so there could be a

24   1B that is only in the $100 denomination and there could be a

25   1B that is only in the $20 or $50 denomination.  So not being

O6Q5men1                      Fuchs - Cross

1    able to filter by 1B13 in the $20s and $50s means that I only

2    looked at $100 bills in 1B13.

3    Q.   In other words, of the bills you were given to analyze for

4    1B13, there were no $20s or $50s?

5    A.   Correct.

6    Q.   Only $100s?

7    A.   Yes.

8    Q.   Let's go back to 1335C and I just want to understand, so

9    you have, again that $79,760 number, and then you have at least

10   one bill released into circulation on or after March 31, 2021;

11   right?

12   A.   Correct.

13   Q.   And the number from 1335A, the sum of the bills that you

14   have analyzed I believe we looked at was $13,800; correct?

15   A.   Yes.

16   Q.   And let's look at the payout dates, let's go to 1335A.

17   Again, this is organized by 1B13 and let's look at the payout

18   dates, if we can scroll down and see.  And you can see here

19   that all of those payout dates, you would agree, Ms. Fuchs, are

20   after January 1, 2018?

21   A.   Yes.

22   Q.   And this will go faster after you help me understand.  This

23   1335C again.  So you were given, for item 1B13, $13,800 to

24   analyze; correct?

25            MS. GHOSH:   Objection.

O6Q5men1                              Fuchs - Cross

 1                    THE COURT:  I will allow it.

 2                    THE WITNESS:  I'm sorry.  Can you ask the question

 3     again?

 4     Q.  For item 1B13 you were given $13,800 to analyze; right?

 5     A.  Yes.

 6     Q.  And all of that $13,800 was released into circulation after

 7     January 2018; correct?

 8     A.  Yes.

 9     Q.  And if you -- you do have here in 1335C the actual total of

10     cash for item 1B13; right?  All the cash?

11     A.  Yes.

12     Q.  Including the cash you weren't given to analyze; right?

13     A.  Correct.

14     Q.  So if you were -- oh no.  If you were to subtract $13,800

15     from $79,760, what would you tell me is the approximate sum of

16     that?

17                    MS. GHOSH:  Objection.

18                    MR. FEE:  (inaudible)  Let's do 79 -- 80,000 minus

19     14,000.

20                    THE COURT:  Do 80,000 minus 14,000, and I can't do

21     that but maybe the witness can.

22                    MR. FEE:  All right.

23     BY MR. FEE:

24     Q.  So that's $66,000, approximately, that is contained in 1B13

25     but was not given to you to analyze?

O6Q5men1                         Fuchs - Cross

1    A.   That sounds correct, yes.

2    Q.   And do you know that all of that $66,000, or so, is older

3    than 2018?

4              MS. GHOSH:   Objection.

5              THE COURT:   Do you know the age of that money, the

6    $66,000?

7              THE WITNESS:   I do not.

8    BY MR. FEE:

9    Q.   But it is definitely not reflected in your chart, the

10   $66,000, that approximate $66,000?

11             MS. GHOSH:   Objection.

12             THE COURT:   I will allow it.

13             You were not given that, what we are now roughing out

14   as $66,000.

15             THE WITNESS:   Correct.

16             THE COURT:   OK.

17   BY MR. FEE:

18   Q.   You remember being asked I think one question, something

19   like if the jury wanted to find out information about the money

20   you had analyzed, where would they look in your chart.  Do you

21   remember being asked a question like that?

22   A.   Yes.

23   Q.   If the jury wanted to find out any information about when

24   that roughly $66,000 was released into circulation, could they

25   look anywhere in your chart for it?

O6Q5men1                          Fuchs - Cross

1   A.  Not on this chart, no.

2           MR. FEE:  Let's scroll down, Mr. Kelly, to the next

3   row down, thank you, and so we can move quicker.

4   Q.  This has another 1B number -- actually, I'm sorry, another

5   question about the first column, Ms. Fuchs.  I apologize.

6       This photo in Column B, row 2 for item 1B13, does this

7   depict only the roughly $14,000?

8   A.  I don't believe I know the answer to that question.

9   Q.  So you don't know whether this shows part of the old money

10  or just the new money?

11          MS. GHOSH:  Objection.

12          THE COURT:  Sustained.

13  Q.  I'm sorry.  You don't know if this depicts bills you

14  analyzed or bills you didn't analyze?

15  A.  I think that we could go back to my chart and filter for

16  1B-134 to see how many bills fall into that category and

17  essentially we could find out the answer to that question, but

18  I can't tell you the answer to that question at this time.

19  Q.  Let's go to the next one, 1B19.  That's what that means,

20  1B19?

21  A.  Yes.

22  Q.  Column A, and it says $7,500 is the total --

23          MR. FEE:  Mr. Kelly are you able to freeze the top

24  column?  No?  OK.

25  Q.  $7,500 is the total cash in that 1B number; right?

1   A.  Correct.

2   Q.  And then Column E says there is at least one bill released

3   on or after April 26, 2021?

4   A.  Yes.

5   Q.  And you have this was taken from room -- or you had been

6   given information indicating that this was taken from Room U

7   (basement) whatever that means; right?

8   A.  Correct.

9           MR. FEE:  And so let's go to 1335A, the list of the

10  $100s and sort by 1B19, Mr. Kelly.  And then if we can do

11  Column A, highlight it there.

12  Q.  Can you see here, Ms. Fuchs, the sum on the bottom is

13  $2,400?

14  A.  Yes.

15  Q.  So that's the sum of the money you were given to analyze

16  for 1B19 that is a $100 denomination?

17  A.  Yes.

18          MR. FEE:  Let's do the same for 1335B and organize by

19  1B19.

20  Q.  So again, we don't see 1B19.  Fair to say that means you

21  were not give any $20s or $50s to analyze for item 1B19?

22          MS. GHOSH:  Objection to analyze the money.  She

23  reviewed numbers.

24          THE COURT:  Fine.

25  Q.  You were not given any $20s or $50s to look at for item

O6Q5men1                          Fuchs - Cross

1    1B19?

2    A.   Correct.

3    Q.   So let's go back to 1335C and the sum we had was $2,400 in

4    your work; right?

5    A.   Yes.

6    Q.   So, $7,500 minus $2,400 is around $5,000 -- $5,100; right?

7    A.   Yes.

8    Q.   And again, no idea whether that $5,100 is older than 2018,

9    whether it was released into circulation prior to 2018?

10   A.   I do not have enough information to answer that question.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6qWmen2                         Fuchs - Cross

1    BY MR. FEE:

2    Q.  You have no information to answer that?

3    A.  Correct.

4    Q.  All right.  And again, this photo, I understand now you

5    don't know if this photo depicts only the bills you were given

6    to analyze or all of the bills or only some number from that

7    item.  Right?

8            MS. GHOSH:  Objection.

9            THE COURT:  Rephrase.

10   BY MR. FEE:

11   Q.  Do you know what is depicted in this photo identified at GX

12   1F-1314?

13   A.  All I know is that that photo is a photo example of some

14   money that can be found in 1B19.

15   Q.  And you testified on direct that you actually went and

16   checked out some of the actual cash seized by the FBI, right?

17   A.  Yes.

18   Q.  So you did have the ability to go access the physical cash,

19   right?

20   A.  Yes.

21   Q.  You did not go and photograph only the bills that were

22   released on or after a certain date, right?

23            THE COURT:  Sustained.

24            Did you photograph anything?

25            THE WITNESS:  No.

O6qWmen2                          Fuchs - Cross

1    BY MR. FEE:

2    Q.  So you didn't photograph any bills?

3    A.  No.

4    Q.  Point being, photographs could have been made that depicted

5    the bills you were actually talking about in this chart,

6    correct?

7             THE COURT:  Sustained.

8    BY MR. FEE:

9    Q.  Whose decision was it to go pull actual bills?  Did you ask

10   for that?

11   A.  I did.  If -- if I found the image was too blurry to be

12   able to do my task and verify the serial number, I asked to

13   view the bill in person.

14   Q.  And did you otherwise raise any concerns about the accuracy

15   of the photo examples put here?

16   A.  No.

17            MS. GHOSH:  Objection.

18            THE COURT:  I'll allow it.

19            THE WITNESS:  I'm sorry.  Could you ask the question

20   again?

21            THE COURT:  You answered it.

22            THE WITNESS:  OK.

23            MR. FEE:  Thank you.

24            And let's, I won't do every row here.  Let's go to,

25   let's look at 1B26, that item.

O6qWmen2                              Fuchs - Cross

1    Q.  So, same idea; the total cash for 1B26 is $20,000?

2    A.  Yes.

3    Q.  And I'm sorry.  You verified the total cash?

4    A.  So, this cash value, as all the other columns was already

5    prepopulated and I just verified that the number was correct,

6    but with this example I looked at each of these photographs

7    that are listed there, and I counted up to reach 20,000.

8        That's not the only way that I verified that it's 20,000.

9    I also reviewed Sentinel documentation that chronicled that as

10   well.

11   Q.  And court transcripts as well --

12   A.  Yes.

13   Q.  -- right?

14   A.  Yes.

15           MS. GHOSH:  Objection.

16           THE COURT:  Proceed.

17   BY MR. FEE:

18   Q.  When you were referring to the hand count, you meant you

19   looked at the photos and actually counted each bill?

20   A.  Yes.

21           MR. FEE:  So on this one, it's 1B26, so let's go to

22   1335A and sort by 1B26, please.  Same exercise.

23   Q.  And so we see here the sum is $1,600.  Do you see that?

24   A.  Yes.

25   Q.  So that's the amount of 100s for 1B26 you were given to

O6qWmen2                          Fuchs - Cross

1   look at?

2   A.   Yes.

3              MR. FEE:  Let's go to 1335B and see if there are 20s

4   or 50s for 1B26.

5   Q.   And you don't see 1B26 there, so you were not given any 20s

6   or 50s for this item, correct?

7   A.   Correct.

8   Q.   So back to 1335C, the total is 20,000, and you were given

9   1,600 from this, correct?

10             MS. GHOSH:  Objection.

11             THE COURT:  You may answer if you can, if you are

12  able.

13  A.   I verified the serial numbers of the 100-denomination bills

14  that were just looked at, if that answers --

15  Q.   It does.

16        And those summed to $1,600?

17  A.   Yes.

18  Q.   So $18,400 from this item, you have no information about

19  when those bills were released in circulation?

20  A.   No.  I was not asked to look for that information.

21  Q.   And again, did they discuss with you why they didn't want

22  you to review the bills --

23             THE COURT:  Sustained.

24  Q.   -- for the rest of that?

25             THE COURT:  Sustained.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6qWmen2                          Fuchs - Cross

1   BY MR. FEE:

2   Q.  And so this chart talks about, in column E -- and actually,

3   all of your work for 1B26, addresses less than 10 percent of

4   the cash in this item; fair to say?

5   A.  I'm sorry.  Can you ask the question again?

6   Q.  Sure.

7       So, the work you did relating to item 1B26 addressed less

8   than 10 percent of the cash from that item?

9   A.  I verified the serial numbers on less than 10 percent of

10  that 1B, yes.

11  Q.  Right.  You verified the serial numbers, but you also

12  verified the accuracy of this chart as it was presented to you,

13  correct?

14  A.  Yes.

15  Q.  So, the picture here is identified as GX 1F-1321?

16  A.  Yes.

17          MR. FEE:  Could we pull that up, please, Mr. Kelly.

18  Q.  You don't know which of the $1,600 your work related to --

19  A.  Correct.

20  Q.  -- that's in this photo?

21      By the way, do you see how the hundred on the left is

22  green?

23  A.  Yes.

24  Q.  And then the 100s, or at least some of the 100s, on the

25  right side are blue?

O6qWmen2                         Fuchs - Cross

1   A.  Yes.

2   Q.  Are you aware that the $100 bills, whether or not they

3   changed in 2013?

4              MS. GHOSH:  Objection.

5              THE COURT:  Do you know?  Are you able to say, looking

6   at this exhibit, that the $100 bills changed their format at

7   one point?

8              THE WITNESS:  No.

9              THE COURT:  All right.

10             MR. FEE:  Let's go back to 1335C and look at item

11  1B28.

12  Q.  So, $21,000 total cash for 1B28, correct?

13  A.  Yes.

14             MR. FEE:  Let's go to 1335A and organize column G by

15  1B28.

16  Q.  $6,500 in 100s; fair to say?

17  A.  Yes.

18             MR. FEE:  Let's go to 1335B and organize by 1B28,

19  please, Mr. Kelly, and sum that up.

20  Q.  $420?

21             THE COURT:  Is that correct?

22             THE WITNESS:  Yes.

23  BY MR. FEE:

24  Q.  And so that's a total of about $7,000 that you analyzed --

25  excuse me, that was provided to you to verify serial numbers

O6qWmen2                           Fuchs - Cross

1    for item 1B26, correct?

2    A.  Yes.

3          MR. FEE:  Let's go to 1335C -- 1B28.  I'm sorry.  I've

4    been referring to 1B28.  Thank you.

5    Q.  Next, just to close it up, this is 21,000 total from this

6    item, but again, your work related only to just under $7,000

7    for item 1B28?

8    A.  Yes.

9    Q.  This exercise that we're doing now, do you have an

10   understanding of whether it would be true for every single row

11   in your chart?

12         MS. GHOSH:  Objection.

13         THE COURT:  Sustained.

14   BY MR. FEE:

15   Q.  Do you know the proportion of the cash total that your work

16   addressed for each row in this chart?

17         THE COURT:  I'll allow that.

18         If you know.

19   A.  No.

20   Q.  Did you ever compare the cash total to the amounts you were

21   given in your work?

22   A.  I was not asked to do that, so no.

23         MR. FEE:  So then let's keep going.  Let's go to row

24   for item 1B29.

25   Q.  $6,000 cash total, correct?

O6qWmen2                          Fuchs - Cross

1    A.  Yes.

2              MR. FEE:  Same process, Mr. Kelly:  1335A, 1B29.

3    Q.  The sum is $1,000, correct?

4    A.  Yes.

5              MR. FEE:  Let's look for 20s or 50s for 1B29 in tab

6    1335B GX.

7    Q.  It's not there, right?

8    A.  Correct.

9              MR. FEE:  So let's go back to 1335C.

10   Q.  Again, you had $1,000 of the total $6,000 for this item,

11   right?

12   A.  Correct.

13   Q.  And unable to say when the $5,000 that you weren't given to

14   work on was released into circulation?

15             MS. GHOSH:  Objection.

16             THE COURT:  Yes.  Too many negatives.  Rephrase.

17             MR. FEE:  Understood.

18   Q.  The $5,000 that were not a part of your analysis, you don't

19   have information about when those bills were released, correct?

20   A.  I can't speak to any bills that I wasn't given.  Yes.

21             MR. FEE:  Totally fair.

22             And again, I won't do this for every one.  Let's pull

23   up GX 1F-1272; this is the photo example.

24   Q.  You worked on ten of these bills and only ten, right?

25             MS. GHOSH:  Objection.

O6qWmen2                          Fuchs - Cross

1          THE COURT:  Did you work on -- how many of these bills

2     in this photo did you work on, if you know?

3          THE WITNESS:  I would need to filter my native Excel

4     by that saving -- I can't even see what exhibit this is in this

5     photo, but I would need to filter by that to be able to answer

6     that question, I believe.

7          MR. FEE:  Of course.

8          Let's go to 1335C.

9     Q.  This was 1B29, the one we just looked at, it summed up to a

10    thousand and there were no 20s or 50s.  Do you remember that?

11    A.  OK.

12         MR. FEE:  If we can go back to 1F-1272.

13    Q.  You don't know which of these bills you verified, but it

14    could only have been ten of them, right?

15    A.  I think I still need to filter to answer your question

16    about ten.

17    Q.  Sure.  What do you want to filter?

18    A.  In 1335A, I think I would need to filter by the GX image

19    or -- OK.  So ten.  OK.  Yeah.

20         MR. FEE:  OK.  Let's go back to 1F-1272.  If we can

21    just zoom in on the bottom, the first bill on the bottom here.

22    Q.  Are you able to read the series number on that bill,

23    Ms. Fuchs?

24    A.  Yes.  That says series 2006, I believe.

25    Q.  All right.  And you reviewed part of Mr. Catania's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6qWmen2                          Fuchs - Cross

1    testimony that was given yesterday, is that correct?

2    A.  Yes.

3    Q.  Did you get an understanding from that as to what it means

4    to be a series 2006 bill?

5    A.  Could you ask me a little more of a direct question?  I

6    don't know if I -- yeah, OK.

7    Q.  Do you know what it means, do you know what a series 2006

8    means on a bill?

9           MS. GHOSH:  Objection.

10           THE COURT:  Do you have an understanding of what

11    series 2006 means?

12           THE WITNESS:  My understanding is that that would be

13    the year that that -- this design was approved.  But that

14    wasn't in the testimony that I reviewed.

15    BY MR. FEE:

16    Q.  OK.  Do you know what, if anything, it means about the date

17    this bill was released into circulation?

18           MS. GHOSH:  Objection.

19           THE COURT:  Do you know if there's a relationship

20    between it being series 2006 and the date this particular bill

21    was released into circulation?  Yes or no.

22           THE WITNESS:  All I know is that this bill would have

23    to be released after 2006.

24           THE COURT:  All right.

25    BY MR. FEE:

O6qWmen2                        Fuchs - Cross

1  Q.  Did you review any testimony of the witness from the Bureau

2  of Engraving and Printing relating to when series 2006 bills

3  stopped being printed?

4           MS. GHOSH:  Objection.

5           THE COURT:  I'll allow it, if she did.

6  A.  No.

7           MR. FEE:  Can we pull out just to see the full bill

8  here, this particular bill.

9           Thank you, Mr. Kelly.

10 Q.  You don't see any blue line going through this bill, just

11 from this photo, Ms. Fuchs, right?

12          MS. GHOSH:  Objection.

13          THE COURT:  Do you see a blue line in that photo?  Yes

14 or no.

15          THE WITNESS:  I do not see a blue line.

16 BY MR. FEE:

17 Q.  And did you review any testimony relating to what's been

18 described as security features?

19          MS. GHOSH:  Objection.  Scope.

20          THE COURT:  I'll allow it.

21 A.  I did not.

22          MR. FEE:  We can put that down.

23 Q.  From your work, are you aware that bills are sometimes

24 removed from circulation by the Federal Reserve?

25          THE COURT:  Sustained.

O6qWmen2                          Fuchs - Cross

1    BY MR. FEE:

2    Q.  Did you review the portion of Mr. Catania's testimony where

3    he talked about how there were almost no 1990s and 2000s bills

4    still in circulation?

5              MS. GHOSH:  Your Honor, I object because we identified

6    specifically the portions of his testimony that she did review,

7    and so Mr. Fee knows that these were not in it, and Mr. Fee

8    appears to be wanting to get another chance to go after

9    Mr. Catania's testimony, which was yesterday.

10             THE COURT:  The jury will disregard the comments of

11   the lawyers.

12             Ask your next question.

13             MR. FEE:  Thank you, your Honor.

14             Let's go back to 1335C and look at item 1B30.

15   Q.  So, this is a cash total of 4,300, right?

16   A.  Yes.

17             MR. FEE:  Let's go to 1335A and sort by 1B30, please.

18   Q.  Nothing; so there's no 100s for 1B30 --

19   A.  Correct.

20   Q.  -- in your work?

21             MR. FEE:  Let's go to 1335B, 1B30, sort.  Let's sum

22   that up.

23   Q.  That's $240; do you see that on the bottom?

24   A.  Yes.

25             MR. FEE:  Let's go back quickly to -- actually, I'm

O6qWmen2                          Fuchs - Cross

1    sorry, go back to 35B.

2    Q.  And just to refresh, in column F here, all of these bills

3    are on or after January 1, 2018, delivered by BEP to Fed

4    Reserve Banks, right?

5    A.  Yes.

6           MR. FEE:  Let's go to 1335C.

7    Q.  So fair to say that you only did work relating to $240 of

8    the $4,300 in item 1B30?

9    A.  I reviewed the serial numbers of bills that equal $240

10   worth of value, yes.

11          MR. FEE:  Let's go to the next one.

12   Q.  Cash total of 8,410, taken from room C (closet).  Do you

13   see that?

14   A.  Yes.

15   Q.  And actually, it says safe.  What do you understand that to

16   mean in this chart?

17          MS. GHOSH:  Objection.

18          THE COURT:  Do you have an understanding of what that

19   means?

20          THE WITNESS:  I do not.

21          MR. FEE:  OK.  Let's put up the photo exhibit here,

22   1F-1158.  And if we could just zoom in tighter on the full set

23   of bills.

24   Q.  Do you see a handful of these bills appear to be blue with

25   a blue line through it, Ms. Fuchs?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1            MS. GHOSH:  Objection.

2            THE COURT:  Are you able to say -- well, approximately

3    how many bills appear to be blue with a blue line through it,

4    if you can tell?

5            THE WITNESS:  Less than 15.  Or 16, exactly.

6            MR. FEE:  Oh, wow.  OK.

7    Q.  So 16 in this picture are blue, and the rest are green?

8    A.  I believe so, yes.

9            MR. FEE:  Can we just zoom in on -- I'll circle it.  I

10   think it's this one.  Oh, no.  That's what I meant.  That one.

11   Q.  Are you able to read the series number just from this

12   photo, Ms. Fuchs?

13           THE COURT:  Blow up the series number, please.

14           MR. FEE:  It might not be clear enough.

15   A.  No.

16           MR. FEE:  No.  OK.

17           Let's just zoom out to the bill then, that same bill.

18   Q.  Can we see who the Secretary of the Treasury is that signed

19   it?

20           MS. GHOSH:  Objection.

21           THE COURT:  I'll allow it.

22           MR. FEE:  Can you zoom in there on the -- yeah.

23   Q.  Do you read that name as appearing to be Paul O'Neill?

24           THE COURT:  I'll allow it.

25           Can you tell that that says Paul O'Neill?

O6qWmen2                        Fuchs - Cross

 1                  THE WITNESS:  Not really.

 2                  THE COURT:  OK.

 3        BY MR. FEE:

 4        Q.  Does this appear to be an O on the second one?

 5        A.  Yes.

 6                  MS. GHOSH:  Your Honor --

 7                  THE COURT:  I'll allow it.

 8                  MR. FEE:  Let's put up what's in evidence as

 9        Government Exhibit 10M-1, and let's go to page 13 of what's in

10        evidence.

11                  MS. GHOSH:  Objection, your Honor.  I believe only

12        page 3 of this document's in evidence.

13                  MR. FEE:  Is that right?  I thought the whole thing

14        was in.

15                  MS. GHOSH:  No.  There was an objection.

16                  MR. FEE:  I'll put it down.

17                  We can put it down.

18        Q.  Do you know when Paul O'Neill was the Treasury secretary?

19                  THE COURT:  Sustained.

20        A.  No.

21                  THE COURT:  You have the answer.

22                  MR. FEE:  That's not the Paul O'Neill I know.

23                  THE WITNESS:  Sorry.

24                  MR. FEE:  All right.  Don't be sorry.

25                  Let's go back to 1335A, and let's jump to spare

O6qWmen2                          Fuchs - Cross

1   everyone.  I want to go to 66, second to last.  We'll do the

2   last two on this chart.

3   Q.  So here we have room Q (office).  Do you see that?

4   A.  Yes.

5   Q.  Item 1B66 with a cash total of $100,000?

6   A.  Yes.

7           MR. FEE:  Let's go to your 1335A and sort by 1B66.

8           None, right?  Zero 100s.  OK.

9           Let's go to 1335B.  1B66.  Let's sum it up.

10  Q.  And you see the sum there is 23,340?

11  A.  Yeah.

12          MR. FEE:  If we can scroll down just to get a look at

13  column F here about when they were delivered by the bureau to

14  the Federal Reserve.

15          Why don't we jump to the bottom of this column.

16  Q.  All -- you would agree it's all January 1, 2018, or after,

17  correct?

18  A.  Yes.

19          MR. FEE:  All right.  Let's go to 1335C.  And so --

20  no.  Go back up to 1B66.

21  Q.  So 1B66 you did work, the work you described, relating to

22  23,340 of that $100,000 in 1B66, correct?

23  A.  Yes.

24  Q.  And again, you have no idea of the age of the other bills

25  that were not a part of your work?

O6qWmen2                              Fuchs - Cross

1   A.  Correct.

2   Q.  And sitting here today, Ms. Fuchs, understanding that your

3   work related to less than 25 percent of the cash in that item,

4   do you think the photo example is misleading?

5              MS. GHOSH:  Objection.

6              THE COURT:  Sustained.

7   BY MR. FEE:

8   Q.  When you say the government gave you those photos, you mean

9   the prosecutors specifically?

10  A.  Yes.

11             MR. FEE:  Let's look at 1B67, the last row in the

12  chart, thankfully.

13  Q.  33,220 is the cash total for 1B67, right?

14  A.  Yes.

15             MR. FEE:  Let's go to 1335A, see if there are any

16  100s.

17  Q.  For 1B67, there are no 100s?

18  A.  Correct.

19             MR. FEE:  1335B, let's filter for 1B67.

20  Q.  $580?

21  A.  Yes.

22             MR. FEE:  Let's go back to 1335C for that row.

23  Q.  So of the $33,220 in this duffel bag, you were given $580

24  to work with?

25             MS. GHOSH:  Objection.

1              THE COURT:  You were shown bills that totaled $580, is

2       that correct?

3              THE WITNESS:  Yes.

4              MR. FEE:  Let's pull up the photo here, 1F-1306.

5       Q.  So your work indicates that roughly 2 percent --

6              MS. GHOSH:  Objection, your Honor.  The -- thank you.

7       The wrong photograph was up.

8              MR. FEE:  Oh.  Thank you.

9       Q.  So for this photograph -- that is, 1B67 -- your work

10      indicates that roughly 2 percent of the cash was released after

11      2018?

12             MS. GHOSH:  Objection.

13             THE COURT:  Is this the correct photo?

14             MS. GHOSH:  This is the correct photo.  Objection to

15      the roughly 2 percent.

16             THE COURT:  I'll allow it.

17             THE WITNESS:  Oh.

18             (Indiscernible overlap)

19             THE WITNESS:  Yes, please.

20             THE COURT:  Ask it again, sir.  Ask it again, or do

21      the numbers.  That will be easier.

22             MR. FEE:  Yes, your Honor.  I had time to prepare

23      that.

24      Q.  You would agree that it's $580 of the roughly $33,000 in

25      this bag was part of your work, correct?

O6qWmen2                          Fuchs - Cross

1    A.  Correct.

2    Q.  And so from your work, all you can say is that $580 from

3    here was released into circulation after 2018, right?

4    A.  Well, without reviewing the other bills, it's kind of

5    difficult to answer the whole question.  But yes, based on the

6    bills that I reviewed.

7    Q.  But if you had been given all the cash, you would have

8    done --

9              THE COURT:  Sustained.  Sustained.  Hypothetical.

10   BY MR. FEE:

11   Q.  You could have done the same analysis for any bill; fair to

12   say?

13             THE COURT:  Sustained.

14             MS. GHOSH:  Objection.

15   BY MR. FEE:

16   Q.  Were you willing to do more work on this?

17             THE COURT:  Sustained.

18             MR. FEE:  We can put that down.

19             Let's bring back up 1335C.  Can we actually highlight

20   all of column D, the cash total.

21             There's no sum for that?  Can you just highlight the

22   numbers and not the text?  It's not going to sum it.

23   Q.  In any event, were you aware that the sum of column D is

24   over $500,000?

25   A.  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6qWmen2                         Fuchs - Cross

1           MS. GHOSH:  Objection.

2           THE COURT:  Again, ladies and gentlemen, remember, the

3    assumption's in the question.

4           All right.  Proceed.

5    BY MR. FEE:

6    Q.  Are you aware of the sum of the cash you were given to do

7    work on?

8    A.  No.

9    Q.  Do you know how much less it is than $500,000?

10          MS. GHOSH:  Objection.

11          THE COURT:  Yes.  Sustained.  If it's one, then it

12   can't be the other.

13          MR. FEE:  Just one moment, your Honor.

14          THE COURT:  Of course.

15          MR. FEE:  I'm going to finish up.

16   Q.  Ms. Fuchs, do you have any understanding of how -- of

17   whether banks can change old bills to new bills?

18          MS. GHOSH:  Objection.

19          THE COURT:  I'll allow it, if she knows.

20   A.  I don't.

21          MR. FEE:  Thank you, Ms. Fuchs.  I'm done.

22          THE COURT:  Mr. Lustberg.

23          MR. LUSTBERG:  No questions, your Honor.

24          THE COURT:  Mr. De Castro.

25          MR de CASTRO:  No.  Thank you, your Honor.

1              THE COURT:  Ms. Ghosh.

2              MS. GHOSH:  Briefly.

3    REDIRECT EXAMINATION

4    BY MS. GHOSH:

5    Q.  Ms. Fuchs, do you recall being asked some questions about

6    the title "photo example" in the third tab of 1335EX or 1335C?

7    A.  Yes.

8    Q.  For some of 1Bs, did you review multiple photos of cash?

9    A.  Yes.

10   Q.  And does column B in 1335C contain just one photo per 1B?

11   A.  Yes.

12   Q.  Do you recall being asked questions about why 1335C, or tab

13   3 of the Excel, doesn't list all the dates for the bills in

14   column E, the payout date column?

15   A.  Yes.

16   Q.  Does 1335A and B contain that information?

17   A.  Yes.

18   Q.  The payout dates for all of the particular bills you

19   reviewed?

20   A.  Yes.

21   Q.  On direct, did we use the native Excel version to filter

22   the spreadsheet and look at all the bill payout dates for a

23   particular 1B?

24   A.  Yes.

25   Q.  I believe you said on direct that you reviewed the serial

O6qWmen2

1    numbers of over 2,000 bills.  Is that correct?

2    A.  Yes.

3    Q.  Do you recall being asked questions about where the jury

4    could look for information about bills that are not in your

5    chart?

6          MS. GHOSH:  I'll rephrase that.

7          THE WITNESS:  OK.

8    BY MS. GHOSH:

9    Q.  Do you recall being asked questions about bills or amounts

10   that were not reflected in your chart?

11   A.  Yes.

12   Q.  Did 5G-300, the Federal Reserve chart that you reviewed,

13   contain more than 2,000 bills?

14   A.  Yes.

15         MS. GHOSH:  No further questions.

16         THE COURT:  Thank you.

17         You are excused.  You may step down, Ms. Fuchs.

18         (Witness excused)

19         THE COURT:  Why don't we take our morning break.

20         Ladies and gentlemen, we'll take 15 minutes.

21         (Continued on next page)

22

23

24

25

O6qWmen2

```
1                    (Jury not present)

2                    THE COURT:  Please be seated.

3               I'm going to excuse juror No. 15.

4                    (Juror No. 15 present)

5                    THE COURT:  Juror No. 15, you'll remember when we had

6          the jury selection process, which was in the jury deliberation

7          room with all of the attorneys, you indicated to me that you

8          had a family cruise starting on June 27 that was nonrefundable

9          and had been planned for a long time, and I informed you that

10         if the trial were not over then you certainly would be able to

11         take the cruise.

12              I'm going to excuse you now.  You have the

13         appreciation of the parties and the lawyers.  Do not think for

14         a moment that your time here was wasted in any regard.  The

15         lawyers are always looking at the jury to try to gauge the

16         response of the jury, and it may have been absolutely necessary

17         to have you as part of the deliberating jury.  But in any

18         event, I'm honoring the representation that we made to you, and

19         you are now discharged, with the appreciation of myself, my

20         staff, the parties and the lawyers.

21                   You are hereby discharged.  Thank you.

22                   Enjoy the cruise.

23                   (Juror No. 15 discharged)

24                   THE COURT:  15 minutes.

25                   Who is your next witness?
```

O6qWmen2

```
 1              MR. MONTELEONI:  The next witness is Vikas Khanna,
 2    which is why we would request the Court's ruling on the issue
 3    raised in ECF-480.
 4              THE COURT:  All right.  Thank you very much.
 5              15 minutes.
 6              MR. WEITZMAN:  Your Honor, I believe we filed a letter
 7    in response.
 8              THE COURT:  Yes.  Since it involved Mearns, I think, I
 9    dealt with more pressing matters, but I've reviewed it.  I'll
10    look at it again.
11              MR. WEITZMAN:  Thank you, your Honor.
12              (Recess)
13              THE COURT:  I have the motion of the government to
14    either instruct this jury on how the grand jury works or allow
15    the government to put on evidence of how the grand jury works.
16    That's in ECF-480, and the response of Mr. Menendez is in 482.
17              I'm going to deny the motion of the government.
18              In United States v. Schwarz, 283 F.3d 76, at what
19    appears to be 109, Judge Walker stated, on behalf of the panel:
20              The thrust of the court's opinion in Aguilar -- that's
21    a Supreme Court case that you're all familiar with -- is that
22    Section 1503 requires a specific intent to obstruct a federal
23    judicial or grand jury proceeding.  Accordingly, the conduct
24    offered to evince that intent must be conduct that is directed
25    at the court or grand jury, and that, in the defendant's mind,
```

O6qWmen2

1    is the "natural and probable effect" of obstructing or

2    interfering with that entity.  *Aguilar*, 515 U.S. at 599.

3              After articulating the rule of *Aguilar* that "the

4    action taken by the accused must be with an intent to influence

5    judicial or grand jury proceedings," the Supreme Court, in

6    *Aguilar*, found that the judge's false statements to

7    investigators did not meet this requirement because his -- now,

8    this is an interior quote from *Aguilar* -- "conduct fell on the

9    other side of the statutory line from that of one who delivers

10   false documents or testimony to the grand jury itself.  Conduct

11   of the latter sort all but assures that the grand jury will

12   consider the material in its deliberations.  But what use will

13   be made of false testimony given to an investigating agent who

14   has not been subpoenaed or otherwise directed to appear before

15   the grand jury is far more speculative."

16             So I'm denying the motion.  I find that that's

17   appropriate under the law.  And also under Rule 403, it's not

18   relevant.  How the grand jury works is not relevant here.  It's

19   confusing of the issues.  It's misleading the jury, and I find

20   that the probative value is substantially outweighed by the

21   danger of misleading the jury, adding to the length of this

22   trial and confusing the issues.

