O6S5men1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                         23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7              Defendants.
                                          Trial
8   ------------------------------x

9                                         New York, N.Y.
                                          June 28, 2024
10                                        9:40 a.m.

11

12  Before:

13                     HON. SIDNEY H. STEIN,

14                                        District Judge
15                                        -and a Jury-

16                     APPEARANCES

17  DAMIAN WILLIAMS
         United States Attorney for the
18       Southern District of New York
    BY:  PAUL M. MONTELEONI
19       DANIEL C. RICHENTHAL
         ELI J. MARK
20       LARA E. POMERANTZ
         CATHERINE E. GHOSH
21       Assistant United States Attorneys
         -and-
22       CHRISTINA A. CLARK
         National Security Division

23

24

25

O6S5men1

1

2                              APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4        Attorneys for Defendant Menendez
BY:  ADAM FEE
5        AVI WEITZMAN
         ROBERT D. LUSKIN
6        RITA FISHMAN

7

8

9  GIBBONS, P.C.
         Attorneys for Defendant Hana
10  BY:  LAWRENCE S. LUSTBERG
         ANNE M. COLLART
11       CHRISTINA LaBRUNO
         ANDREW J. MARINO
12       RICARDO SOLANO, Jr.
         ELENA CICOGNANI
13       JESSICA L. GUARRACINO

14

15  CESAR DE CASTRO
SETH H. AGATA
16  SHANNON M. McMANUS
         Attorneys for Defendant Daibes

17

18

Also Present:  Marwan Abdel-Rahman
19                 Bachar Alhalabi
                   Interpreters (Arabic)
20
                   Rachel Wechsler
21                 Connor Hamill
                   Braden Florczyk
22                 Paralegal Specialists, U.S. Attorney's Office

23                 Justin Kelly, DOAR

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  Please, be seated.

3          I have before me the Daibes request to introduce

4   evidence of specific instances of gift giving.  That is ECF 481

5   and 483.  Mr. Daibes first urges that the introduction of

6   specific acts of his generosity is permitted under Federal Rule

7   of Evidence 405(b) which permits admissible character traits to

8   be proved by "relevant specific instances" "when a person's

9   character or character trait is an essential element of a

10  charge claim or defense."  Here, the government must prove that

11  Daibes acted with a corrupt intent in order to prove he

12  committed bribery in violation of 18 U.S.C. 2001.

13         According to Daibes, the government lacks any direct

14  evidence of his intent and is asking the jury to infer corrupt

15  intent from the fact that he gave items of value to Nadine and

16  Menendez.  He urges that his character trait of generosity is

17  therefore an essential element of his defense as it supports

18  the alternative inference of non-corrupt intent.  I do not

19  agree with that position.

20         Rule 404(b)(1) prohibits evidence of prior acts "to

21  prove a person's character in order to show that on a

22  particular occasion, a person acted in accordance with the

23  character."  Here, Daibes is impermissibly attempting to

24  introduce examples of gifts he gave without expecting anything

25  in return in order to argue that when he gave cash and gold to

O6S5men1

1    Nadine and Menendez he was acting in accordance with the

2    character trait of generosity.  Not permitted.

3            Second, Daibes' generosity is not an essential element

4    of a defense pursuant to 405(b) because the government is not

5    required to prove that Daibes lacked generosity in order to

6    prove its case.

7            I find persuasive the Advisory Committee notes to

8    Rule 405(b), and explained in that note the admission of

9    specific acts character evidence as limited to "cases in which

10   character is, in the strict sense, an issue, and hence

11   deserving of the searching inquiry."  That, as I said, is from

12   the Advisory Committee note to 405.  At most, Daibes'

13   generosity is relevant to rebut an inference of his corrupt

14   intent but the Second Circuit has cautioned that "if specific

15   good deeds could be introduced to disprove intent or intention,

16   which are elements in most crimes, the exception to Rule 405(b)

17   would swallow the general rule of 405(a) that proof of specific

18   acts is not allowed."  *United States v. Doyle*, 130 F.3d 523,

19   542 (2d Cir. 1997).  Here, too, Daibes may not introduce

20   specific acts to disprove his intent pursuant to 405(b).  See

21   *United States v. Zodhiates*, 235 F.Supp. 3d 439, 452 (W.D.N.Y.

22   2017)

23            Finally, evidence of specific acts of gift giving

24   unrelated to the charged offenses is improper under 403 because

25   it is likely to waste time and mislead and confuse the jury

O6S5men1

about which items of value were provided in furtherance of the

alleged scheme and has low probative value.  The probative

value is outweighed by the danger of waste of time and

misleading and confusing the jury, substantially outweighed.

Daibes' alternative argument is that specific

instances of gift giving are admissible as habit evidence under

406, but Rule 406 applies to conduct that is "semi-automatic".

*United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011).

As an example, habit evidence involves a "person's regular

practice of meeting a particular kind of situation with a

specific type of conduct such as the habit of going down a

particular stairway two stairs at a time."  that's *Al Kassar* at

123.  And as we discussed yesterday, habit is punching a time

clock at 9:00 every morning or setting your alarm clock

religiously at 8:00 in the morning.  That is habit but this is

not.  This generosity is not habit.  Daibes' conduct here does

not fall within the scope of Rule 406.  Giving gifts of gold

bars and other items of value is not the sort of conduct that

is "semi-automatic" in nature.  Accordingly, evidence of

Daibes' specific acts is not permitted under Rule 406,

therefore Daibes' motion to introduce specific acts of gift

giving is denied.  The defense may, of course, present opinion

and reputation evidence supporting what it wishes to establish

as Daibes' reputation for generosity under 405(a).

That's my ruling.  I'm not sure, I may have misstated

O6S5men1

1    the test under 403, which I have done before.  I am excluding

2    the evidence because its probative value is substantially

3    outweighed by the danger of misleading the jury and wasting

4    time, undue delay, and unfair prejudice.

5            That's my ruling.  Let's bring this jury in and I will

6    give the instruction on the specific investigative techniques

7    as we decided yesterday.

8            Bring the jury in.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6S5men1

```
 1                  (Jury present)

 2                  THE COURT:  You may be seated.

 3                  Good morning, ladies and gentlemen.  Thank you for

 4       being here.  You may remember yesterday you heard testimony

 5       from an expert on cell site location evidence.  I am reminding

 6       you -- and I have told you this before in this trial -- that

 7       you can consider the testimony about that the government either

 8       used or didn't use certain investigative techniques.  Do you

 9       remember that testimony in regard to this cross-examination of

10       the expert witness?  You can consider testimony and these facts

11       in deciding whether the government has met its burden of proof

12       because you have to look to all of the evidence or lack of

13       evidence when you decide whether each defendant is guilty of

14       the charges against that defendant.  But I also instruct you,

15       as you know, that there is no legal requirement that the

16       government use any specific investigative technique to prove

17       its case.  The government is not on trial here.  Law

18       enforcement techniques are not your concern.  Your concern is

19       simply to determine whether or not, on the basis of all the

20       evidence that you accept or the lack of evidence, each

21       defendant's guilt has been proven beyond a reasonable doubt.

22                  Thank you.

23                  Call your next witness.

24                  MR. MONTELEONI:  We have a very small number of

25       documents to put into evidence first.
```

O6S5men1

1          THE COURT:  All right.  I think that's the second or

2     third time you have told me that, Mr. Monteleoni, so you can

3     remind me rather than say, call the next witness, that you are

4     going to do that, proceed.

5          MR. MONTELEONI:  It is smaller this time.

6          MS. GHOSH:  Your Honor, just one moment.  The witness

7     has been brought in.

8          THE COURT:  The witness can take the stand.  Thank

9     you.

10          I don't mean to call you the witness, we will find out

11     your name shortly.

12          Proceed.

13          MR. MONTELEONI:  Thank you.

14          First, we would, pursuant to stipulation that is in

15     evidence as Government Exhibit 1435, we offer Government's

16     Exhibits A101-105, that is one exhibit, and E117, as well as

17     the stipulations that are Government's Exhibits 1410 and 1451.

18          THE COURT:  Those are admitted into evidence, without

19     objection.

20          (Government's Exhibits A101-105, E117, 1410, 1451

21     received in evidence)

22          MR. MONTELEONI:  Mr. Hamill, can you please put up the

23     stipulation that is in evidence as Government Exhibit 1432 and

24     take us to page 3?

25          I will now read from Government Exhibit 1432,

1  paragraph 8.  This is a portion of the paragraph:  The

2  documents marked for identification as the following

3  government's exhibits consist of true and accurate copies of

4  letters and press releases from the Senate website of Robert

5  Menendez, publicly issued on the approximate dates below, and

6  that refers to Government Exhibit 10C-2 on May 19, 2020.

7          Mr. Hamill, can you please scroll us to the bottom of

8  page 3, top of page 4?

9          I will now read paragraph 9:  Documents marked for

10 identification as the following government's exhibits consist

11 of true and accurate copies of letters and press releases from

12 the Senate Foreign Relations Committee publicly issued on the

13 approximate dates below.  Then it lists Government's

14 Exhibits 10D-1 through 10D-4 on dates in May of 2020 and May of

15 2022.

16         The government offers Government's Exhibits 10C-2,

17 10D-1, 10D-2, 10D-3, 10D-4.

18         THE COURT:  Admitted.

19         (Government's Exhibits 10C-2, 10D-1, 10D-2, 10D-3,

20 10D-4 received in evidence)

21         MR. MONTELEONI:  Mr. Hamill, can you publish

22 Government Exhibit 10C-2?  Can you please highlight the large

23 boldface blue title lines under the date?  Now, Mr. Hamill, can

24 you please publish Government Exhibit 10D-1?  Can you please

25 highlight and expand the first paragraph under the salutation?

O6S5men1

1    Could you please take us to page 2 of Government Exhibit 10D-1?

2    Can you please highlight the first full paragraph?  Can you

3    please highlight the second full paragraph?  And then can you

4    please highlight the signature block?

5            Now, Mr. Hamill, can you please publish Government

6    Exhibit 10D-4?  Can you please, without expanding it, can you

7    please, just highlight in yellow, the large bold title under

8    the date?

9            Can you please publish Government Exhibit 10D-3?

10    Please highlight in yellow, without expanding, the first

11    paragraph?  Can you please highlight, in yellow, without

12    expanding, the second full paragraph?  Can you please publish

13    the second page?  Can you please highlight the second to last

14    paragraph?  Next one down.  Sorry.  And can you please

15    highlight the signature block?  You can take that down

16    Mr. Hamill.  Thank you.

17            MS. GHOSH:  Your Honor, the government calls Megan

18    Rafferty.

19    MEGAN RAFFERTY,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22            THE DEPUTY CLERK:  Please state your full name and

23    spell your whole name for the record.

24            THE WITNESS:  Sure.  Megan Rafferty.  M-E-G-A-N

25    R-A-F-F-E-R-T-Y.

1          THE COURT:  Good morning, Ms. Rafferty.

2          THE WITNESS:  Good morning.

3          THE COURT:  Welcome.

4          Your witness, Ms. Ghosh.

5          MS. GHOSH:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MS. GHOSH:

8    Q.  Good morning, Ms. Rafferty.

9    A.  Good morning.

10   Q.  Where do you work?

11   A.  The Federal Bureau of Investigation.

12   Q.  What is your title at the FBI?

13   A.  I'm a forensic accountant.

14   Q.  What does that position entail?

15   A.  I review bank records and financial documents and I

16   summarize the data within them.

17   Q.  What's your educational background?

18   A.  I have a masters in accounting from you Rider University.

19   Q.  How long have you been at the FBI?

20   A.  A little over four years.

21   Q.  Where did you work before joining the FBI?

22   A.  The New York State Office of the Attorney General.

23   Q.  What did you do there?

24   A.  A similar job title.  I was a special auditor/investigator,

25   forensic accountant.

1   Q.  How long were you there?

2   A.  Just under four years.

3   Q.  Turning to this case, at a high level, what were you asked

4   to do in connection with this case?

5   A.  I was asked to review bank records and other charts.

6   Q.  What, if any role, did you have in the investigation that

7   led up to those projects?

8   A.  I had no role.

9           MS. GHOSH:  Mr. Hamill, could we put up for just the

10  witness what's been marked for identification as Government

11  Exhibit 1336?

12  Q.  Ms. Rafferty, generally, what is this?

13  A.  So this is a chart summarizing cash withdrawals from a

14  federal credit union account.

15  Q.  In whose name is the accountant?

16  A.  Robert Menendez.

17  Q.  Did you create this chart?

18  A.  I did.

19  Q.  And what type of document is it based on?

20  A.  It's based off of bank records.

21  Q.  Were those bank records voluminous?

22  A.  They were.

23  Q.  Does this chart contain a summary of portions of those bank

24  records?

25  A.  It does.

O6S5men1                        Rafferty - Direct

1          MS. GHOSH:  The government offers Government's

2   Exhibits 5H-102, pursuant to stipulation 1405, and Government

3   Exhibit 1336.

4          THE COURT:  Admitted.

5          (Government's Exhibits 5H-102, 1405, 1336 received in

6   evidence)

7          MS. GHOSH:  Mr. Hamill, can we publish Government

8   Exhibit 1336 for the jury?

9   BY MS. GHOSH:

10  Q.  Ms. Rafferty, you mentioned you reviewed certain bank

11  records for Robert Menendez in creating this chart; is that

12  right?

13  A.  Yes.

14  Q.  And from which bank?

15  A.  The Senate Federal Credit Union.

16  Q.  What time frame did you review records for?

17  A.  January 1, 2016, to June 16, 2022.

18  Q.  Did you choose which bank records to review or were they

19  provided to you?

20  A.  They were provided to me.

21  Q.  By who?

22  A.  The U.S. Attorney's office.

23  Q.  Did you choose what time period of records to review?

24  A.  I did not.

25  Q.  What types of transactions does this chart show?

1  A.  So this chart summarizes cash withdrawals out of the

2  account ending in 8151 which included a checking portion and a

3  savings portion.

4  Q.  Now, to be clear, were there other types of transactions in

5  the bank records that you reviewed for this account?

6  A.  There were.

7  Q.  Were there other types of disbursements besides cash

8  withdrawals?

9  A.  There were.

10 Q.  And what is a disbursement?

11 A.  A disbursement is any amount of funds that comes out of the

12 bank account.

13 Q.  Any type of withdrawal?

14 A.  Yes.

15 Q.  Were there also deposits into the account?

16 A.  There were.

17 Q.  I would like to briefly walk through what this chart

18 includes.  What does this oh the first column, which is called

19 Year, indicate?

20 A.  That indicates the year of the withdrawals.

21 Q.  And 2022 in the bottom row only goes through June 16, 2022.

22 Was that your decision or was that a date that you were asked

23 to use?

24 A.  That was the date that I was asked to use.

25 Q.  What does the second column, which is called Number Cash

O6S5men1                              Rafferty - Direct

1    Withdrawals, show?

2    A.   That shows the quantity of cash withdrawals made in that

3    given year.

4    Q.   Setting aside 2022, because that wasn't a full year, what

5    is the range of the number of cash withdrawals over these years

6    in this chart?

7    A.   Between 26 and 44.

8    Q.   Is that approximately every one to two weeks?

9    A.   Yes.

10   Q.   What does the third column in this chart show?

11   A.   That shows the minimum cash withdrawal made that year.

12   Q.   What does the fourth column show?

13   A.   The maximum cash withdrawal made during that year.

14   Q.   Between June 2016 and July 2022, what was the maximum cash

15   withdrawal?

16   A.   I'm sorry.  What?

17   Q.   Between 2016 and June 2022, the time period covered in this

18   chart, what was the maximum cash withdrawal in any of those

19   years?

20   A.   $665.96.

21   Q.   Now, if these are cash withdrawals, why isn't that a round

22   number?

23   A.   So, in this case this was a cash withdrawal that was made

24   overseas and so it reflects the amount of the cash that was

25   withdrawn in the local currency but reflected in the U.S.

1    dollar value at that date.

2    Q.  Do you recall where that was made overseas?

3    A.  It was in Greece.

4    Q.  Turning now to the fifth column, what does that column

5    show, Average Cash Withdrawal?

6    A.  That is the average cash withdrawal made for the year.

7    Q.  What is the approximate range of the average cash

8    withdrawals?

9    A.  $359.23 up to $426.12.

10   Q.  And now the last column, what does that show?

11   A.  That is the total amount of cash withdrawals made during

12   that year.

13   Q.  Of the years on this chart, what year had the highest

14   amount of cash withdrawals?

15   A.  2017.

16   Q.  And how much was withdrawn in cash that year?

17   A.  $17,950.

18   Q.  Over the six and a half year time span in this chart, how

19   much, in total, was withdrawn in cash from this account?

20   A.  $86,947.58.

21   Q.  Let's take that down and turn to a new chart.

22            MS. GHOSH:  Can we please put up for just the witness

23   what has been marked for identification Government Exhibit

24   1342?

25   Q.  Ms. Rafferty, generally, what is this?

1   A.  So, this is a chart -- two charts, actually, summarizing

2   account activity within the M&T bank account ending in 7473.

3   Q.  And whose name was that account in?

4   A.  Robert Menendez.

5   Q.  Did you create this chart?

6   A.  I did.

7   Q.  What type of documents is it based on?

8   A.  It is based off of bank records and Schedule Es that were

9   attached to his tax returns.

10  Q.  You mentioned bank records.  Were those bank records

11  voluminous?

12  A.  They were.

13  Q.  And does this chart contain a summary of those bank records

14  and information from the Schedule Es?

15  A.  It does.

16          MS. GHOSH:  The government offers Government's

17  Exhibits 5N-1004 through 5N 1232 and 5N-2001 through 5N-2062,

18  pursuant to stipulation 1405, as well as 8I-4A through 8I-8A,

19  pursuant to stipulation 1436, and Government Exhibit 1342.

20          THE COURT:  Admitted, without objection.

21          (Government's Exhibits 5N-1004 through 5N-1232,

22  5N-2001 through 5N-2062, 1405, 8I-4A through 8I-8A, 1436, 1342

23  received in evidence)

24          MS. GHOSH:  Can we please publish Government Exhibit

25  1342 for the jury?

1    BY MS. GHOSH:

2    Q.   So now that the jury can see this chart, you mentioned that

3    this was based on Robert Menendez' bank records?

4    A.   Yes.

5    Q.   From which bank?

6    A.   M&T Bank.

7    Q.   And for what time frame did you review those bank records

8    for this chart?

9    A.   January 1, 2018 to June 30, 2022.

10   Q.   Let's discuss what each row shows in the top chart first.

11   Starting with the top row, which refers to certain government's

12   exhibits and then states cash into M&T 7473; what does that row

13   show?

14   A.   That is the amount of cash that was deposited into this

15   account during that year.

16   Q.   Are you able to tell from the bank records where or whom

17   the cash came from?

18   A.   No.

19   Q.   What does the second row, which states checks into M&T

20   7473, show?

21   A.   That shows the checks that were deposited into the account

22   during that year.

23   Q.   Did you review the checks that are included in that row?

24   A.   I did.

25   Q.   Did some of them have information written in the memo field

1    on the check?

2    A.  Yes.

3    Q.  Generally, what types of descriptions were listed there

4    when the memo line was filled out?

5    A.  It could be as generic as rent or just an apartment number,

6    sometimes rent for a specific apartment number and sometimes no

7    memo at all.

8    Q.  What does the third row in this chart show?

9    A.  That shows deposits made into the account for which backup

10    documentation wasn't provided by the bank.  They could be cash,

11    check.  I just didn't have the backup.

12    Q.  What does backup mean in this context?

13    A.  So, in a bank record your statement will just show that

14    there was a deposit made into the account on a specific day but

15    then the banks also provide us backup documentation of what was

16    included in that deposit.  For example, if you deposit a check

17    or a series of checks, we will get copies of those checks so we

18    can see where that money came from, whereas if it was cash

19    deposited in the account we will just see a credit in or some

20    sort of receipt from the bank showing that there was cash

21    deposited into the account that day.

22    Q.  So in this instance in 2018 there was a transaction listed

23    in the bank records but you are just not able to determine if

24    it was cash, or check, or something else?

25    A.  Correct.

1    Q.   The next row is bolded and states Total Into M&T 7473.

2    What does that row show?

3    A.   That row shows the total amount of deposits into the

4    account during that year.

5    Q.   Is that all types of deposits?

6    A.   Yes.

7    Q.   Looking now at the last row in that top chart, that row

8    refers to a different set of government's exhibits.   What

9    documents did you use to fill out that row?

10   A.   The Schedule Es.

11   Q.   What is a Schedule E?

12   A.   A Schedule E summarizes income from rental properties for

13   your tax documents.

14   Q.   Where is a Schedule E found?

15   A.   It is usually attached to your tax return for the year.

16   Q.   Based on the Schedule Es -- just to back up.   Whose

17   Schedule Es did you review for this?

18   A.   Robert Menendez'.

19   Q.   Based on those Schedule Es that you reviewed, what type of

20   information is listed in this last row of this chart?

21   A.   That is the total amount of reported rent received for that

22   year that was listed on the Schedule E.

23   Q.   Reported rent received?   Is that what you said?

24   A.   Yes.

25   Q.   How does that amount from the Schedule E compare to the

1   total amount of deposits into the M&T account for 2018 through

2   2021?

3   A.  They match.

4   Q.  So the reported rental income in a tax return Schedule E is

5   the same as the total of the cash and checks deposited into the

6   M&T account during that time frame?

7   A.  It is.

8   Q.  Looking at the last row for the year 2022, there is an

9   asterisk next to the Schedule E amount for that year.  Why is

10  that?

11  A.  So that's because the amount reported on the Schedule E is

12  a singular number encompassing the entire year, and so in order

13  to estimate what that amount would be halfway through the year

14  stopping at June 30th of the year 2022, I just took that number

15  and I divided it in half which creates a $150 difference

16  between the actual deposits in the M&T account and the amount

17  that I estimated based off of 2022's number on the Schedule E.

18  Q.  Let's now look at the bottom chart of Government Exhibit

19  1342.  What does this chart show?

20  A.  This shows the cash withdrawals made from the M&T Bank

21  account.

22  Q.  How many cash withdrawals out of the M&T account were there

23  between 2018 and June 2022?

24  A.  One.

25  Q.  How much was it?

1    A.  $500.

2    Q.  To be clear, were there certain disbursements in other

3    years?

4    A.  There were disbursements, yes.

5    Q.  But only one cash withdrawal from the account?

6    A.  Yes.

7           MS. GHOSH:  We can take down that chart and put up a

8    new one.  Can we please put up, just for the witness, what has

9    been marked for identification Government Exhibit 1341?

10   Q.  Ms. Rafferty, generally, what is this?

11   A.  So this chart summarizes account activity in a Chase

12   checking account.

13   Q.  Did you create this chart?

14   A.  I did.

15   Q.  What type of documents is it based on?

16   A.  Bank records.

17   Q.  Were those bank records voluminous?

18   A.  They were.

19   Q.  Does this chart contain a summary of those bank records?

20   A.  It does.

21          MS. GHOSH:  The government offers Government Exhibits

22   5F-902, 5F-607, and Government Exhibit 1341.

23          THE COURT:  Admitted.

24          (Government's Exhibits 5F-902, 5F-607, 1341 received

25   in evidence)

1      MS. GHOSH:  Can we please publish Government Exhibit

2  1341 for the jury?

3  BY MS. GHOSH:

4  Q.  Now that we have it up, whose bank records are summarized

5  in this chart?

6  A.  Nadine Arslanian, also known as Nadine Menendez.

7  Q.  From which bank?

8  A.  JP Morgan Chase.

9  Q.  And what are the last four digits of the account number?

10  A.  8431.

11      MS. GHOSH:  Mr. Hamill, can we pull up for just a

12  moment Government's Exhibits 1F-1265 and 1F-1266?  And could we

13  zoom in on the four money bands in the top row of 1266?  Can

14  you zoom in a little more so we can see them a bit closer?

15  Q.  Ms. Rafferty, are you able to see what bank is listed on

16  those four money bands?

17  A.  Yes.  It is Chase Bank.  This one shown on the bank.

18      THE COURT:  It says JP Morgan Chase Bank N.A.?

19  A.  It does.

20      MS. GHOSH:  Can we zoom back in on the four money

21  bands?

22  Q.  And what bank is listed on these?

23  A.  Again, JP Morgan Chase Bank N.A..

24  Q.  And can we look at the last one?  Thank you.

25  A.  JP Morgan Chase, and it is cut off.

1  Q.  And if we could just zoom in on the four together, are you

2  able to see what year is listed on those money bands?

3  A.  Three of them show 2022.

4  Q.  And is the fourth one -- does the fourth one have a

5  different year or are you unable to see the year?

6  A.  I can't see the year.

7          MS. GHOSH:  We can take those down.

8          I would now like to read from a stipulation that is

9  marked for identification as Government Exhibit 1461, related

10  to JP Morgan Chase.  First, the government offers Government

11  Exhibit 1461.

12          THE COURT:  Admitted.

13          (Government's Exhibit 1461 received in evidence)

14          MS. GHOSH:  Can we put this up for everyone and zoom

15  in on paragraph 1?  And I will read from paragraphs A through D

16  if we are able to get all of those up at once.  Thank you.

17          If calls as a witness at trial, a representative of

18  JP Morgan Chase bank (JPMC) would testify that:

19          A good faith search was performed for all JPMC

20  accounts open in 2022 of which Nadine Arslanian, a/k/a Nadine

21  Menendez, was a signatory.

22          The search revealed two depository accounts (1) a

23  checking account in the name Nadine Arslanian, ending in 8431,

24  which was closed on or about January 6, 2022; and (2) a Chase

25  college checking account in the names Sabine Arslanian and

1    Nadine Arslanian ending in 6195.

2            The search also revealed a JPMC debit card ending in

3    0184 that was linked to the Nadine Arslanian JPMC checking

4    account ending in 8431, and closed at the same time on or about

5    January 6, 2022.

6            No other JPMC accounts open as of 2022 were identified

7    for Nadine Arslanian a/k/a Nadine Menendez.

8            We can take that down and go back to the chart

9    Government Exhibit 1341, please.

10   Q.  Ms. Rafferty, the stipulation I just read referred to a

11   signatory.  What is a signatory of a bank account?

12   A.  A signatory is the person who is associated with that bank

13   account.  There could be one or multiple on an account, and

14   those are the individuals authorized to make withdrawals from

15   the account.

16   Q.  In the chart 1341, what are the last four digits of the

17   account?

18   A.  8431.

19   Q.  Is that one of the accounts referenced in the stipulation

20   that we just read?

21   A.  It is.

22   Q.  When was this account opened?

23   A.  June 2 of 2010.

24   Q.  And when was the account closed?

25   A.  January 6 of 2022.

O6S5men1                    Rafferty - Direct

1   Q.  For what time frame did you review bank records for this

2   account?

3   A.  I reviewed January 1, 2016, to the account's closure in

4   January of 2022.

5   Q.  During that period, were there any cash withdrawals?

6   A.  There were.

7   Q.  How many?

8   A.  Two.

9   Q.  How much in total?

10  A.  $777.09.

11  Q.  Setting aside just cash, how much money, in total, was

12  disbursed or taken out of the account between 2016 and the time

13  it closed?

14  A.  $9,530.95.

15  Q.  What was the average disbursement from this account?

16  A.  $11.61.

17          MS. GHOSH:  If we could pull up Government Exhibit

18  1461 again for a moment and go to paragraph 1(e)?

19          Reading again from the stipulation:  A good faith

20  search was performed for all JPMC accounts between 2016 and

21  June 2022 of which Robert Menendez was a signatory.  Credit

22  card accounts ending in 5383, 6967, 6126, 4669, and 7491 were

23  the only accounts identified during that time frame.

24  Q.  Ms. Rafferty, did you review records for those five credit

25  card accounts of which Robert Menendez was a signatory?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6S5men1                        Rafferty - Direct

1    A.  I did.

2    Q.  And what were you looking for in those records?

3    A.  I was looking for cash advances over $10,000.

4    Q.  What is a cash advance on a credit card?

5    A.  A cash advance allows you to borrow cash from the line of

6    credit on your credit card, usually at a higher interest rate

7    than what your interest rate is for the credit card itself.

8    Q.  During 2022, were there any cash advances of $10,000 or

9    more?

10   A.  No.

11   Q.  Were there any cash advances at all in 2022?

12   A.  No.

13   Q.  What about in the prior years, were there any cash advances

14   of $10,000 in any of the records you reviewed?

15   A.  No.

16   Q.  Did you see any cash advances at all?

17   A.  No.

18   Q.  Before we move on to a new chart, the stipulation that I

19   read a few minutes ago mentioned an account held in the name of

20   Sabine Arslanian and Nadine Arslanian.  Did you review records

21   related to that account?

22   A.  I did.

23   Q.  What kind of account was that?

24   A.  It was a Chase college checking account.

25   Q.  Were you able to determine from the records you reviewed

1   approximately how old Sabine was when the account was opened?

2   A.  She was around 18 years old.

3   Q.  Were there any cash withdrawals of $10,000 or more in 2022

4   from that college checking account?

5   A.  No.

6   Q.  Were there any cash withdrawals of $10,000 in any year?

7   A.  No.

8          MS. GHOSH:  I would like to turn now to a new chart.

9   Can we please put up for just the witness what has been marked

10  for identification as Government Exhibit 1338?

