O72Wmen1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          23 Cr. 490 (SHS)

5    ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
6    and FRED DAIBES,

7              Defendants.
                                           Trial
8    ------------------------------x

9                                          New York, N.Y.
                                           July 2, 2024
10                                         5:05 p.m.

11

12   Before:

13

14                  HON. SIDNEY H. STEIN,

15                                         District Judge
                                           -and a Jury-

16                          APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division

23

24

25

O72Wmen1

APPEARANCES CONTINUED


PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:  ADAM FEE
        AVI WEITZMAN
        ROBERT D. LUSKIN
        RITA FISHMAN




GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
        ANNE M. COLLART
        CHRISTINA LaBRUNO
        ANDREW J. MARINO
        RICARDO SOLANO, Jr.
        ELENA CICOGNANI
        JESSICA L. GUARRACINO


CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes


Also Present:  Connor Hamill
                Paralegal Specialist, U.S. Attorney's Office

                Justin Kelly, DOAR

O72Wmen1

```
 1                   (Trial resumed; jury not present)
 2               THE COURT:  All right.  All the attorneys are here,
 3      and you're waiving your clients' appearances, as I understand
 4      it.  Is that correct?
 5               MR. WEITZMAN:  Yes, your Honor.  We've spoken to our
 6      client, and he waives his appearance.
 7               MR. LUSTBERG:  Same for Mr. Hana.
 8               MR de CASTRO:  And for Mr. Daibes.
 9               THE COURT:  All right.  What I want to do this
10      afternoon is the objections on the charts.  I've decided the
11      Critchley deposition objections.  I'm having my clerk pass out
12      the order.  It's already been filed.  These are copies for you,
13      if you want.  So that should be done.  You can adjust the video
14      accordingly, and it will be played tomorrow then.  Then we'll
15      have Gannaway on, and we'll see about the paralegal and
16      Critchley.  And that should be the full day.
17               That leaves *sub judice* for tomorrow or another day the
18      Hana 613 issue on Uribe and the Hana employees issue.  But
19      right now, we'll do the exhibits.
20               MR. LUSTBERG:  You're not going to rule on those Hana
21      motions today.
22               THE COURT:  That's correct.
23               MR. LUSTBERG:  OK.  That means that we're not putting
24      on our employees tomorrow.
25               THE COURT:  Well, as I previewed what we were doing,
```

O72Wmen1

1    there's a full day tomorrow of Gannaway; the paralegal, if the

2    paralegal goes on; and Critchley.  The representation to me was

3    that Gannaway, I think, would be approximately three hours on

4    direct.

5             Is that right?

6             MR. WEITZMAN:  Your Honor, we are trying to streamline

7    as best as possible.  We are reacting a bit to what we've seen

8    from the jury.  They want to get to deliberations, and we're

9    considering streamlining Gannaway considerably as a result.

10            THE COURT:  All right.  Well, that's good to hear.

11            Mr. Lustberg, all I can tell you is that I'm not

12   giving you my rulings on that.  I will tomorrow, if at all

13   possible.

14            MR. LUSTBERG:  We'll be prepared either way.

15            MR. MARK:  And your Honor, we've spoken with

16   Mr. Lustberg.  One of those employees, IS EG employee No. 5,

17   who I think we'll be able to work out, largely work out the

18   evidentiary issues so to the extent that Mr. Lustberg is

19   prepared to call that witness, I think that would probably be,

20   and there's time in the day, we think that probably could be a

21   useful way to proceed tomorrow.

22            THE COURT:  All right.

23            MR. LUSTBERG:  Agreed, your Honor.  We'll be prepared

24   to call her.

25            THE COURT:  OK.  No. 5 will come on if there's time.

O72Wmen1

1          MR. LUSTBERG:  Yes.

2          MR. WEITZMAN:  Your Honor, if I can just elaborate on

3    my comment earlier.

4          THE COURT:  I'm not sure you should elaborate.  I

5    loved every word you said, which was, just for the record, you

6    indicated that your view of watching the jury was that they

7    really would like this to conclude so they can go into

8    deliberations, and I share that view.  One never knows, of

9    course, but just looking at them, it seems to me that that's

10   correct.

11         Go ahead.

12         MR. WEITZMAN:  One of the issues is our witness will

13   establish the process by which the summary charts were created

14   in order to offer and admit them.  We would be willing, at

15   least on the Menendez side -- I can't speak for others.  We

16   would be willing to consider not publishing or eliciting

17   testimony about any particular line entries and just having it

18   available for summations so long as the scope of

19   cross-examination is, therefore, limited to, again, the issue

20   of the creation of the summary charts and not as well

21   cross-examining the witness about any line entries.  So I think

22   that that is a proper scope objection in light of what I'm

23   proposing as the direct, but if that scope objection is not

24   sustained, I think we need to get into the line entries.

25         THE COURT:  All right.  Let me just think about that

O72Wmen1

1    for a moment.

2           You're proposing that the charts simply go in without

3    testimony of what the line entries are?

4           MR. WEITZMAN:  Rather than do what the government did,

5    which is go line by line and have mini summations --

6           THE COURT:  No.  I understand.

7           MR. WEITZMAN:  -- we're proposing putting them in,

8    correct.

9           THE COURT:  But what you want in exchange is the

10   government to not cross on any of the line entries.  In other

11   words, if I understand you, that the Gannaway testimony becomes

12   ten minutes.

13          MR. WEITZMAN:  Correct, your Honor.

14          MR. MONTELEONI:  Well, Your Honor, our

15   cross-examination was never going to be lengthy even when it

16   was going to be a three-hour defense presentation.  But if this

17   is what they're doing, then there's actually no need for the

18   chart.  If the issue is just that they want the things in --

19          THE COURT:  No, but they have additional lines from

20   your charts.

21          MR. MONTELEONI:  Right, and we have no problem with

22   them offering the exhibits supporting those lines, but if

23   they're not doing any -- and then I suppose them using that

24   same chart as a demonstrative in a closing, if they want to,

25   but in order for it to be --

O72Wmen1

1            THE COURT:  No.  Let's get some fundamentals down.

2            I take it, Mr. Weitzman, that you are offering the

3    chart in evidence.

4            MR. WEITZMAN:  It's a summary chart.  It's no

5    different than what the government has offered.  It should go

6    back to the jury, yes.

7            THE COURT:  Right.  The answer to my question is yes.

8            MR. MONTELEONI:  Then they should be subject to the

9    same type of cross-examination on the chart that our charts

10   were.  The point of offering a summary chart as evidence and

11   having it go before the jury as opposed to it being a closing

12   demonstrative is that it will allow the presentation of it

13   before the jury and proper -- we're not planning on going,

14   doing all this extraneous stuff, but proper, appropriate

15   cross-examination about the chart.  I honestly was --

16           THE COURT:  No, but about the chart, meaning you want

17   to cross-examine on the line entries.

18           MR. MONTELEONI:  Yes.  Yes.  And I think that

19   that's --

20           THE COURT:  Well, why can't you do just what

21   Mr. Weitzman is proposing to do in the interest of time; that

22   is, put in the chart and the underlying documents and any

23   argument on that to be made in summations?

24           MR. MONTELEONI:  Well, so, I mean some of the

25   cross-examination is going to go to whether the chart

O72Wmen1

1    accurately reflects what it purports to, but they don't need

2    the chart as an exhibit to summarize anything for the jury if

3    they're not actually proposing to use it to summarize anything

4    for the jury.  They may need the underlying documents.

5         THE COURT:  Wait.  I'm not sure I understand that.

6    He's putting the chart in with the line entries as exhibits, I

7    mean as evidence.

8         MR. MONTELEONI:  Right.

9         THE COURT:  He's also putting in the underlying

10   documents.  These are additional lines to your charts.  He's

11   saying, assuming the government agrees to do the same, we won't

12   do any examination.  The jury will have in evidence the line

13   entries and the underlying documents and let everybody make

14   their arguments in summations based on that evidence that has

15   been introduced.

16        Mr. Weitzman, am I accurately reflecting your

17   comments?

18        MR. WEITZMAN:  100 percent.

19        MR. MONTELEONI:  Right, but --

20        THE COURT:  Just a moment.

21        MR. MONTELEONI:  Sorry.

22        THE COURT:  So why doesn't that not only save

23   everybody time but gives each party free rein to argue as it

24   sees fit from the evidence during closings and the new line

25   entries and the underlying documents would be part of the

O72Wmen1

1    evidentiary basis for whatever arguments the government wants

2    to make or, for that matter, the defense wants to make in

3    summation?  Why isn't that appropriate?

4            MR. MONTELEONI:  Your Honor, first of all, again, the

5    level of examination that I was proposing to do, even if it was

6    a three-hour examination, was something along the lines of

7    maybe 15 to 20 minutes, maximum.  And I think if they're doing

8    something shorter, I think I'll probably be able to do

9    something somewhat shorter.  But the idea of putting in a chart

10   that goes in as evidence for the jury but is not subject to

11   meaningful cross-examination, that's not something that we

12   tried to do.

13           THE COURT:  About the line entries or the process of

14   having arrived at the chart?

15           MR. MONTELEONI:  Well, both.  There's some level of

16   contextual analysis about the line entries.  It's actually

17   critical to understanding what the chart means and the

18   relevance and significance of it.

