O733MEN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4            v.                          23 Cr. 490 (SHS)

5    ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
6    and FRED DAIBES,

7            Defendants.
                                        Trial
8    ------------------------------x

9                                       New York, N.Y.
                                        July 3, 2024
10                                      10:30 a.m.

11

12   Before:

13                    HON. SIDNEY H. STEIN,

14                                      District Judge
15                                      -and a Jury-

16                    APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division

23

24

25

O733MEN1

APPEARANCES CONTINUED


PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:  ADAM FEE
        AVI WEITZMAN
        PAUL GROSS
        RITA FISHMAN


GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
        ANNE M. COLLART
        CHRISTINA LaBRUNO
        ANDREW J. MARINO
        RICARDO SOLANO, Jr.
        ELENA CICOGNANI
        JESSICA L. GUARRACINO


CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes


Also Present:
Marwan Abdel-Rahman, Interpreter (Arabic)
Rodina Mikhail, Interpreter (Arabic)

O733MEN1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  All the parties and the attorneys are

 3     here.

 4              Let me read into the record my decision on 613.  It is

 5     as follows:

 6              Mr. Hana has moved to seek the admission of a prior

 7     statement of Uribe into evidence under Federal Rule of Evidence

 8     613(b) as a prior inconsistent statement.  The alleged

 9     inconsistency is as follows.  At a proffer session on

10     December 22, 2023, Uribe was shown a text message from Nadine.

11              By the way, Nadine and Arslanian are the same person.

12              He was shown a text message from Nadine that said,

13     referring to Hana, "I will pay him back."  The FBI 302 of that

14     session written by an FBI agent states that during the proffer,

15     "Uribe understood the message, 'I will pay him back' to mean

16     that Arslanian was going to pay back the $18,000."  There were

17     no quotation marks in the 302 around the words ascribed by the

18     agent to Uribe, so he never "expressly stated" that that was

19     his understanding, at least according to the 302.

20              On June 10, 2024, on direct examination during the

21     trial of this matter, Uribe was shown Nadine's text message,

22     the same text message, and was asked, "Did Nadine ever tell you

23     that she was paying Will back for mortgage payments?"

24     Transcripts 3061:2-3.  And he answered, "No, she never did."

25     3061:4.
```

O733MEN1

1          The next day on cross-examination, he was again shown

2     Nadine's text message and agreed it said "I will pay him back."

3     Transcript 3324:21.  Hana's counsel then asked Uribe, "Do you

4     remember meeting with the government and telling them that when

5     Nadine told you 'I will pay him back,' you understood that

6     Nadine was saying that she was going to pay Will back the

7     $18,000 that he let her borrow?" 3314:22-25.  Uribe did not

8     recall making that statement, and his being shown the FBI 302

9     in court did not refresh his recollection.  3315:25.

10          I find the proffer statement that Uribe understood the

11     words Nadine's text that "I will pay him back" meant that

12     Nadine was going to pay back the $18,000.  A forward looking

13     statement is not inconsistent with his later statement at trial

14     that Nadine never told him that she was paying back Uribe for

15     the mortgage payments.  His telling the government at the

16     proffer session that he understood Nadine to be saying in her

17     text that she was going to pay Will back the $18,000 is simply

18     not inconsistent with his later trial statement that Nadine

19     never told him "that she was paying Will back for mortgage

20     payments." 3061:2-4.

21          In addition, the third parties, here the FBI agents,

22     characterization of Uribe's statement is not a prior statement

23     of that witness, unless the witness subscribes to the

24     statement, which is not the case here.  The FBI report is

25     merely the agent's characterization of Uribe's statement,

1   rather than a direct quote.  No verbatim transcript of Uribe's

2   words on this point are in the 302.

3         Therefore, Hana's motion seeking the admission of

4   testimony under Federal Rule of Evidence 613(b) or,

5   alternatively, a stipulation, is denied.

6         That's my ruling on that.  Now let's turn to the Hana

7   witnesses.  It seems to me as follows.  That what's relevant is

8   the time period up to the awarding of the monopoly contract in

9   April of 2019 and the McKinney phone call, and perhaps a few

10  months after that, to account for the disruptions in the market

11  due to the award of the monopoly, or lack of disruptions in the

12  market.  But that's the time period.

13        Yes, the conspiracy is alleged to continue beyond

14  that.  But there's nothing that I see in the indictment in

15  regard to this aspect of the conspiracy that extends beyond

16  April, May, June, that area of 2019.  Again, the award of the

17  monopoly, the McKinney phone call, and some time if there is

18  testimony on disruption.  There is certainly evidence already

19  in the record about disruption or the lack of disruption.

20        So it seems to me that's the relevant time period.  I

21  don't think it's relevant that IS EG Halal is a thriving

22  business currently, if it is.  I have no reason to doubt one

23  way or the other.  But certainly the submissions here suggest

24  it's a thriving business.  I don't think that's relevant to the

25  charges here.

1          That's one point that will guide my thinking on what

2    which of the five witnesses, or rather, which of the four

3    witnesses, because the parties have agreed employee number 5

4    can testify, should be allowed to testify.

5          The other parameter that's appropriate, it seems to

6    me, has to do with the global operations.  It seems to me the

7    global operations are not relevant here.  What's relevant is

8    the circumstances of the award of the monopoly to IS EG Halal

9    by Egypt for IS EG Halal to be the sole supplier of halal

10   certified meat to Egypt.  It has nothing to do with India or

11   Latin America.  So I think the witnesses who would testify to

12   global matters is irrelevant here.

13         Now, as I understand it from the submissions, employee

14   number 5 will testify regarding certain things in Latin America

15   and Nadine, but that's a separate issue.  As I say, number 5

16   can testify.

17         So those are the two major parameters, as I see it.

18   The time period, and the fact that we're talking about the U.S.

19   market.  So what that means in specifics is, it seems to me,

20   that employee number 1 should be precluded.  He began working

21   for IS EG Halal in February of 2020, a year or nine months

22   after the period we're talking about, and is the head of the

23   Indian office.  I don't see how that's relevant, so I believe

24   he should be precluded.

25         Number 2 I think it's appropriate.  He's worked for IS

O733MEN1

1    EG Halal since its operations began.  He's responsible for the

2    veterinary aspects of IS EG Halal.  He is a former Egyptian

3    government official who was part of the Egyptian delegation in

4    the 2019 audit of the slaughterhouses that we've heard about,

5    and I think that's relevant.  It seems to me he should be able

6    to testify, if he so chooses, about what he observed during the

7    audit that justified decertifying the other suppliers and what

8    justified certifying IS EG Halal, as well as any disruption to

9    the market or lack thereof during that time period.

10          The government has asked to voir dire him outside of

11    the hearing of the jury to make sure what he's testifying to

12    has to do with his direct observations as opposed to hearsay.

13    I think that's appropriate.

14          The government's position that there is already

15    evidence in the record in regard to these things, it seems to

16    me doesn't prohibit Hana from presenting his evidence.  He's

17    entitled to put on his own evidence.  So, again, I think it's

18    appropriate that number 2, employee number 2 can testify about

19    the audits and IS EG's qualifications and lack of

20    qualifications of the others.

21          Employee number 3 has to do with Latin American

22    operations and the fact that IS EG Halal meets all

23    certification standards.  That's not relevant.  Latin America

24    isn't relevant here.  So he should be precluded.

25          Same with number 4.  He's only been employed since

O733MEN1

1   July of 2021 and was going to testify about IS EG Halal being

2   in compliance.  Presumably number 2 can testify to that, but,

3   employee number 4 only began in July of 2021.  So, that's

4   not -- it seems to me he should be precluded.

5           Number 5 everyone's agreed that he should testify, is

6   able to testify.

7           IS EG Halal's current profitability is irrelevant.

8   The global affairs issues are out under 401 and 403.  That's

9   what seems to me to be appropriate.

10          Mr. Lustberg, did you want to respond in any way and

11  tell me why I'm absolutely wrong?

12          MR. LUSTBERG:  You know I'm happy to do that, your

13  Honor.  Just --

14          THE COURT:  Part of your job.

15          MR. LUSTBERG:  Thank you.  Just two observations.

16  One, I'll answer the question the Court just asked, but with

17  regard to number 2, I want to give the Court an update.

18  Number 2 is currently in Egypt.  The government has cooperated

19  with us -- and I should say, we attempted to get him here.  He

20  obtained approval.

21          THE COURT:  I thought the visa issue was with

22  number 1.

23          MR. LUSTBERG:  There is a visa issue with number 1.

24  But I'm dealing with the one --

25          THE COURT:  Yes, sir.

O733MEN1

1            MR. LUSTBERG:  With regards to number 2, he's in

2      Egypt.  And he was approved for a visa on June 10, so almost

3      coming up on almost a month ago.  Unfortunately that visa has

4      not actually issued.

5            We have worked cooperatively with Ms. Clark, in

6      particular, from the government who has attempted to assist us

7      in expediting his receipt of that visa.  There is the

8      possibility that he'll get the visa today.  Then the weekend

9      happens in Egypt, and there is the possibility that he'll get

10     that, if it isn't today, it could be on Sunday, which would

11     make him available on Monday.  He would fly immediately.

12            So, I wanted to give the Court that heads up that we

13     don't yet know whether he's going to be able to appear, and it

14     is obviously a very critical witness for us for the reasons

15     that the Court has said.  We'll obviously consult with the

16     government.

17            We did propose at one point that his testimony be able

18     to be taken in some remote fashion, whether live streamed into

19     the courtroom or otherwise.  The government did not consent to

20     that.  And obviously, frankly, I would prefer he be here in

21     person as well.  But, just informing your Honor as to that

22     sequence of events, and let the Court know there may be some

23     other application we have to make, depending on what happens.

24            THE COURT:  I appreciate that.  But now let me say

25     from my standpoint, I want -- and you all know and I think

O733MEN1

1    everybody's been working toward that end -- to keep our use of

2    the jury's time as absolutely efficient as possible.  I'm not

3    going to delay this trial for that type of issue.  But it

4    hasn't arisen yet.  So let's see.  And we have some time,

5    unless things progress quite speedily today, that there may be

6    a need for testimony on Monday, so that adds additional time.

7            All I can say, I guess, is two things.  One, we're all

8    going to be as efficient as possible in the use of this jury.

9    And two, I'm not going to significantly delay things for that

10   issue.

11           MR. LUSTBERG:  I understand.

12           THE COURT:  The rule in my court is if you don't have

13   a witness, if there is no other witness, you rest.  But let's

14   take it as it comes.  I'm withholding judgment.

15           MR. LUSTBERG:  With regard to the other witnesses,

16   your Honor.  I want the record to reflect one aspect that

17   perhaps didn't come through as clearly as it should have in our

18   papers.  And for purposes of this, let me focus on witness

19   number 4, who is here and prepared to testify.  She is the one

20   who did not begin work until 2021, so --

21           THE COURT:  Late 2021.

22           MR. LUSTBERG:  I can't remember when it was.

23           THE COURT:  July.

24           MR. LUSTBERG:  Thank you.  That sounds right.  And she

25   would testify to procedures that were in place at IS EG Halal

O733MEN1

1   to -- by way of certifying potential halal meat suppliers that

2   predated her.

3         THE COURT:  How can she do that?

4         MR. LUSTBERG:  There are forms she has she knows were

5   in place before she arrived.  I do think that her testimony,

6   it's clear that her testimony as a result of things that she

7   knows beginning in 2021 has less weight than if she were there

8   back in 2019 when the events in question occurred.  But,

9   respectfully, I think that that's the issue, is that you're

10  precluding them under 401 and 403.  They're not dispositive of

11  what was going on in 2019.  But what's happening today,

12  particularly in her circumstances, is relevant, although the

13  weight may be less in terms of what was going on in 2019.  This

14  is important, your Honor.

15        THE COURT:  Wait.  I'll hear the importance in a

16  minute.  But how is what's happening starting in July of 2021

17  relevant to this case?

18        MR. LUSTBERG:  I understand.  Your Honor, here's why.

19  The impression that this jury has been left with is that

20  Mr. Hana's business -- and I hear the Court saying that having

21  read all the papers, it appears to you to be a thriving

22  business.  Let me be clear.  We're not arguing about thriving.

23  We're not arguing about revenues.

24        THE COURT:  Nor was I putting my imprimatur on that.

25  I was just stating my view of -- I guess the better way to say

O733MEN1

1     it is whether it's thriving or not thriving or somewhere in the

2     middle today, is irrelevant.

3          MR. LUSTBERG:  Respectfully, I don't think it's

4     irrelevant.  I don't think it's dispositive, but I think the

5     fact, the impression that the government has left is that it is

6     a completely bogus enterprise that somehow got this contract

7     based not on merits at all, but on corruption.

8          THE COURT:  In April and May of 2019.  There is

9     nothing about its bona fides as an ongoing organization in this

10    record today.  I'll hear from the government, but go ahead.

11         MR. LUSTBERG:  Our position is that what happens today

12    is probative of what was the case back then.  It doesn't

13    establish what was the case back then.  But one would expect if

14    it was a completely bogus enterprise in 2019, it might well

15    still be today be.  And the fact it is not just thriving, but

16    our point is it does its job in terms of certifying products as

17    either halal --

18         THE COURT:  How is that at issue?

19         MR. LUSTBERG:  How is that at issue?  The government

20    has put -- so, the testimony of Mr. Tate and to a lesser extent

21    I think Mr. McKinney was that IS EG Halal was not qualified to

22    do the job in 2019.  And the fact that it is so able to do that

23    job today, bears upon whether it was in fact capable of doing

24    it in 2019.

25         THE COURT:  I understand.  I don't think so.  But let

O733MEN1

1    me hear from the government in case they want to talk me out of

2    this.

3              MR. LUSTBERG:  Doesn't seem likely.

4              MR. RICHENTHAL:  We'll take the win, your Honor.

5              THE COURT:  All right.

6              MR. RICHENTHAL:  I'm not trying to be cute.

7              THE COURT:  No.  I understand.  I find it's not

8    relevant.  Thank you, Mr. Lustberg, I appreciate it.

9              I do want to tell the parties that the jury has asked

10   for 15 minutes extra for lunch today.  Comes at an inopportune

11   time, but I certainly am trying to accommodate the jury

12   throughout this, and they've been, as I've said, continuously a

13   very prompt jury and that appears to be following the evidence

14   assiduously.  So I'm going to give them the extra 15 minutes.

15             MR. RICHENTHAL:  Can we have one minute to confer with

16   Mr. Lustberg about number 5?

17             THE COURT:  Sure.

18             (Counsel conferring)

19             THE COURT:  What's the expected length of the direct

20   on Mr. Gannaway?

21             MR. WEITZMAN:  Your Honor, we were unable to reach

22   agreement with the government yesterday on the scope of

23   cross-examinations, so we'll have to do a direct examination,

24   I'm hoping my portion of it will be an hour.

25             THE COURT:  Thank you.  Are the parties ready or do

O733MEN1

1    they need more time?

2              MR. WEITZMAN:  I think we need to discuss one issue.

3              THE COURT:  Take your time.

4              (Pause)

5              THE COURT:  Where do we stand?

6              MR. WEITZMAN:  There are some last minute corrections

7    that need to be made.  We propose instead of calling

8    Mr. Gannaway right away, we'll play the Critchley deposition.

9    Hopefully the chart redactions will be finalized in time and

10   we'll start with Gannaway.  If not, we could do an early lunch

11   break I guess.

12             THE COURT:  No, I'm sorry.  I'm not quite sure I

13   understood.  And the jurors have asked for the lunch to be at

14   1 o'clock.

15             MR. WEITZMAN:  I see.  Okay, that's fine.  We'll be

16   ready with Gannaway after Critchley.

17             THE COURT:  Were you suggesting that Gannaway may be

18   available now and you'd rather do Gannaway first if he or she

19   is available?

20             MR. WEITZMAN:  He is available.  But there is still

21   some edits that need to be made.

22             THE COURT:  Let's do Critchley.  Does that make sense,

23   sir?

24             MR. WEITZMAN:  Yes, sir.

25             THE COURT:  I don't want to disrupt your order.

O733MEN1

1              MR. WEITZMAN:  It's fine either way.

2              THE COURT:  Let's bring this jury in and I'll explain

3         to the jury what a video deposition is.

4              MR. MARK:  Your Honor, can we have a brief break after

5         Critchley to make sure all of the changes we had discussed are

6         implemented before Mr. Gannaway testifies?

7              THE COURT:  Yes.  Actually, the Critchley deposition

8         is a tape at this point, which is incorporated in my rulings.

9         So I would think one or more of you could then work during the

10        Critchley deposition playing to make sure that the Gannaway is

11        all set up.

12             MR. MARK:  We will do that, your Honor.

13             THE COURT:  Thanks.  So there will be no need for an

14        early lunch.

15             MR. MARK:  Maybe even just, we'll do that.  We might

16        still have some point to confer, maybe even just a few minutes.

17             THE COURT:  Okay.

18             MR. MARK:  Thank you, your Honor.

19             (Jury present)

20             THE COURT:  Good morning, ladies and gentlemen.  Thank

21        you for being here on time.  I apologize for the wait but it

22        was necessary.  We were handling other matters.  And I assure

23        you, the parties are working assiduously to try to expedite the

24        remaining proofs in this trial.  In fact, everyone was here,

25        the lawyers and I were here until 7 o'clock last night, and

O733MEN1

1    they had work to do after that.

2              What you're going to hear now is another witness and

3    if we'll have Mr. Menendez's lawyers call that witness.  But

4    the witness is going to testify to you here by video.  It's the

5    same thing as if he were in open court, but because of

6    scheduling matters, the parties agreed to take that deposition

7    by video.

8              Mr. Weitzman, call your next witness.

9              MR. WEITZMAN:  Senator Menendez calls Michael

10   Critchley.

11             THE COURT:  Is it going to play on the monitors?

12             MR. WEITZMAN:  It is, your Honor.

13             THE COURT:  Thank you.

14             (Video deposition of Michael Critchley playing)

15             THE COURT:  All right.  That's the testimony of

16   Mr. Critchley.  Counsel, is there another witness?

17             MR. WEITZMAN:  Yes, your Honor.  We have some

18   stipulations to go through.  It shouldn't take too long, but

19   can we do that first?

20             THE COURT:  Of course.

21             MR. WEITZMAN:  Your Honor, at this time we move a few

22   exhibits and a number of stipulations into evidence.

23             The stipulations that we move into evidence with the

24   consent of all parties are marked Defense Exhibit 2503, 2504,

25   2510, 2511, 2512, 2514, 2515, 2516, 2517, 2518, 2519, 2520, and

O733MEN1

1    2521.

2              THE COURT:  Are you moving those for admission?

3              MR. WEITZMAN:  Yes, we move each of those exhibits,

4    which are stipulations, for admission.

5              THE COURT:  Admitted.

6              (Defendant's Exhibits 2503, 2504, 2510, 2511, 2512,

7    2514, 2515, 2516, 2517, 2518, 2519, 2520, 2521 received in

8    evidence)

9              MR. WEITZMAN:  There are two documents, three

10   documents I'd like to move in as well.  The two documents that

11   were just played during the video deposition of Mr. Critchley,

12   Defense Exhibit 1865 and 1868.

13             THE COURT:  Admitted.

14             (Defendant's Exhibit 1865 and 1868 received in

15   evidence)

16             MR. WEITZMAN:  Then Defense Exhibit 2085, which we

17   offer.

18             THE COURT:  Is it by stipulation?

19             MR. WEITZMAN:  It's by agreement, your Honor.

20             THE COURT:  Admitted by agreement.

21             (Defendant's Exhibit 2085 received in evidence)

22             MR. WEITZMAN:  I think at this time we call

23   Mr. Gannaway.

24             MR. FEE:  Your Honor, can we take a slight break just

25   to convey the updated documents we need to convey to the

O733MEN1

1    government?

2              THE COURT:  How long?

3              MR. FEE:  Minutes.

4              THE COURT:  All right.  Ladies and gentlemen, let's

5    take a break for just a couple of minutes.

6              (Jury excused)

7              THE COURT:  Take a few moments.

8              (Recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73Wmen2

```
 1            (Jury not present)

 2            THE COURT:  You may be seated.

 3            I understand there are still technical issues.  What's

 4   happening?

 5            MR. MONTELEONI:  My understanding is that it is still

 6   being loaded.  This is the final version of the exhibits that

 7   they're going to be moving with the witness, and I think that

 8   we are in the process of having the files loaded into our

 9   computers.  That's where we are.

10            THE COURT:  Give me an estimate on time, because I've

11   been hearing two minutes at separate two-minute intervals for

12   about 20 minutes.

13            MS. COLLART:  My apologies, your Honor.  The

14   government has it and has signed off on it.  I think we just

15   need to have the technical capability to show it to the jury.

16            THE COURT:  All right.  I'll wait.  I'll wait.

17            MR. MONTELEONI:  I think that's now happened.

18            MS. COLLART:  We're halfway there.

19            THE COURT:  We don't need the cross-talk.

20            You're halfway there.  What does that imply?

21            MS. COLLART:  There are two exhibits that we were

22   trying to finalize and get over.  One of them is ready to go up

23   for the jury.  The other one is still loading.

