O793MEN1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        23 Cr. 490 (SHS)

 5   ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
 6   and FRED DAIBES,

 7              Defendants.
                                          Trial
 8   ------------------------------x

 9                                        New York, N.Y.
                                          July 9, 2024
10                                        9:45 a.m.

11

12   Before:

13
                          HON. SIDNEY H. STEIN,
14
                                          District Judge
15                                        -and a Jury-

16                         APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys

22

23

24

25
```

O793MEN1

1

2                        APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4        Attorneys for Defendant Menendez
BY:  ADAM FEE
5        AVI WEITZMAN
         PAUL GROSS
6        RITA FISHMAN

7

8    GIBBONS, P.C.
         Attorneys for Defendant Hana
9    BY:  LAWRENCE S. LUSTBERG
         ANNE M. COLLART
10       CHRISTINA LaBRUNO
         ANDREW J. MARINO
11       RICARDO SOLANO, Jr.
         ELENA CICOGNANI
12       JESSICA L. GUARRACINO

13

14   CESAR DE CASTRO
     SETH H. AGATA
15   SHANNON M. McMANUS
         Attorneys for Defendant Daibes
16

17

Also Present:
18   Marwan Abdel-Rahman, Interpreter (Arabic)
     Rodina Mikhail, Interpreter (Arabic)
19

20

21

22

23

24

25

1        (Trial resumed; jury present)

2        THE COURT:  Mr. Monteleoni, you may continue with your

3   summation.

4        MR. MONTELEONI:  Good morning.  So, I still have

5   several hours to go today, especially because I'm going to try

6   to speak more slowly.

7        So, we're looking at the first element of Count Nine,

8   related to honest services fraud, concerning the New Jersey

9   Attorney General conduct.

10        Now, just like for the Egypt-related counts that we

11   looked at yesterday, another reason that you know that there

12   was a corrupt quid pro quo is the special treatment that

13   Menendez was giving to Hana and to Uribe.  And that special

14   treatment included attempts to take officials acts, included

15   promises of official acts, and included claims that he had

16   taken official acts.

17        And just like with Egypt, there doesn't have to be any

18   special treatment at all.  Even if Menendez didn't do anything,

19   and even if everything that he was promising to do was totally

20   routine things, things that he would have done anyway, things

21   that he believed were righteous, things that he believed were

22   in the interests of justice, there is still a quid pro quo if

23   he's doing or if he's promising them, even in part, in exchange

24   for a thing of value with corrupted intent.

25        But here, the official acts that he's trying to do and

1  promising to do were wildly abnormal.  That's another reason

2  that you know that this element is proven.

3            Here's the first official act that Menendez tried to

4  take and that he promised to take.  He is trying to get the New

5  Jersey Attorney General to intervene into Elvis Parra's

6  criminal case.  We've seen from the timeline yesterday that

7  when he's going to go call Grewal, he doesn't ask for evidence

8  of discrimination.  He doesn't ask for any evidence that anyone

9  has been treated any differently than anyone else.  He just

10  asks for what case he should intervene in, not for a basis to

11  intervene.

12            How do you know?  Well, as you see on the timeline,

13  that's the information that Nadine collects after he calls her

14  on the flip phone.

15            Actions speak louder than words.  Words like these.

16  These are Menendez's words to the public.  This is what he

17  tells the world he won't do for his constituents.  This is what

18  the people who aren't secretly paying him hear.  "Our senate

19  office cannot legally get involved with pending litigation,

20  including questions about criminal trials or imprisonment."

21            But what you've seen from the evidence of this case is

22  Menendez's actions are saying something totally different.  His

23  actions are saying, what's on my website, that's just for the

24  people who aren't paying me, promised my girlfriend a Mercedes.

25  Then give me the name of a case, nothing else, just a name and

1    a case number, I'll get right on the phone with the attorney

2    general of New Jersey for you.

3        What you see in that website and in that call is the

4    hypocrisy of someone who will do anything to get paid.

5        You also know that it was special treatment from what

6    the attorney general said.  Because, when you hear from the

7    witness to Menendez's calls, that reinforces what you already

8    know from the timeline.  That Menendez contacted Grewal in an

9    attempt to disrupt two pending state criminal matters.  Grewal

10   told you he knew Menendez was a powerful ally of the governor,

11   was someone he needed to maintain a good relationship with.

12   And out of all the cases handled by the entire New Jersey

13   Division of Criminal Justice, Menendez singled out what was

14   just the Parra prosecution and the related investigations.

15       Right there you know that even just happening to

16   mention the case associated with the people who are buying the

17   Mercedes for his girlfriend, that's special treatment.  But you

18   also know it from how Grewal reacted.  Just like where

19   McKinney, he knew he had to protect his team from pressure.  "I

20   view my job as insulating the team from any type of pressure or

21   interference from the outside, so, I wasn't going to relate to

22   anyone in the office that there was this inquiry."  He didn't

23   want his team to feel pressured or intimidated.  Just like with

24   McKinney, Grewal protected the team from Menendez's pressure.

25       So the fact Grewal said that he didn't feel pressure

1    does not matter.  Grewal shut Menendez down before it could get

2    to there.  And he knew that the fact of the inquiry itself

3    would inherently create pressure on the team.  He didn't say,

4    oh, well, let's tell the team and they'll understand that since

5    Menendez didn't raise his voice on the call, it's fine.  He

6    knew what Menendez was trying to do, and he stopped it.

7              Same for the second official act that Menendez tried

8    and promised.  Again, Menendez tried to intervene in the case,

9    and again, you see Grewal testifying that he worked to insulate

10   his team from the influence.  And he and his deputy immediately

11   realized what was happening.  His deputy said it was gross.

12   And he was right.

13             But he didn't even know what you learned in this

14   trial.  That Menendez reached out to Grewal because Hana and

15   Uribe secretly promised to get Nadine a new car.

16             Let's talk about what Menendez said when he attempted

17   to pressure Grewal on a call and in a meeting.  Menendez said

18   that Hispanic truckers were being treated differently from

19   others.  He was saying that this was a discriminatory

20   prosecution.  A selective prosecution.

21             That is a serious accusation.  That is a call for

22   action.  If it was really a selective prosecution, as Grewal

23   testified, the case would be dismissed.  The case would be

24   dismissed.

25             So you know exactly what Menendez was trying to do by

making that claim with no basis.  He was telling a lie, that if

it was believed, would have been a reason to dismiss the case.

A reason to kill and stop all investigation.

But let's be clear.  Menendez didn't have to say

anything to Grewal in order for there to be a corrupt quid pro

quo.  If Menendez had called Grewal and talked about the

weather, this element could still be proven based on his

promises to Hana and Uribe.  The promises are the crime.  If

Menendez had never even called Grewal at all, but had just

promised intervention, his promises alone would still be

enough.

But he didn't stop at promises.  He tried to shut down

the prosecution.  He tried to shut down the investigation, just

like he was getting paid to do.  But he did it in a smart and

careful way.  Because as you have seen from start to finish in

this trial, Menendez is smart.  Menendez is careful.  He wasn't

foolish enough to tell Grewal you need to kill this case.

Instead, he used a fake claim of discrimination as a tactic

because that is a serious accusation, one that could get a case

dismissed.  Also, because it gave Menendez deniability, if

anyone ever accused him of improperly pressuring Grewal.

You also know Menendez didn't get this fake reason

from Michael Critchley.  Critchley, Parra's lawyer who had

actually looked into the case, who had actually reviewed the

evidence in the case, he did not think that this prosecution

1    was discriminatory.  He thought that the attorney general

2    shouldn't be getting involved in private insurance company

3    debts.  But he did not think that there was anything selective

4    or discriminatory about the prosecution.

5              So when Menendez's counsel stood up in opening and

6    said that Menendez took action because people involved in the

7    case, including the lawyers, told him it was a selective

8    prosecution, you should ask yourself, is that what the evidence

9    showed?

10              And Menendez clearly didn't care what Critchley

11    thought about the case anyway.  Menendez didn't discuss the

12    facts of the case with him.  He didn't talk about any policy

13    issues with Critchley at all, in a two-minute call.  And in

14    fact, Menendez's call to Critchley was in March, after Menendez

15    had already called Grewal in January, and claimed that there

16    was discrimination.

17              Actually, if you remember, as I mentioned yesterday,

18    Menendez called Critchley immediately after getting off the

19    phone with Nadine on March 12.  Remember this call here, where

20    Menendez and Nadine talked for a bit over a minute, and then

21    the minute that Nadine gets off the phone with Menendez, she

22    calls Hana.  And the minute Menendez gets off the same call, he

23    calls Critchley.  And this is the same day that Nadine then

24    calls Uribe to complain that Hana hasn't gotten her the car.

25              From the timing of the calls, you could tell they're

1    obviously talking about the Parra case.  And then when you hear

2    from Critchley, he just reinforces what you already knew from

3    the call records.  Menendez was calling about the Parra case,

4    and it also shows you something that you didn't know from the

5    documents which is he wasn't asking any questions, he wasn't

6    trying to dive into the facts.  Why?  Menendez wasn't trying to

7    learn anything on this call from Critchley.  He was trying to

8    tell Critchley and through him, Parra, that he had an interest

9    in the case.  He was trying to tell them that he had done his

10   part by getting involved, so that word would get back that Hana

11   should pay up.

12         And that's just reinforced by what Critchley didn't

13   know, but you do, which is that Nadine called Uribe later that

14   night, and that after that call, that night, the night of this

15   call with Critchley, Uribe promised Nadine a car.

16         But in any case, you know from the timing more than a

17   month after the call from Grewal, Menendez wasn't talking to

18   Critchley trying to figure out whether there was discrimination

19   in the Parra case.  Discrimination was just a fake reason he

20   came up with.

21         The fact that Menendez went to all this trouble to

22   make up a fake reason to try to get the case dismissed, and to

23   bring that fake reason to the New Jersey Attorney General, is

24   just further proof that Menendez was being bribed.  He went out

25   of his way to pressure Grewal about a specific criminal case as

1    a special favor, not out of the goodness of his heart, but

2    because he wanted to get Nadine the car that she wanted.  Then,

3    he wanted Uribe to keep making payments on that car.

4            One of the most powerful U.S. senators in Washington

5    called the chief state law enforcement officer of New Jersey,

6    to feed him completely made up claims of discrimination, to try

7    to tamper with the integrity of a criminal prosecution, and he

8    did it so his girlfriend could get a convertible.

9            That's another reason you know this element is proven.

10   Let's look at the next one.

11           The Mercedes.  We've already looked at how Menendez

12   knew that Nadine couldn't afford a Mercedes, and how he was

13   looped in on those first phone calls that led to Nadine calling

14   Uribe.  But it's not just that.  He was aware every step of the

15   way, because this car wasn't just something Nadine cared about.

16   Menendez wanted that car, too, because he wanted to keep Nadine

17   happy.  So Menendez was involved in the details of Nadine

18   getting the car.

19           So we've seen this message that we looked at yesterday

20   that she's told Menendez she's going to see if Hana will step

21   up and help with the car, but she's going to get it Monday

22   anyway.

23           Let's look at the next few days.  A few days after

24   this voicemail, she checks with Menendez on the color scheme.

25   Which one do you prefer?  On April 1st, few days after that,

1    she tells Menendez she's furious at Hana for leaving for Egypt.

2    Why?  Well, as she explains to someone else, Hana was supposed

3    to take her to the car dealer, Edison, that's where Ray Catena,

4    the Mercedes-Benz dealer is.  Hana was supposed to take her to

5    the car dealer.  She didn't explain that to Menendez in the

6    text message we just looked at.  Doesn't say why she would be

7    so bothered from the fact that Hana went to Egypt.  She doesn't

8    have to.  He already knows.  And Menendez doesn't respond and

9    ask why do you care if Hana went to Egypt?  He knows.

10         Now look at later that day.  Jose called Leon at Ray

11   Catena to make the arrangements for my car.  She just texts it

12   out to Menendez.  Jose Uribe is making the arrangements for her

13   car.  That text alone, Nadine to Menendez, tells you Menendez

14   knew full well that Uribe was paying for Nadine's Mercedes.

15   But you have even more.

16         Menendez knows all the details about how she's going

17   to get the car.  He's in the weeds on the whole car purchase.

18   He knows that the car that she wanted sold and the dealership

19   needs to get another one.  He knows that they got another one.

20   And he knows exactly how Nadine's getting the money for the

21   down payment.  He knows because he lent her his own car, and

22   here, she's leaving a voicemail telling Menendez how she's

23   going to return his car and then she's going to meet Jose for

24   five minutes.  Menendez doesn't ask why are you meeting him for

25   five minutes?  She doesn't explain why she needs to meet Jose

1    for five minutes.  She doesn't have to.  Menendez already knows

2    that Nadine is going to pick up the cash for the down payment

3    on the Mercedes from Uribe.

4            And remember, this is another example of Nadine

5    keeping Menendez updated on the precise details of her

6    collection of bribes for him.  A five-minute stop in the

7    parking lot to pick up $15,000 in cash.  That is exactly the

8    type of thing she informs Menendez.  He's not in the dark.

9    He's monitoring her every step of the way.

10           He also knows exactly how she's going to get to the

11   dealer, because he's actually arranging to get her driven

12   there.  When she's at the dealer, she's texting with Menendez

13   about being there and texting him about cleaning out her inbox.

14   He's so involved in every detail of her life that she tells him

15   what she's doing while she sits in a waiting room.

16           This is not the kind of relationship where Menendez

17   doesn't know where Nadine miraculously got the money to pay for

18   the car that she can't afford in January.  This is the kind of

19   relationship where the partners share things, including here,

20   all the details of how Nadine is able to finally get the car

21   that she wants.

22           And it is the kind of relationship where Menendez asks

23   questions about even the most mundane details about the car.

24   He's checking in about why it's taking so long at the

25   dealership.  When it's done, "Congratulations mon amour de la

1    vie, we are the proud owners of a 2019 Mercedes."  We.  Because
2    they got the car together through Nadine's negotiations with
3    Hana and Uribe, and Menendez's promises to interfere in a
4    criminal case.  And congratulations.  Because their efforts
5    paid off.  They got the bribe they were promised.

6          Of course Menendez knows how Nadine pays for the car.
7    She tells him, she texts to him, he knows everything about how
8    she gets the car, and he knows that she can't afford it any
9    other way.  Just another way you know there is a quid pro quo.

10         Here's another.  Just like before, Menendez and Nadine
11   try to hide what they're doing with the criminal case.  Instead
12   of saying I got to grab that money that Jose is loaning me for
13   the car, Nadine says meet Jose for five minutes.  She's cryptic
14   for a reason, because she knows that what's happening in those
15   five minutes is a bribe going into her hands, and Menendez
16   knows exactly what she is doing so he doesn't need to ask
17   questions.  You know that from the timeline.

18         The day before, you could see Uribe trying to get
19   together $15,000 in cash, which you know from the purchase
20   records is the amount of the down payment on the car.  And you
21   can see Nadine and Uribe planning where to meet.  They're
22   trying to decide which parking lot to meet at.  They don't
23   really care where they meet, just so long as it is a parking
24   lot.  Why?  It is the perfect place for a quick handoff of
25   cash.  The perfect place for secrecy.

1          And of course Nadine doesn't give that cash to the

2     dealer.  That would be too obvious.  Some of the cash goes to

3     the dealer, but they get checks from Nadine's father, checks

4     from Nadine's bank accounts, and money from Nadine's credit

5     card.  So what does Nadine do with the cash?  She uses most of

6     the cash to reimburse herself, paying down the credit card.

7     But look how she does it.  She doesn't just do it all at once.

8     She breaks it up into six different cash payments on three

9     different days.

10         And on two of those days, April 4 and April 6, the

11    payments are made in different branches within the same day.

12    On April 4 of 2019, Nadine is traveling around New Jersey with

13    a bunch of cash going from branch to branch, stopping to

14    deposit bits of it into different branches.  Why?  To hide the

15    quid pro quo.

16         The secrecy doesn't stop with the cash handoff.  Even

17    once they're using electronic payments, Uribe has his friend

18    Barruos pay, because Uribe just comes out and says he doesn't

19    want to use anything with his name on it.  Even when Uribe

20    starts making the payments himself, he uses his company's, not

21    his own account.

22         The secrecy isn't about just the payments.  When

23    Menendez is getting ready to call Grewal, Menendez calls

24    Nadine's flip phone.  Now, let's be clear.  This case is not

25    about why Nadine has a flip phone.  There is no dispute she got

1    the flip phone because of an ex-boyfriend who was spoofing her

2    and sending her fake texts.  The issue isn't why she got the

3    flip phone.  What matters is why Menendez chose to call her on

4    that phone on that day.

5            You heard from Special Agent Rachel Graves, who

6    reviewed Menendez and Nadine's cell phone records, this was not

7    the phone they usually used to talk.  It wasn't the phone that

8    she used to text with Hana.  But, when he was getting ready to

9    call Grewal, he didn't choose to call the normal phone that he

10   usually called that's registered under Nadine's name.  He

11   called the flip phone, which is not registered under Nadine's

12   name.  And he did it because he didn't want anyone to find out

13   about the call.  He did it because he knew the call was part of

14   a quid pro quo.

15           Just like when he told her not to text or e-mail

16   Daibes about the bogus check from Hana, these calls to the flip

17   phone are part of Menendez's efforts to cover his tracks.

18           Not just the call to Grewal.  Look at this.  The

19   meeting, the meeting in September is on Grewal's calendar.

20   It's not on Menendez's.  And you remember from Grewal, Menendez

21   didn't have any of his staff with him.  Menendez seemed

22   surprised when Grewal didn't come alone to that meeting.  Now,

23   obviously, Menendez's staff will see someone coming into his

24   office.  But the whole point of summoning Grewal to Menendez's

25   office is for Menendez to use his office and his power.  So,

1    having staff see Grewal walk in the door is the price he has to

2    pay.  But what he doesn't have to do is make a record of it by

3    putting it on his calendar.  So he doesn't.  Why?  Because

4    Menendez knows it is wrong.  Because he knows it is part of a

5    quid pro quo.  And that's another reason that you know this

6    element is proven.  Let's look at the next.

7            Just like with Egypt, they don't just act secretly at

8    the time.  They lie to cover it up later.  Let's look at

9    Menendez's financial disclosure forms again.  2020, this is the

10   pre-amendment one, but you won't see it on the amendment

11   either.  There are no car payments listed here in 2020 once

12   they are married and he has to report it.  He amends it to add

13   in the story about the family gold, but he never amends it to

14   report the car payments that Uribe is making in 2020.

15           Or here in 2021 where Uribe paid car payments for the

16   whole year or over $10,000.  Or here, in 2022, where Uribe paid

17   all the way up until the FBI showed up at the door.

18           That's the same thing that he has his lawyers say to

19   the U.S. Attorney's Office for the Southern District of New

20   York.  He doesn't, he didn't know anything about the car

21   payments.  But Menendez knew that Uribe was paying for the car.

22   We've just been through the timeline shows that.  You know he

23   knew Nadine couldn't afford the monthly car payments.

24           Why did he lie?  Why not just say, well, Uribe was

25   paying for the car, but that's fine, it wasn't part of a quid

1    pro quo.  Why not just say, Uribe was paying for the car, but

2    that's fine, it was a loan.  You know the answer.  Because it

3    was a bribe, and because he knew it.

4            Now that takes us to the next reason you know it is a

5    quid pro quo.  This scheme.  Every new piece of the puzzle you

6    see reinforces the clear pattern of corruption that you see

7    throughout the case.  One call standing in isolation, you can't

8    tell much from.  One piece of a jigsaw puzzle, you can't tell

9    much about the whole picture.  But as you add more pieces of

10   the puzzle and they fit together and as you add more pieces of

11   evidence and they fit together, the picture becomes clearer and

12   clearer and it becomes unmistakable.

13           And so you've seen how the pieces of the evidence in

14   this portion of the scheme, they all add up and they reinforce

15   each other.  But now look at it together with the Egypt

16   conduct, because it is all part of the same pattern of

17   corruption.

18           The defense would have you believe that Menendez just

19   happened to make a very unusual call to try to pressure

20   Undersecretary McKinney to protect a monopoly, and that just

21   happened to be exactly the same thing that his website told the

22   world he wouldn't do.  But they would have you believe it's

23   that's not because his girlfriend had been promised some of the

24   profits from that monopoly.  That's just a coincidence.  And

25   now, they would have you believe that in the very same year,

1    2019, Menendez just happened to make two very unusual calls to

2    try to pressure Attorney General Gurbir Grewal to disrupt two

3    criminal matters, and that just happens to be exactly the same

4    thing that his website told the world he wouldn't -- not just

5    wouldn't, but couldn't do.  But they would have you believe

6    that's not because his girlfriend was getting a Mercedes from

7    someone who knew both of the people involved in those criminal

8    matters.  That's just a coincidence too.  It is a coincidence

9    that those two coincidences about Egypt and the New Jersey

10   Attorney General both happened to Menendez and Hana who had

11   nothing to do with each other.

12             Are those just coincidences?  Of course not.  And I

13   haven't even started with the New Jersey U.S. Attorney conduct

14   where Menendez reaches out to yet another law enforcement

15   official about another pending criminal matter, that just so

16   happens to implicate another person who is paying Menendez.

17   But we'll come back to that one.

18             So I want to talk about an extra additional reason

19   that you know that there was a corrupt quid pro quo involving

20   the scheme to disrupt the New Jersey Attorney General criminal

21   matters.

22             And you might have noticed that there is one thing I

23   haven't talked about yet.  And that is a single word of

24   testimony from Jose Uribe.  Nothing that I have said until this

25   point yesterday, nothing that I have said until this point

1    today, relies on a single word of testimony from Uribe.  Before

2    you even consider anything Uribe has to say, there is already

3    enough evidence to prove Count Nine.  I've talked for over two

4    hours between these two days.  I haven't even touched on

5    Uribe's testimony.

6            Even if you ignore Jose Uribe's testimony completely,

7    there would be more than enough evidence to convict every

8    defendant on every count.  But you shouldn't ignore it, because

9    it is devastating proof of the defendants' guilt.

10           First of all, you saw Uribe's demeanor.  He was

11   straightforward about what he did and about what he didn't do,

12   and he was the same person on cross-examination as he was on

13   direct examination.

14           And even more importantly, what Uribe told you was

15   overwhelmingly corroborated.  It matched up with all the

16   evidence in the case, text messages, phone records, financial

17   records.  He told you about the bribes.  Most of them are right

18   there on the documents.

19           And he also told you about things which match up with

20   other evidence he didn't even know about.  For example, when he

21   told you that Fernando Barruos was in the Bronx when Uribe

22   called him to ask him to make the payment on the car, that's

23   exactly what Special Agent Wheeler told you that the phone

24   records, the cell site records showed.  Remember that chart of

25   the deposits that Nadine made after the cash handoff?  Those

1   bank records show that those deposits are made in $100 bills,
2   just like Uribe told you is the type of bills he gave to
3   Nadine.

4           Uribe told you that Menendez rang a bell to summon
5   Nadine.  And Uribe stuck to it, when defense counsel was asking
6   him question after question, trying to suggest that Jose Uribe
7   was lying about a bell, of all things.

8           He stuck to it, because he was telling the truth.  And
9   you know that because Uribe had no way of knowing that about a
10  month before he went over to Menendez's house, Nadine texted
11  Fred Daibes saying she was trying to buy a bell.  And that
12  bell, that bell, by the way, shows that Menendez was in charge.
13  He wasn't the one being led around and manipulated by Nadine.
14  He's not a puppet having his strings pulled by someone that he
15  summons with a bell.  That's why defense counsel was so
16  desperate to get Uribe to back off of what he witnessed about
17  the bell.  But Uribe didn't back off, because as you saw, he
18  was here to tell the truth.

19          And here's another one.  When he was in the backyard,
20  he told you that all he wrote down was the names of the people
21  he wanted Menendez to intervene for.  He didn't tell you
22  Menendez asked him to write down any evidence of
23  discrimination.  He didn't ask for anything like that.  How do
24  you know that's true?  Because that's exactly what Menendez
25  asked for about Parra's case.  Uribe wasn't on these texts

1    where Hana sends Nadine Elvis Parra's name and the case number,

2    but no evidence of discrimination.  He wasn't on the phone call

3    where Menendez then called the New Jersey Attorney General

4    based on that.

5           So when Uribe told you that when Menendez was about to

6    intervene a second time, all Menendez needed was the names, not

7    any evidence, you know he was telling the truth.

8           And here's one more.  You remember this one.  Uribe

9    told you that when he went to Segovia with Menendez with Nadine

10   and her daughter Sabine, Nadine and her daughter went to the

11   bathroom.  Menendez then leaned back and said to him in

12   Spanish, "I saved your ass twice.  Not once, but twice."  On

13   cross-examination, Menendez's counsel again tried to suggest

14   that Uribe was lying.  And Uribe again explained that he was

15   telling the truth, because he was.  Which you know because he

16   had no way of knowing that while he was sitting at the table

17   with Menendez, Menendez texted Nadine and told her to go to the

18   bathroom.  There is quite simply no way he was making this up.

19          So you know that when Uribe says that Menendez said "I

20   saved your ass twice.  Not once, but twice," Uribe is telling

21   the truth.  This text isn't just proof that Uribe was telling

22   the truth, it is also devastating evidence of Menendez's

23   culpability for the scheme.

24          What does this tell you?  First, Menendez is claiming

25   to have done something.  He is bragging about taking an

1    official act.

2            Second, what Menendez is claiming to have done was to

3    kill and stop investigation.  Not to have raised complaints

4    about discrimination.  Menendez didn't say I addressed

5    discriminatory prosecutions twice.  Not once, but twice.  He

6    said "I saved your ass."  That is not the report of a

7    discrimination fighter about addressing injustice.  That is the

8    boast of a corrupt politician about wielding power for the

9    private benefit of the person paying him bribes.

10           Third, Menendez knows what he is doing is wrong.  He

11   does not need to send his wife and daughter-in-law to the

12   bathroom to talk about fighting discrimination.  He's sending

13   them away so his daughter-in-law does not hear him bragging

14   about having taken corrupt official action.

15           And it also shows you that Menendez is in charge.  It

16   shows you he knows what's happening.  Nadine isn't sending him

17   away so that she can scheme without him hearing it.  He's

18   sending her away so he can talk about his crimes, without his

19   daughter-in-law hearing.

20           And Nadine, she doesn't ask questions about it.  She

21   doesn't say I don't need to go to the bathroom.  She doesn't

22   say What?  She just follows his direction.  No questions asked.

23   Just like with the bell.

24           And this isn't about passing judgment on Menendez's

25   marriage.  The point is Menendez is in charge of this bribe

O793MEN1                   Summation - Mr. Monteleoni

1    scheme.  He's not getting sent away.  He's sending her away.

2    Because again, he calls the shots.

3            Here's another thing you know.  "I saved your ass

4    twice.  Not once, but twice" shows, twice, shows Menendez knows

5    about part one, and about part two.  He knows there is a single

6    deal with two parts.  That means when Nadine tells him that

7    Menendez said it would have been so, so easy if we had wrapped

8    both together, Nadine is telling Uribe the truth, that Bob

9    really did say that.

10           That's exactly the same point that Menendez was saying

11   at Segovia when he said he had to save Uribe's ass not once,

12   but twice.  And there is one more thing that you know from the

13   Segovia dinner.  Menendez is lying to Uribe.  Menendez didn't

14   save his ass once or twice.  Grewal told him to pound sand.

15           Look, here is Grewal testifying that when Menendez

16   raised the issue, he said Michael Critchley should be the one

17   to raise it instead.  He said, I can't talk to you about this.

18           So, when Menendez is saying I saved your ass, Menendez

19   is lying to Uribe to keep him happy.  Menendez is claiming to

20   have performed official acts because he knows Uribe is paying

21   for Nadine's car.

22           That's exactly the same thing, by the way, as what you

23   saw with the call that gave Uribe peace.  When Nadine reads

24   Uribe's message that he's not going away, he's going to keep

25   following up until he gets peace.  That is what prompts

1    Menendez to call Uribe back.  Menendez talks to Nadine later in

2    the day that Nadine reads that message, and then the first

3    chance he gets, the first block of office time in his calendar,

4    he calls Uribe.  The first time he has ever called Uribe

5    directly, to tell him it's all done.  But that's a lie.  He

6    didn't take any action to fight discrimination between hearing

7    that Uribe had texted Nadine and calling him.  He didn't take

8    any action at all.  And he didn't learn anything ever that

9    would give Jose Uribe peace.  Mr. Grewal never told him, oh,

10   well, I'll call off the investigation.  Grewal never told him

11   I'll look into selective prosecution.  Grewal told him to mind

12   his own business.

13        If Menendez was sincere about doing anything for

14   Uribe, he would have told him the truth.  Instead, he just

15   sprung into action to call Uribe with a lie in order to keep

16   him happy.  But why does Menendez want to keep Uribe happy?  So

17   that Uribe keeps paying for the car.  He calls because Menendez

18   knows Uribe is paying for the car.

19        More than anything, what you know from all this

20   corroboration is Uribe is telling the truth.  He's telling the

21   truth because he does not have magical powers that would allow

22   him to make up a lie that would line up perfectly, perfectly,

23   with text messages that he has never seen.

24        You also know he's telling the truth of because of his

25   incentives.  You heard him explain how his cooperation works.

1    If he tells the truth, he gets a letter at sentencing.  If he

2    lies, no letter.  And really, if Uribe was trying to lie, if he

3    was trying to perjure himself in this case, don't you think he

4    would have done a better job?  Do you think if maybe he was

5    trying to lie he could have said just once, oh yeah, I told

6    Menendez straight up, you're welcome for paying the car.  If he

7    really thought the way to help himself was to frame Menendez,

8    he would have told better lies.  He would have claimed that he

9    and Menendez explicitly discussed the car payments.  And

10    telling that lie would have been the easiest thing in the

11    world.

12            Look at this.  This is a text chain that Uribe was on,

13    he saw, he testified about.  He sees that Nadine is texting him

14    the last four digits of her Social Security number just a few

15    minutes before the three of them take a picture together with

16    Menendez right next to each other.  How easy would it have been

17    if Uribe just wanted to lie, to say, well, when I was there

18    with Nadine and the senator I said in front of them, I need you

19    to you send me your last four numbers of your social to make

20    the car payment.  He didn't say that because, as you know, he

21    wasn't here to lie.  He was here to tell the truth.

22            Because the truth is, when a sophisticated, careful

23    person like Menendez commits a crime, he doesn't say the quiet

24    part out loud.  He doesn't negotiate the bribe payment himself.

25    He has Nadine do that for him.  He insulates himself so that

1    Nadine and Uribe take on all the risk.

2            But make no mistake, Jose Uribe, a convicted felon,

3    illegally practicing insurance with no political power or

4    influence, does not get to sit alone in a backyard with the

5    senior senator of New Jersey for free.  He only ends up

6    spending an hour alone with Menendez in his backyard at 10 p.m.

7    sipping cognac and smoking cigars because Menendez knows Uribe

8    is paying for Nadine's car.  And because Menendez wants Uribe

9    to keep making those payments.

10           Uribe was exactly right when he told you he had zero

11   doubt that Menendez knew about the car payments.  Otherwise

12   that hour-long one-on-one never happens.  Uribe was telling the

13   truth.

14           So when Uribe says that Menendez said he had been

15   asked by Hana and Nadine to get a better resolution for Parra,

16   and E&K Trucking, you know he was telling the truth.

17   Similarly, when he says he met Hana, Elvis Parra and Bienvenido

18   Hernandez at the Glenpointe Marriott and Hana said he could

19   influence the case in exchange for a cash payment, you know he

20   was telling the truth.

21           When he says that he asked Menendez to stop the

22   investigation, and Menendez said he would look into it, you

23   know he was telling the truth.

24           When Uribe says Menendez's behavior gave him no doubt

25   that he knew that Uribe was making payments for the car, you

1    know he was telling it the truth.

2            And when Uribe says that Nadine Menendez never told

3    him not to talk about making payments on the car with Menendez,

4    you know he was telling the truth.  And think about what that

5    means.  If Menendez didn't know that Uribe was paying for the

6    car, it would have been unbelievably risky for Nadine to let

7    Uribe get one-on-one time with him.  The car could come up at

8    any time.  If Nadine was secretly peddling her boyfriend's

9    influence as a senator behind his back, she would never risk

10   him finding out.

11           You heard from her sister how devastated she was when

12   Menendez briefly broke up with her for a few weeks in 2018.

13   She was crushed.  And she would surely lose him for good if he

14   caught her collecting bribes behind his back by claiming that

15   she could get him to interfere in criminal cases.

16           So if this was a secret that Nadine was keeping from

17   Menendez, she would never have left Uribe alone with Menendez.

18   That would have been way too risky.  But she did.  She left

19   them alone for over an hour in the backyard.  Uribe didn't end

20   up mentioning the car payments during that time, but Nadine

21   didn't know that he wouldn't.  In fact, the car was parked at

22   their house at the time.  It would have been the perfect

23   icebreaker for Uribe to say, hey, how do you like the car.

24           Nadine didn't do anything to prevent him from

25   mentioning that.  Didn't give him any heads up he shouldn't say

O793MEN1                    Summation - Mr. Monteleoni

1    anything like that.  Why?  Because Menendez already knew.  He

2    knew all along.  You know it from his actions, you know it from

3    the texts, you know it from the unfiltered contact that Nadine

4    let Uribe have with Menendez.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. MONTELEONI:  And you know it because your common
2    sense tells you that Nadine was not going behind Menendez's
3    back to collect bribes in his name.  Menendez was in charge.
4    He called the shots.  He was in on the whole scheme.
5              Here's another thing that you know:
6              Nadine was telling the truth to Uribe about what
7    Menendez was going to do and about his role with it.  We've
8    already seen how Nadine was telling the truth when she told
9    Uribe that Menendez said, it would have been so, so easy if we
10   had wrapped both together, because that's the same thing that
11   Menendez said at Segovia:  I had to intervene for you twice --
12   not once, but twice.
13             Here's another example of Nadine telling the truth to
14   Uribe.  Look at this:
15             When Nadine is saying, you see at the bottom, we're
16   heading to 41 Jane Drive, come over, she's actually heading
17   there, the cell site records show.  She's actually with
18   Menendez.  He's actually heading there too.  She's telling the
19   truth.  If Uribe came over after she texted him the address,
20   there would be no time to get their stories straight, no time
21   for her to make sure he's not going to blurt out that he paid
22   for the car, which, if you look at the date, was the very day
23   before.  This is the day after Nadine got the car that Uribe
24   gave her the cash for.  She does -- and this day, she doesn't
25   say we're heading over to 41 Jane Drive, call me if you're

1    interested in coming over so that we can get our stories

2    straight.  She just gives her address and tells him to swing by

3    when she's heading there with Menendez.

4             Why?  She's not afraid of him stopping by.  She's not

5    afraid that Uribe will tell Menendez about the car, because

6    she's already told Menendez about it, because Menendez is in on

7    it too.

8             And here's one other thing you learned from Uribe:

9             After the investigation, Nadine meets Uribe, and he

10   cooks up the story with her that the car payments were a loan.

11   That's exactly the same cover-up story that makes its way onto

12   the presentation that Menendez's lawyers make to the U.S.

13   Attorney's Office for the Southern District of New York and

14   onto the series of checks that she produces under the subpoena,

15   which is coordinated with Menendez's check to her.  I'll talk

16   more about those checks later, but what you see here is

17   Menendez writes her a check with the funds.  She writes Uribe a

18   check falsely saying the exact same cover story that she agreed

19   to with Uribe -- personal loan.  All lies.  All because they

20   all know -- Uribe, Menendez and Nadine -- that the car was part

21   of a *quid pro quo*.

22            So Uribe's testimony is corroborated and is

23   consistent, and you do not need it to convict.  You can prove

24   this element many times over without it.  But it is absolutely

25   devastating, and it matches up with all of the other evidence

O79Wmen2                         Summation - Mr. Monteleoni

1    about that part of the scheme.  It is devastating proof of a

2    corrupt *quid pro quo.*

3             So let's move on to the next element.

4             THE COURT:  Mr. Monteleoni, I apologize for

5    interrupting your summation, but I want to give the jury a

6    stretch break at this point, and it sounds like you're moving

7    on to another aspect.

8             Let's take a few moments to stretch, ladies and

9    gentlemen.

10            OK.  Thank you very much.  You may be seated.

11            Mr. Monteleoni, you may continue.  And again, I

12   apologize.

13            MR. MONTELEONI:  All right.

14            Let's move on to the next element, intent to defraud.

15   This one is straightforward.  The secrecy we've talked about,

16   the lies we've talked about, the cash handoff, making payments

17   using Barruos's business name, the fake claim that Menendez was

18   concerned about discrimination as a the cover for his real

19   motivation in shutting down the case, and Hana asking Elvis

20   Parra and Bienvenido Hernandez for a cash payment in order to

21   have Menendez influence a criminal case.  Menendez and Hana are

22   both here intending to defraud the public out of Menendez's

23   honest services.

24            Same with the third element, material misstatement or

25   omission:

1          There, again, they concealed the bribe.  Handoff of
2     cash in the parking lot, lies on the financial disclosure
3     forms, payments under Barruos's name, and Hana secretly texting
4     Nadine the information about Parra's case for her to deniably
5     pass it to Menendez, Hana asking for payments in cash -- all,
6     again, in an attempt to deceive the public into thinking that
7     Menendez was not taking bribes; to deceive the public into
8     thinking that they were getting his honest services.
9          Final element, the wire:
10         This one's proven again and again.  Barruos is in the
11    Bronx, here in New York.  Uribe calls him from New Jersey and
12    asks him to make the payment.  That is an interstate wire.
13    That is easy.  There are plenty of others through the payment
14    records and those calls from the cell towers going across the
15    river, but one is all you need.  We're done with this element
16    too.
17         Venue is also done.  Those wires are enough.  Menendez
18    doesn't need to know exactly who's paying for the car, but it's
19    obviously foreseeable in a big metro area, like the New
20    York-New Jersey area, where a bunch of payments are being made
21    that some may be made from one side of the Hudson and some from
22    the other.  Venue's easy.
23         Menendez and Hana are guilty of Count Nine.
24         Count Ten, extortion under color of official right.
25    Same part of the scheme, this time just against Menendez.

1          Public official, it's undisputed.

2          Did Menendez obtain property for himself or another?

3    Of course he did, the car for Nadine and himself.

4          Element three, that's the *quid pro quo*, just like for

5    honest services fraud, this can relate to a promise or attempt

6    to advise or pressure a state official, like Gurbir Grewal.

7    It's proven here for the same reasons it was proven for Count

8    Nine.

9          Interstate commerce:

10         Here, there are plenty of effects on interstate

11   commerce, like Barruos in the Bronx paying Mercedes-Benz

12   Financial Services in Michigan; or Nadine, after receiving cash

13   in a parking lot in New Jersey, having some of it deposited

14   into her account at a branch in Long Island; any number of the

