UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                      :

UNITED STATES OF AMERICA           :

                                      :

           *-v.-*                          :       S4 23 Cr. 490 (SHS)

                                      :

ROBERT MENENDEZ,               :
WAEL HANA,                          :
    a/k/a "Will Hana," and        :
FRED DAIBES,                     :

                                        :

                       Defendants.      :

                                        :
------------------------------------------------------------x

## **MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANTS' POST-TRIAL MOTIONS**

 

                                  DAMIAN WILLIAMS
                                  United States Attorney

Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Catherine Ghosh
Assistant United States Attorneys

Christina A. Clark
Special Assistant United States Attorney

- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 1

I.    THE EVIDENCE WAS SUFFICIENT TO SUSTAIN THE CONVICTIONS OF EACH
      OF THE DEFENDANTS ................................................................................ 1

      A.    Applicable Law ............................................................................... 1

            1.    Sufficiency of the Evidence ................................................... 1

            2.    McDonnell and the "Official Act" Requirement ....................... 4

            3.    Obstruction of Justice ........................................................... 10

      B.    Discussion ..................................................................................... 11

            1.    The Evidence Proved a Corrupt Quid Pro Quo Related to Egypt............ 11

                  a)    The Evidence Established Official Acts ......................... 11

                  b)    The Evidence Established a Corrupt *Quid Pro Quo* ..................... 15

            2.    The Evidence Proved a Corrupt Quid Pro Quo Related to the New Jersey
                  State Criminal Matters ................................................................ 25

                  a)    The Evidence Established Official Acts ......................... 25

                  b)    The Evidence Established a Corrupt *Quid Pro Quo* ..................... 29

            3.    The Evidence Proved a Corrupt Quid Pro Quo Related to Daibes's Federal
                  Prosecution and Attempts to Solicit a Qatari Investment ........................ 35

                  a)    The Evidence Established Official Acts ......................... 35

                  b)    The Evidence Established a Corrupt *Quid Pro Quo* ..................... 37

            4.    The Evidence Proved That Count One and Count Two Were Each Single
                  Conspiracies .............................................................................. 42

            5.    The Evidence Proved a Scheme for Menendez to Act as an Agent of Egypt
                  ................................................................................................. 48

            6.    The Evidence Proved Corrupt Endeavors to Obstruct Justice ................. 58

                  a)    The Evidence Established Menendez Agreed to and Did Endeavor
                        to Obstruct the Southern District of New York's Grand Jury
                        Investigation................................................................. 58

                  b)    The Evidence Established Menendez Participated in a Conspiracy
                        to Obstruct the Daibes Federal Prosecution.................... 64

            7.    The Evidence Proved Venue was Proper in this District......................... 68

                  a)    Counts Related to Egypt ............................................. 68

b)      Counts Related to the New Jersey Attorney General's Office ..... 73

c)      Counts Related to Daibes's Federal Prosecution and Qatar ......... 75

d)      Substantial Contacts .................................................................. 77

II.    NONE OF THE DEFENDANTS IS ENTITLED TO A NEW TRIAL ........................... 78

A.    Applicable Law ................................................................................... 78

B.    Discussion ........................................................................................... 79

1.    Menendez's Speech or Debate Claims Do Not Entitle Him to a New Trial ................................................................................... 79

a)      Menendez Overstates the Scope and Effect of the Speech or Debate Clause ................................................................ 82

(1)    The Scope of the Speech or Debate Clause ..................... 83

(2)    Whether an Asserted Legislative Act is Categorically Immune, Without More ................................... 84

(3)    Whether Evidence of an Asserted Legislative Act May be Redacted or the Non-Legislative Portions Introduced ...... 89

b)      The Evidence Did Not Violate the Speech or Debate Clause ....... 90

(1)    Menendez's Text Message to Nadine Menendez Directing Her to Tell Wael Hana That Menendez Will Sign Off on an Arms Sale ............................................................ 91

(2)    Menendez's Position on the Senate Foreign Relations Committee ........................................................ 93

(3)    Menendez's Position and Strategy Concerning Egypt ...... 94

(4)    Menendez's Official Meetings with Egyptian Officials ... 97

(5)    Menendez's Meetings and Communications with Philip Sellinger and Michael Soliman ........................................ 99

(6)    Senate Resolution 390 ................................................... 102

(7)    Senate Bill 1102 (The Eastern Mediterranean Security and Energy Partnership Act of 2019) ..................................... 104

2.    The Government's Presentation of Documentary Evidence Was Proper 105

a)      The Government's Summary Charts Were Admissible .............. 105

(1)    Applicable Law on Admission of Summary Charts ....... 106

(2)    The Government's Summary Charts Adhered to Well-Established Law ............................................................ 110

(3)    Hana's Objection to the Jury Instructions on Summary Charts is Barred and Meritless ........................................ 113

b)    The Mode of the Government's Presentation of Documentary Evidence to the Jury was Appropriate ........................................ 114

     (1)   The Court Properly Allowed Government Witnesses to Read Relevant Evidence to the Jury .............................. 115

     (2)   Hana's Factual Arguments Provide No Ground for a New Trial.................................................................................. 118

c)    The Defendants Had a Full Opportunity to Cross-Examine and Present Responsive Evidence ..................................................... 120

     (1)   Hana Was Not Entitled to Introduce His Defense Case Through Cross-Examination Beyond the Scope of the Witnesses' Testimony..................................................... 121

     (2)   The Government Was Not Required to Call Different Witnesses to Expand the Scope of Cross-Examination .. 124

d)    Any Alleged Error Would Have Been Harmless....................... 127

3.   The Court Properly Excluded Evidence of Specific Instances of Good Acts Under Rule 404(b) and Rule 405 .......................................... 130

a)    Rules 404 and 405 Prevent the Introduction of Evidence of Specific Instances of Conduct to Prove a Character Trait Other Than an Essential Element......................................................... 130

b)    Hana Was Not Precluded from Presenting any Relevant, Admissible Evidence .............................................................. 132

c)    Daibes Was Properly Precluded from Offering Evidence of Specific Instances of Gift-Giving ............................................. 135

4.   There Was No Variance, Retroactive Misjoinder, or Need for a Special Verdict Form ........................................................................ 139

III.   COUNTS ONE AND FIFTEEN ARE NOT MULTIPLICITOUS ................................ 144

   A.    Applicable Law.................................................................................. 144

   B.    Discussion ......................................................................................... 145

CONCLUSION.......................................................................................................... 149

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendants' post-trial motions. (*See* Dkts. 590, 592, 600.)[1] Because the evidence at the nine-week trial overwhelmingly proved each count, the defendants identify no cogent basis for a new trial, and Counts One and Fifteen are not multiplicitous, the motions should all be denied.

## ARGUMENT

## I.    THE EVIDENCE WAS SUFFICIENT TO SUSTAIN THE CONVICTIONS OF EACH OF THE DEFENDANTS

The evidence at the nine-week trial—which included extensive documentary evidence from numerous independent sources, testimony from many lay witnesses, and detailed cooperator testimony—was not merely sufficient to prove every count.  It was overwhelming.

### A.    Applicable Law

#### 1.    *Sufficiency of the Evidence*

"To prevail on an insufficiency of the evidence claim under Rule 29, a defendant bears the heavy burden of showing that no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt." *United States v. Mensah*, 515 F. App'x 59, 61 (2d Cir. 2013) (internal quotation marks omitted)); *see also, e.g., United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (noting the defendant's "heavy burden" in a Rule 29 motion (internal quotation marks omitted)); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (a jury's verdict must be upheld if "*any*

---

[1] Citations to "Dkt." refer to docket entries in this case.  Citations to "Menendez Mem." refer to the memorandum of law filed in support of Robert Menendez's motions, Dkt. 592.  Citations to "Hana Mem." refer to the memorandum of law filed in support of Wael Hana's motions, Dkt. 600.  Citations to "Daibes Mem." refer to the memorandum of law filed in support of Fred Daibes's motions, Dkt. 590.  Citations to "Ex." refer to exhibits to this memorandum of law, submitted herewith.  Citations to "Tr." refer to the trial transcript.  Citations to "GX" refer to Government exhibits at trial.  Citations to "DX" refer to defense exhibits at trial.

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original)).  In other words, "'[a] judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (internal quotation marks omitted).

When evaluating a Rule 29 motion, the Court must "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted); *see also, e.g.*, *Jackson*, 443 U.S. at 319 (the Court must "view[] the evidence in the light most favorable to the prosecution").  Even "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (internal quotation marks omitted); *see also United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (explaining that "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal" (internal quotation marks omitted)); *id.* ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." (internal quotation marks omitted)); *United States v. Ulloa*, 511 F. App'x 105, 107 (2d Cir. 2013) (a conviction must be affirmed, after "credit[ing] every inference that could have been drawn in the government's favor, . . . so long as, from the inferences reasonably drawn, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt" (internal quotation marks omitted)).

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also United States v. Cherico*, No. 08 Cr. 786 (CM), 2012 WL 1755749, at *2 (S.D.N.Y. May 16, 2012) (same); *United States v. Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it."). Accordingly, "the government need not exclude every reasonable hypothesis other than that of guilt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted); *see also, e.g.*, *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("[I]t is the task of the jury, not the court, to choose among competing inferences."). Further, "of critical importance, the evidence must be viewed in its totality, as each fact may gain color from others." *United States v. Cassese*, 428 F.3d 92, 98-99 (2d Cir. 2005) (internal quotation marks and citation omitted).

Thus, even in the presence of defense evidence supporting its preferred set of inferences and where the Government's evidence is "not overwhelming" and "the evidence would certainly have permitted a juror to entertain reasonable doubt," the jury's verdict must stand if the evidence in its totality makes the jury's inference reasonable. *United States v. Facen*, 812 F.3d 280, 288 (2d Cir. 2016) (reversing district court's grant of Rule 29 motion).

The Second Circuit has accordingly held that a district court errs in granting a Rule 29 motion based on its conclusion that the evidence gives "nearly equal circumstantial support to competing explanations." *United States v. White*, 7 F.4th 90, 103 (2d Cir. 2021) (internal quotation marks omitted). In reversing a grant of a Rule 29 motion on this ground, the Second Circuit has explained that this so-called "equipoise rule," derived from *United States v. Glenn*, 312 F.3d 58

3

(2d Cir. 2002), is "of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *White*, 7 F.4th at 103 (internal quotation marks omitted). Accordingly, the Second Circuit held, the rule "applies only where evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." *Id.* (internal quotation marks omitted).

In short, to prevail, a defendant must show not merely that there is insufficient evidence supporting *certain* inferences urged by the prosecution, but rather that the evidence is legally insufficient to support *any* inference that would establish the pertinent element of the offense. *See, e.g.*, *United States v. Salmonese*, 352 F.3d 608, 625 (2d Cir. 2003) ("no new trial is required" by a an alleged "factual insufficiency" in a certain prosecution theory where the jury's general verdict of guilty was supported by sufficient proof on an alternative theory); *see Griffin v. United States*, 502 U.S. 46, 56-59 (1991).

## 2.    McDonnell *and the "Official Act" Requirement*

The Supreme Court, in *McDonnell v. United States*, 579 U.S. 550 (2016), considered, in reviewing a challenge to jury instructions, the definition of "official act" under the general federal bribery statute, 18 U.S.C. § 201.

That statute makes it a crime for, among other things, a public official corruptly "to receive or accept anything of value" in return for being "influenced in the performance of any official act," *id.* § 201(b)(2). "[O]fficial act," in turn, is defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit," *id.* § 201(a)(3). Construing this language in light of certain constitutional

vagueness concerns, the Supreme Court adopted a two-part test for what qualifies as an "official act" under Section 201:

First, the "question" or "matter" must involve a "formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy,' but that does not necessarily fall into one of those prescribed categories." *McDonnell*, 579 U.S. at 569. In addition, "the question or matter must be 'pending' or 'may by law be brought' before 'any public official.'" *Id.* at 570. "'Pending' and 'may by law be brought' suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* "'[M]ay by law be brought' conveys something within the specific duties of an official's position—the function conferred by the authority of his office." *Id.* "The word 'any' conveys that the matter may be pending either before the public official who is performing the official act, or before another public official." *Id.*

Second, where the defendant is the alleged bribe recipient, he or she "must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so. That action or decision may include using [an] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* at 574. However, "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of 'official act.'" *Id.* "Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant . . . . If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to

take an official act." *Id.* at 573. Indeed, "[a] jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal." *Id.*; *see also, e.g.*, *United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017), *cert. denied*, 583 U.S. 1091 (2018).[2]

The Supreme Court also explained that "'official action' could be established by custom rather than 'by statute' or 'a written rule or regulation,' and need not be a formal part of an official's decisionmaking process." *McDonnell*, 579 U.S. at 573 (quoting *United States v. Birdsall*, 233 U.S. 223, 230-31 (1914)).

The Supreme Court further emphasized that "a public official is not required to actually make a decision or take an action . . . . [I]t is enough that the official agree to do so. The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain. Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so. A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." *McDonnell*, 579 U.S.

---

[2] The Supreme Court's decision rested on Section 201, notwithstanding that that statute was not charged, because the parties in the district court agreed to use Section 201's definition in describing honest services fraud and extortion. *See McDonnell*, 579 U.S. at 562. "[T]he Supreme Court did not hold that § 201(a)(3) of the federal bribery statute must *necessarily* be the exclusive source for the definition of an official action in every honest services fraud and Hobbs Act extortion case." *Silver*, 864 F.3d at 116 n.67 (emphasis in original), *see also United States v. Silver*, 948 F.3d 538, 551 (2d Cir. 2020) ("It remains an open question whether vagueness concerns further require that honest services fraud be defined, in all cases, by reference to one of the various federal bribery statutes."), *cert. denied*, 141 S. Ct. 656 (2021). In any event, the Government treats the definition as applicable to the bribery, honest services fraud, and extortion charges in this case, and the jury was instructed accordingly.

at 572; *see also Silver*, 948 F.3d at 551 (a "promise to perform an official act in exchange for payment" is a corrupt *quid pro quo*, and "it is not necessary that the public official in fact intend to perform the contemplated official act" (internal quotation marks and brackets omitted)), *cert. denied*, 141 S. Ct. 656 (2021).[3]

The Supreme Court and the Second Circuit have repeatedly reaffirmed that no actual performance of official acts is necessary in order to commit bribery. *Evans v. United States*, 504 U.S. 255, 268 (1992) ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense."); *United States v. Brewster*, 408 U.S. 501, 526 (1972) ("There is no need for the Government to show that [the defendant] fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise."); *United States. v. Percoco*, 13 F.4th 180, 201 (2d Cir. 2021) ("All that ultimately matters is Percoco's *agreement* to perform official action, not his execution of the deal." (emphasis in original)), *rev'd on other grounds*, 598 U.S. 319 (2023); *Silver*, 948 F.3d at 551 (a "promise to perform an official act in exchange for payment" is a corrupt *quid pro quo*, and "it is not necessary that the public official in fact intend to perform the contemplated official act" (internal quotation marks and brackets omitted)); *United States v. Myers*, 692 F.2d 823, 842 (2d Cir. 1982) ("If Myers

---

[3] Similarly, bribery can involve an agreement by the official "not to perform" an official act. *See McCormick v. United States*, 500 U.S. 257, 273 (1991) (discussing Hobbs Act extortion). Whether the agreement is for official action or declining to take official action, circumstantial evidence often is sufficient. "Indeed, bribery is rarely conducted in explicit terms; instead, the language of bribery is one of implication and innuendo. Past experience shows that the Government will be able to introduce, in the appropriate circumstances, circumstantial and other evidence that the payor and official understood the *quid pro quo* to center on an exchange of a thing of value for official acts related to some sufficiently defined and concrete question or matter involving the formal exercise of governmental power." *Silver*, 948 F.3d at 557 n.10.

was 'playacting' and giving false promises of assistance to people he believed were offering him money to influence his official actions, he violated the bribery statute."); *United States v. Polakoff*, 121 F.2d 333, 334 (2d Cir. 1941) ("success in the endeavor is not necessary"); *United States v. Avenatti*, 432 F. Supp. 3d 354, 362 (S.D.N.Y 2021) (rejecting dismissal of honest services fraud charge; "[t]he Government is not required to prove that the fraudulent scheme was successful" (citing, *inter alia*, *Pasquantino v. United States*, 544 U.S. 349, 371 (2005))); *see also City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 378 (1991) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid.").  It is not even necessary that the public official have the power or ability to perform the promised official act.  *See, e.g.*, *United States v. Hood*, 343 U.S. 148, 151 (1952) ("It is no less corrupt to sell an office one may never be able to deliver than to sell one he can.").

Ultimately, the Supreme Court has indicated that whether a corrupt scheme regarding an official act was proven is a question for the jury, which may consider a "broad range of pertinent evidence," including circumstantial evidence such as "the nature of the transaction."  *McDonnell*, 579 U.S. at 572-73 ("It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*.  The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question."); *see also, e.g.*, *id.* at 573 ("If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act.").

Consistent with *McDonnell*, courts have rejected any bright-line rules that would limit a jury's ability to determine whether a scheme involved an official act, including whether there was a promise or attempt to pressure or advise another official to perform an official act.  For example, there is no requirement that, in order to provide the requisite "advice," a bribe recipient must have "formal authority to influence" the official receiving the advice.  *See, e.g.*, *United States v. Mangano*, No. 16 Cr. 540 (JMA), 2022 WL 2872670, at *3 (E.D.N.Y. July 20, 2022) (the argument that the law requires such a relationship "does not raise a substantial question") (citing, *inter alia*, *United States v. Lee*, 919 F.3d 340, 342 (6th Cir. 2019) ("Defendant claims that an official can only 'provide advice' to a second official if the first official is in an advisory role to the second. However, nowhere in *McDonnell* did the Supreme Court state that it was creating such a rule.  We do not adopt Defendant's additional constraints on the requirements for an official to 'provide advice.'" (ellipses omitted))); *see also, e.g.*, *United States v. Roberson*, 998 F.3d 1237, 1254 n.22 (11th Cir. 2021) (rejecting argument that advice "must come from someone in a more formal advisory role"), *cert. denied*, 142 S. Ct. 1109 (2022).  Instead, as the Second Circuit has recognized, a bribe recipient can provide advice, within the meaning of the bribery statutes, in "any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision." *United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972).

Similarly, there is no bright line or magic words limiting the jury's ability to assess whether a public official attempted to apply "pressure," much less promised or agreed to do so.  *See, e.g.*, *Lee*, 919 F.3d at 352 (rejecting defense argument, holding that "nowhere in *McDonnell* did the Supreme Court state that it was creating" a rule under which "an official can only 'exert pressure'

on a second official if the first official has 'leverage or power' over the second official"); *United States v. Cui*, No. 19 Cr. 322-3, 2024 WL 3848513, at *9 (N.D. Ill. Aug. 16, 2024) ("The jury need not find that [the defendant] had the power to or did perform the act for which he was given or received something of value", citing *id.* (internal quotation marks omitted)); *see also, e.g.*, *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988) ("[W]e see no basis for ruling that a congressman's official acts—especially those demonstrating Congressional interest—may not include efforts that are directed toward local rather than federal officials." (internal quotation marks omitted)); *United States v. Gilbert*, No. 17 Cr. 419 (AKK) (TMP), 2018 WL 2095853, at *5 (N.D. Ala. May 4, 2018) (citing *id.*, holding that state official's contacts with federal agency could be official act under *McDonnell*), *aff'd sub nom. United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2021).

### 3. *Obstruction of Justice*

Section 1503, in relevant part, prohibits a person from "corruptly or by threats or force, or by any threatening letter or communication, influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice."  18 U.S.C. § 1503(a).  In *United States v. Schwarz*, 283 F 3d 76 (2d Cir. 2002), the Second Circuit stated:

> In order to convict for conspiracy to obstruct justice under § 1503, the government must establish (1) that the defendant (a) knowingly entered into an agreement with another, (b) with knowledge, or at least anticipation, of a pending judicial proceeding, and (c) with the specific intent to impede that proceeding; and (2) the commission of at least one overt act in furtherance of the conspiracy.

*Id.* at 105-06.  Moreover, "a judicial proceeding need not be pending at the time the conspiracy began so long as the [defendants] had reason to believe one would begin and one in fact did."  *Id.* at 107.  The conduct offered as proof of the intent to obstruct a federal proceeding must

nevertheless have the "'natural and probable effect of' interfering with that judicial proceeding." *Id*. at 109 (quoting *United States v Aguilar*, 515 U.S. 593, 599 (1995)).

For a substantive violation of Section 1503, the elements here are "action taken by the accused . . . with an intent to influence judicial or grand jury proceedings." *Aguilar*, 515 U.S. at 599. The "action" taken by the defendant "must have a relationship in time, causation, or logic with the judicial [or grand jury] proceedings." *Id*.

### B.    Discussion

The evidence at trial more than sufficiently permitted a reasonable jury to find that the corruption and foreign influence offenses charged in the Indictment were proven beyond a reasonable doubt, that they were each undertaken as parts of a broader overall scheme, that Menendez obstructed justice in an attempt to cover up his crimes, and that venue is proper.

### 1.    *The Evidence Proved a Corrupt* Quid Pro Quo *Related to Egypt*

The evidence at trial overwhelmingly proved that Menendez entered into a corrupt *quid pro quo* agreement with Hana, Daibes, and others to accept things of value in exchange for promising to take, and in some cases taking, official acts related to Egypt.

### a)    <u>The Evidence Established Official Acts</u>

The evidence established that Menendez agreed, promised, and in some cases performed official acts for the benefit of Egypt and of Hana during the course of the scheme. There is no real dispute that actions by Menendez to approve or object to U.S. military aid to Egypt, including through foreign military sales or foreign military financing, would amount to official acts (*see* Menendez Mem. 9), and while the Government—consistent with the Court's rulings related to the Speech or Debate Clause—did not introduce evidence of the *performance* of any such acts, the evidence of the *promise* of such acts was sufficient, standing alone, to establish this aspect of the

offenses.  *See, e.g.*, *Evans*, 504 U.S. at 268 ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense.").

Among other evidence, the Government proved that Menendez texted Hana, through Nadine Menendez, with a promise to swiftly approve a sale of tank ammunition, a clear promise of an official act.  (*See* GX A101-14 ("Tell Will I am going to sign off this sale to Egypt today", listing specifics of tank ammunition to be sold); GX B201-10 (Nadine Menendez screenshot of Menendez text).)  Similarly, even if Menendez's decision to ghostwrite a letter for the Egyptian government in support of U.S. arms sales to Egypt was not itself an official act, the context— Menendez literally writing a response to the basis for holds another U.S. Senator had placed on foreign military financing—allowed the strong inference that Menendez had promised that he would not perform the official act of imposing holds on that financing for those same reasons. (GX A403 ("I write to *respond to some of the issues* that have been raised by Senator [Senator-1] and others, which have lead [sic] to *a hold on $300 million dollars* in appropriated aid to Egypt." (emphases added)).)  In this context, the jury could also reasonably interpret Menendez's offers of information about other arms transfers (*see* GX C206-1 (Hana passing information regarding small arms ban to Egypt following meeting with Menendez)) or legislation affecting the region (*see* GX 3D-2 (Menendez to Daibes emailing S1102 as attachment); GX C419 (Daibes to Hana emailing S1102 as attachment); GX C207-12 (Hana to Ahmed Helmy texting "S1102" and attachment with content not retrieved)) as evidence of additional promises of official acts.

Menendez's promises and attempts to influence the official position of the U.S. Department of Agriculture ("USDA") on an important matter of foreign relations, which also affected U.S.

12

businesses, were also promises and attempts to perform an official act. The evidence at trial showed that the USDA, in corresponding with Egypt regarding the halal certification monopoly it granted to Hana, was engaged in "the United States official diplomatic relations" with another government. (Tr. 1789.) This involved the formulation of an official position of the United States, which was arrived at through an interagency process within the Executive Branch and was adopted by the chargé d'affaires at the U.S. Embassy in Cairo, who was the representative of the President. (Tr. 390, 471-72.)

These formal acts of diplomacy—which are precisely what Menendez agreed to and did seek to influence—are clearly official acts of the Executive Branch through the USDA, particularly given the need for "the Nation" to speak "with one voice" on foreign policy matters. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015); *see also id.* (holding unconstitutional Congressional requirement that the Executive make a statement in a passport, even one that "would not itself constitute a formal act of recognition," because it would conflict with the Executive's exclusive authority to recognize foreign governments, and noting that a passport is "addressed to foreign powers" (internal quotation marks omitted)); *Biden v. Texas*, 597 U.S. 785, 805 (2022) ("Article II of the Constitution authorizes the Executive to engage in direct diplomacy with foreign heads of state and their ministers." (internal quotation marks and brackets omitted)).

Indeed, although it would be sufficient if the evidence showed only that Menendez agreed or promised to attempt to influence the official position of the Executive Branch regarding the halal certification monopoly through advice or pressure but did not in fact try to do so, Menendez's actual actions are precisely the sort of pressure or advice contemplated by the Supreme Court in *McDonnell*. The fact that Menendez was not an executive branch official did not prevent him from

13

being able to attempt (much less promise or agree) to advise or exert pressure over Undersecretary of Agriculture Ted McKinney.  *See, e.g.*, *Carson*, 464 F.2d at 433 ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision."); *Lee*, 919 F.3d at 352 (rejecting defense argument, holding that "nowhere in *McDonnell* did the Supreme Court state that it was creating" a rule under which "an official can only 'exert pressure' on a second official if the first official has 'leverage or power' over the second official").

Although Menendez now attempts to recharacterize his call to McKinney as a routine matter that did not involve any pressure or the use of Menendez's official position (Menendez Mem. 7-9), the jury was entitled to disagree.  *See, e.g.*, *United States v. Burke*, No. 19 Cr. 322, 2024 WL 3090277, at *16 (N.D. Ill. June 21, 2024) ("[The defendant's] attempt to characterize his conduct as a 'permissible constituent referral,' is a thinly veiled challenge to the jury's findings of his corrupt intent.").  The jury could easily infer that the nature, circumstances, and context of Menendez's call showed an attempt to use his official position to apply pressure, or, at the very least, that he had promised those paying him that he would seek to apply such pressure, of which the call was the start.  *See, e.g.*, *id.* ("[W]hen the longest-serving alderman and Chairman of the Committee on Finance asks a city official to 'look into' a pending permit, the request is not taken lightly.  The trial evidence supports the reasonable inference that [the defendant] knew or intended his call to sway the permit evaluation in his favor."); *Gilbert*, 2018 WL 2095853, at *5 (rejecting argument that a state legislator did not commit an official act because he "did not 'threaten to hold

14

an oversight hearing or withhold agency funding unless the state agencies did what he wanted'" (internal quotation marks omitted)).

The evidence showed that Menendez's call attempting to pressure McKinney to reverse the federal government's stance was not only striking and memorable to McKinney, but also in fact unique in McKinney's experience. (*See, e.g.*, Tr. 2009 (McKinney: "I've never had a call like that before."); Tr. 2010 (McKinney: "[I]t was the first time I'd ever had a call that we thought would clearly harm elements of the U.S. food and ag. industry.").) Indeed, in a clear reflection of the pressure Menendez was attempting to apply, McKinney felt the need to reassure his professional staff that he supported them, the only time McKinney had ever needed to do so after a call from a Member of Congress. (GX 8B-12 (McKinney directing subordinate to "reassure Post in Egypt that we have their back"); Tr. 1820-21 (McKinney testifying he had "never" before, or since, reassured his staff following any other call from a Member of Congress).) While there is no requirement that an official act be unusual, *see, e.g.*, *Omni Outdoor Advert.*, 499 U.S. at 378, exactly this sort of evidence about the unusual nature of a politician's contact with an executive official has been held to support an inference of an attempt to exert pressure. *See, e.g.*, *Lee*, 919 F.3d at 357 (holding evidence supported an official act through an attempt to pressure a prosecutor where the prosecutor testified that the defendant "had never contacted her in such a way regarding other cases" (internal quotation marks omitted)); *see also United States v. Reichberg*, 5 F.4th 233, 249 n.70 (2d Cir. 2021) (citing *id.* as example of official act).

b)   <u>The Evidence Established a Corrupt *Quid Pro Quo*</u>

The evidence also proved a corrupt *quid pro quo*, making out bribery offenses under multiple statutes, arising out of Menendez's agreement, promises, and attempts to take official acts related to Egypt.

15

The jury heard extensive evidence of a timeline that showed a corrupt *quid pro quo* exchange involving bribery.  Contrary to the defendants' claims of an after-the-fact gratuity (Menendez Mem. 14-15; Hana Mem. 78-83; Daibes Mem. 49-51), the evidence amply showed that the payments Hana would eventually cause his halal company to make were in fulfillment of promises he had made far earlier, and well in advance of the official acts by Menendez.

The evidence showed that Menendez was aware, far in advance of any of the promised or performed official acts, that Nadine Menendez was expecting and/or promised payment.  (*See, e.g.*, GX B105-3 (April 6, 2018 message from Nadine Menendez claiming she would ask Menendez about "the two deals"); GX B102-A (May 28, 2018 email from Nadine Menendez asking Menendez to edit ghostwritten letter because Hana and a general had gotten her "clearance for a project"); GX A101-19 (January 30, 2019 text from Menendez advising Nadine Menendez before meeting at Egyptian embassy related to Nadine Menendez and Hana doing business with Egyptian government).)  Indeed, these messages made clear that Hana had been promising a paycheck for Nadine Menendez for a year, dating back to March of 2018—*i.e.*, the time of the first meeting Nadine Menendez arranged between Menendez and the Egyptian defense attaché, General Khalid Shawky.  (*See, e.g.*, GX B221-1 (March 26, 2019 text from Nadine Menendez to Howard Dorian complaining about "a year of broken promises by Will to me", claiming she had "kept every promise to Will", and stating, "I am willing to give 100% and make sure this goes skyhigh on condition that I start getting my $ 2500/week"); GX F102 (April 2, 2019 text from Dorian telling Nader Moussa, "[I]t's really important that we make sure Nadine stays happy because if she's not she's going to cancel the meetings that Wael has set up with Senator Menendez").)  The text and voice messages between Menendez and Nadine Menendez make clear that Menendez was

aware, at the time, that Hana had promised Nadine Menendez a job through the halal company and had not made the promised payments. (*See, e.g.*, GX A101-27 (April 8, 2019 text from Nadine Menendez to Menendez stating, "Seems like halal went through.  It might be a fantastic 2019 all the way around"); GX A105-D (March 27, 2019 voicemail from Nadine Menendez telling Menendez, during period of Hana nonpayment, that she was not arranging a dinner for Hana).)

Menendez was also deeply involved in Nadine Menendez's efforts to receive bribe payments in the form of a supposed paycheck to Nadine Menendez's supposed consulting company.  His efforts included getting her a lawyer to set up her company (*see, e.g.*, GX A101-36 (Menendez: "No he is the lawyer setting up your company")), advising her on how to get a form consulting contract (*see, e.g.*, GX A101-50 (Menendez: "Look under Legal Zoom for contract")), and corresponding with her about anticipated checks either from Hana or Daibes (*see, e.g.*, GX A101-40 (Nadine Menendez: "[Daibes's romantic partner] is going away tomorrow through Monday. So I don't know if the check is coming from them or from Will?"); GX A101-48 (Menendez advising Nadine Menendez what to say "when you call Fred [Daibes] to give him your company name")).

Menendez was also aware of the three $10,000 bribe checks themselves.  The evidence showed he personally received the first one from Daibes on August 30, 2019. (*See, e.g.*, GX D207-2 (Daibes to Hana: "Meeting went well"); GX D102-10 (Daibes: "Nadine I personally gave Bob a check for September").)  He fielded Nadine Menendez's complaints about Hana's tardy payment of the second check and advised her not to put anything in writing to Daibes about it. (*See, e.g.*, GX A109-A (Nadine Menendez: "I really want my check"); GX A101-55 (Nadine Menendez: "Please let me know if I should text Fred"); *id.* (Menendez: "No, you should not text or email.").)

And he received an offer from Daibes to hand deliver the third check.  (GX D101-2 ("When will you be back. I have the envelope for Nadine").)

Though Menendez may initially not have been aware of the foreclosure on Nadine Menendez's house, the foregoing demonstrates that he was aware she was expecting payment from Hana.  In the message in which Nadine Menendez explained to Daibes that she had not told Menendez of the foreclosure as of June 2019, she explained that she had not done so because Menendez would be angry that Hana had not paid her—*i.e.*, supporting the inference that Menendez was fully aware of Hana's promises to pay, and simply had not realized the specific need Nadine Menendez had for immediate funds.  (*See* GX D108-A ("I have not told Bob yet, because he is going to flip out against Will.  Um, but, um, my mortgage, I haven't paid it, and I had been counting on the money Will's giving me to do it, and he hasn't given me anything yet.").)  In any event, Nadine Menendez shortly thereafter informed Menendez about the pending payment (*see, e.g.*, GX D108-A (Nadine Menendez to Daibes: "So, um, I will tell Bob on Friday"); GX A101-46 (Nadine Menendez to Menendez: "I double checked about the payments")), leading him to follow up with her in July 2019 to ensure that she in turn asked Daibes to induce Hana to pay (GX D110-A (Nadine Menendez to Daibes: "Bob, um, called me today to find out if everything's been taken care of . . . Bob insisted on me letting you know.  I'm sorry again to bother you.  But, uh, he said that it was important to let you know."), which resulted in Hana paying promptly after Nadine Menendez informed Daibes of Menendez's follow-up (GX 5C-200; *see also* GX 1302 at lines 956, 968-973.  Indeed, Nadine Menendez ultimately deducted the payment made to the mortgage company from the halal paychecks she felt were due (GX D102-C), which is clear evidence that the mortgage payment was no after-the-fact gratuity, but was instead made in partial

satisfaction of Hana's corrupt promises of a paycheck. As these promises dated back long before the official acts Menendez promised and took, the evidence was more than sufficient to allow the jury to infer a bribe.

