**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

        Defendants.

Case No. S4 23-cr-490 (SHS)

---

## MEMORANDUM OF LAW IN SUPPORT OF SENATOR ROBERT MENENDEZ'S SUPPLEMENTAL MOTION FOR VACATUR AND NEW TRIAL PURSUANT TO RULE 33

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Paul C. Gross
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................. 1

RELEVANT FACTS ............................................................................. 6

LEGAL STANDARD ............................................................................ 12

ARGUMENT ........................................................................................ 13

    I.   SENATOR MENENDEZ DID NOT WAIVE HIS SPEECH OR DEBATE RIGHTS ................................................................................. 14

    II.  THE HARMLESS ERROR TEST NEITHER APPLIES NOR IS SATISFIED HERE ........................................................................... 17

    III. VACATUR IS REQUIRED ON ALL COUNTS ................................ 30

    IV. AT MINIMUM, THE COURT SHOULD PERMIT DISCOVERY INTO THE GOVERNMENT'S FAILURE OF QUALITY CONTROL ............. 32

CONCLUSION ..................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barnett v. United States*,
  870 F. Supp. 1197 (S.D.N.Y. 1994) .......................................................................16

*Blondes v. State*,
  16 Md. App. 165 (Md. App. 1972) .........................................................................13

*Eastland v. U.S. Servicemen's Fund*,
  421 U.S. 491 (1975) ..........................................................................................18, 19

*Eur. v. Equinox Holdings, Inc.*,
  592 F. Supp. 3d 167 (S.D.N.Y. 2022) ...................................................................29

*Fry v. Pliler*,
  551 U.S. 112 (2007) ...............................................................................................20

*Gravel v. United States*,
  408 U.S. 606 (1972) ...............................................................................................18

*In re Sealed Case*,
  80 F.4th 355 (D.C. Cir. 2023) .................................................................................4

*In re Search of the Rayburn House Office Building Room No. 2113*,
  432 F. Supp. 2d 100 (D.D.C. 2006) .......................................................................17

*McKaskle v. Wiggins*,
  465 U.S. 168 (1984) ...............................................................................................19

*Nunes v. NBCUniversal Media, LLC*,
  No. 22-CV-01633 (PKC) (SN), 2024 WL 1500945 (S.D.N.Y. Mar. 19, 2024) ......................14

*Plaut v. Spendthrift Farm, Inc.*,
  514 U.S. 211 (1995) ...............................................................................................19

*Rivas v. Brattesani*,
  94 F.3d 802 (2d Cir. 1996) .....................................................................................12

*Sekisui Am. Corp. v. Hart*,
  945 F. Supp. 2d 494 (S.D.N.Y. 2013) ...................................................................29

*Trump v. United States*,
  603 U.S. 593 (2024) ...............................................................................................19

*United States v. Blaszczak*,
    56 F.4th 230 (2d Cir. 2022) .................................................................20

*United States v. Brown*,
    843 F.3d 74 (2d Cir. 2016)...................................................................15

*United States. v. Camporeale*,
    515 F.2d 184 (2d Cir. 1975)................................................................15

*United States v. Gonzalez-Lopez*,
    584 U.S. 140 (2006) ............................................................................17

*United States v. Greer*,
    285 F.3d 158 (2d Cir. 2002)................................................................17

*United States v. Hansen*,
    369 F. App'x 215 (2d Cir. 2010) .........................................................28

*United States v. Helstoski*,
    442 U.S. 477 (1979)........................................................2, 14, 17, 18

*United States v. Jefferys*,
    No. 20-3630, 2022 WL 9627085 (2d Cir. Oct. 17, 2022)................16, 28

*United States v. Johnson*,
    337 F.2d 180 (4th Cir. 1964) ..............................................................30

*United States v. Johnson*,
    383 U.S. 169 (1966).................................................................13, 18, 30

*United States v. O'Brien*,
    No. 13-CR-586, 2017 WL 2371159 (E.D.N.Y. May 31, 2017) ...........16

*United States v. Olazabal*,
    610 F. App'x 34 (2d Cir. 2015) ..........................................................12

*United States v. Stasiv*,
    No. 19-4286, 2021 WL 4888865 (2d Cir. Oct. 20, 2021).....................16

*United States v. Swindall*,
    971 F.2d 1531 (11th Cir. 1992) ...............................................2, 13, 17

*United States v. Tellier*,
    83 F.3d 578 (2d Cir. 1996)..................................................................30

*Weaver v. Massachusetts*,
    582 U.S. 286 (2017)......................................................................17, 20

*Weeks v. Angelone*,
    528 U.S. 225 (2000).............................................................................................................27

**RULES**

Fed. R. Crim. P. 33 ............................................................................................................12

## PRELIMINARY STATEMENT

The core of the government's case against Senator Menendez was always the accusation that he accepted bribes in exchange for approving military aid to Egypt.  The problem was that there was no direct evidence of any corrupt agreement.  Nor could the government try to prove an agreement indirectly, by introducing evidence of the Senator's approvals of military aid, since those legislative acts are protected by the Speech or Debate Clause.  As this Court ruled during trial, that restriction followed from an "ineluctable application of United States Supreme Court precedent holding 'that references to past legislative acts of a Member cannot be admitted without undermining the values protected by the [Speech or Debate] Clause.'"  ECF No. 420 (citing *United States v. Helstoski*, 442 U.S. 477, 489 (1979)).  The government believed this evidentiary restriction created such a hurdle for its case that it sought ***reconsideration*** of the Court's ruling, pleading to be permitted to admit less-redacted versions of exhibits so important they were featured in the Indictment itself.  The government called this evidence "very critical."  Trial Tr. 1041-25-1042:1.  But this Court appreciated the clarity of the governing Supreme Court precedent, and denied the reconsideration motion.

It turns out that the government provided the jury with the excluded evidence anyway.  In a letter to the Court dated November 13, 2024 (ECF No. 630 (the "Letter")), the government revealed that it had loaded onto the jury's laptop nine exhibits that left unredacted the material this Court held was barred by the Speech or Debate Clause (the "Unredacted Exhibits").  Those Unredacted Exhibits contained the ***only evidence in the record*** tying Senator Menendez to the actual, consummated provision of military aid to Egypt—an otherwise-missing fact at the very center of the most central charge against him.  In light of this serious breach, a new trial is unavoidable, despite all of the hard work and resources that went into the first one.  Without

1

doubting that the error was unintentional, the responsibility for it lies exclusively with the government, and the government must accept its consequences.

Instead of doing so, the government tries to shift the blame, arguing that Senator Menendez waived any objection to this evidence by not catching the government's error. That is both factually and legally outrageous. The defense had only a few hours to review a laptop that contained nearly 3,000 exhibits; it had the right to expect that the government had not mislabeled non-introduced and constitutionally barred exhibits as admitted ones. If this were treated as a waiver, that would give parties the incentive to *intentionally* try to pull a fast one. Plus, the standard for waiving Speech or Debate Clause protection is exceptionally high, requiring an "explicit and unequivocal renunciation of the protection." *Helstoski*, 442 U.S. at 491. There is no serious argument that this standard was satisfied by the defense taking the government at its word about the identification of the exhibits it was providing to the jury.

The government also contends that the error can be disregarded as harmless: After all, it says, there were lots of exhibits presented at trial, the jury probably didn't look at the Unredacted Exhibits, and even if jurors did, they wouldn't have understood them. But harmless-error review does not apply here. The constitutional "Speech or Debate privilege is not merely an evidentiary or a testimonial privilege . . . [t]herefore, a harmless-error analysis *will not excuse a violation*." *United States v. Swindall*, 971 F.2d 1531, 1548 n. 21 (11th Cir. 1992) (emphasis added). And that remedial rigidity makes perfect sense given the structural purposes of the Clause.

