UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                          :

UNITED STATES OF AMERICA          :
                                          :

          -*v.*-                     :       S4 23 Cr. 490 (SHS)
                                          :

ROBERT MENENDEZ,              :
WAEL HANA,                        :
  a/k/a "Will Hana," and       :
FRED DAIBES,                  :
                                          :
                      Defendants.    :
                                          :
-------------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANTS' SUPPLEMENTAL POST-TRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney

Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Catherine Ghosh
Assistant United States Attorneys

Christina A. Clark
Special Assistant United States Attorney

- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND .................................................................................... 1

I.  The September 2019 Messages and the January 2022 Messages ....................................... 2

    A.  The May 24 Ruling and the Motion for Reconsideration ...................................... 2

    B.  The Reconsideration Versions of the September 2019 Messages ......................... 3

    C.  The Reconsideration Versions of the January 2022 Messages .............................. 7

II.  The Additional Messages ............................................................................. 8

III.  The Submission of Government and Defense Exhibits to the Jury ................................. 10

    A.  The Solicitation of Corrections to the Admitted Exhibit Lists ............................ 10

    B.  The Review of the Exhibit Versions to be Loaded on the Jury Laptop ................ 11

    C.  The Contents of the Jury Laptop, the Deliberations, and the Post-Trial
        Proceedings ................................................................................ 12

DISCUSSION ...................................................................................... 13

I.  THE DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL ................................. 13

    A.  Applicable Law ......................................................................... 13

    B.  Discussion .............................................................................. 16

        1.  The Defendants Waived Their Objections to the Exhibits on the Jury
            Laptop ................................................................................ 16

        2.  There is No Reasonable Possibility that Any Juror Saw Any Non-
            Admitted Portion of Any Exhibit ................................................. 20

            a)  The Contents of the Jury Laptop and Circumstances of the Jury
                Deliberations Make It Highly Unlikely that Any Juror Saw Any
                Non-Admitted Portion of Any Exhibit ......................................... 21

            b)  The Arguments at Trial Render It Patently Implausible that Any
                Juror Saw Any Non-Admitted Portion of Any Exhibit ............... 25

            c)  The Defendants Are Not Entitled to the Windfall of an Unrealistic
                Adverse Inference on the Basis of Supposed Spoliation of the Jury
                Laptop ................................................................................ 27

3.   Even if Seen by the Jury, the Exhibits Could Not Have Caused Any Prejudice .................................................. 32

a)   The Non-Admitted Portions of the Exhibits Would Have Been Confusing and Incomprehensible Even if a Juror Happened Upon Them ................................................................... 32

b)   The Exhibits Were Cumulative with Abundant Properly Admitted Evidence ................................................................... 36

4.   Nothing About the Court's Prior Ruling Renders the Documents Prejudicial ................................................................ 42

a)   The Documents Did Not Reference a Legislative Act ................. 43

b)   The Supreme Court Has Repeatedly Held That Prejudice Analysis Applies to Speech or Debate Clause Violations .......................... 47

II.   DISCOVERY WOULD SERVE NO VALID PURPOSE ................................ 56

A.   Applicable Law ................................................................ 56

B.   Discussion ................................................................... 58

CONCLUSION ........................................................................ 61

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendants' supplemental motions for a new trial, or, in the alternative, for discovery, resulting from the inadvertent inclusion of incorrect versions of several exhibits on the laptop provided to the jury by the parties.  (*See* Dkts. 641-645.)[1]  Because the defendants waived their objections to the exhibits loaded on the laptop, because there is no reasonable possibility that the inadvertently included versions were seen by any juror, and because, in any event, there is no reasonable possibility that they could have prejudiced the jury even if they were seen, there is no basis for a new trial or discovery.

## BACKGROUND

The defendants' supplemental motions for a new trial are premised on the inadvertent inclusion, on the laptop provided by the parties to the jury, of versions of eleven exhibits (the "Exhibits"), out of more than 3,000 exhibits, that contained fewer redactions than the admitted versions of those exhibits.  As set forth in detail in the Government's November 13, 2024 letter alerting the Court to this Government-discovered error (Dkt. 630 ("Gov. Ltr.")), nine of the Exhibits (the "September 2019 Messages" and the "January 2022 Messages") were first identified by the Government months after the conclusion of the trial, unprompted by any inquiry from the defendants or the Court.  (Gov. Ltr. 2-4.)  As set forth below, the other two of the Exhibits (the

---

[1] Citations to "Dkt." refer to docket entries in this case.  Citations to "Menendez Mem." refer to the memorandum of law filed in support of Robert Menendez's motions, Dkt. 645.  Citations to "Weitzman Decl." refer to the Declaration of Avi Weitzman, Esq., filed in support of Menendez's motions, Dkt. 645-1.  Citations to "Hana Mem." refer to the memorandum of law filed in support of Wael Hana's motions, Dkt. 641.  Citations to "Daibes Mem." refer to the letter-memorandum filed in support of Fred Daibes's motions, Dkt. 644.  Citations to "Ex. A" refer to an exhibit attached hereto.  Citations to "Tr." refer to the trial transcript.  Citations to "GX" refer to Government Exhibits at trial.

"Additional Messages") were identified by the defendants following the filing of Government's letter, after spending almost two weeks reviewing the remainder of the exhibit set—far longer than the jury ever had access to the laptop.

## I.    The September 2019 Messages and the January 2022 Messages

As set forth in detail in the Government's letter, nine of the exhibits on the jury laptop were text messages from September 2019 and from January 2022 which—although redacted and narrowed to include significantly less content than the Government had initially offered— contained fewer redactions than the versions admitted into evidence.  (Gov. Ltr. 2-4.)

### A.    The May 24 Ruling and the Motion for Reconsideration

The Government originally sought to offer several text messages from September 2019, and several text messages from January 2022, in unredacted form, as well as to summarize those messages on a summary chart, Government Exhibit 1302.  (Gov. Ltr. 2-4.)  The version of these messages that the Government originally sought to offer contained direct mention of what the Court determined were legislative acts of Menendez, as set forth in more detail in Background Sections I.B and I.C, *infra*.  The Government explained at length its view of the probative value of the *unredacted* exhibits at oral argument on May 21, 2024.  (*See* Tr. 1019-46.)  On May 24, 2024, the Court issued a ruling excluding certain portions of the unredacted exhibits.  (Dkt. 420 (the "May 24 Ruling").)

Following the May 24 Ruling, the Government sought reconsideration or clarification, seeking to introduce not the full unredacted exhibit set, but a narrowed and redacted exhibit set that removed any reference to acts of Menendez (or indeed any arguably legislative acts at all).  (Gov. Ltr. 2.)  While this motion for reconsideration was pending, the Government prepared versions of the pertinent exhibits that removed the excluded content entirely, to be used in the

event reconsideration was denied (collectively, the "May 24 Ruling Versions"), as well as versions containing the Government's proposed redactions, in the event reconsideration was granted (collectively, the "Reconsideration Versions"). (Gov. Ltr. 2.)

The Court ultimately denied reconsideration, and accordingly the May 24 Ruling Versions of the September 2019 Messages and the January 2022 Messages were the ones that were admitted into evidence. (Gov. Ltr. 2.)

**B.    The Reconsideration Versions of the September 2019 Messages**

The September 2019 Messages included, as initially offered, a direct description of a purported act of Menendez, which was redacted in the Reconsideration Versions ultimately included on the jury laptop. The fully unredacted September 2019 Messages consisted of a message from Egyptian official Ahmed Helmy to Wael Hana containing the sentence, "Director office of Egyptian Affairs in state department 'Kathryn Kiser' told our DCM that senator Menendize put an hold on a billion $ of usaid to Egypt before the recess !!!!" (the "Helmy Message"). The Helmy Message was forwarded twice and was reproduced in several translations of text message chains, and thus eventually appeared in five Government Exhibits. (*See* Gov. Ltr. 4.) The Government originally sought to introduce the fully unredacted Helmy Message and argued it was highly probative of the corrupt scheme (*see* Tr. 1019-46), but the Court excluded the Helmy Message in the May 24 Ruling.

Following the Court's May 24 Ruling, the Government prepared the Reconsideration Versions of the exhibits. The May 24 Ruling Versions redacted the Helmy Message in its entirety. The Reconsideration Versions, instead of deleting the entire Helmy Message, removed the operative clause of the sentence (*i.e.*, the words "that senator Menendize put an hold on"), thus entirely removing not only the reference to Menendez, but also to the act that Menendez was

3

believed to have performed.  Accordingly, the Reconsideration Versions left unredacted only the ungrammatical sentence fragment "Director office of Egyptian Affairs in state department 'Kathryn Kiser' told our DCM [redacted] a billion $ of usaid to Egypt before the recess !!!!"  (Gov. Ltr. 4 & *id.* Exs. D-1 at 1-2, E-1 at 1, F-1 at 5-6, G-1 at 6-7, I-1 at 1.)  The Government argued, by letter, that reconsideration should be granted to allow the jury to infer, from the redacted Helmy Message, that the subject matter related in some way to aid to Egypt, but that the redacted message would not allow the inference that Menendez had performed any act.  (Dkt. 421 at 2-3.)

Menendez initially argued that these Reconsideration Versions of both the September 2019 Messages and the January 2022 Messages would still lead the jury to infer that there must have been some legislative act by Menendez.  (Dkt. 422 at 2-3.)  However, the Government pointed out, in response, evidence in the record inconsistent with any inference that any legislative act was performed or that it was performed by Menendez.  (*See* Dkt. 423 at 1-2 (citing Tr. 868, 873-76, 930).)[2]  Following this response, Menendez all but abandoned this argument, maintaining only that it was a "highly dubious proposition" that the redactions would prevent the jury from inferring a legislative act by Menendez, but providing no additional support or even argument countering the Government's specific citations to record evidence inconsistent with such an inference.  (Dkt. 425 at 2.)  Instead of actually responding to the Government's contentions in a way that could sustain his initial objection, Menendez pivoted to a different argument, which was that effective redactions would necessarily render the Reconsideration Versions of these messages confusing

---

[2] Indeed, as to the Helmy Message, the Government pointed out that even if the jury inferred that the redacted Helmy Message involved an obstacle to aid to Egypt at all (as opposed to some other development related to aid to Egypt), there was specific evidence in the record of a number of obstacles to aid to Egypt having nothing to do with any senator's (let alone Menendez's) legislative acts.  (*Id.*)

and insufficiently probative. (Dkt. 425 at 2 ("But if the proposed redactions actually obscured reference to Senator Menendez and his legislative acts beyond the jury's comprehension (a highly dubious proposition), then the proposed exhibits would be stripped of any probative value, resulting only in juror confusion. The government cannot have it both ways. Either the evidence is probative as to a legislative act, in which case it is barred by the Speech or Debate clause, or it has no probative value in this case and must be excluded." (footnote omitted)); *id.* at 2 n.2 ("Here, the government seeks to redact a short text message that solely references legislative acts and whose contents have no other probative value.")). The Court, on that record, denied reconsideration (Tr. 1343), and none of the parties presented or argued to the jury the substance of the Helmy Message.

Following the May 24 Ruling, the Government read to the jury the substance of some *admitted* portions of the September 2019 Messages, but did so only in support of inferences the Court ruled were "permissible" based on the admitted evidence. Specifically, the Government asked its summary witness to read line entries from the relevant summary chart, Government Exhibit 1302, summarizing admitted portions of the September 2019 Messages as well as toll records of several contemporaneous voice calls. (Tr. 1456-61.) The admitted portions of the September 2019 Messages were messages sent *following* the Helmy Message. In these admitted portions, Helmy asked Hana to ask Menendez urgently about something, leading Daibes to call Menendez and then report back, through Hana, "Not true, and he knows nothing about it." (*See* GX 1302 lines 1031-39, 1041-43.) The admitted portions also included a later episode in which Helmy described a general statement to the Egyptian Embassy about having "things go well in

what relates to Egypt." (*See* GX 1302 line 1060.)[3]  After the summary witness read these admitted portions of the September 2019 Messages, Menendez moved to strike them, arguing that they were irrelevant without the Helmy Message (which, consistent with the May 24 Ruling, the jury was not shown).  (Tr. 1480-87.)  The Government responded that the admitted evidence supported inferences that these calls and messages pertained to the general subject matter of aid to Egypt. (*See* Tr. 1485 (Government explaining inferences that Helmy was "asking about some matter related to aid to – U.S. aid to Egypt").)  The Court, after reviewing the transcript overnight, overruled Menendez's objection, concluding that these were "permissible inferences that the jury can draw" based on the admitted evidence (*i.e.*, not based on the Helmy Message, which was not in evidence).  (Tr. 1507.)

In its summation, the Government briefly referenced these same admitted portions of the September 2019 Messages, again in support of the inferences the Court had ruled were "permissible," in a discussion that was never responded to by any defendant and was not subject to meaningful dispute.  In this brief argument, the Government told the jury that it "doesn't matter" what Helmy had been asking about (Tr. 6400), and that in any event the jury could infer that Helmy's inquiry related to the subject of aid to Egypt (Tr. 6400-01).[4]  In sum, the Government argued precisely the "permissible inferences" the Court had said the jury could draw from the

---

[3] Menendez had initially communicated blanket objections to these portions of the messages in his correspondence with the Government, but did not press them at oral argument.  (*See* Tr. 1017 ("We've done our best to narrow the disputes.").)  Regardless of whether these objections were formally outstanding at the time of the May 24 Ruling, the Court admitted these portions in its ruling.  (*See* Dkt. 420.)

