**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT MENENDEZ, *et al.*,<br><br>Defendants. | Criminal Action No. 23-490 (SHS)<br><br>*Document Electronically Filed* |

---

**SENTENCING MEMORANDUM ON BEHALF OF
DEFENDANT WAEL HANA**

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ................................................................................. iii

**PRELIMINARY STATEMENT** ............................................................................ 1

**BACKGROUND** .................................................................................................... 3

I.     PROCEDURAL HISTORY .................................................................................. 3

    A.     Charges and Jury Verdict ............................................................................ 3

    B.     The Presentence Investigation Report ("PSR") ....................................... 5

II.    THE OFFENSE CONDUCT ................................................................................ 7

**LEGAL ARGUMENT** ......................................................................................... 13

I.     THE APPLICABLE LEGAL STANDARD ....................................................... 13

II.    STEP ONE: ADVISORY GUIDELINES CALCULATION ............................ 13

    A.     The Presentence Investigation Report Miscalculates Loss by Incorrectly
Identifying Relevant Conduct. ................................................................. 13

    B.     In the Alternative, a Downward Departure is Warranted Because the Loss
Calculation Results in a Guidelines Range that Substantially Overstates
the Seriousness of the Offense. ................................................................. 25

III.   STEP TWO:  SECTION 3553(A) FACTORS .................................................... 28

    A.     Application Of The § 3553(a)(1) Factors Warrant A Lenient Sentence. .............. 29

        i.     The Nature And Circumstances Of The Offense ...................................... 29

            a.     Mr. Hana's Longstanding Friendship with Nadine ...................... 29

            b.     Mr. Hana's Relationship with Egypt and his Sole-Source
Contract .............................................................................................. 32

            c.     Mr. Hana's Minimal Role in the Charged Conspiracy ................. 33

        ii.    The History And Characteristics Of The Defendant................................. 35

            a.     Hana's Personal Background:  His Pursuit Of The
American Dream. ............................................................................... 36

            b.     Mr. Hana's Commitment To His Family As A Loving
Husband And Father To Three Small Children ............................ 39

            c.     Mr. Hana is a Generous Man of Deep Faith. ................................ 43

    B.     Application of the Section 3553(a)(2) Factors Also Warrants a Lenient
Sentence. ....................................................................................................... 49

        i.     Seriousness of the Offense........................................................................ 49

        ii.    Promotion of Respect for the Law ........................................................... 50

        iii.   Just Punishment ......................................................................................... 51

            a.     Mr. Hana has already been punished for his offenses. ................ 51

Table of Contents (continued)

Page

C.    Innocent Third Parties Will Be Punished by a Lengthy Sentence Imposed
Upon Mr. Hana. ............................................................................ 53

i.    The Impact Upon Mr. Hana and His Employees ..................................... 53

ii.    The Profound Harm to Mr. Hana's Family, and in Particular, to His
Three Young Children. ............................................................. 55

iii.    Deterrence ............................................................................ 58

a.    Specific Deterrence ....................................................... 58

b.    General Deterrence ....................................................... 61

iv.    Rehabilitation ......................................................................... 62

D.    The Court Should Avoid Unwarranted Sentence Disparities In Accordance
with Section 3553(a)(6). ............................................................. 63

**CONCLUSION** ............................................................................. **66**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Soto-Piedra*,
  525 F.3d 527 (7th Cir. 2008) ................................................16

*United States v. Swiney*,
  203 F.3d 397 (6th Cir.2000) ................................................16

*Cramer v. United States*,
  325 U.S. 1 (1945)................................................24

*Doe v. Menefee*,
  391 F.3d 147 (2d Cir. 2004)................................................17

*Gall v. United States*,
  552 U.S. 38 (2007)................................................ *passim*

*Kimbrough v. United States*,
  552 U.S. 85 (2007)................................................27

*Koon v. United States*,
  518 U.S. 81 (1996)................................................29

*Muhammad v. Jenkins*,
  No. 12-cv-8525, 2014 U.S. Dist. LEXIS 158481 (S.D.N.Y. Nov. 4, 2014)................................................62

*Nelson v. United States*,
  555 U.S. 350 (2009)................................................28

*Pepper v. United States*,
  562 U.S. 476 (2011)................................................29

*Simon v. United States*,
  361 F. Supp. 2d 35 (E.D.N.Y. 2005) ................................................25

*Spears v. United States*,
  555 U.S. 261 (2009)................................................27

*States v. Derbes*,
  369 F.3d 579 (1st Cir. 2004)................................................54

*United Sates v. Blagojevich*,
  08-cr-888 (N.D. Ill.)................................................64

*United States v. Acosta*,
    17 F.3d 538 (2d Cir. 1994)................................................................................24

*United States v. Acosta*,
    No. 06-cr-172, 2008 U.S. Dist. LEXIS 91200 (E.D.N.Y. Sep. 8, 2008) ................................50

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)......................................................26, 48, 61

*United States v. Alatsas*,
    No. 06-cr-473, 2008 U.S. Dist. LEXIS 6446 (E.D.N.Y. Jan. 16, 2008)................................61

*United States v. Alba*,
    933 F.2d 1117 (2d Cir. 1991)................................................................................42

*United States v. Anderson*,
    533 F.3d 623 (8th Cir. 2008) ................................................................................52

*United States v. Baker*,
    502 F.3d 465 (6th Cir. 2007) ................................................................................43

*United States v. Barnes*,
    890 F.3d 910 (10th Cir. 2018) ................................................................................54

*United States v. Bethea*,
    54 F.4th 826 (4th Cir. 2022) ................................................................................60

*United States v. Bills*,
    401 F. App'x 622 (2d Cir. 2010) ................................................................39, 55

*United States v. Booker*,
    543 U.S. 220 (2005)................................................................................13, 28

*United States v. Bryant*,
    07-cr-267 (D.N.J.)................................................................................64

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008)................................................................................13

*United States v. Celado*,
    No. 08-cr-1114, 2011 U.S. Dist. LEXIS 110975 (S.D.N.Y. Sep. 25, 2011) ........................60

*United States v. Childress*,
    788 F. App'x 27 (2d Cir. 2019) ................................................................................60

*United States v. Chong*,
    No. 13-cr-570, 2014 U.S. Dist. LEXIS 135664 (E.D.N.Y. Sep. 22, 2014)............................28

*United States v. Collins*,
    No. 18-cr-1170 (S.D.N.Y. Oct. 17, 2023) ...................................................................48

*United States v. Cooper*,
    394 F.3d 172 (3d Cir. 2005) ...................................................................................48

*United States v. Coppola*,
    671 F.3d 220 (2d Cir. 2012) ...................................................................................23

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) ...................................................................................26

*United States v. Crosby*,
    397 F.3d 103 (2d Cir. 2005) ...................................................................................13

*United States v. Cruz*,
    363 F.3d 187 (2d Cir. 2004) ...................................................................................24

*United States v. Deutsch*,
    987 F.2d 878 (2d Cir. 1993) ...................................................................................23

*United States v. Dominguez*,
    296 F.3d 192 (3d Cir. 2002) ...................................................................................55

*United States v. E.L.*,
    No. 15-cr-137, 2016 U.S. Dist. LEXIS 66063 (E.D.N.Y. May 19, 2016) ...........................57

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) ...................................................................26

*United States v. Esso*,
    486 F. App'x 200 (2d Cir. 2012) ...........................................................................63

*United States v. Fattah*,
    15-cr-346 (E.D. Pa.) ...............................................................................................64

*United States v. Fitzpatrick*,
    No. 23-cr-6722, 2024 U.S. App. LEXIS 29600 (2d Cir. Nov. 21, 2024) ...........................49

*United States v. Franklyn*,
    157 F.3d 90 (2d Cir. 1998) .....................................................................................18

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd* 31 F.3d 73 (2d Cir. 1994) ......................61

*United States v. Gardellini*,
    545 F.3d 1089 (D.C. Cir. 2008) .............................................................................52

*United States v. Getto*,
    729 F.3d 221 (2d Cir. 2013)...............................................................15

*United States v. Golino*,
    956 F. Supp. 359 (E.D.N.Y. 1997) ...............................................39, 57

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)............................................ *passim*

*United States v. Holz*,
    118 F. App'x 928 (6th Cir. 2004) .................................................54, 55

*United States v. Isola*,
    548 F. App'x 723 (2d Cir. 2013) ..................................................39, 55

*United States v. Johnson*,
    505 F.3d 120 (2d Cir. 2007)..........................................................63, 66

*United States v. Johnson*,
    567 F.3d 40 (2d Cir. 2009)..................................................................29

*United States v. Johnson*,
    964 F.2d 124 (2d Cir. 1992).................................................................57

*United States v. Johnson*,
    No. 16-cr-475, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018)...............26

*United States v. Johnston*,
    378 F.3d 230 (2d Cir. 2004).................................................................16

*United States v. Katsman*,
    905 F.3d 672 (2d Cir. 2018).................................................................49

*United States v. Khandrius*,
    613 F. App'x 4 (2d Cir. 2015) .............................................................16

*United States v. Lanni*,
    970 F.2d 1092 (2d Cir. 1992)...............................................................15

*United States v. Martinez*,
    110 F.4th 160 (2d Cir. 2024) ...............................................................24

*United States v. Martinez-Rios*,
    143 F.3d 662 (2d Cir. 1998).................................................................19

*United States v. Mateo*,
    299 F. Supp. 2d 201 (S.D.N.Y. 2004)..................................................52

*United States v. Maynard*,
    596 F. App'x 56 (3d Cir. 2015) ................................................................33

*United States v. McClatchey*,
    316 F.3d 1122 (10th Cir. 2003) ..............................................................15

*United States v. Milikowsky*,
    65 F.3d 4 (2d Cir. 1995) .........................................................................54

*United States v. Moe*,
    571 F. Supp. 3d 267 (D.N.J. 2021) .........................................................58

*United States v. Mulder*,
    273 F.3d 91 (2d Cir. 2001) .....................................................................16

*United States v. Muzio*,
    966 F.3d 61 (2d Cir. 2020) .....................................................................59

*United States v. Patel*,
    No. 97-cr-1580, 1998 U.S. App. LEXIS 22150 (2nd Cir. Aug. 21, 1998) ............55

*United States v. Paul*,
    904 F.3d 200 (2d Cir. 2018) ...................................................................13

*United States v. Percoco*,
    16-cr-776 (S.D.N.Y.) ...............................................................................63

*United States v. Perrone*,
    936 F.2d 1403 (2d Cir. 1991) .................................................................15

*United States v. Preacely*,
    628 F.3d 72 (2d Cir. 2010) .............................................................13, 28

*United States v. Pretty*,
    98 F.3d 1213 (10th Cir. 1996) ...............................................................19

*United States v. R.V.*,
    157 F. Supp. 3d 207 (E.D.N.Y. 2016) ...............................................43, 57

*United States v. Renzi*,
    08-cr-212 (D. Ariz.) ................................................................................64

*United States v. Robinson*,
    634 F. App'x 47 (2d Cir. 2016) .........................................................33, 35

*United States v. Rosen*,
    11-cr-300 (S.D.N.Y.) ...............................................................................64

*United States v. Smalling*,
No. 12-cr-61, 2014 U.S. Dist. LEXIS 44889 (E.D.N.Y. Mar. 14, 2014) .........................33, 38

*United States v. Spotted Elk*,
548 F.3d 641 (8th Cir. 2008) .........................................................................................15, 16

*United States v. St. Bernard*,
No. 06-cr-483, 2008 U.S. Dist. LEXIS 27577 (E.D.N.Y. Mar. 19, 2008) ...........................60

*United States v. Starr*,
111 F.4th 877 (8th Cir. 2024) ...............................................................................................60

*United States v. Stevenson*,
13-cr-161 (S.D.N.Y.) .............................................................................................................64

*United States v. Stewart*,
590 F.3d 93 (2d Cir. 2009) ....................................................................................................51

*United States v. Stewart*,
No. 23-cr-6330, 2024 U.S. App. LEXIS 18186 (2d Cir. July 24, 2024) ...............................65

*United States v. Studley*,
47 F.3d 569 (2d Cir. 1995) .............................................................................................16, 17

*United States v. Tavarez*,
No. 08-cr-242, 2024 U.S. Dist. LEXIS 159043 (E.D.N.Y. Sep. 4, 2024) .............................55

*United States v. Thomas*,
181 F. App'x. 188 (3d Cir. 2006) .........................................................................................39

*United States v. Tomko*,
562 F.3d 558 (3d Cir. 2009) ..................................................................................................54

*United States v. Trapero-Cortez*,
501 F. App'x 800 (10th Cir. 2012) ........................................................................................43

*United States v. Vigil*,
476 F. Supp. 2d 1231 (D.N.M. 2007) ...................................................................................52

*United States v. Wells*,
No. 08-cr-806, 2010 U.S. Dist. LEXIS 29990 (E.D.N.Y. Feb. 24, 2010) .............................58

*United States v. Williams*,
247 F.3d 353 (2d Cir. 2001) ..................................................................................................14

*United States v. Willis*,
14 F.4th 170 (2d Cir. 2021) ............................................................................................16, 17

*Untied States v. Brown*,
   209 F.3d 1020 (7th Cir. 2000) ...........................................................................21

**Statutes**

18 U.S.C. § 371 ....................................................................................................3, 5

18 U.S.C. § 1349 .......................................................................................................3

18 U.S.C. § 1951 .......................................................................................................3

18 U.S.C. § 3553(a)(1) ...................................................................................... *passim*

18 U.S.C. § 3553(a)(2) ...................................................................................... *passim*

18 U.S.C. § 3553(a)(6) .................................................................................29, 63, 66

USSG. 1B1.3 ...............................................................................................18, 22, 25

USSG § 2B1.1 ......................................................................................14, 25, 26, 65

USSG § 5H1.11 .......................................................................................................54

**Rules**

Federal Rules of Criminal Procedure 29 ..................................................................5

Federal Rules of Criminal Procedure 33 ..................................................................5

Rule 404(b) ...............................................................................................................5

**Other Authorities**

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1
   (2006) ..............................................................................................................61

Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*,
   61 Wayne L. Rev. 27 (2015) ..........................................................................58

Rachel Mathisen, *Disproportionate Sentencing Guidelines Recommendations in
   Fraud-on-the-Market*, 35 Rev. Litig. 321 (2016) ...........................................26

Richard S. Frase, *Punishment Purposes,* 58 Stan. L. Rev. 67 (2005)...........................61

U.S. Sent'g Comm'n, Bribery, Research, https://www.ussc.gov/research/quick-
   facts/bribery ...................................................................................................66

U.S. Sent'g Comm'n, Interactive Data Analyzer, Sentencing Outcomes, Sentence
  Length, Average and Median Sentence Length,
  https://ida.ussc.gov/analytics/saw.dll?Dashboard (filtering for Fiscal Year
  2023, Crime Type Bribery/Corruption, Primary Guideline § 2C1.1, and
  Criminal History Category I) ................................................................................65

U.S. Sentencing Comm'n, *Report to Congress: Increased Penalties Under the
  Sarbanes-Oxley Act of 2002* (2003) ......................................................................26

William W. Wilkins, Jr. and John R. Steer, *Relevant Conduct: The Cornerstone
  of the Federal Sentencing Guidelines*, 41 S.C. L. Rev. 495 (1990).........................................15

## PRELIMINARY STATEMENT

Defendant Wael Hana stands convicted by a jury of seven felony counts, of which as the Court knows, he sincerely believes himself to be innocent. But in this moment of sentencing, Mr. Hana sets aside his post-trial motions and any future appeal and comes before this Court seeking to be viewed as more than just the sum of these convictions. Thus, he asks that the Court fashion a sentence that, consistent with the law, achieves justice by truly taking into account both what he actually did ("the nature and circumstances of the offense") and who he actually is ("the history and characteristics of the defendant"), and to truly and thoughtfully impose a sentence that is "sufficient but not greater than necessary" to fulfill the well-established purposes of sentencing in a criminal case.