23             That's my ruling.

24             Let's bring this jury in.

25             I note that one of the cases I was looking at was

O6qWmen2

1    tried by Mr. De Castro, if I'm not mistaken.  That was the

2    Furman decision.  Or at least your name is on it, sir.

3              MR de CASTRO:  I'm familiar with it.

4              THE COURT:  Put the witness on the witness stand.

5              Good morning, sir.

6              THE WITNESS:  Good morning, your Honor.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6qWmen2                          Khanna - Direct

1           (Jury present)

2           THE COURT:  Please be seated in the courtroom.

3           Call your next witness, please.

4           MS. POMERANTZ:  The government calls Vikas Khanna.

5   VIKAS KHANNA,

6        called as a witness by the government,

7        having been duly sworn, testified as follows:

8

9           THE COURT:  Welcome, Mr. Khanna.

10          Your witness.

11  DIRECT EXAMINATION

12  BY MS. POMERANTZ:

13  Q.  Good afternoon, Mr. Khanna.

14  A.  Good afternoon.

15  Q.  How far did you go in school?

16  A.  I graduated law school.

17  Q.  For approximately how long have you been a lawyer?

18  A.  Since 2005, so around 19 years.

19  Q.  Have you held any positions in public service?

20  A.  I have.

21  Q.  Do you currently hold a position in public service?

22  A.  I do.

23  Q.  What is your position?

24  A.  I'm the first assistant United States Attorney for the U.S.

25  Attorney's Office for the District of New Jersey.

O6qWmen2                          Khanna - Direct

1   Q.  What is a First Assistant United States Attorney?

2   A.  It's essentially the No. 2 person in charge at the U.S.

3   Attorney's Office in New Jersey, working right underneath the

4   United States Attorney.

5   Q.  And who is the U.S. Attorney?

6   A.  Philip Sellinger.

7   Q.  I'm going to ask you more about your current job as the

8   First Assistant U.S. Attorney, but first I want to ask you

9   about other jobs you've held.

10      What did you do prior to becoming the First Assistant

11  United States Attorney at the U.S. Attorney's Office for the

12  District of New Jersey?

13  A.  I was a partner at a law firm.

14  Q.  And what kind of work did you do, in general?

15  A.  White collar criminal work.

16  Q.  Was this defense work?

17  A.  Yes.

18  Q.  And for about how long did you do that work?

19  A.  Approximately two and a half years.

20  Q.  Besides your current job as the First Assistant United

21  States Attorney, have you held other positions in public

22  service?

23  A.  Yes.

24  Q.  Which ones?

25  A.  I was an assistant United States attorney and held some

O6qWmen2                          Khanna - Direct

1    supervisory positions in the United States Attorney's Office in

2    New Jersey.

3           THE COURT:  How long were you an assistant U.S.

4    attorney in the District of New Jersey, sir?

5           THE WITNESS:  Approximately eight and a half years.

6    BY MS. POMERANTZ:

7    Q.  What kind of cases did you handle as an assistant United

8    States attorney?

9    A.  All kinds of criminal cases, but I primarily focused on

10   public corruption cases towards the latter part of my career.

11   Q.  What are your general responsibilities as the First

12   Assistant United States Attorney for the District of New

13   Jersey?

14   A.  It's to help the United States Attorney run the office.  So

15   we essentially make high-level case decisions on cases across

16   the office in the criminal and civil and appellate divisions.

17   We make personnel decisions about hiring and how to staff

18   certain matters and where to assign people, to which units,

19   etc.  We make budgetary decisions on how to spend our

20   resources.  So essentially managing the whole office.

21   Q.  You mentioned units.  What do you mean by units?

22   A.  The work in our office in the, particularly in the criminal

23   division, is split into different units based on particular --

24   particular subject matter areas.

25   Q.  Can you give us some examples?

O6qWmen2                          Khanna - Direct

1    A.  Sure.  So, for example, there's a unit that focuses on

2    crimes involving gangs.  There's a unit that focuses on

3    healthcare fraud.  There's a unit that focuses on economic

4    crimes, things of that nature.

5    Q.  You mentioned the criminal division.  Can you just explain

6    what you mean by that?

7    A.  The office is broken up into several divisions, so there's

8    a civil division, which does civil work.  There's an appellate

9    division that does appeals work, and then there's a -- there's

10   a criminal division that does most of the criminal work in the

11   office.  But there's also a special prosecutions division,

12   which focuses on crimes involving public corruption, public

13   officials and related matters.

14   Q.  When did you become the First Assistant United States

15   Attorney?

16   A.  In January of 2022.

17   Q.  How did you become the First Assistant United States

18   Attorney?

19   A.  I was hired by Philip Sellinger.

20   Q.  Did you have to be nominated by the president or confirmed

21   by the Senate?

22   A.  No.

23   Q.  Approximately when did Philip Sellinger become the U.S.

24   Attorney for the District of New Jersey?

25   A.  I believe it was December of 2021.

```
1    Q.  In your current --
2             THE COURT:  So the month before you became first
3    assistant.
4             THE WITNESS:  Yes.
5             THE COURT:  All right.
6    BY MS. POMERANTZ:
7    Q.  In your current position, have you had any role in the
8    investigation or prosecution of this case?
9    A.  No.
10   Q.  Are you familiar with someone named Fred Daibes?
11   A.  Yes.
12   Q.  How are you familiar with Fred Daibes?
13   A.  I first became familiar with Mr. Daibes because I knew
14   there was an investigation in our office involving Mr. Daibes.
15   Q.  And when you say that you became aware there was an
16   investigation, can you explain what you mean?
17   A.  Our office had an investigation involving Mr. Daibes.  I
18   was not a part of that investigation, but I heard the name in
19   that context.
20   Q.  And is that when you were an assistant United States
21   attorney?
22   A.  Yes.
23   Q.  And you said that there was an investigation.  Did you come
24   to learn what came of that investigation?
25   A.  Yes.
```

O6qWmen2                          Khanna - Direct

1   Q.   And can you tell us what you learned?

2   A.   The case was ultimately indicted.

3   Q.   Was that by the U.S. Attorney's Office for the District of

4   New Jersey?

5   A.   Yes.

6          THE COURT:   What do you mean when you say it was

7   indicted?

8          THE WITNESS:   The grand jury indicted Mr. Daibes of

9   certain crimes.

10  BY MS. POMERANTZ:

11  Q.   What was Fred Daibes charged with by the U.S. Attorney's

12  Office for the District of New Jersey, by that grand jury?

13  A.   Generally, the matter involved misapplication of bank

14  funds, loan application fraud and, I believe, false statements

15  made to the FDIC.

16  Q.   You said FDIC.  What's the FDIC?

17  A.   The Federal Deposit Insurance Corporation.

18  Q.   During your time as the first assistant, was Philip

19  Sellinger involved in Fred Daibes's criminal case?

20  A.   No.

21  Q.   Why not?

22  A.   He was recused from the matter.

23  Q.   What do you mean by the word "recused"?

24  A.   He was not allowed to work on the matter.  He was fully off

25  of it.

O6qWmen2                          Khanna - Direct

1   Q.  Was Philip Sellinger recused from Daibes's criminal case

2   before or after you rejoined the U.S. Attorney's Office for the

3   District of New Jersey?

4   A.  I believe he was recused before I joined.

5   Q.  As a result of his recusal, what was your role in the case?

6   A.  I was the, what they call the attorney for the United

7   States, which essentially means I was the U.S. Attorney for

8   that case.

9   Q.  As a result of his recusal, did you speak with Philip

10  Sellinger about Daibes's criminal case in the District of New

11  Jersey?

12  A.  No.

13  Q.  I'm going to ask you more about that shortly, but first,

14  you testified that you became the First Assistant U.S. Attorney

15  in January 2022?

16  A.  Correct.

17  Q.  After you became the First Assistant United States

18  Attorney, did there come a time when you spoke with Robert

19  Menendez?

20  A.  Yes.

21  Q.  Did you speak to him on the phone or in person?

22  A.  On the phone.

23  Q.  Did you call him or did he call you?

24  A.  He called me.

25  Q.  On what phone did he call you?

O6qWmen2                              Khanna - Direct

1    A.  My personal cell phone.

2    Q.  Approximately when did he call you?

3    A.  I believe it was late January of 2022.

4    Q.  Now, without naming anyone's name, what general subjects

5    did Robert Menendez talk to you about on the call?

6    A.  He congratulated me for becoming the First Assistant United

7    States Attorney.  He made some small talk about my brother and

8    Mr. Sellinger.  And I don't remember the exact words, but he

9    said something to the effect of, I know you're going to be

10   working cases with some really great lawyers.  And then he

11   named one or two of the lawyers.  And complimented the lawyers.

12   Q.  Without naming the lawyer by name, did one of the lawyers

13   that Menendez complimented represent Fred Daibes in a pending

14   criminal case charged in the District of New Jersey?

15   A.  Yes.

16   Q.  Is that the case that you just testified about?

17   A.  Yes.

18   Q.  And to be clear, when Robert Menendez called you, did he

19   mention the name Fred Daibes or did he mention the name of the

20   lawyer?

21   A.  Just the name of the lawyer.

22   Q.  I'm going to refer to that lawyer as Daibes's counsel going

23   forward during your testimony and would ask you to do the same.

24   Is that OK with you?

25   A.  Yes.

O6qWmen2                        Khanna - Direct

1   Q.  Were you aware at the time that the lawyer we're calling

2   Daibes's counsel was representing Daibes in the pending case

3   against him?

4   A.  Yes.

5   Q.  At the time did you also understand that Daibes's counsel

6   represented defendants in other cases brought by your office?

7   A.  Yes.

8   Q.  You mentioned that he complimented one or two defense

9   lawyers.  Is that right?

10  A.  Correct.

11  Q.  Do you remember the name of the other defense lawyer that

12  Robert Menendez complimented?

13  A.  Yes.  I'm a bit hazier on him mentioning him, but I believe

14  he also mentioned Michael Critchley.

15  Q.  And did you know who those lawyers were at the time Robert

16  Menendez mentioned them?

17  A.  Yes.

18  Q.  How did you know them?

19  A.  I know both of them personally, and I had two trials

20  against one of them.  And they are very well-known attorneys in

21  New Jersey.

22  Q.  And based on your experience, how prominent, if at all,

23  within the New Jersey legal community would you describe them?

24  A.  They are very prominent.

25  Q.  Prior to this call from Robert Menendez, had you ever

O6qWmen2                              Khanna - Direct

1    received a call from a public official complimenting particular

2    criminal defense lawyers?

3    A.  No.

4    Q.  While on this call, did Robert Menendez bring up any

5    particular cases?

6    A.  No.

7    Q.  Did he mention Daibes's name?

8    A.  No.

9    Q.  After that call, did you tell anyone at the U.S. Attorney's

10   Office that Robert Menendez had called you?

11   A.  No.

12   Q.  Now, I want to ask you about what type of relationship you

13   had with Robert Menendez prior to him calling you in January

14   2022.

15        Had you ever spoken with him before?

16   A.  Yes.

17   Q.  About how many times?

18   A.  I believe three times, but -- around three times.

19   Q.  Approximately when was the first time you spoke with Robert

20   Menendez?

21   A.  I think it was late 2020.

22   Q.  Did you speak with him in person or on the phone?

23   A.  On the phone.

24   Q.  How did that call get set up?

25   A.  At the time President Biden, I believe, had won the

O6qWmen2                          Khanna - Direct

1   election.  I'd expressed interest to Senator Booker's staff

2   that I was potentially interested in the United States Attorney

3   position in New Jersey.  I believe that message was relayed to

4   Senator Menendez's staff, and they set up a call with Senator

5   Menendez to discuss the position.

6   Q.  What did you and Robert Menendez discuss on the call?

7   A.  Generally, just, you know, that position and my -- how I

8   would envision, if I were to get that role how I would envision

9   running the office, what my priorities would be, what some of

10  my thoughts were on criminal justice and criminal justice

11  reform.  Things of that nature.

12  Q.  About how long was the call?

13  A.  Approximately ten minutes, maybe.

14  Q.  What, if any, information did Robert Menendez give you

15  during the call about next steps for becoming the U.S.

16  Attorney?

17  A.  I don't recall any such information.

18  Q.  What, if any, information did Robert Menendez give you

19  during the call about the process for becoming the U.S.

20  Attorney?

21  A.  I don't believe we discussed that.

22  Q.  What, if anything, did Robert Menendez say to you about

23  speaking with Cory Booker?

24  A.  I don't believe that came up.

25  Q.  By the way, did you ever interview for the position of U.S.

O6qWmen2                          Khanna - Direct

1   Attorney with Cory Booker?

2   A.  No.

3   Q.  Based on your conversation with Robert Menendez, did you

4   believe that you were under serious consideration for the

5   position of U.S. Attorney?

6           MR. WEITZMAN:  Objection.

7           THE COURT:  Sustained.

8   BY MS. POMERANTZ:

9   Q.  What was your understanding of whether you were being

10  considered for the position of U.S. Attorney?

11  A.  I don't believe I was seriously considered.

12  Q.  When you spoke with Robert Menendez about the U.S. Attorney

13  position, did you have a personal relationship with Robert

14  Menendez?

15  A.  No.

16  Q.  Had you spoken to him before?

17  A.  I don't believe so.

18  Q.  Were you friends with Robert Menendez?

19  A.  No.

20  Q.  Did you ever see him socially?

21  A.  No.

22  Q.  Did you ever have dinner with him?

23  A.  No.

24  Q.  Did you go to his wedding?

25  A.  No.

O6qWmen2                          Khanna - Direct

1   Q.  Did you ever golf with him?

2   A.  No.

3   Q.  Did you have any follow-up conversations with Robert

4   Menendez about becoming the U.S. Attorney?

5   A.  No.

6   Q.  Now, I believe you mentioned you spoke with him a few times

7   in total.  Is that right?

8   A.  Yes.  I -- a couple times, yes.

9               THE COURT:  I think you said three times.  Is that

10  correct?

11              THE WITNESS:  Correct, your Honor.

12  BY MS. POMERANTZ:

13  Q.  Apart from the two times that we've talked about, were

14  there other times?

15  A.  Yes.  I believe I spoke to him for approximately a minute

16  or two at one or two political events.

17  Q.  Did there come a time when you spoke with Daibes's counsel

18  directly about Daibes's criminal case?

19  A.  Yes.

20  Q.  And was this conversation with Daibes's counsel in person

21  or by video or by phone?

22  A.  It was by video.

23  Q.  And who requested this video conversation?

24  A.  Daibes's counsel.

25  Q.  Approximately when was that videoconference?

O6qWmen2                          Khanna - Direct

1   A.  I believe it was February of 2022.

2   Q.  Who was on that videoconference?

3   A.  It was Daibes's counsel, myself, the prosecutors who were

4   working on that case and their supervisors.

5   Q.  And why were the prosecutors who were working on the case

6   and their supervisors on that videoconference?

7   A.  It's our standard practice.  These kinds of meetings are

8   pretty routine.  Defense counsel will often ask us for

9   meetings.  We usually grant them.  But we always want to make

10  sure that the people who are actually working on the case are

11  also present so they can hear what the defense counsel have to

12  say so they can meaningfully participate in any decisions that

13  have to be made after the meeting happens.

14  Q.  After the call did there come a time when you spoke --

15  after the videoconference, did there come a time when you spoke

16  with Daibes's counsel about the case?

17  A.  About, about -- yes.  About the Daibes's case in New

18  Jersey?

19  Q.  Yes.

20  A.  Yes.

21  Q.  What did you tell Daibes's counsel about the criminal case

22  in New Jersey?

23  A.  Well, Daibes's counsel had requested that we -- the purpose

24  of the meeting was he was requesting that we dismiss the case.

25  That was the request, and I got back to Daibes's counsel and

O6qWmen2                                    Khanna - Direct

1   said that we would not be dismissing the case.

2   Q.  Without telling us what you and the prosecutors and the

3   supervisor handling the case discussed internally, did your

4   office decide to make an offer to resolve the case with Daibes?

5   A.  Yes.

6   Q.  I'm talking about the criminal case in the District of New

7   Jersey.

8   A.  Yes.

9   Q.  And approximately when was that offer made?

10  A.  I believe in February or March of 2022.

11  Q.  What were the terms of that offer?

12  A.  It was a plea to a felony charge with a probationary

13  sentence.

14          MS. POMERANTZ:  Your Honor, may I have one moment?

15          THE COURT:  Yes.

16          MS. POMERANTZ:  No further questions.

17          THE COURT:  When you say you made an offer of a plea

18  to a felony charge with a probationary sentence, tell the jury

19  what you meant by that.

20          THE WITNESS:  Yes, your Honor.

21          There's a provision in the Federal Rules of Criminal

22  Procedure that is Rule 11(c)(1)(C), and essentially what it

23  requires is the parties can agree that the result would be that

24  he would plead to a felony plea.

25          THE COURT:  The result of the investigation would be?

O6qWmen2                          Khanna

1          THE WITNESS:  Correct.  The result of the indictment

2     would be that he would plead to a felony charge, which means a

3     charge where the penalties are potentially more than one year.

4          THE COURT:  And what does "he would plead to a felony

5     charge" mean?

6          THE WITNESS:  That he would agree to plead guilty.

7     Sorry.  Yes.  Thank you, your Honor.

8          THE COURT:  All right.  Is there anything else?

9          THE WITNESS:  And then if the court were to accept

10    that offer -- it's within the court's discretion to accept the

11    offer, but if the court were to accept that offer, then he

12    would get a probationary sentence, which means he would not go

13    to jail.

14         THE COURT:  So if I understand you, sir, and I do not

15    mean to put words in your mouth, what you're telling this jury

16    is that the U.S. Attorney's Office and the Daibes counsel

17    agreed that a resolution of this case -- agreed to resolve this

18    indictment in the following manner:  Mr. Daibes would plead to

19    a felony charge, which you say means a charge where the

20    penalties are potentially more than one year.

21         That was the extent of the agreement, is that correct?

22         THE WITNESS:  Correct.

23         And the second part of it was if, under Rule

24    11(c)(1)(C), if the court were to accept that plea, then the

25    court would agree to sentence him to a probationary sentence.

O6qWmen2                    Khanna

1          THE COURT:  All right.  So -- again, I don't want to

2     put words in your mouth -- I think you're saying that you and

3     Daibes's counsel agreed that he would plead guilty to a felony

4     charge under some rule that's called 11(c)(1)(C), and by virtue

5     of that rule, then it would be up to the judge assigned to the

6     case to decide whether to accept that.

7          THE WITNESS:  Correct.

8          THE COURT:  And part of the agreement between yourself

9     on behalf of the U.S. Attorney's -- rather, the agreement

10    between the U.S. Attorney's Office and Daibes's counsel, under

11    (c)(1)(C), was that the court would agree to sentence

12    Mr. Daibes to a probationary sentence.  Is that correct?

13         THE WITNESS:  Yes, your Honor.

14         THE COURT:  And I think you're saying it's up to the

15    judge assigned to the matter to either accept that plea or not.

16         THE WITNESS:  Yes, your Honor.

17         THE COURT:  Tell the jury what a probationary sentence

18    is.

19         THE WITNESS:  It means you're on probation, which

20    means you don't go to jail, but you have to follow certain

21    conditions of that probation to ensure that you continue to

22    remain not in jail.

23         THE COURT:  And if the judge accepts the agreement

24    that your office reached with Daibes's counsel, what happens?

25         THE WITNESS:  Then he would be sentenced to a

O6qWmen2                          Khanna

1   probationary sentence.

2              THE COURT:  And if the judge decides not to accept

3   that agreement, what's the result?

4              THE WITNESS:  Then he has the option to withdraw from

5   the agreement if he chooses to do so.

6              THE COURT:  He being?

7              THE WITNESS:  Mr. Daibes.

8              THE COURT:  All right.  Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            MR. DE CASTRO:  Thank you, Judge.

 2   CROSS-EXAMINATION

 3   BY MR. DE CASTRO:

 4   Q.  Good afternoon, Mr. Khanna.  I normally speak loud, I am

 5   speaking loud.

 6            THE COURT:  Go ahead, sir.

 7   Q.  Mr. Khanna, my name is Cesar de Castro.  I represent

 8   Mr. Daibes.

 9            You testified that you received a call -- well,

10   withdrawn.

11        You started your job in January of 2022; correct?

12   A.  Yes.

13   Q.  And you received a call from Senator Menendez in late

14   January of 2022?

15   A.  Yes.

16   Q.  He called your cell phone and he congratulated you on your

17   new position; right?

18   A.  Yes.

19   Q.  And that was your new position as First Assistant United

20   States Attorney; right?

21   A.  Yes.

22   Q.  Now, on that call Senator Menendez did not ask you to take

23   a meeting with Mr. Daibes' counsel; right?

24   A.  Correct.

25   Q.  Senator Menendez did not ask you to intervene in the Fred

1   Daibes case at all; correct?

2   A.   Correct.

3   Q.   He never mentioned Fred Daibes or any other case; right?

4   A.   Correct.

5   Q.   And you had not spoken to Philip Sellinger about the Daibes

6   case because he was recused; right?

7   A.   Correct.

8   Q.   Now, you also testified that the senator brought up

9   Mr. Daibes' counsel and Mr. Critchley; right?

10  A.   Correct.

11  Q.   And I think you said he said something like you are going

12  to be working cases with some really great lawyers.  Does that

13  sound about right?

14  A.   Yes, and complimented them in that manner.

15  Q.   Now, those lawyers, I think you said, are very well known

16  lawyers in New Jersey; right?

17  A.   Correct.

18  Q.   And they're well respected members of the New Jersey Bar?

19  A.   Yes.

20  Q.   And they frequently handle cases, to your knowledge, that

21  the U.S. Attorney's office brings?

22  A.   Yes.

23  Q.   And they frequently handle high-profile matters brought by

24  your current office; right?

25  A.   They have handled high-profile matters, yes.

1  Q.  And I think you said you knew them both well?

2  A.  Yes.

3  Q.  And you had come back to the U.S. Attorney's office from

4  private practice; right?

5  A.  Correct.

6  Q.  And you were -- prior to rejoining the office you were a

7  white collar criminal defense lawyer; right?

8  A.  Yes.

9  Q.  So you were part of the same group of white collar defense

10 lawyers that the two lawyers the senator brought up were?

11          THE COURT:  Sustained.

12 Q.  They were, in some respects, your colleagues on the defense

13 side prior to your rejoining the office?

14          MS. POMERANTZ:  Objection.

15          THE COURT:  Rephrase.

16          All three of you were experienced criminal defense

17 lawyers; is that correct?

18          THE WITNESS:  Yes, your Honor.

19 BY MR. DE CASTRO:

20 Q.  And you said you had obviously been an assistant U.S.

21 Attorney in years in the past; right?

22 A.  Yes.

23 Q.  And that's when you first learned about the Daibes case;

24 right?

25 A.  When I was an Assistant United States Attorney?

 1    Q.  Yes.

 2    A.  Yes.

 3            THE COURT:  We are only talking about one

 4    investigation and plea offer and so forth.  Same thing, right?

 5            THE WITNESS:  Correct, your Honor.

 6            THE COURT:  OK.

 7    BY MR. DE CASTRO:

 8    Q.  Now, you testified about this video meeting you had with

 9    Mr. Daibes' counsel in February of 2022; right?

10    A.  Yes.

11    Q.  Now, prior to that you receive a call from Mr. Daibes'

12    counsel; right?

13    A.  I don't -- it might have been an e-mail.  I don't remember

14    if it was a call or an e-mail.

15    Q.  You had some communication for Mr. Daibes' counsel seeking

16    to set up a meeting; right?

17    A.  Yes.

18    Q.  And as far as you knew, he hadn't been trying to get in

19    contact with you prior to the call; right?

20            THE COURT:  Do you know whether or not he had been

21    trying to get into contact with you prior to his calling you?

22            THE WITNESS:  I believe it was an e-mail but I

23    don't -- I don't know.  I don't think so.  I don't -- I don't

24    recall him trying to contact me in any other way.

25    BY MR. DE CASTRO:

1    Q.  You didn't look and see you had a bunch of unanswered

2    e-mails or anything like that from Mr. Daibes' counsel?

3    A.  I'm not sure exactly what you mean.

4            THE COURT:  To your knowledge, had he been attempting

5    to reach you?

6            THE WITNESS:  I don't believe so.

7            THE COURT:  OK.

8            THE WITNESS:  Other than that contact.

9    BY MR. DE CASTRO:

10   Q.  Did you understand his contact, in reaching out to contact

11   you, was to negotiate with you regarding a disposition of the

12   Daibes matter?

13   A.  Not quite.  I thought the purpose was for him to make an

14   argument to us as to why we should dismiss the case.

15   Q.  But it was related to the Daibes matter, it wasn't just,

16   *Hey, I want to come see you.*  It was related to this particular

17   case?

18   A.  Yes.

19   Q.  You understood that he wanted to sort of go up the chain --

20   I guess that is an expression -- go up the chain to talk to

21   additional supervisors which would be you; right?

22           MS. POMERANTZ:  Objection.  Form.

23           THE COURT:  I will allow it.

24           THE WITNESS:  I'm not sure what he wanted but my

25   understanding was that's what he wanted to discuss with me.

1  Q.  That's the normal course, normally defense lawyers will

2  speak to the trial team; right?

3  A.  They will primarily speak to the trial team, yes.

4  Q.  And then sometimes they engage the supervisors of those

5  assistants; right?

6  A.  Yes, sometimes they do.

7  Q.  And then they may go up the chain to you or even to

8  Mr. Sellinger, depending on the circumstances?

9  A.  That happens sometimes, yes.

10  Q.  And you didn't feel any pressure to set up or take that

11  meeting; right?

12          MS. POMERANTZ:  Objection.

13          THE COURT:  I will allow it.

14  A.  No, but we almost always grant these types of meetings.

15  Q.  Something that happens in the ordinary course of your work

16  at the U.S. Attorney's office?

17  A.  Yes.

18  Q.  Do you have any recollection whether or not Mr. Daibes'

19  counsel mentioned Robert Menendez at all in those

20  communications to set up the meeting?

21  A.  He did not.

22  Q.  And so you obviously agreed to take the meeting because you

23  had the meeting in February 2022; right?

24  A.  Correct.

25  Q.  And that was set up as sort of a video or a zoom; right?

1  A.  Yes.

2  Q.  Now, it included, I think you said it included the entire

3  trial team and their supervisors?

4  A.  So, yes, there are two supervisors and I just -- one of the

5  supervisors was definitely there, I just can't remember if the

6  second supervisor was there or not.

7  Q.  Now, you prepared for that meeting; right?

8  A.  Yes.

9  Q.  And would you agree with me that part of that preparation

10  was to speak to the trial team?

11  A.  Yes.

12  Q.  And review any relevant documents; right?

13  A.  Yes.

14  Q.  And review any pleading documents and any previous plea

15  offers; right?

16  A.  I don't recall, I'm sorry, what exactly we reviewed.

17  Q.  It is what you remember, that's all that matters.

18      Do you remember if you reviewed any letters that the

19  defense had sent as part of a sort of negotiation process?

20  A.  I don't recall.

21  Q.  But going into the meeting you were aware, not only from

22  your prior experience in the office but even that review, that

23  the office had spent years investigating that case?

24  A.  Yes.

25  Q.  Do you know if it was investigated from 2016, like when the

1  investigation started?

2  A.  I don't recall.

3  Q.  But the indictment was in 2018; right?

4  A.  I believe so.  I don't remember the exact year.

5  Q.  If I showed you the plea offer would that refresh your

6  recollection in terms of the indictment year?

7  A.  Assuming the caption is on it, yes.

8          MR. DE CASTRO:  Your Honor, may I approach for a

9  second?

10         THE COURT:  Yes.

11         MR. DE CASTRO:  I am approaching with what is stamped

12  SDNY last four digits 638.

13         THE COURT:  Just look at that and see if that

14  refreshes your recollection as to when the indictment came down

15  from the grand jury.  Does it refresh your recollection?  Yes

16  or no.

17         MR. DE CASTRO:  I think it is the first paragraph, it

18  is in the paragraph.

19         THE WITNESS:  Yes, it does.

20         THE COURT:  What does that refresh your recollection?

21         THE WITNESS:  That the indictment was in 2018.

22  BY MR. DE CASTRO:

23  Q.  Now, prior to the meeting, did you understand that your

24  office had made plea offers to Mr. Daibes, prior to this offer

25  that I just showed you?

O6Q5men5                        Khanna - Cross

1    A.  You are talking about the meeting with Daibes' counsel?

2    Q.  Yes.

3    A.  I don't recall.  I'm sorry.  I don't.

4    Q.  Did you understand, prior to the meeting, that

5    Mr. Daibes -- I know you had mentioned he was seeking a

6    dismissal, but actually -- let me withdraw that.  Let me ask

7    you this.

8        Now, you said that his counsel was asking for your office

9    to dismiss the case; right?

10   A.  Yes.

11   Q.  Now, did he also argue -- and that was sort of part of his

12   opening pitch to you; is that right?

13   A.  I thought it was the pitch.

14   Q.  The pitch.

15   A.  Yes.

16   Q.  Did he not have a fallback position, which was to be

17   requesting a misdemeanor offense?

18   A.  Perhaps.  I don't recall -- I don't recall exactly him

19   talking about a misdemeanor.

20   Q.  You don't recall whether he asked if the office was not

21   willing to dismiss the case, that would you be willing to

22   consider a misdemeanor?

23   A.  I don't think it was said in those terms, no.

24   Q.  Do you remember in what particular terms that was said?  Do

25   you remember if that was said?

1   A.  I don't believe that was said.

2   Q.  Based on your review of the file and meeting with

3   Mr. Daibes' counsel, was it clear to you that he had done a

4   substantial amount of work on the case?

5           MS. POMERANTZ:  Objection.

6           THE COURT:  If you are able to respond, you may.

7           THE WITNESS:  He appeared to be well-prepared for the

8   meeting.

9   BY MR. DE CASTRO:

10  Q.  Was it clear to you that there had been a lot of work that

11  he and your team had done in the years prior?

12          THE COURT:  Are you talking about done together?  Is

13  that what you mean?

14          MR. DE CASTRO:  No, I just mean -- let me --

15          THE COURT:  Break it down.

16          MR. DE CASTRO:  Yes.

17  Q.  Was it clear to you that your team at the U.S. Attorney's

18  office had worked very hard on the case?

19          MS. POMERANTZ:  Objection.

20          THE COURT:  I will allow that.

21          THE WITNESS:  The team had worked hard on the case,

22  yes.

23  Q.  Had worked for many years on it, correct?

24  A.  Well, not this particular team.

25  Q.  But a team at the U.S. Attorney's office had worked on the

O6Q5men5                          Khanna - Cross

1   case for several years?

2   A.  So the reason I am hesitating is because for several of

3   those years I wasn't at the office so I can't really testify to

4   that time period.

5   Q.  Well, in preparation for the meeting, did you look at the

6   docket sheet, for example?

7   A.  No.

8   Q.  Were you made aware of what had transpired, procedurally,

9   in court, on the case?

10  A.  In general terms, yes.

11  Q.  You knew that there had been proceedings and that the

12  parties had been working -- had been working on it; correct?

13  A.  Certainly the parties had been working on the case but --

14  Q.  For example, were you aware that motions had been filed?

15  Things like that?

16  A.  I don't recall.

17  Q.  Now, you said that it obviously appeared that Mr. Daibes'

18  counsel was well prepared for the meeting; right?

19  A.  Yes.

20  Q.  And that meeting, in and of itself, was nothing unusual for

21  you; right?

22  A.  Absolutely not.

23  Q.  It was a lawyer advocating zealously for a client; right?

24  A.  Yes.

25  Q.  Now, in that meeting, in that Zoom meeting Mr. Daibes'

1    counsel never mentioned Senator Menendez; right?

2    A.   Correct.

3    Q.   Following that meeting you considered carefully everything

4    that was presented to you; right?

5    A.   Yes.

6    Q.   And you discussed it with your trial team or the trial team

7    on the case; right?

8    A.   Yes.

9    Q.   And you rejected the defense's request but you made a

10   counteroffer?

11   A.   I did not make a counteroffer but I --

12   Q.   You authorized the team to make an offer?

13   A.   The team came up with a proposed -- a proposal on how to

14   proceed and I was comfortable with it.

15   Q.   And that proposal was what you were describing to the judge

16   which was the (c)(1)(C) plea whereby you could agree on the

17   punishment; right?

18   A.   Correct.

19   Q.   And that punishment did not involve any jail time; right?

20   A.   Correct.

21   Q.   Now, the offer that was made acknowledged that there had

22   been no financial loss as a result of Mr. Daibes' actions;

23   correct?

24             MS. POMERANTZ:  Objection.

25             THE COURT:  Just a moment.  I will allow it.

O6Q5men5                      Khanna - Cross

1          MS. POMERANTZ:  Your Honor, assumes a fact and

2    relevance; 403.

3          THE COURT:  Was part of the offer that the parties

4    agreed there had been no financial loss as a result of

5    Mr. Daibes' actions?  Yes, or no, or I don't know.

6          THE WITNESS:  I don't know, your Honor.  I don't

7    believe I have ever seen the offer.

8          THE COURT:  All right.

9    BY MR. DE CASTRO:

10   Q.  Well, you are aware of the general terms of it and the

11   reasons why, right, that you chose to authorize that?

12         THE COURT:  Sustained.

13   Q.  Are you aware that the offer did not require Mr. Daibes to

14   forfeit or surrender to the government any money or property?

15         MS. POMERANTZ:  Objection.

16         THE COURT:  Sustained.

17         Are you aware of the terms of the offer other than

18   what you have testified to?

19         THE WITNESS:  No, your Honor.

20   Q.  Would it refresh your recollection if I showed it to you?

21   A.  I don't believe so because I have never seen it.

22   Q.  So you never saw the actual plea offer made?

23   A.  I don't think so, no.

24   Q.  But you would be familiar with its terms; correct, because

25   they were outlined to you?