11  Q.  Ms. Rafferty, generally, what is this?

12  A.  This is a chart I was asked to review.

13  Q.  Did you create the chart?

14  A.  No.

15  Q.  Who did?

16  A.  The U.S. Attorney's office.

17  Q.  Did you verify that the chart accurately summarizes

18  portions of the sources that are listed on the chart?

19  A.  I did.

20  Q.  And generally, what types of sources did you use to verify

21  the chart?

22  A.  Government's exhibits and photos.

23  Q.  Were some of those sources voluminous?

24  A.  Yes.

25         MS. GHOSH:  Government offers Government Exhibit 1338.

1              THE COURT:  Admitted.

2              (Government's Exhibit 1338 received in evidence)

3              MS. GHOSH:  Can we publish this for the jury?  Let's

4    zoom in on the first few rows.  Thank you.  Perfect.

5    BY MS. GHOSH:

6    Q.  Ms. Rafferty, generally, what type of item did each row in

7    this chart relate to?

8    A.  Cash.

9    Q.  And is it envelopes of cash?

10   A.  Yes.

11   Q.  How many rows of envelopes are in this cart?

12   A.  Can we scroll down?  10.

13             MS. GHOSH:  Let's look at the headings, if we can go

14   back up to the top?  Thank you.

15   Q.  Starting with the second and third columns that are titled

16   Envelope and Cash GX and Location; first, what sources did you

17   review to verify the information in those rows?

18   A.  Government's Exhibits 1301 and 1437.

19             MS. GHOSH:  Can we put up, side by side, Government

20   Exhibit 1301 for a moment?

21   Q.  Is this one of those sources that you mentioned?

22   A.  Yes.

23   Q.  Do you have any independent knowledge regarding the

24   location of the envelope?

25   A.  No.

1            MS. GHOSH:  And you also mentioned -- we can take down

2    1301.  Thank you.

3    Q.  You also mentioned 1437.  Is that a stipulation?

4    A.  Yes.

5    Q.  The next two columns are called Photo and Description and

6    Contents of Envelope.  Can you please read the entry under the

7    photo and description column in row 1?

8    A.  TD Bank envelope with $10,000 written on the flap.

9    Q.  Is there a source cited next to that?

10   A.  Yes; Government Exhibit 1F-1275.

11   Q.  Do you see a source listed in the contents of envelope,

12   above the contents of envelope photo as well?

13   A.  Yes.  That's Government Exhibit 1F-1276.

14   Q.  Are those sources the sources of the photographs cited in

15   those columns of the chart?

16   A.  Yes.

17   Q.  And is that the case for the other rows as well?

18   A.  Yes.

19            MS. GHOSH:  Mr. Hamill, can we please bring up 1F-1275

20   side by side with this chart?

21   Q.  Now, Ms. Rafferty, do you see two envelopes in 1F-1275 that

22   we just brought up?

23   A.  I do.

24   Q.  Does the information in row 1 of the chart 1338 relate to

25   both envelopes or just to the TD Bank envelope in the jacket

O6S5men1                          Rafferty - Direct

1   pocket that is described in the fourth column of the chart?

2   A.  Just the TD Bank envelope.

3   Q.  Is that the same for other 1Bs in this chart that may

4   contain one envelope, that the information is the chart is

5   specific to the envelope shown in the fourth column?

6   A.  Yes.

7           MS. GHOSH:  You can take down 1F-127 5.  Let's go to

8   the next column fingerprints and DNA.

9   Q.  What sources did you use to verify the information in those

10  columns?

11  A.  Government's Exhibits 1334 and 16B-3.

12          MS. GHOSH:  Can we bring up Government Exhibit 1334 on

13  the side for just a moment?

14  Q.  Was this one of those sources that you used?

15  A.  It was.

16          MS. GHOSH:  We can take down 1334.

17  Q.  Ms. Rafferty, do you have any independent knowledge of any

18  DNA or fingerprint analyses?

19  A.  No.

20  Q.  For the envelopes in this chart, 1338, which individuals

21  are listed in the fingerprint and DNA columns?

22  A.  Fred Daibes, Johnathan Pilot, and Robert Menendez.

23  Q.  Is Fred Daibes listed in one of those columns for each row

24  in this chart?

25  A.  Yes.

1  Q.  Looking now at the second to last column, dollar amount,

2  what does this column show?

3  A.  That shows the amount of cash that was in the envelope

4  pictured in the fourth column.

5  Q.  What general sources -- excuse me.

6      First, is that the amount of money in the specific envelope

7  with Fred Daibes' prints or DNA?

8  A.  Yes.

9  Q.  What general sources did you use to confirm the amount of

10  money in each of those specific envelopes?

11  A.  Government Exhibit 1301, photos that were provided that are

12  also government's exhibits, and then there was also a

13  transcript as well.

14  Q.  Are all those sources cited in this chart?

15  A.  They are.

16      MS. GHOSH:  As an example, can we zoom in on row four,

17  please, an envelope from Room C (closet) with prints from

18  Daibes on tape and prints from Robert Menendez on envelope.

19  Q.  Looking at the cell with the photo of the envelope, what

20  amount was written on the envelope?

21  A.  $10,000.

22  Q.  And looking at the second to last column, dollar amount,

23  how much money was in that envelope?

24  A.  $5,300.

25      MS. GHOSH:  We can zoom back out of that and return to

1    the full chart.

2    Q.    Looking now at the last column, Latest Identified $100 bill

3    Payout Date.    What type of information is included in this

4    column?

5    A.    So that's a bill that was within that envelope that was

6    issued within February 2018 or later, print to circulation, and

7    so that bill is the most recently put bill in circulation from

8    the envelope.

9    Q.    What sources did you use to verify that information in your

10   chart?

11   A.    Government Exhibit 5G-300 and Government Exhibit 1335.

12   Q.    Now, how many bills are listed in this latest identified

13   payout date column per row?

14   A.    Just one.

15   Q.    Are the bills listed here necessarily the only bills paid

16   out on the dates listed here or examples?

17   A.    Just examples.

18   Q.    Based on the materials you reviewed, were there some

19   envelopes for which only some or a few of the serial numbers on

20   bills were visible?

21   A.    Yes.

22   Q.    Taking the first row as an example, what is the payout date

23   listed in the last column of this chart?

24   A.    October 21, 2020.

25   Q.    So based on your review of the source documents, is that

 1  the payout date of at least one bill in the TD Bank envelope in

 2  row one?

 3  A.  Yes.

 4  Q.  If we could look through the dates listed in rows 1 through

 5  7 of this chart, what is the earliest payout date listed for

 6  any of these rows?

 7  A.  Can you scroll up a little bit more, please?  August 24,

 8  2020, row 4.

 9  Q.  Does that mean that all of the envelopes in rows 1 through

10  7 contain at least one bill that was paid out in August 2020 or

11  later?

12  A.  Yes.

13  Q.  Turn to page 2 of Government Exhibit 1338.  Is there a

14  payout date listed for the last three rows which are listed as

15  coming from safe deposit box no. 13?

16  A.  There is not.

17  Q.  What does "NA" in those cells mean?

18  A.  Not applicable.

19  Q.  Of all the records you reviewed, are you aware of any

20  records showing which bill came from which specific envelope

21  for this particular 1B?

22  A.  No.

23  Q.  Are you aware of whether the FBI created a record of which

24  bill went with which specific envelope when the cash was seized

25  for this particular 1B?

O6S5men1                        Rafferty - Direct

1    A.   No.

2    Q.   The chart indicates that the cash for those three rows is

3    from GX 13.   Based on your review of Government Exhibit 1335,

4    were some of the bills in 1B13 paid out in 2018 or later?

5    A.   Yes.

6    Q.   Approximately how many?

7    A.   138.

8    Q.   Now, to be clear, can you definitively say which of those,

9    if any, were in these particular three envelopes?

10   A.   No.

11   Q.   Looking at the bottom of this chart, what is the total

12   amount of cash in the ten envelopes with either prints or DNA

13   from Fred Daibes?

14   A.   $82,500.

15          MS. GHOSH:   We can take that down and turn to a new

16   chart.   Can we please put up for just the witness what has been

17   marked for identification as Government Exhibit 1340?

18   Q.   Ms. Rafferty, generally, what is this?

19   A.   So this is a chart summarizing the cash, the cash seized,

20   but as well as the post-2018 bills.

21   Q.   Did you help create this chart?

22   A.   I did.

23   Q.   Did you verify that the contents accurately summarize

24   portions of the sources listed on the chart?

25   A.   Yes.

1   Q.  What types of sources did you use to verify this chart?

2   A.  Government's exhibits .

3   Q.  Were some of those voluminous?

4   A.  Yes.

5   Q.  And does this chart contain a summary of certain

6   information from those sources?

7   A.  It does.

8        MS. GHOSH:  The government offers Government Exhibit

9   1340.

10        THE COURT:  Admitted.

11        (Government's Exhibit 1340 received in evidence)

12        MS. GHOSH:  Can we please publish 1340 for the jury?

13  BY MS. GHOSH:

14  Q.  Ms. Rafferty, can you please read the title of this chart?

15  A.  Cash from June 16, 2022 searches put into circulation in or

16  after February 2018.

17  Q.  Now, in the last chart we looked at, we were discussing

18  certain payout dates.  Is that another way of saying put into

19  circulation?

20  A.  Yes.

21  Q.  We will get to the specific sources included in each bar of

22  this chart in a moment but, generally, what does this chart

23  show?

24  A.  This chart shows the cash in all of the 1Bs.

25  Q.  What source did you use when verifying cash from certain

1    1Bs?

2    A.   Government's Exhibit 1335.

3    Q.   And with all the cash from certain 1Bs -- withdrawn.

4         MS. GHOSH:   Can we put up Government's Exhibits 1335A

5    and 1335B for a moment?

6    Q.   Are these portions of that exhibit that you reviewed to

7    create this chart?

8    A.   Yes.

9    Q.   When you used 1335, were you using a native Excel version?

10   A.   I was.

11   Q.   Do you have any independent knowledge of the dates the cash

12   was put into circulation or were you relying on the data in

13   this source, 1335?

14   A.   I relied on this source.

15        MS. GHOSH:   We can take those down and go back to

16   1340.

17   Q.   So just before we look at the bars, if we can look at

18   footnote 1 in the bar graph, it states that this chart includes

19   2017 and 2017A series $20 and $50 bills sent by the BEP to

20   Federal Reserve Banks in or after January 2018.  Ms. Rafferty,

21   do you know how long after money is sent by the BEP to Federal

22   Reserve Banks it is actually released into circulation?

23   A.   I don't.

24   Q.   I would like to discuss the bars in this chart now.  The

25   first bar is titled Cash in All 1Bs Containing Post-2018 bills.

1    First, how much money is indicated by that bar?

2    A.  $552,190.

3    Q.  Are the specific 1Bs that are included in that amount

4    listed somewhere on this chart?

5    A.  They are.

6    Q.  Did you verify whether each of those 1Bs contains at least

7    one bill that was put into circulation in February 2018 or

8    later based on Government Exhibit 1335?

9    A.  Yes.

10   Q.  And where on this chart are those specific 1Bs shown?

11   A.  They're listed in footnote 2.

12   Q.  The label on the bar refers to post-2018 bills.  What does

13   that refer to?

14   A.  So that refers to any bill that was put into circulation in

15   2018 or later.

16   Q.  Does that also include the bills sent by the Bureau of

17   Engraving and Printing to the Federal Reserve Bank in

18   January 2018 or later?

19   A.  Yes.

20   Q.  Is it OK if I use post-2018 bills sometimes as shorthand

21   for bills placed into circulation?  2018 or later?

22   A.  Yes.

23   Q.  Now, does this chart indicate how many bills, in the

24   particular 1Bs listed in footnote 2, are post-2018 bills?

25   A.  It does not.

1  Q.  If I wanted to find out how many bills in a particular 1B

2  were post-2018 bills, is that information available in the

3  source document Government Exhibit 1335?

4  A.  It is.

5  Q.  We will look at the second bar now labeled Cash in 1Bs from

6  Basement/Office Containing Post-2018 bills.  How much money is

7  indicated by that car?

8  A.  $402,020.

9  Q.  Now, is that a subset of the first bar?

10  A.  It is.

11  Q.  Does the chart show which specific 1Bs are included in

12  getting to that amount?

13  A.  Yes.

14  Q.  Where is that?

15  A.  They are listed under footnote 3.

16  Q.  Did you verify, based on Government Exhibit 1335, that

17  those 1Bs listed in footnote 3 had a listed location of either

18  basement or office?

19  A.  Yes.

20  Q.  Do you have any independent knowledge of where the 1Bs were

21  found?

22  A.  No.

23  Q.  And for the second bar, did you verify whether, based on

24  Government Exhibit 1335, each of the 1Bs in footnote 3 contains

25  at least one post-2018 bill?

1    A.  Yes.

2    Q.  Now, turning to the third bar, which is labeled Total Value

3    of all Post-2018 bills, how much money is indicated by that

4    bar?

5    A.  $117,220.

6    Q.  What does total value of all post-2018 bills mean?

7    A.  So that is the value of all of the bills that are contained

8    in the first bar that were put into circulation in

9    February 2018 or later that we are categorizing as post-2018

10   bills.

11   Q.  So did this bar include the value of any other bills that

12   were in the same envelope or just the value of the post-2018

13   bills themself?

14   A.  Just the 2018 bills.

15   Q.  Are the specific 1Bs containing those post-2018 bills

16   listed on the chart?

17   A.  Yes.

18   Q.  And where are they?

19   A.  They are under footnote 2.

20   Q.  How, if at all, does the approximately $117,000 in this

21   third bar relate to the amount in the first bar?  Is it a

22   subset?

23   A.  It is a subset of that, yes.

24   Q.  Let's look at an example to see what it means here.

25              MS. GHOSH:  Can we put up Government Exhibit 1338 for

1   a moment side by side with 1340?  And could we please zoom in

2   on row 2 which relates to Government Exhibit 34, the TD Bank

3   envelope that contained $9,100?

4   Q.  In preparation for your testimony today, did you review

5   Government Exhibit 1335 to see how many of the $100 bills in

6   that envelope were paid out in 2018 or later?

7   A.  Yes.

8   Q.  How many?

9   A.  48.

10  Q.  So how much money from this TD Bank envelope in row 2 is

11  included in the first bar of 1340, the bar graph?

12  A.  $9,100.

13  Q.  That's the full amount of the money in the envelope?

14  A.  Yes.

15  Q.  You said that the envelope had 48 post-2018 $100 bills, so

16  how much money from this envelope is included in the third bar?

17  A.  $4,800.

18  Q.  And that is just the value of the post-201 bills

19  themselves?

20  A.  Correct.

21       MS. GHOSH:  We can take down the bottom.

22  Q.  Looking now at the fourth bar in this chart, which is

23  labeled total value of basement/office post-2018 bills, what is

24  the total indicated by that bar?

25  A.  $81,980.

1    Q.  And is that a subset of the $402,000 in the second bar?

2    A.  Yes.

3    Q.  What does that $81,980 represent?

4    A.  The total value of post-2018 bills that were in envelopes

5    associated with either the basement or the office.

6    Q.  And again, that's just the specific bills that were put

7    into circulation in February 2018 or later?

8    A.  Correct.

9    Q.  I would like to turn now to the last bar in red.  First,

10   what is the source of the information contained in that last

11   bar?

12   A.  Government Exhibit 1336.

13   Q.  Is 1336 that financial analysis that you did of Robert

14   Menendez' Senate Financial Credit Union cash withdrawals?

15   A.  Yes.

16   Q.  Looking at that bar, which is labeled total amount of

17   Menendez SFCU Cash Withdrawals 2018 Through June 2022, what is

18   the amount indicated in this bar?

19   A.  $55,088.08.

20   Q.  So that is the amount of cash withdrawals during that time

21   frame?

22   A.  Yes.

23   Q.  When we looked at Government Exhibit 1336 earlier,

24   October 6 to June 2022, how did you obtain the value in that

25   chart, 1340, to cover just 2018 through June 2022?

O6S5men1                        Rafferty - Direct

1    A.   I added the values in the right-most column on Government

2    Exhibit 1336 between 2018 and June of 2022.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6sWmen2                      Rafferty - Direct

1   BY MS. GHOSH:

2   Q.  Now, are you able to tell if the cash that was withdrawn

3   from the credit union account is or is not included in the cash

4   seized in the 1Bs listed in this chart?

5   A.  No.

6   Q.  If all of the credit union cash withdrawals from 2018 to

7   2022 were part of the money seized, how does that amount

8   compare to the amount of seized bills that entered circulation

9   in or after 2018?

10  A.  It's less.

11  Q.  If all of the credit union cash withdrawals were part of

12  the money seized, how does that amount compare to the amount of

13  post-2018 seized bills and 1Bs identified as coming from just

14  the basement and the office?

15  A.  It's less.

16          MS. GHOSH:  We can take that chart down.

17          I'd like to turn to one final chart.  Could we put up

18  for just the witness what's been marked for identification as

19  Government Exhibit 1339.

20  Q.  Ms. Rafferty, generally, what is this?

21  A.  This is the chart of gold bars I was asked to review.

22  Q.  Did you create this chart?

23  A.  I did not.

24  Q.  Did you verify that the contents accurately reflect the

25  sources listed on the chart?

1    A.  Yes.

2    Q.  Does this chart include calculations of the value of

3    various gold bars?

4    A.  It does.

5    Q.  Will this chart aid in your testimony to the jury about the

6    value of certain gold?

7    A.  It will.

8            MS. GHOSH:  The government offers Government Exhibit

9    1339 as a demonstrative.

10           THE COURT:  Admitted, as a demonstrative.

11           (Government Exhibit 1339 received in evidence)

12           MS. GHOSH:  Could we please publish 1339 for the jury.

13           THE COURT:  Ladies and gentlemen, you know what that

14   means.  I've told you before.  It's simply an aid.  It's not

15   evidence itself; that is, the chart.

16   BY MS. GHOSH:

17   Q.  Ms. Rafferty, when you originally verified this chart, what

18   form was the document in?

19   A.  It was in an Excel.

20   Q.  And how many tabs did that Excel have?

21   A.  Three.

22   Q.  In this version of 1339, have those three tabs been

23   combined into one document?

24   A.  They have.

25   Q.  Starting with the first page, which is a chart titled "gold

1    bars associated with Fred Daibes," let's look at row 1.

2         What is listed in the location found column, the second

3    column in this chart?

4    A.  41 Jane Drive.

5    Q.  The next column, brand and photograph, contains a photo and

6    some citations to exhibits and transcript pages underneath.

7         Are those citations the source of the location and photo in

8    the second and third columns?

9    A.  Yes.

10   Q.  Next is a serial number.

11        How does that serial number compare to the serial number of

12   the gold bar in the photo next to it?

13   A.  They match.

14   Q.  The next column is weight.

15        What are the weights of the various gold bars in this

16   chart?

17   A.  Either a kilogram or an ounce.

18   Q.  The next column is approximate value, 6/16/22.

19        What source did you use to verify the approximate value of

20   either the kilogram or ounce gold bars as of that date?

21   A.  If we could scroll down, the source website is listed at

22   the bottom of the chart.

23        MS. GHOSH:  Could we go to page 3.

24   A.  Kitco.com.

25   Q.  And have you been to the website for Kitco.com?

1  A.  Yes.

2  Q.  Generally, what type of business does it appear to be?

3  A.  It displays the value of gold, both today and historical

4  numbers as well.

5          MS. GHOSH:  If we could go back up to the top of the

6  chart.

7  Q.  Based on that source, what was the approximate value of a

8  kilogram of gold on June 16, 2022?

9  A.  $59,151.85.

10  Q.  You mentioned that some of the gold bars were in ounces.

11  Based on that source, what was the approximate value of an

12  ounce of gold on June 16, 2022?

13  A.  $1,839.80.

14  Q.  The last column is called inventory information and cites

15  to Government Exhibit 3D-6.

16          In row 1, what does that last column show?

17  A.  So, that shows the serial number listed in Fred Daibes's

18  gold inventory.

19  Q.  How does that serial number from the Fred Daibes gold

20  inventory compare to the serial number on the gold bar in the

21  photograph in row 1?

22  A.  It matches.

23          MS. GHOSH:  Mr. Hamill, could we slowly scroll down

24  through the other entries until we get to page 3.

25          THE WITNESS:  Can I clarify something now that we're

O6sWmen2                          Rafferty - Direct

1    on this page of the chart?

2              So, the ounce gold bars here you'll see in the final

3    column there is a serial number range instead of one specific

4    serial number given.  You'll see in these instances that the

5    serial number on the gold bar falls within that range in that

6    column.

7              MS. GHOSH:  Thank you.

8              If we could go to page 3 and look at rows 12 and 13

9    for a moment.

10             Thank you, Ms. Rafferty.

11             We can pause right there.

12   Q.  Looking at rows 12 and 13, what is the location listed in

13   the second column?

14   A.  Nadine Menendez cell phone photo.

15   Q.  Before row 12, do the first 11 rows all have 41 Jane Drive

16   listed as the address?

17   A.  They do.

18   Q.  Before we discuss those last two rows, I'm going to ask a

19   few questions about how many gold bars of certain kinds are in

20   the first 11 --

21             MS. GHOSH:  If we could scroll up.

22   Q.  -- and my question will be how many one ounce Valcambi

23   Suisse gold bars, found in 41 Jane Drive, have serial numbers

24   within the range listed in the Daibes inventory?

25   A.  OK.

1          Seven.

2     Q.  How many --

3                MS. GHOSH:  If you could scroll down slightly to the

4     bottom of this page.

5     Q.  How many Credit Suisse one-ounce gold bars, found in 41

6     Jane Drive, have serial numbers listed in the Daibes gold

7     inventory?

8     A.  Two.

9     Q.  How many --

10               MS. GHOSH:  If we could scroll up a bit, please.

11    Q.  How many kilogram bars, found in 41 Jane Drive, have serial

12    numbers listed in the Fred Daibes gold inventory?

13    A.  There's two here.

14               MS. GHOSH:  OK.  And if we could now go back down to

15    row 12, please, on page 3.

16    Q.  Ms. Rafferty, you testified earlier that the location of

17    the bars in rows 12 and 13 that we now have on the screen is in

18    a Nadine Menendez cell phone photo.

19         Other than the location being different, are there any

20    differences in how to read those two rows on this chart

21    compared to the other rows of gold found at 41 Jane Drive?

22    A.  No.

23    Q.  How many kilogram bars depicted in the Nadine Menendez cell

24    phone photos have serial numbers listed in the Fred Daibes

25    inventory?

1    A.  Two.

2    Q.  Are those two kilograms the same or different from the

3    kilogram bars found in 41 Jane Drive?

4    A.  Different.

5    Q.  How many gold bars in total are included in this chart that

6    match bars in the Daibes inventory?

7    A.  Kilo bars or one-ounce bars?

8    Q.  Gold bars in total.

9    A.  In total, 13.

10   Q.  What is the approximate total value of those 13 gold bars

11   as of June 16, 2022?

12   A.  $253,165.60.

13          MS. POMERANTZ:  Could we please turn now to page 4 of

14   Government Exhibit 1339.

15   Q.  You said earlier that when you originally reviewed this

16   chart it was in the form of a spreadsheet.  Was this a separate

17   tab on that spreadsheet?

18   A.  Yes.

19   Q.  What is this chart called at the top?

20   A.  Asahi one-ounce gold bars.

21   Q.  Is Asahi the brand name stamped on in this chart?

22   A.  It is.

23          MS. GHOSH:  Let's pull up in what's in evidence as

24   Government Exhibit 1454 side by side and go to page 2.

25   Q.  Ms. Rafferty, do you see here that paragraph B refers to

O6sWmen2                        Rafferty - Direct

1   Asahi gold bars with certain serial numbers ending in 801

2   through 825 that were packaged in a particular box on or about

3   March 26, 2021?

4   A.  Yes.

5   Q.  Is it OK if I refer to that as the first box?

6   A.  Yes.

7           MS. GHOSH:  So let's start with that first box.  Could

8   we go back to the chart, please.

9   Q.  Does this chart contain some of the gold bars with those

10  serial numbers ending in 801 through 825 from the first box?

11  A.  This one does, yes.

12  Q.  And directing your attention first to the middle column,

13  gold bar serial number, and looking at row 1, is the serial

14  number in this chart within the range that was just referenced

15  in the stipulation as being packaged in the first box?

16  A.  Yes.

17  Q.  What is the serial number for the first row?

18  A.  A124806.

19  Q.  And what's the serial number for the row beneath that?

20  A.  A124807.

21  Q.  Are the serial numbers in this chart in sequential order?

22  A.  They are.

23  Q.  Looking at row 1 again, what is the location found for the

24  gold bar shown in row 1?

25  A.  41 Jane Drive as well as the Nadine Menendez cell phone

O6sWmen2                        Rafferty - Direct

1    photo.

2    Q.  So they're in two locations.  Did you verify, based on the

3    sources cited in this document, that that gold bar was both

4    found in a photo on the cell phone and also found at 41 Jane

5    Drive?

6    A.  Yes.

7    Q.  The second-to-last column shows the approximate value as of

8    June 16, 2022.

9         Is that based on the same source that we looked at in the

10   prior section of the chart?

11   A.  It is.

12   Q.  Let's look at row 2 now.

13        What is the location listed?

14   A.  Wael Hana inventory.

15           MS. GHOSH:  Can we pull up for a moment side by side

16   Government Exhibit 3C-20.

17   Q.  Is this photo the source for all the gold bars listed in

18   this chart with the location Wael Hana inventory photo?

19   A.  Yes.

20           MS. GHOSH:  We can take down 3C-20.

21   Q.  Now, in row 2 of this chart, there's no value listed in the

22   second-to-last column.

23        For which items in this chart relating to the Asahi gold

24   bars did you provide an approximate value?

25   A.  Those that were located at either 41 Jane Drive or with the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6sWmen2                          Rafferty - Direct

 1   Nadine Menendez cell phone photo.

 2   Q.  Is that because the Hana gold had no value or for some

 3   other reason?

 4   A.  I was just asked to provide value for those bars.

 5   Q.  Who asked you to only include an amount for the gold bars

 6   from the house or the Nadine Menendez cell phone photos?

 7   A.  The U.S. Attorney's Office.

 8          MS. GHOSH:  If we could scroll down slowly to row 16

 9   on page 7.

10          Thank you.

11   Q.  What is the serial number of the gold bar referenced in row

12   16?

13   A.  A124825.

14   Q.  Based on the stipulation that I read a moment ago, was that

15   the last serial number in the first box?

16   A.  Yes.

17   Q.  Are all the serial numbers in row 16 or higher from that

18   first box?

19   A.  Yes.

20   Q.  Before we move on to the second box, we didn't go through

21   every row, but based on your review of the serial numbers and

22   the sources cited in this chart, were all of the Asahi gold

23   bars in rows 1 through 16 found in either 41 Jane Drive or on

24   Nadine Menendez's phone or in an inventory photograph for Wael

25   Hana?

O6sWmen2                         Rafferty - Direct

1    A.  Yes.

2    Q.  And just to clarify, when we said that all of the serial

3    numbers in row 16 or higher were from the first box, are you

4    referring to rows 1 through 16, meaning 16 or higher looking at

5    the printed page?

6    A.  Yes.

7              MS. GHOSH:  Thank you.

8              If we could put back up Government Exhibit 1454 for a

9    moment and go to paragraph B.

10   Q.  Ms. Rafferty, do you see that this stipulation refers to

11   serial numbers in the range ending in 5976 through 6000

12   packaged in a particular second box on or about March 31, 2021?

13   A.  Yes.

14   Q.  And in the chart, Government Exhibit 1338, what is the

15   serial number of the gold bar in row 17?

16   A.  A125991.

17   Q.  Is that within the range just referenced in the

18   stipulation?

19   A.  It is.

20   Q.  And what about row 18 -- if you could take a look at

21   that -- what's the serial number for that?

22   A.  A125992.

23   Q.  Is that serial number within the range of gold bars in the

24   second box?

25   A.  Yes.

O6sWmen2                          Rafferty - Direct

1   Q.  What is the location listed for the gold in row 17?

2   A.  In row 17?

3   Q.  Yes, please.

4   A.  Receipt for Wael Hana purchase of 22 gold bars.

5   Q.  What is the location for the gold listed in row 18?

6   A.  Nadine Menendez cell phone photo.

7   Q.  Now, directing your attention in this chart to the rows

8   with red text only --

9           MS. GHOSH:  And if we could please scroll up, after I

10  finish my question.

11  Q.  -- how many Asahi gold bars that are listed as being found

12  in either 41 Jane Drive or the Nadine Menendez cell phone

13  photos have serial numbers that place them in the same Asahi

14  boxes as gold bars depicted in one of the Wael Hana

15  photographs?

16  A.  Seven.

17          MS. GHOSH:  Could we please go back to page 7 of 1339

18  and look at the orange row on the bottom.

19  Q.  What was the total approximate value of the seven Asahi

20  gold bars found at 41 Jane Drive or on the Nadine Menendez cell

21  phone?

22  A.  $12,878.60.

23  Q.  Finally, let's turn to the last page of Government Exhibit

24  1339.

25          Is this a summary of the prior two sections?

1   A.  Yes.

2   Q.  What is the total value of the gold that was either seized

3   from 41 Jane Drive or found on the Nadine Menendez cell phone

4   which was either listed in the Fred Daibes inventory or was

5   from the same manufacturer boxes as gold in the Wael Hana

6   inventory and receipt?