19           Again, this is not going to be something that is

20   lengthy.  We saw with Richardson that some level of examination

21   about charts, a cross-examination, can be incredibly critical

22   to allow the jury to assess the significance of it.  I think

23   that the idea -- if they don't want cross-examination about the

24   chart, they should just have it as a demonstrative.  They could

25   have it as a demonstrative in the closing.  They could move all

O72Wmen1

1      their exhibits into evidence.  They don't get cross-examination

2      in the evidentiary fashion about the chart, and it doesn't come

3      in as an exhibit.

4              That's a fine thing to do.  We did it with one chart

5      as a demonstrative, but the ones that we want to be in as

6      exhibits, as evidence for the closing were subject to extensive

7      cross-examination about their contents, and we think that

8      that's appropriate here.  We're not even proposing to do

9      extensive at all.  We're talking about 15, 20 minutes.

10             MR. WEITZMAN:  Your Honor, two things.

11             The first is once the 1006 elements are established,

12     the evidence, the summary chart is in evidence.

13             THE COURT:  Right, under 1006, it becomes evidence.

14             MR. WEITZMAN:  Correct.

15             THE COURT:  There has to be voluminous evidence and

16     this summarizes it, but it comes in.

17             MR. WEITZMAN:  Right.

18             THE COURT:  The chart itself comes in under 1006.

19             MR. WEITZMAN:  Correct.

20             THE COURT:  Presumably you're moving the underlying

21     exhibits in as well.

22             MR. WEITZMAN:  Correct.  And so there's no basis to

23     deny entry or admission of an exhibit and to send it back to

24     the jury or to force a demonstrative merely because

25     cross-examination is limited to that issue.

O72Wmen1

```
1              Secondly --
2              I'll be done in a moment, Mr. Monteleoni.
3              MR. MONTELEONI:  Sorry.
4              MR. WEITZMAN:  That's OK.
5              THE COURT:  Wait.  Restate one.
6              MR. WEITZMAN:  There's no basis to deny admission
7    merely because there is a cross-examination about the line
8    entries.
9              Secondly, you'll recall that the government's view was
10   that the witness can only repeat the words on the document,
11   sometimes the words in the underlying document.  The witness
12   can't be asked questions about inferences to be drawn or
13   anything else.
14             THE COURT:  Correct.
15             MR. WEITZMAN:  It's the same with the defense witness,
16   Mr. Gannaway.
17             THE COURT:  Correct.
18             MR. WEITZMAN:  And therefore, there is nothing that
19   can be done in cross-examination that cannot be done in
20   summation.  Every single thing -- publishing the document,
21   publishing the lines -- can be done in summation in the same
22   exact way, because there are no questions that can go to a
23   witness about inferences or meaning.
24             THE COURT:  I understand.
25             MR. WEITZMAN:  Third, you'll recall that the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O72Wmen1

1    government moved into evidence 700 or so documents.

2            Mr. Richenthal is shaking his head.  I don't know why,

3    but there are six to 700 documents moved into evidence *en*

4    *masse*.

5            THE COURT:  At the end.

6            MR. WEITZMAN:  At the end of the case.

7            We're talking about one summary chart and the

8    underlying exhibits.  It's, I assure you, less than 600 or 700

9    documents.  We didn't have an opportunity to cross-examine any

10   witness about their six or 700 documents moved into evidence.

11   There was no witness to cross-examine.  We're establishing the

12   foundation under 1006, and then we will argue the inferences

13   and publish.

14           THE COURT:  I understand.  Let me hear now from

15   Mr. Monteleoni.

16           MR. MONTELEONI:  I think that certainly Mr. Weitzman

17   is right that if the requisites of 1006 are established it's

18   potentially admissible.

19           THE COURT:  And that's what we're presuming for this

20   chart --

21           MR. MONTELEONI:  Yes.

22           THE COURT:  -- just as we have for each of the other

23   charts.  Go ahead.

24           MR. MONTELEONI:  But I've never heard of the idea that

25   you could limit the scope of cross-examination about a document

1    that's being introduced to not include the document.  That's

2    really far beyond anything I've ever heard.

3              THE COURT:  But wait, wait, wait.  The point is these

4    are "just" paralegals, who all they're doing -- or in the case

5    of the government, agents.  All they're doing is verifying that

6    the underlying document -- I'm sorry, that the line entry is

7    supported by the underlying document.  So there's precious

8    little that one can do in cross-examination there because you

9    can't ask about inferences or conclusions or anything like

10   that.

11             I allowed, at the urging of the defense, the defense

12   to bring out in cross-examination of the agents parts of the

13   document that they believed supported their case that had not

14   been read or part of the line entry on the government case.  In

15   fact, you'll remember Mr. Lustberg being sorely aggrieved by,

16   in his view, that the defense was not being permitted to allow

17   that cross-examination.  And I did it, and the

18   cross-examination was to a fare-thee-well bringing out things

19   from the underlying documents that were in evidence that

20   supported the defense.

21             Indeed, part of the defense, not an insubstantial part

22   of the defense case, came in on cross-examination of the agents

23   on these charts.

24             MR. MONTELEONI:  So, yes.  So, first of all, what I'm

25   proposing is to do a tiny, little fraction of what the defense

O72Wmen1

1    did.

2              THE COURT:  That's progress.  We've gone from 15 to 20

3    minutes to a tiny, little fraction.

4              MR. WEITZMAN:  A tiny, little fraction of what the

5    defense did.  Now, I'm not proposing to do beyond what they

6    did.  I'm not proposing to do what they did, but if you think

7    that I can't be effective with 20 minutes of documents, well,

8    please give me a try.  It's not going to take a lot of time.

9    Maybe I will.  Maybe I won't.

10             THE COURT:  But presumably, or I would assume, since

11   you can't ask about inferences and so forth, you're going to be

12   doing the same thing that the defense did on cross on the

13   government charts; that is, bringing out things about the

14   documents that you think were not appropriately highlighted in

15   the line entries.

16             MR. MONTELEONI:  Well, to an extent.

17             I will point out your Honor has seen the charts, and

18   we didn't make an objection to their admission on this basis,

19   but they are inherently argumentative in a way that our charts

20   were not.  Right?  Because they actually contain a version of

21   our chart and then additional points that are denoted as

22   defense points that are being added, that are additional

23   information.

24             THE COURT:  But the format is really, I was letting

25   the parties try to arrive at what the format should be as to

1    whether there should be interlineations or not, but I thought

2    that was already worked out.

3            Go ahead.

4            MR. MONTELEONI:  On the assumption that we would be

5    able to do a moderate, meaningful cross about it.  We would

6    never have consented to the idea of a document this

7    argumentative coming in as a 1006 exhibit without being able to

8    ask a few basic questions about its contents.

9            THE COURT:  All right.  I understand.

10           Here's where we are.

11           Mr. Weitzman, I suggest you speak to Mr. Monteleoni,

12   get a sense of what that cross is going to be and then you can

13   tailor your direct of Gannaway to that, so maybe we can save

14   time all around.  But given the fact that the government wants

15   the ability to cross, then I'm going to allow them to do that

16   and your presentation should be -- you decide the scope of your

17   presentation in light of the fact I'm going to allow cross.

18           Does that make sense?

19           MR. WEITZMAN:  I will do my best to get that

20   information from the government.

21           I guess one question is whether you're suggesting some

22   sort of a time limit on each side.  So if we do a 15-minute

23   direct, the government gets a 15-minute cross, and they do what

24   they do in that period of time.

25           MR. MONTELEONI:  Your Honor, there are some

O72Wmen1

questions --

THE COURT:  Gentlemen, talk to each other about that.
All right?  Talk to each other.  I suggest to each of you it's
not a game.  OK?  It's all very serious.

OK.  Let's do charts.  The way I'm going to do it is
I'm going to use as the basis, we'll start with ECF-488, and
I'll go through the objections on 488.  I'm not going to hear
argument, by and large.  On some I will, but I've considered
all of these issues.

To start off with, I guess I'd just restate what I
said during the trial, that I thought the defense was, in terms
of Anton, really was not following my guidelines and was trying
to put in much too much that I thought was highly prejudicial.
It may not have been hospitalizations, but it certainly was
prejudicial.

All right.  Let's start.  488, II, dealing with issues
regarding the relationship between Anton and Menendez.

1303, lines 25 to 24 -- does everybody see that?  And
25 to 25, whether the TRO comes in or not depends on
redactions.  I haven't seen the TRO.  I haven't seen the
redactions.  If the parties have worked out the redactions,
fine.  Again, I assume that's been done.

MR. MARK:  Your Honor, I wish that had.  We have had
very productive dealings with Mr. Hana's counsel throughout.
We have not received redacted versions of all of these

O72Wmen1

1    documents, and unfortunately, where it stands right now, we

2    would request that your Honor strike these entries and the

3    exhibits because nothing's changed.

4            THE COURT:  Well, the only one right now -- oh, I see.

5    The next one has a redaction issue also.

6            This does not bode well for how long this conference

7    is going to go on.  There are a couple of things in here where

8    the redactions were proposed, and I assumed that things were

9    acceptable to each of the parties.

10            Go ahead.  What, sir?

11            MR. WEITZMAN:  I'm not going to do tit for tat.  All

12    I'll say is that we're not looking to put in any of the bases

13    for the TRO.  We would redact everything in the substance of

14    the TRO, just that she sought a TRO.  That's it.

15            THE COURT:  That should be acceptable.

16            MR. MARK:  That might be acceptable, but we need to

17    see that to make a determination.

18            THE COURT:  Fair.  Fair enough.  Do it, not right at

19    this moment but don't leave here without doing it.  OK?

20            The subsequent text message to the senator, "I'm

21    waiting for the police to reach the judge," that's out.  It's

22    highly prejudicial under 403.

23            Next thing, 1303, lines 26-58, that also has

24    redactions in it.

25            Have you seen the redactions, government?  Are the

O72Wmen1