24            THE COURT:  Well, can't we show the one that's up to

25   the jury while the other one is loading?  I don't know the
```

O73Wmen2

1    answer to that.

2            MR. WEITZMAN:  That's the later-in-time one in my

3    examination.  The one that's available now is later in time in

4    my examination.

5            THE COURT:  All right.

6            MR. LUSTBERG:  Judge, just to give your Honor a

7    heads-up on one thing, this witness, as a matter of

8    efficiency -- and we talked to your Honor about this

9    yesterday -- is actually a witness that's being called by both

10   defendants.

11           THE COURT:  Yes.

12           MR. LUSTBERG:  So Mr. Weitzman will do his direct.

13           THE COURT:  Called by two defendants is what you're

14   saying.

15           MR. LUSTBERG:  I'm sorry.  Two defendants.  Thank you.

16           And then Mr. Solano will do an examination after that,

17   and they will both be direct examinations.  I don't know

18   whether you want to say something to the jury about it or not.

19   It's completely up to your Honor.

20           THE COURT:  I'll just call on you, and you'll do your

21   examination.  I think that's appropriate.

22           MR. LUSTBERG:  Thank you, your Honor.

23           THE COURT:  And I may characterize it as direct

24   examination.

25           MR. LUSTBERG:  Fair enough.

O73Wmen2

1              THE COURT:  What I'd like to do is be able to finish

2      as much as possible today.  In fact -- well, as much as

3      possible today.

4              MR. WEITZMAN:  Your Honor, just a formality.

5              When I move in the summary charts, rather than read

6      the lengthy number of defense exhibits into the record, I would

7      just propose to, in one line, move in the exhibits referenced

8      therein, assuming you have no objection.

9              THE COURT:  I don't, but at some point, I think we

10     should read into the record the specific exhibits.

11             MR. MONTELEONI:  We can.  If you recall, we used this

12     procedure for the government's case.

13             THE COURT:  No, I don't remember.  I thought that we

14     had moved in each underlying exhibit.  If you're saying we did

15     not do that for the government -- there's been a lot of

16     reference here, I think, through Mr. Fee about goose and

17     gander -- so we'll do the same thing then.

18             MR. MONTELEONI:  Yes.

19             THE COURT:  In other words, if they were moved in

20     wholesale for the government case, let's do it for

21     Mr. Weitzman.

22             MR. MONTELEONI:  Yes.  We agree with that, for

23     efficiency purposes.

24             THE COURT:  All right.

25             Mr. Weitzman, does that make sense, sir?

O73Wmen2

1          MR. WEITZMAN:  Yes, your Honor.  That's fine.

2          THE COURT:  All right.  But articulate that it's not

3   only the charts but the underlying exhibits set forth in the

4   charts.

5          MR. WEITZMAN:  Yes, your Honor.

6          THE COURT:  Ms. Blakely, bring the jury in.  Given

7   that it's 12:15, everyone try to be as efficient as possible.

8   We'll break at one for an hour-and-15-minute lunch, at the

9   request of the jury.

10          Put your witness on the stand, please.

11          Good afternoon, sir.

12          (Continued on next page)

1              (Jury present)

2              THE COURT:  You may be seated in the courtroom.

3              Mr. Weitzman, call your next witness, sir.

4              MR. WEITZMAN:  The defense calls David Gannaway.

5     DAVID GANNAWAY,

6         called as a witness by Defendants Menendez and Hana,

7         having been duly sworn, testified as follows:

8              THE COURT:  Good afternoon, Mr. Gannaway, and welcome.

9              THE WITNESS:  Thank you, sir.

10    DIRECT EXAMINATION

11    BY MR. WEITZMAN:

12    Q.  Good afternoon, Mr. Gannaway.

13        Where do you currently work?

14    A.  I work for the Bederson accounting firm.

15    Q.  What do you do at the Bederson accounting firm?

16    A.  I'm a principal in the forensic accounting and litigation

17    support services practice.

18    Q.  Can you briefly describe your educational background?

19    A.  Yes.  I have a bachelor's degree in accounting and a

20    master's degree in business administration.

21    Q.  How long have you worked with Bederson accounting?

22    A.  A little over two years.

23    Q.  And what did you do before working at Bederson accounting?

24    A.  Began my career with the Internal Revenue Service in 1987.

25    I was a revenue agent in the examination division, where I

1    conducted audits of individual and corporate and partnership

2    tax returns.  Then moved to the criminal investigation division

3    of the Internal Revenue Service, where I conducted white collar

4    crime investigations involving tax evasion, Bank Secrecy Act

5    violations and money laundering.  Did that from -- until 2007.

6    And then I moved into private practice in 2007, and I've worked

7    for accounting and consulting firms in the forensic accounting

8    and litigation support practices since then.

9    Q.  Generally, what is forensic accounting?

10   A.  It's the looking behind the numbers and determine the who,

11   what, when, where, why and how.

12   Q.  And what is litigation support?

13   A.  I work with white collar defense attorneys or civil

14   litigators in their representation of individuals or companies

15   that may be under investigation or shareholder-type dispute.

16   Q.  What has your involvement been in this case?

17   A.  Been a -- I was asked to review Government Exhibit 1302,

18   1303, 1304, and also Defense Exhibits 1300, 1302, 1303 and

19   1304.

20   Q.  We'll talk a bit more about your review of those exhibits,

21   but let me ask you this.

22        When were you retained in this case?

23   A.  Last Tuesday, June 25.

24   Q.  And what is your hourly rate at which Bederson accounting

25   bills you out at?

1   A.  $500 per hour.

2   Q.  Is that paid directly to you or to Bederson accounting?

3   A.  Bederson accounting.

4   Q.  Are you a salaried employee at Bederson?

5   A.  Yes, I am.

6   Q.  Approximately how many hours have you and your team worked

7   on this matter since being engaged?

8   A.  More than a hundred hours.

9   Q.  I'd like to return to your assignment in this matter.  You

10  mentioned that you've reviewed various government exhibits and

11  defense exhibits.  Are those what we call summary charts?

12  A.  Yes.

13  Q.  What was the purpose of your review of those exhibits; what

14  were you asked to do?

15  A.  To compare the government exhibits -- 1302, '3, and '4 --

16  to Defense Exhibits 1302, 1303 and 1304 to make sure that the

17  information on those defense exhibits were accurately reflected

18  and recorded on Defense Exhibits 1302, '3 and '4.

19  Q.  In addition to making sure that the entries from Government

20  Exhibits 1302 through '4 were accurately recorded on Defense

21  Exhibits 1302 through 1304, were there new entries that you

22  reviewed in connection with the defense exhibits?

23  A.  Yes, there were.  On exhibit -- Defense Exhibit 1300, 1302,

24  1303 and 1304, we were asked to compare those entries to the

25  government exhibit -- excuse me, to the exhibit or source

O73Wmen2                        Gannaway - Direct

1   document.

2   Q.   And what was the purpose for which you were comparing the

3   new entries on the defense exhibits to the source documents?

4   A.   To verify the accuracy of them.

5   Q.   When you say accuracy, what are you referring to?

6   A.   To compare the defense exhibits to the actual source

7   document or the exhibit.

8   Q.   And did you review all of the discovery in this case?

9   A.   No, sir.

10  Q.   Did you review all of the evidence in this case?

11  A.   No, sir.

12  Q.   Did you review any testimony in this case?

13  A.   No, sir.

14  Q.   So how did you decide which documents to review in this

15  case?

16  A.   Defense counsel provided those to us.

17  Q.   And are those the underlying source documents of the new

18  entries in the defense exhibits?

19  A.   Yes, sir.

20  Q.   How did you know which entries were new entries and which

21  ones were the old entries in the government exhibits?

22  A.   They were differentiated by color.  It was blue and white

23  in the government exhibits and yellow in the defense exhibits.

24  Q.   What did you do if you found any inaccuracies in the new

25  entries as between the source documents that you reviewed?

1   A.  We reported them to counsel.

2   Q.  And how did you do that?

3   A.  Either by email or by telephone, communicated with them.

4   Q.  Did you and your team then review any revised charts to

5   make sure that inaccuracies you had identified were corrected?

6   A.  Yes, we did.

7   Q.  And were they corrected after you identified inaccuracies?

8   A.  Yes.

9            MR. WEITZMAN:  I'm going to put up for the witness

10  Defense Exhibit 1302.

11           And then let's just go to Defense Exhibit 1303.  This

12  is just for the witness and the Court.

13           And Defense Exhibit 1304.

14  Q.  Do these exhibits contain summaries of voluminous

15  documents, sir?

16  A.  Yes, they do.

17  Q.  Would it aid you in your testimony today to have these

18  exhibits admitted?

19  A.  Yes, it would.

20           MR. WEITZMAN:  At this point in time we offer

21  Defendants' Exhibit 1302, Defendants' Exhibit 1303 and

22  Defendants' Exhibit 1304.

23           THE COURT:  Admitted, without objection.

24           (Defendants' Exhibits 1302, 1303 and 1304 received in

25  evidence)

| | |
|---|---|
| 1 | MR. WEITZMAN:  If we could put up, Mr. Kelly, Defense |
| 2 | Exhibit 1302. |
| 3 | Thank you. |
| 4 | Q.  Do you see that, Mr. Gannaway?  Do you see Defense Exhibit |
| 5 | 1302? |
| 6 | A.  Yes, sir, I do. |
| 7 | Q.  Is this the document, Defense Exhibit 1302, that you were |
| 8 | testifying about that you verified the accuracy of? |
| 9 | A.  Yes, sir. |
| 10 | Q.  Just so I understand, you mentioned that there are |
| 11 | different shades of colors.  What do the blue and the white |
| 12 | entries represent? |
| 13 | A.  That's from Government Exhibit 1302. |
| 14 | MR. WEITZMAN:  And with respect to the entries -- if |
| 15 | you can scroll through a few pages, Mr. Kelly. |
| 16 | Q.  With respect to the entries that are blue and white, what, |
| 17 | if anything, did you do with respect to those entries? |
| 18 | A.  We verified and compared them from the government's exhibit |
| 19 | to the defense exhibit. |
| 20 | Q.  Did you review the underlying source documents for the |
| 21 | accuracy of the blue and white entries? |
| 22 | A.  We did not. |
| 23 | Q.  And why not? |
| 24 | A.  Defense counsel asked us not to, and the document's been |
| 25 | presented by the government. |

1          MR. WEITZMAN:  Now, go back to page 1, Mr. Kelly.

2     Q.  Now, there are also yellow entries here?

3     A.  Yes.

4     Q.  For instance, lines 1.1, 2.1, 2.2; what did you do with

5     respect to those entries?

6     A.  We compared them to the government exhibit or the source

7     document for accuracy.

8     Q.  Were the yellow entries found on the original government

9     exhibits?

10    A.  No, sir.

11    Q.  So the yellow entries are the new entries by the defense?

12    A.  Yes.

13          MR. WEITZMAN:  I'd like to focus your attention on

14    some entries first.  If we can go to lines 384 through 386 on

15    page 48.

16          THE COURT:  Counsel, with your permission.

17          Ladies and gentlemen, you see what's happening here.

18    Government Exhibit 1302 was one of the charts that was in

19    previous testimony admitted into evidence, and there was

20    testimony about that.  The defense has now taken that chart,

21    Government Exhibit 1302, and added its own lines to it.  Those

22    lines, the new lines, added by the defense are in yellow.  The

23    old lines of the government are in blue and white.  So because

24    there are new additions here, this now has been denominated

25    Defense Exhibit 1302 in distinction from the one you saw

O73Wmen2                    Gannaway - Direct

1    earlier, which was Government Exhibit 1302.  The differences

2    are the yellow lines.

3              Is that fair, sir?

4              MR. WEITZMAN:  Yes, your Honor.

5              THE COURT:  OK.

6              MR. WEITZMAN:  And I failed to do an important thing,

7    your Honor.  I need to offer the underlying source documents

8    with respect to Defense Exhibit 1302, 1303, 1304.  We offer

9    them at this point.

10             THE COURT:  All right.  Admitted, without objection,

11   as discussed previously.

12             (Defendants' Exhibits 484, 486, 617, 819, 820, 821,

13   901, 907, 919, 936, 1003, 1010, 1511, 1818, 1819, 2190, 616,

14   617, 825, 831, 1025, 1034, 1865, 1924-1, 1925-1, 1925-2,

15   1925-3, 1928-1, 1933-1, 1933-2, 1933-4, 1933-5, 1933-6, 1933-7,

16   1933-8, 1942-1, 1942-2, 1942-3, 1942-4, 1942-5, 1942-6, 1942-7,

17   1942-8, 1942-9, 1973, 1989-E, 1989-T, 2032, 1989-A1, 1989-A2,

18   1989-A3, 118, 304, 307, 332, 332-A, 334, 334-A, 336, 338,

19   338-A, 342, 344, 347, 350, 405, 406, 409, 412, 413, 416, 439,

20   440, 495, 800, 802, 836, 837, 919, 1027, 1035R, 1036R, 1039-A,

21   1045, 1046, 1300, 1523, 1524, 1525, 1528, 1530, 1531, 1532,

22   1534, 1535, 1541, 1546, 1548, 1550, 1554, 1579R, 1586, 1594,

23   1604, 1605, 1606, 1607, 1608, 1615, 1617, 1618-1, 1619, 1763-A,

24   1764-A, 1765, 1765-A, 1766, 1772, 1772-A, 1772-A-1, 1772-B,

25   1772-B-1, 1772-C, 1772-D, 1772-E, 1772-F, 1772-F-1, 1773,

1    1773-A, 1780, 1800, 1823, 1823-A, 1829, 1829-A, 1831, 1831-A,

2    2002, 2004, 2029-1, 2031, 2037, 2040, 2041, 2083, 2106, 2107,

3    2111, 2112, 2114, 2503, 2504, 2510, 2511, 2512, 2514, 2515,

4    2516, 2517, 2518, 2519, 2520, 2521 received in evidence)

5    BY MR. WEITZMAN:

6    Q.  Mr. Gannaway, looking at line 384, that's a January 24,

7    2019, message from Robert Menendez to Nadine Arslanian.  Can

8    you read the text of it?

9    A.  "OK.  Can't see you on Find My Friends."

10   Q.  And then on line 386, a few minutes later, Nadine Arslanian

11   responds to Robert Menendez, read the text of that.

12   A.  "I will check now, but I'm sending you the picture of the

13   map.  Sends screenshot of location on Anderson Ave., Fort Lee,

14   New Jersey."

15           MR. WEITZMAN:  Can we do a side by side, Mr. Kelly.

16   I'd like to now put Defense Exhibit 1303, line 25-24, which is

17   on page 6, and if you would zoom in on line 24 and twenty --

18   there we go.

19   Q.  Directing your attention, sir, to line -- thank you -- line

20   25-23, what does Nadine Arslanian do with respect to Doug Anton

21   on May 21, 2018, at approximately 5 p.m.?

22   A.  Nadine files temporary restraining order against Doug

23   Anton.

24   Q.  And how many months before the exchange that we looked at

25   involving the Find My Friends in line 384 did Nadine Arslanian

O73Wmen2                      Gannaway - Direct

1    file a temporary restraining order against Doug Anton?

2    A.  Approximately seven or eight months.

3          MR. WEITZMAN:  Now, if we can go to line, in Defense

4    Exhibit 1303, 26-58, which is a couple, a page or two later.

5    And if we could zoom in on that.

6    Q.  This is a June 13 entry.  The last one we just looked at

7    from Defense Exhibit 1303 was May 21, so how long after that

8    last entry is this message on line 26-58?

9    A.  Just one month.

10   Q.  And Robert Menendez sends this text message to Nadine

11   Arslanian at 4:26 p.m.  Can you read the text of 26-58?

12   A.  "My dear Nadine, my disappointment in how this is unfolding

13   is because I worry about you're your safety and well-being.

14       "Knowing that he would not risk his license by violating

15   the TRO.

16          "I respect that this is very hard, has an emotional

17   toll on you based on whatever affection you had/have for him

18   and that you think it will all go away.  I wish it would.

19          "My disappointment, however, does not change my love

20   for you.  You are the love of my life and hopefully we can live

21   in peace and happiness for the rest of our lives."

22          MR. WEITZMAN:  Now, if we can take down 1303,

23   Mr. Kelly, and I'd like to put up Defense Exhibit 1302, page

24   40, line 345-1 through 345-3.  And if you can do that -- blow

25   that up.  Thank you.

1   Q.  The bottom of the screen, sir, is Defense Exhibit 1302,

2   lines 345-1 through 345-3.  What is the date of 345-1?

3   A.  December 1, 2018.

4   Q.  And who does Nadine Arslanian text?

5   A.  Wael Hana.

6   Q.  And that text is at 10:23 p.m.  Can you read the first

7   text?

8   A.  "I am getting all these fake texts from spoofing."

9   Q.  And can you read the next text, sent approximately the same

10  time?

11  A.  "Tomorrow I have to go get a new phone and a new phone

12  number."

13  Q.  And can you read the December 4, 2018, text at line 345-3?

14  A.  "Two people in the office have gotten a text supposedly

15  from me that Doug and I are getting married in August.  Doug is

16  not stopping the spoofing."

17  Q.  Let me ask you, are these -- what color are these texts

18  that you just read?

19  A.  White.

20  Q.  Are they yellow or white?

21          MR. WEITZMAN:  It's a bit unclear in the color.  Maybe

22  we can zoom out, Mr. Kelly, so that we can see the colors.

23  Q.  The ones at 345-1 through 3?

24  A.  Yes, they are yellow.

25  Q.  What does that indicate?

1    A.  That it was additional text and information by the defense.

2    Q.  So these texts --

3              MR. MONTELEONI:  Objection.

4              THE COURT:  Isn't everyone agreed that the yellow

5    entries are the new entries in this new chart?

6              MR. MONTELEONI:  Characterization, new information by

7    the defense.  Look at the citation for 345-1.

8              THE COURT:  Oh, all right.

9              It's simply a new line.

10             MR. WEITZMAN:  Correct.

11             THE COURT:  It's a new line.

12   BY MR. WEITZMAN:

13   Q.  Mr. Gannaway, these new entries were not in the Government

14   Exhibit 1302, correct?

15   A.  Correct.

16             MR. WEITZMAN:  Now can we go down to 345-7.  Go up