15   other payments that were interstate.  This element is proven.

16         And you know those effects on interstate commerce can

17   provide venue as well -- payments from the Bronx, which is in

18   this district; having someone drive across the river to make a

19   cash deposit into Long Island, that necessarily means passing

20   over the waters that are part of the Southern District of New

21   York.  All that satisfies venue for extortion.

22         Menendez is guilty of Count Ten, extortion under color

23   of official right, for attempting to interfere with two pending

24   criminal matters in exchange for a luxury car.

25         Let's move on to the last major part of the bribery

1    scheme, involving the New Jersey U.S. Attorney and Qatar.

2    Again, we're going to group the two bribery counts, Counts

3    Eleven and Twelve here, together.

4              Public official, that's undisputed.

5              Thing of value:  Here, there's an undisputed part and

6    a disputed part.  Looking at this image actually sums it up.

7    The gold bars, like the one shown here in this message from

8    Fred Daibes to Menendez, those are disputed.  We'll get to

9    those in a moment.  But actually if you look at the message

10   above that one, it actually does not seem to be disputed that

11   Daibes gave minor things, like transportation for Menendez from

12   JFK airport to Menendez's home in New Jersey.  And you see here

13   on the cell site records that that's where they go.  That

14   actually is enough for this element, but Daibes gave so much

15   more.  So let's talk about the bigger ticket items.

16             First of all, there can't really be any serious

17   dispute that Daibes gave Menendez at least one $10,000 envelope

18   of cash.  Let's look.

19             In the rack of men's jackets, which include some

20   jackets with his name embroidered on them, next to the men's

21   shoes, which have another envelope of cash with Menendez's

22   fingerprints on them, is this jacket.  This black men's jacket

23   was found with this TD Bank envelope in the pocket.

24             Let's be very clear here.  That is Menendez's jacket.

25   The defense didn't try to show you some picture of Nadine's son

O79Wmen2                    Summation - Mr. Monteleoni

1    wearing it.  It is Menendez's, and Menendez put that envelope

2    in that coat pocket.  The rack has his jackets next to his

3    shoes with another envelope bearing his fingerprints.  The

4    envelope didn't get there because Fred Daibes snuck into

5    Menendez's basement or because Nadine decided to hide this one

6    random envelope in Menendez's coat pocket.  It's there because

7    Menendez put it there.  And you know who gave it to him -- Fred

8    Daibes.

9            That envelope, you can see, if you look closely, has

10   tape on the flap, tape right over the number 10,000 and the

11   dollar sign handwritten on it.  And on the sticky side of that

12   tape, the FBI found Fred Daibes's fingerprints.

13           What was in this envelope in the pocket of Menendez's

14   jacket in the basement with Fred Daibes's fingerprints on the

15   sticky side of the tape sealing up the flap?

16           $10,000 of cash.

17           When did Daibes give this envelope of cash to

18   Menendez?

19           Well, at least one bill in it was first put into

20   circulation in October of 2020.  And if you look at this

21   envelope, the tape is still on it.  You heard Kira Glass

22   testify how the FBI took off the tape with special chemicals

23   that make the tape less sticky.  So it was still taped shut

24   when it was found.  So obviously all of the cash had to be put

25   in it before it was taped shut, and that had to have happened

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O79Wmen2                     Summation - Mr. Monteleoni

on or after October 2020.  Otherwise, that last bill that was
in the envelope when it was taped shut wouldn't have been in
circulation yet, so it couldn't have been put in the envelope.
That means all the cash had to be put in, and Fred Daibes puts
fingerprints on the sticky side of the tape sealing up the
envelope at sometime between October 2020, when this last bill
went into circulation, and June 16, 2022, when it was found by
the FBI in the search of the house.

            What that means is Daibes gave this $10,000 envelope
to Menendez during the scheme.  The evidence is overwhelming,
and that is enough to prove this element.

            But there's more.

            Eight other envelopes with Daibes's fingerprints on
them and another one with a Fred Daibes return address printed
on the envelope and Fred Daibes's DNA on the envelope.  That
envelope with the return address and the DNA, it also had the
fingerprints of John Pilot, Daibes's driver, who drove Menendez
and Nadine home from JFK in October 2021.  And also, as we'll
talk about in a minute, he also dropped off a thing of value to
Nadine in January 2022.

            So taken together with the one in Menendez's jacket in
the basement that we just looked at, the cash in these
envelopes adds up to $82,500.  Every one of Daibes's
fingerprints was either on or transferred from the tape on the
envelopes.  One had his DNA on it, and that DNA was under the

O79Wmen2                              Summation - Mr. Monteleoni

1    flap where you lick the envelope before closing it.  So these

2    were all -- all -- envelopes of cash that Daibes sealed up.

3    These are all things of value that Daibes gave to Menendez.

4           Now, you've heard from Menendez's counsel that nine of

5    these envelopes were found in places where they claim that

6    Menendez didn't go:  Nadine's safe deposit box and the bedroom

7    closet that you heard a lot about.

8           Let's talk about the closet first.

9           First of all, there is zero reason to believe that

10   Menendez was locked out of the closet of his own bedroom.  This

11   suggestion is absurd.  The closet was locked when the FBI

12   arrived at his house, but you know what else was locked?  The

13   bedroom was locked.  Was the man locked out of his own bedroom?

14   Of course not.  The house was all locked up because Menendez

15   and Nadine were not there.

16          And when the FBI conducted the search they even found

17   that the door to the patio was barricaded with a chair.  Was

18   Menendez barricaded out of his own house?  He was not.  The

19   fact that the closet was locked and that the door -- when the

20   FBI arrived that means as much as the fact that the bedroom

21   door was locked and that the patio door was propped.  It was

22   barricaded against outsiders, not against Menendez, which just

23   shows you that they know the value of what they had stashed all

24   over the house.

25          How did it even work for him to be locked out of the

1    closet in his own bedroom?  Does Nadine make him clear out of

2    the room when she needs to get her clothes from the closet?

3    When she's getting dressed and he's still in bed, does she kick

4    him out of bed so that she can get dressed without him being

5    present when she opens the closet door?  Or what about the fact

6    that Nadine's son stores his ties in the closet?  Does Nadine

7    say, Bob, you have to clear out of the bedroom, I need to open

8    the closet so that Andre can get his skull tie?  Of course not.

9    The idea is preposterous.  You should reject it.  He obviously

10   had access to the closet in his own bedroom.

11          What else proves that Menendez knew about the cash in

12   the closet?  It's almost all the same types of envelopes of

13   cash as the one in his jacket, packaged and sealed the same

14   way.  In the safe with the closet, there was the Fred Daibes

15   return address envelope and then four TD Bank envelopes, also

16   sealed with tape, also with $10,000 handwritten on the flap,

17   also with Fred Daibes's fingerprints on the tape.  And outside

18   the safe, another TD Bank envelope without the $10,000 written

19   on it but also, again, with Fred Daibes's fingerprints on the

20   tape.  These are all the same set of envelopes.

21          And remember, Daibes is Menendez's long-time friend.

22   He only met Nadine through Menendez.  They only really started

23   talking when Menendez told Nadine to call Daibes for help with

24   her mortgage in June of 2019.  Now, the text messages show

25   Nadine and Daibes became friends, and sometimes Nadine would

1    text Daibes to confide in him as a friend, but Nadine hasn't
2    been friends with Daibes for decades.  But Menendez has.  They
3    go way back.  Your common sense tells you there's no way that
4    Daibes is giving envelopes stuffed with cash to his close
5    friend's wife behind his friend's back.  What old friend is
6    going to sneak around and secretly hand envelopes of cash to
7    his buddy's wife?  And why would Daibes give one envelope to
8    Menendez but then keep secret from Menendez the nine virtually
9    identical envelopes to Menendez's wife?  He wouldn't.  Daibes
10   wouldn't keep a secret like that from Menendez, and neither
11   would Nadine.

12            As we've already talked about, Nadine kept Menendez
13   updated on even the most mundane parts of her life, like when
14   she was doing chores, when she was cleaning out her email
15   inbox, how long she was waiting around at the dealership.  So
16   of course, she kept him informed about the cash-stuffed
17   envelopes that his close friend gave her.  Obviously Menendez
18   knew about them, whether they were in his own jacket pocket or
19   in the bedroom closet.

20            You know the rock solid proof that makes absolutely
21   clear Menendez knew about the envelopes of cash from Daibes in
22   that closet?  His fingerprints are on one of those envelopes --
23   Menendez's fingerprints on an envelope of Daibes money in the
24   safe in the bedroom closet.

25            And by the way, you know whose fingerprints weren't on

1    any of the envelopes?  Nadine's.  Her fingerprints were not on

2    a single one of envelopes, not in the safe or in the basement.

3    And look at the envelope that's pictured here.  Like most of

4    the others, it also has $10,000 written on it.  But unlike the

5    one that you saw in Menendez's jacket downstairs, this one's

6    been opened, and it only has -- you can see from this chart,

7    only has $5,300 of cash in it, not the $10,000 that was written

8    on the flap.  This isn't just some cash that lies around

9    unused.  They're going into it and taking cash out and using

10   it.  And whose fingerprints are on this envelope that they're

11   going into and taking cash out and using it?  Menendez's.

12           Defense counsel asked the FBI fingerprint expert

13   whether she could tell if Daibes put his fingerprints on it at

14   the same time as Menendez did.  But precisely when Menendez's

15   fingerprints were put on the envelope of cash is a total

16   distraction.  Of course, Menendez is taking the envelope.  He's

17   not going to touch it at the exact same moment that Daibes

18   seals up the envelope with tape.  If Menendez touched it first

19   and then had Nadine put it in the safe, all that means is

20   Menendez took the envelope from Daibes and handed it to Nadine.

21   And if Menendez touched the envelope after Nadine had already

22   put it in the safe, then that means that he, in fact, did have

23   personal access to the items in that safe.

24           Either way, that fingerprint on that envelope proves

25   that Menendez knew that the envelopes of cash in that safe,

1    each and every one of those envelopes are things of value that

2    Daibes gave to Menendez.

3            Same with the safe deposit box.  And the safe deposit

4    box was kept in Nadine's name, but look what's in there.  It's

5    the exact same kinds of envelopes, bank envelopes with $10,000

6    written on the flap, Daibes's fingerprints on the tape, $10,000

7    in each.  Two of them are from TD Bank, the same bank as the

8    other Daibes bank envelopes.  The idea that Menendez got one of

9    these envelopes and put it in his jacket pocket and then

10   handled another of these envelopes that went into the bedroom

11   closet safe but had no idea about the rest of these envelopes

12   is just absurd.

13           For all the reasons I've already discussed, there's no

14   way that Daibes and Nadine were keeping these envelopes full of

15   cash a secret from Menendez.  You only need to decide that he

16   was aware of one thing of value, like the envelope in his

17   jacket or the one in the safe with his fingerprints on it.  But

18   you know he knew about all of them.

19           And look at the dates.  For each of the envelopes

20   where the FBI could ascertain which bills were in the

21   envelopes -- that's each of the ones in the house -- there was

22   at least one bill which first went into circulation during the

23   period of the scheme.  Now, defense counsel tried to suggest

24   that because there were also some older bills in some of the

25   envelopes, that must mean that Menendez or Nadine got it years

O79Wmen2                    Summation - Mr. Monteleoni

1  ago and then just added the more recent bills later on.  That

2  makes no sense.

3          For one thing, as we've already discussed, many of

4  these envelopes were sealed when the FBI found them.  So the

5  most recent bill in those sealed envelopes, that's the absolute

6  earliest date that all of that cash could have been closed up

7  and handed over.  And even the envelopes that had been opened,

8  look, your common sense tells you when someone takes cash out

9  of the bank, they get a mix of bills from different years.

10         You heard that from Joseph Catania -- that bills stay

11  in circulation until they become damaged.  So when Daibes took

12  out $10,000 to put into an envelope for Menendez, he got a mix

13  of bills from different years.  The way you figure out when he

14  put that cash into the envelopes that's likely the most recent

15  bill in the mix, because that's the earliest possible date that

16  Daibes could have gotten that cash to put in the envelope.  And

17  here, all of the envelopes had at least one bill that was put

18  in circulation in 2020 or 2021.  All of these envelopes are

19  things of value given by Daibes, received by Menendez.

20         But it wasn't just the cash.  It was the gold too.

21  Two one-kilo bars found in the house, serial numbers match

22  exactly Daibes's gold inventory.  Two Credit Suisse one-ounce

23  bars found in the house.  Again, these same bars listed in

24  Daibes's inventory.  Seven Valcambi Suisse one-ounce bars found

25  in the house, also tracing back to Daibes's inventory.  And two

1    more one-kilo bars photographed the day that Nadine sold two

2    one-kilo bars to Vasken Khorozian.  She lied to Mr. Khorozian

3    and told him that she was selling her family gold, but the

4    serial numbers don't lie.

5          This is the photo.  Khorozian didn't know if these are

6    the bars that he got from her or not, because he doesn't write

7    down the serial numbers.  But he didn't look on Nadine

8    Menendez's phone and see that this photo of two one-kilo gold

9    bars, along with one of the Asahi gold bars from Hana, which

10   she didn't end up selling, was taken about an hour before she

11   met him and sold him two one-kilo bars.  Obviously these are

12   the two kilos that she sold him.  The numbers on these bars go

13   right back to the Daibes gold inventory.

14         What this photo, what the metadata from the photo and

15   what the messages showing that that photo was taken an hour

16   before Nadine met with Khorozian show you is that these two

17   kilo gold bars pictured on the phone were the ones that she

18   sold to Khorozian falsely claiming that they were her family

19   gold.  So this is gold from Daibes to the Menendezes.  But did

20   Menendez know about it?  Of course he did.  Again, Menendez's

21   old friend is not sneaking behind his back and secretly giving

22   his wife kilo gold bars worth tens of thousands of dollars.

23         But how else do you know he knew?  The Google

24   searches.  Like we've talked about, right after Fred Daibes

25   stopped by with doughnuts, Menendez starts googling the price

O79Wmen2                    Summation - Mr. Monteleoni

1   of a kilo of gold for the first time in his life.  From then

2   on, he keeps googling it from time to time.  Why?  Because he

3   knows about the gold from Daibes.  Whether every time he

4   googles after that is a gold handoff or just checking the price

5   of the kilos he knows about doesn't matter.  He knows there are

6   kilos of gold from Daibes.

7           How do you know that Menendez knew that the gold came

8   from Daibes?

9           Well, first, he starts googling the price of the kilos

10  of gold minutes after Daibes comes to his house, but there's

11  more.  After he learns of the gold, he doesn't go right to the

12  ethics committee.  He waits four months.  When he does, he

13  makes it seem like he just learned of it.  If he really thought

14  that this was Nadine's family gold, which, by weird

15  coincidence, he somehow learned about right when Fred Daibes,

16  who the gold is actually from, stopped by, if that's what he

17  thinks, why is he waiting to disclose it?  And when he

18  discloses it, why is he pretending that he just learned about

19  it?  You know the answer -- because he knew it was from Daibes.

20  He knew it was a thing of value from him.  And that's another

21  way that you know that this element is proven.

22          That brings us to the final set of elements for these

23  counts, the *quid pro quo* and the corrupt intent.  And again,

24  we're going to consider them together since the same evidence

25  proves both.  Was this cash and gold given totally

O79Wmen2                        Summation - Mr. Monteleoni

1    independently of any official action, or was it, too, given in

2    a corrupt *quid pro quo* for official action?

3              You know the answer.  The evidence tells you what your

4    common sense tells you -- the cash and gold was part of a

5    corrupt *quid pro quo*.

6              How do you know?  Same six reasons that you know about

7    the other corrupt *quid pro quo*s.

8              Once again, the timeline tells you what happened.

9    Look at this.  It's December 2020.  Daibes has been under

10   indictment for about two years, but Menendez hasn't had a

11   chance to do anything about it, even though he's obviously been

12   displeased with it.  But now, with a new president coming and

13   upcoming vacancy for U.S. Attorney, Menendez is planning on

14   putting Philip Sellinger forward.  Sellinger is Menendez's

15   friend and clearly wants the job; they talked about it for

16   years.  So Menendez thinks Sellinger is the perfect person to

17   install and then try to use to interfere in Daibes's case.

18             After talking with Sellinger by phone, Menendez gives

19   Sellinger some information for Sellinger's meeting with Cory

20   Booker.  These are the acts in this text message that you see

21   that Cory Booker cares about.  So even before Sellinger comes

22   in to meet with Menendez, Menendez is prepping him to get

23   cleared by Booker too, just like Sellinger told you about.

24             But look what happens when Sellinger comes in to meet

25   with Menendez.

O79Wmen2                    Summation - Mr. Monteleoni

1              So this is the meeting, December 15, 2020.  That's

2      when Menendez specifically raises the Daibes prosecution, says

3      that Daibes was being treated unfairly and says that he hopes

4      that Sellinger will look at it very carefully when he becomes

5      U.S. Attorney.

6              But what happens after that?  Two days later,

7      Sellinger realizes he might have a conflict and calls Menendez

8      back.  When he testified, Sellinger thought it was the next

9      day, but the phone records show, as Special Agent Van Wie

10     testified about, that this, this voice mail was the next call

11     between Menendez and Sellinger.  So Menendez calls back, and

12     this is where Sellinger tells him that he might have to be

13     recused from Daibes's case.  This is the call that turns

14     Sellinger's fortunes around, because, just like that,

15     everything changes.

16             Look what happens as soon as Menendez hears that

17     Sellinger may not be able to have control over the case.

18     Within hours -- hours -- Menendez is having Soliman do research

19     on Esther Suarez.  Now, Suarez is obviously someone that

20     Menendez doesn't know very well, because as you see here, he

21     actually gets her name wrong when he's asking Soliman to

22     research her.  But then he confirms that he's talking about

23     Esther Suarez.  And even though he doesn't know her that well,

24     as soon as Menendez learns that Sellinger may have to be

25     recused from Daibes's case, he does a 180.  He starts the

1    process with Esther Suarez.  Doesn't matter that Sellinger is

2    Menendez's friend or that he is qualified for the job.  What

3    matters to Menendez is installing a U.S. Attorney who can

4    influence the Daibes case.

5         Now, she has some problems, so much so that Soliman

6    and Fred Turner don't think she's a good pick, but she is

7    friends with Menendez's best friend, Donald Scarinci, and she

8    doesn't have to be recused from Daibes's case.  In fact, Daibes

9    likes Esther Suarez and thinks she'll be favorable to him and

10   his case.  Remember you heard that stipulation where he told

11   his counsel that he liked Esther Suarez.  So that's really all

12   Menendez cares about.

13        Sellinger has his prescheduled meeting with Cory

14   Booker.  This is the one that was set up before Sellinger told

15   Menendez about the chance of recusal.  But by this point, the

16   writing's on the wall.  Menendez ignores Sellinger's request to

17   recap right after the meeting in this voice mail.  Sellinger

18   follows up a few days later, but Menendez ghosts him.  Not

19   getting back to him for a week.  All the while, the news starts

20   to get wind that Menendez is picking Suarez.  But Menendez

21   needs an excuse to give to Sellinger.  He can't tell the

22   truth -- that he wants a U.S. Attorney who can get involved in

23   Daibes's case -- so Menendez blames it on the White House.

24   Said he had no choice, because the White House asked Menendez

25   to make more than one recommendation.  But it's all a lie, of

1   course.  As they say here, the plan assumes he -- that's

2   Sellinger -- doesn't have intel into the WH.  Because if

3   Sellinger did have intel into the White House, he would know

4   that this story isn't true.  Menendez gave the White House the

5   one name that he wanted to.

6           This is a glimpse at how Menendez wields power.  He's

7   calculated.  He's happy to lie if it serves his purposes.  And

8   he's not sentimental about it.  He doesn't have anything

9   against Sellinger at this point.  In fact, he's about to

10  recommend Sellinger for ambassador.  But if Sellinger can't

11  help him by taking control of the Daibes case, Menendez isn't

12  going to make Sellinger U.S. Attorney.  And he'll just lie and

13  blame it on the White House if he thinks Sellinger won't find

14  out.

15          But when Esther Suarez stalls out, Menendez needs a

16  plan B.  So he has Soliman get back in touch with Sellinger,

17  and at the end of that conversation, Soliman comes away

18  thinking that Sellinger does not have to be recused from the

19  Daibes case.  Sellinger recalls this conversation differently.

20  But remember, Menendez wasn't present for this conversation.

21  Sellinger never told Menendez about it himself.  The only thing

22  Menendez knows about this conversation is what Soliman tells

23  him about it.  So all that Menendez hears is Soliman saying

24  Sellinger no longer has to be recused.  Whatever leads Soliman

25  to believe that, that's what he communicates back to Menendez.

O79Wmen2                        Summation - Mr. Monteleoni

1    And remember that Soliman testified -- might have been

2    referenced in this Signal message that we're looking at here or

3    it may have been only in another form, but one way or another,

4    Menendez got the message that Sellinger wouldn't have to be

5    recused.  And that is what changes Sellinger's fortunes back

6    again.  As quickly as he was dropped, he gets picked back up.

7    Menendez is helping his application along.

8            A few months later, while Sellinger's moving forward,

9    we've seen Daibes stops by with gold and doughnuts, and by

10   December, Sellinger is sworn in and Menendez is still googling

11   gold prices.  In fact, here, on December 18, he's searching for

12   the price of a kilo just a few hours after doing some searches

13   for Sellinger and his staff.  This is still months, of course,

14   before the first time that he reaches out to the ethics

15   committee claiming that he's just learned of some family gold.

16           But then look what happens.  Daibes's trial gets

17   adjourned, and that night Daibes texts Nadine, checking on

18   Menendez, who sustained a shoulder injury.

19           Let me just pause for a moment.  This is the first

20   time we've seen Nadine in these portions of the timeline that

21   we're going over.  All these things that we've just been

22   talking about, these reversals with dropping Sellinger, picking

23   him back up again, talking to Sellinger about Daibes's case and

24   the interview, Nadine wasn't involved in that.  Bob did that

25   all himself.

1          All right.  So Daibes is checking in on Menendez, says
2    how is he feeling?  And Nadine says, better, having heard the
3    date is postponed.  He is fixated on it.  You know what she's
4    talking about.  Menendez is fixated on Daibes's criminal case.
5    He wants the trial pushed back so that he can have more time to
6    intervene and help Daibes.

7          And look at Daibes's response:  Good.  I don't want
8    him to be upset about it.  This is not his fault.  He was
9    amazing in all he did.  He's an amazing friend and as loyal as
10   they come.  It's not his fault that the case is still going
11   forward.  He was amazing in all he did -- he appointed
12   Sellinger as U.S. Attorney.  He installed a U.S. Attorney who
13   he thought he could influence to help Daibes's case.

14         Now, defense counsel tried to suggest that maybe these
15   texts weren't about the adjournment of Daibes's trial that day
16   but were about Menendez's shoulder surgery being postponed.
17   First of all, that's not what the messages say.  Nadine's
18   message saying Menendez is fixated on Daibes's trial is exactly
19   what the other evidence shows.  It's undisputed that Menendez
20   is all over Daibes's case, even calling up Daibes's lawyer to
21   admonish him for not trying hard enough to make the case go
22   away.  And the idea that this text is about a shoulder surgery
23   makes no sense -- good, I don't want him to be upset over it,
24   this is not his fault, he was amazing in all he did -- does not
25   make sense as a response to someone's surgery being postponed.

1    But it makes a lot of sense as a response to someone who's been

2    trying to make the case go away but is finding that it's not

3    going away.  But more fundamentally, the idea that this text is

4    about postponing a surgery is just not what the evidence shows.

5            Look at this.  On December 20, Menendez doesn't want

6    surgery.  This is him to his doctor saying I want to see if I

7    can have it heal without surgery.  On December 22, the day

8    before Nadine's texts with Daibes that we were just looking at,

9    he's decided that he needs the surgery, and it's scheduled for

10   New Year's Eve.  The next day, the message we just looked at

11   where Nadine is talking about the date being postponed, this is

12   obviously Daibes's trial date.  And on December 24, the day

13   after Nadine's texts with Daibes, the surgery is still

14   scheduled for New Year's Eve.  The surgery date was never

15   postponed.

16           What was?  Daibes's trial date, just like the texts

17   indicate.

18           And this idea that Menendez and Daibes couldn't have

19   known about the trial date being postponed because you didn't

20   see a phone call just doesn't make sense.  Obviously they knew

21   about the postponement.  They're talking about the

22   postponement, and it makes sense that they would.  Daibes's

23   trial was scheduled to start in three weeks.  You think when

24   Daibes's lawyers hear he doesn't have to go to trial in three

25   weeks they're going to wait around to tell him?  Let him go

1   into Christmas Eve thinking he's going to trial on January 11,

2   just because they didn't want to bother to pick up the phone?

3   Of course Daibes is telling his friend, Menendez, who we know

4   is fixated on the case.  This claim they couldn't have known is

5   not what the evidence showed.  It was just a distraction to try

6   to get you to not pay attention to how powerful this text from

7   Nadine to Daibes is as evidence of a *quid pro quo*.

8           Now let's look what happens a few weeks later.

9           Menendez calls Sellinger and learns that Khanna is

10  Sellinger's second in command.  So he does some research on

11  Khanna and tries to reach out to him.  Why?  Because Khanna's

12  now the person who is acting as the ultimate supervisor over

13  Daibes's case.

14          What else happens the day that Menendez tries to reach

15  out to Khanna?  John Pilot, Daibes's driver, reaches out to

16  Nadine, and Nadine then texts Daibes:  Thank you.  Christmas in

17  January.

18          You know what that means.  Daibes just had Pilot

19  deliver another bribe.  Few days later, Menendez is back to

20  googling for the kilo of gold price.

21          A few days after searching again for the price of a

22  kilo, Menendez connects with Khanna.  Khanna isn't Menendez's

23  friend, like Sellinger.  They don't go golfing together.  He

24  didn't go to the wedding, so Menendez isn't comfortable raising

25  a specific case with him, but he does take time to praise just

1    two attorneys -- Daibes's counsel and Elvis Parra's counsel.

2                That's not a coincidence.  Menendez did not just

3    happen to praise the two defense attorneys involved in cases

4    that were connected to the car and the cash and gold that he

5    and Nadine were getting.  He praised them because it might help

6    the people who were bribing him.

7                What's another way you know that?

8                Look what Menendez does right after getting off the

9    phone with Khanna.  He calls Daibes right away.  You know why.

10   He's reporting back to Daibes about the call with Khanna.

11   Again, just like with Grewal, even if Menendez had just called

12   up Khanna to talk about the weather or just told Daibes that he

13   called Khanna but never had, him telling Daibes that he's

14   trying to influence the case, that's the promise of an official

15   act.  That's enough for a corrupt *quid pro quo*.

16               What else happens in January?

17               Menendez asks Soliman to call Sellinger and to get

18   Sellinger to explain why he was recused from Daibes's case.

19   Menendez is upset that he went to all that effort to install

20   Sellinger for nothing.  Sellinger's recusal screws up

21   Menendez's whole plan.

22               Soliman doesn't actually raise the Daibes issue with

23   Sellinger, but he tells Menendez he did.  The first time, in 15

24   years, that Soliman, who's Menendez's top political adviser,

25   has refused to do something Menendez asked and said he did,

1    think about that.  That says volumes.  Soliman knows that what

2    Menendez is asking him to do, pushing a U.S. Attorney about why

3    he was recused from a specific pending federal criminal case is

4    so unethical, that it's the one time he won't do what his boss

5    asked.  And he thought that without even knowing about the gold

6    and the cash that Menendez was getting from the defendant in

7    that very same criminal case.

8            So, after Menendez's attempts to get Sellinger

9    involved don't work, after Menendez's call to Khanna, Daibes

10   has his attorney reach out to Khanna, and they try to work out

11   a plea.  It's going well enough that, by early March, Daibes's

12   attorney hears reporting they're near entering a deal.  Daibes,

13   meanwhile, is setting Nadine up with a realtor to look at

14   expensive houses and is meeting her in person.  And after that

15   meeting, she thanks him profusely.  And you know why.  He just

16   gave her more gold.  How do you know that?  She tells him she's

17   going to meet Vasken Khorozian the next day.

18           What does she bring to that meeting with Vasken

19   Khorozian?  Two kilo bars to sell.  Khorozian doesn't know what

20   bars they are.  He didn't write down the serial numbers, but

21   you know they're the ones that she photographed an hour before

22   just going in to meet with him, the ones that are found on her

23   phone matching Daibes's gold inventory.

24           Quid pro quo.  This for that.  Cash and gold for

25   attempts to influence a federal criminal prosecution.  Doesn't

1    matter that Menendez couldn't ultimately deliver on his

2    attempts to interfere in the case.  What matters is Menendez

3    clearly conveyed to Daibes a promise that he would try to

4    intervene.  You know that because of his actions in deciding

5    who to recommend for U.S. Attorney and pushing Sellinger not to

6    be recused.  You know that because during the exact same time

7    Daibes is giving Menendez and Nadine gold bars and cash.  We

8    may not know the exact dates when Daibes handed over each

9    envelope of cash, but you know from the serial numbers that we

10   talked about earlier they must all have been delivered between

11   2020 -- late 2020, in fact -- and 2022, right in the middle of

12   Menendez's efforts to pick a U.S. Attorney and push Sellinger

13   not to be recused.

14           And you know from Menendez's Google searches that

15   Daibes provided the kilo gold bars during that exact same time.

16   That cash and that gold were in exchange for Menendez's promise

17   to try to intervene in Daibes's case.  You scratch my back and

18   I'll scratch yours.  But there's a flip side to that.  For

19   Menendez, it's you don't scratch my back and I won't scratch

20   yours.  Menendez is still sore about all the work he did to get

21   Sellinger installed as U.S. Attorney only to have him be

22   recused from Daibes's case.  So even after it's all done, when

23   Sellinger calls him in April to invite him to his investiture,

24   Menendez turns him down on the spot, saying the only thing

25   worse than not having a relationship with the U.S. Attorney is

1    people thinking you have one and you don't.

2              And not only that, two minutes after saying that to

3    Sellinger, two minutes after getting off the phone, Menendez

4    texts Cory Booker saying he's turned down Sellinger's

5    invitation and that Sellinger's been a disappointment.

6    Menendez has the gold, but he's not forgiving Sellinger for

7    refusing to be influenced.

8              There's something else going on at the same time.

9    There's another *quo* that Daibes wants for his *quid*.  Another

10   act from Menendez that Daibes wants in exchange for the cash

11   and the gold.  He doesn't just want to get out from under his

12   criminal case.  He wants millions of dollars of financing for

13   his development project.

14             So in June 2020, Menendez introduces Daibes to

15   Heritage Advisors.  This is a firm that is headed by people who

16   introduce themselves as closely tied to the highest levels of

17   the government of Qatar, a Qatari royal who advises the emir,

18   the leader of the country, on investments and the chief of

19   staff to the emir's brother.  And Menendez doesn't just make

20   the intro.  He sends Daibes a press release praising Qatar.

21   Daibes immediately sends it to Ali Al Thawadi, one of those two

22   principals of Heritage I just mentioned, who sends it to Sheikh

23   Sultan, the other, and they talk about how much they appreciate

24   it.

25             Daibes appreciates it too.  A few days later, the same

O79Wmen2                        Summation - Mr. Monteleoni

1    thing happens again.  Ali Al Thawadi sends Sheikh Sultan five

2    links, praising Qatar's assistance in the evacuation from

3    Afghanistan.  They're telling Daibes that this is what they

4    want him to get Menendez to do.  Daibes sends those same five

5    links to Menendez.  Why?  Because he's asking Menendez to put

6    out a similar press release to help Daibes ingratiate himself

7    with Al Thawadi and Sheikh Sultan so that he can get a huge

8    business deal from them.

9            Menendez then immediately tells his staff to put

10   together a press release thanking Qatar.  Why is he doing that?

11   It's not because Daibes is some foreign policy expert whose

12   guidance Menendez trusts on relations with a foreign

13   government.  It's because Daibes is giving Menendez cash and

14   gold, and Menendez wants to keep those bribes flowing, so he

15   puts out the press release.

16           May also be great fodder for policy, may be the right

17   thing to do, but that's not the only reason Menendez does this.

18   The timeline shows that Menendez is motivated by Daibes's

19   request.  A different representative of Qatar has been hounding

20   Menendez's office for days trying to get him to issue a press

21   release about this.  But when it's Daibes who sends these

22   links, Menendez springs into action in minutes, has his staff

23   put together a press release in hours.  You know why.  It's

24   because the request comes from someone who is bribing him.

25           What happens next?

O79Wmen2                    Summation - Mr. Monteleoni

1          Menendez sends this release to Daibes and tells him to

2   send the Qataris a prerelease copy.  This, again, shows you

3   that one of the reasons that Menendez put together this release

4   was to help out Daibes.  It's not just press releases that

5   Daibes wants from Menendez.  Menendez gets Daibes invited to a

6   dinner with the emir of Qatar, the leader of the country.  And

7   just days after that, Daibes is sending Menendez pictures of

8   Patek Phillipe wristwatches.  Why?  Because Daibes wants

9   Menendez to keep taking actions that keep Qatar happy and

10  increase Daibes's chances of getting that business deal.

11         So Daibes offers Menendez an expensive luxury watch

12  and says how about one of these?  Now, Menendez may not have

13  gotten the watch, but he was definitely interested in one.

14  Later that day, here he is searching for Patek Phillipe

15  watches.  Two days after that, Daibes sends Menendez a link to

16  this, a website showing that a resolution praising Qatar has

17  been introduced by another senator, not Menendez, but it's now

18  pending before Menendez, because it's been referred to the

19  Senate Foreign Relations Committee.

20         You know from Sarah Arkin what that means.  It's now

21  waiting for action by Menendez as the chair of that committee.

22  Daibes is asking Menendez to take official action, to support

23  this resolution, in exchange for the bribes Daibes has been

24  providing and will continue to deliver.

25         That's just a couple of weeks before Menendez's trip

O79Wmen2                     Summation - Mr. Monteleoni

1    to Qatar and Egypt and Daibes's delivery of doughnuts and gold
2    that we've talked about.  And Menendez accepts that gold
3    knowing full well that Daibes wants him to support that pending
4    resolution, to take that official act, in exchange for the
5    gold.  But even after that gold delivery, Daibes still hasn't
6    gotten the investment and he still wants action from Menendez.
7    So here you see it again.  On November 3, 2021, Sheikh Sultan,
8    the head of the investment company, calls Daibes.

9         The next day, Daibes is sending an update on that
10   resolution praising Qatar.  It's picked up by another senator,
11   also not Menendez.  You know why Daibes is sending this, and
12   Menendez does too.  He's asking Menendez to take action on the
13   resolution to help Daibes's relationship with the investment
14   company, because he believes it has ties to Qatar.  A few
15   minutes after sending that, Daibes calls back Sheikh Sultan,
16   and of course, couple weeks later another search by Menendez
17   for a price of a kilo of gold, also months before contacting
18   the ethics committee about gold.

19        Yet again, the timeline shows you the *quid pro quo* and
20   the corrupt intent -- Menendez's reversals on Sellinger alone,
21   yanking him when he thinks that Sellinger may have to be
22   recused, coming back to him when he thinks that Sellinger won't
23   have to be recused -- tell the tail.  Menendez's actions show
24   you what he's doing.  They show you the *quid pro quo*, and even
25   though you don't need it, there is, again, so much more.

1          The second reason you know there was a corrupt *quid*

2   *pro quo* in these counts is the special treatment.  Again,

3   Menendez is giving special treatment to Daibes, and Daibes is

4   also asking for special treatment.  There's special treatment

5   Menendez gave Daibes with respect to Qatar.  There's these

6   advance copies of the press releases, invite to the dinner with

7   the emir, special treatment Daibes was asking him for about

8   Qatar, wanting him to use his powers as chair to take the

9   official action in advancing the Senate resolution.

10         But the special treatment that Menendez gave Daibes in

11  his own federal criminal prosecution is on another level

12  altogether.  It is hard to think of more special treatment than

13  manipulating the process for selecting the chief federal law

14  enforcement officer for New Jersey based on who you want

15  presiding over your friend's prosecution.  Menendez's interview

16  of Sellinger to be the U.S. Attorney for New Jersey was a

17  window into exactly what Menendez was thinking.  Of all the

18  hundreds of cases pending before the U.S. Attorney's Office,

19  Menendez mentioned only one:  Daibes's case.  The one of the

20  friend who had put checks into Menendez's hand and who would go

21  on to stuff Menendez's house with cash and gold.

22         (Continued on next page)

23

24

25

1          MR. MONTELEONI:  Doesn't matter that Sellinger didn't

2    realize Menendez was asking for something.  As we've already

3    talked about, Menendez was smart, and he was careful.  He used

4    his power and influence in subtle ways to try to get what the

5    people who were bribing him wanted while not getting caught.

6          You know what Menendez wanted.  Sellinger was

7    Menendez's friend.  Obviously Menendez is going to think he'll

8    be sympathetic to him.  And if you had any doubt about what

9    Menendez wanted when he asked that question, it's answered by

10   what Menendez did within hours, hours after learning Sellinger

11   might have to be recused.  As soon as Sellinger told Menendez

12   he might have to be recused from Daibes' case, he was out.

13         Sellinger may not have thought that Menendez was

14   asking for anything when he brought up Daibes' case, but

15   Menendez sure did.  The special treatment didn't stop when

16   Sellinger was recused.  At that point, Menendez didn't have a

17   lot of good options.  Sellinger wasn't allowed to participate

18   in the case, and Khanna wasn't a friend like Sellinger, so he

19   tried two approaches.  For his approach with Khanna, he praised

20   Daibes' lawyer.  Then at the same time, he actually called up

21   Daibes' lawyer and he admonished him to push for dismissal of

22   the case.  He took the lawyer to task for not pushing

23   aggressively enough.  With Khanna in charge, that was the most

24   that Menendez could do with this approach.

25         Again, he was willing to use his power to help the

1   people paying him bribes, but he didn't want to get caught.  So

2   he carefully chose how much pressure he was willing to apply to

3   avoid setting off alarm bells.

4          But with Sellinger he tried a different approach.

5   Something he knew was so wrong, that he wasn't willing to do it

6   himself, and that Soliman, his longtime advisor, refused to do.

7   He tried to get Soliman to question Sellinger about why he was

8   recused.  And then, he tried to get Soliman to ask Sellinger

9   directly to ensure that Daibes got all due process.

10         Now, obviously, every defendant is entitled to due

11   process.  But he didn't ask Soliman to ask Sellinger to give

12   every defendant due process.  He singled out one defendant.

13   And the defendant that Sellinger was forbidden from giving

14   anything to, due process or otherwise.  And it happened to be

15   the one defendant who was delivering cash and gold to Menendez

16   and his wife.

17         The fact that Menendez used this kind of guarded

18   language about due process, but just due process for this one

19   person, just due process for my friend who is putting the gold

20   and the cash in my house, that doesn't show that his request

21   was innocent.  It shows how improper what he was doing was and

22   how careful he was to try to hide his role in it.

23         That brings us to the third way you know it is a

24   corrupt quid pro quo.

25         The things of value that Daibes provided to Menendez

O793MEN3                    Summation - Mr. Monteleoni

are perhaps the clearest proof of a corrupt quid pro quo of
all.  Envelopes of cash, kilos of gold.  Daibes might be a
wealthy and generous man, but these are simply not gifts.  They
are bribes.  Friends do not give friends envelopes stuffed with
$10,000 in cash, just out of friendship.  Friends do not give
those same friends kilogram bars of gold worth $60,000 each out
of the goodness of their hearts.

        Look at these envelopes.  These are not gift
envelopes.  They're bank envelopes.  Look at the $10,000
handwritten across the flap of almost every one of them.  That
$10,000 is not a gift note.  It is a ledger.  It is a record of
how much Daibes was paying Menendez.  He handwrote $10,000
right on the flap.  Right under the tape that he would just
then seal with his own hands leaving his fingerprints, because