Far from showing a gratuity, the timing strongly demonstrates that Menendez was influenced by Hana's promises of payment to Nadine Menendez. Menendez ghostwrote a letter for the Egyptian government—responding to human rights concerns his own fellow Senators had raised as grounds for withholding hundreds of millions of dollars of aid to Egypt—*the very day* that Nadine Menendez said that she had gotten, from Hana and an Egyptian general, "clearance for a project" (which was obviously, based on context, a remunerative project and not some sort of volunteer project). (GX B102-A; GX A403.) And Menendez's promises to approve a foreign military sale took place during the same time period in which Hana was promising employment for Nadine Menendez. (*See, e.g.*, GX B221-1 (Nadine Menendez complaining of "year of broken promises" in March 2019).)

Similarly, Menendez's contacts with McKinney took place not only after a year of such promises, but also just weeks after Menendez had been informed that Hana would receive the halal monopoly (GX A101-27 ("Seems like halal went through. It might be a fantastic 2019 all the way around")), and almost immediately after Hana's requests to him, passed along through Nadine Menendez. (*See, e.g.*, GX C102-6 (May 23, 2019: Hana to Nadine Menendez sending link to article), GX C501 (May 23, 2019: Hana to Nadine Menendez sending translation of article); GX A404 (May 23, 2019: Nadine Menendez to Menendez sending link to article); GX 8B-16 (May 23, 2019: Menendez staffer to McKinney sending linked article and translation); GX 8B-10 (May 23, 2019: McKinney to USDA official reporting "I took a call from Senator Menendez").) Shortly

19

thereafter, Hana listed Nadine Menendez as vice president of his halal company with a $120,000

salary, which would render her his second-highest paid employee.  (GX C104-4.)[4]

Contrary to the defendants' arguments (*see, e.g.*, Menendez Mem. 14-17; Hana Mem. 29-

32, 38-44, 72-74, 78-79, 85, 98-101; Daibes Mem. 49-57), evidence of the timing of payments and

of actions taken by a public official can—and often does—support a jury's finding of corrupt

intent.  *See, e.g.*, *Silver*, 948 F.3d at 571 (relying on timing of events to conclude that properly

instructed jury would have found requisite *quid pro quo*); *United States v. Bruno*, 661 F.3d 733,

745 (2d Cir. 2011) ("The government's evidence of the timing of the payments in relation to the

actions taken by [the public official] could also be accepted by a rational jury in support of the

conclusion that [the official] understood that the consulting payments were made in return for

official action."); *United States v. Rosen*, 716 F.3d 691, 702 (2d Cir. 2013) (affirming denial of

Rule 29 motion in honest services bribery prosecution where circumstantial evidence of *quid pro*

*quo* included timing of payments to legislators, importance of official action to payor, and failure

to disclose payments); *see also United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988)

("[E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are

seldom accompanied by written contracts, receipts or public declarations of intentions. . . . As a

---

[4] Hana faults the Government for not introducing the legal name of the recipient of this message, who used variations on the display name "HH HH" in his correspondence.  (Hana Mem. 82 & n.26.)  But he scarcely made such a claim at trial (*see* Dkt. 441, at 5), which is insufficient to preserve it, and he identifies no rule of law that requires the legal name of every text message recipient to be offered in evidence, particularly when the recipient's role and relationship with Hana was sufficiently evident from the context of their communications and from witness testimony.  (*See, e.g.*, Tr. 992-94, 996, 998 (Maali testifying about her emails with HH HH during her work at IS EG Halal).)

result, a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt.").

Indeed, such evidence of the timing of key actions can by itself be sufficient to support a jury's verdict. *See, e.g.*, *United States v. Calk*, No. 19 Cr. 366 (LGS), 2022 WL 101908, at *2 (S.D.N.Y. Jan. 11, 2022) ("The timing and circumstances of each loan was sufficient for the jury to infer [the defendant]'s corrupt intent."); *United States v. Calk*, 87 F.4th 164, 182 (2d Cir. 2023) (affirming sufficiency of the evidence of corrupt intent in *id.*); *see also, e.g.*, *Silver*, 948 F.3d at 557 n.10 ("[I]n some circumstances, a wink and a nod, an exchange of monies, and a subsequent vote on a bill likely will be sufficient."). This is logical, as "bribery is rarely conducted in explicit terms; instead, the language of bribery is one of implication and innuendo." *Id.*, *see also, e.g.*, *United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012) ("Parties to a bribery scheme rarely reduce their intent to words, but the law does not require that.'). Indeed, the Second Circuit has expressly held that the timing of a series of calls and text messages was itself sufficient to sustain a bribery conviction. *See Reichberg*, 5 F.4th at 249 (the defendant's "efforts on behalf of one individual in particular leave us with no doubt that this jury's verdict was reasonable and supported by the evidence," reciting timeline of calls and text messages).

Moreover, although timing alone can be sufficient evidence of a corrupt *quid pro quo*, in this case there was far more than mere timing. The very nature and solicitousness of the favorable treatment that Menendez provided and offered was also powerful evidence of the *quid pro quo*. *See, e.g.*, *Burke*, 2024 WL 3090277, at *16 ("Viewed holistically, a reasonable jury could infer that [the defendant's] actions were not taken out of the goodness of his heart. The pole sign was not in [the defendant's] ward nor was [the bribe-payor] his constituent."). And although even

21

promising to take or taking routine actions in exchange for things of value can constitute a bribery offense, Menendez's promises and actions were not routine.   His promise to approve tank ammunition was a promise to do so unusually swiftly (Tr. 900-01 (Joshua Paul testifying about typical time period for foreign military sale approvals in general)), and was immediately recognized as special treatment by Hana and the Egyptian defense attaché, who began discussing who should get credit for it.   (*See, e.g.*, GX C206-7 (Shawky receiving forwarded substance of message and responding with three thumbs-up emojis); GX C206-4T (Hana to Shawky: "The people should repay the kindness" and Shawky to Hana: "the contract owner should send their greetings").)   As noted above, Menendez's call to McKinney was literally unique in McKinney's experience (Tr. 2009-10)—and was also contrary to what Menendez's website told the world he would and would not do for his constituents (*see* GX 10C-1 (Menendez website publicly stating that his office cannot overturn or influence matters involving private businesses)).   This pattern of favorable treatment towards a person who provided things of value can sustain a jury's verdict. *See, e.g.*, *United States v. Hills*, 27 F.4th 1155, 1176-77 (6th Cir. 2022) (listing evidence of favorable treatment including defendant's intervention in a dental residency selection, holding that "[t]he jury could reasonably conclude that [the defendant] was given something of value in return for a promise to intervene when necessary in the resident selection process"); *see also, e.g.*, *Bruno*, 661 F.3d at 744 ("[A] jury may infer guilt from evidence of benefits received and subsequent favorable treatment[.]" (internal quotation marks omitted)).

    Similarly, the nature of the things of value, and particularly the fraudulent nature of Nadine Menendez's supposed employment, provide further support for the inference of a corrupt *quid pro quo*.  *See, e.g.*, *Hills*, 27 F.4th at 1176 (holding that evidence of *quid pro quo* was sufficient where

there was evidence that defendant was "given envelopes containing thousands of dollars of cash" at expensive dinners with bribe-payors); *see, e.g.*, *id.* at 1175-76 ("Defendants argued that those things were simply gifts, but the jury had more than an adequate basis to reject that claim.").  All the defendants were well aware that Nadine Menendez was expecting to get her paid for her previous acts (*i.e.*, her role in arranging Menendez's actions and promises) and not for any real work.  Indeed, Daibes received a voice message in which Nadine Menendez expressed incredulity at Hana's demand, at the time, that she actually be present in IS EG Halal's offices.  (*See, e.g.*, GX D108-A (Nadine Menendez: "[Hana] said that he doesn't need me for anything and I haven't done anything to help him, and a whole bunch of other stuff that I need to be in the office eight hours a day").)[5]  Despite this knowledge of the fraudulent nature of Nadine Menendez's employment by Hana, Daibes subsequently acted to deliver the $1/0,000 checks that she had purportedly earned through this supposed job, including by handing the first of them to Menendez personally.[6]

The jury also heard ample evidence from which it could infer consciousness of guilt.  The evidence showed that Menendez's prior counsel gave a presentation to prosecutors denying that Menendez was aware of the IS EG Halal $10,000 checks and the mortgage company payment, despite the contemporaneous evidence of Menendez's knowledge of each of them.  (*Compare* GX

---

[5] The jury was easily entitled to infer, from the context, timing, and surrounding circumstances, that Hana was telling Nadine Menendez to come into the office because (after having gotten and retained his monopoly with Menendez's assistance) he was looking for an excuse not to follow through on his promises of bribe payments to her, not that he actually expected her to perform office work in an arm's length employment relationship.

[6] Further supporting the jury's inference of a corrupt bribe scheme, Hana provided multiple other valuables, including an approximately $2,700 elliptical purchased through the halal company (GX 3C-11; GX 1F-1015), an almost $500 air purifier also purchased through the halal company (GX 7N-2; GX 1F-1087), and seven one-ounce gold bars worth over $12,000 (GX 1F-1209, GX B201-1A, GX B201-17).

4A-3 (presentation denying knowledge) *with* GX D102-10 (knowledge of first check) *and* GX A109-A (knowledge of second check) *and* GX D101-2 (knowledge of third check) *and* GX D110-A (knowledge of mortgage company payment).)   The jury also learned that Menendez's public financial disclosure forms falsely reported gold as having been provided by Nadine Menendez's family prior to their 2020 marriage, rather than provided by Daibes directly to Menendez in 2021. (*Compare, e.g.*, GX 10E-6 (financial disclosure form) *with* GX A125 (web search for price of kilo of gold) *and* GX 16C-2 at 17 (Daibes presence immediately before time of search).)

Beyond the direct lies, there was also ample evidence from which the jury could infer that the conspirators referred to each other elliptically or took other steps to limit the paper trail generated by their actions.  (GX A101-55 (Menendez to Nadine Menendez: "No, you should not text or email."); GX D109-A (Nadine Menendez to Daibes: "I just got a phone call asking me to give you a call"); GX D207-2 (Daibes to Hana: "Our friend would like to have dinner on Thursday night.").)  Such evidence of consciousness of guilt strongly supports the jury's finding of a bribery scheme.  *See, e.g.*, *United States v. Zheng*, --- F.4th ----, 2024 WL 3957619, at *12 n.5 (2d Cir. Aug. 28, 2024) ("A jury may infer a defendant's knowledge that conduct is wrongful from his efforts to conceal his conduct." (citing *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008)); *see also, e.g.*, *Bruno*, 661 F.3d at 744 (jury may "infer guilt from . . . behavior indicating consciousness of guilt" (internal quotation marks omitted)).

Against this overwhelming proof, the defendants simply restate arguments that were properly directed to, and rejected by, the jury.  For example, the jury heard the evidence Hana points to (*see* Hana Mem. 23, 80-81) about work Nadine Menendez supposedly did for his company and was in no way obligated to credit his arguments that this alleged work justified the

payments she received even in part, let alone exclusively.  Similarly, Daibes's claim that he could not have been found guilty because he allegedly did not have any "business interest" in IS EG Halal (Daibes Mem. 50-52) is not convincing on its own terms given the extensive financial interdependence between them described in Section I.B.4, below, but is in any event purely an argument going to motive, which would not have negated any element of the offenses even if believed.  More fundamentally, however, the jury was not required to accept this or any other of the factual arguments pressed by the defendants, and was amply entitled to find these offenses proven.

2. *The Evidence Proved a Corrupt* Quid Pro Quo *Related to the New Jersey State Criminal Matters*

a) <u>The Evidence Established Official Acts</u>

The evidence at trial also overwhelmingly proved that Menendez, agreed, promised, and attempted to take official acts to influence two New Jersey state criminal matters.  Decisions concerning the disposition of criminal cases and investigations are "the sort of specific, formal exercises of government power that can constitute official acts."  *Reichberg*, 5 F.4th at 249; *see also id.* (holding evidence sufficient to support jury finding that "making an arrest, and then making a decision about whether to issue a desk appearance ticket to the arrestee" was an official act).

And again, although Menendez's agreement and promise alone would be sufficient, his actual attempts to pressure then-New Jersey Attorney General Gurbir Grewal to influence these matters are paradigmatic examples of the situation contemplated by the Supreme Court in *McDonnell* in which a public official may "make a decision or take an action on a question, matter, cause, suit, proceeding or controversy by using his official position to exert pressure on *another*

25

official to perform an official act," or by "advis[ing]" the other official to do so. 579 U.S. at 572 (internal quotation marks omitted) (emphasis in original). Contrary to the apparent arguments of Menendez and Hana (*see* Menendez Mem. 9-11; Hana Mem. 65-66), there is no requirement that an attempt to exert pressure use any particular form of words or, indeed, that any direct evidence be presented regarding a communication during which pressure is exerted or attempted. For example, the Second Circuit has held that the evidence of an official act was sufficient just based on the timing of calls and text messages, without any direct evidence of the content of the phone call during which the bribe recipient exerted pressure on another police officer. *See Reichberg*, 5 F.4th at 249 ("The first arrest-and-release was on February 16, 2014. [The defendant] texted [the bribe recipient] "Eddie Sankari" and "78pct," and one minute later [the bribe recipient] turned around and called the 78th Precinct, where Sankari was being held, setting in motion Sankari's release.").

Indeed, it is a question of fact for a jury whether an official who explicitly *disclaims* any intent to apply pressure was nonetheless actually attempting to do so. In *Lee*, the Sixth Circuit considered the case of a city council member who called a city's chief prosecutor to inquire about a case, and who stated, "I'm not trying to influence you, you can't say I'm trying to influence you. I'm trying to make you think. That's all I'm trying to do; just trying to make you think." 919 F.3d at 344. The court in *Lee* upheld the conviction, holding that "a juror could easily have heard those words and concluded that they meant the exact opposite—that [the defendant] was, in fact, trying to influence the prosecutor." *Id.* at 357; *see also Reichberg*, 5 F.4th at 249 n.70 (Second Circuit citing *Lee* with approval as example of official act). Other contextual information, including the prosecutor's understanding that the defendant might go over her head if she did not return the

defendant's calls, and the prosecutor's experience that the defendant "had never contacted her in such a way regarding other cases," *Lee*, 919 F.3d at 357 (internal quotation marks omitted)), further supported the jury's finding of an official act.

The evidence at trial amply proved that Menendez attempted to perform an official act by pressuring or advising Grewal. Grewal testified that—far from disclaiming any attempt to influence him—Menendez claimed that the criminal matters involved selective prosecution, which would if true have been a basis for dismissal. (*See, e.g.*, Tr. 2715-16 (Grewal testifying that Menendez claimed that the prosecutions treated Hispanic defendants differently from non-Hispanic defendants); Tr. 2737 (Grewal testifying that if there were credible allegations of selective prosecution, he would "counsel on the charging instrument to be dismissed").) Although he himself did not feel pressured, Grewal's testimony shows that he understood the nature of this contact as inherently involving attempted pressure, to the extent that he shielded his team by refusing to pass on even the mere fact of the inquiry. (Tr. 2718 (Grewal: "I view my job as insulating the team from any type of pressure or interference from the outside, and so I wasn't going to relate to anyone in the office that there was this inquiry"); *id.* (Grewal: "I don't want my teams to feal pressured or intimidated"); Tr. 2740 (Grewal: "I want them to be able to do their work without any concern about any outside influence or concern that the senior senator from New Jersey was concerned about the way they were handling the matter.").) And—just as in *Lee*, and as with McKinney—these were the only such contacts that Menendez had had with Grewal. (*Compare* Tr. 2740-41 (Grewal testifying that these contacts were the only time Menendez raised his office's alleged treatment of Hispanic defendants) *with Lee*, 919 F.3d at 357 (relying on

27

prosecutor's testimony that defendant "had never contacted her in such a way regarding other cases").)

The fact that Menendez did not have formal authority over a state prosecutor, similarly, does not prevent Menendez from attempting to commit an official act by pressuring or advising him. *See, e.g.*, *Biaggi*, 853 F.2d at 98-99 (Second Circuit affirming conviction of Congressman for attempts to influence city officials); *United States v. Kimbrew*, 944 F.3d 810, 814, 815 (9th Cir. 2019) (affirming Section 201 conviction of aide to congresswoman for accepting bribes in exchange for promises to pressure city employees, and explaining, *inter alia*, "[t]he bribe recipient need not be the final decisionmaker"), *cert. denied*, 141 S. Ct. 400 (2020); *Lee*, 919 F.3d at 352 (rejecting argument that "an official can only 'exert pressure' on a second official if the first official has 'leverage or power' over the second official"); *United States v. Skelos*, 707 F. App'x 733, 739 (2d Cir. 2017) ("Using one's influence as a high ranking state official to push through county legislation and to bestow a county-issued contract are indisputably formal exercises of governmental power constituting official acts under *McDonnell*."); *United States v. Boyland*, 862 F.3d 279, 292 (2d Cir. 2017) (affirming conviction of state assemblyman for taking bribes in exchange for helping secure permits from city agencies, explaining the charged acts "involved concrete matters that, in order to proceed, needed to be brought before public officials or agencies that would have to make formal and focused administrative decisions").

Of course, all of the foregoing leaves aside Menendez's promises to Uribe and Hana, which are independent grounds for criminal liability that rendered Menendez and Hana guilty even *before* Menendez actually made contact with Grewal. *See, e.g.*, *Evans*, 504 U.S. at 268 ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to

perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense."); *Hood*, 343 U.S. at 151. These promises were amply established through the testimony of Uribe as well as the contemporaneous documentary evidence. (*See, e.g.*, Tr. 3104-05 (Uribe testifying that he asked Menendez "see if there is anything in his power, don't let these people hurt my daughter" and Menendez said he would "look into it"); Tr. 3104 (Uribe testifying that Menendez stated that "he was asked by Will and Nadine to get a better resolution" for Parra and E & K Trucking); GX B209-22 (Nadine Menendez: "[H]e said it would've been so so easy if we had wrapped both together.").)

b)      The Evidence Established a Corrupt *Quid Pro Quo*

The evidence at trial also provided ample proof of a corrupt *quid pro quo*. The timeline of events surrounding Menendez's contacts with Grewal alone provided overwhelming proof of Menendez's corrupt agreement with Hana, Nadine Menendez, Uribe, and others.

The jury heard evidence that in January 2019, Menendez promised and attempted to influence Grewal concerning the criminal prosecution of Elvis Parra in exchange for a luxury Mercedes-Benz convertible (the "Mercedes-Benz Convertible"). That month, in quick succession, Nadine Menendez complained to Hana about her lack of a car (*see, e.g.*, GX B105-31); Menendez performed web searches to ascertain the cost of a Mercedes C300 (*i.e.*, the make and model of the Mercedes-Benz Convertible) (GX A301-12); and Menendez, through Nadine Menendez, invited Hana and Uribe to a planning meeting (*see, e.g.*, GX E102-3 (Hana to Uribe: "bob he want have dinner with us tonight")).

Following these steps, the timeline of communications in the next several days alone establishes Menendez and Hana's corrupt intent surrounding Menendez's call to Grewal. After that dinner, on January 29, 2019, Menendez contacted Nadine Menendez to request basic

29

identifying details about Parra's case (but, notably, not any evidence of discrimination or any other grounds for intervention into that case), which Nadine Menendez in turn requested from Hana in an urgent series of calls and text messages.  (*See, e.g.*, GX 6A-312-1 (Menendez call to Nadine Menendez); GX 6A-112 (Nadine Menendez calls to Hana); GX C115-3 (Hana WhatsApp messages with Parra); GX B105-32 (Nadine Menendez texts with Hana).)  After Nadine Menendez reported back to Menendez, Menendez called Grewal.  (*See, e.g.*, GX 6A-206-1, GX 6B-2401.)  Just days after Menendez's call to Grewal, Hana asked Daibes to pay for a car for Nadine Menendez.  (*See* GX C209-2 (Hana to Daibes, February 1, 2019: "can you please help naden with car . are Expense ."); GX C209-3 (Hana to Daibes, February 7, 2019: "can you please help naden with car .").)  Contrary to Hana's suggestion that this related to a rental (Hana Mem. 100), Nadine Menendez was clear to Hana that she expected to get a new car, as Hana acknowledged to Uribe. (*See, e.g.*, GX B105-34 (Nadine Menendez to Hana, February 3, 2019: "All is GREAT! I'm so excited to get a car next week. !!"); Tr. 3000-01 (Uribe testifying that Nadine Menendez told him that Hana had promised her a car); *see also* Tr. 3001 (Uribe testifying that Hana told him that "from the proceeds he was going to get from the deal once the deal is completed and the guys pay what they agreed to, he was going to buy from that money a car for Nadine.").)  This sequence alone provides powerful evidence of Menendez's and Hana's corrupt intent.  *See, e.g.*, *Reichberg*, 5 F.4th at 249 (holding timing of communications supported inference of official act); *Silver*, 948 F.3d at 557 n.10 ("[I]n some circumstances, a wink and a nod, an exchange of monies, and a subsequent vote on a bill likely will be sufficient."); *Calk*, 2022 WL 101908, at *2 ("The timing and circumstances of each loan was sufficient for the jury to infer [the defendant]'s corrupt intent."), *aff'd*, 87 F.4th at 182.

Moreover, Menendez and Hana's corrupt agreement continued after the January contact with Grewal. Although Uribe eventually provided the cash for the down payment and periodic payments for the Mercedes-Benz Convertible, Hana was deeply involved in Uribe's provision of the car. Uribe was on the phone with Hana when he first texted Nadine Menendez the contact information for the Mercedes dealership. (GX 6D-102-6; GX B209-13; GX B209-L.) Indeed, the evidence showed that Hana offered to assist with the purchase; Nadine Menendez told Menendez she had doubts that Hana would "step up and do anything" as promised and provide the car (GX A105-D), but she expected him to accompany her to the Mercedes-Benz dealership (GX B215 ("Will was supposed to take me to Edison today")). Indeed, in a telling indication that Hana had promised to provide the car, Nadine Menendez told Uribe that she had been waiting on Hana in order to move forward with the purchase, explaining "I didn't want him [*i.e.*, Hana] to think I was *going behind his back*." (GX B209-13 (emphasis added).)

But even beyond Hana's coordination with Uribe on the provision of the Mercedes-Benz Convertible, the evidence showed that Hana actually funded part of the price of this car. The jury heard evidence that Hana received cash from Parra and Parra's business partner Bienvenido Hernandez in exchange for Menendez's representations of assistance with Parra's case, and that Hana then gave Uribe some of the cash to reimburse Uribe for paying for the Mercedes-Benz Convertible—*i.e.*, to reimburse him for some of the bribe payments Uribe was making. (*See* Tr. 3078-79.) This act of contributing to the bribe payments alone is sufficient to support the jury's verdict against Hana with respect to the New Jersey Attorney General's Office-related conduct.

Moreover, the jury was entitled to rely on the testimony presented regarding Menendez's and Hana's corrupt promises. Contrary to Hana's claims to have only provided information about

Parra's case and nothing more (Hana Mem. 92-94), Uribe testified that Menendez told him that Menendez had been asked by Hana and Nadine Menendez to get a better resolution for Parra and E & K Trucking. (Tr. 3104.) This alone was powerful evidence of Hana's corrupt agreement with Menendez, whether or not Uribe was told the details of how Hana and Menendez would carry out their promises. (*Compare* Hana Mem. 90-96 (arguing lack of *quid pro quo* because Hana did not specify how he would make case go away) *with, e.g.*, *McDonnell*, 579 U.S. at 572 ("[T]he public official need not specify the means he will use to perform his end of the bargain[.]").) And contrary to Menendez's claims that the evidence did not show he knew about the car payment (Menendez Mem. 15), the jury was entitled to credit, in addition to Menendez's telltale sequence of actions, Uribe's understanding that Menendez was aware of Uribe's payment of the car (*see* Tr. 3108 (Uribe: "I have no doubt to believe that Mr. Menendez knew I was making payment for the car."); *see also* Tr. 3107-08 (Uribe explaining his observations of Nadine Menendez and Menendez's behavior giving rise to this understanding)), as well as his testimony that—despite arranging for multiple meetings between Uribe and Menendez where the topic could very naturally have come up—Nadine Menendez never told Uribe not to tell Menendez that he was making those payments (Tr. 3108, 3132, 3142-43).

The extensive evidence of the timing of Menendez's solicitous responses to Uribe's demands for intervention into the investigation involving Peguero also show Menendez's awareness of the payment and participation in the corrupt *quid pro quo*. On August 1, 2019, the day after Nadine Menendez met with Uribe, Uribe texted her about the investigation, stating that he wanted to "make things go away," "move fast," and "stop this", and Nadine Menendez assured him she would address it promptly "depending on when he is home", referring to Menendez. (*See*

GX B209-22 (Nadine Menendez texts with Uribe).) After Menendez met with Nadine Menendez that night, he then Googled the initials of the agency conducting the investigation. (GX A301-14.) A month later, when no intervention had been forthcoming, Uribe texted Nadine Menendez a near-explicit *quid pro quo*, writing on September 3, 2019, "Please don't forget about me. I will never forget about you", and emphasizing, "I need peace". (GX B209-23.) Menendez was clearly informed about this *quid pro quo*, as the very next day he called Grewal (the first time he had contacted him since his January 2019 intervention related to Parra's case) to schedule an in-person meeting. (GX 6A-206-2.)

Menendez's statements to Uribe after meeting with Grewal further show his awareness of the corrupt *quid pro quo*. After the meeting, Menendez falsely encouraged Uribe, claiming the meeting had been positive (Tr. 3140-41; GX E109-2), and several weeks later—upon learning that Uribe was going to keep following up with Nadine Menendez until he got "peace"—Menendez called Uribe and falsely claimed that the matter had been resolved (Tr. 3144; GX B209-24; GX 6D-102-12). In fact, Grewal had not said anything encouraging to Menendez, but had instead told Menendez that he could not discuss the case. (*See, e.g.*, Tr. 2729-30 (Grewal: "I can't talk to you about this.").) Menendez's willingness to lie to Uribe was powerful proof that he was simply motivated to keep Uribe happy so Uribe would keep paying for the car—a motivation that of course necessarily implies Menendez's awareness that Uribe was paying for the car.

The jury also heard evidence that Menendez's call to Grewal was special treatment, deviating sharply from his claims to the public on his website that he would not (and purportedly could not) involve himself in criminal matters. (*See* GX 10C-1 ("Our Senate office cannot legally get involved with pending litigation, including questions about criminal trials or imprisonment.").)

Similarly, the jury was presented with evidence of concealment from which they could infer consciousness of guilt, such as Menendez's decision to call Nadine Menendez's flip cellphone instead of her more-frequently-used iPhone when preparing to contact Grewal (*see* GX 6A-206-1; GX 6A-312-1; *see also* Tr. 2395 (Special Agent Graves testifying that Menendez called Nadine Menendez's flip phone approximately 30 times and Nadine Menendez's iPhone approximately 280 times during the same time period)); his awareness that Nadine Menendez was using coded language to describe Uribe's provision of the cash for the down payment (GX A105-E (Nadine Menendez telling Menendez she would be taken to "meet Jose for five minutes")); Menendez keeping his meeting with Grewal off his calendar (GX 3A-9); Menendez's omission of the car payments from his financial disclosure forms (GXs 10E-5, 10E-6, 10E-7); Menendez's counsel's presentation denying his knowledge of the car payment (GX 4A-3); Hana's solicitation of payment in cash (Tr. 2968 (Hana request for $200,000 to $250,000 to affect criminal matters); Tr. 3076, 3078-79 (payments to Hana were in cash)); and Hana's use of Nadine Menendez as a deniable go-between to provide Menendez information about Parra's case (*see, e.g.*, GX B105-32).  Indeed, Menendez's participation with Nadine Menendez in a series of repayments intended to characterize the car payments as a loan (GX 3B-1)—a false cover-up story that Nadine Menendez and Uribe agreed to after being served with subpoenas (Tr. 3165-66)—further shows his consciousness of guilt regarding this bribe.  All of this evidence is more than sufficient to support the jury's verdict.  *See, e.g.*, *Bruno*, 661 F.3d at 744 ("[A] jury can . . . infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt." (internal quotation marks omitted)).

3.     *The Evidence Proved a Corrupt* Quid Pro Quo *Related to Daibes's Federal Prosecution and Attempts to Solicit a Qatari Investment*

a)     <u>The Evidence Established Official Acts</u>

The evidence at trial also overwhelmingly proved that Menendez accepted cash and gold from Daibes in exchange for promised and attempted official acts to influence Daibes's federal prosecution, and knowing that Daibes wished him in exchange to advance a Senate resolution regarding Qatar.  The jury could readily conclude each of these promised, attempted, or requested actions amounted to an official act.   There appears to be no dispute that Menendez's recommendation of whom to appoint for New Jersey U.S. Attorney (*see, e.g.*, Tr. 3631 (Philip Sellinger testifying Menendez stated he would recommend another individual after Sellinger raised prospect of potential recusal); Tr. 3635 (Sellinger testifying that Menendez stated he would recommend Sellinger after Sellinger's conversation with Soliman)), was an official act, which it plainly is under the law.  *See, e.g.*, *Reichberg*, 5 F.4th at 249 (holding that decisions promoting or transferring a police officer are "the sort of specific, formal exercises of government power that can constitute official acts").  Similarly, promises or attempts by Menendez to influence the New Jersey U.S. Attorney's Office's conduct of the Daibes prosecution by contacting the New Jersey U.S. Attorney's Office are also paradigmatic official acts.  *See, e.g.*, *id.* (holding that decisions initiating or regarding specific criminal cases are official acts); *Lee*, 919 F.3d at 344 (holding that indictment alleged an official act by state legislator attempting to influence prosecutor regarding specific case).  The evidence showed that Menendez attempted to do so by asking Michael Soliman to question Sellinger regarding his recusal and ask him to ensure—despite his recusal—that Daibes

receive "all due process." (Tr. 3946-47.)[7]  The evidence also entitled the jury to find that Menendez promised to do so by calling Vikas Khanna, the ultimate supervisor of the case against Daibes, praising Daibes's counsel, and then immediately calling Daibes to report back after that call. (Tr. 4997; GX 6A-820-1; GX 6B-1810.)  The timing regarding this sequence of events warranted a finding by the jury that the promise was made notwithstanding that—as in other cases—direct evidence of the content of the phone call to Daibes was not presented. *See, e.g.*, *Reichberg*, 5 F.4th at 249 (holding evidence sufficient to prove *quid pro quo* regarding official acts based in part on timing of call to police precinct immediately after relevant text messages).

The jury also heard evidence that Menendez accepted cash and gold bars from Daibes knowing that Daibes expected him in return to act on the Senate resolution regarding Qatar. (*See* Section I.B.3.b, *infra*.)  This is sufficient under the law. *See, e.g.*, *McDonnell*, 579 U.S. at 572 ("A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return.").  Whether Menendez did or did not in fact support that resolution (which the jury heard no evidence regarding), or even whether he intended to do so, is legally irrelevant. *See, e.g.*, *McDonnell*, 579 U.S. at 572; *Evans*, 504 U.S. at 268; *Brewster*, 408 U.S. at 526; *Silver*, 948 F.3d at 551-52; *see also id.* at 545 ("Extortion under color of right and honest services fraud require that the official reasonably believe, at the time the

---

[7] Although of course every defendant is entitled to due process, Menendez's choice to single out one defendant, and one whose case he knew Sellinger was forbidden from involving himself in in any way, entitled the jury to conclude that Menendez was requesting favorable treatment. *See, e.g.*, *Lee*, 919 F.3d at 357 ("[A] juror could easily have heard those words and concluded that they meant the exact opposite—that [the defendant] was, in fact, trying to influence the prosecutor.").

promise is made, that the payment is made in return for a commitment to perform some official action.").