Even if harmless-error review did apply, Senator Menendez *was* substantially prejudiced because the Unredacted Exhibits exposed the jury to a theory of criminality that the government was barred from presenting under the Speech or Debate Clause—namely, that Senator Menendez made specific decisions with respect to military sales to Egypt in exchange for bribes. This

Court expressly prohibited any evidence of past legislative activity, including involvement in the provision of any particular military aid to Egypt. *See* ECF No. 252 (ruling that "actions Menendez allegedly took as a Senator in deciding whether or not to place a hold on foreign aid to Egypt are legislative acts," which, under the Speech or Debate Clause, cannot be offered as evidence in a criminal trial). The Unredacted Exhibits squarely crossed that line, however, and allowed the jury to infer bribery from Senator Menendez's legislative acts—exactly what the Speech or Debate Clause is meant to prevent. Specifically, three of the exhibits were January 2022 text messages evidencing Senator Menendez's involvement in the approval of specific arms sales to Egypt. ECF Nos. 630-1 (GX A103-10), 630-3 (GX A120), 630-5 (GX B207-1). The other six were September 2019 text messages concerning a hold that Egyptian officials were concerned Senator Menendez had placed on aid to Egypt.

While the government now tries to downplay this evidence as "of secondary relevance" and "meaningless" (Letter at 1, 8), the Unredacted Exhibits are the *only* evidence specifically tying Senator Menendez to an ***actual, consummated*** provision of military aid to Egypt.[1] That is why these exhibits were important enough to be featured prominently in the operative indictment itself. ECF No. 239 ¶ 29(g) ("In or about January 2022, MENENDEZ sent NADINE MENENDEZ a link to a news article reporting on two pending foreign military sales to Egypt totaling approximately $2.5 billion dollars. NADINE MENENDEZ forwarded this link to HANA, writing, 'Bob had to sign off on this'"). And it is why prosecutors were so adamant in

---

[1] There is a document referenced in the Indictment and admitted at trial referencing a *future* sale of military equipment to Egypt, namely a text message from Senator Menendez to his wife identifying a particular military sale and saying "Tell Will I am going to sign off on this sale to Egypt today. . . $99 million." ECF No. 239 ¶ 20. But a *potential* future sale is different from an *actual* past sale; and in any event, the $99 million sale is a far cry from the "billions of dollars" in aid that the government promised the jury during its opening statement that it would prove. Trial Tr. 50:5-9.

pursuing admission of this evidence, going so far as to seek reconsideration of this Court's order, and describing the material as "***very critical evidence*** in our case."  Trial Tr. 1042:1 (emphasis added).

In short, the government has always felt that evidence tending to show that Senator Menendez was involved in the provision of *specific* military aid to Egypt was critical to its case and tried desperately to get that evidence into the record, but the Court correctly prohibited it from doing so.  It has now been discovered that the government undid that ruling—secretly, even if inadvertently, providing evidence of those past legislative acts to the jury, and thereby infringing on Senator Menendez's "absolute" constitutional privilege not to be faced with evidence of his own legislative acts at a criminal trial.  *In re Sealed Case*, 80 F.4th 355, 365 (D.C. Cir. 2023).  That was undoubtedly prejudicial. A jury skeptical that Senator Menendez promised to provide military aid in exchange for a bribe, but which then learned or inferred based on the Unredacted Exhibits that the Senator was involved in an actual provision of such aid to Egypt, could easily have been improperly pushed outside the realm of reasonable doubt.

The government's refrain that the evidence of guilt was "overwhelming" is hackneyed and irrelevant.  Letter at 8.  For all of the reasons raised in Senator Menendez's post-trial motions, there is ample reason to contest the government's hyperbolic account of the evidence. *See* ECF No. 592.  Indeed, if the government thought its case was overwhelming, why did it fight so vigorously for admission of this "very critical evidence"?  Trial Tr. 1042:1.  Moreover, during its days of deliberation, the jury sent a note requesting clarification on the procedure for rendering a verdict of *not* guilty, strongly indicating that it was considering acquitting at least some defendants on at least some counts.  Trial Tr. at 7175:9-11 (The Court: "We have received a note from the jury.  It says: 'Does a not guilty verdict on a single count require unanimity?'").

It is more than just possible that the Unredacted Exhibits contributed to its ultimate decision not to do so. The government cannot bear its heavy burden to prove harmlessness, even assuming that is the governing standard. This Court must therefore grant a new trial.

At minimum, the Court should order discovery so that Senator Menendez may assess the full scope of the constitutional violations at issue—and supplement this motion, as appropriate. Indeed, despite the government's insistence that there is "no reason to think" the problem here spilled beyond the Unredacted Exhibits and refusal to conduct a basic quality control review of the government exhibits provided to the jury, defense counsel has *already* found multiple other instances of unredacted material being improperly provided by the government to the jury.[2] Only discovery can reveal the extent of the problem—and, as important, shed light on the degree of negligence or recklessness that may have led to these repeated, inexcusable mistakes on the part of the government. On this score, the government has lost the benefit of the doubt, and cannot ask this Court to simply brush away the issue on its say-so that it has not committed any other constitutional errors. So, while the *existing* errors already compel a new trial, the Court should at least order discovery so that Senator Menendez can learn the full extent to which his rights were violated.

---

[2] These include a text message chain between Fred Daibes and a Qatari national in which a highly prejudicial reference by Daibes to "Hitler" is left unredacted. In the version of the same exhibit (GX 3D-1) admitted at trial, the word "Hitler" was appropriately redacted. Weitzman Decl. Ex. H-1.

5

**RELEVANT FACTS**

A. <u>The Government's Long Effort to Present Evidence on Senator Menendez's Connection to Foreign Military Aid</u>

From the outset, the government alleged a single, interconnected bribery scheme.[3]  But the pièce de résistance of the government's case was always the claim that Senator Menendez directed valuable foreign military aid to Egypt in exchange for bribes.  In the Indictment, for example, the government sets forth lengthy allegations describing the United States' system of foreign military aid and the Senate Foreign Relations Committee's role in that system.  ECF No. 239 ¶¶ 17-18.  It also repeatedly asserts that Senator Menendez "promised" to use his authority to direct military aid to Egypt in exchange for bribes, and implies that he *did* ultimately do just that.  *E.g.*, *id.* ¶ 19 ("In exchange for MENENDEZ and NADINE MENENDEZ's promise that MENENDEZ would, among other things, use his power and authority to facilitate [military] sales and financing to Egypt, HANA promised, among other things, to put NADINE MENENDEZ on the payroll of his company in a low-or-no-show job"); ¶ 37(g) ("In or about January 2022, MENENDEZ sent NADINE MENENDEZ a link to a news article reporting on two pending foreign military sales to Egypt totaling approximately $2.5 billion dollars. NADINE MENENDEZ forwarded this link to HANA, writing, 'Bob had to sign off on this'").[4]

---

[3] *See* ECF No. 239 ¶ 1 ("From at least in or about 2018 up to and including in or about 2023, MENENDEZ and his wife, NADINE MENENDEZ . . . engaged in a corrupt relationship with three New Jersey associates and businessmen . . . in which MENENDEZ and NADINE MENENDEZ agreed to and did accept hundreds of thousands of dollars of bribes in exchange for using MENENDEZ's power and influence as a Senator to seek to protect and enrich HANA, DAIBES, and Uribe, and to benefit the Arab Republic of Egypt and the State of Qatar").