[4] During this portion of the argument, the Government displayed portions of the properly redacted summary chart summarizing these admitted portions of the September 2019 Messages, but did not show the jury the underlying exhibits themselves.

admitted evidence.  (Tr. 1507.)  The discussion of this evidence was printed on two transcript pages, but only took up 17 lines, or less than a page, of a four-and-a-half-hour summation that ultimately spanned almost 200 pages.  (Tr. 6366-441; Tr. 6447-556.)  No defendant responded to this discussion in any of their summations, which were delivered over three trial days, and the Government did not return to this subject in rebuttal.

### C.    The Reconsideration Versions of the January 2022 Messages

The January 2022 Messages included, as initially offered, what the Court considered a direct claim that Menendez had performed an act approving an arms sale to Egypt.  The original unredacted set of the January 2022 Messages included the sending of a link to a CNN article; the article itself; and Nadine Menendez texting Hana, "Bob had to sign off on this . I'm sending you an article."  (Dkt. 409 Ex. A line 1267 (under seal).)[5]  The Government, at oral argument, withdrew its offer of the underlying news article, but argued that it believed the unredacted set of the January 2022 Messages—containing the phrase "Bob had to sign off on this"—was probative.  (Tr. 1032-46.)  The Court then excluded the sending of the link, the message "Bob had to sign off on this . I'm sending you an article," and the underlying article in its May 24 Ruling, though other portions of the January 2022 Messages were not excluded by the ruling and were thus admitted.

Following the May 24 Ruling, the Government prepared Reconsideration Versions of the January 2022 Messages, which were redacted so as to remove the references to an act by Menendez, or any act at all.  The Reconsideration Versions omitted the phrase "Bob had to sign

---

[5] The underlying article reported that "the administration formally notified Congress" of certain specific sales, a step which would typically only be performed after the Chairman of the Senate Foreign Relations Committee ("SFRC") had affirmatively approved it.  (GX 10A-6; *see also* Tr. 890.)

off on this," and they omitted entirely the article underlying the CNN link. Instead, they included only the phrase "I'm sending you an article," as well as the link itself (without the article), which link read "https://amp.cnn.com/cnn/2022/01/25/politics/us-arms-sales-egypt/index.html". (*See* Gov. Ltr. Exs. A-1, B-1, C-1, H-1.)[6]

The Government never displayed to the jury any portion of any version of the January 2022 Messages, and never showed the jury any portion of the (properly-redacted) Government Exhibit 1302 summarizing any portion of the January 2022 Messages. The Government also never referenced any of the content of any of the January 2022 Messages in its closing arguments, nor did any defendant.

## II.    The Additional Messages

As described above, on November 13, 2024, the Government alerted defense counsel and the Court of the inadvertent inclusion of the Reconsideration Versions of the September 2019 Messages and the January 2022 Messages on the jury's laptop.

On November 15, 2024, in response to follow-up questions and requests from counsel for Menendez, the Government (a) confirmed for defense counsel that, after tracing the apparent error that had led to the inadvertent inclusion of the Reconsideration Versions of the September 2019 Messages and the January 2022 Messages on the jury laptop, the Government had not undertaken to review every exhibit on the jury laptop for *other* potential errors (which it was in no better position to do than defense counsel, and had no reason to believe occurred), and (b) made available

---

[6] The Reconsideration Version of one of the underlying exhibits also included a thumbnail picture of the CNN logo, and a thumbnail picture of the President of Egypt.

for the defense a full electronic copy of the Government's set of the exhibits loaded on the jury laptop.  (*See* Weitzman Decl. ¶ 11.)[7]

On November 27, 2024—*i.e.*, almost two weeks later—defense counsel indicated that they had found two other instances in which exhibits (not related to those described above) loaded onto the jury laptop also did not have certain redactions applied.  (Dkt. 645.)  Both of these instances concern redactions that were agreed to during the course of trial and are immaterial to any matter to be decided by the jury.  The Government believes that these errors, which also were not noticed by any party during trial, are attributable to the challenges inherent in managing a lengthy, document-intensive trial.

One of the Additional Messages did not redact untranslated Arabic text that no party referenced or relied on.  (Weitzman Decl. Ex. G-2.)  Defense counsel represents that it understands that the Arabic text states, "Washington or New Jersey?" (Weitzman Decl. ¶ 15), and the Government, which has not obtained a certified translation of this text, does not have a basis at present to dispute this interpretation.[8]

The other of the Additional Messages did not redact the word "Hitler" from the sentence "Send me your email address and I will send the articles on the Hitler car," which appeared on the third page of a seven-page text message chain between Daibes and another individual with no further explanatory context.  (Weitzman Decl. Ex. H-2 at 3.)  No party referenced or relied on any

---

[7] The Government also advised defense counsel that by this point—almost four months after the verdict—the data no longer existed on the actual jury laptop (which was not designated for use in only this case).  (*See* Weitzman Decl. Ex. E at 1.)

[8] This untranslated Arabic text, which appears on pages three and four of a 14-page exhibit, was not included in the relevant summary chart, read to the jury, or referenced in the parties' jury addresses.

portion of this message, which was not included in the relevant summary chart, Government Exhibit 1304. Counsel for Menendez and Daibes have represented in their memoranda of law that Daibes intended this message to refer to a car that he owns. (Menendez Mem. 12 n.7; Daibes Mem. 2.) The Government takes defense counsel at their word, but other than these representations by defense counsel (which were not made to the jury), the Government is not aware of any information that would suggest to the jury that this reference to an article about a car had anything to do with a car owned by Daibes.

### III. The Submission of Government and Defense Exhibits to the Jury

As previously described, defense counsel had an opportunity and an invitation, for almost 48 hours, to check the versions of the exhibits the Government proposed to include on the jury laptop. Unfortunately, as detailed in the Government's November 13, 2024 letter, no party noticed that the Reconsideration Versions of the September 2019 Messages and the January 2022 Messages, or the unredacted Additional Messages, were included on the jury laptop.

#### A. The Solicitation of Corrections to the Admitted Exhibit Lists

Prior to the preparation of the final exhibit set, the Government had repeatedly circulated to defense counsel its list of admitted exhibits and solicited corrections through the course of trial in order to resolve any exhibit list issues as early as possible, in part for the purpose of ensuring that by the time the final exhibit set was prepared, the parties would be able to focus not on which exhibits were admitted but on whether the versions of those exhibits were correct. In particular, the Government sent the defense, on a near-daily basis starting as far back in the trial as May 2024, its list of exhibits it understood were admitted, and specifically invited corrections from the defense. Although, in the Government's experience, defense counsel usually review these lists of admitted exhibits day to day throughout the trial and advise on corrections (and also generally

review the daily trial transcript for the same reason), the Government also specifically invited the defense to do so as far back as June 25, 2024, more than two weeks before the jury laptop was submitted on July 12, 2024. (*See* Ex. A (June 25, 2024 email to defense counsel attaching admitted exhibit list and stating, "Since we are near resting, please let us know if you believe our admitted GX or DX lists need to be corrected or supplemented.").) Indeed, the Government put this on the record at a sidebar on July 3, 2024, more than a week before the submission of the laptop to the jury, in connection with an issue that arose that day in which the Government and the defense each believed a different version of the same Government Exhibit had been admitted into evidence. (Tr. 6162 (Government counsel stating, "[I]f there's a version control issue, look, we have been giving them updated exhibits from time to time. We've circulated our exhibit list and asked them for objections. We haven't gotten any corrections to the exhibit list. Obviously, I'm not suggesting there was anything intentional but it seems like there was some sort of mix-up with what the defense believed was the correct exhibit."); *see generally* Tr. 6161-66 (discussion of dispute over which version of Government Exhibit was in evidence).)

### B.    The Review of the Exhibit Versions to be Loaded on the Jury Laptop

On July 10, 2024, almost 48 hours before the laptop was submitted to the jury, the Government gave defense counsel the opportunity not just to check the admitted exhibit numbers—which, as discussed above, they had been enabled to and invited to do throughout the course of trial—but also the specific versions of the exhibits that the Government proposed to load onto the laptop. At approximately 5:39 p.m. on that date, a member of the Government team notified the defense that it had made available to them through electronic file transfer the full exhibit set that the Government proposed to load onto the laptop (which contained the same versions of the Exhibits that eventually were loaded onto the laptop), and asked them to advise if

the uploaded exhibit set reflected defense counsel's "internal versions" so that it could be loaded onto the jury laptop.  (*See* Weitzman Decl. Ex. A at 2-3 ("I've just uploaded to USAfx a full set of all the GX we have marked as admitted.  You can see a full list of those in the attached index, on tab (2).  Let us know if *this set* reflects *your internal versions* so we can have it ready for the jurors' laptop on Thursday."  (emphases added)).)[9]

Then, at approximately 5:12 p.m. on July 11, 2024 (*i.e.*, the day before the laptop would be provided to the jury), the Government offered defense counsel an opportunity to inspect the laptop itself, specifically offering that the inspection could begin later that day if defense counsel wished.  (*See* Weitzman Decl. Ex. A at 1-2 ("Is there a time (later today, or tomorrow morning) where we can meet to review the laptop that goes to the jury?").)  As discussed in the Government's November 13 letter and as stated on the record, members of each of the multiple defense teams then took the opportunity to inspect the laptop prior to its provision to the jury on July 12, 2024. (Gov. Ltr. 2-3.)

### C.    The Contents of the Jury Laptop, the Deliberations, and the Post-Trial Proceedings

The jury's laptop was loaded with 3,125 exhibits, specifically, 2,600 government exhibits comprising 2,993 files, 387 defense exhibits introduced by Menendez, and 138 defense exhibits introduced by Hana.  (Gov. Ltr. 3.)  The version of Government Exhibit 1302—the summary chart covering the subject matter of the September 2019 Messages and the January 2022 Messages— that was loaded onto the laptop was the correct and properly admitted version.  However, as explained previously and above, the laptop was inadvertently loaded with the Reconsideration

---

[9] This set of exhibits was made available to the defense for download on the Government's file-sharing platform for approximately 60 days.

Versions of the September 2019 Messages and January 2022 Messages, and with versions of the Additional Messages that did not contain certain redactions that had been agreed upon during trial.

The jury returned a guilty verdict on all counts on July 16, 2024, after deliberation spanning three days and taking somewhat less than two trial days of time. None of the notes the jury sent indicated any focus on the September 2019 Messages, the January 2022 Messages, or the Additional Messages, or indeed on any conduct to which any of those messages were relevant.

The defendants collectively filed approximately 300 pages of post-trial motions on August 19, 2024—*i.e.*, more than a month after the jury reached its verdict. (*See* Dkt. 592 (Menendez motion); Dkt. 600 (Hana motion); Dkt. 590 (Daibes motion).) These motions all included multiple citations to the record and to Government Exhibits. Menendez and Hana then filed replies in support of their post-trial motions, which both also cited multiple Government Exhibits, on September 30, 2024, 12 days after the Government's opposition papers, and over two months after the jury reached its verdict. (*See* Dkt. 623 (Menendez reply); Dkt. 622 (Hana reply).) In all of their time deciding what motions to file and what exhibits to cite in support of those motions—a time that greatly exceeded the approximately two trial days in which the jury had the laptop—no member of any defense team identified the inadvertent error in the exhibits provided to the jury, and the Additional Messages were only identified by the defense after almost two weeks of review following the Government's November 13, 2024 letter.

## DISCUSSION

## I.   THE DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL

### A.   Applicable Law

"'[D]efense counsel is as responsible as the prosecutor for seeing to it that only proper exhibits are sent to the jury room, and normally the failure of counsel to register a timely objection

to the submission of improper evidence to the jury will be deemed a waiver, unless it is shown that the evidence was so prejudicial that the defendant was denied a fair trial.'" *United States v. Stasiv*, No. 19-4286, 2021 WL 4888865, at *2 (2d Cir. Oct. 20, 2021) (quoting *United States v. Camporeale*, 515 F.2d 184, 188 (2d Cir. 1975)); *see also, e.g.*, *United States v. Jefferys*, No. 20-3630, 2022 WL 9627085, at *3 (2d Cir. Oct. 17, 2022) (citing *Camporeale*); *United States v. O'Brien*, No. 13 Cr. 586 (RRM), 2017 WL 2371159, at *13 (E.D.N.Y. May 1, 2017) ("Here, O'Brien failed to register a timely objection and accordingly, O'Brien waived any objection to the submission of the Jones testimony transcript."); *Barnett v. United States*, 870 F. Supp. 1197, 1205 (E.D.N.Y. 1994) ("In the instant case, petitioner's counsel made no objection to the submission of the improper evidence to the jury.  Therefore, any objection to the submission of the evidence was waived."  (citation omitted)).