This sentencing is, in a way, tragic because it has already resulted in horrific punishment for Mr. Hana who, having come to the United States from Egypt in pursuit of the American dream, worked so hard to build a successful business from which he has now had to step down as CEO as a result of this conviction and will be further threatened by any significant absence should he be incarcerated. It is tragic because, trusting in the U.S. system of justice and having accordingly voluntarily returned to the United States from Egypt to face these charges, he has now been separated from his wife and three infant daughters for well over a year—causing him, and them, almost unimaginable pain. It is tragic because Mr. Hana's reputation, earned over many years, has been decimated by an extremely high profile trial, which now drowns out a life that really was one characterized by extraordinary generosity to those who know, work or worship with him, and by a truly unparalleled work ethic which is all about supporting the young family that he loves so much.

And now, it threatens to become even more tragic, based upon sentencing guidelines that would prescribe a sentence of 8-10 years in prison and a probation recommendation of 7 years,

either of which would be an entirely unjust and unfairly severe sentence, in light of both his personal background, described in detail below, and the actual circumstances of the offenses of which he was convicted. Those circumstances include his complete lack of involvement in many aspects of the conspiracy for which he will be sentenced and his minimal involvement in others. And for the remaining counts, Mr. Hana faces this punishment based upon his generosity to an old friend and for his advocacy with his elected Senator for his native land of Egypt, which chose him—with no help from anyone in the United States—to run a lucrative halal certification business that actually helps to feed Egyptians with food that complies with the precepts of Islam.

Mr. Hana's conviction is, to him and to his counsel, impossible to come to terms with. But a sentence of the kind here sought would only compound this terrible injustice, reflecting bloodthirstiness instead of the careful analysis of the sentencing factors that Congress has dictated. Mr. Hana accordingly comes before this Honorable Court and requests only that he be treated fairly and in accordance with U.S. sentencing law. To that end, he requests a sentence far beneath the applicable Guideline range—whether it is the range set forth in the Presentence Report or the one that should have been arrived at. It should also be far below the extremely harsh recommendation conveyed by Probation. Instead it can and should be humane, merciful and forgiving, which it can be without undermining the purposes of sentencing. It really should be a non-custodial sentence, but in any event, must be one that is fair and just in light of what he actually did and who he really is; at most, it should be a sentence of one year or less.

The reasons for such a sentence follow.

## BACKGROUND

### I.    PROCEDURAL HISTORY

#### A.    Charges and Jury Verdict

On September 21, 2023, a Grand Jury sitting in the United States District Court for the Southern District of New York returned an Indictment (ECF No. 1) against Robert Menendez, Nadine Menendez, Wael Hana, Jose Uribe, and Fred Daibes, charging all Defendants with Conspiracy to Commit Bribery in violation of 18 U.S.C. § 371 and Conspiracy to Commit Honest Services Fraud in violation of 18 U.S.C. § 1349, and charging only Senator Menendez and Nadine Menendez with Conspiracy to Commit Extortion Under Color of Official Right in violation of 18 U.S.C. § 1951.  A First Superseding Indictment (ECF No. 65) was returned on October 12, 2023, which added a charge against Senator Menendez, Nadine Menendez , and Mr. Hana for Conspiracy For a Public Official to Act as a Foreign Agent in violation of 18 U.S.C. § 371.  On January 2, 2024, the Grand Jury returned a Second Superseding Indictment (ECF No. 115) which added new allegations, but not additional charges, against Senator Menendez, Nadine Menendez, and Mr. Daibes.  On March 5, 2024, the Government obtained the final Indictment in this matter (ECF No. 238), which added Obstruction of Justice charges against Senator Menendez and Nadine Menendez.[1]

As to Mr. Hana specifically, the Indictment charged a Conspiracy to Commit Bribery and Honest Services Fraud (Counts 1 and 2), and substantive Bribery and Honest Services Fraud (Counts 5, 6, 7 and 9), whereby Senator Menendez allegedly promised to take a series of actions over a five-year period of time in exchange for purported bribes that benefited him and Nadine Menendez, including:  (1) a scheme for Senator Menendez to assist Egyptian officials with various

---

[1] Hereinafter, unless otherwise noted, the Fourth Superseding Indictment (ECF No. 238) is referred to as the "Indictment," and citations to the same take the form "Ind."

requests, *id*. ¶¶ 16-21, 35-38; (2) a scheme for Senator Menendez to help "protect" Mr. Hana's business, IS EG Halal Certified Inc. ("IS EG Halal"), *id*. ¶¶ 22-34; (3) a scheme for Senator Menendez to "disrupt" two New Jersey State criminal matters, *id*. ¶¶ 39-44; (4) a scheme for Senator Menendez to "disrupt" a Federal criminal prosecution, *id*. ¶¶ 46-54; and (5) a scheme for Senator Menendez to act for the benefit of the Government of Qatar, *id*. ¶¶ 55-66.  Relying upon the same factual allegations involving the Senator's interactions with Egyptian officials, the Government also charged Senator Menendez, Nadine Menendez, and Mr. Hana with conspiring for the Senator to act as an agent of a foreign principal required to register (Count 15).  *Id.* ¶¶ 81-83.

Prior to trial, Mr. Hana moved to dismiss all counts of the Indictment.  See ECF Nos. 143, 186, 261.  Specifically, Mr. Hana argued that (1) Counts 1, 2, 6, 7, and 9 failed to allege a *quid pro quo* scheme; (2) Count 15 failed to allege an offense; (3) the Indictment was duplicitous or, in the alternative multiplicitous and required an election between conspiracy counts; and (4) the Indictment failed to allege venue.  ECF No. 261.

The Court denied Mr. Hana's pre-trial motions in an oral opinion.  Apr. 11, 2024 Tr. 53-62.  Trial commenced on May 15, 2024 and continued until July 16, 2024, when the jury found all Defendants guilty of all counts charged, including that it convicted Mr. Hana of Conspiracy to Commit Bribery (Count 1), Conspiracy to Commit Honest Services Wire Fraud (Count 2), Bribery (Counts 5 and 6), Honest Services Wire Fraud (Counts 7 and 9), and Conspiracy for a Public Official to Act as a Foreign Agent (Count 15).  ECF 511.  The specifics of these charges and the evidence underlying them are further summarized below, for example, in the discussion of the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

Mr. Hana filed post-trial motions pursuant to Federal Rules of Criminal Procedure 29 and 33, arguing that (1) the Government's use of summary charts during trial and related witness testimony was improper; (1) no reasonable jury could find that Senator Menendez undertook or promised to undertake an "official act"; (3) no rational jury could find that Mr. Hana provided anything of value to Senator Menendez in exchange for Senator Menendez taking action on a particular matter or question with respect to the scheme to benefit Mr. Hana and Egypt; (4) no rational jury could find that Mr. Hana entered into any agreement in connection with the scheme to benefit Uribe and Uribe's associates; (5) there was insufficient evidence to sustain a conviction for a conspiracy to have Senator Menendez act as an agent of a foreign principal; (6) the Government did not prove the overarching conspiracies charged in Counts 1 and 2; (7) Mr. Hana was entitled to a new trial because of the improper exclusion of certain evidence under Rule 404(b); and (8) the Court should enter judgment on only one of the § 371 conspiracy counts (Counts 1 and 15) because they were multiplicitous. ECF Nos. 593, 600, 622. The Court agreed that Counts 1 and 15 are in fact multiplicitous and ordered that it would impose judgment on only one of the two counts, the impact of which is discussed below. ECF No. 654. The Court denied the remainder of Mr. Hana's motions. *Id.*

On November 27, 2024, Mr. Hana filed a Motion for a New Trial (ECF No. 641) based upon the improper submission of extra-record evidence to the jury; that motion was later supplemented when it was revealed that other extra-record evidence was also provided on the laptop computer that went in to the jury room. *See* ECF Nos. 641, 652, 664. This motion remains pending.

### B.    The Presentence Investigation Report ("PSR")

On September 6, 2024, the United States Probation Office filed its Draft PSR (ECF No. 605), to which Mr. Hana objected by way of letter response. Mr. Hana asserted numerous

objections to and comments to which Mr. Hana still adheres and does not hereby waive; some of those objections are discussed or referenced herein. Mr. Hana also provided a narrative version of the offense in lieu of specific objections to each paragraph of the Draft PSR pertaining to offense conduct, which was incorporated into Paragraph 39 of the Final PSR (ECF 628).

Grouping together Counts 1, 2, 6, 7, 9, and 15, the Final PSR calculates a base offense level of 12 for Conspiracy to Commit Honest Services Fraud and Bribery. PSR ¶¶ 141-142. The Final PSR then adds a two-point enhancement because there was allegedly more than one bribe, *id.* at ¶ 143, a 14-point enhancement based upon the total value of the bribes, which it calculates as $884,778.39 despite Mr. Hana's total lack of involvement in certain of those bribes, *id.* ¶ 144, a 4-point enhancement for involving an elected public official; it also recommends a 2-point downward adjustment because Mr. Hana is a Zero-Point Offender, *id.* ¶ 152. Therefore the Final PSR calculates a total offense level of 30, *id.* ¶ 153; based on that offense level and a criminal history of category I, the recommended Guideline imprisonment range is 97 to 121 months, *id.* ¶ 204. The PSR, however, recommends a variance to a sentence of 84 months incarceration., *id.* at p. 75, citing as reasons to vary from the Guidelines range "the personal history and characteristics of the defendant, including his lack of criminal history, the lack of any violence in the instant offense, and the defendant's familial responsibilities with respect to his wife and children," *id.* ¶ 225. Probation also recommends 3 years of supervised release, a fine of $300,000, and a special assessment of $600. *Id.* at p. 75.

For the reasons provided herein, Mr. Hana objects to both the Guideline calculation, specifically the fourteen-point enhancement, and Probation's recommended sentence and seeks a far more lenient sentence or no more than one year in prison.

## II.    THE OFFENSE CONDUCT

After coming to the United States from Egypt in 2006, Mr. Hana developed friendships with fellow immigrants and people from the Middle East, with whom he shared a cultural connection.  One of the people who became a friend some 15 years ago, long before she began dating Senator Menendez in 2018, was Nadine Arslanian, who was like a sister to Mr. Hana for many years.  Like any close friends, they had meals together, exchanged gifts, and helped each other when one of them was down on his or her luck.  All of these things were grounded in friendship, and not based upon any expectation of something in return.

Mr. Hana knew that Nadine was divorced, and following her marriage, had been in a physically abusive relationship with Douglas Anton, a New Jersey attorney.  After Nadine was hospitalized in 2017, having suffered a brain fracture, two contusions, and a lesion on her liver from a fall, Tr. 1588:14-17, Mr. Hana helped her out financially.  For example, Mr. Hana tried to get her involved in his businesses so that she could have a steady job and not have to rely on an abusive ex-boyfriend.  At the time, Mr. Hana had been studying the halal business and speaking with contacts in the Egyptian government about providing certification services for products imported to Egypt.  As a Coptic Christian, a long-oppressed group in Egypt, Mr. Hana was in a position to further Egypt's process of disempowering the Muslim Brotherhood, which had previously been in power, including that it had controlled the halal certification process.  When it appeared from those discussions, in 2017, that the Egyptian government would move forward with his proposal, Mr. Hana created a company, IS EG Halal Certified, Inc. ("IS EG Halal"), which would partner with the Egyptian government to handle the administrative component of certifying products as halal in compliance with the technical specifications required by the Koran and Egypt.

Mr. Hana was formally awarded the contract to certify exports as halal with an Egyptian government-owned entity on May 1, 2019, after an audit confirmed that the existing certifiers in

the United States were not complying with Egyptian standards. To date, this is the contractual arrangement that Mr. Hana maintains with the Egyptian government, memorialized most recently in an April 2021 agreement between IS EG Halal and a joint stock company in Egypt owned by three Egyptian government ministries. Through this arrangement, IS EG Halal oversees the administrative components of halal certification while technical experts from Egypt are seconded to the company to oversee religious and veterinary requirements. For its part, IS EG Halal receives thirty percent of sales from certificates, and the Egyptian government receives seventy percent. *See* Hana Ex. 013; Hana Ex. 013T; Hana Ex. 191; Hana Ex. 191T. Mr. Hana carefully built this business, learning from past mistakes in some of his prior ventures, and developed a professional operation with exceptionally qualified and dedicated staff. Indeed, although originally responsible only for certifying products from the United States, Mr. Hana's company has expanded internationally to include offices in Latin America, Australia, New Zealand, Germany, India, and China.

Mr. Hana originally offered Nadine Arslanian a job working in his office in New Jersey when it opened, but she had started dating Senator Menendez and traveled with him frequently. Therefore, Nadine did not want a traditional administrative position that would require her to report to the office eight hours per day. But Nadine continued to communicate to Mr. Hana that she was having financial trouble, so he offered her a consulting role several months later and anticipated that she would assist with setting up international offices as IS EG Halal expanded from the United States and Latin America to India, Australia, Germany, and beyond. Mr. Hana and Nadine negotiated a formal agreement, to be re-evaluated, in light of her performance, after three months. Unfortunately, Nadine's performance was not satisfactory and so, beginning in the fall of 2019, Mr. Hana put someone else on the job and decided not to renew her contract. Although Mr. Hana

could have terminated Nadine's contract early, given their longstanding friendship, Mr. Hana paid the agreed upon amount under the consulting agreement (three months at $10,000 per month), but declined to allow her to continue or to pay her any more money. Mr. Hana hoped that he and Nadine would remain close friends, but he decided that he could not rely on her professionally and did not think that they should have a business relationship after that experience.

Mr. Hana's generosity toward Nadine is, as explained below, typical, for the fact is that he is extremely generous towards his friends, as well as to colleagues, and to the broader communities of which he is a member. With respect to Nadine, for example, when, even earlier in 2019, she told Mr. Hana that she was behind on her mortgage payments, Mr. Hana gave her a loan with no interest, though just as he did with regard to Nadine's work for IS EG Halal, he formalized the arrangement. Thus, although it was not what Nadine wanted, an attorney drafted a promissory note to memorialize the loan, which the evidence showed both Mr. Hana and Nadine understood and intended would be repaid, and indeed, was repaid when Nadine—by then, Mrs. Menendez— was able to do so.

As stated, beginning in around 2018, Nadine started dating New Jersey Senator Robert Menendez. As a result, the Senator came to know Mr. Hana, and the three had some dinners together. Mr. Hana also had several meetings (attended by Nadine) with Senator Menendez, the Chairman (or Ranking Member) of the Senate Foreign Relations Committee, with regard to the relationship between the United States and Mr. Hana's native land of Egypt, including the impact that the Muslim Brotherhood had on the Coptic Christian community. However, Mr. Hana and Senator Menendez never developed a friendship apart from their relationships with Nadine. For example, as the evidence at trial showed, Senator Menendez did not have Mr. Hana's phone number, and Mr. Hana usually communicated with him through Nadine because she, and not the

Senator, was his friend.  That said, Mr. Hana, a United States citizen and resident of New Jersey, where Mr. Hana's company was also incorporated, was a constituent of Senator Menendez (in Arabic, Mr. Hana would call him "my man"), and introduced him to people that he knew in the Egyptian embassy, many of whom were contacts that Senator Menendez's own staff recommended he meet with, independent of Mr. Hana.  Mr. Hana shared with Senator Menendez, sometimes through Nadine, points about Egypt's position with respect to particular policy issues, including that Egypt bears a disproportionate burden in maintaining security and stability in the region.  But, to be clear, it is Mr. Hana's position—and, respectfully, the facts bear out—that he never gave anything to Senator Menendez or Nadine to get the Senator to agree with this or any other position regarding Egypt.  To the contrary, Mr. Hana was merely working with his representative on issues that were and are important to him regarding Egypt—a country where he conducts business and where his family continues to reside.

Further, as the evidence showed at trial, Senator Menendez did not change his stance toward Egypt as a result of Mr. Hana's efforts.  Instead, Senator Menendez remained committed to progressing civil rights in Egypt while simultaneously protecting the critical strategic defense partnership between the U.S. and Egypt, even when the Senator attempted different methods of diplomacy to achieve those ends. And while the Government sought to prove that Senator Menendez shared non-public information with Nadine and Mr. Hana, the proofs at trial did not support this theory.  For example, the number of U.S. Embassy employees in Cairo was well known to the Egyptian government—if Egyptian, they pay taxes and have health insurance, and if American, they have records of their entry and position in the country.  Thus, Egypt did not ask Mr. Hana to acquire this information from Senator Menendez; it would have no reason to do so. And Senator Menendez only cited those numbers to Mr. Hana as part of an argument whether, as

Mr. Hana stated, there were a lot of Muslim Brotherhood-affiliated personnel in the Embassy. Likewise, Senator Menendez's communicating that a ban on small arms sales to Egypt was lifted was also entirely public information that the record showed was simultaneously made public to Egypt and one of its lobbyists; this was not information which Mr. Hana bribed the Senator to receive, and there was no evidence that he did.  Moreover, this exchange of information occurred long before Mr. Hana was awarded the halal contract, according to the Government, the vehicle used to funnel bribes to the Senator and Nadine.