1          MS. POMERANTZ:  Objection.

2          THE COURT:  No, I will allow it.

3          Were the terms outlined to you?

4          THE WITNESS:  What was outlined to me is that we would

5     not agree to a dismissal or a misdemeanor, that it would be a

6     Felony Plea to an 11(c)(1)(C) with a provisionary sentence.

7          THE COURT:  All right.

8          THE WITNESS:  Beyond that level, generally after that

9     point I wasn't involved.

10    BY MR. DE CASTRO:

11    Q.  Well, in your experience if there is a substantial loss

12    number, meaning there is financial loss to someone, does

13    that -- would that normally, in your office, equate to a

14    probationary sentence?

15         THE COURT:  Sustained.

16    Q.  Are you aware whether or not Mr. Daibes was required to pay

17    any restitution?

18         MS. POMERANTZ:  Objection.

19         THE COURT:  Under the offer?

20         MR. DE CASTRO:  Under the offer.

21         THE COURT:  Go ahead.

22         THE WITNESS:  I'm not aware, your Honor.

23         THE COURT:  He has testified that he said what he

24    knows -- he set forth the terms of the plea to the extent he

25    knew them; is that right, sir?

1           THE WITNESS:  Yes, your Honor.

2           THE COURT:  All right.

3    BY MR. DE CASTRO:

4    Q.  At some point you were informed that the offer was

5    acceptable to Mr. Daibes; correct?

6    A.  Yes.

7    Q.  And this process, this negotiation process did not involve

8    the U.S. Attorney Philip Sellinger at all; right?

9    A.  Correct.

10   Q.  Because he was recused and you did not speak with him at

11   all about the case?

12   A.  Correct.

13   Q.  You made your decision based on the circumstances of the

14   case and what you felt was the appropriate disposition; right?

15   A.  Correct, in consultation with the prosecutors who were

16   working on the case and their supervisors.

17   Q.  You took input from the prosecutors, the supervisors, and

18   Mr. Daibes' counsel and you made a decision based on those

19   circumstances?

20   A.  Correct.

21           (Counsel conferring)

22           MR. DE CASTRO:  Just one second, Judge?

23           THE COURT:  Yes.  Of course.

24   BY MR. DE CASTRO:

25   Q.  You testified that you don't remember whether there was any

O6Q5men5                          Khanna - Cross

1    sort of request for a misdemeanor resolution.  Do you remember
2    that?
3    A.  Yes.  I don't believe it was explicitly stated but it was
4    many years ago.  I don't remember exactly what was said.
5    Q.  Totally understood.
6         MR. DE CASTRO:  Can I approach for a second, Judge?
7    Q.  Can I show you what is stamped SDNY, last four digits 0339,
8    and ask you to take a look at that and tell me if that
9    refreshes your recollection whether there were communications,
10   conversations about potential resolution as a misdemeanor?
11        THE COURT:  You understand how this works.  He can
12   show you anything at all.  Just because something is on the
13   document doesn't make it so.  The question is limited to
14   whether it refreshes your recollection in regard to whether
15   there were communications and conversations about potential
16   resolution of the investigation as a misdemeanor.  So your
17   answer will either be yes, it refreshes my recollection; or no,
18   it doesn't.
19        THE WITNESS:  Yes, your Honor.
20   BY MR. DE CASTRO:
21   Q.  Have you reviewed that?
22   A.  Yes.
23   Q.  Does that refresh your recollection?
24   A.  No.
25        MR. DE CASTRO:  Nothing further, Judge.

1            THE COURT:  Thank you.

2            Mr. Lustberg, anything?

3            MR. LUSTBERG:  Nothing, your Honor.

4            THE COURT:  Redirect?  Oh, I'm sorry, Mr. Weitzman.

5            MR. WEITZMAN:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. WEITZMAN:

8    Q.  Good afternoon, Mr. Khanna.

9    A.  Good afternoon.

10   Q.  I think you stated in direct that you were interviewed for

11   the job of U.S. Attorney by Senator Menendez; correct?

12   A.  I spoke to him about my interest in the position.  I'm not

13   sure if it was an actual interview.

14   Q.  You don't recall that it was a job interview?

15   A.  It felt like a job interview but --

16   Q.  And you told the government when you met with them back in

17   February of 2023 that Senator Menendez did interview you for

18   the job of U.S. Attorney; correct?

19   A.  I don't recall saying that word but I recall telling them

20   about that phone call.

21   Q.  And at the time you believed it was a job interview; right?

22   A.  I wasn't sure.

23   Q.  OK.  Now, Senator Menendez didn't need to have that phone

24   call with you; right?

25            MS. POMERANTZ:  Objection.

1       THE COURT:  Sustained.

2       THE WITNESS:  Correct.

3  Q.  You understand that there is wide interest among white

4  collar practitioners in New Jersey to become the U.S. Attorney;

5  right?

6       MS. POMERANTZ:  Objection.

7       THE COURT:  I will allow it.

8       Would you say it is a job that is attractive to many

9  criminal defense lawyers?

10      THE WITNESS:  Yes.

11 BY MR. WEITZMAN:

12 Q.  You don't know how many people were actually interviewed by

13 Senator Menendez, do you?

14      THE COURT:  I will allow it.

15 A.  I do not.

16 Q.  But he did speak to you about your vision of the office;

17 right?

18 A.  Yes.

19 Q.  Your priorities in the office; right?

20 A.  Yes.

21 Q.  Your experience as a white collar criminal defense

22 prosecutor and defense lawyer; right?

23 A.  Yes.

24 Q.  Fair to say, by the way, that Philip Sellinger has

25 significantly more experience than you do as a white collar

O6Q5men5                          Khanna - Cross

1   practitioner?  Let me rephrase?

2            THE COURT:  The witness is hesitating.

3   Q.  He is your boss so I venture to guess what you might say

4   but let's put it this way.  Phil Sellinger has been practicing

5   law for 10, 15, 20 years longer than you?

6   A.  Perhaps more than that, yes.

7   Q.  And you were on the defense side for about two or three

8   years before you got recruited back to the U.S. Attorney's

9   office; right?

10  A.  Yes.

11  Q.  At no point in time during your interview or your

12  discussion with Senator Menendez regarding the position of U.S.

13  Attorney did Senator Menendez mention Fred Daibes; right?

14  A.  Correct.

15  Q.  He didn't mention that he was friends with Fred Daibes;

16  right?

17  A.  Correct.

18  Q.  And he didn't mention the Fred Daibes case; correct?

19  A.  Correct.

20  Q.  And you are aware, sir, that the Fred Daibes case was

21  pending at the time that Senator Menendez interviewed you for

22  the job; right?

23  A.  Yes.

24            THE COURT:  Well, when you say it was -- well, I will

25  let it -- go ahead.

1  Q.  He had already been indicted; correct?

2  A.  Yes.

3  Q.  Now, you did have some other conversations with Senator

4  Menendez before the congratulatory call; right?

5  A.  Brief ones, yes.

6           THE COURT:  How long was the congratulatory call?

7           THE WITNESS:  Maybe like a minute or two, perhaps.

8           THE COURT:  How long was the call that has been

9  described as the interview?  How long was that?

10           THE WITNESS:  I don't remember exactly, your Honor,

11  but if I could guess, perhaps 10-ish minutes, maybe 15.

12           THE COURT:  Thank you.

13  BY MR. WEITZMAN:

14  Q.  You took the position as the first assistant in January of

15  2022; right?

16  A.  Yes.

17  Q.  But before then you have had a number of interactions with

18  Senator Menendez including this interview call, right?

19  A.  I believe there was two or three, yeah.  I don't remember

20  exactly but a couple, yes.

21  Q.  Do you recall hosting a fundraiser, you and your wife, for

22  Senator Menendez?

23  A.  We were co-hosts and there was a video call with many

24  people on it, yes.

25  Q.  Correct.  And you were co-hosts with an individual named

1   Jun Choi and another person named Miles Berger; right?

2   A.  I don't recall.

3   Q.  And you recall that there were 35 to 40 people on this

4   video conference fundraiser?

5   A.  Yes.

6   Q.  It was during COVID, right, March 2021; right?

7   A.  Yes.

8   Q.  That's why it was a video and not in-person fundraiser?

9   A.  Correct.

10  Q.  Are you aware that you raised close to $60,000 for the

11  Senator?

12          MS. POMERANTZ:  Objection.

13          THE COURT:  I will allow it.

14  A.  I did not do that personally.

15  Q.  Fair enough.

16          Did you know that the video conference fundraiser that

17  you co-hosted raised close to $60,000 for the senator?

18  A.  I did not know.  I don't recall that.

19          THE COURT:  How many co-hosts were there, if you know?

20          THE WITNESS:  Several.  I don't remember exactly.

21  Q.  Do you remember any of the names other than the two that I

22  identified, Jun Choi and Miles Berger?

23          MS. POMERANTZ:  Objection.  That wasn't his testimony.

24          THE COURT:  I think we are going a bit far afield.

25  BY MR. WEITZMAN:

1  Q.  In any event, by the time you became first assistant, fair

2  enough to say that you and Senator Menendez certainly

3  recognized each other by name, if not by face; correct?

4  A.  Yes.

5  Q.  So in late January 2022 you receive a call from Senator

6  Menendez; correct?

7  A.  Yes.

8  Q.  And it is congratulatory call; right?

9  A.  That's how we started the call, yes.

10  Q.  In addition to congratulating you on your new position, he

11  also was complimentary of your brother; right?

12  A.  Correct.

13  Q.  Your brother is someone who knows Senator Menendez well;

14  right?

15  A.  Yes.

16  Q.  That's because your brother is a congressman from

17  California; right?

18  A.  Correct.

19  Q.  Another connection between you and Senator Menendez; right?

20          MS. POMERANTZ:  Objection.

21          THE COURT:  I will allow it.

22          THE WITNESS:  I know that my brother knows Senator

23  Menendez quite well.

24  BY MR. WEITZMAN:

25  Q.  So he complimented your brother on this call, right?

1    A.  Yes.

2    Q.  And then he complimented the two lawyers; right?

3    A.  Correct.

4    Q.  Two of the finest lawyers you know in the State of New

5    Jersey; right?

6    A.  They are very fine lawyers.

7    Q.  And both of them have many cases before your office at the

8    U.S. Attorney's office at that time; right?

9    A.  Yes, several.  Yes.

10   Q.  They're repeat players, right?

11   A.  Absolutely.  Yes.

12   Q.  But I think you already covered this, there was no

13   discussion of any particular cases that they were involved in

14   on that call with Senator Menendez; right?

15   A.  Correct.

16   Q.  And Senator Menendez didn't ask you to do anything for

17   those lawyers; correct?

18   A.  Correct.

19   Q.  He didn't ask for any preferential treatment for those

20   lawyers?

21   A.  He did not.

22   Q.  Mainly he was talking about how lucky you are to be working

23   opposite those lawyers because they're so fine; right?

24              MS. POMERANTZ:  Objection.  Argument.

25              THE COURT:  I will allow that.  Is that what he was

 1   saying?

 2              THE WITNESS:  He did not say that, no.

 3   BY MR. WEITZMAN:

 4   Q.  He said that you will be working opposite those fine

 5   lawyers; right?

 6              MS. POMERANTZ:  Objection.

 7   Q.  In sum or substance.

 8              THE COURT:  You may answer.

 9              THE WITNESS:  I believe he said -- I don't remember

10   the exact words.  I believe he said something to the effect of

11   I know you are going to have cases with some really great

12   lawyers.

13   Q.  Senator Menendez wasn't the only senator who called you in

14   late January; right?

15   A.  Correct.

16   Q.  You also received a call from Cory Booker; right?

17   A.  Yes.

18   Q.  And you received a call from Cory Booker before you

19   received a call from Senator Menendez; isn't that right?

20   A.  I believe so, yes.

21   Q.  The Cory Booker call was about the same length as Senator

22   Menendez's call; a minute, two minutes.  Right?

23   A.  I recall it as a very brief call.

24   Q.  And again, a congratulatory call?

25   A.  Yes.

1    Q.  So you were asked -- well, it wasn't surprising to you, by

2    the way, that you would receive a call as first assistant from

3    the two senators congratulating you; right?

4    A.  It was not that surprising.  It was a little bit

5    surprising.

6    Q.  It actually felt pretty good, probably; right?

7                MS. POMERANTZ:  Objection.

8                THE COURT:  I will allow it.

9                THE WITNESS:  Yes.  Yes.

10   Q.  It was a kind gesture on both their parts?

11               THE COURT:  Sustained.

12   Q.  You were asked on direct that prior to the call from

13   Senator Menendez did any other public officials compliment any

14   particular defense lawyers; correct?

15   A.  I believe the question was did any public officials call me

16   to compliment any defense lawyers.

17   Q.  Prior to the call from Senator Menendez in January 2022 you

18   weren't the first assistant; correct?

19   A.  I believe I started in mid-January 2022.

20   Q.  Before their calls, no public official even called you to

21   congratulate you for a good job; correct?

22   A.  Other than my brother, correct.

23               THE COURT:  How about your mother?

24               THE WITNESS:  She is not a public official at this

25   point.

1    BY MR. WEITZMAN:

2    Q.  Now, you also testified about some outreach from

3    Mr. Daibes' lawyer, correct, and some discussions you had with

4    Mr. Daibes' lawyer?

5    A.  Yes.

6    Q.  At no point in time, in any communication with Mr. Daibes'

7    lawyer, whether by video conference, in-person, or via e-mail,

8    did Daibes' lawyer ever reference Senator Menendez; correct?

9    A.  Correct.

10   Q.  Never mentioned that he had a relationship with Senator

11   Menendez; right?

12   A.  Correct.

13   Q.  Never asked for any preferential treatment thrown around

14   with Senator Menendez' name; right?

15   A.  Correct.

16   Q.  Fair to say that you weren't even aware at that time that

17   Mr. Daibes had a personal friendship with Senator Menendez?

18   A.  I was not aware.

19   Q.  The Daibes case, the plea offer you made or you authorized

20   making, that was made on the merits of the case; right?

21   A.  Absolutely.

22   Q.  No doubt about that, right?

23   A.  No doubt at all.

24   Q.  No influence from Senator Menendez in the plea offer you

25   made; right?

1          MS. POMERANTZ:  Objection.

2          THE COURT:  Sustained.

3          MR. WEITZMAN:  Nothing further.

4          THE COURT:  Thank you.

5          Redirect?

6          MS. POMERANTZ:  Very briefly.

7    REDIRECT EXAMINATION

8    BY MS. POMERANTZ:

9    Q.  Mr. Khanna, do you know who Robert Menendez called right

10   after getting off the phone with you in January 2022?

11   A.  I have read the indictment so I have some understanding of

12   it.

13         THE COURT:  No.  Apart from reading the indictment.

14         THE WITNESS:  No.

15   Q.  Do you recall being asked questions on cross-examination

16   about receiving a call from Cory Booker?

17   A.  Yes.

18   Q.  When Cory Booker called you, did he compliment any

19   particular defense lawyers?

20   A.  No.

21   Q.  How many lawyers did Robert Menendez mention when he called

22   you in January of 2022?

23   A.  I believe two.

24   Q.  You said one of them was Michael Critchley?

25   A.  Yes.

1  Q.  At the time of the January 2022 call from Robert Menendez,

2  were you aware whether or not Michael Critchley represented a

3  man named Elvis Parra?

4  A.  No.

5          MR. WEITZMAN:  Objection.  Scope.

6          THE COURT:  We have the answer.

7  Q.  Did the other lawyer represent Fred Daibes?

8  A.  Yes.

9          MS. POMERANTZ:  No further questions.

10          THE COURT:  Thank you.  You are excused.

11          MR. WEITZMAN:  Your Honor, I'm sorry.  I have one

12  recross within that scope.

13          THE COURT:  Go ahead.

14  RECROSS EXAMINATION

15  BY MR. WEITZMAN:

16  Q.  Did your office prosecute a man named Elvis Parra?

17  A.  I'm not familiar with every case in the office but I don't

18  believe so.

19  Q.  Are you aware that Elvis Parra had a case pending before

20  the New Jersey Attorney General's office, not your office?

21          MS. POMERANTZ:  Objection.  Assumes a fact.

22          THE COURT:  I will allow that.

23          Are you aware of that one way or the other?  Are you

24  aware of whether or not there was such a matter pending?

25          THE WITNESS:  At the time or now?

O6Q5men5

```
 1                THE COURT:  No, at the time.

 2                THE WITNESS:  I was not aware.

 3                MR. WEITZMAN:  Thank you.

 4                THE COURT:  You are excused.  You may step down,

 5     Mr. Khanna.  Thank you.

 6                THE WITNESS:  Thank you, your Honor.

 7                (Witness excused)

 8                THE COURT:  Who is your next witness, government?

 9                MR. RICHENTHAL:  Vasken Khorozian.

10                THE COURT:  How long would that take, approximately?

11     How long is the expected direct?

12                MR. RICHENTHAL:  It will certainly take us into the

13     lunch break, if that is the Court's inquiry.  I anticipate the

14     direct, hopefully under an hour.

15                THE COURT:  Let's break for lunch.  2:00.  Enjoy the

16     lunch.

17                (Continued on next page)

18

19

20

21

22

23

24

25
```

O6Q5men5

```
 1                    (Jury not present)

 2              THE COURT:  You may be seated.

 3              Is the expectation of the government that it will get

 4      to Ms. Kopplin?

 5              MR. RICHENTHAL:  Yes, your Honor.  I anticipate

 6      Ms. Kopplin after Mr. Khorozian.  I assume this is why the

 7      Court is asking, there are a couple evidentiary issues.

 8              THE COURT:  It is the June 26 letter, the letter that

 9      I received while on the subway today a document -- but that you

10      don't know -- document 484.  Is that it?

11              MR. RICHENTHAL:  There are two sets of issues.  One is

12      the exhibits we would like to offer that is the subject of the

13      letter, and the other is an exhibit the defense notified it may

14      offer, which I am happy to handle orally.

15              THE COURT:  Do I have notice of that?

16              MR. RICHENTHAL:  Not until I think I have told you

17      just now, no.  I'm happy to take it up first, if the Court

18      would like.

19              THE COURT:  Well, defense, you haven't brought that to

20      my attention; correct?  Whatever this exhibit is?

21              MR. WEITZMAN:  I think they -- I don't know which

22      exhibit they're referring to.

23              THE COURT:  Mr. Richenthal, let's be clear about this.

24              I have document 484, which deals with certain exhibits

25      the government intends to offer in connection with the
```

O6Q5men5

1    testimony of Shannon Kopplin.  My recollection is it was filed

2    about 8:30 this morning.  I have that.  Mr. Richenthal, you are

3    telling me there is something else beyond what's at issue in

4    484?

5              MR. RICHENTHAL:  Yes.

6              THE COURT:  What is it, sir?

7              MR. RICHENTHAL:  A couple of days ago, it may have

8    been even longer than that, I advised the defense that an

9    exhibit for which they had given us notice, marked DX 1950-1,

10   is an exhibit that we objected to.  I reminded the defense

11   again last night that that was an exhibit to which we had an

12   objection.  We still have an objection.  We haven't gotten

13   further information.  If they intend to use it I would like to

14   be heard.

15             THE COURT:  Let's talk to each other and see if they

16   intend to use it.

17             MR. WEITZMAN:  I did e-mail Mr. Richenthal this

18   morning informing him that I do intend to use it.

19             THE COURT:  So a lot was happening while I was on the

20   subway.

21             MR. WEITZMAN:  Yes.  We have -- obviously, we objected

22   to their exhibit many days ago and they've put in a letter this

23   morning.

24             THE COURT:  Tit for tat.  It is time all of that

25   ended.  It is way past time that this silliness, that comes up

O6Q5men5

1   on essentially every exhibit -- you lawyers are more

2   experienced than to be doing that.  The last minute:  *Well, no,*

3   *I told you in advance.  No, I didn't tell you.  You did.  You*

4   *didn't.*  That is no way to engage with each other.

5           What is the issue on 1950-1 since I don't have

6   anything written on it?

7           MR. RICHENTHAL:  1950-1, and we are happy to put it

8   up, it is a text exchange between Mr. Menendez and

9   Ms. Menendez.  Ms. Kopplin is not on this exchange, she's not,

10  to my knowledge, aware of this exchange.  She therefore cannot

11  offer any testimony about this exchange.  It doesn't belong

12  with her on the stand.  It doesn't belong in the government's

13  case at all.

14          What I told Mr. Weitzman is not that we object --

15          THE COURT:  It is the defense case.

16          MR. RICHENTHAL:  Correct, your Honor.  That is what I

17  was going to say.  It is not that I told Mr. Weitzman that we

18  object to the exhibit.  I told Mr. Weitzman we object to the

19  exhibit for Ms. Kopplin, or otherwise, in the government's

20  case.

21          The defense has given us summary charts.  It appears

22  they intend to move a lot of things into evidence.  That is

23  fine, we are in productive negotiations with them.  Maybe

24  they're going to move this in.  But we would then have an

25  opportunity to question the summary witness they call about

O6Q5men5

 1    putting this in context, not putting this in context, et

 2    cetera.  It is not appropriate in our view -- and I don't think

 3    we have done this -- to put an exhibit on the screen that the

 4    witness is literally incapable of talking about, somehow to

 5    seek to impeach the witness or something of that sort that is

 6    going to be confusing to the jury.

 7            THE COURT:  Are you saying she's not on it as a sender

 8    or recipient or copied on it, and to your knowledge she has

 9    never seen it before?

10            MR. RICHENTHAL:  Yes.  Yes to all of those questions.

11            THE COURT:  Let me hear from the defendant.

12            MR. WEITZMAN:  Your Honor, I don't plan to ask her

13    questions about the document.  I'm happy to offer the document

14    and any of her testimony and just publish it but there is no

15    question about the authenticity of the document.

16            THE COURT:  No, but if she has never seen it and it is

17    not on it, why do it through her?

18            MR. WEITZMAN:  Well, I don't need to -- I can offer

19    evidence through any witness if it is not -- if it is

20    authentic, it is non-hearsay, it is not offered for the truth.

21    I can publish evidence in the middle of an examination.  I have

22    never heard of that rule.

23            MR. RICHENTHAL:  It is called our case-in-chief.  They

24    can put evidence in in their case.  We then get to put it in

25    context.  This is like foundational principles.

O6Q5men5

```
 1              MR. WEITZMAN:  It is not.

 2              THE COURT:  Just a moment, gentlemen.

 3         Go ahead.

 4              MR. RICHENTHAL:  I have never heard of a defendant

 5    being permitted to put in an exhibit that no witness we have

 6    called or even can call --

 7              THE COURT:  On your case.  I mean, I think that's

 8    right if it is the government's case.  You are saying you have

 9    never heard of that rule, Mr. Weitzman, but I have heard of

10    that rule.  I guess I just heard of it now.  That is to say,

11    how can you simply put in evidence on the opposing parties'

12    case in which you are not going to ask anyone about it?

13              MR. WEITZMAN:  For example, your Honor, there may

14    be -- there was a conversation between Ms. Kopplin and Senator

15    Menendez.  I think I'm entitled to put this document in and say

16    did Senator Menendez tell you, for example, that he's gotten

17    information from his wife?

18              THE COURT:  Well, I guess you can say that but if

19    she's never seen the document and is not on it, I don't see how

20    you can do that.  You can ask her that question.

21              MR. WEITZMAN:  I could ask her that question, your

22    Honor, that's correct, and I can refresh her recollection with

23    a document as well.

24              THE COURT:  Right.

25              MR. WEITZMAN:  But I'm not -- if this is the rule
```

O6Q5men5

1    they're taking, I think that that is really --

2              THE COURT:  But I have never -- I don't think I have

3    seen -- I may be wrong, and if you gentlemen want to show me

4    anything, I'm not sure I have heard of the opposing side just

5    putting something in without any basis for the witness through

6    whom it is being put in on, and not only that, on the

7    adversary's case.

8              That's where I am.

9              MR. WEITZMAN:  That's fine, your Honor.

10             THE COURT:  I will take a look at anything the parties

11   want to show.

12             MR. RICHENTHAL:  Just to be clear, we do not object to

13   him cross-examining Ms. Kopplin about her awareness of

14   conversations she wasn't a part of.  That seems like fair cross

15   as long as it is properly phrased.  The exhibit is the problem.

16             THE COURT:  You have my views on it.  If you can show

17   me anything that tells me I'm wrong, I will certainly look at

18   it.

19             MR. WEITZMAN:  Your Honor, as to the exhibit that the

20   government wants to put in through Shannon Kopplin, can we have

21   a moment to discuss that?

22             THE COURT:  Yes, sir.  Of course.  I want to read what

23   the government's position is, too.  Go ahead.

24             MR. WEITZMAN:  Your Honor, these are documents that

25   are, one of them, for example, is a 40-plus, 50-page document

O6Q5men5

1    that contains legal instructions of how to fill out certain

2    Senate financial disclosure forms.  The other is a manual on

3    what the forms mean.  These are legal instructions.  This is

4    like putting in the United States Sentencing Commission

5    Guidelines.  This is for you to instruct the jury.  There is no

6    evidence, your Honor, that Senator Menendez has reviewed these

7    documents.  I think Ms. Kopplin will testify that Senator

8    Menendez did not get a training regarding these documents.  And

9    so, until there is a link between these documents and Senator

10   Menendez' knowledge, I don't see the relevance of putting it

11   in.  Ms. Kopplin can certainly testify to what these meant but

12   the documents aren't relevant and are 403.

13           MR. RICHENTHAL:  I'm sorry.  That doesn't make any

14   sense.

15           Mr. Menendez, under oath, filled out Senate financial

16   disclosures.  The Senate financial disclosures repeatedly and

17   expressly use the word "reportable."  Of course what is

18   reportable is defined by the instructions that go with the

19   disclosures.  The defense position seems to be we can offer the

20   disclosures and we cannot offer the very instructions that

21   explain the disclosures that every member of the Senate fills

22   out, including Mr. Menendez.  The jury would literally have no

23   idea what the word "reportable" means.  It would just see a

24   piece of paper.  That may be in Mr. Menendez' interest.  It is

25   not fair or appropriate.

O6Q5men5

```
 1                I can say to the court, because I have been involved
 2      in multiple cases in which disclosures are involved, I have
 3      never heard of a case in which the government can put
 4      disclosures in and not the instructions to the very same
 5      documents which, by the way, are all public.  Every case in
 6      which this happens, whether it is United States v. Sheldon
 7      Silver, or United States v. Sylvia Ash, or any number of other
 8      cases, the disclosures and the instructions come in together
 9      because the disclosures are incomprehensible without the
10      instructions.
11                THE COURT:  Mr. Weitzman?
12                MR. WEITZMAN:  Yes.
13                Under the government's theory you would be permitted
14      to put in tax returns and then put in the tax code.  That is
15      not --
16                THE COURT:  Well, that's not what we have here.
17                MR. WEITZMAN:  It is no different.  The tax code
18      provides instructions on how to fill out what the tax --
19                THE COURT:  Mr. Weitzman -- go ahead, sir.  I didn't
20      mean to cut you off.
21                MR. WEITZMAN:  In many other cases when they put
22      instructions in, there is often a check mark or some form of
23      electronic confirmation:  *I am familiar with this.*  There is
24      trainings that people go to.  There is none of that evidence
25      here.  That's a weakness in their charge or their case, it is
```

O6Q5men5

 1    not a reason to put in evidence that there is documents that

 2    there is no evidence the senator has received or reviewed, and

 3    it is deeply prejudicial to suggest otherwise.

 4              MR. RICHENTHAL:  I'm happy to respond to that.

 5              Do you know what happens in tax cases?

 6              THE COURT:  Go ahead.

 7              MR. RICHENTHAL:  Do you know what happens in tax

 8    cases?  Of course we all know the answer.  The form comes in

 9    too, with the instructions.  That's the analogy.  Schedules,

10    for example, that's a word that is used in the code.  If an

11    individual fills out a schedule, Schedule C, for example, the

12    instructions to Schedule C typically are admitted as well

13    because they are incomprehensible without the instructions.

14              As to the argument Mr. Menendez was unaware,

15    Mr. Weitzman is free to explore that with Ms. Kopplin if he

16    wishes.  I will represent to the Court Ms. Kopplin will say,

17    among other things, she received a call from Senator Menendez

18    asking about how to fill a certain part of the form out.  He

19    certainly seemed aware that he needed to understand what to put

20    in.  If Mr. Weitzman would like to argue despite that awareness

21    on subject A he didn't know about subject B, that's why we have

22    a jury trial.

23              But this is an argument about weight, not

24    admissibility.  Plainly, we can't put in disclosures that use

25    the word "reportable" and have the jury have no idea what that

O6Q5men5

1        refers to.

2                THE COURT:  I'm going to read these materials.

3                Go ahead.

4                MR. WEITZMAN:   Three seconds.

5                The instructions, as your Honor knows, on Schedule C

6        of the tax forms, it is on the back of the tax forms, it all

7        comes in as one.  They can ask Ms. Kopplin what reportable

8        means, what she has discussed with Senator Menendez about that.

9        That's all fine.  But if this comes in, there needs to be an

10       instruction, your Honor, that there is no evidence that Senator

11       Menendez reviewed these or received these.

12               MR. RICHENTHAL:  Except there will be such evidence

13       and that is for the jury, not for the Court.

14               I would also note, Mr. Weitzman is right.  Sometimes

15       the instructions are physically part of the document.

16       Sometimes they're not.  That's not an evidentiary objection.

17       These documents go together, Ms. Kopplin will literally

18       testify, and is subject to cross, that every year the form

19       comes out and every year the instructions come out.  The form

20       and the instructions go together.  The instructions --

21               THE COURT:  And what happens to them?  When you say

22       they come out, you mean they're promulgated?

23               MR. RICHENTHAL:  They're publicly posted.

24               THE COURT:  Yes.

25               MR. RICHENTHAL:  And they're promulgated to the entire

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6Q5men5

 1    Senate community, not just senators themselves; their staff,

 2    all of whom are obligated to file, all of whom are obligated to

 3    electronically certify that they are individuals who did file.

 4            THE COURT:  Wait, wait.  Just a moment.  Go ahead.

 5            MR. RICHENTHAL:  When I say certify they filed meaning

 6    literally the senator, himself, has certified he filed.  The

 7    disclosure itself uses the word "reportable".  That's obviously

 8    a reference to instructions.

 9            THE COURT:  He is certifying to the correctness of

10    these forms.  Is that what you are saying?

11            MR. RICHENTHAL:  Certifying to the disclosure

12    publicly, every year, and electronically, every year, the

13    disclosure has been uploaded and made public.  The

14    instructions, themselves, are also public.

15            THE COURT:  And what evidence are you going to adduce

16    of his knowledge of these things?

17            MR. RICHENTHAL:  Multiple things.  So one is he has

18    been a senator for a long time.  Every year the process is the

19    same.  The instructions go up on the website --

20            THE COURT:  No, from her.  From her, from Kopplin.

21            MR. RICHENTHAL:  Yes.  Ms. Kopplin will say every year

22    the instructions go up on the website.  Every year the

23    instructions are revised and promulgated and issued to the

24    Senate community.  Every year the Senate community asks

25    questions about the Senate Ethics Committee on a variety of

O6Q5men5

1    subjects including financial disclosures.  They answer

2    inquiries about how to fill disclosures out.  And, in fact,

3    Mr. Menendez himself at some point called Ms. Kopplin up and

4    asked her how to fill a disclosure out on a specific issue and

5    she gave him advice.

6           Ms. Kopplin is also capable of testifying that the

7    ethics committee keeps a record of other communications on this

8    subject, that senators can make someone available to ask

9    inquiries on their behalf and Mr. Menendez did that too, in

10   fact he made Mr. Kelly such a person.  And Mr. Kelly also asked

11   inquiries of the committee how to fill things out.  The jury

12   can certainly infer from all of that.

13          THE COURT:  I have heard enough.  I need to read these

14   and we will be back at 2:00.

15          MR. MONTELEONI:  Your Honor, with apologies, there is

16   one other set of exhibit issues that we do want to bring before

17   the Court at the appropriate time.  It is not connected to a

18   witness, these are the cleanup exhibits that we wish to offer

19   before resting.

20          THE COURT:  Well, how can there be an issue between

21   the parties about cleanup exhibits?

22          MR. MONTELEONI:  So, I agree, your Honor.  The

23   defense, as I understand it, has raised, this morning, an issue

24   with the volume of the number of cleanup exhibits that we

25   intend to offer.  We notified them last --

O6Q5men5

1          THE COURT:  I have an issue with the number of issues

2    brought up to the Court at the last minute.  Go ahead.

3          MR. MONTELEONI:  Yes, your Honor.  We don't like

4    raising this orally or at the last minute.  We notified them of

5    one batch of cleanup issues, cleanup exhibits.

6          THE COURT:  Talk to each other and if there are still

7    issues about cleanup -- I don't understand that at all -- but I

8    will handle it.

9          MR. MONTELEONI:  We have talked to them.

10         MR. WEITZMAN:  Just so I can explain, your Honor.

11         We don't have an objection with the cleanup exhibits.

12   They want to move into evidence 700 exhibits that they notified

13   us of the other day.  We have been frantically trying to review

14   700.  They don't want to publish those exhibits before the jury

15   with any witness, they just want to publish them as some

16   unspecified number, who knows how many, in summation.  I don't

17   think that that's the way trials are done, your Honor.

18         MR. MONTELEONI:  Your Honor, we would have -- as you

19   know, I love publishing documents.  And the Court has asked me,

20   as my understanding directed me, to focus on, when things are

21   in evidence, minimize the amount of publishing that you are

22   doing before the jury --

23         THE COURT:  Yes.

24         MR. MONTELEONI:  -- and sum up on them, if necessary.

25   We are trying to do that here.  This is a document-intensive

O6Q5men5

1    case so there is a large volume of documents.  We have been

2    notifying them as fast as we can --

3           THE COURT:  And you want to do this without a witness.

4           MR. MONTELEONI:  Put them in, yes, without a witness

5    and do minimal, if any publishing.  And then, those that are

6    needed at the time of closing we would sum up on.  But that's

7    what I understood that the Court was asking me to do with --

8           THE COURT:  Don't you need a witness through which to

9    put them in?