7   A.  $266,044.20.

8           MS. GHOSH:  Just one moment, your Honor?

9           No further questions.

10          THE COURT:  Mr. Fee.

11          MR. FEE:  Thank you, your Honor.

12  CROSS-EXAMINATION

13  BY MR. FEE:

14  Q.  Hi, Ms. Rafferty.

15  A.  Good morning.

16  Q.  Good morning.

17      So, you said you are a forensic accountant?

18  A.  Yes.

19  Q.  And what, in general, does a forensic accountant employed

20  by the FBI do?

21  A.  I look through bank records and financial documents, and I

22  summarize data within them.

23  Q.  And that work is done to help investigate potential crimes?

24  A.  For the most part.  Or I can prepare summary charts as

25  well.

O6sWmen2                        Rafferty - Cross

1    Q.  Got it.

2    A.  In case of testifying.

3    Q.  That's right.  You're doing something else right now;

4    you're helping present a case to a jury?

5    A.  Correct.

6            THE COURT:  The jury knows to disregard the comments

7    of the lawyers.

8    BY MR. FEE:

9    Q.  As a forensic accountant who assists in investigations, is

10   part of your work to look for trends and patterns in financial

11   records?

12   A.  Sometimes.

13   Q.  Because sometimes identifying patterns in a set of

14   financial records might be helpful in understanding what

15   actually happened?

16   A.  Yes.

17   Q.  And your goal, as a forensic accountant, is to uncover

18   accurate information in financial records, essentially, right?

19   A.  I review the financial records.

20   Q.  Right, when you're --

21   A.  For --

22   Q.  I'm sorry.

23   A.  Yeah, for facts.

24   Q.  For facts.  Facts not fiction?

25   A.  Yes.

O6sWmen2                        Rafferty - Cross

1    Q.  And your work is helped by having access to full and

2    complete financial records, at least whatever's possible under

3    the circumstances, correct?

4                MS. GHOSH:  Objection.

5                THE COURT:  I'll allow it.

6                Do you need certain records in order to undertake your

7    job?

8                THE WITNESS:  I do need to review certain records for

9    my job, yes.

10   BY MR. FEE:

11   Q.  All I mean is, in general, when you're doing investigative

12   work as a forensic accountant, it is better, not worse, to have

13   full access and complete sets of financial records relating to

14   the subjects of your investigation?

15               THE COURT:  Sustained as to form.

16   BY MR. FEE:

17   Q.  In general, is it better to have more records relating to

18   the subjects of your investigation or less?

19               MS. GHOSH:  Objection.

20               THE COURT:  I'll allow it.

21   A.  I review the records that I'm provided.

22   Q.  I'm not asking you about the work you did here.  I'm asking

23   as a forensic accountant who works for the FBI --

24               THE COURT:  I don't think she can say it's better to

25   have more records than fewer records.  It obviously depends

1    upon the nature of the records.

2            Let's move on.

3    BY MR. FEE:

4    Q.  The first time you had involvement in this case, if you

5    remember, was in late April of 2024; is that fair to say?

6    A.  I don't recall exactly.

7    Q.  How did you first get involved in this case?

8    A.  I was asked to meet with the attorney's office.

9    Q.  OK.

10   A.  I don't recall exactly when that was.

11   Q.  And then going forward from whenever that first contact

12   was, you had some meetings with them and you prepared some

13   charts, right?

14   A.  Yes.

15   Q.  And you reviewed those charts with the prosecutors, and you

16   came here today and presented that work; fair to say?

17   A.  Yes.

18   Q.  You also reviewed summary charts that you had not prepared,

19   correct?

20   A.  Yes.

21   Q.  You testified about those; there were some charts that you

22   said the prosecutors prepared and you relied on them?

23   A.  I reviewed them for accuracy.

24   Q.  And then you incorporated some of the prosecutors' summary

25   charts, preexisting summary charts in the work you did here?

1          MS. GHOSH:  Objection.

2          THE COURT:  Did you utilize some of the information

3    the prosecutors gave you in developing your work here?

4          THE WITNESS:  Yes, your Honor.

5    BY MR. FEE:

6    Q.   What I mean, Ms. Rafferty, is Government Exhibit 1335 is a

7    summary chart you cite in the charts you created?

8    A.   Uh-huh.

9    Q.   Correct?

10   A.   Yes.

11   Q.   That's a chart you didn't create, but you cite it in your

12   charts?

13         THE COURT:  I'll allow it.

14   A.   Yes.

15   Q.   You also reviewed some trial testimony with the

16   prosecutors?

17   A.   I reviewed transcripts.

18   Q.   The transcripts of testimony?

19   A.   Yes.

20   Q.   People talking in court?

21   A.   I believe so, yes.

22   Q.   Do you remember the witnesses that you reviewed?

23   A.   I would have to have my memory refreshed on which ones

24   you're referring to specifically.

25   Q.   I'm asking.  I don't know.  Do you remember the subject

O6sWmen2                    Rafferty - Cross

1   matter of the transcripts of testimony you reviewed?

2   A.  Yes.

3   Q.  What was it?

4   A.  So, it was related to preparing the documents I provided,

5   cash, gold.

6   Q.  So it was the testimony of other FBI personnel testifying

7   about summary charts?

8           MS. GHOSH:  Objection.

9           THE COURT:  If you know.

10          Did you review the testimony of other FBI personnel?

11   If you know.  Yes, no, I don't know.

12          THE WITNESS:  I'm not aware of the specific

13   individuals whose testimony it was.

14   BY MR. FEE:

15   Q.  OK.  But they were talking about, if you remember, how they

16   themselves prepared charts relating to cash and gold?

17          THE COURT:  Is that part of the testimony you read, if

18   you remember?

19          THE WITNESS:  I don't recall right now.

20          THE COURT:  All right.

21          MR. FEE:  We'll move on.

22   Q.  When you were doing the work, because you prepared some of

23   these charts yourself, not the prosecutors, correct?

24   A.  Some of them, yes.

25   Q.  Some of them.

O6sWmen2                          Rafferty - Cross

```
 1        In doing that work, were you given information about the
 2   allegations that are at issue in this trial?
 3   A.  I was not.
 4   Q.  So how did you, just in general, approach constructing the
 5   charts you presented here?
 6   A.  I was asked to prepare specific charts, look at specific
 7   sections of the records and prepare a summary of them.
 8   Q.  And when you said you were asked to look at specific
 9   evidence, did the prosecutors tell you, for example, that there
10   was a purpose to these charts?
11   A.  No.
12   Q.  I'm just trying to understand.  How do you even start a
13   chart if you don't know the allegations?
14             THE COURT:  Sustained.
15   BY MR. FEE:
16   Q.  We'll ask about specific charts; it will be easier.
17        Were you told anything about Senator Menendez's defenses in
18   this case?
19   A.  No.
20   Q.  Did you ever learn about Senator Menendez's public
21   statements about making cash withdrawals?
22   A.  No.
23             MS. GHOSH:  Objection.
24             THE COURT:  I'll allow it.
25             MR. FEE:  Let's look at one of the charts you
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  testified about, Government Exhibit 1341, Mr. Kelly, if you can

2  put that up for Ms. Rafferty, and everyone, and zoom in.

3  Q.  So this title, as you said, says Nadine Arslanian a/k/a

4  Nadine Menendez JPMC checking account ending in 8431.

5      This is a J.P. Morgan Chase account, right?

6  A.  Yes.

7  Q.  And you reviewed these files in order to create this chart,

8  the underlying bank records -- excuse me -- to create this

9  chart?

10 A.  Yes.

11 Q.  Who decided on labeling the top of this chart as Nadine

12 Arslanian a/k/a Nadine Menendez; was that you or the

13 prosecutors?

14 A.  That was the attorney's office.

15 Q.  That language, Nadine Arslanian a/k/a Nadine Menendez, that

16 is not in the sources, the source documents listed at the

17 bottom that you reviewed, right?

18 A.  I don't recall.

19      MR. FEE:  Let's put them up, what's in evidence.  The

20 first one you cite is Government Exhibit 5F-902, Mr. Kelly,

21 please.  And this is a J.P. Morgan Chase subpoena response.

22 Let's go to page 3 and zoom in on the nonwhite stuff.

23 Q.  Do you see this is the account ending in 8431; that's the

24 same account you are addressing in your summary chart,

25 Government Exhibit 1341?

O6sWmen2                          Rafferty - Cross

1    A.  Yes.

2    Q.  And it has the customer as Nadine Arslanian?

3    A.  Yes.

4    Q.  Do you see that?

5        And then it has related customers, Nadine Arslanian, and

6    then it says relationship, sole owner.  Do you see that?

7    A.  Yes.

8    Q.  And then it has an open date in June of 2010, and I think

9    you had these in your chart, and a close date in January of

10   '22?

11   A.  Yes.

12   Q.  Senator Menendez is not listed as a customer in these

13   records, correct -- as a related customer in these records,

14   correct?

15   A.  No.

16   Q.  And in fact, the name Menendez does not appear anywhere on

17   the bank records relating to Nadine's account ending in 8431,

18   correct?

19   A.  Not in this checking account summary.  I would have to

20   review the records again to see if his name is anywhere else

21   within the records.

22   Q.  OK.  Well, I don't want to go through every page.

23       You don't recall sitting here today seeing the name

24   Menendez anywhere in the 8431 Nadine account records?

25   A.  I don't remember at this time.  I'd have to review the

O6sWmen2                         Rafferty - Cross

 1   records again.

 2                   MR. FEE:  Understood.  Let's go back to your chart.

 3                   THE COURT:  When you say you don't remember, do you

 4   not remember seeing his name, or you don't know whether or not

 5   you saw his name?

 6                   THE WITNESS:  I don't know either way.

 7                   THE COURT:  OK.

 8   BY MR. FEE:

 9   Q.  Do you think if you had seen Senator Menendez's name on

10   this checking account you would have listed it here?

11                   MS. GHOSH:  Objection.

12                   THE COURT:  If you saw his name on that checking

13   account, would it be listed there?

14                   THE WITNESS:  If he was in the checking, that page

15   that you just brought up, the opening account, if he was a

16   signatory on the account, his name would be listed.

17   BY MR. FEE:

18   Q.  OK.  So just on that last point, Senator Menendez obviously

19   is not a joint accountholder on this account, right?

20   A.  On account 8431, no.

21   Q.  In fact, Senator Menendez and Nadine Arslanian or Nadine

22   Menendez are not joint accountholders on any financial account

23   that you reviewed, correct?

24                   THE COURT:  Are you able to say that?  Yes or no.  Or

25   I mean you can answer the question if you're able to answer it.

O6sWmen2                          Rafferty - Cross

1   A.  I'd have to review the opening account document for the

2   federal credit union account.

3   Q.  OK.  We'll look at that.

4        Sitting here today, do you remember Senator Menendez having

5   a joint account with anyone among the records you reviewed?

6   A.  I don't recall.

7   Q.  OK.  In your experience, as a forensic accountant at the

8   FBI, have you conducted financial investigations of married

9   couples in the past?

10  A.  No.

11  Q.  Have you conducted investigations of individuals who are

12  married?

13  A.  Yes.

14  Q.  In your experience, is it typical for a married person to

15  not have a joint account with a spouse, based only on your

16  experiences, Ms. Rafferty?

17            MS. GHOSH:  Objection.

18            THE COURT:  Yes.  Sustained.

19  BY MR. FEE:

20  Q.  Have you conducted investigations of individuals who are

21  not married in the past?

22  A.  Yes.

23  Q.  Is it typical for those folks to not have joint accounts

24  with their boyfriends or girlfriends?

25            THE COURT:  Sustained.

O6sWmen2                          Rafferty - Cross

1    BY MR. FEE:

2    Q.  All right.  Let's look at this chart.

3        Would it be fair to say that the Nadine Arslanian checking

4    account ending in 8431 doesn't get used very much?

5              MS. GHOSH:  Objection.

6              THE COURT:  I'll allow it.

7              In the time period that you looked at, are you able to

8    say whether or not it was used very much?

9    A.  The disbursements from the account, there were multiple

10   disbursements every month.  It was moderately used.

11   Q.  It was moderately used?

12   A.  Yeah.

13   Q.  When you say -- what is a disbursement again?  I'm sorry.

14   A.  A disbursement is any amount of funds coming out of the

15   account.

16   Q.  So like anything, you buy a coffee, you take out cash, you

17   pay a bill, anything, all of that is a disbursement?

18   A.  Any amount that comes out of the account, correct.

19   Q.  When you say moderate, you said the maximum disbursement,

20   meaning one time, was $1,700, right?

21   A.  Correct.

22   Q.  And then you said the average disbursement was $11 during

23   this period, January 2016 through January '22?

24   A.  $11.61, yes.

25   Q.  Thank you.

O6sWmen2                        Rafferty - Cross

1      And then every single withdrawal during the period January

2      2016 through January 2022 added up to $777?

3      A.  No.  The cash withdrawals.

4      Q.  Cash withdrawals.

5      A.  Cash withdrawals.  There were two cash withdrawals during

6      that time period.  Those two cash withdrawals added up to

7      $777.09.

8      Q.  And then every single disbursement, meaning every single

9      sort of outbound dollar, that was sent from this account during

10     that six-year period added up to about $9,500, correct?

11     A.  Yes.

12     Q.  So whether you call it moderate use, or whatever, it

13     appears that this is not a person who is engaging in

14     significant transactions involving this checking account?

15          MS. GHOSH:  Objection.

16     BY MR. FEE:

17     Q.  Would you agree?

18          THE COURT:  Sustained as to phrasing.

19          Is it your testimony -- you said there was moderate

20     activity, correct?

21          THE WITNESS:  Yes.

22          THE COURT:  Can you say there was significant

23     activity?

24          THE WITNESS:  There were several transactions, usually

25     in smaller amounts.  Not all of them are $1,700.  That was the

O6sWmen2                     Rafferty - Cross

1   maximum amount.  But there were multiple transactions every

2   month of smaller dollar amounts.

3              THE COURT:  OK.

4   BY MR. FEE:

5   Q.  But for instance, if you have a $1,000 mortgage to pay

6   every month, you're not paying it out of this account

7   exclusively, right?

8              MS. GHOSH:  Objection.

9              THE COURT:  Sustained.

10             Let me see if I can get you what you want, sir, in a

11  properly phrased question.

12             Were there, if you know, regular monthly disbursements

13  taken out of that account?

14             THE WITNESS:  Are you asking about recurring expenses

15  that would automatically come out of the account?

16             THE COURT:  All right.  Let's.  Go ahead.

17             THE WITNESS:  Then, no.

18             THE COURT:  All right.

19             MR. FEE:  Thank you, your Honor.

20  Q.  On direct when you were talking about this account, is this

21  when the prosecutor showed you the yellow bag with money in

22  it --

23             MS. GHOSH:  Objection.

24  Q.  -- if you remember?

25             THE COURT:  I'll allow it.

O6sWmen2                         Rafferty - Cross

1   BY MR. FEE:

2   Q.  You can answer, Ms. Rafferty.

3       Let me show you the bag.

4   A.  If you could bring up the exhibit again, please.

5           MR. FEE:  Government Exhibit 1F-1266, please.

6   Q.  And do you remember being shown this?

7   A.  Yes.

8           MR. FEE:  And actually, let's put it side by side with

9   the other picture related to this item.  One moment.  1F -- oh,

10  you already did.  1F-1265, GX 1F-1265.

11  Q.  So you don't know if the cash on the left is from the cash

12  on the right, right, sitting here today?

13  A.  No.

14  Q.  We can look at records, but I just want to ask you, do you

15  remember being asked questions about the photo on the left?

16  A.  Yes.

17          MR. FEE:  And if you can zoom in on the four bills

18  with the bands on them or the straps.  And actually, just go --

19  yeah.

20  Q.  Do you see these sort of bronze and white straps on the

21  bills there?

22  A.  Yes.

23  Q.  And just looking on that photo on the right --

24          MR. FEE:  Don't change anything, Mr. Kelly.

25  Q.  Looking at the photo on the right ending in 1265, the

O6sWmen2                        Rafferty - Cross

1   exhibit number, do you see similar bronze and white bands on

2   the cash laying horizontally to this yellow bag?

3   A.  Yes.

4   Q.  Do you recognize this as a Forever 21 bag?

5           MS. GHOSH:  Objection.

6           THE COURT:  Do you recognize where that yellow bag

7   comes from?

8           THE WITNESS:  It says forever on the side, yes.

9   BY MR. FEE:

10  Q.  Got it.  Do you recognize it as a Forever 21 bag?

11          MS. GHOSH:  Objection.

12          THE COURT:  I'll allow it.

13          Are you familiar with yellow bags from Forever 21

14  which say on them forever?

15          THE WITNESS:  Yes.

16          THE COURT:  Wow.

17  BY MR. FEE:

18  Q.  So, you pointed out here that it said J.P. Morgan Chase

19  bank on the bronze and white bands on the bills on the left,

20  right?

21  A.  Yes.

22  Q.  And just to get to the point, you didn't see anything

23  approaching the amounts that appears to be present in these

24  bands taken out of Nadine Menendez's J.P. Morgan Chase account,

25  is that fair to say, Ms. Rafferty?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    A.  Are you asking about these bills specifically or just an

 2    amount nearing those bills?

 3    Q.  The latter.

 4    A.  The amount nearing those bills, no.

 5    Q.  So likely -- I won't say likely.  Amounts resembling what

 6    we see here was never withdrawn from that J.P. Morgan Chase

 7    account for Ms. Arslanian that you reviewed, correct?

 8            THE COURT:  Are you able to say that?

 9    A.  During the time period I reviewed.  There are records for

10    the account that predate the time period I reviewed that I did

11    not review.

12    Q.  Got it.  So the prosecutors selected the time period of

13    records, as you testified, right?

14            MS. GHOSH:  Objection.

15            THE COURT:  I'll allow it.

16            You were told what time period to review, correct?

17            THE WITNESS:  Correct.

18    BY MR. FEE:

19    Q.  And that's what you reviewed, but during that time period,

20    you didn't see any withdrawals in the amounts resembling this

21    amount?

22    A.  Correct.

23    Q.  Nothing you were given to review enables you to connect the

24    cash we see right here to any particular account that you

25    reviewed?

O6sWmen2                          Rafferty - Cross

1          MS. GHOSH:  Objection.

2          THE COURT:  I'll allow it.

3  A.  I cannot connect this cash with any specific account, no.

4  Q.  And in fact, you're aware that people can obtain cash

5  outside of withdrawing it from a bank account held in their own

6  name?  Just generally.

7          MS. GHOSH:  Objection.

8          THE COURT:  Do you know whether or not people are able

9  to obtain cash in ways other than withdrawing it from their own

10  bank accounts?  Yes or no.

11          THE WITNESS:  I don't know.

12  BY MR. FEE:

13  Q.  You could, for example, go to a swap meet and sell an old

14  guitar and get some cash, right?

15  A.  Yes.

16  Q.  You could also go to a jewelry store and sell your mom's

17  diamond necklace and get some cash, right?

18          MS. GHOSH:  Objection.

19          THE COURT:  I'll allow it.

20  A.  I'm not sure what people do.

21  Q.  Eternal response.

22      You are aware that there are sometimes transactions where a

23  seller receives cash for selling an object, correct?

24  A.  There are transactions where people receive cash, yes.

25  Q.  People also can gift cash apart from receiving something in

1  return, correct?

2            THE COURT:  Sir, let's stick to her job, what she did,

3  what she didn't do.

4            MR. FEE:  Yes, your Honor.

5  Q.  You mentioned reviewing records for one joint account held

6  by Sabine and Nadine Arslanian, is that correct?

7  A.  Yes.

8  Q.  Did you see, do you remember seeing in that joint account

9  transactions at the store Forever 21?

10 A.  I don't recall.

11           MR. FEE:  OK.  Can we put up just for the witness --

12 actually, first, I'm going to just point out the stipulation to

13 orient us.  It's Government Exhibit 1461, the stipulation, if

14 you can put that up, Mr. Kelly.

15           Let's go to, you can see here paragraph 1, a J.P.

16 Morgan person would say -- and then let's look at B -- two

17 depository accounts at JP.

18 Q.  What is a depository account, Ms. Rafferty?

19 A.  It's an account that you can deposit funds into.

20 Q.  OK.  And then this is the joint account you reviewed,

21 starting at B2, a Chase college checking account in the names

22 Sabine Arslanian and Nadine Arslanian ending in 6195?

23 A.  Yes.

24           MR. FEE:  And that 6195 account, let's go to those

25 records.  It's a spreadsheet -- with apologies -- Government

O6sWmen2                          Rafferty - Cross

 1    Exhibit 5F-605 only for the witness and the attorneys.  It's
 2    not in yet.
 3              I'm just going to show you two rows.  Let's go to row
 4    96 -- I'm sorry.
 5    Q.  First, you see it says account name here --
 6    A.  Yes.
 7    Q.  -- Sabine Arslanian?
 8              MR. FEE:  And then if we could go down to row 964.
 9    Q.  Do you see that?
10    A.  Yes.
11              MR. FEE:  You don't have to read it out loud.  I'm
12    sorry to speak over you.
13    Q.  Yes?
14    A.  Yes.
15              MR. FEE:  Your Honor, I'm going to offer just this row
16    and just the account detail information and one more row.  It's
17    1644.
18              THE COURT:  Government.
19              MR. FEE:  I'm going to have to remake the exhibit
20    because I don't have an Excel, but it will be just those two
21    rows.
22              THE COURT:  All right.  Let's see what the
23    government's position is.
24              MS. GHOSH:  No objection.
25              THE COURT:  Admitted.

O6sWmen2                      Rafferty - Cross

```
1   BY MR. FEE:
2   Q.  And you see this one as well?
3   A.  Yes.
4           MR. FEE:  Why don't we just -- if the government has
5   an issue, I can put up just this part of the screen.  It has
6   some other transactions not in, but it seems mundane.
7           THE COURT:  Any objection to the jury seeing this?
8           MS. GHOSH:  No, your Honor.
9           MR. FEE:  OK.  Let's put that up.
10          THE COURT:  Only certain parts of this will be an
11  exhibit.  Go ahead.
12          MR. FEE:  And we looked at two of these, but I'll just
13  show one to the jury to orient them.  It's OK.  Just zoom out.
14  OK.
15  Q.  Do so you see here row 1644 and, Ms. Rafferty, it says
16  account name Sabine Arslanian?
17  A.  Yes.
18  Q.  And row 1644 shows a purchase with a transaction
19  authorization date of June 18, 2018, and the description reads,
20  in part, Forever 21, New York, New York.  Do you see that?
21  A.  Yes.
22          MR. FEE:  OK.  We can put that down.
23          THE COURT:  Take that down.
24          MR. FEE:  Please.
25          Let's go to another chart, Government Exhibit 1336.
```

O6sWmen2                         Rafferty - Cross

1              THE COURT:  It still seems to be up, at least on my

2       screen.

3              MR. FEE:  Yes.  Take it down.

4              THE COURT:  All right.

5       BY MR. FEE:

6       Q.  And this is one of the charts that you yourself prepared?

7       A.  Yes.

8       Q.  Again, like, how did it come about that in preparing this

9       chart you made a column, to take one example, titled "average

10      cash withdrawal from Robert Menendez's Senate Federal Credit

11      Union account?  How did you decide to do that?

12      A.  The attorney's office asked me to.

13      Q.  They actually specified we want you to make a column

14      stating average cash withdrawal?

15      A.  Correct.

16      Q.  And they specified to do the years 2016 through 2022?

17      A.  Through June 16 of 2022.

18      Q.  Through June 16 of 2022?

19      A.  Yes.

20      Q.  Were there records after June 16 of 2022; do you know?

21      A.  I only reviewed what was provided.

22             MR. FEE:  Got it.  Got it.

23             So this is labeled Robert Menendez at this Senate

24      Federal Credit Union account, ending in 8151.

25      Q.  What's a credit union?

1   A.  It's a type of bank.

2   Q.  So for our purposes, it works like a bank?

3   A.  Yes.

4   Q.  You put money in, take it out?

5   A.  Yes.

6   Q.  This account, Robert Menendez was the only accountholder?

7   A.  I would need to confirm with the opening document again.

8   Q.  OK.  We'll look at that.

9        Just to stay on this chart for a moment, this chart, in

10  general, reflects withdrawals that Senator Menendez -- excuse

11  me, withdrawals that were made from Senator Menendez's Senate

12  credit union account, correct?

13              MS. GHOSH:  Objection.

14              THE COURT:  What does this chart reflect?

15              THE WITNESS:  This chart shows cash withdrawals out of

16  the Senate Federal Credit Union account ending in 8151 between

17  January 1, 2016, and June 16, 2022.

18              THE COURT:  I take it the account is in the name of

19  Robert Menendez.  Is that correct?

20              THE WITNESS:  Correct.

21  BY MR. FEE:

22  Q.  And you pointed out that the number of cash withdrawals,

23  the lowest in any of the years you worked on, was 26 cash

24  withdrawals in 2020, right?

25  A.  For the complete years, correct.

1  Q.  Sorry, Ms. Rafferty.  The complete years?

2  A.  Yes.

3  Q.  And the average for all of the years you worked on,

4  complete or incomplete, was around or just under $400 for each

5  withdrawal, correct?

6  A.  Between $360 and $427, yes.

7  Q.  OK.  And then, so the lowest number of cash withdrawals for

8  a complete year on this chart is 26; you would agree that's

9  about once every other week?

10 A.  Around every one to two weeks, yes.

11 Q.  All right.  And then the rest of them are higher, for

12 example, in 2017, for the complete year, you had 44 cash

13 withdrawals?

14 A.  Correct.

15 Q.  So that's like three times a month, or more than three

16 times a month, for that year?

17 A.  It depends on the month.

18 Q.  For the full 12 months, it averages out to more than three

19 times a month?

20 A.  On average, it would be -- yes.

21 Q.  OK.  And then the average cash withdrawal across years is

22 also relatively consistent; you would agree?

23 A.  The average cash withdrawal varies.  There's a different

24 average cash withdrawal for each year in the chart.

25 Q.  OK.  So 2022, the partial year, it said 359 and some

O6sWmen2                          Rafferty - Cross

1   change; that's the average cash withdrawal?

2   A.  Yes.

3   Q.  2021, 426 and change?

4   A.  Uh-huh.

5           THE COURT:  You have to say.

6   A.  Yes.  Sorry.

7   Q.  2020, 378 and change?

8   A.  Yes.

9   Q.  2019, 370 and change?

10  A.  Yes.

11  Q.  2018, 382 and change?

12  A.  Yes.

13  Q.  2017, 407 and change?

14  A.  Yes.

15  Q.  2016, 397 and change, right?

16  A.  Yes.

17  Q.  You would agree, as a forensic accountant, that that looks

18  like a pattern?

19          MS. GHOSH:  Objection.

20          THE COURT:  As a forensic accountant, could you

21  identify that as a pattern?

22          THE WITNESS:  No.

23  BY MR. FEE:

24  Q.  This appears to you, as a forensic accountant for the FBI,

25  to be random?

1    A.  It's just --

2           MS. GHOSH:  Objection.

3           THE COURT:  Sustained.

4    BY MR. FEE:

5    Q.  How would you describe a recurring practice where there are

6    average cash withdrawals around or under $400 over a six year

7    and a half-year period?

8           MS. GHOSH:  Objection.

9           THE COURT:  Sustained.

10   BY MR. FEE:

11   Q.  If not a pattern, what is it?

12          MS. GHOSH:  Objection.

13          THE COURT:  Sustained.

14   BY MR. FEE:

15   Q.  So the Senate credit union --

16          MR. FEE:  If you can pull out a little bit, Mr. Kelly.

17   Q.  The source here is 5H-102; those are the Senate credit

18   union records?

19   A.  Yes.

20          MR. FEE:  Let's look at those, please.  Pull those up.

21   Q.  Actually, before we get into these, do you just recall from

22   sitting here today on the records you were given, this source,

23   the earliest-in-time transaction on those records, like

24   chronologically the first?

25   A.  The specific date of the first transaction --

O6sWmen2                          Rafferty - Cross

1    Q.  Or even --

2    A.  -- you're asking?

3    Q.  -- not the specific date, month, year?

4    A.  January of 2016.

5            MR. FEE:  OK.  Let's go to page 330 of the PDF.

6            There we go.  Can we zoom in on that.  You could

7    actually include the little signature box, because I have these

8    things on the bottom of my screen.

9            Thank you.

10   Q.  What do you recognize this to be, Ms. Rafferty?

11   A.  This appears to be a receipt from a cash withdrawal from

12   the account.

13   Q.  OK.  And so, you tell me if this is right.  It looks like

14   he, it looks like Robert Menendez, on January 13, 2016, at

15   11:44 a.m. engaged in what's reflected here?

16           MS. GHOSH:  Objection.

17   BY MR. FEE:

18   Q.  Just based on your review of the receipt.

19           THE COURT:  I'll allow it.

20   A.  There's a --

21           THE COURT:  What does this receipt reflect to you?

22           THE WITNESS:  I can't say for certain whether Robert

23   Menendez was the person that conducted the transaction, but I

24   can say that there was a transaction in this account with the

25   name Robert Menendez on it on that date at that time.

O6sWmen2                            Rafferty - Cross