```
 1   redactions acceptable?  It's lined out.  The redaction is
 2   actually lined out, so you have the redactions.
 3           MR. MARK:  Your Honor, that also has other issues,
 4   like manipulation.  I think that is, once again, just far too
 5   narrow.  "I worry about your safety and well-being" --
 6           THE COURT:  Did you talk to the other side?  They
 7   proposed redactions.  They gave you the redactions.  Did you
 8   respond and say the redactions aren't acceptable?
 9           MR. MARK:  They gave us their redactions in their
10   response to the Court.
11           THE COURT:  Yes, that's correct.
12           MR. MARK:  As we're saying right here, we do not think
13   those live up to your Honor's guidance here.  I said it deals
14   with safety, it deals with manipulation, and this is not
15   sufficient.
16           MR. WEITZMAN:  Your Honor, our proposed redaction --
17           THE COURT:  Just let me look at what's here.
18           Yes, sir.  Go ahead.
19           MR. WEITZMAN:  Our proposed redaction would be to
20   delete the second sentence.
21           THE COURT:  Right.  "He's a violent man that delivered
22   injuries to you that have affected your health and which you
23   are still living with today."  That's what you wanted deleted.
24           MR. WEITZMAN:  There's already been evidence in the
25   record, testimony in the record --
```

O72Wmen1

1          THE COURT:  My view is that the rest of that is overly

2    dramatic and cumulative and prejudicial.  I'm striking it.

3          MR. WEITZMAN:  When you say the rest of it, what are

4    you referring to, your Honor?

5          THE COURT:  The rest of the entry on 1303, lines 26 to

6    58, out.

7          MR. WEITZMAN:  But the first sentence, "I worry about

8    your safety and well-being" is in?

9          THE COURT:  No.  The whole thing.  The whole thing is

10   out --

11         MR. WEITZMAN:  Your Honor --

12         THE COURT:  -- as prejudicial.

13         MR. WEITZMAN:  Can I just say one thing about that,

14   your Honor?

15         THE COURT:  Yes.  As I say, this was part of the

16   midnight specials.  We're not going to have extensive argument.

17         Go ahead.

18         MR. WEITZMAN:  I understand that.

19         This is the entry, I believe the only entry that

20   establishes that Senator Menendez is aware of risks to Nadine.

21   It's the only entry that explains why he's turned on --

22         THE COURT:  All right.  Let's see if that's true.

23         Government, is that true?  That puts a slightly

24   different turn on it.  If it's the only entry where he's aware

25   of her concern -- I don't think that's true, but I don't have

O72Wmen1

1    anything that I can point to right now.

2          MR. MARK:  Your Honor, there's also other lines we've

3    objected to.  We've tried to be judicious.  I need to take a

4    look to see whether this is the only -- if there are other

5    entries we didn't object to that capture as well that Menendez

6    was aware of that.  We can take a look and we can -- but it's

7    not disputed either.  Like, we didn't object to Mr. Khorozian's

8    testimony.

9          THE COURT:  No.  That's different than having

10   something actually in the record where he knows that.  So far

11   the parties have frustrated me, and my view is that there's

12   been so much back-and-forth here and we should just proceed

13   with my rulings.

14         Go ahead.

15         MR. MARK:  Your Honor, what I will say is we'll take a

16   look at the text messages.  If there is no other message that

17   captures the fact of his contemporaneous knowledge about

18   safety, we would propose different redactions.

19         THE COURT:  All right.  Talk to each other.

20         1302, line zero, where Anton sets forth the rules and

21   saying it's an act of emotional abuse, it inflames the jury,

22   I'm excluding it.  That's clearly out.  Line zero, that entry.

23         Next is 65-1 and 65-2, the reference by Menendez to

24   Nadine, he's good at torturing you, that's out.  It's hearsay.

25         Now, going back, it seems to me if the parties can

O72Wmen1

1  work out a reference to Menendez knowing about Nadine's concern

2  about Anton, if this substitutes for that or if the parties

3  feel that does it, then you can put it back in in place of the

4  one we were talking about earlier.  But right now, the torture

5  reference is out, and it's hearsay.

6          75-3, it's out:  Anton "broke into my house."  It

7  violates my direction.  Defendant's response that it does not

8  refer to any act of violence against Arslanian is not

9  inflammatory is clearly wrong.  It is inflammatory under 403,

10  and it's also hearsay.

11          1303, lines 4 to 15.  Hearsay, no exceptions, not

12  background.  It's out.

13          1303 --

14          MR. WEITZMAN:  Your Honor, I apologize.  I don't know,

15  lines 4 to 15, where you're referring to.

16          THE COURT:  Sorry.  On 488, it's the car plate one.

17  It's the one about the Enterprise car.  It's the next-to-last

18  bullet point on page 4 of ECF-488.

19          MR. WEITZMAN:  Hold on.  Your Honor, I apologize.

20          THE COURT:  That's all right.

21          For your purposes, I'm going through, for all your

22  purposes, I'm going through 488.

23          Mr. Fee, are you with me?

24          MR. FEE:  I am, your Honor.

25          THE COURT:  OK.

O72Wmen1

1            MR. WEITZMAN:  OK.  Thank you, your Honor.

2            THE COURT:  OK.

3            MR. WEITZMAN:  So your ruling is 4 through 15 is out,

4    you're saying.

5            THE COURT:  Yes.  Hearsay.  No exceptions.  It's not

6    background.

7            345-3 and the exhibit underlying it and line 78-5, I'm

8    going to keep in the phrase "Anton is not stopping the

9    spoofing."  I'm also going to allow in "two people in the

10   office have gotten a text supposedly from me that Anton and I

11   are getting married in August.  Anton is not stopping the

12   spoofing."

13           The rest is out under 401 and hearsay.  The part that

14   I've allowed in allows the parties to argue about the spoofing

15   issue.  That's the only relevant part.

16           Let's go to exhibit 1302, the next chart.

17           The first part of that, hearsay evidence pertaining to

18   Nadine's purported work via IS EG Halal should be precluded.

19   That has to do with employee No. 5, and I'm informed that

20   that's been resolved by the parties.

21           MR. MARK:  Again, given the scope of our discussions,

22   we've worked out certain redactions and other limiting

23   instructions, and we understand that the defense is not going

24   to publish those particular entries on the summary chart, but

25   we will engage with -- they will be introduced through IS EG

O72Wmen1

1    employee No. 5, will be subject to cross-examination.

2              THE COURT:  In other words, you agree with my summary.

3    It's been taken care of, correct?

4              MR. MARK:  Yes, your Honor.

5              THE COURT:  Thank you.

6              We're now on chart 1302, lines 1208-1 and 1208-2,

7    emails between a staffer and Arkin, it's out.  It's hearsay.

8    It's not reflective of Menendez's state of mind.  It doesn't

9    provide context.  The fact that Leahy was meeting with Kamel

10   afterwards is not context and is irrelevant.  It's out under

11   401 as well as hearsay.

12             1302, lines 159-1 -- I'm now at the bottom of page 7

13   of ECF-488 -- Ethiopia blasts Trump remark that Egypt will blow

14   up dam.  It's hearsay.  It's irrelevant to his state of mind.

15   There's already evidence in that the conflict was the subject

16   of public discussion.  It's out under 801, 802, 401 and 403.

17             The next, on 1302, which is line 498-1, the résumé

18   email, it's irrelevant.  It clearly goes to her character.

19   It's hearsay.  "I was nominated for all the volunteer work I

20   do," the probative value is substantially outweighed by the

21   danger of misleading the jury.  So that's out, 498-1.

22             We go to 1260-1 and 1260-2.  Menendez, in his

23   response, says that Hana would respond.  There's been no

24   response, and there's no reply by Menendez.  It's hearsay, and

25   Arkin testified that Menendez raised human rights concerns, so

O72Wmen1

1      you have that in the record.

2                 The next one is 1302, lines 2-4 and 2-6.  Menendez

3      took no position.  It's out.  The messages are not relevant to

4      any issue.  Nadine saying to Menendez, you're truly amazing, I

5      think this is overreaching.  It's an effort to show good

6      character.  It's also misleading the jury.  It's out under 403

7      and 401.

8                 The next is lines 637-1, 1198-1, Hana 1313T, 191 and

9      191T.  I've been told it's all resolved.

10                All right.  Now let's go to 1303.  I'm on page 9 of

11     ECF-488.  1303, line zero, at the bottom, the entire sentencing

12     transcript from Uribe's prior state felony conviction, there's

13     no basis for its admission.  It's not inconsistent with

14     anything.  It doesn't come in under 801(d)(1)(A) or (B).  I

15     believe the conviction and the sentence of probation are

16     already in evidence.

17                34-1 and various dates there, in the last bullet point

18     on page 9 of ECF-488.  13 texts by Uribe where he uses the word

19     *culo*, "break his ass, if you would stand on your ass from a

20     chair, your house will be cleaner."  That has nothing to do

21     with whether Menendez used the word *"culito*."  It's out.  It's