17   one, and if we can highlight that.

18   Q.  So we just had read a text message from Nadine Arslanian to

19   Ro Sorce, an email from Nadine Arslanian to Ro Sorce about Doug

20   is not stopping the spoofing.

21        Can you tell us what happens on December 18, approximately

22   14 days later?

23   A.  AT&T records reflect that Nadine Menendez's alternate cell

24   phone number ending in 1212 is activated.  Financially liable

25   party is the Sorce companies.

1          MR. WEITZMAN:  Can we put up 345-3 on top of 345-7 or

2    just expand it so we can see both.  You can take off the top

3    image.  345-3 and 345-7.  Sorry.  345-3 and 345-7.  Great.

4    Q.  Do you see the name of the recipient of the email at 345-3?

5    A.  Yes.

6    Q.  What is her name?

7    A.  Yes.  Ro Sorce.

8    Q.  And is that the same name as the liable party, financially

9    liable party for the cell phone in line 345-7?

10   A.  It says Sorce -- Sorce companies.

11         MR. WEITZMAN:  Now I'd like to put that down and go

12   back to Government Exhibit 1302 and discuss some of the Egypt

13   entries with you, sir.  If I can direct your attention to line

14   26 on page 3 of Government Exhibit 1302.

15         Sorry.  That's not the one.  Can you go up.  Sorry.

16   Make it line 44.  This one.  If you can zoom in on line 44.

17   Q.  Do you recognize this as a voice mail that was listed in

18   the government's original chart?

19   A.  Yes.

20         MR. WEITZMAN:  I'm going to read it for a moment:

21   "Voice mail from Nadine Arslanian to Robert Menendez.  I have a

22   favor to ask you, hopefully you can do it.  Just got off with

23   the general.  Since he has not met you before, he needs to have

24   some clearance from Egypt as to why he's meeting a U.S. senator

25   out of his, the embassy.  And since I think I would really want

1    you to meet him and I think it would be good for the

2    relationship between Egypt and the United States, among other

3    things, and I know you only have an hour, is there any possible

4    way you can meet us at the embassy tomorrow, even if it's for

5    25 minutes.  You'll make introductions with the general, and

6    after that you can meet or talk or do whatever, but the

7    introduction is done and then we don't need an explanation to

8    Egypt as to why he's meeting an official not at the embassy."

9    Q.  What date and time was that message?

10   A.  February 26, 2018, 4:37 p.m.

11          MR. WEITZMAN:  Keep that up, but also put up, on the

12   bottom, line 55-4 on page 5 of this chart.

13   Q.  What color is line 55-4?

14   A.  Yellow.

15   Q.  What's the date and time of that message?

16   A.  February 27, 2018, 10:18 a.m.

17   Q.  So it's the morning after the voice mail we just read?

18   A.  Yes.

19   Q.  OK.  And who is the sender of this text message?

20   A.  Nadine Arslanian.

21   Q.  And who is the recipient?

22   A.  Robert Menendez.

23   Q.  And if you would read the message into the record?

24          THE COURT:  No, there's no need to read it.  The jury

25   sees it.

 1              MR. WEITZMAN:  OK.

 2              THE COURT:  Jury, take a look at that message

 3    yourselves.

 4    BY MR. WEITZMAN:

 5    Q.  Sir, do you see the line:  I canceled the meeting with the

 6    general.  I'm not flying to D.C. just to see him?

 7    A.  Yes.

 8    Q.  And is the name the general the same name that appears in

 9    line 44?

10              MR. MONTELEONI:  Objection.

11              THE COURT:  Sustained.

12              Is the word the "general"?

13              MR. WEITZMAN:  Correct.

14              THE COURT:  Do the two words "the general" appear in

15    each of those lines, 44 and 55-4?

16    BY MR. WEITZMAN:

17    Q.  Mr. Gannaway.

18    A.  Yes, the words appear.

19              THE COURT:  All right.  Next.

20    BY MR. WEITZMAN:

21    Q.  If we can direct your attention to line 66, and just do a

22    single screen.  This is a March 7, 2018, entry at 2:39 p.m.

23    Did this appear on the government's chart?  Is this white or

24    blue or yellow?

25    A.  It's white on my screen.

O73Wmen2                     Gannaway - Direct

1    Q.  OK.  And subject line is RM, and body says --

2           THE COURT:  No need to read it.

3           MR. WEITZMAN:  Just reading the first line:  "Wrote

4    this and handed to Rob."

5           On March 7 -- I want to show you a different entry on

6    March 7, 2018.  Can we go to line 67-1.  Just zoom that out,

7    sir.  And then if you would --

8    Q.  What color is this entry?

9    A.  Yellow.

10   Q.  This is one of the defendant's insertions, is that correct?

11   A.  Yes.

12   Q.  And what is this entry, what date?

13   A.  March 7, 2018.

14   Q.  And just generally, what is the first line of the entry?

15   A.  Press release quoting letter from Senator Menendez and

16   others to Secretary of State Tillerson, stating --

17          MR. WEITZMAN:  You don't need to read the rest.  The

18   jury will read it themselves.

19          Mr. Kelly, can you do a side by side with line 66,

20   please.  66.  Thank you.  And if you can blow that up.

21          Thank you.

22   Q.  Sir, how does the date of line 67-1 relate to the date on

23   line 66?

24   A.  They are the same.

25   Q.  Both occurred on March 7, 2018, correct?

1    A.  Yes.

2            MR. WEITZMAN:  Can we go to page 63 of this summary

3    chart, lines 574 and 575.

4    Q.  These are entries that were on the government's chart, is

5    that correct?

6    A.  Yes.

7    Q.  And these entries are dated April 8, 2019, and concern a

8    meeting with Major General Abbas Kamel.  Do you see that?

9    A.  Yes.

10           MR. WEITZMAN:  Let's now go to line 573-2, right

11   above.

12   Q.  This is the same date, April 8, 2019, correct?

13   A.  Yes.

14   Q.  And what color is this line entry?

15   A.  Yellow.

16           MR. WEITZMAN:  OK.  And the detail states press

17   release.  Can you highlight those.  Thank you.  Press release

18   posted on www.menendez.senate.gov with the title, "leading

19   senators call on Sec. Pompeo to raise key concerns during

20   bilateral meeting with Egyptian President Sisi."

21   Q.  Do those two events, lines 573-2 and 574, occur on the same

22   day?

23   A.  Yes.

24           MR. WEITZMAN:  Let's go to line 578-1 and 578-2, page

25   63.

O73Wmen2                          Gannaway - Direct

1   Q.  What date did these events occur on, in lines 578-1 and

2   578-2?

3   A.  April 8, 2019.

4   Q.  What is it that Robert Menendez sends to Nadine Arslanian

5   at approximately 9:14 a.m.?

6   A.  It's a website link.

7   Q.  Can you read the last portion of the website link, starting

8   with we're calling?

9           THE COURT:  The jury can see that.  Read what's in

10  blue type, ladies and gentlemen of the jury.

11          Next.

12  BY MR. WEITZMAN:

13  Q.  What is Nadine Arslanian's response at 9:21 a.m.?

14  A.  "Wow.  I'm excited to read it."

15  Q.  And now if you would go to line 589-1, this is another

16  yellow insert.

17      Who does Nadine Arslanian forward that link to?

18  A.  Wael Hana.

19  Q.  Now let me direct your attention to line 1134-1, which is

20  page 110.

21      What's the date of this entry?

22  A.  March 6, 2020.

23  Q.  And this concerns a public statement issued by Senator

24  Menendez, is that correct?

25  A.  Yes.  It says, Senator Menendez issues a public statement.

1          MR. WEITZMAN:  OK.  And if the jury would read that to

2     themselves.

3          Now, if we could go to Government Exhibit 1302, line

4     102, which is page 12.

5     Q.  Is this a blue or a white entry that was on the

6     government's original chart?

7     A.  White entry.

8     Q.  And what's the date of it?

9     A.  May 7, 2018.

10    Q.  And it's a text message from Robert Menendez to Nadine

11    Arslanian, is that correct?

12    A.  Yes.

13    Q.  And it says, just the first line:  Just FYI, 277 Americans.

14    And then it refers to the American embassy, correct --

15    A.  Yes.

16    Q.  -- employed in the American embassy?

17         MR. WEITZMAN:  I'd like to now direct you to line --

18    Q.  By the way, this was in the government's original chart?

19    A.  Yes.

20         MR. WEITZMAN:  I'd like to direct you to line 82-6, on

21    page 11.  And can we do a side by side with that last one --

22    I'm sorry -- which was line 102, Mr. Kelly, on page 12.  And

23    then if we could put up line 82-6.  And if you would flip the

24    order so that the earlier-in-time one is above.  Thank you.

25    Q.  What date is 82-6?

1    A.  April 24, 2018.

2    Q.  And what does it say in the box, in the content?

3          THE COURT:  The jury can read that.

4    BY MR. WEITZMAN:

5    Q.  Mr. Gannaway, how many employees did the publicly available

6    report from the State Department indicate worked at the embassy

7    in Cairo as of April 24, 2018?

8          MR. MONTELEONI:  Objection.

9          THE COURT:  Sustained.  It says at the time of

10    inspection.

11          MR. WEITZMAN:  Correct.  Sorry, your Honor.

12    Q.  At the time of the inspection, how many U.S. direct-hire

13    employees were there at the embassy in Cairo, based on line

14    82-6?

15    A.  Approximately 280.

16    Q.  And how many American employees are referenced in Senator

17    Menendez's text message on May 7, 2018?

18    A.  277.

19    Q.  So a difference of three U.S. employees, correct?

20    A.  Yes.

21          MR. WEITZMAN:  I'd like to go to lines 310 to 312, on

22    page 37 of Government Exhibit 1302, and if you would zoom in on

23    those.

24    Q.  These are entries dated July 23, 2018, correct?

25    A.  Yes.

1    Q.  And the first entry is from a woman named Viv Montemayor to

2    Wael Hana.  Do you see that?

3    A.  Yes.

4    Q.  And I'll let the jury read it to themselves, but it refers

5    to a white paper, is that correct?

6    A.  Yes, please find the attached white paper.

7    Q.  And it refers to a meeting of an Egyptian delegation with

8    Senator Menendez, correct?

9    A.  Yes.

10   Q.  Sir, was this in the government's original chart?

11   A.  Yes.

12   Q.  I'd like to now take you to line 304-1.  And what date is

13   this document?

14   A.  July 16, 2018.

15   Q.  And what is the source document that's referenced in this

16   line?

17   A.  Egyptian white paper delegation.

18   Q.  And the source document is Defense Exhibit 1010?

19   A.  Yes.

20   Q.  And according to this line, it says that the white paper

21   delegation had planned meetings with five senators, 19

22   congresspersons, eight Pentagon officials and several others.

23   Do you see that?

24   A.  Yes.

25   Q.  Is this a new addition that was not in the government

1  exhibit?

2  A.  Yes.

3          MR. WEITZMAN:  Can we go to DX 1010.  Pull that up.

4  Q.  Is this the underlying document that was the source

5  document for line 304-1?

6  A.  Yes.

7  Q.  Dated July -- here it says July 26, 2018.  It's from Vivian

8  Montemayor.

9      What office is she emailing from?  If you look at the

10  bottom.

11  A.  Egyptdefense.vivien@gmail.com.

12  Q.  Do you see at the bottom it says Egyptian Defense Office?

13  A.  Yes.

14          MR. WEITZMAN:  Let's go to page 6, and if we can, at

15  the top, let's highlight Egyptian military white paper

16  delegation, July 16-25, 2018.  Then highlight --

17  Q.  There's a reference to the number of senators.  Do you see

18  that, on the bottom, Senator Boozman?

19          THE COURT:  Do you see the list of senators there?

20          MR. WEITZMAN:  Yes.

21  BY MR. WEITZMAN:

22  Q.  Do you see the senators, sir?

23  A.  Yes, I do.

24  Q.  And do you see the list of staff for senators?

25  A.  Yes.

O73Wmen2                            Gannaway - Direct

1    Q.  OK.  And what is the total number of Senate, at the top

2    total number of Senate members and staffers on this document?

3    A.  Five for Congress.  Ten staffers.

4    Q.  And what is total number of House numbers and staffers with

5    this military white paper delegation?

6    A.  23 for House.

7    Q.  What is the total number of Pentagon officials?

8    A.  Eight.

9        MR. WEITZMAN:  You can take that down, and if we can

10   go back to Government Exhibit 1302.

11   Q.  By the way, was --

12       MR. WEITZMAN:  Actually, let's stay with Government

13   Exhibit 1302.  Can you go to lines 1068-4 through 1070 on page

14   96.  Can you do 1068-4 all the way with the next page through

15   1070.  Thank you.

16       Let's start with line 1069, and if you can just blow

17   that one up, Mr. Kelly.

18   Q.  Was line 1069 on the government's original exhibit 1302?

19   A.  Yes.

20   Q.  And it's a text message from Robert Menendez to Nadine

21   Arslanian, dated September 16, 2019, at 9:44 p.m., is that

22   correct?

23   A.  Correct.

24   Q.  And it says:  *Mon amour*, I got a late start for dinner with

25   Fred.  Do you see that?

O73Wmen2                    Gannaway - Direct

1    A.  Yes.

2    Q.  And then line 1070, if you'd just -- that's the next

3    morning, September 17, 2019, at 10:17 a.m.  Do you see that?

4    A.  Yes.

5    Q.  And it's an email from Robert Menendez to Fred Daibes,

6    attaching a Word document titled "S1102" about a Middle Eastern

7    energy and partnership act.  Do you see that?

8    A.  Yes.

9    Q.  I'd like to take you to September 16, earlier in the

10   evening.  If you can, first, focus in on line 1068-6, what time

11   is that entry?

12   A.  8:39 p.m.

13   Q.  And who sends it?

14   A.  Fred Turner.

15   Q.  And who does he send it to?

16   A.  Robert Menendez.

17   Q.  And what does he write?

18   A.  At Bourbon Steak.

19   Q.  What is the next line entry, 1068-7; what time is that?

20   A.  8:41 p.m.

21   Q.  Who is the sender?

22   A.  Robert Menendez.

23   Q.  Who does he send a text to?

24   A.  Fred Turner.

25   Q.  And he writes:  You didn't tell me Cafe Milano was closed.

O73Wmen2                    Gannaway - Direct

1    And what's Fred Turner's response?

2            MR. WEITZMAN:  If you can scroll down, Mr. Kelly, a

3    bit.  Thank you.

4    A.  Mr. Turner's response was, sorry.

5    Q.  Now, if you go back to line 1069, do you see it says, after

6    the reference from Robert Menendez to Fred, he says:  Who tells

7    me he has been texting with you; do you see that?

8    A.  Yes.

9    Q.  Did you see text messages between Nadine Arslanian and Fred

10   Turner on that date, September 16, 2019?

11   A.  There's two on 1068-4 and 1068-5.

12   Q.  Let's review those.  1068-4, at 12:13 p.m., Fred Turner

13   texts Nadine Arslanian:  Got your passport, etc.  Will get it

14   over to Indian embassy this afternoon.  And then at 2:42 p.m.

15   that same day, Nadine Arslanian responds to Fred Turner:  Thank

16   you, Fred.  I can't wait for the trip and for all of your

17   jokes.

18           Do you see that?

19   A.  Yes.

20   Q.  Based on your review --

21           MR. WEITZMAN:  And if you can zoom in -- or zoom out

22   so we can see all of these.

23   Q.  Sir, based on your review of these text messages, do you

24   have an understanding as to who, in line 1069, the Fred

25   referenced there is?

1                    MR. MONTELEONI:  Objection.

2                    THE COURT:  He may have an understanding.

3                    Do you know who Fred is?

4                    THE WITNESS:  Not with just the name Fred on 1069.

5     BY MR. WEITZMAN:

6     Q.  OK.  And do you have an understanding, based on your review

7     of the above text messages, whether Fred is a reference to Fred

8     Turner or Fred Daibes?

9                    MR. MONTELEONI:  Objection.

10                    THE COURT:  Sustained.

11                    MR. WEITZMAN:  Now, if we can go to line 75-1.

12                    Your Honor, I'm about to get into another topic on

13     this exhibit.  Do you want me to proceed?

14                    THE COURT:  How much longer do you have?

15                    MR. WEITZMAN:  Half an hour.

16                    THE COURT:  Ladies and gentlemen, let's break for

17     lunch.  Be back at 2:15.  Thank you.

18                    (Continued on next page)

19

20

21

22

23

24

25

 1                  (Jury not present)

 2                  THE COURT:  You may step down, sir.

 3                  MR. MONTELEONI:  Your Honor, I have an application for

 4      when the witness leaves.

 5                  (Witness not present)

 6                  THE COURT:  You may be seated in the courtroom.

 7                  Yes, sir.

 8                  MR. MONTELEONI:  So, the witness's testimony,

 9      surprisingly to me, indicated that he had been communicating

10      corrections to the charts that he was testifying about -- that

11      is, the subject matter of his testimony -- by email, but we

12      have not received any Rule 26.2 material related to this

13      witness that I'm aware of, so we were quite surprised that he

14      had been generating any written statements of the subject

15      matter of his testimony.  We would ask that they be produced

16      immediately.

17                  THE COURT:  All right.  Have you spoken to the other

18      side?

19                  MR. MONTELEONI:  No.  This is the first opportunity we

20      had to raise it.  There was no break before we first learned of

21      this.

22                  THE COURT:  All right.  Let me hear the response.

23                  MR. SOLANO:  Your Honor, we're in the process of

24      gathering any materials, and we'll confer with the government

25      right now, at the break, as soon as we walk out.

O73Wmen2                         Gannaway - Direct

1              THE COURT:  All right.

2              I think that this is wasting the jury's time.  All of

3     this could be argued.  The lines in the underlying documents

4     are now in evidence.  All of this could be argued in summation.

5              I understand, Mr. Weitzman, your discussions with the

6     government, but it seems to me you really ought to talk to each

7     other.  I think this is unnecessary at this point, especially

8     given the desire of everybody to move forward with the

9     testimony.

10             2:15.  Talk to each other.

11             (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O733men3