Daibes wanted Menendez to know how much he was paying to bribe
Menendez.  That way, Menendez could just tuck one in the pocket
his jacket unopened and know just how much he had gotten from
Daibes, and just how much he owed Daibes.

        Look at this.  If these were gifts, how come all the
ones that the FBI could trace at all were given since late
2020.  Daibes has known Menendez for years.  If bank envelopes
neatly labeled with $10,000 markings were just Daibes' love
language, why did they only start in or after 2020?  You know
why.  Because they were bribes.  They were bribes for
Menendez's attempt to intervene in Daibes' federal criminal

1    case, something Menendez could not do before the presidential

2    election of 2020.

3              Let's not forget, there are thousands on thousands of

4    dollars of cash stuffed in that house.  Not just the cash that

5    has Daibes' fingerprints on it.

6              Look at this.  Look at how much more cash there was in

7    the house than Menendez withdrew from his bank accounts.

8    You've seen the cash and its packaging.  You know it is absurd

9    to think that every single new bill that's in there was taken

10   out by Menendez just very recently and then it was slipped in

11   with a bunch of older bills, which he must have withdrawn

12   before.

13             You know from the testimony from Joseph Catania, the

14   numbers of the post-2018 bills found in the house are wildly

15   too low, since that's just the date that the bills were first

16   put into circulation, sometimes all over the world, not the

17   date which they finally made it to the Menendezes' house.

18             But even if you bend over backwards, if you ignore all

19   the older bills, no matter whether they're packaged in bank

20   envelopes with newer bills, and even if you ignore all the

21   newer bills that are outside of the basement and the office,

22   and even if you ignore all the testimony that you heard about

23   older bills remaining in circulation for years, which your

24   common sense tells you is true, in fact, even if you assume

25   that Menendez somehow gets every bill the day it first comes

1    into circulation, the math still doesn't add up for Menendez.

2    Even the newer bills just in the basement and the office are

3    still not all the money Menendez withdrew from his own bank

4    account.  They can't be.

5         Look at the last two bars.  Just in the basement or

6    office, that Menendez has argued is his area, the FBI found

7    more bills that were first placed into circulation in or after

8    2018 than the total amount that Menendez withdrew during that

9    time period.  Even if, most absurdly of all, he never spent a

10   single dollar that he withdrew and just withdrew it right into

11   the basement, even if every dollar that he withdrew was

12   sprinkled into the various different collections of cash in the

13   basement and the office, it still cannot account for all of the

14   post-2018 money found there.  It is, quite simply, not his

15   money.

16        And even if you go back further, it's still not his

17   money.  You heard a lot from the defense about old money.  A

18   lot from the defense about how Menendez withdrew money from his

19   bank account for years.

20        Let me be clear about this.  Menendez has no burden

21   whatsoever.  He did not have to present any evidence to you

22   about this.  But he did.  Let's talk for a moment about what he

23   chose to put before you to try to explain where all this cash

24   came from.

25             THE COURT:  Excuse me, Mr. Monteleoni, is this a good

1    time for a break?

2            MR. MONTELEONI:  That's a great time for a break.

3            THE COURT:  Why don't we take 15 minutes, ladies and

4    gentlemen.

5            (Jury excused)

6            THE COURT:  15 minutes.

7            MR. FEE:  One quick point.

8            THE COURT:  Yes, sir.

9            MR. FEE:  I'm sure this was inadvertent, and I didn't

10   want to interrupt.  But there was one passage where I think

11   Mr. Monteleoni again, inadvertently, suggested a bit of burden

12   flipping.

13           He said something to the effect it was Bob's jacket,

14   Senator Menendez's jacket, and then here is the part that

15   prompted the concern.  The defense didn't try to show you a

16   picture of Nadine's son wearing the jacket.  And I'm sure he

17   was just saying something about absence of dispute, but I think

18   perhaps a mild curative reminder not focused on that passage,

19   but generally, is appropriate.

20           THE COURT:  I really don't think that's necessary.  It

21   was an offhand remark.  What I do remember from

22   Mr. Monteleoni's presentation is he said at least once the

23   defense has no burden of proving anything here.  I think that

24   would just highlight it.

25           If you want me, you know, on second thought, if you

1    want me to simply say, without referencing going back to what

2    the reference is, I remind you the defense is under no

3    obligation to put on any proof.  I think I can easily do that.

4            MR. FEE:  That's all, your Honor.

5            THE COURT:  Thank you.

6            MR. FEE:  Thank you.

7            THE COURT:  12 minutes.

8            (Recess)

9            (In open court; jury present)

10           THE COURT:  Ladies and gentlemen of the jury, I remind

11   you, as you know, that the defense is under no obligation to

12   put on any evidence.  The burden of proof is always on the

13   government, and that burden of proof is to prove its case

14   beyond a reasonable doubt in order for you to find the

15   defendant you are considering guilty.  Again, the burden of

16   proof on the government is to prove its case beyond a

17   reasonable doubt.

18           Mr. Monteleoni, you may continue, sir.

19           MR. MONTELEONI:  Thank you, your Honor.

20           So, let's talk about what the defense chose to put

21   before you to try to explain where all this cash came from when

22   they had no burden whatsoever to put on anything about this.

23   But they did.

24           You remember Russell Richardson, Menendez's financial

25   analyst?  He's the one that they sent up there with this chart.

1    This chart included this page, which Richardson admitted under

2    oath was inaccurate.  They sent him up there with this page

3    that was inaccurate, because they wanted to make a pattern.

4    What did they do to get that pattern?  They ignore all of the

5    data that didn't fit the pattern, and that left him with what

6    their analyst testified does not accurately describe the

7    underlying bank records.

8            Why did they do that?  Well, they wanted to use that

9    pattern to feed you a bunch of assumptions that were not based

10   on evidence.  This is a page from his chart which lists a bunch

11   of supposed withdrawals that there is no evidence supporting.

12   Do you see this line where it says 26 withdrawals in 1996?

13   They have no records of any withdrawals in 1996.

14           The source that is listed for that slide, as

15   Mr. Richardson testified under oath, is not in fact a source

16   for any of the transactions on this slide.  There is literally

17   no evidence in the record that the transactions that were

18   listed on this slide happened.

19           This slide is what it looks like when you pull numbers

20   from thin air.  This is not evidence.  This is just an

21   assumption that is based entirely on manipulating the bank

22   records that they do have to create the appearance of a

23   pattern.  You should reject it.  You should reject it.

24           When you think about the defense's arguments about the

25   cash that's found in his house, think about the fact that this

1    is what they chose to put before you.  They chose to put before

2    you a chart that is inaccurate.  That lists and adds up a bunch

3    of assumptions that are not based on evidence.

4           But let's consider for a moment what they did admit.

5    Let's give them all those assumptions and add in all these

6    transactions that are not based on the evidence, add in the

7    transactions that are based only on this pattern they created

8    taking their own figures.  This is the defense's own

9    calculations they bent over backwards to get to.  Let's do all

10   this.

11          To be clear, you should absolutely not in fact give

12   them these assumptions.  These assumptions are absurd.  But

13   let's give them this for a moment.  What does that leave us

14   with?

15          That would give us about $307,000 of withdrawals from

16   all the way back to 1995.  So that amount, which is the

17   defendant's own numbers, is still less than all of the money

18   that the FBI found in the basement and the office.  It's over

19   $90,000 less.

20          Let me be very clear.  Even using Menendez's own

21   assumed numbers, and even assuming that he never spent a single

22   dollar that he withdrew from the bank, and even leaving aside

23   all of the money that was found anywhere else in the house, the

24   basement and the office alone contained over $90,000 more than

25   all of the money that the defense is even assuming that he

1    withdrew, back to the 1990s.  The 1990s.

2            You can forget about all those questions about old

3    money versus new money.  The basement and the office versus the

4    closet.  The old money, in the basement and the office, that's

5    not all his money either.  You can look for yourself at the

6    photos of the money.  They're in evidence.  But you're not

7    going to find a lot of photos of bills that were designed

8    before 1995.  Menendez has bent over backwards to try to come

9    up with figures to explain away what the FBI found, which he

10    did not have to do, and the best he could do still shows you it

11    is not all his money.

12            The old money is not his money either.  Think about

13    that when you think about his state of mind and whether there

14    was a quid pro quo.

15            Now, after having said in their opening statement that

16    the cash that was found in the basement of Nadine's home was

17    the senator's cash, defense counsel in their questioning

18    sounded like they were actually trying to run away from some of

19    the cash in the basement.  But what defense counsel suggested

20    about that money in their questioning of the FBI analyst Megan

21    Rafferty about it is simply absurd.

22            They suggested that the money in this bag you should

23    disregard.  Because this -- just what they said -- this bag was

24    from Forever 21.  And because Menendez's daughter-in-law Sabine

25    bought a couple of things from Forever 21.  What are they even

1  saying?  Are they saying it's Sabine's money?  Sabine, who you

2  heard is in her 20s?  There is $95,000 of cash in this bag.

3  And this bag is inches, inches away from the men's jackets that

4  have Menendez's name on them and cash in the pockets.  It's not

5  in some closet, locked or unlocked.  It is right on top of his

6  cash stashes.

7         The idea you should blame Menendez's daughter-in-law

8  because she got a plastic bag from a store, and that plastic

9  bag is now somehow linked to her for all time, is preposterous.

10 It is not a serious argument.  It is an argument of

11 desperation.

12        After sending her away to the bathroom at Segovia,

13 Menendez is now blaming his daughter-in-law for some of his

14 stash of cash.

15        Menendez's houses is filled, filled with cash that he

16 did not earn.  You don't have to go farther than the cash that

17 has Daibes' fingerprints on it.  But all the rest of the cash

18 shows you all that you need to know about Menendez's state of

19 mind.  It shows you that he was receiving large amounts of cash

20 from other people.  It shows you that the cash with Daibes'

21 fingerprints on it was from a quid pro quo.

22        So we have talked about the cash.  But gold wasn't

23 gifts either.  Some gold may be a gift.  People give jewelry

24 made out of gold as gifts.  This case isn't about jewelry.

25 Some people may give gold coins as gifts. This case isn't about

1   gold coins.  Some people might give those small 1 ounce bars of

2   gold as gifts.  Daibes gave at least 4 kilos.  There is no

3   evidence in the record of this trial, zero, that there is some

4   kind of habit or practice anywhere in the world of giving

5   kilogram gold bars worth $60,000 each out of friendship.  Just

6   those four bars alone were worth almost a quarter of a million

7   dollars.  It's not a gift.  In total, Daibes gave over a

8   quarter of a million dollars of gold.

9           Here's another reason that quarter million dollars

10  wasn't gifts.  Daibes is out on bail when he gives all this.

11  The whole time that this is going on, he's out on bail on

12  federal fraud charges.

13          The idea that while under that kind of scrutiny he

14  gave more than a quarter million dollars in gold to a public

15  official, a public official who is literally involved in the

16  process of picking his own prosecutor, along with almost a

17  hundred thousand dollars of cash in bank envelopes, and he

18  thought it was just a gift with nothing to do with his case is

19  absurd.

20          How else do you know these kilos weren't gifts?  Well,

21  there were limits to Daibes' generosity.  Look at this.  When

22  Nadine needed a car, Hana asked Daibes.  Daibes didn't do it.

23  But the car was worth about as much as one of those kilos of

24  gold.  It was worth much less than the 4 kilos that Daibes

25  gave.  And a car was something that Nadine really needed.  If

1   he was willing to give the Menendezes gifts of friendship of

2   that value, it would have been the perfect opportunity.

3   Especially in a time when his friend was desperate for a car.

4   But he didn't.  He didn't give Nadine the car, because he

5   didn't give her things that valuable as gifts.

6          Daibes is a generous man, but he's also a businessman.

7   He's not going to give something that valuable for nothing.  He

8   didn't give her the car because at the time, before the halal

9   company started, before there was a U.S. attorney vacancy that

10  could impact his criminal case, Menendez wasn't in a position

11  to do anything for Daibes.

12         Here's another way you know these weren't gifts.

13  Menendez didn't report them as gifts.  He was aware of the

14  kilos since October 2021.  At least if he thought they were

15  gifts, he could have brought them to the Senate Ethics

16  Committee.  But he didn't, because he knew they were not gifts,

17  they were bribes.  And he didn't report any of the cash, not

18  even the one in the jacket pocket or the one with his

19  fingerprints on it.  If these were innocent gifts, he could

20  have reported those too.  But he didn't.  Again, because they

21  were bribes.

22         Now, was friendship part of the motivation for some of

23  the things that Daibes gave Menendez?  Maybe it was.  The

24  recliner, when Menendez needed it, was a nice gesture of

25  friendship, and would have been if it was new or if it was

1    used.  The handbag for Nadine Menendez's birthday was no doubt

2    partly because they were friends and it was her birthday.

3    Maybe even some of the smaller gold bars could have been given

4    in part because of friendship.

5              But I expect Judge Stein will instruct you that if a

6    thing of value is given or received, both for permissible

7    reasons like friendship, and as part of a corrupt quid pro quo,

8    even only in part, these elements are still satisfied.  Even if

9    part of Daibes' motivation for giving something was friendship,

10   these elements are still proven if part of the motivation was a

11   corrupt quid pro quo.

12             Of course, you don't have to find that everything

13   Daibes gave was part of a corrupt quid pro quo to find these

14   elements proven.  You just have to find unanimously at least

15   one thing Daibes gave or promised was part of a corrupt quid

16   pro quo, even in part.  1 kilo of gold.  One envelope of cash.

17   Were they?  Of course they were.  These are on their face

18   bribes.  It's another reason you know it was a quid pro quo.

19             Which brings me to the fourth reason you know there

20   was a corrupt quid pro quo for these counts.  The secrecy.  The

21   envelopes of cash are secret.  It's about the most secret way

22   that you can get a bribe to someone.

23             Think about how hard it was for the FBI to find the

24   bribes, and figure out when they were paid.  The FBI had to

25   obtain a search warrant, physically search Menendez's house,

1   painstakingly examine the evidence for fingerprints and DNA,
2   and then put together a detailed analysis that showed that each
3   of those envelopes must have been provided at some time during
4   late 2020, 2021 or 2022.  It was hard work, because Menendez
5   and Daibes set it up that way to avoid getting caught.

6           Of course you don't have the precise day-to-day or
7   sometimes minute-to-minute correspondence of the payments like
8   you do in some of the electronic or check payments that we have
9   in other parts of the scheme.  That's why Menendez and Daibes
10  used the cash.  The secrecy.

11          Similarly, the gold is also secret.  Like cash, it's
12  not easily traceable.  There are no bank records that would
13  show when Daibes hands Menendez a gold bar.  The FBI had to
14  search Menendez's house to find it.

15          In fact, that's part of why Daibes paid bribes in that
16  form.  Now as we've already discussed, Menendez and Nadine
17  eventually needed to get this cash into the financial system.
18  And Daibes connected Nadine with Vasken and Khorozian to sell
19  the gold for checks.  They didn't tell Khorozian this was
20  Daibes' gold.  They kept that a secret even from Khorozian.
21  You know that Nadine lied to Khorozian about where the gold
22  came from.  That's part of the secrecy.

23          Taking gold from Daibes, and converting it to a check
24  from a jeweler, she could deposit in her bank account with
25  nobody knowing that it traced back to Daibes.

1          You heard that Mr. Khorozian didn't write down the

2     serial numbers of every piece of gold that passes through his

3     hands.  Why would he?  The only evidence you saw tracing that

4     gold was the picture that Nadine Menendez happened to take the

5     hour before she went to sell those first two gold bars.

6          Imagine trying to figure out whose gold bars they

7     were, if she hadn't done that.  In fact, you don't have to

8     imagine it.  You've actually seen that scenario in trial.

9          Let's look at how many kilo bars Menendez and Nadine

10    had.  There is the two that the FBI found in the house in the

11    closet in the Menendezes' bedroom.  These obviously were not

12    sold to Mr. Khorozian, since they were still in the house.  The

13    FBI compared the serial numbers on these two to Daibes'

14    inventories.  That's 2 kilos from Daibes, kilos 1 and 2.

15         Next.  On March 31, 2022, Nadine went to Mr. Khorozian

16    to sell 2 kilos claiming they were her family gold.  We know,

17    because she happened to take a picture of them first, they were

18    also from Daibes' gold inventory.  These are two different

19    kilo, kilos 3 and 4.

20         But remember, she goes back to Khorozian to sell two

21    more kilos of gold in the middle of May, right around when

22    Daibes gets a letter of intent from Heritage solidifying the

23    deal he had been hoping to get with Menendez's help.  These

24    checks are all the documentary evidence we have of kilos 5 and

25    6.  Menendez and Nadine had two more kilos of gold and sold

1  them.  But because nobody took a picture of the serial numbers,

2  and wrote it down, those two haven't been on those charts.

3  Those two aren't part of the quarter million dollar

4  calculations we've been talking about.

5         This almost $120,000 from the sale of those last

6  2 kilos, 5 and 6, it's not even in that total.  You can draw

7  your own conclusions about where they come from.  The evidence

8  suggests they came from Daibes.  You don't need to find these

9  2 kilos from Daibes to convict.  That's what happens when

10  Nadine sells kilo bars, but doesn't happen to take a photo of

11  their serial numbers.  That's secrecy.

12         Fifth reason that you know there was a corrupt quid

13  pro quo for this count.  The lies.  We've seen how the

14  financial disclosure forms don't show the kilos of gold.  Look

15  what else they don't show.  Envelopes of cash.  This one, the

16  one in Menendez's jacket pocket, had to have been provided in

17  late 2020, 2021 or 2022.  Where is it on the forms for those

18  years?  Nowhere.  Where are any of the envelopes of cash on

19  these forms?  Nowhere.  More lies.  More reasons you know it

20  was a quid pro quo.

21         That brings us to the last reason you know this was a

22  quid pro quo.  The big picture.  We've shown you the pattern of

23  corruption throughout all of the parts of this scheme, and it

24  all makes sense that the same people are doing things the same

25  way, again and again, because it is of course all part of the

1    same overall scheme.

2            But think of the flip side of that.  Think of what

3    needs to be true for none of these to be corrupt quid pro quos.

4    Menendez takes a number of acts to benefit the government of

5    Egypt, but that has nothing to do with the fact that Wael Hana,

6    who is asking him to do these things, has just promised his

7    girlfriend a job.  That's a coincidence.

8            And Menendez takes a number of acts to benefit the

9    government of Qatar and is asked by Daibes to advance a Senate

10    Resolution praising Qatar.  But that has nothing doing with the

11    fact that Menendez's house is filled with cash and gold from

12    Daibes.  Just a coincidence.

13            Menendez calls McKinney to protect the business

14    monopoly that Egypt gives Hana, just like his website says he

15    doesn't do, but that has nothing to do with the fact his

16    girlfriend was promised a job by Hana from that monopoly.

17    Another coincidence.

18            Menendez then calls Grewal to interfere in a criminal

19    case, just like his website says he can't do, but that has

20    nothing to do with the fact his girlfriend was promised a

21    Mercedes by Hana.  Coincidence.

22            Menendez then calls Grewal again, summons him to a

23    meeting to intervene in a criminal investigation, just like his

24    website says he cant' do, but that has nothing do with the fact

25    his girlfriend was given a Mercedes by Hana's friend Uribe.

1    Another coincidence.

2              Menendez then raises another criminal case, Daibes'

3    case, when he's interviewing his friend Sellinger for the

4    position of chief federal law enforcement officer for New

5    Jersey, but that has nothing to do with the fact that his house

6    is full of cash and gold from Daibes.  Another coincidence.

7              The coincidences don't stop.  Just a coincidence that

8    hours after he hears Sellinger may have been to be recused,

9    that's when he looks for Esther Suarez to be U.S. attorney.

10   And it's just a coincidence than Suarez just happens to be

11   someone that Daibes thinks will be favorable to him.  And it is

12   a coincidence he goes right back to Sellinger after his advisor

13   thinks Sellinger can be have control of the Daibes case after

14   all.

15             Just a coincidence that all of this cash was withdrawn

16   during the time period that this was happening.  And it is just

17   a coincidence Menendez was searching for the price of kilos of

18   gold during the time period when this is happening, starting

19   minutes after an in-person visit from Fred Daibes, who actually

20   provided the kilos of gold.

21             Just a series of coincidences?  That is nonsense.  Not

22   a coincidence.  It is a corrupt quid pro quo.  Menendez agreed

23   to and did take all of those actions in exchange for all of

24   those things of value.  These elements are proven.

25             For venue, again, you have plenty.  From the big

things like Vasken and Khorozian selling gold in Manhattan to
the little things like John Pilot giving Menendez and Nadine a
drive home through Manhattan and the Bronx to New Jersey.
Menendez is guilty of Count 11.  Daibes is guilty of Count 12.
The three major pieces of the corruption scheme are proven.
Most of the rest of the counts fall into place more quickly
now.

          Count 13.  Honest services wire fraud against Menendez
and Daibes.  Again, this relates to the New Jersey U.S.
Attorney and Qatar piece of the scheme.  The scheme to defraud
is just a quid pro quo.  It's proven for the same reasons we
just talked about.

          Intent to defraud is proven from the secrecy and the
lies that we just talk about.  Daibes is passing these
envelopes of cash, stopping by with these gold bars, Menendez
is keeping this off the disclosure forms.  They are both
attempting to defraud the public into thinking they're
receiving Menendez's honest services.

          Material misrepresentation or concealment, same thing.
Proven by the secrecy with the cash, the secrecy with the gold,
the false financial disclosure forms.  This element is proven,
too.

          Interstate wire.  There are plenty.  Here's one easy
one.  Vasken and Khorozian is in New Jersey, he calls Avital in
New York about selling the gold.  An interstate wire in order

O793MEN3                        Summation - Mr. Monteleoni

1  to let Nadine get Daibes' gold out of her safe and into the

2  financial system, where she can use it to pay her mortgage or

3  to buy a house with Daibes' assistance.

4          There are more wires in evidence, of course.  Daibes

5  while he's in Manhattan to meet with the Emir of Qatar tries to

6  make a WhatsApp call to Sheikh Sultan.  Every WhatsApp

7  communication gets processed outside of New York.

8          Heritage's deal professionals located in Manhattan,

9  send e-mails to Heritage in London.

10         Plenty of wires.  All you need is one.  This element

11  is done.  Those wires also give you all the venue that you need

12  for this count.  Menendez and Daibes are guilty of Count 13.

13         Count 14.  Extortion.  Menendez, again, the New Jersey

14  U.S. Attorney and Qatar part of the scheme.  Public official,

15  undisputed.

16         Obtained property, we've been through this.  The gold

17  and the cash given in exchange for official action.  The same

18  quid pro quo we've just been talking about.

19         Interstate commerce.  There are plenty of effects

20  here.  Each gold sale in New York is one.  That's all you need.

21  But there is much more.  Even a potential effect on interstate

22  commerce is one.  So just the potential that Menendez's acts

23  would have affected Heritage's decision about whether to make a

24  $95 million investment from abroad into New Jersey would count,

25  too.  This element is also done.

O793MEN3                    Summation - Mr. Monteleoni

1          For venue, again, the gold sale into Manhattan, the

2     free ride from J.F.K. through Manhattan and the Bronx.  These

3     are enough for venue.

4          Menendez is guilty of Count 14.  He used his official

5     position to obtain cash and gold in exchange for promises that

6     he would tamper with the process for selecting the chief

7     federal law enforcement officer for New Jersey, in the hopes

8     and in the hope he would advance a formal resolution of the

9     U.S. Senate.

10         So now that we've gone through the charges that apply

11    to each of the three parts of the scheme separately, let's go

12    back to the top of the indictment for the corruption conspiracy

13    group of counts.

14         Count One is bribery conspiracy.  That's against all

15    three defendants.  Covers the Egypt part of the scheme, and the

16    New Jersey U.S. Attorney and Qatar part of the scheme together.

17         I expect that for the first element, existence of an

18    agreement, Judge Stein will instruct you that a conspiracy is

19    just an agreement or understanding among at least two people to

20    violate the law.  Doesn't mean defendants had to sit around a

21    table and say out loud I agree to exchange a bribe payment for

22    an official act.  Doesn't mean the defendants had to enter into

23    a written contract.  Just means that through their words and

24    their actions, the defendants reached an agreement, even an

25    unspoken agreement, to violate the law.

1          In this case, the objects of the conspiracy are the

2     bribery counts.  So an agreement to commit the bribery offenses

3     in Counts Five or Six relating to Egypt, or in Counts 11 or 12

4     relating to the New Jersey U.S. Attorney and Qatar, is enough.

5          I expect the judge will instruct you that you have to

6     be unanimous about at least one object of the conspiracy, can

7     be more, can be all, but it doesn't have to be.  All you need

8     is one.  So if you find that two or more people agreed that at

9     least one of these offenses in Counts Five, Six, 11 or 12 be

10    committed, this element is satisfied.

11         And here the proof is overwhelming.  We've just gone

12    through the fact that each of these counts is proven.  Now, did

13    two or more people agree to commit each of these counts?  Of

14    course.  Hana and Daibes were bribing Menendez.  They agreed to

15    pay the bribes, Menendez agreed to take them.  They didn't need

16    to say it out loud or put it in writing.  Their actions show

17    you that they agreed to commit bribery together.

18         And you know from the evidence we've gone through that

19    Nadine was also in on it too, so that's another person who

20    agreed to the commission of each of these offenses.  Either

21    way, two or more people, that's all you need.  This element is

22    proven as to each defendant.

23         Second element, that each defendant knowingly and

24    willfully joined the conspiracy.  I expect the judge will

25    instruct that you each defendant must have known what they were

1    doing and taken the actions in question deliberately and

2    voluntarily.  Here that's obvious.  Did Menendez take an IS EG

3    Halal check from Fred Daibes by accident?  Did he call McKinney

4    by accident?  Did Hana write that check by accident?  Did he

5    ask Menendez to call McKinney by accident?  And does Daibes

6    hand those checks to Menendez by accident?  Did he fill

7    Menendez's house with gold and cash by accident?  Of course

8    not.  The defendants took these actions intentionally.  This

9    element is proven against each defendant.

10          And an overt act.  This just means at least one person

11   did something -- anything -- to make the conspiracy happen.

12   The act itself doesn't have to be a crime, it just has to

13   further the conspiracy.  Are there overt acts here?  Of course

14   there are.  There are plenty.  Acts like Menendez sending out

15   the tank ammunition promise.  Menendez calling McKinney.  Hana

16   writing the IS EG Halal checks.  Daibes delivering those

17   checks.  Menendez receiving the checks.  Daibes handing over a

18   bar of gold.  So many more.  This element is proven many times

19   over.

20          The acts that give venue for the substantive counts

21   are enough for venue on the conspiracy counts, too.  So that's

22   all you need.

23          Menendez, Hana, and Daibes are guilty of conspiracy to

24   commit bribery.

25          The next count, Count Two, is conspiracy to commit

1    honest services wire fraud.  That's against all defendants.

2    This relates to the entire corruption scheme.  Egypt, the New

3    Jersey Attorney General, the New Jersey U.S. Attorney, and

4    Qatar.

5              The first element is just that there was an agreement

6    to commit the underlying honest services fraud offenses.  Here,

7    this is any of the honest services fraud offenses, that's Count

8    Seven regarding Egypt, Count Nine regarding the New Jersey

9    Attorney General, or Count 13, regarding the New Jersey U.S.

10   Attorney and Qatar.  Just like with the bribery conspiracy, you

11   have to be unanimous that two or more persons agreed on at

12   least one object.  Could be more, but all that's needed is at

13   least one.

14             As we've discussed, each of the honest services fraud

15   schemes are proven.  And each of them involved the agreement of

16   two or more people.  Menendez, Hana, Daibes, Nadine, Uribe.

17   This element is proven against all of the defendants.

18             The next element is that the defendant knowingly and

19   willfully joined the conspiracy.  Just like with Count One,

20   none of this happened by accident.  Hana didn't promise the

21   Mercedes by accident, Menendez didn't call Grewal by accident.

22   This element is proven as well.  That's all you need for Count

23   Two.  There isn't even an overt act element for honest services

24   fraud conspiracy.

25             Again, venue is shown by any act in furtherance of the

1    scheme, like the wires that we already talked about or other

2    things, like driving to Long Island to make a cash deposit.

3    Count Two is proven.  Menendez, Hana, and Daibes are guilty of

4    honest services fraud.

5            Next is Count Three.  Conspiracy to commit extortion

6    under color of official right.  That's against Menendez, again

7    relating to the entire scheme.  Egypt, New Jersey Attorney

8    General, New Jersey U.S. Attorney, and Qatar.

9            Again, there has to have been an agreement between two

10   or more persons to commit extortion under color of official

11   right.

12           Here the objects are any of the extortion offenses

13   we've been through.  That's Count Eight regarding Egypt, Count

14   10 regarding the New Jersey Attorney General's Office, and

15   Count 14 regarding the New Jersey U.S. Attorney and Qatar.

16   Again, you only have to be unanimous on at least one of those

17   objects.  There could be more.

18           Was there an agreement between two or more persons to

19   commit extortion?  Of course there was.  Menendez agreed with

20   Nadine to use his official position to obtain property that he

21   wasn't entitled to, to obtain bribes.  The two of them worked

22   together, Menendez calling the shots and taking and promising

23   the official actions, Nadine acting as the go-between,

24   connecting Menendez with the bribe payers.  You saw that

25   through all the evidence.  He used her as a go-between to pass

1    messages through her and collected funds through her and he

2    knew what she was doing.  He knew what she was getting paid

3    for.

4           Her communications with Hana, Daibes, and Uribe as

5    well as with all those other people she was complaining to,

6    like Howard Dorian, make clear she knew exactly what her role

7    was in the scheme.  So yes, this element is proven.  Menendez

8    agreed with Nadine to commit extortion under color of official

9    right.

10          Element two.  Did Menendez join this conspiracy with

11   Nadine knowingly and willfully?  Of course he did.  The

12   evidence has proven just like for Counts One and Two.  Menendez

13   didn't do any of this by accident.

14          And just like with Count Two, there is no requirement

15   of an overt act, so Count Three is proven as well.

16          Venue, again, is proven by the same effects on

17   interstate commerce we talked about for the substantive counts,

18   plus any of the other acts in the Southern District of New York

19   like the phone calls, the text messages, the other meetings in

20   Manhattan.  Menendez is guilty of conspiracy to commit

21   extortion under color of official right.  We are done with the

22   corruption offenses.

23          All that's left now are the foreign influence offenses

24   and finally the obstruction offenses.

25          The next one is Count 16 which is a charge that

1    Menendez, while a public official, acted as a foreign agent.

2              The first element is just that Menendez was a public

3    official.  Undisputed.

4              The next is that Menendez was or acted as an agent of

5    a foreign principal required to register under the Foreign

6    Agents Registration Act or FARA for short.  I expect Judge

7    Stein will instruct you that when a private person acts as an

8    agent of a foreign principal in particular ways, that private

9    person has to register under FARA.  But a public official like

10   Menendez does not have the option of registering and taking

11   those actions.  Public officials cannot act as an agent of a

12   foreign principal at all.

13             So first of all, what is a foreign principal?  I

14   expect Judge Stein will instruct you that a foreign government,

15   like the government of Egypt, is a foreign principal.  And that

16   term includes the government's agencies, officials, officers

17   and employees.  So that includes the various Egyptian officials

18   you've heard about throughout this trial, like General Khaled

19   Shawky, like Ahmed Essam, like Ahmed Helmy, like Mai

20   Abdelmaguid.

21             What does it mean to be an agent of a foreign

22   principal?  It requires two things.  One of the ways of being

23   committed -- there is a totally different way of committing

24   this offense which I'll come back to.  So first, the person

25   acts in any capacity the order, request or under the direction

1   or control of a foreign principal.  Someone supervised by a

2   foreign principal.  That's the relationship between the

3   principal and the agent, what I'm going to call the agency

4   relationship.  Second part being an agent of a foreign

5   principal is the agent must, directly or through any other

6   person, do one of least several things.

7           One is political activities for or in the interest of

8   the foreign principal.  That just means influencing any U.S.

9   agency or any U.S. official regarding U.S. policies or the

10  interests of a foreign country.  Another is acting as a

11  political consultant for or in the interests of the foreign

12  principal.  That includes informing or advising anyone about

13  the policies of the United States.  A third is representing the

14  interests of the foreign principal before any agency or

15  official of the United States.

16          The defendant doesn't have to have done all of these

17  things.  Just one is enough.

18          So let's start with the things that Menendez did for

19  Egypt.  Then let's go back to the relationship that Menendez

20  had with the foreign principal.  Did Menendez engage in

21  political activities in the interests of Egypt?  He did.  The

22  ghostwritten letter.  Whether or not this was ever ultimately

23  sent by Egypt, which is irrelevant, this letter that Menendez

24  wrote was intended to respond on behalf of Egypt to the U.S.

25  government's human rights concerns with Egypt.  That letter was

1    in response to an e-mail Menendez sent briefing the Egyptian

2    government on what those concerns were to help them respond to

3    other members of the U.S. Senate.

4              This e-mail where he says "FYI" and describes what

5    another senator is doing with respect to aid to Egypt to help

6    Egypt figure out how to get it some money with no conditions.

7              Then, in 2021, Menendez sent an article about

8    questions other U.S. senators were going to ask Abbas Kamel,

9    the head of Egyptian intelligence, about whether Egypt was

10   involved in a human rights abuses, the murder of Jamal

11   Khashoggi.  He sent that to help Kamel prepare his responses to

12   these questions so he could influence other U.S. senators.

13   That is also a political activity.

14             Here's another political activity.  Did Menendez try

15   to influence a U.S. agency or official with respect to changing

16   the foreign policies of the United States?  That's exactly what

17   McKinney told you Menendez did.  Remember McKinney told you he

18   was engaged in part of the diplomatic relations of the United

19   States with other countries.  That's foreign policy.  Menendez

20   tried to influence McKinney to change course in that foreign

21   policy.  That's exactly what political activities are.

22             How about acting as a political consultant?  Did

23   Menendez engage in informing or advising any other person with

24   reference to the domestic or foreign policies of the United

25   States?  Of course he did.  Here he is informing and advising

1  the Egyptian government, through Nadine and then Hana, about

2  the staffing levels at the U.S. embassy in Cairo.

3          Like we've talked about in looking at all the special

4  treatment he was giving Egypt, this was highly sensitive,

5  real-time information about the U.S. personnel stationed

6  abroad.

7          Here same type of activity.  Menendez informing

8  Egyptian officials about the lifting of a ban on the sale of

9  small arms to Egypt.  Again, informing or advising Egypt on

10 U.S. policy.

11         And that FYI e-mail about the other senator's human

12 rights concerns and the Kamel briefing, those are political

13 activities, since they're intended to help Egypt influence U.S.

14 policy, but they're also the work of a political consultant.

15 He's informing or advising Egypt of the U.S. foreign or

16 domestic policy.

17         And did Menendez represent the interests of the

18 foreign principal before an agency or official of the

19 government in the United States?  He did.  Again, the call to

20 McKinney was an attempt to represent the interests of Egypt,

21 which was dead set on giving this monopoly to Hana before the

22 USDA and before McKinney specifically.

23         Similarly, the ghostwritten letter was intended to

24 represent Egypt's interests before the U.S. Senate.

25         It is absolutely clear that Menendez engaged in

1  political activities, acted as a political consultant, and

2  represented the interests of Egypt before the United States.

3  But what about the other part.  The agency relationship.

4          So, listen carefully to Judge Stein's instructions on

5  this.  I expect he'll tell you what this does and doesn't mean.

6  Doesn't mean Menendez's every move has to be controlled by

7  Egypt.  Doesn't mean he has to be Egypt's servant, and doesn't

8  mean Menendez has to be operating under the direction or

9  control of a foreign principal.

10         It is enough that if Menendez acted at the request of

11 a foreign principal, so long as that request meets some special

12 requirements.  Request in this context, it isn't an ordinary

13 ask.  Doesn't count if the foreign principal just asks or

14 persuades another person for his own reasons to do something.

15 What you have to decide, the ultimate question is whether

16 Menendez was not acting fully independently.  Was not simply

17 stating or following his own views, but was instead acting as

18 an agent of the foreign principal.  How do you know Menendez

19 did that here?

20         Listen to the judge's instructions.  I expect that

21 he's going to tell you to look at common sense factors like

22 were the instructions or requests accompanied by an offer or

23 the provision of compensation?  Did the foreign principal's

24 goals align with the defendant's own views?  How frequently did

25 the defendant interact with the foreign principal or its

intermediaries, could be officials, could be others acting as
go-betweens like Nadine and Hana. And was there an ongoing
relationship or coordination between the principal and the
defendant, and did the defendant seek or receive feedback on
his work from the foreign principal?

How do those apply here? Was Menendez just acting
independently on his own? Doing things that just happened to
benefit Egypt? Was he taking these actions for Egypt between
2018 and 2022 based on his own independent judgment of what
would benefit the United States? Or was he doing it for
another reason, like because he was getting paid.

You know the answer to this one. He was doing it
because he was getting paid. First, through promises to
Nadine, then eventually, through checks, gold, and the other
things that Hana was giving him in connection with the Egypt
counts.

Let's look at the frequency. This wasn't a one-off.
This was years, years of meeting with Hana, years of meeting
with Ahmed Helmy, years of meeting with Mai Abdelmaguid. Years
of learning what they wanted and taking actions to give them
what they wanted.

Were Menendez's goals aligned with Egypt? You've
heard about his human rights record. Before this started, he
was tough on Egypt. That's why, right after they met, Hana dug
up and sent to Nadine an article from months prior about

1    Menendez's tough stance on Egypt.  They thought he was going to

2    be a tough nut to crack.  Common sense tells you, that's

3    exactly why they wanted to bribe Menendez.  They wanted him to

4    go easier on Egypt.  Turns out, it only took a few months of

5    promises of payment to get him to start doing just that.

6          By May of 2018, he's ghostwriting that letter for

7    Egypt, articulating Egypt's views in response to a fellow

8    senator's human rights concerns.  By July of 2018, he's

9    promising to approve a military sale at a record pace.

10         By the spring of 2019, he more fundamentally shifted.

11   He told Sarah Arkin he wanted to try a different approach with

12   Egypt, and he refused to sign a letter that harshly criticized

13   Egypt, choosing instead to soften his public tone.

14         And a few more years of checks, gold, and other things

15   of value later, he's working with Mai Abdelmaguid, someone that

16   his staff thinks is an Egyptian intelligence officer, to set up

17   a trip to Egypt outside of the supervision of the State

18   Department.  And Menendez knows that when the State Department

19   finds out about it, Abdelmaguid panics.  This is supposed to be

20   our trip, not the State Department's trip.

21         How does Menendez react when he learns that

22   Abdelmaguid is panicking?  Does he say, well, I'm just an

23   independent diplomat doing what I think is best for the United

24   States, so there is no problem if the State Department knows

25   about the trip.  No.  He says "taken care of."  How does he

O793MEN3                    Summation - Mr. Monteleoni