<b>b)    The Evidence Established a Corrupt <i>Quid Pro Quo</i></b>

As with the conduct regarding Egypt and the New Jersey Attorney General's Office, the jury heard powerful evidence of the timing of the defendants' actions related to the New Jersey U.S. Attorney and Qatar.  Menendez spoke with Sellinger as the principal candidate for New Jersey U.S. Attorney, brought up Daibes's prosecution, and asked Sellinger to personally involve himself in that case if he became U.S. Attorney.  But when Sellinger informed Menendez he might have to be recused from that prosecution, Menendez *within hours* shifted his support to a different candidate, Esther Suarez, whom Daibes thought would treat him favorably.  (*See, e.g.*, GX A119-A; GX A113-PH4; GX 6B-501; GX 1401; Tr. 3893-94; *see also* GX 1304 lines 32-40.)  Then, after Suarez's candidacy did not appear likely to be successful, Menendez had his outside political advisor Michael Soliman speak to Sellinger, and upon learning that Soliman believed Sellinger would *not* have to be recused from the Daibes prosecution, Menendez reversed himself again and supported Sellinger.  (*See, e.g.*, Tr. 3936-39, 3942 (Soliman testifying he told Menendez he believed Sellinger would not have to be recused, and Menendez thereafter recommended Sellinger); *see also* Tr. 3635 (Sellinger testifying that after Sellinger spoke to Soliman, Menendez recommended him).)  These reversals alone are powerful evidence of Menendez's corrupt agreement with Daibes.  *See, e.g.*, *Calk*, 2022 WL 101908, at *2 (relying on defendant's reversals on whether to extend loans in bank bribery case, concluding "[t]he timing and circumstances of each loan was sufficient for the jury to infer [the defendant's] corrupt intent"), *aff'd*, 87 F.4th at 182.

37

The jury also heard that on or about October 18, 2021, shortly before Sellinger's confirmation, Daibes provided at least one kilogram of gold to Menendez at an in-person visit to Menendez's house, as evidenced by multiple contemporaneous electronic records (*see, e.g.*, GX A125 (Menendez search history for "how much is one kilo of gold worth"); D102-1 (text messages showing in-person meeting); GX 16C-2 at 17 (cell site records showing in-person meeting)) together with the serial numbers of the kilogram bars of gold matching Daibes's inventory (*see, e.g.*, GX 1F-1164, GX 1F-1239, GX B201-1A & GX 3D-6). Menendez did not disclose the receipt of this gold in his financial disclosure forms (GX 10E-6), and indeed did not disclose any gold at all until February 2022 (*i.e.*, approximately four months after receiving this gold), at which time he falsely represented to the Senate Ethics Committee counsel that this gold had been given to Nadine Menendez prior to his 2020 marriage to her, and that he had only recently learned of it. (*See, e.g.*, Tr. 5278-79; GX 8K-1.)

In late 2021, after this delivery of gold, Nadine Menendez texted Daibes that Menendez was "FIXATED" on Daibes's upcoming trial, and Daibes responded, in part, that Menendez "was amazing in all he did". (GX D102-2.) During the next weeks, Menendez and Daibes undertook a series of telling actions, all during a time period in which Menendez repeatedly performed Google searches for the price of a kilogram of gold. Menendez went on to contact Khanna (the ultimate supervisor of Daibes's prosecution after Sellinger's recusal) and praise Daibes's lawyer, and then to immediately thereafter call Daibes. (Tr. 4997; GX 6A-820-1; GX 6B-1810.) On the same day that Menendez made one attempt to call Daibes, Daibes's driver contacted Nadine Menendez, prompting her to thank Daibes for "Christmas in January." (GX D102-11.) And Menendez also told Soliman to contact Sellinger and ask him to explain why he was recused from the Daibes

prosecution—a directive that, for the first time in fifteen years working for Menendez, Soliman declined to follow and falsely told Menendez he had. (Tr. 3945-46.) After again seeking unsuccessfully to have Soliman speak to Sellinger about Daibes's case, Menendez eventually retaliated against Sellinger, shunning his investiture and contacting the other New Jersey Senator, Cory Booker, to try to convince him to do the same. (*See, e.g.*, Tr. 3652-53 (Sellinger: "He said, I'm going to pass. The only thing worse than not having a relationship with the United States Attorney is people thinking you have a relationship with the United States Attorney, and you don't."); GX A204-2.)

During the same time period when Menendez was receiving things of value from Daibes and attempting to influence Daibes's criminal prosecution, Menendez was also attempting to get a company linked to Qatar to invest with Daibes. The jury heard about Menendez's attempts to give Daibes advance copies of press releases praising Qatar (GX A104-2; GX A104-3; GX 3D-5), and Daibes's offer to Menendez of a luxury wristwatch (texting him photographs and writing "How about one of these") just days before sending Menendez information on a resolution favoring Qatar that was newly introduced and pending before Menendez. (GX A104-4; GX A104-B; GX A104-C; GX 10G-1.) This obvious request that Menendez support the Senate resolution was made just weeks before Daibes's kilogram gold delivery to Menendez on October 18, 2021, which was itself followed several weeks later by another message from Daibes to Menendez, this time reporting that another senator had joined the Senate resolution as a cosponsor. (GX A104-5, A104-E.) This second reference to the resolution was plainly another request for Menendez to act on it—one of the Qatari investors called Daibes the day before Daibes sent this message to Menendez, and Daibes called the investor back just minutes after sending it. (GX D209.) And

throughout this time period, Menendez continued to search for the price of a kilogram of gold (still months before contacting the Ethics Committee regarding any gold). (*See, e.g.*, GX A301-1.) This evidence powerfully supported an inference of corrupt intent by Menendez and Daibes. *See, e.g.*, *Bruno*, 661 F.3d at 744 ("[A] jury can . . . infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt." (internal quotation marks omitted)).

Moreover, the jury heard evidence of the highly suspicious things of value Daibes provided to Menendez. Daibes provided a series of at least ten envelopes of cash to Menendez bearing Daibes's fingerprints or DNA, containing a total of $82,500. (*See* GX 1338.) Serial number analysis on these envelopes established that the envelopes all had to have been provided at some point between August 24, 2020 and June 16, 2022—*i.e.*, during the period of the scheme. (*See id.*) In addition to this cash, in total, Daibes provided at least four one-kilogram bars to Daibes and nine one-ounce gold bars. (*See, e.g.*, GX 1F-1164, GX 1F-1165, GX 1F-1188, GX 1F-1239, GX B201-1A & GX 3D-6.)

The evidence of these highly probative things of value amply supported the jury's finding of a bribe scheme. *See, e.g.*, *Hills*, 27 F.4th at 1176 (holding that evidence of *quid pro quo* was sufficient where there was evidence that defendant was "given envelopes containing thousands of dollars of cash" at expensive dinners with bribe-payors); *see, e.g.*, *id.* at 1175-76 ("Defendants argued that those things were simply gifts, but the jury had more than an adequate basis to reject that claim."). Daibes and Menendez's attempts to analogize this case to the Western District of New York's decision in *United States v. Bongiovanni*, No. 19 Cr. 227, 2024 WL 3487914 (W.D.N.Y. July 19, 2024), are strained. (*See* Menendez Mem. 16-17; Daibes Mem. 49.) In that

case, the court found the delivery of only two envelopes of cash, with an unspecified amount of cash in the envelope each time, temporally far removed from any actual or contemplated official acts and with no linkage, was insufficient, but acknowledged that even with those evidentiary deficiencies it was a close case.  *Id.* at *5.  Indeed, the court reasoned that a larger number of envelopes would likely have been sufficient, as would a tighter temporal connection.  *See id.*  Here, Daibes gave—at an absolute minimum—ten envelopes of cash, four one-kilogram gold bars, and nine one-ounce gold bars, as well as participated in the delivery of three bribe checks from Hana and a payment to Nadine Menendez's mortgage company as another bribe, amounting to *twenty-seven* different things of value.  This staggering number of deliveries of things of value alone is within the range that even the *Bongiovanni* court acknowledged "likely would have been sufficient" by itself.  2024 WL 3487914, at *5 ("[H]ad Nigro testified—as she did before the grand jury—that she had witnessed Bongiovanni receive envelopes from Gerace on about 30 occasions from 2013 to 2016, including giving Bongiovanni envelopes five or six times herself at Gerace's direction, that likely would have been sufficient." (internal quotation marks, brackets, and citation omitted).)  Here, there is a very close temporal proximity between the things of value and the requested acts: Daibes delivered all of the envelopes of cash during the time period in which Menendez was acting to influence his criminal case, and at least one kilogram of gold less than three weeks after asking Menendez to support a Senate resolution and less than a month before asking him again to support it.  The timeline also revealed numerous other indications of a *quid pro quo*, such as a delivery of a thing of value on the *very day* that Menendez first called Khanna, and Menendez's telltale reversals in the U.S. Attorney selection.  *See, e.g.*, *Calk*, 2022 WL 101908, at *2; *Calk*, 87 F.4th at 182.  In addition, and also unlike in *Bongiovanni*, the evidence showed that

41

Daibes was involved in other aspects of the broader scheme, including with respect to Egypt, further supporting an inference of corrupt intent.

Moreover, as with the other portions of the scheme—and unlike in *Bongiovanni*—the jury heard evidence of concealment showing consciousness of guilt.  The jury heard evidence that Nadine Menendez, in selling two of the one-kilogram gold bars, falsely told Vasken Khorozian that they came from a family member, when in fact they came from Daibes.  (*See, e.g.*, Tr. 5090 (Khorozian testifying that Nadine Menendez told him gold bars came from her family); GX B201-1A (photograph of two-kilogram bars taken shortly before meeting with Khorozian and found on Nadine Menendez cellphone); GX 3D-6 (Daibes inventory listing serial numbers matching pictured kilogram gold bars).)  As noted above, Menendez's financial disclosures did not disclose the receipt of the gold bars from Daibes (*see* GX 10E-6), and did not disclose the receipt of any cash in any of the calendar years in which it could have been provided (*see* GX 10E-5; GX 10E-6; GX 10E-7).  All of this provides further support for the jury's verdict under well-settled law. *See, e.g.*, *Zheng*, --- F.4th ----, 2024 WL 3957619, at *12 n.5 ("A jury may infer a defendant's knowledge that conduct is wrongful from his efforts to conceal his conduct."); *see also, e.g.*, *Bruno*, 661 F.3d at 744 ("jury may 'infer guilt from . . . behavior indicating consciousness of guilt'" internal quotation marks omitted)).

### 4.    *The Evidence Proved That Count One and Count Two Were Each Single Conspiracies*

Hana separately claims that the evidence at trial was insufficient to prove that Counts One and Two each involved a single conspiracy (to commit bribery and honest services wire fraud, respectively).  (*See* Hana Mem. 131-42.)  This claim requires disregarding the extensive evidence of a single scheme and should be rejected.

42

As an initial matter, Hana repeatedly references an incorrect standard—whether Hana had a "stake" in certain aspects of the conspiracy. (*See, e.g.*, Hana Mem. 131 ("Mr. Hana had absolutely no stake in whether Mr. Daibes received anything of value from Senator Menendez"); *id.* at 137 (Hana "did not have a stake, monetary or otherwise, in whether Mr. Daibes' or Mr. Uribe's aspects of the supposed scheme succeeded"); *id.* at 138 ("the Government failed to prove that the Defendants cared at all about, or had any stake in, the other Defendants' alleged schemes")).  Having a "stake" in the scheme is not the relevant standard, and a financial interest in the outcome of the scheme is not required.  Indeed, "[t]here is no requirement that each member of a conspiracy conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member." *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989) (citations omitted).  "[A] single conspiracy may include multiple groups of people, and the pursuit of multiple illegal objects does not automatically divide a single conspiracy into multiple conspiracies." *United States v. Rigas*, 281 F. Supp. 2d 660, 665 (S.D.N.Y. 2003).  "A single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States v. Payne*, 591 F.3d 46, 61 (2d Cir. 2010) (internal quotation marks and brackets omitted); *see also id.* ("Changes in membership and/or differences in time periods do not necessarily require a finding of more than one conspiracy." (internal quotation marks, brackets, and ellipsis omitted)).

The Second Circuit has held that a finding of multiple conspiracies requires "separate networks operating independently of each other." *E.g.*, *United States v. Dawkins*, 999 F.3d 767,

797 (2d Cir. 2021) (internal quotation marks omitted); *see also id.* (affirming district court's refusal to give multiple conspiracies instruction).

The evidence was more than sufficient to allow the jury to find that, far from constituting "separate networks operating independently of each other," *id.* (internal quotation marks omitted), Hana and Daibes both cooperated on jointly making many of the bribe payments to Menendez, with Daibes at times physically handing bribes from Hana to Menendez.  For example, *first*, after Menendez told Nadine Menendez to call Daibes, she spoke with Daibes and immediately thereafter Hana finally authorized payment of her mortgage (despite her not signing any promissory note). (*See, e.g.*, GX D110-A; GX 5C-200; *see also* GX 1302 at lines 956, 968-973.)  *Second*, the first of the three $10,000 "consulting" checks from IS EG Halal to Nadine Menendez was delivered by Daibes to Menendez—that is, Daibes literally gave the bribe check from Hana to Menendez.  (*See, e.g.*, GX 5A-1001A; GX D102-10; GX D207-2; *see also* GX 1302 at lines 1098-1104.)  *Third*, the next $10,000 check was paid by Hana to Nadine Menendez again after Daibes's intervention; after Menendez told Nadine Menendez that she "should not text or email" Daibes to complain about the late check, she called Daibes and the check was paid soon afterwards.  (*See, e.g.*, GX 5A-1001B; GX A101-55; GX A109-A; *see also* GX 1302 at lines 1109-1117.)  *Fourth*, Daibes expressly told Menendez that he had "the envelope for Nadine"—that is, the third bribe check.  (*See, e.g.*, GX 5A-1001C; GX D101-2; *see also* GX 1302 at lines 1123-1128.)[8]  Hana does not cite any case in

---

[8] As another example, contemporaneous text messages show that, several days after Menendez called Grewal to attempt to intervene in Parra's case, Hana twice asked Daibes to fund the Mercedes-Benz purchase (without providing any additional information).  (GX C209-2; GX C209-3.)  Although Daibes did not contribute money towards the purchase price of the car, the fact that Hana did not feel the need to provide any additional information to Daibes strongly supports the inference that Daibes was already aware of the circumstances of the offer of the car.  The fact that

which a court has found insufficient proof of a single bribery conspiracy where one "spoke" of the wheel writes a bribe check that another supposedly separate "spoke" then personally delivers to the public official at the "hub," and the Government is not aware of any.

Even beyond the direct evidence that the defendants cooperated to provide the same bribes, the evidence at trial showed that Hana and Daibes had a close, interdependent relationship, both personally and financially. Their relationship was described as almost a father-son relationship (*see, e.g.*, Tr. 5076-77), and they worked in close proximity (*see, e.g.*, Tr. 715 (IS EG Halal's headquarters in a Daibes-owned building), 787-88 (Daibes "always kind of floating around" Hana's office space)), and shared employees (*see, e.g.*, Tr. 971 (Daibes's assistant Jamela Maali worked for Hana simultaneously)).

Hana and Daibes also had a direct financial relationship, as they formed joint ventures during the course of the scheme in which Hana invested millions of dollars he obtained as proceeds of his IS EG Halal monopoly into Daibes's real estate projects. (*See, e.g.*, Tr. 749; GXs 3C-6, 3C-7, 3C-8.) The nature of a joint venture, in which each partner depends on the other for the success of the joint venture, strongly shows the interdependence of their relationship. To the extent that the bribes paid to Menendez were intended to support Hana's business (such as by protecting his monopoly), that would have been highly material for Daibes to know in order to gauge the success of a venture involving Hana as a business partner. Likewise, to the extent that the bribes paid to Menendez were intended to support Daibes's business (such as by incentivizing Egyptian or Qatari

---

Hana felt comfortable asking Daibes to contribute to the purchase of the car (which the evidence at trial proved was a bribe) is a powerful demonstration of the conspiratorial relationship between Hana and Daibes.

investment into Daibes's business), that would have been highly material to Hana for the same reasons.

Contrary to Daibes's arguments (Daibes Mem. 50), the evidence showed that Daibes also had involvement in some of the business activities of IS EG Halal. For example, Daibes told IS EG Halal's lawyer at one point "get that contract done" about a share buyback agreement for IS EG Halal (Tr. 787-88), which referred to Daibes as the "lender" of IS EG Halal (GX 4E-1). Associated legal correspondence referred to Daibes brokering the stock buyback at a meeting involving Hana and the other stockholder, and indicated that the buyback discussed at the meeting was at the direction of an Egyptian general. (*Id.*)

Hana also attempted to solicit for Daibes business through the same Egyptian government contacts that Hana reported to (and that Menendez took or promised official acts for the benefit of) in connection with the bribery scheme, showing Hana's awareness of Daibes's desire for funding from foreign governments as well as Hana and Daibes's mutual willingness to use bribery to attempt to obtain it. (*See, e.g.*, GXs C408, C409.)

Hana's joint venture with Daibes also made him highly dependent on the continued success of Daibes's business and the successful resolution of Daibes's criminal case, two objects of the conduct for which these bribes were given. Moreover, Hana's attempts to obtain business for Daibes with Egypt through bribery of Menendez, discussed above, are highly similar in *modus operandi* to Daibes's attempts to obtain business connected to Qatar through bribery of Menendez. Likewise, Daibes's and Menendez's attempts to influence Daibes's criminal case were highly similar in *modus operandi* to Hana's and Menendez's attempts to influence the New Jersey Attorney General criminal matters. Both of these sets of similarities—particularly in light of

46

Daibes's involvement in providing Menendez and Nadine Menendez with the "consulting" checks for Nadine Menendez—support the jury's finding that Menendez, Hana, and Daibes were all part of the single conspiracies charged in Counts One and Two. *See, e.g.*, *Payne*, 591 F.3d at 61 ("mutual dependence and assistance" sufficient for single conspiracy even if there are two or more "phases or spheres of operation"); *Dawkins*, 999 F.3d at 797 (affirming denial of multiple conspiracy instruction in scheme to pay bribes to variety of men's college basketball coaches, noting that evidence did not show "separate networks operating independently of each other"). Indeed, the evidence at this trial of a single conspiracy was far stronger than evidence the Supreme Court has held sufficient, where a number of salesmen, who each individually illegally sold whiskey, were part of a single conspiracy solely because they each knew they were selling from a larger lot of whiskey. *Blumenthal v. United States*, 332 U.S. 539, 558 (1947) (holding evidence showed single conspiracy to illegally sell whiskey, explaining, "True, each salesman aided in selling only his part.  But he knew the lot to be sold was larger and thus that he was aiding in a larger plan.").

All of this evidence amply warranted the jury in finding multiple conspiracies.  Moreover, the jury was properly instructed, at the defense's request, on multiple conspiracies, being told, among other things:

> When two or more people join together to form one common unlawful design or purpose, a single conspiracy exists.  By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.

> Proof of several separate and independent conspiracies is not proof of a single, overall conspiracy charged in each of Counts One and Two, unless one of the conspiracies proved happens to be the single conspiracy described in the count you are considering. . . .

> [I]f you find that the specific single conspiracy charged in the count you are considering did not exist, you cannot find any defendant guilty of that conspiracy. This is so even if you find that some conspiracy, other than the one charged in the count you are considering, existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership.

(Tr. 7147-49.)  Juries are presumed to follow such instructions, and in this case the jury was particularly attentive.  (*See, e.g.*, Tr. 4098 ("Everyone has said, and I think it's true, this is an excellent jury.  They seem to be paying – they're rapt at some points, and several of them have gone through several [note]books."); Tr. 7052 (describing jury as "very attentive to the witnesses and the testimony here").)

Properly instructed, a reasonable jury could, and this jury did, find Hana guilty of the conspiracies charged in Counts One and Two.  Hana provides no basis to disturb this finding.  *See United States v. Orozco-Prada*, 732 F.2d 1076, 1086 (2d Cir. 1984) ("[W]e have consistently held that the question whether one or multiple conspiracies are present is a question of fact, to be resolved by a properly instructed jury"); *see also id.* at 1087 ("While [the defendant's] argument that there were two conspiracies . . . is plausible, it is not so compelling, under the standards that we must apply on this appeal, to persuade us that the jury had to accept it.  . . . [The] evidence, though circumstantial, allowed the jury to infer that there was a single conspiracy and that [the defendant] was a participant in that conspiracy.").  That Hana disagrees with the jury's rejection of his factual arguments does not entitle him to overturn the verdict.

5.    *The Evidence Proved a Scheme for Menendez to Act as an Agent of Egypt*

The evidence also proved that Menendez, while a United States Senator, agreed to and did act as an agent of Egypt by engaging in political activities, acting as a political consultant, representing the interests of Egypt before the U.S. government, and representing and holding

48

himself out as willing to act as an agent of Egypt. Contrary to Menendez and Hana's arguments (Menendez Mem. 35-37; Hana Mem. 109-31), the evidence that Menendez acted at Egypt's request—a request accompanied by the promise and payment of compensation—or at the very least represented that he was willing to do so, was overwhelming.

As an initial matter, Menendez misstates what the Government was required to and did prove at trial. (Menendez Mem. 35.) The Government was not required to prove any actual request by Egypt, but instead *either* that (1) Menendez acted in any one of several capacities including "at the order, request, or under the direction or control" of the foreign principal or its intermediary, *or* (2) that Menendez agreed, consented, assumed, or purported to act as, or was or held himself out as, the foreign principal's agent. (Tr. 7124-25.) The Court instructed the jury that, in this context, a request must be "something more than an ordinary solicitation," and instead must include "some degree of authority" by the principal, such that "the ultimate question, including based on a request, is whether it is fair to draw the conclusion that an individual is not acting independently, such as by simply stating or believing his own views, but is instead acting as an agent of the foreign principal." (Tr. 7127.) The Court instructed the jury that factors that may support such an agency relationship include whether the principal's instructions or requests are "accompanied by the offer or promise of compensation, evidence of an ongoing relationship or coordination between the principal and agent, whether the person seeks or receives feedback on his work from the foreign principal, and if the foreign principal's goals do not align with the alleged agent's own interest or subjective viewpoint." (Tr. 7128.) Each of these factors strongly supported the jury's finding of the requisite agency relationship.

49

The jury heard evidence of the material change in Menendez's public posture towards Egypt during the course of the scheme. Prior to the commencement of the foreign influence scheme, Menendez was a prominent public critic of Egypt. (*See, e.g.*, GX C401.) Beginning in early 2018 and continuing through the course of the scheme, Hana and Nadine Menendez arranged meetings between Menendez and Egyptian government officials, both those involving formal delegations (*see, e.g.*, GX C407 (Hana passing Menendez invitation for "white paper" delegation meeting to Egyptian Defense Office)), and more unusual meetings such as office meetings that were kept off his calendar (*see, e.g.*, GX A101-32 (Menendez and Nadine Menendez corresponding about meeting with Helmy and Hana); GX 3A-14 (calendar not listing meeting)). This pattern of "ongoing relationship" and "coordination" between Menendez and Egyptian officials was itself a factor the jury could rely on supporting an agency relationship (Tr. 7128), but the evidence also showed that these meetings got results for Egypt. During the course of this conduct, Menendez told his staffer that he intended to change his public position on Egypt to be less critical, a move that he characterized as a tactical shift but that the jury was entitled to view, in context, as an act in Egypt's favor. (*See* Tr. 4511-12 (Sarah Arkin testifying about Menendez's change in approach with respect to public statements concerning Egypt in spring of 2019); *see also* Tr. 7128 (agency relationship supported "if the foreign principal's goals do not align with the alleged agent's own interest or subjective viewpoint").)

By June 2021, Menendez's meetings with Egyptian government officials had become even more irregular and accompanied directly by acts for the benefit of Egypt. On June 21, Menendez met with the head of Egyptian intelligence at a hotel without his staff's awareness. (*See* GX B213-4 (Mai Abdelmaguid to Nadine Menendez: "Please let us know when the chairman will be on his

way so i wait for his excellency at the hotel entrance."); GX A103-21 (Nadine Menendez to Menendez forwarding Abdelmaguid message); *see also* Tr. 4548 (Arkin testifying she was unaware of such a meeting and would have expected to be informed).)  During this hotel meeting, Menendez shared with the Egyptian intelligence director topics his own fellow U.S. Senators planned to ask about the next day; after the meeting Menendez then sent the Egyptian officials, through Nadine Menendez, an article providing details on the anticipated questioning—for the stated purpose, according to Nadine Menendez, of letting the Egyptian side "prepare" its "rebuttals."  (*See* GXs A103-17, A103-A (Menendez sending Nadine Menendez Khashoggi article); GX B213-4 (Nadine Menendez sending Abdelmaguid document with article filename and Abdelmaguid responding "Thanks you so much, chairman also raised it today"); GX G301-1 (Nadine Menendez to Abdelmaguid: "Wanted to give you a heads up *so you can prepare your answers*" (emphasis added)); GX B213-4 (Nadine Menendez to Abdelmaguid the next day: "I truly hope the information that I sent you last night was helpful. , I just thought it would be better to know ahead of time what is being talked about and *this way you can prepare your rebuttals*." (emphasis added)).)

This pattern of taking actions in favor of Egypt in connection with direct meetings with Egyptian officials continued and escalated throughout the course of the scheme.  By 2021, Menendez took the highly irregular step of directing his staffer Sarah Arkin to plan a trip to Egypt not with the U.S. State Department but with Abdelmaguid, who his staff believed was an Egyptian intelligence officer.  (*See* Tr. 4577-79; *see also* Tr. 4543.)  When Arkin followed ordinary procedure and contacted the State Department instead (initiating the process for planning a congressional delegation, or "CODEL," under the supervision of the State Department),

Abdelmaguid responded with panic, telling Nadine Menendez that Abdelmaguid would probably lose her job, and writing "SOS," at this development. (GX B213-6.) Nadine Menendez, in turn, passed this unfiltered reaction along to Menendez, who instead of expressing any surprise simply informed Nadine Menendez he had "[t]aken care of" the matter. (GX A103-6.) Several days later, Menendez disinvited Arkin from attending the CODEL, a move that stunned and confused his staff. (*See* Tr. 4585-90.) This backdrop of direct and unfiltered contact with Egyptian government officials and escalating actions in their favor alone was sufficient to allow a reasonable jury to infer that Menendez's actions favorable to Egypt came at the request of those officials Menendez was meeting with and showed an agency relationship, even without more. But there was much more.

The jury heard ample additional evidence of Menendez's actions further supporting the inference that his actions came at the request of Egypt pursuant to an agency relationship. Shortly after an off-the-calendar meeting and dinner with Hana and Helmy in 2019, Menendez called to pressure McKinney to cease his opposition to Egypt's policy goals regarding halal certification, another act on behalf of or benefiting Egypt. (*See, e.g.*, GX A101-32; GX 8B-10.) And as far back as May 2018, immediately after meeting with Hana and Nadine Menendez, Menendez sent Nadine Menendez—for retransmission to Hana and thereafter to Egypt, the evidence showed—two highly telling pieces of information. One was sensitive real-time information about the number and nationality of staff employed at the U.S Embassy in Cairo. (*See, e.g.*, GX A101-6 (text message sending information).) The jury heard that this type of information was highly sensitive because it could allow the identification and location of personnel associated with the Embassy. (Tr. 377 (Bret Tate testifying the total number of staff at Embassy is sensitive and not

public).)  Although certain *out-of-date* information became no longer sensitive and could be publicly disseminated (Tr. 690-91 (Tate testifying staffing information becomes inaccurate, and no longer sensitive, over time)), *current* information such as Menendez provided was sensitive and was treated as such by the staff members involved in obtaining it (*see, e.g.*, GX 8A-1 ("Don't ask why I'm asking"); *id.* ("I would have to ask and then someone is going to ask why.")).  Nadine Menendez passed this sensitive information to Hana, who immediately retransmitted it to Ahmed Essam, an Egyptian government official.  (GX B105-4; GX C112-1; GX 8A-12.)  The jury could readily conclude that this sequence of events, ending with the information in Egyptian government hands, was not a coincidence but came about as a result of a request from the Egyptian government, passed on through Hana at the meeting that immediately preceded Menendez's attempts to gather the information.

The second piece of information Menendez provided for Egypt's benefit after meeting with Hana also directly supported the inference that Menendez was acting as Egypt's agent and sought to conceal that he was doing so.  The day after the meeting with Hana that prompted his sending the Embassy information, Menendez also gathered a summary of the holds that another U.S. Senator had imposed on foreign military financing to Egypt, and of the human rights concerns motivating those holds, and transmitted that summary to Nadine Menendez, who duly passed it on to Hana.  (*See* GX A402.)  That summary of concerns, in turn, led to perhaps one of Menendez's most unusual acts on behalf of Egypt—Menendez, at the request of Nadine Menendez, Hana, and an Egyptian general, ghostwrote for Egypt a response to those very concerns Menendez had just summarized.  Nadine Menendez made explicit that the purpose of this letter was to "prove a point to" an Egyptian general, who Nadine Menendez indicated had, with Hana, given her "clearance

for a project." (*See* GX B102-A.) The jury could obviously infer that this attempt to "prove a point" to the general was not *unsolicited* but rather resulted from the general's request (or, at the very least, was done to ensure that Egypt understood that Menendez was willing act as Egypt's agent, including with respect to his fellow Senators). But even leaving aside this statement, the jury could easily infer that it was an act at the request of the Egyptian government from the nature and content of this ghostwritten letter, which was written in the voice of the Government of Egypt (*e.g.*, using the terms "we" and "our" to refer to the Government of Egypt (GX A403)), which was patently intended to benefit the Government of Egypt by responding to obstacles that had placed a hold on hundreds of millions of dollars of aid to Egypt (*see, e.g., id.* ("I write to respond to some of the issues that have been raised by Senator [Senator-1] and others, which have lead [sic] to a hold on $300 million dollars in appropriated aid to Egypt.")), and which was in fact transmitted to an Egyptian government official (*see* GXs C207-15, C207-A to C207-E (Helmy circulating to Hana a revision containing some of the language drafted by Menendez)).

In addition to all of these circumstantial indications of fulfilled, and often furtive and unusual, requests from Egyptian government officials, the jury heard direct evidence of an Egyptian government official requesting, through Hana, that Menendez take action to help Egypt resolve a human rights lawsuit at Egypt's preferred settlement number of $2 million. (*See* GX C207-7T (Helmy to Hana: "[I]f the guy takes care of this thing through [Senator-1], he'll be settled in." and "Our decision, is that we already gave our final offer… Two million and not a single dollar more…").) Upon receiving this request, Hana indicated he would transmit it to Menendez (*see id.* (Hana to Helmy: "Roger that[.] Consider it done")), and Hana in fact transmitted to Menendez, through Nadine Menendez, documents pertaining to this lawsuit and fielded questions regarding

54

them (*see* GXs C207-7, C207-I, C207-J (documents from Helmy to Hana); GX C102-7 (documents texted from Hana to Nadine Menendez); GX A405 (documents forwarded from Nadine Menendez to Menendez); GX C102-7 (Nadine Menendez to Hana: "I have a question regarding the text you sent me I forwarded it")).  The evidence that Menendez acted at Egypt's request and pursuant to an agency relationship was truly compelling, and more than sufficient.[9]

In sum, the Government presented overwhelming evidence that Menendez's actions and promises on behalf of Egypt were made not independently or pursuant to "an ordinary solicitation" (Tr. 7127), but instead at Egypt's request and, in any event, in exchange for the "offer or promise of compensation" (Tr. 7128).  The extensive evidence of Menendez's acceptance of bribes from Hana and Daibes in exchange for his actions on behalf of Egypt, discussed in Section I.B.1.b, above, itself easily justified the jury's finding that Menendez acted or agreed to act as Egypt's agent, even leaving aside any of the other factors supporting that finding.

In addition to these responses to the requests made by Egypt, Menendez and Nadine Menendez made a number of pronouncements of their willingness for Menendez to serve as an agent.  (*See, e.g.*, Tr. 2126 (Terrie Williams-Thompson: "She asked 'What else can the love of my life do for you?'"); GX C207-13T (Hana to Helmy: "Our man is going to India after two weeks and is asking if we need any message or anything for ISEG"); GX B220-4 (Nadine Menendez to Helmy: "[A]nytime you need anything you have my number and we will make everything

---

[9] In his memorandum, Menendez asserts that "any action that [he] agreed to take at the request of either Nadine or Hana would be insufficient as a matter of law to prove a violation of 18 U.S.C § 219" because neither individual was a foreign principal.  (Menendez Mem. 36.)  Menendez is wrong.  While neither individual was a foreign principal, either could be a person "whose activities are directly or indirectly supervised, directed, controlled, financed or subsidized in whole or in major part by a foreign principal," as the jury was properly instructed.  (Tr. 7125.)

happen.").)  These both evidenced Menendez's willingness to act as an agent, by soliciting Egypt's feedback on how he could continue to act for their benefit (*see* Tr. 7128 (agency supported by "whether the person seeks or receives feedback on his work from the foreign principal")), and also warranted the jury in finding that Menendez held himself out as an agent of Egypt by representing his willingness to act on Egypt's behalf.  Indeed, there is no reasonable explanation otherwise for the actions described above, or for Hana to refer to a United States Senator as "Our man" in speaking to an Egyptian official.  (GX C207-13T.)  Certainly, the jury was entitled to so find.