[4] Although not evidence at trial, in the press release trumpeting the Senator's Indictment, the government also told the *public* that, in exchange for a bribe, Senator Menendez involved himself in the approval of "approximately $2.5 billion" of "pending foreign military sales to Egypt." "*U.S. Senator Robert Menendez, His Wife, and Three New Jersey Businessmen Charged With Bribery Offenses*," September 22, 2023, available at: https://www.justice.gov/usao-

On January 10, 2024, Senator Menendez moved to dismiss the then-operative Indictment arguing, among other things, that any allegation that he used his power and authority to influence the provision of military aid to Egypt "must be purged from the Indictment" as violative of the Speech or Debate Clause.  ECF No. 120 at 30.  In opposing Senator Menendez's motion, the government took the position that Senator Menendez's role in facilitating military aid to Egypt does *not* constitute a "legislative act" and is therefore not protected by the Speech or Debate Clause.  ECF No. 180 at 39-40.  Although the Court refused to dismiss, it correctly held that "actions Menendez allegedly took as a Senator" relating to the provision of foreign military aid to Egypt are "legislative acts" entitled to the protection of the Speech or Debate Clause.  ECF No. 252 at 8.

B.  The Court's Exclusion of the Unredacted Exhibits

On May 21, 2024, the Court held oral argument on numerous objections to exhibits that the government intended to offer in connection with its summary chart, GX 1302.  Those documents included versions of the Unredacted Exhibits.  At oral argument, the government contended that such exhibits should be admitted into evidence without redaction because they go to the "gravamen of the corruption offense" and are "***very critical evidence*** in [the government's] case."  Trial Tr. 1041:22-1042:2 (emphasis added).  On May 24, the Court entered an Order excluding the at-issue exhibits, explaining that "[t]his ruling is the ineluctable application of United States Supreme Court precedent holding 'that references to past legislative acts of a Member cannot be admitted without undermining the values protected by the [Speech or Debate] Clause.'"  ECF No. 420 (citing *Helstoski*, 442 U.S. at 489).

---

sdny/pr/us-senator-robert-menendez-his-wife-and-three-new-jersey-businessmen-charged-bribery (last visited November 24, 2024).

Resisting the Court's ruling, the government moved for reconsideration. Reflecting the unique importance of these exhibits, the government represented that had it known the Court would exclude these exhibits before trial, it would have sought an interlocutory appeal. *See* ECF No. 421 at 2. In connection with its motion for reconsideration, the government prepared "reconsideration versions" of the at-issue exhibits that contained more limited redactions, and asked that, at minimum, this Court admit those versions. ECF No. 630 at 2. It is these "reconsideration versions" of the at-issue exhibits that ultimately became the Unredacted Exhibits. *Id.*

Senator Menendez opposed both reconsideration and admission of these Unredacted Exhibits, contending that, given the context of the exhibits and the evidence presented at trial, the government's proffered redactions would "leav[e] the jury with no reasonable choice but to fill-in-the-blank with Senator Menendez's legislative act[s];" Senator Menendez argued that the redactions therefore were inadequate to uphold the protections of the "Speech or Debate Clause." ECF No. 433 at 2-3.

The Court denied the government's motion to reverse its prior Order, stating that "I know the government disagrees with it, but I believe [the exclusion Order] [is] the appropriate ruling under the law." Trial Tr. 1343:10-12. Much more heavily redacted versions of these documents – with the same Exhibit numbers – were admitted into evidence instead. Letter at 2.

C. Provision of Evidence to the Jury

In light of the Court's rulings, evidence and argument at trial about military aid to Egypt was necessarily abstract, generalized, and indirect. The government argued that the Senator had made a "promise" to provide "billions of dollars" of military aid to Egypt. *See* Trial Tr. 50:8-9 (Senator Menendez "promised to approve billions of dollars in military aid to Egypt"); Trial Tr. 6368:24-25 ("Menendez was powerful. He was so powerful that he could hold up billions of

dollars of U.S. military aid to Egypt") (emphasis added). Trial Tr. 6405:5-6. The government also elicited testimony from multiple witnesses on the general subject of military aid. For example, Joshua Paul from the State Department testified that Senator Menendez's position gave him the authority to "hold foreign military financing grant money." Trial Tr. 862:19-863:4; 872:25-873:6. Similarly, the government elicited testimony from Sarah Arkin from the SFRC that, as is customary, Egyptian officials asked Senator Menendez in meetings she attended to provide the "full amount of its authorized and appropriated military financing without any preconditions." Trial Tr. 4495:5-16. Despite this testimony, however, there was no evidence permitted at trial regarding any particular aid that Senator Menendez approved or rejected, because that would have violated his Speech or Debate rights.

As set forth in detail in the Declaration of Avi Weitzman submitted herewith, at the conclusion of a trial, the government assembled its admitted exhibits onto a laptop to provide the jury free access to all exhibits admitted at trial. That laptop contained approximately 2,800 government exhibits. Weitzman Decl. ¶ 6. The defendants were given a short period of time— approximately 4.5 hours—to review the exhibits on the government laptop before the laptop was sent back to the jury. *Id.* ¶ 7. Counsel for Senator Menendez did the only thing that was practical in this limited window: compare the *exhibit numbers* of the exhibits on the laptop to the list of exhibits properly admitted at trial. *Id.* ¶ 6. Given the natural time limitations, defendants relied on the government's representation that each exhibit on the laptop was what it purported to be (e.g., a copy of the exhibit the government moved into evidence), and could not have reviewed each exhibit line-by-line to ensure that it was, in fact, the same version of the document admitted at trial. *Id.*

In the Letter, however, the government revealed—without any detail or even a sworn Declaration—that it had improperly loaded into the laptop nine Unredacted Exhibits, meaning the versions that had accompanied the government's denied motion for reconsideration, rather than the more heavily redacted versions that the Court permitted to be introduced.

The Unredacted Exhibits fall into two categories. *First*, there are January 2022 text messages that reflect that the Senator's Chief of Staff forwarded to the Senator, and the Senator in turn forwarded to Nadine, a news article concerning U.S. arms sales to Egypt. ECF Nos. 630-1 (GX A103-10), 630-3 (GX A120), 630-5 (GX B207-1) (contains a reference to the article, but not the link).[5] Upon receipt of the news article, Nadine responded "WOW" (all caps in original). The obvious implication is that Senator Menendez was involved in the sale of arms that is the subject of the article.

*Second*, there are a series of September 2019 text messages concerning a hold that Egyptian officials were concerned Senator Menendez placed on aid to Egypt. In these text messages, an Egyptian government official texts Defendant Wael Hana (in relevant part): "Director office of Egyptian affairs in state department . . . told our DCM today that senator Menendize [sic] put an hold on a billion $ of usaid to Egypt before the recess !!!!" ECF Nos. 630-7 (GX C207-8), 630-9 (GX C207-8T), 630-11 (GX C207-9), 630-13 (GX C207-9T), 630-15 (GX C602), 630-17 (GX D207-3). In the versions of these exhibits actually admitted at trial, the entire text message was redacted. ECF 630-8 (Ex. D-2). In the Unredacted Exhibits provided to the jury, however, only the misspelling of Senator Menendez's name and "an hold" are redacted, but the rest of the document was provided to the jury in unredacted form. ECF No. 630-11 (GX C207-9). Any rational juror would readily conclude that behind the black redaction bar is

---

[5] In the versions of these exhibits actually admitted at trial, the link was redacted in its entirety.