Even leaving aside a waiver, "[a]lthough a defendant's Sixth Amendment rights are implicated and prejudice is presumed when a jury is exposed to extra-record evidence, 'that presumption may be rebutted by a showing that the extra-record information was harmless.'" *Jefferys*, 2022 WL 9627085, at *3 (quoting *United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011)); *see also United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002) ("[N]ot every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial.  Many such instances do not.").  The Second Circuit has repeatedly stated that "[t]he touchstone of decision is thus not the mere fact of infiltration of some molecules of extra-record matter but the nature of what has been infiltrated and the probability of prejudice." *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994) (internal quotation marks and ellipses omitted).

14

To determine if the presumption is rebutted, a court considers "(1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury." *Farhane*, 634 F.3d at 169.  In making an objective assessment of possible prejudice, the "trial court should assess the possibility of prejudice by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985) (internal quotation marks omitted).  A court "may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists." *Id.*

A trial court has "broad discretion in reviewing the issue of the prejudicial effect of the infiltration of extra-record evidence into the deliberations of the jury," *id.*, and may inquire into the "circumstances surrounding the jurors' exposure to the information," *Farhane*, 634 F.3d at 169, but "may not reach further to inquire into the subjective effect of the information on jurors' mental processes or on the jury's deliberations," *id.*; *see also* Fed. R. Evid. 606(b).  The Second Circuit has cautioned that "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts."  *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).  While a hearing may be justified by "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred," *id.* (internal quotation marks and ellipsis omitted), such as specific evidence that jurors actually "consulted extra-record information" in reaching their verdict, *id.*, the Second Circuit has affirmed, on plain error review, the denial of a mistrial without a hearing where the district court

concluded based on the circumstances that it "was highly likely that the jury did not view" a mistakenly submitted document and its "contents were either immaterial or already on the record and therefore harmless." *United States v. Nkansah*, 699 F.3d 743, 751 (2d Cir. 2012), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351, 366 & n.9 (2014).

### B.  Discussion

Because all parties inspected the materials on the jury laptop, because there is no reasonable likelihood that any non-admitted matter was seen by the jury, and because it would not have been prejudicial even if seen, there is no basis for a new trial.

### 1.  *The Defendants Waived Their Objections to the Exhibits on the Jury Laptop*

The fact that no party objected to the inclusion of the Exhibits is alone a ground for denying the defendants' supplemental motions for a new trial in these circumstances.

The Second Circuit has held that "'defense counsel is as responsible as the prosecutor for seeing to it that only proper exhibits are sent to the jury room, and normally the failure of counsel to register a timely objection to the submission of improper evidence to the jury will be deemed a waiver, unless it is shown that the evidence was so prejudicial that the defendant was denied a fair trial.'" *Stasiv*, 2021 WL 4888865, at *2 (quoting *Camporeale*, 515 F.2d at 188). As a result, courts in situations such as these rely on the parties to make such objections and deny requests for new trials where those objections are waived. *See, e.g.*, *O'Brien*, 2017 WL 2371159, at *13 ("Here, O'Brien failed to register a timely objection and accordingly, O'Brien waived any objection to the submission of the Jones testimony transcript."); *Barnett*, 870 F. Supp. at 1205 ("In the instant case, petitioner's counsel made no objection to the submission of the improper evidence

to the jury.  Therefore, any objection to the submission of the evidence was waived." (citation omitted)).

Here, all defense teams (each of which consisted of multiple experienced counsel) had and in fact took the opportunity to review the jury exhibit set, which they had for almost 48 hours: first the exhibits that the Government uploaded for defense counsel, and then the laptop itself, both of which inadvertently contained the Exhibits.  Indeed, as noted above, the Government made the laptop itself available to defense counsel at the end of the trial day on July 11, 2024, the day before the laptop went to the jury.

The fact that defense counsel may have unilaterally made the decision to review only the exhibit numbers is further reason to find a waiver.  Defendants each claim that they chose to review only the exhibit numbers, but not the contents of exhibits.  (Menendez Mem. 9; Hana Mem. 3; Daibes Mem. 4.)  Though they present this as a reason *not* to find a waiver, it is the opposite.  The Government specifically and explicitly invited the defendants to inspect the "versions" of exhibits the Government proposed to load onto the laptop almost 48 hours before that was finalized (Weitzman Decl. Ex. A at 3), and the laptop itself the day before it was finalized (*id.* at 1).  If the defendants chose not to do that, and instead chose principally or entirely to check the exhibit numbers—without telling the Government or the Court they had made such a decision—that is a plain intentional relinquishment of their right to inspect the contents of the exhibits.

The defendants' claim that they decided to spend the last 48 hours checking the exhibit numbers instead of the files themselves (Menendez Mem. 9; Hana Mem. 3; Daibes Mem. 4) is also puzzling, at best.   The defendants, who were represented by teams of lawyers, could have checked the exhibit numbers at any time during the trial based on the Government's admitted exhibit list,

17

which the Government circulated to the defendants almost daily, as well as by checking the daily

trial transcript.  Indeed, although not required, during the course of the trial the Government invited

defense counsel to do just that, and assumed based on the lack of objections to the Government's

list of admitted exhibits that the defendants had been doing so, as is standard practice.  (*See* Ex. A

(June 25, 2024 email to defense).)  The Government had no way of anticipating the defendants

would, as they appear to claim now, make the surprising decision—and a highly unusual one in

the Government's experience—*not* to check the exhibit numbers on the lists of exhibits the

Government understood to be admitted at or about the time that the Government circulated them,

*i.e.*, throughout the trial.[10]

What the defendants could not have done until the last week of trial was check the actual

*versions* of exhibits the Government proposed to load onto the laptop, which is why, approximately

48 hours before the laptop was to be finalized, the Government sent defense counsel not just

another copy of the exhibit list, but *also* the actual exhibits themselves, including the versions that

contained fewer redactions than the admitted versions.  It is thus confusing, at best, why the

defendants would, as they appear to claim now, use this time principally or entirely to check the

exhibit numbers and only those numbers, instead of checking—as the Government invited them

to do on July 10, 2024—the actual "versions" of the exhibits to be loaded onto the laptop.

(Weitzman Decl. Ex. A at 3.)  This decision, if indeed it is what the defendants did, is all the more

---

[10] Hana is thus simply wrong to say that defense counsel's review following the Government's upload of the exhibit set was "understood by everyone to encompass verifying that each exhibit number included on the Government's index of admitted exhibits was actually admitted at trial." (Hana Mem. 3.)  The Government expressly invited and expected defense counsel to check the "versions" of the exhibits (which is the obvious purpose of uploading the exhibit set itself, as opposed to just resending the admitted exhibit list).

baffling given that the parties encountered on July 2, 2024, well in advance of the preparation of the jury laptop, a dispute over which versions of Government Exhibits were in evidence, and thus were alerted to the possibility of confusion of exactly this type.  (*See* Tr. 6161-66 (Government and defense each believed a different version of a Government Exhibit was in evidence).)  The Government further notes that an attorney representing Menendez states in a declaration that he *did* inspect the content of certain of the exhibits on the jury's laptop, clearly indicating that Menendez's defense team was aware they were given both the opportunity and the ability to do so.  (*See* Dkt. 645-13 ¶ 4.)

Undoubtedly, checking the versions of the exhibits themselves was a large endeavor, and indeed all counsel failed to identify the handful of errors that have come to light after trial.  But all defendants were very well represented by retained teams of multiple senior lawyers, associates, and paralegals or other support personnel, and any party could have found the errors that emerged as a result of the Government's review of the exhibits after trial (which it undertook in preparation for the forthcoming trial of Nadine Menendez).  (*See, e.g.*, Tr. 2093-94 (Court noting that the defendants were "well represented."); Tr. 2168 (Court noting permission for "seven attorneys" from Menendez's team alone to use electronic equipment in the courtroom).)

Defendants' claim now to have been rushed in their review is hollow.  In the event that the defendants wanted more time to review, they could have asked for such time—but they did not do so.  In fact, even leaving aside entirely the exhibit set uploaded for all defendants almost 48 hours in advance, Menendez did not even act to maximize his time with the laptop itself.  Menendez's counsel declined the Government's offer to inspect the laptop itself the day before it was to be submitted to the jury, choosing to wait until the next morning.  (Weitzman Decl. ¶¶ 5-6.)  This

decision by Menendez renders his claim that he and other defendants "*were given* a short period of time—approximately *4.5 hours*—to review the exhibits on the government laptop before the laptop was sent back to the jury," inexplicable. (Menendez Mem. 9 (emphasis added).) But it also shows that his review of the laptop reflected his own choices.

Even with the time the defendants chose to take on the laptop, their approach to how to conduct the review shows that they have waived their objections. If the particular documents at issue now were of such crucial significance to the case as the defendants all now appear to claim, one would have expected these to be the first documents the defendants checked. For example, as noted above, counsel for Menendez admits in a declaration to having checked the substance of a "select number of exhibit files contained on the Jury Laptop" (Dkt. 645-13 ¶ 4), and if the eleven exhibits at issue now really did risk the prejudicial effect that the defendants now claim, there is no reason whatsoever why they should not have been within that "select number." In short, it is entirely inconsistent for the defendants to both claim that they had insufficient chance to review (because these documents were allegedly indistinguishable to them from a large mass of other documents that would be too burdensome to verify in the span of 48 hours) and also that these documents prejudiced their case (because they were allegedly so important that they overwhelmed all of the other evidence in the case).

      2.     *There is No Reasonable Possibility that Any Juror Saw Any Non-Admitted Portion of Any Exhibit*

The record in this case also makes clear that there is no reasonable possibility that any juror saw any of the non-admitted portions of any of the Exhibits, even if there had been no waiver. As numerous cases recognize, in circumstances where non-admitted documents inadvertently make

their way into the jury room but there is no reasonable possibility that they are actually reviewed or considered by the jury, there is no basis to upset a verdict.

a)  The Contents of the Jury Laptop and Circumstances of the Jury Deliberations Make It Highly Unlikely that Any Juror Saw Any Non-Admitted Portion of Any Exhibit

There is vanishingly little chance that any juror ever became aware of the contents of any non-admitted portion of any of the Exhibits. The jury, which was attentive and familiar with all of the evidence presented to it during the trial—all of which was properly admitted—was not required to and, as a practical reality, obviously did not open every single one of the over 3,000 exhibits on the jury laptop, many of which were multiple pages, during the course of its approximately two days of deliberations, much less review each one of those exhibits closely.

In circumstances such as these, where there is little or no likelihood that any juror was even aware of extraneous information at all, courts find the presumption of prejudice easily rebutted. Contrary to the defendants' arguments (Menendez Mem. 27; Hana Mem. 14; Daibes Mem. 1-3), the Second Circuit has repeatedly held that the unlikeliness that jurors became aware of extra-record information is a basis for rebutting the presumption of prejudice. *See Jefferys*, 2022 WL 9627085, at *3 ("Here, such a presumption is rebutted because there was no indication that the jurors considered the evidence."); *United States v. Hansen*, 369 F. App'x 215, 216 (2d Cir. 2010) ("Here, the introduction of extra-record evidence was not prejudicial because there was no indication that the jury actually considered it."); *Nkansah*, 699 F.3d at 751 (holding no plain error where "it was highly likely the jury did not view" the non-admitted document and that its contents were harmless); *see also Smithwick v. Walker*, 758 F. Supp. 178, 183 (S.D.N.Y. 1991) ("That the jury took time and continued to deliberate for a full day after having the photographs speaks also of the harmlessness of the error. Indeed, it was never determined whether any of the jurors saw

21

the photos for more than a few seconds if at all.").  Indeed, in *Nkansah*, the Second Circuit affirmed where a district court concluded based on the circumstances, without conducting any inquiry of the jurors, that "it was highly likely the jury did not view" the extraneous documents.  *See* 699 F.3d at 747, 751.

Other courts agree.  Indeed, in *United States v. Coney*, the Seventh Circuit recently affirmed a conviction where thousands of pages of electronic communications were inadvertently included on the jury's laptop despite the district court's ruling that it should be removed before the laptop was provided to the jury.  *See* 76 F.4th 602, 605-06, 608-09 (7th Cir. 2024).[11]  Among the factors the Seventh Circuit relied on was the fact that the material identified as potentially prejudicial consisted of only a "few messages and photographs" which were "contained among a massive number of pages given to the jury for a short period of time."  *Id.* at 608.  Although the jury in *Coney* had access to the material for a somewhat shorter period of time than the total deliberations in this case (approximately three hours in that case, *id.*, compared to approximately twelve hours in this case), the court acknowledged the commonsense reality that, under either timeframe, the jury was vanishingly unlikely to have viewed items that were "few and far between in a sea of thousands of documents."  *Id.*

Indeed, defense counsel in this case—after litigating the admissibility of these documents and thus being *more* sensitive to their potential significance than the jury, and after confronting a prior instance of confusion about which documents were in evidence—had comparable time to

---

[11] Although these files had been "formally admitted into evidence," that admission was "over objections that the district court overruled on the condition that" these documents would be removed from the jury laptop.  *Coney*, 76 F.4th at 606 n.2.

review the exhibits as the entire jury deliberations and did not notice this material.[12]  Moreover,

defense counsel then had *months* to prepare and file hundreds of pages of fact-intensive post-trial

motions and replies.  Apparently, during all of this time reviewing and citing exhibits, defense

counsel still did not notice the portions of the documents which the jurors had available for just

two trial days.[13]  Courts rightly look to realities such as this in assessing whether there is any real

chance that jurors saw (much less relied upon) allegedly prejudicial material.  *See, e.g.*, *Coney*, 76

F.4th at 608-09 (affirming conclusion that it was unlikely jurors saw allegedly prejudicial

evidence, in part by noting that defense counsel complained of insufficient time to review exhibits

after the error was noticed).  (*Cf.* Menendez Mem. 11 (claiming that the volume of exhibits

rendered defense counsel unable to complete document-by-document review of the entire exhibit

set over a 12-day period, approximately six times as long as the jury deliberated for); Hana Mem.