Nor, of course, as the evidence clearly showed, did Senator Menendez have anything to do with Mr. Hana getting that contract, a matter which was, as the Court knows, entirely within Egypt's discretion.  That said, when Mr. Hana was awarded the contract in 2019, the USDA opposed it and the Foreign Agriculture Service published a report criticizing Egypt's decision.  Mr. Hana complained to his Senator about that report and Senator Menendez openly and appropriately made a call expressing concern that the report was unfair towards Mr. Hana's company.  But there was no evidence that Mr. Hana ever gave Senator Menendez or Nadine anything in exchange for this telephone call, let alone the envelopes of cash or large gold bars that the Government falsely alleged came from Mr. Hana.  Instead, Mr. Hana considered his communication with his Senator entirely appropriate conduct by both a Senator and by a constituent who was appropriately upset with the U.S. government's stance toward his company.

In truth, Mr. Hana never gave Senator Menendez or Nadine cash or kilogram gold bars at all.  Unsurprisingly, his fingerprints were not found on any of the cash or gold at their residence.  And Mr. Hana certainly did not ask anyone to give cash or gold in his behalf.  Indeed, Nader Moussa, through whom the Government suggested (but in no way proved) Mr. Hana gave cash to Nadine, told the Government that this did not happen, information that the Government did not

disclose to either the Court or jury. The gifts that Mr. Hana did give to Nadine and her husband—for example, an air purifier, an exercise bike, gift baskets of cigars and alcohol at Christmas, and treating them to dinner—were not in exchange for anything. They were just gifts to a long-time friend and her husband.

Finally, some mention is in order with respect to Jose Uribe's decision to purchase a car for Nadine, allegedly in exchange for the Senator's interference with New Jersey criminal investigations into Uribe's illegal insurance scams. The evidence at trial was that Mr. Hana played no role in any such scheme. Though he discussed these investigations with Uribe at one point early in the process, the evidence was unequivocal that, at no point did he ever agree with Uribe to involve Senator Menendez in the issue—and, in fact, Mr. Hana did not do so. Mr. Hana's sole involvement was to refer an attorney to legally deal with the investigation into Ana Peguero, Uribe's "daughter," and Elvis Parra, Uribe's associate; that attorney, did not end up becoming involved. Rather, all of the actions involving the purchase of this car—including, most significantly, paying for it—were conducted by Uribe, and all of the communications about the purchase occurred between Uribe and Senator and Mrs. Menendez, without the involvement of Mr. Hana in any way. Certainly, there was no evidence that Mr. Hana had any knowledge of efforts that the Senator may have made to assist with any investigation or prosecution. Simply put, Mr. Hana had nothing to do with that case. Nor did he have any involvement in any of the alleged schemes involving Fred Daibes, either in terms of influencing the United States Attorney's Office for the District of New Jersey with regard to Mr. Daibes' ongoing prosecution or with regard to any development involving Qatar.

Further discussion of, and detail regarding, these facts is set forth in Paragraph 139 of the Presentence Report and, to a lesser extent, below.

**LEGAL ARGUMENT**

## I.    THE APPLICABLE LEGAL STANDARD

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the United States Sentencing Guidelines are merely advisory, freeing courts to "tailor the appropriate punishment to each offense in light of other concerns." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (en banc).  Although the Court must make a finding regarding the correct Guidelines range, "[a] district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id. at 189*.  Accordingly, district courts in the Second Circuit "'begin all sentencing proceedings by correctly calculating the applicable Guidelines range,' and then consider the factors listed in 18 U.S.C. § 3553(a)." *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)); *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005) ("Once an applicable Guidelines range has been determined, the sentencing judge will have the duty, imposed by subsection 3553(a)(4), to 'consider' it, along with all of the factors listed in section 3553(a).").

As demonstrated below, a Guidelines sentence would not be reasonable in this case.

## II.    STEP ONE: ADVISORY GUIDELINES CALCULATION

### A.    The Presentence Investigation Report Miscalculates Loss by Incorrectly Identifying Relevant Conduct.

As noted, the first step in the sentencing process is the calculation of the applicable Guidelines range.  Notwithstanding that the Guidelines are advisory, that calculation must be correct: if it is not, the sentence may not stand. *United States v. Paul*, 904 F.3d 200, 202 (2d Cir. 2018) (citing *Gall*, 552 U.S. at 49).  Here, the Presentence Investigation Report calculates an advisory guideline sentence of 97 to 121 months, based upon a total offense level of 30.  Much of

this Guidelines range is a result of the §§ 2C1.1(b)(2) and 2B1.1(b)(1)(H) loss enhancement. As detailed below, this loss enhancement is incorrect, because the prosecution has not borne its burden to sufficiently tie Mr. Hana to bribes by others. *See, e.g., United States v. Williams,* 247 F.3d 353, 358 .7 (2d Cir. 2001) ("The government bears the burden of proving, by a preponderance of the evidence, facts relevant to sentencing."). Here, the effect of this increase is dramatic: the PSR increases the base offense level by 14 levels based on a calculation of the total value of the bribes of $884,778.39. *See* United States Sentencing Commission, *Guidelines Manual*, § 2C1.1(b)(2) (Nov. 2024) (providing that, in bribery cases, "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in § 2B1.1 . . . corresponding to that amount"); *id*. § 2B1.1(b)(1)(H) (in larceny, embezzlement, and theft cases, providing for a 14 offense level increase if the amount of loss was between $550,000 and $1,500,000). That figure is calculated based on an inflated loss calculation, which should be reduced to $159,693.14, in which case the loss figure would increase the base offense level by 10 levels, not 14, and would therefore reduce Mr. Hana's recommended sentence by up to approximately four years, to 63-78 months, which would then become the starting point for the variance that the PSR acknowledges is appropriate.

The appropriateness of the PSR's calculation turns on the application of the relevant conduct provisions of the Sentencing Guidelines, set forth in USSG § 1B1.3 Specifically, pursuant to § 1B1.3(a)(2), the base offense level should be calculated on the basis of "all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or

common scheme or plan as the offense of conviction." Thus, subsections (1)(A) and (1)(B) provide that relevant conduct includes:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i) within the scope of the jointly undertaken criminal activity,
>
> (ii) in furtherance of that criminal activity, and
>
> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

The principles underpinning these subdivisions are not the same as those underpinning federal conspiracy law generally. Thus, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (quoting *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991)); *see also United States v. Lanni*, 970 F.2d 1092, 1093 (2d Cir. 1992) ("The Guidelines' approach is narrower than the standard for establishing guilt of the conspiracy offense itself"). "[W]hile the emphasis in substantive conspiracy liability is the scope of the entire conspiracy and foreseeability in light of that scope, the emphasis under § 1B1.3 is the scope of the individual defendant's undertaking and foreseeability in light of that undertaking." *United States v. Spotted Elk*, 548 F.3d 641, 673-74 (8th Cir. 2008).[2] The Sentencing Guidelines' application notes make clear that "[t]he principles

---

[2] This distinction between the scope of the entire conspiracy, for which a defendant may be held accountable under *Pinkerton*, and the scope of the individual defendant's undertaking, for which a defendant may be held accountable under § 1B1.3, was highlighted as a "key point" in a law review article written by the Chairman and General Counsel of the Sentencing Commission in

and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." USSG § 1B1.3, comment. (n.1). Indeed, "[b]ecause a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy." *Id.* at n.3. Therefore "even important participation in one aspect of a conspiracy with awareness of others does not necessarily establish responsibility for the whole of the conspiracy's activities." *United States v. Khandrius*, 613 F. App'x 4, 7 (2d Cir. 2015) (summary order).

The Sentencing Guidelines' "relevant conduct principles" thus require that a district court make two "particularized findings"—the so-called *Studley* findings." *United States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001); *see also United States v. Willis*, 14 F.4th 170, 188 (2d Cir. 2021) (same). First, it must determine "the scope of the criminal activity agreed upon by the defendant." *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995). Second, "only if it finds that the scope of the activity to which the defendant agreed was sufficiently broad to include the conduct in question," the court "must make a particularized finding as to whether the activity was foreseeable to the defendant." *Mulder*, 273 F.3d at 118. Mere "knowledge of another participant's criminal

---

1990. William W. Wilkins, Jr. and John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L. Rev. 495, 510 (1990); *see generally United States v. McClatchey*, 316 F.3d 1122, 1127-29 (10th Cir. 2003) (conviction of conspiracy does not make defendant responsible under § 1B1.3 for all reasonably foreseeable bribes paid by his co-conspirators; the bribes must also fall within the scope of the defendant's joint undertaking); *United States v. Soto-Piedra*, 525 F.3d 527, 531-33 (7th Cir. 2008) ("Conspiracy liability is generally much broader than jointly undertaken criminal activity under section 1B1.3. Actions of coconspirators that a particular individual does not assist or agree to promote are generally not within the scope of that defendant's jointly undertaken activity."); *United States v. Swiney*, 203 F.3d 397, 404 (6th Cir. 2000) ("[T]he Sentencing Guidelines have modified the *Pinkerton* theory of liability so as to harmonize it with the Guidelines' goal of sentencing a defendant according to the 'seriousness of the actual conduct of the defendant and his accomplices.'").

acts" or "of the scope of the overall operation" will not make a defendant criminally responsible for his co-defendants' acts." *Studley*, 47 F.3d at 575; *see also United States v. Johnston*, 378 F.3d 230, 238 (2d Cir. 2004) (holding that it is not enough for a court to find that a defendant knew of a co-conspirator's acts or that a defendant was "aware of the overall operation and therefore should be held accountable for the activities of the whole operation").

In *Studley*, the Second Circuit identified several factors relevant to determining the scope of a defendant's agreement: (1) "whether the participants pool[ed] their profits and resources, or whether they work[ed] independently"; (2) "whether the defendant assisted in designing and executing the illegal scheme"; and (3) "what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct." *Studley*, 47 F.3d at 575. Additionally, the foreseeability analysis requires a "close[] link" between the defendant's conduct and the putative relevant conduct. *Mulder*, 273 F.3d at 119. Finally, a court must undertake this analysis in "a manner that accounts for conflicting evidence or the gaps in [the Government's] evidentiary presentation." *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004); *see also Willis*, 14 F.4th at 189 (reversing factual findings for failure to "account for the gaps in the government's evidence").

Paragraph 125 of the PSR aggregates eleven bribe payments in calculating the loss figure, and attributes that entire figure to Mr. Hana. But only four of these payments—the promised salary payments from IS EG Halal to Nadine Menendez (¶ 125(b)), the payment by Mr. Hana to Nadine Menendez's mortgage company (¶ 125(d)), the gold bars with serial numbers liked to Mr. Hana (¶ 125(e)), and the elliptical machine and air purifier purchased by IS EG Halal (¶ 125(g))—are linked to Mr. Hana by the Government's presentation, even assuming it to be legally sufficient

(which Mr. Hana disputes).[3]  While the PSR  briefly addresses the "same course of conduct or common scheme or plan" analysis required by § 1B1.3(a)(2), *see* PSR ¶ 127, it does not apply the principles of § 1B1.3(a)(1)(A) and (B), and thus fails to assess whether the payments below (1) were within the scope of what Mr. Hana himself agreed to, and (2) whether those payments were reasonably foreseeable to Mr. Hana.

*First*, the PSR includes four payments connected to either Uribe or Mr. Daibes.  Paragraph 125(a) attributes to Mr. Hana the total sale price for the Mercedes-Benz convertible, though Mr. Hana paid none of it (and indeed did not have knowledge of the price); indeed, even Uribe, who promised the car to Nadine, paid only $48,867, none of it from Mr. Hana).  And Paragraphs 125(e), (f), and (h) attribute to Mr. Hana four one-kilogram gold bars and eleven one-ounce gold bars with serial numbers entirely traceable to Mr. Daibes, valued at $253,165.60; the "two additional one-kilogram gold bars" that "Nadine sold for $117,283 through Khorozian in May 2022, after selling two gold bars" traceable to Mr. Daibes (¶ 125(f); and ten envelopes of cash with Mr. Daibes' fingerprints and/or DNA on them, totaling $82,000.  There was literally no showing at trial that any of these amounts could be properly attributable to Mr. Hana under USSG § 1B1.3(a)(2), which requires that for the acts or omissions of other persons to be attributable to him. Hana, those acts or omissions must be "within the scope of the jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity."

---

[3] Paragraph 125 aggregates the value of the payments promised by the Defendants, stating that it is using this figure as a more conservative measure than the value of the benefit conferred to IS EG Halal.  But there is no evidence that IS EG Halal received any benefit whatsoever from Senator Menendez or Nadine.  Trial testimony consistently made clear that Egypt had full discretion and authority to award this sole source contract and there was no suggestion that it was ever in danger. *See* Tr. 594:13-16.   Indeed, Mr. Hana maintains the contract to this very day, despite this prosecution and despite the USDA's continued opposition to it, *see id*. 488:15-592:13, due to the professional and competent business he has built over the past five years.

Subparagraphs (a), (e), (f), and (h) do not address these factors, and the cash and things of value given by Uribe and Mr. Daibes cannot satisfy them, in particular because Uribe's and Mr. Daibes's actions—and their value—were not within the scope of jointly undertaken criminal activity and were not reasonably foreseeable to Mr. Hana. *Cf. United States v. Franklyn*, 157 F.3d 90, 98 (2d Cir. 1998) (affirming district court's conclusion that co-defendant's possession of a machine gun was foreseeable to sentenced defendant where he carried the ammunition for the gun in question); *United States v. Martinez-Rios*, 143 F.3d 662, 674-78 (2d Cir. 1998) (upholding scheme's mastermind's responsibility "for a substantial portion of his co-conspirators' tax losses" where he had "direct personal involvement in the evasion of taxes by [his co-defendants]" and also upholding less culpable defendants' offense level reflecting co-defendants" losses because they shared specific tax evasion mechanisms and pooled resources); *see also United States v. Pretty*, 98 F.3d 1213, 1222 (10th Cir. 1996) (finding that the amounts received by other conspirators was reasonably foreseeable and thus could be attributed to defendant because "the nature of the conspiracy was such that each participant almost certainly knew how much money was going where; the scheme was based on keeping track of money flowing from one conspirator to another").

More specifically, with respect to the Mercedes, the evidence was that it was purchased by Uribe for Nadine, in a series of actions from which Mr. Hana was totally, and expressly, excluded. Indeed, Uribe testified that he made an agreement with Nadine to get her a car in exchange for assistance with a criminal prosecution, *see, e.g.*, Tr. 3031:8-11 ("I [Jose Uribe] found Nadine, Nadine and I entered into an agreement. I am doing my part of the deal. She's already picked up her car and I am willing to continue with the deal until this gets fulfilled."); *id*. 3043:24-3044:2 ("Q. Why did you ask Nadine for the Mercedes invoice? A. It was my obligation to pay for the

monthly payments, it was my arrangement, it was my agreement with her and I wanted to comply with the agreement."), and the Government's exhibits showed that Uribe made promises to and arrangements for Nadine regarding a new car without Mr. Hana's involvement or assistance, and got full credit for doing so; *see, e.g.*, DX 1303, line 656-2 (Nadine thanking Uribe's contact for asking how the car was and saying "Im going to have Jose be my first passenger"); GX B209-13 (Nadine text to Uribe: "You are a miracle worker who makes dreams come true I will always remember that"); GX B209-11 (Nadine text to Uribe: "You have done so much for me . I will never forget it. . . . it's not just part two but for a lifetime I will never ever forget what kind of true person and friend you are."); Tr. 3223:7-19 (Uribe testimony that there was no discussion of a car for Nadine at the Glenpointe Marriott with Mr. Hana).