10          MR. MONTELEONI:  No.  No, the defense has been very

11   productively engaged in a number of stipulations.  These are

12   all ones that are going in, in accordance with stipulations.

13          THE COURT:  Wait.  That is something different.  Are

14   you saying there are stipulations that have been agreed to by

15   the parties for the admission of these documents?

16          MR. MONTELEONI:  Sorry, for the authenticity, that the

17   parties reserved on admissibility.  Right?  And so there is a

18   number of -- there is a huge number of documents that we now

19   have a substantial number that are left that we wish to offer.

20   The authenticity is established by a series of stipulations

21   which we can identify as we go in line.

22          THE COURT:  Are there admissibility issues?

23          MR. MONTELEONI:  We have been talking to the defense

24   and narrowing it.  We are down to about five to seven, I think,

25   that we will need the Court's assistance with on those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6Q5men5

1    disputes.  And as to that, we were hoping to get some of the

2    Court's time this afternoon after the jury leaves so that we

3    can get this all sorted out and rest tomorrow without this

4    being at the very last minute.  But then this morning defense

5    sort of raised further objections, not just to the ones that

6    they have specific issues with the admissibility of, but just

7    to the concept of how many we are offering pursuant to

8    stipulation and the volume of it.  And that's what, you know,

9    obviously we need to be able to put in the evidence to carry

10   our burden so we don't understand that as an objection.

11            THE COURT:  Mr. Weitzman?

12            MR. WEITZMAN:  OK, your Honor.

13            Again, I think that in principal cleanup exhibits are

14   fair.  We haven't even had an opportunity to review the

15   thousands of pages they want us to review and on 48-hours'

16   notice agree to admissibility.  This isn't the process I have

17   ever seen in any case where you offer 700 documents on the last

18   day of trial and then get to build an entire case around those

19   documents.

20            MR. MONTELEONI:  Again, your Honor, I think that it is

21   not the same -- that is not the right amount of notice.  I

22   don't know the page count, I think that there is some amount of

23   substantial pages.  We noticed a large number of them on last

24   Wednesday and then the remainder on Sunday.

25            THE COURT:  When you say noticed, what do you mean?

O6Q5men5

```
 1              MR. MONTELEONI:  Well, we had disclosed these exhibits
 2   to them weeks or months ago.  We said we intend to offer them
 3   at an appropriate point in the proceedings, the equivalent of
 4   the three-day rule for the witnesses.  So, for a number of
 5   them, probably not the majority outstanding but a substantial
 6   number of the outstanding we notified last Wednesday, a week
 7   ago today.  The remainder we notified on Sunday, three days
 8   before today.
 9              So, we have -- you know, obviously, it's a lot.  I'm
10   not saying that it is not a lot.  We are all working a lot and
11   we are all doing a lot.  But, ultimately, we are doing this
12   fast because we are trying to carry our burden and get it to
13   the jury quickly.  And, we also think that a number of these
14   exhibits are ones that might head off a possible rebuttal case.
15   We are trying to build in the things that we will need to have
16   in order to meet what we anticipate the defense has and we
17   think that this is the efficient way we thought the Court
18   wanted us to proceed.
19              MR. WEITZMAN:  If they have a rebuttal case they can
20   put one on, your Honor.
21              But, here is my concern.  They're going to have slides
22   in summation that that refer to documents no one in this court
23   has ever seen -- not the jury, not the defense -- and then we
24   are going to be expected to get up, right then and there, and
25   somehow rebut those documents when when we haven't had an ample
```

O6Q5men5

1    opportunity to do so.

2            THE COURT:  I understand.  Let's see if that's the

3    case.

4            MR. MONTELEONI:  I think that there will be a very

5    limited amount of this.  As you know, it is not our preference

6    to show the jury the things for the first time in summation.

7    We understood that the Court wished us to limit the number of

8    things that we have to show to the jury once and then not sum

9    up on.

10           THE COURT:  As long as they're in evidence.

11           MR. MONTELEONI:  Yes, and what we are attempting to do

12   is to put them in evidence so that we can do that.

13           And the only alternative, we don't want to call the

14   paralegal and then go through each of these in a laborious

15   page-by-page way.  We have been trying to be targeted.  The

16   Court has asked us to be even more targeted, we have been even

17   more targeted.  We have cut a paralegal because we understood

18   that is what the Court wanted.  What we are attempting to do is

19   to efficiently put these exhibits, which they have had for

20   months, into evidence, so that we can sum up on them.

21           And look, I think that the focus, obviously, of the

22   summation, is going to be on the documents that the jury has

23   been seeing and hearing about, but there are a number of

24   issues, there is a number of different charges, there are

25   jurisdictional issues, there are venue hooks, there are

O6Q5men5

particular technical elements.  We haven't featured all of those before the jury.  We understood that for efficiency that is not always preferred.

THE COURT:  Once they're in evidence.

MR. MONTELEONI:  Yes.  And that is what we are trying to do, we are trying to bring them into evidence.

THE COURT:  2:00.

MR. WEITZMAN:  Five seconds, your Honor, just to respond.

I have no objection, if they have documents that are important for their summation and for their elements, they can identify them:  10, 20, 30 documents.  No objection to that. What they're trying to do is bury those key documents, whatever they perceive they may be, as a needle in a haystack so that we can't prepare for our summation.

THE COURT:  I got it.

Any objection to your notifying the defense of which of the however many hundred exhibits they are, you intend to feature in your summation?

MR. MONTELEONI:  Yes.

Your Honor, we can't write our summation before we close.  We are definitely gearing everything towards things that we believe that we will want.  There is some level -- we can try to see if there is some volumes of things that we can live without, but we have -- there is some phone records, we

O6Q5men5

1    might be able to cut down on the number of phone records we are

2    putting in.

3            THE COURT:  No, what I am asking you to do, regardless

4    of the volume -- look.  There have been stipulations into

5    authenticity and there are no admissibility objections.  It

6    seems to me the documents should be able to come in but, again,

7    the same bagging works both ways.  It also seems to me that if

8    there are hundreds of pages here, that you can certainly let

9    the defense know which of this lately-introduced documents you

10   are going to feature in your summation.  You don't have to do

11   it now but you have to give them some notice.

12           MR. MONTELEONI:  All right.  We will --

13           THE COURT:  So that they're not put to going

14   through -- I have heard the number 700, I don't know -- they're

15   not put to going through 700 pages of phone records to figure

16   out what you are going to be talking about.

17           And I would think, counsel for both sides, that you

18   are well put to be focusing on things that indeed have been

19   previewed to this jury during the testimony.

20           MR. MONTELEONI:  Yes.  We absolutely are focused on

21   this but in a case this big and this document-intensive, the

22   volume of cleanup is rather large.

23           THE COURT:  I understand.

24           Mr. Richenthal, you wanted to add something?  You get

25   five seconds.  Mr. Weitzman got five seconds, you get five

O6Q5men5

1    seconds.

2              MR. RICHENTHAL:  I'm not going to look backwards, I'm

3    trying to avoid tit for tat.  I take the Court's remark

4    seriously.

5              The original objection is hearsay.  The new objection

6    is a reported lack of linkage to Mr. Menendez' knowledge.

7              THE COURT:  Well, what are we talking about?

8              MR. RICHENTHAL:  The original objection was hearsay.

9              THE COURT:  Original objection to what?

10             MR. RICHENTHAL:  By the defense to the instructions

11   was solely hearsay.

12             THE COURT:  I'm sorry.  I thought we were talking

13   about the 700 documents.

14             (Continued next page)

15

16

17

18

19

20

21

22

23

24

25

O6qWmen4

1          MR. RICHENTHAL:  No, your Honor.  And because --

2          THE COURT:  Now I'm in a different room in the house.

3          MR. RICHENTHAL:  Yes.

4          THE COURT:  I'm in room U.

5          Go ahead.

6          MR. RICHENTHAL:  Correct.  We've moved to a different

7   room.  And all I'm saying is the room I thought we were in --

8   to continue the analogy -- was a hearsay room.  I'm now

9   understanding us to be in a room about --

10          THE COURT:  Wait.  And now we're talking about the

11  Kopplin --

12          MR. RICHENTHAL:  Yes, your Honor.

13          THE COURT:  -- instructions.

14          MR. RICHENTHAL:  Right.

15          THE COURT:  OK.  You thought it was a hearsay --

16          MR. RICHENTHAL:  I understood, I've been informed,

17  that the objection was hearsay.

18          THE COURT:  And is that, again -- I was on the subway.

19          MR. RICHENTHAL:  I understand.

20          THE COURT:  Is that what 484 is focusing on?

21          MR. RICHENTHAL:  It's the only thing in 484, in that

22  letter, because it's the only thing we understood to be the

23  objection.

24          THE COURT:  OK.

25          MR. RICHENTHAL:  Now that I've heard another --

O6qWmen4

1          THE COURT:  The rug in the room has been pulled out

2    from under you, is that correct?

3          MR. RICHENTHAL:  I'm trying to avoid tit for tat.  I'm

4    not commenting.

5          THE COURT:  OK.

6          MR. RICHENTHAL:  I want to make an argument forward

7    looking.

8          If the objection is no longer hearsay or is no longer

9    just hearsay, if the objection is a purported lack of linkage

10   to Mr. Menendez's knowledge, I want to advise the Court of the

11   following, because this is important.  If the defense wants to

12   take the view that there's a purported lack of linkage to

13   Mr. Menendez's understanding about the disclosure forms and the

14   instructions, I believe --

15         THE COURT:  You just testified that Ms. Kopplin will

16   testify to that.

17         MR. RICHENTHAL:  I don't think I testified.

18         THE COURT:  I'm sorry.  You just proffered.

19         MR. RICHENTHAL:  Yes, your Honor.

20         This is the issue I want to flag.

21         THE COURT:  Go ahead.

22         MR. RICHENTHAL:  On April 26, 2018, Mr. Menendez was

23   publicly admonished -- that's a technical term; it's actually

24   what it's called, admonished -- by the Senate Ethics Committee

25   for, among other things, improper public disclosures.  For, I

O6qWmen4

1    think, obvious reasons -- I hope obvious reasons -- I did not

2    intend to ask Ms. Kopplin about that.  We did not intend to try

3    to prove his knowledge about the disclosure regime based on

4    that.  But if they're now going to go down the path that

5    Mr. Menendez had no idea how disclosures worked, I think that

6    would open the door to us putting in, at least in part, the

7    public admonishment.  We don't want to do that.

8          This is a new objection.  I want to flag for the Court

9    that this takes us down a certain path and that one way to

10   prove his knowledge is he was sent a letter by fellow senators,

11   telling him he didn't do it right in 2018.

12         MR. WEITZMAN:  That doesn't prove knowledge, your

13   Honor.  It doesn't prove receipt of instructions.  It doesn't

14   prove what he did after that, and the threat of opening the

15   door is empty and should not be countenanced.

16         THE COURT:  Well, I'm not going to deal with it now.

17   I'm going to read this material.

18         (Luncheon recess)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6qWmen4

```
1                          AFTERNOON SESSION

2                              2:15 p.m.

3            THE COURT:  You may be seated in the courtroom.

4            My deputy is finding out if all the jurors are here.

5            MR. RICHENTHAL:  Your Honor, we have one small thing

6    for the record.

7            THE COURT:  Yes.

8            MR. RICHENTHAL:  With much embarrassment, an unnamed

9    member of the team -- the name being me -- took a wrong turn

10   off the elevator, opened the door to the room we use for

11   witnesses, and it was the jury's room.  I immediately turned

12   around while hearing them say something like, wrong room.

13           I have informed all defense counsel.  They didn't ask

14   that I put this on the record, but I wanted to, with much

15   chagrin.

16           THE COURT:  All right.  Thank you.

17           I've reviewed ECF-484 regarding objections raised by

18   Mr. Menendez to exhibits with the testimony of Shannon Kopplin.

19   Those objections center around instructions in the ethics

20   manual.  I find the instructions are not assertions of fact.

21   They're not hearsay.  They're not offered to prove a fact.

22   They are definitely needed to make sense of the forms

23   themselves.

24           There are any number of cases where instructions are

25   permitted to come in with the forms, and I'm permitting the
```

O6qWmen4

1    instructions to come in with the forms here.  There's no

2    objections to the forms themselves, apparently.

3            In terms of the Senate Ethics manual, again, that's

4    not an assertion.  It's not hearsay.  I think it arguably goes

5    to consciousness of wrongfulness.  I am going to allow the

6    ethics manual in as well.

7            So I am overruling the objections of the defense.

8            Bring this jury in.

9            MR. WEITZMAN:  Your Honor, I have an issue.

10           THE COURT:  Yes, sir.

11           MR. WEITZMAN:  Mr. Richenthal said that if I question

12   Ms. Kopplin regarding whether Senator Menendez received a copy

13   or read or does she know anything about what his knowledge of

14   those instructions or manual is it somehow opens the door to a

15   Senate Ethics filing of a complaint against Senator Menendez.

16           THE COURT:  No.  I would think not.

17           MR. WEITZMAN:  OK.  Thank you, your Honor.

18           MR. RICHENTHAL:  And just to be clear, I believe what

19   I said is it might open the door to the letter of admonishment,

20   not what Mr. Weitzman referred to.  In any event, I don't

21   intend to go there.  I just thought it was something the Court

22   should be aware of; Mr. Weitzman should not go down that path.

23           THE COURT:  How long is this witness going to take?

24           MR. RICHENTHAL:  Mr. Khorozian, the jeweler?

25           THE COURT:  No.  I'm sorry.  I thought already we were

O6qWmen4

1    on Kopplin.  You told me about Mr. Khorozian.  How about

2    Ms. Kopplin?  Under an hour, is that what you said?

3              MR. RICHENTHAL:  Mr. Khorozian I hope to do in under

4    an hour.  Ms. Kopplin is probably substantially under an hour.

5              THE COURT:  All right.

6              MR. RICHENTHAL:  I think Ms. Kopplin may be 30 or 40

7    minutes.

8              THE COURT:  Let's bring this jury in.  We're getting a

9    lot of testimony in front of the jury.  That's good.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Please be seated.

3              Call your next witness.

4              MR. RICHENTHAL:  The government calls Vasken

5    Khorozian.

6     VASKEN KHOROZIAN,

7         called as a witness by the government,

8         having been duly sworn, testified as follows:

9              THE COURT:  Good afternoon, Mr. Khorozian.  Welcome.

10             THE WITNESS:  Good afternoon, your Honor.

11             THE COURT:  Your witness, Mr. Richenthal.

12   DIRECT EXAMINATION

13   BY MR. RICHENTHAL:

14   Q.  Good afternoon, Mr. Khorozian.

15   A.  Good afternoon.

16   Q.  What is your educational background?

17   A.  High-school dropout.

18   Q.  Where are you from originally?

19   A.  Armenia from Syria.

20   Q.  I'm sorry, sir.  Did you say Armenian through --

21   A.  Armenian from Syria.

22   Q.  Approximately when did you come to the United States?

23   A.  1974.

24   Q.  Where did you go to school in the United States?

25   A.  Lincoln school.

1    Q.  Where is that?

2    A.  In New Jersey, Fairview.

3    Q.  Are you employed?

4    A.  Yes.

5    Q.  What do you do for a living?

6    A.  I'm a jeweler.

7    Q.  Do you sell jewelry, repair jewelry, or both?

8    A.  I work jewelry, repair jewelry and sell jewelry.

9    Q.  For approximately how long have you done that?

10   A.  After I left high school, 1979.

11   Q.  Do you have your own store, sir, or do you work for someone

12   else?

13   A.  My own store.

14   Q.  Where is your store?

15   A.  Edgewater, New Jersey.

16   Q.  Now, is that store a standalone store, or is it part of

17   something larger?

18   A.  It's a jewelry center.  Standalone store but other

19   jewelers.

20   Q.  What do you mean by that, Mr. Khorozian?

21   A.  It's like the jewelry exchanges on 47th Street, something

22   similar with different jewelers, multi other jewelers.

23            THE COURT:  But it's not on 47th Street --

24            THE WITNESS:  No, your Honor.

25            THE COURT:  -- is that correct?

1        THE WITNESS:  It's so people understand what it is.

2        THE COURT:  Yes.

3        MR. RICHENTHAL:  Mr. Khorozian, I'm going to ask our

4   paralegal, Ms. Wechsler, to put on your screen what's been

5   marked for identification as Government Exhibits 2B-11 through

6   2B-20.  I'm going to ask her to scroll through them one at a

7   time.  Look up when you're done.  OK?

8        THE WITNESS:  Right here?

9        MR. RICHENTHAL:  I think we may be having technical

10  trouble, your Honor.  I can move on and hopefully come back to

11  that.

12        I'm going to come back to what I wanted to show you.

13        Oh, wait.  Ms. Wechsler.

14        THE WITNESS:  Screen is on.

15        MR. RICHENTHAL:  All right.  I'll come back to it.

16  Q.  Mr. Khorozian, do you know an individual by the name Wael

17  Hana or Will Hana?

18  A.  Very well.

19  Q.  For approximately how long have you known Mr. Hana?

20  A.  Since 19 -- 2018.

21  Q.  I'm sorry.  Since when?

22  A.  2018.

23  Q.  Do you recognize Mr. Hana in the courtroom?

24  A.  Yes.

25  Q.  Could you describe what he's wearing, please?

1          MR. LUSTBERG:  We'll stipulate to the identification.

2          THE COURT:  All right.

3          THE WITNESS:  Because he's behind.

4          THE COURT:  Is it the gentleman next to the gentleman

5    who just stood up, on his right?

6          THE WITNESS:  Yeah.  The guy with the -- some guy and

7    the lady next, in the middle.

8          THE COURT:  All right.  The handsome guy has been

9    identified as Mr. Hana.

10   BY MR. RICHENTHAL:

11   Q.  Mr. Khorozian, did you know Mr. Hana by the name Will or

12   Wael?

13   A.  Will.

14   Q.  How did you come to meet Mr. Hana?

15   A.  Andy Aslanian's office.

16   Q.  Did you say Andy Aslanian's office?

17   A.  Andy Aslanian office.

18   Q.  Who is Mr. Aslanian?

19   A.  An attorney.

20          MR. RICHENTHAL:  Now, I don't know if the screens are

21   back working, but -- the screens are not yet working.  I'm

22   going to come back to that too.

23   Q.  Now, prior to approximately 2023, did you have an

24   opportunity to see Mr. Hana and Andy spend time together?

25   A.  Always.

O6qWmen4                          Khorozian - Direct

1   Q.  Always?

2   A.  Yeah.  Most -- I mean, yeah.  When I say always, once or

3   twice or three times a month.

4   Q.  In what kind of settings?

5   A.  Restaurants.

6   Q.  How would you describe their relationship?

7   A.  Friendly.

8   Q.  Now, after you met Mr. Hana, did you also develop a

9   relationship with him?

10  A.  Yeah.  I liked him right away.  Yeah.

11  Q.  Did you see each other socially?

12  A.  Yes.

13  Q.  What kinds of things did you do together?

14  A.  We would hang out in the restaurant.  If he's there, I hang

15  out with him.  Then we go to my house, smoke a cigar in my

16  garage.

17  Q.  Did there come a time when you spoke to Mr. Hana about his

18  home?

19  A.  One time he mentioned he was losing his home, yes.

20  Q.  That he was losing his home?

21  A.  Yes.

22  Q.  Approximately when was that?

23  A.  Probably 2019.  I don't know.

24  Q.  What, if anything, did you offer to him when you learned he

25  might be losing his home?

O6qWmen4                          Khorozian - Direct

1   A.  He can come stay with me if that happens.

2   Q.  Why did you offer him that?

3   A.  Because I like him.

4   Q.  Did there come a time when you learned that Mr. Hana's

5   finances changed?

6   A.  I didn't pay attention, but sometime in 2019, '20, maybe.

7   Q.  What did you understand from speaking with him caused his

8   finances to change?

9   A.  I didn't speak in detail in the business, but I know that

10  he was doing some halal business and that changed his -- I

11  guess he made money.  I don't know.

12  Q.  Now, after the time when Mr. Hana began to make money, did

13  he move somewhere; that is, did he move from where he lived

14  before to a different place?

15  A.  Alexander.

16  Q.  The Alexander?

17  A.  Yes.

18          MR. RICHENTHAL:  Ms. Wechsler, is our screen working

19  yet?

20          Mr. Khorozian, I'm going to show you something on your

21  screen now and then go back to things I wanted to show you

22  before.  OK?

23          THE WITNESS:  No problem.

24          MR. RICHENTHAL:  So let's see if we can get up on your

25  screen what's been marked and is in evidence as GX 2B-3.

1          THE WITNESS:  That's my store.

2          MR. RICHENTHAL:  We're going to come back to that.

3          THE WITNESS:  OK.

4   BY MR. RICHENTHAL:

5   Q.  Do you see what's on your screen now?

6   A.  That's Alexander.

7   Q.  Is that the place to which Mr. Hana moved?

8   A.  Yes.

9          MR. RICHENTHAL:  Now let me go back to what I was

10  going to ask you before.

11         Ms. Wechsler, can you take that down from the jury's

12  screen and put up for Mr. Khorozian, the Court and the parties

13  what's been marked as Government Exhibits 2B-11 through 2B-20.

14  Scroll through them one at a time for Mr. Khorozian.

15  Q.  Did you have an opportunity to look at those, Mr.

16  Khorozian?

17  A.  Yes, I see a jewelry center.

18  Q.  What are these things that I've just shown you, this set of

19  material?

20  A.  I'm seeing a jewelry center.  That's my store.

21  Q.  OK.  And are the other photographs also of your store, sir?

22  A.  The one you just bypassed, yes.

23  Q.  Yes.  The other set that I had Ms. Wechsler put on your

24  screen, were those also of your store?

25  A.  Yes.

1              MR. RICHENTHAL:  The government offers 2B-11 through

2    2B-20.

3              THE COURT:  Admitted, without objection.

4              (Government Exhibits 2B-11 through 2B-20 received in

5    evidence)

6    BY MR. RICHENTHAL:

7    Q.  Now, Mr. Khorozian, this should now be on everyone's

8    screen, including the jury.  I'm going to go through them.  I

9    just want you to describe in general what you see.  OK?

10        But first, and I think you may have said this already, what

11   is on your screen now, Mr. Khorozian; that is, 2B-20?  What is

12   this?

13   A.  That is the jewelry center.  That's my store.

14   Q.  This is the outside of the building?

15   A.  Yes, sir.

16             THE COURT:  If I understand you correctly, your store

17   is one of the stores in the jewelry center.  Is that correct?

18             THE WITNESS:  May I describe, your Honor?

19             THE COURT:  Yes, please.

20             THE WITNESS:  It's a jewelry center where there's

21   multi other jewelers, but I own the jewelry center.  I rent the

22   space to subtenants.

23             THE COURT:  I see.

24             THE WITNESS:  I'm a subtenant.  I rent to them as

25   subtenants.  So I have tenants.  I run back.  I have my own

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O6qWmen4                         Khorozian - Direct

1   business.

2             THE COURT:  Thank you.

3             MR. RICHENTHAL:  Mr. Khorozian, I'm going to ask

4   Ms. Wechsler now to go from this photograph to a different one

5   in the set, 2B-11, and I'm going to ask again if you can

6   describe what we see on the screen.  OK?

7   Q.  What is this, Mr. Khorozian?

8   A.  This is the store, from the back looking front.

9   Q.  Is this what you referred to as the different parts of the

10  jewelry center?

11  A.  Yeah.  If you look on the left side and the right side,

12  different names, yes.

13  Q.  Now, when you say different names, are you referring to the

14  different --

15  A.  Tenants.

16  Q.  -- different tenants?

17  A.  Uh-huh.

18  Q.  To whom do these tenants pay rent; that is, are these

19  people you rent space to?

20  A.  They pay me rent.

21  Q.  Approximately how many different jewelers are part of the

22  photograph we're looking at?

23  A.  Seven, including me.

24            MR. RICHENTHAL:  Seven including you?

25            Ms. Wechsler, can we go to the next photograph,

```
 1   please, 2B-12.

 2   Q.  What are we looking at now, Mr. Khorozian?

 3   A.  This is the back room?

 4   Q.  Where the --

 5   A.  Where the toilet is, on the right.

 6   Q.  The back room of the jewelry center?

 7   A.  Yeah.

 8           MR. RICHENTHAL:  Now 2B-13, please.

 9   Q.  What are we looking at now?

10   A.  This is a -- supposed to be office, but it's a, my office

11   back space, my safe, everything, just to be my shop.

12   Q.  Just to pause there, sir, when you say your safe, can you

13   describe where in the photograph you're looking?

14   A.  You see a red box?  On the bottom is the safe.

15   Q.  Could you circle it?  Your screen should actually let you

16   circle it.

17   A.  OK.

18           MR. RICHENTHAL:  Or perhaps not.

19           THE WITNESS:  I did circle it.

20           THE COURT:  With your finger, press lightly.

21           Oh, he did.

22           THE WITNESS:  I did.  Do you want me to press enter or

23   something?

24           THE COURT:  Try it again.  Circle it again.  Let's see

25   what happens.
```

1            Is that coming through?

2            MR. RICHENTHAL:  I don't see it, your Honor.  I don't

3    know if anyone else does.

4            THE COURT:  All right.  The witness has circled --

5            THE WITNESS:  The gray box on the right is the safe.

6            THE COURT:  The witness has circled the black box on

7    the right.

8    BY MR. RICHENTHAL:

9    Q.  Mr. Khorozian, I think you said that there's also something

10   on the left of the photograph; that is, with some photos.

11   Could you describe what we're looking at on the left of the

12   photograph?

13   A.  I don't understand what you're saying.

14   Q.  Do you see what appears to be a table or a desk?

15   A.  Yes.

16   Q.  What is that?

17   A.  That's a table I put in there just to have, just to have a

18   table, like a desk.

19           MR. RICHENTHAL:  Let's now go to 2B-18.

20   Q.  What is this, Mr. Khorozian?

21   A.  That's my office and -- and the booth, office in

22   combination together.

23   Q.  You said booth.  What do you mean by booth?

24   A.  Every booth is a store.

25   Q.  A separate jewelry store?

1    A.  So, seven booths are seven stores.  Yes.  Yes, that's what

2    I mean.

3    Q.  And this one is yours, is that what you're saying?

4    A.  Yes.

5              MR. RICHENTHAL:  Could we go now to 2B-20, if you

6    could, Ms. Wechsler.

7              I'm sorry.  Go back.  Can you go back one.

8    Q.  And here, Mr. Khorozian, 2B-19 -- I misspoke -- what's in

9    2B-19?

10   A.  That's another location.  That's mine.  Nobody wants to

11   rent.  I make it into silver department.

12   Q.  I'm sorry, sir.  Did you say silver department?

13   A.  Silver department, yes.

14   Q.  What do you mean by that?

15   A.  Silver jewelry.

16             MR. RICHENTHAL:  Now, Ms. Wechsler, you can take those

17   down.  I want to show you a couple other things I was going to

18   show you before we had the technical problems.

19             Ms. Wechsler, can you put up what's in evidence as

20   2A-8.

21   Q.  Mr. Khorozian, is there a photograph on your screen now?

22   A.  Yes.

23   Q.  Who is that?

24   A.  Andy Aslanian, the attorney.

25   Q.  Is that the Andy you referred to a few minutes ago?

O6qWmen4                         Khorozian - Direct

1    A.  Yes.

2              MR. RICHENTHAL:  Now I want to show you, if I could,

3    2B-2 also in evidence.

4    Q.  Is there a photograph on your screen now?

5    A.  Yes, that's Andy's office sign.

6              MR. RICHENTHAL:  And now let's go back to 2B-3, which

7    is now in evidence.  And you can now publish that for everyone,

8    Ms. Wechsler.

9    Q.  Sir, I think you said this is the Alexander to which Will

10   moved, is that right?

11   A.  Correct.

12             MR. RICHENTHAL:  Thank you, Ms. Wechsler.

13             Can we switch now from Andy and Will to another

14   individual.

15   Q.  Do you know anyone named Fred Daibes?

16   A.  Absolutely.

17   Q.  For approximately how long have you known Mr. Daibes?

18   A.  Since 1982.

19   Q.  How did you come to meet Mr. Daibes?

20   A.  I used to work out in Palisadium, and he was just hanging

21   out there.  I didn't know who he was at the time.

22   Q.  Do you recognize Mr. Daibes in the courtroom?

23   A.  Yes.

24   Q.  Could you describe what he's wearing, please?

25             You can stand up, if need be.

1    A.  Black jacket.  Black jacket and white shirt.

2              MR. McMANUS:  We'll stipulate, your Honor.

3              THE COURT:  Do you see the handsome guy on the right

4    there?

5              THE WITNESS:  He's next to the handsome guy right

6    there.

7              THE COURT:  All right.  The witness has identified Mr.

8    Daibes.

9              MR. RICHENTHAL:  And is the prosecutor asking you

10   questions also handsome, sir?

11             THE COURT:  Let's move on.

12             THE WITNESS:  No.  You're the man.

13             MR. RICHENTHAL:  Let's go back, away from the

14   prosecutor, to Mr. Daibes.

15   Q.  What was the nature of your relationship with Mr. Daibes?

16   A.  I'm not -- I don't know how to explain it.  It's a special

17   relationship.

18   Q.  What do you mean by special relationship?

19   A.  I just love being with him and seeing him.

20   Q.  And did you see him socially?

21   A.  When he's out, I see him.

22   Q.  What kinds of places?

23   A.  Restaurants.

24   Q.  Did you ever see him socially with Mr. Hana; that is, the

25   three of you?

1    A.  Yes.

2    Q.  How did they appear to get along to you?

3    A.  Like father and son.

4    Q.  Now, I want to ask you about someone else for a moment.

5        Do you know anyone named Nadine Menendez?

6    A.  Yes.

7    Q.  Approximately when did you meet Ms. Menendez?

8    A.  Same time as I met Will.  1980 -- 2018.

9            MR. RICHENTHAL:  Ms. Wechsler, can you put on the

10   screen what's in evidence as 2A-2.

11           Appreciate your patience, Mr. Khorozian.

12           THE WITNESS:  OK.  Better than being back there.

13   BY MR. RICHENTHAL:

14   Q.  Is that on your screen, sir?

15   A.  Yes.

16   Q.  Who do you recognize this as?

17   A.  Nadine Arslanian.

18   Q.  You said Nadine Arslanian.  Is that also the individual who

19   was later known as Nadine Menendez?

20   A.  Nadine Menendez, yes, now.

21   Q.  Did Ms. Menendez ever come to your jewelry store?

22   A.  Yes.

23           MR. RICHENTHAL:  You can take that down.

24   Q.  Now, I want to go back to Mr. Hana, to Mr. Daibes.  Did

25   either of them ever buy gold from you, or did you ever assist

O6qWmen4                        Khorozian - Direct

1   either of them to buy gold?

2   A.  Yes.

3   Q.  What was your role in assisting them; that is, what did you

4   do, in general -- we'll talk about specifics in a moment, but

5   in general -- to help them buy gold?

6   A.  Yes.

7   Q.  What did you do, sir, to help them buy gold?

8   A.  If someone was looking to sell gold and I would call them,

9   if -- especially started with Freddy, if he's interested.  I

10  take the gold, get the money, exchange, and that's it.

11  Q.  Sir, I think you just said Freddy.  Are you referring to

12  Fred Daibes?

13  A.  Fred Daibes, yes.

14  Q.  Now, I want to start with Mr. Hana, and then I'll go back

15  to Mr. Daibes.  Is that OK with you?

16  A.  Yes.

17  Q.  All right.  So starting with Mr. Hana, approximately when

18  did Mr. Hana start to buy gold from you?

19  A.  Sometime early 2022, maybe.

20  Q.  And generally speaking, in what form did he buy gold?

21  A.  What do you mean by form?

22  Q.  Does gold come in different sizes and shapes and types?

23  A.  Yes.

24  Q.  Are you familiar with that from your work as a jeweler?

25  A.  Yes.

O6qWmen4                          Khorozian - Direct

1    Q.   What type did Mr. Hana typically buy from you or buy with

2    your assistance?

3    A.   He bought coins and --

4    Q.   I'm sorry, Mr. Khorozian.

5    A.   Coins and one-ounce bars and one kilos.

6    Q.   Now, roughly speaking, approximately how many times did

7    Mr. Hana buy gold from you?

8    A.   Not more than five, six times.

9    Q.   Now, let me switch to Freddy; that is, Mr. Daibes.  OK?

10        What kind of gold -- that is, in what form -- did

11   Mr. Daibes buy gold from you?

12   A.   Ounces and kilos.

13   Q.   And again, roughly how many times did Mr. Daibes buy gold

14   from you?

15   A.   The kilos probably about 10 to 12 times.

16   Q.   Now, turning back to the sales for Mr. Hana for a moment,

17   how, if at all, did you make money from the sales of gold for

18   Mr. Hana?

19   A.   I did -- I made, maybe, $300 by peddling the guy who's

20   selling it.

21   Q.   Now, I think you just used the term "peddling,"

22   Mr. Khorozian.  In this context, what do you mean by peddling?

23   A.   The guy was in the middle selling the gold for someone

24   else.  I knew I was making money, and I don't want to really

25   ask Will for money, so two times I peddled the guy.  I don't

1   know if he paid me or not.  I took, I remember, $150 once --

2   not from Will but the guy who's selling it.  So say that Mr. A

3   will have the gold.  Mr. B wants to sell it for me.  I am

4   Mr. B.  I try to take from the Mr. B couple of dollars, and I

5   give it to Mr. Will.

6   Q.  In this example, Mr. Khorozian, are you playing what might

7   be called as the middleman?

8   A.  Yes.

9   Q.  Between the person who has the gold and the person who is

10  buying the gold?

11  A.  Yes.

12  Q.  Now, I've asked you that question with respect to Mr. Hana.

13  I want to ask you the same question with respect to Mr. Daibes.

14      How, if at all, did you make money from the gold you

15  assisted Mr. Daibes to buy?