```
 1   BY MR. FEE:
 2   Q.  OK.  So that person put in a check -- it says, check
 3   received, $25.50.  Do you see that --
 4   A.  Yes.
 5   Q.  -- at the bottom third, check received?
 6       Yes?
 7   A.  Yes.
 8   Q.  And then it says, cash dispense clearing.  Do you know what
 9   that means?
10   A.  So $425 was cashed out during that transaction.
11           THE COURT:  In other words, $25.50 was deposited into
12   that Senate Federal Credit Union account, and $425 was taken
13   out of it, is that correct?
14           THE WITNESS:  Yes.
15   BY MR. FEE:
16   Q.  And it looks like the 25 in was actually a check; is that
17   how you read these records?
18           MS. GHOSH:  Objection.
19           THE COURT:  No.  I'll allow that.
20           Does that reflect that the $25.50 that was deposited
21   was in the form of a check?
22           THE WITNESS:  Yes.
23   BY MR. FEE:
24   Q.  And then there's a signature here, understanding you have
25   no idea who actually signed that, but do you see what appears
```

1    to be a handwritten signature on the cash-received-by line?

2    A.  It appears to be a signature, yes.

3          MR. FEE:  All right.  So let's just zoom out.

4          And let's just scroll forward.  Like the next page.

5          You can keep going.  Next page.

6          You can zoom in here briefly.

7    Q.  So if you don't mind, Ms. Rafferty, can you just tell us

8    what you see here?

9    A.  There's a $175 deposit made to the account and then $175

10   withdrawn from the account.

11   Q.  So there's a check received and then cash removed?

12   A.  Correct.

13         MR. FEE:  Let's pull out and go back in.  And scroll

14   forward again, please.

15         We can zoom in here.

16   Q.  January 27, another $400 withdrawal?

17   A.  Yes.

18         MR. FEE:  OK.  Let's go forward.

19         Zoom in, just quick.

20   Q.  February 11 of 2016, another $400 withdrawal?

21   A.  Yes.

22         MR. FEE:  Let's scroll forward.

23         Zoom in.

24   Q.  By the way, do you see on these receipts it says United

25   States Senate SCU Hart branch?  Do you understand that there is

O6sWmen2                        Rafferty - Cross

1    a branch of the Senate Federal Credit Union within the Hart

2    Senate Office Building?

3             MS. GHOSH:  Objection.

4             THE COURT:  Do you know whether or not there is a

5    branch of the Senate Federal Credit Union in something called

6    the Hart building?  Yes or no.

7             THE WITNESS:  I have no knowledge of the Senate

8    building or anything in it.

9    BY MR. FEE:

10   Q.  It would make sense for the Senate credit union to have an

11   office --

12            THE COURT:  Sustained.

13   BY MR. FEE:

14   Q.  This is March 2 of 2016, another $400 withdrawal?

15   A.  Yes.

16            MR. FEE:  OK.  Let's scroll forward.

17            I'll stop soon.  I promise.

18            THE COURT:  Talking about stopping, when you have a

19   logical point to break, I'll give the jury its midmorning

20   break.  OK?

21   BY MR. FEE:

22   Q.  This is it.  March 9, 2016.  Last question.  March 9, 2016,

23   another $400 withdrawal and then someone signs cash received

24   by.  Do you see that, Ms. Rafferty?

25   A.  Yes.

O6sWmen2                          Rafferty - Cross

1              MR. FEE:  We can stop here, your Honor.

2              THE COURT:  All right.  Ladies and gentlemen, let's

3    take our midmorning break.  As I told you, we'll go until 1:30.

4    I'm told there are oranges and apples and things there that you

5    can eat if you wish to eat.

6              Let's make it 15 minutes, and then we'll go through to

7    1:30.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6sWmen2                    Rafferty - Cross

 1                    (Jury not present)

 2                    THE COURT:  You may step down, Ms. Rafferty.

 3                    (Witness not present)

 4                    THE COURT:  15 minutes.

 5                    MR. RICHENTHAL:  Very briefly.

 6             Your Honor sustained an objection to the question

 7      about whether the witness had seen public statements of the

 8      defendant.  We assume Mr. Fee and Mr. Weitzman do not intend to

 9      ask other witnesses about public statements of the defendant.

10      It's improper.  It's hearsay.  It has no business even being

11      asked, much less answered.

12                    THE COURT:  Mr. Fee.

13                    MR. FEE:  Yes, your Honor.

14                    THE COURT:  All right.

15             Also, I must say I was giving you a great deal of

16      leeway there, but when you started getting into swap meets and

17      guitars, I had to stop it.  Stick to what she did.

18                    MR. FEE:  Yes, your Honor.

19                    THE COURT:  OK.  Thank you.

20                    (Recess)

21

22

23

24

25

O6S5men3                     Rafferty - Cross

1          THE COURT:  Jury entering.

2          (Jury present)

3          THE COURT:  You may be seated in the courtroom.

4          Mr. Fee, you may continue with your cross-examination

5   of Ms. Rafferty.

6          MR. FEE:  Thank you, your Honor.

7   BY MR. FEE:

8   Q.  Hi again, Ms. Rafferty.  Let's put up the exhibit and go to

9   page 367.  So I have jumped ahead in time here, Ms. Rafferty,

10  do you see here again in these same account records another

11  $400 withdrawal on May 25 of 2017?

12  A.  Yes.

13  Q.  We can go to the next page, zoom in, and so we now have a

14  $500 withdrawal on June 7, 2017.  Do you see that?

15  A.  Yes.

16  Q.  Let's do two more.  Let's go to the next page.  So, here we

17  have another check received.  Do you see that phrase?

18  A.  Yes.

19  Q.  And then we have a $427 withdrawal?

20  A.  Yes.

21  Q.  On June 21 of 2017?

22  A.  Yes.

23  Q.  One more.  June 29, 2017 -- is that today? -- a $500

24  withdrawal?

25  A.  Yes.

O6S5men3                          Rafferty - Cross

Q.  We can put that down.

You testified that that particular exhibit that was a
source for the last chart you reviewed, the transactions
started in January of 2016; is that right?

A.  That is the time frame, yes.

Q.  Do you know, from looking at the records, when that Senate
Federal Credit Union account held by Senator Menendez was
opened?

A.  I don't recall.

MR. FEE:  I'm going to read a stipulation marked as
Defendant's Exhibit 2504, and if we can put that up, Mr. Kelly?

I'm not going to read the preamble but the parties
stipulate and agree to the following:  The document marked for
identification as Defendant's Exhibit 2080 consists of true and
correct copies of account information and bank statements from
the Senate Federal Credit Union for account holder Robert
Menendez.  The document marked for identification as
Defendant's Exhibit 2080 consists of true and accurate copies
of records of the Senate Federal Credit Union and are records
of regularly conducted activity created and maintained by the
Senate Federal Credit Union that were made at or near the time
of their creation by or from information transmitted by a
person with knowledge of the matters set forth in the records
and were kept in the course of the regularly conducted activity
of such financial institutions as a regular practice of that

O6S5men3                    Rafferty - Cross

1   activity.  And it states at the bottom that this stipulation is

2   admissible in evidence.

3       Your Honor, pursuant to that stipulation -- well, let me

4   put up for the witness and parties only, Defendant's Exhibit

5   28, and if you can just zoom in on the non-white portion?

6   Q.  You see here, Ms. Rafferty, the top right account number

7   ending 8151?

8   A.  Yes.

9   Q.  And you see the name:  Senator Robert Menendez?

10  A.  I do.

11          MR. FEE:  Your Honor, we offer Defendant's Exhibit

12  2080, pursuant to that stipulation.

13          THE COURT:  Admitted.

14          (Defendant's Exhibit 2080 received in evidence)

15          MR. FEE:  Mr. Kelly, can we scroll it down to show the

16  jury numbers 1 through 7.

17  Q.  Ms. Rafferty, these are records of that same account ending

18  in 8151 for which you reviewed records in 2016?

19  A.  Yes.

20          MR. FEE:  And so this is, we actually have to just

21  pull out for one moment, Mr. Kelly?  Just zoom in on the date

22  range here?  Yes.

23  Q.  Do you see that is January 1, 2008 through January 31,

24  2008?

25  A.  Yes.

1    Q.  Let's zoom in on the transactions on that first page.  And

2    so you see some transitions or what appear to be transactions

3    reflected here in the same Senate credit union account,

4    Ms. Rafferty?

5    A.  Yes.

6    Q.  You have some deposits?  Did you say something?

7    A.  No.

8    Q.  I'm sorry.  In my head.

9         On January 10, 2008, there is a withdrawal at an ATM for

10   $401.50.  Do you see that?

11   A.  Yes.

12   Q.  And it is at an ATM on Washington Street in Hoboken, New

13   Jersey?

14   A.  Yes.

15   Q.  Do you have any understanding of whether withdrawals from

16   ATMs that are not owned by your bank sometimes impose a

17   transaction fee?

18   A.  They do.

19   Q.  And do you see that $401.50 number here?

20   A.  Yes.

21   Q.  And then we have a couple of deposits that says ACH U.S.

22   Senate, and that one is on January 14.

23        Were you provided any information about Senator

24   Menendez' Senate salary?

25        MS. GHOSH:  Objection.

1        THE COURT:  Were you given any information as to what

2    his salary was?

3        THE WITNESS:  I don't know the specific salary, no.

4    BY MR. FEE:

5    Q.  In the credit union records you reviewed for 2016 to 2022,

6    did you see basically it's paychecks from the Senate being

7    deposited in the records you reviewed?

8    A.  I saw ACH deposits from the U.S. Senate like this one.

9    Q.  What is an ACH deposit, if you know?

10   A.  It is an electronic deposit into an account.  Rather than

11   taking your physical paycheck to the bank, it gets deposited.

12   Q.  Is that sometimes called a direct deposit?

13   A.  Yes.

14   Q.  Do you have any idea, based on your review of the records,

15   whether the Senator Menendez' Senate salary changed at all

16   during the time he served in the Senate?

17       MS. GHOSH:  Objection.

18       THE COURT:  Sustained.  She didn't know what his

19   salary was.

20   BY MR. FEE:

21   Q.  I'm sorry.  The deposits you saw in the records, did the

22   amount of those ACH deposits from the U.S. Senate change, if

23   you remember?  Did they go up or down?

24   A.  Between 2016 and 2022, the time period reviewed, they

25   fluctuated slightly sometimes; yes.

1   Q.  Slightly ballpark, if you know, up and down 10?  Up and

2   down 1,000?  If you remember.

3           MS. GHOSH:  Objection.

4           THE COURT:  I will allow it if she understands the

5   question and if she can answer it.

6           THE WITNESS:  I don't recall.

7   BY MR. FEE:

8   Q.  Let's cycle forward to the next page and look at a few of

9   these, page 2.  So now we are in March 1, '08 through March 31,

10  '08 in the same account, and you see here, again, some deposits

11  from the Senate like on March 11?

12          MS. GHOSH:  Objection as to scope.

13          MR. FEE:  It is the same thing --

14          THE COURT:  I will allow it.  Go ahead.

15  BY MR. FEE:

16  Q.  Do you see the deposit on March 11?

17  A.  Yes.

18  Q.  The withdrawal on March 11, it says ATM Dirksen Building,

19  Washington, D.C.?

20  A.  Yes.

21  Q.  And here we have the $400 amount, not the $401.50 amount;

22  right?

23  A.  Yes.

24  Q.  And then that's March 11.  On March 21 we have another

25  withdrawal, I will jump ahead --

1          MS. GHOSH:  Objection to the commentary.

2          THE COURT:  Next.

3    Q.  Let's go to page 5.  So here we have June 1, 2008 through

4    June 30, 2008.  Do you see that?

5    A.  Yes.

6    Q.  And again, on June 2nd we have something that says:

7    Deposit ACH U.S. Senate.  Do you see that?

8    A.  Yes.

9    Q.  June 12 we have a withdrawal at ATM and it says ATM SH116

10   Senate Hart Off, Washington, D.C. in the amount of $400.  Do

11   you see that?

12   A.  Yes.

13   Q.  And then on June 19, after -- sorry, June 18 there is

14   another deposit and then a June 19 there is another ATM

15   withdrawal of $400 at Hart Off Washington, D.C.  Do you see

16   that?

17   A.  Yes.

18   Q.  Let's go to page 25.  So now we are in 2010, February 2010

19   and I won't make us go line by line here highlighting, but do

20   you see on every one, the deposit?

21   A.  Yes.

22   Q.  February 17 withdrawal in Union City, New Jersey?

23   A.  Yes.

24   Q.  $403 there?

25   A.  Yes.

1   Q.  February 25, another withdrawal in Washington, D.C. for

2   $400.  Do you see that?

3   A.  Yes.

4   Q.  And then why don't we jump to page 72.

5           MS. GHOSH:  Your Honor, we object as cumulative.

6           THE COURT:  How many more of these do you have?

7           MR. FEE:  I will do three, your Honor.

8           THE COURT:  Three deposit slips?

9           MR. FEE:  Three pages, and I won't review every line.

10          MS. GHOSH:  We maintain our objection.

11          THE COURT:  Let's close it out.

12  BY MR. FEE:

13  Q.  So here we are in 2014.  Do you see that at the top?

14  A.  Yes.

15  Q.  And I would just circle, so we do it all at once, do you

16  see that I circled the dates January 6 and --

17          THE COURT:  No, nothing has come up.

18  Q.  Do you see January 6 and January 16 withdrawals at ATMs in

19  the amount for $400 each time?

20  A.  Yes.

21  Q.  Let's go to page 91.

22          MS. GHOSH:  Your Honor, I had objected to this.  I am

23  not sure what your Honor's ruling was on the cumulative nature.

24          THE COURT:  I am letting him finish out the three.

25  That is my ruling.

O6S5men3                        Rafferty - Cross

1   BY MR. FEE:

2   Q.  Now, in 2015, if we can focus in on the part above the

3   dotted line, just to make it easier to see, do you see here on

4   February 11 and then roughly two weeks later February 26

5   withdrawals at ATMs in D.C. for $400 each time?

6   A.  Yes.

7   Q.  Last one, page 1 -- let's go to the very last page, page

8   109.  Famous last words.  So the format is different but you

9   can see here if we can focus in on the primary savings portion?

10  Actually, I don't know if you can see the year.

11          MR. FEE:  Can you zoom out to see the year, Mr. Kelly?

12  Q.  So statement period up top it says December 1, 2015,

13  through December 31, 2015, for this same account.  Do you see

14  that?

15  A.  Yes.

16  Q.  Let's go back to the primary savings box.  December 6th,

17  15th, and 30th you have withdrawals at ATMs, $403.50, $400 and

18  $403.

19          Do you see all of that Ms. Rafferty?

20  A.  Yes.

21  Q.  You can put that down.

22          So, if you remember, we just looked at the Senate Federal

23  Credit Union account records from at some point in 2008 through

24  some point in December 2015.  You agree?

25  A.  Yes.

O6S5men3                      Rafferty - Cross

1   Q.  And the records you reviewed to make that chart were for

2   that same account but only from 2016 through mid-June 2022;

3   right?

4   A.  Correct.

5   Q.  And 2008 -- dumb question -- 2008 to 2022 is roughly 14

6   years?

7   A.  I can't count in my head right now.

8   Q.  I think it is about 14 years.

9           THE COURT:  Next question.

10  Q.  OK.  So, if you saw a pattern of withdrawals roughly every

11  two weeks over a 14-year period -- excuse me.

12      If you saw withdrawals roughly every two weeks in roughly

13  the same amount over a 14-year period, would you consider that

14  to be a pattern based on your experience as a forensic

15  accountant with the FBI?

16          THE COURT:  Sustained.

17  Q.  Were you given any information about how long Senator

18  Menendez served in the Senate?

19  A.  No.

20  Q.  You saw he had a Senate Federal Credit Union account in

21  2008?

22  A.  Just now you showed me, yes.

23  Q.  Were you given any information about Senator Menendez'

24  service in the House of Representatives?

25          MS. GHOSH:  Objection.

1          THE COURT:  Beyond the scope.

2    Q.  Were you given any financial records for Senator Menendez

3    predating 2008?

4    A.  No.

5    Q.  Were you given any records at all for something called the

6    Congressional Federal Credit Union, whether it related to

7    Senator Menendez or anybody else?

8          MS. GHOSH:  Objection.

9          THE COURT:  I will allow it.

10   A.  No.

11         MR. FEE:  I am going to read a stipulation,

12   Defendant's Exhibit 2503, if we can put that up, Mr. Kelly?

13         So I won't read the preface, but the parties, it is

14   here by stipulated and agreed among the parties that:

15         1.  The documents marked for identification as

16   Government Exhibit 5W-1 are true and accurate copies of records

17   of Congressional Federal Credit Union for an account ending in

18   X83, in the name Robert Menendez, and are records of regularly

19   conducted activity created and maintained by Congressional

20   Federal Credit Union that were made at or near the time of

21   their creation by, or from information transmitted by, a person

22   with knowledge of the matters set forth in the records, and

23   were kept in the course of the regularly conducted activity of

24   Congressional Federal Credit Union as a regular practice of

25   that activity.

1              2.  As a matter of general practice, the Congressional

2    Federal Credit Union does not retain account records for a

3    period of longer than 7 years and makes efforts to destroy

4    account records older than 7 years.  Other than the documents

5    marked for identification as Government Exhibit 5W-1, no

6    additional records relating to the account ending in X 83 in

7    the name Robert Menendez have been located by Federal Credit

8    Union.

9              And the parties agree that there will be no objection

10   under 901 and that the stipulation itself is admissible.

11             You can put that down.

12             THE COURT:  Are you moving the admission of that or

13   has it already been admitted.

14             MR. FEE:  I am moving the admission of that and I am

15   moving -- I don't know if it is, do you know GX 5W-1.

16             MS. GHOSH:  Your Honor, we have no objection to the

17   documents for use in a defense case.  We object to them as to

18   the scope for Ms. Rafferty's testimony.

19             MR. FEE:  Your Honor, it is a government exhibit, she

20   is a forensic accountant.

21             THE COURT:  It is coming in by virtue of stipulation,

22   correct?

23             MS. GHOSH:  We stipulated to the authenticity of the

24   bank records which were, as Ms. Rafferty said, not something

25   she reviewed, so we object to scope for their presentation

1   during her testimony.

2           THE COURT:  I'm going to allow it.  Admitted.

3           (Government's Exhibit 5W-1 received in evidence)

4           MR. FEE:  Let's put up Government Exhibit 5W-1,

5   please, let's focus in there.

6   BY MR. FEE:

7   Q.  Do you see that it says:  How to open an account, on the

8   top left, Ms. Rafferty?

9   A.  Yes.

10  Q.  And then on the right it says membership application and

11  then the next line you see the numbers 83?

12  A.  Yes.

13  Q.  And then it says, under that:  Menendez, Robert?

14  A.  Yes.

15  Q.  And then the date, there is a signature and then the date

16  appears to be September 19 of 1995.  Do you see that?

17  A.  I do.

18  Q.  And then you just heard the reference to this exhibit being

19  the only records available for the account ending in -83.  Do

20  you remember hearing that a moment ago, Ms. Rafferty?

21  A.  I remember reading that stipulation.

22  Q.  Thank you.

23      And again, when you were preparing the chart of the

24  senator's withdrawals, were you given any information about an

25  account he held at the Congressional Federal Credit Union?

1          MS. GHOSH:  Objection.

2          THE COURT:  I will allow it.

3          You may answer.

4          THE WITNESS:  I'm sorry.  Can you repeat the question?

5   Q.  Sure.  When you were working on the charts you showed to

6   this jury, were you provided with any information relating to

7   this account Mr. Menendez', then Representative Menendez',

8   account with the Congressional Federal Credit Union?

9   A.  No.  I'm confused.  Are you saying that this is the opening

10  document for the account that we just reviewed the withdrawals

11  from?

12  Q.  No.

13  A.  OK.

14  Q.  Different account, different account number.  I'm sorry.

15  And I think you answered the question.

16  A.  OK.

17  Q.  You were not provided with any information about this

18  Congressional Federal Credit Union account?

19  A.  I didn't review records for that account, no.

20  Q.  Very good.  Thank you.

21          Let's go back to your chart, Government Exhibit 1336.  I

22  don't think it is reflected here, do you know or can you do in

23  your head a rough approximation of the average amount of cash

24  withdrawn from this account for each complete year?  Meaning

25  like if you took all six complete years, can you calculate the

1    average amount of cash withdrawals each year?

2                MS. GHOSH:  Objection.

3                THE COURT:  Sustained.

4                MR. FEE:  No?

5                THE COURT:  No.  Let's go on.

6                You see the figures there for the full years; right?

7                THE WITNESS:  Correct.

8                THE COURT:  And one presumably could average them,

9    correct?

10               THE WITNESS:  If I had a calculator, yes.

11               THE COURT:  Move on.

12   BY MR. FEE:

13   Q.  The total is $86,000, right?

14   A.  $86,947.58.

15   Q.  So if you take away $5,000 from $86,947.58, you would get

16   $81,947 --

17               THE COURT:  Next question.

18   Q.  -- 58 cents.

19               MS. GHOSH:  Objection.

20               THE COURT:  There is no question.  Next question.

21   Q.  So, if Senator Menendez withdrew an average of, let's say,

22   $10,000 for 16 years, how much cash would that --

23               THE COURT:  Sustained.

24               These are in.  You can make your arguments in

25   summation.

 1                MR. FEE:  Absolutely.

 2     BY MR. FEE:

 3     Q.  Did you see anything in the records you used to prepare

 4     this chart that indicated the reason why these withdrawals were

 5     being made, just based solely on your review of the records?

 6                THE COURT:  You may answer.

 7                THE WITNESS:  No.

 8     Q.  Did you see anything in your review of the records for this

 9     chart or any of the other charts including the ones with

10     photographs indicating where Senator Menendez stored the cash

11     that he withdrew?

12                MS. GHOSH:  Objection.

13                THE COURT:  I will allow it.

14                Did you see any evidence about that one way or the

15     other?

16                THE WITNESS:  Storage of money?

17                THE COURT:  Yes.

18                THE WITNESS:  Specifically, no.

19     Q.  Meaning you saw some pictures of money but you can't say if

20     it was the money withdrawn from any particular account?

21                MS. GHOSH:  Objection.

22                THE COURT:  You don't know where the money that you

23     saw pictures of came from; is that correct?

24                THE WITNESS:  That's correct, Judge, I do not.

25                MR. FEE:  Let's put up what is in evidence Government

O6S5men3                         Rafferty - Cross

1   Exhibit 1F-1092.

2   Q.   Is this one of the pictures you were provided with by the

3   prosecutors?

4            MS. GHOSH:  Objection.

5            THE COURT:  Let's see if it was one of.  Is it in

6   evidence?

7            MR. FEE:  It is in evidence.

8            THE COURT:  Did the prosecutors give you that picture?

9   If you know.

10            THE WITNESS:  I don't recognize this photo.

11   Q.   Let's show just two others that are also in evidence,

12   Government Exhibit 1F-1305 and 1F-1306.

13            THE COURT:  Same question?

14            MR. FEE:  Same question.

15            THE COURT:  Were you shown those photos?

16            THE WITNESS:  I don't recall.

17   Q.   Let's go to Government Exhibit 1338, another one of your

18   charts.  Just focus on the top third for a moment.

19        This is titled:  Fred Daibes Envelopes?

20   A.   This section of it, yes.

21   Q.   This section of it.  Did you pick that title or did the

22   prosecutors?

23   A.   I did not.

24   Q.   Who did?

25   A.   The attorney's office did.

1  Q.  And then if we go down to the bottom of this section, it

2  gives a total dollar value found in what is labeled as:  Fred

3  Daibes Envelopes of $82,500; right?

4  A.  Yes.

5  Q.  And you did the math here?

6  A.  I summarized the column that is second from the right, yes.

7  Q.  And based on your work here --

8  A.  And I just verified that that total was correct, to be

9  clear.

10 Q.  Understood.

11     Based on your work here, do you have any understanding of

12 the common factor among the items shown in this chart labeled

13 Fred Daibes envelopes?

14         THE COURT:  Sustained.

15 Q.  Are you aware that one of the things that is common is that

16 a fingerprint or DNA of Fred Daibes is on this?

17         THE COURT:  Sustained.

18 Q.  Do you see in this chart there is a column that says

19 Fingerprints?

20 A.  Yes.

21 Q.  And there is a column that says DNA?

22 A.  Yes.

23 Q.  And you were asked on direct if Fred Daibes was in either

24 one of these columns for each item listed?

25 A.  Yes.

1  Q.  When you created this chart or worked on this chart called

2  Fred Daibes Envelopes, were you given any information

3  indicating when or how a fingerprint of anyone got onto these

4  items?

5            MS. GHOSH:  Objection.

6            THE COURT:  I will allow it.

7            Were you given any information about that fingerprint

8  apart from what is on the chart?

9            THE WITNESS:  No.

10  BY MR. FEE:

11  Q.  It is labeled Fred Daibes Envelopes and it includes

12  pictures of cash and contents of envelope, correct, in the

13  column labeled Contents of Envelope?

14  A.  It is a photo of the cash, yes.

15  Q.  And in fact every row in that column has a picture of cash;

16  right?

17            MR. FEE:  You can pull out, Mr. Kelly, so Ms. Rafferty

18  can see.

19            THE COURT:  The column that says contents of envelope.

20  A.  Yes.

21  Q.  And part of your work, you said, was to verify the accuracy

22  of the information on this chart?

23  A.  Yes.

24  Q.  So were you given any information indicating how much cash

25  was in each envelope at the time a fingerprint or DNA was

O6S5men3                    Rafferty - Cross

1  actually deposited on that envelope?

2            MS. GHOSH:  Objection.

3            THE COURT:  Sustained.

4            MR. FEE:  Did you rule, Judge.

5            THE COURT:  I said sustained.

6            MR. FEE:  Hope springs.

7  BY MR. FEE:

8  Q.  So, the third column here that says Location is supposed to

9  indicate, as far as you understand it, where the item is found;

10 right?

11 A.  It is the location from the government's exhibits.

12 Q.  Got it.  So you cite some exhibits and that's where you

13 pull the location from?

14 A.  Yes.

15 Q.  Let's go to the bottom section, the three rows in red.

16 Those three rows say safe deposit box no. 13.  Do you see that?

17 A.  Yes.

18 Q.  And do you understand from your review of the source

19 documents cited here that that is a safe deposit box located at

20 Chase Bank in Englewood, New Jersey?

21 A.  Yes.

22 Q.  And from the records you reviewed to prepare this chart,

23 are you aware that that safe deposit box is held individually

24 by Nadine Arslanian?

25           MS. GHOSH:  Objection.

 1                THE COURT:  Sustained.

 2                MR. FEE:  Let's put up Government Exhibit 5F-2401, and

 3      if we can move forward a -- sorry -- zoom in on the non-white

 4      here.

 5      Q.  These are records you reviewed for this chart,

 6      Ms. Rafferty?  Do you recognize it?

 7                MS. GHOSH:  Your Honor, we object to the scope of

 8      these questions.

 9                THE COURT:  Not if they're documents she reviewed to

10      prepare the chart.  That I will allow.  Let's see.

11                THE WITNESS:  Can you repeat the question again?

12      Q.  Sure.  Just to set the context, you testified that the safe

13      deposit box listed in this chart is the safe deposit box at

14      Chase Bank in Englewood, New Jersey?

15      A.  Yes.

16      Q.  And are you aware that that was box no. 13?

17      A.  Yes.

18      Q.  And who is the holder of that safe deposit box?

19      A.  Nadine Arslanian.

20      Q.  Just going to this portion, were you -- did you review the

21      portions of the record that reflected who accessed the safe

22      deposit box during the period for which you created this chart?

23      A.  No.

24      Q.  Are you aware that Senator Menendez does not appear to have

25      ever accessed --

1           THE COURT:  Sustained.

2    Q.  -- based on these records.

3           THE COURT:  Sustained.

4    Q.  In your review of records relating to the Nadine Arslanian

5    safe deposit box do you recall, sitting here today, seeing

6    anything indicating that Senator Menendez accessed a safe

7    deposit box?

8           THE COURT:  Sustained.

9    Q.  In the records you reviewed to prepare this chart relating

10   to the safe deposit box, do you recall seeing Senator Menendez'

11   name anywhere on the records relating to the safe deposit box?

12          THE COURT:  I will allow that.

13          MS. GHOSH:  Your Honor, I don't believe this is one of

14   the cited sources in her chart so we continue to object to the

15   scope.

16          MR. FEE:  I'm not asking about the exhibit, I am

17   asking about the records she reviewed.

18          THE COURT:  Go ahead.  I allow that question.

19          THE WITNESS:  I don't recall.

20          MR. FEE:  We can put that down, Mr. Kelly.  Let's go

21   back to those last three rows on -- there we go.

22   Q.  So the second to last column has dollar amounts; right?

23   A.  Yes.

24   Q.  And it cites, it says TR. 2190.  What is that?

25   A.  Transcript.

O6S5men3                         Rafferty - Cross

1   Q.  A transcript from this trial or some other proceedings?

2   A.  From?

3   Q.  Do you know what proceeding that transcript, from which

4   proceeding that transcript was created?

5   A.  I don't recall.

6   Q.  So, if you sum up these three rows -- 8, 9, 10 -- you get

7   $30,000; correct?

8   A.  Yes.

9   Q.  And so the total amount, if you can zoom out just a little

10  bit, is $82,500 for this portion of the chart?

11          THE COURT:  Not for this portion.

12  Q.  I'm sorry.  Just the Fred Daibes Envelope chart, the total

13  is $82,500; correct?

14  A.  Rows 1 through 10 on this exhibit totals $82,500.

15  Q.  And the $30,000 reflected in 8 through 10 were not found at

16  41 Jane Drive, they were found at the safe deposit box;

17  correct?

18          MS. GHOSH:  Objection.

19          THE COURT:  See if she knows.

20          THE WITNESS:  I have no knowledge.

21  Q.  I'm sorry.  You listed the location as safe deposit box

22  no. 13; right?

23          MS. GHOSH:  Objection.  Argumentative, and she

24  testified that her knowledge is based on sources cited in the

25  document.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           THE COURT:  What is the question?

2           MR. FEE:  So let's zoom out, I will rephrase.  Let's

3    go to the first page.

4    Q.  Do you see it says location on the third column?

5    A.  Yes.

6    Q.  Let's look down on this page of the locations listed for

7    other items.  Do you see it says Room U, Room C, Room C?  Do

8    you see that?

9    A.  Yes.

10   Q.  Let's go to the second page.  You would agree that the

11   location column here says safe deposit box no. 13?

12   A.  Yes.

13   Q.  And it says it for rows 8, 9, and 10?