22     irrelevant under 401.  It's not impeachment, and it's

23     misleading the jury.  Clear overreaching.  It's out.  As I

24     said, 401 and 403.

25                1142-1 to 1142-20, 1142-30 to 1142-46, 35 text

O72Wmen1

1   messages, and Hana responded to this.  The messages are between

2   Uribe and someone else, discussing a loan.  It's not 613

3   because it's not inconsistent.  It's not impeachment.  It's

4   speculative.

5           (Continued on next page)

O723MEN2

1    THE COURT:  The suggestion that it's Uribe not Hana

2  that took the $150 is speculative.

3    No basis for the connection, overly speculative, and

4  confusing to the jury under 403.

5    Hana says the fact that he would put 150 down suggests

6  it was Uribe, not Hana, who received the cash from Parra and

7  Hernandez.  This is far too speculative and has low probative

8  value and risks the danger of confusing and misleading the

9  jury.  It is extraordinarily speculative.

10    1142-49.  The government says it's improper

11  impeachment on a collateral matter.  That is Uribe's purchase

12  of a home is a collateral matter.  No one objected to this.  So

13  I'm taking it out.  No one responded to that, is what I should

14  say.  So it's out.

15    Let's move on to what the government has at the top of

16  page 11 and characterizes it as evidence of Menendez prior

17  specific acts.

18    MR. WEITZMAN:  Your Honor, I'm loath to interrupt, but

19  there is one thing I'd like to just bring to your Honor's

20  attention.  I know this was Mr. Hana's counsel's point.

21    But on the $150,000 and the loan, the issue, your

22  Honor, is that there is no evidence tying Mr. Hana to $150,000.

23  There is no deposit in his bank, there is no evidence of a

24  search, there is nothing other than Mr. Uribe's testimony

25  that -- which was hearsay, he didn't witness it, he heard from

1    someone else that the $150,000 was given to Mr. Hana.  That's

2    the speculation in our opinion.

3            Here you have actual evidence that Mr. Uribe possessed

4    $150,000 in cash, and then used that cash as a down payment.

5    It is less speculative than the inferences government is asking

6    to draw.

7            THE COURT:  He says he has 150 down.  That's correct.

8    There is no connection between that and what you're proposing

9    in this document.  In other words, the connection that you're

10   seeking to draw is speculative.  It is based on nothing, except

11   the fact that he has 150.

12           MR. WEITZMAN:  It's based on the timing and the fact

13   he says Parra paid a $150,000 bribe.  So the only evidence of

14   $150,000 existing is in Mr. Uribe's hands, not in Mr. Hana's

15   hands.  So the --

16           THE COURT:  I understand.

17           MR. WEITZMAN:  It is less speculative than the

18   inferences the government is asking the jury to draw.  These

19   are just competing inferences.

20           THE COURT:  I understand.

21           MR. RICHENTHAL:  If helpful, and I think it is, the

22   150K reference, which is not to cash, is in 2020.  It is not in

23   fall 2019 regarding the bribe.

24           THE COURT:  My recollection is that, I was looking at

25   the dates, I think it was April or May.

1          MR. RICHENTHAL:  Yes.  April of '20 and the bribe

2    conversation they're talking about is prior to, into fall 2019.

3    That's not the only reason it's speculative.  That's a major

4    reason.

5          In addition, although I would think that should be

6    enough, Mr. Uribe in fact purchased the home.  That's not

7    disputed.  He did so even later.  And all of his bank records

8    were produced.

9          THE COURT:  Wait just a second.  But what Mr. Weitzman

10   is saying is ah-ha he got the 150, it wasn't given to Hana, it

11   was given to Uribe.

12         MR. RICHENTHAL:  I heard what Mr. Weitzman said.  And

13   what I would say is the following.  That requires the jury to

14   believe the following rather fantastical series of events.

15         In fall 2019 there is a conversation --

16         THE COURT:  I want to hear that.  But before you do

17   that, so don't lose that fantastical series of events.  What is

18   the relevance of the fact he actually did purchase the house?

19         MR. RICHENTHAL:  Because --

20         THE COURT:  Because it shows he had the 150?

21         MR. RICHENTHAL:  Exactly.  And the bank records were

22   produced to the defendants long ago.  And there is no cash in

23   them.  He paid by check.  So the rather fantastical series of

24   events would be as follows.

25         In fall 2019, conspirators talk about a bribe.  In

O723MEN2

1    April 2020, one of the conspirators, now cooperating defendant

2    Jose Uribe, refers to a $150,000 down payment.  I would note

3    that is 20 percent of the price of the house, meaning it is a

4    normal sized down payment.  There is nothing unusual about

5    that.  Later he in fact buys the home and he uses checks, not

6    cash, and he pays a normal down payment.

7         The home I believe is $752,000.  20 percent is

8    approximately $150,000.

9         In addition, the Court I think could take notice of

10   this fact, I don't think it is disputed.  Cash doesn't mean

11   cash in the context of a real estate transaction.  There's

12   loan, i.e. mortgage, or cash i.e. you have the money or you

13   don't.  So we're literally talking about a transaction years

14   later, with --

15         THE COURT:  I thought one is the fall, the other is

16   the following spring.

17         MR. RICHENTHAL:  So in the fall there is the bribery

18   discussion.  The following spring Mr. Uribe says to someone, in

19   sum, I'm looking for a house, it's $500,000, I have 150 to put

20   down.  Later he actually finds a house, he actually purchases a

21   house.  He uses checks, not cash.  He puts down a normal

22   deposit.  There is a reference to cash even later, but of

23   course everyone knows it is not cash.  A, because that's not

24   how real estate transactions work.  And B, because he didn't

25   pay in cash.

1              So the fantastical series of events is over a series

2    of years, following the conversation about bribes, Mr. Uribe

3    pays a down payment in a normal amount, 20 percent of the

4    purchase price, in checks, and the normal amount happens to

5    match an amount of a bribe years earlier.  There is nothing

6    unusual about that. I've just had four or five speculations to

7    get to the point the defense wants to make.

8              THE COURT:  I have the point.

9              MR. WEITZMAN:  Your Honor, we're not disputing that

10   this is a normal amount in the sense that it's 20 percent down.

11   The question is where does that 20 percent down come from.

12   I've not seen, and the government has not offered, and there is

13   nothing before this jury that suggests that it was paid for by

14   check.  I've not seen that check.  The government hasn't shown

15   us that check.  It is 150,000 down.  The exact amount that was

16   discussed in this bribe.

17             This is a fair inference, your Honor, and it is not

18   fantastical.  It is an inference.  They can argue the

19   inferences to the jury, just like we have to argue inferences

20   to a jury.

21             MR. RICHENTHAL:  So, let me be precise.  There is no

22   $150,000 check because it's just a text message talking about a

23   down payment.  Mr. Uribe in fact buys the home.  He uses checks

24   as I've said.  There is no down payment.  He outright buys the

25   home.  So the checks I am talking about are the actual purchase

O723MEN2

1    years later of a $752,000 home.

2            I would also note the number of messages they want to

3    put in about this.

4            THE COURT:  35.

5            MR. RICHENTHAL:  Far outweighs the, shall we say,

6    strained inference they want.

7            MR. WEITZMAN:  We'll reduce the number of messages.  I

8    think the 150,000 and a couple of contextual messages as to

9    what that means.  But, when someone says $150,000 down and

10   that's the exact number that is supposedly delivered.  But

11   there is no record of a delivery of $150,000 to Mr. Hana at

12   all.  No bank account, no deposit, searches of his home,

13   nothing occurs, there is nothing, no evidence of that.  So the

14   only $150,000 anybody references in this is conspiracy is

15   Mr. Uribe.  That's evidentiary.

16           MR. RICHENTHAL:  So, they can argue, I'm sure they

17   will, that Mr. Uribe was not telling the truth.  That's not the

18   fight we're having right now.  The fight we are having is can

19   you put in text messages subsequent in time talking about --

20           THE COURT:  I agree with that.  Uribe and a third

21   party.  I am going to exclude them on the basis that I've

22   already said.

23           I think I've deciphered my notes.  On page 11,

24   evidence of Menendez's prior specific acts, we're really

25   talking about the potential or actual calls to Grewal, and I

O723MEN2

1    think the specifics are on Hana 1303 at 101-1 which is the

2    Raphael Fernandez to Menendez e-mail regarding antisemitism in

3    Jackson and Dr. Richard Roberts.

4           I think it's propensity evidence suggesting that

5    because he was considering calling Grewal or actually called

6    him on other matters, he did so here.  It's not permitted under

7    Rule 404 and 405.  It's also likely to confuse the jury under

8    403.  And certainly I think the defendant could have

9    cross-examined Grewal on this when Grewal was on.  I don't

10   think there is any evidence that he actually called Grewal on