```
 1                      AFTERNOON SESSION

 2                         2:15 p.m.

 3           (Jury not present)

 4           MR. FEE:  We have one quick issue.  This should be

 5   quick, your Honor.  Mr. Weitzman has cut down his presentation,

 6   which will be the remainder of the defense case for Senator

 7   Menendez.  It will be about 15 minutes.

 8           The one thing I did want to flag and make a note of,

 9   your Honor, I of course know the Court is focused on the

10   efficiency of the presentation of evidence.  We are concerned

11   that the Court's instructions in front of the jury about not

12   reading entries have perhaps unintentionally signaled -- in the

13   defense summary charts aloud.  Meaning --

14           THE COURT:  Because what I'm instructing the jury is

15   to read the entries.

16           MR. FEE:  You are instructing the lawyer not to read

17   it into the record, and you are saying jurors read it, and I

18   know why you are doing it.  My only concern is --

19           THE COURT:  I am doing that for the efficient

20   presentation of evidence.  But go ahead, what's your point?

21           MR. FEE:  The only concern, which I'm sure you can

22   guess what I am going to say.  I fear because this instruction

23   has only happened during the defense case, which I understand

24   is also the eighth week, that it may have unintentionally

25   signaled to the jury something about the relative importance of
```

O733men3

1    the defense lawyers doing that versus, say, the government

2    lawyers doing that.

3            THE COURT:  I wouldn't think so.  But what would you

4    like me to do?

5            MR. FEE:  I have no relief, your Honor.

6            THE COURT:  I'm open to anything you suggest.  I can

7    do the same thing on the government case.

8            MR. FEE:  Don't worry about that, your Honor.

9            THE COURT:  What do you propose?  I think it is a bit

10    far afield, but I want to be responsive to your concern.

11            MR. FEE:  The only note I'll make is Mr. Weitzman may

12    refer to a handful of portions of entries in the remaining 15

13    minutes of examination.  And if we can avoid the instruction in

14    front of the jury, that would be welcomed.

15            THE COURT:  Done.

16            MR. FEE:  Thank you, your Honor.

17            THE COURT:  Anything else?

18            MR. FEE:  No, your Honor.

19            THE COURT:  Okay.  I'm being serious.

20            MR. FEE:  I'm being serious, too.  Thank you, your

21    Honor.

22            THE COURT:  Mr. Solano, how long is your direct?

23            MR. SOLANO:  I suspect right around 30 minutes, your

24    Honor.

25            THE COURT:  Really?

O733men3

 1           MR. SOLANO:  Yes.

 2           THE COURT:  We may not be able to conclude the full

 3   presentation today.

 4           Mr. De Castro, anything on direct?

 5           MR. DE CASTRO:  No, your Honor.

 6           MR. FEE:  Your Honor, to your point, we can prompt you

 7   when the cross is done, but obviously the Court wanted to let

 8   the jury out to do the colloquy.

 9           THE COURT:  Allocution.  I'll do the same thing at the

10   same time, I'll do the allocution, if appropriate, for

11   Mr. Daibes.

12           MR. DE CASTRO:  That's fine, Judge.

13           THE COURT:  And then I'll bring the jury back and then

14   each of you can rest, if indeed that's what you intend to do.

15   Then we'll see where we are on the Hana case.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Mr. Weitzman, you may continue with your

3    direct examination of Mr. Gannaway.

4              MR. WEITZMAN:  Thank you, your Honor.

5    BY MR. WEITZMAN:

6    Q.  Good afternoon, Mr. Gannaway.

7              Can we turn to Defense Exhibit 1303.  We were

8    previously on 1302, correct, sir?  We were on Defense

9    Exhibit 1302 previously?

10   A.  I don't remember the number.

11   Q.  We're going to turn to Defense Exhibit 1303, if we can put

12   the first page up.  This is one of the defense exhibit summary

13   charts you reviewed?

14   A.  Yes.

15   Q.  Directing your attention to line 22 on page 3.  This is an

16   entry dated April 4, 2018, at 6:31 p.m. from Jose Uribe to Will

17   Hana.  Can you please read the text.

18   A.  "The deal is to kill and stop all investigation.  I am

19   talking to Andy and he is falling sleep."

20             MR. WEITZMAN:  Can we do a split screen and put

21   beneath that line 23-1 on page 4 of Defense Exhibit 1303.  Can

22   you do top and bottom, sir.  Thank you.

23   Q.  Directing your attention to line 23-1.  How long after the

24   6:31 text message from Jose Uribe to Will Hana did this message

25   appear?

1   A.  Less than an hour.

2   Q.  Who is it from?

3   A.  Doug Anton.

4   Q.  Who is it to?

5   A.  Wael Hana.

6   Q.  Can you read the first and second sentence.

7   A.  "I just want to say it was a pleasure meeting you today and

8   I hope our first meeting today is one in a series of many

9   future meetings and good times.  I am very happy to report that

10  the love of my life Nadine is fine and on her way back into

11  town.  Thank you for taking the time to speak with me today and

12  I look forward to see you again soon."

13  Q.  Now I'd like to put up at the bottom lines 25-2 to 25-9.

14  Why don't we start with the top, line 25, sir.  This is a

15  May 10, 2018, entry at 8:28 p.m. and it is a text message from

16  Will Hana to Nadine Arslanian.  Can you read what Will Hana

17  sends to Nadine Arslanian.  Can you read the top.

18  A.  Yes.  "Sends two images of Parra GJ transcript pages."

19  Q.  And both these entries, lines 22 and 25, were in the

20  original Government Exhibit 1303, is that correct?

21  A.  Yes.

22  Q.  Let's scroll down 25 and go from 25-1 to the rest of the

23  page.  On May 17, 2018, at 11:28 a.m. at line 25-2, who's

24  sending a text to whom?

25  A.  Nadine Arslanian to Wael Hana.

1  Q.  And Nadine writes, "Do you know the name of the new

2  attorney they hired from Union City?"

3  A.  Correct.

4  Q.  What does Wael Hana respond at the same time?

5  A.  "I will ask."

6  Q.  Then what does Nadine respond to Will Hana one minute

7  later?

8  A.  "Thank you.  I need to get this case done myself.  One for

9  the money and two so that we can do the fundraiser."

10  Q.  What is Wael Hana's response in the next two lines?

11  A.  "Okay.  Call."

12  Q.  Then if we can go down to 25-8, what does Nadine Arslanian

13  write to Wael Hana?

14  A.  "Did you find out the name of the new lawyer?"

15  Q.  What does Wael Hana respond one minute later?

16  A.  "I will meet him tonight after r dinner."

17  Q.  If we can go to the next page, 25-12.  And Nadine Arslanian

18  texts Wael Hana at 12:47 p.m., whose number does she text?

19  A.  Doug Anton.  201-647-9182.

20  Q.  Now can we go to line 25-17.  What is this?

21  A.  Texts from Wael Hana to Doug Anton.

22  Q.  On what date and time?

23  A.  May 19, 2018, 5 p.m.

24  Q.  What does he write?

25  A.  "Let me know when you send e-mail."

O733men3                        Gannaway - Direct

1    Q.  Can we go to 25-29.  Actually 25-28 and 29.

2            On May 22, in line 25-28, what does Doug Anton text to

3    Wael Hana?

4    A.  "Will it was nice having dinner with you, Andy, Dr. Jack,

5    and Michelle last night.  Thank you.  Were you able to reach

6    out to the client to request discovery?"

7    Q.  And what does Will Hana respond one minute later?

8    A.  "Any time.  I will ask him today."

9    Q.  And then at 6:55 p.m. on May 24, who does Will Hana text?

10   A.  Jose Uribe.

11   Q.  Can we scroll that down a bit.  And what does he text in

12   the two text messages after 6:55 p.m.?

13   A.  "You got the peppers.  Paper."

14   Q.  What does Jose Uribe respond?

15   A.  "Yes."

16   Q.  Next message at 10:02 p.m.?

17   A.  "Brother I give you the papers tomorrow morning.  I am

18   going home.  Dead tired.  Be safe."

19           MR. WEITZMAN:  Now can we go to lines 25-39 and 25-40.

20   It's the prior page, perhaps.  25-39.  Sorry.  25-39.  Now

21   scroll down, please.  It's 25-37 and 38.

22   Q.  On May 26, 2018, at 5:54 p.m., what does Doug Anton write

23   in an e-mail to Will Hana?  Just read the first sentence.

24   A.  "Will, also the grand jury document you gave me is missing

25   page 3 of 50 and page 4 of 50."

O733men3                        Gannaway - Direct

1   Q.  Then the next two sentences?

2   A.  "This is where the witnesses and the criminal conduct

3   complained of is written, on these two pages.  So I need those

4   pages."

5   Q.  And at the top of this line, what is the subject matter of

6   the e-mail?

7   A.  "Re State of N.J. v. Elvis Parra."

8   Q.  And then at 8:20 p.m. on line 25-38, who does Will Hana

9   send part of this message to requesting particular pages?

10  A.  Jose Uribe.

11  Q.  If we can go to line 26-4.  Who does Jose Uribe send the

12  message that Will Hana sent to on May 29, 2018 at 12:03 p.m.?

13  A.  Bienvenido Hernandez.

14  Q.  Again, these entries that we just read were in yellow; is

15  that correct?

16  A.  Yes.

17  Q.  Can we now go to Government Exhibit 1304.  I'm sorry

18  Defense Exhibit 1304.  Thank you.  And this is the defense

19  exhibit that corresponds to the Government Exhibit 1304; is

20  that correct?

21  A.  Yes.

22  Q.  And again the yellow reflects what?

23  A.  Defense inserts.

24  Q.  Let me direct your attention to line 0-1.  What is the date

25  of that document?

O733men3                        Gannaway - Direct

1   A.  February 8, 1976.

2   Q.  Can you read it into the record.

3   A.  "Inventory of Arslanian family gold and jewelry, including

4   10 $20 coins in gold, 10 gold pesos coins, 177 pieces of gold

5   sovereign, and three kg of gold bars."

6   Q.  Can we now go to lines 1, 3 and 14 on page 1.  On July 30,

7   2019, at 9:53 a.m. who is Robert Menendez sending a text to?

8   A.  Donald Scarinci.

9   Q.  What does he write?

10  A.  "Hi.  Hope all is well.  Haven't seen you in a while.  Did

11  you ever get Nadine's coins back?"

12  Q.  What does Mr. Scarinci respond approximately nine minutes

13  later?

14  A.  "Yes, I have them certified and ready to discuss auction

15  and I am meeting with someone on Saturday about the metals."

16  Q.  Now can we go to lines 187-2 through 187-6 in this

17  document.  So these are October 29 entries, October 29, 2021,

18  correct?

19  A.  187-2 through 187-6.

20  Q.  187-2 is an October 29, 2021, text message from 12:57 p.m.

21  from Nadine to Robert Menendez.  What does Nadine write?

22  A.  "I was in Philadelphia all day yesterday.  Who would you

23  like the check made payable to?  This is the check for your

24  gold coins."

25  Q.  What does she say one minute later?  What does she write

1    one minute later?

2    A.   "Should I say mortgage company or me?"

3    Q.   Robert Menendez at 12:58 p.m. responds, "What's the

4    amount?" And what does Nadine Menendez respond at 1 p.m.?

5    A.   "$8300 and no cents."

6    Q.   And Robert Menendez responds at 1:02 p.m. "Make it to you."

7    A.   Correct.

8    Q.   On line 187-7 on October 31, 2021, what occurs?

9    A.   There is a communication from Joseph Linzalone to Nadine

10   Menendez.

11   Q.   What is that?

12   A.   Check from J. Linzalone to Nadine in the amount of 8,145.

13   Q.   And how does the number 8,145 compare to the $8300 that

14   Nadine references on October 29?

15   A.   It's $155 less.

16   Q.   Let me direct your attention to Defense Exhibit 1304,

17   line 191, which is page 36.  Line 191 was in the Government's

18   Exhibit 1304; is that correct?

19   A.   Yes.

20   Q.   And it is a search history from the Robert Menendez cell

21   phone for 1 kilo gold bar.  Do you see that, dated November 20,

22   2021?

23   A.   Yes.

24   Q.   I'd like to show you now the very next line if you can

25   expand it, Mr. Kelly.  191 through 191-7.  On November 21 at

O733men3                         Gannaway - Direct

1    10:29 p.m., who does Robert Menendez send a text to?

2    A.  191-1?

3    Q.  Yes.

4    A.  Robert Menendez to Donald Scarinci.

5    Q.  What does he write?

6    A.  "Hi.  Can you please bring Nadine's check on Wednesday?

7    Thanks."

8    Q.  And go down to line 191-6.  On November 24, 2021, at

9    11:42 a.m., what does Donald Scarinci write to Robert Menendez?

10   A.  "I have the check, see you at Bareli's by 7 p.m."

11   Q.  If we can go to line 192-2.  On November 30, Nadine

12   Menendez does what?  If you read the line.

13   A.  Makes a check -- excuse me.  "Nadine makes a 4,000

14   principal payment towards one of her mortgages."

15   Q.  Now let's go to line 325-1.  What does Nadine Menendez do

16   on May 9, 2022?

17   A.  "Nadine deposits $60,808 check from Avital Gold and

18   Platinum."

19   Q.  What does she do in line 326-1?

20          MR. WEITZMAN:  If you can expand that a bit,

21   Mr. Kelly, so we can get a few lines in.  Thank you.

22   Q.  What does she do on May 11, 2022?

23   A.  "Nadine sends a $29,193.06 outbound wire transfer."

24   Q.  On May 11, 2022 at 4:07 p.m., what does she text Nadine

25   text to Robert Menendez?

A. "Just did the wire transfer for the payoff of one of the mortgages. I can't wait to get the document from them that says it's completed."
Q. Now if we can go to line 328-1 and 328-2 on the next page. On May 13, 2022, what does Nadine do?
MR. WEITZMAN: If you can highlight that line entry, Mr. Kelly. 328.
A. "Nadine makes a 15,937.98 payment towards her mortgage."
Q. And the following day on May 14 at 6:13 p.m., what's the search conducted on the Robert Menendez Google search history?
A. "Search history of one ounce Krugerrand gold coin value."
Q. Let's go to lines 342-4 through 342-7. On lines 342-4 and 5, on June 14 and June 16, there are checks from Avital Gold to Nadine Menendez in the amount of a bit more than $58,000 on each line. Do you see that?
A. Yes.
Q. What happens on June 22, line 342-6?
A. "Nadine makes a $33,162 payment towards her mortgage."
Q. What happens on line 342-7 on June 23, 2022?
A. "Nadine makes a $18,000 payment towards her mortgage."
Q. Just have a couple more questions. If I can direct your attention to GX -- Defense Exhibit 1304, line 199, which is on page 37. What happens on December 16, 2021, sir?
A. "Philip Sellinger sworn in as U.S. Attorney for the District of New Jersey."

1    Q.  Now if we can go to line 329-2 which I think is page 51 or

2    so.  What happens on May 23, 2022?

3    A.  "Philip Sellinger investiture ceremony is scheduled to

4    occur."

5    Q.  If we can scroll up to the prior line.  Line 329-1.  What

6    do Robert Menendez's cell phone records reflect on May 21 to

7    May 24, 2022, as far as a location?

8    A.  "Switzerland."

9              MR. WEITZMAN:  Your Honor, no further questions.

10             THE COURT:  Thank you, Mr. Weitzman.

11             Ladies and gentlemen of the jury, you've now seen

12   Mr. Weitzman do the direct examination of Mr. Gannaway on

13   behalf of Mr. Menendez.  Next is Mr. Solano doing a direct

14   examination of Mr. Gannaway on behalf of Mr. Hana.

15   DIRECT EXAMINATION

16   BY MR. SOLANO:

17   Q.  Mr. Gannaway, I want to go back to Defense Exhibit 1302

18   which is already in evidence.

19             MR. SOLANO:  And Mr. Kelly, if we can pull up on

20   page 106, line 1122.

21   Q.  Mr. Gannaway, I want to focus your attention on entry 1122.

22   And first of all, this is an entry from the government's

23   original Exhibit 11 -- 1302, correct?

24   A.  Yes.

25   Q.  And can you read who the "from" and "to" is on this

O733men3                              Gannaway - Direct

1    message?

2    A.   "HH HH Wael Hana."

3              MR. SOLANO:  If we can pull up at the end of this

4    exhibit there's -- I'm sorry.  At the end of this entry there

5    is an Exhibit for GX C104-D.  If we can pull that up,

6    Mr. Kelly.

7    Q.   And Mr. Gannaway, can you just read the name of the company

8    at the top of this exhibit.

9    A.   Medi-Trade Co.

10   Q.   Thank you.  And we don't need to read it but if we can

11   highlight for the jury the paragraph under financial claim.

12   And while leaving that up, Mr. Gannaway, can you tell us who

13   signs this financial claim.

14   A.   There is --

15   Q.   On the bottom left.

16   A.   It says General Ahmad Sharif Lutfy.

17   Q.   Thank you.  And the date, if we can go back to 1122.

18   Line 1122.  Date of this is October 22 of 2019, correct?

19   A.   Yes.

20   Q.   Now if we can go back in this exhibit, Defense Exhibit 1302

21   to page 69 and specifically line 637.  Sorry.  637-1,

22   Mr. Kelly.  And this is one of the new entries on Defense

23   Exhibit 1302, correct?

24   A.   Yes.

25   Q.   And as we can see, this cites to two exhibits, Hana 013,

O733men3                          Gannaway - Direct

1    and Hana 013-T, correct?

2    A.  Yes.

3         MR. SOLANO:  Your Honor, pursuant to stipulation

4    between the parties, Hana 1002, the parties have stipulated

5    that Hana 013-T is a fair and accurate English translation of

6    Hana-013.  With your permission, I'd like to publish for the

7    jury Hana 013-T, the first page.

8         THE COURT:  All right.

9    Q.  And first of all, if we can go to page 2 of the PDF, do you

10   see at the very top, Mr. Gannaway, it says "consulting and

11   technical service contract"?

12   A.  Yes.

13   Q.  And can you just tell us the date of this contract, and the

14   two parties listed there.

15   A.  5/1/2019.  First party is IS EG halal Certified, Inc.  The

16   first party.  Second party is Medi-Trade Co.  The second party.

17   Q.  Thank you.  And if we can go to the last page of this

18   exhibit?

19        THE COURT:  I take it, Mr. Gannaway, you don't know

20   whether that signified May 1, 2019, or January 5, 2019; is that

21   correct?

22        THE WITNESS:  No, sir.

23   Q.  Thank you.  If we can go to the last page of this exhibit.

24   And can you tell us who the signatory is for the second party.

25   A.  Ahmad Sharif Lutfy.

1   Q.  Is that the same individual on the exhibit that we

2   previously pulled up, Government Exhibit C104-D.

3         I'm sorry.  Is that the same individual who signed the

4   financial claim that was Government Exhibit C104-D?

5   A.  That's the same name.

6   Q.  Thank you.  And then if we can go back up to the first

7   page, the first PDF of this exhibit, Mr. Kelly.  And the top

8   e-mail, who is that from, Mr. Gannaway, or who it is identified

9   as being from?

10   A.  HHH HHH.

11   Q.  And halfway down there is a box and an e-mail from a

12   forwarded message.

13   A.  Yes, I see it.

14   Q.  And who is that sent to, the forwarded message?

15   A.  HH HH and HHH HHH.

16   Q.  And the last question on this area, if we can go back to

17   line 1122, Mr. Kelly.  Is that the same individual that sent

18   this financial claim?

19   A.  It is the same initials, HH HH.

20   Q.  Thank you.  And quickly, we're not going to go through all

21   of them, but if we can pull up on page 72, Mr. Kelly.  On line

22   683, we don't need to highlight them at this time, but at

23   line 683 through line 685, Mr. Gannaway, are those messages

24   exchanged between Mr. Hana and HH HH?

25   A.  Yes.

1    Q.  And then if you look further down, on line 688 through

2    line 691, are those additional messages between Mr. Hana and HH

3    HH?

4    A.  Yes.

5    Q.  And without going through the entire exhibit, are there

6    other entries that you saw that were defense added entries with

7    messages between -- strike that.

8            Are there additional entries that you saw in Defense

9    Exhibit 1302 that are additional messages between Mr. Hana and

10   HH HH?

11   A.  Yes.

12           MR. SOLANO:  Now Mr. Kelly, if we can fast forward to

13   page 118, line 1198-1.  Again, for your Honor, pursuant to the

14   same stipulation, Hana 1002, Hana Exhibit 1191-T is a fair and

15   accurate English translation of Hana 191 which is reflected in

16   this line entry.

17           THE COURT:  All right.

18           MR. SOLANO:  Can we pull up, Mr. Kelly, Hana

19   Exhibit 191-T for the jury.

20   Q.  And Mr. Gannaway, the title of this is "cooperation

21   agreement," correct?

22   A.  Yes.

23   Q.  And can you just read again the first party and the second

24   party?

25   A.  IS EG Halal Cert Inc.

1    Q.  And the date nexts to Cairo is?

2    A.  Monday, 4/21/2021.

3    Q.  If we can go to the next page and just highlight where it

4    says second party halfway down, Mr. Kelly.  And the parentheses

5    after that.  Thank you.

6           Mr. Gannaway, am I correct that it reads "IS EG Halal"

7    and then in parentheses "An Egyptian joint stock company"?

8    A.  Yes.

9           MR. SOLANO:  If we can go to page 4 of Exhibit 191-T.

10   Under the scope if we could highlight the first paragraph for

11   the jury.  And we don't need to read it but if the jury can,

12   we'll leave it up here for a minute for the jury to read it.

13   Thank you, Mr. Kelly.

14          If we can move to page 5, the bottom of page 5 there

15   is a paragraph that goes on to page 6 if we can put those up.

16   And Mr. Kelly, can you read the title of section 6 or VI.

17   Q.  You see the title there, Mr. Gannaway?

18   A.  Yes, "compensation."

19   Q.  Okay.  And then if you can just read the first two, the

20   first three lines of Subsection B.

21   A.  "The two parties agree that the first party, in return of

22   the issuance of the halal certificate, is entitled to

23   30 percent of the revenue from issuing the certificate received

24   by the United States of America and the other offices. Before

25   deducting any expenses and for each throughout the term of this

O733men3                    Gannaway - Direct

1   agreement, provided payment is as follows."

2   Q.  I think we can stop there.  Thank you.  We can pull that

3   down, Mr. Kelly.  If we can now move to Defense Exhibit 1303

4   which is already in evidence.  And just for context if we can

5   pull up on page 4, line 24.

6            Do you see this is an entry dated April 11, 2018, from

7   Andy Aslanian to Detective Lopez, Mr. Gannaway?

8   A.  Yes.

9   Q.  And the white is the government entry from the original

10  Government Exhibit 1303.  If you can just read that line.

11  A.  "Enclosure slip containing subpoena responses for Phoenix

12  Risk Management in response to subpoena."

13  Q.  Thank you.

14           MR. SOLANO:  At this time, your Honor, pursuant to

15  Hana Exhibit 1000, which is a stipulation between the parties,

16  admitting into evidence Hana Exhibits 197, 198, 199 and 200.

17           THE COURT:  Admitted.

18           (Defendant's Exhibit Hana 197, 198, 199, 200 received

19  in evidence)

20           MR. SOLANO:  Mr. Kelly, can we pull up two lines

21  together, specifically on page 1, entry 1-2, and then on

22  page 12, entry 34-2.

23  Q.  Mr. Gannaway, can you look at please at the two entries

24  highlighted here.  Are those cash withdrawals in the amount of

25  4,000 and 2,000 from the Trust Account of Phoenix Risk

1    Management?

2    A.  Yes, they are.

3            MR. SOLANO:  Mr. Kelly, we can put those down.  If we

4    can pull up two additional entries on page 26, line 204-1.  And

5    then on page 85, line 10 -- excuse me.  Line 1142-1.

6    Q.  And the same question with regards to this, these two

7    lines, Mr. Gannaway.  Are those cash withdrawals in the amount

8    of $5,000 and then $8,000 from the Trust Account of Phoenix

9    Risk Management LLC?

10   A.  Yes.

11           MR. SOLANO:  We can pull that down, Mr. Kelly.  Last I

12   want to bring up just for the witness, the Court, and the

13   parties Hana Exhibit 1300.

14   Q.  Mr. Gannaway, can you tell us what is this chart?

15   A.  "Messages between Wael Hana and Nadine Arslanian prior to

16   Nadine dating Senator Menendez dated September 6, 2016, through

17   December 31, 2017."

18   Q.  Is this one of the charts that you reviewed as part of your

19   engagement in this case?

20   A.  Yes.

21   Q.  Did you create this chart?

22   A.  No, I did not.

23   Q.  Who did?

24   A.  Defense counsel.

25   Q.  As with the other defense summary charts we saw, did you

1    decide which exhibits to include or not include?

2    A.  I did not.

3    Q.  Who did, again?

4    A.  Defense counsel.

5    Q.  With respect to Hana Exhibit 1300, was there a

6    corresponding Government Exhibit 1300 that you compared this

7    chart to?

8    A.  No, there was not.

9    Q.  Did you undertake the same process of reviewing the

10   underlying exhibits listed in support of the entries, the line

11   entries on Hana 1300?

12   A.  Yes, we did.

13   Q.  I want to focus you on the bottom of page 1, there is a

14   footnote.  Can you tell us what that means?

15   A.  It says "All the messages that are located within Exhibit

16   Hana 171-R, those are the ones that are contained throughout

17   the exhibit unless there is a specific cite to reference

18   another exhibit."

19   Q.  Greet.  We'll look at one of those examples in a minute.

20          What did you do as you were looking at this chart if

21   you found any inaccuracies?

22   A.  We provided it to counsel.

23   Q.  And then did you review the revised chart to make sure that

24   those inaccuracies had been corrected?

25   A.  Yes, we did.

1          MR. SOLANO:  Your Honor, we would move to admit Hana

2     Exhibit 1300 and the exhibits cited throughout Hana

3     Exhibit 1300.

4          THE COURT:  Admitted.

5          (Defendant's Exhibit Hana 1300 and exhibits cited

6     within Hana 1300 received in evidence)

7          MR. SOLANO:  Thank you.  We can publish that for the

8     jury now, Mr. Kelly.

9     Q.  Mr. Gannaway, can you tell us why do the messages in this

10    chart start on September 6 of 2016?

11    A.  My understanding is this was the earliest date that the

12    information was available.

13    Q.  Does the chart contain every message between Mr. Hana and

14    Ms. Arslanian during this time period?

15    A.  No, it does not.

16         MR. SOLANO:  Can we go to page 2, line 33.  And if we

17    could highlight the footnote on the bottom as well, Mr. Kelly.

18    Thank you.

19    Q.  Mr. Gannaway, is this an e-mail on -- I'm sorry.  Strike

20    that.  A message on December 31 of 2016 between Ms. Arslanian

21    and Mr. Hana?

22    A.  Yes.

23    Q.  Can you just read the body of that text.

24    A.  "Happy new year, Wael.  To many great times with you and

25    Andy in 2017."

1  Q.  And there's no exhibit cited at the end of this.  So is

2  this an exhibit in which, because there is no exhibit, the

3  underlying supporting exhibit is Hana-171-R?

4  A.  Correct.

5         MR. MONTELEONI:  Objection.  Leading.

6         THE COURT:  It's leading but I'll allow it.

7  Q.  If we can just go to the next line, line 34.  And again is

8  this another message from Ms. Arslanian to Mr. Hana on

9  January 1st of 2017, Mr. Gannaway?

10  A.  January the 11th of 2017.

11  Q.  Thank you.  And if we could just read the body of this

12  message.

13  A.  "Thank you very much for my extremely generous present.  It

14  was so nice seeing you and Andy last night.  Mostly thank you

15  beyond words for all the care you are doing for Andy.  It's

16  priceless."

17  Q.  And as you testified, this chart spans approximately 15

18  months of messages?

19  A.  Yes.

20  Q.  We're only going to highlight a few.  If we can go to lines

21  75 and 76 on page 30.  I'm sorry on page 3, Mr. Kelly.  Line 75

22  and 76 on page 3.

23         Mr. Gannaway, if you can just read the first entry on

24  April 9 of 2017 from Ms. Arslanian to Mr. Hana.

25  A.  "Good morning, Wael.  I just turned on the news and heard

1   about the two explosions in Egypt.  I hope none of your family

2   is affected."

3   Q.  And Mr. Hana's response in the next line?

4   A.  "Thanks.  Everyone form my family okay."

5   Q.  If we can move ahead to lines 332 and 333 on page 11.  On

6   line 332, the message from Ms. Arslanian to Mr. Hana dated

7   September 13 of 2017, Mr. Gannaway, if you can read the last

8   two sentences of that longer message and we'll leave it up.

9   A.  "Most importantly, I want to thank you for all your support

10  and for keeping on top of Andy to help me in every way he can."

11  Q.  And Mr. Hana's response in the next line on the same date

12  to Ms. Arslanian?

13  A.  "Good luck.  If you need any help let me know.  See you

14  soon."

15  Q.  Thank you.  And if we can move ahead to line 439 on page 15

16  and line 440.  And again, if you can just read the body of the

17  message that Ms. Arslanian sends to Mr. Hana on 10/3 of 2017.

18  A.  "I have been in Englewood Hospital since Saturday morning.

19  Horrible stomach aches."

20  Q.  And Mr. Hana's response on that same date a couple minutes

21  or within the same minute?

22  A.  "Sorry to hear about it."

23  Q.  And if we can highlight 452 through 461, Mr. Gannaway,

24  looking at these messages, are they text messages about

25  Mr. Hana visiting Ms. Arslanian in the hospital?

1          MR. MONTELEONI:  Objection.

2          THE COURT:  If you can tell.  Can you tell?

3          THE WITNESS:  On 454, Wael Hana replies to Nadine

4    Arslanian "I will be there in 35 minutes."

5    Q.  And then on line 460, what's Ms. Arslanian's text message

6    to Mr. Hana?

7    A.  "Thank you very much for c-o-i-n-h-g."

8    Q.  Thank you.  If we can move ahead to page 16, line 479 and

9    line 480.  And then again, are these messages between

10   Ms. Arslanian to Hana and then Hana to Ms. Arslanian on

11   October 18 of 2017?

12   A.  Yes.

13   Q.  And if you can just read the first two lines on the top.

14   A.  "Thank you for your text.  I was at the doctors today, I am

15   not doing well at all.  He said I have and he is making an

16   emergency appointment for tomorrow.  He said no TV, no

17   computer, no phone, no reading."

18   Q.  And what is Mr. Hana's response in the next line?

19   A.  "Sorry about it.  Let me know if you need any help or to do

20   anything."

21          MR. SOLANO:  Thank you.  We can pull that down,

22   Mr. Kelly.  And if we can jump back to page 2, lines 48 and 49.

23   Q.  And am I correct those are text messages from Ms. Arslanian

24   to Mr. Hana on March 21 of 2017, and photos of ties that she's

25   sending him?

O733men3                          Gannaway - Direct

1   A.  Yes.

2   Q.  If we can move ahead a couple, one page or couple lines to

3   pages, to lines 56 and 57.  And can you read just the first

4   line from Ms. Arslanian to Hana on April 6 of 2017.

5   A.  "Hi, I just told Andy.  La Mezza has kebbe naye today."

6   Q.  And Mr. Hana's response in the next line?

7   A.  "Lol, will have dinner there today."

8   Q.  And if we can move to line 116 on page 4.  And what is

9   Ms. Arslanian's message to Hana?

10  A.  "Are we still on for 5:30 today at La Mezza?"

11  Q.  Sorry.  On line 117, what is Mr. Hana's response to

12  Ms. Arslanian?

13  A.  "Yes."

14  Q.  And then moving ahead two lines, 413 to 416 on page 14.  On

15  line 413, can you read Mr. Hana's message to Ms. Arslanian and

16  then her response in the next line?

17  A.  "We are here.  On my way.  In Fort Lee."

18  Q.  And we've reviewed a number of these messages, but are the

19  there other entries that reflect messages between Ms. Arslanian

20  and Mr. Hana making dinner arrangements?

21  A.  Yes.

22          MR. SOLANO:  No further questions, your Honor.

23          THE COURT:  Thank you.  Mr. De Castro, any direct of

24  this witness?

25          MR. DE CASTRO:  No direct, your Honor.

O733men3                          Gannaway - Cross

1            THE COURT:  We now will see if there is

2     cross-examination.  Mr. Monteleoni, is there cross-examination

3     on behalf of the government for Mr. Gannaway?

4            MR. MONTELEONI:  There is, your Honor.

5            THE COURT:  How long is that approximately?

6            MR. MONTELEONI:  I think approximately 20 minutes.

7            THE COURT:  Thank you.

8     CROSS-EXAMINATION

9     BY MR. MONTELEONI:

10    Q.  Good afternoon, Mr. Gannaway.

11    A.  Good afternoon, sir.

12            MR. MONTELEONI:  Mr. Hamill, can you please put up

13    Defense Exhibit 1302, page 11.

14    Q.  Now Mr. Gannaway, directing your attention to line 82-6.

15    Do you remember being asked about this line on direct

16    examination?

17    A.  Yes, sir.

18    Q.  Now where this entry on this line has a date of April 24,

19    2018, it says "Publicly available report issued by State

20    Department Office of the Inspector General.  States embassy

21    Cairo has 21 total staff members, at the time of inspection

22    approximately 280 U.S. direct hire positions were filled."

23    Does this line say when this 2100 figure and this 280 figure

24    were from?

25    A.  There is no date associated with that detail line.

O733men3                     Gannaway - Cross

1   Q.  Is there anything in this chart that would tell you how old

2   those two numbers were by the April 24, 2018, date that's

3   listed here for this line?

4   A.  There's no date listed, sir.

5   Q.  So the line, and you can't tell from reading this just how

6   old these numbers were as of April 24, 2018, right?

7   A.  Correct.

8   Q.  So, this line cites two exhibits, Defense Exhibit 748 and

9   771, right?

10  A.  Yes, sir.

11          MR. MONTELEONI:  Mr. Hamill, can you please put up

12  page 3 of Defense Exhibit 748.

13  Q.  So Mr. Gannaway, this is where the staffing information

14  comes from, right, those two numbers that you verified in the

15  chart; is that right?

16  A.  I'm not sure it comes from, but the numbers match, 2100 and

17  the 280 match, yes.

18  Q.  When you verified that line that said that the report

19  issued on April 24, 2018, listed those two numbers, was this

20  the source you verified it against?

21          MR. WEITZMAN:  Objection, misstates.  The line doesn't

22  say that the report is issued on that date.

23          THE COURT:  Just a minute.

24          Was this document the source that you used to verify

25  the information on the appropriate line, if you know?