```
 1    take care of it?  Well, a few days later, he's telling Sarah
 2    Arkin not to go on the CODEL.  Does his staff say, well, that's
 3    just independent diplomat Robert Menendez making deals on his
 4    own initiative to advance his viewpoint on behalf of the
 5    country?  No.  You know what they say.  "All of this Egypt
 6    stuff is very weird, I've never seen anything like it."
 7              It is.  And they haven't.  They didn't understand what
 8    was going on to make Menendez act so weird about Egypt.  But
 9    you do.  You know about the mortgage payment, the IS EG Halal
10    checks for the sham job, the envelopes of cash from Hana's
11    associates, Moussa and Gus Lita with their fingerprints on
12    them, the Asahi gold bars from Hana.
13              And that's how you know that Menendez's acting like an
14    agent.  He was changing his behavior, changing his views,
15    changing his approach to line up more with Egypt's.
16              Now, of course, he didn't stop all criticism of Egypt.
17    That would have been way too suspicious after the years spent
18    as one of Egypt's biggest critics.  But he softened his tone
19    and he start taking more actions that were in Egypt's
20    interests.
21              And here's one other thing.  You can consider whether
22    he seeks feedback from the principal.  Did he?  Did Menendez
23    seek feedback?  You bet he did.  What else can the love of my
24    life do for you?
25              And look at this second line.  Hana is telling Helmy
```

1    our man is asking if there is any message we need or anything

2    for IS EG. He is a U.S. senator. At the time he's the ranking

3    member of the SFRC. But to Hana and Helmy, he's our man.

4         Just like how when Abbas Kamel, the head of Egyptian

5    intelligence, writes Menendez a letter, he calls him Bob. He's

6    a friend of Egypt. He's their man.

7         Any time you need anything, says Nadine to Helmy, you

8    have my number and we will make everything happen. He's having

9    Nadine ask for their feedback on how he can give them what they

10   want. He's having Nadine tell the Egyptians that Menendez is

11   their agent.

12        That brings me to an entirely different way that this

13   element is proved. The second way. Even if Menendez didn't

14   actually do any of these acts for Egypt, or didn't actually

15   enter into an agency relationship with Egypt, this element is

16   still satisfied if he agrees, consents, assumes, or purports to

17   act as, or if he holds himself out to be an agent of a foreign

18   principal. So all these offers that he is giving of his

19   assistance, these are also evidence of his agreeing to act as

20   or holding himself out as their agent. So one way or another,

21   this element is proved.

22        The last element is that the defendant acted

23   knowingly. This is the same element as in the other counts,

24   and obviously, Menendez did not do any of this by accident, but

25   it's actually even clearer.

1          MR. MONTELEONI:  First of all, this rule is in the

2     Senate Ethics Manual, but also look at this:

3          These are letters that you saw on the last day of the

4     government's case.  Menendez is writing to the Justice

5     Department, asking them to investigate a former congressman

6     under FARA, Foreign Agent Registrations Act.  Look what he's

7     writing here.  He knows all about the law.  He knows about

8     political activities.  He knows about political consultants.

9     Even puts up a press release on his website about this letter.

10    And he's not done.

11         Two years later, he's writing to the Attorney General

12    of the United States, following up, showing you how much he

13    knows about how the law defines agency and how the law

14    prohibits a U.S. person from acting as an agent of a foreign

15    principal without registering, showing you this element is

16    proven.

17         And venue for the foreign agent charge includes any

18    act in furtherance of the agency relationship.  So the meal at

19    Mr. Chow to plan the meeting with General Shawky, Hana's

20    WhatsApp messages from there, the gold sales in Manhattan, all

21    of it.  Menendez was elected to the U.S. Senate to represent

22    the interests of the United States and its people.  He cannot

23    hold that position and at the same time act on behalf of a

24    foreign government.

25         But what you've seen at this trial is that that is

1  exactly what he did.  Menendez is guilty of being a public

2  official acting as a foreign agent.  He is guilty of Count

3  Sixteen.

4          Let's go to Count Fifteen, conspiracy to have a public

5  official act as a foreign agent.  This is against Menendez and

6  Hana.

7          The first element, agreement of two or more persons,

8  is obvious.  Menendez, Nadine and Hana, they all worked

9  together on this one.  This wasn't Menendez doing it in a

10 vacuum.  He didn't just randomly wake up one day and decide to

11 act as a political consultant for Egyptian officials.  Hana

12 recruited him, encouraged him to meet with Egyptian officials.

13 Nadine acted as a go-between, relaying messages between

14 Menendez and the Egyptians, asking the Egyptians for feedback

15 on what else Menendez could do to help them.  Indeed, Menendez

16 relied on Nadine and Hana to get his responses back to the

17 government of Egypt.  The whole plan wouldn't have worked if

18 they weren't in on it.  This element proven.

19          The second one is also clear.  None of this is by

20 accident.  Menendez didn't send the embassy information to

21 Nadine by accident, and when he got it from Nadine, Hana didn't

22 send it to Ahmed Essam by accident.

23          Overt acts.  Just like with the bribery conspiracy

24 here, there is overt act after overt act after overt act --

25 sending the embassy information, writing a ghost-written

1    letter, meeting with Hana at Mr. Chow to schedule the Shawky

2    meeting and dinner, having Nadine sell the gold bar he got from

3    the scheme in Manhattan.  This element is proven too.

4            Venue, again, includes everything from the substantive

5    crime we just talked about for the first count, so you know

6    it's satisfied here.  Menendez and Hana are guilty of

7    conspiracy for a public official to act as a foreign agent.

8    They are guilty of Count Fifteen.

9            Now we're down to the obstruction counts, the last

10   group.

11           First, Count Eighteen, obstruction of justice against

12   Menendez based on the endeavor to obstruct the Southern

13   District of New York's investigation in this very case.

14           The first element is that there was a proceeding

15   pending before a federal court or grand jury.  We didn't spend

16   a lot of time on this at trial, but that's because it's quite

17   clear from the documents.  Look at these subpoenas.  Grand jury

18   subpoena.  Grand jury, right there, Southern District of New

19   York.  Right there, in black and white, is proof that a

20   proceeding was pending before a federal grand jury in this

21   district in 2022.

22           Next is that Menendez knew of the proceeding.

23           Did he know?  Of course he did.  This is a subpoena to

24   him, served on June 16, 2022, the day of the search of his

25   house.  And there was another to his wife Nadine served that

1    same day.

2          The last two elements are did the defendant act to

3    obstruct or impede, or endeavor to obstruct or impede, the

4    proceeding?  And did the defendant have corrupt intent?

5          Here, I expect Judge Stein will instruct you that this

6    endeavor doesn't have to be successful.  All that's required is

7    that the defendant took action that would have the natural and

8    probable effect of obstructing the due administration of

9    justice in that proceeding and that the defendant engaged in

10   conduct that was directed at the court or grand jury and that

11   he believed would have that natural and probable effect of

12   interfering with the proceeding.

13         So did he?  Did Menendez do that?

14         Of course he did.  Look at these checks, which we

15   showed you briefly.  These were produced pursuant to the grand

16   jury subpoena to Nadine.  So these are clearly directed at the

17   grand jury.  They're his checks as well as hers, and look at

18   what these checks show.

19         Menendez writes Nadine a check, dated December 11,

20   2022, memo to liquidate loan.  And she writes a check the next

21   day.  She writes a check after getting that, the next day, in

22   trust to Hana, full payment of Wael Hana loan.  She even writes

23   a letter, saying it was for a personal loan, also produced to

24   the grand jury.

25         And Menendez sends his lawyers in to meet with

1    prosecutors in this district for the presentation, doubling

2    down on those checks, saying it was a loan and he didn't know

3    anything about it, also directed at the grand jury, because it

4    is reinforcing these checks that were produced to the grand

5    jury.  But this is all phony.  Those checks and that letter

6    submitted to the grand jury pursuant to the subpoena were all

7    to create a fake paper trail, claiming that the mortgage

8    payment was a loan that had to be paid off.

9            Remember that handwritten rundown that Nadine sends

10   Daibes?  Again, Nadine is deducting this mortgage payment,

11   that's the very amount that gets -- in the check that goes back

12   to Hana, that she, once the investigation is known to them, but

13   this amount she's deducting in 2019 from the amount she thinks

14   she's owed for her supposed salary.  As you know, she's not

15   planning on paying a penny of her supposed salary back.  So by

16   deducting this, subtracting this from the amount of the salary

17   she's demanding, she's obviously saying she's not planning on

18   paying this mortgage payment back either.  So even though Hana

19   may have at one point wanted to get paid back, she was never

20   planning to, and Hana was fine with that.  It wasn't a loan.

21           Remember that loan agreement?  Remember how she

22   refused to sign it?  That agreement had a two-year term.  That

23   would have been due in 2021.  There's no evidence of any

24   repayment, any extension, any anything.  It just wasn't a loan.

25   Hana wanted to get paid back at first, but he gave up.  It was

1    never a loan.

2           But how do we know that Menendez knew that?

3           Remember this presentation that he sends his lawyers

4    to make to the U.S. Attorney's Office reinforcing what's on

5    these checks.  He didn't have them say I knew about this

6    payment at the time and it was a loan.  He had them say he

7    didn't know about the mortgage payment at all until 2022.  And

8    you remember from the timeline we went through yesterday, not

9    only did he know, he was insisting Nadine follow up with Daibes

10   to get that payment made, that payment that he's having his

11   lawyers here deny knowledge of.  Back in 2019, he was following

12   up on that.  So him getting his lawyers to say this, to say

13   now, once he's under investigation, that he had no knowledge of

14   it, that's just like how he got his lawyers to say he didn't

15   know about the sham halal company checks, even the one that

16   Fred Daibes put into his hand.

17          So with those checks, checks to Nadine and then the

18   checks that Nadine, in coordination, sends out to Hana,

19   Menendez is generating a fake paper trail to be submitted to

20   the grand jury in response to the grand jury's subpoenas, which

21   is what they were.  That's a corrupt endeavor to obstruct

22   justice, to trick the grand jury into believing the lie that

23   the mortgage payment was just a loan.

24          It wasn't just that one time.  Later in December, he

25   dates another check to Nadine, this one for car payment.  Now,

O79Wmen4                    Summation - Mr. Monteleoni

1    on the same day, Nadine then dates a check to José Uribe,

2    paying most of that money back.  What does she write on this

3    one?  Personal loan.  But you know, ladies and gentlemen, those

4    car payments weren't a loan.  They were never a loan.  A loan

5    was just the cover story that you heard that Uribe cooked up

6    with Nadine after they got subpoenas.

7              There's another way you know that Menendez doesn't

8    really think these are loans.  He doesn't disclose them as

9    loans on his financial disclosure forms.  You know from Shannon

10   Kopplin that he has to disclose the highest value of the loan

11   each year.  And you know that Menendez understood that if he

12   found out about an item that should have been disclosed in a

13   prior year, he needed to file an amended disclosure.  If he

14   thought that they were loans, he would have listed them, and he

15   could have made a note saying that they were paid off and the

16   year they were paid off.  And if he really found out about the

17   loans in 2022, he would have amended his past disclosures to

18   note them.  But he didn't do any of that, because these were

19   never loans.  They were bribe payments.  Loans were just a

20   cover story that Menendez and Nadine decided to use once they

21   learned about the grand jury's investigation from getting

22   served with subpoenas.  That's the same cover story that

23   Menendez had his lawyers double down on.  Again, he doesn't say

24   I knew of those car payments at the time and that's fine

25   because they were a loan.  He said he didn't know about the car

1    payments at all.  As we've talked about, of course he knew

2    about them.

3              There's one other detail here.  Look at what he has

4    his lawyers say.  His lawyers are claiming he didn't know about

5    the payments for the car at the time, but his lawyers in the

6    presentation say, OK, well, now he knows that Uribe made the

7    monthly payments on the car.  The lawyers don't say that now he

8    knows Uribe handed over $15,000 in cash for the down payments.

9    Lawyers say that the down payment was made all by the father,

10   when, really, you know that the father only chipped in about a

11   third of the down payment.  The lawyers clearly don't even

12   know, even in September 2023, that Uribe made that down

13   payment.

14             Why?  Why did they get this wrong?

15             The monthly payments that the lawyers know about,

16   those were electronic.  Those show up in bank records.  They're

17   the kinds of things that Menendez knows are going to get found

18   out once he gets served with subpoenas, so those are the ones

19   that he tells his lawyers about.  What he doesn't tell his

20   lawyers about, you can tell from this slide, is the cash

21   handoff in the parking lot.  That one he thinks that nobody's

22   going to find.

23             But you know better.  You know Menendez knew about

24   Uribe paying for the car from the beginning.  You know when he

25   wrote checks to fund Nadine's fake repayment of a fake loan, he

1    was trying to help her generate a paper trial, a paper trail

2    that would get submitted to the grand jury -- there's a

3    stipulation showing that -- to obstruct justice.  These were

4    produced in response to the subpoenas you've seen in Government

5    Exhibit 1409 to obstruct justice.

6            The statements that he had his lawyers make in the

7    presentation were reinforcing the false statements on checks

8    that had already been produced to the grand jury, exhibits 3B1

9    and 3B1-C.  3B1 shows you the range, the control numbers on it

10   are within the range of what was produced in response to the

11   grand jury subpoenas.  This was directed at the grand jury.

12   More lies.  More obstruction of justice.  These elements are

13   proven.

14           And for venue, it's obvious.  These documents were

15   produced to a Southern District of New York grand jury, and the

16   presentation was made to the U.S. Attorney's Office for the

17   Southern District of New York.  Menendez is guilty of

18   obstruction of justice.

19           Let's turn to Count Seventeen, conspiracy to commit

20   obstruction of that same grand jury proceeding we've just been

21   talking about.

22           Element one, two or more people agree.  Menendez

23   agreed with Nadine.  You see that from the coordination in the

24   checks.  You see that from the cover story that Menendez is

25   pushing be coordinated with the cover story that Nadine and

Uribe cooked up after being served with subpoenas.  This
element is proven.

          Menendez acted knowingly, not by accident.  You know
this type of coordination doesn't happen by accident.  You know
that they were overt acts, like Menendez and Nadine writing the
checks, Nadine producing the checks to a grand jury in this
district, and Menendez sending his lawyers to give a
presentation to prosecutors in this district.

          Venue is the same as for the substantive offense.
Menendez is guilty of Count Seventeen.

          One more to go -- the conspiracy to obstruct the New
Jersey U.S. Attorney's Office prosecution.  This count is
against Menendez and Daibes.

          Is there an agreement to commit obstruction of
justice?

          Yes, there was.  You know from the discussion of the
bribery offense in Counts Eleven and Twelve that that's exactly
what Menendez and Daibes agreed to do.  The District of New
Jersey prosecution was a pending proceeding.  Both Menendez and
Daibes knew about it.

          Did they endeavor to obstruct justice?

          Yes.  When Menendez attempted to use his power to
recommend the U.S. Attorney who he thought he could influence
over Daibes's case in exchange for bribes, that was a corrupt
endeavor to obstruct justice.  When Menendez tried to have

1    Sellinger get involved in the Daibes case, even after he was

2    recused, that was also a corrupt endeavor to obstruct justice,

3    to interfere in a federal criminal prosecution.  When Daibes

4    showered Menendez with cash and gold in exchange, that was part

5    of the same corrupt endeavor.  This element is proven.

6            Did both defendants knowingly join the conspiracy?

7            Yes, they did.  You know this from the bribery

8    offenses and the bribery conspiracy.  None of this was by

9    accident.

10            Is there an overt act?

11            Of course there was.  Menendez's recommendations to

12   nominate Suarez and Sellinger, Daibes's delivery of cash and

13   gold, Menendez's attempts to get Soliman to influence Sellinger

14   once he is confirmed, these were all overt acts.  This element

15   is proven as well.

16            For venue, any act in furtherance of the conspiracy is

17   enough, so just like with the bribery offense, the sales of

18   gold in New York, Khorozian's call into New York to sell the

19   gold, Daibes getting John Pilot to give Menendez and Nadine a

20   free ride from JFK through Manhattan and the Bronx, all grounds

21   for venue.  Menendez and Daibes are guilty.

22            All of the defendants are guilty.

23            Before I sit down, I want to talk for a few minutes

24   about the big picture.  Don't lose sight of the forest for the

25   trees.  This is a big case, but it all boils down to a classic

1    case of corruption on a massive scale.

2          This is about a politician who put his power up for

3    sale and the people who were willing to buy it from him.  A lot

4    of what you've heard from the defense throughout this trial is

5    a distraction away from that part of the case:  Distractions

6    like making their own summary charts, loaded up with rows that

7    have nothing to do with the core facts.

8          Now, as I've said, it's our burden.  Defendants don't

9    have to present evidence of their own in a chart or any other

10   way, but if they do, you should scrutinize it and ask yourself,

11   even if they're reliable or in order, are any of those rows

12   that they added, do any of those rows that they've added take

13   away from the essential facts of the *quid pro quo*?  Do any of

14   those additions negate what you've seen from the hard evidence?

15         They do not.  They're just distractions:  Distractions

16   like Nadine's ex-boyfriend and whether Menendez was monitoring

17   Nadine's location with Find My Friends to protect her from him

18   or some other reason.  That motive has nothing to do with the

19   allegations of the case.  Whether Menendez had a good reason

20   for monitoring her movements closely or a bad reason for

21   monitoring her movements closely, he was still monitoring her

22   movements closely.  And there was no way that she could pull

23   the wool over his eyes so that he didn't know what she was

24   doing.

25         Distractions like whether Nadine had a rich family or

O79Wmen4                    Summation - Mr. Monteleoni

1    whether she ever got jewelry from them.  The case isn't about

2    her family jewelry.  It's not about anything that Nadine got in

3    the 1980s from her family.  It's about what Menendez got in

4    2018 to 2022 from Hana and Daibes.

5         Distractions like whether Menendez ever withdrew cash,

6    let alone whether other people of Cuban Heritage do.  The case

7    isn't about whether every dollar in Menendez's house is a

8    bribe.  It's about whether any of the cash in his house or the

9    other valuables are bribes.

10        Distractions like ractopamine, which I think counsel

11   for Menendez spent more time asking Under Secretary McKinney

12   about than he did about the call that Menendez made to try to

13   pressure McKinney in exchange for bribes.  All of these

14   distractions are just the defense trying to add something else

15   for you to look at to get you to look away from the evidence of

16   their conduct.

17        What you see when you look at the evidence of their

18   conduct is someone who believes that the power he is entrusted

19   with belongs to him, not to the public, and that he is

20   entitled -- entitled -- to use it to get a payday for himself.

21   You also see the entitlement of the people who think that, with

22   their connections or with their deep pockets, they can buy that

23   power.  You see the entitlement of someone who is empowered by

24   the public to approve or not approve hundreds of millions of

25   dollars of lethal military equipment sales, who thinks that

Case 1:23-cr-00490-SHS    Document 577    Filed 08/09/24    Page 110 of 213    6554
O79Wmen4                    Summation - Mr. Monteleoni

1    power is his to put up for sale for promises that his

2    girlfriend is going to get paid; the entitlement of someone who

3    is entrusted by the public with sensitive information about

4    Americans serving overseas, who thinks that information is his

5    to send out to a foreign government, who thinks he can act for

6    a foreign government at the same time that he is an elected

7    representative of the people of the United States; the

8    entitlement of someone using their power and a position in

9    office to call up an under secretary in the U.S.D.A. to lean on

10   them, to stand down from opposing a monopoly just because his

11   girlfriend has been promised payment from it; a monopoly that

12   was dropped in the lap of someone unqualified based on a single

13   decision by the Egyptian government.

14           It's also the entitlement of someone who thinks that

15   by using his connections and making all sorts of promises to

16   all sorts of people he can get a monopoly like that, someone

17   who thinks he can keep that monopoly just by promising to kick

18   back some of the money to a powerful patron; the entitlement of

19   someone who will abuse the trust placed in him as a senator to

20   make up claims of discrimination to stop law enforcement from

21   looking into the people who pay him.  If you're just a member

22   of the public, his website says he's not going to do anything

23   about your case, but if you promise a Mercedes to his

24   girlfriend, all you have to do is send Menendez a name.  You

25   don't have to show there's any discrimination.  Just pay up and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    tell him who, and he'll make up a claim of discrimination to

2    get them off the hook;

3        The entitlement of someone who will put his power to

4    recommend the chief federal law enforcement officer in the

5    state up for sale just to protect his friend and keep the cash

6    and gold flowing.  Doesn't matter how good your credit

7    determines are.  If you're not going to be able to have control

8    over the prosecution of the man who put cash and gold into

9    Menendez's hands, he's going to yank your candidacy and blame

10   it on the White House.  And if you get appointed and then you

11   get recused, then you're dead to him.  He's going to shun your

12   investiture and he's going to tell the other senator to do the

13   same.  And the entitlement of someone who thinks that he can

14   buy his way -- buy his way -- out of a federal criminal

15   prosecution just because he has deep pockets and a friend in a

16   high place, who, while he's out on federal bail, is showering a

17   powerful public official with over a quarter million dollars of

18   cash and gold and is hearing all about that official's calls to

19   the very people who are supervising his own prosecution.

20       But it's also the entitlement of someone who is

21   entrusted by the public with unimaginable power but who tries

22   to deflect the most basic responsibility for his actions onto

23   the people who are close to him.  Throughout this trial, you've

24   heard that everyone is to blame but Menendez, blaming his staff

25   for his financial disclosure forms but also trying to have it

O79Wmen4

1    both ways and say when he's googling for the price of a kilo of

2    gold, it's to fill out those very same disclosure forms that

3    he's now blaming his staff for, blaming his staff for what's on

4    his own website, even though it's been there year after year.

5         Blaming his wife -- blaming his wife -- for the

6    attempts that he makes to pressure other officials; blaming his

7    wife for the promises that he makes about military aid; blaming

8    his wife for what's in his search history on his phone -- only

9    the bad searches, not the good ones.  When he's searching for

10   gold price to say fill out his financial disclosure forms,

11   that's him.  When he's searching for kilos of gold after Fred

12   Daibes stops by with doughnuts, that must be his wife.  Blaming

13   his wife for what's in their bedroom closet.  Blaming his wife

14   or his daughter-in-law for what's in his basement, in a plastic

15   bag inches -- inches -- away from the jackets with his name on

16   them, trying desperately to pass the buck to the people close

17   to him.

18        Ladies and gentlemen, the buck stops here.  The

19   thousands on thousands of bucks stop here.  It's time to hold

20   him responsible.  It's time to hold them all responsible.  It's

21   time to return the only fair and just verdict, the only verdict

22   supported by the evidence -- that Robert Menendez, Wael Hana

23   and Fred Daibes are guilty.

24        THE COURT:  Thank you, Mr. Monteleoni.

25        Ladies and gentlemen, let's take our lunch break.  One

O79Wmen4

1    hour.  Be back at 2 o'clock, and we'll hear from counsel for

2    one of the defendants.

3            (Jury not present)

4            THE COURT:  Yes, sir.

5            MR. WEITZMAN:  Your Honor, in many respects, that

6    summation was highly improper, and there are three that I'd

7    like to note in particular.

8            THE COURT:  You may be seated in the courtroom.

9            MR. WEITZMAN:  First, you may recall there was a

10    reference to the Damian Murphy text message --

11            THE COURT:  Yes.

12            MR. WEITZMAN:  -- where Mr. Murphy says all of this

13    Egypt stuff is very weird.

14            There was a representation made by the government, at

15    the Court's request, when we were discussing the admissibility

16    of that text message, and the representation was very clear

17    that they will not use that text message to argue that Senator

18    Menendez was a foreign agent.  And that's exactly what they

19    did.  Pages 2683 through 2685 of the transcript, on page 2683,

20    specifically, your Honor says:  Wait a minute.  Is the

21    government going to argue that from this -- referring to the

22    Damian Murphy weird text message -- that Menendez is an agent

23    of Egypt?

24            Mr. Mark responds:  No, that's not what it goes to.

25    There are certain points that this does go to.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O79Wmen4

1            And then later, Mr. Richenthal tries to back away from

2    that, on page 2680 through 26 -- I'm sorry, page 2684 through

3    2685, the Court says:  I understand.  You're obviously going to

4    argue that, as I understand the pleadings, that Menendez was an

5    agent of Egypt.  We're talking about these words, referring to

6    the Damian Murphy text.

7            Mr. Richenthal says:  Yes, but part of these words is

8    part of the story, and that story includes strange things in

9    the planning of a trip to Egypt.  We are obviously entitled to

10   ask the jury to infer things were strange because it was an

11   atypical relation.  These exact words, no, we're not going to

12   point to these words.

13           And that's what they did.  That's the first thing.

14           The second thing, they made representations about

15   statements that the lawyers made at the proffer that, as your

16   Honor knows, Abbe Lowell is the lawyer.  There's no evidence of

17   the statements that were made.  He was referring specifically

18   to oral statements, not to the statements on the PowerPoint,

19   because he says the statements they made are consistent.

20           So that's the second thing.

21           The third thing --

22           THE COURT:  I'm sorry.  Say that again.

23           MR. WEITZMAN:  Yes.

24           THE COURT:  I'm not quite sure I get that.

25           MR. WEITZMAN:  When he says the statements the lawyers

O79Wmen4