In challenging the sufficiency of his conviction on the foreign influence charges, Menendez also briefly renews his challenge to the constitutionality of 18 U.S.C. § 219.  (Menendez Mem. 37-38.)  However, in so doing, Menendez simply repeats, in summary form, his same sweeping Speech or Debate position that this Court has already resoundingly and repeatedly rejected, which is meritless for the reasons explained below.[10]  In particular, as he did in his first motion to dismiss (Dkt. 120. at 35-37), Menendez asserts that because Section 219 supposedly targets actions, rather than agreements, "the government's prosecution under § 219 necessarily required the jury to evaluate legislative acts and motives" that are "immunized" by the Speech or Debate Clause.  (Menendez Mem. 37.)  This argument fails for multiple reasons.

---

[10] Menendez also asserts that Section 219 allegedly violates the separation of powers.  His argument in that respect is a single conclusory sentence, without citation to authority.  (Menendez Mem. 37-38 ("The separation of powers does not permit prosecutors and judges to superintend the basic work of the legislative branch; because extending FARA to sitting members of Congress does just that, as made plan by this trial, it is unconstitutional.").)  The Court accordingly need not consider this assertion.  Nor does Menendez acknowledge that the Court has already rejected his argument, in a published decision, concluding that "the decision to impose criminal sanctions on its Members who act as foreign agents was an *expression* of congressional autonomy" that did not violate the separation of powers.  *United States v. Menendez*, No. 23 Cr. 490 (SHS), --- F. Supp. 3d ----, 2024 WL 1120182, at *8 (S.D.N.Y. Mar. 14, 2024) (emphasis in original).

As an initial matter, the "action" criminalized by Section 219 is being an agent of a foreign principal required to register under the Foreign Agents Registration Act ("FARA"). 18 U.S.C. § 219(a). And FARA, in turn, defines such an agent as someone who, among other things, agrees to so act, or represents or holds himself out as such, as the jury was correctly instructed (Tr. 7125). It therefore is simply wrong that Section 219 requires a jury to evaluate "legislative acts." Of course, in weighing whether Menendez agreed to and did act as an agent, the jury was entitled to consider his actions. But as this Court has repeatedly and correctly found, none of the actions in this case falls within the Speech of Debate Clause. (*See* Section II.B.1, *infra*.)

Nor does Menendez accurately describe the record of this case in making his renewed argument. He asserts that "critical to the [Section 219] charge was the question of whether a foreign hand was at play when Senator Menendez approved the $99 million military aid package to Egypt." (Menendez Mem. 37.) But in accord with the Court's pretrial ruling, the Government did not introduce evidence of such approval, and Menendez cites nothing in support of his statement. He is not entitled to relief on the basis of the alleged introduction at trial of evidence that was not in fact introduced.

Ultimately, contrary to Menendez's claims of an "extraordinary" prosecution (Menendez Mem. 35), the jury's verdicts of conviction on Count Fifteen and Count Sixteen reflect nothing more than the application of the law to overwhelming evidence that, while he was a U.S. Senator, Menendez acted, in a wildly abnormal and corrupt manner, for the benefit of Egypt and as its agent, and he represented to Egypt that he would do so.

57

6.    *The Evidence Proved Corrupt Endeavors to Obstruct Justice*

a)    The Evidence Established Menendez Agreed to and Did Endeavor to Obstruct the Southern District of New York's Grand Jury Investigation

As described in Sections I.B.1 and I.B.2, above, the evidence at trial proved that Menendez knew about the payments Uribe and Hana made towards his wife's mortgage and car, and that he knew they were not loans. The evidence was more than sufficient to demonstrate that, after Menendez learned about the federal grand jury investigation in June 2022, he agreed to and did seek to obstruct the investigation by (i) covering up that he knew about the bribe payments made by Uribe and Hana, (ii) falsely claiming that he believed, after he learned about them, that they were legitimate loans, and (iii) creating documents that were provided to the grand jury to support that false cover story.

As an initial matter, Menendez's claims that he did not know that the memo lines on checks that he and his wife wrote to cover-up the bribes and repay Uribe and Hana were false, or that the statements his counsel made to the U.S. Attorney's Office to avoid prosecution were not accurate (Menendez Mem. 41) is belied by the evidence described above (*see* Section I.B.1 and I.B.2, *supra*). And the jury's determination that such conduct was done with an intent to obstruct justice was amply supported by the evidence.

The jury heard evidence that Menendez first learned about the federal grand jury investigation on June 16, 2022. On that date, Menendez's cellphone was seized from him by the FBI, pursuant to a court-authorized search warrant, and other electronic devices were seized from his co-conspirators, including his wife, Nadine Menendez, and Jose Uribe, and from the residence he shared with Nadine Menendez in New Jersey. (GX 1435.) Beginning on June 16, 2022, and continuing through mid-2023, Menendez, his Senate office, his wife, and his co-conspirators,

including Jose Uribe and IS EG Halal, were served with multiple subpoenas issued by a grand jury in the Southern District of New York.  (GX 11A-1 to 11A-5, 11B-1 to 11B-3, 11C-1 to 11C-4, 11C-7, 11C-8, 11E-1 to 11E-14, and GX 1443, 1450, 1458.)  Menendez was served with grand jury subpoenas dated June 16, 2022 (GX 11A-1), dated November 22, 2022 (GX 11A-2), dated May 11, 2023 (GX 11A-3), and dated June 6, 2023 (GX 11A-4), and his Senate office was also served with a grand jury subpoena dated November 22, 2022 (GX 11A-5).

Approximately one month after the FBI executed the initial seizure of electronic devices and served grand jury subpoenas on Menendez and others, Nadine Menendez went to Uribe at Uribe's office in Union City, New Jersey, and arranged to get together later that day at the Glenpointe Marriott.  (Tr. 3161, 3163.)  At that meeting, Uribe discussed that the FBI had served him grand jury subpoenas and searched and seized his phone, and Nadine Menendez explained that she "felt sick" looking at the "papers" the FBI had given her.  (Tr. 3164-65.)  Nadine Menendez asked Uribe what he would say if law enforcement asked him about the payments he had made for the Mercedes-Benz Convertible, to which Uribe responded that he would say those payments had been a loan for a friend until the friend was able to pay him back, and Nadine Menendez said that sounded good.  (Tr. 3165.)  Uribe admitted that he suggested this cover story to hide his "wrongdoings."  (Tr. 3166.)

The jury heard that, thereafter, Menendez and his wife sought to implement the cover story—*i.e.*, that the money Nadine Menendez had received from Uribe and was a loan—by returning the money and falsely characterizing the transactions to repay the money as repayment of a "loan."  In particular, in December 2022, Menendez sought with his wife to return to Uribe bribe money Uribe had paid to obtain the Mercedes-Benz Convertible for Nadine Menendez.

59

Menendez wrote Nadine Menendez a check for $23,000 with the memo line "for car payment." (GX 3B-1.) Nadine Menendez then wrote Uribe a check for $21,000 with the memo line "personal loan." (GX 3B-1; Tr. 3167-68.) Menendez and his wife took a similar approach with the money she received from Hana. In particular, in December 2022, Menendez wrote his wife a check for $23,569 (*i.e.*, the sum that Hana paid to Nadine Menendez's mortgage to avoid foreclosure in 2019, rounded up to the nearest dollar), bearing the handwritten memo line "To Liquidate loan." (GX 3B-1.) Nadine Menendez then wrote a check for $23,568.54 (*i.e.*, the precise amount of the mortgage payment) to Hana's counsel, in trust for Hana, with the handwritten memo line "Full payment of Wael Hana loan," along with a handwritten letter that stated, in part, that the check was "in full payment of a personal loan he [*i.e.*, Hana] gave me [*i.e.*, Nadine Menendez]." (GX 3B-1.) Thereafter, in response to grand jury subpoenas issued to her, Nadine Menendez produced Menendez's checks to her, along with her checks to Uribe and Hana, all of which contained false and misleading memo lines describing the nature of the payments. (GX 3B-1; GX 1409.)

The jury was entitled to conclude from the close coordination of this sequence of checks, as well as from the extensive evidence presented at trial of Menendez's involvement in Nadine Menendez's daily life, that Menendez was involved in Nadine Menendez's production of the checks containing false and misleading statements in response to a grand jury subpoena, which is itself sufficient to prove obstruction of justice under well-settled law. *See, e.g.*, *Aguilar*, 515 U.S. at 601 ("[O]ne who delivers false documents . . . to the grand jury" commits obstruction of justice). Indeed, the Second Circuit has affirmed an obstruction of justice conviction where a defendant deleted documents that were likely to be later sought by a grand jury subpoena, even though "at no time did [the defendant in that case] delete a document for which there was an outstanding

subpoena." *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 168 (2d Cir. 2008). Since the evidence entitled the jury to find that Menendez, by contrast, was involved in submitting false documents pursuant to "an outstanding subpoena," *id.*, it necessarily sufficed to prove obstruction of justice.

Although the Court need go no further than the false checks to uphold the verdict, the jury also heard evidence that Menendez, through his then-counsel, took additional steps to reinforce the false statements that had been transmitted to the grand jury. Specifically, he had his then-counsel meet with the U.S. Attorney's Office, before charges were brought in this case, and relay the false story that the payments from Uribe and Hana were loans. (Tr. 4270-76, 4284-85, 4309, 4311; GX 4A-3.) Menendez's counsel also unknowingly relayed the false claims that Menendez was not contemporaneously aware of the payments both Uribe and Hana made for his wife, and only learned of them after learning of the investigation in 2022. (Tr. 4274-76; GX 4A-3.)[11] Although Menendez was not present for his then-counsel's meeting with the U.S. Attorney's Office, it was reasonable for the jury to infer that Menendez—a sophisticated politician and lawyer himself by training—authorized the presentation and false information presented by his counsel. Indeed, the presentation itself contained explicit representations concerning Menendez's knowledge and awareness, and also referred to and relied on the misleading checks that he and his wife had prepared to repay Uribe and Hana. (GX 4A-3.) *See United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984) (client's participatory role in an attorney's statement is evident inferentially when the statement "is a direct assertion of a fact which in all probability had to have been

---

[11] The evidence did not suggest, and the Government has not alleged, that any of the counsel involved were aware of or engaged in any wrongdoing.

confirmed by the defendant"); *see also United States v. Mercado*, No. S1 02 Cr 675 (WHP), 2003 WL 21756084, at *8 (S.D.N.Y. July 30, 2003). And the jury also had already heard that Uribe, similarly, had specifically authorized his then-counsel to relay the false cover-story to the prosecutors to avoid prosecution. (Tr. 3171-72 (Uribe).) In these circumstances, it was reasonable for the jury to infer that Menendez likewise authorized his then-counsel to make false statements to the prosecutors to avoid prosecution—indeed, it would be hard for the jury to avoid such a conclusion. (*See* Dkt. 473 (Order rejecting Menendez's objection to admission of the presentation).)

Contrary to the position that Menendez appears now to take (Menendez Mem. 40), the law does not require that the defendant himself must produce false documents to the grand jury or that a defendant know that his false or misleading statements or information literally will be transmitted to the grand jury. *See, e.g.*, *United States v. Quattrone*, 441 F.3d 153, 179 n.25 (2d Cir. 2006) ("we reject Quattrone's proposed instruction that the jury had to find he had knowledge of the scope and subject matter of the grand jury investigation, such that he knew what documents or categories of documents had been subpoenaed by the grand jury and that he corruptly endeavored to obstruct by causing the destruction of documents he knew to be sought in the investigation"); *Aguilar*, 515 U.S. at 601 ("Were a defendant with the requisite intent to lie to a subpoenaed witness who is ultimately not called to testify, or who testifies but does not transmit the defendant's version of the story, the defendant has endeavored to obstruct, but has not actually obstructed, justice."). Nothing in *Schwarz*, which is also relied on by Menendez, requires knowledge that the false or misleading statements at issue must literally be successfully transmitted to the grand jury or that the defendant himself must produce the false and misleading documents to the grand jury, instead

62

of his wife. *See Schwarz*, 283 F 3d at 108 (describing "nexus" requirement that is "satisfied only when the defendant's conduct has some relationship in time, causation or logic to a judicial proceeding, such as a federal grand jury proceeding, so that it may be said to have the natural and probable effect of interfering with that judicial proceeding" (internal quotation marks omitted)). Were the law otherwise, the word "endeavor" in the statute would be rendered meaningless. And it is, for very good reason, not the law. *See Quattrone*, 441 F.3d at 179 n.25 ("Under our analysis, it would be sufficient to show that [the defendant] knew that his actions were likely to affect the proceeding[.]"); *Aguilar*, 515 U.S. at 601-02 (The term "endeavor" has a "useful function to fulfill"—"[i]t makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way.").

Even putting Menendez's counsel's presentation to U.S. Attorney's Office to the side, as detailed above, there is thus more than sufficient evidence of Menendez's agreement to obstruct the federal grand jury investigation and participate in the scheme to do so through repayment of the money to Uribe and Hana, including checks with false and misleading memo lines that were produced in response to grand jury subpoenas. *See, e.g.*, *Aguilar*, 515 U.S. at 601. However, Menendez's counsel's presentation to the Government to avoid charges is also both powerful evidence of Menendez's motive and intent to participate in the scheme to obstruct the investigation, as well as an additional act in furtherance of the scheme. That is so even though there was no evidence it was presented to the grand jury or that his counsel expressly stated he wanted it presented to the grand jury. There simply is no requirement that the defendant intend that the false or misleading information literally be transmitted to the grand jury itself, as Menendez argues (Menendez Mem. 40), as long as the "nexus" requirement is satisfied, as it was

63

here. *See, e.g.*, *Mangano*, 2022 WL 2872670, at *9 (rejecting argument that "lies to agents and prosecutors during the two proffer sessions were not sufficiently connected to the grand jury investigation to constitute obstruction"); *id.* at *11 ("[A] jury could conclude that, after the service of the grand jury subpoena by these FBI agents, the FBI and grand jury investigations were inextricably intertwined and the Manganos (and Singh) would have viewed them as such."); *United States v. Sutherland*, 921 F.3d 421, 428 (4th Cir. 2019) (affirming conviction where defendant was served with grand jury subpoenas seeking financial records, and thereafter his attorney sent to the U.S. Attorney's Office a letter that purported to explain away transactions relating to the subpoenaed materials and attached loan documents that were false); *United States v. Fassnacht*, 332 F.3d 440, 451 (7th Cir. 2003) (finding that "even if it believed that the defendants' obstructive efforts were primarily aimed at the IRS agents, the jury was entitled to make the rational inference that Fassnacht and Malanga understood that the IRS agents were acting as the 'arm of the grand jury,' and that impeding the agents' efforts necessarily meant obstructing the grand jury."). This is particularly so where, as here, the false statements made by counsel reinforced the false statements on checks Menendez and Nadine Menendez had worked together to transmit to the grand jury pursuant to subpoena.

> b)    The Evidence Established Menendez Participated in a Conspiracy to Obstruct the Daibes Federal Prosecution

As described in Section I.B.3, above, the evidence at trial proved that Menendez, in exchange for bribes, promised and attempted to take official acts by selecting a prosecutor that would treat Daibes's criminal case more favorably than it had been, and attempting to get that prosecutor to give Daibes a more favorable disposition than Daibes had been previously been

offered.  The same evidence underlying the bribery charges more than amply supported the jury's finding that he agreed to obstruct justice in connection with the Daibes federal prosecution.

The jury heard that since at least late 2020 Menendez was frustrated by Daibes's federal criminal prosecution by the New Jersey U.S. Attorney's Office.  (Tr. 3612, 3619.)  Menendez was also disappointed that Rachael Honig, who Menendez understood was responsible for the prosecution's handling, was in charge of the New Jersey U.S. Attorney's Office after Joseph Biden became President, until a new U.S. Attorney was appointed.  (Tr. 3886.)  While speaking with Sellinger, who would eventually be nominated to be the U.S. Attorney, Menendez stated that he hoped that Sellinger would look at the case "carefully" if Sellinger became the U.S. Attorney, because Menendez stated it had been treated "unfairly."  (Tr. 3612.)  After Sellinger indicated that he might be recused from the case (Tr. 3623-24), Menendez decided to pursue an alternate candidate, Esther Suarez, who was a close ally of Menendez's best friend Donald Scarinci (Tr. 3632, 3804, 3893), while allowing his staff and outside political consultant to have the false impression that he had had a "falling out" with Sellinger (Tr. 3888-89), and approving their transmission to Sellinger of a different false account of the reason Menendez was not recommending Sellinger (Tr. 3905 ("We can say something along the lines of blaming it on the White House")).

However, after Suarez's candidacy was not able to advance within the Biden administration, Menendez returned to Sellinger as a candidate only after being informed by his top outside political advisor, Michael Soliman, that Sellinger would not need to "recuse himself" from the Daibes matter.  (Tr. 3935-39.)  Then, after Sellinger became U.S. Attorney he was in fact recused, and Menendez remained upset about Daibes's treatment by the U.S. Attorney' Office,

complaining that the case should be dismissed. (GX 1401.) Despite knowing that Sellinger was recused, Menendez continued to attempt to get Sellinger involved in the case, even wanting Soliman to question Sellinger about why he was recused. (Tr. 3943-46.) In March 2022, Menendez, who remained frustrated by Sellinger's office's handling of the prosecution, requested that Soliman tell Sellinger that Sellinger should give Daibes "all due process." (Tr. 3946-47.)

To the extent Menendez argues that he did no more than ask others to look into the prosecution (Menendez Mem. 43-44), given the above-described evidence and that Daibes already had an excellent and well-regarded lawyer representing him in the case brought by the New Jersey U.S. Attorney's Office, the jury was entitled to disagree. In particular, the jury was permitted to conclude that Daibes, in exchange for bribes, sought Menendez's assistance in order to get a more favorable resolution on his case. The jury was also entitled to infer from Menendez's conduct— including the request he wanted Soliman to give to Sellinger to give Daibes "all due process" despite being recused—that Menendez, in return for those bribes, agreed to and did seek to have Sellinger take action to make sure that Daibes would get a better outcome than he had been offered.

In sum, far from simple "lobbying" (Menendez Mem. 42-43), the evidence amply demonstrated that, in exchange for bribes, Menendez agreed to use his position and influence as a U.S. Senator in an effort to cause the New Jersey U.S. Attorney to resolve a pending criminal case more favorably to his co-conspirator, Daibes. Such conduct squarely falls within the heartland of conduct covered by Section 1503. In *United States v. Polakoff*, 121 F.2d 333 (2d Cir. 1941), involving the predecessor offense of 1503, the Second Circuit squarely rejected the premise that obstruction of justice through an effort to influence a prosecutor could not be based on "otherwise legitimate arguments [to that prosecutor] for concealed or falsified ends." *Id. Polakoff* involved

attempts by a bail bondsman, who was being paid bribes, to "influence" a state prosecutor "to recommend a reduced sentence" for a defendant. *Id.* at 334.  The Second Circuit held that the defendant's efforts to influence justice for concealed motives (*i.e.*, bribes) constituted a corrupt endeavor within the meaning of the statute. *Id.* at 333; *see also id.* at 335 ("It is as 'corrupt' to persuade a public officer by lies as by bribes; indeed, to influence him by fraud is not far afield from influencing him by 'threats or force,' also prohibited by the statute."); *United States v. Freidel*, 124 F.2d 515, 515-516 (2d Cir. 1941) (rejecting argument that an agreement to request a prosecutor not to charge individuals could not be criminal, where defendant government informant agreed to intercede with prosecutors in exchange for bribes); *cf. United States v. Cioffi¸* 493 F.2d 1111, 1119 (2d Cir. 1974) (holding that "giving of advice to a witness to plead his constitutional privilege against self-incrimination"—although otherwise lawful—can be a crime when "one who bribes, threatens, coerces a witness to claim it or advise with corrupt motive a witness to take it" (citing *Coleve v. United States*, 29 F.3d 437 (9th Cir. 1964)).

The Supreme Court's recent decision in *Fischer v. United States*, 144 S. Ct. 2176 (2024), cited by Menendez (Menendez Mem. 43), is not to the contrary.  *Fischer* dealt with the statutory interpretation of an entirely different and more recent statute, and does not disturb the Supreme Court's prior holding that "the 'Omnibus Clause' [of Section 1503] serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice," which is appropriately limited by the "nexus requirement." *Aguilar*, 515 U.S. at 598-600.  This case, in which Menendez, in exchange for bribes, endeavored through an intermediary to ask a recused prosecutor to provide special treatment to a specific pending case, is well within the heartland of obstruction of justice. *See Polakoff*, 121 F.2d at 333.

67

7.    *The Evidence Proved Venue was Proper in this District*

The evidence at trial also amply supported the jury's verdict that venue was proper in this district, as each of the counts was supported by evidence enabling the jury to find by a preponderance of the evidence that essential conduct elements took place in this district.[12]

"When a federal statute defining an offense does not specify how to determine where the crime was committed, '[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'"  *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (internal quotation marks and citations omitted).  "Venue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place."  *Id.* (citation omitted).  "[V]enue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense."  *Id.* at 319 (citation omitted).  In the context of bribery-related charges, the Second Circuit has held that contacts "laying the groundwork" for the solicitation or receipt of bribes are "part and parcel" of the bribes themselves and are essential conduct for venue purposes.  *See United States v. Davis*, 689 F.3d 179, 190 (2d Cir. 2012) ("[T]elephone calls placed into the Southern District of New York laying the groundwork for bribes were 'part and parcel' of a bribery offense culminating weeks later." (quoting *United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990)).

a)    <u>Counts Related to Egypt</u>

The counts related to Egypt are supported by evidence of a number of acts of essential conduct in this district, which were more than sufficient for the jury to find venue proven by a

---

[12] Menendez does not challenge venue for Counts Seventeen and Eighteen, charging him with conspiring and endeavoring to obstruct a grand jury in this district.  (Menendez Mem. 30-35.)

preponderance of the evidence on these counts. These involved evidence that: (i) Hana, through Andy Aslanian, paid several hundred dollars for a meal for Menendez and Nadine Menendez at the Mr. Chow restaurant in midtown Manhattan (GX 7B-2, GX 5E-101A); (ii) while at Mr. Chow Menendez and Nadine Menendez (in the June 2018 paid for by Aslanian), Hana sent an interstate WhatsApp message to Shawky scheduling a July 2018 meeting and dinner that precipitated Menendez's promise to approve a sale of tank ammunition (GXs C206-3 & C206-3T; GX 7A-3; GX 7B-1; GX 1463); (iii) Menendez, Daibes, and Helmy met at a hotel in Manhattan to discuss rewarding Daibes with business ventures with Egypt (GX D101-1 (Daibes and Menendez texts regarding meeting); GX B220-1 (Helmy and Nadine Menendez texts regarding meeting); GX B220-2 (Helmy informing Nadine Menendez that he had been instructed to start discussions on business ventures discussed at meeting)); (iv) Daibes provided free transportation to Menendez and Nadine Menendez through Manhattan on their way back from a trip to Egypt (*see, e.g.*, GX A111-PH1 (Signal message from Daibes offering Menendez transportation); GX 16C-2 at 16 (cell site analysis showing transportation through district)); and (v) in order to facilitate a real estate purchase which Daibes was offering Nadine Menendez and Menendez assistance with, Nadine Menendez, in consultation with Menendez and Daibes, sold gold bars through Vasken Khorozian (who called a Manhattan gold dealer and traveled to Manhattan) under the false claim that they were from a family member (*see, e.g.*, Tr. 5090-93; GX B201-1A; GX 3D-6).

These acts in this district are essential conduct for the counts related to Egypt and fully sufficient to allow the jury to find venue was proven. The provision of things of value in the district, even things with comparatively modest value such as the meals or transportation, is itself essential conduct for the bribery and foreign influence offenses. *See, e.g.*, *Stephenson*, 895 F.2d

at 874.  The defendants were free to argue to the jury that these minor things of value were not connected to the offenses charged, but the jury could disagree.  *See, e.g.*, *Calk*, 87 F.4th at 183 ("In determining whether there is a 'thing of value,' we have observed, what matters is 'the value that the defendants subjectively attached to the items received.'" (quoting *United States v. Williams*, 705 F.2d 603, 623 (2d Cir. 1983))); *see also, e.g.*, *Calk*, 87 F.4th at 183 ("'It is enough if the item received was regarded as a benefit by the recipient, whether or not others might have taken a different view of its value.'" (quoting *United States v. Ostrander*, 999 F.2d 27, 31 (2d Cir. 1993) (brackets omitted))).

Even leaving aside the fact that an actual thing of value was provided in this district, the in-person meetings in New York that laid the groundwork for a further exchange of things of value for official acts could themselves easily be found to be essential conduct for these charges.  *See, e.g.*, *Davis*, 689 F.3d at 190; *Stephenson*, 895 F.2d at 875.  Indeed, in strikingly similar circumstances, then-District Judge Nathan held venue was sufficient based on messages providing information to facilitate the next steps of a bank bribery scheme.  *See United States v. Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111, at *38 (S.D.N.Y. Oct. 18, 2017).  Those messages were essential conduct "in at least two respects," *Gross*, 2017 WL 4685111, at *39, first because they were "acts necessary" to carry out the next steps of the scheme, *id.*; and second because they provided reassurances to the bribe payors that the bribe recipient was willing to assist them, in order "to lay the groundwork for his ultimate receipt of the largest bribe payment," *id.*

The evidence showed that the jury could have found that the meetings between Menendez and his bribe-payors in New York were essential conduct under the Second Circuit's law.  Just as in *Gross*, the meeting Menendez and Nadine Menendez had with Hana at Mr. Chow—along with

the interstate wire Hana sent to Shawky during that meeting (GX 1463)—was an act "necessary" to carry out the scheme because Menendez's agreement to the meeting with Shawky precipitated his promise to approve a tank ammunition sale, and it "demonstrated [Menendez's] good faith efforts to demonstrate to [Hana] that he was actively working towards this goal—to lay the groundwork for his ultimate receipt of" the bribe payments Hana had been promising. *Gross*, 2017 WL 4685111, at *39. By the same token, Menendez's meeting with Daibes and Helmy in Manhattan was part of an effort for Menendez to ensure that Daibes received business from the Egyptian government (GX B220-2), as well as a way for Menendez to "demonstrate[]" his "good faith efforts" to reward Daibes and "lay the groundwork for" Menendez's receipt of bribes from Daibes. *Gross*, 2017 WL 4685111, at *39.

Finally, the jury could easily have found that the sale in New York by Khorozian, at the direction of Nadine Menendez and Menendez, of gold from Daibes was a "crucial component[]" of" the scheme for Daibes to provide things of value to Menendez including gold and assistance in obtaining real estate. *Stephenson*, 895 F.2d at 874. The evidence showed that this sale—which Nadine Menendez was aware would be physically carried out in New York, and which was brokered by a phone call to the Manhattan-based dealer made in her presence (*see, e.g.*, Tr. 5092-93; *see also* Tr. 5093 (Khorozian testifying he told Nadine Menendez "Yeah, I'm going to take it to New York"))—was intended to pay down Nadine Menendez's existing home mortgage debts at a time when, the evidence also showed, Daibes was assisting Menendez and Nadine Menendez in looking for a new home to purchase. (*See, e.g.*, GX D102-6; GX B234; GX 8K-1 (providing reporting advice if Nadine Menendez "use[d] the proceeds of the sale of the gold bars to repay a mortgage").) The conversion of a gold bar to a liquid form that could be used to pay the mortgage

debt—and the use of false statements that the bar was Nadine Menendez's family gold instead of a delivery from Daibes—was essential to that scheme because it enabled the further real estate transactions contemplated as part of the scheme. The defendants' argument that the scheme had ended by that point (Menendez Mem. 31-32) is properly directed to the jury, which was entitled to reject it given, among other things, the evidence of Daibes's involvement in Menendez and Nadine Menendez's real estate search (GX D102-6); Daibes's involvement in the gold sale in Manhattan (GX D102-8); and Menendez and Nadine Menendez's coordinated involvement in the making of false statements to cover up that sale (Tr. 5092-93 (Nadine Menendez statements to Khorozian); Tr. 5278-79 (Menendez statements to Kopplin); GXs 10E-4, 10E-6 (Menendez financial disclosure forms)).[13] *See, e.g.*, *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *4 (S.D.N.Y. Jan. 18, 2017) (finding single conspiracy continuing through liquidation of fraudulently inflated stock positions and laundering of the defendant's gains); *cf., e.g.*, *United States v. Prevezon Holdings*, 251 F. Supp. 3d 684, 690 (S.D.N.Y. 2017) ("Acts of perpetration and subsequent acts of concealment in wide ranging, complex frauds are often one and the same." (brackets, internal quotation marks, and citation omitted)). Indeed, the Second Circuit acknowledged that a real estate closing could be an essential act in a bank bribery scheme even when it did nothing more than carry out a corrupt agreement previously made. *See United States*

---

[13] Indeed, with respect to the honest services fraud counts, the concealment of the source of the gold is literally an element of the offense, as the jury was instructed. (*See, e.g.*, Tr. 7105 (Court's instructions: "The third element the government must prove beyond a reasonable doubt is that the scheme or artifice to defraud involved a material misrepresentation, false statement, false pretense, or concealment of fact.").) But for all the counts, the sale and the concealment of Daibes as the source, by design, furthered Menendez and Nadine's receipt of Daibes's assistance in their obtaining real estate, and are thus worlds apart from an after-the-fact resale of an ordinary asset received long ago as part of a scheme.

*v. Kaufman*, No. 21-2589, 2023 WL 1871669, at *2 (2d Cir. Feb. 10, 2023) (summary order) ("That [the defendant] may have *agreed* to the scheme prior to the closing does not mean that the scheme ended then . . . and as explained above, a jury could find that the closing was tantamount to [the defendant's] acceptance of [the payor's] gratuities.").

        b)    <u>Counts Related to the New Jersey Attorney General's Office</u>

The trial evidence straightforwardly established venue for the counts related to the New Jersey Attorney General's Office. The jury heard evidence that (i) bribe payments were made from this district, as Uribe, from New Jersey, called an associate in the Bronx and caused him to make payments on the Mercedes-Benz Convertible while that associate was in the district (Tr. 3041-42; GX 16C-2 at 8-12); (ii) Nadine Menendez caused bribe cash that Uribe had provided her to be deposited in bank accounts both in New Jersey and on Long Island on the same day—which necessarily entailed moving the cash across the waters that are part of this district (GX 1328; GX 5F-202); and (iii) Nadine Menendez, both in her texts with Uribe and her calls with Menendez in carrying out the scheme, connected to cell towers in this district, thus utilizing physical structures in this district to transmit core communications carrying out the crime, including instructions for Uribe to meet with Menendez the evening before Menendez met with Grewal, in order for Uribe to specify the persons he wished Menendez to intervene on behalf of (GX 16C-2 at 13), and then for Uribe to meet with Menendez several hours after Menendez had met with Grewal, for Menendez to offer Uribe false assurances in an effort to keep Uribe paying for the car (GX 16C-2 at 14).

The jury could readily have found that all of these acts in this district, which plainly suffice for venue, *see, e.g.*, *Stephenson*, 895 F.2d at 874, were foreseeable to Menendez and Hana. The Second Circuit has recognized that the proximity of districts covering the New York metropolitan

area can support a finding of foreseeability where a long-running scheme involves a number of separate financial transactions, and certain of those transactions in fact take place in this district. *See United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) ("The proximity of Manhattan to Brooklyn and Queens and the conspirators' transfer of hundreds of thousands of dollars in cash admitted *a preponderance finding that Boruch could reasonably have foreseen that his coconspirators transported at least some of the money* at issue to Brooklyn and Queens from Manhattan." (emphasis added)); *see also, e.g.*, *United States v. Shepard*, 500 F. App'x 20, 23 (2d Cir. 2012) ("The proximity of the conspiracy's Brooklyn-Queens base of operation to parts of the Southern District of New York, as well as the need to traverse that district in procuring marijuana from New Jersey, permitted a reasonable jury to make a preponderance finding that the aforementioned acts' occurrence in the Southern District was reasonably foreseeable to [the defendant]."); *United States v. Davis*, 689 F.3d 179, 188-89 (2d Cir. 2012) (proximity of targeted Long Island residence to Southern District of New York, combined with co-conspirators' prior robberies in Bronx, supported venue in Southern District based on foreseeability that robbery target dealt drugs there).