Senator Menendez's name and/or some reference to an action taken with respect to "a billion $ of usaid to Egypt."  As a consequence, the jury was exposed to evidence of the government's *precluded* theory that Senator Menendez took specific actions with respect to billions of dollars of military aid to Egypt in exchange for bribes.

### D.  Additional Errors in Exhibits Provided to the Jury

Following the government's disclosure of its alleged error, the undersigned moved diligently to investigate and determine whether any additional *un*admitted versions of exhibits had been provided to the jury (something the government admits that – even after discovering the errors on the Jury Laptop – it did not do).[6]  Specifically, we requested an electronic version of all documents provided to the jury and have been undertaking to compare them to our records of the exhibits that were actually admitted at trial. Given the volume of exhibits, this project is not yet complete.  But even in the early stages of our review, we have uncovered two *further* discrepancies, beyond those identified in the government's letter.

*First*, the version of GX C207-10 provided to jury left certain Arabic language text messages unredacted, even though those texts were redacted in the version of that exhibit admitted at trial.  Weitzman Decl. Ex. G-2.  This error further demonstrates the inadequacy of the government's review and quality control procedures.  *Second*, and alarmingly, the text message chain between defendant Fred Daibes and a Qatari national that the government marked

---

[6] *See* Weitzman Decl. Ex. E (email from the government dated November 14, 2024) ("We have not identified any other exhibits on the jury laptop as containing extraneous material, and have no reason to think that that occurred given how, when, and why the not-fully-redacted versions were created and labeled, as described in detail in the letter we filed with the Court, and accordingly **have not conducted a document-by-document review** of each file in our copy of the set of exhibits loaded onto the jury laptop").

as GX 3D-1 includes a reference by Daibes to "Hitler."[7]  In the version of GX 3D-1 admitted at

trial, the word "Hitler" was redacted, but in the version of GX 3D-1 *provided to the jury*, the

reference to Hitler was left unredacted (as shown below).  Of course, any reference by a

defendant to "Hitler" in evidence provided to a jury in a criminal trial is highly prejudicial.



Weitzman Decl. Ex. H-2 (GX 3D-1 as shown to jury) (emphasis added).

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, this Court may "[u]pon the defendant's

motion . . . vacate any judgment and grant a new trial if the interest of justice so requires."  Fed.

R. Crim. P. 33(a).  This rule confers "broad discretion upon a trial court to set aside a jury verdict

and order a new trial to avert a perceived miscarriage of justice."  *United States v. Olazabal*, 610

F. App'x 34, 37 (2d Cir. 2015) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir.

1992).  Such a "motion for a new trial ***must*** be granted if the trial was not fair to the moving

party."  *Rivas v. Brattesani*, 94 F.3d 802, 807 (2d Cir. 1996) (emphasis added).

While trials implicating the Speech or Debate Clause are rare, the few cases to have

considered the issue have found that violations of the Clause require vacating convictions.  *See*

---

[7] Our understanding is that Fred Daibes, at least at one point, owned a car that is a similar model
to Adolph Hitler's infamous touring Mercedes.  Apparently, Daibes and others sometimes
referred to that car as the "Hitler car."

*United States v. Johnson,* 383 U.S. 169, 185 (1966); *Swindall*, 971 F.2d at 1534; *Blondes v. State,* 16 Md. App. 165, 174 (Md. App. 1972).

## ARGUMENT

Had prosecutors blurted out the contents of the Unredacted Exhibits during closing, there is no doubt this Court would have ordered an immediate mistrial.  The only question here is whether a different remedy is warranted, because the government slipped this "very critical" evidence to the jury via a laptop, rather than a summation.  The answer is no.

The government's admission that it violated this Court's Speech or Debate order is all that is needed to warrant reversal.  Speech or Debate Clause violations are structural errors, which are not amenable to harmless-error review.  But even if that were not so, vacatur and a new trial would be plainly required on these facts.  The Unredacted Exhibits do not contain mere collateral or cumulative evidence.  As the government itself stressed to this Court, this evidence was "very critical."  *Supra* Trial Tr. 1042:1.  To try to save its convictions, the government now does a total 180, but it was right the first time: Without the Unredacted Exhibits, the government had no evidence of the Senator approving *any* military aid on behalf of Egypt (and indeed, no evidence of the Senator taking any *official action* either).  The Unredacted Exhibits thus filled a major gap in the government's case, and cannot be cavalierly dismissed as harmless.

Perhaps for this reason, the government mostly asks this Court to avert its eyes.  It asserts that Senator Menendez somehow *waived* its objections here—objections to evidence that Senator Menendez has contested from day one—because the government was able to slip these exhibits past defense counsel's (highly time-limited) review.  That is not how waiver works in any case— and *especially* not in the Speech or Debate context, where waiver must be clear and unequivocal. As bad, the government declares that the Court need not worry, because the jury probably did not bother looking at these violative exhibits.  But the government offers nothing for this Alfred E.

13

Neuman defense—which is premised on the jury ignoring this Court's instruction to review the summary charts' underlying exhibits. The only proper remedy here is vacatur on all counts.

## I.    SENATOR MENENDEZ DID NOT WAIVE HIS SPEECH OR DEBATE RIGHTS

As a threshold, the government takes the remarkable position that wherever a *prosecution-provided* exhibit containing excluded, prejudicial material slips past a defendant's review, the defendant has "waived" any objection to the jury's consideration of such exhibit. Letter at 6. Accordingly, the government argues that because Senator Menendez's counsel had a narrow window in which to review the nearly 3,000 exhibits on the jury's laptop, he waived any objection to the jury's consideration of the constitutionally barred Unredacted Exhibits that he had successfully kept out at trial. *Id.* That is decidedly not the law. It is, instead, an argument of desperation.

To start, recall the heightened standard for waiver in the constitutional Speech or Debate Clause context. As the Supreme Court has directly held, "the ordinary rules for determining the appropriate standard of waiver ***do not apply*** in this setting." *Helstoski*, 442 U.S. at 491 (emphasis added). Instead, a waiver of Speech or Debate rights may ***only*** be found upon an "explicit and unequivocal renunciation of the protection" that the Clause provides. *Id.*; *see also Nunes v. NBCUniversal Media, LLC*, No. 22-CV-01633 (PKC) (SN), 2024 WL 1500945, at *2 (S.D.N.Y. Mar. 19, 2024) ("Waiver of the Speech or Debate Clause's immunity privilege 'can be found only after explicit and unequivocal renunciation of the protection'") (citing *Helstoski*, 442 U.S. at 491). Here, the government cannot (and does not even try to) identify any act even approaching an "explicit and unequivocal renunciation" of Senator Menendez's Speech or Debate protection over the Unredacted Exhibits. For that reason alone, the waiver argument is dead on arrival.

14

Even outside the Speech or Debate context, the government's argument would be wrong, and should be readily rejected.  As described above, Senator Menendez repeatedly registered his objections to admission of material protected by the Speech or Debate Clause (including material evidencing his connection to any particular sale of military equipment to Egypt), both before and throughout trial.  He objected to the particular exhibits at issue, and indeed *successfully* opposed the government's motion for reconsideration, which sought to introduce the Unredacted Exhibits. There can thus be no dispute that Senator Menendez put the Court and government on notice that he had no intention of waiving his objection to the jury's consideration of the improper exhibits. In that context, the fact that defense counsel did not catch the government's mistake—when given just a few hours to review a laptop containing thousands of exhibits, and when those exhibits purported to be the ones that the Court had admitted at trial—cannot be characterized as waiver by any stretch.  *See, e.g.*, *United States v. Brown*, 843 F.3d 74, 81 (2d Cir. 2016) ("Waiver is the intentional relinquishment or abandonment of a known right.") (internal quotation and citation omitted).