5 (claiming that it would have been difficult, if not impossible, for counsel to have reviewed all of

the exhibits during the approximately two days it had access to them, somewhat longer than the

jury deliberated for).)

While the Court has discretion to inquire into "'circumstances surrounding the jurors'

exposure to the information," *Farhane*, 634 F.3d at 169, that is not necessary where—as here—

the circumstances make it "highly likely that the jury did not view" mistakenly-submitted

---

[12] Both the jury deliberations and defense counsel's review of the documents took place over one full day and portions of the preceding and succeeding days.  However, unlike the jurors, defense counsel had access to the documents outside of the trial day and thus had more time to review them than the jurors ultimately took to reach a verdict.  Defense counsel, unlike the jurors, also had numerous computers, not merely a single laptop, and also had dedicated support personnel.

[13] The Government, which did not notice the issue until recently, raises this point not to fault able defense counsel for errors the Government also did not notice sooner, but only to point out that it is highly implausible that the jurors conducted the type of document-by-document review that would have led them to become aware of the non-admitted portions of the Exhibits at all.

documents, *Nkansah*, 699 F.3d at 751.[14]  Indeed, no defendant asks for this sort of inquiry to be conducted here, and the Government agrees that it would not likely be productive.  (*See, e.g.*, Menendez Mem. 28 n.10.)  However, that such an inquiry is not requested by any defendant, and would not be productive, does not mean that—as the defendants suggest (Menendez Mem. 27; Hana Mem. 15-16; Daibes Mem. 2-3)—the Court should indulge in and rely upon presumptions utterly contrary to reality and common sense.  Indeed, the defendants' position, charging the jury with knowledge of every word in every document on the jury laptop, is irreconcilable with the repeated holdings of the Second Circuit.  (*Compare* Menendez Mem. 27 *and* Hana Mem. 15-16 *and* Daibes Mem. 2-3 *with Jefferys*, 2022 WL 9627085, at *3 ("Here, such a presumption is rebutted because there was no indication that the jurors considered the evidence."), *and Hansen*, 369 F. App'x at 216 ("Here, the introduction of extra-record evidence was not prejudicial because there was no indication that the jury actually considered it."), *and Nkansah*, 699 F.3d at 751 (holding no plain error where "it was highly likely the jury did not view" the non-admitted document and that its contents were harmless).)  Contrary to the defendants' arguments, the Court may properly, and should, acknowledge the obvious reality, consistent with cases such as *Nkansah* and *Coney*, as well as common sense:  there is no reason to believe any juror saw any non-admitted portion of any of the Exhibits.

---

[14] Hana is wrong to claim the Government ignores the standard for post-verdict inquiry.  (Hana Mem. 14.)  The Government both set forth in its initial letter, and *supra*, the standard under which the Court may inquire into the jurors' exposure to the extra-record information but may not go further and inquire into the impression the jurors had about it.  (*See* Section I.A, *supra*; *see also* Dkt. 630 at 5.)

b)    The Arguments at Trial Render It Patently Implausible that Any
Juror Saw Any Non-Admitted Portion of Any Exhibit

Defense counsel's claims that the jurors would likely have consulted the Exhibits during the course of their deliberations are at odds with the trial record.  None of the Exhibits was the subject of any serious dispute at trial, and the defendants' attempts to claim otherwise are strained.

Most of the Exhibits were not featured, in any way, in any party's summation.  The January 2022 Messages were not referenced in any party's summation, and the defendants' speculation that the jurors may nevertheless have delved into these documents defies credulity.[15]  The jury had ample *actually disputed* matters to occupy itself with, and to the extent its jury notes indicated any focus on any subject matter, it was on unrelated disputed issues.  (*See, e.g.*, Tr. 7177 (jury note related to Menendez's actions with respect to Daibes's federal prosecution).)  Indeed, by the time it began deliberating, the jury had already served for substantially in excess of the parties' estimated length of trial, and—while the attentive and dutiful jury no doubt deliberated carefully on the matters that were in real dispute—the idea that the jurors would have protracted their deliberations by going through what were essentially backup documents related to undisputed parts of the record is absurd.

The September 2019 Messages also were not themselves displayed in summation, and the Government's brief reference in its summation to the *admitted* portions of those messages (*i.e.*, several of the properly admitted messages sent after the Helmy Message)—a reference to which no defendant bothered to respond—plainly would not have drawn the jury's attention to the

---

[15] Nor were the Additional Messages, except for a brief reference to a properly admitted portion of a 14-page exhibit that also (unmentioned and no doubt unnoticed) bore on pages 3 and 4 the untranslated Arabic phrase "Washington or New Jersey," which no defendant suggests could possibly have caused prejudice.

underlying documents.  (*See* Tr. 6400-01.)  This argument took up less than a page of a four-and-a-half-hour Government summation that ultimately spanned nearly 200 pages over two trial days. (*See* Tr. 6366-441; Tr. 6447-556.)  In that brief discussion, the Government stated that it "doesn't matter" what Helmy had been asking about (Tr. 6400)—*i.e.*, the subject that defense counsel now claims the jury would have been curious to learn (*see, e.g.*, Menendez Mem. 25-26)—and that in any event the jury could infer based on other (properly admitted) evidence that it related to the subject of aid to Egypt (Tr. 6400-01).[16]  No defendant bothered to respond in any way to this comment in his summation, nor did the Government return to it in its rebuttal.[17]  There is simply no realistic likelihood that the jury would nonetheless have sought to examine any material related to these messages at all, let alone that they would have examined the underlying documents instead of the properly-admitted summary charts referred to in summations.[18]

---

[16] As explained in Section I.B.3.b, *infra*, precisely these inferences—*i.e.*, reasoning based on other, properly admitted evidence that the subject related to aid to Egypt generally—were ones the Court had explicitly ruled were "permissible inferences that the jury can draw."  (Tr. 1507.)

[17] Menendez's claim now that "these parts of the summary charts were highly intriguing" (Menendez Mem. 28) is another attempt to rewrite the record of this trial.  In fact, the Court actually already rejected the claim that these very messages were particularly dramatic or engaging.  (Tr. 1481-82 ("First of all, there is nothing dramatic that I've heard.").)

[18] Contrary to the apparent arguments of Menendez and Daibes, the fact that the Government encouraged the jury to look, if it felt it needed to, at any document underlying a summary chart, does not of course make it remotely realistic that the jury in fact felt the need to or did so with respect to the particular documents at issue now.  (Daibes Mem. 3; *see also* Menendez Mem. 27-28.)  Indeed, the Government was not suggesting that the jurors who had sat attentively through the trial had any need to do so, as the Government made explicit during summation.  (*See, e.g.*, Tr. 6401 ("*You've heard the evidence*, but *if you want to see it again*, you can write down the number of this chart and then look at every exhibit in it *that you want*." (emphasis added)); *see also, e.g.*, Tr. 6376 ("We're not going to go through all the evidence with you today, *because you sat through the trial*, but *if you want to* go through any of it as you deliberate, you can just write down the exhibit numbers and it's going to be there for when you deliberate *if you want to look at it again*." (emphasis added)).)

In sum, the contention that the jury would have felt the need to consult any documents on the subject matter of the Exhibits, let alone the underlying exhibits themselves, let alone the non-admitted portions of them, is divorced from the reality of the trial as it was presented to the jury. On the contrary, the jury, as the Court repeatedly remarked, was alert and attentive (*see, e.g.*, Tr. 4098 ("Everyone has said, and I think it's true, this is an excellent jury.  They seem to be paying – they're rapt at some points, and several of them have gone through several [note]books."); Tr. 7052 (describing jury as "very attentive to the witnesses and the testimony here")), and there is every reason to believe, from the conduct of the jurors at trial and the content of their notes, that they focused their deliberations on the matters that were truly in dispute, not wasting their time inspecting every corner of the thousands of documents that were not contested by or even referenced by the parties.  In circumstances such as these, courts rightly find that the remoteness of the possibility that jurors accessed extraneous material rebuts the presumption of prejudice.  *See, e.g.*, *Jefferys*, 2022 WL 9627085, at *3; *Hansen*, 369 F. App'x at 216; *Nkansah*, 699 F.3d at 751; *Smithwick*, 758 F. Supp. at 183; *Coney*, 76 F.4th at 608-09.  So too here.

        c)        <u>The Defendants Are Not Entitled to the Windfall of an Unrealistic Adverse Inference on the Basis of Supposed Spoliation of the Jury Laptop</u>

Menendez and Hana are both also incorrect to argue that, because the data was removed from the jury laptop after the verdict (for unrelated and entirely innocuous reasons), they are now entitled to an inference, months after trial, that the Government spoliated the evidence and can enjoy the windfall of a presumption, contrary to any reasonable likelihood based on the actual record, that the jurors actually reviewed these exhibits.  (*See* Menendez Mem. 28-30; Hana Mem. 16-17 & n.5.)  There was obviously no spoliation, and the defendants should not be permitted to use that serious and groundless claim as a means to ask the Court to draw unreasonable inferences.

The law on spoliation is settled. "A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time that it was destroyed; (2) that the [evidence was] destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *United States v. Tompkins*, No. 23-6525-cr, 2024 WL 4645689, at *3 (2d Cir. 2024) (internal quotation marks omitted); *see also Tompkins*, 2024 WL 4645689, at *2 (affirming denial of adverse inference instruction based on finding of lack of culpable state of mind, even where Government had duty to preserve evidence and defendant characterized Government's conduct as negligent). And where, as here, the allegedly spoliated evidence is electronically stored information, to justify an adverse inference—even a permissive adverse inference instruction to a jury, which is a far less severe sanction than Menendez's and Hana's requested relief of the Court drawing the adverse inference itself—the Federal Rules of Civil Procedure require not merely intent to destroy the electronically stored information (which is often trivially satisfied and in no sense *culpable*), but intent to deprive a party of use of that information in litigation (which patently did not happen in this case). *See, e.g.*, Fed. R. Civ. P. 37(e)(2) ("the court . . . *only* upon finding that the party acted with the *intent to deprive another party* of the information's use in the litigation may . . . presume that the lost information was unfavorable to the party," among other sanctions (emphasis added)); *see also, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust*

*Litigation*, 341 F.R.D. 474, 496 (S.D.N.Y. 2022) (requiring showing of intent to deprive by clear and convincing evidence).[19]

In any event, under any applicable standard, there is no basis for the Court to draw an adverse inference, particularly one so obviously at odds with reality, on the ground of the Government's purported failure to preserve a jury laptop for months after the verdict was returned, without being asked to do so, just in case some unanticipated error with respect to its contents later came to light.  In order for the deletion of data from the laptop to be deemed spoliation, the Government would have had to have been under a duty to preserve the laptop after trial so that it could be examined, and that duty would have had to have persisted for the over *three months* which it took for the Government to notice the error (which it then promptly disclosed).  Menendez and Hana cite no authority for the proposition that the Government is under such a duty, which would impose significant technical, financial, and administrative burdens on the Government if it could not reuse laptops used in jury trials for months or longer.[20]  The lack of any authority imposing such a duty is itself fatal to any spoliation claim.  *See, e.g.*, *Tompkins*, 2024 WL 4645689, at *3 ("A party seeking an adverse inference instruction based on the destruction of evidence must establish . . . that the party having control over the evidence had an obligation to preserve it at the

---

[19] The Second Circuit has applied civil standards for spoliation in criminal matters in several summary orders (but has not yet done so in a precedential opinion and has not yet had occasion to apply the intent-to-deprive standard in a criminal case).  *See Tompkins*, 2024 WL 4645689, at *3 n.4.  There is thus no justification for the Court to, as Menendez and Hana seek, apply a sanction in this matter that would actually be forbidden under the applicable civil rule.

[20] Hana's claim, made in a footnote (Hana Mem. 17 n.5), that the Government had a duty to retain, through the pendency at least of direct appeal, not just copies of the trial evidence—which of course it has done—but the actual jury laptop in a forensically pristine state, just in case an issue of this sort may arise in which inspection of the laptop's metadata is feasible, is supported by no authority imposing such a rule, and the Government is aware of none.

time that it was destroyed." (internal quotation marks omitted)).  It would be deeply unfair to judicially impose, post hoc, a duty to require that a new jury laptop be used at every trial and to impose ex post facto sanctions, much less to give the defendants the windfall of a new trial, for the unknowing violation of such a newly-created duty.[21]

Moreover, there has been no showing, and there is no likelihood, that the examination of the laptop would have supported the defendants' claim that the jurors opened any of the Exhibits. To the contrary, even if inspection of the laptop could have answered this question (which is not established), it is far more likely, for all the reasons set forth in this section, that examination of the laptop would have revealed that the jurors did *not* open these files, and thus that in light of the defendants' motions, the Government, not the defense, was prejudiced by the deletion of data from the laptop.  *See, e.g.*, *Tompkins*, 2024 WL 4645689, at *3 ("A party seeking an adverse inference instruction based on the destruction of evidence must establish . . . that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that *it would support that claim or defense*.'" (internal quotation marks omitted, emphasis added)); *see also, e.g.*, *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (agreeing with district court's observation, in denying motion for adverse inference instruction, that the overwhelming evidence at the trial was that the missing data "would show evidence contrary, against, the interests of the defendant" (italics omitted)).