As for the gold bars and cash associated with Mr. Daibes, no evidence at all was introduced at trial that Mr. Hana was involved in the scheme to influence the U.S. Attorney selection in relation to Mr. Daibes's case in the District of New Jersey or that Mr. Hana was in any way involved in the Qatar transaction—and, specifically, no evidence was introduced that the payments related to Mr. Daibes were within the scope of what Mr. Hana himself (as opposed to the conspirators more generally) agreed to. Indeed, there is no evidence or testimony suggesting that Mr. Hana even knew about those events, let alone could reasonably foresee that they would be undertaken in exchange for these bribe payments. Likewise, there was no evidence that Mr. Hana was involved in transmitting the cash with Mr. Daibes's fingerprints and/or DNA on it or any of the one-kilogram gold bars in Mr. Daibes's possession, as reflected on his inventory, to Senator and/or Nadine Menendez or had reason to foresee that this would occur.

The conclusion that the above cash and things of value were "made as a part of a common scheme or plan," as stated in Paragraph 127, is incorrect, as the listed commonalities are too broad

to support such a conclusion.  For example, the fact that the things of value had "a common victim, the people of the State of New Jersey," is far too general to be the basis for sentencing, and would capture every bribe ever given to a Congressperson from New Jersey.  The contention that there were "common accomplices" is also incorrect and sweeps far too broadly; for example, as discussed, Mr. Hana was not involved in certain, or let alone all, of the conduct discussed above.  Nor is it appropriate to link them all through the common purpose of the "bribery of ROBERT MENENDEZ in return for official acts in their favor"; not only is that purpose far too broad but the bribery of Senator Menendez, without more, is not a purpose in and of itself, but instead, even assuming the allegation to be true, would be a means to accomplish more specific purposes, and the evidence did not show that Mr. Hana shared any such purpose with Uribe and Mr. Daibes with regard to the above cash and things of value.

Finally, the proposed similarities in *modus operandi* are too general to indicate a "common scheme or plan."  For example, merely attempting to obtain foreign business (regardless of whether it was from one country or another—here, for example, Egypt or Qatar) is not specific or unique enough to constitute a *modus operandi*.  The attempt to influence Mr. Daibes's Federal criminal case was also not similar to the attempt to influence the criminal matters being investigated by the New Jersey Attorney General, either in substance or in terms of the relevant actions:  even if believed, the former involved the appointment of a federal prosecutor, the latter involved the attempted persuasion of a state prosecutor, and the concept of seeking to influence a criminal prosecution is better characterized as the goal of the scheme rather than its *modus operandi*.  And, the fact that there are "similarities" between various person's gifts of gold bars and cash is not enough to show a common scheme or plan; such an argument would sweep in anyone who paid cash to Senator Menendez, no matter how unrelated to Mr. Hana.  Moreover, even if the *modus*

*operandi* were similar, "[c]rimes are not related just because they have similar *modus operandi*, or because they were part of a crime spree." *See Untied States v. Brown*, 209 F.3d 1020, 1024 (7th Cir. 2000). Committing "like crimes that were close in time and similar in style" is, as a matter of law, simply not enough to establish a "singular common scheme or plan." *Id.*

Indeed, as noted in USSG § 1B1.3, Application Note 5(B)(ii), offenses may not be part of the same course of conduct if they are not "sufficiently connected or related"; one must consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." These factors counsel against a finding that there is one course of conduct: even crediting the Government's own theory and evidence, the offenses described each sought separate benefits from Senator Menendez and thus are not sufficiently similar; the offenses were sporadic, individual, and not repeated; and there were gaps of months or even years between offenses. Indeed, the conduct involving Mr. Hana occurred in approximately 2018 and 2019, whereas the conduct involving Mr. Daibes's District of New Jersey prosecution occurred in 2021. *See* GX 1304. Likewise, Mr. Hana had no communications with Nadine or Uribe in connection with Uribe's payment of Nadine's car payments or solicitation of assistance from Senator Menendez. For example, the text communications and call records reflect that Uribe declined a call from Nadine because Uribe was with Mr. Hana and said he could not talk as a result; Nadine likewise responded that Uribe should come to her home, but only after dropping Mr. Hana off elsewhere, again demonstrating that Mr. Hana was expressly excluded from this scheme and had neither actual knowledge of their scheme, nor could he have reasonably foreseen the payments made by Uribe to Nadine. *See* GX 1303, lines 685-695. And this was typical, as Uribe began excluding Mr. Hana from conversations with Nadine and, eventually, stopped communicating with Mr. Hana concerning this matter altogether. *See generally* GX 1303, lines 841 to 1142 (showing

Mr. Hana appears in no text messages in June through July 2019; no relevant text messages in August or September 2019; and no text messages in October through November 2019). Uribe also met with Senator Menendez and Nadine multiple times—each time without Mr. Hana—to discuss the criminal investigation into Ms. Peguero. *See, e.g.*, Tr. 3099:23-24 (meeting between Uribe, Senator Menendez, and Nadine at Il Villagio on August 7, 2019); *id*. at 3124:1-19 (meeting between Uribe, Senator Menendez, and Nadine at Nadine's house on September 5, 2019).

*Second*, the PSR includes three entries associated with Nader Moussa and Gazmund Lita: a "plastic bag with $95,000 in cash, including cash with April 2022 JPMorgan Chase Bank money bands, found near the jackets containing cash with DAIBES fingerprints, the boots containing cash with Moussa's (an associate of HANA) fingerprints, and other cash with ROBERT MENENDEZ fingerprints, in the basement storage area" (¶ 125(i)); a "paper bag with $100,000 in cash, found near the jackets containing cash with DAIBES fingerprints, the boots containing cash with Moussa (an associate of HANA) fingerprints, and other cash with ROBERT MENENEDEZ fingerprints, in the basement storage area (¶ 125(j)); and "envelopes of cash with the fingerprints of Moussa and Lita (associates of HANA), with total value $9,550" (¶ 125(k)). But attribution of these funds to Mr. Hana requires the Court to engage in the most egregious and improper speculation, relying upon the kind of layering of inference upon inference that the law does not allow, even in the sentencing context. *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation."); *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) (a court may not engage in "speculation" in establishing facts relevant to sentencing). Specifically, the Government's argument that these funds are attributable to Mr. Hana as a bribe payment would require the Court to infer: (1) that after Mr. Hana's home was searched

in November 2019, he stopped paying Nadine for her consultancy through checks as a result, a fact for which there is no support; (2) that after Nadine stopped receiving checks from IS EG Halal, Mr. Hana continued to pay her in cash, a proposition for which there is no proof; (3) that Mr. Hana paid Nadine through his "employees," a contention that finds no support anywhere in the record; (4) that Moussa was in fact Mr. Hana's employee though this was not established; (5) that because Moussa and Lita worked for Mr. Hana that the envelopes found in the Menendez home must have been from Mr. Hana, an improper, guilt-by-association, inference, *see United States v. Cruz*, 363 F.3d 187, 198 (2d Cir. 2004) ("Guilt may not be inferred from mere association with a guilty party."); and (6) that other envelopes of cash in the Menendez home without Lita or Moussa's fingerprints, let alone Mr. Hana's, also must have come from Mr. Hana, which is total speculation. Moreover, these layered inferences must be made in the context of evidence (or absence of evidence) to the contrary, including that Mr. Hana's fingerprints were *not* found on the envelopes in question and that the Government provided no direct or even indirect evidence that Mr. Hana ever gave Moussa or Lita any cash to give to Nadine or Senator Menendez or that Mr. Hana ever withdrew this money to give to Nadine, or any employee with the instruction to provide it to Nadine. Indeed, the Government's discovery included a prior statement of Moussa to law enforcement officials that he had a bank account with PNC Bank, that he would at times get cash from PNC Bank, that he left Nadine approximately $300 in her garage in early 2019, and, most significantly, that *"[n]o one gave envelopes to [Nader Moussa] to give to [Senator Menendez]/[Nadine Menendez]." See* ECF No. 600.1, Ex. B at 6.

Nor, of course, does the jury's verdict mean that it adopted the Government's summation argument that Mr. Hana must have given Moussa and Lita cash to pay to Nadine and/or Senator Menendez. *See United States v. Martinez*, 110 F.4th 160, 175 (2d Cir. 2024) (rejecting use of

general verdict in sentencing context because "[w]ith the return of a general verdict, it is impossible to know anything more than the jury's bottom-line decision"); *cf. United States v. Acosta*, 17 F.3d 538, 546 (2d Cir. 1994) (noting that "[a] court knows only what the jury's verdicts were, not what the jury found"); *see generally Cramer v. United States*, 325 U.S. 1, 36 n.45 (1945) (where "[t]he verdict . . . was a general one of guilty, without special findings as to the acts on which it rests . . . it [was] not possible to identify the grounds on which [defendant] was convicted, [and] the verdict must be set aside if any of the separable acts submitted was insufficient"). Ultimately, there was simply no evidence that Mr. Hana ever gave cash to Nadine or Senator Menendez or that he gave it to others to serve as intermediaries for bribing the Senator and his long-time friend whom he saw regularly. Therefore, the 14-point enhancement is inappropriate. The loss figure is unjustifiable and unfair and any sentence based upon it would be a violation of law.

      **B.**    **In the Alternative, a Downward Departure is Warranted Because the Loss Calculation Results in a Guidelines Range that Substantially Overstates the Seriousness of the Offense.**

Probation's recommendation of a 14-level increase in the base offense level based upon the purposed loss, which ultimately drives the total offense level of 30, if accepted would result in significantly overstating the seriousness of Mr. Hana's conduct in this case. *See* USSG § 2B1.1, comment. (n. 21(C)) ("downward departure may be warranted" if the offense level determined under § 2B1.1 "substantially overstates the seriousness of the offense"). Simply put, a Guidelines range premised substantially on promises made by persons other than Mr. Hana is not commensurate with Mr. Hana's purported level of culpability. Even if the Court determines that the promises discussed above were somehow part of what Mr. Hana may be responsible for under USSG § 1B1.3, because (1) he (as opposed to others) agreed to it, or (2) those promises were reasonably foreseeable to Mr. Hana, that loss calculation significantly overstates Mr. Hana's involvement in the offenses at issue and thus risks the imposition of an excessive sentence. *See,*

*e.g.*, *Simon v. United States*, 361 F. Supp. 2d 35, 49 (E.D.N.Y. 2005) (concluding that Guidelines sentence substantially overstated the seriousness of the offense); *United States v. Gupta*, 904 F. Supp. 2d 349, 350-55 (S.D.N.Y. 2012) (recognizing guideline sentence was irrational and sentencing well below the guideline range), *aff'd* 747 F.3d 111 (2d Cir. 2014).

Courts in this circuit have criticized the loss amount enhancement (which applies here, albeit in the form of putative gain, through § 2C1.1) as a flawed measure of a defendant's culpability. *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring) (noting "the widespread perception that the loss guideline is broken" and "leaves district judges without meaningful guidance in high-loss cases"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512, 515 (S.D.N.Y. 2006) (finding the loss enhancement "patently absurd" and describing the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic"); *United States v. Johnson*, No. 16-cr-475, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (noting that § 2B1.1 enhancements "do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime," and thus recommending that "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that [guideline] provides"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (Lynch, J.) (stating that the specific amount of loss (or gain) is often "a kind of accident" providing a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence"). And academics have acknowledged that the § 2B1.1 loss table was not developed using an empirical approach based on data about past sentencing practices, but instead assembled in response to national media attention on infamous frauds. *Corsey*, 723 F.3d at 379 (Underhill, J., concurring); Rachel Mathisen, *Disproportionate Sentencing Guidelines Recommendations in Fraud-on-the-Market*, 35 Rev.

Litig. 321, 321-22 (2016); U.S. Sentencing Comm'n, *Report to Congress: Increased Penalties Under the Sarbanes-Oxley Act of 2002*, at 7 (2003) (noting that Sarbanes-Oxley sentencing enhancements responded to the high-profile accounting scandals of the early 2000s).  Applying a total offense level of 30 to the offense here would obviously implicate just such concerns, concerns that can be addressed through the vehicle of a downward departure.  *See Kimbrough v. United States*, 552 U.S. 85, 111-12 (2007) (affirming district court's departure from guidelines based on a policy disagreement with the guidelines); *Gupta*, 904 F. Supp. 2d at 351 ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face."); *see also Spears v. United States*, 555 U.S. 261, 264 (2009) (explaining that when the Guidelines fail to account for past sentencing practices, a district court can vary downward "based on policy disagreement with them, and not simply based on an individualized determination that the yield an excessive sentence in a particular case").

Such a downward departure is appropriate not only with respect to the losses that, in reality, have nothing to do with Mr. Hana, but even with respect to those that do fall within that to which he was specifically charged.  For example, a downward departure is appropriate with respect to PSR ¶ 125(b), which incorporates $120,000 ("The payments from IS EG Halal to Strategic International Business Consultants") into the aggregate value of things of value promised to Senator and Nadine Menendez.  But while the Government argued that Mr. Hana promised $120,000 to Nadine, the evidence was that Mr. Hana, in fact, made only three payments, totaling $30,000, based upon a contract that was negotiated and thus reflects the party's actual intent, not one rooted in speculation or ambiguity.  In this regard, too, including the hypothetical full salary, which Nadine did not receive and Mr. Hana took affirmative steps not to pay her, substantially

overstates the gains to—and those promised to—Nadine Menendez, even assuming that these were bribes.  Likewise, Paragraph 125(c) of the PSR incorporates $23,568.54 paid by Mr. Hana directly to Nadine's mortgage company.  However, a downward departure is warranted on this basis as well because the payment was a loan, which Nadine ultimately repaid.  *See, e.g.*, GX 4C1-D; GX 1302, lines 947, 966, 971, 982-83; DX 1302, lines 985-1 to 985-4 ("The current reinstatement amount is $23568.54"; "That is the amount that I am wiring"; "That is the amount he authorized to send as a personal loan with no interest as the memo"); GX 5C-200.

For all of these reasons, even if the Court decides to apply the PSR's recommended Guidelines calculation, the Court should depart downward pursuant to USSG § 2B1.1, comment. (n. 20) due to the gain calculation's substantial overstatement of Mr. Hana's involvement, particularly given the established failure of the loss table with regard to assessing actual culpability.

## III.    STEP TWO:  SECTION 3553(A) FACTORS

Although calculating the applicable Guidelines range is the required first step in the sentencing process, following *Booker* the Guidelines are advisory only and district judges are directed to "craft an appropriate sentence taking full account of 'the history and characteristics of the defendants.'"  *Preacely*, 628 F.3d at 84 (Lynch, J., concurring) (quoting 18 U.S.C. § 3553(a)(1)); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. . . . The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." (emphasis in original)); *Gall*, 552 U.S. at 49-50 ("[T]he district judge . . . may not presume that the Guidelines range is reasonable.").  In exercising this discretion, judges are guided by 18 U.S.C. § 3553(a), which instructs sentencing courts to take a holistic approach to sentencing, requiring the court to consider "the nature and circumstances of the offense," as well

as "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The statute thus

mandates that courts impose a sentence "sufficient, but not greater than necessary" to, among other

considerations, "reflect the seriousness of the offense, . . . promote respect for the law, and provide

just punishment for the offense," and to "afford adequate deterrence to criminal conduct." 18

U.S.C. § 3553(a)(2); *see also United States v. Chong*, No. 13-cr-570, 2014 U.S. Dist. LEXIS

135664, at *9 (E.D.N.Y. Sep. 22, 2014) ("Discretion remains an indispensable mitigating safety

valve for the law's sometimes destructive and illogical effects."). Section 3553 also directs courts

to "the need to avoid unwarranted sentence disparities among defendants with similar records who

have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). At the end of the day, courts

must make "an individualized assessment" of all of the facts and circumstances. *United States v.

Johnson*, 567 F.3d 40, 51 (2d Cir. 2009) (internal quotation marks omitted); *Gall*, 552 U.S. at 50

("[The sentencing judge] must make an individualized assessment based on the facts presented.").

And in doing so, the Court must abide by the guiding principle dictated by the Supreme Court: it

must "consider every convicted person as an individual and every case as a unique study in the

human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518

U.S. 81, 113 (1996)).

Here, application of the § 3553(a) factors warrant a non-custodial sentence or, in the

alternative, a below-Guideline range.