16  A.  I never made money on that gold for Mr. Daibes.

17  Q.  Why not?

18  A.  Because I love him.  I want to make him happy.  Some deal

19  comes and it's opportunity to see him, and it's more than money

20  for me.

21      MR. RICHENTHAL:  Now, Mr. Khorozian, I'm going to ask

22  Ms. Wechsler to put on the screen something else, 3L-1, marked

23  for identification.  You can put it on the witness's screen,

24  the Court's screen and the lawyers' screens, please.

25  Q.  Mr. Khorozian, do you recognize what's on your screen now?

1   A.  Yes.

2   Q.  I'm not going to ask you to describe it just yet, but in

3   general, what is this?

4   A.  These are one-ounce gold bars.

5   Q.  Sir, just before you describe what's in it, what is this

6   document?  What are we looking at, in general, here?

7   A.  This is a document that's -- it says 22 bars for sale.  The

8   guy's calling me, Edward.

9   Q.  Does this relate to a sale of gold you helped for Mr. Hana?

10  A.  Yes.

11          MR. RICHENTHAL:  The government offers 3L-1.

12          THE COURT:  Admitted, without objection.

13          (Government Exhibit 3L-1 received in evidence)

14          MR. RICHENTHAL:  Now, Ms. Wechsler, you can put that

15  on everyone's screen.

16  Q.  Mr. Khorozian, let me just orient ourselves.  OK?

17      Do you see the top --

18  A.  Yes.

19  Q.  -- where it says Edward buy G?

20  A.  Yes.

21  Q.  What is that, Edward buy G?

22  A.  This is Edward, who is a peddler who, where he put, sends

23  state me about the gold, which he knows that I'm -- I have Fred

24  and -- he doesn't know anything about Will.  Only know that I

25  sell it to Fred.  He sends to me, and I called Will if he

1   wanted it.

2   Q.  Let me just back up.  This is an individual who has gold

3   for sale, at least at this time, is that right, Mr. Khorozian?

4   A.  Yes.

5   Q.  Could you look at the date, please?  Just direct your

6   attention --

7           MR. RICHENTHAL:  I might ask Ms. Wechsler to highlight

8   it.

9   A.  June 22, 2021.

10  Q.  Thank you, Mr. Khorozian.

11          Now, in this exchange -- are these text messages?

12  A.  Yes.

13  Q.  And I think you said you were arranging to purchase gold

14  from Edward, is that right?

15  A.  Yes.

16  Q.  Now, this gold you were arranging to purchase, who was that

17  for; that is, who was going to ultimately get the gold?

18  A.  When he -- Edward --

19          MR. RICHENTHAL:  Withdrawn.  Let me ask it a different

20  way.

21  Q.  Were you purchasing gold for yourself?

22  A.  No.

23  Q.  Did you, in fact, purchase this gold for someone else?

24  A.  Yes.

25  Q.  For who?

1    A.  Will.

2    Q.  Mr. Hana?

3    A.  Yes.

4    Q.  Now, could you look at the photograph beneath the date.  Do

5    you see that?

6    A.  Yes.

7            MR. RICHENTHAL:  If I could ask Ms. Wechsler to blow

8    it up.

9    Q.  Could you describe for us, sir, what we're looking at in

10   this photograph?

11   A.  It's one-ounce gold bar, Troy ounce.

12   Q.  Let me just pause for a second.  You said this is a

13   one-ounce gold bar?

14   A.  Yes.

15   Q.  Now, Mr. Khorozian, are we looking at one or more than one?

16   A.  These are sample pictures of one, one side, one on the

17   other side.  So the same coin.  He flipped it, send me the

18   picture so I understand what it is, when I'm going to -- when

19   I'm going to solicit it, whoever's going to buy it so they know

20   what they're buying.  But there's 22 of them it says on top.

21   Q.  Let's just take it one at a time, if we can.  I think you

22   said -- please tell me if I get it wrong -- that we're looking

23   at a one-ounce gold coin.  Is that right?

24   A.  Yes.

25           THE COURT:  You said one-ounce gold coin, sir?

1         THE WITNESS:  Gold bar.

2         MR. RICHENTHAL:  If I may, your Honor?

3    Q.  Mr. Khorozian, do you refer to these type of gold as a

4    coin, a wafer, a bar or something else?

5    A.  It's a bar.

6    Q.  A bar.

7         Are they also sometimes referred to as coins or wafers?

8    A.  It's an amateur thing if you say coin.  Has to say bar or

9    coin.  Coin is round.  Bars are square and long.

10   Q.  What would you typically refer to it as, a bar or a wafer?

11   A.  I never heard the name wafer, but bar.

12   Q.  All right.  Let's call it a one-ounce bar.  I think you

13   said we're looking at two one-ounce bars; one is one side and

14   one's the other.  Is that right?

15   A.  Correct.

16   Q.  So if you could just direct us, which one is the top or

17   front and which one is the bottom, in the photograph, sir?

18   A.  So, again, let me explain.  It says Asahi, whatever it

19   says, is the front and the other side is the back.  It's the

20   same coins, opposite side.  So he send me a picture of front

21   and the back.

22   Q.  Now, when you said the front, are you referring to the

23   left-hand part?

24   A.  In the front.

25   Q.  And I think you said that there were 22 of these gold bars?

O6qWmen4                         Khorozian - Direct

1  A.  Yes, but it's not in the picture.

2  Q.  OK.  But the set was 22, is that right?

3  A.  Yes.

4  Q.  If you could look at the top -- that is, what appears to be

5  paper above the photograph, sir -- do you see that?

6  A.  Yes.

7  Q.  Do you see the number 22?

8  A.  Yes.

9  Q.  Do you see then is an X and then 1855?

10 A.  Times 1855 each.

11 Q.  Could you explain what you mean by that?

12 A.  1855 ounce of gold is that day he wants.

13          THE COURT:  Is that 1,800 --

14          THE WITNESS:  850 dollars.

15          THE COURT:  55 dollars.

16          THE WITNESS:  55 dollars.  Sorry.

17          THE COURT:  For each one-ounce bar of gold?

18          THE WITNESS:  Yes, your Honor.

19 BY MR. RICHENTHAL:

20 Q.  Now, do you see beneath that there appear to be another set

21 of number, 40810?

22 A.  Yes.

23 Q.  What is that, Mr. Khorozian?

24 A.  $40,810.

25 Q.  What is that?

1    A.  Dollars.

2    Q.  What relationship does that have to the sale?  What does

3    that mean?

4    A.  22 times eight -- 1,855 is equal 40,810.  The guy doesn't

5    know how to go to school, so he doesn't know how to write.

6        He's like me.

7    Q.  Is this the total dollar figure of the sale, sir?

8    A.  Yes.

9            MR. RICHENTHAL:  Now, if I could ask you,

10   Ms. Wechsler, I think, can assist in turning the photograph.

11           Ms. Wechsler, can we actually turn it.

12   Q.  Mr. Khorozian, is this now the same photograph upside down?

13   On your screen, sir.

14   A.  Yes.

15   Q.  OK.  If I could ask you to read the number at the bottom

16   beneath one ounce Troy; do you see that?

17   A.  Yes.

18   Q.  Could you read it, please?

19   A.  A125991.

20   Q.  Do you see above where it says one ounce Troy?

21   A.  Yes.

22   Q.  What is one ounce Troy, Mr. Khorozian?

23   A.  One ounce is one ounce.  Troy is used for metals -- silver

24   Troy ounce, gold Troy ounce, cooper.  Not pounds of meat, it's

25   not Troy.  Only silver or gold is Troy.

1  Q.  Now, do you see above that it says fine gold and then

2  beneath that 9999?  Do you see that?

3  A.  Yes.

4  Q.  What is that, Mr. Khorozian?

5  A.  Just like human.  No one's perfect 999.  It's not 100

6  percent gold.

7  Q.  Could you explain what you mean by that?

8  A.  I swear.

9  Q.  No, not the human part, sir.  The gold part.

10  A.  Oh, yeah.  So -- just so you know, in manufacturing,

11  sometimes they cheat.  So government lets them to make a

12  mistake, half a carat.  So if it's 14, it's usually 13-plus.

13  So in 99 means no one can make perfect 100 percent gold.  So

14  that's why says 999.

15  Q.  Now, I think you said that each of these bars is one

16  kilogram.  Is that right?

17  A.  One ounce.

18  Q.  One ounce.  Excuse me, sir.

19      How many Troy ounces or just ounces are in a kilogram?

20  A.  32.10.

21  Q.  Roughly speaking, how much does a kilogram bar then weigh

22  in pounds?

23  A.  454 grams is in a pound.  So it would be two pounds.  One

24  kilo will be two pounds.

25  Q.  And I think you said there were 22 one-ounce bars in this

1   sale?

2   A.  22 one-ounce bars.

3   Q.  And you sold this to Mr. Hana, is that right?

4   A.  Yes.

5           MR. RICHENTHAL:  I want to ask Ms. Wechsler now to put

6   something else on your screen.  It's marked as 3M-1 in

7   evidence.

8   Q.  Mr. Khorozian, if I could direct your attention to the

9   bottom of the screen, do you see what appears to be a check?

10          MR. RICHENTHAL:  Ms. Wechsler, could you just blow up

11  the check, please.

12  Q.  Do you see that, Mr. Khorozian?

13  A.  Yes.

14  Q.  What is this check?

15  A.  That's the check for the gold.

16  Q.  The gold that you've been talking about?

17  A.  Yes.

18  Q.  Who -- from whom is this check?

19  A.  It's Will Hana's check.

20          MR. RICHENTHAL:  You can take that down.  Thank you,

21  Ms. Wechsler.

22  Q.  Mr. Khorozian, now turning to 2022, did there come a time

23  when Nadine Menendez sought to sell you something or sell

24  something with your assistance?

25  A.  Yes.

1    Q.  What did she seek to sell?

2    A.  She sold -- she wants to sell two kilos of gold.

3    Q.  I'm sorry, sir.  Two kilograms of gold?

4    A.  Yes.

5    Q.  In what form?

6    A.  In -- two, two different kilos.  In, like each kilo is like

7    the size of your hand.  Two of those.

8    Q.  Mr. Khorozian, are these also sometimes referred to as

9    kilogram bars?

10   A.  Yes.

11   Q.  Now, did you talk with her about her wanting to sell these

12   two kilogram bars?

13   A.  When she came in, yeah.

14   Q.  Let's just start there.  Come in where?

15   A.  Came to the store.

16   Q.  Is that your jewelry store?

17   A.  Yes.

18   Q.  And where did you have a conversation with her in the

19   jewelry store?

20   A.  Right next to that safe I tried to describe.

21   Q.  Is this in the back of the store, Mr. Khorozian?

22   A.  Back of the store.

23   Q.  Now, to the best of your memory, what did Ms. Menendez say

24   to you about these two kilogram bars?

25   A.  She said she wanted to sell it.

1   Q.  Did she tell you why she wanted to sell them?

2   A.  She said she needed to pay the bills.

3   Q.  I'm sorry, sir?

4   A.  She need to pay bills.

5   Q.  Did she say from where she got the kilogram bars?

6   A.  She said it was from her family.

7   Q.  I'm sorry, sir.  From her family?

8   A.  From her family, her Lebanese family that she had.

9   Q.  Now, at the time you had this conversation, did she

10  actually have the gold bars with her?

11  A.  Yes.

12  Q.  Where?

13  A.  She was sitting there, and she took it out of her bag.

14  Q.  Can you describe what they looked like, Mr. Khorozian?  And

15  by they, I mean the bars.

16  A.  Just like a pineapple, cut it in half, and both sides, size

17  of that, so everybody understands what it is.

18  Q.  And I think you said she had them in a bag.  Is that right?

19  A.  In woman's purse.

20  Q.  Now, did you agree to help her sell the gold?

21  A.  Yes.

22  Q.  How, if at all, did you tell her you would sell the gold?

23  A.  That she's going to take a loss on the premium.

24  Q.  Could you explain what you mean by loss and premium, sir?

25  A.  Every time you sell gold and buy gold, you lose money.

1    Q.  Why is that?

2    A.  Because we got to make money.

3    Q.  Who is the we in that --

4    A.  People who's buying and people who's selling.

5    Q.  And so what did you explain to her about how she would lose

6    money?

7    A.  I said I'm going to make $10 an ounce and I got to call,

8    see how much the guy wants to make.  She said fine.

9    Q.  Let's take that one at a time, if we can.

10       You said you're going to make $10 an ounce.  Do you mean

11   $10 an ounce for the sale?

12   A.  Yes.  If I'm going to sell it for her, yeah.

13   Q.  And again, how many ounces in a kilogram?

14   A.  32.10.

15   Q.  And I think you also said, you referred to the guy.  Who is

16   the guy, Mr. Khorozian?

17   A.  The guy in New York.

18   Q.  What guy in New York?

19   A.  His name is Robert.

20   Q.  Who's Robert?

21   A.  Robert is a wholesale -- he -- Robert is a refiner who buys

22   gold from jewelers, not from person or like -- like, he doesn't

23   deal with people, just jewelers.

24   Q.  To be clear, sir, when you say Robert, this is the

25   individual to whom you planned to sell the gold on behalf of

O6qWmen4                        Khorozian - Direct

1    Nadine?

2    A.  Yes.

3    Q.  And you said that he would take a "cut"; was that the word

4    you used?

5    A.  Yes.

6    Q.  What was his cut going to be?

7    A.  $20 an ounce.

8    Q.  And did you explain that to her as well?

9    A.  Yes.

10   Q.  Did she agree to let you help her sell the gold?

11   A.  Yeah, because I already warned her.  She said fine with it.

12   Q.  You said warned her.  Warned her of what?

13   A.  Before I made the phone call, she knew she was going to

14   take a loss.

15   Q.  Let me just pause there for a second.  You said you made a

16   phone call?

17   A.  Yes.

18   Q.  Was this a phone call while you were with Menendez?

19   A.  Exactly.

20   Q.  A phone call to who?

21   A.  To Robert Avital.

22   Q.  This is the person to whom you were going to sell the gold?

23   A.  Yes.

24   Q.  Now, where was Mr. Avital located?

25   A.  47th Street, New York.

1  Q.  Is that in Manhattan, sir?

2  A.  Manhattan.

3  Q.  And you were in New Jersey at the time, is that right?

4  A.  Yes.

5          THE COURT:  Slow down a little, sir.

6          MR. RICHENTHAL:  I'm sorry.

7  Q.  Mr. Khorozian, when you were talking with Ms. Menendez

8  about selling the gold, did you tell her how you were going to

9  sell it?

10  A.  Yeah, I'm going to take it to New York.

11  Q.  Did you tell her that?

12  A.  Yeah.

13  Q.  Did she agree?

14  A.  Yeah.

15  Q.  Now, when you talked to Ms. Menendez, did you explain to

16  her how, if at all, she would get her payment for the gold;

17  that is, her portion?

18  A.  Checks.

19  Q.  I'm sorry, sir?

20  A.  With checks.

21  Q.  Checks?

22  A.  Yeah.

23  Q.  Did she then leave the gold with you, or did she take it

24  back?

25  A.  No.  She left with me.

1   Q.  In your store in New Jersey?

2   A.  And I put it in the safe.

3   Q.  That was my next question.

4   A.  I read your mind.

5       Sorry.

6   Q.  Mr. Khorozian, why didn't you just buy the gold from her

7   directly?

8   A.  Excuse me?

9   Q.  Why didn't you just buy the gold from her yourself; that

10  is, directly?

11  A.  I don't do that.  That's too much money for me to invest.

12  Q.  What do you mean by that, sir?

13  A.  I'm not going to sit on $120,000 gold.

14  Q.  I'm sorry.  You said $120,000 of gold?

15  A.  Two kilos, almost 60,000 each.

16  Q.  How do you know that?

17  A.  Because that's when I sold it.

18  Q.  I'm sorry, sir?

19  A.  That's when I sold it.  That was the price.  58,000,

20  something like that.  60,000.  I don't remember exactly, but

21  I'm giving you ballpark.  Why would I sit on money like that?

22  What am I going to do with it?

23  Q.  Let me ask it a different way, Mr. Khorozian.

24      Is gold always the same price every day?

25  A.  No.

1   Q.  Is there a market for gold?

2   A.  Every 24 hours changes.  Every minute changes, but the

3   price is every 24 hours.

4   Q.  Let me just pause there.

5        Do you track the price in the ordinary course of your

6   business, Mr. Khorozian?

7   A.  Six times a day.

8   Q.  I'm sorry, sir?

9   A.  Six, seven times a day.

10  Q.  Do you use a website to do that?

11  A.  No.  My phone.

12  Q.  On your phone, sir, do you go to a particular website or

13  use a particular application?

14  A.  Yeah, I go on the website.  It's an app.  You press, and it

15  shows you how much the gold is.

16  Q.  An app for what company?

17  A.  I forgot the name now.

18  Q.  Have you heard of the company Kitco?

19  A.  Yeah, yeah.  Kitco.

20  Q.  K-I-T-C-O?

21  A.  Yeah.

22  Q.  Is that the app you used, sir?

23  A.  Yes.

24  Q.  To your knowledge, do others in your industry also rely on

25  Kitco?

O6qWmen4                          Khorozian - Direct

1   A.  Best of my knowledge, I don't know what they do, but that's
2   what I do.  Mostly they do, but there must be other things too.
3   I don't know.
4   Q.  I'm not asking you, sir, if everyone relies on Kitco, but
5   as far as you're aware, do other jewelers mostly rely on Kitco?
6   A.  Mostly, yes.
7   Q.  Now, I think you said that --
8           MR. RICHENTHAL:  One moment, your Honor?
9   Q.  Just to go back for one moment, Mr. Khorozian.  I think you
10  said that Ms. Menendez said she needed to pay bills.  Is that
11  right?
12  A.  Yes.
13  Q.  Did she say what kinds of bills?
14  A.  She said she had expenses in, like, home bills.  Nothing
15  specifically I questioned her.
16  Q.  Now, I believe you also said that she said she got the gold
17  from her family.  Is that right?
18  A.  Correct.
19  Q.  Did you say what family member she got it from?
20  A.  I didn't get into the conversation like that.
21  Q.  Well, do you recall her naming a particular family member?
22  A.  Maybe the mother side, mother's.
23  Q.  Now, let's go back.
24  A.  Mother and father.  Jewelry from the mother.
25  Q.  I'm sorry, sir?

1  A.  From the mother or the father.  Family.  I don't know if

2  they were together at the time.  I don't know.

3  Q.  Now, I think you said you put the gold in your safe.  Is

4  that right?

5  A.  Yes.

6  Q.  What did you do with it next?

7  A.  Nothing.  I put in the safe.  I went on with my life.  Said

8  bye.

9  Q.  Let's --

10  A.  No.  I told her I'm going to go to New York next week.

11  Q.  OK.  Thank you, Mr. Khorozian.

12  A.  Can I say one more thing?

13      So she knows that the gold price that day she left me will

14  not be the price.  The day I sell it will be the day that she's

15  going to get the lowest of the gold price.  So this way I was

16  honest with her, because she's a friend.  I don't want her to

17  think that that was the day, if gold went up, went up, she's

18  going to get more.  If gold goes down, she's going to get less.

19  I don't her to feel like I'm cheating.  So that's why I told

20  her, when I go that's the day you going to get the price.  She

21  said fine.

22      MR. RICHENTHAL:  Now, I'm going to talk about what

23  happened next in a moment.  But first, let's put up --

24      THE COURT:  When was this, sir?  I don't know if you

25  testified to when.  Do you know when in 2022 she came to your

1    store and you had this conversation?

2              THE WITNESS:  March 31.

3              THE COURT:  March 31?

4              THE WITNESS:  Yes.

5              THE COURT:  All right.  Thank you.

6              THE WITNESS:  In the afternoon.  Around 4 o'clock.

7    BY MR. RICHENTHAL:

8    Q.  And just for clarity, sir, that's March 31, 2022?

9    A.  2022, yes.

10             MR. RICHENTHAL:  Ms. Wechsler, can we put up GX 2B-17.

11   Q.  Do you recognize this photograph, Mr. Khorozian?

12   A.  I don't know -- of course.

13   Q.  Is this where you had the conversation with Ms. Menendez?

14   A.  Yes.

15   Q.  Is this in the back of your store, sir?

16   A.  Yes.

17   Q.  Now, I think you said that you told Ms. Menendez you'd go

18   next week to New York to sell the gold.  Is that right?

19   A.  Correct.

20   Q.  And by New York, sir, did you mean Manhattan?

21   A.  To Avital, Manhattan.  47th Street, Manhattan.

22   Q.  Did you, in fact, go to Avital the following week?

23   A.  Yes.

24   Q.  Did you, in fact, sell the gold to Mr. Avital?

25   A.  Yes.

1   Q.  How did Mr. Avital pay for the gold?

2   A.  Two different checks.

3   Q.  Two different checks?

4   A.  Yes.

5   Q.  Now, made out to whom?

6   A.  I made out to Nadine Menendez.

7   Q.  What was your understanding as to why it was two different

8   checks?

9   A.  Because he didn't have enough money, I guess, that day for

10  one check so he split it just in case.

11  Q.  Now, to be clear, sir, you gave Mr. Avital the gold?

12  A.  Yes.

13  Q.  And he gave you the checks?

14  A.  Yes.

15  Q.  And what did you do with the checks?

16  A.  I put in my pocket.

17      I came to Jersey.

18  Q.  That was my next question.  You left New York and returned

19  to New Jersey?

20  A.  Yes.

21  Q.  With the checks?

22  A.  Yes.

23  Q.  Where did you put the checks?

24  A.  In the safe.

25  Q.  Same safe that the gold was in?

1   A.  Yes.

2   Q.  Now, did there come a time when you gave Ms. Menendez the

3   checks?

4   A.  Yes.

5   Q.  Approximately how long after you got them?  Approximately.

6   A.  One second.  I tell you exactly.

7       Probably three weeks.  More.

8           MR. RICHENTHAL:  Mr. Khorozian, I'm going to ask

9   Ms. Wechsler to put two more things on your screen.  They're in

10  evidence.  It's Government Exhibits 5A-5001A and 5A-5001B.

11  Q.  Are those on your screen, sir?

12  A.  Yes.

13  Q.  Do you see them on your screen?

14  A.  Yes.

15  Q.  What are these?

16  A.  These are the gold checks for each kilogram.

17  Q.  Are those from the sale that we just talked about?

18  A.  Yes.

19  Q.  If I could ask you to look at the first check, on your

20  left, 5001A, do you see that, Mr. Khorozian?

21  A.  What do you want me to see?

22  Q.  Just do you see the check on the left that I've asked Ms.

23  Wechsler to zoom in on?

24  A.  Yes, I saw it.

25  Q.  Do you see the date on it, Mr. Khorozian?

1    A.  Yes.

2    Q.  What's the date?

3    A.  4/7, 2022.

4    Q.  So approximately how long after when Ms. Menendez dropped

5    off the gold did you get this check?

6    A.  About 25 days.  25, 27 days.

7    Q.  I'm sorry.  I'm going to back up.  I may have misspoken.

8        You said Ms. Menendez dropped the gold off on March 31?

9    A.  Yeah.  Then I sold it at April 3rd or 4th.  The check was

10   written, postdated.

11   Q.  So let me pause there.

12       You sold the gold a few days before the date on the first

13   of these checks?

14   A.  Yes.

15   Q.  What was your understanding as to why the date was a few

16   days after the date you actually sold the gold?

17   A.  Because the guy doesn't have money.  And he said put it

18   this day, so he guaranteeing that that date will be available.

19   That's why.

20   Q.  Now, the check on the left is April 7, is that right?

21   A.  Yes.

22   Q.  Could you look at the date on the check on the right?

23   A.  Yes.

24   Q.  What's the date on that check?

25   A.  Day after, which is the 8th.

1    Q.  Is that for the same reason, Mr. Khorozian?

2    A.  Yes.

3    Q.  Could we go back to the check on the left?  Do you see the

4    address for Avital Gold & Platinum Inc.?

5    A.  Yes.

6    Q.  Do you see the reference to 47th Street?

7    A.  Yes.

8    Q.  Now, is that the 47th Street you referred to earlier in

9    your testimony?

10   A.  Correct.

11   Q.  In Manhattan?

12   A.  Yes.

13   Q.  Is that in the area generally known as the Diamond

14   District?

15   A.  Correct.  Yes.

16           MR. RICHENTHAL:  Your Honor, with the Court's

17   permission, I'd like to display a transcript.

18           Let me back up for a second.  B2116-1 is in evidence.

19   I'd like to display, with the Court's permission B2116A-TR.

20   And then I'd like to play B216.

21           THE COURT:  All right.

22           Ladies and gentlemen, you know the transcript is

23   simply an aid.

24           MR. RICHENTHAL:  Mr. Khorozian, coming up on your

25   screen will be a document, but I'm also going to play

1    something.  OK?

2           Ms. Wechsler, if we could play -- I'm sorry.  I was

3    speaking.  My apologies.  Could you start from the beginning

4    and play B2116-1.

5           (Media played)

6           MR. RICHENTHAL:  Could we go up, Ms. Wechsler.

7           Thank you.

8    Q.  Mr. Khorozian, why did you leave this message for Ms.

9    Menendez?

10   A.  So that she knows that I'm going to New York and I'm going

11   to sell the gold, and that's the day.  And then if the guy

12   doesn't take it, I made her feel comfortable that I will take

13   the check under my name, if he doesn't want to get personal.

14   It would be under VK Jewelers or, you know, jewelry center.  I

15   didn't know exactly what was I -- the law I didn't know, but I

16   made sure that I can get the check and rewrite the check for

17   her.

18          MR. RICHENTHAL:  You can take that down.  Thank you,

19   Ms. Wechsler.

20   Q.  Mr. Khorozian, you've been talking about a sale of two

21   one-kilogram gold bars, right?

22   A.  Correct.

23   Q.  Now, I want to ask you, did there come a time when

24   Ms. Menendez sought to sell gold with your help of a different

25   form; that is, a different type of gold?

1    A.   She drop six one-ounce American Eagles.

2    Q.   Now, for anyone who may not know, sir, what is a one-ounce

3    American Eagle?

4    A.   Same -- one ounce 24 carat, which is 999, is one ounce

5    gold, Troy ounce gold.

6    Q.   Where did you have a conversation with Ms. Menendez about

7    her wanting to sell six one-ounce American Eagles?

8    A.   In the store.

9    Q.   That's your store, sir?

10        You have to say yes or no for the record, sir.

11   A.   Yes.  Yes.

12   Q.   Did you agree to try to sell the six coins for her?

13   A.   Yes.

14            THE COURT:  Is an American Eagle a coin?

15            THE WITNESS:  American Eagle.

16            THE COURT:  It's a coin?

17            THE WITNESS:  It's a coin, yes, sir.  It's a very

18   popular coin.

19   BY MR. RICHENTHAL:

20   Q.   Did you agree to help her sell the six coins?

21   A.   Yes.

22   Q.   What happened next?

23   A.   She text back.  She didn't want to sell all of them.  She

24   said she wants to keep two out of four, but she made a mistake.

25   I corrected it.  She said four out of six.  She said thank you.

1    Q.  Let me just back up, Mr. Khorozian.

2         Ms. Menendez left you six coins, is that right?

3    A.  Yes.

4    Q.  And you agreed to help her sell the six?

5    A.  Yes.

6    Q.  Now, later she actually said she only wanted to sell how

7    many?

8    A.  Four.

9    Q.  Four.  That would leave two, is that right?

10   A.  Yes.

11   Q.  Did you sell the two for her?

12   A.  No.  I gave it back to her.

13   Q.  All six or just some?

14   A.  No.  Just -- four I sold, two gave back.

15   Q.  Now, how did you get paid for those you sold?

16   A.  I sold with cash.

17   Q.  Did you give Ms. Menendez a portion of that cash for the

18   coins?

19   A.  Yes.

20   Q.  Where?

21   A.  In the back of my store.

22   Q.  Approximately how long after you sold the coins did you

23   give Ms. Menendez the cash in your store?

24   A.  Do not remember.

25   Q.  Well, was it within days, weeks, months?  Do you have a

1   sense?

2   A.   Could be weeks.

3   Q.   OK.

4   A.   Don't remember.

5   Q.   And generally -- that is, estimate -- what was the amount

6   of cash that you gave Ms. Menendez?

7   A.   7,200.

8   Q.   I'm sorry, sir.  How much?

9   A.   7,200.

10  Q.   And did you give her the cash also in your store or

11  somewhere else?

12  A.   In the store.

13          MR. RICHENTHAL:  I want to now show you, if I can,

14  some other materials.

15          Ms. Wechsler, could we put up B216-2 in evidence.

16  Thanks.

17  Q.  Mr. Khorozian, do you now see what's on your screen?

18          MR. RICHENTHAL:  Now, I can ask Ms. Wechsler to make

19  it bigger for you, sir.

20          THE WITNESS:  Little bit bigger, yeah.

21          MR. RICHENTHAL:  Ms. Wechsler, can you make it a

22  little bigger.

23          THE WITNESS:  OK.  Perfect.

24  BY MR. RICHENTHAL:

25  Q.  Now, Mr. Khorozian, are these text messages?

O6qWmen4                          Khorozian - Direct

```
 1   A.  Yes.

 2   Q.  Between you and Nadine Menendez?

 3   A.  Yes.

 4   Q.  Do you see the first one, on April 28, 2022?

 5   A.  Correct.  Yes.

 6   Q.  It says:  I'm on the train from Washington heading to

 7   Newark.  Do you see that?

 8   A.  Yes.

 9   Q.  Do you see she wrote, will you be at work if I stop by on

10   my way home?

11   A.  Yes.

12   Q.  What did you understand her to mean by at work?

13   A.  At work means?

14   Q.  Yes, sir.

15   A.  Yeah.  My shop.

16   Q.  Your store?

17   A.  Yeah.

18          MR. RICHENTHAL:  Could we go back out, Ms. Wechsler.

19   Q.  You responded, yes, I'm here until 7 p.m.  Do you see that?

20   A.  Uh-huh.

21          MR. RICHENTHAL:  Can we go to the next page.

22          THE COURT:  You have to say yes or no, sir.

23          THE WITNESS:  Yes, yes.  Sorry, your Honor.

24          THE COURT:  That's all right.

25   BY MR. RICHENTHAL:
```

1    Q.  She responds:  Great, thank you, I'll stop by around noon.

2    See all that --

3    A.  Yes.

4    Q.  -- on my way to you?

5         MR. RICHENTHAL:  Could we go to the next page.

6         You can stop there.

7    Q.  Now, when I first asked you about the exchanges, I directed

8    your attention to the date April 28, 2022.  This is now April

9    29, 2022, but is this the same conversation continuing to the

10   next day?

11        MR. RICHENTHAL:  Let me ask it differently.

12        THE WITNESS:  OK.

13   BY MR. RICHENTHAL:

14   Q.  Are you still talking to Ms. Menendez about meeting at your

15   store?

16   A.  She's preparing to pick up the check.

17        MR. RICHENTHAL:  Let's go to later in the message.

18        THE WITNESS:  This is the text.

19   BY MR. RICHENTHAL:

20   Q.  Now, Mr. Khorozian, if I could direct your attention to the

21   bottom message, this is now on May 2, 2022?

22   A.  Uh-huh.

23   Q.  Do you see where it says:  Good morning, Vasken.  I'm going

24   to keep two out of the four pieces I gave you because I think

25   the prices are going together up.  Do you see that?

1   A.  Yes.

2   Q.  What did you understand she meant by two out of the four

3   pieces?

4   A.  She miss -- she miscommunicated.  It was six out of four.

5   Q.  Mr. Khorozian --

6   A.  For the gold coins.

7   Q.  Sorry, sir.

8       Are you referring to the six coins she dropped off?

9   A.  Yes.

10  Q.  When you say she miscommunicated, you mean she

11  miscommunicated about what?

12  A.  She started -- she started saying six.  She saying four.

13          MR. RICHENTHAL:  If we go on in the conversation,

14  please.  Stop there.  Thank you.

15  Q.  Mr. Khorozian, do you see --

16          MR. RICHENTHAL:  Could we go to the middle message,

17  Ms. Wechsler.

18  Q.  -- you say out of six, not four?  Do you see that, sir?

19  A.  Yes.

20  Q.  What are you telling Ms. Menendez here?

21  A.  That it was -- she gave me six, not four, coins.  So I'm

22  saying you going to get two back, and I sold already the four.

23          MR. RICHENTHAL:  Can we go down now.

24  Q.  And next you wrote, you gave me six?

25  A.  Yes.

1   Q.  Is that a reference again to the six coins she gave you?

2   A.  Six American Eagle coins.

3         MR. RICHENTHAL:  Go down further, Ms. Wechsler.

4   Q.  You wrote, you want two back?

5   A.  Yes.

6   Q.  Do you see that?

7         MR. RICHENTHAL:  And if we could just now go up.  And

8   can you blow up the bottom two messages.  Thank you.

9   Q.  Do you see how she responded, yes, please?

10  A.  Yes.

11  Q.  And then she wrote:  Good morning.  Can I deposit the first

12  check this morning?

13  A.  Yes.

14  Q.  Now, Mr. Khorozian, that last message is on May 9, 2022.

15  If you recall, sir, the checks I showed you are from April 7

16  and April 8, 2022?

17  A.  Yes.

18  Q.  Did you understand her to be referring to one of those

19  checks or something else?

20  A.  Those are the checks she's referring to.

21  Q.  Now, what did you understand her to be saying by, can I

22  deposit the first check this morning?

23  A.  Because -- can I explain?

24  Q.  Please.

25  A.  When those checks were supposedly given to her, she was in

1  Washington.  She wasn't able to come.  Then I went to Florida.

2  She wasn't able to come because I wasn't there.  Then when she

3  came, the Russian guy went to his country.  I don't know where

4  he's from.  And I don't want her to deposit the money and them

5  bounce.  So I called the guy.  The guy didn't answer.  Then the

6  guy answer.  So I got the message, told her certain day she can

7  deposit, because I warned her not to deposit until I hear from

8  this guy.  I want to be fair and honest with her and doing my

9  due diligence for $300 I made.