14   A.  Yes.

15   Q.  And so there is $30,000 in these rows found at the location

16   of safe deposit box no. 13?

17   A.  Yes.

18           MR. FEE:  Let's go to rows 2 through 6 on the first

19   page.

20   Q.  So each of these is listed as the location Room C (closet)

21   safe.  Do you see that?

22   A.  Yes.

23   Q.  And in fact, just briefly, row 4 here you were asked about

24   on direct, it indicates Fred Daibes on tape, Robert Menendez on

25   envelope.  Do you see that?

O6S5men3                    Rafferty - Cross

1    A.   Yes.

2    Q.   And again, you were not given any information about whether

3    these two fingerprints were deposited on that envelope at the

4    same or different times?

5            THE COURT:   Sustained.

6    Q.   How did you verify the accuracy of this portion of your

7    chart, the column in 4 that says Fred Daibes on Tape, Robert

8    Menendez on envelope.  How did you verify the accuracy of that

9    entry?

10           MS. GHOSH:   Objection, your Honor.  The chart speaks

11   for itself.

12           THE COURT:   Did you do anything to verify what that

13   says there?

14           THE WITNESS:   I relied on the source document.

15           THE COURT:   Yes.  Thank you.

16           The jury will disregard my comment.

17   Q.   So location Room C (closet) safe what, if anything, did you

18   do to verify that entry, that text?

19           THE COURT:   Again, I assume you just accepted that as

20   having been stated by the prosecutors; correct?

21           THE WITNESS:   It was mentioned in the source document,

22   your Honor.

23           THE COURT:   That's the better way of phrasing it.

24   Thank you.

25           MR. FEE:   Let's put up what is in evidence as 1F-1019.

O6S5men3                          Rafferty - Cross

1   Q.  Were you ever shown a photograph of what you have

2   referenced in that chart as closet and safe?

3           MS. GHOSH:  Objection.  Scope.

4           THE COURT:  Sustained as to scope.

5   Q.  OK, we will put this down.

6           Were you shown any photographs of the things in the

7   chart that state closet and safe?

8           MS. GHOSH:  Objection.

9           THE COURT:  I will allow it.

10          THE WITNESS:  I was shown the photos that are

11  referenced in source documents in the chart.

12  Q.  So if it is listed in the chart, you saw the photo.  If it

13  is not listed in the chart, you didn't see them?

14  A.  There are other photos I reviewed for other exhibits that

15  are not encompassed in that chart.

16  Q.  Do you remember seeing any photographs of a closet?

17  A.  No.

18  Q.  Let's put up the chart again, rows 2 through 6, and I just

19  want to sum here.  So, from the items listed as location Room C

20  (closet) safe we have rows 2, 3, 4, 5, 6, let's just start with

21  those.  If we can add those together it is $9,100, plus $7,400,

22  plus $5,300, plus $9,500, plus $10,000.  And then we don't have

23  to do the math here but let's go to the next page.

24          MS. GHOSH:  Your Honor, we object to adding things up.

25  This is in evidence.

O6S5men3                        Rafferty - Cross

1          THE COURT:  Let's see.  I don't have a question yet.

2    Q.  And then room 7 says Room C (closet) but not safe.  Right?

3    Do you see that, Ms. Rafferty?

4    A.  It says Room C (closet).

5    Q.  And is it doesn't have the word "safe" here?

6    A.  No.

7    Q.  And then that one says $1,200?

8    A.  Correct.

9    Q.  And if I told you that the sum of rows 2 through 7 was

10   about --

11          THE COURT:  Sustained.  Let's move on.

12   Q.  Do you know how much of the $82,500 total at the bottom of

13   this, just from the chart, do you know how much was found

14   either in the safe or the safe deposit box?

15          THE COURT:  Can you say looking at it right now?

16          THE WITNESS:  I would like a calculator to verify.

17          MR. FEE:  Can I give her a calculator, your Honor?

18          THE COURT:  No.  Let's move on.  It is in evidence.

19   You can do the calculations and argue to the jury.  Move on.

20          MR. FEE:  Yes, your Honor.

21          Just to pull out one last piece on this chart, can we

22   do the two pages side by side or is it too small?

23   Q.  Let's do this.  You would agree, Ms. Rafferty, that the

24   only item on the Fred Daibes Envelope chart that is not from

25   Room C or the safe deposit box is in row 1; is that correct?

1           THE COURT:  Show her the full chart.

2           MR. FEE:  Just leave it like that.

3   A.  And can you repeat the question?

4   Q.  Sure.  You would agree that the only item on this chart

5   that has a location other than Room C or safe deposit box

6   no. 13 is row 1?

7   A.  Yes.

8   Q.  And row 1 location says Room U (basement) black jacket;

9   right?

10  A.  Yes.

11  Q.  And I just want to understand.  When you verified the

12  accuracy of this chart, were you given any information

13  indicating how and when the envelope depicted there was placed

14  in the black jacket?

15          THE COURT:  Sustained.  We have been through this on

16  any number of iterations.  She said what the extent of her

17  knowledge is.  Let's move on, sir.

18  Q.  None of the entries on this chart, this particular chart,

19  come from something called Room Q; right?

20          MS. GHOSH:  Objection, your Honor.

21          THE COURT:  Is Room Q listed on that chart?

22          THE WITNESS:  Room Q is not one of the locations

23  listed on this chart.

24  Q.  Staying in the wide shot, the latest date of any of the

25  bills in the final column here is October 12, 2021 in row 2; is

1    that right?

2    A.  You are saying the most recent date?

3    Q.  Yes, yes.  I'm sorry.

4    A.  In this column?  Give me one second to verify.  October 12,

5    2021; yes.

6    Q.  And this, the last column has an image of one bill in each

7    row except for rows 8 through 10; correct?

8    A.  Yes.

9    Q.  Do you know if the bill depicted in the image is actually

10   the bill that bears the date listed in that column?

11              MS. GHOSH:  Objection.

12              THE COURT:  Yes.  Sustained.

13   Q.  I'm asking, what is that bill depicted, the image of the

14   bill, like, just say row 1, last column, what is that bill?

15   A.  So that bill is the bill that corresponds with the serial

16   number above it next to the date in bold, and then that

17   information comes from Government's Exhibits 5G-300 and 1335.

18   Q.  On direct examination do you remember being asked whether

19   there might be more bills with post-2018 payout dates that are

20   not depicted here?

21   A.  Yes.  I recall that.

22   Q.  Do you actually know from your work if there are more bills

23   for the post-2018 dates, let's say, for row 1?

24   A.  You would be able to do that by going back to the

25   government exhibit and filtering it.  I can't give you an exact

O6S5men3                        Rafferty - Cross

1   detail for each and every row in this chart from memory but

2   more than happy to pull up that exhibit.

3   Q.  So the way to find post-2018 bills is to go to one of the

4   government's exhibits and filter it; correct?

5   A.  Yes.

6   Q.  And if it is not in that government exhibit, so far as you

7   understand the work you did, it's not a post-2018 bill;

8   correct?

9             MS. GHOSH:  Objection.

10            THE COURT:  I will allow that if you can answer it.

11            THE WITNESS:  I don't know.

12  Q.  How do you know that that exhibit could indicate to you

13  other post-2018 bills?

14            MS. GHOSH:  Objection.

15            THE COURT:  Sustained.

16  Q.  What exhibit are you referring to?  Do you know offhand?

17            MS. GHOSH:  Objection.  Asked and answered.

18            THE COURT:  I will allow it.

19  A.  Which exhibit are you asking me about?

20  Q.  When you said I could go find out the other post-2018

21  bills, do you know the exhibit number offhand?

22  A.  It would be Government's Exhibit 5G 300 and Government's

23  Exhibit 1335.

24            MR. FEE:  Let's put up another one of the charts,

25  Government Exhibit 1342.  So this is -- just focus in on the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   non-white portions.

2   Q.  You testified about this being an M&T Bank account.  Is it

3   held individually by Senator Menendez, if you know?

4   A.  I would need to see the opening document again.  I don't

5   recall.

6   Q.  But you have reviewed the underlying records?

7   A.  Yes.

8   Q.  And then the bottom row says:  Reported rents received.  Do

9   you remember testifying about that?

10  A.  About the Schedule E line?

11  Q.  Yes.

12  A.  Yes.

13  Q.  Do you know from what -- you reviewed this Schedule E form?

14  A.  Yes.

15  Q.  Do you know what, from where the rents are coming in?  Is

16  it a building?  Is it a home?  Is it a commercial office?  Did

17  Schedule E indicate?

18          MS. GHOSH:  Objection.

19          THE COURT:  Did Schedule E indicate the source?

20          THE WITNESS:  I don't recall.  I would have to look at

21  the Schedule E again.

22  Q.  The chart says:  Rents received.  What do you mean by

23  "rent" in this chart?

24  A.  So a Schedule E is where you would itemize any income from

25  rental properties that you own and receive rent for, so rental

1   income therefore would be rental income received from that

2   rental property.

3   Q.   From some one of these records you have come to understand

4   that there was rent payments being made into this account?

5              MS. GHOSH:  Objection, your Honor; scope.

6              THE COURT:  I will allow it.

7              THE WITNESS:  I understand that --

8              THE COURT:  It is on the chart.

9              THE WITNESS:  I understand that on the Schedule E the

10  amount of reported rents received was that number, and then

11  that number matched the amount of deposits into the M&T

12  account.

13  Q.   Did you learn the location of the building for which rents

14  were being paid from reviewing the Schedule E?

15             MS. GHOSH:  Objection.

16             THE COURT:  Is it set forth on the Schedule E, to your

17  knowledge?

18             THE WITNESS:  I don't recall.  I would have to see the

19  Schedule E again and see if there is an address associated with

20  the rental property that was listed on that return.

21  Q.   Last question about the Schedule E.  Did it indicate that

22  Senator Menendez was the owner of the property for which rents

23  were being received?

24             MS. GHOSH:  Objection.

25             THE COURT:  Sustained.

1          Does the Schedule E indicate the owner of the --

2          THE WITNESS:  Of the rental property?

3          THE COURT:  Yes.

4          THE WITNESS:  I don't recall, your Honor.

5          THE COURT:  OK.  Thank you.

6  BY MR. FEE:

7  Q.  This account for which rents were being reported on federal

8  tax forms -- sorry, is it federal tax forms Schedule E?

9  A.  A Schedule E is part of federal income tax returns.

10  Q.  Who filed that?

11          MS. GHOSH:  Objection.

12  Q.  If you know from the review of the Schedule E.

13          THE COURT:  I will allow it.

14  A.  I was only provided a copy of the Schedule E.  I didn't see

15  the return in its entirety.

16  Q.  Were there any names listed on the Schedule E at all?

17  A.  I don't recall.

18  Q.  But it is in a chart for this bank account held by Robert

19  Menendez?

20          THE COURT:  How much longer do you have, sir?  The

21  jury can see that, you can see that.  You can argue it, it is

22  already in evidence.  How much longer do you have?

23          MR. FEE:  40 minutes, your Honor.

24          THE COURT:  Let's continue.

25          MR. FEE:  Not all on this chart.  Believe me.

O6S5men3                           Rafferty - Cross

1             THE COURT:  Let's continue.

2    BY MR. FEE:

3    Q.  So here you list cash into M&T and then checks into M&T.

4    Do you see those first two rows?

5    A.  Yes.

6    Q.  And then there is one row that has one deposit?

7    A.  Are you referring to the third row?

8    Q.  Yes.

9    A.  Where backup was not provided?

10   Q.  Yes.

11   A.  Yes.

12   Q.  And then you summed those up in the 1, 2, 3 -- fourth row

13   it says total M&T, that reflects the sum of the cash and the

14   checks in that one deposit; is that correct?

15   A.  Yes.

16   Q.  And then you listed what was actually reported on the taxes

17   relating to these rents; right?

18   A.  Yes.

19   Q.  And so, the total that was deposited into M&T is cash or

20   check was accurately reported on the Schedule E tax form; is

21   that your understanding?

22             MS. GHOSH:  Objection.

23             THE COURT:  Sustained.

24   Q.  Are the numbers in row 4 from 2018 forward the same as the

25   numbers in row 5 from 2018 forward?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        MS. GHOSH:  Your Honor, this was her direct testimony.

2    We don't need to go through it again?

3        THE COURT:  I will allow this question.

4        THE WITNESS:  The number in the fourth row of the

5    chart that shows the total amount deposited into M&T ending in

6    4743 matches the amount of the number reported as reported

7    rents received in the Schedule E between 2018 and 2021.

8    Q.  So every dollar of cash deposited into M&T is also

9    reflected in the amount on the Schedule E form?

10        MS. GHOSH:  Objection.

11        THE COURT:  I will allow it.  We need to move forward.

12   A.  Those two numbers match.

13   Q.  And you prepared charts reflecting cash and gold found in

14   certain locations; correct?

15        MS. GHOSH:  Objection.  Misstates.

16        THE COURT:  Did you?

17        THE WITNESS:  I didn't prepare the gold chart.  I

18   reviewed it, as well as the chart that you just had up before

19   with the cash.  I didn't prepare it, I just reviewed that for

20   accuracy.

21   BY MR. FEE:

22   Q.  Thank you.  So you reviewed charts and testified about them

23   here that depicted the locations where cash and gold were

24   found; correct?

25   A.  Yes.

1   Q.  In your review of those charts you did not see anything,

2   any cash, any gold that was taken from the property for which

3   rents are received here; correct?

4           MS. GHOSH:  Objection.

5           THE COURT:  Sustained.

6   Q.  As part of your preparing to testify today -- you can put

7   that down, Mr. Kelly -- you also reviewed Senator Menendez'

8   income; correct?

9   A.  I reviewed bank accounts for which there were deposits

10  into.

11  Q.  And then you also --

12          THE COURT:  In his name.

13          THE WITNESS:  In his name.

14          As I testified before when you were displaying the

15  federal credit union returns, there were deposits from the

16  Senate in there.

17  Q.  Thank you.  You also did something, described a schedule

18  Partial Expenses?

19          MS. GHOSH:  Objection.

20          THE COURT:  Yes.

21  Q.  Did you look at Senator Menendez' expenses?

22          MS. GHOSH:  Objection.

23          THE COURT:  I will allow that.  I will allow it.

24          THE WITNESS:  I reviewed bank accounts in Senator

25  Menendez' name that included withdrawals other than cash

O6S5men3                        Rafferty - Cross

1   withdrawals -- disbursements, I should say, other than cash

2   withdrawals.

3   Q.  Do you remember telling the prosecutors that you scheduled

4   partial expenses from a rental apartment held by Robert

5   Menendez?

6   A.  No.

7           MR. FEE:  Let's put up just for the witness and the

8   attorneys 3535-10 and zoom in on the date.

9   Q.  Don't say anything, Ms. Rafferty.  I am going to ask you a

10  question after you have had a chance to review.

11          And if we can highlight the second sentence?

12          THE COURT:  Do you see that second sentence?  Yes or

13  no.

14          THE WITNESS:  I see that second sentence, yes.

15          THE COURT:  Next question.

16  BY MR. FEE:

17  Q.  Does that refresh your recollection that you scheduled

18  partial expenses from rental apartment in RM rents?

19          THE COURT:  Now, just because something is there

20  doesn't mean it is true.  The question here is simply having

21  looked at whatever that is, do you now have a refreshed

22  recollection in regard to whether you scheduled partial

23  expenses from a rental apartment in RM rents?  Yes or no.

24          THE WITNESS:  It doesn't refresh my memory, no.

25  Q.  We can put that down.

1    Did you see any records reflecting Senator Menendez paying

2    rent on a Washington, D.C. property or apartment?

3         MS. GHOSH:  Objection.  Scope.

4         THE COURT:  Sustained.

5    Q.  Let's put up your GX 1339 chart.  So location found, so

6    this is titled Gold Bars Associated with Fred Daibes; correct,

7    Ms. Rafferty?

8    A.  This section of the exhibit, yes.

9    Q.  This section of 1339.  Thank you.  The location found is

10   all 41 Jane Drive, right?

11   A.  On this page, yes.

12   Q.  Let's go to the next page and the next page.  So up until

13   rows 12 and 13 it says 41 Jane Drive for the location; right?

14   A.  Rows 1 through 11, yes.

15   Q.  Thank you.  And then rows 12 and 13 say Nadine Menendez

16   cellphone photo; correct?

17   A.  Yes.

18   Q.  Now just go back to page 1 of this chart.  So, different

19   than the last chart we reviewed, this doesn't have a specific

20   location within 41 Jane Drive under location found; correct?

21   A.  Correct.

22   Q.  It just states the address 41 Jane Drive?

23   A.  Yes.

24   Q.  When you were reviewing and confirming the accuracy of this

25   chart, were you able to come to the understanding that all of

O6S5men3                          Rafferty - Cross

 1    these items were found in the closet safe at 41 Jane Drive?

 2              MS. GHOSH:  Objection.

 3              THE COURT:  Sustained.

 4              I take it you only know the information that is set

 5    forth on the chart; right?

 6              THE WITNESS:  Yes, your Honor.

 7              THE COURT:  Next question.

 8    Q.  You did have to look at FBI records or government records

 9    to verify the location found; correct?

10              MS. GHOSH:  Objection.

11              THE COURT:  No, I will allow that.

12              THE WITNESS:  I reviewed government's exhibits and, as

13    I said, charts and photos, primarily.  I did see photos of

14    these gold bars.  I don't have independent knowledge of where

15    they came from or what specific room in any sort of property.

16    Q.  Understood.

17              Can we zoom out, Mr. Kelly?

18    Q.  Do you know the source document for the location found

19    column that you used to verify the location found column here?

20              MS. GHOSH:  Objection.

21              THE COURT:  I will allow it.

22              THE WITNESS:  I don't recall specifically.

23    Q.  Do you remember verifying this column?

24    A.  I remember verifying the entire chart.

25    Q.  If the source document is not listed in the column is there

O6S5men3                          Rafferty - Cross

1    another place where it might be listed?

2              MS. GHOSH:  Your Honor, we covered this on direct.

3    This cross has already lasted far longer than the direct so we

4    continue to object to the scope.

5              THE COURT:  Indeed, that is true.

6              Go ahead.  Next question, sir.

7    BY MR. FEE:

8    Q.  You don't remember this source document to verify this

9    column?

10             THE COURT:  She said that.

11   Q.  Let's go to the bottom of page 3 of this chart.  So these

12   two entries that say Nadine Menendez Cellphone Photo, what do

13   you understand those words to mean?

14             MS. GHOSH:  Objection.

15             THE COURT:  Sustained.  They mean:  Nadine Menendez

16   cellphone photo.

17   Q.  Ms. Rafferty, do you understand, in verifying the accuracy

18   of this chart, whether this physical bar was ever recovered by

19   the government?

20             MS. GHOSH:  Objection.

21             THE COURT:  Sustained.

22             I take it, Ms. Rafferty, that you were provided with a

23   photo from a cellphone that the government said was a Nadine

24   Menendez cellphone; is that correct?

25             THE WITNESS:  I was provided with a photo and that's,

1    yes, where it is attributed to.  I have no independent

2    knowledge.

3            THE COURT:  OK.

4    BY MR. FEE:

5    Q.  I know you don't have independent knowledge, I am just

6    asking about this chart and how you ended up preparing it.  You

7    listed $59,151.85 as the value of the gold bar depicted in the

8    photograph, correct?

9            MS. GHOSH:  Objection.

10           THE COURT:  Is that what that depicts?

11           THE WITNESS:  The value in that column that you have

12   highlighted of $59,000 is the value of the kilo of gold -- one

13   kilogram gold bar on that date, and in row 12 and 13 they each

14   have a picture of a 1 kilo gold bar.

15   Q.  On which date?  I'm sorry.

16   A.  If you scroll up -- June 16, 2022.  It is in the asterisk

17   there.

18   Q.  So the way you determined the value listed in rows 12 and

19   13 was by going to the website listed on the bottom, kitco.com?

20   A.  Yes.

21   Q.  And going to particular date on June 16, 2022?

22   A.  Correct.

23   Q.  Do you have any understanding as so why you used that date

24   to provide the value?

25   A.  It was the date I was asked to use by the U.S. Attorney's

1    office.

2    Q.  Again, do you understand anything about any transaction

3    relating to the images of the gold bars in rows 12 and 13?

4             MS. GHOSH:  Objection.

5             THE COURT:  Sustained.

6             You already have the limits of her knowledge, sir.

7             MR. FEE:  Your Honor, she testified about the chart.

8    I am just asking what the charts mean.  I want to make sure I

9    understand.

10            THE COURT:  Well, I think you have the limits of her

11   knowledge.  You keep on asking essentially the same question.

12            Go ahead.  Next question.

13   Q.  So the value you took for each of these bars, when you sum

14   it up, is around $120,000, just under $120,000 correct?

15            MS. GHOSH:  Objection.

16            THE COURT:  I will allow it.

17            $59,000 and $59,000 equals, for a non-forensic

18   accountant, apparently, about $160,000.  Is that the

19   approximate sum of those two figures?

20            THE WITNESS:  For simplification purposes round the

21   $59,000 up to $60,000, multiply that by 2, so that would be

22   $120,000.  Slightly less, because we rounded up.

23   Q.  Thank you.  And so fair to say that of the total listed on

24   the bottom of this chart, of roughly less than $120,000, is

25   from images found on Nadine Menendez' cellphone?

1          MS. GHOSH:  Objection.

2          THE COURT:  No, I will allow it.

3          Is the approximately $120,000 of the approximately

4   $253,000 derived from rows 12 and 13 which say Nadine Menendez

5   Cellphone Photo, and it contains the bars, total somewhat less

6   than $120,000.  Is that so?

7          THE WITNESS:  Yes, your Honor.

8          THE COURT:  Next.

9   BY MR. FEE:

10  Q.  Let's go to the next section of Government Exhibit 1339.

11  So the first one on this chart or this section of 1339 is

12  titled Asahi One Ounce Gold Bars; correct?

13  A.  Correct.

14  Q.  And the first row says:  Location found 41 Jane Drive.  And

15  it also says Nadine Menendez Cellphone Photo; is that correct?

16  A.  Yes.

17  Q.  What does that mean, as you understood in preparing this

18  chart?

19          MS. GHOSH:  Objection, your Honor.

20          THE COURT:  Sustained.

21          MS. GHOSH:  Asked and answered.

22          THE COURT:  Sustained.

23          MR. FEE:  Asked and answered by me?  Is that the

24  objection?

25          THE COURT:  No.  It's been asked and answered by this

O6S5men3                        Rafferty - Cross

1   witness as to Nadine Menendez Cellphone Photo.

2           MR. FEE:  Your Honor, my question is why there are two

3   locations.

4           THE COURT:  If she knows.

5           MS. GHOSH:  It was again covered on direct, your

6   Honor.

7           MR. FEE:  It is possible.

8           THE COURT:  No byplay between the attorneys.

9           MR. FEE:  Yes, your Honor.

10          THE COURT:  The jury will disregard the comments of

11  the attorneys.  You know that.

12          MR. FEE:  So that's my question.

13          THE COURT:  Everyone is getting tired.  Let's do this

14  in an appropriate fashion.

15          MR. FEE:  Yes, sir.

16          THE COURT:  Ask your question.

17  BY MR. FEE:

18  Q.  My question is why are there two entries under location

19  found in row 1, if you know?

20  A.  My understanding of my review, there are two photos of the

21  same bar, one is a photo attributed with the location being 41

22  Jane Drive, one is attributed with Nadine Menendez Cellphone

23  Photo.

24  Q.  And then if we pull out from there, the rest of the photos

25  on this chart, page 1, I just point out there is no value

O6S5men3                          Rafferty - Cross

1    listed for rows 2 through 5; correct?

2    A.  On this page, no.

3    Q.  And then the next page, 6 through 9 there is no values

4    assigned?

5            MS. GHOSH:  Objection.  Cumulative.

6            THE COURT:  I will allow it.

7    A.  There is no value assigned, no.

8    Q.  Thank you.  Let's go to page 8 of this chart.  So this is

9    titled:  Total Value of Gold Seized from 41 Jane Drive or in

10   Photographs from Nadine Menendez' phone that was (1) listed in

11   Fred Daibes' inventory; or (2) from same manufacturer boxes as

12   gold in Wael Hana inventory and receipt.

13           Do you see that?

14   A.  Yes.

15   Q.  You would agree that most of the monetary value listed

16   here, meaning more than half, was found only as pictures on

17   Nadine's phone; correct?

18           MS. GHOSH:  Objection.

19           THE COURT:  Is that true?  If you know.

20   A.  If you are referring to the $120,000 figure I calculated

21   before, that would be less than half of this total.

22   Q.  And then there is also another 9,199 one-ounce bars found

23   own her phone, correct, a photo?

24           MS. GHOSH:  Objection, your Honor.

25           THE COURT:  I will allow it.

1              Is that true?

2              THE WITNESS:  If we can go back to the tab I would

3    like to verify that that number is correct.

4    Q.  Sure.  Let's go to the Asahi one and you see there is one

5    that says 41 Jane and Cellphone Photo?

6    A.  Yes.

7    Q.  And it has a value of $1,839.80?

8    A.  Uh-huh.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6sWmen4                          Rafferty - Cross

1          MR. FEE:  Next page.

2    Q.  Row 10, there's a photo, just a photo, with that same

3    value?

4    A.  Uh-huh.

5          THE COURT:  You have to say yes or no.

6          THE WITNESS:  I'm sorry, your Honor.

7    A.  Yes.

8    Q.  And then the next page.  We have one, two, with just cell

9    phone photo and the same valuation.  Do you see that,

10   Ms. Rafferty?

11   A.  Yes.

12   Q.  And then there's another one, 15, that has, again, 41 Jane

13   Drive --

14   A.  Yes.

15   Q.  -- and a photo.

16       I won't ask you to do the math, but you see that those are

17   entries with locations depicted as either just Nadine Menendez

18   cell phone photo or 41 Jane Drive and Nadine Menendez cell

19   phone photo, right?

20   A.  Yes.

21         MR. FEE:  Let's go to the last chart we haven't

22   covered, Government Exhibit 1340.

23   Q.  This is titled "cash from June 16, 2022, searches, put into

24   circulation in or after February 2018," correct?

25   A.  Yes.

O6sWmen4                         Rafferty - Cross

1    Q.  Who wrote that title?

2    A.  The attorney's office.

3    Q.  Who prepared this chart?

4    A.  It was a collaborative effort between me and the attorney's

5    office.

6    Q.  Did you propose a different title?

7    A.  I did not.

8    Q.  Did you discuss with the prosecutors the accuracy of this

9    title?

10            MS. GHOSH:  Objection.

11            THE COURT:  Sustained.

12   BY MR. FEE:

13   Q.  So fair to say that the title indicates that this chart

14   shows cash from the June 16, 2022, searches that was put into

15   circulation in or after February 2018?

16            THE COURT:  That's what the chart says.  Next

17   question.

18   BY MR. FEE:

19   Q.  OK.  Let's look at the first bar that says $552,190.  Do

20   you see that?

21   A.  Yes.

22   Q.  Are you able to point me to any supporting source,

23   referenced here on this chart, that supports the statement that

24   there is $552,190 in cash from the June 16, 2022, searches that

25   was put into circulation in or after February 2018?

1          MS. GHOSH:  Objection.

2          THE COURT:  What is the support that you have for that

3    figure?

4          THE WITNESS:  So, this $552,190 figure comes from the

5    total of cash in all 1Bs that contained post-2018 bills.

6    Doesn't necessarily mean that those post-2018 bills total to

7    that figure because that's indicated in another bar.  It's just

8    that if there was an envelope that contained a post-2018 bill,

9    all of the cash in that envelope was included in this total.

10   BY MR. FEE:

11   Q.  OK.  So there could be a bunch of 1990 bills and one 2019

12   bill, and the total value of that 1B item would be put into

13   this first bar?

14         MS. GHOSH:  Objection.

15         THE COURT:  I'll allow it.

16         If that's true.  Only you know.

17   A.  If there was an envelope and only one bill had --

18   contained -- if there was an envelope and only one bill is a

19   post-2018 bill, the entire amount of that envelope would be

20   included in this figure.

21   Q.  And same story for the second bar -- that what is reflected

22   in that $402,020 number is not, in fact, cash that was put into

23   circulation in or after February 2018, right?

24         THE COURT:  Sustained.

25   BY MR. FEE:

1    Q.  Is every dollar of that 402,000 cash from a June 16, 2022,

2    search that was put into circulation in or after February 2018?

3           MS. GHOSH:  Objection.

4           THE COURT:  I'll allow it.

5    A.  The $402,020 figure is the cash from the first bar but then

6    narrowed down to the envelopes that were found in the basement

7    or office on the Government Exhibit 1335 schedule.  So it's a

8    subset of the first bar.

9    Q.  With the same qualification as the first bar, meaning if

10   you found an envelope that had a bunch of old bills --

11          THE COURT:  She said it's a subset, so the

12   qualification on the first applies to the second.

13          Next question.

14   BY MR. FEE:

15   Q.  Who decided to group the basement and the office together,

16   you or the prosecutors?

17   A.  The attorney's office.

18   Q.  Do you know whose office is described there?

19          MS. GHOSH:  Objection.

20          THE COURT:  When it says basement/office, do you have

21   an understanding of what that was?

22          THE WITNESS:  It was the location title used in

23   Government Exhibit 1335 for those 1Bs that were included in

24   there, and those 1Bs are listed in footnote No. 3.

25          THE COURT:  And beyond that you don't know what the

1  basement/office was, correct?

2         THE WITNESS:  I don't.

3         THE COURT:  All right.

4         MR. FEE:  Thank, your Honor.

5  Q.  And so the middle bar reflects the total post-2018 bills,

6  as it says, right?

7  A.  The total value of all post-2018 bills, yes.

8  Q.  And that's also a subset of the 552,000 and 402,000,

9  correct?

10 A.  Yes.

11 Q.  And then there's another subset in the fourth bar, which

12 again, looks only at the basement and office, right?

13 A.  Yes.

14 Q.  That's what basement/office means; it is combining them

15 together?

16 A.  Yes.

17 Q.  And do you know, did you do any work to break down how much

18 of that fourth bar's value the $81,988 was in the basement

19 versus the office?