11   the 101-1 issue.

12          Now, on 1142-21 to 1142-27, this is the report on the

13   Dominican Republic Foreign Ministry's efforts to vote abroad.

14   It has nothing to do with the call to Grewal regarding an

15   individual case.  Menendez's state of mind regarding general

16   matters has nothing to do with this call on a specific matter.

17          It's irrelevant under 403, and risks confusion.

18   That's 1142-21 to 1142-27.

19          It's irrelevant.

20          MR. FEE:  Your Honor, if I may.

21          THE COURT:  Yes.

22          MR. FEE:  I think the more fair picture is to permit

23   some evidence of contact or the suggestion that Mr. Menendez

24   contacted Attorney General Grewal.

25          THE COURT:  But you have that in the record already

O723MEN2

1    from Grewal.

2            MR. FEE:  Your Honor, I think it is different in kind

3    from what came through Attorney General Grewal.  I think the

4    suggestion that his staff makes -- the argument, the inference

5    that the government has elicited repeatedly is that the mere

6    fact that Senator Menendez contacted Attorney General Grewal is

7    inherently suspicious.

8            THE COURT:  No.  I'll let the government speak for

9    itself.  But I think it has to do -- contacted him on

10    supposedly a specific pending case is suspicious.

11            MR. RICHENTHAL:  That's exactly right.

12            MR. FEE:  I think we would dispute -- given the

13    testimony of Attorney General Grewal, there was no specific

14    case raised.  I would also --

15            THE COURT:  But that's different from what the

16    inference that I think the government is seeking to draw.  That

17    is, you don't contact Grewal on -- he was very clear about

18    this.  You don't -- I don't take calls about specific cases.

19            MR. FEE:  Two things, your Honor.

20            THE COURT:  Then you can argue back and forth about

21    what the nature of the call from Menendez was.  But that's all

22    on the record already.

23            MR. FEE:  Two things, your Honor.  One of the entries

24    you excluded, 101-1, is about a specific case where the staff

25    reminds Senator Menendez that he is going to call Attorney

O723MEN2

1     General Grewal about this.  And as the Court heard --

2              THE COURT:  We don't know he did, right?

3              MR. RICHENTHAL:  He did not.

4              MR. FEE:  That's why it's state of mind, your Honor.

5     We're not offering it for the truth.  We are saying to Senator

6     Menendez, contrary to the inference being urged on this jury,

7     there is nothing inherently suspicious, you don't need to bribe

8     the man to get him to contact Attorney General Grewal.  That's

9     the only purpose for which this is being offered.  This is the

10    only purpose for which we would use it in summation, your

11    Honor.  I think excluding all of it creates an unfairly narrow

12    picture --

13             THE COURT:  We're not excluding all of it.  You've got

14    the other stuff in the record from the Grewal testimony.

15             MR. FEE:  Your Honor, I think it's different in kind

16    than the senator's staff outside of Attorney General Grewal

17    saying, hey, Senator Menendez, here is a specific case, you

18    offered to call Attorney General Grewal when speaking with this

19    other constituent.

20             THE COURT:  But the government said he never did so

21    where does it get you.

22             MR. FEE:  I don't know if the government knows whether

23    he did or not.  That's exactly the purpose for which we're

24    offering it.  State of mind.

25             MR. RICHENTHAL:  So first, there is zero evidence he

O723MEN2

1    ever did, and Mr. Fee is being careful in saying he did because

2    he didn't.  Second --

3                THE COURT:  You're representing to me that he did not.

4                MR. RICHENTHAL:  I'm representing -- I thought I said,

5    if I misspoke I apologize -- there is no evidence that he did,

6    and defense counsel is not saying that he did, from which I

7    think the Court can infer he did not.  Mr. Grewal --

8                THE COURT:  No.  I can infer there is no evidence that

9    he did.

10               MR. RICHENTHAL:  The jury can infer there is no

11   evidence he did.  I'm noting for the record that defense

12   counsel is not saying he did.  So in addition to there being no

13   evidence, no one in the courtroom is saying it happened.

14               Mr. Grewal was asked about his other conversations.

15   He testified about them.  There is also phone records

16   indicating there are other conversations.  This is not a

17   pending criminal case.

18               THE COURT:  My decision stands on this.  It's too far

19   afield.

20               C.  Evidence of Anton's statements regarding a

21   kickback to Nadine in connection with potentially representing

22   Parra.  I'm going to allow this, but just for Nadine's state of

23   mind.  The parties are to agree on appropriate redactions.

24   That's 1303 lines 25-19.

25               Now let's go to D, miscellaneous line entries.

1          MR. RICHENTHAL:  Just so we understand the Court's

2    ruling.  There is a paragraph in this rather lengthy document

3    regarding the past relationship with Mr. Anton which is

4    separate from this issue.  We understand the Court directed the

5    parties to confer, because we have concerns about that

6    paragraph which is not --

7          THE COURT:  I understand.  That's why there are

8    redactions that are needed here.  And I think the defense

9    understands now the parameters of my ruling regarding Anton.

10         Let's go to D, miscellaneous line entries.  First,

11   36-4 to 36-5, texts between Uribe and Peguero.  That's hearsay.

12   It's unclear what the reference is to it.  The statement that,

13   quote, we are hurting people and that's not fair, end quote.

14   The probative value is substantially outweighed by the danger

15   of unfair prejudice and confusing the issues, it is a highly

16   prejudicial statement.  It's out.

17         MR. FEE:  To whom is the prejudice unfair?  We are not

18   offering it for the truth.  It's frankly proof of the competing

19   inference about what the government is saying Uribe was up to.

20         THE COURT:  You want her to say to this jury that she,

21   and presumably Uribe, are hurting people and that's not fair?

22         MR. FEE:  Your Honor, the record is very clear.

23   Mr. Uribe admitted that they're committing insurance fraud and

24   he's saying he didn't think he was doing anything wrong.  He

25   said both of those things to the jury.  This very clearly

O723MEN2

1    impeaches that testimony that he thought Ana was innocent.  He

2    thought he didn't do anything wrong.  It was merely an

3    administrative issue.

4            MR. RICHENTHAL:  I agree with the Court's analysis

5    under 403.  But I would submit, actually, there is another

6    problem here.  Which is this is inherently a 613 issue.  And

7    let me explain why.

8            If this is designed to impeach Mr. Uribe, which the

9    defense said in his letter on the record, it only does that if

10   he agreed with the statement they're hurting people, in other

11   words if it is an adopted statement.  If it is an adopted

12   statement, i.e. an out-of-court statement offered to impeach in

13   court testimony, he has to be cross-examined on it.  He has to

14   be shown this.  Asked about it.

15           THE COURT:  It may or may not be 613, but I'm standing

16   on 403.

17           Let's move on.  36-1 and 74-1.  I'm going to admit the

18   line entries that reflect the dates.  The underlying transcript

19   is hearsay, and there is no evidence regarding whether Uribe

20   read it or not.  It is not relevant to Uribe's state of mind.

21   But the line entries reflecting the dates can come in.

22           Let's go to 1304.  A.  Praise of Qatar that is

23   unconnected to Menendez.  I'm going to allow the press

24   statements in for context, but not for the truth of the matter.

25   That's all they can come in for, but they can come in.

1          Let's look at B.  Evidence regarding the involvement

2    of the lawyers in due diligence.  I'm going to allow that

3    evidence to come in, but not for the truth.  I don't want this

4    to bog down on due diligence.  All right.  But I'm going to let

5    the parties show that there was some due diligence, and they

6    thought it was a worthwhile investment.

7          What they actually did is irrelevant.  But the

8    defendants can touch lightly on due diligence.  I think it

9    would be unfair to exclude all evidence of efforts that they

10   took.

11         MR. RICHENTHAL:  So can I ask the Court to consider

12   excluding the evidence related to lawyers?  For the reasons set

13   forth in our letter, that is far more confusing.

14         THE COURT:  No.  I think the fact that lawyers were on

15   board is okay.  But the defendants can't argue that everything

16   that happened was deemed legal by the lawyers and was rubber

17   stamped by the lawyers.  They can't argue that no bribe was

18   involved because the lawyers obviously cleaned this issue up.

19   None of that.

20         MR. WEITZMAN:  That's not our intention.

21         THE COURT:  But the fact that there was some due

22   diligence is fine.  But, gentlemen, you know, don't be too

23   lengthy or heavy handed in that. I want you to be able to show

24   what was done, but if you really go to town, that will annoy

25   the jury no end and is unnecessary.

O723MEN2