```
 1              THE WITNESS:  I don't recognize the document.
 2              MR. MONTELEONI:  Mr. Hamill, can you please put up to
 3     one side Government Exhibit 1302, page 11.  Sorry.  Defense
 4     Exhibit 1302, page 11.
 5     Q.  So do you see the citation in this line, line 82-6, to
 6     Defense Exhibit 748?
 7     A.  Yes, I see Defense Exhibit 748, yes.
 8              THE COURT:  Does that mean you went to Defense
 9     Exhibit 748 to verify the information on that line?
10              THE WITNESS:  I didn't review this line, sir.
11     Q.  So, this is actually not -- it is cited in support of this
12     line, but you actually didn't verify this document?
13              MR. WEITZMAN:  Objection, misstates.
14              THE COURT:  Let's see.
15     A.  I did not review the document.  One of my staff may have,
16     but I did not specifically do it myself.
17              THE COURT:  Well, do you know whether or not one of
18     your staff did?
19              THE WITNESS:  No, sir, I do not know.
20     Q.  So you do see that it is in fact cited, however, Defense
21     Exhibit 748, in this document that you've been testifying
22     about?
23     A.  Yes.
24              MR. MONTELEONI:  Mr. Hamill, can you drop the
25     expansion but keep 1302 page 11 on one side.  Can you expand so
```

O733men3                          Gannaway - Cross

1    we can see the rest of 748-003.

2    Q.  Directing your attention to the top of this page, Defense

3    Exhibit 748.  Directing your attention to those words with the

4    red line striking through it.  Those words with the red line

5    stricken through it say "sensitive but unclassified," right?

6    A.  Yes, sir.

7              MR. MONTELEONI:  Now, Mr. Hamill, can we now go to

8    page 1 of Defense Exhibit 748, which is cited in support of

9    this April 24, 2018, line entry.

10   Q.  Mr. Gannaway, directing your attention to the top center of

11   page 1, do you see where it says April 2016 up there?

12   A.  Yes, sir.

13   Q.  Would you agree that April 2016 is approximately 2 years

14   before April 2018?

15   A.  Yes, sir.

16   Q.  And so, by April 2018, numbers that were contained in an

17   April 2016 report would be at least about 2 years old, right?

18             MR. WEITZMAN:  Objection.  Foundation.

19             THE COURT:  Rephrase it.

20   Q.  Numbers that were current as of an April 2016 report would

21   be at least about 2 years old as of April 2018; isn't that

22   right?

23   A.  I don't know the numbers.  If there an increase or decrease

24   in the numbers between April of 2016 and April of 2018, I do

25   not know.

1   Q.  And there is no way from looking at the chart that this

2   line entry refers back to a report that is in April 2016,

3   right?

4   A.  Correct.

5         MR. MONTELEONI:  Mr. Hamill, can you please drop

6   Defense Exhibit 748.  Please take to us page 37 of Defense

7   Exhibit 1302.

8   Q.  So Mr. Gannaway, directing your attention between line 311

9   where it reflects Hana sends Nadine a white paper, then

10  line 320 where Menendez texts to Nadine "Tell Will I'm going to

11  sign off this sale to Egypt today" and then some more text.

12  There aren't any yellow lines in between those two, are there?

13  A.  No, sir.

14  Q.  There is nothing that you reviewed and verified in between

15  those two lines, are there?

16  A.  There's nothing to review; no, sir.

17        MR. MONTELEONI:  Mr. Hamill, can you please take us to

18  page 40 of Defense Exhibit 1302.

19  Q.  Mr. Gannaway, directing your attention to lines 341 --

20  sorry.  345-1 and 345-2.  Do you remember being asked about

21  these on direct examination?

22  A.  Yes, I do.

23  Q.  So, directing your attention to line 345-1.  Can you please

24  read the exhibit number that's cited there.

25  A.  GX B105-40.

1  Q.  Do you know from reviewing it that that is a government

2  exhibit?

3  A.  Yes.

4  Q.  And directing your attention to the next line, by the way,

5  are there a number of government exhibits that are actually

6  cited in the yellow lines that you verified?

7  A.  Yes, there's government exhibits, yes.

8  Q.  By the way, I think that you testified when we were looking

9  at that previous line, that that document, Defense Exhibit 748,

10  even though it was listed there, isn't one that you remember

11  verifying; is that right?

12  A.  Correct.

13  Q.  Do you know how many other documents that are cited in

14  these yellow lines that you didn't verify?

15  A.  Not specifically, no.  I do not know that number.

16  Q.  Do you know if it is a large number or a small number?

17  A.  No, sir.

18        THE COURT:  Sir, when you say you did not verify.  Do

19  you know that members of your staff verified the documents?

20        THE WITNESS:  Yes.

21        THE COURT:  And did they do their work under your

22  supervision and control?

23        THE WITNESS:  Yes, sir.

24  Q.  So, when you were talking about verifying the whole time

25  about this document, were you actually talking about you

1   personally verifying or just people working for you?

2   A.  Both.

3   Q.  So, now, you said, I believe you said that you recognize

4   that Government Exhibit B105-40, which is cited in line 345-1,

5   is a government exhibit.  And there are other government

6   exhibits that are cited for these yellow lines; is that right?

7   A.  Yes, sir.

8   Q.  Now, directing your attention to the line 345-2.  Do you

9   see where it says DX B105-40?

10  A.  Yes.

11  Q.  Do you know, is there a DX B105-40 that you've ever seen or

12  your team has ever seen?

13  A.  I do not know.

14  Q.  Do you know that this text message is actually contained in

15  Government Exhibit B105-40?

16  A.  I would want to review it, but I accept what you're saying.

17          MR. MONTELEONI:  Mr. Hamill, can you please put up to

18  one side Government Exhibit B105-40 and go so we see the

19  government exhibit sticker.  Can you go show the second page

20  and second text message, Mr. Hamill.

21  Q.  So, you see that that text message on Government Exhibit

22  B105-40 actually matches what's cited as Defense Exhibit

23  B105-40 in the chart that you verified; is that right?

24  A.  Yes, I see that.

25          MR. MONTELEONI:  Mr. Hamill, you can drop Government

O733men3                          Gannaway - Cross

1    Exhibit B105-40.  And Mr. Hamill, can you please take us to

2    page 41.

3    Q.  So now rows 345-5 and 345-6 are in yellow, right?

4    A.  Yes.

5    Q.  These are ones that you or your team verified?

6    A.  Yes.

7    Q.  And the times at the top are listed in ET, right?

8    A.  Yes.

9    Q.  That corresponds to Eastern Time?

10   A.  Yes.

11   Q.  345-5 is listed as having been sent at 7:58 p.m. Eastern

12   Time on December 13, 2018, right?

13   A.  Yes.

14   Q.  345-6 is listed as having been sent at 3 p.m. Eastern Time

15   on the same day, right?

16   A.  Yes.

17   Q.  So you would agree that either those times are not both

18   accurate, or these entries are not in chronological order; is

19   that right?

20   A.  Appears to be not in chronological order.

21   Q.  Directing your attention to row 345-7.  This is another one

22   that you verified, right?

23   A.  Yes.

24   Q.  And it lists the cell phone with the number 1212 as having

25   been activated on December 18, 2018, right?

O733men3                        Gannaway - Cross

1   A.  Yes.

2   Q.  Do you remember that in another of the charts that you

3   verified there was a different yellow line that listed that

4   same cell phone as having been activated on December 14, 2018?

5   A.  I don't remember that.

6   Q.  Let's look at what's cited here where it says GX 6A-314 at

7   5, that's another Government Exhibit.

8   A.  Yes.  GX.

9   Q.  Right.

10            MR. MONTELEONI:  Mr. Hamill, can you please put up to

11   one side Government Exhibit 6A-314, page 5.

12   Q.  Directing your attention in the middle of the page to where

13   it says user information.  See after the MSISDN number, the

14   number that ends in 1212?

15   A.  Yes.

16   Q.  So you see the service start date a few lines down is

17   December 14, 2018, right?

18   A.  Yes, sir.

19   Q.  So would you agree that the chart line that you verified or

20   your team verified is not accurate where it says that this

21   phone number was activated on December 18, 2018, right?

22   A.  I don't know if -- activated versus I don't know if the

23   financial liability part is what is referenced in the yellow

24   part here.  But I see, yes, there is 12/14/18 versus

25   December 18 of 2018 in 345-7.

O733men3                         Gannaway - Cross

1              MR. MONTELEONI:  So you can drop the expansion but

2     keep us on page 5, Mr. Hamill, on the right of government

3     Exhibit 6A-314.

4     Q.  You would agree that there is nothing in this whole page

5     which is what's cited in this line that supports the

6     December 18 date that is actually listed in the chart that you

7     are verified, right?

8     A.  No, there is a January 27 of 2022 in the upper-left-hand

9     corner.  A December 14, 2012 in the lower section.

10    Q.  There is no December 18, 2018, right?

11    A.  No, sir.

12             MR. MONTELEONI:  You can take down Government

13    Exhibit 6A-314, Mr. Hamill.  Thank you.

14             Mr. Hamill, can you please take us to page 11 of

15    Defense Exhibit -- sorry.  Not 11.  Page 100, rather, Defense

16    Exhibit 1302.

17    Q.  Directing your attention to line 1099 where Fred Daibes

18    texts Nadine, "Nadine, I personally gave Bob a check for

19    September."

20             Are there any insertions before or after that line?

21    A.  No, there's not.

22    Q.  Do you see any yellow lines anywhere on this page?

23    A.  No, sir.

24             MR. MONTELEONI:  Mr. Hamill, can you please take us to

25    page 104.

O733men3                    Gannaway - Cross

1    Q.  So directing your attention, Mr. Gannaway, to line 1106, so

2    first of all, you testified on direct examination that part of

3    what you did is you compared Defense Exhibit 1302 against

4    Government Exhibit 1302, right?

5    A.  Say that again?

6    Q.  Not with reference to this particular line, but in general,

7    you compared the white and blue lines in Defense Exhibit 1302,

8    to Government Exhibit 1302, to make sure they matched.  Is that

9    what you testified about on direct?

10   A.  Yes.

11   Q.  Do you know on 1106 where it says text I'm S0000000 upset,

12   whether those reflect zeros or Os in Government Exhibit 1302?

13   A.  I do not know.

14        MR. MONTELEONI:  Mr. Hamill, could you please just put

15   up Government Exhibit 1302 page 2 to one side.

16   Q.  Now directing your attention to line 1106, if you can blow

17   that up.  Are those zeros or are those Os in the government

18   exhibit?

19   A.  Appear to be Os.

20        MR. MONTELEONI:  Let's take a look at Defense

21   Exhibit 1303 now.  Mr. Hamill, please put up Defense

22   Exhibit 1303, page 31.

23   Q.  So, directing your attention, Mr. Gannaway, to the bottom

24   of the page, to line 277-1, reflecting a text from Wael Hana to

25   Nadine Arslanian, at 1:42 p.m.  January 26, 2019.

1          First of all, this line is not in order, right?

2    A.   What do you mean?

3    Q.   It's not in chronological order with the 5:21 p.m. message

4    that comes before it; is that right?

5    A.   Compared to 277, right.

6    Q.   And line 277-2 at 5:19 p.m. is also not in chronological

7    order with the white and blue lines in Government Exhibit 13 --

8    Government Exhibit -- sorry.  The white and blue portions of

9    Defense Exhibit 1303; is that right?

10   A.   Yes, sir, that's right.

11   Q.   And both of these yellow lines, 277-1 and 277-2, cite to

12   Government Exhibit E102-3; is that right?

13   A.   Yes.

14   Q.   So you and your team verified these messages are actually

15   in Government Exhibit E102-3?

16   A.   That or they would have accepted them as coming from your

17   chart.  I think we went to the source document to look at it.

18   Q.   Sorry, so, maybe this will be easier if you drop the

19   highlighting, Mr. Hamill.

20          These are yellow lines right at the bottom of 277-1

21   and 277-2?

22   A.   Yes.

23   Q.   You and your team verified the yellow lines against the

24   underlying exhibits?

25   A.   Yes.

O733men3                         Gannaway - Cross

1   Q.  Did you verify these two messages between Wael Hana and

2   Nadine Arslanian are in Government Exhibit E102-3?

3   A.  I do not remember looking at it.

4            THE COURT:  Can you say that either you or a member of

5   your staff did that, sir?

6            THE WITNESS:  Yes, they would have reviewed that.

7            MR. MONTELEONI:  So let's put up, Mr. Hamill,

8   Government Exhibit E102-3 to one side.  And can you take us to

9   page 2, Mr. Hamill.  So, you can expand the top blue text,

10  Mr. Hamill, on page 2 of E102.  Can we get both of those blue

11  texts together, Mr. Hamill, please.  Thank you.

12  Q.  So, first of all, these texts from Government Exhibit

13  E102-3 are actually between Wael Hana and Jose Uribe, not Wael

14  Hana and Nadine Arslanian, right?

15  A.  Which row number are you referencing to?

16  Q.  277-1 and 277-2 are both with Nadine Arslanian.

17  A.  The owner of Jose Uribe, participant Jose Uribe.  That's

18  been read.  And Wael is the from.

19           MR. WEITZMAN:  Objection.  It's not the same text.

20           THE COURT:  That is the issue.  Let's see.

21  Q.  Let me just step back.  Would you agree that, in fact, this

22  text in government -- or on line 277-1 does not appear in

23  Government Exhibit E102-3?

24           MR. MONTELEONI:  If you can expand the whole page.

25  Q.  Would you agree the text at 142 should have actually showed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O733men3                         Gannaway - Cross

1    up if it was in there in between the 5:46 pm. text the day

2    before, and then the 3:59 p.m. text that we were just looking

3    at, right?

4    A.  I don't see this is a government exhibit on the right of

5    the screen.  Is this the government exhibit?

6    Q.  Yes.

7              MR. MONTELEONI:  Mr. Hamill, can you please go on the

8    right of the screen and show the government exhibit sticker.

9    Q.  You agree this is the government exhibit that is cited in

10   this line, if you can go --

11             THE COURT:  Sir, the right-hand part of the screen

12   says Government Exhibit E102-3.

13             THE WITNESS:  Now I see it, yes.

14             THE COURT:  The same exhibit as is listed as the

15   source for the line entries on what look like 277-1 and 277-2.

16             THE WITNESS:  Yes, that's correct.

17             THE COURT:  All right.

18             (Continued on next page)

19

20

21

22

23

24

25

1   BY MR. MONTELEONI:

2   Q.  Now, if we could go to page 2, would you agree that,

3   actually, this message in 277-1 doesn't appear in Government

4   Exhibit E102-3, the cited source?

5   A.  No, it does not.

6           MR. MONTELEONI:  All right.  And if you scroll us

7   down, Mr. Hamill, in E102-3, the top of page 3.

8   Q.  And Mr. Gannaway, please look out for the text in the line

9   277-2.

10          MR. MONTELEONI:  In fact, Mr. Hamill, can you actually

11  scroll us back up so we're straddling page 2 and page 3.

12  Q.  Mr. Gannaway, would you agree that the text that's listed

13  in line 277-2 doesn't appear in the cited source for it either?

14  A.  No, it does not.

15          MR. MONTELEONI:  Mr. Hamill, if you could drop

16  Government Exhibit E102-3 and take us to page 34 of Defense

17  Exhibit 1303.  34.  Sorry.

18  Q.  All right.  So, Mr. Gannaway, there's one yellow line on

19  this page, right, and a bunch of blue and white lines?

20  A.  Yes.

21  Q.  And the blue and white lines are in chronological order, is

22  that right?

23  A.  Yes.

24  Q.  All right.  The yellow one isn't, though, is it?

25  A.  It's in between the 11 -- the 12:02 a.m.  No, it would not

O73Wmen4                         Gannaway - Cross

1    be.

2                 MR. MONTELEONI:  Mr. Hamill, could you please take us

3    to page 39 of Government Exhibit 1303.

4                 All right.  And actually, can you scroll us down a

5    little bit so that we see line 354 up at the top and we see the

6    rest of the page.

7                 All right.  Stop there.

8                 That's great, Mr. Hamill.  Thank you.

9    Q.  Mr. Gannaway, directing your attention to line 354,

10   reflecting that Robert Menendez calls Nadine Arslanian's flip

11   phone for five minutes and 58 seconds at 11 a.m. on January 29,

12   2019, and then are there any yellow lines on the page that you

13   see going down till line 371?

14   A.  No.

15                MR. MONTELEONI:  All right.  And can we control scroll

16   down a little bit farther, Mr. Hamill.

17                Keep going.

18                And can we keep going a little bit longer.  Keep 371

19   at the top.  OK.  No.  That's fine.

20   Q.  Now, Mr. Gannaway, from line 371 down to line 379, where it

21   reflects that Robert Menendez called Gurbir Grewal for seven

22   minutes, are there any yellow lines in between those lines?

23   A.  No, sir.

24                MR. MONTELEONI:  Mr. Hamill, could you please take us

25   to Defense Exhibit 1303, page 79.

O73Wmen4                    Gannaway - Cross

1    Q.  So, directing your attention to line 1017, where Uribe

2    texts Nadine Arslanian: *Hola*, please don't forget about me,

3    I'll never forget about you, on September 3, 2019, between that

4    line and line 1021, where Robert Menendez calls Gurbir Grewal

5    on September 4, 2019, are there any yellow lines at all between

6    those lines?

7    A.  No, sir.

8    Q.  Any yellow lines on September 3 or September 4 at all?

9    A.  No, sir.

10          MR. MONTELEONI:  Mr. Hamill, could you please put up

11   Defense Exhibit 1304.  Take us to page 4.

12   Q.  And Mr. Gannaway, between line 34, where Sellinger leaves a

13   voice mail for Menendez at 8:59 a.m., line 36, where Menendez

14   sends a Signal to Soliman, saying please do a little checking

15   on Salas time as Superior Court judge and prosecutor, is there

16   any yellow there?

17          MR. WEITZMAN:  Objection, your Honor.  This document

18   is in evidence.

19          THE COURT:  Do you see that, sir?

20          THE WITNESS:  That there's no yellow?

21   BY MR. MONTELEONI:

22   Q.  Did you verify any lines anywhere on this page?

23   A.  It was a government exhibit?

24   Q.  Sorry.  This is the defense exhibit.

25          Were there any lines that you were asked to verify as

O73Wmen4                          Gannaway - Cross

1    defense insertions anywhere on this page?

2    A.  No, sir.

3            MR. MONTELEONI:  All right.  Mr. Hamill, please take

4    us to page 7 of Defense Exhibit 1304.

5    Q.  And now directing your attention to line 60-3, this is a

6    yellow line, Mr. Gannaway, right?

7    A.  Yes, sir.

8    Q.  This is one of the lines that you or your team verified?

9    A.  Yes.

10   Q.  It reflects that on February 13, 2021, Robert Menendez

11   forwarded to Michael Soliman what's described as Bergen WEDO's

12   endorsement of Esther Suarez for U.S. Attorney?

13   A.  Yes.

14   Q.  And cites Defense Exhibit 1027?

15   A.  Yes.

16   Q.  Does Defense Exhibit 1027 reflect that Robert Menendez sent

17   that to Michael Soliman --

18           THE COURT:  I need you to slow down, sir.

19           MR. MONTELEONI:  Oh, I'm so sorry.

20   Q.  Does Defense Exhibit 1027 reflect that Robert Menendez sent

21   that to Michael Soliman or that Michael Soliman sent that to

22   Robert Menendez and someone else?

23   A.  I need to review Defense Exhibit 1027 --

24           MR. MONTELEONI:  Sure.

25   A.  -- to answer the question.

1          MR. MONTELEONI:  Mr. Hamill, could we please put up

2     Defense Exhibit 1027 to one side.

3     Q.  Directing your attention to that top header information,

4     would you agree that line 60-3 in Defense Exhibit 1304 is not

5     accurate as to who that message is from and to?

6     A.  It's from Michael Soliman to Bob Menendez.

7     Q.  And cc Fred Turner in the underlying exhibit, right?

8     A.  Yes.

9     Q.  All right.  And that's not what the chart reflects, right?

10    A.  No, it does not.

11         MR. MONTELEONI:  All right.  Mr. Hamill, you can take

12    down Defense Exhibit 1027 -- or, sorry.  Please take us to the

13    bottom of page 33, top of page 34 of Defense Exhibit 1304.  All

14    right.

15    Q.  Now, directing your attention to lines 176 to 180, are

16    there any yellow lines you were asked to verify within that

17    range?

18    A.  No, sir.

19    Q.  And looking at line 176, you testified that you or your

20    team verified, if I'm right, that this line matched the line

21    176 in Government Exhibit 1304 as part of your work, is that

22    right?

23    A.  Yes.

24    Q.  So where it says that this first search on line 176 was for

25    how much is one kilo of gold worth, do you know if that's what

O73Wmen4                           Gannaway - Cross

1  Government Exhibit 1304 reflects were the search terms in that

2  line?

3  A.  It's Government Exhibit A125.

4  Q.  Well, do you know if that's what Government Exhibit A125

5  reflects?

6  A.  Need to see it.

7  Q.  All right.  But you actually wouldn't have been verifying

8  this line against Government Exhibit A125, right; you would

9  have just been checking it against Government Exhibit 1304, the

10 government's chart?  Is that right?

11 A.  Right.

12        MR. MONTELEONI:  Let's put up, Mr. Hamill, on one

13 side, Government Exhibit 1304, page 13, and if you could,

14 Mr. Hamill, please expand lines 176 in Government Exhibit 1304

15 and in Defense Exhibit 1304.  And you don't have to go all the

16 way to the page.

17 Q.  Would you agree that on line 176 in Defense Exhibit 1304 it

18 doesn't actually match what you --

19        THE COURT:  Which one?

20        MR. MONTELEONI:  Oh, sorry.

21        THE COURT:  The top one or the bottom one?

22        MR. MONTELEONI:  The defense is now on the bottom, and

23 the government's is now on the top.

24 Q.  So would you agree that the search terms listed in Defense

25 Exhibit 1304, line 176, doesn't match the search terms that are

1    listed in Government Exhibit 1304, line 176?

2              MR. WEITZMAN:  Objection, your Honor.  The search is

3    right there underneath, and so that's misleading.

4              THE COURT:  I think he can answer that question.

5              Sir, in the search history of each of those 176s, is

6    it identical?

7              THE WITNESS:  Well, on the left column, it's

8    10/18/2021, 11:12:14 a.m. UTC4.

9              THE COURT:  No.  I'm referring to the search history,

10   the line that begins with search history.  Are they identical?

11             THE WITNESS:  How much is one kilo --

12             No, they're not.  The word "worth" is in addition on

13   the lower.

14             THE COURT:  On the defense exhibit, correct?

15             THE WITNESS:  Yes.  If that's the one below.

16             THE COURT:  All right.

17             THE WITNESS:  Yes.

18   BY MR. MONTELEONI:

19   Q.  So the defense exhibit search terms for that line doesn't

20   match the government exhibit search terms for that line, is

21   that right?

22   A.  Correct.

23             MR. MONTELEONI:  You can take down Government Exhibit

24   1304, Mr. Hamill.  Thank you.

25   Q.  And now, where this line that we've been looking at,

O73Wmen4                     Gannaway - Cross

1    defense exhibit line 176 reflects a search for how much is one

2    kilo of gold worth, is there any yellow line in this chart

3    earlier than October 18, 2021, that includes search terms for a

4    search of a kilogram of gold?

5    A.  Not that I see.

6            MR. MONTELEONI:  Now, Mr. Hamill, could you please

7    take us to page 41 of Defense Exhibit 1304.

8    Q.  I'm directing your attention, at the top, to line 246 now

9    reflecting an email from Shannon Kopplin to Robert Menendez

10   saying, thank you again for contacting the committee.  What is

11   the date of that line?

12   A.  February 17, 2022.

13   Q.  Now, between line 246 here that we're looking at and then

14   going back to line 176 that we just looked at on October 18,

15   2021, there were several insertions, right?

16   A.  Yes.

17   Q.  Did any of them reflect any emails between Robert Menendez

18   and Shannon Kopplin?

19   A.  I would have to look at it to see.