```
 1   made, I don't believe he was referring to the PowerPoint.  It's

 2   certainly not the impression I got.  The statements are the

 3   statements made in a proffer, not the PowerPoint presented.  So

 4   he's making representations about statements made in a proffer,

 5   where there is no evidence and where we were precluded from

 6   questioning the witness about that.

 7           THE COURT:  Yes.  I understand.  I'll want to hear

 8   from Mr. Monteleoni on that.  I thought the reference was to

 9   the statements in the PowerPoint, but I'll hear.  OK.

10           MR. WEITZMAN:  The third point was --

11           THE COURT:  Yes, sir.

12           MR. WEITZMAN:  -- it came awfully close to speech and

13   debate, your Honor.  He was talking about his laundry list of

14   entitlements, how these defendants are so entitled.  And he

15   said that essentially Senator Menendez has an entitlement and

16   is empowered by the public to approve or not approve hundreds

17   of millions of dollars of lethal military equipment sales.

18           First of all, the word "lethal" should have never been

19   there.  The suggestion that the senator somehow used any power

20   for lethal purposes is beyond the pale in this case, your

21   Honor, especially when, as they know, many of those rounds, if

22   not all, were dummy ammunition rounds, not actually lethal.

23           Secondly -- and it's clearly an effort to prejudice

24   the jury.

25           The second thing is he's not talking about a promise
```

O79Wmen4

```
 1   in that sentence.  He's talking about the empowerment to
 2   approve or disapprove, and he says hundreds of millions of
 3   dollars of military sales, of which there is no evidence that
 4   there were hundreds of millions of dollars in military sales at
 5   issue in this case.  There was a $99 million sale.  That's all
 6   the government has suggested there was a promise of.
 7               So I think those three, and there were a lot more --
 8   I'm not going to continue with the laundry list.  Those three
 9   are the most salient ones, and we're not sure exactly what
10   relief we're requesting at this point.
11               THE COURT:  I'm sorry.  That's exactly my question.
12               MR. WEITZMAN:  Yes.  We will consider that over lunch,
13   your Honor.
14               THE COURT:  All right.  Let me hear a response.
15               MR. MONTELEONI:  First of all, there's nothing in my
16   summation about oral statements.  I didn't say --
17               THE COURT:  The one I'm concerned about is No. 1.  I
18   want you to respond to all three, but in No. 1, in light of the
19   transcript that Mr. Weitzman is citing in which you say you're
20   not going to refer to it -- I want you to address two and
21   three -- but my concern at this point is one.
22               MR. MONTELEONI:  Well, so, the way that I read what my
23   colleagues said is that we're not saying from the words alone
24   that he's an agent.  I thought that that was the entire point
25   of the Court's questioning but that the words were part of a
```

O79Wmen4

1    longer course of conduct.

2            THE COURT:  That's not the way it sounded, at least

3    from the excerpt that Mr. Weitzman gave.  It sounded like your

4    colleague had made a representation that they would not refer

5    to all this Egypt stuff as weird in arguing that Menendez was

6    an agent.

7            MR. MONTELEONI:  Well, right, but Mr. Weitzman

8    actually read it in a highly selective fashion, because he

9    started reading it at line 24 of page 2684, right after

10   Mr. Richenthal said:  So I think we need to be precise about

11   our argument here.  What Mr. Mark was referring to is this text

12   alone.

13           Right?  That was -- and then went on and the rest of

14   what you heard was said.  But we clearly understood this that

15   the text in combination with other factors was obviously --

16           THE COURT:  I see.  This text.  In your

17   interpretation, this text alone meant you couldn't use that by

18   itself, but you could use it in conjunction with other

19   evidence.  Is that what you're saying?

20           MR. MONTELEONI:  Yes, exactly.

21           THE COURT:  Well, I will look at pages 2683 to 2685

22   over the break.

23           MR. WEITZMAN:  The rest of that, which he's not read,

24   is:  These exact words, no, we're not going to point to these

25   words.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O79Wmen4

```
 1                 THE COURT:  OK.  Everybody's made their point.

 2                 What about two and three, sir?

 3                 MR. MONTELEONI:  I mean, so just about what the

 4      transcript says, I think that if there's any ambiguity about it

 5      here, I think you have to look at are these relevant for

 6      supporting that point?  Would there be any reason why we

 7      shouldn't be able to argue this text in connection with

 8      everything else?  We certainly --

 9                 THE COURT:  I think you should but for those

10      transcript words.  I want to look at those transcript words.

11                 MR. MONTELEONI:  All right.  We certainly understood

12      it that we were --

13                 THE COURT:  I understand.

14                 MR. MONTELEONI:  The statements about the lawyers and

15      the PowerPoint, we didn't say anything about oral statements.

16      There's no evidence in the record about oral statements.  We're

17      clearly talking about the statements that were on the pages,

18      and if some juror was, like, well, I wonder if there could be

19      oral statements, then they would look and they would see

20      there's no evidence about it.  I just don't understand what the

21      issue is there.