Indeed, in a bribery scheme, venue was held to be proper based on the foreseeability not of any one particular electronic communication, but on the foreseeability that *at least some* communications over the course of a scheme would be made in this district. *See Gross*, 2017 WL 4685111, at *40 ("Even if it was not reasonably foreseeable that any *one* of these emails would be sent from Manhattan, . . . a reasonable jury could have concluded by a preponderance that it was reasonably foreseeable to [the defendant] that, over the course of the bribery scheme and conspiracy, he would receive some essential e-mails from [a co-conspirator] while [the co-

conspirator] was in this district." (emphasis in original)).  For similar reasons, the jury could infer that a technologically adept individual such as Menendez (who was entrusted with the review and approval of multi-million dollar sales of technologically advanced military equipment and who used applications such as Signal and WhatsApp to communicate) was sufficiently aware of basics like the fact that physical obstructions like buildings interfere with radio waves, and thus able to foresee that sometimes cellphones used near the Hudson River, where Menendez and Nadine Menendez lived, would connect to cell towers across the river.  And in any event, the jury was plainly entitled to infer that Menendez, who the evidence showed closely supervised and was involved in the most quotidian details of Nadine Menendez's life, was aware of or able to foresee that Nadine Menendez would cause some of the bribe money to be deposited into her account by transporting it through this district.  (GX 1328; GX 5F-202.)

c) <u>Counts Related to Daibes's Federal Prosecution and Qatar</u>

The evidence also showed ample basis for venue for the counts related to Daibes's federal prosecution by the New Jersey U.S. Attorney's Office and Qatar.  That evidence included (i) Daibes's provision of transportation through the district, which was in connection both with the Egypt and the Qatar conduct (*see, e.g.*, GX A111-PH1 (Signal message from Daibes offering Menendez transportation); GX 16C-2 at 16); (ii) the sale of kilogram gold bars that Daibes provided in connection with both the Egypt and the Qatar conduct in Manhattan (*see, e.g.*, Tr. 5090-93; GX B201-1A; GX 3D-6); (iii) an in-person meeting between Menendez, Daibes, and the Emir of Qatar in New York and Daibes's attempts to make WhatsApp calls to the principals of Heritage while in Manhattan for that meeting (GX 4F-2; GX 4F-3; GX 16C-2 at 15; GX A104-D; GX D209; GX D210); and (iv) numerous electronic communications by various professionals involved in evaluating and effectuating the real estate transaction that the investment company

75

made with Daibes, which was one of Daibes's objects in the bribery scheme (GX 4F-8; 4F-28; GX 4F-31).

The provision of transportation and the sale of kilogram gold bars in this district both provide ample basis for the jury to find venue for the New Jersey U.S. Attorney's Office and Qatar-related counts just as for the Egypt-related counts. Both of these acts, the evidence showed, were part and parcel of not just the Egypt component of the scheme but the New Jersey U.S. Attorney's Office and Qatar portion as well. Indeed, both related to things of value Daibes provided during the two days after Menendez returned from a trip that was both to Egypt and Qatar. (*See, e.g.*, GX A125; GX A111-PH1; GX 16C-2 at 16-17; GX 3A-20; *see also, e.g.*, Tr. 4573 (Arkin testifying that CODEL was to "Egypt and Qatar").)

In addition, the jury could readily infer that the in-person meeting between Menendez, Daibes, and the Emir of Qatar served as a way for Menendez to "demonstrate[]" his "good faith efforts" to reward Daibes by benefiting his business and "lay the groundwork for" Menendez's receipt of bribes from Daibes, just as the meeting with Helmy did in connection with the Egypt counts. *Gross*, 2017 WL 4685111, at *39. Indeed, Daibes's invitation to this meeting came through the principals of Heritage, and Daibes attempted to call one of them while in Manhattan (GX 4F-2; GX 4F-3; GX D209; GX D210), and it was just days after the meeting that Daibes messaged Menendez an offer to provide him with a luxury wristwatch (GX A104-4; GX A104-B; GX A104-C), supporting just this inference. Similarly, the acts of the real estate professionals in New York evaluating and carrying out the investment also served to further the scheme, by facilitating Daibes's receipt of the multimillion-dollar investment from Heritage that he was bribing Menendez to attempt to obtain. (GX 4F-8; GX 4F-28; GX 4F-31.)

d)    <u>Substantial Contacts</u>

In the face of the firm bases for venue in this district, Menendez grasps at straws in suggesting that there are not substantial contacts with this district.  (Menendez Mem. 29.)  But that inquiry is not relevant here in light of the proven overt acts committed in this district.  *See United States v. Tang Yuk*, 885 F.3d 57, 70 (2d Cir. 2018) ("When an overt act in furtherance of a criminal conspiracy has been committed in the district . . . , th[e] supplemental [substantial contacts] inquiry has no relevance."); *Tzolov*, 642 F.3d at 321 (finding the substantial contacts test satisfied where the defendant "committed overt acts in furtherance of the conspiracies in the [district of conviction]").  Indeed, in addition to each of the bases for venue listed above, the offenses had additional substantial contacts with this district.  The evidence showed that the foreign military funding grants that Menendez promised to approve (which were used to finance the foreign military sales that Menendez also promised to approve) were sent to a bank account held in the name of Egypt at the Federal Reserve Bank of New York (Tr. 873), which has its headquarters in Manhattan (Tr. 4845).[14]  Moreover, Menendez committed obstruction of an investigation into these very crimes by a grand jury in this district (*see, e.g.*, GX 3B-1; GX 4A-3; GX 11A-1; GX 11B-3; GX 1409), rendering it particularly inappropriate for him to claim a lack of substantial contacts.

---

[14] No evidence was presented of any decision by Menendez to approve or not approve any foreign military financing grant or any foreign military sale.  But, for example, the Hobbs Act extortion counts can be based even on a *potential* effect on interstate commerce.  *See, e.g.*, *United States v. Rose*, 891 F.3d 82, 86 (2d Cir. 2018) ("It is the law in our circuit that if the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle, or even potential, it is sufficient to uphold a prosecution under the Hobbs Act" (internal quotation marks omitted)).  Even leaving that aside, Menendez's promises to affect huge sums of money in this district during the course of the scheme show the hollowness of any argument that the scheme lacked substantial contacts with this district.

In any event, the "substantial contacts" test "does not even apply . . . unless the defendant establishes that 'prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial.'" *United States v. Chait*, No. 17 Cr. 105 (JMF), 2017 WL 6502228, at *1 (S.D.N.Y. Dec. 18, 2017) (citation omitted). Menendez makes no such showing.

## II. NONE OF THE DEFENDANTS IS ENTITLED TO A NEW TRIAL

The defendants were found guilty by a conscientious jury after a fair and thorough nine-week trial, and identify no valid basis to overturn the jury's considered verdict.

### A. Applicable Law

Motions for a new trial pursuant to Rule 33 "are disfavored in [the Second] Circuit." *United States v. Figueroa*, 421 F. App'x 23, 24 (2d Cir. 2011). Accordingly, "[t]he ultimate test [on a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013). This Court—after examining the totality of the evidence and considering objectively all of the facts and circumstances—must exercise its authority under Rule 33 "sparingly" and in "the most extraordinary circumstances." *United States v. Padilla*, 511 F. App'x 8, 10 (2d Cir. 2013). Put another way, a motion pursuant to Rule 33 should only be granted if the Court finds "a real concern that an innocent person may have been convicted." *Aguiar*, 737 F.3d at 264. This Court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurp[ing]" the role of the jury. *See United States v. Polouizzi*, 564 F.3d 142, 162 (2d Cir. 2009). "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *United States v. Hernandez*, 521 F. App'x 14, 17 (2d Cir. 2013).

The Second Circuit has twice reaffirmed in the last four years that "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (internal quotation marks omitted); *see also United States v. Landesman*, 17 F.4th 298, 330-31 (2d Cir. 2021).  Under the "preponderates heavily" standard, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Landesman*, 17 F.4th at 331 (internal quotation marks omitted).  "To the contrary, absent a situation in which, for example, the evidence was patently incredible or defied physical realities, where an evidentiary or instructional error compromised the reliability of the verdict, or where the government's case depends on strained inferences from uncorroborated testimony, a district court must defer to the jury's resolution of conflicting evidence." *Id.* (internal quotation marks and citations omitted).  In applying the "preponderates heavily" standard, moreover, a district court "must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Id.* (internal quotation marks omitted).

## B.    Discussion

### 1.    *Menendez's Speech or Debate Claims Do Not Entitle Him to a New Trial*

Menendez contends that "[t]hroughout trial," the Government "repeatedly trampled upon Article I's Speech or Debate Clause."  (Menendez Mem. 17.)  This hyperbolic contention fails on both the law and the record.  In any event, to the extent preserved (and many of them are not), Menendez's arguments are no more than a rehash of the same claims that the Court previously rejected, including in writing, and often more than once.  *See United States v. Menendez*, No. 23 Cr. 490 (SHS), --- F. Supp. 3d ----, 2024 WL 1120182 (S.D.N.Y. Mar. 14, 2024); *United States v.*

*Menendez*, No. 23 Cr. 490 (SHS), 2024 WL 3014205 (S.D.N.Y. June 14, 2024). (*See also, e.g.*, Tr. 564 ("I couldn't have been clearer, I believe, in my decision on speech or debate and in the decision denying the motion for a mistrial."); Tr. 4476 ("You just can't press speech or debate as far as you want. I am receptive to the argument of speech and debate and protections the constitution gives it but not when you go this far."); Tr. 4487 ("[T]he defense has been sandbagging the government consistently in waiting until beyond the last minute to raise these issues. . . . I think I've laid down the guidelines.").) Repeating the same claims yet again does not entitle Menendez—who bears the burden on his motion, chose not to seek reconsideration or an interlocutory appeal, and did not timely object to all of the evidence that he now appears to challenge—to the extraordinary remedy of a new trial.

Indeed, Menendez does not even attempt in this section of his memorandum to establish, as he must, "a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted). Plainly that did not occur in this case. Rather, the Court, after hearing from the parties and careful consideration, admitted indisputably authentic, indisputably relevant, and indisputably *inculpatory* evidence. Menendez, like any other defendant convicted after trial, is entitled to continue to take the position that that evidence should not have been admitted. But the proper vehicle for his claims, to the extent preserved, is a direct appeal following sentencing, not repackaging the claims in a Rule 33 motion. *See, e.g.*, *United States v. Malka*, 623 F. Supp. 3d 306, 328 (S.D.N.Y. 2022) ("Courts routinely deny attempts to relitigate already resolved matters under the guise of a Rule 33 motion."); *United States v. Donziger*, No. 11 Civ. 691 (LAP), 2021 WL 3726913, at *4 (S.D.N.Y. Aug. 23, 2021) (denying Rule 33 motion where defendant "essentially seeks reconsideration,"

which "alone is fatal to his motion, especially because this case presents no concern that an innocent person may have been convicted" (internal quotation marks omitted)); *United States v. Soto*, No. 12 Cr. 566 (RPP), 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("[I]n the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions.") (collecting cases), *aff'd sub nom.*, *United States v. Ramos*, 622 F. App'x 29 (2d Cir. 2015); *United States v. Delva*, No. 12 Cr. 802 (KBF), 2015 WL 629375, at *4 (S.D.N.Y. Feb. 13, 2015) ("A Rule 33 motion is not an appropriate forum to revisit an evidentiary issue that the Court already decided."); *United States v. Smith*, No. 08 Cr. 390 (BSJ), 2009 WL 4249120, at *8 (S.D.N.Y. Nov. 25, 2009) (denying Rule 33 motion where defendant "seeks to use Rule 33 as a vehicle to relitigate evidentiary rulings with which he disagrees"); *see also United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014) ("We review a district court's rulings on the admissibility of trial evidence for abuse of discretion.").

As this Court explained during trial:

> The defense opted not take an interlocutory appeal from [the Court's Speech or Debate] opinion. That's their decision, that's okay. . . . If there is a conviction, the defense will have the opportunity to appeal it. They didn't appeal it now. So what I decided there is the law of the case and the parties are bound by it.

(Tr. 565.)

Nor does overheated rhetoric or attacks on the Government, which carefully followed the Court's decisions, bolster the persuasive value of Menendez's claims. (*See* Menendez Mem. 17 (alleging there were "pervasive Speech or Debate violations" (capitalization omitted)); *id.* at 19 ("the government repeatedly crossed the line"); *id.* at 20 ("the government trampl[ed] on Senator Menendez's Speech or Debate rights"); *id.* at 21 (the Government introduced "precisely the type

of testimony that the Speech or Debate clause flatly prohibits"); *id.* (the Government introduced evidence that was "clearly off limits"); *id.* at 25 ("the government crossed the line"); *id.* at 26 ("the government repeatedly ran roughshod over the constitutional protections afforded to Senator Menendez under the Speech or Debate clause, all in an effort to secure an unjust conviction").) *Cf., e.g.*, *United States v. DiPietro*, No. S5 02 Cr. 1237 (SWK), 2005 WL 1863817, at *2 & n.4, *3 (S.D.N.Y. Aug. 5, 2005) (rejecting Rule 33 motion where defendant submitted "seven pages of previously rejected argument interspersed with an occasional new paragraph," noting pattern in which defendant "reargues, albeit in a much more accusatory manner, the same issue" after losing, and concluding "[t]he evidence upon which a reasonable mind might (and did) fairly conclude guilt beyond a reasonable doubt against [the defendant] was abundant," requiring denial of motion), *aff'd sub nom. United States v. Genua*, 274 F. App'x 53 (2d Cir. 2008).

In sum, Menendez was "ably represented by a team" of well-experienced counsel who presented a "thoroughly prepared" defense, including the very claims that he now asserts. *United States v. Mazer*, No. S2 11 Cr. 121 (GBD), 2014 WL 1569495, at *5 n.4 (S.D.N.Y. Apr. 17, 2014) (denying Rule 33 motion). Indeed, he often asserted those claims more than once. (*See, e.g.*, Tr. 566 ("If the defense is going to raise this issue time and time and time again, the trial is going to be completely bogged down.").) "Turning up the volume" of the same arguments, yet again, does not entitle Menendez to overturn the jury's verdict, which was amply supported, including by evidence he does not challenge. *DiPietro*, 2005 WL 1863817, at *2 n.4.

a)    <u>Menendez Overstates the Scope and Effect of the Speech or<br>Debate Clause</u>

Prior to trial, in response to the defendants' first motions to dismiss, the Government submitted a memorandum setting forth, in detail, case law concerning the Speech or Debate Clause

(the "Clause").  (Dkt. 180, at 20-30.)  The Government does not repeat that discussion herein, but respectfully incorporates it by reference.  However, before turning to Menendez's specific post-conviction Speech or Debate claims, the Government first outlines three fundamental legal points that, in his Rule 33 memorandum, Menendez misstates, mischaracterizes, or omits, and that assist in disposing of or substantially narrowing his claims, including to the extent that the Court chooses to consider preserved ones anew (which it need not).

(1)    The Scope of the Speech or Debate Clause

*First*, Menendez asserts, without caveat: "All told, the test [as to whether an act falls within the Clause] is whether the activity is 'related to the due functioning of the legislative process.'" (Menendez Mem. 19 (quoting *United States v. Johnson*, 383 U.S. 169, 172 (1966)).)  That is wrong.  The Supreme Court—in clear and unequivocal terms—has held that that is *not* the test. The Supreme Court has explained, in rejecting the very position that Menendez takes, that it has not endorsed such a "broad[] test," and, on the contrary, the scope of covered conduct is far narrower:

> It is urged that we held that the Clause protected from executive or judicial inquiry all conduct 'related to the due functioning of the legislative process.' It is true that the quoted words appear in the *Johnson* opinion, but appellee takes them out of context; in context they reflect a quite different meaning from that now urged. . . . In stating that those things 'in no w[ay] related to the due functioning of the legislative process' were not covered by the privilege, the Court did not in any sense imply as a corollary that everything that 'related' to the office of a Member was shielded by the Clause. Quite the contrary, in *Johnson* we held, citing *Kilbourn v. Thompson*, *supra*, that only acts generally done in the course of the process of enacting legislation were protected.

*Brewster*, 408 U.S. at 513-14 (upholding prosecution of a U.S. Senator); *see also Hutchinson v. Proxmire*, 443 U.S. 111, 131 (1979) (explaining that in *Brewster*, "we [the Supreme Court] went

on to note that *United States v. Johnson*, 383 U.S. 169 [] (1966), had carefully distinguished between what is only 'related to the due functioning of the legislative process,' and what constitutes the legislative process entitled to immunity under the Clause"); *Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir.) (the Speech or Debate Clause does not extend to "official activities of Congress members . . . outside the legislative core" (internal quotation marks omitted)), *cert. denied*, 469 U.S. 1036 (1984).

In short, contrary to the framing of Menendez's motion, "[t]he Speech or Debate Clause does not prohibit inquiry into illegal conduct simply because it has some [alleged] nexus to legislative functions." *Brewster*, 408 U.S. at 528. As this Court correctly stated in its written opinion: "[T]he Speech or Debate Clause 'does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself.'" *Menendez*, 2024 WL 1120182, at *2 (quoting *Brewster*, 408 U.S. at 528). Menendez is not entitled to re-write settled precedent such that evidence of acts not "done in the course of the process of enacting legislation," *Brewster*, 408 U.S. at 514, are immune from prosecution. They are not.

(2)    Whether an Asserted Legislative Act is Categorically
Immune, Without More

*Second*, Menendez argues that if an act *might* be connected to legislative activity, it is covered by the Speech or Debate Clause, in its entirety and without further analysis. (*See* Menendez Mem. 17; *see also id.* at 19.) That too is wrong. To be sure, certain acts, on their face, are inherently and undeniably legislative acts. *See, e.g.*, *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 522 (3d Cir. 1985) (listing examples of such "manifestly legislative acts," as "introducing proposed legislation," "subpoenaing records for committee hearing," "introducing evidence during committee hearings," or "delivering a speech on the floor of the House," and citing cases); *see also*

84

*Menendez*, 2024 WL 1120182, at *2.  But no such acts were presented at trial—not even close.

Other acts may or may not be legislative acts, in whole or in part, depending on the context and

details.  *See, e.g.*, *Lee*, 775 F.2d at 522 ("In the instant case, [the defendant] argues that his

'conversations' and 'meetings' in New York and Washington with various officials were likewise

protected by legislative privilege.  However, [his] private conversations do not, in and of

themselves, trigger the legislative privilege because they are not manifestly legislative acts.").

And critically, a court cannot merely accept a legislator's say-so about such acts, which

would result in the very thing that the Supreme Court has cautioned against, *i.e.*, turn "Members

of Congress" into "super-citizens, immune from criminal responsibility."  *Brewster*, 408 U.S. at

516; *see also, e.g.*, *United States v. Renzi*, 769 F.3d 731, 736 (9th Cir. 2014) ("Congressmen may

write the law, but they are not above the law."), *cert. denied*, 576 U.S. 1054 (2015).  Yet that is

precisely what Menendez repeatedly argues this Court should have done—preclude, based on his

conclusory, after-the-fact, self-interested assertions, wholesale categories of communications or

actions, without regard to allegations in this case or the form or nature of the evidence in support

of those allegations.  (*See, e.g.*, Menendez Mem. 20-21 (all testimony, no matter the context,

"regarding" Menendez's "positions and strategy vis-à-vis Egypt" is "the type of testimony that the

Speech or Debate clause flatly prohibits"); *id.* at 21 (all "evidence," in any form, "of his official

meetings with Egyptian officials was clearly off limits"); *id.* at 22 (all "evidence of Senator

Menendez's meetings and discussions with Sellinger, Suarez, or other potential U.S. Attorney

candidates," regardless of what was said, "as well as his discussions with his staff regarding those

candidates," regardless of what was said, "were within the scope of the Speech or Debate clause

prohibition and inadmissible").)

As the Eleventh Circuit explained, the reason that sweeping proposition is not—and cannot be—the law "is obvious": "'there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process.'" *Fulton Cnty. Special Purpose Grand Jury v. Graham*, No. 22-12696-DD, 2022 WL 13682659, at *1 (11th Cir. Oct. 20, 2022) (per curiam) (quoting *Brewster*, 408 U.S. at 516); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (the Clause only applies "*once it is determined* that" the act in question involved a Member of Congress "acting within the legitimate legislative sphere" (emphasis added; internal quotation marks omitted)); *United States v. Menendez*, 831 F.3d 155, 168 (3d Cir. 2016) ("claims of [congressional] 'oversight' do not automatically result in Speech or Debate protection"), *cert. denied*, 580 U.S. 1198 (2017); *Fields v. Office of Johnson*, 459 F.3d 1, 11, 16 (D.C. Cir. 2006) (en banc) (because the "duties [of a congressional aide] are too crude a proxy for protected activity," in a suit in which a Member of Congress raises a Clause defense, the court must "determine whether the asserted activity is in fact protected"). Were the law otherwise, there would be virtually no limit to the Clause. But the Supreme Court "has repeatedly insisted that the [] Clause is subject to 'finite limits,' refusing to stretch its protective umbrella 'beyond the legislative sphere' to conduct not 'essential to legislating.'" *McSurely v. McClellan*, 553 F.2d 1277, 1285 (D.C. Cir. 1976) (quoting *Doe v. McMillan*, 412 U.S. 306, 317 (1973), and *Gravel v. United States*, 408 U.S. 606, 625-25 (1972)), *dismissing cert.*, 438 U.S. 189 (1978).

In short, where an act, on its face, may or may not be a legislative act, a court must weigh the actual act, not simply opine whether such an act *could* be a legislative act, or accept a defendant's assertion that, in his or her particular case, it is such an act. *See Graham*, 2022 WL 13682659, at *1 ("[E]ven assuming that such informal investigations are covered by the Speech

and Debate Clause, courts still must determine whether a legislator's conversation was a protected investigation or an unprotected non-legislative discussion."); *Menendez*, 831 F.3d at 168 ("We therefore reject Senator Menendez's first argument that the Speech or Debate Clause necessarily protects apparently legislative activity.  Courts may dig down to discern if it should be deemed legislative or non-legislative."); *Lee*, 775 F.2d at 523-24 (vacating decision where defendant asserted "conversations purportedly involved legislative fact-finding, [and] legislative immunity barred any inquiry into whether the conversations actually involved legislative fact-finding," and remanding for district court "to determine which acts were proper legislative acts").  As this Court held, when such a challenge is made, the legislator, as the movant invoking a form of privilege, bears the burden.  *Menendez*, 2024 WL 1120182, at *2; *see also Lee*, 775 F.2d at 524; *In re Grand Jury (Intervenor A)*, 587 F.2d 589, 597 (3d Cir. 1978); *United States v. Rostenkowski*, 59 F.3d 1291, 1302-03 (D.C. Cir. 1995).

In his memorandum, Menendez appears to suggest that whatever the law might be elsewhere, the Second Circuit held, in *United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988), that a court may not inquire at all into any purportedly legislative act, no matter its nature.  (Menendez Mem. 19.)  Menendez is demonstrably incorrect.  His suggestion rests on an excerpt in which he both omits the word "generally" from what he quotes and omits that the court's general statement was not only unnecessary to the decision, but was simply a citation to a Fourth Circuit case that held that it is inappropriate to look at the propriety and the motivation of acts that bear a sufficiently strong showing of being legislative, none of which is remotely presented in this case.  *See Biaggi*, 853 F.2d at 103 ("While it is generally true that the Speech or Debate Clause forbids not only inquiry into acts that are manifestly legislative but also inquiry into acts that are purportedly

legislative, 'even to determine if they are legislative in fact,' *United States v. Dowdy*, 479 F.2d 213, 226 (4th Cir.), *cert denied*, 414 U.S. 823, 94 S. Ct. 124, 38 L.Ed.2d 56 (1973), the trial record does not indicate that an impermissible inquiry was conducted."); *see also Dowdy*, 479 F.2d at 226 (holding that after a threshold showing of Congressional action in the form of a "full investigation of [a specific] complaint to determine if formal subcommittee hearings should be held," courts should not examine "the propriety and the motivation for the action taken, as well as the detail of the acts performed").  Moreover, the Second Circuit's general statement was pure dicta in *Biaggi*, which *affirmed* the inquiry in that case into allegedly legislative travel.  *See Biaggi*, 853 F.2d at 103.  As the Third Circuit explained in Menendez's prior federal criminal case, *Biaggi* "allows the Government to inquire into the reasons for apparently legislative activity."  *Menendez*, 831 F.3d at 168.

In any event, whatever ambiguity may exist in *Biaggi*'s general statement, the Second Circuit—consistent with all of the case law cited herein—has squarely rejected a claim on the ground that the *content* of a communication rendered it unprotected, notwithstanding that it was between two Members of Congress on the House floor.  *See Myers*, 692 F.2d at 860 ("Thompson claims that the Speech or Debate Clause bars the introduction into evidence of his private conversations with Congressman Murtha on the floor of the House of Representatives, in which he invited Murtha to join the ranks of those accepting bribes.  One would think that a Congressman, even when grasping for objections to a criminal conviction, would understand that the Speech or Debate Clause accords immunity to what is said on the House floor in the course of the legislative process, *Gravel v. United States*, *supra*, not to whispered solicitations to commit a crime."), *cert denied*, 461 U.S. 961 (1983).  As this Court correctly recognized in its written opinion: "[T]he

Second Circuit has found that even activity that might otherwise sit comfortably within the heartland of the Speech or Debate Clause—speech on the House floor—is denied protection from the Clause when the speech is not made 'in the course of the legislative process,' but rather functions as a 'whispered solicitation[ ] to commit a crime.'" *Menendez*, 2024 WL 1120182, at *7 (quoting *Myers*, 692 F.2d at 860). In short, both precedential case law and the law of this case are irreconcilable with the proposition that Menendez asks this Court to accept.

(3)    Whether Evidence of an Asserted Legislative Act May be
Redacted or the Non-Legislative Portions Introduced

*Third*, Menendez repeatedly argues that if a legislator took a protected legislative act or might in the future, no evidence on the topic may be introduced, even in redacted form or without reference to the protected act. (Menendez Mem. 20, 22-24.) For example, Menendez argues, because he actually approved a certain arms sale, the Government could not introduce evidence that he said to a private party that he would do so. (*Id.* at 19-20.) Similarly, Menendez argues, the Government could not introduce evidence that a certain resolution or legislation was pending before the Senate, because Menendez had already made or would have to make a decision whether to support it. (*Id* at 23-25.) The legal premise of these arguments is baseless. It is settled law that just as with any other evidence that may be partially privileged or otherwise protected, where the evidence of an act contains both protected legislative components and non-protected components, only the protected components are shielded from use. *See United States v. Helstoski*, 442 U.S. 477, 488 n.7 (1979) (the Speech or Debate Clause does not "prohibit[] excising references to legislative acts, so that the remainder of the evidence would be admissible. This is a familiar process in the admission of documentary evidence."); *see also In re Grand Jury Investigation*, 608 F. App'x 99, 101 (3d Cir. 2015). And it is also settled law that the Speech or Debate Clause does

89

not prohibit evidence of what was or would in the future be "pending" before a defendant, which is not an act *of* the defendant. *See, e.g.*, *Brewster*, 408 U.S. at 527 (bribery charge properly resting on payment in exchange for the official's "action, vote and decision on postage rate legislation which had been pending before him in his official capacity"); *see generally United States v. Myers*, 635 F.2d 932, 937 (2d Cir. 1980) ("Legislative actions are referred to in the indictment only for the entirely permissible purpose of detailing the nature of the corrupt promise allegedly made.").

As the Court recognized in its written opinion, that the S2 Indictment alleged that, by virtue of his position, Menendez had "influence over, among other things, the Executive Branch's decisions to provide foreign military sales, foreign military financing, and other aid or support to or for the benefit of the Government of Egypt" did not violate the Speech or Debate Clause, because what Menendez had the ability to do, or led others to think he could or would do, is not a legislative *act*. *Menendez*, 2024 WL 1120182, at *1, *5. So too, as the Court explained during trial: "The public sharing of a piece of legislation is not a legislative act subject to speech or debate protections. The mere mentioning of a piece of legislation is not a legislative act." (Tr. 3592.) Menendez offers no basis for this Court to reconsider its decisions in this respect, which were in accord with decades of case law.

> b)    The Evidence Did Not Violate the Speech or Debate Clause

As described above, and in greater detail below, Menendez's Speech or Debate claims fail for multiple reasons. As an initial matter, Menendez, who bears the burden on his motion, does not even attempt to demonstrate, as he must, that admission of the evidence about which he complains resulted in the conviction of an innocent person. *See, e.g.*, *Canova*, 412 F.3d at 349. The evidence did not. Menendez was proven, overwhelmingly, to be guilty. Moreover, to the extent that Menendez's claims were already decided upon by this Court—as nearly all were, often

more than once—those claims are not properly brought under Rule 33. *See, e.g.*, *Malka*, 623 F. Supp. 3d at 328. And to the extent that Menendez appears to bring one or more new claims, challenging evidence to which he did not timely object at trial, those claims are waived, or at the very least, forfeited.[15] In any event, should the Court reach the merits of Menendez's claims, it should reject them.

> (1)    Menendez's Text Message to Nadine Menendez Directing Her to Tell Wael Hana That Menendez Will Sign Off on an Arms Sale

Menendez first claims that this Court erred in admitting a text message (GX A101-14, also admitted as GX B201-10) in which he told Nadine Menendez to "[t]ell Will" Hana "I am going to sign off" on a particular arms sale to Egypt.[16] Menendez concedes that a promise to take an act— no matter what the act is—is not protected by the Speech or Debate Clause. (Menendez Mem. 26.) He argues, however, that this message should not have been admitted because Menendez *in fact* signed off on the referenced sale, notwithstanding that the jury was not so informed and the Government did not so argue. (*Id.* at 20.) This argument has no support in case law, the language of the actual exhibit, or common sense. As the Court explained in previously rejecting the argument Menendez makes:

---

[15] Given the conclusory and broad nature of Menendez's claims, and the limited degree to which he cites the record, it is difficult to determine whether all aspects of his claims are preserved. The Government identifies certain apparent claims that are plainly unpreserved, but generally focuses on the merits, and the discussion herein should not be read as a concession that all aspects of Menendez's claims are preserved. For the same reasons, the Government does not herein analyze whether, even if a particular claim were correct, any alleged error was harmless (and Menendez would bear the burden to demonstrate to the contrary for unpreserved claims), but reserves the right to so argue, and is prepared to file supplemental briefing should the Court request it.

[16] As noted above, the standard of review of an evidentiary decision is abuse of discretion. *See, e.g.*, *Fazio*, 770 F.3d at 165. Menendez's claims fail under any standard.

> [T]o the extent that the indictment alleges that a corrupt agreement was formed in which Menendez agreed—or promised—to use his power to influence foreign military sales or foreign military financing to Egypt, or to the extent Menendez says he will place a hold or sign off on foreign military sales or foreign military financing, the Speech or Debate Clause does not apply.

*Menendez*, 2024 WL 1120182, at *6.  Indeed, during trial, after considering the pertinent exhibit, the Court *again* explained that Menendez's claim had no merit:

> I think the defense is pushing too hard. . . . That [message] is a promise . . . . [The defense] argues that [it] is evidence of a legislative act and is precluded.  Well, it's certainly not precluded by my opinion.

(Tr. 564-65; *see also* Tr. 566 ("Promises by a member to perform an act in the future are not legislative acts.  Tell Will I am going to sign off this sale to Egypt today is a promise." (internal quotation marks omitted)).)  Menendez offers no basis for this Court to revisit its decision, which was manifestly correct, much less does Menendez offer a sufficient basis for this Court to do so in response to his third attempt to press the same argument.[17]

On the contrary, were the proposition for which Menendez advocates adopted, a legislator could insulate himself against prosecution simply by following through on a corrupt promise; in short, the *more* successful the bribery scheme, the *less* the corrupt legislator could be held accountable.  For very good reason, that absurd proposition is not the law.  *Cf., e.g.*, *United States v. Williams*, 644 F.2d 950, 952 (2d Cir. 1981) (rejecting argument that the Speech or Debate Clause barred introduction of a video of a defendant's "discussion of a proposed immigration bill with the

---

[17] The Government also respectfully maintains that Menendez's claim concerning this text message (along with other of his claims) fails because holds are not legislative acts, for the reasons set forth in its memorandum in opposition to the defendants' first motions to dismiss.  (Dkt. 180, at 37-40.)  This Court disagreed, *see Menendez*, 2024 WL 1120182, at *5, and it need not revisit that decision to deny Menendez's claims.

undercover agent"); *United States v Renzi*, 651 F.3d 1012, 1022, 1025 (9th Cir. 2011) (rejecting defendant Representative's argument "that the district court drew too fine a line between present and future conduct" and "that his prosecution must be barred to avoid impugning later 'legislative acts'"; "If [the defendant's] unprotected negotiations are sufficiently cloaked under a broader category of protected legislative activity, *i.e.*, an investigation, then the Clause would fall like an iron curtain to preclude prosecution for the otherwise unprotected activity as well."), *cert. denied*, 565 U.S. 1157 (2012); *see generally Menendez*, 831 F.3d at 168 ("[A] blanket approach is much too broad, as it would immunize many illegal acts that have only dubious ties to the legislative process.").

> (2)  Menendez's Position on the Senate Foreign Relations Committee

Menendez next claims that this Court erred in permitting former State Department witness Joshua Paul to supposedly testify that "that no military aid to Egypt could be approved without authorization from the Chair and Ranking Member of the SFRC, both positions that Senator Menendez held at all relevant times." (Menendez Mem. 20.)[18]  Menendez's entire argument is a single sentence, without citation to case law or other authority.  For this reason alone, it need not be considered.  *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).  In any event,

---

[18] Menendez's characterization of Paul's testimony is not accurate.  While Paul testified that it was rare for an arms sale to be approved if the Chair or Ranking Member of the SFRC objected, it was undisputed that, although it was uncommon, aid and arms sales could be, and were at times, approved and authorized by the Executive Branch irrespective of any position of the SFRC leadership.  As Paul testified, the Executive Branch disregarded holds on at least two occasions in 2018 and 2019, and on other occasions during the relevant time period avoided congressional consultation altogether.  (Tr. 930-31.)