The Second Circuit's decision in *United States. v. Camporeale*, 515 F.2d 184 (2d Cir. 1975), proves the point.  In *Camporeale*, excerpts of the defendant's grand jury testimony were "received in evidence" during trial, but with substantial redaction of prejudicial material that the court "deemed not proper for the jury to see."  *Id.* at 187.  During jury deliberations, though, the court clerk inadvertently provided the jury with an *unredacted* copy of the grand jury testimony. The Second Circuit ruled that because, during trial, "counsel had put the court, prosecutor, and clerk on notice that he did not intend to waive objection to the jury's consideration of the [redacted] portion of the defendant's testimony," there was no waiver.  *Id.* at 188.  So too here.

The authorities the government cited in its Letter are inapposite, because none involves material that a defendant (successfully) objected to during trial. *See United States v. Jefferys*, No. 20-3630, 2022 WL 9627085, at *3 (2d Cir. Oct. 17, 2022) (defendant did not object to unredacted portions of government exhibits during trial); *United States v. Stasiv*, No. 19-4286, 2021 WL 4888865, at *2 n.2 (2d Cir. Oct. 20, 2021) (jury was inadvertently provided with a document that the government did not offer, and the defendant did not object to, during trial); *United States v. O'Brien*, No. 13-CR-586, 2017 WL 2371159, at *13 (E.D.N.Y. May 31, 2017) (waiver found where defendant "reviewed the court reporter's transcript and agreed—without any objection—that it should be sent back to the jury as transcribed").[8]  These authorities do not support the government's urged rule that because the defense did not notice (and could not have noticed) errant missed redactions during its review of the laptop containing thousands of exhibits to be provided to the jury, all prior objections are rendered irrelevant and waived.

The government's position would not only be unjust; it would create perverse incentives for prosecutors to allow prejudicial material into sets of evidence provided to the jury and then claim waiver whenever defense counsel does not detect such evidence in truncated periods of review.  Indeed, if that was enough to trigger waiver, prosecutors would be entitled to take that step *intentionally*, and there would be nothing the court could do about it.  That is not the law in any context—and certainly not when dealing with evidence that is constitutionally barred by the Speech or Debate Clause.  The Court should firmly reject the government's waiver claim.

---

[8] In *Barnett*, which the government cited in its Letter, the jury was specifically instructed not to review the inadvertently provided evidence. *See Barnett v. United States*, 870 F. Supp. 1197, 1205 (S.D.N.Y. 1994) ("when it was discovered that the jury had received the bag, this Court immediately instructed the jury to disregard the bag").  Of course, no such instruction was provided to the jury here with regard to the Unredacted Exhibits.

## II.    THE HARMLESS ERROR TEST NEITHER APPLIES NOR IS SATISFIED HERE

"It is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002).  To overcome this presumption, the government argues that the Unredacted Exhibits "could not have caused any prejudice" in light of the volume of evidence and the circumstances of the case.  Letter at 7.  Essentially, the government argues that this error is harmless.  That is wrong twice over.

**A.**    Foremost, Speech or Debate Clause errors are structural, and defy harmless error analysis.  As the Eleventh Circuit has held, "harmless-error analysis will not excuse a violation" of the Speech or Debate Clause—such errors are *per se* prejudicial.  *Swindall*, 971 F.2d at 1548 n.21; *see also In re Search of the Rayburn House Office Building Room No. 2113,* 432 F. Supp. 2d 100, 116 n.9 (D.D.C. 2006) ("[A] harmless-error analysis is not appropriate in the context of the Speech or Debate privilege."), *rev'd on other grounds*, 497 F.3d 654 (D.C. Cir. 2007).  The government simply *assumes* harmless-error analysis applies, but ignores *Swindall* and cites all of zero cases holding as much in this context.

While most errors (and many constitutional errors) are susceptible to harmless-error review, violations of the Speech or Debate Clause are different.  They fit one of the classic molds of structural errors, because the Clause "protects some other interest . . . where harm [at trial] is irrelevant to the basis underlying the right."  *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017); *see also, e.g.*, *United States v. Gonzalez-Lopez*, 584 U.S. 140, 149 n.4 (2006).

As the Supreme Court has explained, the "purpose" of the Speech or Debate Clause is "to preserve the constitutional structure of separate, coequal, and independent branches of government."  *Helstoski*, 442 U.S. at 491.  Shaped by the lessons of England, the Founders were deeply concerned about "intrusion by [the] Executive and Judiciary into the legislative sphere."

*Id.* So they "designed" the "Speech or Debate Clause" to assure that Members of Congress would have a "wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch." *Gravel v. United States*, 408 U.S. 606, 616 (1972). To guard against this sort of intimidation, the Clause establishes a "prophylactic" rule: Neither the Executive nor the Judiciary may consider *any* legislative act as part of a criminal proceeding. *United States v. Johnson*, 383 U.S. at 182. Obviously, but also critically, nothing about that rule is geared toward preserving "fair trials." *Helstoski*, 442 U.S. at 491; *see also id.* at 488-89. It is instead concerned entirely with interests that exist *outside* of the courtroom: The point of the Clause is to provide clear *ex ante* protections for Congress against inter-branch intrusion, so that its Members are free to exercise their constitutional duties without fear that their legislative acts may become subject to criminal process, colored by the harsh light of another branch.

But these front-end protections only have force if violations are predictably remedied on the back-end. For the Clause to work, a Member must know that his legislative acts will *never* be used as part of obtaining a criminal conviction. *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975) (describing Clause's protections as "absolute"). If the answer is *maybe*, so long as the other evidence is sufficiently strong, then the Clause's shield rapidly becomes more decorative than functional. And the Clause's purpose—to prevent the *chill* on legislative activity that comes from the *risk* of prosecution—is vitiated. Truly, if the Executive is allowed to use legislative acts as part of securing a conviction, only to be checked by the Judiciary's evaluation of whether that violation influenced the jury, the Legislature is left to the mercy of the other branches—the *very* dynamic, doctrinally and practically, that the Clause was supposed to stop.

The Speech or Debate Clause is thus one of those rare instances where the Constitution does not care about showings of "specific harm"—but instead "establish[es] high walls and clear

18

distinctions because low walls and vague distinctions" fail to serve the interests at stake. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995). Case-by-case adjudication of whether a given error affected a given case does not fulfill the Clause's function. A Member's rights under the Speech or Debate Clause are in turn the kind of rights that are "either respected or denied"—and "cannot be harmless," regardless of their effect on a given "trial outcome." *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984) (making similar point in context of right to self-representation).

The Supreme Court's recent decision in *Trump v. United States* underscores the rationale for why. There, in dealing with the President's analogous constitutional immunity from criminal process, the Court held that the "immunity would be defeated" if a jury could *ever* "consider evidence concerning the President's official acts," because the sheer *prospect* of it doing so would impermissibly chill and impair the President's "decisionmaking." 603 U.S. 593, 631-32 (2024). When a constitutional immunity is premised on *insulating* a decisionmaker's actions so he has the freedom to act, it is necessary for those actions to be *categorically* immune. And what holds for the President holds too for Congress: Unless Members can be assured that violations of the Speech or Debate Clause will be met with vacatur—versus the uncertainty of fact-intensive harmless-error review by courts—then the Clause loses its force, and "the interests that underlie [legislative] immunity" would be hollowed. *Id.* at 632. Simply put, an immunity is either "absolute" or it is not. *Eastland*, 421 U.S. at 501. And an absolute immunity does not brook any departures, nor tolerate any infringements. But harmless-error review is just that—a means for excusing an entrenchment on what the Constitution says is inviolable.