---

[21] This case is thus utterly unlike that cited by Menendez in which a permissive adverse inference instruction (which is less of a severe sanction than the Court as factfinder drawing the inference itself) was given when a seized package of drugs (not electronically stored information) was destroyed because not all officers were aware it was relevant to a pending investigation, although some were.  *See United States v. Dalisay*, No. 03 Cr. 1305 (JGK), 2005 WL 1176115, at *11 (S.D.N.Y. May 17, 2005).

In any event, even if (contrary to fact and law) there were anything improper about the Government, which has limited resources, not using a brand-new laptop for every criminal trial, Menendez's and Hana's attempt to seize on the Government's reuse of jury laptops to claim an unearned and implausible inference would still be inappropriate. Even if some kind of sanction were appropriate—and it is not—a spoliation sanction is not meant to provide one party a windfall by making the factfinder's decisionmaking less, rather than more, accurate. *See, e.g.*, *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 411-12 (S.D.N.Y. 2015) (noting that sanctions should be "no greater than necessary" to, among other things, "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party"). Thus, even where sanctions are appropriate, courts will not draw adverse inferences where those inferences are unrealistic. *See id.* at 412 ("Here, because there is no evidence that significantly more people visited the Website during the relevant time period than during the time when Google Analytics data was available or that those who visited the site were affected by the infringement warning, the Court declines to impose the severe sanction of an adverse inference."); *see also, e.g.*, *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008) ("In general, the adverse inference instruction is an extreme sanction and should not be imposed lightly.").

At base, the defendants, who bear the burden on their motions, are not entitled to enjoy the benefit of highly unrealistic presumptions that the jurors would have, with one computer in two trial days, done what the exceedingly capable and well-resourced defense teams have proclaimed themselves to have been unable to do with many computers in a comparable period of time, and review every word in every document in the exhibit set. To the contrary, on a motion for a new trial as a result of the possible exposure to extraneous evidence, the Court may, and should, draw

31

*realistic* conclusions from the circumstances. In this case, the only realistic conclusion is that it is highly unlikely that any juror, over the course of approximately two days of deliberations, picked out, from over 3,000 exhibits, the handful of non-admitted sentences on the 11 unremarkable and unremarked-on files at issue.

        3.     *Even if Seen by the Jury, the Exhibits Could Not Have Caused Any Prejudice*

            a)    <u>The Non-Admitted Portions of the Exhibits Would Have Been Confusing and Incomprehensible Even if a Juror Happened Upon Them</u>

Even if, contrary to any reasonable possibility, a juror had looked at any of the Exhibits, those documents—encountered in that form, with no argument or presentation of supporting context to guide the jury—would not have been prejudicial. Indeed, the pertinent portions of the documents would have been all but incomprehensible.

Without any explanation from a witness or argument from a party in summation, the non-admitted portions of the Reconsideration Versions of the September 2019 Messages or the January 2022 Messages would have been effectively meaningless and impenetrable if a juror had seen them. The mere sending of a link about the subject of arms sales to Egypt, which is all that the January 2022 Messages show, would have led at most to the conclusion that there was *some* news about *something* related to arms sales to Egypt. Stripped of any placing of this sending in context, or any argument related to what the jury should have inferred from it, it defies logic that the jury would have drawn any inference more specific than what the evidence already showed, and the Court had ruled proper—that Menendez generally discussed matters related to arms sales with

Egypt.[22]  Indeed, the Government originally offered not just the Reconsideration Versions of these exhibits alone but versions that included much more direct reference to Menendez's actions— Nadine Menendez's statement, "Bob had to sign off on this," and the text of the article which made clear it was not simply a news article on the topic of arms sales to Egypt but was in fact a report that specific identified sales had passed the point at which the chairman of the SFRC would likely have approved them.  But because the jury never was exposed, in any way, including on the laptop, to this additional explanatory evidence, the jury would have lacked sufficient information to understand the Reconsideration Versions of the January 2022 Messages even if, implausibly enough, it had happened upon them.[23]

    The September 2019 Messages would have been at least as confusing, because the versions provided to the jury were redacted so that the version of the Helmy Message on the laptop was not a complete or grammatical sentence, let alone one that identified anything beyond that there was some development related to aid to Egypt.  In arguing otherwise, the defendants cite, repeatedly,

---

[22] Indeed, the jury heard evidence of Menendez sharing a number of developments related to arms sales to Egypt that did not involve any legislative acts, such as the State Department's lifting of a ban on the sale of small arms to Egypt.  (*See, e.g.*, GX C206-1.)  If the jury was to draw any inference from the fact that a news article had a URL including the phrase "us-arms-sales-Egypt," it would likely have inferred that the article was reporting on some similar such development.

[23] Menendez's attempt to argue that the jury would have understood that this message related to an act by Menendez just because Nadine Menendez said, "WOW" after receiving the link (Menendez Mem. 10, 21-24), is a non sequitur.  Even leaving aside the fact that the evidence at trial showed that Nadine Menendez often made highly emphatic exclamations in her text messages, her saying "WOW" at a news article about arms sales to Egypt would not lead to the inference that that article was inculpatory or showed some act *by Menendez* (much less a protected legislative act), but rather only, at most, that some news article about the general topic of arms sales to Egypt was in some way notable.  Menendez's claim that "[t]he obvious implication is that Senator Menendez was involved in the sale of arms that is the subject of the article" (Menendez Mem. 10) goes far beyond what is inferable from the text of the link, which includes only, as relevant here, the text "us-arms-sales-Egypt" and does not give rise to the inference that any arms sale was even transacted, as opposed to other developments such as described in footnote 22, *supra*.

to the Government's arguments seeking to admit the *unredacted* messages, as if the unredacted messages were what was found on the jury's laptop.  (*See, e.g.*, Menendez Mem. 1, 4, 7, 13, 20, 26; Hana Mem. 9, 16, 22; Daibes Mem. 1, 4 & 4 n.3.)  But those are simply not the messages at issue.  The fact that the Government believed that the *unredacted* documents would have been highly probative and compelling, at least when accompanied by other contextualizing evidence and explained to the jury in summation, does nothing to establish that the documents on the jury laptop—which were heavily redacted and unaccompanied by explanation, context, or argument— would have been powerful, or even independently comprehensible, to the jury.  Indeed, the Government's arguments were premised on this very point, that, without sufficient context, the jury would not understand the probative value of the documents.  The versions of the documents on the jury laptop lacked that context.

In short, contrary to the framing of the argument advanced by the defendants, the documents on the jury laptop, though not containing all of the redactions required by the Court's ruling, were *not* the unredacted versions but the Reconsideration Versions, and were so significantly redacted as to interfere with their basic comprehensibility, at least without argument by counsel to the jury about them (of which there was none).[24]  Indeed, the principal argument Menendez ultimately retreated to, when the Government cited record evidence showing that the Reconsideration Versions did not allow the inference of a legislative act, was that, as redacted, they would be "stripped of any probative value, resulting only in juror confusion."  (Dkt. 425 at

---

[24] It is thus confusing and inaccurate for Menendez to call them the "Unredacted Exhibits" (Menendez Mem. (passim)), since they in fact contained highly relevant redactions.

2.)[25]  Menendez was correct that, as redacted, *and given that the Government never explained or argued their content to the jury*—as it would have if reconsideration had been granted—the Reconsideration Versions of the September 2019 Messages were "stripped" of probative value, so that even if any jurors did stumble upon the Reconsideration Versions in deliberation, this would have "result[ed] only in juror confusion."  (Dkt. 425 at 2.)  That is not prejudice to the defendants, who did not bear the burden at trial, much less such prejudice that a new trial is warranted, even assuming *arguendo* that the jury even saw the pertinent documents.

The Additional Messages, similarly, would have resulted only in juror confusion even in the exceedingly unlikely case in which a juror became aware of their content.  No defendant argues that an untranslated Arabic phrase meaning "Washington or New Jersey?" would have prejudiced any defendant in this case, nor could they reasonably do so.  And a juror who stumbled upon Daibes texting the unredacted phrase, "Send me your email address and I will send the articles on the Hitler car," would have literally no idea what these articles referred to or what it had to do with Daibes, besides that he proposed to text some news articles on a "Hitler car" of unknown provenance, ownership, or connection to the case.  Indeed, the fact that Daibes and Menendez are forced to supply to the Court and the Government a proposed explanation of what this message is about (Menendez Mem. 12 n.7; Daibes Mem. 2)—an explanation that was never provided to the jury—underscores that this message, in isolation, would simply be meaningless to the hypothetical juror who (implausibly) chanced to read it.

---

[25] Menendez's parenthetical claim that it was a "highly dubious proposition" that the redactions would prevent the inference of a legislative act was the *entirety* of his response to the Government's detailed explanation, supported by record citations, of how the redactions would do just that.  (Dkt. 425 at 2; *see also* Dkt. 423 at 1-2 (Government letter citing Tr. 868, 873-76, 930).)

In contrast to the Exhibits here, which would have been essentially meaningless to the jury, courts have found even extra-record documents with an obvious facially prejudicial effect to be insufficiently prejudicial in the circumstances of the case. *See, e.g.*, *Smithwick*, 758 F. Supp. at 183 (finding no prejudice from submission to the jury of extraneous photographs of murder victim, even while acknowledging that "[n]o photograph of a deceased person is going to be pleasant"). Here, the non-admitted portions of the Exhibits, without context or explanation, simply lacked any facial relevance or prejudicial effect at all.

        b)    <u>The Exhibits Were Cumulative with Abundant Properly Admitted Evidence</u>

Even indulging in the highly implausible counterfactuals in which a juror actually reviewed every word of the Reconsideration Versions of the September 2019 Messages or the January 2022 Messages and somehow, without the benefit of any context or explanation, inferred that each of these related to discussions of military aid to Egypt, these messages could not possibly have prejudiced any defendant, because they bore on secondary issues in the trial and—even on those issues—were cumulative with truly abundant and properly admitted evidence.

*First*, the entire topic of military aid to Egypt was, as the case was ultimately argued to the jury, a secondary issue in the case. No count relied solely on any promised (let alone actual) official act related to military aid to Egypt. Indeed, the Government, on the Egypt-related corruption counts, actually urged that the jury in summation could convict based solely on Menendez's attempts to pressure the USDA regarding Hana's halal monopoly, without even reaching any of the conduct related to promises of military aid to Egypt. (*See, e.g.*, Tr. 6395-96; Tr. 6396 ("[T]his one incident, the McKinney call, and the bribes surrounding it, is all you need to convict on the Egypt bribery counts."); Tr. 6398 ("You can stop right here in the timeline and

that's all you need to convict Menendez and Hana on these counts. This text tells you Hana is making good on these promises of payment in exchange for Menendez's call to McKinney just days earlier."); Tr. 6399-400 ("You can begin and end with this sequence surrounding the McKinney call to convict the defendants on the Egypt bribery counts.").)[26]  As to the foreign influence counts, the Government argued that the jury could rely on the USDA contacts (Tr. 6534-35), and though the Government did not explicitly ask the jury to do so exclusively, neither did it place any significant emphasis on the promises of military aid to Egypt. Instead, the Government focused—understandably in light of that statute's terms—not on promises of official acts but on Menendez's provision of information and advocacy to Egyptian officials. (*See* Tr. 6533-36 (listing acts Menendez took in furtherance of agency relationship, not describing promises to approve military aid to Egypt).)

This lack of emphasis on the subject matter of the pertinent messages by the Government demonstrates that the messages, even if seen by the jury in the form on the laptop, could not have been prejudicial. Indeed, the Second Circuit has affirmed the denial of a motion for a mistrial without a hearing in a case where jurors *actually considered* extra-record information about a fact "critical to the government's case," because that fact was "cumulative" with "abundant properly admitted evidence" and not itself subject to dispute in summation. *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir. 1983). Here, where the facts at issue were so far from "critical to the

---

[26] It is telling that, in order to recharacterize this evidence as crucial to the Government's case, Menendez is forced to resort not to the Government's actual arguments to the jury, but to matters the jury never saw, such as paragraphs of the Indictment (which were *not* provided to the jury) and even a press release (which too was of course *not* provided to the jury). (*See* Menendez Mem. 3, 6-7 & nn.3-4.)

government's case" that the Government urged the jury to convict *without even considering* them (Tr. 6395-96; Tr. 6398-6400), there is simply no basis for finding prejudice.