### A.    Application Of The § 3553(a)(1) Factors Warrant A Lenient Sentence.

#### i.    *The Nature And Circumstances Of The Offense*

##### a.    **Mr. Hana's Longstanding Friendship with Nadine**

As is explained, Mr. Hana and Nadine Arslanian (later, Menendez) had a longstanding

friendship that preceded Nadine's relationship with and then marriage to Senator Menendez by

many years. As such, Mr. Hana gave gifts and did favors for Nadine, as she did for him, not in exchange for anything but because they were friends for decades. Though the jury ultimately found that Mr. Hana provided Nadine and the Senator with bribe payments, the relationship between Mr. Hana and Nadine—which is undisputed—is relevant to understanding and putting into fair and proper context the things of value Mr. Hana gave to Nadine and, at times, her husband. To be more specific, those "things of value" were as follows:

*First*, when Nadine fell behind on her mortgage, Mr. Hana as a good friend, provided Nadine with a no-interest loan. This loan was not made in exchange for anything, but was just part of their friendship. To make even clearer that it was not a bribe, it was memorialized by a promissory note, *see* GX 4C1-D; DX 1302, lines 947, 966, 971, 982-83, and made clear to be a loan on the cashier's check to Nadine's mortgage company, issued long before this investigation or prosecution, *see* GX 5C-200.

*Second*, as is also discussed above, Mr. Hana's company, IS EG Halal, entered into a consulting agreement with Nadine that offered her $10,000 per month for three months. GX 3C-9. As explained, Mr. Hana tried to get Nadine involved in his business efforts from as early as 2017—before she even started dating Senator Menendez—so that she did not have to rely on her abusive ex-boyfriend for financial support. When Mr. Hana officially obtained the sole-source contract to certify halal imports into Egypt, Mr. Hana initially offered Nadine an office job. However, at the time, she preferred to work remotely as she traveled frequently with the Senator; Nadine was not interested in a formal eight-hour a day position. GX D108 (voicemail from Nadine to Mr. Daibes indicating that she did not want to work eight hours per day). Instead, Mr. Hana offered Nadine a three-month consulting role from September through November 2019 and anticipated that she would assist with setting up international offices as IS EG Halal expanded

from the United States and Latin America into India, Australia, Germany, and beyond. GX 3C-9; DX 1302, lines 1104-1 through 1104-18. When Nadine failed to perform, Mr. Hana replaced her, *see* Hana Ex. 42, and though he paid Nadine the full contract amount ($30,000), he did not extend the contract, as he could have by its terms. Nor did he immediately terminate the contract, as he could have, given his longstanding relationship with Nadine, or opt for something larger or more informal. And, as explained above at pp. 21-28, there was simply no credible evidence that Mr. Hana continued paying Nadine in cash after November 2019. But in any event, these "things of value," were not part of any *quid pro quo*; more to the point for this analysis, as the Court considers the nature and circumstances of the offense, they should be considered in the full context of the relationship between Mr. Hana and Nadine Arslanian/Menendez.

*Third*, over the years, Mr. Hana gifted Nadine and the Senator miscellaneous items such as an exercise bike, Christmas gift baskets of cigars and alcohol, one-ounce gold bars, and dinners. Though these were denominated bribes at trial and made to look sinister, that is only possible by considering them out of context. In fact, these were gifts, or simple generosity, between longtime friends.

Though the jury found these favors to be bribes, the relationship between Mr. Hana and Nadine is relevant at sentencing in order to truly understanding the nature of the offense for sentencing purposes, in satisfaction of 18 U.S.C. § 3553(a)(1). Mr. Hana was not convicted of providing anything of value to Senator Menendez—all that he gifted was through Nadine. Nor was Mr. Hana convicted of bribing a stranger or someone with whom he had no prior relationship. Instead, Mr. Hana was convicted of bribery and honest service fraud on the bases of things of value he gave to his friend for many, many years, gifts that were reciprocated, not by Senator Menendez but by Nadine—as friends do.

   **b.** **Mr. Hana's Relationship with Egypt and his Sole-Source Contract**

Mr. Hana was born and raised in Egypt by relatively wealthy parents, PSR ¶ 164, who had contacts with the Egyptian government through their status and work in the wholesale food industry. Indeed, it was never disputed at trial—and, in fact, the Government proved—that Mr. Hana had relationships with Egyptian officials or that he was friendly with certain members of the Egyptian government. In fact, Mr. Hana relied on these contacts in 2017—before Nadine and Senator Menendez even started dating—when he started studying the halal business and spoke with contacts in the Egyptian government about providing certification services for products imported to Egypt. Dr. Hajjar Ltr. at 1; D'Alessio Ltr. at 1. That same year, Mr. Hana's Egyptian contacts informed him that the government would accept his proposal following an audit of the current halal certifiers in the United States. Then, in May 2019, when it became apparent that existing certifiers were not complying with Egyptian and Islamic standards, IS EG Halal was formally awarded the exclusive contract to certify exports, at which point Mr. Hana's company, IS EG Halal, commenced operations. And, when the USDA began complaining about IS EG Halal's sole-source contract, Mr. Hana (a New Jersey resident) turned to his congressional representative, Senator Menendez, to advocate for the New Jersey business.

Whatever his guilt or innocence, Mr. Hana's relationship with Egyptian officials is a circumstance of the offense that sheds light on what occurred here, including his communications with certain Egyptian officials. Moreover, although Mr. Hana is a United States citizen, he maintains property and supports his family in Egypt. PSR ¶ 167. His continuing connection to Egypt further explains his communications with Senator Menendez on topics such as military funding and financing. Again, while the jury ultimately found that Mr. Hana conspired with Senator Menendez and Nadine to have the Senator act as an agent of Egypt (a conviction for which

he cannot and will not be sentenced, since that count was held by the Court to be multiplicitous),

for sentencing purposes, Mr. Hana's familial contacts with Egyptian officials and government

employees provides important factual context in evaluating his culpability under the nature and

circumstances of the offense prong of 18 U.S.C. § 3553(a)(1).

### c.    Mr. Hana's Minimal Role in the Charged Conspiracy

In considering the nature and circumstances of the offense, the Court should also consider

Mr. Hana's actual role in the conspiracy.  As the Second Circuit recognizes, "a defendant's role in

the conspiracy may be a germane factor under § 3553(a), and the facts regarding his role are

relevant to sentencing." *United States v. Robinson*, 634 F. App'x 47, 50 (2d Cir. 2016); *see also*

*United States v. Maynard*, 596 F. App'x 56, 60-61 (3d Cir. 2015) ("[T]he District Court properly

weighed [co-conspirator's] relative culpability and the other § 3553(a) factors.").  Indeed, even

though Mr. Hana did not receive a Guidelines role adjustment in the PSR, his minor role in the

offense should be considered as part of the "nature and circumstances" of the offense under §

3553(a)(1).  *See United States v. Smalling*, No. 12-cr-61, 2014 U.S. Dist. LEXIS 44889, at *4

(E.D.N.Y. Mar. 14, 2014) ("The court considered the 'nature and circumstances of the offense and

the history and characteristics of the defendant.' *See* 18 U.S.C. § 3553(a)(1).  [Defendant] played

a minor role in creating and distributing fraudulent credit cards.  Her participation in the instant

access device fraud operation was largely dictated by co-defendant Miller, with whom she had a

romantic relationship.").  Here, the PSR identifies Senator Menendez, not Mr. Hana. as the

"organizer/leader of the overall scheme," not Mr. Hana.  PSR ¶ 133.  Indeed, the PSR notes that

Senator Menendez "directed" Nadine "to pass information and documents along from him to [Mr.

Hana]" and "directed" Nadine "on how to convey information to [Mr. Hana]." *Id.*  His role in the

offense should be considered accordingly.  Moreover, as was explained in Section II, *supra*, Mr.

Hana was not involved at all in two of the alleged schemes, described again below.

*First*, the evidence demonstrated that Uribe, not Mr. Hana, purchased a Mercedes car for Nadine.  Indeed, Uribe testified that he made an agreement with Nadine to purchase the vehicle in exchange for assistance with a criminal prosecution.  *See*, *e.g.*, Tr. 3031:8-11 ("I [Jose Uribe] found Nadine, Nadine and I entered into an agreement. I am doing my part of the deal. She's already picked up her car and I am willing to continue with the deal until this gets fulfilled."); *id*. 3043:24-3044:2 ("Q. Why did you ask Nadine for the Mercedes invoice? A. It was my obligation to pay for the monthly payments, it was my arrangement, it was my agreement with her and I wanted to comply with the agreement.").  And, the Government's exhibits demonstrated that Nadine thanked only Uribe for the car, highlighting Mr. Hana's absence from the arrangement. *See*, *e.g.*, DX 1303, line 656-2 (Nadine thanking Uribe's contact for asking how the car was and saying "Im going to have Jose be my first passenger"); GX B209-13 (Nadine text to Uribe:  "You are a miracle worker who makes dreams come true I will always remember that"); GX B209-11 (Nadine text to Uribe:  "You have done so much for me . I will never forget it. . . . it's not just part two but for a lifetime I will never ever forget what kind of true person and friend you are."); *see also* Tr. 3223:7-19 (Uribe testimony that there was no discussion of a car for Nadine at the Glenpointe Marriott with Mr. Hana).  At most, Uribe testified that Senator Menendez told him that the Senator had been asked by Mr. Hana and Nadine to get a better resolution for Uribe's associate, Elvia Parra.  Tr. 3104.  But even accepting Uribe's testimony as true, it says nothing about whether Mr. Hana agreed with Uribe to bribe Senator Menendez, and no other evidence was presented to support that theory; indeed, Uribe specifically testified that Mr. Hana did not propose the purchase of the Mercedes, or any other thing of value to Senator Menendez or Nadine, in exchange for such action, official or not.

**Second**, the Government did not present any evidence at all linking Mr. Hana to the scheme to influence the U.S. Attorney selection or the Qatar transaction, both of which provided the purported bases for the prosecution of Mr. Daibes.  Indeed, there is no suggestion that Mr. Hana even knew about those events, let alone could foresee that they would be undertaken in exchange for these bribe payments.  In fact, Mr. Hana was not mentioned at all in GX 1304, the summary chart upon which the Government relied to prove these schemes.

In sum, in applying the § 3553(a) factors, the Government should consider Mr. Hana's more limited role, including vis-à-vis Senator Menendez, which, here, weighs in favor of a non-custodial sentence or, at the very least, a sentence of no more than 12 months imprisonment..  *See Robinson*, 634 F. at 50.

### ii.    *The History And Characteristics Of The Defendant*

The sentencing statute, 18 U.S.C. § 3553(a)(1), also requires that the Court consider Mr. Hana's history and characteristics.  *Gall*, 552 U.S. at 49 n.6.  Here, beyond the lack of any criminal record, dozens of friends, family members, colleagues, and employees have submitted letters of support on behalf of Mr. Hana.  They each describe a compassionate, generous, hard-working, religious, and dedicated family man who has "an incredible sense of responsibility for others." Dr. Hajjar Ltr. at 1.[4]  Indeed, in addition to his business successes, Mr. Hana "is known for his involvement in community activities and charitable causes." Dr. Hussein Ltr. at 2.  And as Mr. Hana has become more successful, his dedication to service has only grown:  "As he has been blessed with more, his desire to give back has only grown stronger." █████████ Ltr. at 2.

---

[4] The letters in support of Mr. Hana are attached to this memorandum and designated as Exhibits A-1 to A-50.  An index of the letters in alphabetical order by last name, indicating the corresponding exhibit number, is attached at the end of this memorandum.

This memorandum focuses on four aspects of Mr. Hana that demonstrate his true character and are most significant for purposes of sentencing: (1) Mr. Hana's pursuit of the American Dream; (2) his dedication to his family, most especially to his wife Selvya Faragalla and their three daughters Marla, Myla, and Mylin; and (3) his compassion and generosity; including his dedication to his faith and the Coptic Christian community.

### a.    Hana's Personal Background:  His Pursuit Of The American Dream

Mr. Hana was born in the village of Menia, Egypt in 1983. PSR ¶ 162. His father worked in the food industry as a wholesale distributor and his mother was a homemaker. However, in February of 1999, when Mr. Hana was 15 years old, his father passed away, leaving Mr. Hana's mother to raise and support four children alone. Hany Hana Ltr. at 1. The loss of Mr. Hana's father has "shaped the man he has become today and given him a deep sense of empathy and responsibility, which is reflected in his actions towards others." Faragalla Ltr. at 2.

While Mr. Hana was in university, he started his first business, opening a wholesale convenience store. Nabil Hana Ltr. at 1 ("Wael started his first business, which was innovative and different, in his university years; it was a big store that sells chocolate, candy, potato chips, and the like in bulk, he dealt with producers directly, and it was a distinctive project."). After completing his education, Mr. Hana immigrated to the United States in 2006 as part of a visa lottery program, PSR ¶ 139, and he immediately worked hard to learn English and to develop a business here. *See*, *e.g.*, Aslanian Ltr. at 1 ("I have known Wael Hana since 2009 having first met him when he retained me to review a lease in connection with a gas station business he was developing. Wael was in his mid[-]twenties at the time having recently arrived in the United States with the aspiration to become a business owner and pursue the American dream."). Mr. Hana first found a job as a janitor and then started a small business providing cleaning services for homes

and offices. Nabil Hana Ltr. at 1. From there, Mr. Hana "purchased a gas station, then a restaurant, then a freight company." *Id.* Along the way, he experienced many "problems and difficulties," *id.*, including the destruction of his trucking business after Hurricane Sandy ██████████ Ltr. at 2.[5] On January 6, 2012, he became a naturalized citizen, PSR ¶ 166, which he reports as one of the greatest days of his life, for notwithstanding the events of this case, Mr. Hana is a very proud American, who is horrified that he has been found to violate the laws of the county he worked so hard to come to and loves so much. Burgueno Ltr. at 1 (noting that Mr. Hana "loves and is grateful for" the United States, "the country that adopted him").

Despite a number of ups and downs, Mr. Hana was always determined—as he remains today—to keep working hard and to learn from his mistakes, all in the hope of earning a living here in the United States to support his family in Egypt. Lita Ltr. at 1. Between 2016 and 2017, Mr. Hana became interested in returning to his food-industry background and began "diligently researching" the halal industry. Dr. Hajjar Ltr. at 1; D'Alessio Ltr. at 1. As discussed above, Mr.

---

[5] Although Mr. Hana suffered through periods of financial instability, he always remained committed to repaying his debts:

> In 2011, Wael encountered a significant challenge when he lost his business due to Hurricane Sandy. Before the hurricane, he had borrowed money from several individuals to fund his trucking and gas station business. After the disaster, these individuals approached me with concerns about repayment. I spoke with Wael, who sincerely promised to repay everyone, though he needed time to manage his situation. Despite the prolonged hardship, Wael never wavered in his commitment. He consistently reassured me of his intent to fulfill his promises, even when hope seemed to diminish. Through relentless hard work, Wael eventually repaid every penny, including interest. This reflects not only his steadfast dedication but also his profound integrity and resilience demonstrating how deeply he values his commitments, and the trust others placed in him.

██████████ Ltr. at 2.

Hana reached out to family contacts in the Egyptian government about providing halal certificates for products imported into Egypt. As noted, when it appeared that the Egyptian government was receptive to his proposal, he created IS EG Halal Certified Inc. ("IS EG Halal"), a company which would handle the administrative and logistic components of certifying products as halal. The Egyptian government formally awarded Mr. Hana and IS EG Halal a sole-source contract for their certification services on May 1, 2019. To date, Mr. Hana retains the exclusive contract and operates IS EG Halal offices all over the world, including in South America, Asia, Australia, and Europe. After the success of IS EG Halal, Mr. Hana entered into the real estate industry through his company Capital Management.

Mr. Hana's successes stem from his extraordinary dedication and really incredible work ethic, as noted by many of his colleagues and employees. *See* Kossup Ltr. at 1 ("Mr. Hana's dedication and hard work are truly admirable, and it's a testament to his character and commitment to his company."); Lawlor Ltr. at 1 (". . . Wael's dedication and work ethic are truly remarkable. He has always been incredibly proud of his achievements as a successful United States business owner."); D'Alessio Ltr. at 1 ("The commitment of time Wael puts towards his business is one of the many keys to his success. I have seen him work around the clock, from early morning hour calls with Egypt associates, then putting in a full 9-5 work day, then attending an off hour work meeting with our international offices, and capping it off with work dinner at night. . . . I've found that in life, half the battle is simply showing up, and Wael "shows up", twenty four hours a day, seven days a week, for his business interests."); Garcia Ltr. at 3 ("I deeply admire how Mr. Hana has built such a solid company across multiple countries, especially considering his journey as an immigrant from Egypt at a young age. As an immigrant myself, I respect his resilience and ability to thrive in a challenging environment like the United States."). That work ethic is and ought to

be a characteristic of his that weighs in his favor under 18 U.S.C. § 3553(a)(1). *See Smalling*, 2014 U.S. Dist. LEXIS 44889, at *4-5 (noting that "Defendant's employment history demonstrates a strong work ethic and dedication to supporting herself" in analyzing the § 3551(a)(1) factors).