10 Q.  Let me just pause for a second.

11 A.  All that time.

12 Q.  When you said the Russian guy, are you referring to Mr.

13 Avital?

14 A.  Avital is the Jewish Russian guy from -- from Russia

15 somewhere.  I don't know where.

16 Q.  And when you said -- if I get it wrong, please correct me,

17 sir -- you wanted to tell Ms. Menendez when to deposit the

18 check, are you saying because you wanted to make sure that it

19 cleared; that is, there was enough in the account for it to

20 work?

21 A.  No.  It was -- it was -- I communicated with Avital that --

22 Q.  Yes.

23 A.  -- when it's clear for her to deposit the check.

24 Q.  That when would Mr. Avital would think it was OK for Ms.

25 Menendez to deposit the check?

1    A.  Yes.

2    Q.  Now, she refers here to the first check?

3    A.  First checks.

4    Q.  Now, is that because, sir, you understood her to have

5    gotten two checks?

6    A.  She means first two checks, meaning first check.  I don't

7    know.  I guess the first day, I have no idea what she means by

8    that.

9           MR. RICHENTHAL:  We can take that down, Ms. Wechsler.

10   Q.  Now, Mr. Khorozian, I've asked you about a sale of two

11   one-kilogram bars and a sale of certain American Eagle coins.

12   I want to ask you about something else now.  OK, sir?

13       Did there come a time when Ms. Menendez sought to sell gold

14   with your assistance again; that is, a third time?

15   A.  Yes.

16   Q.  Approximately when was that?  Approximately.

17   A.  It has to be -- sometime in middle of May.  I'm not sure.

18   Q.  Is your best estimate here right now, sir, middle of May?

19   A.  Possibly yeah.  I'm not sure.

20          MR. RICHENTHAL:  We'll come back to that.

21          THE COURT:  Middle of May what year, sir?

22          THE WITNESS:  2022.

23          THE COURT:  Thank you.

24          MR. RICHENTHAL:  We'll come back to that in a moment,

25   Mr. Khorozian.

1   Q.  Putting the day aside for a moment, what did she seek to

2   sell this third time?

3   A.  She took out the two kilos, and she wanted to sell it.

4   Q.  Mr. Khorozian, when you say two kilos, referring to this

5   third time, what are you referring to?

6   A.  OK.  Two kilo means two separate one kilos each.

7   Q.  Similar to the first sale that you helped her with?

8   A.  Yes.

9   Q.  Now, where did you talk to Ms. Menendez about this sale;

10  that is, the third sale of two one-kilogram bars?

11  A.  In my store.

12  Q.  The same store you talked about earlier?

13  A.  Not in the back.  In the booth.

14  Q.  Not in the back of the store?

15  A.  Where office space is.

16  Q.  I'm sorry, sir?

17  A.  Where the office space I said, there.

18  Q.  Is this office space where I showed you a photograph and

19  you described it as your office area?  Is that what you mean?

20  A.  Yes.

21          THE COURT:  Wait.  Let's make sure.

22          I thought you said in the booth.

23          THE WITNESS:  In the booth is office together in one.

24          THE COURT:  OK.

25          THE WITNESS:  But you're right, your Honor.  In the

1    booth, make it easier, yeah.

2    BY MR. RICHENTHAL:

3    Q.  Now, for this third sale, Mr. Khorozian, the two more

4    one-kilogram bars, did she say where she got these one-kilogram

5    bars from?

6    A.  We never ask, and then she didn't say anything to me.

7    Q.  Now, similarly, for this third sale, did she say why she

8    wanted to sell them at that time?

9    A.  We never talked about why.

10   Q.  Did you agree to help her sell this third time?

11   A.  Yes.

12   Q.  To whom did you intend to sell the gold this third time?

13   A.  Avital.

14   Q.  That's the same individual in the Diamond District?

15   A.  Yes.

16   Q.  Did you tell her you were going to sell it to the same

17   individual?

18   A.  I didn't say anything.  Just took it.

19   Q.  What did you tell her?

20   A.  I said OK.

21   Q.  Did you tell her how you were going to sell the gold?

22   A.  I --

23   Q.  Let me ask it a different way, sir.

24       Did you agree to help Ms. Menendez sell gold this third

25   time?

1    A.  Yes.

2    Q.  What did you say to her, to the best of your memory, when

3    you agreed to sell gold the third time?

4    A.  The same process.  I was -- I didn't say anything.  I just

5    took it.  I said OK.

6    Q.  Well, I just want to be clear, sir.  When you say the same

7    process, I'm asking what you actually said to her, not what you

8    were thinking.

9        So what did you say to Ms. Menendez this third time about

10   how you were going to sell the gold?

11            MR. FEE:  Asked and answered, your Honor.

12            THE COURT:  I'll allow it.

13   BY MR. RICHENTHAL:

14   Q.  Do you understand my question, Mr. Khorozian?

15   A.  I don't remember any conversation, like details, but --

16   Q.  I'm not asking you the exact words, sir.

17       What did you say to her, to the best of your memory, in

18   substance, as to how you were going to sell gold this third

19   time?

20            THE COURT:  Did you tell her anything about how you

21   intended to sell the gold she wished you to buy?

22            THE WITNESS:  Your Honor, I have no memory of any

23   conversation, how and what.  I assume she knows I'm doing the

24   same thing.

25            THE COURT:  All right.  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   BY MR. RICHENTHAL:

2   Q.  Let's step away from the conversation for a moment.

3       When the conversation ended, did she take the gold back, or

4   did she leave the gold?

5   A.  She left it with me.

6   Q.  What did you do with it?

7   A.  Put it in the safe.

8   Q.  That's the same safe you testified about earlier?

9   A.  Yes.

10  Q.  Now, did there come a time when you actually sold the gold

11  or arranged for the gold to actually be sold?

12  A.  Yes.

13  Q.  To whom?

14  A.  Avital.

15  Q.  That's the same individual in the Diamond District?

16  A.  Correct.

17  Q.  How this time did Mr. Avital pay for the gold?

18  A.  Two different checks again.

19  Q.  Just like he did the first time?

20  A.  Yes.

21  Q.  Checks made out to whom?

22  A.  Nadine Menendez.

23  Q.  Now, did there come a time this third time when you gave

24  her those checks?

25  A.  Yes.

1    Q.  Where?

2    A.  In the store.

3    Q.  That's your store?

4    A.  Yes.

5    Q.  And again, sir, these were checks from Mr. Avital in

6    Manhattan that you brought back to your store in New Jersey, is

7    that right?

8    A.  Correct.

9            MR. RICHENTHAL:  Now, let's put up on the screen,

10   Ms. Wechsler, if we could, the exhibits marked as 5A-5001C,

11   5A -- excuse me, 5I-603A.

12   Q.  Mr. Khorozian, is this on your screen?

13   A.  Yes.

14           MR. RICHENTHAL:  And let's also make sure it's on the

15   Court's screen and the lawyers' screens.

16   Q.  Are each of those on your screen, Mr. Khorozian?

17   A.  Yes, I see both checks.  Both checks.

18   Q.  Are these the checks you got from Mr. Avital for the third

19   sale, sir?

20   A.  Yes.

21           MR. RICHENTHAL:  The government offers 5A-5001C and

22   5I-603A.

23           THE COURT:  Admitted, without objection.

24           (Government Exhibits 5A-5001C and 5I-603A received in

25   evidence)

1              MR. RICHENTHAL:  Could we put that on everyone's

2    screen now, please.

3    Q.  Mr. Khorozian, now directing your attention to the check on

4    the left, do you see the date on it?

5    A.  Yes.

6    Q.  What is the date?

7    A.  June 14, 2022.

8    Q.  And what is the date on the check on the right?

9    A.  June 16, 2022.

10   Q.  Now, is each of these checks made out to Nadine Menendez?

11   A.  Yes.

12   Q.  Is each from Avital?

13   A.  Yes.

14   Q.  Do you see the address on the checks?

15   A.  Yes.  37 West 47th Street.

16   Q.  Now, is this the same address that I think I asked you

17   about a few minutes ago?

18   A.  Yes.

19              MR. RICHENTHAL:  You can take that down, Ms. Wechsler.

20              Now let's put up what's in evidence as Government

21   Exhibit B216-3.

22   Q.  Mr. Khorozian, is that now on your screen?

23   A.  Yes.

24   Q.  Are these other text messages between you and Ms. Menendez?

25   A.  Yes.

1   Q.  Take your time.

2       Does this text exchange start on June 6, 2023?

3   A.  Yes.

4       MR. RICHENTHAL:  Could we go back out, Ms. Wechsler.

5   Q.  If I could have you look at the bottom message, sir -- this

6   is now June 11, 2022 -- do you see you wrote, the guy dropped

7   off your check?

8   A.  Wait.  Where are you?  The guy dropped off your check.

9   Q.  Do you see that, Mr. Khorozian?

10  A.  Yes.

11  Q.  What check are you referring to there?

12  A.  This is the check for the last two kilos.

13  Q.  Now, you said check, singular, but was there one check or

14  two checks?

15  A.  Two.  Two checks.

16      MR. RICHENTHAL:  OK.  We can go back out,

17  Ms. Wechsler.

18      Can we go to the next page.  Stop there.

19  Q.  Mr. Khorozian, do you see Ms. Menendez wrote, are you at

20  the store so I can pick it up?

21  A.  Yes.  Yes.

22      MR. RICHENTHAL:  Back down, please.

23  Q.  And then at the bottom, she wrote:  Enjoy your evening.  I

24  will get it from you Monday?

25  A.  Yeah, because that was a Saturday.  I wasn't going to be

1    there.  She said I'll come Monday.

2    Q.  This is to come to pick up the checks, Mr. Khorozian?

3    A.  Yes.

4              MR. WEITZMAN:  Could we continue, please.

5    Q.  Can you look at the middle message:  Good morning.  Will

6    you be at the store around 2:45 p.m. if I stop by to pick up

7    the check?

8    A.  Yes.

9    Q.  Do you see that, Mr. Khorozian?

10   A.  Yes.

11   Q.  Now, this is June 15, 2022, is that right?

12   A.  Yes.

13   Q.  During the period between when you got the checks and June

14   15, where were they?

15   A.  In my safe.

16   Q.  In your store?

17   A.  Yeah.

18             MR. RICHENTHAL:  Go back out.

19   Q.  You respond, OK, and that's the end of the exchange.

20        Did Ms. Menendez, in fact, pick up the checks from you?

21   A.  Yes.

22   Q.  Where?

23   A.  In my store.

24   Q.  Did she do so in approximately mid-June?

25   A.  I think that last text she's going to come.  Monday, I

O6qWmen4                          Khorozian - Direct

1    think that's when she came.

2    Q.  Would that, sir, be the Monday either of or following the

3    last message in that exchange?

4    A.  Yes.

5              MR. RICHENTHAL:  Could we go back out for one second,

6    Ms. Wechsler.

7    Q.  Mr. Khorozian, the last message here is June 15, 2022.  Do

8    you see that?

9    A.  OK.  June 15, 2022.

10   Q.  I'm just asking if you see it, sir.

11   A.  Yeah, I see it.

12   Q.  So when you said she was going to pick it up that Monday,

13   do you mean either that day, which was a Monday, or whatever

14   the following Monday was following that day?

15   A.  Whenever the text is it's supposed to be that day, not the

16   following Monday.  When I said Monday, when she was going to

17   pick up the check or she was going to stop by Saturday before

18   this.

19   Q.  I see.  Let me ask you this way, Mr. Khorozian.

20   A.  And I said I'm not going to be there.  And she said, OK,

21   I'll follow up with you Monday.

22   Q.  Let me ask it a different way, sir.

23        The date on this check is June 15, 2022?

24   A.  Yeah.

25   Q.  Did Ms. Menendez pick up the checks from you on that day or

1  approximately on that day?

2  A.  Can -- is there any more text under, after this?

3  Q.  Mr. Khorozian, I'm just asking is that date approximately

4  when --

5  A.  Yes.

6  Q.  -- Ms. Menendez picked up the checks?

7  A.  Yes.

8  Q.  Thank you.

9  A.  That's better.  Approximately, yes.

10          MR. RICHENTHAL:  Now, your Honor, I'd like to read a

11  portion of a stipulation in evidence as Government Exhibit

12  1435.

13          THE COURT:  Go ahead.

14          MR. RICHENTHAL:  Ms. Wechsler, could we put up page

15  10.  This is already in evidence as Government Exhibit 1435.

16  I'm going to read just paragraph B:

17          "The documents marked for identification as Government

18  Exhibits B201-1 through B201-24 and B233 are true and correct

19  copies of image files and associated metadata extracted from

20  the second Nadine Menendez cell phone."

21          Now, Ms. Wechsler, can you put on the screen in

22  evidence Government Exhibit B201-17, which is within that

23  range.

24  Q.  Now, Mr. Khorozian, can you read the number on the bar in

25  the bottom right?

O6qWmen4                          Khorozian - Direct

1       MR. RICHENTHAL:  And to make your life easier,

2   Ms. Wechsler can flip it around.

3   Q.  Are you able to read that, sir?

4   A.  A1 -- A12481 -- 3 or 9.  I can't read that one.  Another

5   one?

6       THE COURT:  Can that be blown up more, that number?

7       MR. RICHENTHAL:  Ms. Wechsler, is it possible to make

8   it a little bigger, please?

9       THE WITNESS:  If you leave everything around, I can

10  read from this left side.  I believe it's that one -- A124819.

11      MR. RICHENTHAL:  Could we back that out and then put

12  back on the screen 3L-1.  And can we blow up the part of the

13  photograph on the left.

14  Q.  Mr. Khorozian, earlier I asked you to read the number here.

15  Do you recall that?

16  A.  Yes.

17  Q.  Are those numbers only off by one digit?

18      Take your time.

19  A.  I'm a little confused.  Is this the same?

20  Q.  I'm just asking you to read them, sir.

21  A.  Oh.  OK.  What do you want me to do?

22      A125992 -- A1259 -- OK.  It's one digit off.

23  Q.  And just for clarity, on the left-hand side of the screen

24  now is one of the bars in the photograph I showed you, is that

25  right?

1    A.  Yes.

2    Q.  And it reads A125992, is that correct?

3    A.  Yes.

4    Q.  And on the right side of the screen is 3L-1.  This is the

5    text message I asked you about earlier.  Do you recall that?

6    A.  Yes.

7    Q.  And that reads A125991, is that right?

8    A.  Yes.

9    Q.  Now, Mr. Khorozian, are those only off by one digit?

10   A.  Yeah.

11   Q.  Sir?

12   A.  Yes.

13   Q.  Now, before you prepared to testify, had you ever seen the

14   photograph on the left before?

15   A.  No.

16           MR. RICHENTHAL:  No further questions.

17           THE COURT:  All right.  Thank you.

18           Cross-examination.

19   CROSS-EXAMINATION

20   BY MR. FEE:

21   Q.  How's it going, Mr. Khorozian?

22   A.  Good.

23   Q.  You've been working in the jewelry business since around

24   1980, is that right?

25   A.  Yes.

1   Q.  And you're now -- you have that jewelry center in, that's

2   in Edgewater?

3   A.  Yes.

4   Q.  And you said you're Armenian Syrian, is that right?

5   A.  Armenian from Syria.

6   Q.  Thank you, sir.

7       Is there a large Armenian community in New Jersey?

8   A.  Yes.

9   Q.  You talked about Nadine during your direct.  Is Nadine

10  Armenian?

11  A.  Yes.

12  Q.  Do you know where she was born?

13  A.  Lebanon.

14  Q.  And you learned from Nadine that she came from a wealthy

15  family in Lebanon, right?

16  A.  Yes.

17  Q.  And you first came to, you first met Nadine around the

18  early 2000s because you saw her at the gym, is that right?

19  A.  Yes.

20  Q.  But you got to know her a little bit better more recently,

21  hanging around with Will Hana and --

22  A.  Correct.

23  Q.  Now, you also have met a few times Senator Menendez, right?

24  A.  Correct.

25  Q.  That good-looking guy over there?

1    A.  Yes.

2    Q.  Yes.

3    A.  Good man.

4    Q.  Yeah, yeah.  Well, we'll see.

5        But Senator Menendez never came to your jewelry store,

6    right?

7    A.  Never.

8    Q.  And Senator Menendez is not Armenian, as far as you know,

9    right?

10   A.  Sometimes.

11   Q.  Well, what's --

12   A.  No.  He's Cuban American.

13   Q.  Thank you.

14   A.  His heart is Armenian, little bit.

15   Q.  What do you mean by that, that his heart --

16   A.  He always helps us.

17   Q.  So you know him to be a supporter of the Armenian

18   community?

19   A.  Greeks, Armenians, yeah.

20   Q.  And about how many years ago did you first meet Senator

21   Menendez, if you know?

22   A.  Be honest with you, I met him in whole -- Bed Bath & Beyond

23   probably about 25 years ago.  He was shopping there.  That's

24   what I like, that he was shopping in the community.

25   Q.  Got you, got you.

O6qWmen4                        Khorozian - Cross

1   A.  But I didn't speak to him.  I knew of him.

2   Q.  I hear you.  I hear you.

3   A.  And Bed Bath & Beyond is next to my store.  That's why.

4   Q.  Still?

5   A.  No.  It just closed.  I have to stop shopping there.  They

6   closed.

7   Q.  Do Armenians give gold as gifts?

8           MR. RICHENTHAL:  Objection.

9           THE COURT:  I'll allow it, in general.

10  A.  All Middle Eastern people do that.  Indians, Chinese.

11  Q.  Tell me about that.

12          THE COURT:  Sustained.

13  A.  If they give money --

14          THE COURT:  There's no question pending, sir.

15  BY MR. FEE:

16  Q.  If the judge says sustained, you're not allowed to answer.

17  A.  Oh, I'm sorry.

18  Q.  That's all right.

19      Do some of the folks to whom you sell jewelry, do they buy

20  and hold gold for many years?  You can answer that.

21  A.  They buy just for gifts, jewelry.

22  Q.  OK.  In your experience from the jewelry business, do

23  people sometimes treat gold like an investment?

24          MR. RICHENTHAL:  Objection.

25          THE COURT:  Be more specific.

 1              MR. FEE:  Sure, sure.

 2   Q.  Do you have customers that you have told to invest in gold?

 3   A.  I usually don't do that, but some people do that.

 4   Q.  What does it mean to invest in gold?

 5   A.  Buy and hold.

 6   Q.  And you said all Middle Eastern people give gold as gifts.

 7   Why is that?

 8              MR. RICHENTHAL:  Objection.

 9   A.  It's a --

10              THE COURT:  Sorry, sir.  Wait just a moment.  Just a

11   moment.

12              Do you know why people give gold as gifts?

13              THE WITNESS:  You're asking me?

14              THE COURT:  Yes, I am.

15              THE WITNESS:  Why people give gold as gifts?  Can I

16   answer it?

17              THE COURT:  If you know.

18              THE WITNESS:  Yes.  At the weddings, usually they give

19   gold as gifts, not money.

20   BY MR. FEE:

21   Q.  In your experience, do people sometimes pass gold down to

22   their children?

23              MR. RICHENTHAL:  Objection.

24   A.  Yes.

25              THE COURT:  I'll allow it.

1    A.  Yes.

2    Q.  And is that the same sort of people you just referenced,

3    Middle Eastern --

4    A.  Yes.

5    Q.  -- communities?

6        You testified about checking the price of gold.  Do you

7    remember that?

8    A.  Yes.

9    Q.  And you said it can change even by the minute, right?

10   A.  Yes.

11   Q.  And in your experience, people who have gold and are

12   thinking about selling it, do they check the price of gold,

13   generally?

14            THE COURT:  Do you know whether or not people check

15   the price of gold?

16            THE WITNESS:  I think so, yes.  In late -- late ten

17   years, yes.  Before no, they didn't know how.

18   BY MR. FEE:

19   Q.  Now you have the phone?

20   A.  Internet.

21   Q.  Yeah.

22   A.  Hurts our business.  Maybe know too much.

23   Q.  Not before.  All right.

24       And you talked about a handful of gold transactions with

25   the prosecutor, right?  And I think you said for Mr. Hana and

1    Mr. Daibes, you had bought one-ounce gold bars, one-kilogram

2    gold bars and coins when they were looking for those sorts of

3    things.  Is that right?

4    A.  They were looking, you said?

5    Q.  Well, you had helped them --

6    A.  They weren't looking.  I was calling them if they want to

7    buy.

8    Q.  Got it.

9    A.  They never ask me.  I said to them buy.  If there is

10   something, I call them.

11   Q.  You gave them a heads-up?

12   A.  Yes.

13   Q.  And the types of stuff, of gold you got for them were the

14   one-ounce bars, the one-kilo bars and coins, right?

15   A.  Yes.

16   Q.  And for Nadine, did you call her Nadine Arslanian or Nadine

17   Menendez when you knew her?

18   A.  Nadine.

19   Q.  Just Nadine.

20       When Nadine came to you, it was one-kilo gold bars and

21   coins, and that's it, right?

22   A.  That's it.

23   Q.  So Nadine never sold to you or bought from you a one-ounce

24   gold bar, the smaller one?

25   A.  Never did transaction with her, no.

O6qWmen4                       Khorozian - Cross

1          MR. FEE:  Can we put up what's in evidence as

2    Government Exhibit 201-1A, for everyone, Mr. Kelly.

3    Q.  Was this picture taken in your jewelry center?  Can you

4    tell just from looking at it?

5          MR. RICHENTHAL:  Just for the record, I think this is

6    B201A, not 201.

7    A.  No.

8    Q.  I'm sorry.  You said no, you can't tell?

9          OK.  So this has a one-ounce gold bar, right?

10         THE COURT:  Is that a picture of a one-ounce gold bar,

11   sir?

12   A.  Oh, you asking me.

13         One bar.

14   Q.  And I'm sorry.  Just on the last question I asked you,

15   Mr. Khorozian, you can't tell if this was taken in your store,

16   or you just don't know?

17   A.  This is not in my store, no.

18   Q.  It's not in your store because you don't recognize the

19   surface?

20         THE COURT:  Do you know --

21         THE WITNESS:  I have no knowledge of being in my

22   store.

23   BY MR. FEE:

24   Q.  I hear you.  I hear you.  But you see here it looks like a

25   metal surface underneath it, like a safe or something, if you

1    can tell?

2    A.  Yes.

3              THE COURT:  Can you tell what is the background of

4    this picture?

5              THE WITNESS:  I can't tell --

6              MR. FEE:  OK.

7              THE WITNESS:  -- what it is.

8    BY MR. FEE:

9    Q.  Fair to say -- sorry.

10         Fair to say, Mr. Khorozian, that because this has a

11   one-ounce bar here, this is not stuff that you bought or sold

12   to Nadine, right?

13             MR. RICHENTHAL:  Objection.  He said he doesn't know

14   what this is.

15             MR. FEE:  He said he didn't know where it was taken,

16   your Honor.

17             THE COURT:  Yes.

18             MR. FEE:  It's a different question.

19             THE COURT:  Yes.  I'll allow it.

20   A.  This has nothing to do with my stuff.

21             THE COURT:  All right.

22   BY MR. FEE:

23   Q.  Including whatever transactions you did with Nadine?

24   A.  OK.  The one on the bottom has nothing to do with Nadine,

25   and the one on top I have no idea what this is.  It is two

1    kilos, separate kilo bars.  But I don't do the pictures in my

2    possession, while it was in my possession.  I don't know where

3    it's taken or where.

4    Q.  You don't know?

5    A.  No.

6    Q.  But you never bought from Nadine two kilos and a one-ounce

7    bar all at the same time, right?

8    A.  No.

9          MR. FEE:  All right.  You can put that down.

10   Q.  And just talking about one-kilo bars, the half-pineapple

11   bars, can you tell one kilo apart from another kilo bar just by

12   looking at it?

13   A.  Absolutely not.

14   Q.  Tell me about that.  Why not?

15   A.  Because they look alike unless you look at the number.

16   Q.  You said the number.  What do you mean the number?

17   A.  They have numbers.

18   Q.  Like serial numbers?

19   A.  Serial numbers.

20         THE COURT:  I take it you can tell a one-kilo bar from

21   another on the basis of the number on it.  Is that correct?

22         THE WITNESS:  Yes.  Correct, your Honor.

23         THE COURT:  All right.

24   BY MR. FEE:

25   Q.  And during the back-and-forth with the prosecutor, they

O6qWmen4                         Khorozian - Cross

1    didn't show you any serial numbers for the four gold bars that

2    you remember Nadine selling to you, correct?

3    A.  There was no serial numbers on those kilograms, the bars

4    that we -- OK.  Say that again?

5        The small bars, yes, we talked about, but not with Nadine.

6    But the big bars, I never really wrote the serial numbers or

7    know Avital wrote, nor she said this is the serial number.

8    Just the kilo I took blindly and sold it.

9    Q.  Got it.  So in all the -- in the two transactions with

10   Nadine involving four one kilos --

11   A.  Yes.

12   Q.  -- nobody, to your knowledge, wrote down the serial number?

13   A.  No.

14   Q.  So if you just -- if I picked up a gold bar here, a

15   one-kilo bar and showed it to you, you'd be unable to tell me

16   if that was the bar, one of the bars that Nadine --

17   A.  Correct.

18   Q.  -- sold through you?

19            THE COURT:  Sustained.

20   BY MR. FEE:

21   Q.  And I think you said --

22            THE COURT:  The jury will disregard the answer.

23            MR. FEE:  Let's put up Government Exhibit 5001A and B.

24   We could even do a split screen, if you have them.

25            You can just zoom in on the check portions, if you're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    able.

2    Q.  Mr. Khorozian, you remember answering some questions about

3    these checks?  If you want to look at them for a second, these

4    are the ones from April 7 and April 8 from Mr. Avital?

5    A.  Yes.

6    Q.  Is it Mr. Avital?

7    A.  Yes, Robert Avital.

8            THE COURT:  This is the Robert you testified to

9    earlier, correct?

10           THE WITNESS:  Yes.

11           THE COURT:  All right.

12   BY MR. FEE:

13   Q.  Just to follow up on your point, Mr. Khorozian, none of the

14   numbers or writing you see on these checks reflects a serial

15   number related to the bars that Nadine sold, right?

16   A.  Correct.  No serial numbers.

17           MR. FEE:  OK.  Thank you.  You can put those down.

18   Q.  I think -- well, let me ask you.

19       Was it the first time Nadine came to sell the kilo bars or

20   the second time where you said she called Avital, if you

21   remember?

22   A.  First time.

23   Q.  First time.  And you said -- you mentioned that Avital was

24   in New York, and she called him?

25   A.  She never called him.    (Continued on next page)

O6Q5men5                     Khorozian - Cross

1   BY MR. FEE:  (Continuing)

2   Q.  She never called Avital?

3   A.  No.

4   Q.  Why?

5   A.  She don't know who he is.

6   Q.  Got it.  Ok.

7        But that's where you mentioned Avital is in New York?

8   A.  I mean, I know Avital.  She don't know.  I just made a

9   phone called and she trust me, I made the deal.  I don't have

10  to explain her everything.

11  Q.  I hear you.  Let me just ask one clarifying question.

12  Nadine never told you that she was sharing this information

13  with Senator Menendez, correct?

14          MR. RICHENTHAL:  Objection, vague.

15          THE COURT:  Just a moment.  Is there an objection.

16          MR. RICHENTHAL:  Yes.  Vague.  I don't know what "this

17  information" means.

18          THE COURT:  I will allow it.

19          MR. FEE:  Oh, you allowed it.

20  BY MR. FEE:

21  Q.  Do you want me to ask the question again, Mr. Khorozian?

22  A.  Absolutely no conversation like that happened.

23  Q.  Quickly, Nadine, you said that she mentioned that those

24  first two kilos she brought to you came if her family?

25  A.  Yes.

O6Q5men5                          Khorozian - Cross

1   Q.  Do you remember testifying about that?

2   A.  Yes.

3   Q.  And did she mention if she had more jewelry or gold from

4   her family when she was talking with you in March?

5   A.  It was a very short conversation.  Nothing like that, no.

6   Q.  And fair to say it wasn't surprising that an Armenian New

7   Jerseyite came in with family gold?

8            THE COURT:  Sustained.  Don't answer.

9            THE WITNESS:  I didn't even understand it.

10           THE COURT:  That's why I sustained the objection.

11           MR. FEE:  (inaudible)

12           THE WITNESS:  Speak English.

13  BY MR. FEE:

14  Q.  You typically don't buy gold?

15  A.  Excuse me?

16  Q.  You typically don't buy gold because it is a hassle; right?

17  A.  Not big like that, no.

18  Q.  But Nadine, because she was a friend of yours and a friend

19  of Will's, you made an exception on that first occasion in

20  March; right?

21  A.  Yes.

22  Q.  And you understood that Nadine knew you were friends with

23  Will and Fred; right?

24  A.  Yes.

25  Q.  And had Nadine ever been to your jewelry center before she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    came to sell those gold bars?

2    A.  Yes.

3    Q.  Can you tell me about the other times she had been there

4    before March 2022, if you remember?

5    A.  2018, when Will I met, Andy, and with Nadine occasionally

6    would stop by.  And you know, that's when she came to my store

7    but she looked around, she never bought or sold anything.  She

8    liked one bracelet, silver, and I gave it to her later when she

9    got married as a gift.

10   Q.  That's nice of you.  You gave it to her as a gift meaning

11   you didn't charge her for it?

12   A.  No.

13   Q.  And in March 2022, when she sold those two kilogram gold

14   bars, Nadine mentioned to you, actually, that she thought she

15   could sell the gold elsewhere, possibly, but she trusted you?

16   A.  Yes.  She mentioned something like that, she said I feel

17   comfortable with you, and I said OK.

18   Q.  In fact, she even said she was afraid to go herself to New

19   York City to the Diamond District because she thought she might

20   get ripped off?

21   A.  I wouldn't let her do that just in case one guy says yeah

22   and then they call the robber outside.  I wouldn't let her do

23   that.

24   Q.  Gotcha.

25   A.  With me, I'd punch them.  I'd hit them with gold.

1   Q.  Do you know if Nadine had sold, say, gold coins to anyone

2   other than you?

3            MR. RICHENTHAL:  Objection.

4            THE COURT:  Just a moment.

5   A.  I have no knowledge.

6            THE COURT:  I will allow you to answer, sir.

7   A.  No knowledge of that.

8   Q.  Have you ever heard of a coin collector named Donald

9   Scarinci?

10  A.  No.

11           MR. RICHENTHAL:  Objection.

12           THE COURT:  I will allow that.

13  Q.  Did Nadine ever mention to you that she had sold gold coins

14  to other people, not you, in the past?

15           MR. RICHENTHAL:  Objection.

16  A.  I have never spoken --

17           THE COURT:  I will allow that.

18  A.  Nothing.

19           THE COURT:  Sir, if you will wait a moment.

20           THE WITNESS:  Sorry, your Honor.

21           THE COURT:  When the gentleman in front rises --

22           THE WITNESS:  When he rise.  When he sit, I answer.

23  So that means it's not --

24           THE COURT:  Well, not necessarily.  It depends whether

25  I permit you to answer or not.  But we will take it very

O6Q5men5                    Khorozian - Cross

1    slowly.

2              THE WITNESS:  When you say sustained, what does that

3    mean?

4              THE COURT:  Sustain means I agree with the objection.

5              THE WITNESS:  Objection of the prosecution.

6              THE COURT:  And you should not answer, correct.

7              THE WITNESS:  And the other one is?

8              THE COURT:  If I overrule it, that means you can

9    answer.

10             THE WITNESS:  If you overrule then I answer.  OK.  I

11   got it.

12             THE COURT:  These are just legal formalities, there is

13   no reason you should know this in advance.

14             THE WITNESS:  I'm just a jeweler.

15             THE COURT:  Hardly.

16             THE WITNESS:  You're right.

17             MR. FEE:  I'll let this play out.

18             THE COURT:  Sir, question.

19             You know, ladies and gentlemen of the jury, sometimes

20   we have some light moments here and that is nice, but obviously

21   this is a very serious matter for everyone concerned.  It is a

22   serious matter for the United States government, it is a

23   serious matter for Mr. Menendez, it is a serious matter for

24   Mr. Hana, it is a serious matter for Mr. Daibes, and I am sure

25   you will treat this with all the seriousness that it deserves.

O6Q5men5                        Khorozian - Cross

1          Sometimes I will make a lighthearted comment in an

2     attempt to alleviate some of the tension or with the conflict

3     but, overall, this is a very serious matter and I am sure you

4     understand that.

5          Proceed.

6          MR. FEE:  Yes, your Honor.

7     BY MR. FEE:

8     Q.  To this day, Mr. Khorozian, Senator Menendez has never come

9     in to your jewelry center; correct?

10    A.  Absolutely no.

11    Q.  And he has, Senator Menendez has never sold gold to you?

12    A.  No.

13    Q.  He has never sold anything to you?

14    A.  Not bought, not sold.

15    Q.  He has never bought anything from you?

16    A.  Never been in my store.

17    Q.  You don't have Senator Menendez' phone number?

18    A.  No.

19    Q.  You never texted with the man?

20    A.  No.

21    Q.  Never called the man?

22    A.  No.

23    Q.  And every time you saw Nadine she was not with Senator

24    Menendez; correct?

25    A.  98 percent.

1    Q.   There were a couple times you saw her with the senator?

2    A.   Maybe three or four times.

3    Q.   Tell me about what you remember about those times.  Where

4    were you when that happened?

5    A.   In the town restaurant and things like that.

6    Q.   Gotcha.

7         And you said hi?

8    A.   Yeah.  I like to say hi.

9    Q.   What did you observe about the senator and Nadine when you

10   saw them together?

11   A.   What do you mean?  Oh, they're happy.

12   Q.   Thank you.

13        Did Nadine tell you that she needed to sell the gold bars

14   to avoid having to disclose them?

15   A.   What does that mean?

16   Q.   Meaning did Nadine express any concern to you that she

17   would have to tell the senator or put them in a filing with the

18   U.S. government, the gold bars?

19   A.   She mentioned something that they reported that they had it

20   or something, yeah.

21   Q.   She mentioned to you -- tell me if this sounds right --

22   that when she got married to a senator --

23   A.   Yes, she had to register what she had, so -- with the

24   government, yes.