20        MS. GHOSH:  Objection.

21        THE COURT:  Well, I take it you don't even know, or do

22 you know what that space is?

23        THE WITNESS:  I have no independent knowledge of the

24 space, what it looked like, if it was an office and a basement.

25        THE COURT:  Right.

O6sWmen4                         Rafferty - Cross

1            THE WITNESS:  I have no knowledge.

2            THE COURT:  I take it you don't know whether it was a

3    basement and a separate office or a basement within which there

4    was an office.

5            THE WITNESS:  Correct.

6            THE COURT:  Or an office that's in the basement.

7            THE WITNESS:  Correct.

8            THE COURT:  All right.

9            THE WITNESS:  I have no way of knowing that, sir.

10   BY MR. LUSTBERG:

11   Q.  Well, I just want to clarify that.  You did review the FBI

12   evidence listed in footnote 3, right?

13   A.  I did.

14   Q.  And you looked which items of those evidence were found in

15   a thing called the basement, right?

16           MS. GHOSH:  Objection.  Misstates.

17           THE COURT:  Ask that again.

18   BY MR. FEE:

19   Q.  You looked at the FBI items --

20           THE COURT:  Do you know if there were items that were

21   identified to you as being from a basement as opposed to a

22   basement/office?

23           THE WITNESS:  So, how I arrived at this figure is I

24   took Government Exhibit 1335, which lists the 1Bs and the

25   envelopes, and any of them that had a location associated as

1    basement or office were included in this total.

2              MR. FEE:  OK.  Let's look at 1335, 1335C, which is in

3    evidence.

4    Q.  You relied on -- well, 1335C, you relied on this to make

5    the chart we were just looking at, correct?

6    A.  Yes.

7    Q.  That's what you just said?

8    A.  Yes.

9              MR. FEE:  OK.  Thank you.

10             Let's go to the last two rows in 1335C.  I guess this

11   is 1335-EX tab 1335C.  OK.  Now this is 1335C.  And let's go to

12   the last two rows.

13   Q.  Do you see here, Ms. Rafferty, that this is room Q

14   (office).  Do you see those words?

15   A.  Yes.

16   Q.  And then another room Q (office), right?

17   A.  Yes.

18   Q.  This is what you reviewed to find the office amounts listed

19   in your chart, Government Exhibit 1340?

20   A.  Yes.

21   Q.  And you added -- I'm sorry?

22   A.  Yes.  These were office ones.

23   Q.  And this is what you reviewed to make that chart?

24   A.  I reviewed this exhibit, yes.

25   Q.  So you added $100,000 from the office to $33,220 in office,

O6sWmen4                          Rafferty - Cross

and that's the office money reflected in Government Exhibit

1340, correct?

           MS. GHOSH:  Objection.

           THE COURT:  No.

           Is it?

A.   I would have to -- I don't have an actual breakdown room by

room of the total amount for each one.  I just have that total

figure that I calculated.

Q.   But you would agree that 100,000 plus 33,220 is 133,220,

correct?

           THE COURT:  Next question.  You don't need to ask this

witness that.  Next question.

           MR. FEE:  Let's go back to your chart, Government

Exhibit 1340.

Q.   Of the total in the second bar here, 402,020 that says cash

in 1Bs from basement office containing post-2018 bill, isn't it

true that only 133,000-and-some dollars was found in the

office?

           MS. GHOSH:  Objection.

           THE COURT:  Can you state that 133,000 was located in

the office?

A.   Those two figures you added up before were both associated

with room Q, which was described as an office.  I don't recall

right now if Government Exhibit 1335 had other rooms, where

other rooms were also put as part of the office, or an office,

1    and I didn't break down totals by room.  I just summarized it

2    all into one grand total here for this chart.

3              MR. FEE:  Let's put up Government Exhibit 1335C again,

4    please.

5              MS. GHOSH:  Objection, your Honor.  This is in

6    evidence, and the defense can make whatever arguments they want

7    in closing.  But this goes beyond the scope of what

8    Ms. Rafferty has verified.

9              THE COURT:  I would like you to conclude, sir.

10             MR. FEE:  I am trying to conclude, your Honor.  Ten

11   minutes.

12             THE COURT:  It's been 40 minutes already.

13             Go ahead.

14   BY MR. FEE:

15   Q.  Let's start with the last page, with the office entries.

16   Do you see those say room Q (office)?

17   A.  Yes.

18             MR. FEE:  You can stay zoomed out, Mr. Kelly.

19   Q.  And just look for anything else that says room Q (office)

20   in this exhibit you used to prepare 1340.

21   A.  Sure.

22             MR. LUSTBERG:  Go back.

23             THE COURT:  Is that the whole chart?

24             MR. FEE:  There's one more.

25             THE COURT:  All right.

O6sWmen4                    Rafferty - Cross

1    BY MR. FEE:

2    Q.  Do you see office anywhere else?

3    A.  No.

4            MR. FEE:  So let's go back to 1340.

5    Q.  And so everything other than the 133,000-and-some-odd

6    dollars in that 402,000 figure is from the basement, correct?

7    A.  $402,020 less that $133,000 figure from the office goes to

8    the balance of the basement.

9    Q.  Got it.

10   A.  Yes.

11           MR. FEE:  Let's go back to Government Exhibit 1335C

12   and look at one of the items marked as basement in row 16.

13   Q.  So do you see here the cash in the yellow bag with forever

14   on it again?

15   A.  Yes.

16   Q.  And you'd agree that it says here, room U basement shelf,

17   and then the value $95,000, correct?

18   A.  Yes.

19   Q.  And then, so this is 1B item -- it's 1B43, is that right?

20   A.  Yes.

21           MR. FEE:  All right.  Let's go to 1335-EX and isolate

22   the 1Bs for 43.

23           MS. GHOSH:  Objection to scope.

24           THE COURT:  I'll let him do it.  It's the chart.

25           MR. FEE:  It's reflected in the chart.  Thank you.

1    Q.  And so we have all the 1B43s isolated, and if we highlight

2    the column A, the sum is 40,000.  Do see that on the bottom,

3    Ms. Rafferty?

4    A.  Yes.

5    Q.  So 40,000 of the 95,000 -- well, let me step back.

6        This is the exhibit you used to identify cash paid out

7    after 2018?

8    A.  Yes.

9    Q.  So if we highlight again, of 1B43 from the hundreds,

10   there's $40,000 of post-2018 cash, correct?

11   A.  Yes.

12           MS. GHOSH:  Objection.

13           THE COURT:  I'll allow it.

14   BY MR. FEE:

15   Q.  And let's just look in 20s and 50s and see if 1B43 has

16   anything listed there.  Nothing, right?  Ms. Rafferty, you

17   don't see 1B43 there?

18   A.  No.

19           MR. FEE:  Let's go back to 1340, please.

20   Q.  So the fourth bar that says $81,980, that is -- you see

21   it's described as total value of basement/office post-2018

22   bills; you would agree that $40,000 of that 81,980 number of

23   post-2018 bills is from that Forever 21 bag, correct?

24   A.  Yes.

25   Q.  And so if you exclude that $40,000, you have an amount that

1    is less than the red bar at the end, correct?

2              MS. GHOSH:  Objection.

3              THE COURT:  Is that amount less than the red bar at

4    the end?

5              THE WITNESS:  If you subtract the 40,000 from that

6    $81,000 figure, yes.  It would be $41,980, so it would be less

7    than the red bar.

8    BY MR. FEE:

9    Q.  And the red bar reflects the cash withdrawals by Senator

10   Menendez only between 2018 and June 2022, correct?

11             MS. GHOSH:  Objection.  Form.  Assumes facts.

12             THE COURT:  It's labeled total amount of Menendez SFCU

13   cash withdrawals for the 2018 to June 2022.  I'll let her

14   answer.

15   A.  Could you repeat the question?

16   Q.  Just that red bar indicates what was withdrawn in cash from

17   the Menendez Senate Federal Credit Union account between 2018

18   and June 2022, right?

19   A.  Yes.

20   Q.  And it is more than the $41,980 number you just identified

21   as the blue bar minus the Forever 21 post-2018 bills?

22             MS. GHOSH:  Objection.

23             THE COURT:  I'll allow it.

24             MS. GHOSH:  Asked and answered.

25   A.  Yes.

1           MR. FEE:  Thank you.

2           Just one moment, your Honor?

3           Thank you, Ms. Rafferty.  I'm done.  I think

4    Mr. Lustberg has a little.  Or a lot.  Not for me to say.

5           THE COURT:  Mr. Lustberg.

6           MR. LUSTBERG:  A few questions.

7           THE COURT:  All right.

8           Sir.

9    CROSS-EXAMINATION

10   BY MR. LUSTBERG:

11   Q.  Just a few questions, Agent Rafferty, about Government

12   Exhibit 1339.

13          MR. LUSTBERG:  If we could pull that up for everybody

14   to see.

15   Q.  The Government Exhibit 1339 has two sections, right: One

16   part regarding Mr. Daibes and one part regarding Mr. Hana?

17   Correct?

18   A.  Correct.

19   Q.  OK.  The previous exhibit that you testified to, 1338, was

20   about cash.  Do you remember that exhibit?

21   A.  Can I see 1338?

22   Q.  Sure.

23   A.  There's a few.

24   Q.  Yes.

25   A.  Yes.  OK.

1   Q.  Mr. Hana's not mentioned on this exhibit, correct?

2   A.  No.

3           MR. LUSTBERG:  Thank you.  Going back down to 1339

4   now --

5   Q.  Oh, and I should say with regard to 1338, no evidence that

6   you saw of Mr. Hana's fingerprints or DNA with regard to cash,

7   right?

8   A.  He's not listed on that chart, no.

9           MR. LUSTBERG:  Thank you.

10  Q.  Now with regard to Government Exhibit 1339, so the first

11  part is about, is gold bars, says associated with Fred Daibes.

12  Mr. Hana's not referenced with regard to any gold bars, is that

13  correct?

14      You can flip through if you want to.

15  A.  In this section -- yeah, if we could just scroll down.

16  Q.  Sure.

17  A.  Yeah.  In this first part of the exhibit, Mr. Hana's not

18  included in there.

19          MR. LUSTBERG:  Thank you.

20  Q.  So now we get to the second part.  I just want to make sure

21  we understand the numbers.  This part is all about one-ounce

22  Asahi gold bars, correct?

23  A.  Yes.

24  Q.  And so those are the things that you were making charts of

25  that had to do with Mr. Hana, right?

O6sWmen4                        Rafferty - Cross

1   A.  I didn't make this chart.

2   Q.  OK.  Well, that you analyzed or verified?

3   A.  I reviewed it, yes.

4           MR. LUSTBERG:  Thank you.

5   Q.  Now, if you look at what's in front of you right now, you

6   see row 2, it says Wael Hana inventory photograph.

7       Do you have an understanding about what Wael Hana inventory

8   photograph refers to?

9   A.  I know that Government Exhibit 3C-20 is a picture of photos

10  associated with the inventory for Mr. Hana.

11  Q.  OK.  And so those were the one-ounce Asahi gold bars that

12  were in Mr. Hana's inventory, as far as you understood?

13  A.  Those, yeah, in the photo of inventory.

14  Q.  Right.  Inventory, meaning that were in his possession,

15  correct?

16          MS. GHOSH:  Objection.

17          THE COURT:  Yes.  Sustained.

18  BY MR. LUSTBERG:

19  Q.  Just to make sure I understand.  So when it says Wael Hana

20  inventory photograph, all you know is that these were gold bars

21  that appeared in the picture that was called Wael Hana

22  inventory photograph, correct?

23          MS. GHOSH:  Objection.

24          THE COURT:  I'll allow it.

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6sWmen4                           Rafferty - Cross

1    Q.  And I don't know if you counted them up, but you can flip

2    through.  You would agree with me -- and take your time to

3    quickly look at this; I can identify the lines -- that there

4    are ten of these gold bars that are in the Will Hana inventory,

5    correct?

6                THE COURT:  Ten gold bars depicted here with the

7    notation they were from the Will Hana inventory?

8                MR. LUSTBERG:  Right.

9                THE COURT:  Is that true?

10               THE WITNESS:  If we could scroll through again a

11   little bit slower, please.

12               MR. LUSTBERG:  Sure.  Let's do it.  It's row 2, row 3,

13   row 4, row 5, row 6, row 7, row 8, row 9, row 13 and row 14.

14   Q.  And that seems like ten.  Is it?

15   A.  That would be ten, but it's not the end of the chart.

16   Q.  OK.

17   A.  Row 17 as well.

18               MR. LUSTBERG:  OK.  So -- fair enough.  So -- OK.

19   There's another gold bar that was in -- but row 17 -- OK --

20   then that's -- but row 17 -- let me ask you this.

21   Q.  In that picture in row 17, it just says receipt for Wael

22   Hana purchase of 22 gold bars, was that also in his inventory,

23   to your knowledge?

24               MS. GHOSH:  Objection.

25               THE COURT:  Is that listed as in the source document

1    for Wael Hana inventory, if you know?

2            THE WITNESS:  I know that it's associated with Wael

3    Hana.  I don't recall if the word "inventory" was used.

4    BY MR. LUSTBERG:

5    Q.  OK.  So now, there are two of the gold bars here, and let

6    me refer you to rows 1 -- I'm sorry.  Yeah, rows 1 and rows 15

7    that say location found 41 Jane Drive, and I just want to make

8    sure I understand correctly that there are exactly two of these

9    one-ounce gold bars that were found at 41 Jane Drive.  Take a

10   look at row 1 and row 15.

11   A.  Can we just scroll to the second page as well, Nos. 6

12   through 10?

13       For the first box there are two gold bars that were

14   associated with 41 Jane Drive.

15       I can't see rows 16 and 17 that are --

16   Q.  OK.

17   A.  OK.

18       Then, yes.  Two associated with 41 Jane Drive.

19   Q.  Associated with, meaning that they were -- it says location

20   found.  That that's where they were found, correct?

21   A.  Yes.

22   Q.  And then -- by the way, you don't know, you have no

23   information about how they got to 41 Jane Drive or anything?

24           THE COURT:  Sustained.  It's clear she doesn't.

25           MR. LUSTBERG:  That's fine.

1          THE COURT:  Next.

2          MR. LUSTBERG:  There are also, there are five of these

3    gold bars that are on Ms. -- on Nadine Menendez's cell phone,

4    and just in addition to the ones that are found at 41 Jane

5    Drive, there are five that are just on her cell phone.  I just

6    want to make sure I have that number right.

7          MS. GHOSH:  Objection.  Form and assumes a fact.

8          THE COURT:  What's the question?

9          MR. LUSTBERG:  Sure.

10          THE COURT:  Let's have a question.

11   BY MR. LUSTBERG:

12   Q.  There are five one-ounce gold bars that are on her cell

13   phone but are not found at 41 Jane Drive, is that correct?

14   A.  Just so I'm understanding correctly, there are seven gold

15   bars within this section of the chart, two of which are

16   attributed to both the cell phone photo and 41 Jane Drive, five

17   of which are only attributed to the cell phone photo.

18   Q.  OK.  And again, you don't know why or how they were

19   taken --

20          THE COURT:  Established.

21          MR. LUSTBERG:  Just one more set of questions.

22   Q.  You testified that with regard to Government Exhibit 1454,

23   which was the stipulation from Asahi -- do you remember that?

24   A.  Yes.

25          MR. LUSTBERG:  OK.  And you can see, if we can flip

O6sWmen4                          Rafferty - Cross

1    down to paragraph B.

2    Q.  There are two, there were two series of gold bars, series

3    of serial numbers, right?

4    A.  There were two boxes, so there were two ranges, yes.

5    Q.  So one range from one box was A124801 through 124825 and

6    the other one was A125976 through A126000.  So each of those

7    boxes contains, as you understand it, 25 gold bars, correct?

8    A.  Yes.

9    Q.  OK.  And then you looked to see whether the -- which

10   series, which of those series the gold bars you have on your

11   chart were from, right?

12   A.  I'm not sure I understand the question.  Can we go back to

13   the chart.

14           MR. LUSTBERG:  It wasn't a great question.  Let's go

15   back to Government Exhibit 1339.

16   Q.  So the first series was, as we just said, A124801 through

17   8124925 and those, and you can see --

18           MR. LUSTBERG:  Let's go back to -- sorry.  Go back to

19   the second.  Thank you.

20   Q.  I think you testified that they were basically in order

21   starting with one, row 1, and going through row 16, they were

22   from that first -- that box I just mentioned, right?

23   A.  Rows 1 through 16 are from that first box, yes.

24   Q.  So 1 through 16 means there 16 gold bars, and you obviously

25   have no idea what happened to the other nine, right --

1        MS. GHOSH:  Objection.

2        THE COURT:  Sustained.

3   BY MR. LUSTBERG:

4   Q.  -- from that box?

5        THE COURT:  Sustained.  We've well established the

6   limits of her knowledge.

7        MR. LUSTBERG:  Thank you.

8        One last thing.  Likewise, if we could go down to rows

9   17 and 18.

10  Q.  So you say, so row 17, in your left column says receipt for

11  Wael Hana purchase of 22 gold bars.  Do you see that?

12  A.  Yes.

13  Q.  And the gold bar that's there has the number 125991, right?

14  A.  A125991, yes.

15  Q.  And the one below it, 18, which was on Ms. Menendez's

16  phone, has 125992, right?

17  A.  Yes.

18  Q.  OK.  And with regard to those -- well, once again, you have

19  no idea what happened to the other 23 in that box.  But leave

20  that aside.

21       Do we have -- how do you know that the Asahi gold bar

22  that's in 17, what's the association between that and the note

23  above it that says 22 times -- 22 times 1855?

24       MS. GHOSH:  Objection to form and scope.

25       THE COURT:  I'll allow it.

1   A.  I don't have any independent knowledge of the transaction

2   depicted in that.

3   Q.  Here's my question:  When it says 22, do you know what that

4   22 refers to?

5           THE COURT:  She said no.  She has no knowledge of any

6   transaction.

7           MR. LUSTBERG:  OK.  She reviewed.

8   Q.  You have no knowledge of what that 22 is about, nothing?

9   A.  I have no independent knowledge of the exhibit, the exhibit

10  which was provided to me for my review.

11  Q.  OK.  And so just looking under there, 18 gold bars that are

12  listed here, you don't know what the relationship is between

13  these 18 and that 22, am I right?

14          MS. GHOSH:  Objection.

15          THE COURT:  Sustained.

16          MR. LUSTBERG:  That's all I have.

17          Thank you, Judge.

18          THE COURT:  All right.

19          Mr. De Castro, anything, sir?

20          MR de CASTRO:  Very briefly.

21          THE COURT:  Yes, sir.

22          MR de CASTRO:  Very briefly.

23          THE COURT:  And then we'll do the government.  We'll

24  try to conclude by 1:30.

25  CROSS-EXAMINATION

O6sWmen4                     Rafferty - Cross

1    BY MR de CASTRO:

2    Q.  Just let me ask you a couple questions about the same

3    exhibit we had up, Government Exhibit 1339.

4              MR de CASTRO:  I don't need it, Mr. Kelly.  It's OK.

5    A.  Is this the chart that has the gold exhibit?

6    Q.  That's the gold chart, correct.

7         And the first tab on that had -- related to Mr. Daibes,

8    correct?

9    A.  Yes.

10   Q.  Now, it had a column listing the price of gold on it as of

11   June of 2022, correct?

12   A.  June 16, 2022.

13   Q.  Right.

14        And you were told to use that date?

15   A.  By the attorney's office, yes.

16   Q.  You can't say when any of that gold was purchased, correct?

17   A.  I have no knowledge of that.

18   Q.  So you obviously can't say what the price of gold was when

19   the gold was purchased, right?

20   A.  I don't know when it was purchased, no.

21   Q.  So you can't say how much any individual bar or ounce was

22   purchased for, correct?

23   A.  Correct.

24   Q.  Now, like, sort of this applies also to the cash in

25   Government Exhibit 1338, you can't tell how the gold or cash

O6sWmen4                           Rafferty - Redirect

 1   got to 41 Jane Drive, right?

 2              THE COURT:  Sustained.  We've established that.

 3              MR de CASTRO:  Nothing further, Judge.  Thank you.

 4              THE COURT:  All right.  Thank you.

 5              Is there any redirect by the government?

 6              MS. GHOSH:  Very briefly, your Honor.

 7              THE COURT:  Yes.

 8   REDIRECT EXAMINATION

 9   BY MS. GHOSH:

10   Q.  Ms. Rafferty, do you recall being asked some questions

11   about Congressional Federal Credit Union records?

12   A.  Yes.

13              MS. GHOSH:  Could we pull up Government Exhibit 5W-1

14   for a moment.  Go to the last page, please.

15   Q.  And do you see the section that refers in the middle to

16   your total checking balance and your total savings balance

17   being zero dollars, just below the dotted line?

18              THE COURT:  Enlarge that, please.

19   A.  Yes.

20   Q.  Is that consistent with how bank records appear when an

21   account is closed?

22   A.  Yes.  The -- the bank account wouldn't have a balance if

23   the account was closed.

24              MS. GHOSH:  Could we look at the top of that page,

25   please.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.   In the top right corner, what date do you see listed?

2    A.   Typing says account closed December 9, 2016.

3              MS. GHOSH:   Thank you.   You can take that down.

4    Q.   Do you recall being asked questions about bank records from

5    the Senate Federal Credit Union and Congressional Federal

6    Credit Union accounts that go back further than 2016, that are

7    earlier than 2016?

8    A.   Yes.

9    Q.   Could cash withdrawals prior to 2016 include any cash that

10   was released into circulation in 2018 or later?

11   A.   You said prior to 2016?

12   Q.   Yes.   Could cash withdrawn before 2016 include any cash

13   that was released into circulation in 2018 or later?

14   A.   No.

15             MS. GHOSH:   Could we put up Government Exhibit 1340,

16   please.

17   Q.   Is the amount listed in the red bar at the end the full

18   amount of all cash withdrawals from the Senate Federal Credit

19   Union account between 2018 and June 2022?

20   A.   Yes.

21   Q.   In other words, $55,088 is the amount if none of the cash

22   withdrawn during those four and a half years was spent on

23   anything, correct?

24   A.   Yes.

25   Q.   Looking at the third blue bar in this exhibit, you said

1    earlier that this is the total of just the specific seized

2    bills released in 2018 or later, right?

3    A.  Yes.

4    Q.  It's roughly 117,000?

5    A.  Yes.

6            MS. GHOSH:  We can take that down.  And can we please

7    pull up Government Exhibit 1F-1275, 1F-1170, 1F-1178 and

8    1F-1202.  And could you please zoom in on the envelopes.

9    Q.  Ms. Rafferty, are these photos of four of the ten envelopes

10   from Government Exhibit 1338, the envelope chart?

11   A.  Yes.

12   Q.  Of that total of roughly $117,000 that we just mentioned

13   for just post-2018 bills, that doesn't include the full value

14   of 1F-1275, does it?

15   A.  No.

16   Q.  Just the bills in that envelope that were released into

17   circulation in 2018 or later?

18   A.  Yes.

19   Q.  And that total of roughly 117,000 doesn't include the full

20   value of 1F-1170, does it?

21   A.  No.

22   Q.  And that total of roughly 117,000 doesn't include the full

23   value of 1F-1178, does it?

24   A.  No.

25   Q.  That total of roughly 117,000 doesn't include the full

1    value of 1F-1202, does it?

2    A.  No.

3    Q.  What was the dollar amount written on the flap of each of

4    those envelopes?

5    A.  $10,000.

6            MS. GHOSH:  No further questions.

7            THE COURT:  All right.  Thank you.

8            You're excused, Ms. Rafferty.  You may step down.

9            (Witness excused)

10           THE COURT:  Next witness for the government.

11           MR. MARK:  Your Honor, at this time the government

12   rests.

13           THE COURT:  All right.  Thank you, sir.

14           Ladies and gentlemen, you've seen the government rest.

15           When you come back on Monday, we'll see if any of the

16   defendants have a defense case that they wish to put on.  You

17   know that each defendant is under no obligation to prove

18   anything.  The burden is always on the government to prove its

19   case beyond a reasonable doubt until such time -- and you must

20   presume that each defendant is innocent until such time, if

21   ever, that the government, in your estimation, proves the guilt

22   of the defendant you are considering beyond a reasonable doubt.

23           So I'm leaving you with the thought that these

24   defendants are still presumed to be innocent.  They have no

25   obligation to put on a case.  That's an individual

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6sWmen4                        Rafferty - Redirect

1    determination.  And when you come back on Monday, we'll see

2    whether they wish to put on a case.  And they have the complete

3    right, each of them, to put on a case if they so wish.

4            Enjoy the weekend.  Keep an open mind.  Do not discuss

5    this case.  Do not read any media attention to it.

6            We'll see you on Monday at 9:30, and we are proceeding

7    on the schedule that we outlined for you last week.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6sWmen4

1              (Jury not present)

2              THE COURT:  You may be seated.

3              All right.  How do the parties wish to proceed?

4              We can hear motions.  There are some outstanding

5      matters.

6              Again, to recount, we have the government response due

7      today on the issue regarding 613(b).

8              We have the Hana response today on document 485.

9              I'm set to rule on the issue of Menendez family

10     members.

11             I don't have yet any objections to the Menendez

12     summary charts; the parties were still working on trying to

13     resolve their differences on the summary charts, and I take

14     it -- well, I shouldn't take it.

15             Are there going to be defense motions at this time?

16             MR. LUSTBERG:  Yes, your Honor.

17             THE COURT:  Yes, for Mr. Lustberg.

18             MR. WEITZMAN:  Yes, your Honor.

19             THE COURT:  All right.  And Mr. De Castro.

20             MR de CASTRO:  Yes.

21             THE COURT:  All right.  I have a sentencing this

22     afternoon that I have to handle.  I think we should take care

23     of the defense motions, but tell me where we stand on the

24     outstanding matters that I've already set forth.

25             When am I going to have the government response on the

O6sWmen4

1    613(b) issue?

2            MR. MARK:  Your Honor, the government will file that

3    later this afternoon.

4            THE COURT:  All right.  What about the Hana response

5    to the Hana business evidence issue, document 485?

6            MR. LUSTBERG:  Same, your Honor.

7            THE COURT:  All right.

8            What's the status of the objections to the Menendez

9    summary charts that the parties were trying to work out?

10           MR. MARK:  The government and the defense are

11   continuing to confer.  I think we're going to narrow those

12   issues, but we intend to submit a motion to your Honor, ideally

13   tomorrow, on the remaining matters for your Honor to rule on.

14           THE COURT:  All right.  Let's have that by midday

15   tomorrow.

16           MR. MARK:  Will do, your Honor.

17           THE COURT:  I want any response by midday -- that's

18   noon -- on Sunday.

19           MR. WEITZMAN:  Yes, your Honor.

20           THE COURT:  All right.

21           What I propose then is, it's now 1:30.  Everyone

22   should get lunch.  I have that sentencing I have to attend to.

23   The parties should be back at 3:30.  I still may be involved in

24   the sentencing, but I think that's a good target.  All right?

25   OK.  Thank you.

O6sWmen4

1          MR. WEITZMAN:  Your Honor, may we release our clients?

2          THE COURT:  Oh, yes, of course.

3          Gentlemen, clients, we're just going to be handling

4   legal matters so you certainly don't have to be here.

5          All right.  Thank you, all.

6          (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6sWmen4

|   |   |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | 3:40 p.m. |
| 3 | THE COURT:  Good afternoon. |
| 4 | Please be seated. |
| 5 | I've been assuming that each party wishes to make a |
| 6 | Rule 29 motion for a judgment of acquittal, so I'll hear those |
| 7 | motions.  Please try to be as succinct as possible.  I'll hear |
| 8 | from each defendant, and then I'll hear from the government. |
| 9 | Is it Mr. Weitzman? |
| 10 | MR. WEITZMAN:  It is, your Honor.  I'm happy to start. |
| 11 | THE COURT:  You have to talk into the microphone, sir. |
| 12 | MR. WEITZMAN:  I was just conferring with Mr. Lustberg |
| 13 | as to who should start. |
| 14 | THE COURT:  All right. |
| 15 | MR. WEITZMAN:  He has said he will let me start. |
| 16 | Your Honor, we move for a Rule 29 judgment of |
| 17 | acquittal on each of the counts of the indictment in which |
| 18 | Senator Menendez is charged, and we so move for multiple |
| 19 | reasons. |
| 20 | First, with respect to all of the bribery counts, |
| 21 | there is a lack of sufficient evidence to send this to the |
| 22 | jury. |
| 23 | THE COURT:  Well, that's the test. |
| 24 | MR. WEITZMAN:  Yes, your Honor. |
| 25 | There is no evidence of an agreement.  There is no |

O6sWmen4

1    evidence of the *pro* in the *quid pro quo.*

2              Mr. Richenthal is making a bunch of hand gestures.

3              (Discussion off the record)

4              MR. WEITZMAN:  He seemed a bit animated, I didn't know

5    if I was upsetting him.

6              MR. RICHENTHAL:  (inaudible).  I apologize.

7              MR. WEITZMAN:  In any event, there is no *pro* in the

8    *quid pro quo.*  There's no *quo* either; we'll get there.  There's

9    no *quid*, but there's certainly no evidence of an agreement.

10             At best, the government is trying to draw inferences

11   that are unsupported by the facts, inferences of an agreement,

12   but none exists, merely by the fact that the senator took the

13   same type of actions and conduct that he always take, often

14   takes, to benefit constituents.  That's the first reason.

15             The second thing is there is no official act alleged

16   with respect to many of the schemes, and I can just break it

17   down.

18             With respect to both the New Jersey State prosecution

19   scheme, which is the Uribe-Parra charge and with respect to the

20   Daibes federal prosecution scheme, as charged, there is no

21   evidence of any pressure or threats applied or agreed to be

22   applied.  The witnesses themselves have denied that they faced

23   any pressure or threats.  The charge cannot be sustained in the

24   absence of pressure or threats.

25             With respect to the Egyptian aid scheme, there's again

O6sWmen4

1   no evidence of an agreement.  This is not the FARA charge, your

2   Honor, *per se*.

3           THE COURT:  It's characterized as the Egyptian scheme.

4           MR. WEITZMAN:  Yes.

5           THE COURT:  Yes.

6           MR. WEITZMAN:  But not the IS EG component of it.

7           There is uniform testimony that aid was being given

8   throughout, for decades.  The senator did not change his

9   position.  All he changed was, at best, according to the

10  government's own witnesses, tactics but had a consistent

11  position throughout with respect to Egypt.  And there's nothing

12  connecting any bribe from anybody to Egyptian aid.

13          In fact, the bulk of the government's indictment in

14  that regard is not even in evidence because of the speech and

15  debate problems that the government walked into in its

16  indictment and at trial.

17          Further, on the sufficiency of the evidence, there is

18  a lack of evidence that the senator was an agent of Egypt.