```
 1              MR. WEITZMAN:  We understand.
 2              MR. RICHENTHAL:  One more question.  So I understand
 3    the Court's talking about diligence which involves, as we
 4    understand it, an outside firm, both legal and non-legal.
 5    There are also references in the chart to Heritage internal
 6    memoranda, which we understand to be distinct from diligence.
 7    They're just confusing, and I don't think it's necessary to get
 8    into internal memoranda within the company if the Court is now
 9    permitting external valuation and legal analysis.
10              THE COURT:  I hadn't separated them out that way.
11    What's the position of the defense?
12              MR. RICHENTHAL:  I was going to direct the Court to
13    the lines 329-2 and 342-14.
14              THE COURT:  I'll take a look at it now.
15              MR. RICHENTHAL:  And I believe also 342-8 and 342-9.
16    I believe there are four lines, not all sequential.
17              THE COURT:  Let me take a look at them.
18              MR. FEE:  Sure, your Honor.
19              THE COURT:  Yes, sir.  What's the response?
20              MR. FEE:  Your Honor, the response is that this is
21    diligence.  I think it is a bit of an artificial distinction.
22              THE COURT:  I'm going to allow it in.
23              C page 15.  Additional evidence related to plea
24    negotiations of the Daibes District of New Jersey prosecution
25    should be precluded.
```

O723MEN2

1          I'm going to allow it in, but not for the truth.

2     Simply for the fact that the plea negotiations existed.  The

3     defense cannot argue or suggest that the government hid the

4     details of plea negotiations from the jury during its case.  Do

5     you understand that?  Does that make sense?

6          MR. WEITZMAN:  Yes, your Honor.

7          THE COURT:  All right.  Or that the government didn't

8     want the details to come out in any way.  You can't make that

9     argument.

10          MR. RICHENTHAL:  Embedded within this, your Honor, are

11     descriptions of counsel's advocacy with respect to the Daibes

12     matter.

13          THE COURT:  That seems to me that shouldn't be in.

14          MR. RICHENTHAL:  We have trouble understanding how the

15     jury could take that, other than the fact that the Daibes

16     matter should never have been brought.

17          THE COURT:  No.  The advocacy -- let me take a look at

18     those again.

19          MR. RICHENTHAL:  Or there are discussions how it is a

20     no loss case, he may be innocent, etc.

21          THE COURT:  No.  That sort of thing shouldn't come in.

22     That opinion issue shouldn't come in, no.

23          MR. RICHENTHAL:  We can confer with the defense, if

24     that's the Court's position regarding redactions.

25          THE COURT:  No.  He should not be prosecuted at all.

1    Fred's view is he should not be prosecuted at all.  I'm sorry I

2    didn't distinguish those.

3            No, that type of opinion shouldn't come in.  The

4    specifics of the negotiations can.

5            D on page 16, miscellaneous line entries contained

6    inadmissible hearsay or confusing should be precluded.  That's

7    the government's heading.  I'm not saying that.

8            198-1 where he breaks his shoulder, the line item

9    itself can come in.  It's already in the record, in fact, but

10   not the underlying self-serving hearsay press article where the

11   senator talks about how intrepid he is and what a fighter he

12   is.  But the line item can come in.  Again, the fact he broke

13   his shoulder is already in the record.  In fact, I think the

14   testimony has him tripping on those little carts that take the

15   senators around.

16           216-1 hearsay, clearly for the truth of the matter

17   asserted.  Doesn't go to Menendez's state of mind.  It's out.

18           263-1 to 263-2.  It's hearsay.  It's out.  For the

19   truth of the matter asserted.  There is no indication as to

20   what, if anything, was discussed, and in fact she never sold

21   the gold.  The low probative value is outweighed by the danger

22   of wasting time on a collateral matter.

23           326-4 is the wire transfer from her cousin for family

24   aid.  It's hearsay.  Despite the argument in the papers, the

25   thrust of the e-mail is indeed to show that she was receiving

O723MEN2

1    family aid.  It's not relevant that she was getting family aid.

2         328-3, the press release showing that the senator was

3    at the World Economic Forum, it's hearsay.  There is no

4    evidence in the record that it meets either 803(6), which is

5    business records, or 803(8), public records.

6         330-1, I'm at the World Economic Forum.  It's clearly

7    hearsay when offered by the defense.  It's excluded.

8         This part I didn't understand, Mr. Weitzman.  You say

9    you're substituting cell site records.  If these are already in

10    the record, then there is no issue.

11         MR. WEITZMAN:  Yes, your Honor, I need to check to

12    make sure they're in the record.  I think his phone records are

13    in the record.  And the phone records clearly establish that

14    he's in Switzerland.

15         THE COURT:  I think so.  I can't tell you whether

16    they're in or not, but I remember some discussion of them.

17         MR. WEITZMAN:  I'm pretty sure they are.  So with your

18    Honor's permission, those are valid --

19         THE COURT:  If they're in, I have no issue with them.

20         MR. MONTELEONI:  I think they're in, but there is no

21    expert testimony about what they mean.  I think I know which

22    lines he's referring to, and certainly those records are in

23    evidence.  But I think that the value of what arguments you can

24    make from them, without someone to interpret them, is

25    potentially going to be limited.  But we can talk after.

1          THE COURT:  Okay.  You'll talk.

2          331-2 to 331-3, text exchange regarding a Heritage

3    employee and an advisor re Fred's tarnished record.  Double

4    hearsay for the truth of the matter asserted.  It has minimal

5    relevance and it's cumulative.  You'll have the due diligence

6    in the record.  That's out.

7          E.  Miscellaneous line entries.  Again, the

8    government's characterization here.  Just so you can orient

9    yourself in 488 is page 17.  14-1 to 14-3, the calendar entries

10   calls with Dan Goldman.  Nadine is sick.  Menendez's check to

11   an architectural firm and engineers.  It's hearsay.  There is

12   no indication on the chart as to what in fact was discussed

13   with Goldman and the others.  The defendant is inviting pure

14   speculation by the jury.  It has minimal probative value.  It's

15   outweighed about the risk of confusion.  They're out.

16         180-4 and 180-5.  Nadine's food poisoning.  I'll allow

17   it in.  It's existing physical condition.  But only the

18   sentences that refer to her physical condition.  Nothing about

19   Bob's schedule, nothing what he had to do on those days.  But

20   existing physical condition, yes.

21         Next, 244-1 and 246-1.  Checks to the architectural

22   firms and engineers.  Hearsay.  There is no linkage here.  It's

23   irrelevant to the home renovations, or for that matter, as near

24   as I can tell, a search for a new home, for those issues.  So

25   it's out.

1           Let's go to 1305.  Exhibit 1305 was provided by

2    Menendez to the government at 9 p.m. last Friday night.  That's

3    June 28.  But I had previously set a clear and definitive

4    deadline of Saturday, June 29, at noon in which the government

5    had to submit any objections to any summary charts.  The fact

6    that the government didn't even have these proposed Defense

7    Exhibit 1305 in its possession until a mere 15 hours before the

8    noon June 29 deadline was far too short a time for the

9    government to effectively lodge any objections to the 1305

10   chart.

11           I'm striking it for the fact that it effectively

12   violated my order.  The deadline was the deadline for the

13   government to respond at noon on Saturday.  But the fact that

14   the defense was presenting this chart at 9 p.m. on Friday, as I

15   say, 15 hours or thereabouts beforehand, prevented the

16   government from effectively objecting to 1305 by noon.  And

17   therefore, I'm finding it violated my specific order.

18           In addition, it is a 22-page compilation of press

19   releases and internal memos that Menendez took actions to

20   advocate for Latinos over a 15-year period.  There is evidence

21   already in the record that the defense can use about his

22   advocacy.  But I am striking 1305 for violating my order.

23           In addition, it largely contains evidence of prior

24   acts in violation of 404(b)(1).  Most of it is hearsay.  Much

25   of the chart predates the charges.  It goes back to I think

1    2007.  And it's cumulative and wasteful of the jury's time

2    under 403.  There is evidence from which the defense can make

3    its arguments.

4            Now let's go to 2500.

5            MR. FEE:  Can I briefly on that make a proposal?

6            THE COURT:  Sure.

7            MR. FEE:  I hear the Court's ruling.  I'm not going to

8    argue it.

9            There are two underlying exhibits which were produced.

10   All of the underlying exhibits were produced to the government

11   in the first defense production.  And there are two exhibits,

12   it's on 1305, it's rows -- one moment, your Honor.  Row 33 and

13   then rows 42 and 43.

14           I'm sorry.  It's DX 2165.  No, not that one.  DX 2170

15   and DX 2171.  These are two memos --

16           THE COURT:  I'm going to look at the line entries.

17   Just a moment while I get them.  While my clerk gets them.

18           MR. MARK:  Your Honor, I believe 42 is September 22,

19   2019.  And 43 is March 9, 2020.

20           THE COURT:  What are you telling me about those dates?

21           MR. MARK:  33 is June 6, 2017.

22           That's just how we were locating the entries on the

23   chart.  Because defense counsel did give us a revised version

24   after we filed with line entry numbers, but we didn't have that

25   when we filed our motion.

O723MEN2

1              MR. FEE:  Do you want to hear my pitch, your Honor?

2              THE COURT:  No.  I don't have the underlying

3    documents, but I'll find 1305-33 and 1305-42 and 43.

4              MR. FEE:  Can I hand it up to you?

5              THE COURT:  Sure.

6              MR. FEE:  42 and 43.

7              THE COURT:  And 33.  I thought I had 2500 here.  Go

8    ahead.

9              MR. FEE:  So, your Honor, all three of these --

10             THE COURT:  Have you talked to the government about

11   this?

12             MR. FEE:  No, do you want me to?

13             How do you guys feel about those exhibits?

14             MR. RICHENTHAL:  I think he didn't mean on the record.

15             THE COURT:  I can negotiate the propriety of the

16   questions you're asking.

17             (Counsel conferring)

18             MR. FEE:  Good news and bad news.

19             THE COURT:  Just a moment.  You're fighting uphill.

20   For the reasons I've set forth, I believe the striking of the

21   entire chart is appropriate.  But go ahead.

22             MR. FEE:  So I'm not fighting on the chart.  The

23   underlying exhibits, and I'll just focus on 2170 and 71 because

24   they are similar in kind.  They are memos from the senator.

25             THE COURT:  Are they in 33?

O723MEN2

1              MR. FEE:  I think --

2              THE COURT:  They're 42 or in 43.

3              MR. FEE:  The later ones.  This is for the non-hearsay

4    purpose of establishing the state of mind of the senator that

5    he goes to events or meetings with foreign officials and

6    civilians, constituents.

7              As recently as yesterday, the government suggested

8    through its cross of Caridad Gonzalez that there was something

9    unusual about the senator having direct contact with a

10   constituent who raised a concern.  This happened on cross where

11   they asked about the woman who had raised an immigration issue,

12   and they elicited from Caridad, or tried to, that, oh, the

13   senator only passed off his office line.

14             There has been a series of questions through cross --

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O72Wmen3

| | |
|---|---|
| 1 | THE COURT: Actually, I thought the purpose of that |
| 2 | cross was somewhat different. But go ahead. |
| 3 | MR. FEE: I think the general purpose, the general |
| 4 | government argument I'm pointing to that these underlying |
| 5 | exhibits do undercut is that the fact that the senator is |
| 6 | engaging directly with constituents and the fact that he is |
| 7 | engaging in meetings with foreign officials and members of |
| 8 | those diaspora communities is not inherently suspicious and, |
| 9 | therefore, does not support, or at least does not support as |
| 10 | strongly as the government would like, the inference that Will |
| 11 | Hana coming to that meeting with the Egyptians is evidence of a |
| 12 | bribe. |
| 13 | That's it, your Honor. These are two exhibits. |
| 14 | They're within the time period charged. |
| 15 | THE COURT: But where do you see in 42 or 43 anything |
| 16 | about his engaging with constituents or involving constituents? |
| 17 | MR. FEE: These are both events in New Jersey. One is |
| 18 | for Colombians, Colombian Americans to come, and the other is |
| 19 | for Ecuadoran Americans to come. They're open forums, just as |
| 20 | described in the memo. We're not going to offer any proof |
| 21 | beyond that. |
| 22 | THE COURT: Again, all I have before me is the line |
| 23 | entries here. |
| 24 | MR. FEE: That's right. And so if you look at the one |
| 25 | that's dated -- I don't have the numbers here, but the |

O72Wmen3

1   Colombian one, on September 22, 2019.

2          THE COURT:  Yes.

3          MR. FEE:  It's a forum with the Colombian President

4   Duque held, I believe, in New Jersey, and you can see that the

5   attendees include --

6          THE COURT:  Again, I can't, based on what I have in

7   front of me.  But go ahead.

8          MR. FEE:  It's in there.  It's inserted in the chart.

9          THE COURT:  Oh, the next line.

10          MR. FEE:  It's very small.  I'm sorry.

11          THE COURT:  Let me read that, the carryover.

12          MR. FEE:  Yes.  It's at Elizabeth High School, in New

13   Jersey.

14          MR. RICHENTHAL:  I'm happy to respond whenever the

15   Court would like.

16          THE COURT:  I don't know.  Well, I'll hear from the

17   government.

18          Anything else you wanted to tell me, Mr. Fee?

19          MR. FEE:  No, your Honor.

20          THE COURT:  OK.

21          MR. RICHENTHAL:  First, this is classic hearsay.

22   There's no such thing as a --

23          THE COURT:  No, I don't think he's arguing that it's

24   not clear hearsay.

25          MR. RICHENTHAL:  I thought he said it was state of

O72Wmen3