20   Q.  Do you remember any of them reflecting any emails between

21   Robert Menendez and Shannon Kopplin?

22   A.  I do not.

23           MR. MONTELEONI:  No further questions.

24           THE COURT:  All right.  Thank you.

25           Is there any redirect, sir?

1          MR. WEITZMAN:  Yes, your Honor.

2   REDIRECT EXAMINATION

3   BY MR. WEITZMAN:

4   Q.  You were asked some questions, sir, about the United States

5   State Department OIG, office of inspector general, report.  Do

6   you recall that?

7          MR. WEITZMAN:  Let's put up Government Exhibit 1302,

8   line 82-6 -- sorry.  I meant Defense Exhibit 1302, line 82-6.

9   Q.  Line 82-6 is dated April 24, 2018, correct?

10  A.  Yes.

11  Q.  And it refers to two source documents, correct; Defense

12  Exhibits 748 and Defense Exhibit 771?  Correct?

13  A.  Yes.

14  Q.  You were shown Defense Exhibit 748 in the government's

15  cross-examination.  Were you shown Defense Exhibit 771?

16  A.  No.

17         MR. WEITZMAN:  OK.  Can we put up Defense Exhibit 771

18  as a side by side.

19  Q.  And sir, do you see in Defense Exhibit 771 the URL at the

20  top that says Wayback Machine?  Do you see the top of the

21  exhibit that says Wayback Machine?

22  A.  Yes, I do now.

23  Q.  Do you know what a Wayback Machine is?

24  A.  Yes, it was -- yes, sir.

25  Q.  What is a Wayback Machine?

1    A.  It's a type of program that goes back to determine any

2    prior filings.

3    Q.  On the web, correct?

4    A.  Yes, on the web.

5         MR. WEITZMAN:  Can we enlarge the Wayback Machine,

6    Defense Exhibit 771.  And can you enlarge it to the full

7    screen.

8    Q.  And is this the same exhibit as what was in the OIG report

9    that you were shown in Defense Exhibit 748, best as you know?

10   A.  Yes, but I believe the other had redactions in it.

11   Q.  Correct.

12        And do you see the date in the top left next to Wayback

13   Machine, where it says 13 captures, and it says April 24, 2018?

14   A.  Yes.

15   Q.  Do you understand that means that this report was available

16   online as of April 24, 2018?

17        MR. MONTELEONI:  Leading.

18        THE COURT:  Do you understand that that's what it

19   means, sir?

20        THE WITNESS:  That the information was gathered on

21   that day, April 24, 2018.

22        THE COURT:  Do you know that that's what that means?

23   I don't mean to ask it that way.  I'm just asking, do you know

24   that?

25        THE WITNESS:  It represents the date of April -- 24

1    April 2018.

2            MR. WEITZMAN:  Now, sticking with Government Exhibit

3    1302, can we go to line 80 -- I'm sorry, line 345-7.  I'm

4    saying Government Exhibit.  Apologies.

5            Defense Exhibit 1302, lines 345-7.

6    Q.  You were asked some questions about the December 18 date on

7    this line entry.  Do you recall that?

8    A.  Yes, sir.

9    Q.  And the government showed you that the source document

10   reflects a December 14, 2018, date?

11   A.  Yes.

12           MR. WEITZMAN:  Now, can we put up side by side Defense

13   Exhibit 1303, line 87-1.

14   Q.  Now, in Defense Exhibit 1303, what is the date

15   corresponding to the same entry of the AT&T records reflecting

16   Nadine's flip phone?

17   A.  December 14, in the second column from the left.

18   Q.  OK.  Fair to say that on Defense Exhibit 1302, that was a

19   typo, not an intentional error?

20           MR. MONTELEONI:  Objection.

21           THE COURT:  Sustained.

22   BY MR. WEITZMAN:

23   Q.  Other than identifying the difference in the four days

24   reflected between Defense Exhibit 1302 and Defense Exhibit

25   1303, did the prosecutor ask you any questions about Doug's,

O73Wmen4                           Gannaway - Redirect

1   Doug Anton's spoofing of Nadine's phone?

2               THE COURT:  Sustained.

3               MR. MONTELEONI:  Objection.

4   BY MR. WEITZMAN:

5   Q.  Were you asked any questions about why Ro Sorce or the

6   Sorce companies purchased this phone after the text message

7   regarding Doug Anton's spoofing?

8               THE COURT:  Sustained.

9   BY MR. WEITZMAN:

10  Q.  Let's go to line 13 -- DX-1303, lines 277-1 and 277-2.

11  Now, you recall being asked some questions here about these

12  entries, and I think the government suggested that the -- or

13  they asked you whether the underlying exhibits supported these

14  entries?

15              THE COURT:  Yes.  Sustained as to suggested.  You can

16  refer to specific questions if you wish.

17              MR. WEITZMAN:  Yes.

18  Q.  Do you recall that you were asked questions about whether

19  the government exhibit listed here supports as a source these

20  two line entries, 277-1 and 277-2 of Defense Exhibit 1303?  Do

21  you recall that?

22  A.  Yes.

23              MR. WEITZMAN:  OK.  Can we put up Government Exhibit

24  E102-3.  And go to the next page.  First of all, highlight the

25  bottom of Government Exhibit E102-3, Mr. Kelly.  Can you zoom

1    in on the bottom so that everybody sees the sticker.

2    Q.  What's that government exhibit?

3    A.  E102-3.

4              MR. WEITZMAN:  Can we go to the next page of the

5    document.

6    Q.  You were shown this page.  Do you recall that?

7    A.  Yes.

8              MR. WEITZMAN:  OK.  Now let's go to page 4 of the

9    document.  And can we do a side by side with Defense Exhibit

10   1303, line 277-1 and 277-2.

11             THE COURT:  It's up.

12             MR. WEITZMAN:  Now, can you highlight the first two

13   messages on page 4 of Government Exhibit E102-3.

14   Q.  Is that the underlying text messages that are referenced in

15   Defense Exhibit 1303 at lines 277-1 and 277-2?

16   A.  Yes.

17   Q.  You weren't shown those in the cross-examination, right?

18   A.  No, I was not.

19             MR. WEITZMAN:  OK.  One last question.  Defense

20   Exhibit 1304, if we can go to line 176.

21   Q.  You were asked about whether the search history description

22   on the top of this line entry was an accurate reflection of

23   what was in the government exhibit.  Do you recall that?

24   A.  Yes.

25   Q.  If you look at the actual image of the search, does that

1    appear in this very line entry?

2              THE COURT:  Does what appear?

3              MR. WEITZMAN:  The actual image of the search.

4    Q.  Do you see it says, how much is one kilo of gold?

5    A.  Yes.

6    Q.  So the actual search is there; there was just one

7    additional word added on top, in the description?

8    A.  "Worth" is an additional word, yes.

9              MR. WEITZMAN:  No further questions.

10              THE COURT:  All right.  Thank you.

11              You may step down, sir.  You are excused.

12              MR. MONTELEONI:  Your Honor, I have brief recross on

13    the point that was just raised.

14              THE COURT:  Very brief, sir.

15              It was premature for me to excuse you, sir.

16              MR. MONTELEONI:  Mr. Hamill, could you please put up

17    the current version of Government Exhibit E102-3.

18    RECROSS EXAMINATION

19    BY MR. MONTELEONI:

20    Q.  Mr. Gannaway, can you please look out for those two text

21    messages with Nadine Arslanian.  Look out for any text message

22    with Nadine Arslanian?

23              MR. MONTELEONI:  Mr. Hamill, please scroll down to the

24    bottom.

25              MR. WEITZMAN:  Objection, your Honor.  We have a

1    different version.  That's not on us.

2              MR. RICHENTHAL:  This is the one in evidence.

3              MR. WEITZMAN:  The one we got, we thought, was in

4    evidence, your Honor.  We get them from the government.

5              THE COURT:  Gentlemen, it's pretty important what's in

6    evidence and what isn't.

7              MR. WEITZMAN:  I agree.

8              THE COURT:  Do we have some agreement as to what is in

9    evidence here or not?

10             MR. WEITZMAN:  Your Honor, we get the government

11   exhibits from them.  If they gave us a different one --

12             THE COURT:  Do we have an agreement as to what is in

13   evidence here on this particular exhibit or not?

14             MR. WEITZMAN:  Apparently not, because they have a

15   different version.

16             THE COURT:  All right.  Sidebar.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  First of all, I think everybody should

3     make sure that we understand exactly what's in evidence and

4     what isn't.

5          Is this point really worth following up at this

6     juncture in time?

7          MR. MONTELEONI:  Well, I think that the point that

8     this wasn't an error of the government, the witness -- if

9     there's a version control issue, look, we have been giving them

10    updated exhibits from time to time.  We've circulated our

11    exhibit list and asked them for objections.  We haven't gotten

12    any corrections to the exhibit list.  Obviously, I'm not

13    suggesting there was anything intentional, but it seems like

14    there was some sort of mix-up with what the defense believed

15    was the correct exhibit.  But if this witness wasn't going off

16    of the most updated exhibit, I think it's important --

17         THE COURT:  Do we know what the most updated exhibit

18    is?

19         MR. MONTELEONI:  Yes.  Our paralegals have been

20    producing them on a daily basis to the defense.

21         MR. WEITZMAN:  Your Honor, two points.  The first

22    is --

23         VOICE:  Your Honor --

24         (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O73Wmen4                        Gannaway - Recross

1                    (In open court)

2                    THE COURT:  Ladies and gentlemen, rather than have you

3     wait here, why don't you take a midafternoon break.

4                    Thank you.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73Wmen4                              Gannaway - Recross

1              (At sidebar)

2              MR. MONTELEONI:  My only point is, look, I think that

3      it seems pretty clear that what happened is there's some sort

4      of mix-up.  As you know, we've had consistent numbering, and

5      there wouldn't be --

6              THE COURT:  There is a mix-up.  Go ahead.

7              MR. MONTELEONI:  I think that the point was just to

8      bring for the jury that this wasn't that the government doesn't

9      know what's in its own exhibits, that there's a version control

10     issue.  So I was just showing -- well, I was proposing to show,

11     by scrolling down through this three-page document, that that

12     document, the updated version that the government has offered

13     and used, is not what the witness -- is not what supports it,

14     and that whether it's good by the witness or bad by the witness

15     doesn't matter.  It still goes to the reliability of the chart

16     because he was verifying it based on documents that were --

17             THE COURT:  Yes, but --

18             MR. WEITZMAN:  Two things.

19             The first is at some point in time we got a government

20     exhibit that included that fourth page.  If they switched it

21     out and didn't tell us, that's not on us.

22             THE COURT:  No.  Just a moment.  There's no --

23             MR. WEITZMAN:  No accusation.  I'm just saying we

24     relied in good faith on the government exhibits we received.

25             THE COURT:  What Mr. Monteleoni is saying is there's a

1    later version that's not reflective, apparently, of the

2    document you used.  There's no dispute about that.  It's

3    inadvertent, but it's a later version.

4              What's your second point?

5              MR. WEITZMAN:  I'm happy to stipulate to it.

6              My second point is this.  When they provided us their

7    government exhibit summary charts, they were riddled with

8    errors, and we sent back to them, whenever we found an error,

9    said the underlying source exhibit doesn't support the entry.

10   Their entire cross is exactly the opposite of what we've done,

11   and so they've tried to inject that you can't trust the chart

12   as a result of that.

13             THE COURT:  But I thought on both sides there were --

14   not with him, but with other witnesses -- the same thing was

15   being done to show there were, to my mind, minor inaccuracies

16   on both sides.

17             MR. WEITZMAN:  There was one question I asked about an

18   inaccuracy with their very first line entry.

19             THE COURT:  Where are you going with this?

20             MR. WEITZMAN:  There could be a stipulation.  We can

21   stipulate that there are two versions of this, due to version

22   control, and that we've acted -- we acted in good faith, they

23   acted in good faith.

24             THE COURT:  We don't have to go that far, because

25   that's not the issue.  We can stipulate.

O73Wmen4                          Gannaway - Recross

1              It seems to my why don't I just tell the jury that

2       there is a dispute between the parties as to what is the proper

3       version of this exhibit and to leave it at that.

4              MR. WEITZMAN:  That's fine by me.

5              THE COURT:  You've made the points -- you wanted to

6       point out errors -- in other ones.  I don't think we need to do

7       it on this one as well.

8              MR. MONTELEONI:  All right.

9              THE COURT:  What's the number?

10             MR. MONTELEONI:  E102-3.

11             THE COURT:  I will tell them that this dispute that

12      brought us to sidebar is simply an issue of two versions of the

13      same chart.

14             MR. WEITZMAN:  The same exhibit.

15             MR. RICHENTHAL:  Same exhibit.

16             THE COURT:  Of the same exhibit, same underlying

17      document, and simply to leave it at that.

18             MR. MONTELEONI:  That's fine.

19             MR. WEITZMAN:  Yes.

20             THE COURT:  Now let's talk, because you were done;

21      that was it.

22             And I take it you have no other witnesses.

23             MR. WEITZMAN:  Correct.

24             MR. FEE:  None.

25             THE COURT:  OK.  So I think I do need the jury -- no.

O73Wmen4                          Gannaway - Recross

1     I can do the allocution now.

2              MR. WEITZMAN:  Yes.

3              THE COURT:  And why don't I do the allocution now as

4     to Mr. Daibes as well.  Let's continue on the record.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73Wmen4

1          (In open court)

2          THE COURT:  May I excuse the witness, counsel?  May I

3    excuse the witness now?

4          MR. MONTELEONI:  Yes.

5          MR. WEITZMAN:  Yes.

6          THE COURT:  You're excused, sir.  You may step down.

7    I'll inform the jury of that when they return.

8          (Witness excused)

9          THE COURT:  Mr. Menendez, if you would rise.

10         Counsel for Mr. Menendez, I understand you have no

11   other witnesses.  Is that correct?

12         MR. FEE:  That's correct, your Honor.

13         THE COURT:  Mr. Menendez, I wish to inform you of a

14   few things.

15         First of all, as I believe you know, the defense in a

16   criminal case is never required to prove anything.  The defense

17   doesn't have to put on any witnesses or any evidence at all,

18   and that's because the burden of proof, in a criminal case, is

19   always on the government to prove its case beyond a reasonable

20   doubt.

21         Do you understand that, sir?

22         DEFENDANT MENENDEZ:  Yes, I do, your Honor.

23         THE COURT:  So you don't have to do anything.  Your

24   entire defense could -- you don't have to put on any evidence.

25         Now, you could put on evidence if you so chose, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O73Wmen4

1    obviously, your lawyers here have presented witnesses in your

2    defense.  They say now there are no other witnesses, but the

3    issue is I need to tell you that you have the right to speak to

4    this jury and to present your own evidence; that is, you

5    yourself, can be a witness.  You're under no obligation to do

6    so, as I've told you, because the defense never has to prove

7    anything at all in a criminal case.  But you can testify if you

8    want to.  You have the right to do that.

9            Do you understand that?

10           DEFENDANT MENENDEZ:  Yes, I understand that, your

11   Honor.

12           THE COURT:  I also need to tell you that anything you

13   do say if you take the stand can be used against you.

14           Do you understand that.

15           DEFENDANT MENENDEZ:  I do, your Honor.

16           THE COURT:  Now, in a criminal case, there are certain

17   things that are really ultimately for the lawyers to decide,

18   such things as what witnesses to call, what questions to ask,

19   what motions to make or not make or, for that matter, what

20   questions not to ask and witnesses not to call.  But there are

21   a limited number of very important items that are not for the

22   lawyers to decide but for you, the client, the defendant, to

23   decide.  And whether or not to take the stand in your own

24   defense and testify in your own defense is a decision for you,

25   not for the lawyers.

O73Wmen4

1          Do you understand that, sir?

2          DEFENDANT MENENDEZ:  Yes, I do, your Honor.

3          THE COURT:  Now, I want you to talk to the lawyers

4    about that issue, and I want you to listen to them.  And I'm

5    sure they'll give you some advice -- I don't want to know what

6    that advice is; don't tell me what their advice is -- but you

7    don't have to follow their advice.

8          Have you discussed this issue as to whether or not you

9    should take the stand with Mr. Weitzman and Mr. Fee?

10         DEFENDANT MENENDEZ:  At length, your Honor.

11         THE COURT:  Pardon me?

12         DEFENDANT MENENDEZ:  At length, your Honor.

13         THE COURT:  At length.  OK.

14         Did they answer your questions, sir?

15         DEFENDANT MENENDEZ:  They have, your Honor.

16         THE COURT:  Do you have any questions of me about that

17   issue?

18         DEFENDANT MENENDEZ:  I do not, your Honor.

19         THE COURT:  And what is your decision, sir?

20         DEFENDANT MENENDEZ:  I'm not seeking to take the stand

21   at this time.

22         THE COURT:  If I understand you, you do not wish to

23   stay the stand.  Is that correct?

24         DEFENDANT MENENDEZ:  Correct.

25         THE COURT:  All right.  Thank you.

O73Wmen4

1              Mr. Fee, are there any additional questions you wish

2    me to adduce of your client at this time?

3              MR. FEE:  No, your Honor.  Thank you.

4              THE COURT:  Government, are there any additional

5    questions you wish me to adduce?

6              MR. MONTELEONI:  No, your Honor.  Thank you.

7              THE COURT:  All right.  Thank you.

8              When the jury comes back, I'll ask Mr. Menendez's

9    attorneys if there are any other witnesses, and you'll say you

10   rest.

11             We now will go to Mr. De Castro.

12             Mr. De Castro, I understand from you that you've

13   decided not -- well, let me hear from you.

14             Is there going to be a case, sir?

15             MR de CASTRO:  That's correct.  We decided -- your

16   Honor ruled on our motion to call certain witnesses.  We

17   decided we are not going to call any witnesses, and I

18   understand Mr. Daibes will not take the stand either, but I'll

19   let him answer.

20             THE COURT:  Yes, sir.

21             Mr. Daibes, I'm going to inform you of basically the

22   same things that I've informed Mr. Menendez of, and I'm going

23   to ask you basically the same questions, because this really is

24   a very important issue.

25             Do you understand, sir, that the defense in a criminal

O73Wmen4

 1    case is not obligated to put on any evidence?

 2              Do you understand that?

 3              DEFENDANT DAIBES:  Yes, I do, your Honor.

 4              THE COURT:  You and your lawyers could remain

 5    completely silent and not question any witnesses of the

 6    government and not put on any witnesses of your own.

 7              Do you understand that?

 8              DEFENDANT DAIBES:  Yes, sir.

 9              THE COURT:  And the reason for that is that in the

10    United States, in criminal cases, the burden of proof is always

11    on the government to prove its case beyond a reasonable doubt.

12              Do you understand that?

13              DEFENDANT DAIBES:  Yes, I do.

14              THE COURT:  And you have no obligation to prove

15    anything.

16              You can put on witnesses, and you can put on proof --

17    that is, your lawyers can do it -- as you've seen that they've

18    cross-examined the witnesses here.  But Mr. De Castro has told

19    me that at this point there are no witnesses specifically to be

20    offered on your defense.

21              The question now is, just as it was for Mr. Menendez,

22    do you wish to take the stand?  And that issue is, as you heard

23    me say to Mr. Menendez, a question that is for you to answer.

24    Your lawyers can't answer that for you.  As I told

25    Mr. Menendez, there are certain things that are for the lawyers

O73Wmen4

1    to decide.  I'll characterize them as minor; they're not really

2    minor, but you know what I mean -- what motions to make, what

3    witnesses to call, what questions to ask.  They're not minor in

4    the scheme of things, but what's important for these purposes

5    is whether or not you wish to take the stand, and it's for you

6    to decide that, not for them.

7           I want you to listen to them.  Listen to their advice,

8    but you don't have to follow it.

9           Have you discussed this issue with Mr. De Castro?

10           DEFENDANT DAIBES:  Yes, I have, your Honor.

11           THE COURT:  Has he answered your questions about it?

12           DEFENDANT DAIBES:  Yes, he has.

13           THE COURT:  Do you have any questions of me about it?

14           DEFENDANT DAIBES:  No.

15           THE COURT:  Have you made a decision, sir, as to

16    whether or not you wish to take the stand in your own defense?

17           DEFENDANT DAIBES:  Yes, I have.

18           THE COURT:  And what is that decision, sir?

19           DEFENDANT DAIBES:  I will not.

20           THE COURT:  All right.

21           Mr. De Castro, after Mr. Menendez's lawyers rest, I'll

22    turn to you, and then you can say that you rest as well.

23           All right.  Thank you.

24           Are there any questions, further questions, on the

25    allocution of Mr. Daibes that you wish me to ask, sir?

O73Wmen4

1          MR de CASTRO:  No, your Honor.  Thank you.

2          THE COURT:  Government, anything the government wishes

3    on the allocution?

4          MR. MONTELEONI:  No, your Honor.

5          THE COURT:  All right.  Thank you.

6          Let's bring this jury in.

7          Mr. Lustberg, are you prepared to put your first

8    witness on, sir?

9          MR. LUSTBERG:  Yes, your Honor.

10          THE COURT:  All right.  Thank you.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73Wmen4

1            (Jury present)

2            THE COURT:  Please be seated in the courtroom.

3            Ladies and gentlemen of the jury, you'll remember that

4     just before I gave you the break, we had a sidebar because

5     there was an issue between the lawyers.  I wish to tell you

6     that that was simply a dispute as to which version of exhibit

7     E102-3 was the proper version.  Each side had a slightly

8     different version.  Those things happen, and I'm going to leave

9     it at that.

10            You'll see that I excused the witness, because there

11     were no further questions of the witness.

12            Mr. Weitzman, is there an additional witness on behalf

13     of Mr. Menendez?

14            MR. FEE:  Your Honor, that was our last witness, and

15     with that, the defense for Senator Menendez rests.

16            THE COURT:  All right.  Thank you, sir.

17            You now have seen the defense for Mr. Menendez rest.

18            I now will turn to Mr. De Castro and see if there's

19     going to be the presentation of evidence on behalf of

20     Mr. Daibes.  You know, because I've told you this before, a

21     defendant in our system is never required to put on any

22     evidence or any proof or prove anything, because the burden is

23     always on the government to prove its case beyond a reasonable

24     doubt.

25            Mr. De Castro, is there a witness for Mr. Daibes?