22                 THE COURT:  Now, I don't think I have the capability

23      of checking that out as to what was said, because we don't have

24      the transcript, but I take it I could use Live Note to find

25      that.
```

O79Wmen4

1          OK.  Go ahead.  Next.

2          MR. MONTELEONI:  Certainly, as far as I'm concerned, I

3     certainly didn't intentionally say anything about oral

4     statements, and I don't think Mr. Weitzman is saying that he

5     heard that I did.

6          Then finally, about the arms sales, first of all, the

7     fact that some of this was lethal military equipment, this is

8     all just in the mix.  Mr. Fee questioned Mr. Paul extensively

9     on the military conflicts, the situation in the Middle East,

10    that it involved regional stability.  There was plenty of

11    testimony about the fact that this is a hot spot of the world,

12    where military equipment gets used.  So I think that saying the

13    word "lethal" is in no way different from what the evidence in

14    the case already is.

15         THE COURT:  Well, I'm not concerned about lethal at

16    this point.  He says that trenches on speech or debate.

17         MR. MONTELEONI:  Well, yes, your Honor.  This is

18    exactly what we, this is exactly the line that the Court

19    indicated.  We talked about his powers.  Right?  We didn't talk

20    about any of his acts, just his powers.  And the Court

21    permitted testimony from Joshua Paul about what his powers were

22    with respect to these in particular.  The Court permitted

23    testimony from Sarah Arkin that was about what his powers were

24    in the context of Senate resolutions, which again, is not

25    what's at issue here, but in both cases the principle's the

O79Wmen4

1    same, that the powers are not speech or debate.  It's acts,

2    which we obviously were very careful to steer clear of.

3              THE COURT:  I think that's right.  I'm not concerned

4    with three.  I'll look at the Live Note on two.  My sense, as I

5    said before, is that the reference was to the presentation, the

6    written presentation as opposed to oral.  And I'll look at the

7    transcript, 2683 to 2685, and I'll hear from Mr. Weitzman at 2

8    o'clock.

9              MR. MONTELEONI:  And may I just add one other thing?

10             You know, I think that Mr. Mearns -- if you recall,

11   there was a number of sidebars in the cross-examination of

12   Mr. Mearns.

13             THE COURT:  I do remember.

14             MR. MONTELEONI:  And defense counsel was permitted to

15   ask some questions about oral statements, and I think he chose

16   to ask only a few of them, and then on redirect examination, my

17   colleague asked a few more.

18             So ultimately, Mr. Mearns did testify that there were

19   oral statements made and that they weren't inconsistent with

20   the written statements.  So even if there was something that

21   could, in a stray way, lead a juror to think that there was

22   anything oral, which I don't think there is, it's still going

23   to be consistent with the evidence.

24             THE COURT:  You believe Mearns testified that the oral

25   statements were not inconsistent, although he didn't say what

O79Wmen4

1    they were, obviously.

2              MR. MONTELEONI:  Yes.  I think the idea was that he

3    didn't have a very detailed memory of it, but he definitely

4    didn't remember there being any oral statements that were

5    inconsistent.

6              THE COURT:  Thank you.

7              2 o'clock.

8              MR. WEITZMAN:  Your Honor, the reference to the

9    statements that I was referring to were Mr. Monteleoni

10   repeatedly says the lawyers say, the lawyers say.  And I have

11   it at 17:02:59 on the Live Note.

12             THE COURT:  Yes, but "the lawyers say" could reference

13   the presentation.  As a matter of fact, it sounds like it does.

14             I'll take a look at it.  Thank you.

15             2 o'clock.

16             (Luncheon recess)

17

18

19

20

21

22

23

24

25

O793MEN5

<div align="center">AFTERNOON SESSION</div>

<div align="center">2:00 p.m.</div>

1          (In open court; jury not present)

2          THE COURT:  Mr. Weitzman, you said you wanted to talk

3   with your colleague over lunch.  Let me tell you what I think

4   at this point.  I did read the transcript pages that you were

5   referring me to.  I think it's unfortunate in a way.  I

6   understand also that Mr. Richenthal was making a slightly

7   different statement or he was saying not those words alone.

8   What Mr. Mark was referring to is this text alone.

9          It would have been better had they not used that

10  phrase the way they did.  But I'm not going to call it out at

11  this point.  I don't think that would be appropriate.

12         In terms of the number 3, speech or debate, it just

13  does not entrench on speech and debate.  I have not read the

14  LiveNote on the statement the lawyers made.  Again, my

15  recollection is it was a reference to the presentation.  I will

16  look at it.

17         I do appreciate the fact that you did not interrupt

18  the summation.  I don't think any of this really rises to the

19  level that I should be intervening with the jury.  That's my

20  conclusion.

21         MR. WEITZMAN:  Thank you, your Honor.

22         THE COURT:  Of course.  Bring this jury in.

23         Mr. Fee, what's your estimate, sir?

<div align="center">SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300</div>

1            MR. FEE:  Three-ish hours I'll try to get done.

2            THE COURT:  I accept that.

3            MR. FEE:  Thank you.

4            THE COURT:  As a matter of fact, that brings it up to

5    about when we close, 5 o'clock.

6            MR. FEE:  We'll see.

7            THE COURT:  If you are going to go over a little,

8    fine.  If you're going to go over a lot, let me know.  Look at

9    me or something and I'll close it at 5 or simply you can do

10   what Mr. Monteleoni did, it is an appropriate time to break.

11   Ideally you'll finish by 5, but take it as it comes.

12           MR. FEE:  Okay.  Thank you.

13           (Jury present)

14           THE COURT:  You may be seated in the courtroom.

15   Ladies and gentlemen, we're now going to hear the summation on

16   behalf of Mr. Menendez by Mr. Fee.

17           Mr. Fee.

18           MR. FEE:  Thank you, your Honor.  Hi, everybody.

19           To state the obvious, this is an important moment for

20   my client, Senator Menendez.  But it is an important moment for

21   each and every one of you as well, because you have the

22   opportunity to acquit him of every charge in this case.

23           And when I'm done, I'm going to ask you to find what

24   we think the evidence supports, that the government has not

25   proven a single count beyond the very high burden they have,

1    proof beyond a reasonable doubt.

2            And what makes this system that you now have spent

3    quite some time existing in so special, is that everyone -- the

4    powerful, the powerless -- have one thing standing between them

5    and a lifetime of shame, a conviction.  A jury.  A jury that

6    upholds its oath and looks at the evidence.  Doesn't look at

7    lawyer arguments, other than for what they are, arguments.  It

8    looks at the evidence and the absence of evidence.

9            So that's what we're going to talk about today.  And

10   the point of what I'm doing is an argument.  It's that the only

11   honest verdict, I submit here, is to acquit him on each count

12   because they have not met that high burden.

13           You heard many hours of summation from the prosecutor.

14   And I think you heard every version of misdirection about this

15   case.  You heard a story.  They have a story.

16           The question I want to focus on, and I will spend a

17   lot of time focusing on, is that story, those inferences --

18   that's what they call them -- is it based on credible evidence.

19   Evidence you can trust.  Evidence that is proof beyond a

20   reasonable doubt.

21           So, before we spend more hours together, I do want to

22   stop and say thank you, because it's weird to be here for so

23   many weeks, we see you more than our families, we can't say hi

24   in the courtroom.  But we appreciate what you're doing.  I am

25   not sure I've ever seen a jury that's so cheerful, so

1    attentive, and so engaged.  So we appreciate that.

2            But this is your show.  You heard lawyers talking, you

3    heard witnesses, you heard evidence.  The rest is up to you.

4    You are the important part now, and you have to cut through all

5    these many weeks of lawyer stuff, and evidence, and pointing

6    out the gaps in the evidence, and figure out one question:

7    Have they met their burden.

8            Now, you know, because you've heard it many times,

9    that Senator Menendez doesn't have to prove anything here.  The

10   burden stays with these prosecutors.  But, we are human beings,

11   and let's be realistic.  A one-sided story sounds compelling.

12   It does.  So our goal throughout this trial was to try to point

13   out to you where are you getting half truths.  Where are you

14   seeing the absence of evidence get filled in by a story that is

15   not supported by proof.

16           And I'm going to cover three big topics.  The first I

17   want to talk about how the prosecutors have not come close to

18   meeting their burden to show you that any of the gold or cash

19   was given to Senator Menendez as a bribe.  And that's the

20   important part.

21           The government, the prosecutors, feature the cash,

22   they feature the gold.  We're going to talk about that.  But

23   it's obvious why.  It's provocative.  It's atypical.  I'm sure

24   it's more gold and cash than you probably have in your house.

25   That's why that's their focus.

O793MEN5                          Summation - Mr. Fee

1          Have they shown you evidence, a human being, a text
2   message, an e-mail, something you can rely upon, a reasonable,
3   credible inference, that shows you something was given to the
4   senator in exchange for taking an official act.  That's what
5   they need to prove.
6          Second big topic I'm going to talk about is how the
7   things Senator Menendez did, the acts that you've actually
8   heard evidence about in this case, that those were 100 percent
9   appropriate.
10         And now, I think you caught the prosecutors saying a
11  bunch of times it doesn't matter if Senator Menendez actually
12  achieved the things we say, the prosecutors say, were his big,
13  bad objectives.  They're making a legal argument that they
14  don't have to prove success to show a bribe.
15         But it definitely matters.  If, for example, Senator
16  Menendez made a two-minute phone call and then did nothing,
17  ever again, it is relevant to considering was he actually doing
18  this because he had some corrupt intent to achieve the
19  objective of a bribe scheme?  Or did he make a phone call
20  because he had a constituent say, hey, I have a problem.  So it
21  does matter.
22         And that's the second point I'm going to cover.
23  Because the simple truth is exactly what we said in our opening
24  statement.  His actions were lawful, normal, and good for his
25  constituents, and this country.

1           By the way, I'm going to call him Bob because there

2     are too many syllables to say Senator Menendez a thousand

3     times, so you're going to hear that.

4           Then I'm going to finish my time about talking about

5     three points that I submit to you cannot reasonably be disputed

6     that show he should be acquitted across the board.  Okay.

7           Before I do that, though, I want to take some time to

8     discuss two things that happened during the very first week of

9     the trial.  And I bet you, there will be another prosecutor

10    summation by the way, I bet you these will be called

11    distractions.  They are not.

12          These two things are critical, I really mean this,

13    critical to how you think about this case.  Because this entire

14    case, the prosecutor's entire case, you heard it.  You heard a

15    lot of things in that summation that I'm sure you never heard a

16    witness talk about.  A lot of ideas and theories that I bet you

17    didn't even think of during the last seven weeks.

18          Now, the word the prosecutors want to use for that is

19    inference, right.  That means moving from one truthful fact to

20    another truthful fact.  One truth to another.  You can do that.

21    That is evidence.  But it's got to be a truthful fact, and you

22    have to have reasonable inferences from evidence.

23          So, the reason I want to talk about these two events

24    is this entire case, it's their burden, that's the one question

25    here, the entire case is are they asking you to draw inferences

1      that are credible, and based on evidence.  That's the question.

2                So let's talk about two things.  The blazer in

3      Nadine's closet, and the number of embassy employees.

4                And I do think these two things in many ways answer a

5      lot of what you heard.  Really, the most important things you

6      heard from the prosecutor.  Because, what it shows, what these

7      two events reveal to you, I would submit, is that you have

8      heard a story from the prosecutors that ignores and asks you to

9      ignore evidence that does not support the story, the inferences

10     they need you to adopt.

11               Another way to say that is these two events reveal

12     that the story you must adopt to convict Senator Menendez is

13     false.

14               So, let's look at that closet.  So, this is Nadine's

15     closet.  You've seen a lot of it.  All women's clothing.  A

16     locked bedroom, a locked closet, a locked safe within the

17     closet.  And you heard some testimony eventually about like

18     where Bob's stuff was.

19               Bob's life in that house was not in this closet.  He

20     had his suits in one of the kid's old bedrooms, and he had his

21     ties in another of the kid's old bedrooms.

22               But I think to the point about asking you to ignore

23     things that don't fit their theory, you see this little chart,

24     behind it, that's the FBI's chart.  The rooms where Bob had his

25     suits and his ties don't even exist on that chart.  The FBI

1    didn't sketch them.

2              But Nadine's sister Katia actually showed you those

3    rooms because she had seen the stuff there.  So those are his

4    ties, those are his suits.

5              And then you also heard about in this house the

6    office.  And you see golf balls, sports stuff, and those two

7    duffle bags with his cash.  And remember Katia told you that

8    she had never seen Nadine go in that office when he wasn't

9    there.  Those are his areas.

10             Let's go back to that bedroom, to Nadine's closet.

11   Can we go back that one slide to the closet.

12             Listen.  I don't actually think it would prove a

13   bribery scheme if Bob had some of his clothes in that closet.

14   I just don't.  You need more, right.  You need more to prove

15   the man sold his office in exchange for whatever the

16   prosecutors pointing out.  But he didn't.  He just didn't have

17   anything in there.  And that's bad for the prosecutor's story.

18   It's bad.

19             Now, again, because this is based on inferences, and

20   there is stuff in that closet that they want you to infer Bob

21   took, had, knew about, whatever.  That's why the prosecutor

22   kept saying Fred Daibes gave Bob this envelope, that envelope,

23   this envelope.  That's an inference.  Okay.  You haven't seen

24   any proof beyond those prints, which we'll talk about, that

25   Fred handed an envelope to Bob.

1        You've seen some proof of those prints that maybe they

2   touched it, but that's an inference, and they need that.

3        And there is a big difference between a reasonable

4   inference and what they are asking you to do, these

5   prosecutors.  There are other names for what I submit you are

6   being asked to do here.  Names like assumption, speculation,

7   fantasy, conjecture.  They can call it inference.  It's not.

8        So, I think the blazer is the first and most revealing

9   example in this case of what I'm trying to convey to you.  And

10  I would point out that you did not hear the word blazer, I

11  don't think you heard the word Agent Kougemitros in that

12  six-hour summation.  You heard it a lot on the first day of

13  trial.  Right.  That was the star witness.  That was the search

14  witness.

15       I want to show you what he testified about.  You

16  didn't hear it today.  Just to pause on that.  The inferences

17  that they want to you draw are shifting.  They're workshopping

18  the story during the trial, I would submit, and I'm going to

19  show you they're workshopping their story during the summation.

20  And my point to you with these examples is do you find it

21  credible, can you trust what they're asking you to conclude.

22       So, here's what Agent Kougemitros said during part of

23  his direct testimony.  First witness, first thing you hear

24  about is gold and cash.  You don't know anything about Daibes,

25  you don't know anything about Hana, you don't know anything

1    about Qatar, you don't know anything about Egypt.  They wanted

2    you to listen about gold and cash in the man's house and stop.

3    That was the goal.  And it sounded pretty good.

4         What happened to the men's jacket that was found --

5    excuse me, to the blue jacket that was found in the closet?  So

6    that was the prosecutor's words actually saying that.  And then

7    you hear.  Kougemitros says it was removed from room Charlie.

8    Charlie is what he calls the closet.  Okay.

9         You know, point for the government.  Senator's blazer

10   in that closet with all the gold, all the cash, they got that

11   one.  That's easy.  They would not have messed that up.

12        Let's see what he said on cross at first.  He doubled

13   down.  Six times he said that jacket was in the closet.  He

14   says, yeah, it was hanging on the door.  The second answer it

15   gets worse.  I made it worse.  It was in Charlie and the door

16   was closed.

17        And then the judge asked him:  Was it on the inside of

18   the door?  Yes, your Honor.

19        Again, good stuff.  Just, you know, a brick in the

20   foundation of the inferences they want you to draw.

21        Here's the problem.  This was 100 percent false.  Like

22   100 percent false.  The truth was the opposite of what he said

23   under oath on the witness stand like eight times during direct

24   testimony.

25        So what happened?  And we showed him stills from an

1    FBI video of the search.  You might remember what he said he

2    did.  At the end of day one, he sees that video, he goes home,

3    he looks again.  He calls them exit photographs, so those are

4    actually images from an FBI video, that's what he is referring

5    to.  He says he talks to his supervisor, and then he changes

6    his testimony to the blazer was on the door of room Bravo.  So

7    that means the bedroom, not in the closet.  In the bedroom.

8    That's his accurate testimony.

9         Now here's the deal.  I'm not saying that where this

10   blazer was should determine the outcome of this federal

11   criminal trial.  I'm really not.  Like, I think it is a good

12   point for the defense that his stuff is not in that closet, but

13   let's not go crazy.  It's a blazer, okay.

14        What is important is what this reveals about the

15   inferences you are being asked to draw.  Because the question

16   that the blazer should give rise to in your mind is it a

17   credible story you are being told.  I would submit, this is a

18   case with a lot of inferences.  A lot of things that you don't

19   have a human being has told you.  You don't even have a text

20   message or a photo or an e-mail.  You are being asked to

21   imagine in the gaps of evidence the criminal stuff.  And we're

22   going to talk more about that, but that's why I'm focusing on

23   this.  Because it is not reliable.  It was not reliable.

24        So I think there's two important questions.  And

25   first, just as context, I just want to be clear, this was a

1    video made by the FBI.  Right.  Like, they produced this to us.

2    The thing that caused him to tell the truth was a video that

3    his search team made.

4            Did he know that before he took the witness stand and

5    said it seven times?  It was an FBI video.  We confronted him

6    with it and he changed his testimony.

7            So, here's the question.  Actually, we also showed the

8    ties.  You heard a lot about those ties on the first day.

9    Those are obviously, like, a teenage boy's ties.  Not the

10   senator's.

11           But let's get to the important question.  What if we

12   didn't have video?  What would have happened?  Just, like,

13   imagine in your head, I tried to cross the guy.  I said you're

14   wrong, I don't think that blazer was in that closet.  Nope, no,

15   sir, it was.  The judge asked him, the judge, definitely was in

16   the closet.

17           If we don't have a video, do you think you wouldn't

18   have heard about that blazer in the summation?  If we didn't

19   have a video, don't you think a part of the story, a part of

20   your common sense would be asking you to say, folks, if your

21   blazer is in the closet, you're going to see the gold.

22           So, again, my point is not the blazer is the thing.

23   The point is it's not a credible story.  You saw it.

24   Kougemitros was the first witness.  He's gone.  It's like he

25   didn't exist in this case.  That's what I'm asking you to focus

on.  Because of this event, that has disappeared from the government's story.

And the second related question, how many other things are there in this case for which you do not have a recording?  How many phone calls did this prosecutor spend minutes riffing about the contents?  How many meetings did this prosecutor spend a whole bunch of time explaining to you what must have happened?  If there is a video of Jose Uribe at Segovia or whatever that restaurant was, is that still in the summation?

This is the question.  This is their burden.  They have decided to put on this evidence, and to leave the gaps in the evidence and to ask you to fill them in with what they are calling inferences.  If you cannot trust the inference, if you cannot find evidence to support that inference, you have to acquit.

That's what this is about.

Now, the second one has stayed, the second event that I think proves the same point, the same core truth, that the story is not credible, has stayed in this case because they're stuck with it.  It's the e-mail or text or whatever it was about the number of embassy employees in Cairo.

So, you remember this e-mail, I'm sure.  In the world outside this courtroom, this is a commonplace event.  Okay.  This is like asking somebody in the government, hey, how does appropriations work.  Or like, how many under secretaries for

1    agriculture are there in the State Department.

2             The number of embassy employees is public.  You can

3    Google it.  It's been public in 2016, it has republished in

4    2021.  You can find it in 2018 when this e-mail was sent.  You

5    can find it today.  It is public.  Period.

6             Here's the thing though.  I think you saw something

7    interesting happen during Bret Tate's testimony, which I'm

8    going to show you.  I don't think he or the prosecution

9    realized this information was public.  Because during his

10   testimony this was a big deal.  Like a big deal.

11            Remember what they asked him?  Is it public?  No.  Why

12   not?  Bret Tate, Bret Tate agricultural attache for the U.S.

13   Department of Agriculture told you we could be targets of

14   terrorists.

15            Al Qaeda wants this information, folks.  That's what

16   Bret Tate told you on the witness stand under oath.  If this

17   information gets out, they, the terrorists, would know what the

18   total number of targets were.  That's what this man told you.

19            Listen, I hear you, that sounded serious at first.

20   Like maybe you had a moment where you're thinking why is this

21   agriculture guy who, like, visits granaries in Chile talking

22   about terrorism.  Maybe you had a moment.  But I'm sure you

23   presumed they would back this up.  You don't get this wrong.

24   You don't start talking about terrorism on day whatever, two or

25   three, of a bribery trial, unless you are sure.  Right?

1          Bret Tate got it 100 percent wrong.  Like 100 percent

2     wrong.  And I mean, not false in the way the prosecutor's

3     saying things are false and just saying things are corrupt and

4     whatever without really pointing you to the evidence.  Right.

5     He told you a story, they told a story.  They definitely got a

6     story.  But he's not pointing you how he knows all that stuff.

7     He's asking you to come on that journey with him, to trust him

8     that the story he's telling you is reliable and based on

9     evidence.

10          Bret Tate didn't have evidence, and we showed him the

11    opposite of what he was saying public United States State

12    Department reports about the number of personnel in Egypt.

13    Now, he got it wrong.  You can find that information easy.

14          I don't think it's really should be that surprising

15    that he got it wrong.  I mean, ask yourself, are there probably

16    human beings in the world that could have been called to this

17    witness stand who know more about protecting sensitive

18    information relating to U.S. embassies than an agricultural

19    attache?  Are there Marines?  Maybe the embassador to Egypt?

20    Is there someone out there who knows more than him?  Of course

21    he got it wrong.

22          It is pushing the evidence.  It is pushing the margins

23    of the story in a way that helps.  That's every bit of this

24    case.  And you know what?  When it turns out that they were

25    pushing into an area that ended up not working, it disappears.

1    The blazer is gone from the case.  And now they have a spin on

2    this 280 employees e-mail.  Right now it's like the information

3    was a little older.  No.  It was public.  It was public.

4         By the way, it makes sense that it is public.  Bret

5    Tate told you this.  When U.S. diplomats go to Egypt, to work

6    at the embassy in Cairo, they don't come in on a boat in the

7    dark of night.  They go through the airport and they present

8    their diplomatic passport to the government of Egypt.  Egypt

9    knows the diplomats who work at that embassy.  The Egyptian

10   intelligence service, who was described by Sarah Arkin as

11   omnipresent in Egypt, they know the Egyptians who work at the

12   embassies.

13        That's why this is public.  It's obvious.  Bret Tate

14   told you on cross why it's obvious.  He should have realized

15   it, but he was asked to fill in a fact -- it should be in air

16   quotes -- fact that the prosecutors want in their story.  It

17   doesn't work.

18        And again, two things.  One, I think this exposes that

19   one of the alleged objects of the Egypt scheme, as they call

20   it, should be disregarded.  This is just totally routine stuff

21   and we'll talk about it.  But you got to remember, Bob Menendez

22   took this public information and sent it to Nadine.  Not to the

23   Egyptians, not to Will Hana.  He sent it to Nadine.  She sent

24   it on to other people.  So that's one.

25        But secondly, when you take this and you take the

O793MEN5                    Summation - Mr. Fee

1    blazer, together, I'll say it again, you need to deeply

2    question the credibility and the accuracy of what you are being

3    asked to conclude by these prosecutors.

4            Imagine how important this decision will be for

5    Senator Menendez.  Right.  There is a high burden here.  High

6    burden.  Highest burden in our legal system, proof beyond a

7    reasonable doubt.

8            Imagine facing down this sort of situation, and

9    imagine this is what you have to sit and see being presented as

10   the proof.  Okay.

11           You don't have to find him innocent.  You have to

12   question whether they have met their burden.  And you are

13   presented with like this shifting uncertain, like, surprising

14   twists and turns.  And what do they want you to know?  What do

15   they want you to conclude?  When does silence mean criminality?

16   Oh, they didn't call each other.  That's because they knew.

17   They knew about the bribery scheme, so they don't need to talk.

18   When does silence mean they had nothing to say?  No response.

19           It's all shifting.  Imagine facing down this sort of

20   proof in this sort of high-stakes situation.  How would you

21   feel about that?

22           It happened, by the way, yesterday, still, this

23   blazer, the Bret Tate thing.  It kept happening.  They keep

24   ignoring the evidence that is bad for their story.  This is not

25   a distraction.  This is not marginal.  This shows you what

1    you're dealing with.

2           Let's put up what you heard yesterday.  So this is the

3    transcript of the words the prosecutor told you.  First, he's

4    talking about that list of gold from Nadine's family.  List of

5    gold and diamonds and jewelry.  And he says the gold bars added

6    up to 3 kilos.  It didn't say they're actually 1 kilogram bars.

7    I mean, it says 3 kilos of gold bars.  It is an argument.  I

8    don't think it's good, because this list has lots of other gold

9    in other places and then it calls these kilos of gold bars, but

10   whatever.

11          The thing I want to focus you on, the blue blazer

12   example, one of them you heard yesterday, even Nadine's sister

13   Katia, you were told Katia didn't remember if she ever saw

14   Nadine with any kilo of gold bars.

15          You know, he said it knowing that these court

16   reporters are writing down every word during the trial.  He

17   still went for it.  He still said it.  Folks, Katia never said

18   it.  Never said it.

19          She said it.  Hey, have you ever seen a 1-kilo bar at

20   41 Jane Drive?  I have.  When did you see it?  Years and years

21   ago.

22          Another one, yesterday.  These are like little

23   marginal pieces of their story, and they're going to come back

24   and tell you the richness of the detail.  The texture of the

25   evidence is overwhelming.  I promise you you'll hear this is

O793MEN5                    Summation - Mr. Fee

1    overwhelming.

2              It is not overwhelming.  But this, this tells you

3    about the credibility of the story.  This kind of stuff.

4    Summation.  It's a bribe.  It's a bribe.  Right.  You remember

5    that?  The lady who gave me the scarf.  How do you know that

6    this is part of a criminal conspiracy, the prosecutor told you.

7    Because she didn't say her name.  Nadine didn't say her name.

8    Criminal conspiracy.  Man, that's easy.

9              Well, look what happened.  The first time Nadine said

10   the lady who gave me the scarf is October 2020.  I don't know

11   when this woman came in as an official diplomat of the Egypt

12   embassy, which is, by the way, what she was.  They want to call

13   her an intelligence agent.  There is no proof that Bob was ever

14   told she is an intelligence agent.  There is proof that she was

15   an official diplomat of the U.S. embassy in Cairo.  I don't

16   know when she got there.

17             The first thing Nadine says is the lady who gave me

18   the scarf.  But then as time goes on, they use the name Mai.

19             Now listen, if I was doing what the prosecutors are

20   doing, I would tell you she called her Mai.  There must not be

21   a criminal conspiracy.  But that's, like, that's not how it

22   works.  This is too important.

23             These little games, these little misdirections, these

24   lawyerly arguments, where you take a line, that's what this is,

25   this is one line out of the thousands of lines of summary

1    charts.  My God, the summary charts.  This is one line and he

2    spent minutes telling you, telling you this is proof of a

3    criminal conspiracy.  It's not true.  Like the factual premise

4    is not true.  She used her name.  Whatever.  Who cares if she

5    used her name.

6            The bigger point is the inference.  Criminal

7    conspiracy is a serious thing.  That's the whole point.  They

8    need to prove that.  They can't just say it.  And they cannot

9    say it when they are lacking in credibility.

10           I'm going to talk about the evidence you see, you have

11   seen and you have not seen.  I am not going to spend my time

12   dealing with this cherrypicked nonsense.

13           Proof beyond a reasonable doubt.  You can use

14   inferences.  These are not inferences.  Okay.  These are

15   guesses, these are angles, these are arguments, and they

16   change.  They change.  It hasn't been that long of a trial.

17   Your theory on day one is not your theory today?  How can I

18   know you're sure of your story?

19           It should be upsetting if you were in this position

20   and you want to say I didn't do this, I'm not guilty of the

21   things they have proven.  But hey, you know, you can jump

22   around a summary chart, you can say look at this, look at that,

23   look at this, look at this.

24           How many minutes do you think that prosecutor spent

25   talking about a human being's testimony?  Six-ish hours of

1    talking to you, telling you the story.  How many minutes of

2    human being testimony did he spend time addressing?  10 to 20,

3    30?  Because you know what you can't do with a human being?

4    Let's get at it with the witness testimony.  I'm going to talk

5    a lot about it.  But you can't just say, man, Grewal said he

6    didn't mention the case name.  That didn't happen.  Folks,

7    that's proof of a conspiracy.  The fact that he didn't say

8    the -- like, it's harder to fudge a human being.  You can

9    fudge, they are fudging, they are misleading you about all this

10   other stuff.

11           And I want to be clear, I'm not saying that there is,

12   like, texts and e-mails that the defense is unable to explain.

13   and I know we don't have the burden, but hey, human beings hear

14   two sides of the story.  We can explain all this stuff.  It's

15   not that hard because there is no text, there is no e-mail,

16   there is no recording, there is no voicemail, there is no

17   photo, that ever shows Senator Menendez taking a bribe in

18   exchange for doing something.  There is none.  There are riffs

19   on summary charts and some other stuff.

20           This is the prism I want you to take when you think

21   about that summation, when you hear the next prosecutor get up

22   and try on some new theories.  Who know what will come.  I want

23   you to think about the blazer.  I want you to think about Bret

24   Tate.  I want you to think about the prosecutors saying

25   yesterday Katia never said she saw a 1-kilo gold bar.

1          Because your job is not to pick a story.  Your job is

2     not to say do I like that prosecutor, do I like that defense

3     lawyer.  Your job is to look at the evidence.  This isn't

4     evidence.  What I'm doing isn't evidence.  What he did is not

5     evidence.

6          Okay.  Let's talk about the government's number 1, by

7     a mile, topic.  Cash and gold.  If you listen to the

8     prosecutors, you may think there is cash and gold in like every

9     room of 41 Jane.  Just like Scrooge McDuck swimming in gold

10    coins in every room in that house.

11         But it was found in three places, okay.  So first was

12    the closet.  We'll talk more about it.  I'm sure you're sick of

13    hearing about it.  That was Nadine's closet.  I don't know if

14    Senator Menendez opened the door to see her get dressed.  I

15    don't want to know.  The point is that is her gold and her

16    cash.

17         We put on the witness, the only witness who had ever

18    seen that closet used by a human being, Katia.  That was her

19    sister.  That was not a hard line of questioning.  It was like,

20    no, that's her closet, man.  She had a key.  She held the key.

21    We'll talk more about what it means.  Because that's what's

22    going on in the summation.  That's the story.  They're jumping

23    to the end of what it means.  Right.  Every dollar, every piece

24    of gold.  It's Bob's.  It's Bob's.  How do you know?  Well, you

25    just know.  He's entitled.  All right.  Whatever.  He's

1   entitled.  You know.  That's the end of the story.  We got to

2   get there.  You got to do the work.  Okay.

3          So that's the first location.  The second is Bob's

4   office.  We've already seen this.  That's his stuff.  And

5   that's where he had the cash in duffle bags.  And that's where

6   he put the money he was withdrawing from ATMs from his savings.

7   We'll talk more about that, and we'll talk about how Bob's cash

8   in those duffles doesn't look like the other cash.

9          So, Nadine, closet, oh and the safe deposit box.

10  That's Nadine.  There is no evidence Bob has ever been there.

11  No evidence he's ever walked in that safe deposit box.  That's

12  Nadine's.  I don't think there is any reasonable dispute.

13  Office, that's Bob's.

14          But there is a third area where cash was found.  Gold

15  is only found in her closet, by the way.  That's why the blazer

16  mattered.  That's why it was so important.  And I think the

17  argument is now, I think I just said it, they lost the blazer.

18  So now it's he watches his wife get changed in the morning.

19  That puts him in the closet.  That's the new theory.

20          But the third place where cash was found is the

21  storage room or the basement.  Now, whose cash is in that

22  storage room?  Point one.  The prosecutors don't know whose

23  cash that is.  They don't.  They don't.  I mean, there is a lot

24  of stuff in that basement.  It's not organized well.  No

25  judgment.  Whose is.  It is not organized well.

 1          But, like, within 5 feet of each other you got a

 2    Forever 21 bag with some cash in it, wrapped totally

 3    differently than everything else.  Then you got like Bob's

 4    jacket with the envelope stuffed in the pocket.  There's some

 5    in that basement that's in those envelopes with 10,000 written

 6    on it.  And the tape on it.  You heard a lot about that.  There

 7    is some in the boots.  There is even some with a different type

 8    of notes on it.  We'll show you all this.  And then there is

 9    that Forever 21 bag.

10          By the way, we'll talk more about that.  Nobody but

11    that prosecutor said that was the daughter's-in-law.  That is

12    not his daughter's-in-law.  That's not Sabine's.  That's

13    Nadine's I would submit.  But the point is, the prosecutors

14    want you, really need you to accept all-or-nothing conclusions

15    about the stuff in that basement.  Right.  It's all Bob's.  You

16    heard that.  Every dollar in that basement is Bob's.

17          They didn't prove that.  They did not prove that.  In

18    your heart of hearts, you know that they don't know that every

19    dollar in that basement can be traced to Bob.  They like to

20    point out that they found, like, some of the bills were

21    circulated later in time.  That doesn't mean it's Bob's.

22          They like to point out there's fingerprints on some of

23    those envelopes.  You heard about what those fingerprints do

24    and do not show.  That doesn't say it was Bob's money.  But the

25    prosecutor, the prosecutors cannot have confidence about whose

1    money that is, because the evidence does not supply confidence

2    about that conclusion.  And we'll talk more about that.

3         So, I do want to show you more about that cash and a

4    little bit about that gold.  And you know, we started out with

5    the Agent Kougemitros, poor disappeared Agent Kougemitros,

6    where he's walking the money before you.  You got handed the

7    money and you got handed the bars, and the bars were like super

8    heavy and it was a lot of money.

9         That was the point.  That was impressive to you.  That

10   was the core of the government's case.  That's why the only

11   piece of evidence you were physically delivered was the cash

12   and the gold.  I don't know why.  But you felt cash before.

13   You felt gold before.  It was a form of argument, okay.

14        Maybe that's true.  I don't know if you held gold

15   before.

16        But the point being that was a form of argument to

17   overwhelm you with something that seems atypical.  Right.

18   Like, this is the point.  This is the point.  Who has gold in

19   their house?  I don't have gold in my house.  Who has that much

20   cash in their house?  Don't answer that question.

21        The point being I would not blame you for having the

22   immediate reaction that something fishy must have been going

23   on.  You might still feel the tug of that today.  This must

24   mean something.  What does it mean?  These guys are saying the

25   word "bribe" a lot.  And they threw out a ton of evidence about

1    something.  Maybe that's the story.

2            That's the point.  That is the whole point of this

3    case.  But it is not how our system works.  Right.  The reason

4    you have been here so long is because we don't take that

5    knee-jerk immediate reaction and jump to a conclusion.  You

6    hear the evidence, you hear the witnesses -- if there are

7    witnesses -- who can tell you facts about this cash and this

8    gold, and then you reach conclusion.  That's why we have this

9    trial.

10           So, Bob's cash in 41 Jane.  The story of his cash, as

11   you heard, starts in Cuba.  Bob's beloved older sister talked

12   about her baby brother, and she told you something that is key

13   to understanding this case.  And this man Bob's family fled

14   Cuba with nothing more than the cash they had stored in the

15   grandfather's clock.  And when the bad guys came in Cuba and

16   little Caridad Gonzalez was sitting in front of that clock, the

17   money there was the only thing that separated the Menendezes

18   from whatever was going to happen in Cuba and the life they

19   have lived here.  Just that cash.

20           Now listen, that has an impact.  The prosecutor told

21   you that was irrelevant.  That's not irrelevant.  That explains

22   why Bob was doing what he was doing.  Because everyone in his

23   family was basically hoarding cash.  It was like a habit.

24   Whatever.  They went, he went every other week, two or three

25   times a month, and withdrew roughly the same amount of money

1    for decades.  Decades.

2              This is not a story that Bob came up with when this

3    case was charged.  Okay.  He's not just saying that he did

4    that, that he withdrew cash.  We showed you the records.  We

5    showed you the bank records.  And yes, the bank records don't

6    exist in the past because he had been doing it for so long that

7    his old bank actually destroyed the records after a certain

8    year.  That's in evidence.  He has been doing this for a very

9    long time.

10             And we learned something similar about Nadine.  Katia,

11   her sister, told you her family had to suddenly flee from

12   Lebanon due to a civil war, and Nadine was about 10 years old,

13   and the same basic questions and concerns impacted that family.

14   Where are we living?  Are we safe?  Where do we keep our

15   assets?  Do we have any assets?  And that impacted her and her

16   entire family as well.

17             This is Katia talking about some of the stuff they

18   found in that home.  Just some of it being passed down.

19             So, this is why it's relevant.  The story the

20   prosecutors tell you is that it is so weird, it is so

21   inherently suspicious, that if Bob saw cash in 41 Jane that was

22   not his, if he saw cash that he himself did not withdraw from

23   his savings, he must have known it was a bribe.  If he saw

24   gold, if he sold gold bars in that closet, Bob must have known

25   it was a bribe.

1          That's actually what this is about.  It is the

2    knowledge element and it is also the intent element.  That's

3    what they're arguing.  It is so inherently unusual and

4    suspicious, that Bob must have known there were bribes being

5    paid.

6          That is false.  That is false.  That is why the

7    defense had to draw out of witnesses that it was commonplace in

8    these communities, among these circles of people, to have gold,

9    to have jewelry, to have a lot of cash in your house.

10         And folks, you heard it from literally every witness

11   who knew Nadine or was in this community.  People whose names

12   you may not even remember that gold, gifting gold, buying gold,

13   trading gold, selling gold, Mierna Hanna, the young lady who

14   testified very briefly and worked for Wael Hana, told you that

15   when somebody gets married, they still to this day give the

16   weight of gold of the bride as a gift.  It is not atypical in

17   these communities to have gold in the home.

18         In fact, you know it wasn't unusual for Nadine.  We

19   proved it to you.  On the day Nadine was born, she had who

20   knows how many hundreds of thousands of dollars of gold and

21   diamonds and other beautiful things gifted to her by her

22   family.  That's what she was relying on every day.

23         So the prosecutors are telling you a very simple and

24   very misleading story.  They want you to conclude that every

25   dollar, every piece of gold, every item of value that you have

1    heard a reference to in this case must have been a bribe.

2                    It doesn't matter if it is in Bob's office, Nadine's

3    closet, a Forever 21 bag, a jacket, a boot, it doesn't matter.

4    It's all a bribe.

5                    And again, knowing what we know now about the

6    credibility of some of these inferences, does it strike you as

7    genuine that they have established beyond a reasonable doubt

8    that every single thing in that house was a bribe?

9                    Just go down to the basics.  Okay.  The cash in that

10   house, whether it's in an envelope, whether it's in a bag,

11   whether it's in a duffle bag, have the prosecutors proved to

12   you, actually proven to you, not told you a story during

13   summation.  Have they proven to you to whom it was given?  Do

14   you know?

15                   You know there are some fingerprints.  That does not

16   prove to whom it was given.  All those TD Bank envelopes, the

17   prosecutor kept calling Daibes' cash, Daibes' cash, Daibes'

18   cash.  TD Bank is a bank.  Have you seen any TD Bank

19   withdrawals from Fred Daibes' account?

20                   The Forever 21 bag, it was wrapped up -- the

21   prosecutor didn't show it to you.  It was wrapped up in these

22   little bands that said Chase Bank.  Do you think there is

23   someone at Chase Bank who might be able to tell you something

24   about that money?  Have they proven to you the most basic

25   facts?  To whom was that money given?  When was it, when was it

1    given?

2            Again, you heard some trickery in that summation.

3    They pulled out a dollar, or a bill, and they say ah-ha, this

4    was released after a certain date.  Therefore, you know all the

5    money in that envelope must have come out of that date.

6            No, you don't.  You don't know anything about that

7    money.  They don't know anything about that money.  They only

8    know what they need you to conclude about that money.

9            You can feel it is unusual, weird, atypical,

10   culturally distinct, whatever, to have that amount of cash and

11   gold in your home.  You should not and cannot, I would submit,

12   uphold your oath of concluding that they have proven beyond a

13   reasonable doubt that that stuff is a bribe.

14           41 Jane, what else did we learn about it.  Bob didn't

15   live there for much of the time period at issue in this case.

16   Right.  Nadine owned 41 Jane.  She's lived there for like

17   30 years.  She raised her kids there with her first husband.

18   She got it in the divorce.  The DNA in that house is Nadine's.

19   She's deciding what goes where.

20           And you heard witness after witness tell you that even

21   after Bob started to sleep over at 41 Jane, he spent much of

22   the week in Washington, D.C., because that's where his job is.

23           And so, when we go back to that closet, what the FBI

24   found in that room is really the core of their case.  It's how

25   they started this case, and they wanted to end the case there.

O793MEN5                    Summation - Mr. Fee

1    And again, only Katia has seen that in action, and I think she

2    told you what you already know.  That it was Nadine's, she had

3    a key that she kept on her at all times, and she had been

4    keeping it locked for decades.

5            Katia told you that story about some long-ago nanny

6    that stole from Nadine, when Nadine's now-grown children were

7    little.  So this is a long time ago.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. FEE:  This is long before Bob.  This is long

2     before this alleged scheme started.  Nadine was locking that

3     closet up, because that's how she handled her stuff in there.

4     And that's what Katia told you.  It is her stuff.

5          Now, again, the reason this closet matters is because

6     that's where the gold is, and the key fact is there is no

7     evidence tying Bob to any of the gold in Nadine's closet.

8     There is one fingerprint on one of those bars, on the bag that

9     one of those bars was wrapped in.  It's Agent Kougemitros's.

10    It's no one else's.  So the prints don't put him with the gold.

11    They don't put anyone with the gold.

12         But you also have heard the argument now that, well,

13    he must have seen the gold, therefore, he is guilty.  I don't

14    think that makes sense.  That's not an inference you can

15    reasonably draw, but let's just talk a little more about how

16    commonplace it was to see gold with Nadine or Daibes or others

17    in those circles.

18         Now, this is the list, on the next slide, that Katia

19    told you about, where the family gold and other things of

20    value -- gold coins, three kilos of gold bars, something called

21    177 pieces of gold sovereigns, this is the gold.  And again,

22    they want you to count all of the stuff at 41 Jane and every

23    photo of gold -- on Nadine's phone, by the way -- the photos of

24    gold as bribes as well.  Truly, the photos are included in that

25    tally, that dollar tally of gold.  They are counting that as

1    bribes, proven beyond a reasonable doubt, photos, and we'll

2    talk more in a moment about that.

3              Actually, we'll talk more about it right now.

4              So this is one of the photos of gold, and this matters

5    to the prosecutors because these serial numbers, on this gold,

6    was found on a list, an inventory that Daibes kept.  OK?

7              Now, here's the thing.  This gold has never been found

8    by the FBI.  It wasn't found at 41 Jane.  It wasn't found in

9    her safe deposit box.  It exists in this image, and the FBI and

10   the prosecutors have told you, accurately, this is a photo on

11   Nadine's phone.  And it was created at 2:04 p.m.

12             What was happening on this date at 2:04 p.m.?

13             Nadine is at Vasken Khorozian's gold shop.  Let's go

14   back, actually, just to make sure you see the text on the

15   government slide.  This is Nadine saying where she's going to

16   be.

17             And if we could go to the next slide.

18             Now, Vasken did not recognize this gold.  He did not

19   recognize the thing underneath where this gold was

20   photographed.  Frankly, we don't have to prove anything about

21   this gold, because it's an image; it's a photo.  But I do want

22   to tell you there is not proof beyond a reasonable doubt that

23   Nadine ever possessed this gold.

24             Look at this photo.  Two things:

25             One, Vasken was crystal clear that he never sold a

1    one-ounce gold bar for Nadine.  Remember that?  He said he sold

2    four gold bars for her.  She said it was family gold.  He could

3    have marked the serial numbers; he doesn't remember what they

4    looked like.  But he never, ever sold one-ounce gold bars.

5    That's a one-ounce gold bar in this photo.  So you can make

6    arguments about these two other bars, but this photo is not the

7    stuff in total that Nadine sold that day.

8         The second thing I will point out is the background

9    for these images looks to me an awful lot like this safe on the

10   left side of that photo in Vasken's shop.  And again, the

11   burden's on the government.  I don't think they've proven that

12   Nadine had this gold, because all they have is this image.  I

13   think the far more likely explanation is that when Nadine was

14   there that day, Vasken showed her Fred's gold and she took a

15   photo.  She doesn't send this to anyone.  She doesn't say hey,

16   this is the gold I sold to Vasken today.  She doesn't say

17   anything about this gold.  It's just a photo.

18        And I do want to make sure you understand what the

19   evidence does say about Nadine and gold.  And just get a

20   picture of this.  So the evidence has shown that Nadine had not

21   had a steady job for decades.  Katia told you she didn't work

22   during her first marriage.  She didn't have a career after the

23   marriage, and she had obviously fallen on some lean times

24   financially.  And we're going to talk more about that.

25        For decades, Nadine has had to find a way to get by,

1    long before she ever met Bob.  How was she paying for kids'

2    clothes?  How was she paying for dinners?  How was she living

3    her life without a career?  I would submit that this is a far

4    more reasonable inference for what was going on.

5            These are the items Katia told you that were divided

6    between Katia and Nadine at some point over the course of their

7    lives.  Katia also told you that most of the things -- some of

8    these very valuable things that she saw on this list -- she did

9    not see in the items recovered from 41 Jane.

10           Here's the point.  Nadine was supporting herself by

11   selling gold, by selling jewelry, by selling other things.  I

12   don't think she wanted to do that because these were family

13   heirlooms, but I don't think she had any other option,

14   especially in those years where she was dealing with that

15   abusive ex-boyfriend, no job, and she hasn't even met Bob.

16   That's what she's doing.  She's selling gold.  She's selling

17   jewelry.  She's selling coins.  That's why there's cash in her

18   house.  That's why she is buying and selling this stuff.

19           The bottom line is, based on the proof you know as it

20   relates to Bob, whether or not Bob ever saw gold at some point

21   in Nadine's home, before disclosure, even before the marriage,

22   if he ever saw it, there would have been absolutely nothing to

23   him that was inherently suspicious about seeing Nadine with

24   gold.  Everyone who knew her told you the same thing.

25           Let's turn to when Bob disclosed publicly the gold

1    that he learned about from Nadine.  This came in through

2    Shannon Kopplin, the ethics lawyer who testified in this case.

3    And I would submit, despite the arguments made by the

4    prosecutors, that Shannon Kopplin gave you evidence that

5    disproves the government's charges in a very powerful way.  So

6    remember, this was what Ms. Kopplin told you, the woman from

7    the Senate Ethics Committee.

8            First, she saw Bob on TV approach Senator Coons, the

9    chair of the committee.  And she was told that that's when Bob

10   went up to Senator Coons and said:  Hey, my wife has some

11   family gold, what do I do.  And then Shannon Kopplin testified

12   that she had a conversation with Bob where he basically said,

13   what do I do with this gold?  To be clear, he didn't have a

14   plan.  He didn't suggest to her, hey, this can't be disclosed,

15   or hey, we have to disclose this and here's the value.  He

16   asked her what to do, and he did it.  He did exactly what

17   Shannon Kopplin told him to do with his disclosure.  And so he

18   disclosed on these forms, following his marriage, gold bullion

19   and the value you see there.  And an accurate value.  Even the

20   prosecutors aren't disputing that this is an accurate valuation

21   of that gold.

22           But here's the key point.  Here is why Shannon

23   Kopplin's testimony is actually totally helpful in proving

24   Bob's innocence.  Bob filed these forms on March 16 of 2022.

25   That's three months before the FBI searched 41 Jane.  There is

1    no evidence in this case -- none -- that at this point, when

2    Bob tells the world my wife has gold, that he was under, that

3    he thought he was under any sort of investigation.  No evidence

4    that someone told him, hey, the FBI might be looking at you,

5    these might be bribes.  Nothing.  Bob decided to go to the

6    ethics people and say, do I need to disclose?  Yes, disclose.

7           And you even heard Shannon Kopplin say that there was,

8    like, a media frenzy when he did this, because it is unusual.

9    It is atypical.  Not in Nadine's community, not for Fred

10   Daibes, not for Vasken Khorozian.  But for other folks, yes.

11   And so just ask yourself -- we're in the world of inferences,

12   and I'm asking you to use your common sense -- if Bob was part

13   of a bribery scheme, if he was taking gold as bribes, if he

14   knew Nadine was taking these gold bars as bribes, if he knew

15   that the other gentlemen here, Daibes and Hana, were giving

16   gold to Nadine and to him as bribes, why would he ever, ever

17   disclose this?  He didn't know anything about an investigation.

18          He just volunteers it to the world?  While taking

19   bribes?  Is that what your common sense tells you someone

20   taking bribes is likely to do, especially when they know the

21   world is going to focus on this?  Because it's a little weird?

22          Of course not.  Of course not.  Bob just put these

23   questions to Shannon Kopplin.  No tricks, no deception.  Told

24   her exactly what they were, even told her that he thought

25   Nadine might sell them to pay her mortgage.  And that's

1    reflected in what Shannon Kopplin told you.  It makes no sense

2    what the government is suggesting about this disclosure.  It

3    makes no sense.  It proves the opposite of the alleged scheme.

4            Now, this is how the government addressed this

5    problem, and it's a problem for their case.  It is a problem

6    that somebody accused of being in a bribery scheme decides to

7    volunteer to the world that the alleged bribe is in my

8    possession -- for no reason, for absolutely no reason.  So the

9    reaction of these prosecutors should not be surprising.

10   They're shifting.  They're picking a new theory, and I want to

11   ask you if you either understand this theory, have seen

12   evidence to support this theory or find this theory credible.

13           Yesterday, the prosecutor told you that Bob's

14   disclosure of gold does not actually show his innocence because

15   he secretly needed to find a way to launder the gold, because

16   he had to sell it because Nadine needed to pay off her

17   mortgage.  So therefore, he asked Kopplin what to do, knowing

18   she'd make him disclose it, and then he could sell the gold.

19   Got it?

20           What's the evidence of that?  What text, what email,

21   what recording, what document suggests to you that that story's

22   credible?  I know the prosecutors want you to believe that

23   everything Bob is doing is a lie, that everything he is doing

24   is in furtherance of a bribery scheme.  But that's not how you

25   have to approach this evidence.  That is the end of their

O79Wmen6                          Summation - Mr. Fee

story.  That is the top of the mountain.  They have not

supplied to you any compelling evidence for the theory they

offered you today.  And this, I would submit, is more shifting,

is more riffing to explain what has happened in the trial,

because it's bad for them, what he did with Shannon Kopplin.

It's bad that he said, Shannon, what do I do?  Disclose, Bob.

OK.  Crime, that's the argument you heard yesterday.  But

that's not what Shannon, a human witness, Shannon Kopplin told

you happened.  That is not an inference you can draw from her

testimony.  This is what she told you -- that he asked, what do

I need to do, when do I need to do it?  And she said, disclose,

Bob.  It is the opposite -- this proof, the actual evidence, is

the opposite of a scheme.

        That word is used a lot, a "scheme," like a plan,

something designed to achieve an object.  This is not a scheme.

This is Bob saying:  My wife has a thing.  I've learned about

it.  I need to disclose it.

        You've also heard lots of arguments about what Bob

didn't disclose.  Those arguments were about things that they

say Nadine had and, therefore, Bob must disclose.  Folks, first

of all -- first of all -- he is not charged with, like, form

issues.  He's charged with bribery.  He cannot disclose

something he doesn't know about.  They're saying that the

mortgage loan should have been disclosed years ago.  There's no

evidence -- no evidence -- that he knew about that loan from

Hana to Nadine.  There was actually a lot of actual evidence
that Nadine kept every bit of her financial problems from Bob
and that she did so after he had broken up with her because she
didn't want to let that happen again.  And we'll show you that.

And by the way, just the last point on this theory
that Bob somehow had to disclose the gold in order to pay off
her mortgage -- this is in evidence -- Bob had in his savings
account, not in the cash that he was, like, hoarding in the
duffel bags.  In his savings account he had $250,000, more than
that.  He could have paid off Nadine's mortgage if he knew she
was on the verge of foreclosure ten times over.

What does your common sense tell you is more likely?
Let's use that frame.  That Bob told the world about his gold
bribes for no reason other than to help Nadine pay her
mortgage?  Is that what he would have done?  Or would he have
used some of the hundreds of thousands of dollars in cash in
his savings account that he got from his Senate salary to pay
off that mortgage?  Even if he was taking bribes, this does not
make sense.  This is evidence of innocence -- innocence.  And
it is being twisted -- twisted -- to tell you a story that they
hope sticks.  That's the point.

The gold, the cash, hooks you.  What is this?  There
must be a reason.  I can tell you the reason, ladies and
gentlemen.  I could spend six hours telling you the reason
because of things I made up in my mind.  Kougemitros said

1   something that doesn't help my story.  I'm not going to mention

2   that.  Bret Tate said something that wasn't true -- ah, ah, ah.

3   That's what you're hearing.  Imagine facing that.

4           Gold.  So, how did they get the gold to Bob?  How?

5   How?  How?

6           Can we take another break before I get to that one?

7           THE COURT:  All right.  I think it's a logical time,

8   ladies and gentlemen.

9           Thank you, Mr. Fee.

10          Let's take ten minutes.

11          (Jury not present)

12          THE COURT:  All right.  Ten minutes.  Thank you.

13          MR. MONTELEONI:  Your Honor, I have some applications.

14          THE COURT:  Yes.

15          You may be seated in the courtroom.

16          MR. MONTELEONI:  There were a number of statements

17  that Mr. Fee made, some of which transgressed the rulings that

18  the Court made on our letter, and one of which wasn't in the

19  letter.  And I'm honestly, and I don't say this lightly,

20  surprised that he did this, because it's extremely improper.

21          First of all, on the letter, he repeatedly talks about

22  witnesses who could have been called.  He said couldn't marines

23  have been called?  Couldn't the U.S. ambassador to Egypt have

24  been called?  And couldn't someone at Chase Bank have been

25  called?

1            That's in the letter.  This, I believe, calls for yet
2     another curative instruction about investigative techniques as
3     the defense has repeatedly prompted the Court to do.  And I
4     think that the part about the government not being on trial in
5     that is appropriate given the remarks that he's making about
6     the personal choices and litigation strategy of the
7     prosecutors.  But most surprising of all to me, honestly -- and
8     this was a very difficult decision not to object in his
9     summation -- is repeated references to what the jury would do
10    if they were put in the position of having to defend
11    themselves.  He just said, just before calling this break, he
12    said imagine facing that.  And he made two more, similar
13    remarks at other times earlier in his remarks.
14            I honestly found myself in a difficult position
15    deciding whether or not to object, because I'm trying not to.
16    But it is absolutely improper to put the jury in the position
17    of imagining themselves as defendants facing particular
18    litigation strategies.  I have never seen that done, and it's
19    completely improper.
20            Also, you know, this is, I think, a different level of
21    seriousness, but I don't understand why he has to say he
22    doesn't have gold in his house.  The Court made a ruling about
23    that the lawyers' own experiences are not relevant.  That's
24    sort of a side point, but he should really be sticking to the
25    Court's rulings.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          So our request is that the Court again give the

2     investigative techniques instruction and that Mr. Fee be

3     directed not to again make any remarks that puts the jury in a

4     position of imagining facing certain charges, facing certain

5     litigation tactics.  And if he does that again, I'm going to

6     have to stand and object, even though I don't want to.

7          And also, the equally available witness instruction is

8     appropriate to say at this point.  I think that it's honestly

9     disappointing that after putting in a letter on all of these

10    issues we're in a position where we have to raise this when he

11    happens to call a break because we're trying not to interrupt

12    his summation.

13          THE COURT:  Mr. Fee.

14          MR. FEE:  Your Honor, that's not investigative

15    techniques.  I am not saying the government has obtained the

16    unavailability of Chase Bank.  We're pointing out the absence

17    of evidence.  That is the core of the defense.  It is totally

18    appropriate and commonplace to say, did you hear from anyone

19    who could have explained this evidence?  That's what that's

20    about.

21          THE COURT:  Then you walked into, it seems to me, the

22    equally available witnesses charge.

23          MR. FEE:  I have not said one word about them making a

24    witness unavailable.  Your Honor, they have the burden.

25          THE COURT:  Just a moment.

O79Wmen6                    Summation - Mr. Fee

1          MR. FEE:  Yes.

2          THE COURT:  Let's do this.

3          MR. FEE:  Yes, your Honor.

4          THE COURT:  I actually made a note to myself -- I

5  didn't know whether the prosecution was going to raise this or

6  not -- when you said you haven't heard from any of those people

7  at the bank, I think you said that a couple of times, in the

8  same sequence, it seems to me you clearly, clearly raised the

9  question of why didn't they call people from the bank.

10         MR. FEE:  Your Honor, I will do that again when we get

11  to Qatar.  It is 100 percent appropriate to point out they have

12  not called a human being to explain their proof.  This case in

13  particular is about summary charts and arguments.  It is 100

14  percent appropriate to say, did you hear anyone who explained

15  to you the meaning of evidence?  He talked about --

16         THE COURT:  That's OK.  That's all right.  Pointing

17  out the absence of evidence is OK.  But saying, essentially,

18  why didn't they call somebody -- not essentially, I think

19  almost literally -- why didn't they call somebody from the

20  bank, that's not OK.

21         MR. FEE:  Actually, there's a slight difference.  I'm

22  saying, did you hear from somebody at Chase Bank?  Your Honor,

23  I really, truly believe it is appropriate to point out that the

24  government made a choice not to call witnesses to explain these

25  things.

1         THE COURT:  And the charge is that if witnesses are

2    equally available, you can't draw any inferences from the

3    failure to call those people.

4         MR. FEE:  Your Honor, I think it is fair to point out

5    that the nature of the government's proof here is largely

6    devoid of witnesses.  It is their burden.

7         THE COURT:  It's OK to point out that they haven't met

8    their burden of proof in this regard or that regard.  I don't

9    have a problem with that.

10        MR. FEE:  Your Honor, clearly I don't think that

11   crosses a line.  I don't even think that is investigative

12   techniques.  I don't think that's pointing out --

13        THE COURT:  I'm not talking about investigative

14   techniques now.  What I'm talking about is the equally

15   available witness charge.

16        MR. FEE:  Your Honor, that charge is in the case.

17        THE COURT:  Yes.

18        MR. FEE:  And I would point out Mr. Monteleoni also

19   pointed out the failure of the defense to call witnesses to

20   talk about evidence.  He did, and he has the burden.

21        THE COURT:  Actually, that's a point I was a little

22   surprised that you offered proof of innocence when you don't

23   have that burden.  But I understand why you did it.  You did it

24   to make the point that, hey --

25        MR. FEE:  That's right, your Honor.

1          THE COURT:  I understand why you made that point.

2          MR. FEE:  Your Honor, that charge is in the case.  I

3   don't think it would be appropriate to do that during the

4   summation because it suggests, frankly, that the defense had

5   some burden to call the witnesses that the government did not.

6   It is rhetorically appropriate to point out that they have the

7   burden and that they are filling in the gaps in the evidence by

8   offering information and argument without calling witnesses.

9   That is the point.

10          THE COURT:  It's certainly appropriate to point out

11   that they have the burden, as you've done and as you can and

12   should do, I take it.  You can point out the fact that they're

13   relying on charts and not human beings.  You've said that.

14   That's perfectly OK.  But I think you crossed the line when you

15   said you haven't heard anybody from the bank, you haven't heard

16   from the marines.  I don't remember that, actually, but that

17   was --

18          MR. FEE:  That's what I said.

19          THE COURT:  OK.

20          Sir.

21          MR. MONTELEONI:  Your Honor, I want just to amplify

22   that point because, there, he wasn't even talking about

23   something that we didn't do.  We had a witness who testified

24   and he actually was just saying are there more witnesses who

25   would know even more.  I mean ask yourself are there probably

1   human beings in the world that could have been called to this

2   witness stand who know more about protecting sensitive

3   information relating to U.S. embassies than the agriculture

4   *attaché*?  Are there marines?  Maybe the ambassador to Egypt?

5   Is there someone out there who knows more than him?

6              This is exactly why the missing witness instruction is

7   called for.

8              MR. FEE:  I would disagree on that, your Honor.  That

9   is a commentary on the nature of the proof and the credibility

10  of an argument they are making.  He said in his summation that

11  terrorists want to know that information.  This is a bribery

12  case.

13             I am well within fair defense rhetoric to say if the

14  prosecutors want you to believe terrorists want this

15  information, they could have done a better job.  That's what

16  I'm saying.

17             THE COURT:  It seems to me that that argument is

18  appropriate.

19             Here's what I'm going to do.  I'm going to read, in

20  essence, the uncalled witnesses equally available or

21  unavailable charge that says I want to remind you that each

22  party had an equal opportunity or lack of opportunity to call

23  any particular witness.  Don't draw any inference or reach any

24  conclusions as to what those people would have testified to had

25  they been called.  Their actions should not affect your

 1    judgment in any way.  Remember, however, that my instruction

 2    that the law does not impose -- I'm sorry.

 3            Remember my instruction that the law does not impose

 4    on a defendant in a criminal case the burden or duty of calling

 5    any witness or producing any evidence.  And I'm going to leave

 6    it at that, Mr. Fee.

 7            And just as I thank Mr. Weitzman for not interrupting

 8    Mr. Monteleoni's summation, I thank Mr. Monteleoni for not

 9    interrupting Mr. Fee's summation.

10            Mr. Fee, you see the line I'm drawing in terms of the

11    witnesses.  You certainly can, and undoubtedly will, point out

12    a lack of evidence.  But you can't say they should have called

13    somebody from the bank or they should have called somebody

14    else.  OK.

15            MR. MONTELEONI:  Thank you, your Honor, but I am still

16    concerned about the repeated remarks, one of which we heard

17    just a moment before the break was called, about imagine facing

18    that, sort of asking the jurors to put themselves in this

19    position of facing criminal prosecution or imagine themselves

20    adverse to the government lawyers in this case.  So there's

21    that.  And similarly, I will say that that underlines repeated

22    references to consequences of punishment that --

23            THE COURT:  What were those?  Because I think I'm on

24    outlook for that on both sides.

25            MR. MONTELEONI:  So I think that counsel --

 1              THE COURT:  Counsel for both sides, no references to

 2    punishment or the results of a finding of guilt by the jury.

 3              MR. MONTELEONI:  Right.  So I think that the first of

 4    what ended up being many references, which I think were

 5    oblique, was that --

 6              THE COURT:  Maybe that's why I didn't catch them.

 7              Go ahead.

 8              MR. MONTELEONI:  Well, they were close to the line,

 9    but he says the parallels have one thing standing between them

10    and a lifetime of shame, a conviction.  Then there were

11    repeated references.

12              THE COURT:  That was in this summation?

13              MR. MONTELEONI:  Yes, right at the beginning of the

14    summation.

15              THE COURT:  I'm sorry.  I didn't catch that.

16              Yes.

17              MR. MONTELEONI:  And then there were repeated

18    references to how important this case is to Senator Menendez.

19              THE COURT:  That's OK.  It's important to the

20    government also.

21              MR. MONTELEONI:  All right, but those actually --

22    maybe we can pull up one of these, but -- right.  So what you

23    have here is he says imagine how important this decision will

24    be for Senator Menendez.  Right?  There's a high burden here,

25    high burden, highest burden in our legal system.  Imagine

O79Wmen6                        Summation - Mr. Fee

1    facing down this sort of situation, and imagine this is what

2    you have to sit and see being presented as the proof.

3            All right?  So he's linking --

4            THE COURT:  Yes, I understand that.

5            Let me hear from Mr. Fee.  I didn't realize it went

6    that way.

7            MR. FEE:  I don't think any of that is about

8    punishment, your Honor.  My only point is imagine a situation

9    where you're facing the circumstances, to highlight the, I

10   think, frankly, unfairness of the government's approach to its

11   evidence.  I'm not asking you, I'm not saying imagine your

12   loved one or yourself.  I'm just saying imagine a situation.

13   It's just phrasing.

14           MR. MONTELEONI:  Well --

15           THE COURT:  You can talk about, as you have, how --

16           Well, let me hear from Mr. Monteleoni.

17           MR. MONTELEONI:  All right.  So, first of all, I

18   think, again, these references to the consequences of

19   conviction, even in oblique ways, is section 3 of our letter,

20   which I understood the Court granted.  There are a number of

21   references where, again, the references to the consequences are

22   a little bit oblique, for understandable reasons, but they are

23   unmistakable, and the Court precluded them already.  But we

24   don't ask jurors to imagine if they were victims of crimes.

25   That is totally improper.  It is not appropriate to imagine, to

1    ask the jurors to imagine themselves adverse to one of the

2    parties in the case, to imagine them adverse to the precise

3    legal team in the case.  You know, he can criticize our

4    techniques.  He can criticize our litigation strategy, but not

5    in this highly charged way, which is totally inappropriate.

6               THE COURT:  All right.

7               Mr. Fee.

8               MR. MONTELEONI:  I'm sorry.  One other thing.  About

9    the publicity of the information, he seemed to be inviting the

10   jurors to actually do extra-record research.

11              THE COURT:  I have a note to myself also on that,

12   because that was, you can google this or you can google that.

13   I am going to tell the jury that they should not do any

14   searches or anything along those lines.

15              I'll give the equally available witness charge,

16   although not in as formal a way as I'm going to deliver it when

17   I deliver the charge.  And I will tell them not to do any

18   research.

19              In terms of putting themselves in the position of

20   being subject to this, I think you should stay away from that,

21   Mr. Fee.  I don't want this jury to be thinking that they're

22   adverse to the government in any way or to imagine themselves

23   as being adverse to the government in any way.  Stick to

24   your -- I mean you do the summation as you want, but you're on

25   safer ground sticking to the government hasn't met its burden

1    of proof in your terms by a long shot.

2              MR. FEE:  Understood, your Honor.

3              THE COURT:  All right.  Let's bring this jury in.

4              MR. MONTELEONI:  Will we be able to have a restroom

5    break?

6              THE COURT:  It will go faster if I don't give you one.

7              All right.  Go ahead.  Five minutes.  Five minutes,

8    everyone.

9              (Recess)

10             THE COURT:  Bring the jury in, please.

11             MR. MONTELEONI:  Your Honor, before they get here, I

12   want to make one thing clear.  I certainly am trying to not

13   interrupt Mr. Fee, but if he does continue to make these

14   remarks that the Court has ruled are out of bounds, I will be.

15             THE COURT:  Let's get the jury in.

16             (Jury present)

17             THE COURT:  Please be seated in the courtroom.

18             Ladies and gentlemen of the jury, there are a couple

19   of things I want to remind you of.

20             One is there were references to -- not these exact

21   words -- you can Google this, you can look this up, that sort

22   of thing.  You know not to do any of that.  Don't do any

23   research at all, and indeed, don't listen to or watch any of

24   the publicity here.

25             Also, there were references to individuals who did not

1    testify here.  I remind you that each party had an equal

2    opportunity, or lack of opportunity, to call any person.  You

3    should not draw any inference or reach any conclusions as to

4    what those individuals would have testified to had they been

5    called.  Their absence should not affect your judgment in any

6    way, but remember that the law does not impose on a defendant

7    in a criminal case the burden or duty of calling any witness or

8    producing any evidence.  You know that.

9              Mr. Fee, you may continue, sir.

10             MR. FEE:  Thank you, your Honor.

11             Gold.  So the gold at 41 Jane was in Nadine's closet,

12   and it was in a bag.  One of them was in a bag that had

13   Kougemitros's prints.  One of them was not.  And Nadine sold,

14   you heard from the evidence, Nadine sold four gold bars to

15   Khorozian.  She hid it from Bob.  I'm going to talk more about

16   that.  She avoided going back to Bob's best friend, and I'm not

17   sure if you caught this in the evidence.  Don Scarinci, which

18   you heard was Bob's childhood friend, best man at his wedding,

19   had actually sold gold, gold coins, for Nadine in the past or

20   helped to sell them.  And Bob helped her connect with Don

21   Scarinci to do that.

22             When Nadine went to sell those four gold bars, she did

23   not go to Don Scarinci, and she actually told Bob -- she

24   omitted from her conversations with Bob that she was going to

25   see Vasken.  I'm going to show you that, but I want to make a

1    point about the Google searches first.

2            The four gold bars, I would submit, the evidence shows

3    that Bob didn't know that Nadine had those four gold bars.  He

4    eventually did, obviously, because he disclosed them.

5            Now, none of those one-ounce gold bars that you heard

6    about having been seized at 41 Jane, there's been no evidence

7    connecting those to Bob at all.  When the prosecutors say

8    that's Bob's gold, what they're really doing is making the

9    argument that this is a bribery scheme:  We think we've proved

10   the bribery scheme; the gold is the thing they paid him for the

11   bribery scheme.

12           That's why they're saying it's Bob's gold.  There is

13   no evidence that Bob touched that gold, owned that gold, picked

14   up that gold, whatever about gold.

15           So what are we left with?  And again, this was the

16   point of the blazer originally to somehow get Bob connected to

17   gold.  Again, start with the cash.  Start with the gold.  Find

18   a way to make a story.  That's, I think, what you're seeing

19   here.

20           The Google searches.

21           Bob, I imagine, like most humans, has done a lot of

22   Google searches.  So why is Bob sometimes searching for gold?

23   Now, the story from the prosecutors is that he's searching for

24   gold when he gets a gold-bar bribe.  Just take that sentence on

25   its own.  I'm not sure that actually tracks.  If you get a

1    bribe, do you immediately search that day's value?  Are you

2    selling it that night?  Is that the theory?  But let's put that

3    aside.

4              Bob is searching for gold on a lot of occasions when

5    the government does not allege he's receiving bribes.  That's

6    in the evidence.  He's doing a lot of searches for gold.

7              Now, Bob himself has never owned gold.  You saw he

8    disclosed, as he has had to do for decades as a member of

9    Congress, his assets.  The only time he has disclosed gold is

10   the one you've heard quite a bit about now.  You haven't heard

11   any witness -- Caridad, who's known him longer than anyone, no

12   one has said or been questioned about whether Bob owned gold

13   before he met Nadine and started living at 41 Jane.

14             But at the point in life where you are learning about

15   Bob, we do know that he actually has a lot of people in his

16   life -- frankly, through circumstance and through living in the

17   state of New Jersey -- that are from communities where they buy

18   and sell and own and trade and like gold:  Hana; Daibes; his

19   new girlfriend and then fiancée and then wife, Nadine; Nadine's

20   family.  You heard from Katia.  You might have seen what Katia

21   was wearing on her wrists.  Jewelry, gold, diamonds, that's

22   commonplace in Bob's circles.  So I am sure, I would submit to

23   you, common sense tells you that the people Bob is sometimes

24   hanging around with, because we're seeing a slice of Bob's

25   life.  In every phase, right?  We talked about Egypt a lot.

1    Bob was working diplomatically with a lot of other countries.

2              Your common sense tells you that the slice of life you

3    are seeing, where Bob is interacting with Hana, with Daibes,

4    with Nadine, her family, common sense tells you gold, jewelry,

5    what you can trade it for, sell it for, whatever, comes up in

6    conversation.  That is the most reasonable inference to draw

7    from Bob's searching the value of gold on a day when Daibes

8    came over for doughnuts.  When you remove the prosecutors

9    filling in the gaps of the story with the inferences they need

10   you to take, the evidence suggests to you that that is the most

11   reasonable explanation for what you saw on that particular day.

12   Fred's there, Nadine's there.  He brings over doughnuts.  Bob,

13   or somebody using his Google account -- might have been Bob;

14   I'm going to show you that sometimes it wasn't -- searches for

15   one kilogram of gold.  That does not constitute proof that he

16   was taking gold as bribes.

17             Let's look at his Google searches.

18             So these reflect what's in evidence about Bob doing

19   searches around the time when he knew Nadine had family gold.

20   Remember, that's what she told him.  That's what he volunteered

21   to the world long before he ever knew of this investigation and

22   this case -- that Nadine told him she had family gold.  And

23   these searches he's doing are right around when she is selling

24   gold to pay her mortgage.

25             So the top are events you've seen in evidence in this

case, and the bottom are gold searches. April 8, you see that's when the check from Avital is dated. That's paying Nadine for one of the gold bars. There's a search on Bob's Google account, how much is an ounce of gold worth today? Does it relate to her selling that? Probably. Has any witness, any human being come in and told you that? No.

May 9, Nadine deposits another check from Avital Gold, and then texts Bob: Just did the wire transfer, the payoff for one of the mortgages, I can't wait to get the document from them that says it's completed. Again, this is what Bob told Shannon Kopplin. Nadine has family gold, she's selling it to pay her mortgage. This is evidence. I'm not asking you to infer this. This is Nadine telling Bob, in black and white, I sold gold, I got the gold, I'm going to pay off my mortgage. She's not saying: Bob, they're going to foreclose. Can you help me? She's not saying I'm in desperate straits. She's saying I'm selling the gold to pay off the mortgage.

By the way, the mortgage is Nadine's mortgage. It's in her name. It's her home. Bob is not on the documents. It was taken out before they ever met. It is Nadine's mortgage.

Again, fast forward to May. You see another search on the bottom from Bob about the value of krugerrand, gold coin. No one has come in and told you. Does this definitely connect to A or B? But you can see right around there, Nadine again is depositing the proceeds of the sale and then making a payment,

1    sale of gold and making a payment.  And then on June 6 you

2    essentially see the same thing.  About a week before Bob

3    searches kilo of gold price again.  Nadine sells it and makes a

4    payment on her mortgage.

5           Vasken Khorozian, who I miss dearly, told you that

6    this is what you do when you're selling gold.  He talked about

7    the website he uses.  It was elicited from him by the

8    prosecutors.  The price changes constantly.  It's a commodity.

9    People who have owned gold since the date of their birth know

10   this and do this.  So this is commonplace.  These are the

11   searches explained here.  These are not all the searches.  I'm

12   not telling you that the evidence explains each and every

13   search, because I don't think that is credible.  But I'm

14   telling you that many of these gold searches can be explained

15   just by the evidence you have in this case.

16          There are other Google searches that, I think, common

17   sense tells you just from looking at them why Bob did them.

18          So on March 6, Bob gets an email from Shannon

19   Kopplin -- I'm sorry.  He sends an email to Shannon Kopplin,

20   talking about he's getting ready to amend his report and asking

21   her one of these technical questions about the disclosure

22   rules, and he searches for a kilo of gold, because he has to

23   disclose the estimated value of Nadine's family gold.

24          And then this is that second event I talked about.

25   This is important for two reasons:

1            This is Bob searching for the price of gold at around

2    the time when Nadine is selling some of her gold.  Before

3    they're married, she's selling some family gold, and it's

4    telling and, I think, disproves part of the government's theory

5    how Nadine handles this sale.  She goes to Bob.  Bob connects

6    her with the best man at his wedding, Don Scarinci, who he's

7    known since he was a kid.  That was the testimony from Mike

8    Soliman.  And you can see him following up from Bob to Don:

9    Hey, haven't seen you in a while.  Did you ever get Nadine's

10   coins back?

11           And then later on you see that Don actually did

12   complete the sale of Nadine's gold coins, because Bob says

13   bring Nadine's check on Wednesday.  So this is Nadine looping

14   Bob in to the sale of gold.  And there are many instances that

15   we will show you where Nadine is excluding Bob from certain

16   things.  The car payments that Uribe was giving her, we have

17   shown you that she was excluding Bob from that.  Other gold

18   sales, she's not going to Scarinci.  She's excluding him, but

19   again, it explains some of these searches.

20           Next slide.

21           So the text is small, but these are more Google

22   searches that are about things other than the bribery scheme

23   that the government is asking you to believe.  And the point

24   here is not to overstate the evidence.  As you know, they have

25   the burden.  We don't.  But I do want to make sure that you

O79Wmen6                          Summation - Mr. Fee

1    understand that the evidence has to be treated credibly.  I'm

2    not going to overstate what's here.  I'm not telling you that

3    every Google search can be explained or that every gold search

4    was Nadine using Bob's account on his phone or a laptop, or

5    whatever.  The evidence doesn't tell you that.  I don't think

6    you can reasonably infer beyond a reasonable doubt that that's

7    the case.

8         I am telling you that there are definitely times when

9    Nadine is asking Bob to run searches or running searches

10   herself, or someone other than Bob is running searches.

11        The point of that is to explain to you why they

12   haven't met their burden.  I just want to be clear about that,

13   because they are telling you that you have to adopt a

14   conclusion.  And that conclusion has many, many pieces, but the

15   tag line of their conclusion on Google searches is it's proof

16   that Bob was bribed with gold.  And the point of this evidence

17   is it is not proof beyond a reasonable doubt of that.  There

18   are many times and many reasons Bob is searching gold, and

19   there are definitely times when he is not, even where he's

20   either getting a request to search or having someone else do a

21   search.

22        Blow dry bars in D.C., and on the right, these, I

23   would submit, are not Bob doing these searches.

24        You heard he's a fluent Spanish speaker.  How do you

25   say girlfriend in Spanish, Google search, July 2018.  How do

1    you say tomato in Spanish, February 2021.  How do you say cake

2    in Spanish?  I would submit those are not Bob's searches.

3           The Google searches are not incriminating evidence.

4    The prosecution has sort of put them in this towering Jenga

5    stack of stuff and telling you you know this must be proof of a

6    bribe.  I want you to look at all the evidence in context and

7    then draw the reasonable inference.  I don't think they're

8    right.

9           OK.  Let's talk about the cash a little bit more.  And

10   again, we don't have the burden, but we wanted to show you

11   evidence about Bob making this pattern of ATM withdrawals over

12   decades.  Let's first look at what we have records for.

13          This is 2008 through 2022.  These are all the

14   withdrawals, not just the one in that pattern that the

15   prosecutors call fake.  And I'll talk about that in a minute.

16   This is every dollar of cash that Bob took out from his Senate

17   Federal Credit Union account for the period for which there are

18   records, 2008 to 2022.  This is every dollar he took out of

19   that account, $178,000.

20          Now, you heard from Caridad that he had at least been

21   doing this, there's evidence to indicate Bob had been doing

22   this since the '80s, when his daughter was born.  Remember the

23   boot box with cash in it?  And as you heard the prosecutor

24   mention, but perhaps not explain, the House Federal Credit

25   Union at which Bob had an account when he was in Congress,