Menendez, who himself included the unobjectionable fact that the SFRC has a role in foreign affairs and foreign aid in his opening statement (Tr. 94), fails to offer any basis for this Court to reconsider its decision that the fact of Menendez's "influence over, among other things, the Executive Branch's decisions to provide foreign military sales, foreign military financing, and other aid or support to or for the benefit of the Government of Egypt" is not covered by the Speech or Debate Clause, because what Menendez had the ability to do, or led others to think he could or would do, is not a legislative *act*. *Menendez*, 2024 WL 1120182, at *1, *5. (*See also* Tr. 4479 (Court agreeing that "the government can elicit the structure and power generally with respect to a United States senator" and stating that defense counsel is "off base" is arguing otherwise)); Tr. 4482 (Court agreeing that the Government can "introduce evidence that a person offered a public official money to take action on a matter pending before the public official").) And again, as explained above, the proposition for which Menendez advocates is irreconcilable with settled precedent. *See Brewster*, 408 U.S. at 527 (bribery charge properly resting on payment in exchange for the official's "action, vote and decision on postage rate legislation which had been pending before him in his official capacity").

(3)    Menendez's Position and Strategy Concerning Egypt

Menendez next claims that this Court erred in permitting then-staffer Sarah Arkin to testify about certain discussions she had with Menendez regarding "his positions and strategy vis-à-vis Egypt." (Menendez Mem. 20-21.) This claim also fails for multiple reasons.

*First*, again, Menendez's entire argument is a single sentence, without citation to case law or other authority.[19]

---

[19] For the same reason, it is difficult to discern the scope of Menendez's claim. To the extent that

*Second*, again, Menendez fails to offer any basis for this Court to reconsider its decision to admit such evidence.  *See Menendez*, 2024 WL 1120182, at *6-7.  (*See also* Tr. 4485 ("Seems to me that's quite appropriate for questioning.").)

*Third*, to the extent that Menendez's claim appears to rest on the proposition that the Government offered, and the Court admitted, testimony generally about Menendez's "positions and strategy," including with respect to legislative acts bearing on Egypt, that is false.  Menendez cites nothing in support of his conclusory assertion that the "evidence the government offered from the Senator's own staff effectively put Senator Menendez's authorization of military aid, information gathering, and other legislative activities directly at issue."  (Menendez Mem. 21.) The record refutes that assertion.  As the Court is aware, Arkin's pertinent testimony concerned the degree to which Menendez changed his *public* stance, and, in particular, why he said he would not sign a particular public letter.  (*See* Tr. 4512-14.)  And that is why the objection had no merit, because the law is crystal clear that not everything a Member of Congress says to a staffer, or everything a staffer does, falls under the Speech or Debate Clause.  (*See* Tr. 4339 (Government: "We've talked with the defense at length about this. . . . Ms. Arkin is expected to testify about conversations with Mr. Menendez regarding his work as a senator, but not holds, not legislation. We're steering far clear of that."); Tr. 4484 (Court: "Press releases are fair game and you [defense

---

he may be challenging the entirety of Arkin's testimony—a witness whom he had listed on his own witness list and for whom he produced 26.2 material—such a claim is unpreserved.  Indeed, defense counsel expressly agreed with the Court that "the fact of the matter is all discussions that this staffer had concerning Egypt are not, do not implicate speech or debate."  (Tr. 4475.)  Given that agreement, and that, in his opening statement, Menendez argued that he had a "consistent position" with respect to Egypt (Tr. 94-95; *see also* Tr. 96-97), there is a strong argument that such a broad claim, were Menendez to bring it, is waived.  In any event, the claim fails regardless of its scope or degree of preservation.

counsel], in fact, say you want to introduce some." Defense counsel: "Correct."); Tr. 4485 (Court: "It seems to me that the context, which, again, is my focus on these things, is it's concerning a press release. Fair game vis-à-vis speech and debate."); Tr. 4487 (Court: "[I]t does seem to me with the representation that she's not going to be talking about arms and no question will elicit anything about arms, I'm going to allow it to proceed. . . . I think I've laid down the guidelines. You have the statement that there's not going to be any testimony about arms. Let's proceed on that basis."); *see also* Dkt. 479 (Government letter describing history of defense objections and the parties conferring); Tr. 4489 (Court acknowledging receipt of letter prior to ruling).)

At trial, the Court aptly summarized Menendez's argument as "anything having to do with Egypt is speech or debate." (Tr. 4475.) And the Court rightly rejected that radical position:

> Now we are all agreed on, I think on the basic concepts, that is, communications that the senator had with staff about specific legislation about votes, about committee meetings, about placing [or] lifting holds, that's core legislative acts, and that impinges on speech and debate but it is not any conversation regarding Egypt. We all know the language [in *Brewster*] about not making legislat[ors] super citizens.

(Tr. 4475; *see also* Tr. 4476 ("I am receptive to the argument of speech and debate and protections the constitution gives it but not when you go this far.").) The Court was correct. Menendez's argument went too far. It still does.

*Finally*, in the course of making the same sweeping argument, Menendez suggests that even if Arkin's testimony would not otherwise have violated the Speech or Debate Clause, the introduction of certain staff "memoranda," attached to or contained within emails about which she testified, constituted a violation. (Menendez Mem. 21; *see also id.* at 22 n.4.) But Menendez did not object to those memoranda being admitted; Menendez requested, and the Government

accepted, that the exhibits be offered with far *fewer* redactions to the memoranda than the Government had proposed; and Menendez does not even attempt to explain what in the redacted memoranda referenced a protected legislative act—and nothing in them did.

(4)    Menendez's Official Meetings with Egyptian Officials

Menendez also claims that this Court erred in permitting evidence of "his official meetings with Egyptian officials." (Menendez Mem. 21.)[20] Once again, this claim is conclusory. Menendez simply asserts that "evidence of his official meetings with Egyptian officials was clearly off limits, as those are precisely the types of information-gathering activities that are safeguarded by the Speech or Debate Clause," and notes that Arkin testified that a particular meeting did "not involve any discussion of bribes or other inappropriate requests." (*Id.*) Menendez does not even acknowledge, much less provide a basis to reconsider, this Court's written opinion. In that opinion, this Court explained that, for multiple reasons, his meetings with Egyptian officials were not protected legislative conduct. *Menendez*, 2024 WL 1120182, at *6-7.[21]

Nor does Menendez explain how the evidence of his meetings actually presented at trial—not his characterization of it—which evidence did *not* include a single question he asked or reference a particular arms sale or any other particular matter, nevertheless should be deemed protected "information-gathering" (Menendez Mem. 21). Instead, Menendez, who in his opening

---

[20] Menendez does not explain what he means by "official meetings," and he cites only a single meeting, that in March 2018. (Menendez Mem. 21.) The Government accordingly assumes that Menendez is not challenging the admission of evidence of meetings that did not appear on his Senate calendar and/or were not arranged by or made known in advance to Senate staff. In any event, any such challenge would plainly fail.

[21] The Court also rejected Menendez's claim that the information he provided *to* such officials was protected legislative conduct. *Menendez*, 2024 WL 1120182, at *7. Menendez does not appear to re-raise that claim in his motion.

statement claimed that the evidence would supposedly show that he took "Egypt to task" and was "telling them they needed to be better on human rights" (Tr. 94-95), now appears to take the same "anything having to do with Egypt is speech or debate" position that he took previously—and that this Court rightly rejected. (Tr 4475; *see also* Tr. 4480 (Government: "The Court could not have been more clear . . . we're allowed to elicit he had meetings with foreign [officials] and we're allowed to elicit what the officials asked for in the charged time period. That's where we're going to go next; that [Arkin] attended meetings, she understood from those meetings what Egyptian officials want[] from the Senate. We're not asking about specific sales or goals at all."); Tr. 4488-89 (Government: "[M]y intention was to ask her, consistent with the Court's ruling and prior back-and-forth, what were the goals they expressed in those meetings; that is, what did they want from the United States? Court: "The Egyptians." Government: "Correct, your Honor." Court: "That's fine.").) Menendez is not entitled to a new trial on the ground that the Court rejected his stunningly broad position concerning the Speech or Debate Clause, and admitted limited testimony about the general goals of certain foreign officials.

Nor is Menendez entitled to a new trial under the Speech or Debate Clause because the Court admitted a text message in which a staffer characterized Menendez's conduct with respect to Egypt as "weird." (Menendez Mem. 21.) Menendez did not object to that message on Speech or Debate grounds at trial, he does not even attempt to explain how the staffer's characterization could remotely be deemed a protected legislative act, and he does not otherwise challenge the

admission of the text message, which the Court correctly ruled was an admissible agency statement under Rule 801(d)(2)(D).  (Tr. 2684.)[22]

(5)    Menendez's Meetings and Communications with Philip Sellinger and Michael Soliman

Menendez next claims that this Court erred in admitting the testimony of Philip Sellinger and Michael Soliman, including concerning meetings and/or communications they had with Menendez.    According to Menendez, all such evidence was "part and parcel of Senator Menendez's constitutional 'advice and consent' role" with respect to U.S. Attorney nominations, and thus protected legislative activity.  (Menendez Mem. 22.)  Not so.[23]  As the Court explained in its written opinion, because the recommendation of whom the President should nominate is not a legislative act, "a Senator's pre-nomination activities—including information gathering in determining who the Senator is considering for recommendation to the President plus the recommendation itself—are not legislative acts."  *Menendez*, 2024 WL 1120182, at *4.  Menendez

---

[22] Menendez seems to direct his objection to the message in which Menendez's staff director states, in reaction to Menendez's unusual actions in connection with the CODEL and beyond, "All of this Egypt stuff is very weird, I've never seen anything like it."  (GX 8F-22 at 6; *see also* Tr. 2684 (Court admitting this portion over objections, which objections did not concern Speech or Debate Clause).)  In his memorandum of law, however, Menendez also quotes an earlier portion of the same text chain, on page 2 of the same exhibit, in which Menendez's staff director stated he believed Arkin's inability to locate a particular Egyptian official was "weird".  (*See* Menendez Mem. 21 ("GX 8F-22 (Ms. Arkin's [sic] text message that 'I'm [sic] that's weird.  How big is the embassy.'") (second sic in original).)  Given that Menendez never objected to this earlier portion of the text chain on any ground, and that this earlier text message undisputedly referred only to a simple misunderstanding about the name of the Egyptian official Arkin could not find, the Government assumes Menendez is not attempting to challenge this earlier message (and any such challenge would be unpreserved).  Regardless, neither message is barred by the Speech or Debate Clause.

[23] While Menendez challenged the pertinent portions of the S2 Indictment, not all of what was presented at trial with respect to the District of New Jersey/U.S. Attorney scheme was alleged in the S2 Indictment, and Menendez did not object to all of what was presented at trial.  Accordingly, at least certain aspects of this claim are unpreserved, including as to meaningful portions of Soliman's testimony, but the Court need not determine what is preserved to reject the claim.

99

offers no cogent basis for the Court to reconsider this decision, which was well-grounded in both the text of the Constitution and case law.  *See id.* at *1-4.

Rather, Menendez's asserts that "the Court's analysis is beside the point" because a "Senator's vetting process of potential U.S. Attorney nominees is an integral part of the deliberative process by which Senators later vote on U.S. Attorney nominees." (Menendez Mem. 23.)  But the Court already considered and rejected that very argument.  The Court explained:

> Extending Speech or Debate Clause protection to a Senator's meetings with a potential candidate for recommendation to the President—not a legislative act—for the President to nominate that candidate—not a legislative act—and present that candidate to the Senate for a vote would implicate the same concern articulated in *Brewster*.  The Court therefore declines to extend the Speech or Debate Clause to cover a Senator's pre-nomination conduct while considering candidates to recommend to the President.

*Menendez*, 2024 WL 1120182, at *4.  Menendez does not acknowledge the Court's decision, much less offer a basis for it to be reconsidered.

In any event, even if Menendez were correct that, at least in theory, certain meetings with or communications concerning potential U.S. Attorney candidates could be covered by the Speech or Debate Clause, the evidence presented at trial would not be so covered.

With respect to Michael Soliman, he was not a member of Senate "staff" (Menendez Mem. 22), but rather was an outside political consultant employed by a private firm.  (Tr. 3860-62.) Menendez cites no case, and the Government is unaware of any, in support of the proposition that a Senator may choose to act not through legislative staff—who, among other things, are subject to Senate ethics rules and discipline, as described in the Senate Ethics Manual, *see* Select Comm. on Ethics, U.S. Senate, Senate Ethics Manual (2003), *available at* https://www.ethics.senate.gov/downloads/pdffiles/manual.pdf—but rather through an outside

political consultant with a private firm, and then claim protection under the Clause.  *See, e.g.*, *United States v. Menendez*, 132 F. Supp. 3d 610, 624 (D.N.J. 2015) ("Nothing . . . in *Gravel* or later cases suggests that the Speech or Debate Clause protects a *former* aide who has left the employment of a Member." (emphasis in original)), *aff'd*, 831 F.3d 155 (3d Cir. 2016), *cert. denied*, 580 U.S. 1198 (2017).

Moreover, Soliman had no role in advising or assisting Menendez with respect to the merits of candidates or the policies they might advance.  Rather, his job concerned "how the candidate would be received politically and in the press."  (Tr. 3866.)  And indeed, Soliman testified that, in this role, he undertook, at Menendez's direction or with his assent, actions such as placing stories with the press (Tr. 3881, 3897-99), and engaged in discussions about what to tell Sellinger as to why he was not being recommended (Tr. 3905).  Nothing in Soliman's testimony—which Menendez does not cite or describe—could plausibly be deemed a protected legislative act.

So too with the testimony of Sellinger.  Menendez asserts that his meeting and communications with Sellinger were protected legislative information gathering in aid of Menendez's eventual vote on a U.S Attorney nominee.  (Menendez Mem. 22.)  But Menendez does not cite or describe Sellinger's actual testimony about that meeting and those communications—which testimony did not involve any specific information "gathered" by Menendez apart from whether Sellinger was likely to be recused from Fred Daibes's pending criminal case.  That bears no resemblance to protected legislative information gathering.  *Cf. Menendez*, 831 F.3d at 171 (rejecting argument that because communications with the Executive Branch could have been motivated by "policy concerns," they were protected, because the actual communications were at least predominantly made "with an eye toward Dr. Melgen's specific

situation"); *United States v. McDade*, 28 F.3d 283, 300 (3d Cir. 1994) (drawing distinction between letter advocating on behalf of specific company and letter that discussed a "broader policy question"), *cert. denied*, 514 U.S. 1003 (1995); *see generally Johnson*, 383 U.S. at 172 (rejecting claim that the Clause covers corrupt "attempt to influence the Department of Justice"). Nor does it matter that Menendez's meeting with Sellinger might facially have appeared legitimate. *Cf., e.g.*, *Myers*, 692 F.2d at 860.

(6)    Senate Resolution 390

Menendez next claims that this Court erred in admitting two text messages in which Fred Daibes transmitted to Menendez the publicly-available status and title of Senate Resolution 390, which concerned Qatar. (Menendez Mem. 23-24 (citing GX A104-4; GX A104-5; GX A104-E; GX 10G-1).) Menendez argues that the then-proposed resolution is a "protected legislative act," so its introduction, even in this form, and even though he had taken no action of any kind on the resolution at the time of the text messages, violated the Speech or Debate Clause. (Menendez Mem. 24.) This argument is frivolous. As the Court explained in a written opinion—which Menendez does not acknowledge, much less offer a basis to reconsider—"it is without question that a text to a senator, sent by an individual who is neither a legislator nor an aide, providing that senator with publicly available information regarding a pending resolution as to which the senator has yet to take any legislative act is not 'speech or debate.'" *Menendez*, 2024 WL 3014205, at *2.

Menendez suggests that that might be so, except that the resolution was sponsored by other Senators, who did not waive any Speech or Debate protection that might attach to the fact that they sponsored the resolution. (Menendez Mem. 24.) But Menendez does not have standing to raise a potential claim of other Senators. *See Gravel*, 408 U.S. at 622; *see also Nunes v. NBCUniversal Media*, LLC, No. 22 Civ. 01633 (PKC) (SN), 2024 WL 1500945, at *2 (S.D.N.Y. Mar. 19, 2024).

102

And in any event, the names of the sponsoring Senators were redacted, precisely as the Court ruled was permissible. *Menendez*, 2024 WL 3014205, at *2 ("As the Court has previously ruled, while the Government may not introduce into evidence a document that names a senator in relation to a legislative act performed by that senator, that same document is admissible provided the senator's name is redacted or replaced by a pseudonym.").

Menendez also argues that even if the text messages themselves might have been properly admitted, the Government violated the Clause when it argued that Daibes sent Menendez these messages because Daibes wanted Menendez to take action on the resolution.  (Menendez Mem. 25.)  This argument is also frivolous.  As described above, it is settled law—for very good reason— that evidence that a bribe-payor sought action from a legislator on a matter pending before the legislator is not an act of the legislator, much less one covered by the Speech or Debate Clause. *See, e.g.*, *Brewster*, 408 U.S. at 527 (bribery charge properly resting on payment in exchange for the official's "action, vote and decision on postage rate legislation which had been pending before him in his official capacity"); *see generally Myers*, 635 F.2d at 937.

In short, the Government's arguments were entirely proper.  As the Court explained in its written opinion:

> The evidence at issue here . . . is not backward looking, but forward looking.  It contemplates not a legislative act already performed, but, at most, a request for a future legislative act that may or may not be performed at some unknown subsequent time. As *Helstoski* itself sets forth, "it is clear from the language of the [Speech or Debate] Clause that protection extends only to an act that has *already been performed*." *Helstoski*, 442 U.S. at 490 (emphasis added).  [A]s of the latest date represented in the exhibits . . . to which Menendez objects—November 4, 2021—no legislative act related to S. Res. 390 had "already been performed" by Menendez, and thus Speech or Debate Clause protection does not extend to that evidence.

*Menendez*, 2024 WL 3014205, at *1; *see also id.* at *2 ("This is not a close call.").  Menendez does not acknowledge this portion of the Court's decision either, much less offer a basis for it to be reconsidered.

(7)    Senate Bill 1102 (The Eastern Mediterranean Security and Energy Partnership Act of 2019)

Finally, Menendez argues that this Court erred in admitting an email from Daibes to Jamela Maali (his assistant), forwarding the text of Senate Bill 1102, which Menendez previously sent to Daibes, without comment.  (Menendez Mem. 25-26 (citing GX 3D-2).)[24]  Menendez does not acknowledge this Court's prior rejection of his argument:

> . . . I do want to handle the Menendez motion to strike the evidence from Ms. Maali concerning GX 3D-2, the Eastern Mediterranean Security and Energy Partnership Act of 2019.  It was a couple of lines from her plus the introduction of that GX 3[D]-2, which was an email from Mr. Daibes to, in effect, Ms. Maali, which had as an attachment the bill, the Eastern Mediterranean Security and Energy Partnership Act of 2019. . . . And that was the attachment, and it was received by Mr. Daibes from Mr. Menendez in an email from Menendez to Daibes, subject S1102.docx, and that attachment, based on the evidence, is simply the Eastern Mediterranean Security and Energy Partnership Act of 2019.  And Menendez has moved to strike that as well as the references in the summary chart of Daibes forwarding it on to [Wael] Hana and then Hana forwarding it on to [Ahmed] Helmy, or not.
>
> The public sharing of a piece of legislation is not a legislative act subject to speech or debate protections.  The mere mentioning of a piece of legislation is not a legislative act.  The text itself and sending the text itself is not a legislative act; that is, the text of an act.  There's not a reference to a legislative act in the testimony or the chart or the exhibit, so there's no speech or debate issue with this

---

[24] This claim is unpreserved.  Menendez initially objected to the exhibit on relevance grounds only, not Speech or Debate grounds.  (Tr 1002, 1011.)  Menendez waited *nine days* after the exhibit was admitted into evidence to object on Speech or Debate grounds, moving to strike it.  (*See* Dkt. 436 (outlining history).)  In any event, his claim is meritless, even if preserved (which it is not).

104

> evidence.  I cite *Gravel*, 408 U.S. 625; *Hutchinson v. Proxmire*, 443
> U.S. 111, at 133; *Doe v.McMillan*[,] 412 U.S. 306, at 313-14.
>
> There's no speech or debate issue in this transmission.

(Tr. 3591-92.)  The Court was unquestionably correct.  Indeed, Menendez does not cite a case or

any other authority to make his argument, which fails for all of reasons his prior argument failed.

2.      *The Government's Presentation of Documentary Evidence Was Proper*

Hana argues, at length, that it was purportedly unfair and unconstitutional for the

Government to present to the jury, through summary charts or otherwise, voluminous documentary

evidence of his and his co-defendants' guilt.  (Hana Mem. 7-51.)  None of his complaints has merit.

a)      <u>The Government's Summary Charts Were Admissible</u>

In order to allow the consideration of large volumes of documentary evidence in a

comprehensible and efficient fashion, the Court admitted a series of summary charts that

summarized portions of numerous government exhibits and placed them in chronological order.

(*See* GXs 1302, 1303, 1304.)  The charts summarized highly probative and inculpatory evidence,

but—contrary to Hana's complaints (Hana Mem. 7-51)—that did not somehow render the charts

improper.  Without the summary charts, the documentary evidence of guilt would have been

equally overwhelming, but the trial would have been much longer.  In any event, Hana's challenge

is to an evidentiary decision on which he lost during trial (*see* Dkt. 441; Tr. 2312), and is therefore

not properly sought to be relitigated under Rule 33, as explained above.  *See, e.g.*, *Malka*, 623 F.

Supp. 3d at 328.[25]  The Court accordingly need not consider his claim, but if the Court chooses to

do so, it should reject it for multiple reasons.

---

[25] That is not to say that all aspects of Hana's lengthy argument are preserved.

(1)    Applicable Law on Admission of Summary Charts

Summary charts, including chronological summaries of communications, are regularly admitted under the law of the Second Circuit.  *See, e.g.*, *United States v. Ho*, 984 F.3d 191, 209-10 (2d Cir. 2020) (hundreds of pages of text messages, emails, and other documents "merited the use of summary charts in a complex fraud trial," citing cases); *United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020) (affirming admission of summary chart of "hundreds of calls and text messages" and explaining that "this information would have been difficult for the jury to synthesize and evaluate without the aid of a summary"); *United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) (affirming admission of "government's summary charts [which] set forth detailed information concerning well over 100 telephone calls spanning three days between four individuals"); *see also United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003) (stating the Second Circuit has "regularly affirmed" the use of summary charts "to draw the jurors' attention to particular evidence culled from a voluminous set of records"); *United States v. Lasko*, 146 F. App'x 530, 532 (2d Cir. 2005) ("The use of charts summarizing evidence is a common procedure whose use we have repeatedly approved." (internal quotation marks omitted)).

While summary charts must be based on the evidence they purport to represent, they need not include all evidence the opposing party may wish.  *See, e.g.*, *United States v. Gentile*, No. 21 Cr. 54 (RPK) (PK), 2024 WL 3046193, at *3 (E.D.N.Y. June 18, 2024) (rejecting defense argument that Rule 1006 slides improperly "cherry-pick" certain transactions to highlight, holding "these are the sort of summary slides that Rule 1006 permits").  "A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case." *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 333 (E.D.N.Y. 2013) (internal quotation marks and brackets omitted); *see also, e.g.*, *DL v. District of*

106

*Columbia*, No. 05 Civ. 1437, 2015 WL 6446087, at *6 (D.D.C. Oct. 23, 2015) (rejecting defense argument that a Rule 1006 chart was "inappropriately argumentative" because it was selective). Because "selection of relevant evidence for presentation to the factfinder is inherent to the nature of litigation," the "non-comprehensive nature of the data underlying a summary goes to evidentiary weight, not the threshold question of admissibility." *United States v. Hofstetter*, No. 13 Cr. 27 (TAV) (DCP), 2019 WL 5057176, at *5 (E.D. Tenn. Oct. 8, 2019) (internal quotation marks omitted). In short, "[a] summary, to be admissible . . . need not give effect to the contentions to the accused," but only "be what it purports to be." *United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983).

Accordingly, a summary chart is admissible even when a defendant complains that it takes evidence out of context in order to support prosecution theories. In *United States v. Parnas*, No. 19 Cr. 725 (JPO), 2022 WL 669869 (S.D.N.Y. Mar. 7, 2022), a defendant opposed the admission of chronological summary charts of communications and did "not contend that anything included in the charts was false; he instead assert[ed] that the charts were misleading because they took evidence out of context to support the government's narrative." *Id.* at *7. Judge Oetken rejected that argument, holding that it was "well within the government's right" to present evidence to support its narrative in its case in chief. *Id.*; *see also, e.g.*, *United States v. Bendelstein*, No. 18 Cr. 309 (HG), 2023 WL 2457842, at *10 (E.D.N.Y. Mar. 10, 2023) ("Although Defendant asserts that the charts were improperly argumentative, he notably 'does not contend that anything included in the charts was false.'" (quoting *Parnas*, 2022 WL 669869, at *7-8)). Indeed, numerous courts have rejected such arguments. *See, e.g.*, *Ho*, 984 F.3d at 209-10 (rejecting argument that timeline of selected exhibits could not be introduced under Rule 1006 because it was allegedly "created for

the purpose of generating a narrative supporting the prosecution's theory of the case"); *United States v. Skelos*, No. 15 Cr. 317 (KMW), Tr. 2252-57, 2262 (S.D.N.Y. 2015) (rejecting defense argument that timeline charts were "argument presented through an FBI agent" and "in effect summation," and finding that "it is precisely the type of information that has been allowed to be used in charts"); *United States v. Calk*, No. 19 Cr. 366 (LGS), Tr. 2-3 (S.D.N.Y. June 22, 2021) (admitting similar timeline charts over objection); *United States v. Gatto*, No. 17 Cr. 686 (LAK), Tr. 1443-48 (S.D.N.Y. Oct. 16, 2018) (admitting summary chart, rejecting defense argument that it should be used in "closing" instead).

Instead of any supposed requirement to include all documents the opposing party wishes, under the law a summary under Rule 1006 must only be "'based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent [and admissible] evidence.'" *U.S. Secs. & Exchange Comm'n v. Alpine Secs. Corp.*, 354 F. Supp. 3d 396, 419 (S.D.N.Y. 2018) (quoting *Fagiola v. Nat'l Gypsum Co AC&S*, 906 F.2d 53, 57 (2d Cir. 1990)). "Objections that a summary 'd[oes] not fairly represent the [underlying] documents and [is] excessively confusing and misleading go more to [the summary's] weight than to its admissibility.'" *Alpine Secs.*, 354 F. Supp. 3d at 419 (quoting *U.S. ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 163 (2d Cir. 1996)). Accordingly, a summary chart that is based on "doubletalk" rather than on the evidence it purports to summarize is of course inadmissible. *See, e.g.*, *United States v. Citron*, 783 F.2d 307, 316-17 (2d Cir. 1986) (excluding summary chart where "the government provided no explanation . . . showing how it derived" the most important figure, and where the court "did not consider whether the chart was based on the evidence but instead noted that the chart was based on

'doubletalk' and admitted it").  But if a summary chart has a foundation in the evidence, "[t]he inaccuracy of a summary under Rule 1006 . . . goes to the weight, rather than the admissibility, of the evidence." *BD ex rel. Jean Doe v. DeBuono*, 193 F.R.D. 117, 130 (S.D.N.Y. 2000); *see also, e.g.*, *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008) ("Even if the calculations are mistaken, the chart is itself admissible, since admissible evidence may be unpersuasive and a defendant has the opportunity to rebut it."); *Nat'l Credit Union Admin. Bd. v. Wells Fargo Bank, N.A.*, No. 14 Civ. 10067 (KPF) (SN), 2020 WL 2216560, at *2 (S.D.N.Y. May 7, 2020) (quoting *id.*).

In order to have a proper foundation in the evidence, a summary chart need not be accompanied by "detailed testimony stating the basis" of each entry, but simply enough explanation to allow the jury to see how the information on the chart was "derived from the underlying evidence."  *Citron*, 783 F.2d at 317; *see also id.* ("Our ruling that the chart was inadmissible does not mean that the government must provide detailed testimony stating the basis of each calculation undertaken when a summary chart is prepared.  All that is required is enough explanation to allow the jury to see how the numbers on a chart were derived from the underlying evidence put before it.").

The grant of a new trial based on any arguably misleading aspects of a summary chart is an "exceptional" step that is not appropriate when even an "arguably somewhat confusing" chart is accurate and any allegedly misleading aspect is brought to the jury's attention, such as through cross-examination.  *Archer*, 977 F.3d at 198 n.4 (reinstating conviction where district court had granted new trial based on allegedly misleading summary chart).

(2)    The Government's Summary Charts Adhered to Well-
Established Law

The Government's summary charts here were admissible under settled law, as the Court

correctly ruled.  (*See* Tr. 1012, 2312, 4806.)   Each of the summary witnesses provided clear

foundational testimony to allow the jury to see how the information on the chart was "derived from

the underlying evidence," *Citron*, 783 F.2d at 317, and indeed the charts themselves each "already

list[ed] the source of the summary material," *Gentile*, 2024 WL 3046193, at *4, amply justifying

the charts' foundation in the evidence.  (*See* Tr. 1172-78 (GX 1302); Tr. 2316-19 (GXs 1303,

1307-29); Tr. 4112-15 (GXs 1304, 1337, 1351).)[26]   As discussed in Section II.B.2.c, below, the

defendants had a full opportunity to cross-examine the summary witnesses about the connection

of the summaries to the underlying evidence, which further undercuts any motion for a new trial.

*See, e.g.*, *Archer*, 977 F.3d at 198 n.4 (reversing grant of new trial because "the threat of prejudice

was mitigated by the cross-examination, which highlighted" a payment reversal reflected in the

underlying evidence).

The charts used by the Government were each of a form that the Court ruled is appropriate.

(*See* Tr. 1012 ("The format of the summary chart seems to me quite appropriate, and there is

nothing unusual about it."); Tr. 2312 ("The underlying material is voluminous, the chart and its

format are appropriate.").)[27]   As collections of selected documents arranged in chronological order,

---

[26] The Government's other summary charts were also properly admitted and supported by ample
foundational testimony, and Hana does not mount any substantial challenge to them.  (*See, e.g.*,
Tr. 196-97 (GX 1301); Tr. 2848-52 (GX 1334); Tr. 4925-36 (GXs 1335A, 1335B, 1335C, 1335-
EX); Tr. 5552-55 (GX 1336); Tr. 5568-69 (GX 1338); Tr. 5575-80 (GX 1340); Tr. 5562-63 (GX
1341); Tr. 5556-60 (GX 1342); *see also* Tr. 4806 (GXs 1338, 1340, 1341).)

[27] There is no dispute that the evidence summarized in the charts is voluminous within the meaning
of Rule 1006.

the principal charts challenged—Government Exhibits 1302, 1303, and 1304—are substantively indistinguishable from summary charts approved by the Second Circuit in *United States v. Ho*, 984 F.3d at 209-10, which took the form of visual timelines,[28] and are virtually identical in form to those admitted in a number of other cases in this district. (*Compare, e.g.*, GX 1302 (chronological summary chart related to Egypt) *with, e.g.*, Ex. A (summary chart admitted in *Parnas*, 2022 WL 669869, at *7).)[29] They are, of course, identical not just in form but also in content to the charts that the defendants themselves used in their case, except that the defendants also inserted their own entries to the chart. (*Compare* GXs 1302, 1303, 1304 *with* DXs 1302, 1303, 1304; *see also* DX Hana 1300 (additional defense summary chart in similar format).) The defendants' use of identical responsive charts not only shows that they had a full and fair opportunity to counter the Government's evidence, as discussed in Section II.B.2.d, below, but it also belies any claim that any of the defendants truly contemporaneously believed that charts of this fashion were misleading or inappropriate to present to the jury.

Hana's complaints with the form of the summary charts all reduce to the complaint that these charts did not include material he would wish to have been included. (Hana Mem. 22-26,

---

[28] These visual timelines have also, consistent with *Ho*, routinely been admitted in this district. *See, e.g.*, *United States v. Percoco*, No. 16 Cr. 776 (VEC) (GXs 1501, 1502, 1703, 1704, 1706, 1707, 1708); *United States v. Avenatti*, No. 19 Cr. 374 (JMF) (GX 804); *United States v. Ray*, No. 20 Cr. 110 (LJL) (GX 1401); *United States v. Shea*, No. 20 Cr. 412 (AT) (GX 903-A); *United States v. Milton*, No. 21 Cr. 478 (ER) (GX 1005, 1007). The Government can provide the Court with copies of such exhibits upon request.