In short, harmless-error analysis does not apply here, because "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other

interest." *Weaver*, 582 U.S. at 295. The Speech or Debate Clause is not about individual trials, but instead the separation of powers: And it only works where its clear *ex ante* protections are backed up by similarly clear *ex post* remedies. The admitted violations here are thus structural errors, and demand relief.

**B.**    Even if harmless-error review did apply here, the government cannot satisfy it. At minimum, violations of the Speech or Debate Clause are constitutional errors that are presumed prejudicial, and "can be considered harmless only if a court is 'able to declare a belief that it was harmless beyond a reasonable doubt.'" *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (citation omitted). This is a very heavy burden, and one that the government must shoulder alone. *See, e.g.*, *United States v. Blaszczak*, 56 F.4th 230, 245 (2d Cir. 2022).

It cannot do so here. The Unredacted Exhibits do not include cumulative evidence or merely inflammatory content. They reveal—as the government put it—"very critical" evidence covering something otherwise ***completely lacking*** from the government's case: a genuine official act by Senator Menendez on behalf of the Egyptian Government. That is, unlike any other exhibit at trial, the Unredacted Exhibits directly linked Senator Menendez to ***specific, actual, consummated*** provisions of "billion(s)" of dollars of aid to Egypt, just as the government promised the jury they would hear (but as the Court otherwise prohibited).

That is a huge deal. Recall, the government here charged one of the most influential legislators in the country with selling out his country to a foreign sovereign. But to support this remarkable charge, the government failed to put forward any meaningful action that the Senator took on behalf of Egypt. It was forced instead to rest its case on a few-minute phone call with someone from the Department of Agriculture, the fact the Senator punched up a letter provided to him by his wife, and that he passed along non-confidential information and public news

articles to certain Egyptians.  None of that passes the smell test: If the government is going to charge a sitting senator with engaging in a multi-year bribery scheme with a foreign nation, a rational jury would expect that there would be *something* to show for it. But absent the Unredacted Exhibits, the government had all of nothing—precisely why it panicked when this Court excluded them in the first place.

The Unredacted Exhibits filled this major gap in the government's case.  As for their substance, they fall into two categories, which are helpful to take in turn.

*First*, there are January 2022 text messages that reveal Senator Menendez's past involvement in the provision of arms sales to Egypt—*i.e.*, that the Senator *had in fact* signed off on specific aid to benefit Egypt.  Those text messages involve communications between Senator Menendez and his wife, as well as his Chief of Staff, forwarding a link to a news article that contains the words "us-arms-sales-egypt."  ECF Nos. 630-1 (GX A103-10), 630-3 (GX A120). 630-5 (GX B207-1) (contains a reference to the article, but not the link).[9]  In context, the import of these Unredacted Exhibits to the jury's analysis (and thus the prejudice to Senator Menendez) is striking.  Specifically, at trial, the government relied heavily on summary charts that contained certain redactions in response to defense objections.  In particular, the very last page of summary chart GX 1302 appeared, in relevant part, as reproduced below.

| No. | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| 1265 | January 28, 2022 | 12:33 PM | Nadine Menendez | Robert Menendez | Text: "WOW" (GX A103-10) |
| 1266 | January 28, 2022 | 12:35 PM | Nadine Menendez | Wael Hana | Missed WhatsApp voice call (GX C603) |
|  |  |  |  |  |  |

*See* Weitzman Decl. Ex. F (GX 1302) highlighting added.

---

[9] In the versions of these exhibits actually admitted at trial, the link was redacted in its entirety.

So, on this summary chart, the jury saw Nadine Menendez texting her husband "WOW" in response to some redacted, unknown document or event and a citation to GX A103-10 (one of the Unredacted Exhibits). Concurrently, with respect to summary charts, the Court instructed the jury that "the underlying evidence and the weight which you attribute to that underlying evidence is what gives value and significance to these charts." Trial Tr. 7052:15-17. Given Nadine's exclamation, the placement of the evidence at the very end of the chart, and the temptation to uncover what might be behind a black redaction bar, the jury naturally may have sought to review the evidence underlying this portion of the chart. Candidly, it would be strange for the jury *not* to do that during deliberations: What was it, they would have naturally asked, that caused Nadine to exclaim "WOW" as the closing event in the government's presentation on Egypt?

Had the jury looked to this part of the summary chart and its underlying exhibits—as this Court had instructed them to do—the jurors would have opened the improperly unredacted version of GX A103-10, copied in relevant part below:

| 422 | Native Messages | Mon Fiance Parfait* | Bob Menendez* (owner) | 1/28/2022 12:33:10 PM(UTC-5) | Direction: Incoming Body: WOW |
|-----|-----------------|---------------------|------------------------|------------------------------|-------------------------------|
|     |                 |                     |                        |                              | Participants: |
|     |                 |                     |                        |                              | Participant      Delivered      Read      Played |
|     |                 |                     |                        |                              | ████████ Bob Menendez      1/28/2022 12:33:25 PM(UTC-5) |



ECF No. 630-1 (Unredacted GX A103-10) (highlighting added).

That is, because of the government's error, had the jury reviewed the "underlying evidence" cited in the summary chart, it would have learned that, three minutes before Nadine's exclamation "WOW," Senator Menendez forwarded her a link to a news article containing the text "***us-arms-sales-egypt***." *Id.* (emphasis added). The obvious implication is that Senator Menendez was involved in the sale of arms that is the subject of the article. And if there was any doubt about that, another of the Unredacted Exhibits is an earlier-in-time text message from Jason Tuber, the Senator's Chief of Staff, to Senator Menendez *forwarding the same article,* as shown below.



ECF No. 630-3 (Unredacted GX A120) (highlighting added).  The *only* inference that a rational

jury would have drawn from this evidence—that the article concerned Senator Menendez's role

in approving arms sales to Egypt, and resulted in Nadine's all-caps exclamation "WOW"—is

indeed precisely the reason why the government fought so hard for its admission.

    *Second*, there are a series of September 9, 2019 text messages concerning a hold that

Egyptian officials were concerned Senator Menendez placed on aid to Egypt—*i.e.*, evidence of a

specific legislative act taken by Senator Menendez, and the Egyptian response to it.

    In these text threads, an Egyptian government official texts Defendant Wael Hana (in

relevant part) "Director office of Egyptian affairs in state department . . . told our DCM today

that senator Menendize [sic] put an hold on a billion $ of usaid to Egypt before the recess !!!!"

ECF Nos. 630-7 (GX C207-8), 630-9 (GX C207-8T), 630-11 (GX C207-9), 630-13 (GX C207-

9T), 630-15 (GX C602), 630-17 (GX D207-3).  The Court excluded the admission of this

evidence because it, too, made specific reference to a past, consummated legislative act.  In the

versions of these exhibits actually admitted at trial, the text message was redacted in its entirety.

ECF No. 630-8 (Ex. D-2). In the Unredacted Exhibits provided to the jury, however, the

misspelling of Senator Menendez's name and "an hold" are redacted, but the rest of the

document was provided in full form:



ECF No. 630-11 (GX C207-9).