*Second*, and more fundamentally, even as to military aid to Egypt, the January 2022 Messages and September 2019 Messages were entirely cumulative with abundant properly admitted evidence, including (1) Menendez promising to approve a sale of tank ammunition (*see, e.g.*, GX A101-14 ("Tell Will I am going to sign off this sale to Egypt today," listing specifics of tank ammunition to be sold); GX B201-10 (Nadine Menendez screenshot of Menendez text)); (2) Menendez providing information about other senators' objections to such aid and writing Egypt's response to these objections—an act which the Government argued was a means of assuring Egypt that he would continue approving this aid notwithstanding these objections (GX A403 ("I write to *respond to some of the issues* that have been raised by Senator [Senator-1] and others, which have lead [sic] to *a hold on $300 million dollars* in appropriated aid to Egypt." (emphases added))); and (3) the request that Menendez intervene in a personal injury matter that was one of the bases of these objections to continuing aid to Egypt (*see, e.g.*, GX C207-7T (Helmy to Hana: "[I]f the guy takes care of this thing through [Senator-1], he'll be settled in." and "Our decision, is that we already gave our final offer… Two million and not a single dollar more…"); *id.* (Hana to Helmy: "Roger that. Consider it done"); GXs C207-7, C207-I, C207-J (documents from Helmy to Hana); GX C102-7 (documents texted from Hana to Nadine Menendez); GX A405 (documents forwarded from Nadine Menendez to Menendez); GX C102-7 (Nadine Menendez to Hana: "I have a question regarding the text you sent me I forwarded it")). This cumulativeness with admitted evidence is a paradigmatic reason why extra-record documents are held to be nonprejudicial. *See, e.g.*, *Nkansah*, 699 F.3d at 751 (affirming denial of new trial where contents

of document "were either immaterial or already on the record"); *O'Brien*, 2017 WL 2371159, at *13 (rejecting new trial where substance of allegedly incorrect document was consistent with facts in the record).

The defendants' arguments that the Reconsideration Versions were important because they purportedly showed "actual, consummated" military aid to Egypt (Menendez Mem. 1, 3; *see also id.* at 13, 20; Hana Mem. 11-12, 18-22) disregard the reality of the trial and the way the case was presented to the jury. Even leaving aside the fact that these documents did *not* in fact show any "actual, consummated" act of any kind, much less by Menendez in particular, the Court instructed the jury, properly under the law, that proving such an act was entirely unnecessary. (*See, e.g.*, Tr. 7090 ("[I]t is *not necessary that the public official in fact performed* or had the actual authority or ability to perform the act[.]" (emphasis added)); *see also, e.g.*, Tr. 7090-93.) The Government, for its part, embraced and emphasized in summation that its case was based on Menendez's promises and did not rely on whether he took an act. (*See, e.g.*, Tr. 6402 ("Menendez didn't even have to do anything at all, let alone do anything out of the ordinary.").) Indeed, the Government argued that the counts related to, for example, the New Jersey Attorney General's Office, were proven based on Menendez's claims and promises to have performed an official act, even when Menendez was lying about having taken action. (*See, e.g.*, Tr. 6467 ("Menendez is lying to Uribe. Menendez didn't save his ass once or twice. Grewal told him to pound sand.").) The fact that the jury had no trouble convicting on all of the counts related to that conduct—along with all of the other counts—shows that there was no particular significance, either under the law or in the mind of the jury, to whether or not Menendez undertook an "actual, consummated" act. Menendez's hyperbolic claims that this "is a huge deal," that the absence of a consummated act does not pass

39

the "smell test," and that the jury would "expect that there would be *something* to show for it" are simply rhetoric that is contradicted by the record.  (Menendez Mem. 20-21 (emphasis in original).)  Thus, even if the messages had shown any such act (which they did not), they would still have been entirely cumulative with the abundant evidence of Menendez's corrupt promises, which the jury properly relied on and which was sufficient under the law.

Indeed, even the Government's one reference to the admitted portions of the September 2022 Messages—the closest the Government came to referencing the subject matter of any of the Reconsideration Versions in its jury addresses—shows the cumulativeness of the Reconsideration Versions.  The Government, in arguing that it "doesn't matter" what the admitted portions of the messages were about, and that in any event the jury could infer that they related to aid to Egypt (Tr. 6400-01), was urging precisely the "permissible inferences" that the Court had ruled could be drawn from the admitted evidence (Tr. 1507).[27]  And this general reference to aid to Egypt, in turn, is all that the Reconsideration Versions themselves say, at most.[28]  Where, as here, the non-admitted portions of a document only say something that was already permissibly inferable from

---

[27] Hana's objection, now, to this portion of the Government's summation (Hana Mem. 10-11) is thus not only a forfeited objection to the summation but is contradicted by the Court's proper ruling that the evidence supported "permissible inferences" based on the context of the history of the parties' communications.  (Tr. 1507.)

[28] Menendez's claim that there would be no reason to present this evidence unless it showed a completed act (Menendez Mem. 24-26) is the same argument he unsuccessfully made, at length, to strike the evidence when it was presented at trial (Tr. 1481-87), an argument the Court rejected after carefully reviewing the transcript overnight and concluding that the admitted evidence (without the excluded content) supported "permissible inferences that the jury can draw."  (Tr. 1507).  The argument is no more persuasive now.

properly admitted evidence, they are by definition cumulative with the admitted evidence. *See, e.g.*, *Nkansah*, 699 F.3d at 751; *O'Brien*, 2017 WL 2371159, at *13.[29]

Moreover, the defendants' own conduct further confirms that the Exhibits could not have caused any prejudice. No defendant, in the course of summations that took place over three days, bothered to respond to the Government's mention of the admitted portions of the September 2019 Messages (let alone to raise anything related to the September 2019 Messages or January 2022 Messages themselves).[30] And as noted above, one of the declarations filed by Menendez reveals that when given an opportunity to inspect the contents of the jury laptop, Menendez's counsel evidently chose not to prioritize any of the Exhibits as among the "select number of exhibit files" to check. (Dkt. 645-13 ¶ 4.) It is only now, with the benefit of learning in hindsight that certain non-admitted portions were included on the laptop, that these previously-unmentioned exhibits loom so large in the defendants' retelling of the trial. The defendants' contemporaneous assessment of the documents—showing that when actually litigating the case before the jury, they

---

[29] Hana claims, puzzlingly, that Helmy's statement that "A female employee at his office called the embassy and said that they informed the State Department to have things go well in what relates to Egypt" was not supposed to be shown to the jury. (Hana Mem. 10.) He is wrong. This statement was properly in evidence. It was discussed in connection with Menendez's motion to strike the testimony reading it (Tr. 1484-85); the Court declined to strike that testimony (Tr. 1507); it was included in the Government's summary chart (GX 1302 line 1060); and it was even included in the defendants' own summary chart (DX 1302 line 1060).

[30] Hana's claim that he could not address the excluded portions of the messages in his summation (Hana Mem. 2, 8 n.2) is beside the point, as he could have addressed the admitted portions of the messages in his summation, if he believed the subject matter was worth responding to, but chose not to. And of course, the content contained in the Reconsideration Version established, at most, the same "permissible inferences" (Tr. 1507), which Hana did not consider worth responding to. Accordingly, his attempt to establish prejudice from the inclusion of these exhibits fails. (*See* Hana Mem. 8 n.2.)

considered these exhibits not worth mentioning to the jury or checking on the laptop—is more reliable and should be weighed far more heavily than their post hoc protestations of prejudice.

In any event, as discussed in detail in the Government's memorandum of law in opposition to the defendants' post-trial motions (Dkt. 611 at 11-42, 48-66), there was far more than "an abundance of properly admitted evidence," *Weiss*, 752 F.2d at 783; *see also, e.g.*, *Stasiv*, 2021 WL 4888865, at *2 & n.2 (finding extra-record evidence in jury room harmless, even while assuming it was covered by district court's ruling excluding evidence of prior criminal record, because of the overwhelming evidence). That evidence, just on the Egypt counts, included testimony of Menendez's staffers, Hana's employees, a public official Menendez tried to pressure, other Executive Branch official witnesses, law enforcement witnesses involved in searches, a Senate ethics official, a jeweler Menendez and Nadine Menendez used to liquidate gold bar bribes under false pretenses, and voluminous documentary evidence including extensive text message, email, phone, and financial evidence (*see, e.g.*, Dkt. 611 at 11-25, 48-56), to say nothing of the other documentary, cooperator, witness, fingerprint expert, DNA expert, cell site expert, and other evidence that was offered principally to prove other portions of the broader scheme (*see id.* at 25-42, 58-66). This is simply not a case in which the scant improperly redacted exhibits could possibly have caused any prejudice (assuming those exhibits were even seen by the jury).

        4.    *Nothing About the Court's Prior Ruling Renders the Documents Prejudicial*

The Court's prior ruling excluding both the unredacted versions and the Reconsideration Versions of the September 2019 Messages and January 2022 Messages does not change the foregoing analysis. When extra-record documents are found in the jury room, it is not, of course, uncommon for them to have been the subject of a prior ruling, but courts still look in those

circumstances to whether those documents were in fact prejudicial.  *See, e.g.*, *Stasiv*, 2021 WL 4888865, at *2 & n.2 (finding extra-record evidence in jury room harmless even while assuming it was covered by district court's ruling excluding evidence); *United States v. Friedland*, 660 F.2d 919, 928 (3d Cir. 1981) (affirming denial of new trial where evidence covered by a ruling excluding certain categories was provided to jury, but was "inconsequential when compared with" the rest of the evidence, citing *Camporeale*); *United States v. Strassman*, 241 F.2d 784, 785-86 (2d Cir. 1957) (affirming conviction and noting duty of counsel to check exhibits where a document, including portions which had been excluded, was provided to the jury).

Menendez is wrong to argue that the analysis should be different because the basis for the Court's May 24 Ruling relied on the Speech or Debate Clause, for two reasons, as explained further below.[31]  First, the exclusion of the Reconsideration Versions does not establish that any of those versions actually revealed the content of any protected legislative act.  Second, even if any of these documents had mentioned any legislative act, the Supreme Court's case law is clear that the Government does not impermissibly rely on protected legislative actions when the erroneous introduction of references to legislative acts does not prejudice a defendant.

a)    <u>The Documents Did Not Reference a Legislative Act</u>

The Court's ruling excluding the Reconsideration Versions of the September 2019 Messages and the January 2022 Messages does not necessitate the conclusion that, in the redacted form in which they were inadvertently included on the laptop, they still infringed on the Speech or

---

[31] Hana and Daibes, of course, lack standing to make any argument based on the Speech or Debate Clause.  *See, e.g.*, *Gravel v. United States*, 408 U.S. 606, 622 (1972) (the Speech or Debate Clause is "invocable only by the Senator or by the aide on the Senator's behalf").

Debate Clause.[32]  As noted in Background Section I.B and in Section I.B.3.a, above, in a surreply to the Government's motion for reconsideration proposing the Reconsideration Versions, Menendez did not (and could not) make any cogent effort to argue that the Reconsideration Versions would in some way still reveal Menendez's legislative acts, a possibility he briefly raised in a parenthetical without any supporting argument.  Instead, he emphasized that if the redactions they contained did obscure reference to legislative acts, the Reconsideration Versions would be confusing and lack probative value.  (*See* Dkt. 425 at 2 ("But if the proposed redactions actually obscured reference to Senator Menendez and his legislative acts beyond the jury's comprehension (a highly dubious proposition), then the proposed exhibits would be stripped of any probative value, resulting only in juror confusion.  The government cannot have it both ways.  Either the evidence is probative as to a legislative act, in which case it is barred by the Speech or Debate clause, or it has no probative value in this case and must be excluded." (footnote omitted)).)

In any event, none of the nine Reconsideration Version exhibits, in the form they were loaded onto the jury laptop, makes any reference to any legislative act.  Even in the exceedingly unlikely circumstance in which a juror reviewed any or all of these documents, that juror would lack any information about whether Menendez had or had not performed an actual legislative act. The act of receiving and sending a link reading "https://amp.cnn.com/cnn/2022/01/25/politics/us-arms-sales-egypt/index.html" (without the linked article or Nadine Menendez's statement "Bob had to sign off on this," both of which the Government initially offered but which were not included on the jury laptop), would not allow a juror to conclude that any arms sale was approved

---

[32] No party argues that the Additional Messages implicated the Speech or Debate Clause, which they obviously do not.

44

or rejected (even assuming that that would lead to the inference that Menendez played a role), rather than any number of other reasons an article might discuss the topic of arms sales to Egypt.[33]

Similarly, the Reconsideration Versions of the September 2019 Messages—which in the redacted form in which they were included on the laptop lacked any tie to any action by Menendez (or even any action at all)—simply did not allow the jurors to infer that Menendez did or did not take any legislative act. Without the crucial clause—namely, "that senator Menendize put an hold on"—which was originally offered by the Government but was *not* included on the jury laptop, the remainder of the Helmy Message was just the ungrammatical phrase "Director office of Egyptian Affairs in state department 'Kathryn Kiser" told our DCM [redacted] a billion $ of usaid to Egypt before the recess !!!!".  This sentence fragment does not provide any information that anyone, let alone Menendez, took or did not take an action.  That lack of contextual information may have been a non-frivolous ground for Menendez to argue—as he in fact did—that the messages should have been excluded as confusing and insufficiently probative.  (Dkt. 425 at 2). But the same lack of contextual information means that none of the messages was a "mention of a legislative act," *United States v. Helstoski*, 442 U.S. 477, 490 (1979).  Even in the implausible case where a juror simply happened upon the Reconsideration Versions of the exhibits in deliberation, the juror would not have any understanding of whether Menendez took or did not take a legislative act from these documents, which do not "mention" any act at all, let alone one by Menendez.  The mere fact that (in actuality but unknown to the jury) Menendez's staff had taken legislative acts with respect to these subjects is simply not relevant, because no evidence of those acts was

---

[33] As noted in footnote 22, above, evidence of some newsworthy developments related to arms sales to Egypt, not related to the approval or rejection of any pending sale or to any other possible legislative act, was in fact presented to the jury.

presented.  This principle is the same one applied by the Court in overruling Menendez's objection to the reference to the text of Senate Bill 1102, a piece of legislation that (in actuality but unknown to the jury) Menendez had taken a legislative act to advance.  (*See* Tr. 3591-92 (Court's ruling).)