### b.    Mr. Hana's Commitment To His Family As A Loving Husband And Father To Three Small Children

There is no question that Mr. Hana is a dedicated family man who loves and supports his wife and children above all else. Indeed, his life is and always has been consumed by his orientation to his family and his dedication to their well-being. Hanna Ltr. at 2 ("Beyond the thoughtful gestures and kindness, he shows to others, he is, first and foremost, a dedicated family man."); Radoniqi Ltr. at 1 ("Beyond his professional accomplishments, Wael is a devoted father who has raised his children with the same principles he embodies—honesty, respect for others, and a deep faith in God."); Kossup Ltr. at 1 ("Over these past two years, I've seen how dedicated he is to his family."). Mr. Hana's devotion to his family, as illustrated through many of his friend's and family's letters, is precisely the type of information that the Court should consider in determining Mr. Hana's sentence under 18 U.S.C. § 3353(a)(1). *See United States v. Isola*, 548 F. App'x 723, 725 (2d Cir. 2013) (identifying "[defendant's] family circumstances and the effects of his incarceration on his daughter" as one of the factors to be considered under 18 U.S.C. § 3553(a)); *United States v. Bills*, 401 F. App'x 622, 624 (2d Cir. 2010) (holding that "the likely effects of [defendant's] incarceration on her daughter" were one of the "mitigating factors" that was appropriately considered under 18 U.S.C. § 3553(a)); *United States v. Thomas*, 181 F. App'x. 188, 190 (3d Cir. 2006) ("[U]nder Section 3553, the history and characteristics of the defendant, including her family ties, are pertinent to crafting an appropriate sentence."); *see also United States v. Golino*, 956 F. Supp. 359, 363 (E.D.N.Y. 1997) ("The sentencing court must guard against the possibility of wreaking undue depredations upon the defendant's innocent family.").

Specifically, Mr. Hana and his wife Selvya married in 2020.  Hany Hana Ltr. at 2.  They have three young daughters:  three-year old Marla and one-year old twins Myla and Mylin.  *Id.* Since Mr. Hana voluntarily left Egypt in September 2023 to stand trial, he has been entirely separated from his family—an unfathomable burden that he, his wife, and his children bear every day.  Faragalla Ltr. at 3 ("Although the girls are very young, their father's absence has profoundly affected them.  They may not fully understand why he isn't physically present, but they certainly feel his absence.  His absence weighs heavily on them, particularly during moments when they long for his attention and affection.  Since Wael left in September, it has been heart-wrenching as a mother to witness the deep emotional toll on my children—a pain I never imagined experiencing."); Hany Hana Ltr. at 2. ("[Mr. Hana's] wife is very affected by his absence, and we can say that she is an adult and understands why he has gone away from her and the children. But his older daughter's constant questions about him, and when she sees him on video calls and asks him when he is coming back, [it] cause[s] anyone who is present at the time to cry."); Hanna Ltr. at 2 ("If anything has deeply affected Wael during this entire ordeal, it's the pain it has caused his family.").  Indeed, despite his efforts to bring his family to the United States, the Egyptian authorities have tragically prevented Mr. Hana's wife from leaving the country, PSR ¶ 168, imposing a terrible punishment upon him even when he was presumed innocent.

That said, and despite the physical distance, Mr. Hana continues to work "tirelessly" to build a better future for his family.  Lawlor Ltr. at 1.  Indeed, Mr. Hana's "commitment to providing for his loved ones, even while apart, is a testament to his deep love and responsibilities. The sacrifices he has made to create a stable and secure life for his family, despite numerous challenges, emphasize how much he values and cherishes them."  *Id.*  As described by ███████ ███████ Mr. Hana's personal friend, and ███████████████:

40

> Wael has always maintained a strong and affectionate bond with his family, which speaks to his deep personal values. . . . [His] profound concern for their emotional needs highlights Wael's deep love and sense of responsibility toward his family, even while he is physically apart from them.

████ Ltr. at 2-3.

Furthermore, although Mr. Hana is the sole wage-earner, he never lets the demands of work, or his physical distance from his family, get in the way of being there for his wife and kids. *See* D'Alessio Ltr. at 3 ("He does not miss a phone call, however there is one special phone call that is not related to work he surely will not miss. That all important phone call (FaceTime) is from his wife, and his three daughters are often part of those calls. . . . In those brief calls, daily stress, burdens and personal woes fade into the background, and is replaced with love at its purest form. His smile and laughter become more genuine, his voice becomes a little softer, and time is allowed to slow down while he is transported to that shared space with his family."); *see also* Hanna Ltr. at ("Along with his generosity, one of Wael's most defining characteristics is his deep commitment to his family. . . . Whether it's making time to Facetime his daughters, or talking with his wife or mother, he always puts his family first."). As anyone who knows and spends time with Mr. Hana (including the undersigned counsel) can attest, he remains in constant contact with his family through telephone calls and video chats. Of course, these moments, however, are bittersweet, as they highlight for his children Mr. Hana's physical absence. *See* Sinisi Ltr. at 2-3 ("This unfortunate situation has taken a toll on Wael and his family, especially on his wife and daughters. Wael, being a devoted husband and father has suffered by being forced to watch his young children achieve milestones over video. I have had the privilege to witness and sometimes participate in video calls with his oldest daughter, who is three years old. The sparkle in her eyes and huge smile on her face when she sees her father is heartwarming. I can tell how much she misses him, having not been able to see him in a year."); Lawlor Ltr. at 1-2 ("Despite the physical

distance from his family, Wael has worked tirelessly to build a better future for them.  His commitment to providing for his loved ones, even while apart, is a testament to his deep love and responsibilities. . . . He frequently Facetimes his children, and each time he hangs up, the sadness is very clear."); Kossup Ltr. at 1 ("He's constantly in touch with his wife and regularly FaceTimes with his children.  The bond between them is clear especially when you see the longing in his daughter's [*sic*] eyes, as they haven't been able to reunite in person for over a year now.").

That said, there is no question but that "[t]his unfortunate situation has taken a toll on Wael and his family, especially on his wife and daughters."  Sinisi Ltr. at 2-3.  It has been "heartwrenching" for his wife "to witness the deep emotional toll" that Mr. Hana's absence has had on their children.  Faragalla Ltr. at 3.  Unquestionably, his children long for the day they can reunite and are confused by the separation.  *Id*. ("The girls become visibly distressed when they see other children with their fathers at church or daycare.  We live near an airport in Cairo, and whenever an airplane flies overhead, their faces light up with hopeful excitement as they chant, 'Daddy is coming home!'  Marla, at just three and a half years old, often approaches her teachers with questions like, 'When is Daddy coming?' because neither I nor her father can give her a direct answer.  The sadness over her father's absence became so overwhelming that she refused to attend daycare for six months, in hope of his return.").

Sentencing Mr. Hana to any term of imprisonment, would only serve to further deprive his daughters, ranging in age from one to three, of the quality time with their father that they so desperately need at the critical stages of each of their respective developments.  For example, his children would certainly be deprived of the opportunity to see their father through Facetime or video chats, especially since they are being prohibited from coming to the United States as a result of this matter.  A non-custodial sentence, then, is not only the best but it is the only way that the

Court has available to it to consider this factor and limit the deleterious effects of Mr. Hana's sentence. *See, e.g., United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (holding that the sentencing court's "determination to depart downwardly relying on [the defendant's] family circumstances [was] not an abuse of its discretion" where "incarceration in accordance within the Guidelines might well result in the destruction of an otherwise strong family unit"); *United States v. R.V.*, 157 F. Supp. 3d 207, 255 (E.D.N.Y. 2016) (finding, under § 3553(a), that fact that "defendant belongs to a strong family unit and his children would suffer from his absence" warranted non-custodial sentence); *United States v. Baker*, 502 F.3d 465, 467-68 (6th Cir. 2007) (affirming district court's sentence of probation, which was based on "the effect incarceration would have on defendant's older son"); *United States v. Trapero-Cortez*, 501 F. App'x 800, 801 (10th Cir. 2012) (district court granted defendant's request for a downward variance, citing his "commitment to his family").

**c.      Mr. Hana is a Generous Man of Deep Faith**

Irrespective of whether Mr. Hana was up or down on his luck, his commitment to others has remained a steadfast and defining characteristic, and perhaps what sets Mr. Hana apart from others the most. Dozens of his friends and family commented on his compassion and generosity, and his constant "willingness to assist others having difficulties." Aslanian Ltr. at 1; *see also* Dr. Hussein Ltr. at 1 ("Regarding charitable donations and community contributions made by Wael Hana, I believe they are well known . . . and likely exceed even my own awareness. His generosity and commitment to giving back are evident in the numerous ways he supports those in need, and I am confident that his impact is deeply appreciated by all who benefit from his kindness."); ███████ Ltr. at 2 ("Wael's generosity is a profound reflection of his compassionate character. He consistently directs his efforts towards helping those in need,

particularly those who are ill[.]"); Kossup Ltr. at 1 ("Mr. Hana's heart is full of compassion; he's always looking to help others, not bring them down.").

Indeed, Mr. Hana has provided hundreds of Americans and Egyptians with financial support for both basic healthcare and life saving medical treatment.  Faragalla Ltr. at 2 (noting that Mr. Hana "provid[es] assistance to those in need of medical equipment, medication, or procedures," in Egypt"); Dr. Hajjar Ltr. at 2( "I vividly recall how he would frequently come to me with X-rays, diagnostic tests, blood work, and medical reports from people in Egypt—many of whom had limited access to advanced healthcare.  Wael was deeply concerned about their well-being, always seeking my expert opinion so he could help guide their treatment.  During COVID-19, he was constantly sending essential supplies—ranging from masks and sanitizers to medications and personal protective equipment—to send to his friends, family, and community members." ); Khamis Ltr. at 1("He takes it upon himself to help those who need medication or education, as well as many orphans. There is also an open account in the village's pharmacy that Mr. Wael covers for anyone who can [sic] pay for medication among the villagers."); Nabil Hana Ltr. at 1 ("I learned this from the family in Egypt when we were talking about helping the sick in our village, they told me that Wael pays a monthly amount to the Church to dispense medication to those who can't afford it, and that he pays the same amount to the mosque for the same purpose."); *see also* Amin Ltr. at 2 ("In Egypt, he ensures free food distribution for the poor every year, on Big Eid. This experience is a testament to Mr. Hana's character, as it highlights his concern to act selflessly and with great care for the well-being of others, even though the people he is helping, may not be of the same religion as him.").  For example, in Egypt, widows face the threat of imprisonment if they are unable to pay their debts, which is often difficult since many have never worked.  Faragalla Ltr. at 2.  But Mr. Hana has "consistently made sure that no widow

44

is left in such circumstances" in his community. *Id.* He is also dedicated to caring for the medical needs of the people living in his village, purchasing medical equipment or medication or paying for medical procedures. Recently, Mr. Hana covered the cost of cornea implants, "which is extremely costly and must be paid for upfront," for a person who could not afford the surgery, "alleviating a significant burden from the individual and their family." *Id.*; *see also* Khamis Ltr. at 1 ("He takes it upon himself to help those who need medication or education, as well as many orphans. There is also an open account in the village's pharmacy that Mr. Wael covers for anyone who can [sic] pay for medication among the villagers. Wael told me once 'I pray to God to increase my wealth only for the sake of these people.'").

Mr. Hana is also an active parishioner and donor to the Coptic Christian church. Aslanian Ltr. at 1 ("Mr. Hana is a Christian with deep faith in his religion and great dedication to his church, Saint Abanoub Coptic Orthodox Church in Bayonne."); Kossup Ltr. at 1 ("Mr. Hana is deeply religious, always praying and ready to support his church whenever needed."). Mr. Hana provided significant material support to his church in Bayonne, including financing its reconstruction, ███████ Ltr. at 1-2, and also donates $10,000 per month to his church in Egypt, Fr. Massoud Ltr. at 1. Additionally, Mr. Hana has funded water and solar power installations for a Coptic monastery in California. Nabil Hana Ltr. at 1.

But Mr. Hana's compassion and generosity extend beyond monetary donations. He is consistently present for those in need of emotional support, and his "dedication to helping others is a fundamental aspect of Mr. Hana's beliefs and core values." Aslanian Ltr. at 2. One example in particular highlights the extraordinary and selfless ways in which Mr. Hana will help a friend in need. While his long-time friend and mentor, Antranig "Andy" Aslanian, Jr., has battled cancer, Mr. Hana has remained by his side for chemotherapy infusions and radiation treatments, and cared

for Mr. Aslanain and his family as if they were Mr. Hana's own. *Id.* ("The cancer was very advanced and required an extreme regimen of numerous 8 hour chemotherapy infusions and daily radiation treatments for 12 weeks. Mr. Hana was by my side at the chemo infusions and nearly all of the radiation treatments. At a certain point I was too ill to drive and Wael transported me wherever I needed to go. . . . But it did not end there. The cancer metasticized [sic] to my lungs twice, requiring two separate surgeries at Columbia Presbyterian in New York City. Once again Mr. Hana was with my wife and I throughout the process. He would drive my wife to the hospital each day and then pick her up to return her to our home in New Jersey each night. He would then return to the hospital and stay with me all night then pick up my wife and bring her back to me in the morning. In my entire life I have never had a person willing to give me and my family the level of help, compassion and love that I received from Wael Hana. His dedication to helping others is a fundamental aspect of Mr. Hana's beliefs and core values."); *see also* Dr. Hajjar Ltr. at 1 ("[M]y belief in Wael's character became especially clear in 2017 when my dear friend Antranig was diagnosed with stage 4 throat cancer. It was during this incredibly difficult time that I truly came to know Wael's character. Wael was deeply involved in Antranig's care, going far beyond what even the closest of friends might do. He was there for every stage of Antranig's illness. As Antranig's consulting doctor, I frequently received calls from Wael, who always wanted to ensure everything was being handled correctly. He knew Antranig's chemotherapy and infusion schedules as if they were his own, driving him to every appointment and sitting with him for hours during treatments."). Indeed, Mr. Aslanian "attribute[s] a great deal of [his] survival" to Mr. Hana's "selflessness, generosity, and kindness." *Id.* ("In my entire life I have never had a person willing to give me and my family the level of help, compassion and love that I received from Wael Hana.").

In a similar vein, Mr. Hana frequently drives ██████████ to various liturgies ██████ ██████ at 2.  Indeed, as ██████████ highlighted, Mr. Hana's conduct demonstrates "his eagerness to help and his commitment to active community involvement.  [Mr. Hana's] dedication to supporting others shines through every aspect of his life, reflecting a genuine and selfless devotion to both his faith and those in need.  As he has been blessed with more, his desire to give back has only grown stronger."  *Id.*

Thus, in many ways, Mr. Hana's "generosity has made a significant difference in people's lives."  Faragalla Ltr. at 2; *see also* Sinisi Ltr. at 2 ("With his success, he has provided for people in need.  He has helped people with their rent, donated to multiple charities and purchased a bus for the community of Edgewater."); Lawlor Ltr. at 1 ("Over the years, I have witnesses Wael's generosity firsthand.  One day, I mentioned that our town needed a bus for medical transport, shopping, events, and other community purposes.  Without hesitation, Wael offered to donate a bus to meet this need.  He handled all the necessary arrangements, ensuring that everything was properly managed.  This act of kindness is just one example of his commitment to supporting our community in a meaningful way."); Oliveto Ltr. at 1 ("A notable example of his empathy and generosity occurred when he asked me to organize a gathering for Middle Eastern immigrants living in Uruguay.  The event, held at the Uruguayan Islamic Center, included lunch, children's games, and other activities.  This initiative demonstrated his deep interest in supporting the community and holding those in vulnerable situations."); Hanna Ltr. at 2 ("In Uruguay, he would donate blood; in Egypt, he provided medication to patients that was otherwise inaccessible; and in India, he offered financial assistance to those in need.  The list of these simple yet impactful acts of charity is extensive.").  Even when he was living "paycheck to paycheck" or enjoying his

successes, Mr. Hana "always prioritized other people rather than himself"; "his generosity knows no bounds." Lita Ltr. at 1.