25   Q.   And your understanding was Nadine was worried about telling

1    the senator that she had these bars --

2            THE COURT:  Sustained.

3    Q.  What did she tell you about that?

4    A.  She said something like that she did report it when she got

5    married, like some things.  I don't know the legal form.

6    Q.  And she told you this in the context of getting your help

7    in selling the bars in exchange for cash?

8    A.  Exchange for the money, checks.

9    Q.  Sorry.  Not cash, checks.

10   A.  Yes.

11   Q.  Thank you.

12       Checks made out to Nadine?

13   A.  To Nadine Menendez.

14   Q.  Sorry, Mr. Khorozian.  I am skipping all of the bad

15   questions.  Those were the good questions.

16       So, you mentioned both times charging Nadine a commission.

17   Is that the word you used?

18   A.  Yes.

19   Q.  Meaning that the person buying the gold -- well, who got

20   commissions?

21   A.  Me and Avital.

22   Q.  So you and Avital both got a small price per ounce; is that

23   how it works?

24   A.  Every kilo I made 320 and he made 640.

25   Q.  For 1 kilo?

O6Q5men5                          Khorozian - Cross

1    A.  For 1 kilo.

2    Q.  Did Nadine haggle with you about the size of the

3    commission?

4    A.  No, she -- no, she didn't.

5    Q.  Did you see her call or text the senator, to your

6    knowledge?

7    A.  No, she did not.  No.

8    Q.  And she didn't try to push back or mention anyone else when

9    you said, hey, this is the commission?

10   A.  No.

11   Q.  In either March or the second time Nadine sold the kilo

12   bars to you, did you talk to her about whether it was a good

13   time or bad time to sell gold?

14   A.  No.

15   Q.  Did you ever talk about the price of gold?

16   A.  No.

17   Q.  Even if you didn't talk to her on either of those occasions

18   with Nadine, do you recall thinking this was a good or a bad

19   time to sell?

20   A.  I didn't care.

21          MR. RICHENTHAL:  Objection.

22          THE COURT:  Sustained.

23   Q.  Just in general, there are some times where it could be a

24   bad time to sell gold?

25          MR. RICHENTHAL:  Objection.

1           THE COURT:  Bad time for whom?

2    Q.  For the seller, because there are times --

3           THE COURT:  I will allow it.

4    Q.  Yes.

5    A.  Yes.  If the people look at the news and they look and say

6    it is good or bad time, yes.  For me it doesn't matter, I still

7    make my $10.

8    Q.  Right; because you are in the middle.

9    A.  Yes.

10   Q.  But for the seller, can you just explain to me what you

11   mean that it might be a bad time to sell gold under what

12   circumstances?

13   A.  It is up to them.  Not my business.

14   Q.  But like if a price is especially low one day?

15   A.  How do I know it is not going to go lower?

16   Q.  I guess that is a good point.

17   A.  You need, money you sell.  You don't need, shut up and sit.

18   Q.  Got it.

19          So Nadine, during those two occasions, wasn't asking you --

20   A.  No.

21   Q.  -- if this is a good or bad time to sell; right?

22   A.  She probably did her due diligence and she knew what to do.

23   Q.  And as you said, she wanted to sell those days?

24   A.  Yes.

25   Q.  And you mentioned a few times -- or excuse me, twice she

1    picked up the checks from you; right?

2    A.   Yes.

3    Q.   I'm sorry.  I couldn't remember.  Did she pick up the

4    checks both occasions in your store or you met her somewhere?

5    A.   No, always in my business place.

6    Q.   Always in your business place.

7         When she came to pick up the checks, did she come

8    alone?

9    A.   Yes.

10   Q.   Not even with Mr. Hana or Mr. Daibes?  Alone?

11   A.   No.  By herself.

12   Q.   When she came to sell the first two gold bars, did she come

13   alone?

14   A.   Yes.

15   Q.   Did she give you a heads-up that she was coming the first

16   time?

17   A.   She keep texting me she wants to meet me.  I didn't know

18   why so she came.

19   Q.   She texted you, if you remember, just you or was it like a

20   group chat with Mr. Daibes or Mr. Hana?

21   A.   No, just me.

22   Q.   Just you.

23        From your interactions with Nadine in that March 2022

24   transaction, did you say anything or did she say anything about

25   alerting Mr. Daibes to the fact that she was there?

O6Q5men5                         Khorozian - Cross

1   A.  No.

2   Q.  To your knowledge, Mr. Daibes didn't know about it?

3   A.  No.

4   Q.  What about Mr. Hana?

5   A.  No.

6   Q.  Same questions for the gold coins that she told you.

7   A.  No.

8   Q.  She came alone?  So far as you know?

9          You have to say yes or no, sir.

10  A.  Yes.

11  Q.  So far as you know, Mr. Daibes didn't know she was doing

12  that?

13  A.  No.

14  Q.  So far as you know, Mr. Hana didn't know she was doing

15  that?

16  A.  No.

17  Q.  Last time.  The second set of two bars that Nadine said she

18  sold to you, she came alone?

19  A.  Yes.

20  Q.  So far as you know, Mr. Hana and Mr. Daibes didn't know

21  about it?

22  A.  No.

23  Q.  And of course Senator Menendez, to your knowledge, knew

24  nothing about it?

25  A.  No.

1        MR. FEE:  I just have one more question or a couple

2   more questions, your Honor.

3        (Counsel conferring)

4        THE COURT:  Why don't you finish up.  I realize I have

5   forgotten the midafternoon break.  Why don't you finish.

6   BY MR. FEE:

7   Q.  Do you also give cash as gifts?  Or just gold?

8        MR. RICHENTHAL:  Objection.

9        THE COURT:  I will allow that.

10  A.  Yeah.

11  Q.  And again, is that typical in the Armenian community?

12       MR. RICHENTHAL:  Objection.

13       THE COURT:  I'm sorry.  Just a moment.  The question

14  was:  Do you also give cash as gifts?  Or just gold?  What is

15  your answer to that?

16       THE WITNESS:  Both.

17       THE COURT:  OK, both.

18  BY MR. FEE:

19  Q.  Is it true, sir, that you actually wanted to give gold

20  coins as gifts to these prosecutors?

21  A.  Silver.

22  Q.  Silver coins.

23  A.  I was joking with them.

24  Q.  You were joking?  If they said "yes" would you actually

25  give them?

1    A.   Yes.

2              MR. RICHENTHAL:  Objection.

3              THE COURT:  Sustained.  Sustained.  Just a moment.

4              THE WITNESS:  I was joking.  I was just joking.

5              THE COURT:  You were joking as you have been?

6              THE WITNESS:  Yes, I was joking.

7              THE COURT:  OK.

8    BY MR. FEE:

9    Q.   Got it.  And it was just a funny gesture --

10   A.   I was just talking to my lawyer and I said, you guys want

11   some gold -- I mean silver coins?  They were like $25 and

12   that's it.  I was just joking with them.  I knew they weren't

13   going to take it but I was joking.  It was the end of the

14   conversation and they were just laughing.  That's it.  It was

15   my fault, they never asked anything.

16   Q.   Oh, I know.  I'm not suggesting.  My only question is this:

17   Is that something you do to somebody you like, offering a gift

18   like that, right?

19             THE COURT:  I'm sorry.  What is the question?

20   Q.   That's my question.  You are doing that as a kind gesture?

21             MR. RICHENTHAL:  Objection to "that".

22             THE COURT:  Yes.  Sustained.

23   Q.   You are offering to give coins as a gesture of kindness?

24             MR. RICHENTHAL:  Your Honor, he said it was a joke.

25             THE COURT:  Sustained.

O6Q5men5                          Khorozian - Cross

1          MR. FEE:  No further questions, your Honor.

2          THE COURT:  I apologize.  I forgot.  Let's take 10

3   minutes, and we are going to end exactly at 5:00 tonight.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6Q5men5                         Khorozian - Cross

 1                     (Jury not present)

 2                     THE COURT:  You may step down Mr. Khorozian.

 3                     10 minutes.

 4                     (Recess)

 5                     THE COURT:  Put the witness on the stand, please.

 6                     MR. MONTELEONI:  While we are waiting for that, I have

 7     one thing to put on the record, briefly.

 8                     THE COURT:  Yes, sir.

 9                     MR. MONTELEONI:  Pursuant to our discussion before the

10     lunch about the cleanup of exhibits, I have informed counsel

11     for Senator Menendez, after this witness, I am going to read in

12     the ones that aren't subject to specific objections and I have

13     committed that we will be making -- we will be informing them

14     of exhibits that we are going to feature in closing in advance

15     that haven't been shown to the jury before.

16                     THE COURT:  All right, but that leaves the exhibits

17     for which there are objections.

18                     MR. MONTELEONI:  Yes, and we can address that after

19     the jury goes home.

20                     THE COURT:  How many are there?

21                     MR. MONTELEONI:  I have to check.  I think it is

22     between five and eight.

23                     THE COURT:  All right.  And you will have talked to

24     the other side so that if the number of objections can be

25     reduced, they'll be reduced before I handle it.

O6Q5men5                         Khorozian - Cross

1           MR. MONTELEONI:  They have been reduced this morning

2   actually, your Honor, as a result of just those discussions.

3           THE COURT:  Jury entering.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Please, be seated.

3              Mr. Lustberg or Mr. Solano, examination.

4              MR. SOLANO:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MR. SOLANO:

7    Q.  Good afternoon, Mr. Khorozian.  How are you?

8    A.  Good.  How are you doing?

9    Q.  My name is Ricardo Solano and I represent Will Hana in this

10   matter.  You and I have never had a chance to speak before now,

11   correct?

12   A.  Yes.

13   Q.  You testified on direct that you have known Mr. Hana for

14   about six years; is that correct?

15   A.  Yes.

16   Q.  And obviously you had some sales that you have made to him,

17   but beyond that, what was your relationship with Will like?

18   A.  We were friends.

19   Q.  You hung out socially, I take it?

20   A.  Yes.

21   Q.  You consider yourself close friends?

22   A.  Yes.

23   Q.  The government asked you about some of the gold that you

24   sold to Will and I think you mentioned that you sold him gold

25   five or six times; is that correct?

O6Q5men5                          Khorozian - Cross

1   A.  Yes.

2   Q.  In addition to that, though, isn't it correct that you also

3   sold Will gold, gold jewelry and other jewelry; correct?

4   A.  Yes.

5   Q.  In fact, he purchased those items from you on numerous

6   occasions; right?

7   A.  Yes.

8   Q.  With respect to those items that will --

9           THE COURT:  I'm sorry.  Did you say he purchased those

10  items from you?

11          MR. SOLANO:  Correct.  Mr. Hana.

12          THE COURT:  Yes.

13  Q.  He purchased those items from you on multiple occasions,

14  correct?

15  A.  Jewelry items, yes.

16  Q.  And with those purchases, did Mr. Hana always pay by check?

17  A.  Always check.

18  Q.  I'm going to show you what we have marked -- just for the

19  witness and the Court and the other attorneys -- what we have

20  marked as 172A through K, excluding 172 I, so, A, B, C, D, E,

21  F, G, H, J, and K.

22          MR. SOLANO:  And Mr. Kelly if we can put them up on

23  the screen for Mr. Khorozian for a couple of seconds?

24  Q.  Mr. Khorozian, if you can take a look at those, and I'm

25  going to ask you a question about them once you have had a

O6Q5men5                    Khorozian - Cross

1    chance to see them.

2         Have you had a chance to look at those all of those,

3    Mr. Khorozian?

4    A.   Yes.

5    Q.   Are those checks that Mr. Hana gave to you for purchases he

6    made from your jewelry store?

7    A.   Yes.

8             MR. SOLANO:  Your Honor, at this time we would move in

9    Government's Exhibits 172A, 172B, 172C, 172E, 172F, 172G, 172H.

10            MR. RICHENTHAL:  They're defense exhibits, not

11   government exhibits.

12            MR. SOLANO:  Thank you.  Hana Exhibits 172A through H,

13   172J, and 172K.

14            MR. RICHENTHAL:  But no objection.

15            THE COURT:  Admitted, without objection.

16            (Defendant's Exhibits 172A through H, 172J, 172K

17   received in evidence)

18            MR. SOLANO:  I don't intend to go through all of them

19   but if we can show a couple starting with 172G?  If we can

20   publish those, Mr. Kelly?

21   BY MR. SOLANO:

22   Q.   So, Mr. Khorozian, your store is named VK Jewelers?

23   A.   I have two businesses; one is the jewelry center which I

24   collect rent from only; and this is only sales, VK Jewelers is

25   my business since 1970 -- from 1984.

1    Q.  For the jewelry sales?

2    A.  Yes.

3    Q.  And then this represents a check that Mr. Hana -- sorry,

4    strike that.

5        This represents a check for a purchase that Mr. Hana made

6    from you for $11,500 on June 29, 2020; correct?

7    A.  Yes.

8              MR. SOLANO:  If we can go through 172 to Hana Exhibit

9    172D?

10   Q.  Similarly, this is a check for a purchase that Mr. Hana

11   made from you for some jewelry items for $11,000 on

12   September 28 of 2020?

13   A.  Yes.

14   Q.  And the last one we will publish for the jury is 172J, and

15   likewise, this is another check that Mr. Hana gave to you for a

16   purchase of jewelry on March 11 of '22 for $3,900; correct?

17   A.  Yes.

18   Q.  Thank you.

19       During the time that you spent with Mr. Hana you had a

20   chance to interact with him and other friends of his; correct?

21   A.  Yes.

22   Q.  Based upon those interactions with Mr. Hana and your

23   personal experiences with them, is it your opinion that he is a

24   generous person?

25   A.  Very generous.

1  Q.  Does he have a reputation for being generous person?

2  A.  Yes.

3  Q.  Does he have a reputation for being a generous person with

4  family, friends, and even co-workers?

5  A.  Co-workers.

6  Q.  I'm sorry?

7  A.  Co-workers.

8  Q.  And co-workers as well?

9  A.  Yes.

10  Q.  What was your understanding of Mr. Hana's relationship with

11  Nadine Arslanian, later Nadine Menendez?

12  A.  They were like very good friends from what I saw.  They

13  were always hanging out together.

14  Q.  So you regularly saw them hanging out together in social

15  settings?

16  A.  Yes.

17  Q.  And you said you think that they were very good friends?

18  A.  Yes.

19  Q.  You were asked questions and you testified about gold eagle

20  coins?

21  A.  Yes.

22  Q.  Do you recall that?  Just to be clear, those are round?

23  A.  Round.

24          MR. SOLANO:  Could we show or publish what is in

25  evidence Government Exhibit 3M-1?

1    Q.   Now, Mr. Khorozian, I think you testified -- if we can blow

2    up a little bit the check first?

3              You testified that those gold bars that we saw were

4    the items that Mr. Hana purchased from you?   Is that correct?

5    A.   Yes.

6    Q.   And the date here is June 23rd, 2021.   That would have been

7    a date around which Mr. Hana would have purchased those gold

8    bars from you; correct?

9    A.   That's the exact date.

10   Q.   And then just to confirm, those are one-ounce gold bars;

11   correct?

12   A.   Yes.

13             MR. SOLANO:   One second, your Honor?

14             (Counsel conferring)

15             MR. SOLANO:   No further questions, your Honor.

16             THE COURT:   Thank you.

17             Mr. Agata?

18             MR. McMANUS:   Mr. McManus.

19             THE COURT:   I'm sorry.   Mr. McManus.

20             MR. McMANUS:   That's all right.

21   CROSS-EXAMINATION

22   BY MR. McMANUS:

23   Q.   Good afternoon, Mr. Khorozian.

24   A.   Good afternoon.

25   Q.   My name is Shannon McManus.   I represent Fred Daibes.

O6Q5men5                          Khorozian - Cross

1          So, you have known Mr. Daibes for a long time;

2   correct?

3   A.   Correct.

4   Q.   You guys met in the early 1980?

5   A.   Yes.

6   Q.   I think you said that you ran into each other at a gym in

7   Edgewater?

8   A.   No, in Cliffside Park, Palisadium.

9   Q.   At the time Mr. Daibes was working as a busboy; correct?

10  A.   Don't know.  That was earlier.  I didn't know him then.

11  Q.   Do you know what he was doing when you guys met?

12          MR. RICHENTHAL:  Objection.  Relevance.

13          THE COURT:  I will allow it.

14          You may answer, sir, if you know the answer.

15          THE WITNESS:  I think he was just running a restaurant

16  there or something like that.  I don't know.  There was

17  Palisadium Restaurant, there was Palisadium Gym.  So they were

18  like working together, something like that.  I didn't know him

19  well, I just seen him in there.  I never really talked to him

20  until many years later.

21  BY MR. McMANUS:

22  Q.   But now I think you described your relationship as a

23  special relationship?

24  A.   Yeah.

25  Q.   What does that mean?

1    A.  Special relationship means to me like he is not my best

2    friend, I don't hang out with him, but I like his energy, I

3    like to be with him and hang out.  When he is there I enjoy

4    being with him.

5    Q.  So you don't go out for drinks together?

6    A.  No.

7    Q.  You do speak often though, correct?

8    A.  Yeah.

9    Q.  You get kebabs together?  No?

10   A.  No.  No kebabs.  Hamburgers.  No, just --

11   Q.  The two of you had similar interests though; correct?

12   A.  What does that mean?

13   Q.  So, do you have things in common?

14   A.  Yes.  We come from the same background.

15   Q.  You are both immigrants?

16   A.  Yes.

17   Q.  You both lived in Edgewater for many years?

18   A.  Never lived -- oh, sorry.  I did live a little bit when --

19   after I got divorced I lived in his building, he gave me a

20   discount rent and I stayed there for like a year or two, then I

21   got thrown out.

22   Q.  When was this?

23   A.  2002-2004.  20 years ago.

24   Q.  You both worked in Edgewater and you both currently work in

25   Edgewater; correct?

1   A.  Correct.

2   Q.  You both own your own businesses?

3   A.  Correct.

4   Q.  You both have interests in gold?

5           MR. RICHENTHAL:  Objection.

6           THE COURT:  Sustained.

7   A.  I don't have --

8           THE COURT:  Sustained.  I'm sorry, sustained.  No.  Do

9   not answer.

10  Q.  If you are aware, before you met Mr. Daibes, did he invest

11  in gold?

12  A.  No.  Oh.  Sorry man.

13          THE COURT:  That's all right.  You're not a lawyer.

14          THE WITNESS:  I'm just a liar.

15  Q.  Mr. Khorozian, do you see gold as a good investment?

16          THE COURT:  Sustained.

17  Q.  The value of gold, over time it goes up; correct?

18  Traditionally?  Historically?

19  A.  Yes.

20          THE COURT:  Does it also go down?

21  A.  Yes.  When I buy, it goes down; when I sell, it goes up.

22  Q.  Last year the price of gold went up or down?

23  A.  It went up, yes.

24  Q.  And if you know, when there is inflation, what happens to

25  the price of gold?

1  A.  Price goes up.

2  Q.  So it essentially protects you against inflation if you are

3  investing in gold?

4          MR. RICHENTHAL:  Objection.

5          THE COURT:  Sustained.

6  Q.  Did you encourage Mr. Daibes to invest in gold?

7          MR. RICHENTHAL:  Objection.

8          THE COURT:  Sustained.

9  Q.  Did you speak about gold with Mr. Daibes?

10          THE COURT:  I will allow it.

11  A.  I asked him -- I told him one time you should invest in

12  gold.

13  Q.  Now, when you did that, you weren't trying to sell him

14  gold, were you?

15  A.  No.

16  Q.  I think you already testified that your business is not

17  selling gold bars or any gold bullion; correct?

18  A.  No.

19  Q.  But you believe that it is a good investment?

20          MR. RICHENTHAL:  Asked and answered.

21          THE COURT:  Sustained.

22          MR. RICHENTHAL:  Same objection.

23          THE COURT:  Sustained.

24  Q.  You have heard that Mr. Daibes also thinks that gold is a

25  good investment; correct?

O6Q5men5                          Khorozian - Cross

1          MR. RICHENTHAL:  Objection.

2          THE COURT:  Sustained.

3   A.  I could describe what happened.

4   Q.  Can you describe what happened?

5          MR. RICHENTHAL:  Objection.

6          THE COURT:  I will allow it.

7          MR. RICHENTHAL:  Happened to what?

8          THE COURT:  Yes.  When are you --

9   A.  At one point --

10          THE COURT:  I'm sorry.  Let's do this the right way.

11          Next question, please.

12  BY MR. McMANUS:

13  Q.  So I'm not sure how you described it, I think that you said

14  that if you hear that there is gold available, you will let

15  Mr. Daibes know; correct?

16  A.  Absolutely.  Yeah.

17  Q.  And sometimes when these deals happened, not with

18  Mr. Daibes, so -- withdrawn.

19      If you were to be selling gold, sometimes you would take a

20  commission or a broker fee; correct?

21  A.  Yes.

22  Q.  If you were acting as the middle man?

23  A.  Yes.

24  Q.  And you didn't do that with Mr. Daibes though, did you?

25  A.  Never did that, no.

1  Q.  Can you tell me why you wouldn't do that for Mr. Daibes?

2  A.  Because I love Mr. Daibes and it was a good way for me to

3  call him.  And I see that he smiles when he buys it, he gets

4  it.  It makes me happy.  And he is a good guy to me and that

5  makes me happy.  I'm not going to embarrass myself to make $5,

6  $10.  When he buys jewelry I make money on him.

7  Q.  Would you say that Mr. Daibes has a reputation as a

8  generous person?

9  A.  Absolutely yes.

10 Q.  Now, acting as the middle man for Mr. Daibes, you have been

11 doing that for a little over 20 years would you say?

12 A.  Doing what?

13 Q.  Acting as a middle man if he was interested in buying gold.

14 A.  Yeah.  Probably around that time.  I don't know, 12 years,

15 10 years, I don't know -- what year are we?  About 12, 15

16 years.

17 Q.  And I think you said that you sold him between 10 and 12

18 1-kilogram bars, correct?

19 A.  More or less.  I didn't count but more or less, yes.

20 Q.  And you sold him one-ounce pieces of gold as well, correct?

21 A.  Yes.

22 Q.  Over a hundred?

23 A.  At least over 70 to a hundred, could be more.  I never --

24 yeah, possible.

25 Q.  Now, I know you said it but you make your money by renting

1   out the stalls and the booths in the jewelry center; correct?

2   A.  Yes.

3   Q.  And you are not a gold dealer but you know other gold

4   dealers; correct?

5   A.  Yes.

6   Q.  You mentioned Mr. Avital.  You know the business Jajal?

7   A.  Yes.

8   Q.  Are you aware that you can purchase gold online as well?

9   A.  Yes.

10  Q.  Are you aware that gold is sold at COSTCO?

11          MR. RICHENTHAL:  Objection.

12          THE COURT:  I will allow that.

13          THE WITNESS:  I heard it on the news.  I don't know.

14  Yeah.

15  Q.  What about Wal-Mart?

16  A.  I don't know.  They should just sell food.  I don't want to

17  sell grocery in my store.  Unbelievable.

18  Q.  I think that you had testified that buying gold and working

19  as a middleman was a bit of a headache.  Did you say that?

20  A.  Not for Freddy.  I don't think the headache.  But for other

21  people it is.  I don't want to deal with it.

22  Q.  Is that because you and Fred have a special relationship?

23  A.  He is a special person for me, yes.

24  Q.  And you are doing a favor for him?

25  A.  Yeah.

```
 1              MR. McMANUS:  One moment?

 2              (Counsel conferring)

 3              MR. McMANUS:  Nothing further, Judge.  Thank you.

 4              THE COURT:  Any redirect?

 5              MR. RICHENTHAL:  Yes, your Honor.  Do you mind if I do

 6    it here?  The screen is a little easier.

 7              THE COURT:  That's all right.

 8    REDIRECT EXAMINATION

 9    BY MR. RICHENTHAL:

10    Q.  Mr. Khorozian, I think that you said something about

11    knowing Nadine's family was wealthy.  Do you recall saying

12    that?

13              I will say it a different way, sir.  Do you recall

14    being asked whether you understood that Nadine came from a

15    wealthy family in Lebanon?

16    A.  I heard of it but she didn't tell me that.

17    Q.  Yes, sir.

18              And when you say you heard of it, you were referring

19    to her family in the 1970s, correct?

20    A.  I don't know.

21    Q.  Well, you had no personal knowledge of her financial

22    situation in 2022, did you?

23    A.  I didn't hear that.

24    Q.  You had no personal knowledge of her financial situation in

25    2022, did you?
```

```
1    A.  No.  No.

2    Q.  And, in fact, she told you she needed to pay bills in 2022,

3    right, Mr. Khorozian?

4    A.  Yes.

5    Q.  Now, do you recall being asked questions about a reference

6    Ms. Menendez may have made to having to file a report?  Do you

7    recall being asked that by Mr. Fee?

8    A.  I understand that.

9    Q.  Just earlier today, sir, Mr. Fee asked you --

10   A.  Who is Fee?

11   Q.  I'm sorry.  The individual --

12   A.  OK.  OK.

13   Q.  He asked you questions, if you recall, about Nadine talking

14   potentially about some sort of report that she may have had to

15   file after she got married.  Do you recall being asked about

16   that Mr. Khorozian?

17   A.  Today?

18   Q.  Yes.

19   A.  I don't remember.  Report filed for wedding?  Oh, oh, oh,

20   oh.  Yeah, yeah, yeah.

21   Q.  I am just asking if you recall being asked about that a few

22   minutes ago.

23   A.  She mentioned something like that, yes.

24   Q.  So that is what I am asking you, Mr. Khorozian.  Now, the

25   conversation you are talking about took place in 2022; right?
```

1   A.  Yes.

2   Q.  Now Ms. Menendez got married in 2020; correct?

3   A.  Yes.

4   Q.  So when she was talking about a report from wedding gifts,

5   she was talking about gifts from 2020; is that right,

6   Mr. Khorozian?

7           MR. FEE:  Objection.  Leading.

8   A.  I didn't question --

9           MR. FEE:  Objection.

10          THE COURT:  Just a moment.  Rephrase it.

11  BY MR. RICHENTHAL:

12  Q.  Mr. Khorozian, at the time you had this conversation in

13  2022, did you understand Ms. Menendez had already been married?

14  A.  Yes.

15  Q.  And did you understand she had been married since 2020?

16  A.  Yes.

17  Q.  I think you said she referenced a report about the wedding

18  gifts.  Do you recall saying that, sir?

19          MR. FEE:  Objection.  Misleads.

20  A.  She never said to me --

21          THE COURT:  Let's see.  Let's see.

22  A.  I never heard anything to do with wedding gifts or

23  anything.  She just -- she said that she reported this when she

24  got married, not wedding gift or anything like that.  I never

25  had a conversation like that with her.

O6Q5men5                          Khorozian - Redirect

1   Q.  Forget the word wedding gifts, let's just focus on what you

2   just said.  I believe you just said she was talking of

3   reporting it when she got married.  Did I hear you correctly?

4          MR. FEE:  Objection.  Misstates.

5          THE COURT:  Let's see.

6   A.  I hear something -- look.  It was -- I didn't care what she

7   did or what she didn't do at the moment, it is not my problem.

8   What I remember, something she did, she reported this.

9   Q.  And the reference you just made was to reporting in

10  connection with a wedding.  Is that what you said?

11  A.  No wedding.  I don't know anything about wedding.

12         THE COURT:  There you are.

13  Q.  I'm sorry, sir, yes or no.

14  A.  I don't know that.  No.

15  Q.  Now, when she told you why she was selling gold, did she

16  reference a wedding?

17  A.  No.

18  Q.  Did she reference a disclosure?

19  A.  No.

20  Q.  Did she reference having to pay bills?

21  A.  She talked to me about bills.

22  Q.  Did she tell you that's why she was selling the gold?

23  A.  She needed financial money.

24         THE COURT:  I'm sorry.  What was your answer, sir?

25         THE WITNESS:  She had a financial situation and she

O6Q5men5                         Khorozian - Redirect

1    wanted to sell the gold.  That is what the gold is, for when

2    you need money, you sell.

3    BY MR. RICHENTHAL:

4    Q.  I'm sorry, sir.  I didn't mean to cut you off.

5        That was the first of the three sales; is that right,

6    Mr. Khorozian?

7    A.  It was the first sale that she made.  She mentioned it.

8    After that I didn't speak about anything or questions.

9    Q.  So after that, for the second and third sales, did she tell

10   you why she was selling the gold?

11   A.  We never talked about that.

12   Q.  Did she tell you why she was selling the goal then?

13   A.  When is then?

14   Q.  Meaning at that moment versus some other moment?

15   A.  The first time?

16           MR. FEE:  Objection.  Vague.

17           THE COURT:  I will allow it.

18   BY MR. RICHENTHAL:

19   Q.  The second?

20   A.  The first time she said she need to pay, she has financial

21   bills, whatever.  Second, third, I didn't question anything,

22   she never said anything, it was just a physical thing.  She sat

23   down, we had a conversation, she gave it to me, l took it, and

24   I sold it.

25   Q.  OK.  Now, do you recall being asked about whether you

1    believed Mr. Hana was generous?  Do you recall Mr. Solano

2    asking whether you thought Mr. Hana was generous?

3    A.  Yes.

4    Q.  And do you recall my asking you previously today about you

5    helping Mr. Hana purchase 22 one-ounce kilogram bars?

6    A.  Yes.

7    Q.  And I showed you photographs?

8            MR. SOLANO:  Objection, your Honor.  I think that is

9    not accurate.

10   BY MR. RICHENTHAL:

11   Q.  I said once-ounce kilogram.  Forgive me, Mr. Khorozian; 22

12   one-ounce bars.

13   A.  22 one-ounce bars.

14           THE COURT:  Thank you, Mr. Solano.

15   A.  The square ones.

16   Q.  Yes, sir.  The ones I showed you the photograph of.

17   A.  The picture that is in plastic.

18   Q.  Yes.

19           Now, when Mr. Hana purchased those from you, did he

20   say they were a gift?

21   A.  We never talked about these things.

22   Q.  Now, you do you also recall being asked questions about

23   whether you wrote the serial numbers down of the gold you

24   helped Nadine sell?

25   A.  Excuse me?

1    Q.  Do you recall Mr. Fee asking you whether you wrote the

2    serial numbers down of the gold you helped Nadine sell?

3    A.  No.  No.

4    Q.  You didn't write them down, did you?

5    A.  I didn't write anything down.

6    Q.  Why not?

7    A.  What would I write?

8    Q.  Why not write the serial numbers down?

9    A.  Because it is coming from reputable guy and I'm -- if I

10   know what I know now, I would do things differently.  I didn't

11   write it down.

12        MR. RICHENTHAL:  Now, can we put up Government Exhibit

13   B201-A as in apple?  B201-1A.

14   Q.  Mr. Khorozian do you recall being asked about this

15   photograph by Mr. Fee?  I am just asking if you remember being

16   asked questions about it.

17   A.  Yes.

18   Q.  Now, looking at the top two parts of the photograph, does

19   this appear to be 1 kilogram gold bars?

20   A.  1 kilogram is 1 kilo, yes.

21   Q.  Is that what they appear to be?

22   A.  They are.

23   Q.  They are 1 kilogram gold bars?

24   A.  Yes, that's what I said.

25   Q.  Do these look like the 1 kilogram gold bars that

1    Ms. Menendez asked you to help sell?

2    A.  They weren't looking like this.

3    Q.  Did they look like that.

4    A.  Similar.

5    Q.  Did they look like the type of bars she asked you to sell?

6           THE COURT:  Slow down, sir.

7    Q.  Sorry.  I am asking, do they look like those bars, sir?

8    A.  The same.  They all look alike.

9           MR. RICHENTHAL:  Can we help put up Government Exhibit

10   B201-1 in evidence?

11   Q.  Mr. Khorozian, do you see on the right side of this

12   document there is a smaller version of the same photograph?  Do

13   you see that, sir?

14   A.  I see.

15          MR. FEE:  Objection.  Scope.

16          MR. RICHENTHAL:  He was literally asked about this.

17          MR. FEE:  I couldn't hear.  Sorry.  Literally what?

18          MR. WEITZMAN:  Asked about it.

19   BY MR. RICHENTHAL:

20   Q.  Many Khorozian, I'm going to ask Ms. Wechsler to zoom back

21   out so you can see what is on the screen.  Do you see that,

22   sir?  I am just asking if you see what is on the screen,

23   Mr. Khorozian.

24   A.  I see blurry picture of a --

25   Q.  OK.  You see a smaller version of the same photo I showed

 1    you, right?

 2    A.  Yes.

 3    Q.  And then you see some other data.  Do you see that, stir?

 4          THE COURT:  Other numbers and words?

 5    A.  Yes.

 6    Q.  Do you see the date March 31, 2022?

 7          THE COURT:  The question is simply do you see that

 8    date written on that material?

 9          THE WITNESS:  Yes.

10          THE COURT:  He said yes.

11    A.  Yes.

12    Q.  Is that the same date Ms. Menendez dropped off the two

13    one-kilogram bars to you for the first sale?

14    A.  Yes.  Yes.

15    Q.  Now, do you recall also being asked who, if anyone, knew

16    about the sales other than you, Nadine, and Robert Avital.  Do

17    you recall being asked questions about that?

18    A.  Asked questions from who?

19    Q.  Mr. Fee or other people this afternoon.

20          THE COURT:  Today.  Do you remember being asked

21    questions about that today?

22    A.  No.  No, I don't remember anything.

23    Q.  I am just asking, sir, whether this afternoon you recall

24    one of the lawyers asking you a question about who knew about

25    the sale.

1   A.  No one knew except me --

2   Q.  Sir, hold on.

3           MR. FEE:  Objection.

4           THE COURT:  Let's slow down.  Everybody slow down and

5   don't talk over one another.

6           Now, the question is simply this, sir, and the answer

7   should be yes, or no, or I don't know.  Do you remember that

8   this afternoon one of the lawyers asked you questions about who

9   knew of the sales?  Do you remember being asked questions about

10  that?  Yes or no.