19          THE COURT:  You're still on Egyptian aid?

20          MR. WEITZMAN:  No.  This is on FARA.

21          THE COURT:  OK.

22          MR. WEITZMAN:  There is a lack of evidence that the

23  senator took direction and instruction from Egypt.  The

24  evidence uniformly shows that he was acting on behalf of the

25  United States and for the benefit of the United States in

O6sWmen4

1     furtherance of the United States's interests.  There is no

2     evidence that he did anything in furtherance of Egyptian

3     interests.

4          The second reason for dismissal is a lack of venue.

5          THE COURT:  I was a little surprised, based on today's

6     testimony -- or maybe it was yesterday's testimony -- that

7     you're pressing that.  The venue requirements are so mild, and

8     we've got the travel from JFK to New Jersey.  We've got the

9     telephone calls.  But go ahead.  Make your point.

10         MR. WEITZMAN:  Your Honor, even if you think that

11    those overt acts would support venue for the conspiracy counts,

12    there's an absence of proof that supports venue as to the

13    substantive count, which is Counts Five -- largely Counts Five

14    through Eighteen, although there are a couple of conspiracy

15    counts with respect to obstruction of justice.

16         As you know, the government has the burden here.

17         THE COURT:  Yes.

18         MR. WEITZMAN:  The test is that the essential conduct

19    has to have occurred in the Southern District of New York by a

20    defendant.  If it doesn't occur by the defendant the Court is

21    considering and it's occurring by a different defendant, it has

22    to be foreseeable to the defendant you're considering.

23         There's no evidence of any essential conduct

24    supporting the substantive counts that it occurred in the

25    Southern District.  For example, in a bribery case, the

O6sWmen4

1    essential conduct underlying bribery is the act of the bribe or

2    the act taken, the *quid* or the *quo*.  There's no evidence of a

3    *quid* in the Southern District, and there's no evidence of a *quo*

4    in the Southern District.  Every single alleged *quo* occurred in

5    New Jersey or in Washington, D.C.  Nothing occurred in the

6    Southern District.  Frankly, even with the JFK drive, they

7    haven't proven --

8            THE COURT:  Do you need a *quid* or a *quo*?

9            MR. WEITZMAN:  You do need a *quid* and a *quo*.

10           THE COURT:  Here, in the Southern District?

11           MR. WEITZMAN:  That's the essential conduct.  Yes,

12   there needs to be an agreement.  There needs to be something

13   that is essential conduct in the Southern District.  That's

14   what one is required to show.

15           For instance, let's take Daibes, the U.S. Attorney's

16   scheme.  There's nothing that occurs here in the Southern

17   District.  Even if you believe that the *quo* is the appointment

18   of Sellinger or that there's a *quid* involving gold -- and I

19   don't think there's any evidence that ties the senator to

20   that -- there's no evidence of where that gold was provided.

21   Driving through the Southern District from JFK to New Jersey

22   would be precisely the type of incidental contact with this

23   district that courts do not permit to proceed.

24           So I do think that there's an absence of proof as on

25   to venue, certainly with respect to the substantive counts.

O6sWmen4

1           With respect to the conspiracy counts, they have to be

2    able to show, again, that the agreement, which is the essential

3    conduct underlying the conspiracy, occurs in the Southern

4    District or an overt act in furtherance of that agreement

5    occurs in the Southern District.  For Rule 29 purposes, your

6    Honor, the problem is that every single overt act that they've

7    alleged, to my knowledge, is done by someone other than the

8    senator.

9           Now, there is a dinner with Qataris.  I agree.  There

10   is a dinner at the Palace Hotel, but there is no evidence

11   showing that there was an overt act in furtherance of any

12   scheme.  Yeah, there's a dinner with Qataris at the Palace

13   Hotel -- at which multiple other senators are located.  They

14   haven't proved the "in furtherance" prong, and they haven't

15   proved that the acts that were done in furtherance -- like

16   Barruos being in the Bronx -- is in any way foreseeable to the

17   senator.  Not one shred of evidence of that foreseeability.

18          Finally, with respect to the obstruction counts, I

19   think Rule 29 --

20          THE COURT:  Does something that supports venue have to

21   be foreseeable?

22          MR. WEITZMAN:  Yes.  An overt act taken by someone

23   other than the defendant in support of a conspiracy count has

24   to be foreseeable to the defendant.

25          THE COURT:  All right.

O6sWmen4

1          MR. WEITZMAN:  Finally, I think the obstruction

2     counts, I think, frankly, your Honor previewed that they're

3     truly unsustainable under the Supreme Court decision --

4          THE COURT:  *Aguilar.*

5          MR. WEITZMAN:  *Aguilar.*

6          THE COURT:  *Schwarz.*

7          MR. WEITZMAN:  *Schwarz*, and most recently the *Schulte*

8     decision by Judge Furman.

9          THE COURT:  Yes.  Those are the three I think I cited

10    in our discussion.

11         MR. WEITZMAN:  Absolutely, your Honor.  And I think

12    the evidence there, the court, in all three of those cases,

13    said there is a lack of evidence.  You cannot -- you cannot --

14    sustain a conviction, which will be the Rule 29 standard here.

15    This case is even weaker than those cases.

16         In each of those cases, you actually had a defendant

17    making false statements or doing something that was false to

18    the investigator, and the investigator -- in each of those

19    cases, the defendant knew there was a grand jury investigation.

20    In some instances, for instance, in the *Schulte* case that Judge

21    Furman decided very recently, the defendant made false

22    statements to investigators minutes after being served with a

23    subpoena.

24         Here, we don't have the defendant making false

25    statements.  At best, the government has alleged that his

O6sWmen4

1    attorney had submitted a PowerPoint presentation, a few pages

2    of which and a few lines of which have what they allege to be

3    false -- there's no evidence.  First, it wasn't presented to

4    any investigator or anybody who might testify in the grand

5    jury.  It's never been presented to the grand jury.  There's no

6    evidence that it was warned or thought to be presented to the

7    grand jury.  There's no evidence that Senator Menendez approved

8    or authorized those statements.

9              THE COURT:  We've been through that.

10             MR. WEITZMAN:  Yes.  So I think under those three

11   precedents, binding as two of them are, there's no way the

12   obstruction charge can go forward.

13             I would say one more thing about that, your Honor.

14             There's a conspiracy count, and I'm sure they'll lean

15   heavily on the conspiracy count.  There's no evidence that

16   whatever agreement was reached, if any, between Nadine Menendez

17   and José Uribe, José Uribe's testimony is clear that he never

18   told Senator Menendez about any obstructive conduct --

19             THE COURT:  Yes.

20             MR. WEITZMAN:  And there was no evidence that Nadine

21   did.  So I don't think it's a fair inference either.

22             For all those reasons, we move, under Rule 29, for a

23   judgment of acquittal on each of the counts.

24             THE COURT:  All right.  Thank you.

25             Mr. Lustberg.

O6sWmen4

1              MR. LUSTBERG:  Thank you very much, your Honor.

2          Yes, there we go.

3              THE COURT:  My deputy had that hood taken off at your

4    request.

5              MR. LUSTBERG:  Thank you.  I appreciate that.

6              Your Honor, Mr. Hana as well moves for a judgment of

7    acquittal pursuant to Federal Rule of Criminal Procedure 29.

8              Frankly, my experience of late has been that courts

9    typically reserve decision under Rule 29(a), and we understand

10   the Court certainly has the discretion to do that.

11             THE COURT:  I'm considering it.

12             MR. LUSTBERG:  Yes.

13             THE COURT:  Or denying it and allowing it to be

14   renewed.

15             MR. LUSTBERG:  There really are three sets of

16   allegations against Mr. Hana.  Obviously, as a matter of law,

17   there are conspiracy charges, there are bribery and honest

18   services charges, and then there's the Section 219 charge.  But

19   it's important to understand that with regard to Mr. Hana, he

20   is not alleged to be a part of each and every scheme that's set

21   forth in the indictment.

22             For example, there is no allegation, and obviously no

23   proof, that he had anything to do with what we call the

24   Sellinger scheme, the selection of the U.S. Attorney in New

25   Jersey aspect of it.  That would have, candidly, created even

O6sWmen4

1       more conflicts for me.

2               There's also no allegation whatsoever --

3               THE COURT:  I take it that's because you're a leading

4       lawyer in New Jersey.  Is that correct?

5               MR. LUSTBERG:  I believe that that is the one thing

6       that has been clearly proven beyond a reasonable doubt, your

7       Honor.

8               MR. RICHENTHAL:  We can just stipulate to it.

9               MR. LUSTBERG:  Albeit anonymously.

10              He also has absolutely nothing to do with the Qatar

11      scheme, your Honor.

12              So let me very, very quickly address the three schemes

13      that he is alleged to be part of.

14              One is that he's alleged to have obtained his

15      contract, although not really obtained, because the government

16      has been clear that it's not obtained, that there was an effort

17      that he could maintain his halal certification monopoly through

18      bribery.  There is no proof of that.  There is no *quid*; that

19      is, nothing, no payment that can be tied to that end.  There is

20      no *pro* because there's no evidence that whatever benefits may

21      have flowed from him to Nadine Arslanian or Menendez yielded

22      that contract.

23              Instead, it's very clear that -- and this came out

24      loud and clear in the proofs -- that Mr. Hana got that contract

25      for one reason and one reason only: because Egypt wanted to

O6sWmen4

1    give it to him.  It may be that the government doesn't like

2    that.  It may be that they think a monopoly is a bad idea or

3    that he wasn't qualified, but that's not enough.

4            To the extent that Senator Menendez did anything -- he

5    made one phone call to Mr. McKinney; that was, of course, after

6    the decision had already been made, as we know from the record,

7    for Mr. Hana to have the contract -- it had absolutely no

8    effect, and respectfully, that action was not an official act

9    within the meaning of *McDonnell* in any event.

10           THE COURT:  I may have lost you on that.  Putting

11   pressure on an executive official is not an official act under

12   *McDonnell*?

13           MR. LUSTBERG:  Well, if there were pressure, that

14   would be one thing, but I believe that what the testimony was

15   from the government's witness, from Mr. McKinney, was that he

16   did not feel pressure.

17           It's notable, your Honor, and this will all be fleshed

18   out, if necessary, at the time of summations and so forth.  But

19   it's notable that Senator Menendez never did anything

20   thereafter to follow up on it.  It's one phone call.  And there

21   is language in *McDonnell*, I think, that stands for the

22   proposition that one phone call just does not do the trick.

23   That's in addition to the fact that, as he made clear in that

24   phone call, he was engaged in constituent services.

25           THE COURT:  Isn't that really a jury question as to

O6sWmen4

1    what he was indeed doing?  Why is that a question for me?

2                  MR. LUSTBERG:  I don't think there's a lot of dispute.

3          I mean the thing about this case that makes it so

4    extraordinary, and you can see it with the way it's been tried,

5    largely through summary charts -- there's not a lot of disputed

6    facts.  The call was made.  The real question is, A, was that

7    call an official act; and B, and most significantly, did it

8    matter given that this was a decision for Egypt?  What Senator

9    Menendez did was to make a call to the Department of

10   Agriculture that had absolutely and could have absolutely no

11   impact on Egypt's decision.  That goes to the entire, both the

12   official act and the *quid pro quo* prong.

13         With regard to the other, remaining issues that

14   Mr. Hana is alleged to have been involved with is the

15   conspiracy to take action to benefit Egypt, which I'll get to a

16   little bit later when I just talk a little about the Section

17   219 claim.

18         He is alleged, in Count Nine of the indictment, to

19   have been involved in the scheme to get a car for Nadine.  What

20   we saw develop in the proofs of that was that Mr. Hana is

21   involved in certain meetings at the beginning of it but is

22   then, if you believe all the proofs -- and we have to take the

23   facts, we have to assume them to be true for purposes of this

24   argument.  But at the end of the day, not even at the end of

25   the day, early on in that scheme, it's very clear that he's

O6sWmen4

1    completely cut out of that; that his role is superseded by

2    Mr. Uribe, who then pays for the car, makes the arrangements

3    for the car and gets thanked for the car by Nadine.

4         I'm sorry to refer to her by first name.  I know

5    that's not appropriate, but it's so confusing.

6         THE COURT:  Throughout the trial I think everybody's

7    been referring to Mrs. Menendez as Nadine to distinguish her

8    from Mr. Menendez, and the parties have been referring to

9    Mr. Menendez as either Senator Menendez or Mr. Menendez or

10   Menendez.

11        MR. LUSTBERG:  The final aspect of the case against

12   Mr. Hana has to do with allegations that he essentially

13   arranged or conspired to have Senator Menendez act as an agent

14   of Egypt.  That's the way the allegation reads in Count

15   Fifteen: that he conspired to have Senator Menendez act as an

16   agent of Egypt.

17        Leaving aside the ambiguity in that allegation, which

18   this Court has already addressed in pretrial motions, the

19   overwhelming and really undisputed facts are that Senator

20   Menendez acted as a senator.  He advocated, as Mr. Weitzman

21   says, with regard to what he believed Egypt should and

22   shouldn't do.  Sometimes it was favorable to the existing

23   regime.  Sometimes it was opposed to it.  But the notion that

24   he was acting as an agent of Egypt, honestly, it's fanciful.

25   And to the extent that Mr. Hana was involved, what the record

O6sWmen4

reveals is that what Mr. Hana did is make various introductions

of people to Senator Menendez.  That is not enough to bespeak a

conspiracy, let alone substantive acts with which he is not

charged other than in the bribery count.

At the end of the day, any of the benefits that flowed

from Mr. Hana to Nadine were both minimal.  Today we saw

something like $12,000 of gold bars.  There was a job that was

$10,000 a month for three months, which I'll address in just

one second.

THE COURT:  Wait.  That's not the issue.  What she was

paid is not the issue.

MR. LUSTBERG:  Agreed.  Agreed.

What I was about to say is whatever those benefits

are, none of them can be tied to a specific *quo*; that is, even

if one assumes that there's a *quid*, that Mr. Hana does things

for Mrs. Menendez, and even if one assumes that doing something

for Mrs. Menendez is doing something for Senator Menendez, in

order for there to be a bribery scheme, that has to be linked

to particular actions that were provided in return.  Neither as

a matter of timing, nor as a matter of showing an agreement is

there any evidence of that.  And it's for that reason that the

motion should be granted.

Finally, I will say this.

We join in Mr. Weitzman's application with respect to

venue and for precisely the reasons that he says.  I understand

O6sWmen4

1    the Court's statement that venue can also be a very thin read.

2    But it can't be based on actions that are not at the core.

3              THE COURT:  That's what I think I disagree with

4    Mr. Weitzman on, but I'll hear more from the government.  But

5    he seems quite comfortable that the acts supporting venue have

6    to be supportive of an essential element.  There are a number

7    of cases where venue rests on acts that I didn't think were

8    tied to essential elements of a crime, but I want to hear more

9    from the government on that.

10             MR. LUSTBERG:  Your Honor, I'll just say, without

11   repeating, this was fairly completely briefed in connection

12   with the pretrial motions, and we rely on those.

13             THE COURT:  OK.

14             MR. LUSTBERG:  Thank you very much.

15             THE COURT:  Thank you, sir.

16             MR. WEITZMAN:  Your Honor, to clarify, it's essential

17   conduct, not essential elements.

18             THE COURT:  I'm sorry.  Quite correct.  Thank you.

19   Thank you, sir.

20             Just in time.  Sir, who is going to argue?

21             The record should reflect that Mr. De Castro is

22   walking in from a previous legal engagement he had.

23             Yes, sir.

24             MR. McMANUS:  Thank you, your Honor.

25             I'll be very brief.

O6sWmen4

1          We also move for a judgment of acquittal, under Rule

2     29, for all of the counts that Mr. Daibes was charged in -- I

3     believe that is Counts One, Two, Four, Six, Seven, Twelve and

4     Thirteen -- and we do so because we don't believe that the

5     government has presented sufficient evidence to sustain a

6     conviction.

7          For the Egypt scheme, which is Counts One, Two, Six

8     and Seven, the government, in its case, has not connected any

9     cash, gold or anything else of value that was found in Nadine

10    Menendez's home that has some connection to Mr. Daibes.  They

11    have not connected that to any promise of an official act

12    related to Egypt.

13         Similarly, for Counts One, Two, Twelve and Thirteen,

14    the Qatar and DNJ counts, they have not been able to connect

15    any of the cash, gold or anything of value to any promise of a

16    benefit for either Qatar or Mr. Daibes and his District of New

17    Jersey case.

18         On the obstruction count, Count Four, the government

19    has not given sufficient evidence to prove that Mr. Daibes ever

20    engaged in a conspiracy to obstruct justice.

21         And just finally, I join in the arguments made by

22    counsel for Senator Menendez and for Mr. Hana with respect to

23    venue.

24         THE COURT:  All right.  Thank you.

25         Let me hear from the government.

O6sWmen4

1          MR. MONTELEONI:  Thank you, your Honor.

2          THE COURT:  I should say, when I said for the record

3     that Mr. De Castro was entering, I should also state for the

4     record, if there is a conviction, throughout this trial when

5     one side or the other has been rising to object, I have been

6     ruling on that objection.  I haven't waited for the person

7     rising to formally object.  The record, scores of times, simply

8     shows I'm saying sustained and does not indicate that whoever

9     was objecting was, in fact, objecting.  But I just want it

10    clear that the Court could perceive there was an objection and,

11    therefore, ruled.

12          Go ahead.

13          That's for the record.

14          MR. MONTELEONI:  Thank you, your Honor.  The evidence

15    is more than sufficient in this case.  It's extremely

16    voluminous and really overwhelming, and the Rule 29 motions

17    should all be denied.

18          Regarding the sort of core bribery proof, the jury

19    heard extensive, detailed, granular timelines that show the

20    provision of things of value.  They show the promises or

21    performance of official acts, and they show the intertwining of

22    those and, in certain cases, very explicit linkages of those by

23    coconspirators, far more than you, candidly, often get in

24    bribery cases.  And all of this is extremely powerful proof of

25    corrupt *quid pro quo*s that violate the honest services, bribery

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6sWmen4

and extortion statutes, even leaving aside the powerful witness
testimony and cooperator testimony that, of course, the jury is
entitled to believe.  So we think on this substance, it's
really quite clear.  This is a jury question.

        We certainly don't agree with Mr. Menendez's counsel's
assertions about an official act.  Certainly whether there was
an attempt to pressure someone in no way turns on whether the
recipient of that attempt perceived it as pressure, used the
word "pressure" or even was aware of it.  And whether there was
a promise to apply pressure, that doesn't even require an
attempt.  So the person could have accurately reported a total
absence of pressure, and the charge would still be founded
based on the promise which was shown by voluminous evidence, as
I say.

        But in this case, there also was compelling evidence,
because of the context of these contacts, that there actually
was substantial pressure.  I think Under Secretary McKinney's
need to immediately reassure his staff that they shouldn't
change their actions because he was anticipating heat coming in
is really a very eloquent statement of exactly what pressure
is.  That's even leaving aside the fact that advice, separate
from pressure, is a totally separate basis for an official act
under *McDonnell*.

        The special sort of additional point that the decision
to do the halal monopoly was Egypt's decision, I think that the

O6sWmen4

1    jury has heard ample evidence that the position of the United

2    States was a position formulated through the interagency

3    process and was a part of the United States's diplomacy and its

4    exercise of its foreign affairs power.  That change of position

5    or that attempt to change a position or that promise of an

6    attempt to change a position clearly qualifies as an official

7    act under *McDonnell*.  So we think that this sort of core

8    evidence is truly overwhelming.

9              Regarding the obstruction counts, leaving aside what

10    would have happened in a different case, where the only

11    obstructive conduct was the pre-charge presentation that

12    Mr. Weitzman focused on, here, there was --

13              THE COURT:  I think he was taking the position -- I

14    think -- that was the only obstructive conduct in the record.

15              MR. MONTELEONI:  Well, it's not.

16              THE COURT:  Mr. Weitzman, is that correct?  Was that

17    the position you were taking?

18              MR. WEITZMAN:  I think that's the core of their

19    allegation.  To the extent that they're relying on the checks

20    themselves, I do have a response to that.

21              MR. MONTELEONI:  The checks, in order to be efficient,

22    we didn't spend as much time on them before the jury, but we'll

23    obviously be summing up on them.  What you have is exactly, in

24    the words of *Aguilar*, the delivery of false documents to the

25    grand jury.  That is exactly the paradigm satisfaction of the

O6sWmen4

1    nexus.  Then the fact that a false presentation actually

2    references and builds upon the same false statements in those

3    checks just takes this case into a different category than the

4    *Schwarz* and *Schulte* and *Aguilar* cases, because what we have is

5    exactly what was absent in those cases.

6            THE COURT:  How do we know the record indicates those

7    were seen by the grand jury?  Because that's really the focus

8    of *Schwarz* and *Aguilar*.

9            MR. MONTELEONI:  We know from trying *Capital Group*,

10   the Second Circuit's decision, that it's the production in

11   response to a grand jury subpoena that brings them within the

12   ambit of the grand jury's authority, and there's a stipulation

13   that indicates that those checks were produced in response to

14   those subpoenas.  Those subpoenas were entered into evidence.

15   Those are grand jury subpoenas of this district.  So we think

16   that's clear, and if the defense wants to argue that there was

17   no corrupt intent, that Menendez wasn't a part of it, that's a

18   jury question.  But for Rule 29 purposes, we think that that's

19   just straightforwardly satisfied.

20           Then, with respect to venue, I think it is true that

21   the substantive standard requires a closer focus of the conduct

22   on the type of offense than in the conspiracy standard, but

23   again, as Mr. Weitzman's response to your question made quite

24   clear, it's not exactly that an essential element has to be

25   completed in the district or anything like that.  It's that

O6sWmen4

1    essential conduct -- that is, a type of conduct that is closely

2    related to the sort of core conduct aspects of the offense

3    took -- place in the district.  And actually, we know what

4    satisfies this in bribery cases.  This comes up in substantive

5    bribery charges.  Not just the provision of things of value or

6    the taking or promising of official acts applies, but also acts

7    that lay the groundwork is the phrase that is used by the cases

8    for those steps to be taken.

9            I want to pause for a moment.  This case is not like

10   about meals or about free transportation.  That's not really

11   the core of it.  But for Rule 29 purposes, there's really no

12   dispute that those things of value were actually provided in

13   this district.  There was evidence of the payment for the

14   Mr. Chow's meal.  There was evidence that Fred Daibes arranged

15   the transport from JFK to New Jersey.  That's a service.

16   Certainly not going to say that's why Menendez did all these

17   things, for these services, but it's part of the scheme, and we

18   think that that sort of takes care of this, frankly, entirely

19   from a Rule 29 perspective.

20           But regarding additional aspects that fully meet the

21   essential conduct test, in *United States v. Gross*, a recent

22   bank bribery case that also used the bribery standard, they

23   pointed out that emails that laid the groundwork for further

24   meetings that were core to the scheme, if they were venued in

25   the district, that gave venue for the substantive bribery

O6sWmen4

1    counts in this district.

2            Here, what you have is you have meetings in New

3    York -- again, Mr. Chow's in Midtown Manhattan -- and you have

4    messages that have been sent out from Wael Hana while at dinner

5    with Menendez and Arslanian, at the time, to one of the

6    Egyptian officials to set up the meeting that is then going to

7    precede the tank ammunition text, which is one of the core

8    promises, obviously, of an official act.

9            THE COURT:  I'm sorry.  Do that again.

10           MR. MONTELEONI:  Yes.  Sorry.

11           THE COURT:  I was focusing on the back of the room.

12           MR. MONTELEONI:  Absolutely.

13           So, on June 30 of 2018, Nadine then Arslanian,

14   Menendez and Wael Hana sit down for dinner in midtown Manhattan

15   at Mr. Chow's restaurant.

16           THE COURT:  Yes.

17           MR. MONTELEONI:  During that dinner Wael Hana sends

18   two WhatsApp messages to Khaled Shawky, the Egyptian defense

19   *attaché*, setting a precise time for a meeting of a military

20   delegation which Shawky was participating in to meet with

21   Menendez and also setting a time for dinner following that

22   meeting.

23           THE COURT:  OK.

24           MR. MONTELEONI:  Now, the meeting was one of a series

25   of meetings that the delegation was taking around Washington,

O6sWmen4

1    D.C., but that obviously doesn't mean that it can't be part of

2    the bribery scheme because we see from the white paper that was

3    circulated in advance of the meeting from Hana to Nadine to

4    Menendez that the Egyptians were requesting official acts,

5    including the approval of foreign military sales.  And the day

6    after both the delegation meeting and then the dinner, both of

7    which were -- they happened in Washington, D.C., but they were

8    arranged, they were scheduled in Midtown Manhattan at

9    Mr. Chow's.  The day after that meeting, the dinner, is when

10   Menendez texts Nadine, tell Will I'm going to sign off the sale

11   to Egypt $99 million of tank ammunition.

12          So that actually is directly analogous of laying the

13   groundwork; it's in-person contact between the briber and bribe

14   recipient indicating a willingness to take the next steps that

15   are going to set up the official acts.  And that's important

16   both because it moves the scheme forward and also because it

17   communicates from the bribe recipient to the briber a

18   willingness to move the scheme forward.  Right?  And promise is

19   the core of a bribery offense.  It's actually not really

20   necessarily an exchange of things of value for official acts;

21   it's really an exchange of promises for things of value, for

22   promises of official acts.  So the indication of the

23   willingness to actually do this is absolutely part of the core

24   promise and elements.  That's the decision the *Gross* case came

25   to.  They said this didn't just set up the meeting but it also

1    showed the willingness to advance the scheme.  So in that way

2    manifestation for willingness to act in the future.

3            THE COURT:  Do you have a citation on that?

4            MR. MONTELEONI:  I do, your Honor.  I just need to

5    turn to the right page.  This is 2017 WL 4685111, and the

6    discussion is around Westlaw pages 38 through 39.  That's

7    *United States v. Gross*, a 2017 decision.

8            THE COURT:  By whom?

9            MR. MONTELEONI:  By Judge Nathan.

10           THE COURT:  For the circuit?

11           MR. MONTELEONI:  No, no.  On the district level.  It

12   was affirmed by the circuit but not on venue grounds.  They

13   didn't raise venue grounds in the appeal.  It's affirmed under

14   the name of *United States v. Lebedev*.  You can see that in the

15   citing history.  It doesn't this precise issue.

16           THE COURT:  OK.

17           MR. MONTELEONI:  But the laying the groundwork

18   formulation is used by the circuit.  It's discussed in *United

19   States v. Davis*.  That's a 2012 Second Circuit decision, which

20   glosses *United States v. Stephenson*.

21           The point is that laying the groundwork for the step

22   is an essential element.  That's different from just the truly

23   preparatory acts of transitory travel through the district,

24   where the travel isn't a thing of value being provided, where

25   the travel is just passing through, which itself is enough for

O6sWmen4

1  a conspiracy. But these sort of groundwork-laying steps are

2  enough for the substantive offenses, and that's what we have

3  here.

4          You had a question also about foreseeability.

5          There does have to be not foreseeability of what

6  precise action would be taken in this district but that there

7  would be some actions taken in this district, and that has to

8  be foreseeable by a preponderance to a reasonable jury. So

9  we're several layers away from Rule 29 here, and there are

10  cases that sort of the proximity of the district and the New

11  York-New Jersey metropolitan area in the context of a sort of

12  complex and involved scheme makes it highly foreseeable that

13  some action is going to go across those district boundaries.