```
 1    mind, which is a hearsay exception under 803, but there's no
 2    such thing as a state of mind for whether a fact occurred
 3    historically.  That's not a state of mind.
 4              THE COURT:  Is your argument, Mr. Fee, this reflects
 5    Menendez's state of mind?  As to what?
 6              MR. FEE:  Your Honor, I do think it reflects a state
 7    of mind that his staff is routinely telling him, or at least
 8    more than one occasion, that you're going to go to these events
 9    with civilians and foreign officials.
10              THE COURT:  And that refers to his state of mind?
11              MR. FEE:  Yes, your Honor.  It is directed to him.  He
12    is going to the event.  That's what's contemplated in the memo.
13              MR. RICHENTHAL:  Again, attending something is not a
14    state of mind or anger or sadness.  It's an historical fact.
15    He either attended or did not.  In fact, Mr. Fee referenced who
16    attended the event.  Who attended the event is demonstrably an
17    historical fact or nonfact.  It cannot be admitted for his
18    state of mind.  But just to put aside the hearsay problem --
19              MR. FEE:  Well, your Honor --
20              THE COURT:  No.  Let him finish.
21              MR. RICHENTHAL:  Put aside the hearsay problem, to be
22    clear, we're not conceding.  I just think the Court can rule
23    without even going there.  The defense has chosen two events.
24              THE COURT:  What do you mean when you say we're not
25    conceding?
```

O72Wmen3

1          MR. RICHENTHAL:  What I mean is this is hearsay, and
2     the Court could on that ground preclude it.
3          THE COURT:  I've already found that it's hearsay.
4     Go ahead.
5          MR. RICHENTHAL:  Then I don't know that I need to
6     speak further, but I was going to say even if the Court assumed
7     *arguendo* that it were not hearsay, it should still be
8     precluded.  Because what the defense is choosing two different
9     events involving Latino communities in New Jersey.  That has no
10     relevance to this trial.  And even if it did --
11          THE COURT:  Yes, but he's not arguing -- that hurts
12     him.  He's not really arguing relevance except to say it's
13     reflective of Menendez's state of mind that he deals constantly
14     with open fora where there are normal constituents as well as
15     government officials.  I think that what he's doing.
16          Is that right, Mr. Fee?
17          MR. FEE:  That's right, your Honor.
18          THE COURT:  OK.
19          MR. FEE:  We're not proving the event.
20          THE COURT:  OK.
21          MR. FEE:  I will say they also say it refers to the
22     small group meeting, and then there's an open forum.
23          THE COURT:  Yes.
24          MR. RICHENTHAL:  So any reference to it happening is
25     hearsay.  They keep going back to what actually occurred.

O72Wmen3

| | |
|---|---|
| 1 | That's hearsay.  But again, let's ignore that for a moment. |
| 2 | They're choosing two events with Latino people for a purpose |
| 3 | that isn't disputed.  Ms. Arkin testified he meets with |
| 4 | constituents all the time.  Ms. Arkin actually testified they |
| 5 | have a policy of trying to meet with every constituent.  Some |
| 6 | get meetings with the senator.  Most get meetings with the |
| 7 | staff. |
| 8 | THE COURT:  No.  With every constituent who raises an |
| 9 | issue with him. |
| 10 | MR. RICHENTHAL:  Yes, but my point is there's abundant |
| 11 | evidence in the record that Senator Menendez is a busy man, |
| 12 | that Senator talks to constituents, that constituents contact |
| 13 | his office, that he goes and meets with people.  In fact, there |
| 14 | were specific series of cross-examination questions about |
| 15 | meeting with Coptic Christians in New Jersey, about meeting |
| 16 | with other people in New Jersey. |
| 17 | That's in the record.  What isn't in the record, and |
| 18 | under 404 and 405, should not be in the record are specific |
| 19 | instances of meeting with specific Latino communities from |
| 20 | which the jury undoubtedly will infer something about this case |
| 21 | they should not infer.  And everything I just said the Court |
| 22 | could ignore because it's also just hearsay. |
| 23 | MR. FEE:  I'm not quite sure I understand.  We could |
| 24 | show he's meetings with Coptic Christians from Egypt, but not |
| 25 | Ecuadorians and Colombians.  But the point is we're not going |

1    to harp on the national identity.

2              THE COURT:  That cuts against you.  You already have

3    it in the record.

4              MR. FEE:  Well, yes, your Honor, but this case is only

5    about the strength of inferences to be argued.  There's no

6    direct proof of the schemes alleged.  It's only about the

7    strength of inferences, so when they say it's already in the

8    record through Sarah Arkin, first of all, I think Sarah Arkin

9    actually said she wasn't sure he actually met with foreign

10   officials.

11             THE COURT:  OK.  I'm going to cut this off and stand

12   by my ruling on it.  It's hearsay, 404.  It violates 404(b)(1).

13   I think you do have in the record what you need.

14             Now, just so the record's clear, I'm striking 1305.

15             Now let's go on to 2500, and that's the last thing

16   that I have on my agenda and, therefore, the last thing you

17   have on your agendas.

18             Since this was part of the weekend events, I just have

19   the government letter, which is ECF-493.

20             Now, 2500 is a chart that's been put in by the

21   government with the addition of E and F.

22             First, a minor point, Mr. Fee.  Fuchs is not an agent,

23   so if the chart comes in, you have to change that.

24             MR. FEE:  Yes, your Honor.

25             THE COURT:  It seems to me a couple of things.

O72Wmen3

1          One, you made these points to a fare-thee-well.  I

2     mean you went over it and over it and over it.  This is the one

3     where I think the cross was twice the direct.

4               MR. FEE:  You said fairly well, your Honor, or

5     fare-thee-well?

6               MR. MONTELEONI:  Fare-thee-well.

7               THE COURT:  Fare-thee-well.

8               MR. FEE:  Got it.

9               Thanks, Paul.

10               THE COURT:  Fare-thee-well.  Mr. Weitzman would say

11     *touche* to that.

12               So you did it to a fare-thee-well.  You did the 2

13     percent.  I believe I stopped you -- I certainly hope I stopped

14     you -- when you asked always your penultimate question about

15     don't you think this is misleading, as overly argumentative,

16     but it seems to me you got out all of that over and over and

17     over again.  This jury -- well, I don't know what the jury

18     thinks of all this, but you presented all of that.  Granted, I

19     don't think you did every line, but nonetheless, you did enough

20     and you drove that point home and home and home again and left

21     the inference that somehow that was misleading.  But I really

22     think this is simply cumulative and a waste of time.  And if I

23     understand the testimony, the underlying cells are in evidence,

24     so you can make the percentage argument for the ones that you

25     didn't question her about in your summation.  So I don't really

O72Wmen3

1    see any point in putting in a new chart with E and F and

2    wasting this jury's time.  I really think you've done it.

3              Speak to me, sir.

4              MR. FEE:  Your Honor, you've silenced me with

5    flattery; I didn't know it landed so well.  So we'll withdraw

6    the chart.

7              THE COURT:  OK.  Thank you.

8              MR. FEE:  I hear you.

9              THE COURT:  That's it?

10              MR. MONTELEONI:  Your Honor, can we talk scheduling?

11              THE COURT:  I'll tell you what the scheduling is.

12              The scheduling is tomorrow we have Gannaway, who is

13    going to be substantially reduced.  When you give the defense a

14    sense of how limited your cross is, they will accordingly pare

15    down their direct.  We don't need the paralegal because 2500 is

16    out, and we've got the Critchley deposition.

17              With my rulings, about how long is the Critchley

18    deposition?  Does anyone know?

19              MR. FEE:  Without the rulings, it was about an hour.

20    So it's going to be shorter.

21              THE COURT:  OK.  So we're not into the afternoon.  If

22    Menendez rests, there will be an allocution.  As we talked, let

23    me know before you rest so I can do the allocution.  And then

24    we'll go into the Hana case.  And we've got at least No. 5,

25    employee No. 5 at this point.  And I may be able to have

O72Wmen3

1    rulings on the others for you by the morning.

2              MR. LUSTBERG:  Your Honor, I just want to point out

3    one issue as a result of all this.  No fault of anybody, it's

4    almost 7 o'clock.

5              THE COURT:  Five more hours to go only before midnight

6    when you guys are filing things.

7              Go ahead.

8              MR. LUSTBERG:  Not me, but my concern is --

9              THE COURT:  That's right.  Not you.

10             MR. LUSTBERG:  My concern is that the Court's rulings

11   have to be reflected in these summary charts.

12             THE COURT:  Yes, sir.

13             MR. LUSTBERG:  That doesn't happen automatically.

14   It's going to take time, and once we do it, we need to run it

15   by the government.  They're going to want to review it.

16             THE COURT:  Fair point.

17             MR. LUSTBERG:  I'm still a little worried about being

18   ready first thing in the morning, as you suggested.  It may be

19   too late, but if you could do the afternoon instead of the

20   morning, I think it would make some sense.  I haven't had a

21   chance to, obviously, confer with counsel.

22             THE COURT:  I don't think we can notify the jury.

23   They would have left by the time we start notifying them, I

24   would think.  But I understand your point, sir.

25             MR. MONTELEONI:  Your Honor, I think that we think