```
 1              MR de CASTRO:  Your Honor, Mr. Daibes rests.

 2              THE COURT:  All right.  Thank you.

 3              Ladies and gentlemen, you now have seen Mr. Daibes

 4    rest.

 5              We now will turn to Mr. Lustberg on behalf of

 6    Mr. Hana.

 7              Mr. Lustberg, if you would call your next witness.

 8              MR. LUSTBERG:  Ms. Collart will handle that matter,

 9    your Honor.

10              THE COURT:  All right.  Thank you.

11              Ms. Collart.

12              MS. COLLART:  Yes, your Honor.

13              On behalf of Mr. Hana, the defense calls Carolina

14    Silvarredonda.

15     CAROLINA SILVARREDONDA,

16         called as a witness by the Defendant Hana,

17         having been duly sworn, testified as follows:

18              THE COURT:  Welcome, ma'am.

19              Your witness.

20    DIRECT EXAMINATION

21    BY MS. COLLART:

22    Q.  Good afternoon, Ms. Silvarredonda.  Thank you for being

23    here.

24         Where do you live?

25    A.  I live in Uruguay.
```

1    Q.  In September of 2019, where did you work?

2    A.  I started working at IS EG Halal.

3    Q.  And where was your office based?

4    A.  In Montevideo, Uruguay.

5    Q.  At that time, what was your job?

6    A.  I was international account manager, and I was also

7    Mr. Hana's assistant.

8    Q.  And what were your responsibilities, generally?

9    A.  Well, basically creation of reports, handling of accounts

10   and representing the company abroad.

11   Q.  As part of your role, were you also involved in setting up

12   international offices?

13   A.  Yes.

14   Q.  And during your tenure with the company, what other

15   international offices were opened?

16   A.  India, Brazil, New Zealand and Australia, if I don't

17   remember wrong.

18   Q.  In connection with your work for IS EG Halal, have you ever

19   met a woman named Nadine Arslanian?

20   A.  Not in person.

21   Q.  Have you communicated with her?

22   A.  Yes.

23   Q.  And why did you start communicating with her?

24   A.  Because she was hired to get us physical office space to

25   open the office in India, and I needed to follow up several

1    times, because she didn't get the office.

2    Q.  Generally, what happened with your work with Ms. Arslanian?

3    A.  Well, basically I was the point of contact, and as I said,

4    I needed to follow up many times because she didn't send us any

5    information.  And suddenly, when she did, a long time from the

6    beginning, like, there was already a person handling that task.

7    Q.  When did Ms. Arslanian first communicate with you?

8    A.  If I'm not wrong, she first communicated with me on

9    September 25, 2019.

10   Q.  And how did that communication come about?

11   A.  By text message.

12          MS. COLLART:  OK.  Mr. Kelly, just for the witness,

13   the Court and counsel, can you please bring up Defense Exhibit

14   Hana 190.

15   Q.  Do you see that on your screen?

16   A.  Yes.

17   Q.  Ms. Silvarredonda, do you recognize this document?

18   A.  Yes.

19   Q.  What is it?

20   A.  It is a screenshot from the text messages that I exchanged

21   with Nadine.

22   Q.  And what is the date at the top that these messages begin?

23   A.  It's September 25, 2019.

24          MS. COLLART:  Defense offers Hana 190.

25          THE COURT:  Admitted.

1          MR. RICHENTHAL:  No objection, with the standard

2     limiting instruction.

3          THE COURT:  I'm sorry?

4          MR. RICHENTHAL:  No objection, with the standard

5     limiting instruction.

6          THE COURT:  Yes.  These are not for the truth of the

7     matter asserted.

8          (Defendant's Exhibit Hana 190 received in evidence)

9          MS. COLLART:  Thank you, your Honor.

10          Mr. Kelly, can you please publish that to the jury.

11     Q.  Ms. Silvarredonda, is this page we're looking at the

12     exchange you had with Ms. Arslanian on September 25, 2019?

13     A.  Yes.

14     Q.  And who are the messages in the gray background with the

15     little green bubble and the letter N from?

16     A.  Nadine's.

17     Q.  And the messages with the greenish-blue background, who are

18     those from?

19     A.  Those are mine.

20          MS. COLLART:  You can zoom back out, Mr. Kelly.

21     Q.  In addition to these messages, did you also speak with

22     Ms. Arslanian on the phone about her assignment?

23     A.  Yes, I did, a few times.

24     Q.  And did you update Mr. Hana about your communications with

25     Ms. Arslanian?

1   A.  Yes, I did.

2           MS. COLLART:  Mr. Kelly, just for the witness, the

3   Court and counsel, can you please bring up Defense Exhibit Hana

4   210.

5   Q.  Ms. Silvarredonda, do you see these messages?

6   A.  Yes.

7   Q.  Do you recognize them?

8   A.  Yes.

9   Q.  What are they?

10  A.  They are the screenshots of the text messages that I sent

11  to Mr. Hana updating him about the situation.

12  Q.  What is the date at the top of the screenshot?

13  A.  It's September 25, 2019.

14          MS. COLLART:  The defense offers Hana 210 in evidence.

15          MR. RICHENTHAL:  Same.  No objection, with the

16  standard limiting instruction.

17          THE COURT:  Admitted.  They're not for the truth of

18  the matter asserted therein.

19          (Defendant's Exhibit Hana 210 received in evidence)

20          MS. COLLART:  Thank you.

21          Mr. Kelly, can you publish that for the jury, please.

22  Q.  Ms. Silvarredonda, after you spoke with Ms. Arslanian on

23  September 25, 2019, what did you tell Mr. Hana about when you

24  expected to hear back from her?

25  A.  As soon as possible.

O73Wmen4                        Silvarredonda - Direct

1   Q.  And did Ms. Arslanian send you any information that day?

2   A.  No.

3           MS. COLLART:  Mr. Kelly, can you take us back to Hana

4   190 but page 2 this time, please.

5   Q.  Ms. Silvarredonda, what did you do the following day?

6   A.  I followed up on the matter.

7   Q.  And are these messages on the screen here your exchange

8   with Nadine following up?

9   A.  Yes.

10  Q.  And did she send you any of the requested information that

11  day?

12  A.  No.

13          MS. COLLART:  Mr. Kelly, can you take us back to 210,

14  please.

15  Q.  Still directing your attention to September 26, what did

16  you tell Mr. Hana about when you expected to hear back from

17  Nadine that day?

18  A.  That we expected to hear back from her the following week.

19          MS. COLLART:  Mr. Kelly, can you take us back to Hana

20  190 but the third page this time, please.

21  Q.  Ms. Silvarredonda, did you hear back from Ms. Arslanian the

22  following week?

23  A.  No.

24  Q.  When did you follow up with her again?

25  A.  In October 9, 2019.

O73Wmen4                              Silvarredonda - Direct

1   Q.  And when did Nadine say that she would send you the

2   information this time?

3   A.  She said that she was going to send it the following day.

4   Q.  And did she send it the following day?

5   A.  No.

6   Q.  Did you ever receive any of the requested information from

7   Ms. Arslanian?

8   A.  Yes.

9   Q.  When?

10  A.  On October 15, the same year.

11          MS. COLLART:  Mr. Kelly, for the witness, the Court

12  and counsel, can you please bring up Defense Exhibit Hana 042.

13          THE COURT:  And the same year is 2019, is that

14  correct?

15          THE WITNESS:  Yes.

16          THE COURT:  Thank you.

17          MS. COLLART:  Thank you, your Honor.

18  Q.  Ms. Silvarredonda, do you recognize this document?

19  A.  Yes.

20  Q.  What is it?

21  A.  Those are two emails, one that Nadine sent and one that I

22  replied back to her when she sent me the information.

23  Q.  OK.  Looking at the email at the top of the screen, who is

24  that from?

25  A.  That is from me.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  And what is the date of that email?

2   A.  It's October 17, 2019.

3           MS. COLLART:  Defense offers Hana 42 in evidence.

4           THE COURT:  It's admitted.

5           MR. RICHENTHAL:  Same, your Honor, standard limiting

6   instruction.

7           THE COURT:  Yes.  Not for the truth.  These are all

8   not for the truth.

9           (Defendant's Exhibit Hana 42 received in evidence)

10          MS. COLLART:  Thank you.

11          Mr. Kelly, please publish for the jury.  Thank you.

12  Q.  Ms. Silvarredonda, directing your attention to the bottom

13  of the page, who is this email from?

14  A.  It is from Nadine.

15  Q.  And what is it dated?

16  A.  It is dated October 15, 2019.

17  Q.  And what is the subject line?

18  A.  New Delhi office.

19  Q.  After you received this email from Ms. Arslanian, what did

20  you do?

21  A.  I updated Mr. Hana, and I replied back to her, thanking her

22  for her efforts and telling her that we already had a person in

23  charge of it.

24  Q.  And why?

25  A.  Because she didn't do what she was asked.

1   Q.  Was the India office ultimately opened through the work of
2   this other person?
3   A.  Yes.
4   Q.  And do you know whether Ms. Arslanian actually did any of
5   the work that you followed up with her about?
6   A.  No.
7   Q.  Did she ever respond to this email?
8   A.  No.
9   Q.  Ms. Silvarredonda, how long have you worked with Mr. Hana?
10  A.  I have been working with him for five years now.
11  Q.  In your experience, what are Mr. Hana's expectations with
12  regard to those who do work for him?
13          MR. RICHENTHAL:  Objection.
14          THE COURT:  Just a moment.
15          MS. COLLART:  Just based on her experience, your
16  Honor.
17          THE COURT:  You can ask about his expectations as
18  expressed by him in regard to her, in regard to his
19  expectations as to her.
20          MS. COLLART:  Understood.
21  Q.  As Mr. Hana's employee, based on your experience of working
22  with him, what do you understand that he expects of you?
23  A.  To do my tasks.
24  Q.  And are you aware of Mr. Hana having fired anyone for
25  failing to meet his expectations?

1    A.  Yes.

2    Q.  Is that someone other than Ms. Arslanian?

3    A.  Yes.

4           MS. COLLART:  No further questions, your Honor.

5           THE COURT:  All right.  Thank you.

6           Is there anything, government?

7           MR. RICHENTHAL:  Yes, your Honor, but I don't know if

8    any other counsel --

9           THE COURT:  Oh, all right.  Yes.  I'm sorry.

10          Let's see.

11          MR. FEE:  Just two or three questions, your Honor.

12          THE COURT:  Yes.  Thank you.

13   DIRECT EXAMINATION

14   BY MR. FEE:

15   Q.  Hi, Ms. Silvarredonda.  How are you?

16   A.  Good.

17          MR. FEE:  Can we put up what's in evidence as Hana

18   042, please.  And if we can focus in on the bottom email,

19   please.

20   Q.  Ms. Silvarredonda, before we get to that, I just want to

21   make sure I understand.  Your understanding is that

22   Ms. Arslanian was hired to help set up an office for IS EG in

23   India?

24   A.  Yes.

25   Q.  Was it any particular city in India?

O73Wmen4                          Silvarredonda - Direct

1    A.  New Delhi.

2    Q.  New Delhi.  And so looking at this email exchange from

3    October 15, Ms. Arslanian says to you:  Good afternoon,

4    Carolina.  As I mentioned to you via text last week, I had two

5    meetings in New Delhi regarding renting office space in Delhi,

6    India.  Do you see that?

7    A.  Yes.

8    Q.  And do you remember her saying at least that she had done

9    two meetings in New Delhi, outside of this email?

10   A.  Uh-huh.

11   Q.  Do you remember this email --

12          THE COURT:  Apart from this email, did Ms. Arslanian

13   ever tell you that she had had two meetings in New Delhi

14   regarding renting office space?

15          THE WITNESS:  Not on that day at least.

16   BY MR. FEE:

17   Q.  OK.  So in this email where she references the two

18   meetings, she then goes on to give you some other information.

19   Is that fair to say?

20   A.  Yes.

21   Q.  She talks about, Eros Tower is very centrally located.  Do

22   you see that?

23   A.  Yes.

24   Q.  She talks about it being near a metro station.  Do you see

25   that?

1    A.  Yes.

2    Q.  And then she goes on, and in the second-to-last line on the

3    screen at least, she says:  I was informed that that was a very

4    large office space, but that is what Wael wanted in terms of

5    square footage.  Do you see that?

6    A.  Uh-huh.

7              THE COURT:  You have to say yes or no --

8              THE WITNESS:  OK.

9              THE COURT:  -- because there's a reporter here.

10             MR. FEE:  Thank you, your Honor.

11   A.  Yes.

12   Q.  And I just want to understand, Ms. Silvarredonda.  After

13   this message, you indicated that there were some requests that

14   Ms. Arslanian did not follow up on?

15   A.  What do you mean, some requests?

16   Q.  Well, why don't you tell me what happened next, after this

17   message on October 15, in terms of Ms. Arslanian working on the

18   New Delhi office.  What's your best recollection of what

19   happened next?

20   A.  I would update Mr. Hana about this email, and we would

21   inform her that a person was already taking care of getting an

22   office space for the India office.

23             MR. FEE:  Got it.

24             THE COURT:  You've already testified to that, correct?

25             THE WITNESS:  Yes.

1           MR. FEE:  That's right.

2           Let's zoom out.

3    Q.  So Ms. Arslanian sends you that email about the two

4    meetings in New Delhi and the information about Eros Towers on

5    October 15 of 2019.  Do you see that date?

6    A.  Yes.

7    Q.  And then you respond on October 17 with the message that

8    you just testified about, we have a person already in charge of

9    the Delhi office?

10   A.  Yes.

11   Q.  And so your understanding of your own message here,

12   Ms. Silvarredonda, is that you were telling Ms. Arslanian

13   essentially IS EG doesn't need your help any longer?

14   A.  Yes.

15   Q.  OK.  And to your knowledge, was that the only project, the

16   India office opening, that Ms. Arslanian had been asked to

17   assist IS EG on?

18   A.  Yes, as per my understanding.

19   Q.  And to the best of your recollection, after this message

20   you sent on October 17 of 2019, did you have any further

21   contact with Ms. Arslanian?

22   A.  No.

23          MR. FEE:  Thank you, your Honor.

24          THE COURT:  All right.  Thank you.

25          Mr. De Castro, anything?

1          MR de CASTRO:  Oh, I'm sorry.  No, Judge.

2          THE COURT:  All right.

3          Anything from the government?

4          MR. RICHENTHAL:  Yes, your Honor.

5  CROSS-EXAMINATION

6  BY MR. RICHENTHAL:

7  Q.  Good afternoon.

8  A.  Good afternoon.

9  Q.  The events that you testified about took place between

10  September 25 and October 17, is that right?

11  A.  Yes.

12  Q.  And your testimony, if I understand it, is that between

13  September 25 and October 17, Ms. Arslanian did not do what she

14  was asked to do?

15  A.  Yes.

16  Q.  Is that right?

17  A.  Yes.

18          MR. RICHENTHAL:  All right.  So let's start with

19  September 25, the email that's 190, I think.  Could we put that

20  on the screen.  Thank you, Mr. Hamill.

21  Q.  Do you see the top of this email?

22  A.  Yes.

23  Q.  Ms. Arslanian wrote:  Good morning, Wael.  Regarding

24  Mumbai, if there are any connections or interests you have, as

25  I offered last week, please let me know by Friday.  I'll

O73Wmen4                        Silvarredonda - Cross

1    happily look into matters that will facilitate the opening

2    office in Mumbai.  Do you see that?

3    A.  Yes.

4    Q.  Now, that was the first email in this short period of time,

5    right?

6    A.  Yes.  That was the first text message --

7    Q.  I'm sorry.  Text message, thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  And she was offering to help facilitate the opening.  At

2   least that's what she wrote?

3   A.  This is what she wrote.

4   Q.  Then you have a back and forth, if you go down.  Stop

5   there.  Go up, Mr. Hamill.

6          You wrote "He wants the office in New Delhi."  You see

7   that?

8   A.  Yes.

9   Q.  There is further back and forth.  New Delhi yesterday we

10  said Mumbai.

11  A.  Yes.

12  Q.  That's the next day, the 26th?

13  A.  Hmm-hmm.

14  Q.  You can scroll down.  Stop there.  Wael originally said

15  Mumbai I'll cancel Mumbai and set up Delhi?

16  A.  Yes.

17  Q.  When I get the information, I'll e-mail it to you, right?

18  A.  Yes.

19  Q.  Keep going.  October 9.  Now she said she had the meetings,

20  right?

21  A.  Yes.

22  Q.  Stop there.  I had two meetings, right?

23  A.  Hmm-hmm, yes.

24          THE COURT:  You have to say yes or no.

25          THE WITNESS:  I'm sorry.

1    Q.   And she says she'll send you the information.

2    A.   Yes.

3    Q.   That's October 9, right?

4    A.   Hmm-hmm.

5    Q.   Your testimony, if I understand it, was between October 9

6    and October 17 or 15, you didn't get the information?

7    A.   No.   Until October 15, we didn't get the information.

8    Q.   Right.   In the six days between October 9 and October 15,

9    right, you didn't get the information?

10   A.   We didn't get information from September 25 until

11   October 15.

12   Q.   Okay.

13   A.   Yes.

14   Q.   Therefore, you also didn't get it between October 9 and

15   October 15?

16   A.   Yes.

17   Q.   And October 9 is when she told you she had the meetings and

18   would send you the information, right?

19   A.   Yes.

20   Q.   You would agree with me she can't send you information if

21   she doesn't have information to give?

22   A.   Yeah.

23   Q.   Now, let's go to the next message 210.

24            MR. RICHENTHAL:  DX 210.  Mr. Hamill.  210R, excuse

25   me.

1   Q.  So this is September 25, right?

2   A.  Yes.

3   Q.  You tell Wael she's going to send us the information about

4   India?

5   A.  Yes.

6   Q.  He says "thanks," right?

7   A.  Yes.

8   Q.  He doesn't say need it immediately?

9   A.  Excuse me, what?

10  Q.  He didn't say I need it immediately, right?

11  A.  Not in that text.

12  Q.  He didn't say I'm going to fire her if I don't get it

13  immediately?

14  A.  Not in that text.

15  Q.  He didn't say that at all, right?

16  A.  I don't remember.

17  Q.  You don't remember.  Now, you responded, I talked to her,

18  what's the next message.  She said she'll set up meetings in

19  New Delhi and will send it to us by next week?

20  A.  Yes.

21  Q.  Roughly speaking, would you agree with me September 26,

22  next week is early October?

23  A.  Yeah, October 3 maybe.

24  Q.  Give or take?

25  A.  Yeah, I don't know.  I would have to check the calendar.

1   Q.   Roughly speaking, October 3 or so, September 26?

2   A.   Yeah.

3   Q.   Fair game?

4   A.   Yeah.

5   Q.   All right.  Now, Mr. Hana responded "Okay, thanks."  Right?

6   A.   Hmm-hmm, yes.

7   Q.   Didn't say that's too late?

8   A.   No.

9   Q.   Now, can we go back to 190 for a second.  Just looking at

10  the top here.  I think you said that she was being hired to

11  head the New Delhi office.  Did I hear you correctly?

12  A.   To what?

13  Q.   Head the New Delhi office?

14  A.   No.  To get a physical office space.

15  Q.   To find the office space?

16  A.   Yes.  To find the office space.

17  Q.   That's her offer on September 25 at the top of the screen?

18  A.   Yes.

19  Q.   So let's go back now to 290.  290R.  Ms. Collart just

20  corrected me.  210R.

21          So now we're the next day and you told Mr. Hana she's

22  going to get the information, she'll send it to you by next

23  week, right?

24  A.   Yes.

25  Q.   I think we've established roughly October 3 or so?

1   A.  Yup.

2   Q.  So can we now go back to 190.  That is your exchange with

3   Ms. Arslanian.  Let's scroll down to roughly October 3 or so.

4   Not there yet.  Stop.  You see the top of the screen.  Can you

5   go up, Mr. Hamill, just briefly.  Stop there.  Thank you.

6           There is this back and forth.  Originally it's Mumbai,

7   now it's New Delhi, she said she'll cancel the meetings in

8   Mumbai, she'll set up meetings in New Delhi.

9           Right?  You with me?

10  A.  Yes.

11  Q.  Now October 9.  She writes I had the two meetings.  We can

12  go down now.  You understood those to be the two meetings in

13  New Delhi?

14  A.  Right.  Yes, that's what she said.

15  Q.  October 9, let's keep going.  Scroll down.  Let's stop

16  there.  Do you see she wrote the e-mail address you sent me is

17  not valid?

18  A.  Yes.

19  Q.  Please send me a new e-mail address where you want the

20  information sent.

21  A.  Yes.

22  Q.  So you sent her a different e-mail address or IS EG

23  Halal.com e-mail address?

24  A.  Yeah, that's my e-mail.

25  Q.  That's your work e-mail?

O733MEN5                         Silvarredonda - Cross

1    A.  Yes.

2    Q.  She said she got it.  Yeah?

3    A.  Yes.

4    Q.  Thanks you?

5    A.  Hmm, sorry?

6    Q.  She thanks you?

7    A.  Yes.

8    Q.  This is October 15, right?

9    A.  Yes.

10   Q.  Roughly six days after October 9?

11   A.  Yes.

12   Q.  Let's now go to 42.  Hana 42.  You see at the bottom it is

13   October 15, right?

14   A.  Yes.

15   Q.  That's the same date she said she would e-mail you

16   information?

17   A.  Yes.

18   Q.  And as far as you know, that's when she sent it, right?

19   A.  Yes.

20   Q.  October 15 she says she'll send it, and she sent it on

21   October 15?

22   A.  Yes.

23   Q.  Now, your testimony, as I understand it, is that was

24   unacceptably late.

25           MS. COLLART:  Objection.  Misstates.

1   Q.  If I understand your testimony, Mr. Hana led you to believe

2   that was too late, Ms. Silvarredonda?

3   A.  I don't remember.

4   Q.  You don't remember.  Let's look at your response two days

5   later.  October 17.  You wrote "Received.  Okay."  Is that

6   right?

7   A.  Yup.

8   Q.  You wrote, "Thank you, we appreciate your time and

9   service." Is that right?

10  A.  Yes.

11  Q.  You didn't write Mr. Hana's firing you, did you?

12  A.  No.

13  Q.  You didn't write this is too late?

14  A.  No.

15  Q.  In fact, you waited two days to respond, correct?

16  A.  Yes.

17  Q.  In fact, the 17th was a Thursday?

18  A.  Yeah, yes.

19          THE COURT:  Look in the second line from the top.

20  Q.  She e-mailed you on a Tuesday?

21  A.  Yes.

22  Q.  Those are workdays?

23  A.  Yes.

24  Q.  And then you informed her we have a person already in

25  charge of the Delhi office, right?

1    A.  Yes.

2    Q.  In charge of the Delhi office is entirely separate from

3    helping to set up where the office would be.  Would you agree

4    with me?

5    A.  It could be.  But I was referring to getting the office

6    space in that e-mail.

7    Q.  So when you wrote we have a person already in charge of the

8    Delhi office, what you really meant was someone's already

9    identified office space for us?

10   A.  Someone's already working on it, yes.

11   Q.  That's what you meant?

12   A.  Yes.

13   Q.  That's not what you wrote.

14   A.  Okay.

15   Q.  I'm asking, ma'am.  Is that what you wrote?

16   A.  No.

17   Q.  Now, can we scroll down to 42.  You can stop there.  Says I

18   had two meetings, the nicest building is Eros, Mr. Fee asked

19   you some questions about this too.  Fair to say, seems like

20   maybe a few hours' work?

21   A.  I didn't understand.  I'm sorry.

22   Q.  I'm sorry, Ms. Silvarredonda.  Fair to say it seems like

23   maybe a few hours' work?

24              THE COURT:  By whom?

25              MR. RICHENTHAL:  By Ms. Arslanian.

1   Q.  The work described in the e-mail.

2   A.  I don't know.

3   Q.  Doesn't seem like dozens and dozens of hours, right?

4   A.  I don't know.

5   Q.  Okay.  So let's scroll back up.  October 17.  If I'm

6   understanding you correctly, you were informing her she had not

7   done the work quickly enough, correct?

8   A.  Yes.

9   Q.  And that she had not done the work well enough?

10  A.  Not direct, but yes.

11  Q.  I am not asking the words on the page, but that was the

12  message I understand you said you wanted to convey?

13  A.  Yes.

14  Q.  If I'm understanding correctly, you conveyed that message

15  because you understood from Mr. Hana that's what you were

16  supposed to do.  Is that your testimony?

17  A.  Yes.