```
 1    going back to the '90s, it destroys records after seven years.

 2    So they do not exist for anyone.  But let's look at the next

 3    slide.  So no one has the actual documents showing these

 4    withdrawals.

 5         I'm sorry.  I'm not to the part where we're at the

 6    credit union yet.  This is the Senate withdrawals in that

 7    pattern.

 8         Now, let me explain the pattern.  The reason we had

 9    Richardson do withdrawals of only $400 to $403.50 is because we

10    wanted to be conservative in how we drew the inference from the

11    evidence.  And again, I don't think it's disputed.  We didn't

12    want to include, in Bob's withdrawals, these habitual cash

13    withdrawals when Bob was taking out a hundred dollars to give a

14    gift to a niece or a nephew.  We didn't want to include when

15    Bob takes out $600 because he's got to buy a nice piece of

16    furniture at a secondhand store that only takes cash.

17    Whatever.  We wanted to exclude that and focus on what Caridad

18    and what the records show is a pattern.  So it's a smaller

19    number.  That's the point of the 400 to $403 pattern.  We

20    wanted to focus on what Bob doing every two to three weeks,

21    taking it out and putting it somewhere, in a duffel bag, in his

22    house, wherever he lived at the time.  So that's the total when

23    you just focus on that more conservative pattern, $150,000.