[29] Numerous other summary charts of a nearly indistinguishable format have been admitted in other cases in this district. *See, e.g.*, *United States v. Skelos*, No. 15 Cr. 317 (KMW) (GX 3303); *United States v. Calk*, No. 19 Cr. 366 (LGS) (GX 2109); *United States v. Shea*, No. 20 Cr. 412 (AT) (GX 904); *United States v. Wynder*, No. 20 Cr. 470 (PKC) (GX 2209); *United States v. Milton*, No. 21 Cr. 478 (ER) (GX 1006); *United States v. Rangott*, No. 23 Cr. 4 (JHR) (GX 1306). The Government can provide the Court with copies of such exhibits upon request.

29).  But the law is clear that this is not required.  *See, e.g.*, *Linde*, 922 F. Supp. 2d at 333 ("A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case."); *Parnas*, 2022 WL 669869, at *7; *Gentile*, 2024 WL 3046193, at *3.  All that was required, which each chart clearly satisfied as brought out on extensive direct and cross-examination, is that each chart was "what it purports to be." *Lemire*, 720 F.2d at 1349.  Apart from stray "minor inaccuracies" (Tr. 6165)—*i.e.*, factual errors that go squarely to the charts' weight and not their admissibility, *DeBuono*, 193 F.R.D. at 130, and were ably brought out on cross-examination (Tr. 6165 (Court: "[O]n both sides there were—not with him, but with other witnesses, the same thing was being done to show there were, to my mind, minor inaccuracies on both sides."))—Hana identifies no way in which the charts do not accurately reflect what they purport to.

Because the Government's summary charts accurately reflected what they purport to reflect, they served the salutary purpose of facilitating the efficient presentation of indisputably voluminous evidence.  *See, e.g.*, *Blackwood*, 366 F. App'x at 212 ("[T]he summaries were helpful to the jury in its evaluation of the evidence because they showed the pattern and timing of telephone calls among the co-conspirators on the three crucial days of the charged conspiracy.").  If the summary charts were excluded, the Government would have been left to read voluminous documents themselves into the record.  As discussed in Section II.B.2.c, below, that is a perfectly permissible manner of presenting evidence and was used to a limited extent in this trial.  But were the use of summary charts to have been forbidden for some reason, the Government would have

been forced to read a far greater volume of underlying documents into the record.[30]  Rule 1006

exists to prevent just this sort of inefficiency.

> (3)    Hana's Objection to the Jury Instructions on Summary
>        Charts is Barred and Meritless

Hana's objection to the Court's jury charge on the consideration of the summary charts is

similarly unavailing.  The language of the Court's charge was drawn exactly from the charge he

requested.  (*See* Dkt. 353-1, at 19 (request number 13).)  Any objection to it is thus barred by the

"invited error" doctrine.  *See, e.g.*, *United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009)

("[A] defendant who has invited a challenged charge has waived any right to appellate review."

(internal quotation marks omitted)).  Even if considered under the plain error doctrine, the Court's

instructions were not erroneous, let alone plainly or prejudicially so.  Although juries are often

instructed not to consider summary charts themselves as evidence, this precaution is not required

by Rule 1006, which allows the admission of a summary chart as a *substitute* for the underlying

evidence (which was not attempted here).  *See United States v. Abou-Khatwa*, 40 F.4th 666, 688

(D.C. Cir. 2022) ("Under Rule 1006, the exhibits were substantive evidence and needed no limiting

instruction."); *see also, e.g.*, *United States v. Weaver*, 281 F.3d 228, 233 (D.C. Cir. 2002) (rejecting

argument that "Rule 1006 summaries are not evidence or that in admitting such a summary into

evidence the court commits plain error if it omits some sort of cautionary instruction when the

defense has not requested one").  Indeed, in *United States v. Rom*, the Second Circuit affirmed a

conviction in which a district court did not give the same instruction before allowing a jury to

---

[30] Hana's plainly preferred alternative would, of course, be to contrive some means of precluding all such documentary proof, but as discussed in Section II.B.2.c, below, this absurd result—which would preclude proof of matters as to whom no percipient witness was available, no matter how strong the documentary evidence—is not the law.

consider *non-admitted demonstratives* because it "mistakenly assumed that the charts had been admitted pursuant to Rule 1006," reasoning that "the charts relied on properly admitted data and were possibly admissible themselves under Rule 1006."  528 F. App'x 24, 29 (2d Cir. 2013) ("While the district court did not instruct the jury here and mistakenly assumed that the charts had been admitted pursuant to Rule 1006, the charts relied on properly admitted data and were possibly admissible themselves under Rule 1006.").  Here, where the charts also "relied on properly admitted data" and were not just "possibly admissible" under Rule 1006, 528 F. App'x at 29, but were in fact properly admitted under that rule, there is no error at all, let alone plain error.  *See, e.g.*, *Hertular*, 562 F.3d at 444-45.[31]

   b)    The Mode of the Government's Presentation of Documentary Evidence to the Jury was Appropriate

The Government's presentation of documentary evidence—both through summary charts and in the non-summary form of simply reading admitted exhibits to the jury—adhered to well-established law.  Contrary to Hana's contentions (Hana Mem. 18-29), nothing in this presentation served as a closing argument, or indeed any argument at all.

As an initial matter, Hana's arguments about the Government's mode of presentation of evidence (Hana Mem. 18-29) largely restate, at length, Hana's previous motion to strike the testimony of the first chronological summary witness (Dkt. 441), which the Court denied (*see* Tr.

---

[31] Indeed, the Government in its summation urged the jury to consider the underlying exhibits cited in the chart, not the charts themselves, and there is no realistic possibility that the attentive jurors who sat through days of cross-examination about the reliability of the charts failed to grasp the significance of ensuring that they were in fact reliable before relying on them.  (*See, e.g.*, Tr. 6401 ("The *exhibits in* this chart are everything you need to prove the corrupt *quid pro quo*. . . .  [Y]ou can write down the number of this chart and then look at *every exhibit in it* that you want." (emphasis added).)  And as explained in Section II.B.2.d, below, even if there were any plain error, it would have been harmless.

2312).  His Rule 33 motion is not a vehicle for Hana to simply relitigate the Court's rejection of

these arguments.  *See, e.g.*, *Malka*, 623 F. Supp. 3d at 328.  In any event, Hana's complaints are

contrary to settled law.

(1)     The Court Properly Allowed Government Witnesses to
Read Relevant Evidence to the Jury

In addition to the presentation of summary charts, "it is permissible for a summary witness

to 'also read admissible non-summary evidence into the record.'"  *Gentile*, 2024 WL 3046193, at

*3 (quoting *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 636 F. Supp. 3d 144, 161 (D.D.C.

2022)); *see also, e.g.*, *United States v. Denton*, 944 F.3d 170, 185 (4th Cir. 2019) (no error in

permitting a special agent to read portions of defendant's Facebook records to the jury); *United

States v. Tragas*, 727 F.3d 610, 614 (6th Cir. 2013) ("As long as the evidence itself is properly

admitted pursuant to the Rules of Evidence and does not run afoul of other safeguards like the

Confrontation Clause, [the Court does] not see how a defendant could be prejudiced if the evidence

is read aloud to the jury.").

Contrary to Hana's complaints (Hana Mem. 24-27), as with the selection of documents for

summary charts, there is, of course, no requirement that a witness reading admitted exhibits into

the record read all the documents, or all the portions of documents, that the adverse party wishes.

*See Fairholme Funds*, 636 F. Supp. 3d at 161-62 ("[T]o the extent defendants challenge the

*selection* of documents [the witness] will read into the record . . . they cite no authority for the

proposition that a witness reading documents into the record as part of non-summary testimony

must also read documents, or portions thereof, that shed a more favorable light on the opposing

party."); *see also, e.g.*, *United States v. Markovich*, 95 F.4th 1367, 1378 (11th Cir. 2024)

("Summary testimony need not summarize *all* the records at issue, but may be based on a mere

115

subset, provided that the testimony does not purport to represent 'all the evidence.'" (citing *Flemister v. United States*, 260 F.2d 513, 517 (5th Cir. 1958)).  Rather, "[i]f defendants think the non-summary portions of [the witness's] testimony omit key documents, they are free to offer those documents into evidence themselves." *Fairholme Funds*, 636 F. Supp. 3d at 162.

Accordingly, Hana's contentions that the presentation of documentary evidence functioned as a closing argument (Hana Mem. 18-29) are simply wrong as a matter of law.  Where witnesses do not opine or interpret but simply present evidence, courts have routinely rejected defense motions characterizing the presentation of documentary evidence—whether through summary charts, summary testimony, or the non-summary reading of portions of admitted exhibits—as akin to closing argument.  *See, e.g.*, *Lemire*, 720 F.2d at 1350 ("[A] summary should not draw controversial inferences or pronounced judgment; these functions are best left to the closing argument of counsel.  Here, however, the summary involved only routine computations and culling through of documents to eliminate confusing and extraneous evidence.  Consequently we find no force to the argument that [the summary witness's] testimony provided an unwarranted second closing for the government."); *United States v. Baker*, 923 F.3d 390, 398 (5th Cir. 2019) ("[A]lthough [the summary witness] highlighted some key pieces of evidence, the testimony did not draw inferences for the jury, was not 'wholly argumentative,' and did not serve as a substitute for closing argument.  Rather, the testimony consisted of reading the contents of exhibits and sorting through the evidence to show how the documents related to each other and to the charges in the indictment."); *United States v. Nicholson*, No. 18 Cr. 23 (KS) (MTP), 2019 WL 2146605, at *2 (S.D. Miss. May 16, 2019) (similar, citing *id.*).

The Government's witnesses did not "draw controversial inferences" or "pronounce[] judgment", *Lemire*, 720 F.2d at 1350, but instead involved the entirely proper exercises of "routine computations" such as calculating the time between one communication and another, and the "culling through of documents to eliminate confusing and extraneous evidence," *id.*   This is the type of presentation courts permit.  *See, e.g.*, *Baker*, 923 F.3d at 398 (where summary witness "highlighted some key pieces of evidence" but "did not draw inferences for the jury," it "did not serve as a substitute for closing argument").  A summary witness does not engage in any inferences where his or her testimony consists of "lining up and comparing information already provided in" underlying documents, as here.  *Abou-Khatwa*, 40 F.4th at 686 ("Cross-referencing invoices to identify the differences between them simply requires lining up and comparing information already provided in the invoices themselves.  No inferences are needed.").  Indeed, a summary witness has been permitted even to use the charges in the indictment as a demonstrative and associate particular pieces of documentary evidence with particular counts in the indictment, a procedure that the Government did not use here.  *Baker*, 923 F.3d at 397, 398 n.20.

In casting about for a means of invalidating highly probative evidence, Hana wrongly likens the Government's summary witnesses to the entirely different, and widely criticized, concept of an "overview witness."  (Hana Mem. 22.)  An "overview" witness is a type of witness who offered "lay opinion providing a summary overview of anticipated evidence," *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005), "gave his personal opinion as to guilt or innocence," *United States v. Moore*, 651 F.3d 30, 59 (D.C. Cir. 2011), and "essentially testified that each of the defendants was guilty of the conspiracy charged," *United States v. Flores-De-Jesus*, 569 F.3d 8, 24 (1st Cir. 2009).  The Government's summary witnesses did nothing of the sort, and certainly

did not summarize "evidence that has not yet been presented to the jury" (Hana Mem. 22), as all of the underlying documents being summarized were first properly introduced in evidence.  Hana's list of allegedly objectionable examples of presentation of evidence (Hana Mem. 11-13, 16-18, 25-26), consists nearly exclusively of the witnesses computing how much time elapsed between the listed date and time of one document and another.[32]  That is precisely the type of "routine computations" that are squarely permissible.  *Lemire*, 720 F.2d at 1350.  Indeed, the Second Circuit recognized that a summary chart showing just this sort of "pattern and timing" of relevant communications was "helpful to the jury" and thus properly admitted.  *See Blackwood*, 366 F. App'x at 212 ("[T]he summaries were helpful to the jury in its evaluation of the evidence because they showed the pattern and timing of telephone calls among the co-conspirators on the three crucial days of the charged conspiracy.").

    (2)    Hana's Factual Arguments Provide No Ground for a New Trial

Most of Hana's objections to the Government's presentation of documentary evidence are really just thinly-disguised factual arguments claiming, at great length and in the manner of a

---

[32] Hana also complains now that the prosecutor's questioning was performed in a "dramatic" fashion (Hana Mem. 16) and objects now, for the first time, about unspecified "facial expressions and other body mannerisms" of the prosecutor (*id.* at 26 n.9).  The fact that there is no record supporting these complaints is part of the reason the rules require a contemporaneous objection, as it is deeply unfair to any counsel to have to defend, weeks after trial, against unsupported and *ex post* complaints of such a nebulous nature.  But in fact, these complaints are all meritless.  During the trial, the Court properly and vigilantly observed the demeanor of all counsel before the jury and gave corrective directives to counsel as needed.  (*See, e.g.*, Tr. 2281-82 (directive to defense counsel to use "game face"); Tr. 6414-15 (same).)  Apart from directing the prosecutor to speak more slowly, none of these correctives involved the demeanor of the prosecutor during the summary witness examinations.  Indeed, the one time a defense counsel complained about an allegedly "dramatic" moment during a summary witness examination, the Court rightly rejected this claim.  (*See* Tr. 1481-82 (Court: "First of all, there is nothing dramatic that I've heard.").)

summation, that a factfinder should have declined to draw certain inferences against the defendants. (*See* Hana Mem. 11-13, 24-25, 32-44.) As such, they were properly directed to the jury, and in no way a ground for a new trial. *See, e.g.*, *Landesman*, 17 F.4th at 331 ("[A] district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." (internal quotation marks omitted)). Arguments such as these— even if they were considered on their merits and found persuasive, which they should not be—do not actually prove any error whatsoever.[33] *See, e.g.*, *Hemphill*, 514 F.3d at 1359 ("[A]dmissible evidence may be unpersuasive and a defendant has the opportunity to rebut it."). As such, they are really arguments that the weight of the evidence is against the verdict, but they do not remotely meet the high standard of showing that the evidence "preponderates heavily against the verdict." *Archer*, 977 F.3d at 188. Even Hana does not claim that any of the documentary evidence he is objecting to "was patently incredible or defied physical realities," *Landesman*, 17 F.4th at 331, and he cannot now on a post-trial motion simply ask the Court to grant a new trial because he believes that the documentary evidence should have been weighed more favorably to him by the jury.

---

[33] It bears emphasis that these arguments are simply unpersuasive on their own terms. Hana complains, for example, that it was somehow unfair for the Government to argue that cash found in Menendez's residence bearing the fingerprints of Hana's associates Gazmend Lita and Nader Moussa was connected to the scheme, and puzzlingly lays this inference at the feet of the summary charts as a key example of supposed unfairness. (Hana Mem. 33-38.) But Lita and Hana's association with Hana was established by witness testimony (Tr. 717 (Moldovan testifying that Lita was Hana's employee); Tr. 1115 (Maali testifying that Moussa was friends with Hana)), and their fingerprints were proven through expert testimony (Tr. 2865, 2869-70). This testimony, which was obviously admissible and has nothing to do with the chronological summary charts, fully justified the jury in drawing the inference that the envelopes of cash bearing Lita's and Moussa's fingerprints were connected to Hana. The fact that summary charts *also* cite evidence supporting that inference (*see, e.g.*, GX 1302 line 759) is not any indication of unfairness. It is an indication of overwhelming evidence.

Ultimately the only thing even arguably unusual about the Government's presentation of documentary evidence in this case was how extensive and overwhelming that documentary evidence was.  Given the nature of the scheme and the wealth of documentary evidence proving the defendants' guilt, it is hardly surprising that the Government sought to present that evidence to the jury or that its presentation took substantial time.  The fact that Hana believes that such evidence does not support the inferences the Government urged from it, however, is not a basis for error, and is not a ground for overturning the jury's contrary conclusion.

          c)     <u>The Defendants Had a Full Opportunity to Cross-Examine and Present Responsive Evidence</u>

All of the defendants had a full and fair opportunity to confront and cross-examine each of the Government's summary witnesses on the matters within the scope of their direct testimony, and to present responsive evidence, which they took full advantage of.  Hana's suggestions that the Government was obligated to instead present witnesses whose testimony had a broader scope, so that he could expand the scope of cross-examination to include the Government's trial strategy (*see* Hana Mem. 48-49 (seeking to question "the creators of the charts—*i.e.*, the prosecutors in this case")), or that he was entitled to inject his case into the middle of the Government's case (Hana Mem. 14-15, 49 (complaining that Hana should have been able to present or highlight documents during cross-examination)), simply do not reflect the law.

Like his other complaints about documentary evidence, Hana's claims regarding cross-examination (Hana Mem. 44-51) are an attempt to repackage and relitigate claims that were previously made (Dkt. 441 at 6-8) and rejected (Tr. 2312), and thus not a basis for a Rule 33 motion.  *See, e.g.*, *Malka*, 623 F. Supp. 3d at 328.  In any event, they are not meritorious.

(1)    Hana Was Not Entitled to Introduce His Defense Case
Through Cross-Examination Beyond the Scope of the
Witnesses' Testimony

District courts have "broad discretion in controlling the scope and extent of cross-examination." *United States v. James*, 712 F.3d 79, 103 (2d Cir. 2010) (internal quotation marks omitted).  Rule 611(b) of the Federal Rules of Evidence limits the scope of cross-examination "to the subject matter of the direct examination and matters affecting the credibility of the witness." *Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 110 (2d Cir. 2012).  Consistent with that rule, courts can, should, and routinely do defer a defendant's presentation of evidence supporting their contentions to the defendant's case.  For example, in *United States v. Stadtmauer*, the district court prevented the defendant from admitting documentary evidence during cross-examination because the materials were "not really specifically impeachment material, but more akin to case-in-chief type evidence."  620 F.3d 238, 272 (3d Cir. 2010) (internal quotation marks omitted).  On appeal, the defendant argued that the materials fell within the scope of direct examination under Rule 611(b), and so the district court should have allowed their use on cross.  The Third Circuit had "little trouble concluding that the District Court did not abuse its discretion in postponing the admission of [the defendant]'s proposed exhibits" until his case.  *Id.*  As it explained, the district court had ample authority to manage the presentation of evidence, including its timing.  *Id.*  Other courts have readily reached the same conclusion.  *See, e.g.*, *United States v. Lambert*, 580 F.2d 740, 747 (5th Cir. 1978) (district court did not abuse its discretion under Rule 611(a) by excluding defendant's "proffers of voluminous documentary evidence" during cross-examination); *United States v. Ellison*, 557 F.2d 128, 135 (7th Cir. 1977) (district court did not abuse its discretion by excluding proposed defense exhibits during cross-examination, even assuming the documents

"would have been relevant rebuttal evidence if offered during the presentation of [the defendant's] own case").

Courts in this district routinely limit the scope of cross-examination of summary witnesses to the scope of their direct examination.  *See, e.g.*, *United States v. Londonio*, 17 Cr. 89 (CS) (ECF No. 857) (S.D.N.Y. 2019) (requesting that scope of cross be limited to scope of direct for purposes of efficiency, and that inquiry into other matters be conducted during defense case); *Londonio* Tr. 592 (granting request); *United States v. Calk*, 19 Cr. 366 (LGS) (ECF No. 230) (S.D.N.Y. 2021) (similar, including with respect to summary witness); *Calk*, Trial Tr. 388 (granting request, remarking: "The defendant is certainly entitled to elicit that the documents summarized were selected by the prosecutors, that they are a selective set, and that those are the only ones she summarized and that there are other documents, perhaps many documents that are pertinent to the case and pertinent to the defense case that she did not summarize and that were not brought out on her direct. . . . But, it's not an opportunity for the defense then to take all of those documents in the defense case and say, oh, and you didn't summarize this one which says X, Y, Z, or this one which says X, Y, Z, or this one. That is for your defense case, that is not within the proper scope of cross-examination of a summary witness.").

Indeed, the Second Circuit has affirmed limiting the cross-examination of law enforcement witnesses who provide summary testimony to the scope of the direct examination.  *See United States v. Koskerides¸* 877 F.2d 1129, 1134, 1136-37 (2d Cir. 1989) (affirming limiting scope of cross-examination of witness who performed net worth calculations, to exclude loans the witness had not testified about); *id.* at 1137 (affirming limiting scope of cross-examination of witness who testified as to gross receipts from a diner, to exclude questioning about the nature of the diner or

the circumstances of its sale). And in circumstances strikingly similar to here, the D.C. Circuit has affirmed the limitation of cross-examination of a summary witness on matters outside the scope of the witness's testimony. In *Lemire*, the D.C. Circuit considered a summary witness whose testimony summarized the Government's evidence on certain cash flows, and affirmed the preclusion of cross-examination on a defendant's cost of shipping, a defense theory allegedly undercutting the evidence that the defendant company had engaged in overcharging. *Lemire*, 720 F.2d at 1349.

Hana, like his co-defendants, had a full and fair opportunity to cross-examine each of the Government's summary witnesses about the scope of their testimony—*i.e.*, whether the summary charts they reviewed had a foundation in the evidence. *See, e.g.*, *Archer*, 977 F.3d at 198 n.4 (reversing grant of new trial because "the threat of prejudice was mitigated by the cross-examination, which highlighted" the way in which an entry on the chart was "arguably somewhat confusing"). The additional points that he wished to make, such as presenting his own documents, or reading at length from what he believed to be exculpatory portions of those cited documents (*see* Hana Mem. 13-15), were "not really specifically impeachment material, but more akin to case-in-chief type evidence." *Stadtmauer*, 620 F.3d at 272. As such, the Court was well within its discretion to defer all of this presentation of evidence—which did not depend in any way on any personal knowledge of the Government summary witnesses—until the defendants' case. The Court's decision, at Hana's counsel's request after the examination of the Government's first summary witness, to allow defense counsel "some more leeway" to read more extensively during cross-examination from portions that the defense considered favorable of documents referenced by Government summary witnesses (*see* Hana Mem. 15 & n.6), was a reasonable exercise of the

Court's discretion to manage "the mode and order of examining witnesses and presenting evidence."  Fed. R. Crim. P. 611(a).  But it was in no way "implicitly acknowledging" any "improper constraints" (Hana Mem. 15), as there was no reason that the reading of such evidence could not wait until the defendants' case.  *See, e.g.*, *Stadtmauer*, 620 F.3d at 272; *Lambert*, 580 F.2d at 747; *Ellison*, 557 F.2d at 135.

(2)    The Government Was Not Required to Call Different<br>Witnesses to Expand the Scope of Cross-Examination

Unable to maintain any argument that he was forbidden from cross-examining the summary witnesses within the scope of their direct testimony, Hana pivots to a creative—but meritless—argument that the Government was obligated to effectively *expand* the scope of the witnesses' testimony by calling witnesses who he could cross-examine about more topics, including making the Government's litigation strategy a subject of cross-examination.

Hana objects to the presentation of documentary evidence by those who were not involved in the creation of summary charts (Hana Mem. 48-49), but where a summary witness is able to testify about their review and verification of the charts, there is no requirement that the witness have drafted the charts in the first instance.  *See, e.g.*, *Lemire*, 720 F.2d at 1349 (holding that where summary witness "had carefully reviewed the charts and ensured that they reflected information contained in documents already in evidence," and where the jury was "well aware" that the witness had not prepare the charts, "the fact that [the summary witness] did not prepare the charts in no way hampered the defendants' ability to cross-examine him, and therefore did not prejudice the defense").  Indeed, one of the cases Hana cites as an example of an "adequately" knowledgeable witness involved a summary witness who "clearly explained" that the summary was only based on a subset of records and was subject to cross-examination on the limitations of the summary.  (Hana

124

Mem. 47 (citing *Markovich*, 95 F.4th at 1378-79).)  This, of course, is indistinguishable from the Government's summary witnesses, who each similarly "clearly explained" the non-comprehensive nature of the summaries, both on direct and cross-examination.  (*See, e.g.*, Tr. 1174-76, 1572, 1583-85, 2318-20, 2561, 2563, 2579-82, 2650-52, 2667, 2669-71, 4113-14, 4116, 4218-23, 4226.)

Nor is the fact that Government counsel chose which documents to summarize unusual or somehow a violation of the Confrontation Clause, as Hana suggests (Hana Mem. 44-49).  Entries on a summary chart are not "akin to a witness statement taken in the course of an interrogation by a law enforcement officer," and are in no sense "testimonial," rendering the Confrontation Clause inapplicable.  *United States v. Stein*, 584 F. Supp. 2d 660, 663 (S.D.N.Y. 2008).  It is in fact routine for attorneys to direct the preparation of, make decisions concerning the content of, or directly draft, summary charts.  *See, e.g.*, *United States v. Lebedev*, 932 F.3d 40, 50 (2d Cir. 2019) (affirming admission of summary testimony where the witness testified that "the government had specifically directed" the summary witness to use a particular methodology), *abrogated on other grounds by Ciminelli v. United States*, 143 S. Ct. 1121 (2023); *Alpine Secs.*, 354 F. Supp. 3d at 422 (admitting summary chart, noting: "The SEC may have relied on an expert and consulting group to assist it in assembling the groups of transactions on which the SEC would focus in this action, but *that task could have been done as well by an SEC attorney* or an SEC paralegal.  It reflects no more than the SEC's contentions." (emphasis added)); *Gentile*, 2024 WL 2046193, at *2 (admitting summary slides based on representation that witness would testify "the government instructed him as to which formulas to use" in slide charts).  Indeed, counsel's "selection of relevant evidence for presentation to the factfinder is inherent to the nature of litigation," *Hofstetter*, 2019 WL 5057176, at *5, and not a subject for cross-examination.

Instead, Hana's claim that he should have had the chance to cross-examine someone about the choice of documents presented to the jury at trial is essentially a novel demand to have a chance to cross-examine Government counsel about their trial strategy. (Hana Mem. 48-49 (complaining that Hana wished to cross-examine "the creators of the charts—*i.e.*, the prosecutors in this case").) The strategic decisions of what exhibits to present to the jury, and in what order, in the litigation of a trial are not the subject matter of witness testimony and are certainly not themselves "testimonial" so as to invoke the Confrontation Clause. To the contrary, they are core opinion work product of government counsel and safeguarded by the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 16(a)(2).[34] Indeed, the Confrontation Clause is not a vehicle to force the Government to call a witness for the defense to examine on issues such as the Government's strategy and the existence of other evidence. *See, e.g.*, *United States v. Hunt*, 534 F. Supp. 3d 233, 256-57 (E.D.N.Y. 2021) (rejecting contention that Confrontation Clause bars foreign business certifications, remarking, "Defendant['s] true contention is that the use of written certifications deprives them of the ability to examine live custodian witnesses on issues such as whether there exist other records that the Government might not have requested and/or that were not produced in response to government subpoenas. But the defense misconstrues the scope of authentication and mistakenly believes that they will be able to examine a live custodian witness on issues that have nothing to do with authentication."); *see also id.* at 257 n.17 (indicating its intention to

---

[34] Hana audaciously criticizes the Government for eliciting, without objection, that the prosecutors had decided what documents to summarize (Hana Mem. 49 n.17), when this testimony was elicited precisely in order to *avoid* leaving the jury with a damaging misimpression about how the charts had been compiled. In any event, this sort of foundational testimony has been approved by the Second Circuit, *Lebedev*, 932 F.3d at 50, and the defendants elicited the exact same testimony about their own charts (Tr. 6082).

preclude such questioning). There is thus no merit to Hana's attempt to press the Confrontation Clause into service as a means of making Government trial strategy a subject of testimony.

Though perhaps less novel than the claim that he should have been permitted to cross-examine opposing counsel, Hana's argument that the Government was obligated to use summary witnesses who were more knowledgeable about the investigation (Hana Mem. 44, 46), is no more persuasive. Even where the witness is a law enforcement agent who has had wide involvement in an investigation of the defendant, that mere fact does not expand the scope of permissible cross-examination. *See, e.g.*, *United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989) (affirming district court's limitation of cross-examination of case agents to scope of direct testimony); *United States v. McLaughlin*, 957 F.2d 12, 18 (1st Cir. 1992) (affirming limitation of cross-examination of government agents to scope of direct because "a party has no right, unless the court in the exercise of its discretion allows, to cross-examine a witness beyond the subject matter of his direct examination and beyond matters affecting credibility."); *United States v. Adeniyi*, No. 03 Cr. 86 (LTS), 2004 WL 1077963, at *3 (S.D.N.Y. May 12, 2004) ("The Court is also unpersuaded by Defendant's apparent contention that [the case agent's] acknowledgment during direct examination that he had participated in an investigation of Defendant, coupled with [the case agent's] testimony regarding certain specific aspects of that investigation, combined to give defense counsel carte blanche to inquire into any subject related to the investigation of Defendant.").

### d)    Any Alleged Error Would Have Been Harmless

Even if there had been any error in the introduction of the summary charts or the Court's rulings concerning the Government's or the defendants' questioning of the summary witnesses—and there was none—any alleged error would have been harmless.

127

As noted in Section II.B.2.a.3, above, the charts merely summarized "properly admitted data," *Rom*, 528 F. App'x at 29. That properly admitted documentary evidence was, as discussed in Section I, truly overwhelming. *See id.* (holding any possible error in use of summary chart harmless in light of "ample evidence supporting the jury verdict"). Also as in *Rom*, the "government witnesses explained to the jury how the charts were constructed from the underlying data," and there is no indication that the "jury was unable either to grasp the charts' methodology or to differentiate between the utility of the charts and the reliability of the underlying data." *Rom*, 528 F. App'x at 29; *see also, e.g.*, *Archer*, 977 F.3d at 198 n.4 (any arguable error in summary chart harmless). As a result, just as the Second Circuit held in *Rom*, any alleged error would be harmless.

Moreover, any purported error regarding either the charts or the testimony of the summary witnesses (and there was none) could not have prejudiced the defendants, much less so prejudiced them to warrant a new trial, for the additional reason that Hana and his co-defendants had—and availed themselves of—ample opportunity in their case to present documentary evidence in exactly the same way that the Government did. The defendants not only offered summary charts through the testimony of a witness who verified but did not draft them, but in fact put on *the same* summary charts that the Government did, with additional insertions chosen by defense counsel (and not by the witness). (Tr. 6081-83.)[35] Ultimately, the defendants collectively introduced over five hundred

---

[35] Indeed, if anything, the defendants' charts—unlike the Government's—were argumentative, since by color-coding the defendants' insertions, they effectively commented on the Government's litigation strategy by attempting to suggest that the Government had withheld relevant evidence from the jury. (*See* Tr. 6084-86.) Defense counsel went on to amplify this suggestion in their questioning. (*See, e.g.*, Tr. 6094 ("This is one of the defendant's insertions, is that correct?"); Tr. 6099 ("Is this a new addition that was not in the government exhibit?").) The Government, in its

defense exhibits (of which over one hundred were Hana's alone), many of which were summarized in their charts. Hana's complaint about being unable to question the summary witnesses in a way that "would identify communications and documents that the Government chose not to include in the charts" (Hana Mem. 49) is a red herring. Hana was allowed to, and with his codefendants did, "identify" and present to the jury hundreds of such documents. *See, e.g.*, *Fairholme Funds*, 636 F. Supp. 3d at 162 (if defendants believe key documents are omitted, "they are free to offer those documents into evidence themselves"). His only complaint is with *when* he did so, which the Court rightly reserved until his case under Rule 611. *See, e.g.*, *Stadtmauer*, 620 F.3d at 272; *Lambert*, 580 F.2d at 747; *Ellison*, 557 F.2d at 135.

Finally, Hana can point to no evidence he was precluded from introducing in response to the Government's documentary evidence. Instead, he presented a substantial response to the Government's evidence, both through cross-examination of the Government's summary witnesses on matters within the scope of their testimony and, jointly with his codefendants, through introduction of hundreds of exhibits, lengthy joint defense summary charts, and an additional summary chart presented only by Hana. (*See* DXs 1302, 1303, 1304; DX Hana 1300.) The jury was presented with everything Hana wanted, including evidence on direct and cross-examination that the Government's charts were not "complete," and admissible evidence that Hana believed was relevant in response, in the same form (by Hana's choice) that the Government presented its evidence. Hana therefore had an ample evidentiary predicate to make arguments to the jury about

---

attempts to work cooperatively with the defendants, did not oppose the form or admission of the defendants' summary charts, but notes this argumentative character of the defendants' charts simply to underscore that the defendants had substantial leeway to present documentary evidence in response to the Government's.

both the Government's summary charts and the inferences to be drawn from the documentary evidence. The fact that the jury rejected those arguments does not entitle him to a new trial.