Some of these exhibits, too, were blacked out of the relevant summary chart, depicting

events at the same time, GX 1302 (as shown below).

| 1039 | September 9, 2019 | 8:00 PM | Wael Hana | Fred Daibes | WhatsApp call: 1 minute, 59 seconds (GX D202-2) |
|------|-------------------|---------|-----------|-------------|------------------------------------------------|
|      |                   |         |           |             |                                                |
| 1041 | September 9, 2019 | 8:02 PM | Fred Daibes | Robert Menendez | Call: 1 minute, 19 seconds (GX 6A-206) |
| 1042 | September 9, 2019 | 8:04 PM | Fred Daibes | Wael Hana | WhatsApp Call: 21 seconds (GX D202-3) |
| 1043 | September 9, 2019 | 8:05 PM | Wael Hana | Ahmed Helmy | WhatsApp: *[Not true, and he knows nothing about it.]* (GX C207-8, GX C207-8T) |

Weitzman Decl. Ex. F (GX 1302).

Again, in context, any rational juror would readily conclude that behind the black

redaction bar in GX C207-9 is Senator Menendez's name and/or some reference to an action

taken with respect to "a billion $ of usaid to Egypt." There would be no other reason to present

this exhibit at trial: The government would not bother with Egypt freaking out about an

unrelated Senator's actions; nor would it log a series of calls made in response to an unrelated

legislator's actions. As a consequence, yet again, the jury was exposed to evidence of the

government's *precluded* theory that Senator Menendez actually took specific actions with

respect to billions of dollars of military aid to Egypt in exchange for bribes – and, worse, the

government *encouraged* the jury to adopt that theory. Specifically, in summation, the

government emphasized the September 9, 2019 contacts between Helmy, Hana and Daibes,

despite the lack of evidence regarding the substance of those communications. The government

instead asked the jury to speculate that the communications must have been "about the things that Egypt always cared about" – meaning, military aid.  Trial Tr. 6400.  In the face of the defendants' arguments that the jury could not and should not speculate about these matters, the jury would naturally have investigated further to understand what these September 9 communications were about, which would have led to the Unredacted Exhibits and the information the Court precluded about military aid to Egypt.

To be very clear, accessing this evidence did not require any special diligence on the jury's part.  All the jury would have needed to do to see the Unredacted Exhibits is identify blacked out portions of the summary chart GX 1302 and either review the underlying exhibits *cited* in the chart (as the Court instructed), or review exhibits with dates close in time to the redactions.  And then, upon seeing the Unredacted Exhibits, the jury could easily have inferred that they reflect Senator Menendez approving specific military aid to Egypt—precisely as the government initially intended, and precisely as this Court prohibited it from arguing.

Finally, the government's insistence that no juror would have relied on the Unredacted Exhibits, even if they had seen them, makes no sense in light of their substance, and the great efforts the government took to present this evidence to the jury in the first place.  As described above, the government fought vigorously to get evidence of Senator Menendez's involvement in providing foreign military aid to Egypt before the jury: It spuriously argued in opposing Senator Menendez's motion to dismiss that holds are not legislative acts at all; it promised the jury in opening statements that they would hear evidence of Senator Menendez "promising" to provide "billions of dollars" in aid to Egypt; it vehemently argued to admit *these very exhibits* as "critical evidence" and  moved for reconsideration when they were excluded; and it elicited testimony from multiple witnesses clearly implying (even if not stating outright) that this case is about

Senator Menendez's provision (and/or withholding) of military aid to Egypt. The government's self-serving assertion *now* that this evidence didn't matter at all should not be credited.

    **C.**    Tacitly admitting that if the jury *had* seen the Unredacted Exhibits that would be highly prejudicial, the government spends pages of the Letter speculating that the jury probably did not open or review the Unredacted Exhibits at all. *See, e.g.*, Letter at 7 (arguing that there is "exceedingly low likelihood, given the circumstances of the trial, that any juror actually became aware of or considered the Reconsideration Versions"). But this sort of speculation cannot satisfy the government's burden in affirmatively proving harmlessness. Even in terms of speculation, the government's is rank at best.

    *First*, as touched on, the jury was specifically instructed to review the underlying evidence supporting the summary charts. The presumption—absent evidence to the contrary—is that the jury followed this instruction. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). To borrow from the government, this "careful and attentive jury would have followed the Court's … instruction" to read the exhibits underlying the summary charts. ECF No. 611 (government Opposition to Post-Trial Motions) at 140. Indeed, early in deliberations the jury sent a note indicating that they were not able to review the exhibits on the Jury Laptop due to a technical problem (which was promptly resolved). Trial Tr. 7171:2-5 ("THE COURT: We have a jury note from earlier [reading]. . . 'We need a display port cable to connect the laptop to the TV screen.' And the parties provided that."). This further indicates that *this* jury wanted to – and did – review the underlying evidence during its deliberations.

    *Second*, the above holds especially true in the context of the summary charts. As this Court is well aware, the government used summary charts in a way that was "quite unusual." Trial Tr. 3540:15-17. But the government's whole rationale for this strategy—its use of

uninformed lay witnesses to usher in the lion's share of the government's case—was that the underlying evidence is all that mattered, and the jury would closely review those exhibits (rather than rely only on the charts). ECF No. 409 (government letter arguing for admission of summary charts) at 4-5. The government cannot now turn around and declare that the jury blew past all of this, and could not have been bothered to look through the underlying exhibits it was told to consider.

*Third*, a modicum of common sense helps here too. These parts of the summary charts were highly intriguing—like Nadine's "WOW" comment, and Hana's response "Not true and he knows nothing about it." *Supra* at 21, 25. And it also involves the central part of the government's case—the Senator's alleged bribery scheme with a foreign sovereign. To the extent that the "very attentive and quite interested" jury was going to skip over anything, this was the *last* area where it would do so. Trial Tr. at 3760:15-17.[10]

*Fourth*, to the extent the Court wanted to reliably determine whether the jury accessed the Unredacted Exhibits, the government ***destroyed the only means for doing so***. The government has admitted that it failed to preserve the actual laptop provided to the jury, but fails to disclose when, why, and how the laptop was not preserved. *See* Weitzman Decl. Ex. E (email from the government dated November 14, 2024 admitting that "the data is no longer on the laptop itself").

---

[10] The government's authorities cited in this section are not to the contrary. Indeed, in the primary authorities cited by the government, the court *actually asked* the members of the jury and credited the jurors' statements that they did not review the evidence. *See United States v. Jefferys*, No. 20-3630, 2022 WL 9627085, at *3 (2d Cir. Oct. 17, 2022) ("At the Government's request, the district court polled the jurors and asked whether they had read the labels. None of the jurors indicated that they had[.]"); *United States v. Hansen*, 369 F. App'x 215, 216 (2d Cir. 2010) ("The district court explicitly credited the jurors' statements that they had not looked at the extra-record evidence"). It is telling that the government has not even suggested that the Court poll the jury regarding its review of the Unredacted Exhibits. But anyway, that option is no longer reliably available, given the passage of time, among much else.

Had that laptop been preserved, it likely could have been forensically examined to determine whether the jury accessed these particular exhibits.  Given that the government was the party that took possession of the laptop and failed to preserve it—and more important, given that it is the government's burden here to prove harmlessness—any inferences by the Court about what the jury did or did not review should be made against the party that spoliated the evidence (the government), not the uninvolved defendants who were not informed that the government would wipe the laptop clean.  That is especially so here, because the government *should have known* of the potential motion practice concerning the inclusion of improper exhibits on the laptop.  *See* ECF No. 630 (arguing that the Court should deny "any request for a new trial in these circumstances"); *Eur. v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 176 (S.D.N.Y. 2022) ("The obligation to preserve evidence arises . . . when a party should have known that the evidence may be relevant to future litigation").