Accordingly, the Reconsideration Versions of the messages—which do not include "mention of a legislative act," *Helstoski*, 442 U.S. at 490, cannot possibly be said to threaten the "independence of individual legislators," consistent with the Court's reasoning in approving other redactions.  *United States v. Menendez*, No. 23 Cr. 490 (SHS), 2024 WL 3014205, at *2 (S.D.N.Y. June 14, 2024) ("[T]he independence of individual legislators is not threatened if the identities of those legislators are withheld from the relevant documents." (internal quotation marks omitted)).  Moreover, as explained in Section I.B.3.a, above, the incomplete nature of the Reconsideration Versions of the exhibits is compounded by the fact that they were not incorporated into any argument by any party or accompanied by any other contextual evidence.  Thus, even if the Court had been concerned that the Reconsideration Versions of the exhibits could have been a component of some argument that Menendez engaged in a legislative act, that concern is not implicated where no such argument was made.

In sum, irrespective of whether the actual documents on the jury laptop—the Reconsideration Versions of the September 2019 Messages and the January 2022 Messages, not the unredacted versions that the Government originally sought to offer—were properly excluded in light of the prior ruling by the Court, they simply did not include "mention of a legislative act," *Helstoski*, 442 U.S. at 490.

b)    The Supreme Court Has Repeatedly Held That Prejudice Analysis
Applies to Speech or Debate Clause Violations

Even if the exhibits on the jury laptop had included evidence of a protected legislative act,

Menendez is wrong to claim that any possible exposure of a juror, even in theory, to such materials

would necessitate a new trial, with no consideration of actual prejudice.  Indeed, the Supreme

Court has repeatedly held that vacatur is not required where the Government does not "rely on"

evidence of legislative acts, *United States v. Brewster*, 408 U.S. 501, 512 (1972), and has made

crystal clear, in the canonical cases of *Johnson*, *Brewster*, and *Helstoski*, that a count does not "rely

on" evidence of a legislative act if evidence of that act does not prejudice the defendant.

Menendez's lengthy discussion of the principles and purposes behind the Speech or Debate

Clause and other constitutional provisions he considers analogous (Menendez Mem. 17-20) does

not grapple with the Supreme Court's analysis of the specific and discrete question here, which is

whether a count of conviction may stand if evidence of a legislative act is introduced but is

nonprejudicial as to that count.  The Supreme Court addressed that question in *United States v.

Johnson*, 383 U.S. 169 (1966), and—although the majority and the dissent in that case divided on

whether the defendant was in fact prejudiced—has unanimously endorsed a prejudice analysis, as

the detailed discussion in that case, and later Supreme Court cases analyzing it, make clear.

In *Johnson*, the government introduced evidence of a Member of Congress's speech on the

floor of the House of Representatives, necessitating a new trial on a conspiracy count to which this

evidence related.  383 U.S. at 185.  The Member, however, also stood convicted of other counts

relating to a conflict of interest, which the Court of Appeals had ruled were also prejudiced by the

introduction of the evidence of the speech.  *See* 383 U.S. at 185 ("The Court of Appeals held that

Johnson was entitled to a new trial on the conflict of interest counts because the admission of

47

evidence concerning the speech aspect of the conspiracy count was prejudicial on these other counts as well.").  Since the government did not argue before the Supreme Court that the legislative-act evidence was not prejudicial, a majority of the Supreme Court in *Johnson* declined to disturb the Court of Appeals' "assessment of the record" that the evidence prejudiced both counts. *Id.* at 185-86 ("In these circumstances we find no occasion to review the Court of Appeals' assessment of the record in this respect.").  In partial dissent, however, three justices wrote that the legislative-act evidence was *not* prejudicial as to the conflict of interest counts, and would have reinstated the Member's conviction on those counts.  *Id.* at 188-89 (Warren, C.J., joined by Douglas, J., and Brennan, J., concurring in part and dissenting in part) ("After reading the record, it is my conclusion that the Court of Appeals erred in determining that the evidence concerning the speech infected the jury's judgment on the substantive counts. . . .  Therefore, *I would affirm the convictions on the substantive counts*." (emphasis added)).  In doing so, the partial dissent looked to the standard factors supporting a finding of lack of prejudice, such as the overwhelming evidence, *see id.* at 188 ("The evidence amply supports the prosecution's theory and the jury's verdict on these counts[.]"), the tangential nature of the legislative act evidence, *see id.* at 189 ("The speech was a minor part of the prosecution."), and the fact that it was not inflammatory, *see id.* ("There was nothing in it to inflame the jury[.]").  That is, the dissenters in that case not only acknowledged the theoretical possibility that legislative act evidence may be nonprejudicial in a Member of Congress's criminal trial, but they would have actually relied on that rule of law to reinstate the conviction.  *Id.* ("I would affirm the convictions on the substantive counts.").

Crucially, the *Johnson* majority *did not disagree* with the dissenters about the legal standard (*i.e.*, about the appropriateness of a prejudice analysis); instead, they simply disagreed

48

about whether to review the Court of Appeals' "assessment of the record," *Johnson*, 383 U.S. at 186 (majority opinion), that prejudice had been shown in that particular case. Notably, the majority did not state, or even suggest, that a prejudice analysis should not have been conducted (even though that would have, if correct, directly responded to the dissent) but instead, as described above, effectively acknowledged that an "assessment of the record" was the appropriate analysis. *See Johnson*, 383 U.S. at 186 (majority opinion) ("In these circumstances we find no occasion to review the Court of Appeals' *assessment of the record* in this respect." (emphasis added)).

In two canonical cases following *Johnson*, the Supreme Court made clear that the *Johnson* majority and dissent were "unanimous" about the legal standard for the effect of the Speech or Debate Clause on a prosecution. In *Brewster*, the Supreme Court recited the *Johnson* majority's holding, 408 U.S. at 510-11, quoted the very language from the dissenters stating that they would have reinstated the conflict of interest counts because the evidence did not cause prejudice on that count, *id.* at 511-12 ("'After reading the record, it is my conclusion that the Court of Appeals erred in determining that the evidence concerning the speech infected the jury's judgment on the (conflict-of-interest) counts. . . . Therefore, I would affirm the convictions on the substantive counts.'" (quoting *Johnson*, 383 U.S. at 188-89 (Warren, C.J., joined by Douglas, J., and Brennan, J., concurring in part and dissenting in part)))—and from this concluded, "*Johnson* thus stands as a *unanimous* holding that a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts." 408 U.S. at 512 (emphasis added). But of course, the holding in *Johnson* could only have been "unanimous" as to the legal standard if the standard included a prejudice analysis. That is because the dissent in *Johnson* did not just articulate but actually *based its dissenting view*

49

*on the use of* a prejudice analysis, so could not have been "unanimous" on any rule that forbade such an analysis. The Supreme Court in *Brewster* thus confirmed what was apparent from *Johnson*—that the Supreme Court was "unanimous" on the rule that a count of conviction did not "rely on" legislative acts if the erroneous admission of those materials did not prejudice the defendant on that count. *Brewster*, 408 U.S. at 512.

This principle was again repeated by the Supreme Court in *Helstoski*, which quoted and relied on *Brewster*'s holding that "'*Johnson* thus stands as a unanimous holding that a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts.'" *Helstoski*, 442 U.S. at 487-88 (quoting *Brewster*, 408 U.S. at 512). Neither *Brewster* nor *Helstoski*, which both involved appeals from pretrial motions, gave the Supreme Court the occasion to apply a prejudice analysis to those particular defendants, but both cases reaffirmed that the majority and the dissent in *Johnson*— which did involve such an analysis—were unanimous on the applicable legal rule.[34]

The foregoing legal rule—that the Government does not "rely on" evidence within the meaning of the Speech or Debate Clause where that evidence does not prejudice the defendant on the pertinent count, and thus that the count stands even if evidence should not have been admitted—is entirely consistent with the principles of structural error that Menendez cites (and misapplies). (*See* Menendez Mem. 17, 20.) Structural error is not a term for any type of error that

---

[34] Because *Brewster* and *Helstoski* both relied, in their reasoning, on *Johnson*'s unanimous standard, their interpretation of *Johnson* is part of their holdings, not merely dicta. In any event this interpretation, in these canonical cases, is authoritative, *see, e.g.*, *Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620, 625 (S.D.N.Y. 2010) ("Even if everything the Supreme Court said in elaborating its decision were deemed dictum, it does not at all follow that this Court can cavalierly disregard it[.]" (internal quotation marks and brackets omitted)), and the standard applied by the majority and dissent in *Johnson* is clearly the holding in that case.

is derived from the Constitution.  *See, e.g.*, *Greer v. United States*, 593 U.S. 503, 513 (2021) ("A constitutional error does not automatically require reversal of a conviction." (internal quotation marks omitted)).  Instead, it is error that "affect[s] the entire conduct of the proceeding from beginning to end."  *Id.* (internal quotation marks omitted).  The "highly exceptional category of structural errors includes, for example, the denial of counsel of choice, denial of self-representation, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt."  *Id.* (internal quotation marks omitted).  Such an error amounts to "a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself."  *Neder v. United States*, 527 U.S. 1, 8 (1999) (internal quotation marks omitted).[35]  By contrast, "discrete defects in the criminal process," *Greer*, 593 U.S. at 513, even highly significant ones such as "the omission of a single element from jury instructions," *id.*, are "not structural because they do not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."  *Id.* (internal quotation marks omitted, emphasis in original).

The holdings of *Johnson*, *Brewster*, and *Helstoski* that the erroneous introduction of evidence of a legislative act is not necessarily a ground for vacatur if the Government does not "rely on" it to a defendant's prejudice are entirely consistent with structural error principles, as the

---

[35] Menendez goes badly astray when he plucks language from *Weaver v. Massachusetts*, 582 U.S. 286 (2017), from its context.  (*See* Menendez Mem. 17, 19-20.)  *Weaver* indicated that some errors are structural because they affect "some other interest" than the interest in avoiding conviction, referring to errors such as the denial of the right to self-representation at trial, which plainly affects the "framework within which the trial proceeds." 582 U.S. at 295.  Indeed, *Weaver* reaffirmed that "the defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself."  *Id.* (internal quotation marks omitted).  *Weaver* thus provides no support for the idea that the erroneous inclusion of documents on a laptop (a paradigmatic "error in the trial process") can somehow affect "the framework within which the trial proceeds."

introduction of evidence, in any form, fits comfortably within the category of "discrete defects in the criminal process," *Greer*, 593 U.S. at 513. Indeed, the inadvertent inclusion of several sentences of non-admitted matter in documents on a laptop provided to the jury during deliberations is almost a definitional example of an "error in the trial process itself," rather than a "defect affecting the framework within which the trial proceeds." *Neder*, 527 U.S. at 8 (internal quotation marks omitted); *see also, e.g.*, *United States v. Dhinsa*, 243 F.3d 635, 659-60 (2d Cir. 2001) ("It is beyond cavil that most constitutional errors occurring during trial may be deemed harmless and, thus, not require automatic reversal of a conviction. Categorized as 'trial errors,' these errors typically arise 'during the presentation of the case to the jury,' are suited for harmless error analysis because such errors can be 'quantitatively assessed in the context of other evidence presented in order to determine whether their admission was harmless beyond a reasonable doubt.'" (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307, 308 (1991)) (citations omitted; alteration incorporated)); *see also Yarborough v. Keane*, 101 F.3d 894, 897 (2d Cir. 1996) ("Errors are properly categorized as structural only if they so fundamentally undermine the fairness or the validity of the trial that they require voiding its result regardless of identifiable prejudice.").

The Eleventh Circuit's opinion in *United States v. Swindall*, 971 F.2d 1531 (11th Cir. 1992), relied upon by Menendez, is not to the contrary and in any event cannot and does not somehow overturn the holdings of *Johnson*, *Brewster*, and *Helstoski*. In *Swindall*, the Eleventh Circuit held that an indictment should not be dismissed even though legislative act evidence was presented to the grand jury, 971 F.2d at 1548, but stated, in dicta and without analysis, that it was not conducting a harmless error analysis and that harmless error was not the appropriate framework for Speech or Debate Clause violations, *id.* at 1548 n.21. Whatever the merits of that statement, it

is irrelevant here, where the question is not whether a specific preserved objection should nevertheless be denied relief on appeal because the error was harmless, but whether a defendant is entitled to a new trial by virtue of an error that was not the subject of contemporaneous objection, went unnoticed at the time, and there is no plausible scenario in which it affected the jury at all. Moreover, the Eleventh Circuit in *Swindall* appeared largely or entirely to be focused on verbiage, not legal analysis, because it did the very thing that Menendez condemns here, reasoning that where "reference to a legislative act is irrelevant to the decision to indict, the improper reference has not subjected the member to criminal liability," and thus does not violate the Speech of Debate Clause. *Id.* at 1548. That proposition is the opposite of what Menendez claims is the law.