"[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513-14. Indeed, as courts in this circuit recognize, "[t]his elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *Id.* And courts have granted below-guidelines sentences based upon a defendant's history of charitable works. *Gupta*, 904 F. Supp. 2d at 354 (imposing below-Guidelines sentence in light of defendant's extensive charitable works, which evidenced "an extraordinary devotion, not only to humanity [at] large, but also to individual human beings in their times of need."); *United States v. Collins*, No. 18-cr-1170 (LAP) (S.D.N.Y. Oct. 17, 2023), ECF No. 244, Sent'g Tr. at 20:23-21:1 (holding that the defendant's "lifelong good works and charity" "work[ing] for his church, his family, his schools, and numerous other deserving organizations that work to better individuals' lives," combined with collateral factors such as reputational damage, supported a below-Guidelines sentence); *United States v. Cooper*, 394 F.3d 172, 177-78 (3d Cir. 2005) (affirming a below-Guidelines sentence for a defendant who created a youth athletic organization in his community and paid for the high-school tuition of several boys he mentored).

This law, so well-established and so much a part of our sentencing jurisprudence, requires that this Court consider Mr. Hana's entire background, including his hard work, his dedication to

family and community, and his incessant generosity in fashioning an appropriate sentence, well below the Guidelines and the draconian recommendation of the Probation Office.

**B.**     **Application of the Section 3553(a)(2) Factors Also Warrants a Lenient Sentence.**

Mr. Hana acknowledges that the offenses of conviction suggest a prison sentence. However, what is not appropriate is the exceptionally severe sentence called for by the Guidelines or even the below-Guideline sentenced Probation recommends.  Instead, under § 3553(a)(2), the Court must consider "the need for the sentence imposed," which must "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with [rehabilitation, *i.e.*] needed educational or vocational training, medical care, or other correctional treatment."  18 U.S.C. § 3553(a)(2)(A)-(D).  Always, the Court must consider Congress's fundamental command, embodied in the first few words of the sentencing statute, that it "impose a sentence sufficient, but not greater than necessary," to serve these sentencing purposes.  *United States v. Katsman*, 905 F.3d 672, 675 (2d Cir. 2018) ("Section 3553(a) requires that courts 'impose a sentence sufficient, but not greater than necessary[.]'").  . These factors, discussed in turn below, all disfavor the imposition of the lengthy custodial sentence recommended by Probation.

### i.     *Seriousness of the Offense*

Mr. Hana does not dispute that bribery and honest services fraud are extremely serious offenses, a factor which the Court must and will consider.  *See United States v. Fitzpatrick*, No. 23-cr-6722, 2024 U.S. App. LEXIS 29600, at *3 (2d Cir. Nov. 21, 2024) (noting that the court must weigh the "need to 'reflect the seriousness of the offense'").  But the nature and circumstances of the charged conduct contextualize the crimes of which Mr. Hana has been

convicted and thus bear on their seriousness. That is, Mr. Hana's historic relationship with Nadine Arslanian, then Menendez, and his lifelong contacts in Egypt, provide significant explanations of what occurred here and bear upon the actual seriousness of his conduct. Likewise, his truly limited involvement, or complete non-involvement with what was alleged against all Defendants also places it in a context that allows for a fairer and more just assessment of the seriousness of at least his offense conduct. Mr. Hana adheres to the positions set forth in his post-trial motions, and though the Court has rejected them, it has not rejected the facts based upon which a careful, merciful and even-handed assessment of the seriousness of his offense may be made. That is all Mr. Hana requests with regard to this factor.

### ii. *Promotion of Respect for the Law*

While courts often look to this factor as a basis for imposing harsh sentences, at times, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54. Such circumstances are present here, as argued throughout, where Mr. Hana was neither the organizer nor leader of the charged schemes, PSR at ¶ 133, was not involved at all in two of the alleged schemes, and was responsible for much less than the total value of the bribe payments, *see supra* at Section II. *See United States v. Acosta*, No. 06-cr-172, 2008 U.S. Dist. LEXIS 91200, at *4 (E.D.N.Y. Sep. 8, 2008) ("A sentence of imprisonment in light of the fact that individuals and entities more culpable than this defendant were not prosecuted 'may work to promote . . . derision[] of the law if the law'" (quoting *Gall*, 552 U.S. at 54)). To sentence him as harshly as is being called for, given the true facts set forth herein regarding both the nature and circumstances of the offense and the history and characteristics of Mr. Hana, would, then undermine the credibility of our system of justice, rather than promote it. Mr. Hana respectfully requests that this reality be considered as well.

### iii.    *Just Punishment*

In assessing Mr. Hana's forthcoming punishment, he most respectfully requests that the Court consider both the punishment that has already been visited upon him as a result of his investigation, prosecution and conviction, but also the punishment that will be imposed upon innocent others as a result of the sentence that the Court will dole out to Mr. Hana.

### a.    Mr. Hana has already been punished for his offenses

To say that Mr. Hana has already been punished as a result of this criminal investigation, prosecution, trial and conviction would be a terrible understatement.  His life and career are in tatters, his business has been threatened, he has been separate from his family for many months now, and his reputation has been destroyed by his inclusion in such a highly publicized case against a sitting United States Senator.  These consequences are very real and palpable:  Mr. Hana has had to step down as CEO of the company which he spent so many years, and such hard work, building, *see* Carrero Ltr. at 1 (noting that Mr. Hana strong work ethic has "been key to the success of our team and company"); he has been emotionally and psychologically destroyed by being separated from his family, *see* Hanna Ltr. at 2 ("If anything has deeply affected Wael during this entire ordeal, it's the pain it has caused his family."); and his reputation has, in this high profile case, taken an extreme, public beating, *see* Burgueno Ltr. at 2 ("Since this prosecution started, it has damaged his professional reputation, and took a toll on him physically, psychologically, and emotionally.").  Furthermore, he has been deprived of his liberty to a great extent already, given the significant restrictions imposed upon his by his release on home detention, which included a curfew, electronic GPS monitoring, travel restriction and the surrender of  all travel documents, ECF Nos. 15, 59, and after conviction, home incarceration on weekends, ECF No, 513.

Taken all of these facts together, there really can be no question:  Wael Hana has been severely punished already, a fact that must, under the law, be taken into account at the sentencing

phase. *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (approving a downward variance because defendant's conviction made it doubtful that he could pursue his career, and, therefore, "the need for further deterrence and protection of the public is lessened because the conviction itself 'already visits substantial punishment on the defendant'" and stating "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (affirming below-Guidelines range sentence for defendant convicted of insider trading and money laundering where district court "specifically addressed other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon him as a result of the fact that his actions brought his wife and friend into the criminal justice system"); *United States v. Mateo*, 299 F. Supp. 2d 201, 209-10 (S.D.N.Y. 2004) ("[B]eyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding downward variance warranted, in part, because defendant lost his position and "suffered incalculable damage to his personal and professional reputation as a result of tremendous media coverage of his case"); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (upholding downward variance from Guidelines range in part because defendant posed little risk of recidivism and "already suffered substantially due to the criminal investigation").

### C.    Innocent Third Parties Will Be Punished by a Lengthy Sentence Imposed Upon Mr. Hana.

#### i.    *The Impact Upon Mr. Hana and His Employees*

Mr. Hana, his companies, and his employees have already been profoundly, negatively affected by Mr. Hana's prosecution.  Burgueno Ltr. at 2; Amin Ltr. at 2.  Burgueno Ltr. at 2; Amin Ltr. at 2.  Although Mr. Hana made the decision to step down from the role of CEO of his companies, as one of his employees noted:  Mr. Hana "is the 'Brain' behind the mission. A mission that provides for the livelihoods, and career development for a hundred plus employees worldwide and literally food for the table for millions of Egyptians."  D'Alessio Ltr. at 2.  Without Mr. Hana's involvement, the survival of IS EG Halal is questionable, at best; it may very well implode, leaving families across the globe without employment, or at the very least, in a precarious situation:

> I hear from Mr. Hana's employees that they are concerned about the future of the company and therefore, their living expenses.  As the company and the employees depend on Mr. Hana's lead, to drive the business with his relationships with clients and suppliers globally. His unavailability in recent times has certainly had a negative impact on the workflow and on the business relationships he has built over the years.

Amin Ltr. at 2.  In this regard, Mr. Hana's sentence will impact the future of his employees, their families, and the people of Egypt who rely on his services for sustenance.

And this impact will far exceed a mere job.  For years now, Mr. Hana has shown his employees unwavering support—both emotional and financial—during times of crisis, support upon which his employees rely.  For example, Mr. Hana provided the cost of treatment in connection with an employee's hospital stay in New Delhi and "was always in touch with [him] to check on [his] health."  Dr. Kafafy Ltr. at 1.  Similarly, Mr. Hana bore the cost associated with the sudden illness of another employee's wife.  Nassar Ltr. at 2; *see also* Mortati Ltr. at 1 ("I had to undergo serious lung surgery, and he promptly assisted me with resources to help me pay part

of the costs incurred due to the surgical procedure. For me, this attitude alone demonstrates how exemplary the character of Wael Hana is, a person to whom I have particular gratitude."). And, when one employee was representing IS EG Halal in the important Gulf Food Exhibition in the Emirates, and his ten-year old daughter required unexpected and emergency surgery, although the "exhibition was of immense importance to [the] company, and [the employee's] role was critical and irreplaceable," Mr. Hana provided him "with immediate and unwavering support" and afforded him "the opportunity to travel to Egypt without hesitation, ensuring that [his] daughter's well-being was prioritized above all else." Dr. Hussein Ltr. at 1; *see also* Garcia Ltr. at 2 ("I have witnessed Mr. Hana's remarkable generosity and dedication to his employees. For instance, he covered funeral expenses for a colleague's family member in Uruguay [and] paid over $5,000 USD in medical bills for a supervisor in Paraguay involved in a car accident[.]").

These are all relevant considerations under the Sentencing Guidelines. Under USSG § 5H1.11, the impact on a defendant's business ventures is a permissible consideration, as an "employment-related contribution." *United States v. Holz*, 118 F. App'x 928, 935 n.3 (6th Cir. 2004). And, in particular, a below-Guideline range may be appropriate where the defendant is indispensable to his business and his employees. *See United States v. Barnes*, 890 F.3d 910, 918 (10th Cir. 2018) (upholding a downward variance from the Guidelines range, emphasizing the district court's holistic inquiry into the 18 U.S.C. § 3553(a) factors, which included a "review[] [of] the significant impact the sentence would have on [defendant's] career and family" who were heavily dependent on him); *United States v. Tomko*, 562 F.3d 558, 572, 575 (3d Cir. 2009) (affirming district court's downward variance, sentencing defendant to a term of probation and home confinement, after considering that defendant's incarceration would threaten the jobs of over 300 employees); United *States v. Derbes*, 369 F.3d 579, 583 (1st Cir. 2004) (noting that a lower

sentence may be justified "where the defendant is essential to a small business whose innocent employees might suffer if the company goes out of business" (citation omitted)); *Cf. United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) ("While we agree with our sister circuits that business ownership alone, or even ownership of a vulnerable small business, does not make downward departure appropriate . . . departure may be warranted where, as here, imprisonment would impose extraordinary hardship on employees. As we have noted in similar circumstances, the Sentencing Guidelines 'do not require a judge to leave compassion and common sense at the door to the courtroom.'").  These are important factors for the Court to consider, and further demonstrate why a below-Guideline range is appropriate here.  *See United States v. Patel*, No. 97-cr-1580, 1998 U.S. App. LEXIS 22150, at *13 (2nd Cir. Aug. 21, 1998) (affirming the district court's grant of a downward departure based upon a combination of family considerations and business impact); *see also Holz*, 118 F. App'x at 933 (upholding district court's downward departure from the Guidelines where sentencing the defendant to prison "would impact his family and his business and that the combination of the family impact and business impact would cause extraordinary harm.").

> **ii.**     ***The Profound Harm to Mr. Hana's Family, and in Particular, to His Three Young Children***

In imposing a sentence, and again, cognizant that any term of imprisonment will not only punish Mr. Hana, but also those around him, the Court, most respectfully, should consider the impact of its sentence on the defendant's family circumstances.  *See, e.g., Isola*, 548 F. App'x at 725 (considering "[defendant's] family circumstances and the effects of his incarceration on his daughter" under 18 U.S.C. § 3553(a)); *Bills*, 401 F. App'x at 624 (considering the effects that defendant's incarceration would have on her daughter under 18 U.S.C. § 3553(a)); *United States v. Tavarez*, No. 08-cr-242, 2024 U.S. Dist. LEXIS 159043, at *4 (E.D.N.Y. Sep. 4, 2024) ("In its current guidelines, the U.S. Sentencing Commission has identified several categories of

extraordinary and compelling reasons—such as medical circumstances, age, family circumstances, or abuse—that may warrant a sentence reduction."); *see also United States v. Dominguez*, 296 F.3d 192, 198 (3d Cir. 2002) ("It is appropriate—indeed, essential—that the District Court consider the impact of a defendant's family circumstances on the purposes underlying sentencing.").

As described above, Mr. Hana's three young daughters have already suffered tremendously as a result of Mr. Hana's criminal conduct, and will suffer even more profoundly from his absence from their lives during any period of incarceration, but especially a substantial one.  As Mr. Hana's wife, who herself has suffered deeply, explained:

> Although the girls are very young, their father's absence has profoundly affected them.  They may not fully understand why he isn't physically present, but they certainly feel his absence.  His absence weighs heavily on them, particularly during moments when they long for his attention and affection. . . .  We live near an airport in Cairo, and whenever an airplane flies overhead, their faces light up with hopeful excitement as they chant, 'Daddy is coming home!'  Marla, at just three and a half years old, often approaches her teachers with questions like, 'When is Daddy coming?' because neither I nor her father can give her a direct answer.  The sadness over her father's absence became so overwhelming that she refused to attend daycare for six months, in hope of his return.

Faragalla Lrt. at 2; *see also* Hany Hana Ltr. at 2  ("His wife is very affected by his absence, and we can say that she is an adult and understands why he has gone away from her and the children.  But his older daughter's constant questions about him, and when she sees him on video calls and asks him when he is coming back, cause anyone who is present at the time to cry."); ███████ Ltr. at 3 ("Should incarceration occur, it would significantly intensify the distress felt by all his loved ones.").

Beyond the psychological consequences, if Mr. Hana is imprisoned, his family will also be without their only source of income.  For years, Mr. Hana has been the sole breadwinner, while his wife stayed at home to care for their children.  *See* Hanna Ltr. at 2 ("Though Wael traveled

often, it was this drive that made him work even harder to provide for and support them."). As one longtime friend wrote: "Mr. Hana has a beautiful family with a three and a half year old daughter and two twin daughters who are one and a half. Their lives will be irreparably damaged if Mr. Hana is unable to financially support them and provide the parenting that all children need to develop successfully." Aslanian Ltr. at 2.

To reduce the collateral damage to Marla, Myla, Mylin, and the rest of Mr. Hana's family, who do not deserve to suffer any more pain, as even the PSR indicates, *see* PSR ¶ 225 (stating that a variance under § 3553(a) is appropriate based upon "the defendant's familial responsibilities with respect to his wife and children"), this Court should consider a lenient—indeed, a non-custodial—sentence; as other courts have recognized, there are times when this is the only way to achieve a just punishment. Indeed, sentencing Mr. Hana to any—let alone a substantial—term of incarceration would serve only to exacerbate the pain of his innocent family members who do not deserve to suffer any longer. *See Golino*, 956 F. Supp. at 363 (explaining that "the sentencing court must . . . consider the ill-effect of potentially depriving a family of financial support" in rendering a defendant's sentence); *United States v. E.L.*, No. 15-cr-137, 2016 U.S. Dist. LEXIS 66063, at *4 (E.D.N.Y. May 19, 2016) (imposing below-Guidelines sentence upon finding "[a]n incarceratory Guidelines sentence . . . [would] deprive [the defendant's] family of vital financial and emotional support while doing little to further protect the public"); *United States v. Johnson*, 964 F.2d 124, 128-29 (2d Cir. 1992) (extraordinary family circumstances are a valid reason for a downward departure; "we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing"); *R.V.*, 157 F. Supp. 3d at 255 (E.D.N.Y. 2016) (finding, under § 3553(a), that negative effect of separating defendant from his children warranted non-custodial sentence); *see also Gall*, 552 U.S. at 59 (observing that probation could be

appropriate if family members would be "very badly hurt" by defendant's incarceration).  There is no question but that this sentencing factor is, tragically, established here; it should, in the interests of humanity and mercy, guide the Court's sentencing here.