11          THE WITNESS:  I don't remember.

12          THE COURT:  OK.

13  BY MR. RICHENTHAL:

14  Q.  OK, forget the questions.

15      Mr. Khorozian, have you ever been included on text messages

16  between Mr. Menendez and Nadine?

17  A.  No.

18  Q.  Have you ever been included on text messages between Nadine

19  and Fred Daibes?

20  A.  No.

21  Q.  Do you know what, if anything, Nadine and Mr. Daibes talked

22  about the day before she met you?

23  A.  No.

24  Q.  Have you ever been to the home of Nadine Menendez and

25  Mr. Menendez?

O6Q5men5                          Khorozian - Recross

```
 1   A.  No.

 2   Q.  Do you know where, if anywhere, she kept the gold she sold

 3   to you?

 4   A.  No.

 5              MR. FEE:  Objection.  Foundation.

 6              THE COURT:  Just a moment.  Sustained.

 7   Q.  Do you know where the gold she brought to your store came

 8   from?

 9              MR. FEE:  Objection.

10              THE COURT:  I will allow it.  I will allow it.

11   A.  I have no idea.

12   Q.  Do you know whether Mr. Menendez and her ever talked about

13   it?

14              MR. FEE:  Objection.  Foundation.

15              THE COURT:  No.  I will allow it.

16   Q.  Do you know the answer, Mr. Khorozian?

17   A.  No.

18              MR. RICHENTHAL:  No further questions.

19              MR. FEE:  Your Honor, I have one.

20              THE COURT:  Go ahead.

21              MR. FEE:  One.  Can we put up the B201-1A, please?

22   RECROSS EXAMINATION

23   BY MR. FEE:

24   Q.  You never saw Nadine line up two 1-kilo bars and a

25   one-ounce bar and take a picture; right?
```

1    A.  No.

2    Q.  You never saw her with a one-ounce bar in your shop or

3    anywhere else; right?

4    A.  Not in my shop.

5              MR. FEE:  Thank you, Mr. Khorozian.

6              MR. SOLANO:  Your Honor, I have one question to ask

7    based on redirect.

8              THE COURT:  All right, then the government can ask

9    one.

10   RECROSS EXAMINATION

11   BY MR. SOLANO:

12   Q.  Mr. Khorozian, Mr. Richenthal just asked you whether when

13   Mr. Hana purchased those 22 one-ounce gold bars he said to you

14   whether they were gifts and you said you never discussed that,

15   correct?

16   A.  No.

17   Q.  Based upon your interactions with Mr. Hana, did you

18   understand that on the other occasions in which he purchased

19   items and jewelry from your store, that those were gifts?

20             MR. RICHENTHAL:  Rule 405(b), your Honor.

21             MR. SOLANO:  He opened the door on redirect.

22             THE COURT:  Just a moment.

23             MR. RICHENTHAL:  And 404.  Principally Rule 405(b).

24             THE COURT:  I will allow it.

25             THE WITNESS:  Ask me again.  I forgot what you said.

 1  BY MR. SOLANO:

 2  Q.  Based on your interactions with Mr. Hana, was it your

 3  understanding that on the other occasions in which he purchased

 4  jewelry and other items from you, that those were gifts?

 5          THE COURT:  Do you know that they were gifts?

 6  A.  Of course.  Yes.

 7          MR. SOLANO:  Thank you, your Honor.  No further

 8  questions.

 9          THE COURT:  Anything?

10  REDIRECT EXAMINATION

11  BY MR. RICHENTHAL:

12  Q.  Do you remember my asking you whether two photographs had a

13  number one digit apart?

14  A.  Yes.

15  Q.  Did you ever see the first photograph I showed you that had

16  the number that was one digit different from the text message

17  you were on before --

18          MR. FEE:  Objection.

19          THE COURT:  I will allow it.

20  Q.  I will start again.

21      Mr. Khorozian --

22  A.  I remember you --

23          THE COURT:  Wait for the question.

24  Q.  Before preparing to testify, had you ever seen the

25  photograph that I showed you that was not the text message with

O6Q5men5

1    Mr. Edward Buy Gold.  Before you prepared to testify, had you

2    ever seen that photograph before?

3    A.  The photograph you shown me today?

4    Q.  I showed you two photographs, sir, one was text messages

5    with Edward Buy Gold?

6    A.  That I remember.

7    Q.  The other photograph I showed you, at the time that you

8    were buying and selling gold --

9    A.  Today?

10    Q.  Yes, the other photograph.

11    A.  You showed it to me to today?

12    Q.  Today, sir.

13    A.  Because you showed me other times.  I'm confused.

14    Q.  That is what I am asking.  Before you prepared to testify,

15    had you ever seen that other photograph before?

16    A.  The one in the blue?

17    Q.  I think it was blue.

18    A.  The one in the blue with mat, no.

19            THE COURT:  The answer is no.

20            MR. RICHENTHAL:  OK.  No further questions.

21            THE COURT:  You may step down, sir.  You are excused

22    Mr. Khorozian.  Thank you.

23            THE WITNESS:  Thank you, your Honor.

24            (Witness excused)

25            THE COURT:  Next witness for the government.

O6Q5men5

1          MR. MONTELEONI:  Prior to calling the government's

2     next witness, we have a number of stipulations and documents to

3     offer.

4          THE COURT:  All right.

5          MR. MONTELEONI:  So, first, the government offers the

6     stipulation Government Exhibit 1450, which authenticates

7     several documents that the government will then offer.

8          May I publish Government Exhibit 1450?

9          THE COURT:  Yes.

10         MR. MONTELEONI:  Ms. Wechsler, can you please put up

11    Government Exhibit 1450, and I will now read from paragraph 1:

12         On or about the following dates, grand jury subpoenas

13    from the Southern District of New York marked for

14    identification as the following government's exhibits were

15    served on the following individuals or entities (or counsel for

16    such).  And there are three different exhibits, I'm not going

17    to read them all out loud, but the first one is Government

18    Exhibit 11A-1 dated June 16, 2022, recipient Robert Menendez.

19         We offer Government's Exhibits 11A-1, 11B-1, and

20    11B-2, they are the ones referenced in the stipulation.

21         THE COURT:  Admitted.

22         (Government's Exhibits 11A-1, 11B-1, 11B-2 received in

23    evidence)

24         MR. MONTELEONI:  Ms. Wechsler, can you please briefly

25    publish Government Exhibit 11A-1?  Can you please turn now to

O6Q5men5

```
 1    page 2?  Can you please highlight the "to" line?  Can you
 2    please highlight the caption above that?  Can you please
 3    highlight the line above that?  And now can you please
 4    highlight the date above the signature?
 5              Now the government will offer another stipulation,
 6    Government Exhibit 1443, and with the Court's permission, if I
 7    can ask Ms. Wechsler to publish that while I read it?  I will
 8    now read paragraph 1:
 9              On or about the following date, grand jury subpoenas
10    from the Southern District of New York marked for
11    identification as the following government's exhibits were
12    served on the following individuals or entities (or counsel for
13    such).
14              Ms. Wechsler, if you could, now that you have
15    displayed the first page, if you could go take us to the second
16    page and display the remainder of the list?  I'm not going to
17    read that all out loud but now that the jury has had a chance
18    to see those, the government offers government exhibit, not
19    just 1443, but also the cited exhibits that are the subpoenas
20    listed here which is Government Exhibit 11A-2, 11A-3, 11A-4,
21    11B-3, 11C-1 through 11C-8, 11E-8 through 11E-14.
22              THE COURT:  Admitted, without objection.
23              (Government's Exhibits 11A-2, 11A-3, 11A-4, 11B-3,
24    11C-1 through 11C-8, 11E-8 through 11E-14 received in evidence)
25              MR. MONTELEONI:  The government offers Government
```

O6Q5men5

1    Exhibit 1458, and with the Court's permission, I would like to

2    publish it while I read from it.

3            THE COURT:  Yes.

4            MR. MONTELEONI:  Ms. Wechsler, if you can please put

5    you Government Exhibit 1458?

6            On or about the following dates, grand jury subpoena

7    from the Southern District of New York marked for

8    identification as the following government exhibit, was served

9    on the following entity (or counsel for such).

10            Government Exhibit 11A-5, November 22, 2022, the

11    office of Senator Robert Menendez.

12            We offer Government Exhibit 11A-5.

13            THE COURT:  Admitted.

14            (Government's Exhibit 11A-5 received in evidence)

15            MR. MONTELEONI:  The government offers and asks the

16    Court's permission to publish Government Exhibit 1409, another

17    stipulation.

18            THE COURT:  Yes.

19            MR. MONTELEONI:  Ms. Wechsler, if you can please put

20    that up?

21            Paragraph 1 reads:  The document marked for

22    identification as Government Exhibit 3B-2 is a true and

23    accurate copy of a record from Strategic International Business

24    Consultants, LLC; and then 2 -- if you can expand paragraph 2,

25    Ms. Wechsler, please?

O6Q5men5

1          All documents marked with the control numbers within

2     the following range consist of true and accurate copies of the

3     records produced by counsel for Nadine Menendez and Strategic

4     International Business Consultants in response to the grand

5     jury subpoenas marked for identification as Government's

6     Exhibits 11B-1, 11B-2, and 11B-3, and that range is

7     SDNY_R04_05966490 to SDNY_R04_05969677.

8          The government offers Government Exhibit 3B-2 as well

9     as 3B-1, which is marked with base numbers within the range I

10    just read, and Government Exhibit 3B-1C, which is a color

11    version of Government Exhibit 3B-1.

12          THE COURT:  Admitted.

13          (Government's Exhibits 1409, 3B-1, 3B-2, 3B-1C

14    received in evidence)

15          MR. MONTELEONI:  Ms. Wechsler, can you please put up

16    3B-1C?  Ms. Wechsler can you please highlight the name in the

17    top left corner of the check?  Can you please highlight the

18    date?  If you can highlight the name and the pay to the order

19    of?  Can you please highlight the amount?  Can you please

20    highlight the memo line?

21          Ms. Wechsler, can you please take us to page 2,

22    Government Exhibit 3B-1C?  Page 3?  Page 4?  Page 5?  And can

23    you please rotate it 90 degrees counterclockwise?  Can you

24    please highlight the amount?  Can you please highlight the memo

25    line?  Can you please highlight the signature line?

O6Q5men5

```
 1              Ms. Wechsler, can you please take us to page 6 of
 2     Government Exhibit 3B-1C?  Can you please rotate it 90 degrees
 3     counterclockwise?  Can you please highlight the name printed on
 4     the check?  And can you please highlight the name above that
 5     that is printed on the check?  Thank you.  And can you please
 6     highlight the amount?  Can you please highlight the memo line?
 7     Please take us to page 7?  Thank you.  Please take us to page
 8     8, Ms. Wechsler?  And page 9?  Can you please rotate it 90
 9     degrees counterclockwise?  Can you please highlight the pay to
10     the order of?  Can you please highlight the memo line?  You can
11     take that down, Ms. Wechsler.
12              The government offers Government Exhibit 1416, another
13     stipulation.
14              THE COURT:  Admitted.
15              (Government's Exhibit 1416 received in evidence)
16              MR. MONTELEONI:  Ms. Wechsler, can you publish, I will
17     now read paragraph 1 and 1B.
18              So 1 is:  If called as a witness at trial, a
19     representative of the New Jersey Department of Labor would
20     testify that -- skipping down to paragraph (b) -- during all
21     relevant years, New Jersey business corporations were required
22     to report to the New Jersey Department of Labor the wages paid
23     to their employees.
24              The government offers also Government Exhibit 8G-1,
25     which are New Jersey Department of Labor records related to
```

O6Q5men5

1    IS EG Halal Certified, Incorporated, referenced in the

2    stipulation.

3              THE COURT:  Admitted.

4              (Government's Exhibit 8G-1 received in evidence)

5              MR. MONTELEONI:  You can take that down, Ms. Wechsler.

6              The government now offers Government Exhibit 1417, a

7    stipulation authenticating records in the New Jersey Department

8    of Revenue, as well as New Jersey Department of Revenue records

9    that are Government Exhibit 8H-1A, relating to IS EG Halal

10   Certified; 8H-1B, relating to Kray SPE LLC; 8H-1C, relating to

11   EG Trade, Incorporated; 8H-1D, relating to Loundes Express,

12   LLC; 8H-1E, relating to Loundes Logistics, LLC; 8H-1F, relating

13   to Kray Plaza, LLC; 8H-2A, relating to Capital Management EG,

14   LLC; 8H-2B, relating to Medi Trade EG, Inc; and 8H-9, relating

15   to Strategic International Business Consultants, LLC.

16             THE COURT:  Admitted.

17             (Government's Exhibits 1417, 8H-1A, 8H-1B, 8H-1C,

18   8H-1D, 8H-1E, 8H-1F, 8H-2A, 8H-2B, 8H-9 received in evidence)

19             MR. MONTELEONI:  As well as Government's Exhibits 3C-3

20   through 3C-6, 3C-14 through 3C-19, and 3C-21.

21             THE COURT:  Admitted.

22             (Government's Exhibits 3C-3 through 3C-6, 3C-14

23   through 3C-19, and 3C-21 received in evidence)

24             MR. MONTELEONI:  The government now offers Government

25   Exhibit 1459, another stipulation.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6Q5men5

1           THE COURT:  Admitted.

2           (Government's Exhibit 1459 received in evidence)

3           MR. MONTELEONI:  Ms. Wechsler, if you can please put

4      up Government Exhibit 1459?

5           If called to testify as a witness, a custodian of

6      records for IS EG Halal Certified, Inc., would testify, as

7      follows.

8           (a), the custodian of records has performed a thorough

9      search of all files currently in the possession of IS EG Halal

10     Certified, Inc., and has been unable to locate (1) any files

11     specifically labeled as belonging to John Moldovan; (2) an

12     executed version of the promissory note between Wael Hana and

13     Nadine Arslanian; or (3) an executed version of the consulting

14     agreement between IS EG Halal Certified, Inc., and Strategic

15     International Business Consultants, LLC.

16          Now, the government will offer a set of stipulations

17     and associated --

18          I apologize.  My colleague informs me that I may I

19     need to offer again the following stipulations to make sure

20     that they are received:  Government Exhibit 1450, Government

21     Exhibit 1443, and Government Exhibit 1458.

22          THE COURT:  Admitted.

23          MR. MONTELEONI:  Thank you.

24          (Government's Exhibits 1450, 1443, 1458 received in

25     evidence)

O6Q5men5

1          MR. MONTELEONI:  The government will offer the

2   following stipulations and associated exhibits:  Government

3   Exhibit 1456 concerning translations; Government Exhibit

4   E116-T; Government Exhibit 1425, concerning USDA records; and

5   Government Exhibit 8B-22; Government Exhibit 1429, concerning

6   Google records; Government's Exhibits 7G-512 to 7G-515; 7G-601

7   through 7G-603, and 7G-900.

8          THE COURT:  Admitted.

9          (Government's Exhibits 1456, E116-T, 1425, 8B-22,

10  1429, 7G-512 to 7G-515, 7G-601 through 7G-603, and 7G-900

11  received in evidence)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O6qWmen6

1          MR. MONTELEONI:  The government offers the following

2     additional stipulations:

3          Government Exhibit 1433, regarding the UTC time

4     standard;

5          Government Exhibit 1455, also concerning translations;

6          Government Exhibit 1453, concerning Amazon records;

7          Government Exhibit 1452, concerning certain electronic

8     evidence; and

9          The government offers, pursuant to the stipulation

10    that's in evidence as Government Exhibit 1432, the following

11    government exhibits:  10G-2, 10G-3, 10G-5, 10H-5 and 10H-6.

12          THE COURT:  Admitted.

13          (Government Exhibits 1433, 1455, 1452, 1432, 10G-2,

14    10G-3, 10G-5, 10H-5 and 10H-6 received in evidence)

15          MR. MONTELEONI:  The government offers, pursuant to

16    stipulation, Government Exhibit 1405, which is in evidence, the

17    following government exhibits:  Government Exhibits 5A-5001,

18    5A-50011A and 5A-5001B.

19          The government then has a stipulation to read, so if

20    you could receive that.

21          THE COURT:  Admitted.

22          (Government Exhibits 1405, 5A-5001, 5A-50011A and

23    5A-5001B received in evidence)

24          MR. MONTELEONI:  Thank you.

25          The government now offers Government Exhibit 1454 and,

O6qWmen6

1    if admitted, will publish it.

2              THE COURT:  Admitted.

3              (Government Exhibit 1454 received in evidence)

4              MR. MONTELEONI:  Ms. Wechsler, if you could please

5    publish Government Exhibit 1454:

6              "1.  If called as a witness at trial, a representative

7    of Asahi Refining U.S.A. Inc. ('Asahi') would testify that:

8              "A.  Documents marked for identification as 7K-127 and

9    7K-204 are true and accurate records of Asahi."

10              I'll skip the remainder of that paragraph and go down

11    to paragraph B.

12              "As reflected in Government Exhibits 7K-127 and

13    7K-204, one-ounce Asahi gold bars with serial numbers A124801

14    through A124825 were packaged in box MBK0007318 on or about

15    March 26, 2021, and one-ounce Asahi gold bars with serial

16    numbers A125976 through A126000 were packaged in box MBK0007329

17    on or about March 31, 2021."

18              The government offers Government Exhibits 7K-127 and

19    7K-204.

20              THE COURT:  Admitted.

21              (Government Exhibits 7K-127 and 7K-204 received in

22    evidence)

23              MR. MONTELEONI:  The government now offers, pursuant

24    to a stipulation that's in evidence as Government Exhibit 1432,

25    Government Exhibits 10C-2, 10D-1, 10D-2, 10D-3 and 10D-4; and

1          Pursuant to Government Exhibit 1435, the following

2    government exhibits:  A103-17 through A103-20, A106, A107,

3    A111-PH29, A101-EX5, A112-PH, A113-6, A115-PH1, A115-PH3, A121,

4    A122, A123, A134, A135, A136, A302, A406, A412, A415, A417,

5    B105-22, B105-23, B119, B201-2 through 201-3, B201-6, B201-7,

6    B201-9, B201-13, B201-14, B201-16, B201-19, B201-23, B207-3,

7    B209-1 through B209-8, B209-25 through B209-27, B209-H, B209-I,

8    B213-5, B227, B231, B232-1, B232-2 through B232-5, B232-A,

9    B233, B302, B514, B522, B602, B605, C118-1, C118-1T, C207-14.

10   C211-1, C211-1T, C304, C305, C416, C418, C425, C427, C429, C502

11   through C505, C507, C514, D101-3, D101-6, D101-A, D102-12,

12   D106, D108, D301, D303, D306, D307, D314 through D320, D401,

13   E101-1, E101-13, E101-J, E104, E104, E104-A, E108-3, E109-1,

14   E109-2, E111, E118, E201, E202, E207-B, E502-1 through E502-44,

15   F110, F114, F126, F126-T, F126-A, G201, G202, G204, H101;

16          Pursuant to Government Exhibit 1428: 3A-5, 3A-14,

17   3A-15, 3A-16, 3A-18, 3A-19;

18          Pursuant to 1402:  3G-2, 3G-3, 3G-5 through 3G-7,

19   though 3G-7 not for the truth;

20          Pursuant to 1445:  4K-1;

21          Pursuant to 1405:  5B-2001, 5F-1802, 5I-107, 5I-503,

22   5I-605, 5I-606, 5I-15007, 5I-17007, 5I-17008, 5I-20002,

23   5I-20004, 5I-605, 5I-606;

24          Pursuant to 1420:  7E-2;

25          Pursuant to 1439:  7F-1, 7F-2, 7F-5, 7F-6, 7F-9

O6qWmen6

1    through 7F-11;

2            Pursuant to 1410:  4F-1 to 4F-27, 4F-19 through 4F-35;

3            Pursuant to 1434:  6A-100, 6A-200, 6A-300, 6A-400,

4    6A-500, 6A-600, 6A-900, 6A-1000, 6A-1100, 6A-1200, 6B-100,

5    6B-400, 6B-1300, 6B-1400, 6B-1900, 6B-2100, 6B-2300, 6B-2400,

6    6B-2500, 6C-100, 6C-200, 6C-400, 6C-500, 6C-600, 6C-700,

7    6C-800, 6C-900, 6C-1000, 6C-1100, 6C-1200, 6C-1300, 6C-1400,

8    6D-100, 6F-200, 6G-100, 6G-200, and 6H-100.

9            THE COURT:  How many more do you have, sir?  I

10   promised this jury they could go exactly at five tonight.

11           MR. MONTELEONI:  Absolutely.  If you could receive

12   these, I'll have two more things to read, which I could do

13   tomorrow in five minutes.

14           THE COURT:  All right.

15           All of those are admitted.

16           (Government Exhibits A103-17 through A103-20, A106,

17   A107, A111-PH29, A101-EX5, A112-PH, A113-6, A115-PH1, A115-PH3,

18   A121, A122, A123, A134, A135, A136, A302, A406, A412, A415,

19   A417, B105-22, B105-23, B119, B201-2 through B201-3, B201-6,

20   B201-7, B201-9, B201-13, B201-14, B201-16, B201-19, B201-23,

21   B207-3, B209-1 through B209-8, B209-25 through B209-27, B209-H,

22   B209-I, B213-5, B227, B231, B232-1, B232-2 through B232-5,

23   B232-A, B233, B302, B514, B522, B602, B605, C118-1, C118-1T,

24   C207-14.  C211-1, C211-1T, C304, C305, C416, C418, C425, C427,

25   C429, C502 through C505, C507, C514, D101-3, D101-6, D101-A,

O6qWmen6

1   D102-12, D106, D108, D301, D303, D306, D307, D314 through D320,

2   D401, E101-1, E101-13, E101-J, E104, E104, E104-A, E108-3,

3   E109-1, E109-2, E111, E118, E201, E202, E207-B, E502-1 through

4   E502-44, F110, F114, F126, F126-T, F126-A, G201, G202, G204,

5   H101, 3A-5, 3A-14, 3A-15, 3A-16, 3A-18, 3A-19, 3G-2, 3G-3, 3G-5

6   through 3G-7, not for the truth, 4K-1, 5B-2001, 5F-1802,

7   5I-107, 5I-503, 5I-605, 5I-606, 5I-15007, 5I-17007, 5I-17008,

8   5I-20002, 5I-20004, 7E-2, 7F-1, 7F-2, 7F-5, 7F-6, 7F-9 through

9   7F-11, 4F-1 to 4F-27, 4F-19 through 4F-35, 6A-100, 6A-200,

10  6A-300, 6A-400, 6A-500, 6A-600, 6A-900, 6A-1000, 6A-1100,

11  6A-1200, 6B-100, 6B-400, 6B-1300, 6B-1400, 6B-1900, 6B-2100,

12  6B-2300, 6B-2400, 6B-2500, 6C-100, 6C-200, 6C-400, 6C-500,

13  6C-600, 6C-700, 6C-800, 6C-900, 6C-1000, 6C-1100, 6C-1200,

14  6C-1300, 6C-1400, 6D-100, 6F-200, 6G-100, 6G-200, and 6H-100

15  received in evidence)

16          THE COURT:  You have five minutes left?  Do it.  You

17  have five minutes.

18          MR. MONTELEONI:  We offer Government Exhibits 1463 and

19  1466, two stipulations.

20          THE COURT:  Yes.

21          (Government Exhibits 1463 and 1466 received in

22  evidence)

23          MR. MONTELEONI:  Ms. Wechsler, if you could please

24  publish Government Exhibit 1463.

25          If it's not coming up on the screen, I can just read

O6qWmen6

1    it from my notes; it is agreed to:

2             "If called as a witness at trial, a representative of

3    Meta Platforms Inc. ('Meta') would testify that:

4             "A.  WhatsApp relies on metadata centers to transmit

5    calls and messages; and

6             "B.  Meta's servers are not located in New York, New

7    Jersey or Washington, D.C."

8             Now, Ms. Wechsler, if you could please publish

9    Government Exhibit 1466.

10            If called as a witness at trial -- I'll go from my

11   notes until 1466 comes up:

12            "If called as a witness at trial, a program analyst in

13   the FARA unit at the Department of Justice would testify that:

14            "A.  The United States Department of Justice maintains

15   a searchable public database of foreign agents who are

16   registered pursuant to the Foreign Agents Registration Act

17   ('FARA');

18            "B.  Searches of the public FARA database returned

19   negative results for Nadine Arslanian, Nadine Menendez,

20   Strategic International Business Consultants, Wael Hana, Will

21   Hana, IS EG Halal Certified Inc., Fred Daibes and Daibes

22   Enterprises indicating that the FARA unit has no records

23   indicating that the above individuals or entities ever

24   registered as foreign agents."

25            And the government asks to confirm that Government

O6qWmen6

1    Exhibits 1463 and 1466 are received.

2            THE COURT:  Admitted.

3            MR. MONTELEONI:  Thank you.

4            THE COURT:  That's it?

5            MR. MONTELEONI:  One or two things tomorrow, but

6    that's it for today.

7            THE COURT:  Ladies and gentlemen, you have had a full

8    day of testimony.  I appreciate your attention to the

9    testimony.  We'll pick it up tomorrow.  I can tell you that so

10   far we are on track to meet the targets that we gave you last

11   week.  Again, no guarantees.

12           See you tomorrow at 9:30.  You've been very prompt.  I

13   appreciate that.  9:30 tomorrow.

14           You have not heard all the evidence.  Keep an open

15   mind.  Don't discuss this matter.  Don't look at any of the

16   news media.

17           Enjoy the evening.

18           And if we can we'll take half a day on Friday, ending

19   about 1:30, if we're able to.

20           (Continued on next page)

21

22

23

24

25

O6qWmen6

```
 1              (Jury not present)
 2              THE COURT:  You may be seated.
 3              What are the evidentiary issues?
 4              MR. MONTELEONI:  So, I'm just trying to pull up the
 5     most recent correspondence that I've had with defense counsel.
 6              THE COURT:  Talk to each other.  Remember how to talk
 7     to each other?  If some have been resolved, so much the better.
 8     If you want me to do it tomorrow morning in order for you to
 9     continue talking, I'll do it tomorrow morning.
10              MR. MONTELEONI:  We can do it tomorrow morning.
11              THE COURT:  All right.
12              MR. MONTELEONI:  In light of the limited volume,
13     tomorrow morning would be perfect.
14              THE COURT:  All right.
15              There may be some objections.  Let's meet at 9:15
16     tomorrow.  All right?
17              9:15 tomorrow.  Enjoy the evening.
18              MS. POMERANTZ:  Your Honor, just very briefly?
19              THE COURT:  Yes, ma'am.
20              MS. POMERANTZ:  We expect, as we previewed, that we'll
21     be ending up filing some motions relating to some defense
22     witnesses and exhibits, but we will, of course, do so after
23     further conferring.
24              THE COURT:  Yes.  Obviously I'd like those as early as
25     possible, but by the same token, try to reduce it so that there
```

O6qWmen6

1   are fewer things that are given to the Court for resolution.

2   It's always preferable if the parties can agree amongst

3   themselves.

4           All right.  Thank you.

5           MS. POMERANTZ:  Thank you, your Honor.

6           THE COURT:  See you tomorrow at 9:15.

7           Government, we've got Ms. Kopplin next, is that it?

8           MR. RICHENTHAL:  Yes, your Honor.

9           THE COURT:  And then Mr. Wheeler.

10          MR. MONTELEONI:  Ms. Wheeler, Special Agent Wheeler.

11  And Megan --

12          THE COURT:  How long is Ms. Wheeler's direct?

13          MR. MONTELEONI:  An hour and a half or less.

14          THE COURT:  All right.  Thank you.

15          See you tomorrow.

16          (Adjourned to June 27, 2024, at 9:15 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2   Examination of:                            Page

 3   ISABELLA FUCHS

 4   Direct By Ms. Ghosh  . . . . . . . . . . .4921

 5   Cross By Mr. Fee . . . . . . . . . . . . .4946

 6   Redirect By Ms. Ghosh  . . . . . . . . . .4984

 7    VIKAS KHANNA

 8   Direct By Ms. Pomerantz  . . . . . . . . .4990

 9   Cross By Mr. De Castro . . . . . . . . . .5008

10   Cross By Mr. Weitzman  . . . . . . . . . .5024

11   Redirect By Ms. Pomerantz  . . . . . . . .5034

12   Recross By Mr. Weitzman  . . . . . . . . .5035

13    VASKEN KHOROZIAN

14   Direct By Mr. Richenthal . . . . . . . . .5063

15   Cross By Mr. Fee . . . . . . . . . . . . .5124

16   Cross By Mr. Solano  . . . . . . . . . . .5153

17   Cross By Mr. McManus . . . . . . . . . . .5158

18   Redirect By Mr. Richenthal . . . . . . . .5166

19   Recross By Mr. Fee . . . . . . . . . . . .5176

20   Recross By Mr. Solano  . . . . . . . . . .5177

21   Redirect By Mr. Richenthal . . . . . . . .5178

22                     GOVERNMENT EXHIBITS

23   Exhibit No.                            Received

24    1438    . . . . . . . . . . . . . . . .4923

25     1F-3142 through 1F-3144; 1F-4017  . . . . .4924
```

```
 1                through 1F-4019; 1F-6009

 2                through 1F-6015, 1F-7129

 3                through 1F-7137; 1F-8139

 4                through 1F-8140; 1F-9021

 5                through 1F-9024; 1F-10026

 6                through 1F-10028; 1F-11030

 7                through 1F-11061; 1F-12301

 8                through 1F-12331; 1F-13146

 9                through 1F-13299; 1F-14093

10                through 1F-14127; 1D-263

11                through 1D-291

12   1335A, 1335B, 1335C, 1335EX   . . . . . . . .4926

13   2B-11 through 2B-20   . . . . . . . . . . .5070

14   3L-1   . . . . . . . . . . . . . . . . . .5081

15   5A-5001C and 5I-603A  . . . . . . . . . . .5117

16   11A-1, 11B-1, 11B-2   . . . . . . . . . . .5180

17   11A-2, 11A-3, 11A-4, 11B-3, 11C-1 . . . . .5181

18                through 11C-8, 11E-8 through

19                11E-14

20   11A-5   . . . . . . . . . . . . . . . . . .5182

21   1409, 3B-1, 3B-2, 3B-1C   . . . . . . . . .5183

22   1416   . . . . . . . . . . . . . . . . . .5184

23   8G-1   . . . . . . . . . . . . . . . . . .5185

24   1417, 8H-1A, 8H-1B, 8H-1C,  8H-1D,  . . . .5185

25                8H-1E, 8H-1F, 8H-2A, 8H-2B,
```

```
 1              8H-9

 2   3C-3 through 3C-6, 3C-14 through 3C-19, . . .5185

 3              and 3C-21

 4   1459    . . . . . . . . . . . . . . . . .5186

 5   1450, 1443, 1458  . . . . . . . . . . . .5186

 6   1456, E116-T, 1425, 8B-22, 1429, 7G-512 . . .5187

 7              to 7G-515, 7G-601 through

 8              7G-603, and 7G-900

 9   1433, 1455, 1452, 1432, 10G-2, 10G-3, . . . .5188

10              10G-5, 10H-5 and 10H-6

11   1405, 5A-5001, 5A-50011A and 5A-5001B  . . .5188

12   1454    . . . . . . . . . . . . . . . . .5189

13   7K-127 and 7K-204   . . . . . . . . . . .5189

14   A103-17 through A103-20, A106, A107,  . . . .5191

15              A111-PH29, A101-EX5, A112-PH,

16              A113-6, A115-PH1, A115-PH3,

17              A121, A122, A123, A134, A135,

18              A136, A302, A406, A412, A415,

19              A417, B105-22, B105-23, B119,

20              B201-2 through B201-3, B201-6,

21              B201-7, B201-9, B201-13,

22              B201-14, B201-16, B201-19,

23              B201-23, B207-3, B209-1

24              through B209-8, B209-25

25              through B209-27,
```

1            B209-H, B209-I, B213-5, B227,

2            B231, B232-1, B232-2 through

3            B232-5, B232-A, B233, B302,

4            B514, B522, B602, B605,

5            C118-1, C118-1T, C207-14.

6            C211-1, C211-1T, C304, C305,

7            C416, C418, C425, C427, C429,

8            C502 through C505, C507, C514,

9            D101-3, D101-6, D101-A,

10            D102-12, D106, D108, D301,

11            D303, D306, D307, D314 through

12            D320, D401, E101-1, E101-13,

13            E101-J, E104, E104, E104-A,

14            E108-3, E109-1, E109-2, E111,

15            E118, E201, E202, E207-B,

16            E502-1 through E502-44, F110,

17            F114, F126, F126-T, F126-A,

18            G201, G202, G204, H101, 3A-5,

19            3A-14, 3A-15, 3A-16, 3A-18,

20            3A-19, 3G-2, 3G-3, 3G-5

21            through 3G-7, not for the

22            truth, 4K-1, 5B-2001, 5F-1802,

23            5I-107, 5I-503, 5I-605,

24            5I-606, 5I-15007, 5I-17007,

25            5I-17008, 5I-20002, 5I-20004,

```
 1                    7E-2, 7F-1, 7F-2, 7F-5, 7F-6,

 2                    7F-9 through 7F-11, 4F-1 to

 3                    4F-27, 4F-19 through 4F-35,

 4                    6A-100, 6A-200, 6A-300,

 5                    6A-400, 6A-500, 6A-600,

 6                    6A-900, 6A-1000, 6A-1100,

 7                    6A-1200, 6B-100, 6B-400,

 8                    6B-1300, 6B-1400, 6B-1900,

 9                    6B-2100, 6B-2300, 6B-2400,

10                    6B-2500, 6C-100, 6C-200,

11                    6C-400, 6C-500, 6C-600,

12                    6C-700, 6C-800, 6C-900,

13                    6C-1000, 6C-1100, 6C-1200,

14                    6C-1300, 6C-1400, 6D-100,

15                    6F-200, 6G-100, 6G-200, and

16                    6H-100

17      1463 and 1466   . . . . . . . . . . . . . .5192

18                        DEFENDANT EXHIBITS

19      Exhibit No.                          Received

20       172A through H, 172J, 172K  . . . . . . . .5155

21

22

23

24

25
```