14  Really, that's a jury question. It's not a Rule 29 question.

15          For that reason, we respectfully request that the

16  Court deny the motions.

17          THE COURT: All right. Thank you.

18          Mr. Weitzman, did you indicate that you wanted to

19  respond to something?

20          MR. WEITZMAN: Your Honor, two things.

21          The first is on the foreseeability standard, I think

22  the government's argument proves too much. It would mean that

23  whenever there are adjacent districts, it would inevitably be

24  foreseeable to a defendant that an adjacent district would

25  bring a charge because they're adjacent, so obviously crimes

O6sWmen4

1    can transition from one border to the other.

2              The second is that the checks that were submitted

3    pursuant to a grand jury subpoena were not submitted by Senator

4    Menendez.  I believe that they were only submitted by Nadine

5    Menendez's counsel.  Senator Menendez did not have the checks.

6    He wrote the check to his wife, and she returned them to the

7    grand jury.  I think.

8              I don't think the stipulation distinguishes the two,

9    so I don't think they've met their burden with respect to

10   Senator Menendez on the obstruction charge.

11             THE COURT:  All right.  Do you have a response to that

12   latter point?

13             MR. MONTELEONI:  Factually, it is certainly true that

14   they were produced in response to the Nadine Menendez grand

15   jury subpoenas, but it's a jury issue that the jury's going to

16   have plenty of evidence to conclude that it was part of a

17   coordinated scheme given the close coordination in subject

18   matter, announced timing and memo lines between the Robert

19   Menendez checks and the Nadine Menendez checks and the

20   coordination of those checks with the statements that Menendez

21   would then make to investigators -- so all of this.  He can

22   argue to the jury that Menendez didn't know about it, but

23   there's ample information based on which the jury can reject

24   that.

25             THE COURT:  All right.  Thank you.

O6sWmen4

1        My decision really was foreseen by Mr. Lustberg.  At

2   this point I'm not going to enter judgment of acquittal on the

3   grounds that evidence is insufficient for the jury to sustain a

4   conviction.  The argument has been helpful to me.  It's helped

5   focus me on obstruction and refocus me on obstruction and to

6   think more deeply about venue.  But at this point I'm denying

7   the Rule 29 motions, and if there are convictions these things

8   can be raised anew at the conclusion of the case.

9        That's my decision on the Rule 29.  They've been

10  denied at this point.

11       Let me turn to what's coming here.

12       We've scheduled, I think, everything that I have on my

13  plate with the exception of the Critchley deposition.  If there

14  are going to be objections to that, in what format am I going

15  to get it, and when is the Critchley deposition going to be at

16  issue here?

17       MR. WEITZMAN:  We would like Critchley's deposition

18  played on Monday, was our goal.  It was a short deposition, I

19  think probably only about an hour and a half long.  We provided

20  our designations.  I think we're waiting; I'm not sure.  Maybe

21  there was an email that came across, but I don't recall seeing

22  it.  We're awaiting the designations of objections and

23  counterdesignations.

24       THE COURT:  Yes, I know, but then the parties need to

25  talk to each other about that and see if there's anything that

O6sWmen4

1    I need to rule on.  So talk to each other.

2          When is that going to happen, Ms. Pomerantz?

3          MS. POMERANTZ:  Your Honor, I anticipate that there

4    will be issues for your Honor to rule on.  There were many

5    objections during the course of that deposition, and so --

6          THE COURT:  Yes, but my question is when am I going to

7    get those issues, and is it going to be in written form, or you

8    just want me to go through the deposition on Monday morning?

9    Mr. Weitzman has said Monday.

10          MS. POMERANTZ:  We'll confer with defense counsel

11    about the process for your Honor.

12          THE COURT:  All right.  But then if it's going to be

13    in writing, I'm going to need it teed up by noon on Sunday.

14    And I hate to use jury time on Monday.

15          MS. POMERANTZ:  Understood, your Honor.

16          THE COURT:  All right.  What I can say now is I have

17    no information whatsoever on the Critchley deposition, and it's

18    4:35 on Friday.

19          OK.  My notes indicate something about arguing orally

20    concerning Richardson as the forensic accountant, and I don't

21    have anything on that either.

22          Are there Richardson issues that need to be addressed?

23          MS. GHOSH:  Yes, your Honor.

24          I'm not sure at this point if the defense still plans

25    to offer his testimony as expert testimony or lay witness

O6sWmen4

1    testimony, so I think that's one issue.  We finally received

2    summary charts that will apparently be introduced through him,

3    whenever he testifies, which it seems may be Monday.  We

4    received them late last night.  We're still reviewing them.  We

5    do have some concerns.

6         One of the slides appears to summarize credit card

7    spending from a political action committee related to Menendez,

8    which seems to be something that would be very confusing to the

9    jury as to what is authorized spending from a PAC versus not

10    authorized.  I don't think this witness is going to be able to

11    speak to that, so the introduction of those records do give us

12    concern.  Again, we haven't had a chance to confer with defense

13    because we received these last night for the first time.  We

14    will do so, but that is one concern we have regarding his

15    testimony; and then, secondly, whether he is going to be put

16    forth as an expert or not, given that, again, we got these

17    materials only last night.

18         We had very little information until we got them about

19    what he would actually be saying.  We haven't received any

20    engagement letter or fee or rate information for him or for the

21    other retained expert -- sorry, retained witness for the

22    defense who will be presenting a summary chart, which we did

23    request earlier today but haven't received a response yet.

24         THE COURT:  Well, this goes back to my comments

25    yesterday.  There really is no way to have the ability to

O6sWmen4

1    rationally hear from each side and know what their issues are

2    and then for me to be able to decide it.  Everything is far too

3    rushed.

4         I've told this jury to be here at 9:30, so I think

5    that part of the train has already left the station.  I would,

6    again, hate to have them sitting there, and probably they would

7    hate it more than I, given the comments they've made about not

8    wanting to just sit there.  Actually, there's no specific

9    comment that I know to that extent, but I can tell from

10   watching them that they want to keep moving forward here.

11        Well, they're coming in at 9:30.  I would just urge

12   the parties to work throughout the weekend and, to whatever

13   extent you can get this -- I guess we're talking specifically

14   Critchley and Richardson, because everything else you've

15   promised me dates on -- get it to me in writing to the extent

16   you can.

17        MR. WEITZMAN:  Yes, your Honor.  We will.

18        THE COURT:  I'm not addressing this to you

19   specifically except, at this moment, it's easy to say "yes,

20   your Honor."  It's another thing to actually do the work so it

21   comes to me in an organized fashion.

22        Go ahead, sir.

23        MR. WEITZMAN:  I believe we are not going to offer any

24   opinion testimony from Mr. Richardson.  We've told the

25   government that.  I don't expect that we will, therefore,

O6sWmen4

1   qualify him because the things that he does are simple math,

2   and I've told the government that so long as they don't object

3   to a fact witness, a lay witness doing that type of simple

4   math, we don't intend to qualify him as an expert.

5           THE COURT:  So he's a fact witness.

6           MR. WEITZMAN:  He's a lay witness, yes.

7           THE COURT:  I call that a fact witness.

8           MR. WEITZMAN:  He is a fact witness, correct.

9           THE COURT:  OK.

10          MR. WEITZMAN:  He just goes through the credit card

11  statements and the bank statements, the same ones that the

12  government has had since we produced his opinion before trial.

13  So they have had that stuff.  And there are some summary charts

14  which we have produced.  They're largely pie charts and tables

15  that show amounts in and out of accounts.  So it's pretty

16  simple math, and we'll confer.

17          THE COURT:  They need an opportunity to see those and

18  to do the math themselves, and so forth.

19          MR. WEITZMAN:  Correct.  They have received them.  I

20  understand they need some time.  I'm not suggesting otherwise,

21  your Honor.  We will be available throughout the weekend for

22  them if there are any errors that they want to identify or

23  anything else they'd like to discuss.

24          THE COURT:  On the last witness, Mr. Fee's cross was

25  twice the length of the direct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6sWmen4

1          Government, try not to do that on this witness.  All

2     right?

3          MS. GHOSH:  Don't worry, your Honor.  We won't.

4          THE COURT:  Now, I think it's not very clear on

5     Critchley or Richardson, but otherwise, I have a clear idea of

6     what I've directed you to do, so hopefully it will be orderly

7     on Monday.

8          Anything else?

9          MS. GHOSH:  Your Honor, if we could just confirm that

10    the defense will be providing us with the engagement letters

11    and fee information for the two retained witnesses -- that's

12    Mr. Richardson and their retained witness who will be putting

13    on the summary charts.

14          As I said, they haven't responded, and if they're

15    going to be telling us later tonight or over the weekend that

16    they're refusing to produce it, we would then bring that before

17    your Honor.  If they're going to produce it and just haven't

18    done so yet today, that's fine, but I don't want to be bringing

19    this up Monday morning shortly before testimony from one of

20    these witnesses.

21          THE COURT:  I appreciate that.

22          MR. WEITZMAN:  Your Honor, I actually need to think

23    about this.  He's not being qualified as an expert witness.

24          THE COURT:  Who are you talking about right now?

25          MR. WEITZMAN:  I'm talking about Mr. Richardson.

O6sWmen4

1          THE COURT:  OK.  Go ahead.

2          MR. WEITZMAN:  So I need to think about this.  If he's

3    not being qualified as an expert witness, I don't think

4    compensation should enter the discussion.

5          THE COURT:  Oh, please.  It seems to me they can

6    establish how much the man is being paid for his testimony.

7    That's not really an issue.

8          MR. WEITZMAN:  We'll make the disclosure.  Yes, we'll

9    make the disclosure again.

10          THE COURT:  I don't know if that's artful or not.

11          MR. WEITZMAN:  No.  We'll disclose the hourly rate.

12    I'm not sure that they're entitled to -- they can ask him what

13    he's getting, if he's getting anything.  He may not be getting

14    anything for this.  There's a difference between an entity and

15    an individual.  There's an engagement letter with an entity.

16          THE COURT:  No, no, no.  If he's an employee of X

17    entity, it seems to me if the entity is getting paid, it seems

18    to me they're entitled to know how much his employer is

19    getting.

20          You're telling me a partner -- let me just think about

21    this.

22          MR. WEITZMAN:  He may not be making one cent off this,

23    your Honor.

24          THE COURT:  Just a moment.

25          If A partner at a law firm is testifying, he can

O6sWmen4

1   testify to his hourly rate.  If he's not being asked how much

2   he's receiving out of his billable, why isn't it the same thing

3   for this witness?

4            MR. WEITZMAN:  I agree that the witness can testify to

5   an hourly rate.  I totally agree with that.

6            THE COURT:  The hourly rate and how many hours, in

7   other words --

8            MR. WEITZMAN:  To the extent.

9            THE COURT:  Just a moment.

10           -- what his employer, how much his employer is being

11  paid for his testimony here.

12           MR. WEITZMAN:  To the extent he knows it, your Honor.

13  This is what happens.

14           THE COURT:  Wait, wait, wait, wait.  One at a time.  I

15  don't know if there's a shell game going on.  It just seems to

16  me that the adversary of a proponent's testimony who is being

17  paid is entitled to know what he's being paid or what his

18  employer is being paid.  The jury has the right, it seems to

19  me, to know what's in it for this person.  It's only logical.

20           MR. WEITZMAN:  I agree as to what's --

21           THE COURT:  I'm not sure why you're fighting me or why

22  you're pushing back against that.

23           MR. WEITZMAN:  I agree it's what's in it for the

24  person.

25           THE COURT:  Or his employer.

O6sWmen4

1          MR. WEITZMAN:  If he's a salaried employee --

2          THE COURT:  Or his employer.

3          MR. WEITZMAN:  Your Honor, we don't cross-examine FBI

4    agents on how much they're being paid and what's in it for the

5    FBI.

6          THE COURT:  No.  It's different, totally different.

7    He's a private individual.

8          I'm not sure what we're debating, sir.  You tell me.

9          MR. WEITZMAN:  I'm not --

10         THE COURT:  I think we're agreed -- is he being paid

11   by the hour for his services on this case?  Yes or no.

12         MR. WEITZMAN:  He is not.  His employer is billing by

13   the hour.

14         THE COURT:  OK.

15         MR. WEITZMAN:  He does not see those bills.  He's not

16   on those bill.  He's not a partner at his firm.

17         THE COURT:  He doesn't know what he's being billed at?

18         MR. WEITZMAN:  He may know what he's being billed at.

19   I agree with that.  That's a different statement than knowing

20   what an employer when he's a -- he could be a salaried

21   employee.  I actually don't know the answer to this.  That's

22   different than saying what is the employer, who is fulfilling

23   other services -- other services -- for the defense that are

24   privileged, is earning.  That's a different statement.

25         THE COURT:  I agree that the other side is not

O6sWmen4

1    entitled to know what his employer is being paid for services

2    that were not rendered by this man on this matter.  You don't

3    have to worry about that.  That's not at issue.  But I do

4    think -- or when I say is being paid, is being billed at.

5         I do think the other side is entitled to know what you

6    are paying for his services on this matter.  That's pretty

7    straightforward.  Does that make sense?

8         MR. WEITZMAN:  I hear you.  I'm just looking at the

9    rules, your Honor.

10         THE COURT:  Go ahead.  Pick a good one.

11         MR. WEITZMAN:  Yes.  I mean I'm not sure.

12         THE COURT:  I have no idea what the jury makes out of

13    all the numbers of rules we've been throwing at them, but I

14    hope they follow my instruction that it's of no concern to

15    them.

16         MR. WEITZMAN:  Your Honor, I'd like to do some

17    research on this.  When you look at Rule 16, unlike in the

18    civil rules, which do require the disclosure of rates, Rule 16

19    actually doesn't require disclosure of rates for expert

20    witnesses.  What your Honor is saying I understand, but this is

21    a salaried employee.  He doesn't earn one cent from the

22    engagement.

23         THE COURT:  I want the other side to know what it's

24    costing you for his services on this matter.  Not other

25    services he has done.  When I say on this matter, I mean

O6sWmen4

1    involving his testimony.  If he's had other jobs involving this

2    litigation, I don't want to know about that.  They don't want

3    to know about that.  If his employer has employed other people

4    for things on this litigation, I don't need to know about it.

5    But the other side has a right to know what you have -- not you

6    personally -- paid for his services on this matter.

7                MR. WEITZMAN:  I think what we can do, your Honor --

8                THE COURT:  The more you push back, the more I'm sure

9    the government is intrigued here.  It seems to me pretty

10   straightforward.

11               MR. WEITZMAN:  Well, I think the number of hours he's

12   worked and his billable rate would be fair game.  And I agree

13   with that.  But I'm sensitive to other services being performed

14   by this company.

15               THE COURT:  Other services being performed by this

16   company are not at issue.  His services are.

17               MR. WEITZMAN:  So that will be number of hours and

18   rate.

19               THE COURT:  Well, let me hear from the government.

20               MS. GHOSH:  All of this makes it seem quite apparent

21   that the engagement letter, which is not privileged, is

22   something that we should be able to see, because now it's very

23   confusing.  Were there other people at this firm that prepared

24   most of the summary charts and he just verified them?  And are

25   they only going to give us the information for what he verified

O6sWmen4

1  and not the full amount that that firm is making off of his

2  testimony presenting those charts?  I don't know.  It's all

3  become very confusing and what we thought was a relatively

4  straightforward request which the jury may or may not make

5  anything of and we may or may not make anything of, but we're

6  entitled to know and the jury's entitled to know what someone

7  who's testifying his or his employer has been paid related to

8  his testimony.

9          THE COURT:  I think that's basically right -- what he

10  or his employer have been paid for the services rendered in

11  connection with his testimony.  I think that's right, sir.

12  It's not simply hourly rate times hours worked.  If there's

13  other things that have gone into his testimony that his

14  employer is being billed for, it's appropriate.

15          MR. WEITZMAN:  I don't know the answer to that, and I

16  will find out, your Honor.

17          THE COURT:  All right.  Thank you.

18          MR. WEITZMAN:  We'll make the disclosure.

19          THE COURT:  All right.

20          You just heard they will make the disclosure.

21          MS. GHOSH:  I hope soon enough before his testimony on

22  Monday.

23          We'd also note that this applies or may apply to the

24  witness they're using to present their summary charts, who is

25  also from some sort of consulting firm, I believe.  And so we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6sWmen4

1    make the same request with regard to that.

2            THE COURT:  Again, if somebody is being paid for their

3    testimony -- for the work done in connection with whatever it

4    is they did as well as hours spent in court, the other side is

5    entitled to this that.  Pretty straightforward.

6            MR. WEITZMAN:  Your Honor, I know you're saying it's

7    straightforward.  I'm not going to refuse.  I will give it, but

8    let me give you the analogy.

9            We could have a paralegal testify, and that paralegal

10   was a salaried paralegal and as a result of the salary, as a

11   result of the paralegal's hours, we could be billing a client a

12   lot of money.  And that doesn't mean that you get to

13   cross-examine the paralegal and say, your firm just earned X

14   amount of dollars of all this work.  It's no different when it

15   comes to Mr. Galloway or our nonexpert forensic accountant.  So

16   the question --

17           THE COURT:  Wait just a moment.  I understand that.

18   In other words, you don't look behind a paralegal's hourly rate

19   to see how much money the law firm is making on the paralegal

20   or, for that matter, what percentage of the differential --

21   we're getting even more down into the weeds -- is due to

22   overhead and which is due to profit.

23           MR. WEITZMAN:  Right.  That is my point.

24           So the question and the legitimate thing to inquire is

25   one of bias, and that's whether this witness is earning money

O6sWmen4

1    as a result of the engagement.

2           THE COURT:  All right.  Let me hear from the

3    government on Mr. Weitzman's specific point.

4           MR. RICHENTHAL:  It's unfortunate we're still talking

5    about this.  The difference between retaining a private firm

6    for a specified nonlegal service and the lawyer putting a

7    member of the team on the stand is obvious.  The jury

8    understands the legal team are advocates for the defendant.

9    The jury does not necessarily understand that a former federal

10   agent, which is the person they purport to want to call to

11   testify, is no longer a federal agent.  In fact, a private

12   person making a living, nothing wrong with that --

13          THE COURT:  I'm not sure why you're even introducing

14   that he was a former federal agent.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O6S5men5

1          THE COURT:  I'm not sure why you are even introducing

2     if he was a formal federal agent.  Who cares.

3          MR. RICHENTHAL:  We are going to raise that because

4     that is in his biography.

5          THE COURT:  That is totally separate.

6          MR. RICHENTHAL:  So putting that aside for the moment,

7     the point is he is a private individual for a private company.

8     We are allowed to explore bias.  One form of bias is the desire

9     for future work, past work, and the total sum of money.  This

10     isn't complicated.

11          Putting a paralegal of the defense team on the stand

12     is very different for obvious reasons:  Of privilege, the fact

13     that they're working with the lawyers at the table.  There are

14     other ways to explore potential biases that are separate.  This

15     is essentially an expert witness no longer testifying as an

16     expert.  We just want basic information to explore whether

17     there is a small amount of bias.

18          THE COURT:  It doesn't matter.  It doesn't matter.

19     Oh, I see, because if he was designated as expert there are

20     specific provisions for that.  That's why you are raising that.

21          MR. RICHENTHAL:  Yes, your Honor.

22          I will also note that if we are looking for a

23     provision for the engagement letter we would just point to

24     26.2.

25          THE COURT:  You are going to get the engagement

O6S5men5

1    letter, he said.

2            MR. RICHENTHAL:  OK.

3            THE COURT:  I reverted.  It is straightforward.  Let's

4    find out what he and his employer are being paid.

5            Mr. Weitzman, there you have it.  9:30 Monday.

6            MR. WEITZMAN:  Yes.

7            MS. POMERANTZ:  Your Honor, I apologize.

8            I believe your Honor mentioned earlier about you

9    having reviewed the government's papers relating to --

10            THE COURT:  Oh, thank you.  Thank you.  The family

11    members.

12            MS. POMERANTZ:  Yes, your Honor.

13            THE COURT:  The question is what the family members

14    can testify to, and I think it's -- I really limbed it I think

15    pretty well in our discussion of yesterday.  Senator Menendez'

16    family member can testify generally to the background

17    information raised during his attorney's opening on it such as

18    being the child of Cuban immigrants, the family fled Cuba --

19    assuming the witness knows that.  They lost their savings at

20    some point, if that's true.  He grew up in a tenement.  All of

21    that general background is perfectly acceptable, assuming the

22    sister knows it.  I think he said it was the sister.

23            Details of childhood poverty, sort of Angela's Ashes

24    sorts of things or emotional trauma, are not being permitted

25    under Rule 403.  She can testify, in addition, to his general

involvement in constituent services and a commitment on his

part, assuming she knows it, to advocacy on the part of the

Latino community but she can't specify the specific instances

of advocacy under 404(b) in order to show that on other

occasions, such as the Suarez nomination, he acted in

conformity to that advocacy.

Now, I understand that there are two exhibits that are

agreed upon that talk about specific advocacy.  That's in one

of the submissions.  Obviously if they're agreed upon and there

is a caveat there about appropriate redactions, the parties

should work out appropriate redactions and if you agree upon

two exhibits, that's fine.

She can't testify to what Menendez told her about the

family history or, for that matter, what anyone else told her

about the family history.

She can testify to cash she saw that Menendez had.

That is a percipient witness.  I have no problem with that.

In terms of Nadine's family member, basically the

same.  Again, this is all very logical it seems to me.  She can

testify generally to her knowledge of Nadine's relationship

with the ex-boyfriend Doug Anton, the dates of that

relationship, and the fact that Nadine was, at times, and if

she knows the times, fearful of Anton, if she knows of that

firsthand and not because Nadine told her.  She cannot testify

to specific acts of stalking or abuse.  Again, it seems to me

O6S5men5

1    that probative value would be substantially outweighed by the

2    danger of unfair prejudice under 403.  There is, especially

3    now, issues of domestic abuse risk substantial prejudice but

4    she can talk in general terms about the fact that Nadine was

5    fearful of Anton.  The risk of prejudice from specific acts of

6    abuse or stalking far outweigh any probative value, especially

7    because there is not a sufficient connection to abuse or

8    stalking to the charges in this case.  She may testify in

9    regard to the flip phone that Nadine, if she knows, that Nadine

10   procured the flip phone because of her fear that Anton had

11   access to her iPhone.  Hearsay in all these cases, is not going

12   to be permitted.

13             I hope that gives a good map for the parties.

14             Anything else?

15             MS. POMERANTZ:  Yes, that is helpful, your Honor.

16             I do want to note that there were three defense

17   exhibits that we, relating to Nadine's relative's testimony,

18   that we indicated to the defense that in line with the guidance

19   from the Court yesterday we objected to those exhibits.  And

20   so, I don't know if the defense will be revisiting its position

21   in light of your Honor's further explanation today, but we

22   would just, again, indicate that those three exhibits we think

23   fall squarely within the guidance that your Honor has provided

24   and that they should not be permitted.

25             THE COURT:  I have no idea what those exhibits are.

O6S5men5

1          Mr. Fee?

2          MR. FEE:  Your Honor, we can continue talking to the

3    government about it.  These are three text messages from Nadine

4    to the testifier and we think, very clearly, go under state of

5    mind exceptions.  They don't talk about any explicit

6    references --

7          THE COURT:  Yes, but what is the prejudice here?  Is

8    there abuse mentioned?  What is it?

9          MR. FEE:  No, it is actually -- it is in line with, I

10   believe, the Court's ruling and that is why I would like to

11   engage with the government on, given that we have heard your

12   ruling, where we land, and we are happy to be reasonable but

13   they don't talk about physical abuse.

14         THE COURT:  I am not going to ask you -- your position

15   very well may harden when put in open court.  So, just talk to

16   each other.

17         MR. FEE:  Thank you, your Honor.

18         MS. POMERANTZ:  Your Honor, we have engaged with them.

19   I would just say, very briefly, these are specific instances,

20   just as your Honor has previewed should not be permitted.  And

21   this raises 401 concerns, 403 concerns.  These are text

22   messages on which Robert Menendez is not copied, he is not on

23   them.  The relevance is -- they're only relevant if Robert

24   Menendez was on these text messages or if he heard him say it.

25   There is no indication of that.  There is 403 concerns.  These

O6S5men5

 1    are specific instances.  They refer to things that are

 2    incendiary, that are inflammatory, and they should not be

 3    permitted.  It falls squarely within the guidance your Honor

 4    has given us.

 5            THE COURT:  What can I tell you?  Mr. Fee said he

 6    still wants to talk to you.

 7            MS. POMERANTZ:  I am happy to speak to Mr. Fee.  I

 8    just want to flag this for the Court because our position

 9    remains.

10            THE COURT:  Thank you.  And I will take those up first

11    thing Monday, if that's what you want.  As Mr. Fee himself

12    said, in an aside, which I hope I told the jury to ignore

13    comments of counsel, I think he said something like:  Hope

14    springs.  So, I repeat that.

15            MR. RICHENTHAL:  In the same spirit, we have not

16    received any 26.2 material for Mr. Richardson at all.

17            THE COURT:  Yet.

18            MR. RICHENTHAL:  I hope it's "yet".  I would note

19    Mr. Weitzman referred to privilege in our back and forth about

20    material regarding Mr. Richardson.  Under Rule 26.2(c), if the

21    defense position is that 26.2 material need not be disclosed

22    because it is privileged, the defense is obligated to give it

23    to your Honor for your Honor to rule *in camera* as to whether

24    that assertion is correct.  We invoked this provision in the

25    parties' written agreement and the defense agreed, but in

O6S5men5

1    addition not receiving 26.2 material, we have not been told

2    they've given any to your Honor.

3                THE COURT:  I certainly haven't received any.  What is

4    the 26.2 subdivision?

5                MR. RICHENTHAL:  C, as in cat.

6                THE COURT:  Let me just read it.  Yes, I do see it so

7    I assume they're not going to assert privilege on any

8    information.

9                Thank you.  9:30 Monday.  And let's try to make sure

10   that the jury isn't kept waiting while other issues are

11   debated.  Thank you.

12               (Adjourned to July 1, 2024, at  9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2      Examination of:                              Page

3      MEGAN RAFFERTY

4      Direct By Ms. Ghosh  . . . . . . . . . . . .5551

5      Cross By Mr. Fee . . . . . . . . . . . . . .5596

6      Cross By Mr. Lustberg  . . . . . . . . . . .5686

7      Cross By Mr de Castro  . . . . . . . . . . .5695

8      Redirect By Ms. Ghosh  . . . . . . . . . . .5696

9                        GOVERNMENT EXHIBITS

10     Exhibit No.                               Received

11      A101-105, E117, 1410, 1451  . . . . . . . .5548

12      10C-2, 10D-1, 10D-2, 10D-3, 10D-4   . . . .5549

13      5H-102, 1405, 1336  . . . . . . . . . . . .5553

14      5N-1004 through 5N-1232, 5N-2001  . . . . .5557

15              through 5N-2062, 1405, 8I-4A

16              through 8I-8A, 1436, 1342

17      5F-902, 5F-607, 1341  . . . . . . . . . . .5562

18      1461    . . . . . . . . . . . . . . . . . .5564

19      1338    . . . . . . . . . . . . . . . . . .5569

20      1340    . . . . . . . . . . . . . . . . . .5576

21      1339    . . . . . . . . . . . . . . . . . .5585

22      5W-1    . . . . . . . . . . . . . . . . . .5640

23                        DEFENDANT EXHIBITS

24     Exhibit No.                               Received

25      2080    . . . . . . . . . . . . . . . . . .5630