```
1    starting at 11 might make a little bit of sense.  That would
2    allow time with the parties to do anything necessary for the
3    charts.  And look, we've had to deal with some last-minute
4    chart changes too.  Redaction isn't pretty, but it goes a lot
5    faster.  We could suggest doing it that way.
6         But if we could start at 11 and then we could get
7    rulings covering the other Hana witnesses, then we'd be in a
8    position, I think, to potentially to get where I think we have
9    to be, where the defense actually all rests tomorrow instead of
10   leaving it out until Monday, which would have drastic swing in
11   the effective length of the case and the risk of losing the
12   jury.  So that would be our proposal.  If we start at 11, then
13   I think that unless something is really unusually long, we
14   could be in a position for all the defendants to rest.  Maybe
15   we could do a charge conference later in the day.  I would be
16   interested in that.
17        THE COURT:  No.  I think the question revolves around
18   my rulings on the other Hana employees.
19        MR. MONTELEONI:  Yes, though my understanding from
20   speaking with Hana's counsel and from the conversations that
21   we've been having is that even if all of them were permitted to
22   testify, they're not extremely lengthy, and so if we start at
23   11, given everything else that's there, I think it's possible
24   that they might all be done tomorrow anyway, even if they're
25   all allowed in.  I'm not sure.
```

O72Wmen3

1          I'm not at all going to promise that, but I think it's

2     a realistic possibility.  We certainly shouldn't be in a

3     position -- or we could start at 10:30, perhaps.  But we really

4     don't want to be in a position where anything gets pushed until

5     after the break that doesn't have to be, because given the

6     length of a number of summations and a lengthy case and the

7     length of the jury instructions, very concerned about hitting

8     the window for when the jury actually gets to be able to

9     deliberate.

10          THE COURT:  But nothing's going to change except

11     however long it takes for whatever remains, which is clearly

12     under a day.  There's no more effect than whatever the time is

13     that it's taking up.

14          MR. MONTELEONI:  Well, yes, but --

15          THE COURT:  Yes, there's an advantage to everybody if

16     everyone rests tomorrow.  I don't know if that can be done.

17          MR. MONTELEONI:  Yes.

18          THE COURT:  OK.

19          MR. MONTELEONI:  I think it could also be good to have

20     a sense of when the charge conference will be.  I think we

21     would like it as soon as possible, but obviously a lot has to

22     go into it.

23          THE COURT:  All right.  Why don't we do 10:30 then.  I

24     don't think we can contact the jurors now, but when they come

25     in --

O72Wmen3

1              Wait.  I'll give you a chance to talk, gentlemen.

2              When they come in, we can tell them we're going to

3    start at 10:30.  I think that makes sense.

4              Gentlemen, you can talk to each other if you want.

5              MR. LUSTBERG:  Your Honor, I'm just trying to express

6    my concern that we don't have the Court's ruling with respect

7    to both issues, our employees, who we have to get here and, you

8    know, we've held them off.  I mean we did expect to be able to

9    get them on and off this week, but there are some logistical

10   challenges to that.  And even the Rule 613 issue, I think the

11   discussions we've had with the government have led us to

12   believe that that would require a witness, but we would have to

13   put together a stipulation, depending on what the Court's

14   ruling is.

15             THE COURT:  My ruling, which I'm trying to hone, just

16   for your planning purposes, is it's not inconsistent.  OK?

17   That's essentially it, but I want to make it clearer.

18             MR. LUSTBERG:  All right.  At least I understand the

19   ruling, and we reserve our rights, of course.

20             THE COURT:  Of course.

21             MR. LUSTBERG:  Your Honor, I kind of agree with what

22   the Court said.  I mean if there's not going to be a charge

23   conference tomorrow --

24             THE COURT:  No.

25             MR. LUSTBERG:  -- then I don't see what the great

1    advantage is of everybody resting tomorrow as opposed to on

2    Monday.  So we can rest on Monday early in the day,

3    presumably -- that makes the jury come in -- but then have our

4    charge conference and do summations on Tuesday, which seems

5    like the schedule we were working toward in any event.  I'm

6    just being clear.  We have been trying to work with the

7    schedule that we have, and we have witnesses.  There are some

8    challenges with some of those witnesses we're trying to get

9    into the country still, and the government has been very

10    helpful in that regard.  It would be helpful to be able to do

11    that on Monday, perhaps.

12         THE COURT:  I was asked to sign a letter, which I put

13    on the open record.

14         MR. LUSTBERG:  Yes.

15         THE COURT:  And I signed that letter.  Are you

16    suggesting that that person may be able to be here next week,

17    but not tomorrow?

18         MR. LUSTBERG:  Well, not that the person is not going

19    to be here tomorrow.  I think it's a possibility that that

20    person will be here for next week.

21         THE COURT:  OK.

22         MR. LUSTBERG:  If not, we'll have to deal with it.

23         THE COURT:  Here's what we're going to do.  I've

24    previewed my 613 ruling.  I'll get you the employee rulings

25    tomorrow.  We've got employee No. 5, agreed, coming in.  We'll

O72Wmen3

| | |
|---|---|
| 1 | start them at 10:30.  When the jury comes in at 9:30, I'll tell |
| 2 | them we're going to start at 10:30, and we'll take it from |
| 3 | there. |
| 4 | I think that's the way to proceed.  If everybody can |
| 5 | rest tomorrow, wonderful.  If they can't, they can't. |
| 6 | Mr. De Castro, I think you indicated you were not |
| 7 | going to put on a case. |
| 8 | MR de CASTRO:  That's right, your Honor. |
| 9 | THE COURT:  Then we could have you do that in front of |
| 10 | the jury, rest, before the Hana case starts.  And that will |
| 11 | have Menendez resting and Daibes resting, at least. |
| 12 | MR de CASTRO:  Fine. |
| 13 | MR. MONTELEONI:  Your Honor, should we be here at 9:30 |
| 14 | for legal matters so that we can start with the jury when the |
| 15 | jury's ready. |
| 16 | THE COURT:  Oh, you mean Hana.  Come in at 10.  Come |
| 17 | in at 10.  All right?  You need the time, I thought.  The |
| 18 | parties need the time to effectuate my rulings. |
| 19 | MR. LUSTBERG:  Yes.  That's right.  And it's going to |
| 20 | be tough to get it done by 10:30, but we'll do our best. |
| 21 | THE COURT:  So then don't come in early.  Work on |
| 22 | effectuating the changes in the charts, and get to your places |
| 23 | of work now. |
| 24 | MR. WEITZMAN:  I know I've already said this, but of |
| 25 | course, if we were to just offer the chart and limit |

O72Wmen3

1    cross-examination, we could always continue discussing the

2    redactions and so on afterwards.  But I'll discuss that with

3    the government.

4              THE COURT:  Talk to each other.

5              All right.  I think we've taken it as far as we can on

6    the record.  I appreciate everybody staying here.

7              Thank you.

8              MR. WEITZMAN:  Thank you, your Honor.

9              (Adjourned to July 3, 2024, 10:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25