18  Q.  Therefore, IS EG Halal was done with Ms. Arslanian then.

19  That's your understanding, right?

20  A.  That's my understanding.

21  Q.  Hasn't worked fast enough?

22  A.  Sorry?

23  Q.  She hasn't worked fast enough.

24  A.  That's my understanding.

25  Q.  I am asking your understanding.

1   A.  Yeah.

2   Q.  She hasn't worked well enough?

3   A.  I don't know.

4   Q.  That was your understanding?

5   A.  My understanding is she didn't.

6   Q.  I think you said, as a result, someone else did the work

7   that you understood she was supposed to do?

8   A.  Yes.

9   Q.  Not her?

10  A.  Not her.

11  Q.  So she was basically fired.  Is that your understanding?

12  A.  Yeah.

13  Q.  Done?

14  A.  That's what I understand.

15  Q.  Terminated?

16  A.  Yeah.

17  Q.  No more financial relationship?

18  A.  No more relationship.

19  Q.  At all?

20  A.  At all.

21  Q.  Financial or otherwise?

22  A.  That's what I understand.

23  Q.  We're finished; yes?

24  A.  At least with this.

25  Q.  That's your understanding at the time?

O733MEN5                         Silvarredonda - Cross

1   A.  Yes.

2           MR. RICHENTHAL:  So can we go up to Government

3   Exhibit 5A-1000C.  It's in evidence.  Can we put up 5A1000C.

4           I'm sorry 1001C.  5A-1001C.  I think it was up but I

5   think I misspoke.

6   Q.  Mr. Silvarredonda, this is a check for $10,000 from IS EG

7   Halal to Ms. Arslanian's consulting company.  You see that?

8   A.  I see it.

9   Q.  And if we can zoom in on the top.

10          MS. COLLART:  Objection, your Honor.  Scope.

11          MR. RICHENTHAL:  This is directly responsive.

12          THE COURT:  I'll allow it.

13  Q.  Can we zoom in on the top.  Do you see the date on the

14  check?  We can zoom in further.

15  A.  Yes.

16  Q.  Do you agree with me it's November 5, 2019?

17  A.  Yes.

18  Q.  Is that before or after October 17, 2019?

19  A.  After.

20  Q.  Meaningfully after, right?

21  A.  Yeah.

22  Q.  Not just a day or two?

23  A.  A few weeks after.

24  Q.  It's actually the next month, right?

25  A.  Yes.

1    Q.  That's $10,000, correct?

2    A.  Yes.

3    Q.  As far as you know, you've testified to this but tell me if

4    I'm wrong, between October 17 and November 6, Ms. Arslanian did

5    nothing, right?

6    A.  Yeah, she didn't do nothing during the time that I

7    contacted with her.

8    Q.  So she did nothing ever?

9    A.  Yeah.

10   Q.  Can we now put up government Exhibit 4C-1-P also in

11   evidence.  Can we scroll down.

12          Now, this is the unsigned agreement between IS EG

13   Halal and Ms. Arslanian's consulting firm, right?

14   A.  I see it.

15   Q.  Do you see it's dated August 12, 2019?

16   A.  Yes.

17   Q.  Now, that's before October 17, 2019, right?

18   A.  Yes.

19   Q.  A few months before?

20   A.  Yeah, four months before.

21   Q.  Can we go down to number 3.  Do you see the number 3 term.

22   You see the term commences September 1, 2019?

23   A.  Yes.

24   Q.  You see that, right?

25   A.  Yes.

1    Q.  Now, and it says it is a three month term?

2    A.  I didn't understand, sorry.

3    Q.  I'm sorry, ma'am.  It says shall continue for a three month

4    term?

5    A.  Yes.

6    Q.  So three months being September, October, and November?

7    A.  That's what I understand.

8    Q.  Okay.  Do you see the last sentence, "The company, however,

9    retains the right to terminate this agreement at any time, for

10   any reason, and without notice."  Do you see that?

11   A.  Yes.

12   Q.  Termination meaning done, right?

13   A.  Yes.

14   Q.  Don't have to pay you?

15   A.  I didn't hear well.  What?

16   Q.  Termination meaning --

17              MS. COLLART:  Objection, your Honor.

18   Q.  Meaning done.

19   A.  Yeah.

20              MS. COLLART:  Objection.

21              THE COURT:  Sustained.

22   Q.  Do you understand termination to mean the agreement can be

23   terminated?

24              MS. COLLART:  Objection.

25              THE COURT:  I'll allow it.

1    A.  Yes, that's what I understand for termination.

2    Q.  And the company here is IS EG Halal, right?

3    A.  Yes.

4    Q.  Can we go to the top of the agreement.  That's where it

5    says IS EG Halal, right?

6    A.  Yes.

7    Q.  Can we go to the bottom of the agreement.  This isn't

8    signed, but see that the line for signature is Wael Hana?

9    A.  Yes.

10   Q.  So here Wael Hana could terminate this agreement, correct?

11   A.  That's what we understand from this.  I've never seen this

12   before this case.

13   Q.  You were his assistant, correct?

14   A.  Yes.

15   Q.  That's what you understand this to have meant?

16   A.  I didn't understand, sorry.

17          MS. COLLART:  Objection.

18          THE COURT:  Sustained.

19   Q.  Let's change subjects just quickly.  Now, you have not

20   worked for IS EG Halal in New York or New Jersey or anywhere in

21   the United States, right?

22   A.  No.

23   Q.  You just worked in Uruguay?

24   A.  Yes.

25   Q.  You started working there in September 2019.  Did I hear

1   you correctly?

2   A.  Yes, in September 6, 2019.

3   Q.  So, during the time period you've talked about, you started

4   working a few weeks before you had the messages with

5   Ms. Arslanian, right?

6   A.  Yes.

7   Q.  You kept working there?

8   A.  Yes.

9   Q.  Now, you've never worked for IS EG Halal in the United

10  States at all?

11  A.  No.

12  Q.  In fact, you had to fly in to testify, correct?

13  A.  Yes.

14  Q.  Now, because you started in September 2019, you didn't work

15  for IS EG Halal when it opened, right?

16  A.  I worked at IS EG Halal when it opened in Latin America, in

17  Montevideo.

18  Q.  You didn't work for IS EG Halal when it opened in the

19  United States?

20  A.  No.

21  Q.  That was long before you started, wasn't it?

22  A.  As far as I am aware it was, yes.

23  Q.  And you were also not involved in how it started, correct?

24  A.  No.

25  Q.  Didn't have any job in opening the office in New Jersey?

O733MEN5                            Silvarredonda - Redirect

1    A.  No.

2    Q.  Didn't have any role in interacting with the United States

3    Department of Agriculture?

4    A.  No.

5    Q.  Not at all?

6    A.  No.

7    Q.  Didn't have any role in any audit that may have been

8    performed in connection with it getting the license to ship

9    meat to Egypt?

10             MS. COLLART:  Objection.

11             THE COURT:  Sustained as phrased.

12   Q.  Did you have any role in anything that led IS EG Halal to

13   get a license to export meat to Egypt?

14   A.  No.

15             MR. RICHENTHAL:  No further questions.

16             THE COURT:  Thank you.  Ms. Collart, anything?

17             MS. COLLART:  Just a moment, your Honor.

18             MR. FEE:  Just a few questions, your Honor.

19             THE COURT:  Let's see if Mr. Hana has.

20             MR. FEE:  Sorry.

21             THE COURT:  Mr. Fee, go ahead.

22             MR. FEE:  Thank you, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. FEE:

25   Q.  Almost, Ms. Silvarredonda.

1              Can we put back up Government's Exhibit 4C-1P.  Thank

2      you.

3      Q.  So, just to be clear, your job was to help out IS EG in

4      Montevideo, correct?

5      A.  Yes.

6      Q.  And this document, when you were doing your job, you never

7      saw this document that's on your screen right here?

8      A.  Back then, no.

9      Q.  Got it.  And you remember being asked questions by the

10     prosecutor about termination means done or something like that?

11     A.  Yes.

12     Q.  Can we just focus in on the term provision here.  Number 3.

13     And it states that the term is a three month term starting from

14     September 1 of 2019.

15             Do you see those words on the page?

16     A.  Yes.

17     Q.  And then the final sentence of this says "The company

18     retains right to terminate this agreement at any time, for any

19     reason, and without notice."

20             Now, I want to understand from your perspective, you

21     stopped working with Ms. Arslanian on the India office at some

22     point in October 2019, right?

23     A.  Yes.

24     Q.  But you don't have any idea whether Mr. Hana actually

25     issued a formal termination notice to her pursuant to this

1    agreement that you haven't seen before?

2    A.  No.

3    Q.  And you have no idea, fair to say, what the legal

4    obligations under this agreement were for IS EG.  Fair to say?

5    A.  No.

6    Q.  Okay.

7              MR. FEE:  No further questions.

8              THE COURT:  Ms. Collart, anything?

9              MS. COLLART:  No, your Honor.

10             THE COURT:  Mr. De Castro, nothing?

11             MR. DE CASTRO:  No, Judge.

12             MR. RICHENTHAL:  Just briefly.

13   RECROSS EXAMINATION

14   BY MR. RICHENTHAL:

15   Q.  Ms. Silvarredonda, I think you said you were Mr. Hana's

16   assistant; is that right?

17   A.  Yes.

18   Q.  You regularly sent e-mails at his direction?

19             MS. COLLART:  Objection.

20             THE COURT:  Just a moment.

21             Ms. Collart?

22             MS. COLLART:  Objection.  Misstates the testimony.

23             THE COURT:  I'll allow it.

24   Q.  Did you regularly send e-mails at his direction?

25   A.  To his direction?  What do you mean?  On his behalf?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Yeah, on his behalf, would you send e-mails?

2    A.  I don't remember.

3    Q.  You don't remember if you've ever sent e-mails on behalf of

4    Mr. Hana?

5    A.  I don't remember, no.

6            MR. RICHENTHAL:  One moment, your Honor.

7            THE COURT:  When you said you were his assistant, were

8    you his assistant for the Uruguay office or were you his

9    assistant in general?

10            THE WITNESS:  For the Uruguay office and Latin

11   America.

12            THE COURT:  For Latin America, okay.

13            THE WITNESS:  Yes.

14   Q.  You've also sent e-mails connected to India, correct?

15   A.  Yes.

16   Q.  And other parts of the world?

17   A.  I don't remember that.

18   Q.  And you would send e-mails sometimes because he would ask

19   you to, correct?

20   A.  Yes.

21   Q.  And in fact, you would also copy him on a lot of your

22   e-mails, right?

23   A.  Yes.

24   Q.  You would also copy others from the company in your e-mail?

25   A.  Yes.

1   Q.  He would ask you to do things to assist in the operation of

2   IS EG Halal?

3              MR. FEE:  It's scope.  The redirect was very narrow.

4              MR. RICHENTHAL:  It's foundation, but I'll get there.

5              THE COURT:  Gentlemen, gentlemen, the job

6   responsibilities was done on direct, go ahead.

7   Q.  Have I gotten it right so far, Ms. Silvarredonda?

8   A.  I didn't understand.

9   Q.  Have I described aspects of your job correctly?

10  A.  Can you repeat it?

11  Q.  You sent e-mails at Mr. Hana's request?

12  A.  Sometimes, yes.

13  Q.  They weren't just sent within Uruguay, right?

14  A.  No.

15  Q.  They were sent to other countries, correct?

16  A.  Yes.

17  Q.  I think I used India as an example.

18  A.  Yes.

19  Q.  It's not the only example, right?  You also sent e-mails to

20  people in other countries that IS EG Halal did business with?

21  A.  Yes.

22  Q.  In your entire time, did you ever send an e-mail to

23  Ms. Arslanian with a termination letter that Mr. Fee referred

24  to?

25  A.  No.

O733MEN5                              Silvarredonda - Recross

1    Q.  Did Mr. Hana ever ask you to do so?

2    A.  No.

3    Q.  As far as you know, between October 17 and the date of that

4    $10,000 check, did Ms. Arslanian do anything for IS EG Halal at

5    all?

6              MS. COLLART:  Objection.

7              THE COURT:  As far as she knows.  As far as you know.

8              THE WITNESS:  Not as far as I know.

9              THE COURT:  All right, Ms. Collart, you were the

10   proponent of the witness so you get the last shot.  Anything at

11   all?

12             MS. COLLART:  No.

13             THE COURT:  Ms. Silvarredonda, you are excused.  You

14   may step down.

15             (Witness excused)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

O733MEN5

1          THE COURT:  Ladies and gentlemen, it's 10 to 5.  Let

2    me give you a break now while I discuss some matters with the

3    lawyers.  All right.  Just take a few minutes and I'll have you

4    back.

5          If I was unclear, we're having a late midafternoon

6    break for 10 minutes.

7          (Jury excused)

8          THE COURT:  Mr. Lustberg, where do we stand, sir?

9          MR. LUSTBERG:  Your Honor, we do not have any other

10   witnesses here today.  We do have a stip or two to read.

11         As the Court knows from our dialogue earlier this

12   morning, we have a witness who we're hoping will be here on

13   Monday morning.  We don't know for sure whether that witness

14   will be here.  We would ask the Court's indulgence,

15   particularly given --

16         THE COURT:  You need to speak into the microphone.

17         MR. LUSTBERG:  I would ask the Court's indulgence to

18   allow us the opportunity to get that witness.

19         THE COURT:  No.  It's 5 o'clock.  I'm not going to

20   shut you off now.  If you have another witness, I want that

21   witness here Monday morning.

22         MR. LUSTBERG:  Okay.

23         THE COURT:  And it's just one, your expectation is one

24   witness.

25         MR. LUSTBERG:  Yes, your Honor.

O733MEN5

1          THE COURT:  Then it seems to me that's the end of the

2     case, unless there is a government rebuttal case.  I assume

3     there is not.

4          MR. RICHENTHAL:  We'll take a look and we'll decide.

5     If there is, it will be narrow.  We'll advise the Court

6     promptly.  I don't think we are in a position to answer

7     affirmatively or negatively at this time.

8          THE COURT:  Then what I propose is that I send you the

9     charge over the weekend, and we have a charging conference.

10    Rather than bring the jury in just for short witnesses -- that

11    witness, how long is that witness?

12         MR. LUSTBERG:  Really quite brief, your Honor.

13         THE COURT:  So rather than have the jury come in at

14    9:30 for a brief witness, and assuming there is no or a limited

15    government rebuttal case, I wouldn't want the jury to have to

16    sit there while we have the charging conference.

17         So why don't I bring the jury in at 11 on Monday.

18    I'll bring the lawyers in at 9:30 for a charging conference.  I

19    think that's more than enough time for the charging conference.

20         Does that make sense?  Charging conference 9:30

21    Monday, witness 11, we'll put the witness on if there is one,

22    if there isn't, everyone rests.

23         Make sense, government?

24         MR. RICHENTHAL:  Yes, with the proviso I think we'll

25    decide in the next 24 to 48 hours if we have a rebuttal case

O733MEN5

1   and we'll advise the Court and defense.

2            MR. MONTELEONI:  Your Honor, I think closings would

3   then start on Tuesday so we could incorporate any rulings at

4   the charging conference, rather than have to do it on Monday.

5            MR. FEE:  Joined.

6            MR. MONTELEONI:  There is a lot of law and we don't

7   want to get it wrong or be in a position, especially if we're

8   going first, to not be able to adequately tell the jury what we

9   expect the judge will instruct.

10           THE COURT:  I'm not expecting major issues on the

11  charge.

12           MR. MONTELEONI:  I think there's a lot of different

13  counts, they involve a number of different legal issues, and I

14  don't think that we can assume --

15           THE COURT:  Talk into the microphone.

16           MR. MONTELEONI:  I was trying to avoid feedback.  I

17  don't think we can prejudge that there won't be changes from

18  the charge conference.  And for us to then not have an

19  opportunity to incorporate any changes into our presentation

20  while others would have that opportunity, I think would

21  prejudice us.

22           THE COURT:  Well, you are asking for quite a bit given

23  the length of the trial.

24           Do all the attorneys want the summations to start on

25  Tuesday?

O733MEN5

1          MR. FEE:  Yes, your Honor.  And we have a slightly

2     different concern, in that if that's the schedule on Monday, we

3     would rather avoid where say the opening defense summation is

4     leading into 6 p.m. or we have to break it up over two days.

5          THE COURT:  We're going to have that issue regardless

6     of when we start.  Because I don't know how long you're going

7     to take, and I assume you don't know how long you are going to

8     take at this point.

9          MR. FEE:  That's true, your Honor.  I just think we

10    essentially guarantee it if we have a late start on Monday, a

11    government summation, and then a defense summation.  And we

12    otherwise might get lucky.  So I would join in the application

13    of Mr. Monteleoni.

14         THE COURT:  I may regret this, but we'll start

15    summations first thing Tuesday morning.

16         Now, just let me think about that.  Because that may

17    mean -- no.  That may not work.  That may mean we're bringing

18    in the jury for no testimony or very short testimony on Monday.

19    I don't want that.

20         MR. LUSTBERG:  May I make a suggestion?  Just a

21    suggestion.

22         THE COURT:  Yes.

23         MR. LUSTBERG:  I think it is clearly correct that we

24    have a right, and as Mr. Monteleoni says, it will be a great

25    benefit to the attorneys to know the charge before we sum up.

O733MEN5

1    I think given that the testimony is likely to be short, if

2    there is any, I know this might be a little unconventional, but

3    we could have our charge conference on Monday, we could bring

4    the jury in for whatever's remaining of the testimony first

5    thing Tuesday morning, and then go into summations perhaps very

6    quickly.  This may depend of course on whether the

7    government's --

8            THE COURT:  I don't want to risk that.

9            This is what we're going to do.  We're going to have

10   the -- let me think for a moment.  We're going to have the

11   charging conference at 9:30 on Monday.  I'm going to bring the

12   jury in at 10:30.  Roughly testimony 10:30 to 11, 11:30.  We

13   then will give the jury a two hour break, two hour lunch, and

14   we'll start charges.  I'm sorry.  We'll start the summations.

15           So the government should be prepared to begin its

16   summation, you'll have a couple of hours after the charging

17   conference.  That's it.  Charging conference 9:30.  I'll bring

18   the jury in at 10:30.  And I'll give them a two hour lunch or

19   thereabouts so that the parties have time to order their

20   summations.  I'm not expecting major changes in the charge, but

21   we'll see.

22           All right.  I think that's it.  9:30 on Monday for

23   everybody.  I'll bring the jury back now and tell them that

24   they're to come in at 10:30 on Monday.

25           Bring the jury in.

O733MEN5

1          The parties are going to have Thursday, Friday,

2    Saturday, Sunday to be working on their summations.  And

3    they're not going to vary significantly based on any

4    alterations in the charge.  I don't see any major issues in the

5    charge.  I may be wrong.

6          MR. MONTELEONI:  Your Honor, I'm a little concerned

7    about whether my summation would finish on Monday if we start

8    then.

9          THE COURT:  Then you won't finish.  From your

10   standpoint, you get the advantage of another day.  I'm not

11   being facetious.  I don't know which way that cuts, but that's

12   really not my concern.

13          Jury entering.

14          (Jury present)

15          THE COURT:  My concern is an efficient use of the

16   jury's time, giving all the lawyers adequate time to prepare.

17          You may be seated in the courtroom.

18          Ladies and gentlemen, we're going to end for the day

19   now.  Now I understand why there was consternation on your

20   faces.  You thought I was literally calling a midafternoon

21   break at 10 to 5.  But I needed time outside of the hearing of

22   the jury to work out matters with the lawyers.

23          I'm going to ask you to come in -- I'm going to ask

24   you, first of all, to have a very enjoyable holiday weekend.

25   Thursday, Friday, Saturday, Sunday.  Secondly, to come in on

O733MEN5

1    Monday at 10:30 in the morning.  I am going to meet with the

2    lawyers at 9:30.  We have work to do.  At 10:30 in the morning,

3    we'll continue with the testimony.

4            And on June 17, I told the jury that our expectation

5    was that we would have this case in your hands for your

6    consideration by the end of the week of July 8th.  That is

7    still our expectation.

8            Be here Monday, 10:30, we'll hear more evidence.

9    Enjoy the weekend.  Thank you.  You have not heard all of the

10   evidence.

11           (Jury excused)

12           THE COURT:  Enjoy the holiday.  I'll get you that

13   charge as soon as I can.  I'll have my deputy send it however

14   she does it.  I guess e-mail.

15           Thank you, enjoy the weekend.

16           MR. WEITZMAN:  Happy holidays, your Honor.

17           MR. RICHENTHAL:  You too.

18           (Adjourned until July 8, 2024, at 9:30 a.m.)

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3    DAVID GANNAWAY

4   Direct By Mr. Weitzman . . . . . . . . . . .6079

5   Direct By Mr. Solano . . . . . . . . . . . .6119

6   Cross By Mr. Monteleoni  . . . . . . . . . .6133

7   Redirect By Mr. Weitzman . . . . . . . . . .6155

8   Recross By Mr. Monteleoni  . . . . . . . . .6160

9    CAROLINA SILVARREDONDA

10  Direct By Ms. Collart  . . . . . . . . . . .6176

11  Direct By Mr. Fee  . . . . . . . . . . . . .6185

12  Cross By Mr. Richenthal  . . . . . . . . . .6189

13  Redirect By Mr. Fee  . . . . . . . . . . . .6206

14  Recross By Mr. Richenthal  . . . . . . . . .6208

15                   DEFENDANT EXHIBITS

16  Exhibit No.                              Received

17   2503, 2504, 2510, 2511, 2512, 2514, . . . .6073

18          2515, 2516, 2517, 2518, 2519,

19          2520, 2521

20   1865 and 1868  . . . . . . . . . . . . . . .6073

21   2085   . . . . . . . . . . . . . . . . . . .6073

22   1302, 1303 and 1304  . . . . . . . . . . . .6083

23   484, 486, 617, 819, 820, 821, 901, 907, . .6086

24          919, 936, 1003, 1010, 1511,

25          1818, 1819, 2190, 616, 617,
```

```
1              825, 831, 1025, 1034, 1865,

2              1924-1, 1925-1, 1925-2,

3              1925-3, 1928-1, 1933-1,

4              1933-2, 1933-4, 1933-5,

5              1933-6, 1933-7, 1933-8,

6              1942-1, 1942-2, 1942-3,

7              1942-4, 1942-5, 1942-6,

8              1942-7, 1942-8, 1942-9, 1973,

9              1989-E, 1989-T, 2032, 1989-A1,

10             1989-A2, 1989-A3, 118, 304,

11             307, 332, 332-A, 334, 334-A,

12             336, 338, 338-A, 342, 344,

13             347, 350, 405, 406, 409, 412,

14             413, 416, 439, 440, 495, 800,

15             802, 836, 837, 919, 1027,

16             1035R, 1036R, 1039-A, 1045,

17             1046, 1300, 1523, 1524, 1525,

18             1528, 1530, 1531, 1532, 1534,

19             1535, 1541, 1546, 1548, 1550,

20             1554, 1579R, 1586, 1594, 1604,

21             1605, 1606, 1607, 1608, 1615,

22             1617, 1618-1, 1619, 1763-A,

23             1764-A, 1765, 1765-A, 1766,

24             1772, 1772-A, 1772-A-1,

25             1772-B, 1772-B-1, 1772-C,
```

1              1772-D, 1772-E, 1772-F,

2              1772-F-1, 1773, 1773-A, 1780,

3              1800, 1823, 1823-A, 1829,

4              1829-A, 1831, 1831-A, 2002,

5              2004, 2029-1, 2031, 2037,

6              2040, 2041, 2083, 2106, 2107,

7              2111, 2112, 2114, 2503, 2504,

8              2510, 2511, 2512, 2514, 2515,

9              2516, 2517, 2518, 2519, 2520,

10             2521

11   Hana 197, 198, 199, 200   . . . . . . . . . .6125

12   Hana 1300 and exhibits cited within Hana 13006128

13   Hana 190    . . . . . . . . . . . . . . . .6179

14   Hana 210    . . . . . . . . . . . . . . . .6180

15   Hana 42   . . . . . . . . . . . . . . . . .6183

16

17

18

19

20

21

22

23

24

25