24    And these are the records of just what's in that more

25    conservative pattern.  Right?  Excluding the highs and the
```

1    lows, it's a smaller number.  That's all.

2          Now, that's a pattern, period.  This is a pattern.

3    Year after year, month after month.  You can say you should

4    have picked a different dollar amount, but look.  Look what

5    he's doing.  It's always 400 or 403 in the parameters we've

6    chosen.  We didn't make up these records.  Nobody created these

7    documents.  This is a pattern.

8          The point of looking backwards is, I would submit,

9    your common sense tells you this pattern almost certainly

10   didn't start -- you can even see the first entry here is

11   January 10 of 2008.  That's the earliest record we have.

12   There's no way this pattern started on that day.  Look at it.

13   He's doing it every two weeks, every three weeks.  It must have

14   started earlier.

15         Have you seen evidence as to when it started, as to

16   exactly when he was doing this?  No.  Have you seen bank

17   records?  No, because they were destroyed.  But we wanted you

18   to get a sense if he started this pattern when he entered

19   Congress how much total cash would that be.  I am not telling

20   you that every dollar of that cash was found at 41 Jane.  The

21   purpose of this is -- they are throwing out very large numbers

22   of cash, so I want you to have a sense of what Bob was doing

23   with his own cash, because I actually think it is atypical.  It

24   does seem weird.  We tried to explain, to give context to it,

25   but the prosecutors are relying on that sort of sense of

1   oddness throughout.  Why is the cash here?  Who does those

2   withdrawals?  It's irrelevant.  It's a distraction.  Bribes,

3   they're relying on that.  So that's the purpose of doing this.

4          And then if you add up the backwards-looking -- I'm

5   sorry.  This is the backwards-looking assumption.  So assume

6   the pattern continued going back to when Bob joined Congress,

7   this is how much cash he would have withdrawn for the period

8   for which we don't have records.  So if you take the 127 and

9   you add it to the other withdrawals, that's the same number or

10  roughly the same number the prosecutors showed you.  And yes,

11  absolutely no one can tell you, no one from our side will come

12  and say that you know every dollar of that was in 41 Jane.

13  Probably not, but something else we had that financial analyst

14  testify to is that Bob actually didn't need to spend a dollar

15  of this cash he was hoarding.

16         The part of the bottom line of this exhibit in

17  evidence that the analyst put in was to show you that this

18  dollar amount, the bottom here, labeled net increase in his

19  Senate Federal Credit Union account from 2018 through '22 was

20  $167,000.  That is taking away the withdrawals.  This is the

21  real number.  This is how much his account went up, including

22  him taking cash out two to three times a month, the point being

23  that Bob can live his life and cover his expenses purely from

24  what he's getting from the Senate salary, that rental property

25  where Caridad lives, and you see here his pension and social

1    security, which, given his age, are very helpful.

2           So I cannot prove to you that every dollar he withdrew

3    in cash is still in 41 Jane.  I can prove to you that he could

4    live his life and save a lot of money even though he was

5    withdrawing cash every other week, every three weeks.

6           Another point about the cash in the house.  There was

7    definitely more total cash found in 41 Jane than Bob had

8    withdrawn over the years.  Even if you take the biggest number

9    that we showed you, using that sort of backward-looking

10   assumption, there is more cash found by the FBI in 41 Jane than

11   that number.  Full stop.  Nobody will dispute that.

12          Is that incriminating?  Does it support the proof of

13   the crimes with which Bob is charged?  I think it is only

14   incriminating if you accept what I would say are two leaps, two

15   factual leaps the prosecutors are making:

16          First, that all the cash in the house can only be

17   Bob's and not Nadine's.  Then it's, maybe, incriminating,

18   right?  Well, Bob has $200,000, Nadine has no cash in that

19   house.  So where did the other $90,000 that the prosecutor

20   repeated that must be a bribe.  If you accept that fact, it's

21   incriminating.  Don't accept that fact.

22          The second fact that I think you need to accept in

23   order to have that point be meaningful is that any dollar Bob

24   didn't withdraw from an ATM must be a bribe.  Any other dollar

25   in that house that Bob cannot account for -- this is the

1    suggestion -- implicit, or explicit in the prosecutor's

2    summation, any dollar that we cannot account for, the defense,

3    with a withdrawal must be evidence of a bribe.  That has also

4    not been proven.

5         There is zero direct evidence -- meaning somebody said

6    it to you, you saw it, you heard it -- of Bob ever discussing a

7    bribe.  None.  None.  There is zero evidence of him saying or

8    suggesting that he was doing something because of a bribe.

9    There are lots of arguments about sequence and timing, which

10   we're going to talk about, but there's no direct evidence of

11   that.

12        But let's just take on sort of those facts the

13   prosecutors would need you to accept to conclude there is some

14   importance to the fact that there's more cash in 41 Jane than

15   Bob had ever withdrawn.  The evidence in this case showed that

16   in addition to the ATM withdrawals, Nadine had cash at 41 Jane.

17   Bob did not live alone.  Bob actually didn't live in that house

18   for most of the years at issue here, and certainly not for the

19   prior decades.  It was Nadine's house, and Nadine did have cash

20   in that house.  And you also heard that Nadine lived her life

21   largely outside of the banking system.  Her family did too.

22   She wasn't using banks very much at all for decades.

23        Now, I don't think her and her family did that because

24   they were engaged in crimes.  There's no evidence of that.

25   That's because her family had that tradition for decades,

O79Wmen6                    Summation - Mr. Fee

1   because they, I would submit, like Bob's family, fled a country

2   where the banks, property they owned, the government that

3   regulated the financial systems one day went poof and

4   disappeared.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MR. FEE:  I would submit to you that is why their sort
2   of quirky behavior, to some people, about not using banks,
3   about having cash in your home, about relying on gold as an
4   investment.  Remember Vasken and Khorozian talking about that
5   that's a different way to live a financial life.
6        That's not how Bob lived with gold.  He lived it in
7   cash.  You are seeing different cultures and different styles
8   and different family traditions coming into play in this case.
9        And it's not suspicious.  It would not have been,
10  knowing what you know from this case from the evidence, it
11  would not have been unusual for Bob to see at least some of
12  Nadine's cash around the house.
13       So again, this is the event I talked about Bob helping
14  Nadine sell some gold coins.  He definitely knew she had gold
15  coins.  You heard people testify about Nadine's love of
16  jewelry.  I don't think you could have encountered her and not
17  realized she likely had nice jewelry and other nice stuff in
18  her house.  What else do we know about the cash at 41 Jane?  It
19  is old.  Much of the cash at 41 Jane is really old.  So, the
20  FBI and the prosecutors have shown you that there is just over
21  20 percent of the cash seized from that house that we're
22  calling it "new" here.  It means it was put into circulation on
23  or after January 1, 2018.  So that's 20 percent.  Everything
24  else in this evidence you don't have a tally.  You do know it's
25  older than 2018.  And I'm sure you don't want to see more

1    lawyers putting up photos of cash with like 2003, 2006, 1996.

2         Point being, there is a lot of cash here that is old.

3    And as you heard, a lot of that cash that is old gets taken out

4    of circulation.  Period.  And the government's witnesses told

5    you that, you heard from Catania and you heard from the woman

6    who worked at the place that prints money.  The 1996 bills,

7    they stopped printing those in 2001.  2001 bills stopped

8    printing in 2006.  2006 in 2013.  That means that when an old

9    bill from like 2006 passes through a bank, they take it.

10        So, I would reject the government's suggestion that

11    these older bills may have been part of alleged bribes in the

12    case.  Maybe some of them, but I don't think it is reasonable

13    based on the evidence to think you can go to a bank in 2018 and

14    pull out that many 1996 bills or 2003 bills.

15        And again, these are the inferences they want you to

16    adopt.  It is our job and it is appropriate for us to tell you

17    why those inferences are shaky.  This is not marginal.  This is

18    not a distraction.  This is how you build an inference.  This

19    is the job you would have to do to even consider the story that

20    they have told you.

21        So, where does that money in 41 Jane come from and

22    what does the evidence show about that money?  Again, zero

23    evidence about who, when, or how this money was provided.

24    There is some arguments based on dates of money and

25    fingerprints.  But no one has told you, Fred took a TD Bank

1    envelope and put it in the house.  No one has told you, Will

2    Hana took that cash on this date and gave it to Nadine.  No one

3    has told you that.  There are no text message showing that.

4           It is fair for you to consider the quality of the

5    evidence backing up these inferences.  And I don't think

6    they've proven to you the basic important facts for you to be

7    able to conclude who gave this money, when they gave it, why

8    they gave it.

9           And so just to focus on one part of the house, Bob's

10   office.  The cash is totally explained by his ATM withdrawals.

11   So, you see in the bottom right, this is one of those FBI

12   photos where they lay out the money, and they told you that.

13   Obviously that's not how they found it.  They found it in

14   duffles.  But it does, I think, show you that the way Bob kept

15   this cash appears different than the cash in the rest of the

16   house.  You see these little torn Post-its, some rubber bands,

17   not in TD Bank envelopes, kept in that duffle.  That's one.

18          And if you just look at some of the math that folks in

19   this case did.  So bar 1 again is all the actual withdrawals

20   from Bob's Senate account.  Bar 2 is the withdrawals in that

21   more conservative pattern, a lower number.  Bar 3 is all the

22   cash the FBI found in that office.

23          So, that's where Bob has been keeping I would say the

24   cash that he's been taking out of his savings account and

25   essentially hoarding in his duffle bags.  And again, this is

1    not like all of his life savings being kept in the duffle bag.

2    He had bank accounts, he had savings, he had other funds.  He

3    was doing this for reasons you have heard.

4            Let's go back to slide 29 briefly.  This is the duffle

5    bags.  And then if we go to the closet.  So this is some of the

6    cash that was found in Nadine's closet.  And again, it's just

7    packaged differently.  I don't think you've heard any evidence

8    to suggest you can draw any firm conclusions, but it does seem

9    that Nadine was keeping this cash differently than Bob's.  And

10   then the next slide is from the safe deposit box.  And this,

11   again, resembles some of the cash in Nadine's closet.  It's

12   packaged in envelopes.

13           Again, I think you can conclude reasonably Nadine put

14   that cash in the safe deposit box at some point.  You can

15   conclude Bob put that cash in the duffle bags.  You can

16   conclude, based on the evidence, that Nadine put that cash in

17   the safe in her closet.  The evidence does not allow you to

18   conclude how that cash got there, other than Bob's.  You have

19   arguments.  You do not have to accept the argument.  Especially

20   when you can't trust the credibility of the evidence underlying

21   the argument.

22           And then we have the room with some chaos in it, the

23   storage room.  You have the Forever 21 bag in the top left and

24   that's above the coats.  Two men's coats, one with Bob's name

25   on it, one without.  You see Bob's boots on the right side.

1  There is a lot of cash stuffed in a variety of places in the

2  basement.  Let's just look at the cash in the jackets.

3          Now, the prosecutor, of course, no surprise, told you

4  that the cash in this jacket was a bribe.  That has not been

5  proven.  Let's just deal with this cash must be Bob's.

6          Now, if you look at that cash, it is one of those TD

7  Bank envelopes with 10,000 written on it.  And it's put in

8  Bob's jacket.

9          You probably know by now, if you look at the cash

10  taken from Nadine's safe deposit box, it is packaged the same

11  way.  10,000 in an envelope.  Remember this search is in June.

12  I think this evidence suggests that Nadine, from wherever she

13  got this cash, because no one has proven to you it is a bribe,

14  put this in the jacket.  Do I know that beyond any shadow of a

15  doubt?  No.  And Bob may have seen this in his jacket.

16  100 percent.  It would not have been odd for him to see Nadine

17  have cash in that house.  Is would not have been odd.

18          Last point I will make.  And listen, these are

19  inferences.  The inference the government is arguing that you

20  knew this was a bribe is because it was in Bob's jacket.  The

21  prosecutor said that.  The prosecutor then mocked the other

22  argument about the cash being in the Forever 21 bag.  That just

23  because it's in a bag, doesn't mean it's Nadine's.  It's still

24  Bob's.

25          This is the opposite, right.  This is cash in Bob's

1    jacket.  The government wants you to be sure that's Bob's.

2    They also want you to be sure that the cash in the Forever 21

3    bag is not Nadine's.  Do you know either beyond a reasonable

4    doubt?  Genuinely, you might have a hunch.  This is Bob's

5    jacket; must be his cash.  I hear you, I accept that.

6          But this is not every day life where you have to make

7    quick judgment calls about what to believe and what not to

8    believe.  You have a very specific job here.  Have you seen

9    proof beyond a reasonable doubt that Bob had this money in this

10   jacket as a bribe?  You've heard argument.  Have you seen

11   proof?

12         What does the proof show us?  It's in his jacket, it

13   is marked like the things in her safe deposit box.  Beyond that

14   it is guesswork.  It is.

15         Now, the prosecutor did spend a lot of time talking

16   about the prints and DNA found on some of the envelopes, not

17   the cash, the envelopes in 41 Jane.  And you know, there was a

18   lot of sort of odd things about that.  It seems to have limited

19   value.  Like Nadine doesn't have any fingerprints in her own

20   house.  The agent has as many fingerprints as Bob in that

21   house.  There is a lot of data thrown at you.

22         I think this is the bottom line.  I don't think this

23   is a case where the DNA or the prints tell you much of

24   anything.  I know the prosecutors like to leave the suggestion

25   that there is some scientific certainty to this.  Right.  Like

1    there is a fingerprint from Daibes on tape, it's a bribe.

2    Those dots have not been connected.  The backward dots from

3    that cash to a bribe to being delivered.  It is overstating

4    what this is showing to you.  And you heard it, you heard it.

5    DNA -- excuse me.  The prints can't tell you when it was

6    applied, how it was applied, what was in the envelope, when the

7    print -- when it was touched by the person.  None of that can

8    be told.  It is an association, nothing more.

9            So I don't think there is any sort of scientific

10   evidence that shows Bob's guilt here.  I think, again, there is

11   an absence of scientific evidence supporting those charges.

12           The government, just to take on that envelope that

13   they like, and it is the one that they spend the most time on,

14   the envelope in room C.  That's the closet with a print from

15   Daibes and a print from Bob and there was cash in there.  That

16   is the lynchpin of this case.

17           We have to look backwards to see what did Bob do?  Did

18   he take an act that was official in exchange for a bribe?

19   That's all work to be done.  But just focusing on this.  There

20   is no proof, and there is no government theory about the proof,

21   that actually says Daibes handed this TD Bank envelope to Bob

22   and that it contained a bribe.

23           They're saying that must be what is shown by the

24   prints.  But you haven't heard a witness, you haven't seen

25   evidence to say that happened.  It's purely inference from the

1    prints.

2         Bob lived in that house.  Fred Daibes was his friend

3    for 30 years.  Fred Daibes was Nadine's friend independent of

4    Bob.  And you heard everyone in this courtroom tell you how

5    generous the man was.

6         Again, it is not the salacious story or the salacious

7    inference, but I do think the most reasonable conclusion from

8    what you actually know here is that, at some point, they both

9    touched this envelope.  It might have had money in it.  The

10   government has not proven to you what it means beyond arguing

11   it is a bribe.

12        Also, on this point, again, this is the evidence that

13   we have to engage on.  Right.  The prosecutor in his final sort

14   of stanza called Bob entitled, said that Bob blamed his

15   daughter-in-law, and then said Bob was basically throwing his

16   wife under the bus.

17        Guys, Bob doesn't want to be here seeing his texts to

18   his girlfriend in open court.  He doesn't want to be here doing

19   this.  The government's theory, the prosecutors' theory, they

20   said it, Nadine was the go-between for Bob in a bribery scheme.

21   It is 100 percent relevant to question that, to question does

22   that hold up.  Were Bob and Nadine dating during the time

23   period of the alleged conspiracy?  Is there any proof showing

24   that Nadine kept her financial problems from Bob?  Is there a

25   reason she was doing that?  The answer to those questions is

O793MEN7                        Summation - Mr. Fee

 1    yes.  It is highly relevant because of the prosecutors'

 2    allegations.  Don't let them bring an allegation and ask you to

 3    adopt a story and then say how dare, how dare the defendant

 4    offer evidence that disproves our theory.

 5            Nadine's not guilty of a bribery scheme.  But Nadine's

 6    not on trial here.  We have to meet the government's evidence,

 7    and we are.

 8            Let's look at the evidence that Nadine was asking for

 9    money from other people except Bob.  And then we're going to

10    put this in context and explain why she was doing this.

11            This is August 2018.  Again, this is like eight months

12    into the government's alleged conspiracy.  She's asking her

13    abusive ex-boyfriend Doug Anton to get him to pay something,

14    and she tells him that her TD account has only $11 left in it.

15    She's also complaining about Will and her credit score.

16            In the tens of thousands of messages you have in this

17    case that involve Bob in some way, you have not seen one where

18    Nadine says something like this.  Not one.

19            Now, the prosecutors want you to ignore that because

20    it is not helpful to the story.  Remember, the prosecutors'

21    story is Bob controls Nadine.  Controls.  That is nonsense

22    based on this evidence.  But let's just look at what's in front

23    of us here.  They have to ignore this because Nadine says this

24    stuff to Doug Anton.

25            Look, June 2019, she's telling Uribe that she has to

1    go to a bank and send an electronic wire to put the house back

2    in normal status.  She's talking about her house almost being

3    in foreclosure.  She's never said that to Bob.  Never once.

4            Here is a voicemail to Fred Daibes in June of 2019.

5    She says I haven't told Bob yet about the mortgage.  She had

6    been counting on money Will's going to give and he hasn't given

7    me anything yet.

8            Fred is her friend.  There are hundreds of messages

9    where they independently have a relationship.  Fred is a nice

10   and generous guy.  He's not going to tell Bob if she doesn't

11   want him to.  That's between Nadine and Fred.  That's why he

12   doesn't get a text about this.

13           The evidence you've seen just in this case strongly

14   supports the inference that Fred Daibes, because he was so

15   generous, was giving Nadine stuff, probably gold, because it's

16   Fred and he loves that stuff, and cash as a means of helping

17   her through these lean times.  She had a tough divorce, she was

18   getting out of a horrible situation with Doug Anton, and you've

19   seen evidence about that and she was reaching out for help to

20   others.

21           It also shows that Nadine is comfortable asking people

22   other than Bob for help financially.  There is nothing like

23   this with Bob.

24           I'm sorry.  So that was the last slide.  This is a

25   different point.  So you did hear from the prosecutors that

1    sometimes Nadine is telling others that she is going to talk to

2    Bob either about the mortgage or the car.  You never, ever see

3    Nadine actually talking to Bob about those things.  The point

4    here is that you can understand why.

5            There are times when Nadine invokes Bob's name to get

6    people to do stuff.  Period.  Jose Uribe in September, thank

7    you for everything you do for me.  I'm praying today's meeting

8    is in God's hand.  He is talking about that Grewal meeting.

9    Remember, Nadine helped him get in front of Bob, which we'll

10   talk about.  Nadine tells Uribe I didn't sleep one hour.  He,

11   meaning Bob, hasn't been sleeping well at all for a week.

12           Now, the suggestion here is that Bob is losing sleep

13   over Jose Uribe's predicament.  Has anything in this case

14   suggested to you that was true, that Bob was so worried about

15   Jose Uribe he lost sleep for a week?

16           Bob made one phone call about a case that had been

17   presented to him as an abusive prosecution.  That's what Mike

18   Critchley, like the best lawyer in New Jersey, told him.  He

19   made one phone call.  This is not true.

20           Then she says, it's actually earlier that year, she's

21   talking about her mortgage, and then she says to Jose, you are

22   one in a billion.  Our friend said so tonight.  He is right.

23   Good night.

24           Again, I don't think there is anything to suggest that

25   Bob Menendez ever described Uribe as one in a million or knew

1    him well enough to say that.

2            She's doing this to ingratiate herself to others, just

3    like everyone does sometimes one on one.  You saw other texts

4    where she's referring to our friend, when she is talking to

5    Hana and Daibe.  Of course the government said this shows you

6    it is a conspiracy because they are being secretive.  They're

7    not using Bob's name.  They are just saying our friend.  It's

8    just the same.  She's using it to say, Fred, I'm closer to you.

9    Will, I'm closer to you, we have a mutual friend.  She's

10   obviously using Bob's name all the time.

11           By the way, that last voicemail you saw to Fred, where

12   she's actually telling Fred or suggesting to Fred that Fred

13   help her get Will to give her money.  Now, you remember one of

14   the e-mails the prosecutor showed you where he showed Bob

15   telling Nadine, hey, don't text or e-mail.  I won't make you

16   look at it again.

17           What's going on when Bob says, hey, Nadine, don't text

18   or e-mail Fred.  The prosecutor says of course it's secretive.

19   He doesn't want to put things in writing.  I would submit to

20   you that if you don't want to put things in writing, writing

21   don't text or e-mail is not consistent with that objective.  So

22   I will put that aside.

23           What is going on is Bob is telling her not to bother

24   Fred about her issues with Will.  Nadine and Will fought

25   constantly about money, about everything else.  They were like

1    brother and sister is how the witnesses have described them.

2    That's what that text means.

3         All right.  Now let's focus on the cash in the house

4    that was circulated after 2018.  Now, we know beyond any doubt

5    that if you add up all of the post-January 2018 cash Bob

6    withdrew, and then you take away that Forever 21 bag, that's

7    actually every dollar of post-2018 cash in 41 Jane.

8         Let me just say that again.  If you just take what Bob

9    was taking out of his savings in cash and keeping after 2018,

10   it accounts for every dollar of new cash in 41 Jane, other than

11   what's in that Forever 21 bag.

12        So that's what this chart reflects.  So again, just

13   focusing on 2018 to 2022 the total withdrawals is the first

14   bar, 57K.  Middle bar is the total cash, the new cash found in

15   the office and the basement, taking away what's in the Forever

16   21 bag.  Because, say whatever you want about it, I acknowledge

17   you can move things between bags.  That cash is very different

18   than Bob's cash.  We'll talk more about that.

19        And then the last number is just the cash that was

20   found in the office.

21        So the point being the first number, what Bob was

22   withdrawing from his own savings actually covers all of the new

23   cash, just minus the Forever 21 bag.

24        And folks, it is a boring bar graph.  This is actually

25   the whole government's case.  This is it.  If Nadine just gets

 1    the portion of cash that's in that Forever 21 bag from some

 2    other source -- not illegitimate -- from some other source.

 3    She sells some of those gold sovereigns.  She sells one of

 4    those diamond solitaires on that list that Katia mentioned.

 5    She trades something and then sells it.  Whatever.  So long as

 6    Nadine can get some cash that makes up the amount in the

 7    Forever 21 bag, which is packaged totally different than all

 8    the other cash in the house, especially differently than Bob's,

 9    then every other dollar of post-2018, post-January 2018 cash,

10    is explained just by Bob's withdrawals, documented in black and

11    white from his Senate savings.  Every dollar.

12             That's how this case can shift when you don't have

13    reliable proof about where this cash came from or why it was

14    given or when it was given, how it was given.  You just have

15    that little tweak.  Forever 21 packaged differently, and I'll

16    show you, take that away, every dollar explained by documented

17    bank withdrawals.  That's it.  That's the government's case.

18    That's the lifetime of their conspiracy.

19             You change one piece of the story, and they have truly

20    nothing.  Nothing.  They'll have to have a backup story like,

21    oh, well, all the older cash is actually the bribes, because,

22    like, Fred Daibes is over 50.  Whatever.  They'll have a backup

23    story.

24             But that's what this case is.  So any instinct to buy

25    that story, and I understand there is a human instinct to buy

1    the prosecutors' story, it is a story.  It has a beginning, a

2    middle, and an end.  You have to do your duty to uphold your

3    oath, to look at the evidence.  Because you change one piece,

4    one piece of the story, and it's gone.  It's gone.  There is no

5    bribe.  This means there is not a dollar of possible bribes.

6    This alone.

7            Let's look at that Forever 21 cash.  So, once again,

8    the prosecutors, they don't have any details.  They mocked the

9    suggestion -- which no one made -- that this is Sabine's cash.

10   The proof shows only that there was a purchase or purchases

11   made from Forever 21 from a joint account held by Sabine and

12   Nadine.  That's a strawman that the government wants to use to

13   provoke you, to say Bob's blaming his daughter-in-law.  It's a

14   play on emotion and it should be rejected as a basis for

15   finding any part of that story credible.  That was the

16   suggestion in the summation.  Put that aside.

17           But that is the only evidence in the case.  You can

18   build inferences on guesses or you can build it in the evidence

19   you have in this trial.  It is not always easy to cut through

20   arguments to understand what is the evidence.  But the evidence

21   in this case is that the only person to have ever gone to

22   Forever 21 is Nadine using that account with her daughter.

23           And by the way, the arguments about this money are

24   filling in the absence of evidence with a story.  And when the

25   prosecutors fill in those gaps with a story of guilt, they're

1    doing something that I would submit to you is improper for you

2    to do.

3         The absence of evidence should be held against the

4    prosecution.  You get what I mean?  It is their burden and they

5    are exploiting the gaps in the case they have presented to you

6    and filling it in with incriminating inferences.

7         Folks, it's ridiculous to suggest that this is

8    Nadine's money or to suggest it's Sabine's money.  How

9    ridiculous.  It's Bob's money.

10        Is that more or less ridiculous?  Do you have the

11   proof about whose money this is?  Look, look at the money.

12   Look how it's wrapped.  Nothing like the stuff you know is

13   Bob's in those duffle bag.  Look at those wrappers.  Is there

14   anything in the record that tells you anything about those

15   wrappers?  I don't know if you remember zooming in on those

16   stamps.  It says Chase Bank.  Is there anything in the record

17   about anybody having a Chase Bank account?  Does Bob have a

18   Chase checking account?  Nope.  No, he doesn't.  Nadine has a

19   Chase checking account, but she didn't have this much in it.

20        What do you know about this money?  What do you know?

21   You know what they want you to conclude about the money, but

22   what do you know?

23        It's not easy.  It's not normal to think about stories

24   in this fashion.  This is our system, okay.  This is how it

25   works.  Don't do the easy thing.  You are not hearing two

1    stories on the street and saying, eh, I'll go with A, not B.

2    That is not your job.  They are filling in the absence of

3    evidence with incriminating evidence.

4            That's 4:40, I got worried I'm 40 minutes over.

5            Point is, I assure you if the government had any idea,

6    had any proof that could supply a theory about how this money

7    got there, you would have heard it.  Daibes, Hana, Bob,

8    anybody, you would have heard it.  I promise you.  You have

9    heard nothing.  Again, the gaps you are being asked to fill are

10   not based on evidence.  Don't fall into the trap of buying a

11   story.  A forceful, well-told, long, long story.  Resist that.

12   I submit it would not be consistent with your job.

13           The evidence here, if you had to draw an inference

14   about whose money this is, here's what I would ask you.  Does

15   this look like the stuff Bob was withdrawing and keeping in his

16   office?  No.  Does Bob have a Chase account?  No.  Does Bob

17   shop at Forever 21?  Probably no.  That's the evidence.  I

18   don't think you can conclude anything beyond a reasonable

19   doubt.

20           But if you had to infer something from the evidence in

21   this record, you would infer this is Nadine's money.  Again,

22   just that, just that, and the government's whole, whole package

23   of inferences and assumptions disappears.  That's what this

24   case is.  That's how slim, how thin the evidence you have seen

25   is.  The evidence of guilt.

1           Could Nadine have gotten a check for selling some gold

2    solitaires or a diamond -- sorry.  Gold sovereigns or a diamond

3    solitaire and cashed it and put it in that bag?  Sure.  Would

4    that be a bribe?  No.  Does the evidence support that

5    inference?  Absolutely.

6           Could Nadine have gotten a cashier's check from

7    somebody for selling something, some of all that amazing stuff

8    Katia told you she inherited, and when Nadine fell on lean

9    times and needed to support herself, sold that stuff.  Is that

10   this money?  You could infer that from the evidence in this

11   case, and that be would not be a bribe.

12          There are many choices you could pick off the shelf

13   here.  The government wants you to take one and they want you

14   to ignore every little thing that is inconsistent with that

15   story.  Do not do that.

16          Okay.  Let's move away from the cash.  Your Honor, I

17   won't conclude today unfortunately, but I'll do another 15

18   minutes, if that's okay.

19          THE COURT:  Go ahead.

20          MR. FEE:  You tell me.

21          THE COURT:  Did you just say you will conclude or you

22   won't conclude?

23          MR. FEE:  Important question.  I will not conclude.

24          THE COURT:  All right.  Go to 5 o'clock, sir.

25          MR. FEE:  Thank you, your Honor.

```
 1                THE COURT:  We'll pick it up tomorrow.

 2                MR. FEE:  Great.

 3                Let's talk about the acts.  Let's not talk about money

 4     for a little bit.  The acts Bob is alleged to have taken in

 5     this case.

 6                Now, here's what I'm going to explain to you.  I

 7     submit that the evidence makes it overwhelmingly clear that

 8     everything Bob did that is the subject of these allegations was

 9     absolutely the right thing for a senator to do.  More

10     importantly, I submit to you the evidence makes clear that

11     nothing that he did was done because of a bribe.  He did not

12     take one single action due to any sort of a bribe, and you

13     haven't seen evidence, reliable evidence, of that.

14                So, let's first look, before we dive into the evidence

15     about Bob's actions, at what the government's witnesses, the

16     human beings who have told you things that they saw and heard

17     and remembered told you about Bob's conduct.

18                This is not something you can do in every case.  You

19     can take the government's witnesses in this case and you can

20     look to them to disprove the government's theories.  That is

21     why you heard so little in that summation about witnesses.  You

22     heard like a sentence characterizing what somebody told you or

23     maybe a snippet, a paragraph here or there.  The government's

24     witnesses disprove their case.

25                This is Phil Sellinger.  I never believed him, Bob, to
```

1    be asking me to do anything unethical or improper.  Never

2    anything unethical or improper.  Pretty definitive.

3            He was the man that the government told you was the

4    target of the scheme to get Fred Daibes' federal case

5    dismissed.  But Sellinger told you he didn't think Bob asked

6    him to do anything improper.  Nothing unethical.  And I'll

7    submit that means nothing illegal.

8            All right.  Another government star witness.  Gurbir

9    Grewal, the former Attorney General of New Jersey.  He didn't

10   tell you he wants the case dismissed, the prosecutor asked him.

11   Excuse me.  This is on cross, but this is the government's

12   witness.  He did not say that.  He didn't ask you to call the

13   prosecutors on any particular case.  He did not ask me to call

14   anybody.

15           Folks, in the summation do you remember the prosecutor

16   said about 10 times that Bob called Grewal to talk about

17   Parra's case.  Again, he's building in an argument into those

18   sorts of statements.  Right?  Because Gurbir Grewal, the human

19   being, told you I had no idea which case.  I didn't know which

20   case.  Gurbir Grewal, you heard them elicit he was worried

21   about insulating his team.  There is no team to insulate.  He

22   had no idea which case Bob had called about.  Grewal remembered

23   that Bob had raised a concern about a selective prosecution, a

24   racially motivated prosecution.  That is a serious allegation,

25   and that's why Bob called the attorney general.

1          Grewal says he has told the FBI that Bob raised

2   concerns from constituents about how they were being treated.

3   Again, Menendez didn't ask him to call any prosecutors, he

4   didn't name a case, he didn't ask him to do anything.  Nothing

5   improper, nothing unethical, nothing illegal.  Government

6   witness.

7          Ted McKinney.  This is the man who is supposed to be

8   the object of the scheme, I don't know how, to somehow get

9   Egypt to continue giving a monopoly that they decide who gets.

10  That's something of the theory.

11         McKinney said that he understood Bob to be advocating

12  for his constituents.  What else did McKinney say?  After the

13  call, what did you do?  Did you change your position on IS EG

14  Halal?  No.  Did you direct anyone in Cairo to withdraw the

15  objections to IS EG Halal?  Nope.  Didn't do that.

16         What did he say next.  During did the call, did Bob

17  make any threats?  No.  No threats.  Was he going to stop

18  passing USDA nominees?  No.  Was he going to haul you before

19  Congress?  Was he going to subpoena you?  No.  No.  No.

20         McKinney told you that even he believed Menendez was

21  just raising another constituent concern in that

22  two-to-four-minute phone call.  And that didn't change a thing.

23  In fact, the USDA, you heard, continued to push all that

24  hormone meat on the Egyptians and to push to get rid of IS EG.

25         Nothing unethical.  Nothing improper.  Nothing

1    illegal, according to Ted McKinney.  All right.

2            So this is the man that the government is now both

3    abandoning and not abandoning.  We're going to talk more about

4    this, but remember the summation.  You can disregard everything

5    Uribe said.  I didn't even talk about him for two hours.  But

6    you should also credit everything he said because it's

7    devastating.

8            That's what you now have from the government on Jose

9    Uribe.  That's the game that's being played right here.  Don't

10   believe him, guilty.  Believe him, double guilty.  That's the

11   core of the government's argument.

12           What did this guy say?  Right.  Nadine never told you

13   that she told the senator you were helping her get the car.

14   Never told me that.  Nadine never told you or you, Mr. Uribe,

15   did not tell Senator Menendez that Nadine was getting a car

16   from you.  Nope.  I never spoke about the car payment.  Never.

17   You never mentioned the car to Bob.  Nope.  We did not talk

18   about a car at all.

19           You know, this is supposed to be the strongest

20   evidence Jose Uribe has.  Put aside the bell, and the culito

21   story for a moment.  This is like maximum Uribe.  Right.

22   Talking about the scheme.  Uribe himself cannot tell you that

23   Bob said one word about a bribe.  One word.  Uribe never talked

24   to Bob about a car, about the bribery scheme, about mortgage

25   payments, about this deal that Uribe said he had with Bob.  He,

1    he himself, tells you he never talked to Bob about it.  The

2    government witness is telling you that Bob did not have this

3    information.

4            Remember and then they asked him, well, but, hey, hey,

5    hey, hey, Mr. Uribe, don't you think he knew?  And he said yes.

6            That's not -- that is not evidence.  That is not

7    evidence.  That actually highlights the absence of evidence,

8    that they had to get him to offer, like, an opinion that Bob

9    must have known.  Uribe was face to face with a man he's

10   accusing of having bribed, and he told you he never mentioned

11   the scheme.  I don't mean he didn't mention the word "bribe."

12   He didn't mention the word bribe.  He didn't even talk about

13   the arrangement.  He didn't use a code word.  He didn't subtly

14   suggest anything.  He has a story about Bob saying I saved your

15   ass.  But even on that story, Jose Uribe doesn't say he saved

16   my ass from getting prosecuted.  Or hey, Bob, hey, Jose, thanks

17   for getting a car for my wife, that's why I saved your ass.

18           Even Uribe, in that supposedly devastating story, has

19   literally nothing to say about a bribe, a scheme, a car.  I

20   think he saved his ass from getting pulled over from driving

21   drunk that night.  We'll talk more about that.  Okay.

22           Let's put up the witnesses who talked about this Qatar

23   scheme.

24           There are no witnesses.  These are documents.  This is

25   what you have as proof beyond a reasonable doubt about Qatar.

O793MEN7

1    About this extensive overwhelming evidence you have been -- it

2    has been described to you as overwhelming, this, I don't know,

3    slide deck about Qatar.  That's what you had in this case about

4    this part of the scheme.

5            These documents, we don't have to go through them now,

6    they disprove whatever the government theory is about Qatar.

7    Everybody you have heard about this case, The New York Times,

8    CBS News, Senator Chris Murphy, Representative Gregory Meeks,

9    everybody is thanking Qatar for stopping a famine in Yemen.

10   Everybody's also thanking Qatar for saving people who are

11   evacuating Afghanistan.

12           There is no proof, truly none, certainly no human

13   beings, but there is no documents showing that Bob did anything

14   related to Qatar because of a bribe.

15           I'll show you.  But let's start with Uribe.  Actually,

16   let's stop.  And then we'll get to Uribe tomorrow.

17           THE COURT:  Fine.  Ladies and gentlemen, you've had a

18   full day of summation.  Remember none of that was testimony.

19   But it's all things you should listen to.

20           If you are here at 9:30 tomorrow, we'll be here at

21   9:30.  I don't believe there will be any other issues I need to

22   handle with the lawyers.  So please be here at 9:30.  See you

23   tomorrow.

24           (Jury excused)

25           THE COURT:  You may be seated in the courtroom.

O793MEN7

1    Mr. Fee, where do you stand?  You had estimated three hours.

2    It's three hours.  You did indicate you may go over a bit.

3    Where do you stand?

4              MR. FEE:  If flew by for me, your Honor.  I think I

5    have about another 90 minutes to two hours.  I'm sorry for

6    underestimating.

7              THE COURT:  All right.  Between Mr. Hana's attorneys

8    and Mr. Daibes' attorneys, who is going first?

9              MR. LUSTBERG:  I will.

10             THE COURT:  Mr. Lustberg, how long, sir, about?

11             MR. LUSTBERG:  Two-and-a-half hours, Judge.

12             THE COURT:  Mr. De Castro?

13             MR. DE CASTRO:  Hour, maybe an hour and 15 minutes.

14             THE COURT:  I'll see everyone tomorrow at 9:30.  Thank

15   you.

16             (Adjourned until July 10, 2024, at 9:30 a.m.)

17

18

19

20

21

22

23

24

25