> 3.     *The Court Properly Excluded Evidence of Specific Instances of Good Acts Under Rule 404(b) and Rule 405*

Hana and Daibes were not entitled to introduce evidence of specific instances of their alleged giving of unrelated gifts in order to suggest to the jury that the things of value they provided to Menendez and Nadine Menendez were not bribes. While the defendants were free to (and did) offer opinion and reputation testimony about their pertinent character traits, specific instances of gift-giving were properly precluded as precisely the type of specific good-act propensity evidence that settled law prohibits. To the extent Hana and Daibes's objections now do not simply repeat the arguments in Daibes's prior motion to admit this evidence (Dkt. 481)—which was rightly rejected (Tr. 5544-45) and need not be considered on a Rule 33 motion, *Malka*, 623 F. Supp. 3d at 328—these arguments are unpreserved. In any event, the Court correctly excluded this evidence under Rules 403, 404(b), and 405(b) (Tr. 5543-46), and any theoretical error, of which there was none, would in any event be harmless.

> a)     <u>Rules 404 and 405 Prevent the Introduction of Evidence of Specific Instances of Conduct to Prove a Character Trait Other Than an Essential Element</u>

Although a defendant may offer evidence of a defendant's "pertinent character trait," Fed. R. Evid. 404(a)(2), "[e]vidence of a person's character or character trait is *not* admissible to prove that on a particular occasion the person acted in accordance with the character or character trait." *Id.* 404(a)(1) (emphasis added). Any character evidence must also conform to the requirements of Rule 405, which permits reputation or opinion testimony regarding that trait, but expressly

prohibits evidence of specific instances of conduct unless the "character or character trait is an essential element of a charge, claim, or defense." *Id.* 405(a), (b).

Moreover, it is settled law—even where specific acts evidence may otherwise meet the requirements of Rule 405—that for evidence of specific prior acts to be admissible under Rule 404(b), such evidence "must serve a non-propensity purpose." *Quattrone*, 441 F.3d at 191. This is so because otherwise the two rules (Rules 404 and 405) would seem to conflict.

Accordingly, it does not matter whether the alleged acts in question were "good acts" or "bad acts." *See United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011) (citing Fed. R. Evid. 404(b)); *see also United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *Dawkins*, 999 F.3d at 792 ("No less than evidence of a defendant's prior 'bad acts' used to show he committed the crime charged, such 'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—*i.e.*, if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit."); *United States v. Rossy*, No. 22 Cr. 550 (NSR), 2023 WL 8039500, at *6 (S.D.N.Y. Nov. 20, 2023) (explaining that, while a defendant would be "permitted to offer evidence as to her character for truthfulness," she was not permitted to offer evidence of "any prior good acts").

"It is rare that character is an essential element. The typical example of such a case is defamation—where injury to reputation must be proven." *Johnson v. Pistilli*, 95 Civ. 6424, 1996 WL 587554, at *3 n.5 (N.D. Ill. Oct. 8, 1996); *Government of Virgin Islands v. Grant*, 775 F.2d 508, 510-11 (3d Cir. 1985) (same). In short, "[c]haracter is directly in issue" only "when it is a

material fact that under the substantive law determines rights and liabilities of the parties." *United States v. Morris*, 41 F. App'x 160, 164 (10th Cir. 2002).  As the Second Circuit has explained, "if specific good deeds could be introduced to disprove knowledge or intention, which are elements of most crimes, the exception of Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed." *United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997).

Courts accordingly routinely reject attempts to introduce specific instances of conduct for the purpose of proving character when it is not strictly an essential element of a crime. *See, e.g.*, *United States v. Zodhiates*, 235 F. Supp. 3d 439, 452 (W.D.N.Y. 2017) (excluding reverse 404(b) evidence that went to knowledge and explaining that the "admission of specific-acts character evidence" should be limited to "cases in which character is, in the strict sense, in issue and deserving of a searching inquiry") (internal citations omitted), *aff'd*, 901 F.3d 137 (2d Cir. 2018); *United States v. Nektalov*, S2 03 Cr. 828 (PKL), 2004 WL 1637010, at *2 (S.D.N.Y. July 21, 2004) (character not "in issue" when the defendant is charged with money laundering); *United States v. White*, 737 F.3d 1121, 1137 (7th Cir. 2013) (specific evidence of law-abidingness was "not an essential element of a wire fraud charge, nor a defense to it" thus evidence was not admissible under Rule 404(b)); *United States v. McMahan*, 394 Fed. App'x 453, 463-64 (10th Cir. 2010) (prohibiting specific acts evidence to seek to prove lack of intent to commit bribery); *United States v. Marrero*, 904 F.2d 251, 259-60 (5th Cir. 1990) (holding a defendant may not use specific instances of conduct to seek to prove lack of intent).

        b)    <u>Hana Was Not Precluded from Presenting any Relevant,<br>Admissible Evidence</u>

Given Rule 405(b), there is no force to Hana's assertion that evidence of "his prior non-bribes" are relevant to ascertaining his intent and admissible in any form.  (Hana Mem. 158.)

Rather, so-called "prior non-bribes" to unrelated persons at unrelated times are just the sort of prior good acts (or lack of bad acts) that cannot be proven through specific instances of conduct, under settled law. Hana does not really appear to disagree. Instead, he asserts that the Court erred in allegedly precluding him from introducing evidence of certain prior non-bribes, namely gifts, *to Menendez or Nadine Menendez* (*id.*). This argument fails for multiple reasons.

As an initial matter, for the reasons explained above, prior good acts (or the lack of bad acts) cannot be proven through specific instances of conduct. To the extent Hana appears to suggest otherwise, his position is irreconcilable with uniform precedent and the language of the pertinent rules, as the Court explained in denying Daibes's similar argument. (*See* Tr. 5544-45.)

In any event, contrary to the narrower argument Hana presses, Hana was not precluded from introducing evidence of his alleged prior gifts to Menendez or Nadine Menendez in particular. And indeed, he in fact introduced evidence of just such conduct. (*Compare* Hana Mem. 158 ("Mr. Hana was not permitted to introduce evidence of those gifts.") *with* DX Hana 1300 line 34 (Nadine Menendez to Hana: "Thank you very much for my extremely generous present") *and* Tr. 6129 (Hana counsel asking witness to read *id.*) *and* DX Hana 1300 line 332 (Nadine Menendez to Hana: "I really really appreciate and realize everything you do") *and id.* line 333 (Hana to Nadine Menendez: "if u need any help let me know") *and* Tr. 6130 (Hana counsel asking witness to read *id.*) *and* DX Hana 1300 line 466 (Hana to Nadine Menendez: "u want me to pick up lunch for u from ani") *and id.* line 480 (Hana to Nadine Menendez: "let me know if u need any help or to do anything") *and id.* lines 481-83 (Nadine Menendez asking Hana for "any information that could help" in advance of a deposition; Hana asking for the names of persons to be researched;

Nadine Menendez sending names and writing "You are my hero thank you" and "Can't thank you enough Wael").)

Hana complains that he was precluded from asking certain questions of Maali or Meirna Hanna on cross-examination (Hana Mem. 154), but (a) such questions were outside of the scope of their direct examination, (b) Hana did not seek to call either of them in his defense case, and (c) the Court's rulings in this respect are not properly sought to be relitigated under Rule 33, *see, e.g.*, *Malka*, 623 F. Supp. 3d at 328. Hana also claims that the Court allegedly precluded him from eliciting evidence of Hana's gift-giving from Carolina Silvarredonda (Hana Mem. 154), whom he did call to testify at trial, but he does not cite the record in making this complaint, in neither his written proffer of her testimony nor his Rule 26.2 material for her did he disclose any such statements, and the Government is still entirely unaware what admissible evidence she allegedly could have offered. And for none of these witnesses does Hana offer any explanation as to why, if he truly believed he was unable to present evidence of Hana's gifts to the Menendezes, he offered, introduced, and read to the jury evidence of just such gifts.

In any event, even if (1) the Court had precluded Hana from introducing evidence of his prior gifts to Menendez and Nadine Menendez (which it did not), and (2) such a ruling would have been error (which it would not, because evidence of prior gift giving is not admissible regardless of the form of the evidence, and basic rules about hearsay or the scope of cross-examination remain applicable), and (3) Hana's challenge were preserved, any such error would have been harmless in light of the evidence Hana introduced. Hana did not proffer before or during trial—and he does not identify now—any specific and admissible evidence of his alleged giving of gifts to Menendez or Nadine Menendez that is not entirely cumulative with the evidence he introduced cited above.

134

Moreover, any alleged evidentiary error would also have been harmless for the fundamental reason that the charges against Hana were supported by the overwhelming evidence of Hana's guilt referenced at length above. That evidence included the evidence concerning the timing of the defendants' actions and communications; the special treatment that Menendez accorded Hana; the nature and form of the things of value Hana provided; and the steps that the defendants took to conceal them, including, in Menendez's case, to do so through making false statements. *See* Section I.B.1.b, I.B.2.b, *supra*. Indeed, the evidence surrounding Hana's participation in the delivery of bribes that bore no trappings whatsoever of gifts—such as checks for a fraudulent consulting job, styled as payments from one corporation to another and supposedly documented by an unsigned sham contract (*see, e.g.*, GXs 5A-1001A, 5A-1001B, 5A-1001C; GX 4C1-P)—overwhelmingly supported conviction even standing alone, as the Government argued to the jury in summation. (Tr. 6396; Tr. 6398-400.) It is thus impossible to see how any alleged error concerning evidence of Hana giving certain gifts could possibly have affected the verdict.

c)      Daibes Was Properly Precluded from Offering Evidence of Specific Instances of Gift-Giving

Daibes, for his part, offers no reason for the Court to revisit its considered and correct decision that specific instances of gift giving are prohibited under Rule 405(b). As the Court already ruled, "Daibes's generosity is not an essential element of a defense pursuant to 405(b) because the government is not required to prove that Daibes lacked generosity in order to prove its case." (Tr. 5544; *see also id.* (citing advisory committee notes limiting admission of specific acts character evidence to "cases in which character is, in the strict sense, an issue").) The Court correctly reasoned that "[a]t most, Daibes's generosity is relevant to rebut an inference of his corrupt intent but the Second Circuit has cautioned that if specific good deeds could be introduced

135

to disprove intent or intention, which are elements in most crimes, the exception to Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed." (*Id.* (citing *Doyle*, 130 F.3d at 542).)  The Court also ruled that allowing evidence of specific acts of gift giving unrelated to the charged offenses had insufficient probative value to outweigh the danger of waste of time and misleading and confusing the jury.  (Tr. 5544-45.)  These rulings were and remain correct.[36]

Daibes's only real argument in seeking reconsideration of the Court's rulings is the creative claim that, by giving an instruction on goodwill gifts, the Court somehow converted generosity into an essential element of the offense.  (Daibes Mem. 59-60.)  But this is not only unpreserved; it is a non sequitur.  Nothing about the goodwill gifts instruction (which the defense specifically requested) required the Government "to prove that Daibes lacked generosity in order to prove its case."  (Tr. 5544.)  Instead, the goodwill gifts instruction merely highlighted, at the defense's request, a defense theory of how he might lack corrupt intent.  But as the Court noted, the Second Circuit has held that "if specific good deeds could be introduced to disprove knowledge or intention, which are elements of most crimes, the exception of Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed."  *Doyle*, 130 F.3d at 542.  (*See also* Tr. 5544 (citing *id.*).)

Rather than give any valid reason for the Court to reconsider its ruling, Daibes instead faults the Government for relying on it by noting, in its summation, the inconsistency of the trial evidence with certain defense theories.  (Daibes Mem. 60-62.)  But this argument is both forfeited

---

[36] Daibes apparently does not renew his prior contention that his gift-giving rose to the level of habit, which the Court properly rejected.  (Tr. 5545.)

and meritless. First, Daibes did not make any objection to the challenged remarks during or following the Government's summation. *See, e.g.*, *United States v. Briggs*, 457 F.2d 908, 912 (2d Cir. 1972). Second, Daibes's *post hoc* claims that he would have presented evidence that Daibes gave gifts (i) of cash in excess of $10,000 (Daibes Mem. 60); and (ii) of kilogram gold bars (Daibes Mem. 61), were never raised prior to this motion. To the contrary, Daibes's letter to the Court gave notice only that he would introduce evidence of (a) the gift of a handbag (Dkt. 481 at 2); and (b) "gifts of gold and/or cash" without any specification of type or amount (*id.*; *see also id.* at 3 ("Ms. Maali and other potential defense witnesses would testify that Mr. Daibes has a routine practice of gifting gold and cash to those with which he maintains relationships.")). The only Rule 26.2 material that Daibes provided that appears to bear on this subject at all reads, in the entirety of the relevant part: "3) Gift Giving". (*See* Ex. B.) The Government could hardly have discerned from this terse "notice" that Daibes sought to offer evidence that he provided gifts of cash in excess of $10,000 and of kilogram gold bars.[37]

More fundamentally, however, it was in no way misconduct for the Government to correctly note in its summation what was and was not in evidence. Daibes cites no case for the novel proposition that instead of basing its summation on the evidence that was admitted, the

---

[37] Indeed, neither the Government's interviews of those witnesses it spoke to, nor any defense 26.2 material, suggested that any of these witnesses could testify about gift giving of *kilogram* sized gold bars (as opposed to the smaller one-ounce variety) or tens of thousands of dollars of cash. Moreover, consistent with the Court's ruling based on Rule 403 (Tr. 5544-45), this evidence would also not have been probative in response to the Government's comments. For example, the Government's question about why the envelopes of cash started in or after 2020 was clearly a reference to the fact that Daibes did not provide any such envelopes *to Menendez* prior to that date. (*See* Tr. 6507 ("*Daibes has known Menendez for years.* If bank envelopes neatly labeled with $10,000 were just Daibes's love language, why did they only start in or after 2020?" (emphasis added).) Evidence of Daibes giving envelopes to *someone else* before 2020, which appears to be all Daibes is claiming he could have offered, would simply be a non sequitur.

Government was required to base it on the evidence that Daibes wishes were admitted.  The law is to the contrary.  Provided that the Government refrains from mischaracterizing the evidence or stating facts not in evidence, *see, e.g.*, *Rosa*, 17 F.3d at 1549, it "has broad latitude in the inferences it may reasonably suggest to the jury during summation," *e.g.*, *United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003) (internal quotation marks omitted), and may permissibly draw the jury's attention to the lack of evidentiary support for defense factual theories, *see, e.g.*, *United States v. Aquart*, 912 F.3d 1, 28-29 (2d Cir. 2018) ("Although a prosecutor certainly cannot shift the burden of proof to a defendants, he can argue the lack of trial evidence to support an argument urged by the defense[.]" (citation omitted)); *United States v. Salameh*, 152 F.3d 88, 136 (2d Cir. 1998) ("The government is free to comment on the failure of defendant to refute government evidence or to support his own claims." (internal quotation marks omitted)); *United States v. McDermott*, 918 F.2d 319, 327 (2d Cir. 1990) ("[A] prosecutor is entitled to comment on defendant's failure to call witnesses to contradict the factual character of the Government's case, as well as on defendant's failure to support his own factual theories with witnesses.").

In any event, even if there had been any alleged error in the Government's summation, it would certainly have been harmless.  *See, e.g.*, *Aquart*, 912 F.3d at 27 ("It is a rare case in which we will identify a prosecutor's summation comments, even if objectionable, as so prejudicial as to warrant relief from conviction." (internal quotation marks omitted)).  An accurate comment on the absence of trial evidence could not plausibly have affected the jury's deliberations; with or without the comment, the jury would no doubt have in any event followed the Court's instructions to base its verdict only on the evidence.

138

More broadly, as with Hana, even if there was any alleged error in the exclusion of any Daibes gift-giving evidence, or in the Government's comments on the evidence in summation—and there was no error in either—any such error would be harmless in light of the overwhelming evidence. As with Hana, that evidence included evidence of the timing of the defendants' actions; Menendez's special treatment towards Daibes; the nature and form of the things of value Daibes provided; and the steps that Daibes and Menendez took to conceal them, including, through Menendez's false statements. *See* Section I.B.1.b, I.B.3.b, *supra*. Daibes, as well as Hana, participated in the delivery of bribes that were clearly not gifts, such as the fraudulent consulting job paychecks, which alone overwhelmingly supports the verdict. (*See, e.g.*, GXs 5A-1001A, 5A-1001B, 5A-1001C; GX 4C1-P; Tr. 6396; Tr. 6398-400.) Any theoretical error as to the exclusion of Daibes gift-giving evidence, or in the prosecution's comments in summation, even if preserved, would therefore similarly have been harmless.

4.    *There Was No Variance, Retroactive Misjoinder, or Need for a Special Verdict Form*

Hana makes several related arguments premised on the wrongheaded idea that Counts One and Two, as proven at trial, each involved (at most) multiple conspiracies rather than the single conspiracies charged in the Indictment. Hana claims there was a variance between the Indictment and what was proven at trial (Hana Mem. 142-46), there was retroactive misjoinder and Hana should have been tried separately from both Menendez and Daibes (*id.* at 146-50), and the verdict sheet should have broken each count out into five separate conspiracies (*id.* at 150-52). None of these arguments has merit, particularly because the evidence at trial proved a single conspiracy in each of Counts One and Two.

139

A variance may be found when, unlike in the case of a constructive amendment of the indictment, "the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (citing *Salmonese*, 352 F.3d at 621). A "defendant alleging variance must show 'substantial prejudice'" to warrant relief. *Rigas*, 490 F.3d at 226 (quoting *McDermott*, 918 F.2d at 326); *see also, e.g.*, *United States v. Dupre*, 462 F.3d 131, 140 (2d Cir. 2006). A variance is not substantially prejudicial "where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *United States v. Mucciante*, 21 F.3d 1228, 1236 (2d Cir. 1994) (internal quotation marks omitted).

Hana's claims that he suffered from a prejudicial variance (Hana Mem. 142-43) and that he was entitled to a special verdict form (*id.* at 150-52) are wholly unpersuasive. As noted in Section I.B.4, above, the jury was given a multiple conspiracies instruction. *See, e.g.*, *United States v. Aracri*, 968 F.2d 1512, 1519 (2d Cir. 1992) ("Whether the government has proved a single conspiracy or has instead proved multiple other independent conspiracies is a question of fact for a properly instructed jury." (internal quotation marks omitted)). There was thus no need for a special verdict form. Had the jury found that the evidence amounted only to multiple conspiracies and not the charged single conspiracies, the careful and attentive jury would have followed the Court's unchallenged multiple conspiracies instruction and entered a general verdict of not guilty. *See, e.g.*, *id.* at 1517, 1519-23 (affirming conviction where properly instructed jury returned general verdict of guilty on single conspiracy after hearing multiple conspiracy instruction); *see*

*also, e.g.*, *United States v. Bell*, 584 F.3d 478, 484 (2d Cir. 2009) ("[T]here is a historical preference for general verdicts and a traditional distaste for special interrogatories in criminal cases." (internal quotation marks omitted)).  The Court accordingly properly rejected Hana's proposed special verdict form (Dkt. 392-1), which also was 9 pages long and confusing.  Hana offers no cogent basis for the Court to revisit that decision.

Even leaving aside the multiple conspiracy instruction and the overwhelming evidence of the charged conspiracies, Hana has made no showing that he could have suffered any prejudice from any arguable variance, much less substantial prejudice.  He was fully on notice of the Government's theory through, among other things, the litigation of his duplicity motion, which the Court rejected (Transcript of Apr. 11, 2024, at 55-60), and from the Government's opening statement, which closely tracked the trial evidence presented over the subsequent weeks, *see, e.g.*, *United States v. Watts*, No. 17 Cr. 372 (JS), 2020 WL 6136211, at *9 (E.D.N.Y. Oct. 19, 2020) (finding no substantial prejudice from arguable variance where Government outlined its theory in opening statement), *affi'd in part, and vacated in part on other grounds*, Nos. 21-2925, 21-3028, 2023 WL 2910634 (2d Cir. Apr. 12, 2023); *United States v. Ng*, No. S5 15 Cr. 706 (VSB), 2018 WL 2287101, at *14 (S.D.N.Y. May 9, 2018) (even if there were a variance, "pre-trial references and disclosures gave [the defendant] more than sufficient notice of the Government's theory").

Hana's other claims of prejudicial variance fare no better.  First, contrary to his claim, the Court did not "give a *Pinkerton* charge."  (Hana Mem. 143.)  The jury charge cited by Hana is simply the law regarding a conspiracy—that "each member of the conspiracy is deemed responsible for such acts, declarations, statements and omissions of any other coconspirator made in the course of and in furtherance of the conspiracy"—and not a *Pinkerton* charge that allows a

defendant to be held responsible for the *substantive* crimes of a co-conspirator that were foreseeable and within the scope of the conspiracy (such as when, during a robbery, one participant in the robbery conspiracy commits murder, and other participants are held responsible for that murder even though they were not part of a conspiracy to commit murder).[38]  Here, the substantive offenses of which Hana was convicted were for his own conduct, not based on *Pinkerton* liability.

Similarly, Hana's claim that there was significant evidentiary spillover as to him, purportedly showing prejudice, distorts the trial record (even assuming arguendo that there was a variance, which there was not).  (Hana Mem. 144-46.)  His suggestion that Jose Uribe should not have been permitted to testify at his trial (*id.* at 144; *see also id.* at 148) is both unpreserved and puzzling, particularly since Uribe testified about statements that Hana made to him in the course of the bribery scheme Hana was charged with.  (*See, e.g.*, Tr. 2968 (Uribe testifying that Hana requested $200,000 to $250,000 to affect criminal matters); *id.* at 3001 (Uribe testifying that Hana told him that "from the proceeds that he was going to get from the deal once the deal is completed and the guys pay what they agreed to, he was going to buy from that money a car for Nadine."); *id.* at 3078-79 (Uribe testifying that Hana agreed to let him keep cash paid in exchange for promise to influence criminal case).)[39]  And Hana's complaints that evidence regarding Daibes allegedly

---

[38] A *Pinkerton* charge informs the jury that it can convict a defendant of a substantive offense if (1) the substantive offense was committed by a member of a conspiracy; (2) the substantive offense was committed pursuant to a common plan and understanding as part of that conspiracy; (3) the defendant was a member of the conspiracy when the substantive offense was committed; and (4) the defendant could have reasonably foreseen that the substantive offense might be committed by his co-conspirator.  *See, e.g.*, *United States v. Gershman*, 31 F.4th 80, 99-100 (2d Cir. 2022).

[39] In making his initial pretrial motions, Hana stated that he "joins in all applicable motions filed by his co-defendants" (Dkt. 143, at 131), who made certain severance motions, but Hana made no severance motion and did not identify what he believed to be "applicable."  In any event, his post-trial claim is meritless even if preserved.

had little to do with him would, even if both fully preserved and entirely accurate (and they are neither), hardly show substantial prejudice.  The facts related to Hana—which included Menendez's providing non-public information about an American embassy to a foreign government, promises to approve military aid, and ghostwriting a letter on behalf of a foreign country to respond to human rights concerns—are substantially more inflammatory than the facts related to Daibes's New Jersey bank fraud prosecution case or business investments involving Qatar.  In any event, as the Court remarked in rejecting Daibes's motion for a severance, there is "no reason to believe that a properly instructed jury would not be able to distinguish between Daibes's conduct and the conduct of other defendants."  (*See* Transcript of Apr. 11, 2024, at 41-42.)

Hana similarly fails to establish any retroactive misjoinder.  (Hana Mem. 147-50.)  Since no conspiracy count should be vacated, there is simply no predicate for a claim of retroactive misjoinder.  But even if there were, Hana would still not satisfy the three-part test the Second Circuit applies to such claims.  *See United States v. Hamilton*, 334 F.3d 170, 182 (2d Cir. 2003) ("We consider (1) whether the evidence introduced in support of the vacated count was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts, (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong." (internal quotation marks omitted)).  Here, the evidence as to Hana was more inflammatory than that involving Daibes, precluding a retroactive misjoinder finding.  *See id.* ("The first prong of this test is not met where the evidence that the government presented on the reversed counts was, as a general matter, no more inflammatory than the evidence that it presented on the remaining counts."

(internal quotation marks omitted)).  Similarly, the Government's evidence at this nine-week trial

was overwhelming, again fatal to a retroactive misjoinder claim.

## III.  COUNTS ONE AND FIFTEEN ARE NOT MULTIPLICITOUS

Hana's claim that the conspiracies charged in Counts One and Fifteen him are

multiplicitous (Hana Mem. 159-69) is meritless.  Count One charges Hana, Menendez, and Daibes

with conspiring to commit bribery, and Count Fifteen charges Hana and Menendez—but not

Daibes—with conspiring for Menendez to act as an agent of a foreign principal, Egypt.  As the

evidence at trial established, the counts address two different criminal agreements Hana entered

into with Menendez and others, and as such are not multiplicitous.

### A.    Applicable Law

The Double Jeopardy Clause of the Fifth Amendment to the Constitution "protects against

multiple punishments for the same offense."  *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).

"An indictment is multiplicitous if it charges the same crime in two counts," since "the jury can

convict on both counts, resulting in two punishments for the same crime in violation of the Double

Jeopardy Clause."  *United States v. Ansaldi*, 372 F.3d 118, 124 (2d Cir. 2004).  "If the jury convicts

on more than one multiplicitous count," then "the district court should vacate the conviction on all

but one" before sentencing.  *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006).

"A claim of multiplicity cannot succeed, however, 'unless the charged offenses are the

same in fact and in law.'"  *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006) (quoting *United

States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003)).  "If the two offenses at issue are both

conspiracies charged under the same statute, then the multiplicity inquiry turns on whether the two

conspiracies are the same 'in fact,' meaning they involve the same agreement." *United States v.

Maxwell*, No. 20 Cr. 330 (AJN), 2022 WL 1294433, at *3 (S.D.N.Y. Apr. 29, 2022) (quoting

*United States v. Araujo*, No. 17 Cr. 438 (VEC), 2018 WL 3222527, at *3 (S.D.N.Y. July 2, 2018)). A defendant may be convicted of separate counts for "'overlapping' conspiracies," but not "where a smaller conspiracy is 'wholly contained' within a larger one." *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004) (quoting *United States v. Macchia*, 35 F.3d 662, 672 (2d Cir. 1994) (Newman, C.J., concurring)).

"The Second Circuit has explained that in this posture, the Court's multiplicity analysis is limited to whether a rational, properly-instructed jury could convict the defendant of two distinct conspiracies." *United States v. Fishman*, No. 20-CR-160 (MKV), 2022 WL 1744698, at *3 (S.D.N.Y. May 31, 2022) (citing *Jones*, 482 F.3d at 72). The analysis is based on the "entire record," and *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985), provides eight factors that, though "not exhaustive," "might typically be relevant" to the analysis. *United States v. Maslin*, 356 F.3d 191, 196 (2d Cir. 2004).

"Where, as here, separate counts of a single indictment allege that the defendant participated in more than one conspiracy in violation of the same statutory provision, but allege that the conspiracies existed for different—albeit overlapping—periods of time, and that the defendant, in each alleged conspiracy, had different groups of coconspirators, the question of whether one, or more than one, conspiracy has been proven is a question of fact for a properly instructed jury." *Jones*, 482 F.3d at 72 (rejecting claim of multiplicity).

**B.    Discussion**

The two conspiracies of which Hana was convicted in Counts One and Fifteen included different participants, different underlying crimes that the participants agreed to commit, different harms, different overt acts, and different crucial facts. They are not multiplicitous.

Count One charged Hana, Menendez, and Daibes with conspiring to commit bribery of a federal employee from approximately 2018 through 2023, which requires, among other things, an agreement to engage in a corrupt *quid pro quo* (unlike Count Fifteen).  Count Fifteen charged Hana and Menendez—and not Daibes—with conspiring to have a public official act as a foreign agent from approximately 2018 through 2022, which requires an agreement that, in sum, Menendez would act as an agent of a foreign principal (unlike Count One).

First, the fact that the two conspiracies thus contained different statutory objectives is an overwhelming obstacle to any possible finding of multiplicity.  The conspiracy charged in Count One related to Hana's and Daibes's agreement to bribe Menendez (including through Nadine Menendez) in exchange for certain official actions that Menendez promised to take, including related to Daibes's District of New Jersey prosecution and Qatar.  That is, the actions in Count One do not relate solely to actions to benefit Egypt or at Egypt's request, even if actions related to Egypt were among the actions for which Menendez accepted bribes.  The conspiracy charged in Count Fifteen, in contrast, related to certain actions to benefit the Government of Egypt, which the jury did not need to find were official acts.  Although some of the evidence of each conspiracy is similar, certain critical components of each—a corrupt *quid quo pro* involving official action, and acting as an agent of a foreign principal—are different.  *See, e.g.*, *Macchia*, 35 F.3d at 668 (the fact that there was "overlap with respect to a number of characteristics, including time frame, geographic locale, participants, and criminal objective" does not necessarily mean that there was but a single conspiracy); *United States v. Papadakis*, 510 F.2d 287, 296 (2d Cir. 1975) ("there is no reason why people cannot enter into two separate criminal agreements more or less at the same time"); *Korfant,* 771 F.2d at 663 ("[t]he participation of a single common actor in what are

146

allegedly two sets of conspiratorial activities does not establish the existence of a single conspiracy"); *see also, e.g.*, *Fishman*, 2022 WL 1744698, at *6 (rejecting multiplicity motion where one conspiracy count had an objective not possessed by another count); *United States v. Jones*, 296 F. App'x 179, 182 (2d Cir. 2008) (rejecting multiplicity challenge where "the government's evidence demonstrated that the two conspiracies served different purposes, neither of which was entirely subsumed by the other").

On top of the difference in statutory objects, the difference in participants creates a truly fatal obstacle to a finding of multiplicity. Although it is theoretically possible, in some cases, for conspiracies with two different statutory objects to be multiplicitous—because "a single conspiracy" can contain "multiple criminal objectives," *e.g.*, *Salameh*, 152 F.3d 148—here Daibes was not charged with joining the agreement for Menendez to act as a foreign agent of Egypt, so there was not an alleged single agreement among all three defendants to violate both of the different criminal statutes. *See, e.g.*, *Fishman*, 2022 WL 1744698, at *5 (rejecting multiplicity motion where the evidence at trial would have entitled a reasonable jury to find two distinct conspiracies with "some overlapping personnel"); *see also, e.g.*, *United States v. Dhafir*, 342 F. App'x 702, 705-06 (2d Cir. 2009) (where two different charged conspiracies under 18 U.S.C. § 371 had different underlying objects and involved different participants, and jury was properly instructed, district court did not commit plain error). This alone compels a finding that the two charges are not multiplicitous. Unless Hana is suggesting that Daibes was required to be charged in a multi-object conspiracy including a foreign influence object he was not charged with previously (a suggestion that it is safe to assume Daibes would take exception to), it is difficult to understand Hana's claim.

Furthermore, the societal interest in avoiding bribery is not the same interest that is protected by the foreign influence statute. Section 201 (the object of the conspiracy in Count One) prohibits, in sum and in part, giving or offering a public official anything of value with intent to influence an official act. Section 219 (the object of the conspiracy in Count Fifteen) prohibits a public official from engaging in certain actions such as political activities or public relations on behalf of foreign principals, regardless of whether the public official is being paid and regardless of whether the actions are "official acts." "[T]he Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Garrett v. United States*, 471 U.S. 773, 793 (1985). It is implausible that Congress would have intended for someone who agrees to take money in exchange for performing official acts not be further punished if he also agrees to take certain other actions as an agent of a foreign government. Indeed, it is far from unusual for defendants in public corruption cases to be convicted of and sentenced on multiple similar but distinct conspiracies. *See, e.g.*, *United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021) (upholding convictions—not challenged on multiplicity grounds—of, among other things, conspiracy to commit extortion under color of official right, in violation of 18 U.S.C. § 1951 (Count One), and conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 1349 (Count Two), both related to agreements for Dean Skelos to take official actions in exchange for payments from certain entities to his son Adam Skelos).

Just as in *Jones*, in which the Second Circuit found no multiplicity, the jury was properly instructed regarding its role in determining whether one or multiple conspiracies had been proven (Tr. 7146-49), and "[t]hus instructed, the jury found [Hana] guilty on both [counts]" based on evidence that was "sufficient to permit inferences that" Hana conspired with Daibes and Menendez

to bribe Menendez in exchange for promises of official acts (Count One), and that Hana "entered into a separate conspiracy" with Menendez for Menendez to act as an agent of Egypt (Count Fifteen). *See Jones*, 482 F.3d at 73; *see also, e.g.*, *Jones*, 296 F. App'x at 182 (rejecting multiplicity challenge, citing *id.*); *Dhafir*, 342 F. App'x at 705-06 (rejecting multiplicity challenge, citing *Jones*, 482 F.3d at 72); *Fishman*, 2022 WL 1744698, at *5-6 (rejecting multiplicity motion even where there was "some overlap of time" between conspiracies, where one count was "not merely a smaller conspiracy that was wholly contained within" the other (internal quotation marks omitted)).

## <u>CONCLUSION</u>

For the foregoing reasons, the defendants' post-trial motions should be denied.

Dated:  New York, New York
       September 18, 2024

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney

By:    <u>s/                         </u>
                            Eli J. Mark
                            Daniel C. Richenthal
                            Paul M. Monteleoni
                            Lara Pomerantz
                            Catherine Ghosh
                            Assistant United States Attorneys
                            (212) 637-2431/2109/2219/2343/1114
                            Christina A. Clark
                            Special Assistant United States Attorney
                            (202) 307-5191