Even if the government wiped the laptop before discovering the provision of the Unredacted Exhibits to the jury, the government's lack of transparency about the circumstances of the inclusion of the Unredacted Exhibits and the wiping of the laptop requires further inquiry, and likely adverse inferences against the spoliating party.  *See Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 506 (S.D.N.Y. 2013) (awarding an adverse inference as a sanction for the intentional, albeit not malicious, destruction of evidence and holding that "[i]n the context of an adverse inference analysis, there is no analytical distinction between destroying evidence in bad faith, *i.e.*, with a malevolent purpose, and destroying it willfully").

Critically, rules requiring sanctions for intentional (even if non-malicious) destruction of evidence apply with equal force where the government is the responsible party.  For example, in *United States v. Dalisay*, a narcotics case, the government inadvertently destroyed a FedEx

package from which narcotics had been recovered.  Even though the package was destroyed

because of evidence processing errors – and was *not* destroyed "in bad faith" or as "part of an

effort to prevent anyone from reviewing the evidence in this case" – the court nevertheless

allowed an "adverse inference to be drawn against the Government as a result of the

destruction."  *United States v. Dalisay*, No. 03 CR. 1305 (JGK), 2005 WL 1176115, at *11

(S.D.N.Y. May 17, 2005).  The court supported that decision with citation to controlling Second

Circuit authority including *United States v. Bufalino*, 576 F.2d 446, 449 (2d Cir. 1978)

("[w]here, as here, destruction is deliberate, sanctions will normally follow, irrespective of the

perpetrator's motivation, unless the Government can bear the heavy burden of demonstrating that

no prejudice resulted to the defendant").  This Court should apply the same analysis here:  even

if the wiping of the Jury Laptop was done in good faith, the fact is that the wiping was still

deliberate. An adverse inference as to what the Laptop would have shown is warranted.

## III.    VACATUR IS REQUIRED ON ALL COUNTS

As a fallback position, the government seems to argue that— at worst—the Unredacted

Exhibits merely poisoned the jury's deliberation on those counts related to Egypt, and so there is

no basis for a mistrial on any other counts.  While it is true that the Egypt-related counts are most

directly tainted and clearly must be vacated, the relief should not end there, given the way the

different counts were woven together by the prosecutors throughout the trial.

Foremost, at trial, the government argued to the jury that Senator Menendez and his

codefendants perpetrated a single, interconnected bribery scheme.  *See, e.g.*, Trial Tr.

(Government Opening) at 51:9-13 (Government Opening: "So what will the evidence show? The

bribery scheme had three main goals. They all involved Robert Menendez selling his influence

and power as a U.S. senator to Wael Hana and Fred Daibes, and they also involved Menendez

using his wife as a go-between") (emphasis added); *id.* at 6373:1-10 (Closing: "I'm going to

spend some of the most time on [the charges related to Egypt] because, in a way, they're the building block of most of the rest of the other counts."); *see also* ECF No. 180 (government Opposition to Motions to Dismiss) at 91 ("The Indictment's factual allegations also state that each count relates to ***an overarching scheme*** in which Menendez and Nadine Menendez 'agreed to and did accept hundreds of thousands of dollars of bribes in exchange for using MENENDEZ's power and influence as a Senator'") (emphasis added).

The counts "related to Egypt" thus cannot cleanly be cleaved off from the other counts—indeed, that was the government's theory of the case. Instead, improper evidence that Senator Menendez engaged in *some* legislative acts in exchange for bribes necessarily biases the jury toward the conclusion that he did so in other instances as well.

Indeed, in the seminal Speech or Debate Clause case, *United States v. Johnson*, the appellate court found that the introduction of evidence that violated the Speech or Debate Clause on one count "infected the jury's consideration of his innocence or guilt," and was "***obviously*** prejudicial to his right to the unbiased consideration of the jury on the remaining counts"; that finding was affirmed by the Supreme Court. *Johnson*, 337 F.2d at 204 (emphasis added), *aff'd*, 383 U.S. 169 (1966); *see also United States v. Tellier*, 83 F.3d 578, 582 (2d Cir. 1996) (granting new trial on all counts based on spillover prejudice).

Here, the government argued in seeking admission of this evidence that the Unredacted Exhibits reflect a sitting Senator actually providing billions of dollars of military aid to a foreign government, *not* based on national security interests, but instead in exchange for a bribe. In light of that, the jury could easily have concluded that where a Senator abdicated his responsibility to act solely in the public interest with respect to providing *lethal military equipment* to a volatile part of the world, that person would be all the more likely to also perform personal favors to

31

friends in exchange for bribes (*i.e.*, intervene in the criminal prosecutions of Jose Uribe and/or Fred Daibes).  This is precisely the type of spillover prejudice that infects all counts of conviction.  Vacatur and a new trial is thus the required remedy across the board.

## IV.  AT MINIMUM, THE COURT SHOULD PERMIT DISCOVERY INTO THE GOVERNMENT'S FAILURE OF QUALITY CONTROL

The pall cast over Senator Menendez's convictions by the revelation of the government's error – and the attendant prejudice to Senator Menendez – is more than sufficient basis for this Court to vacate all counts of conviction and order a new trial.  But to the extent the Court is not inclined to grant vacatur at this stage, as an alternative remedy Senator Menendez should be permitted to take discovery into the facts and circumstances underlying the government's transmission of excluded evidence to the jury and the scope of the improper evidence that was provided.

*First*, the Court is not required to accept – and on this record should *not* accept – the government's conclusory assertion that the inclusion of this evidence was simply an innocent mistake.  It is no secret that the government fought doggedly to admit the *very* exhibits that became the Unredacted Exhibits.  It is therefore at least plausible that the government was reckless (or at least negligent) in not preventing the transmission of this evidence to the jury.  If that were the case, sanctions or other relief may be appropriate.  Senator Menendez should be permitted to investigate this troubling irregularity further.

*Second,* as described herein, even in a truncated period of review, we have already identified additional improperly unredacted evidence (including a prejudicial reference by Daibes to Hitler) in the files sent to the jury (which the jury never should have seen).  We therefore do not accept the government's averment that there is "no reason to think" there was further improper evidence provided to the jury.  If it turns out that *even more* excluded evidence

was provided to the jury, that will provide additional reason to grant a vacatur motion. Thus,

Senator Menendez should, at minimum, be permitted to investigate that issue as well.

## CONCLUSION

For the reasons set forth herein, Senator Robert Menendez respectfully requests that this

Court vacate each count of conviction and grant this motion for a new trial. At minimum, as a

first step, the Court should authorize discovery into the details and scope of the government error

that led to the improper submission of excluded evidence to the jury.


Dated: November 27, 2024                           Respectfully submitted,


Yaakov M. Roth (*pro hac vice*)
JONES DAY                                          By: */s/ Adam Fee*
51 Louisiana Avenue N.W.                           _____
Washington, D.C. 20001                                 Adam Fee
Telephone: (202) 879-3939                              PAUL HASTINGS LLP
Facsimile: (202) 626-1700                              1999 Avenue of the Stars
                                                       Los Angeles, CA 90067
                                                       Telephone: 1(310) 620-5719
                                                       Facsimile: 1(310) 620-5819

                                                       Avi Weitzman
                                                       Paul C. Gross
                                                       PAUL HASTINGS LLP
                                                       200 Park Avenue
                                                       New York, NY 10166
                                                       Telephone: 1(212) 318-6000
                                                       Facsimile: 1(212) 725-3620

                                                   *Attorneys for Defendant Robert Menendez*