Applying the same reasoning to the circumstances here would lead to the conclusion that, where "reference to a legislative act is irrelevant to" the jury's decision to convict, because it is not prejudicial, "the improper reference has not subjected the member to criminal liability" and there is no basis for reversal. *Id.*  In sum, *Swindall*'s actual holding (as distinct from its dicta, which this Court need not pass upon) was entirely consistent with the holdings of *Johnson*, *Brewster*, and *Helstoski* that prejudice analysis applies to Speech or Debate errors, as well as with the decisions of the Second Circuit and other courts that the presentation of legislative act evidence to a grand jury does not require dismissal of the indictment if it is nonprejudicial. *See, e.g.*, *United States v. Williams*, 644 F.2d 950, 952 (2d Cir. 1981) (affirming denial of motion to dismiss indictment where material covered by the Speech or Debate Clause "constituted an insignificant portion of the evidence presented to the jury and was not a factor in the issuance of the indictment"); *see also United States v. Renzi*, 651 F.3d 1012, 1029 (9th Cir. 2011) ("[T]he mere fact that some 'legislative act' evidence was presented to the grand jury cannot entitle Renzi to

dismissal. That would contravene the [Supreme] Court's example in *Brewster* and *Johnson*—two cases in which the Court decided that dismissal of the indictment was not warranted even though each Member was indicted by grand juries to whom the Government had presented 'legislative act' evidence.")

Menendez's sweeping claim that any analysis of prejudice would work an impermissible chilling effect (Menendez Mem. 18-19) is not just unsupported but also foreclosed by all of these precedents. It is contradicted by *Johnson*, in which both the majority and the dissent endorsed just such an analysis, as recognized by *Brewster* and *Helstoski*. (*Compare* Menendez Mem. 19 (arguing that the Clause prohibits "the uncertainty of fact-intensive harmless-error review by courts") *with Johnson*, 383 U.S. at 186 (majority declining to disturb "the Court of Appeals' assessment of the record") *and Johnson*, 383 U.S. at 188 (dissent writing, "After reading the record, it is my conclusion that the Court of Appeals erred in determining that the evidence concerning the speech infected the jury's judgment on the substantive counts.").)[36] It is also inconsistent with the holdings of the Second Circuit and other courts of appeals engaging in an analysis of prejudice when legislative act material is presented to a grand jury. *See Williams*, 644 F.2d at 952 (affirming denial of motion to dismiss indictment where material covered by the Speech or Debate Clause "constituted an insignificant portion of the evidence presented to the jury

---

[36] There is no relevant distinction between the question of whether evidence that is prejudicial as to one count causes spillover prejudice affecting other counts, addressed in *Johnson*, and the situation here in which no count was prejudiced. If Menendez was right that consideration of prejudice was foreclosed by the Speech or Debate Clause, then all the justices in *Johnson* would have to have been wrong in their analysis. In any event where, as here, the evidence was not even intentionally introduced or argued as to *any* count, but simply inadvertently placed on a laptop, it is best analyzed under the framework of spillover prejudice as to all counts. For the reasons discussed in Section I.B.3, however, it was not prejudicial on any count under any framework.

and was not a factor in the issuance of the indictment"); *Renzi*, 651 F.3d at 1029; *Swindall*, 971 F.2d at 1548. And it is inconsistent with ordinary principles of structural error, in which "the defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself," *Weaver*, 582 U.S. at 295 (internal quotation marks omitted), and pursuant to which the Second Circuit has squarely held that "harmless error analysis applies to evidentiary errors," *United States v. Tropeano*, 252 F.3d 653, 659 (2d Cir. 2001) (citing *Dhinsa*, 243 F.3d at 649, 656). Menendez's demand that his case should deviate from the ordinary rules of criminal jurisprudence, lest bad consequences supposedly result, is at base a *policy* argument about what the law should be, and is foreclosed by the foregoing binding precedent establishing what the law is. *Cf. Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 779 (2018) ("[T]his case presents a question of statutory interpretation, not a question of policy.").

Accordingly, even if (a) Menendez and his co-defendants had not waived any objection, (b) there were a reasonable likelihood that any juror had actually reviewed the Reconsideration Versions of the September 2019 Messages and the January 2022 Messages, and (c) those documents actually referenced any protected legislative act of Menendez—none of which occurred—a new trial would still not be warranted, because those materials did not cause any prejudice to any count of conviction (let alone to all counts). In short, in *Johnson*, *Brewster*, and *Helstoski*, the Supreme Court held that even erroneous introduction of evidence of a legislative act does not warrant overturning a conviction on a count that is not prejudiced by that evidence, and the foregoing amply establishes that no count was prejudiced by the inadvertent inclusion of certain documents on the jury laptop.

## II.    DISCOVERY WOULD SERVE NO VALID PURPOSE

Menendez's alternative request for discovery (Menendez Mem. 32-33) should be denied, as he has not made a substantial preliminary showing that it would serve any proper purpose.

### A.    Applicable Law

Internal government documents prepared in connection with the litigation of a criminal case are specifically exempted from disclosure by Federal Rule of Criminal Procedure 16(a)(2) (exempting from discovery, subject to inapplicable exceptions, "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case"), and in many cases protected by the attorney work product and deliberative process privileges.  *See generally, e.g.*, *ACLU v. U.S. Dep't of Justice*, 90 F. Supp. 3d 201, 212-13 (S.D.N.Y. 2015) (describing privileges); *see also id.* at 216-17 (finding DOJ memoranda protected by deliberative process privilege).

To be sure, courts faced with allegations of government misconduct sometimes authorize limited discovery of relevant government documents, but before doing so they require that the defendant make a substantial threshold showing that misconduct in fact occurred.  *See Wade v. United States*, 504 U.S. 181, 186 (1992) (defendant claiming refusal to file a 5K motion was based on unconstitutional motive must make a "substantial threshold showing"); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (defendant seeking discovery on claim of selective prosecution must provide "some evidence tending to show the existence of the essential elements of the defense"); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (same for claim of vindictive prosecution).  These are, of course, applications of the broader principle that courts do not hold hearings without a substantial preliminary showing that doing so may reveal meritorious grounds for relief under substantive law.  *See, e.g.*, *United States v. Menendez*, No. S4 23 Cr. 490 (SHS),

2024 WL 912210, at *3 (S.D.N.Y. Mar. 4, 2024) ("To obtain a *Franks* hearing on the basis of alleged misstatements or omissions in a warrant application, the defendant bears the burden of making a substantial preliminary showing that (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) those misrepresentations or omissions were material, or necessary to the issuing judge's probable cause or necessity finding." (internal quotation marks and brackets omitted)).

This principle—of reserving discovery or hearings for circumstances in which there has been a substantial preliminary showing that the discovery or hearing will reveal relief is appropriate—applies with equal force in the area of spoliation. "Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) (internal quotation marks omitted). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Id.* (internal quotation marks omitted). "In addition, once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." *Id.* (internal quotation marks omitted). If evidence has been lost and its loss is chargeable to the government, the defendant must still make "a two-pronged showing that (1) the evidence possessed exculpatory value that was apparent before it was destroyed, and that (2) it was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *E.g.*, *United States v. Cesiro*, No. 23-6649, 2024 WL 4647667, at *1 (2d Cir. Nov. 1, 2024). "Even when the

57

government is under an obligation to preserve" evidence, "where a defendant has pointed to no evidence that the [evidence was] intentionally destroyed, [its] destruction could not have amounted to spoliation." *United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020) (internal quotation marks omitted); *see also, e.g.*, *United States v. Pirre*, 927 F.2d 694, 697 (2d Cir. 1991) (affirming conviction, holding "absent bad faith there is no violation"); *United States v. Rastelli*, 870 F.2d 822, 833-34 (2d Cir. 1989) ("'[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" (quoting *Arizona v. Youngblood*, 488 U.S. 51 (1988))).

Consistent with the foregoing settled law, a spoliation motion for a new trial or dismissal of an indictment can and should be denied without a hearing where the defendant "failed to show bad faith on the part of the government." *United States v. Greenberg*, 835 F.3d 295, 302 (2d Cir. 2016); *see also id.* (affirming denial of motion to dismiss indictment on grounds of spoliation, without hearing, on the grounds that "the record is devoid of evidence that the Government acted in bad faith in failing to preserve the data"); *see also, e.g.*, *Walker*, 974 F.3d at 208-09 (citing and relying on *Greenberg* in affirming denial of new trial on the basis of defendant's "speculations about spoliation").

## B.    Discussion

Menendez seeks discovery into internal Government documents and litigation decisions without a valid basis, much less a substantial showing. There is plainly no need of discovery to decide the defendants' supplemental motion for a new trial. Internal Government documents would (even apart from any privilege) not shed any light on the degree to which *defense counsel* through their conduct waived, or did not waive, their objections to the exhibits to be loaded on the laptop. Similarly, such Government documents would not in any way elucidate the likelihood that

any juror reviewed any of the Exhibits.  Indeed, it is notable that the defendants do *not* seek to conduct a post-verdict inquiry of the jurors themselves, which the Government agrees would not likely be productive.  And of course, internal Government documents also do not remotely bear on the questions whether the exhibits on the jury laptop would have been confusing to the jurors if reviewed, whether they are cumulative with properly admitted evidence, whether the evidence is overwhelming, or otherwise whether their inclusion on the jury laptop did or did not prejudice any defendant.  There is, in short, no need whatsoever for discovery or a hearing in order to determine the defendants' supplemental motions for a new trial.

Rather, it appears that the only basis for which Menendez seeks discovery is to pursue a fishing expedition to attempt to impugn counsel for the Government with baseless accusations of culpable conduct.  But no such accusation is remotely supported by any substantial preliminary showing necessary to justify discovery or a hearing.

First, Menendez seeks discovery to support the extraordinary, inflammatory, and false accusation that the loading of the Exhibits onto the jury laptop was not "simply an innocent mistake." (Menendez Mem. 32.)  Apparently Menendez's suggestion is that (1) the Government included the pertinent exhibits on the jury laptop in an attempt to circumvent rulings of the Court; (2) the method the Government chose to effect this scheme involved providing the same exhibits to defense counsel (thus making it far more likely that the scheme would be discovered); (3) after the alleged misconduct succeeded, months later, and unprompted by any inquiry from defense counsel or the Court, who were entirely unaware of the scheme, the very same Government counsel chose to bring this issue to the Court's attention; and (4) in doing so, the same counsel chose to effect a blatant fraud on the Court, by characterizing, in writing, what had occurred as inadvertent

59

and only recently discovered.  (*See* Gov. Ltr. 1 (describing laptop as having been "inadvertently" loaded as a result of "an error recently discovered by the Government").)  To recount this supposed theory is to refute it.  It is not just unsupported by a substantial preliminary showing; it is preposterous.

Second, Menendez claims that discovery into internal Government documents would theoretically help him identify additional errors he speculates may be on the laptop.  This is a complete non sequitur.  Internal Government documents are not necessary, or even relevant, to determine if the exhibits on the jury laptop (which Menendez has copies of) match the admitted versions of the exhibits (which Menendez also has copies of).  And given that Menendez has had a team of able counsel reviewing the copies of the documents on the laptop for weeks now, any errors that have not already been found—if there are any—could not conceivably have been noticed by the jury in its approximately two days of deliberations.

Finally, Menendez raises concepts of spoliation of evidence by the Government's failure to maintain the data on the jury laptop for months after the trial.  Menendez only briefly seeks a hearing to support a finding of spoliation (Menendez Mem. 29), although he also contradictorily proceeds as if there already has been a hearing at which he has prevailed and thus helps himself to an unearned adverse inference against the Government, *see supra* Section I.B.2.c.  But there has been no spoliation, a party making out such a claim must demonstrate multiple elements (which Menendez does not do), and there is no basis for such a hearing.  As discussed in Section I.B.2.c, above, the Government was under no duty to preserve after a verdict a jury laptop for a period of months, just in case it may later find some error.  There is also no showing whatsoever that any additional files on the laptop were not properly redacted, or that the metadata of the Exhibits, if

inspected, would have revealed that the jurors opened those files (and in all likelihood it would have revealed the opposite). And of course, there has been no showing of bad faith; indeed, the Government's unprompted disclosure of this inadvertent error readily shows the opposite.

## **CONCLUSION**

For the foregoing reasons, the defendants' supplemental post-trial motions should be denied.

Dated:  New York, New York
       December 6, 2024

                     Respectfully submitted,

                     DAMIAN WILLIAMS
                     United States Attorney

By:    s/ Paul M. Monteleoni
          Eli J. Mark
          Daniel C. Richenthal
          Paul M. Monteleoni
          Lara Pomerantz
          Catherine Ghosh
          Assistant United States Attorneys
          (212) 637-2431/2109/2219/2343/1114
          Christina A. Clark
          Special Assistant United States Attorney
          (202) 307-5191