### iii.    *Deterrence*

As the Court is well aware, it is required to consider both specific and general deterrence and, as explained, fashion a sentence that is sufficient but not greater than necessary to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(B) and (C).  Here, a much shorter sentence than that dictated by the Guidelines and recommended by Probation would certainly accomplish those objectives.

### a.    **Specific Deterrence**

With respect to specific deterrence, the Court can be assured that the conduct that led to Mr. Hana's conviction will not reoccur, ***first,*** because the circumstances of this offense are simply no longer present.  *See United States v. Wells*, No. 08-cr-806, 2010 U.S. Dist. LEXIS 29990, at *5-6 (E.D.N.Y. Feb. 24, 2010) (specific deterrence satisfied in light of defendant's "good work history, his supportive family, and the fact that it is unlikely he will again be in a position to commit a similar offense."); *United States v. Moe*, 571 F. Supp. 3d 267, 276 (D.N.J. 2021) (finding specific deterrence satisfied where defendant would never be in the position to commit the same offense again); *see also* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27 (2015), at 31 ("It is certainly questionable whether a punishment imposed on one white-collar criminal has an impact on others because the violations are usually the product of a unique set of circumstances that allowed the crime to occur . . . . .").  Here, that is because Senator Menendez is, quite simply, no longer in office and Mr. Hana—whose only connection to the Senator was through Mr. Hana's friendship with Nadine—does not have a relationship with any other United States public official.  Thus, the idiosyncratic relationship between Mr. Hana and

Senator Menendez, which existed solely because Senator Menendez happened to marry Mr. Hana's close friend, are no longer present.

**Second**, that Mr. Hana is not in need of specific deterrence is demonstrated by his exemplary compliance with the strict conditions of his pre-and-post trial release for well over a year now, all of which followed the extraordinary circumstance of his voluntary return to the United States to face the charges against him. Indeed, Mr. Hana immediately traveled to the United States to stand trial when the initial indictment was returned in September 2023. Faragalla Ltr. at 4 ("In September, when the indictment was announced, Wael and I were together, and the moment the news broke, he was on the phone with the U.S. office, urgently demanding a ticket to fly out immediately."). Following his voluntary surrender, Mr. Hana was released on bail "after posting a $5 million PRB secured by $300,000 cash." PSR at p. 2. But Mr. Hana was also subject to strict pre-trial release conditions; he was required to surrender all travel documents (which he has done) and was subject to travel restrictions, a curfew, and electronic GPS monitoring. *See* ECF Nos. 15, 59. Mr. Hana has, as the PSR makes clear, *see* PSR ¶¶ 27-29, fully timely complied with those conditions, has worn the GPS monitoring ankle device, and been fully compliant with the terms of his curfew and other conditions of his release, including, of course, appearing in Court as required. PSR at p. 81. His curfew restrictions were recently relaxed by this Court, *see* ECF No. 87, and he has remained compliant with all conditions, including extension requests.[6] This compliance is, obviously, highly relevant to the sentence to be imposed, as it bears upon the extent to which he is

---

[6] The PSR accurately references a temporary restraining order ("TRO"), which was filed against Mr. Hana in August 2024, and following which Mr. Hana received a demand for $6 million to resolve the restraining order and a threatened employment action, which counsel for Mr. Hana rejected as impermissible under New Jersey law. PSR ¶ 171. The trial of the allegations in the TRO has been repeatedly adjourned at the request of opposing counsel and remains pending as of the date of this submission. Mr. Hana continues to maintain that these allegations are categorically false and to keep the Office of Pretrial Services apprised as to the status of the matter.

not a danger to recidivate, but rather to comply with legal requirements imposed upon him, no matter how difficult or uncomfortable.  *See, e.g., United States v. Muzio*, 966 F.3d 61, 66 (2d Cir. 2020) (acknowledging that the district court reasonably considered defendants "good behavior while on pretrial release" at sentencing); *United States v. Childress*, 788 F. App'x 27, 30 (2d Cir. 2019) (upholding defendant's sentence where the district court properly "considered [defendant's] conduct on pretrial release and cited his compliance as one of its reasons for departing downward from the Guidelines range"); *United States v. Celado*, No. 08-cr-1114, 2011 U.S. Dist. LEXIS 110975, at *15 (S.D.N.Y. Sep. 25, 2011) (citing defendant's "dedicat[ion] to his rehabilitation, and [the fact that] his behavior on pretrial release has been commendable" to justify the court's sentence beneath the Guidelines range); *cf. United States v. Starr*, 111 F.4th 877, 880 n.3 (8th Cir. 2024) (noting that "[t]he district court properly took [defendant's] pretrial release revocations into account" when weighing the relevant sentencing factors); *United States v. Bethea*, 54 F.4th 826, 836-38 (4th Cir. 2022) (holding that the trial court properly considered, in its § 3553(a) analysis, "the fact that . . . while on pretrial release pending trial in this case, [the defendant] used the opportunity to go back to cooking crack cocaine in his home").

**Third**, as explained, should Mr. Hana ever consider violating the law again, he will certainly be deterred from doing so by the punishment already visited upon him, discussed above— including the devastation of his career and threats to his business, from which he has had to step down as CEO, the separation from his family and the damage to a reputation which he has worked so hard to build.  Indeed, as numerous courts hold, the punishment that Mr. Hana has already experienced, achieves the specific deterrence that Congress seeks to impose through sentencing. *See, e.g., United States v. St. Bernard*, No. 06-cr-483, 2008 U.S. Dist. LEXIS 27577, at *3 (E.D.N.Y. Mar. 19, 2008) (given defendant's history and close family ties, specific deterrence was

achieved by a sentence of time served).  Courts have held that such reputational damage can satisfy the need for specific deterrence.  *Gupta*, 904 F. Supp. 2d at 355 ("no further punishment" was needed for the purposes of specific deterrence where the defendant suffered a "blow to his reputation" making him "unlikely to repeat his transgressions"); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income . . .constitutes a source of both individual and general deterrence."), *aff'd* 31 F.3d 73 (2d Cir. 1994).  Shame associated with felony convictions satisfies the objections of specific                                                                               deterrence. *United States v. Alatsas*, No. 06-cr-473, 2008 U.S. Dist. LEXIS 6446, at *4 (E.D.N.Y. Jan. 16, 2008).

### b.    General Deterrence

As for general deterrence, courts have recognized that in the context of white collar criminal cases, "[c]ommon sense suggests that most business executives fear even a modest term to a degree that more hardened types may not." *Gupta,* 904 F. Supp. 2d at 355; *see also Adelson*, 441 F. Supp. 2d at 514; Richard S. Frase, *Punishment Purposes,* 58 Stan. L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty.").  And, empirical research has shown that, for such cases, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, . . . reached that conclusion, as has every major survey of the evidence."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1, 28-29 (2006) (citations omitted).  For these reasons, a lengthy prison term is not required to generally deter white collar crimes.

In this case, these lessons apply with particular force: anyone who would consider committing offenses like that at issue here, who understood the punishment that Mr. Hana has already suffered, from the loss of his position as CEO of the company that he founded to the lengthy absence from his family, from the costly attorneys' fees which he has had to pay to the loss of his liberty through the imposition of his arrest, from the threats to his business to the devastation of his reputation would certainly be deterred from committing such an offense. Specific and general deterrence, then, though powerful and important sentencing factors under § 3553(a)(2)(B) and (C), are of somewhat diminished weight here, and thus mitigate in favor of a far less severe sentence than that prescribed by the Sentencing Guidelines and that recommended by Probation.

### iv.    *Rehabilitation*

Finally, there is no evidence or indication that Mr. Hana requires "educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a)(2)(A)-(D). **First**, there is no evidence that Mr. Hana suffers from mental illness or addiction. PSR ¶¶ 175-180. **Second**, Mr. Hana obtained a bachelor's degree in Egypt, *id.* at ¶ 182, attended English courses at Hudson Community College, *id.* at ¶ 183, and has an established employment record, *id.* at ¶¶185-194. **Third**, there is no suggestion in the PSR that Mr. Hana would require any "other correctional treatment." Indeed, the caselaw suggests that Mr. Hana's lengthy period on restrictive conditions already serve the purposes of rehabilitation. *See Muhammad v. Jenkins*, No. 12-cv-8525, 2014 U.S. Dist. LEXIS 158481, at *18 (S.D.N.Y. Nov. 4, 2014) (noting that, generally, conditions of release serve "the public-interest purpose of rehabilitation and deterrence). Certainly, this is a factor that does not favor the lengthy sentence sought.

### D. The Court Should Avoid Unwarranted Sentence Disparities In Accordance with Section 3553(a)(6).

Section 3553(a)(6) directs sentencing courts to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The "primary purpose" is "to reduce unwarranted sentence disparities nationwide," *United States v. Johnson*, 505 F.3d 120, 123 (2d Cir. 2007), in furtherance of which this Court should consider "similarities and differences among co-defendants when imposing a sentence," *United States v. Esso*, 486 F. App'x 200, 202 (2d Cir. 2012).

For all of the reasons stated above, a sentence significantly below the Sentencing Guidelines and less than the 84 months proposed in the PSR is warranted. This is also true because, under § 3553(a)(6), such a sentence would far exceed the nationwide average sentence for a defendant similarly situated to Mr. Hana. Indeed, the PSR itself acknowledges that nationwide data from the last five years (2019 to 2023) shows that, for defendants whose primary guideline was § 2C1.1, with a final offense level of 30 and a criminal history category of I, the average sentence imposed was 45 months and the median sentence imposed was 48 months. ECF No. 628 at 60-61. Yet the PSR recommends a term of imprisonment nearly twice the average, without any explanation or justification for precisely the kind of sentencing disparity which the statute prohibits. The Court should disregard the PSR's unsupported recommendation.

This disparity is only exacerbated when the fact that Mr. Hana was not the public official who accepted the bribe, a distinction that has resulted in lesser sentences for defendants in that position, as opposed to those imposed upon the public official bribees. *See Esso*, 486 F. App'x at 202 (district court may consider differences among co-defendants for sentencing). For example, in *United States v. Percoco*, 16-cr-776 (S.D.N.Y.), the recipient of the bribes, Joseph Percoco, was sentenced to 72 months (ECF No. 867), whereas his co-defendants' terms of imprisonment were

far less:  Peter Kelly was sentenced to 14 months (ECF No. 890), Joseph Gerardi was sentenced to 30 months (ECF No. 945), and Steven Aiello was sentenced to 36 months (ECF No. 946). Similarly, in *United States v. Stevenson*, 13-cr-161 (S.D.N.Y.), New York Assemblyman Eric Stevenson was sentenced to 36 months (ECF No. 133), whereas his co-defendants (albeit after entering guilty pleas) received lesser sentences:  Igor Belyansky was sentenced to 20 months (ECF No. 113), Rostislav Belyansky was sentenced to 18 months (ECF No. 112), Igor Tsimerman was sentenced to 24 months (ECF No. 111), and David Binman was sentenced to 9 months (ECF No. 110).  Also in *United States v. Rosen*, 11-cr-300 (S.D.N.Y.), New York State Senator Carl Kruger was sentenced to 84 months (ECF No. 220), whereas his co-defendant David Rosen, who was found guilty after a bench trial, was sentenced to 36 months (ECF No. 241), and other co-defendants who pleaded guilty were sentenced to 24 months (ECF Nos. 223, 243).  In *United States v. Bryant*, 07-cr-267 (D.N.J.), New Jersey State Senator Wayne R. Bryant was sentenced to 48 months (ECF No. 189), whereas his co-defendant, Michael Gallagher, was sentenced to only 18 months' imprisonment (ECF No. 190).  And in *United States v. Fattah*, 15-cr-346 (E.D. Pa.), United States House of Representatives member Chaka Fattah was sentenced to 120 months (ECF Nos. 588, 737), whereas co-defendants Herbert Vederman and Robert Brand were sentenced to 24 months (ECF Nos. 619, 749) and 30 months (ECF No. 613), respectively.  And these are just a few of many possible examples.[7]

---

[7] *See also, e.g.*, *United States v. Renzi*, 08-cr-212 (D. Ariz.) (United States House of Representatives member Richard Renzi sentenced to 36 months, ECF No. 1318, co-defendant James Sandlin sentenced to 18 months, ECF No. 1319); *United Sates v. Blagojevich*, 08-cr-888 (N.D. Ill.) (following trial, Illinois Governor Rod R. Blagojevich sentenced to 168 months, ECF No. 904, co-defendant William Cellini sentenced to 1 year and 1 day, ECF No. 1106).

For these reasons, the Court should be guided by nationwide data for defendants convicted of bribery or fraud more generally.  Specifically, the data compiled by the United States Sentencing Commission, which shows that the average sentence length for a defendant in Criminal History Category I for bribery/corruption offenses under Guidelines § 2C1.1 is only 23 months, and the median is 15 months.  *See* U.S. Sent'g Comm'n, Interactive Data Analyzer, Sentencing Outcomes, Sentence Length, Average and Median Sentence Length, https://ida.ussc.gov/analytics/saw.dll?Dashboard (filtering for Fiscal Year 2023, Crime Type Bribery/Corruption, Primary Guideline § 2C1.1, and Criminal History Category I) (last visited Dec. 30, 2024); *see also United States v. Stewart*, No. 23-cr-6330, 2024 U.S. App. LEXIS 18186, at *5 (2d Cir. July 24, 2024) (relying on the Interactive Data Analyzer and remanding for resentencing because "the district court procedurally erred by not providing any reasoning to support its assertion that a non-Guidelines sentence would result in unwarranted sentencing disparities, and because nationwide sentencing data may contradict that conclusory assertion").  Likewise, for a defendant in Criminal History Category I sentenced for a fraud offense under USSG § 2B1.1, the average sentence length is also 23 months, and the median is only 12 months.  *See* U.S. Sent'g Comm'n, *supra* (filtering for Fiscal Year 2023, Crime Type Fraud/Theft/Embezzlement, Primary Guideline § 2B1.1, and Criminal History Category I).[8]  And the average sentence imposed for bribery decreased from 25 months in 2019 to 23 months 2023,

---

[8] Because Mr. Hana asserts that he should be sentenced to a non-custodial sentence, he relies on the Interactive Data Analyzer data for sentence length, which includes data for probationary sentences.  However, for completeness, Mr. Hana notes that the Interactive Data Analyzer displays similar information for imprisonment length.  Using the same filters described above, the national average and median imprisonment length for bribery/corruption offenses is 29 months and 21 months, respectively, and for fraud offenses is 27 months and 18 months, respectively.

indicating a downward trend in the length of sentences imposed. *See* U.S. Sent'g Comm'n, Bribery, Research, https://www.ussc.gov/research/quick-facts/bribery (last visited Dec. 30, 2024).

Thus, under the law of this Circuit, *see, e.g.*, *Johnson*, 505 F.3d at 123 (recognizing the "primary purpose" of 18 U.S.C. § 3553(a)(6) is "to reduce unwarranted sentence disparities nationwide"), and based on national sentencing data for similarly situated defendants, if Mr. Hana is to be sentenced to any term of incarceration—which, whatever it would be, would be harsh punishment indeed—his terms of incarceration should be no more than 12 months.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should impose a sentence far beneath the Guidelines range, however calculated, and much less than that recommended by Probation.

Dated:  January 2, 2025                    Respectfully submitted,

*s/ Lawrence S. Lustberg*
Lawrence S. Lustberg
Ricardo Solano, Jr.
Anne M. Collart
Kelsey A. Ball
Andrew J. Marino
Christina M. LaBruno
Jessica L. Guarracino
Elena M. Cicognani
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com
